CASE NO. ___O8cv1589___

ATTACHMENT NO. ___3___

EXHIBIT _____

TAB (DESCRIPTION) _____

1    prejudicial in light of the proposed insanity

2    defense, you got that one, you can withdraw that.

3          You're going to withdraw that one?

4        MR. GANT:  Yes.

5          May I proceed, your Honor?

6        THE COURT:  Yes.

7        MR. GANT:  Your Honor, I would like to

8    direct, if I may, your attention to the second

9    page, paragraphs 4 and 5.

10        As a matter of fact, those two

11    paragraphs very succinctly set out our position in

12    this regard.

13        As your Honor well knows, the trial of

14    the capital murder case is divided into two

15    phases.  It's a bifurcated trial.

16        One of the things that your Honor is

17    going to have to do, assuming that there's a

18    finding of guilty in this case, and the State then

19    decides to proceed to a death penalty sentencing

20    hearing, you are going to have to instruct the

21    jury, assuming that there will be one, that their

22    concern about the death penalty can in no way, and

23    should in no way have any bearing on their

24    decision regarding the guilt or innocence stage of

1    the trial.

2              And your Honor will be required to

3    instruct the jury to do that because the law quite

4    clearly says there are separate and distinct kinds

5    of burdens and kinds of decisions that have to be

6    made.

7              I am suggesting to your Honor if that is

8    in fact the law, why then would it be necessary to

9    Witherspoon a jury at the guilt and innocence

10   phase?   Because once you start to Witherspoon

11   them at the guilt or innocence phase, right away

12   they realize that this is going to be a death

13   case.

14             That in and of itself, just the

15   knowledge of that, may well tend to influence the

16   jury in terms of guilt and innocence insofar as

17   what they should do at that point, long before we

18   get to -- if we do at all --  long before we get

19   to a hearing on life or death.

20             For that reason I am suggesting to your

21   Honor that since the sentencing phase has no

22   bearing on guilt or innocence, then the jury

23   should not be Witherspooned at that point. that is

24   at the guilt or innocence stage.

1        That's what this motion is directed at,

2   your Honor.

3        THE COURT:   Mr. Boskey.

4        MR. BOSKEY:   Judge, again, briefly, the

5   Illinois Supreme Court has addressed this very

6   issue on numerous, numerous occasions.   And has

7   held that Witherspooning, as a matter of law, is

8   not unconstitutional.

9        It doesn't call for a necessity pro-

10  conviction or pro-State jury.   And, in fact, the

11  Supreme Court even dictates that if we would be

12  seeking the death penalty, the jury would have to

13  be Witherspooned if we use that jury in the death

14  phase part of the capital case.

15       I believe the law is clear.   The Supreme

16  Court is clear.   And it dictates that

17  Witherspooning is proper and should be done in

18  capital cases.

19       We would rest on the various Illinois

20  Supreme Court cases, beginning with Gacey and

21  others that indicate that Witherspoon is proper in

22  death cases.

23       THE COURT:   Mr. Gant.

24       MR. GANT:   I have nothing further, your

1    Honor.

2         THE COURT:   In paragraph 8 of the Defendant's

3    motion, asserts that dispite the recent decision

4    in Lockhart versus McGee, this Honorable Court can

5    and should, as a matter of due process and equal

6    protection recognize that Witherspoon juries are

7    conviction prone.

8              The problem, however, is that he doesn't

9    tell me how I can do that in light of Lockhart,

10   without disregarding it.

11             And while I don't necessarily agree with

12   the Lockhart Court, nonetheless it is the highest

13   Court in the land, and nonetheless, I think the

14   evidence seems to proliferate in favor of the

15   argument that Witherspooning eschews the jury in

16   several respects.

17             Nonetheless the Supreme Court has held

18   that even if that is true, it does not reach to

19   the level of Constitutional impermissibility.   And,

20   of course, the cases in Illinois are numerous that

21   Witherspooning does not offend the Illinois

22   Constitution or the United States Constitution.

23   And, indeed, if we have a capital situation, the

24   jury must be Witherspooned.

53                    **53**

1          There are some ways which are suggested

2    in the reports for the defendant to avoid that,

3    but the consequences of doing that requires the

4    relinquishment of other valuable Constitutional

5    Rights.   The defendant is perhaps placed upon the

6    horns of a dilemma.

7          But nonetheless if the defendant elects

8    to try his case to a jury, the jury is going to be

9    Witherspooned under the law of Illinois, and

10   there's nothing in the cases decided by the United

11   States Supreme Court or any other Federal Court

12   that I am aware of that would be sufficient to

13   overcome the status of the law in Illinois.

14         Accordingly, the defendant's Motion to

15   Prohibit Dealth Qualification of the jury during

16   the guilt/innocence stage of the trial is denied.

17        MR. GANT:   Your Honor, you have before you a

18   motion entitled:   Motion to preclude the State

19   from Death Qualifying a potential jury, or, in the

20   alternative, a motion or a hearing to determine

21   that there is a substantial probability that the

22   defendant is eligible for the death penalty.

23        THE COURT:   You may proceed.

24        MR. GANT:   In light of your Honor's ruling on

1  the previous motion, and in light of your Honor's

2  ruling on the motion entitled motion to preclude

3  the death penalty procedure, I will adopt the

4  arguments made on that motion, and incorporate

5  them by reference, to the present motion.

6        I have nothing further.

7        THE COURT:  Mr. Boskey.

8        MR. BOSKEY:  Again, for the same reason

9  stated, Judge, I believe death qualifying or

10  Witherspooning, if you will, the jury, on a

11  capital case is mandated by the Supreme Court of

12  Illinois.

13        In addition to that, Judge, I am aware

14  of no, nothing in the previous cases that's before

15  the Illinois Supreme Court that will indicate that

16  there should be a separate hearing to see if

17  there's a substantial probability that the

18  defendant is eligible for a death penalty.

19        Your Honor is aware of the charges that

20  Mr. Hendricks is charged with.  He's charged with

21  both murder, as well as various, quote, forcible

22  felonies, which would death qualify the defendant

23  if he was guilty.

24        I believe the State does not have a

1   burden to go further than that, Judge.  There's

2   nothing in the Constitution or in the Supreme

3   Court decisions that would indicate before we seek

4   the death penalty that we should have a separate

5   preliminary hearing, if you will, on that issue,

6   on whether or not there's a substantial

7   probability.

8        That is not mandated by the Statute or

9   by any of the court decisions.

10       We would ask that this motion also be

11  denied.

12      THE COURT:  Response, Mr. Gant.

13      MR. GANT:  I have nothing, your Honor.

14      THE COURT:  All right.

15       This motion is somewhat different, or

16  substantially different from the motion presented

17  by Mr. Clayborn.  In that this, the aggravating

18  factors that would make Mr. Hendricks eligible for

19  the death penalty, are apparent.  That is, he is

20  charged with felony murder and several counts of

21  the indictment -- He's charged with other

22  forcible felonies including aggravated sexual

23  assault, aggravated kidnapping, and one or two

24  others.

1          So that his ability to determine, if

2     convicted of all of those charges, whether or not

3     he would be death eligible, does not depend upon

4     his ability to construe language which the Supreme

5     Court has heretofore said is too broad to be

6     utilized in a capital sentencing hearing.

7          So this defendant's motion to prohibit

8     death qualifying of the jury is denied.

9          MR. GANT:  Your Honor, might we move now to

10    the series of motion that involve discoverable --

11    pardon me, discovery requests.

12          The first one, motion to produce the

13    record on all Juvenile Court proceedings.

14          I will then take the next motion, which

15    will be a motion to compel the Prosecution to

16    disclose any non-statutory aggravating factors.

17          And then, finally, the Motion for

18    Discovery and a Bill of Particulars as to

19    aggravation.

20          THE COURT:  All right.

21          MR. GANT:  Judge, with regard to motion to

22    discovery of Juvenile records, I haven't received

23    any recent response indicating the State's

24    objection.

57

1           I suggest it will be a number of
2    witnesses in this case, with at least two who are
3    juveniles and others who, through my own
4    investigation I have learned do have some prior
5    contact with the Juvenile Court.
6           I have listed the names of those
7    possible witnesses.  These witnesses undoubtedly
8    will be State witnesses.
9           Under Davis versus Alaska, in terms of
10   the Defense being in a position to impeach the
11   credibility of the witnesses, I don't think
12   there's any question but in a case, especially a
13   capital case, that this kind of information is
14   certainly discoverable.
15          Not only is it discoverable, Judge, but
16   given the facts and circumstances of this case, it
17   is extremely crucial.
18          For that reason and the argument set out
19   in the motion, we ask that your Honor grant our
20   request.
21       THE COURT:  Mr. Boskey.
22       MR. BOSKEY:  Judge, I will run the various
23   records that the People have put on his motion.
24   Depending on what shows up, there might be a

**58**

1    motion in limine.  But I will comply with this
2    motion.
3         THE COURT:  All right.   The Defense motion
4    to compel the disclosure of Juvenile Court records
5    regarding the witnesses is granted.
6         MR. GANT:  The next motion, your Honor, is a
7    motion to compel the Prosecution to disclose any
8    non-statutory aggravating factors that they intend
9    to present at the sentencing hearing, should there
10   be one.
11             And we rely specifically on Gardner
12   versus Florida in our request for that
13   information.
14        MR. BOSKEY:  I will comply with that motion,
15   and the motion to discovery and the Bill of
16   Particulars, as to aggravation.  I will comply to
17   both.
18        THE COURT:   Without objection both motions
19   are granted.
20             That is, the Defendant's Motion to
21   Compel the Prosecution to Disclose any non-
22   statutory aggravating factors that were --  they
23   will present at the sentencing hearing.  And the
24   defendant's motion to discovery and a Bill of

59                        59

1    Particulars as to aggravation, are both granted

2    without objection.

3         MR. GANT:  Your Honor, the next series of

4    motions involve matters that might well best be

5    left until such time as we are on the eve of

6    trial.

7              Those three motions are motions for

8    certain orders regarding pre-trial publicity in

9    this case.

10        THE COURT:  All right.

11        MR. GANT:  Motion for attorney participation

12   that is his full participation in voir dire.

13        THE COURT:  All right.

14        MR. GANT:  And motion for individual

15   sequested voir dire.

16        THE COURT:  All right.  We might as well

17   decide them now.

18        MR. GANT:  We will stand on the motion as

19   drafted, your Honor.

20              Mr. Boskey.

21        MR. BOSKEY:  As for the motion regarding pre-

22   trial publicity, I have no objection.

23              I don't know if Counsel is referring to

24   a gag order type of situation.  I have no problem

1    with that.

2         Is that what you mean?

3    MR. GANT:   Yes.

4         And there was at the time of the offense

5    a good deal of print, publicity, your Honor.   I am

6    primarily concerned with that.    Any kind of

7    publicity that may arise once that case goes to

8    trial.

9    THE COURT:   As I read this motion, it is not

10   only directed towards Counsel in the case, but as

11   I understand it, he's asking me to bar the press

12   from pre-trial proceedings in this case.

13   MR. GANT:   Judge, if I may just address you

14   on that.

15        In light of at least two recent rulings

16   involving the Circuit Court of Cook County, I

17   don't know whether -- if you think -- I don't know

18   whether or not you would have the authority to do

19   that anyway.

20        I certainly would not be in a position

21   to ask your Honor to do something the Court didn't

22   have authority to do.

23        Insofar as the request, I request you to

24   do -- ask you to do that, at this point we ask

61                    **61**

1    that portion be stricken.

2         THE COURT: All right. Then there's nothing

3    else left to this motion.

4         It seems to me that the rules of

5    professional responsibility, in particular Rule

6    7-107, covers this aspect insofar as Counsels are

7    concerned.

8         And without trying to verbatim state the

9    rule, essentially the rule says that neither

10   Counsel should indulge in any out-of-Court

11   statements that likely will impede the defendant's

12   ability to receive a fair and impartial trial.

13        That's a matter of disciplinary rule.

14   And I assume and I'm certain that both sides will

15   comply with the rules in all respects.

16        MR. BOSKEY: Judge, as to the motion for

17   attorneys' participation in voir dire, obviously

18   that is discretionary within your Honor's

19   discretion.

20        My personal indication from my past

21   history is not my request, but I believe it is

22   under your Honor's discretion. And I would leave

23   it up to your Honor's discretion, as to that

24   particular motion.

1          As to the defendant's other motion,

2   motion for individual voir dire and sequestering

3   of the jury during the voir dire process, it is

4   becomming more and more -- it's been done in this

5   very building twice in the last month.

6          I have no objection.

7       MR. GANT:  Again, on those two motions a lot

8   of that depends on the kind of publicity that may

9   or may not develop.  It may not be necessary.  But

10  I thought that it was just the smart thing to do,

11  to put this request in writing before your Honor,

12  at this time, just to let the Court know that I am

13  at least cognizant of the possibility there may he

14  such publicity and if so, these requests might be

15  a way to obviate it.

16      THE COURT:  All right.  These motions also

17  have impact without regard to whether or not that

18  publicity emerges at trial.  It also has some

19  impact if the jury is going to be Witherspooned,

20  particularly, the motion for sequestered venire

21  examination.

22          It would be important in Witherspooning

23  the jury so as not to contaminate the jury by the

24  response of a few.

63                  **63**

1          I will grant both motions.  If they

2    become necessary for one reason or another, we can

3    always address it at the trial.  Right now they

4    are granted.

5          MR. GANT:  Your Honor, with that there is

6    presently pending before you a motion to waive

7    jury for death eligibility phase or sentencing.

8    We are withdrawing that at this time.

9          THE COURT:  All right.

10          MR. GANT:  Also a motion before you for

11    hearing on proportionality.  We are withdrawing

12    that at this time.

13          THE COURT:  All right.

14          MR. GANT:  And according to my tally sheet,

15    that is it.

16          THE COURT:  Well, your tally sheet is wrong.

17          MR. GANT:  That's why you are a Judge and I

18    am just a lawyer.

19          THE COURT:  You have a motion to allow Mr.

20    Hendricks the right of allocution.

21          MR. GANT:  That's correct.  You're absolutely

22    right.  My fault, Judge.

23          We will stand on the motion as drafted.

24          THE COURT: Mr. Boskey.

1       MR. BOSKEY:   Again, we would oppose this

2   motion.

3           Whether or not a defendant in a capital

4   case has a right of allocution has been decided by

5   the Illinois Supreme Court, and various other

6   Supreme Court decisions.

7           Most recent that I'm aware of, People

8   versus Perez, that's 108 Ill. 2d, page 70.   I

9   believe the same issue has been addressed in

10  People versus O'Toole and several other Illinois

11  Supreme Court cases that indicate that the

12  Defendant does not have a Constitutional Right to

13  allocution, that is to give an unsworn statement to

14  the jury.

15          We would oppose this motion.

16      THE COURT:   Mr. Gant.

17      MR. GANT:   I have no response, Judge.

18      THE COURT:   All right.

19          At least in People versus Gaines, and in

20  a number of other cases, the Illinois Supreme

21  Court has ruled that an Illinois defendant has no

22  such right of allocution.   Although he or she would

23  have such a right in a non-capital case before the

24  jury that the defendant chooses, must take the

**65**

1   oath and testify, otherwise he doesn't have a

2   right.

3          So your motion to allow the defendant

4   the right to allocution is denied.

5          You also have, Mr. Gant, a motion to

6   prohibit consideration of arrest not resulting in

7   convictions, during the aggravation and mitigation

8   phase of sentencing hearing, and a memorandum of

9   law in support thereof.

10         The memorandum of law did not accompany

11  the document.

12     MR. GANT:  I saw that in the file.

13         I don't have a copy of that motion

14  myself.  May I view it?

15         Your Honor, we would ask that motion be

16  withdrawn at this time.

17     THE COURT:  I have a motion to bar the death

18  penalty sentencing hearing under 9-1(b) and to bar

19  imposition of the death penalty.

20     MR. GANT:  You ruled on that one.

21     THE COURT:  I denied it.

22     MR. GANT:  Yeah, you denied that earlier.

23     THE COURT:  I have a motion to preclude the

24  death -- the State from death qualifying also.

66                    **66**

1            I ruled on that also.

2       MR. GANT:  You did earlier.

3       THE COURT:  I take it, Mr. Gant, that

4   concludes all of your motions now?

5       MR. GANT:  It does.

6       THE COURT:  Where do we stand with discovery?

7       MR. GANT:  We are still a number of pieces,

8   Judge, still missing.

9         If you will indulge us just one status

10  date so I can sit down and go over with Counsel my

11  list.  Then we can set if for trial.

12      MR. BOSKEY:  That's fine.

13      THE COURT:  What day would you like to come

14  back to visit us?

15      MR. GANT:  Friday, April 14th, your Honor.

16      MR. BOSKEY:  Fine.

17      THE COURT:  By agreement, April 14th.

18      MR. GANT:  Thank you, Judge.

19        (Whereupon, the above entitled cause

20        was continued, by agreement,

21        to April 14, 1989.)

22

23

24

67

67

1  STATE OF ILLINOIS    )
                        ) SS:
2  COUNTY OF C O O K    )

3

        IN THE CIRCUIT COURT OF COOK COUNTY
4         COUNTY DEPARTMENT-CRIMINAL DIVISION

5  THE PEOPLE OF THE        )
   STATE OF ILLINOIS        )     IND. NO. 88 CR 12517
6                           )
        VERSUS              )     CHARGE: Murder, Agg.
7                           )     Crim. Sex. Ass., Agg.
   JEROME HENDRICKS         )     Kid., Unlaw. Restraint
8

9                REPORT OF PROCEEDINGS

10          BE IT REMEMBERED that on Tuesday,

11  February 27, A.D. 1990, this cause came on for

12  hearing before the Honorable LEO E. HOLT,

13  Judge of said Court, upon the Indictment herein,

14  the Defendant having entered a plea of not guilty

15

16     APPEARANCES:

17          HON. CECIL PARTEE,
               State's Attorney of Cook County, by
18          MS. MARY MALLO, MR. EDWARD RONKOWSKI,
               Assistant State's Attorneys
19             appeared for the People;

20          MR. RANDOLPH STONE,
               Public Defender of Cook County, by
21          MS. MARIJANE PLACEK, MR. VINCENT LUFRANO
               Assistant Public Defenders
22             appeared for the Defendant.

23  BETTE N. SACKS,  C.S.R.,
    Official Court Reporter
24

68

1          THE CLERK:   Jerome Hendricks.

2          MR. RONKOWSKI:   We are ready.

3              My partner is bringing the witnesses

4    down.

5          MS. PLACEK:   This is our motion to quash and

6    suppress.  And it is our burden to go ahead for

7    it.

8              Unless Counsel needs his partner down

9    here, we can go ahead right now.

10         THE COURT:   I need a five minute recess to

11   clear the cobwebs from my head, so I can give your

12   case my undivided attention.

13                        (Thereupon, a short recess

14                        was taken, after which the

15                        following proceedings were had:)

16

17

18

19

20

21

22

23

24

69

1          THE CLERK:  Jerome Hendricks.

2          THE COURT:  As I read the motion, the

3     defendant has the burden of going forward, and the

4     burden of persuasion.

5               I will hear any opening statements.

6          MS. PLACEK:  Judge, in this particular

7     matter, I notice that the State has brought

8     certain rebuttal witnesses down.

9               I believe they would be the police

10    officers that they would call when they feel

11    necessary to rebut our case.

12              I would, of course, make a motion to

13    exclude.

14              I have a note saying that although I am

15    a stranger in a strange land, and my practice is

16    not normally in this building, that it is

17    somewhat, since there is a back door, easy to be

18    heard and to hear.

19              Since I am also partially deaf and have

20    the occasion of speaking rather loudly, I would

21    ask that the --

22         MR. RONKOWSKI:  I have had some experience

23    with Ms. Placek.

24              I have never known her to be deaf. But

1    she does talk loudly.  And I have no objection

2    that they go into the jury room.

3         THE COURT:  Why don't you go put them in the

4    jury room or the State's witnesses' room around

5    the corner?

6         MR. RONKOWSKI:  That is kind of cold.  They

7    turned the heat off.

8

9                    OPENING STATEMENTS

10                   BY MS. PLACEK:

11                   Judge, in this particular

12   matter, the simplicity of the case hedges over one

13   issue and one only.  And that is when in fact the

14   arrest of my client, Jerome Hendricks, took place.

15             The particular issue is that it is the

16   defendant's contention at this particular time.

17   and we believe that it will be shown through the

18   evidence that on August the 8th, the defendant was

19   in fact, during the evening hours, sitting in his

20   home.

21             The evidence will further show that he

22   was told by his mother that the police had wanted

23   to speak to him.  He, quite frankly, wishing to

24   cooperate with the police, and there in fact being

                          71

1    no evidence to rise to the level of either

2    probable cause or for that matter serious

3    suspicion as to their investigation, called the

4    police and invited them to in fact his home for

5    the purpose of this conversation.

6         Now, when I say invited to his home. I

7    believe that the evidence from the stand will

8    further reveal that. number one, he never

9    consented to go anywhere with the police, because

10   that becomes the next issue.

11        Because as soon, almost as soon as he

12   put down that phone telling the police detective

13   in fact that he was at home and would be perfectly

14   willing to speak to him at his home, he then

15   picked up the phone again.  And while on the phone

16   with his sister, who happened to live in Maywood,

17   more or less discussing both family business and

18   the happenings of the day, there was a knock

19   almost immediately on the door.

20        Now, that knock at the door was opened

21   by his mother.  His mother opened the door. and

22   the police then ran up on the defendant. using

23   profanity. swearing at him, that he better put

24   down that phone,  and were ready to handcuff him

1    at that particular time.

2         When they were ready to handcuff him,

3    quite frankly the defendant looked at them in

4    somewhat of astonished amazement and said:  "Why

5    are you handcuffing me?  Why are you seeking to

6    possibly do anything to me, when I said I would

7    sit in this house and in fact talk to you about

8    whatever you wanted to talk to me about?"

9         Again, we got a barrage of profanity

10   from the police and again we had what can be

11   likely called an altercation, because the police

12   did not come alone.

13        You will hear from the stand that

14   several people were in fact at this time involved

15   in this arrest, not only involved in this arrest,

16   but it took place in fact within the realm of the

17   defendant's own home while he was in the living

18   room, or living room area, after being pushed off

19   the phone and literally continuing and resisting

20   to be handcuffed, and continually saying to the

21   police, "I thought all you wanted to do was talk

22   to me.  Well, talk to me."

23        He was then handcuffed, taken to the

24   police station, and at that particular time, after

73

1    several long hours, never consenting either to go

2    with them, never consenting to be handcuffed.

3    what happened was certain evidence was

4    in fact taken from the defendant.

5          This is the evidence that is a result of

6    the motion to quash that we are also seeking to

7    suppress before your Honor.

8          What we will show, and what we believe

9    the evidence will warrant from the stand, is,

10    number one. that the police had no cause to either

11    come into the defendant's house and arrest him in

12    that manner, for they had no warrant, nor in fact

13    did they have probable cause to make such an

14    arrest in the alternative.

15          The law also points that out in the

16    State of Illinois under existing factual

17    situations.

18          And the police will deign testify in

19    rebuttal to my client's statement that they did

20    not even have evidence enough where they could

21    take to a Judge and ask for a warrant for my

22    client's arrest for the simple reason. Judge, that

23    he had shown in the past no pattern for flight.

24    He had shown no exigent circumstance which would

74

1   in fact cause such arrival at his house at that

2   particular time.

3           At the conclusion of this evidence, your

4   Honor, we would ask for a finding sustaining our

5   motion and in fact suppressing the items that in

6   fact we spoke of earlier.

7           Thank you, your Honor.

8       THE COURT:  State.

9

10              OPENING STATEMENTS

11              BY MR. RONKOWSKI:

12          Briefly, as Counsel indicates, there is

13  an issue as to when the police arrested the

14  defendant.

15          There is also the containing issue as to

16  whether or not probable cause existed at the time

17  of the arrest.

18          And as Counsel stated, you will hear

19  evidence that the defendant called the police and

20  initiated that contact.

21          Before the police even met the

22  defendant, they knew the following:  victim, age

23  12, was found dead with some ligatures around the

24  neck.  Citizens indicated to the police, numerous

7 5

1    citizens, that the defendant was the last person

2    to be seen talking to the victim when she was

3    alive.    Her body had been discovered in the

4    vicinity of where the defendant lived.

5            Also, the police knew, based on

6    information that was given them, and a record

7    check, that the defendant had an arrest for

8    contributing to the sexual delinquency of a 13

9    year old victim.

10       MS. PLACEK:    Objection.

11       THE COURT:    If this is opening statements,

12    and the evidence doesn't show that, it doesn't

13    show it.

14            But he can state what he thinks the

15    evidence will show.

16            The objection is overruled.

17       MR. RONKOWSKI:    A 13 year old victim where

18    the crime occurred next door to where the body

19    was found.

20            Also, he was on parole for raping and

21    choking a 15 year old victim.

22       MS. PLACEK:    Continuing objection.

23       THE COURT:    The objection is noted for the

24    record, and it is overruled.

1      MR. RONKOWSKI:  Counsel also mentioned that

2   the defendant called the police.  She failed to

3   mention why.

4           There was a crowd outside that can be

5   described as unruly, and directed toward the

6   defendant's attention.

7           It was the defendant who called the

8   police, asking the police to clear his name.  The

9   defendant was unable to clear his name and

10  admitted to some sexual contact with the 12 year

11  old victim.

12          It was not until then that the defendant

13  was arrested.

14          At the conclusion of the case, we ask

15  you to deny the defendant's motion to suppress.

16      THE COURT:  Please call your first witness.

17      MS. PLACEK:  Judge, we would call Mr.

18  Hendricks.

19                  (Witness sworn)

20

21

22

23

24

77

1                    JEROME HENDRICKS,

2   the Defendant herein, was called as a witness in

3   his own behalf, having been first duly sworn, was

4   examined and testified as follows:

5                   DIRECT EXAMINATION

6                           BY

7                    MS. PLACEK:

8        Q    State your name for the purposes of the

9   record, spelling the last name for the court

10  reporter, please.

11       A    Jerome Hendricks, H-e-n-d-r-i-c-k-s.

12       Q    How old are you today?

13       A    28.

14       Q    Calling your attention to August the

15  8th, 1989 (sic), during the early evening hours,

16  could you tell his Honor, Judge Holt, exactly

17  where you were?

18       A    Yes, ma'am.

19            I was at home.

20       Q    When you say at home, did anyone share

21  that home with you?

22       A    Yes, my mom.

23       Q    And what is your mother's name?

24       A    Earline Hendricks.

78

1          Q     Now, you say you were at home.  Did

2    anything unusual happen?

3                Excuse me.  May I withdraw and rephrase,

4    your Honor?

5          THE COURT:  You may.

6          MS. PLACEK: Thank you.

7          Q     Did you do anything unusual that

8    evening, on that August 8th date?

9          A     Well, I came in and I was told the

10   police wanted to talk to me.

11         Q     Now, when you say you were told the

12   police wanted to talk to you, who told you that?

13         A     My mom.

14         Q     And when you found that out, what, if

15   anything, did you do?

16         A     I called the Chicago police.

17         Q     And when you called the Chicago police,

18   what, if anything did you say to the police?

19         A     That I was home now, and that I was

20   willing to talk to them.

21         Q     And when you say you were willing to

22   talk to them, what, if anything, did you do after

23   you hung up the phone?

24         A     I waited on the police and called my

79

1    sister.

2         Q    When you say you waited on the police

3    and called your sister --

4              By the way, how soon after you called

5    the police did you call your sister?

6         A    Just minutes after.

7         Q    And did anything unusual happen while

8    you were on the phone with your sister?

9         A    Yes, it did.

10        Q    Could you tell his Honor, Judge Holt,

11   what exactly happened?

12        A    There was a knock at the door, and my

13   mom opened the door.

14        Q    Now, I am sure Judge Holt nor myself

15   have ever been in your house.

16             Could you tell his Honor, Judge Holt,

17   how far away this phone was from the door you

18   spoke of?

19        A    About maybe eight feet, nine feet.

20        Q    Would it be correct to say that the

21   door, the telephone is in front of the door in a

22   hall?

23        A    No, it wouldn't.

24        Q    Then describe it for us, please.

80

1   A  It would be a living room area and

2 dining room area and a kitchen area.

3   A  Okay.  And when you say about eight

4 feet, did you hear anything when the door --  or,

5 excuse me, strike that.

6     May I withdraw and rephrase, your

7 Honor?

8   Q  Who answered the door, if you know?

9   A  My mother did.

10   Q  And when your mother answered the door,

11 what, if anything happened?

12   A  Yes, it did.  The police rushed in the

13 house.

14   Q  And when you say the police rushed in

15 the house, how did you know they were police?

16   A  I would assume they were police.

17   Q  And tell his Honor, Judge Holt, why you

18 made that assumption?

19   A  Because I called them, and they said

20 they were on their way to come and talk to me.

21   Q  Now, you described them as rushing in

22 the house.

23     What was the first thing they did when

24 they in fact got in the house?

1          A    They ordered me to get off the phone.

2          Q    And what, if anything, did you do?

3          A    I hung up the phone.

4          Q    Now, when you say they, how many police

5     officers actually came into your house?

6          A    At that time it was three or four of

7     them.

8          Q    Now, were they in plain clothes, or in

9     uniform?

10         A    Plain clothes.

11         Q    And were they white or black?

12         A    They were white.

13         Q    And do you know any of their names?

14         A    Not that I recall.

15         Q    Thank you.

16              Now, you said that they told you to get

17    off the phone.   And did you, in fact, get off the

18    phone?

19         A    Yes.

20         Q    And what happened after you got off the

21    phone?

22         A    They pulled me to the side.   One of them

23    pulled out his handcuffs.

24         Q    Now, you say one of them pulled out his

82

1    handcuffs.

2             Could you describe that man to his

3    Honor, Judge Holt, if you can?

4         A    Describe the manner?

5         Q    The man.

6         A    The detective.

7             He was a white guy, kind of tall.

8         Q    Now, I believe you said a gun, is that

9    correct?

10        A    No.  I said guy.

11        Q    Guy. I'm sorry.

12            Well, let me ask you this.  Did they

13   have their guns drawn at this time?

14        A    Not that I recall.

15        Q    But he pulled out his handcuffs?

16        A    Yes.

17        Q    And what, if anything, did you say to

18   him?

19        A    I stepped back and said I was not

20   willing to put handcuffs on.

21        Q    Now, when you say you were not willing

22   to put the handcuffs on, did this officer say

23   anything about you putting on handcuffs?

24        A    Yes.

83

1              He just told me to come on again.

2         Q    And when he said come on, did he put

3    forward his handcuffs in any way?

4         A    He reached for me like he was going to

5    put them on.

6         Q    And what happened after he did that?

7         A    At that time I stepped back toward the

8    living room where my mom was.

9         Q    And what happened after that?

10        A    A couple more police surrounded me.

11        Q    Were they saying anything to you at that

12   time?

13        A    I don't use profanity.  But they were

14   using certain words like --

15        Q    Were they swearing at you?

16        A    Yes, they were.

17        MS. PLACEK:  Instead of going into some sort

18   of colorful detail, could we just go on that?

19        THE COURT: That is entirely up to you.

20        MS. PLACEK:   Q    You said they were using

21   profanity, is that correct?

22        A    Yes.

23        Q    And who were they using the profanity

24   toward?

1        A      Towards me.

2        Q      And when you say they surrounded you,

3    what happened after they surrounded you?

4        A      I tried to back up off of them again.

5        Q      When you say tried to back up off of

6    them again, tell his Honor, Judge Holt, what

7    exactly you did?

8        A      Well, I backed up.

9               There was one behind me.  He sort of

10   walked up toward me.  And the other two were on

11   the side, walked in toward me.

12       Q      Would it be correct in saying that in

13   fact you got into a little scuffle with the police

14   at that time?

15       A      Yes, it would.

16       Q      And what happened after you got into

17   this little scuffle with the police?

18       A      Well, the result was I wound up with the

19   handcuffs on.

20       Q      And what were you saying to them while

21   they were trying to handcuff you during this

22   scuffle?

23       A      I didn't want to be handcuffed.

24       Q      Did they tell you anything?

85

1        A       Nothing.

2        Q       Did they continue swearing at you?

3        A       Swearing at me, and taking me toward the

4   door.

5        Q       And did you in fact leave your home that

6   day?

7        A       Yes, I did.

8        Q       Did you consent, or did you agree to

9   leave your home with the police?

10       A       No, I didn't.

11       Q       You did not?

12       A       I did not.

13       Q       Let me ask you this:

14               When in fact you left your home, you

15  were, of course, in the custody of the police and

16  handcuffed, is that correct?

17       A       Yes, ma'am.

18       Q       Did you feel that you were free to

19  leave?

20       A       No, ma'am.

21       Q       And, by the way, they took you in their

22  car handcuffed, is that correct?

23       A       Yes, ma'am.

24       Q       And they took you to a police station,

86

1    correct?

2        A    Yes.

3        Q    And did you feel that you were free to

4    leave?

5        A    No, ma'am.

6        Q    Also, let me ask you this:

7             At the time the police came to your

8    house, were you violating any city, State, or

9    municipal statute?

10       A    No.

11       Q    Were you violating any laws of the State

12   of Illinois?

13       A    No, I wasn't.

14       Q    Thank you.

15            By the way, at the time did the police

16   ever show you a warrant for your arrest?

17       A    Nothing at all.

18       Q    As a result of your arrest on August the

19   8th, did you make certain statements to the

20   police?

21       A    Yes, I did.

22       Q    And that was after, correct, your arrest

23   on August the 8th?

24       A    Yes, it was.

87

1      Q    Specifically that was on August 9th,

2  correct?

3      A    True.

4      Q    And to the best of your knowledge, those

5  statements are --  To the best of your knowledge

6  --  The police intended to use those statements

7  against you in court, correct?

8      A    Correct.

9      MS. PLACEK:  That's all, Judge.

10     THE COURT:  Cross.

11

12              CROSS EXAMINATION

13                  BY

14           MR. RONKOWSKI:

15      Q    What time did you get home that day?

16      A    Around 5:00 in the evening.

17      Q    How long had you been home before you

18  called the police?

19      A    I was home for five minutes.

20      Q    And who else was home when you arrived

21  there?

22      A    My mom and my sister and my brother.

23      Q    How old is your sister?

24      A    32.

1          Q     And what is her first name?

2          A     Devita (phonetics) Hendricks.

3          Q     And your brother, how old is he?

4          A     John, he was 23 at the time.

5          Q     Okay.  And your mother's name?

6          A     Earline Hendricks.

7          Q     And this is when your mother said that

8    the police wanted to talk to you?

9          A     Yes.

10         Q     And you had no problems talking with the

11   police?

12         A     No, I didn't.

13         Q     And upon your mother's suggestion, you

14   called the police?

15         A     Yes, I did.

16         Q     And at the time you called the police,

17   do you remember anybody being outside the

18   premises?

19         MS. PLACEK:  Objection.

20         THE COURT:  Overruled.

21         MR. RONKOWSKI:  Q   Was there anybody

22   outside?

23         THE WITNESS:  A   No, there wasn't.

24         Q     How long before the police arrived in

89

1    response to your phone call?

2         A    Say minutes after the phone call.

3         Q    How many minutes, if you know?

4         A    Just about five.

5         Q    Okay.    And when the police arrived

6    there, did you see any other people outside your

7    house besides the police?

8         MS. PLACEK:    Objection.

9              Presuming, Judge, he first saw the

10   police in his house.

11        MR. RONKOWSKI:    I'm asking if he knows.    He

12   saw them.

13        THE COURT:    I am not quite certain I

14   understand the nature of the objection.

15        MS. PLACEK:    Assuming a fact not in evidence.

16   The defendant testified he was inside the house.

17   He never stated he saw the police outside when

18   they arrived.

19        MR. RONKOWSKI:    Let me rephrase it.

20        THE COURT:    All right. Rephrase it.

21        MR. RONKOWSKI:    Q    When the police arrived

22   and you saw the police, did you see anybody

23   outside of your house besides the police?

24        MS. PLACEK:    Same objection, Judge.    The

90

1    question is confusing.

2         THE COURT:  Overruled.

3             If he understands, he may answer it.

4         THE WITNESS:  A   I never looked out.

5         MR. RONKOWSKI:    Okay.

6         Q    Well, you went down with the police to

7    the police station?

8         A    Yes, I did.

9         Q    When you went to the car, did you see

10   anybody there that wasn't the police?

11        MS. PLACEK:  Objection.  Beyond the scope.

12        THE COURT:  Overruled.

13        MR. RONKOWSKI:  Q   Did you see anybody

14   outside your house when you walked from your house

15   to the police car that wasn't the police?

16        THE WITNESS:  A   Across the street from my

17   house, yes.

18        Q    How about anybody in the vicinity of

19   your house?

20        A    Not in the vicinity of my house, no.

21        Q    Anybody between you and the police car?

22        A    No, there was not.

23        Q    How many people could you see in that

24   vicinity when you walked to the police car?

1          MS. PLACEK:  Objection.

2               He already testified not in the

3     vicinity, Judge.

4          THE COURT:  Well, can you rephrase it?

5               I don't know what vicinity means --  Or

6     define it.  One or the other.

7          MR. RONKOWSKI:  Q   How many people could you

8     see as you walked from your house to the police

9     car?

10         THE WITNESS:  A   Quite a few people across

11    the street.

12         Q    How many people did you see across the

13    street?

14         A    I didn't count them.

15         Q    More than 20?

16         MS. PLACEK:  Objection.

17         THE COURT:  Overruled.

18         MR. RONKOWSKI:  Q   More than 20?

19         THE WITNESS:  A   I didn't count.

20         Q    Do you recall if they were saying

21    anything to you?

22         MS. PLACEK:  Objection.

23              This goes to the relevancy of the

24    motion, Judge.

92

1     THE COURT:  Overruled.

2     MR. RONKOWSKI:  Q    Do you recall if they

3  were saying anything to you?

4     A    No.  There was no one saying anything to

5  me.

6     Q    Were they saying anything to the police?

7     A    Not that I recall.

8     Q    Now, when you say you got a ride down to

9  the police station, how many police were in your

10  vehicle?

11     A    I recall three.

12     Q    Did you know any of their names?

13     A    No, I didn't.

14     Q    And were you in the front seat or back

15  seat of the police van?

16     A    I was in the back seat.

17     Q    Was there someone with you?

18     A    From my home?

19     Q    In the back seat?

20     A    Yes, there was.

21     Q    Who was that?

22     A    A plain clothes officer.

23     Q    Was there anyone in the front seat?

24     A    Yes, there was.

93

1          Q     How many?

2          A     Two officers.

3          Q     How long were the police with you inside

4    of your house?

5          A     I don't know.  It wasn't very long, just

6    enough time to handcuff me.

7          Q     A couple minutes?

8          A     I wasn't counting at the time.

9          Q     Besides calling your sister, did you

10   make any other phone calls while you were in the

11   house, from the time you entered until the time

12   you left?

13         A     From the time I left?

14         Q     From the time you entered your house and

15   your mother told you that the police wanted to

16   talk to you, until the time you left with the

17   police, did you make any other phone calls besides

18   calling your sister?

19         A     No, I didn't.

20         Q     You never called Russ Ewing?

21         A     No.  I wasn't the one that called.

22         Q     Did anybody else use the phone inside

23   your house?

24         MS. PLACEK:  Objection.

94

1        THE COURT:  Overruled.

2            If he knows, he may answer.

3        MR. RONKOWSKI:  Q   At the time you entered

4    and your mother told you the police wanted to talk

5    to you, did you see anybody else using the phone

6    other than at the time you called your sister?

7        A    Yes, there were.

8        Q    And who used the phone --

9        MS. PLACEK:  Objection.

10       THE COURT:  Overruled.

11       MR. RONKOWSKI: Q   Who used the phone?

12       THE WITNESS:  A   A friend of my sister's.

13       Q    And what was the name of this friend?

14       A    Maria.  I don't know her last name.

15       Q    Anybody besides Maria and you used the

16   phone?

17       A    Not that I recall.

18       Q    Do you know who Maria called?

19       A    She called Russ Ewing.

20       Q    Did you have any other conversation with

21   the police other than what you have testified at

22   the time you were inside your house?

23       A    No, I didn't.

24       MR. RONKOWSKI: Nothing further by the State.

1          THE COURT:  Redirect?

2          MS. PLACEK:  Just a few.

3

4                    REDIRECT EXAMINATION

5                            BY

6                       MS. PLACEK:

7          Q     Mr. Hendricks,  the Assistant State's

8    Attorney asked you about people across the street

9    is that correct?

10         A     Yes, ma'am.

11         Q     Well, as a matter of fact there was

12   quite a struggle ensuing in your house when the

13   police broke in, wasn't there?

14         A     Yes.

15         Q     As a matter of fact, the Assistant

16   State's Attorney asked you about Russ Ewing.

17               Your mother was shouting for someone to

18   help, is that correct?

19         A     Yes.

20         Q     Because you were being dragged out of

21   the house, correct?

22         A     Yes, ma'am.

23         Q     And to the best of your knowledge, that

24   is why Maria called Russ Ewing, from your house?

                            96

1          A     Yes, ma'am, that is why she called.

2          Q     As a matter of fact, the Assistant

3    State's Attorney asked you about being transported

4    to the station.

5          Could you describe the vehicle, or the

6    car that you were taken to the station in?

7          A     I was transported in a detective's car.

8          Q     When you say a detective's car, could

9    you tell his Honor, Judge Holt, how you knew it

10   was a detective's car?

11         A     (No response)

12         Q     Would it be --  May I withdraw and

13   rephrase, Judge?

14         Would it be correct in saying that

15   although they were supposed to be plain clothes

16   cars, everyone in the neighborhood knows what they

17   look like?

18         A     Yes.

19         Q     Because they were the same make?

20         A     Yes.

21         Q     They are the same model?

22         A     Yes.

23         Q     And they begin with the same letters of

24   the license plates?

97

1          A     License plates, yes, ma'am.

2          Q     Thank you.

3                And, by the way, would it also be

4     correct in saying that the neighborhood you were

5     living in at that time and date was primarily a

6     black neighborhood?

7          A     Yes.

8          Q     And it would be out of the ordinary to

9     see white men in that neighborhood?

10         A     Yes, it would be.

11         Q     Thank you very much.

12               That is all, Judge.

13         MR. RONKOWSKI:  Nothing further by the State.

14         THE COURT: Thank you, Mr. Hendricks.  You may

15    step down.

16                    (Witness excused)

17         MS. PLACEK:  At this time the Petitioner

18    would rest on the motion.

19         THE COURT:  Petitioner rests.

20               State?

21         MS. MALLO:  Judge, we would ask that

22    Counsel's motion be denied.

23               No argument, Judge.

24         THE COURT:  Defense?

                        98

1          MS. PLACEK:  Does the Court wish me to

2     respond?

3          THE COURT:  If you choose.

4          MS. PLACEK:  I'd ask that the motion of the

5     State be denied.

6          THE COURT:  Motion denied.

7          MS. MALLO:  Your Honor, with that, the

8     People would call Detective Lawrence Nitsche.

9                    (Witness sworn)

10         THE COURT:  Good afternoon.

11              That microphone is on, sir.   Will you

12    speak directly into it?

13              Keep your voice up.

14              You may proceed.

15

16              DET. LAWRENCE M. NITSCHE,

17    was called as a witness herein on behalf of the

18    People of the State of Illinois, having been

19    first duly sworn, was examined and testified as

20    follows:

21

22

23

24

99

```
 1                    DIRECT EXAMINATION

 2                           BY

 3                      MS. MALLO:

 4        Q     Detective, would you state your name,

 5   please, and spell your last name?

 6        A     Lawrence M. Nitsche, N-i-t-s-c-h-e, star

 7   number 15137, Chicago Police Officer, Area 2,

 8   Violent Crimes.

 9        Q     And, Detective, was that your assignment

10   on the 8th of August, 1988?

11        A     Yes, ma'am.

12        THE COURT:  '88 or '89?

13        MS. MALLO:  '88, Judge.

14        THE WITNESS:  '88.

15        MS. MALLO:  Q   Detective, on August the 8th,

16   1988, were you working in what is commonly called

17   the third watch?

18        A     Pardon?

19        Q     What watch were you working?

20        A     Second.

21        Q     And what hours are they?

22        A     9:00 o'clock till 5:00 o'clock in the

23   afternoon.

24        Q     And while on that watch, did you receive
```

100

1    an assignment to investigate a murder?

2        A    Yes, I did.

3        Q    And about -- Did you then go to the

4    area of 251 West 117th Street in Chicago?

5        A    Yes, ma'am.

6        Q    And at that location, you did some

7    investigation?

8        A    Yes, ma'am.

9        Q    And from there did you go and begin to

10   canvass that area, canvass that neighborhood?

11       A    Yes, ma'am.

12       Q    And specifically, Detective, did you

13   speak to any people that lived in that

14   neighborhood?

15       A    Yes, ma'am.

16       Q    And do you recall who the first person

17   you talked to was?

18       A    Yes.

19       Q    And who would that have been?

20       A    I believe it was Carolyn -- I can't

21   think of her last name.

22            Oh, I can't.

23       Q    Could it have been Carolyn McCoy?

24       A    Yes.

101

1          Q     And do you recall where she was when you

2     spoke to her?

3          A     Yes, ma'am.  She was on her porch.

4          Q     And when you spoke with her, Detective,

5     did you identify yourself as a detective?

6          A     Yes, I did.

7          Q     And when you spoke with her,

8     specifically what did you say to her?

9          A     I told her I was a police officer, and

10    we had just discovered a body after --  what we

11    believed to be a young girl in a garage near her

12    home, and from the people in the neighborhood, we

13    were told that there was a missing person from her

14    house.

15               And we talked to her.  We were asking

16    her when was the last time she had seen her niece.

17    I believe it was her niece.

18         Q     And when you asked her that, what did

19    she say to you?

20         A     She told me the last time she had seen

21    her niece was on the 1st of August of 1988.  And

22    it was around 6:00 o'clock that night,  and she

23    was on the porch with a Jerome Hendricks.

24               She said she went out of the house and

1    told Jerome to leave the porch, and not to be

2    talking to her niece because he was too old to be

3    talking to her niece.

4         And she further told me that Jerome

5    Hendricks had been arrested before for doing

6    something with a girl.

7       Q    And after you learned that information,

8    did you have any further conversation with Mrs.

9    McCoy at that time?

10      A    Not at that time, no.

11      Q    And after your interview with Ms. McCoy

12    what did you do at that time, Detective?

13      A    I -- Well, also I believe Yolanda was

14    on the porch, and she basically told me the same

15    thing.

16      Q    Would that have been Yolanda Hill?

17      A    Yes.

18      Q    And you spoke with her at approximately

19    the same time?

20      A    Yes.

21      Q    And did you ask her if she had seen this

22    young girl named Denise?

23      A    She had seen the same thing Mrs. McCoy

24    had seen.

1          Q      After you talked with Mrs. McCoy and Ms.

2    Hill, what then did you do?

3          A      There was also another woman, I can't

4    remember her name.  She had told me that she had

5    seen Denise.

6          Q      Would it be Paula Townsend?

7          A      That is correct, Paula Townsend.

8                 Paula Townsend also told me that she had

9    seen Denise on the night of August the 1st talking

10   to Jerome Hendricks, and Jerome asked her would

11   that be okay.

12         Q      Asked who?

13         A      Asked Denise, Denise Johnson, the

14   deceased, would it be okay.

15                And she said yes.  And what that meant,

16   we really didn't know.

17         Q      And did Miss Townsend tell you anything

18   else?

19         A      She said she had seen Denise walk toward

20   119th Street, and Jerome walk toward his house.

21         Q      And on that day, on the 8th of August,

22   did you also have a conversation with a James

23   Hill?

24         A      Yes.

104

1          Q     And when you spoke with James Hill,

2     again did you tell him that you were a detective?

3          A     Yes, I did.

4          Q     And when you spoke with James Hill, what

5     did you tell him?

6          A     We told him that we were investigating

7     the homicide, what we believe now was Denise

8     Johnson.   And asked him the last time he had seen

9     her.

10              And he couldn't recall the last time he

11     had seen her, but he knew he had a couple

12     conversations with Jerome Hendricks, who

13     originally said he didn't see him.

14              And another time he said he saw her at

15     119th Street.   And another time at his house, at

16     255 West --  whatever street.

17          Q     And James Hill told you what Jerome

18     Hendricks had told James Hill?

19          A     Told James Hill those three different

20     versions of different places that he had seen her,

21     or hadn't seen her.

22          Q     Now, after you talked to Townsend,

23     McCoy, Hill, and that is Yolanda Hill and James

24     Hill, did you ever do anything with the

1   information you had learned?

2        A    I ran a background check.  I didn't

3   personally, I called our office, gave them the

4   information on Jerome Hendricks, and they ran a

5   background check on him to find out what his

6   criminal history was.

7        Q    And when you ran that background check,

8   did you also get an arrest report pertaining to

9   each entry on that background check?

10       A    Yes.

11            I didn't have them personally, but I was

12  told what he had been arrested for.

13       Q    And, Detective, did you also learn that

14  the defendant, Jerome Hendricks, had ever been

15  convicted of any felonies?

16       A    Yes.

17       MR. LUFRANO:  Objection, your Honor,

18  irrelevant.

19       THE COURT: Overruled.

20       THE WITNESS:  A    Yes.

21            We learned that he had been in fact and

22  he was on parole at that time.

23       MS. MALLO:  Q    For what?

24       A    For criminal sexual assault.

106

1          Q     And did you also learn any details of

2     that case?

3          A     Yes, I did.

4          Q     And what were those?

5          A     I learned that the victim had been

6     strangled and sexually molested.

7          Q     And did you learn of any other entries

8     on the defendant's rap sheet?

9          A     I believe there were two sexual attacks

10         Q     And the other sexual attack, what were

11    the details of that, Detective?

12         A     That's supposed to have happened right

13    next door to the house where Denise was found at.

14               The victim was supposed to have lived

15    there, but had since moved into a house and now it

16    was an empty house.

17         Q     So that would have been the address, the

18    victim in that case lived at  251 West 117th

19    Street in Chicago?

20         A     Yes, that is correct.

21         Q     Now, after you had all this information,

22    what then did you do?

23         A     We then tried to locate Jerome

24    Hendricks.

107

1        Q    And where did you go to do that?

2        A    To his home.

3        Q    And when you went to his home, what --

4    When you say we, who are you referring to?

5        A    I'm talking about myself, other

6    officers.

7             I am not sure -- I think Wolf, and I'm

8    not sure if there were any other officers there

9    also.

10       Q    And when you went to Jerome Hendricks'

11   house, did you speak with anyone?

12       A    To his sister.

13       Q    And that would be Devita Hendricks?

14       A    Yes, that is correct.

15       Q    When you spoke to her, was the defendant

16   there?

17       A    No, he was not.

18       Q    And did you tell her that you were a

19   police officer?

20       A    We identified ourselves as police

21   officers.

22            She had also seen us out in the yard

23   next door.  I mean, she knew.  She had seen us in

24   the garage.

108

1          She knew we were the same police

2    officers who were next door.

3          Q    And you told her at that time that you

4    wanted to speak to her brother?

5          A    That is correct.

6              At that time we knew he was the last

7    person that we knew at that time was with the

8    victim -- that we knew of.

9          Q    Now, when the defendant, Jerome

10   Hendricks, was not there, what did you do?

11         A    We left a message that we would like to

12   talk to him, if he came home, to give our office a

13   call or whatever.

14         Q    And did you go back to Area 2?

15         A    Yes.

16         Q    And while at Area 2, did you ever

17   receive a phone call?

18         A    Yes, I did.

19         Q    And from whom did you receive the call?

20         A    From Jerome Hendricks, a person who

21   identified himself as Jerome Hendricks.

22         Q    Approximately what time was that?

23         A    Approximately 8:30 at night.

24         Q    And after you received that phone call,

109

1    what did you do?

2        A    I went to Jerome Hendricks' home.

3        Q    And what time approximately did you

4    arrive?

5        A    Approximately five, six minutes later.

6        Q    And when you arrived there, were you

7    alone or were you with Detective Wolf then?

8        A    I was with other detectives, yes.

9        Q    And when you pulled up in front of

10   Jerome Hendricks' house, or the address that he

11   had given you, did you notice anything unusual?

12       A    Yes.

13            There was a large amount of people in

14   front of the house, and, you know, all through the

15   street.

16            But there were probably 25, 30 people in

17   front of the house.

18       Q    And did they say or do anything when you

19   pulled up?

20       A    Not then, no, they didn't.

21            We went through the crowd and into the

22   house, and people in the house were waiting for

23   us.   They had the door open.

24            And we came in.   And that is the first

1    time that I had seen Jerome Hendricks.

2        Q   Do you see that person you called Jerome

3    Hendricks in court today?

4        A   Yes.

5        MS. PLACEK:  Stipulation.

6        THE WITNESS:  A   He is sitting over there.

7        MS. MALLO:  We would accept the stipulation,

8    your Honor, that the detective identified the

9    defendant, Jerome Hendricks.

10        Q   Detective, backing up for a minute, when

11    you received this phone call from the person who

12    identified himself as Mr. Hendricks, at Area 2,

13    did he say anything else to you besides the fact

14    that he wanted to speak to you?

15        A   He said he wanted to come into the

16    station.   He said he wanted to get this thing

17    cleared up.

18        Q   And did he tell you why he wanted to get

19    it cleared up?

20        A   Because he didn't do it, and he wanted

21    to clear his name.

22        Q   Now, you said that when you got to the

23    house -- Did you have to walk up to a porch, or

24    through a door?

1    A    Just one step, and another step is the
2    house.
3         It is not a full sized porch, you know.
4    Q    And when you got there, you testified
5    that the door was in what condition?
6    A    There was someone --  I can't remember
7    who --  but someone had the door open, and waving
8    us to come into the house.
9    Q    And you and Detective Wolf went in the
10   house?
11   A    Yes.
12        I went in first, and then Detective Wolf
13   was behind me.
14   Q    There were other detectives?
15   A    They didn't enter the house, though.
16   Q    Just you and Detective Wolf?
17   A    Yes.
18   Q    And when you got in the house, what did
19   you say?
20   A    I talked to Jerome, and he said he
21   wanted to come to the police station and get
22   himself cleared of this.
23        And he agreed to come in.  And we just,
24   at that time, walked out of the house,  and that

1    is when the crowd was yelling that they wanted to

2    kill him, you know.

3         And I know there were some people who

4    had boards and sticks in their hands, and the

5    other detectives helped clear them away.

6         And we got into the squad and drove

7    away.

8    Q    When you say helped clear away, what did

9    they do?

10   A    They ran toward Jerome and myself.

11   Q    The crowd did?

12   A    Yes.

13   Q    And what did the detectives do?

14   A    They more or less pushed everybody back

15   and cleared everybody away, so we could get from

16   the house to the car.

17   Q    Now, when you entered the home, you say

18   Jerome told you he wanted to go with you to Area

19   2?

20   A    Yes.

21   Q    Did you at that time put handcuffs on

22   Jerome?

23   A    No, we did not.

24   Q    When you walked from Jerome's house to

113

1 your squad car, did you at that time have Jerome
2 in handcuffs?
3   A No, we did not.
4   Q And how did you walk to that car?
5   A We actually ran to the car.
6   Q And when you got to the car, was Jerome
7 then handcuffed?
8   A No, he was not.
9   He got in the back seat with my partner
10 and I got in the front seat and drove away.
11   Q Was that car a marked car?
12   A No, it was a '79 -- excuse me, an '86
13 four door Chevy.
14   Q And when you say four door, would the
15 defendant have been able to open that door?
16   A There are no locks on the inside.  There
17 are handles on the inside to get out, or whatever
18 -- What I can best say it is a normal passenger
19 automobile.
20   Q Now, when you got to the area, did you
21 then -- To Area 2, did you then walk into Area 2
22 with the defendant, you and Detective Wolf?
23   A Yes, we did.
24   Q And at that time as you walked from your

114

1   squad car into Area 2 at that time was the

2   defendant handcuffed?

3        A    No, he was not.

4             Basically, there was no particular order

5   that we walked into the station.   I don't

6   remember if I walked in first, he walked in first,

7   or the two of us walked in together.   I don't

8   remember the order.   We just walked into the

9   station.

10       Q    And when you got to Area 2, did you go

11  upstairs to the Detective's area?

12       A    Yes.

13       Q    And when you got up there, where did you

14  go?

15       A    Myself and Jerome went into one of the

16  interview rooms.

17       Q    And when you got to that interview room,

18  what did you do?

19       A    I advised him of his rights, his Miranda

20  warnings, I guess it would be called.

21       Q    How did you do that?

22       A    I read them --

23       THE COURT: Excuse me just a moment, Officer.

24            Miss Mallo, I don't understand the

115

1    relevance.

2              This motion alleges an unlawful arrest,

3    not a violation of Miranda.

4         MS. MALLO:  Fine, Judge.

5              Judge, I just wanted to cover all the

6    events that occurred.

7         THE COURT:  Well, those which are relevant.

8         MS. MALLO:  Judge, fine.

9              I just didn't want that to be brought up

10   at a later date.

11        MS. PLACEK:  Judge, at this time I have no

12   problem.  That is why I didn't object to the

13   officer.

14        THE COURT:  I understand.

15             But I have a problem sitting here

16   listening to evidence that is irrelevant.   And

17   your motion doesn't raise a Miranda violation.   So

18   I assume that the defendant was Mirandized,

19   acknowledged his Miranda warnings, and waived

20   them.

21             Otherwise you would have told me about

22   them in the motion.

23        MS. PLACEK:  But it is interesting sometimes

24   the reasons and how and why Miranda warnings are

116

1    given.

2         THE COURT:   What difference does it make?

3         MS. PLACEK:   Pursuant to an arrest.

4         THE COURT:   What difference does it make?

5              Are you suggesting that --   Is there a

6    contention by the State that the 5th Amendment

7    Rights were attenuated from the 4th Amendment

8    Rights?

9         MS.  PLACEK:  No, Judge.   Perhaps I

10   am making myself unclear.

11        THE COURT:  You are, to me.   That wouldn't

12   be my fault.

13        MS. PLACEK:  No, it's probably mine, Judge.

14   Let me make myself clear.

15             There are diametrically opposed views at

16   the present time as to when the arrest took place.

17             All circumstances congenial with in

18   fact, to our point of view, of course no objection

19   to --

20        THE COURT:  I'm not certain it got any

21   clearer.  But in any event, since both sides seem

22   to think it has some relevance, I will defer to

23   that.

24             And you may continue your examination

117

1    around the 5th Amendment.

2         MS. MALLO:    Q    Detective, when you spoke

3    with Jerome Hendricks at Area 2, did you at that

4    time -- Did Jerome Hendricks tell you why he

5    wanted to come to Area 2?

6         THE WITNESS:    A    He told me he wanted to be

7    completely cleared of this before he went home.

8    He didn't want anybody to think that he killed

9    this girl.

10        Q    Did the defendant tell you what he would

11   do?

12        A    He said he would do anything possible to

13   clear his name.

14        Q    And did he make a suggestion about

15   something he wanted to do to clear his name?

16        A    He said --

17        MS. PLACEK:    Objection.    Leading and

18   suggestive.

19        THE COURT:    No, overruled.

20        THE WITNESS:    A    Yes, he did.

21        MS. MALLO:    Q    And upon making that

22   suggestion, was the defendant transported to 11th

23   and State?

24        A    Yes, ma'am.

118

1        Q     And was he transported by you to 11th

2   and State?

3        A     No, ma'am, he was not.

4        Q     Now, Detective, prior to --  At about

5   2115 hours, did the defendant at that time ask you

6   if he could use the telephone?

7        A     Yes, he did.

8        Q     And did you allow the defendant to use

9   the telephone?

10       A     Yes, ma'am, he did.

11       Q     And at that time where were you, and

12  where was the defendant?

13       A     Well, the defendant was on the phone

14  that was located in the, I guess what is commonly

15  referred to as a work area, and on one of the

16  desks there was a phone.

17            And I told him to use our police phone,

18  or whatever.

19       Q     Did you sit with the defendant when he

20  made his calls?

21       A     No.

22       Q     Did you listen to his conversation?

23       A     No, I did not.

24       Q     Did the defendant tell you who he wanted

119

1      to speak to?

2           A     He told me he wanted to make calls.

3           Q     And did the defendant tell you who he

4      made the calls to?

5           A     He told me he called Russ Ewing from ABC

6      News, and he said he called his mother.

7           Q     And after he hung up the phone, was

8      there a second call to his mom?

9           A     I'm not sure.

10               Russ Ewing was the first call, and I

11     believe the second call was to his mother, yes.

12          Q     And after he hung up the phone, and

13     after the second phone call, did the defendant say

14     anything to you?

15          A     He said he was ready.

16          Q     Did he say what he wanted?

17          A     What he wanted to do, he was ready to

18     do.

19          Q     And did he say his desire was --

20          A     His desire was to completely clear

21     himself and for us to be able to tell the people

22     that he did not do this.

23          MS. MALLO:   Your Honor, may I have a moment?

24                         (After a short period of time)

120

1        MS. MALLO:  Thank you, Judge.

2        Q    Detective, you testified that on the 8th

3   of August, 1988, you were assigned to investigate

4   this homicide?

5        A    Yes.

6        Q    And you went to the scene of where the

7   body was recovered?

8        A    Yes, ma'am.

9        Q    And at that time did you view the body?

10       A    Yes, I did.

11       Q    And did you know the sex of the victim?

12       A    Not from basically viewing the body.  We

13   could tell by the clothing that we believed it was

14   a woman.

15       Q    And could you tell the age of that

16   victim?

17       A    We couldn't tell just by viewing the

18   body.

19            It was not until someone else told us

20   that they believed it was Denise.

21       Q    And did you learn Denise's age?

22       A    Yes.

23       Q    What was her age?

24

121

1          A      12 years old.

2          Q      And did you also learn anything about

3   any injuries to the victim?

4          MS. PLACEK:  Excuse me.

5               With all due respect, I am going to

6   object on foundation, Judge.

7          THE COURT:  What is the relevance?

8          MS. MALLO:  Judge, I am trying to show the

9   specific facts about this victim and the crimes to

10  this victim, and other arrests that the detective

11  has already testified to regarding this defendant.

12         THE COURT:  Well, for the purpose of

13  establishing probable cause --

14         MS. MALLO:  Yes.

15         MS. PLACEK:  Objection.

16         THE COURT:  What is the objection?

17         MS. PLACEK: First of all, unless the State is

18  going to show that these other arrests were

19  murders involving this case, Judge, I would

20  suggest that this sort of guilt by innuendo can be

21  used for nothing more than a ground of suspicion.

22         THE COURT: Well, as to the subject matter

23  that we are trying to elicit from this officer,

24  the objection to that is overruled.

122

1            As to the lack of any foundation for the

2    basis of his knowledge, that objection is

3    sustained.

4            In the event that this appears to be

5    nothing more than what you suggest, that is

6    innuendo, probable cause by innuendo, probable

7    cause and speculation, I will toss it out.

8        MS. PLACEK: I would move that at this

9    particular time, Judge.

10       THE COURT: Well, I can't tell whether it's

11   going to be relevant or not until I hear it.

12       MS. PLACEK:  That is one of the reasons the

13   foundational objection was made, Judge.

14       THE COURT:  And that objection on foundation

15   was sustained.

16       MS. MALLO:  Q   How did you determine the

17   victim's age?

18       THE WITNESS:  A   We determined the victim's

19   age by identifying who the victim was.

20           And what we identified there was tennis

21   shoes with her name, Denise, written on it, that

22   relatives identified were her shoes.

23           We could tell that it was, what we

24   believed was a female, because of the clothing.

123

1    She was wearing a brassiere, her shirt was up

2    around her neck, and the slacks and shoes --  and

3    according to the hair, from our own observations,

4    we believed it to be a woman.

5         Q    And when the victim's --  Did the

6    victim's family ever view the shoes and clothing?

7         A    They viewed the shoes and said they were

8    Denise's shoes.

9         MS. PLACEK:  Judge, can we get a time on

10   this?

11            When?

12       THE COURT:  The objection is sustained.

13   Foundation.

14       THE WITNESS:  A   This happened on the 8th of

15   August, between the hours of 2:30 in the

16   afternoon, and approximately 5:00 o'clock, some

17   time --   I can't remember the exact time that

18   these people actually viewed this stuff.  But it

19   was in that time frame.

20       Q    And when they viewed the clothing, did

21   you then ask them specific questions about Denise?

22       A    Yes.

23       Q    And did you ever ask them how old Denise

24   was?

1          MS. PLACEK:  Excuse me, Judge.

2              While we are talking about they, can we

3     find out who they were?

4              That is part of the foundation.

5          THE COURT:  Sustained.

6          THE WITNESS:  A   These were relatives of the

7     victim.

8          MS. MALLO:  Q   Can you tell us their names?

9          A   I believe Carolyn McCoy was one of the

10    ones we spoke to, and I can't think of the others

11    There were several people out there at the time.

12    And I can't remember exactly.

13             But I know Carolyn McCoy definitely

14    identified the shoes.

15         Q   What was her relationship to the victim?

16         A   She was an aunt of the victim, and the

17    victim was staying at her house.

18         Q   And did Carolyn McCoy know the age of

19    the victim?

20         A   Yes, she did.

21         Q   And what did she tell you the victim's

22    age was?

23         A   She told me that the victim's age was 12

24    years old.

1        Q    Detective, you testified that the

2    defendant had also been involved in a case where

3    the victim lived in the vicinity of 251   West

4    117th Place in Chicago?

5        A    Yes, that is correct.

6        Q    And do you know the age of that victim?

7        A    I don't recall the age.  I know it was a

8    young girl. but I can't remember the exact age.

9        Q    And that also in that case, the

10   defendant was charged with a sex offense?

11       A    Yes, ma'am.

12       MS. PLACEK:  Well, Judge, again there would

13   be a continuing objection.

14       THE COURT:  The objection is overruled.

15       MS. MALLO:  Q  And, Detective, you testified

16   that the defendant had been convicted of another

17   sexual offense?

18       A    That is correct.

19       Q    And was that victim in that case a

20   female?

21       A    Yes, ma'am.

22       Q    And was that --  Do you recall the age

23   of that victim?

24       A    No, I do not.

126

1        Q      Is there anything that would refresh
2    your recollection?
3        A      A case report from that incident, or an
4    arrest report from that incident.
5        Q      Detective, did you determine the
6    condition of the neck of the victim, of the body
7    you viewed in August of 1988?
8        A      There were ligatures around the neck and
9    the hands were tied.
10        Q      And, Detective, you testified that in
11    the case where the defendant was convicted of a
12    sex offense, that in that case the victim also had
13    been choked in that case?
14        A      Yes.
15    MS. PLACEK:   Objection.
16    THE COURT:   Objection is sustained.
17    THE WITNESS:   A    Yes, ma'am.
18    MS. MALLO:   Q   You testified earlier about
19    the defendant being convicted of a sex offense?
20        A      Yes.
21        Q      And when you testified about that sex
22    offense, you also in that case, you knew of other
23    details of that case?
24        A      Yes.

127

1       MS. PLACEK:  Objection.

2       THE COURT:  The objection is sustained.

3       MS. MALLO:  Judge, he's already testified to

4   that.

5       THE COURT:  The objection is sustained.

6       MS. MALLO:  Your Honor, if I may approach the

7   defense?

8       MS. PLACEK:  Judge, may we have a sidebar for

9   a second?

10      THE COURT:  On or off the record?

11      MS. PLACEK:  On the record.

12          I would ask the officer to just step out

13   of the room.

14      THE COURT:  All right.

15                  (Thereupon, the following

16                  proceedings were had outside

17                  of the presence and hearing of

18                  the witness:)

19      MS. PLACEK:  There has been a continuing

20   objection.

21          And I proffer what would be marked as

22   Defendant's Exhibit No. 1 for Identification.  It

23   seems to be what purports to be what in fact the

24   Assistant State's Attorney seeks.

128

1          And again, there has been a constant

2     objection to this sort of innuendo.

3          This is an '84 case, Judge.  I am

4     showing you what has been previously marked as a

5     current rap sheet of the defendant.

6          Now, since this is an arrest report, you

7     can see that there is only one conviction listed

8     on there.

9          And again -- correct me if I am wrong

10    -- because I have been known to read those wrong.

11    But that is before His Honor, Judge Boharic.

12          There is a case in '84 before Judge

13    Sodini.  Now, I don't see any outcome of that.

14    But I am sure --

15       THE COURT: Finding of guilty, six years

16    Illinois Department of Corrections, Judge Boharic.

17       MS. PLACEK:  Yes.

18          Now, the problem I am having, Judge, is

19    that the State is putting on essentially what is

20    supposed to be a competent witness without

21    foundation as to when he found out these things.

22       THE COURT:  That is precisely the point.  And

23    that is why I am sustaining your objection.

24       MS. PLACEK:  Thank you, Judge.

129

1       THE COURT:  Will you ask the witness to come

2   back in?

3       MS. PLACEK:  I will, Judge.

4

5                   (Thereupon, the following

6                   proceedings were had in

7                   the presence and hearing

8                   of the witness:)

9       THE COURT:  You may proceed, Ms. Mallo.

10      MS. MALLO:  Q  Detective, you testified that

11  after talking with Carolyn McCoy you learned the

12  defendant had had some prior arrest for sex

13  offenses?

14      A    That is correct.

15      Q    And after you learned that, was it then

16  that you called Area 2?

17      A    Right.

18      MS. PLACEK: Excuse me, Judge.   I am having a

19  continuing objection, especially as a result of

20  the sidebar.

21      THE COURT:  Overruled.

22      MS. MALLO:  Q  When you called Area 2, what

23  did you do?

24      A    I asked them to run a name check on --

130

1    Oh, God -- Jerome, Jerome Hendricks.    And they

2    ran a name check.

3              I gave them the information they needed

4    to run it.

5              And later on they called us and gave us

6    the information that they had received.

7         Q    Do you know what time that was

8    approximately that you received the call to call

9    in to the office?

10        A    I can't remember the exact time.

11        Q    Could it have been in the afternoon?

12        MS. PLACEK:  Objection.  Leading and

13    suggestive, Judge.

14        THE COURT:  Objection sustained.

15        MS. MALLO:  Q    Would it have been an August

16    date?

17        THE WITNESS:  A    Yes.

18        Q    Approximately what time?

19        A    Approximately between 2:30 and maybe

20    6:30, 7:00 o'clock at night.

21        Q    And when you spoke with detectives at

22    Area 2, what did you learn?

23        A    I learned he had been arrested previous

24    times and that they were sexual cases.

131

1          And he also gave a name of a parole

2    officer to call and talk to.    And he told me

3    that --

4          MS. PLACEK:   Objection.   No foundation,

5    Judge.

6          THE COURT: The objection is sustained.

7          THE WITNESS:    Okay.

8          MS. MALLO:   Q    When did you call the parole

9    officer?

10         A    Right after I talked to my office and

11   found out that he had been arrested for the other

12   offenses.

13         Q    And when you talked to the parole

14   officer, did you learn details of that case?

15         A    He told me of two other arrests that I

16   remember him telling me about;   one happened

17   next door, and I believe he told me that that was a

18   young girl.

19         And then the other one, he said happened

20   where the girl was choked and raped.

21         Q    And do you recall the sex and age of

22   that victim?

23         A    No, I don't.

24         MS. PLACEK:   Objection.

132

1      THE COURT:  The objection is sustained.

2      MS. MALLO:  Judge, if I may have one minute.

3                 (After a short period of time)

4          Judge, we tender this witness for cross

5   examination.

6      MS. PLACEK:  I have a motion to strike as to

7   prior, Judge.

8      THE COURT: Overruled.

9      MS. PLACEK:  May I inquire, your Honor?

10      THE COURT:  You may.

11

12                 CROSS EXAMINATION

13                       BY

14                  MS. PLACEK:

15      Q    Officer, when did you first become

16   involved with this homicide?

17      A    August the 8th, at 2:30 in the

18   afternoon.

19      Q    And of course you had read all prior

20   reports involved in this homicide, and all prior

21   reports in preparation to testify in court,

22   correct?

23      A    I don't understand.

24          Are we talking about August the 8th?

133

1      Q    No, we are talking about today.

2      A    I didn't read all of them.  I read most

3  of the reports, yes.

4      Q    When you say most of the reports, I'm

5  showing you what would be marked as Defendant's

6  Group Exhibit No. 2 for Identification.

7           Would it be correct in saying that you

8  read those reports?

9           Take your time and go through them.

10     A    Every one of them, ma'am?

11     Q    Look at them, yes, please.

12     A    I didn't read the first one.

13     Q    Okay.

14     A    Or this second one --  Wait, excuse me.

15  I did read this.

16     Q    The first one we will take right off,

17  okay?

18     A    Okay.

19          I didn't recall this, no.

20     Q    But you read the ones prior to this?

21     A    Well --

22     Q    You didn't read the so-called street

23  files?

24     A    I didn't read the stuff that didn't have

134

1    my name on it, not all these.

2        Q    Well, the things that have your name on,

3    you did read, correct?

4        A    Yes.

5        Q    All right. Let's separate that.

6            Would it be true and correct in saying

7    that in reading those in preparation for

8    testimony, you would adopt as correct?

9        A    As much as I remember, yes.

10       Q    Thank you.

11           Showing you what has been marked as

12   Petitioner's Exhibit No. 3.

13           Would you look at those and tell me if

14   you have ever seen that before?

15       A    Yes, ma'am.

16       Q    And what does that purport to be?

17       A    This is the supplementary report that

18   myself and my partner --

19       Q    And likewise, you adopted that as true

20   and correct?

21       A    It is a summary of what happened.

22       Q    Exactly.

23           But there are no changes that you want

24   to make today?

135

1        MR. RONKOWSKI:  Objection.

2        THE COURT:  Sustained.

3        MS. PLACEK:  Q   Well, showing you

4    Petitioner's No. 4, the missing person's report.

5            Did you read that?

6        A    No, I did not, ma'am.

7        Q    Thank you.

8            Now, let's talk about a few things you

9    said today.

10           Officer, calling your attention to when

11   you said you first came up to Jerome Hendricks'

12   house.

13           I believe you said there was a mob in

14   front of the house, literally calling for Mr.

15   Hendricks' blood, is that correct?

16       A    There were people yelling for him.

17       Q    There was a disturbance, you believe you

18   saw people with sticks?

19       A    Yes.

20       Q    Making threatening gestures to the

21   house, correct?

22       A    No, toward Jerome.

23       Q    Toward Jerome Hendricks?

24       A    Yes.

136

1        Q       As a matter of fact. I believe you

2    described that you had to actually go out

3    protecting yourselves and run to the car, is that

4    correct?

5        A       That is correct.

6        Q       And, by the way, something like that

7    would have been mentioned in your report, correct?

8        A       Not necessarily.

9        Q       Well, as a matter of fact, isn't it

10   correct that in all reports you read, there is

11   nothing about a mob?

12       A       No.

13       Q       No, I am incorrect?   Or no, I am

14   correct?

15       A       No, there is nothing in it about the

16   mob.

17       Q       And you said also that one of the

18   reasons that you felt that you were somewhat

19   suspicious of Mr. Hendricks is because Yolanda --

20   I am sorry --  what was her name, Officer,

21   Yolanda, the woman you spoke to?   What was her

22   last name?

23       A       Was it Yolanda or Carolyn?

24       Q       Yolanda Hill?

137

1   A  Yolanda Hill.

2   Q  Yolanda Hill, as you described, is the

3 aunt?

4   MS. MALLO:  Objection.  Yolanda Hill was not

5 described as the aunt.

6   THE COURT:  Overruled.

7    Put a question.

8   MS. PLACEK:  May I?

9   Q  Had Jerome Hendricks been described to

10 you as the last person in fact who saw the victim,

11 correct?

12   THE WITNESS:  A He was one of the last

13 people that we know that had seen her alive and he

14 was with her, yes.

15   Q  Let's talk about --   That was not the

16 last person, was it?

17   A  I don't know.

18   Q  Do you know who the guardian of this

19 young lady was?

20   A  I am not sure.

21   Q  Was it her aunt?

22   A  No, she was visiting her aunt.

23   Q  Well, when you say --

24   A  I believe it was her grandparents.

1        Q    Denise Johnson?

2        A    Pardon?

3        Q    Denise Johnson?

4        A    The grandmother?

5        Q    Yes.

6        A    I am not sure what her name was.

7        Q    Officer, let me ask you this:

8             Did you, in fact, during your

9    investigation of this case, ever come across a

10   woman by the name of Fields, Estelle Fields?

11       A    Possibly.

12       Q    And as a matter of fact, wasn't Estelle

13   Fields described as the child's guardian?

14       A    Possibly.  I don't know.

15       Q    And in fact didn't Yolanda Hill --

16   Well, strike that.

17            May I withdraw and rephrase?

18            Didn't you have information that when in

19   fact, according to your investigation, the

20   defendant was speaking with the young lady on the

21   porch, that the young lady in fact returned back

22   into the house?

23       A    That which young lady returned back into

24   the house?

139

1        Q    The victim in this case?

2        A    That isn't what I was told, no.

3        Q    Beg your pardon?

4        A    I was told she walked away.

5        Q    When you say walked away?

6        A    Walked toward 119th Street.  I believe

7 that was what was said to me.

8        Q    Well, isn't it correct, Officer, that

9 what really happened, according to the report, was

10 that she in fact returned to the house and had an

11 altercation with Miss Fields?

12        A    I don't know.

13        Q    When you say you don't know, is that

14 because your memory is exhausted as to that fact?

15        A    I don't know that that happened, no.

16        Q    Well, when you say you don't know that

17 that happened, isn't it correct that Miss McCoy

18 said that it was Jerome Hendricks who walked

19 toward 119th Street?

20        A    That is what I wrote there in the

21 report, yes.

22        Q    Thank you.

23           Would it also be correct in saying that

24 when you testified to the Assistant State's

1    Attorney, I believe you stated that you found out

2    through your conversation with your office that

3    Mr. Hendricks in fact had two convictions,

4    correct?

5        A    Two -- Two arrests.

6        Q    Two arrests.

7        So am I correct, when you speak of an

8    arrest, you are not speaking of convictions,

9    correct?

10        A    Not always, no.

11        Q    Well, in this particular instance?

12        A    I don't know. I can't remember now if

13    she told me he had convictions or just arrests. I

14    don't recall.

15        Q    Now, when you say you can't remember

16    now, let's go one step into your memory.

17        You told the Assistant State's Attorney

18    that you spoke to a parole officer, correct?

19        A    Yes.

20        Q    And that parole officer, according to

21    your testimony, gave you information that

22    influenced your future actions, correct?

23        A    No -- I don't think it influenced it

24    any more than it already was.

141

1      Q      Well, when you say it already was, would
2  it be correct that that parole officer's
3  information to you had no significance at all?
4      MR. RONKOWSKI:  Objection.
5          Counsel is arguing with the witness at
6  this point.
7      THE COURT:  The objection is sustained.
8      MS. PLACEK: Q    Well, let me ask you this.
9          What time did you speak to that parole
10  officer?
11      THE WITNESS:  A  I don't recall the time. I
12  think it was 4:30, 5:00 o'clock, though.
13      Q      What was his name?
14      A      I wrote it --  Birch, or Bouch,
15  something like that.
16      Q      Where did you call?
17      A      At 78th and Cottage.
18      Q      That's where he was?
19      A      That was his office, I believe.
20      Q      And this was about 5:00 o'clock?
21      A      Or earlier.  I'm not sure of the time.
22      Q      And you stated that at the time you were
23  aware that the defendant was on parole, is that
24  correct?

142

1      A    Yes.

2      Q    And when you say you learned the

3  defendant was on parole, did you also find out

4  certain other matters at that time?

5      A    I'm not sure.

6      Q    Well, let me ask  you this:

7           Did you find out what year he was

8  originally convicted for the crime he was on

9  parole for?

10     A    I probably did, but I don't recall.

11     Q    Well, do you recall not only what year,

12 but do you remember what Judge he would have told

13 you?

14     A    No.

15     Q    Would it be correct in saying that when

16 you talked to this parole officer, that you were

17 in fact in your office, correct?

18     A    (No response)

19     Q    Or at a police station?

20     A    I know I was on the street still.

21     Q    When you say out on the street, was your

22 information relayed, or did you use a phone booth?

23     A    I was using a phone booth, or phone --

24 I can't remember if we were using someone's phone.

143

1      I think we were using a neighbor's phone.

2           Q     What was the neighbor's name?

3           A     I don't recall.

4                 I know I used a couple phones that day.

5      I can't remember which one I used.

6           Q     What street did this neighbor live on?

7           A     As I said, I was not sure which house I

8      was in at the time, ma'am.

9           Q     Do you recall besides making the phone

10     call whether or not, with this information, you

11     felt that you should arrest the defendant?

12          A     I definitely felt that he should be

13     brought in to talk to, yes.

14          Q     Well, did you ever seek to, at that

15     time, to get a warrant?

16          A     No, I did not.

17          Q     When you say brought in and talked to,

18     let's talk a little further.

19          A     Maybe not -- Okay.

20          Q     When you started your investigation and

21     you first spoke to the people that the State's

22     Attorney characterized as the family, you had no

23     idea exactly whether or not you were investigating

24     the homicide of Denise Johnson, correct?

144

1        A      We were probably about as sure as we

2    could be without some formal identification, yes.

3        Q      Well, let's talk about that for a

4    second.

5               Officer, showing you what will be marked

6    as Group Exhibit No. 5.

7               Do those purport to be the death photos?

8        A      Yes, those are the photos.

9        Q      Thank you.

10               And would it also be correct in saying

11    that -- By the way, do you know when these photos

12    were taken?

13        A      Yes, ma'am.

14        Q      When?

15        A      On the 8th of August, between 2:30 in

16    the afternoon and 6:00 o'clock at night.

17        Q      Were you present when they were taken?

18        A      I can't recall if I was still standing

19    there or not.

20        Q      Would I be correct in saying that you

21    couldn't tell the age of the alleged victim by

22    those photos?

23        A      That is correct.

24        Q      Would it be correct in saying that you

145

1    would have a great deal of difficulty, other than

2    the clothing on the body, to tell the sex of that

3    victim?

4           A    Other than the clothing, yes, ma'am.

5           Q    Would it be correct in saying that

6    besides the age and the sex, that as you observed

7    there were maggots actually covering the body at

8    that particular time, correct?

9           A    Yes, ma'am.

10          Q    Not only are there maggots, would it be

11   correct in saying also that when you first

12   approached the members, or what essentially you

13   said Miss McCoy said, essentially what you said

14   was we heard that someone was missing in your

15   family, correct?

16          A    That is correct.

17          Q    And as you previously told me at that

18   time when you approached her you had no idea how

19   long this person had been missing, correct?

20          A    I am not sure, ma'am, if I did or not.

21               I know there was a missing case report

22   made on her.  And I am not sure if I was aware of

23   that.

24          Q    Well, as a matter of fact, I showed you

146

1    the missing case report, correct?

2         A    Yes, ma'am.

3         Q    And I believe you said that you didn't

4    see that case report before?

5         A    I didn't.

6         Q    Have you seen it since?

7         A    You just showed it to me.

8         Q    Other than my showing it to you?

9         A    I probably had seen it, you know, a

10   couple years ago.  But I don't recall.

11             I was aware that there was a missing

12   person because of the district personnel on the

13   scene were aware that they had been on the lookout

14   for a missing.

15        Q    Well, in that case report and the

16   personnel --   By the way, did you have a

17   conversation with those personnel on the scene?

18        A    Excuse me.  I don't know which personnel

19   you are talking about.

20        Q    The ones who were investigating the

21   missing person report.

22        A    Well, there were several people

23   investigating the missing report.

24        Q    Well, who were they?

147

1      A      Well, all the district personnel had a

2    lookout message.

3      Q      Were you part of that?

4      A      No.

5      Q      Would it be correct in assuming that

6    when in fact you were at the scene where the body

7    was found, that in fact certain people involved in

8    this missing person report were also present?

9      A      Police officers that were in the beat

10   car were aware of the missing.

11           No, there was no particular officer.

12   All officers in that section knew that there was a

13   missing person from that address.

14     Q      Isn't it correct that in fact Chicago

15   police had information that the victim of the

16   missing person report was in fact seen on the

17   2nd of August?

18     A      That is in one of the reports, that is

19   correct, ma'am.

20     Q      And as a matter of fact, when you speak

21   of this defendant supposedly being the last person

22   who saw this alleged victim, we are speaking about

23   the 1st of August, correct?

24     A      That is correct, ma'am.

148

1        Q     You have no information at all, as you

2    sit there at this time, or as you did that time,

3    that this defendant even saw this person on the

4    1st of August, correct?

5        A     (No response)

6        Q     Or the 2nd of August?

7        A     That he saw the person?

8        Q     On the 2nd of August?

9        A     The information I had was that he was

10   seen with her on the 1st of August.

11       Q     That is correct.

12             But you also had information that she

13   was seen alive on the 2nd of August, correct?

14       A     I did not have that.

15       Q     But the Chicago police had it, correct?

16       A     Well, that report says that, yes.

17       Q     So when you told the Assistant State's

18   Attorney that he was the last person who saw her

19   alive, you were mistaken, correct?

20       A     No.

21             At that particular time when I was

22   investigating --

23       MR. RONKOWSKI:   Objection --

24       THE WITNESS:   A    --  he was the last

149