CASE NO. _____08cu1589_____

ATTACHMENT NO. _____4_____

EXHIBIT _____

TAB (DESCRIPTION) _____

1    person--

2        THE COURT:  Just a minute.

3            The objection is sustained.

4        MS. PLACEK:  Q   Well, let's go a step

5    further.

6            You found out about certain other male

7    relatives, correct, of this alleged victim,

8    correct?

9        A    I don't understand the question.

10        Q    Well, did you find out about a step-

11    grandfather?

12        A    I don't recall.

13        Q    Do you recall if you found out about the

14    name of Johnson?

15        A    Denise Johnson?

16        Q    No, Johnson.  George.

17        A    Oh, I don't know.

18            Can you refresh my memory on that?

19        Q    Well, did you find out about a Harding

20    Johnson (phonetics)?

21        A    Is that in my report there?

22        Q    I'm asking you, Officer:

23            In your investigation --

24        A    I don't recall.

150

1           But if you can show me something that I

2   did --

3        Q     Did you, in fact, find out from Carolyn

4   McCoy that in fact there was a family altercation

5   with Denise Johnson, between her and Mrs. Hill?

6        A     Did I find this out?

7        Q     Did you find that out?

8        A     Not that I know of.

9        Q     Officer, showing you what would be

10  previously marked --  And I believe this was part

11  of the group Exhibit referring directly to Carolyn

12  McCoy,  is that in fact contained within the

13  report?

14       A     This is not a report, no.

15       Q     Not your report.  But as a group of the

16  reports that you said you reviewed?

17       A     I don't remember seeing this one. no.

18       Q     Well, Officer --

19       A     If it was there, I don't remember seeing

20  this one.

21       Q     Officer, isn't it correct that Carolyn

22  McCoy told in fact the Chicago Police Department

23  that there was an altercation between Mrs. Hill

24  and the family and Denise Johnson, and that is

151

1    when she in fact walked off toward 119th Street?

2        MR. RONKOWSKI:  Objection.

3        THE WITNESS:  A  It doesn't say what the

4    altercation was.

5        THE COURT:  Wait a minute.

6        MR. RONKOWSKI:  She is trying to impeach this

7    officer with another officer's report.

8        THE COURT:  She is trying to elicit from him

9    substantive evidence, as I understand it.

10        And the knowledge of this police

11    officer, or any other police officer, is relevant

12    because this police officer can rely upon

13    information known to other police officers,

14    whether it had been communicated to him or not in

15    substantiating probable cause.

16        It can likewise be used by the Defendant

17    to show that the knowledge of the police

18    department and not just one particular police

19    officer disputed probable cause.

20        The pendulum swings both ways.  The

21    objection is overruled.

22        THE WITNESS:  A  The family altercation Mrs.

23    McCoy told us about, she told us that Jerome was

24    on the porch, and she told him not to talk to

152

1 her.

2   MS. PLACEK: Q When you say family

3 altercation, that is not what is down here, is it?

4   A That is what she was talking about.

5   Q Is that down there in black and white,

6 Officer?

7   A That is what she considered a family

8 altercation.

9   Q That is what you are telling us today?

10   A What is it, then?

11   Q Well, let's talk a little further.

12   Isn't it correct that, quote, Mrs. McCoy

13 and Miss Hill had told the Chicago Police

14 Department that this young lady was boy crazy, or

15 man crazy?

16   A I don't remember that.

17   Q Well, isn't it correct that in fact on

18 the missing person's report, where it says

19 interest, meaning the missing person, it is down

20 there, boys and men?

21   A Not in my report.

22   Q Well, Officer, do you know if it is down

23 there?

24   A I don't know, ma'am.

1        Q    Officer, showing you what would be

2    marked as Defendant's Exhibit No. 7, or

3    Petitioner's No. 7.

4             Will you tell his Honor what this is?

5        A    This is a missing case report.

6        Q    Does that show an interest of this young

7    lady, as put down by the Chicago Police

8    Department?

9        A    Yes.

10       Q    What is it?

11       A    It says boys.

12       Q    Officer, when was that report taken?

13       A    The report was originally taken on the

14   2nd of August.

15            This here is signed on the 5th of

16   August.

17       Q    Showing you what in fact would be marked

18   as Petitioner's No. 8.

19       A    Uh-huh.

20       Q    Does that in fact --   What does that

21   purport to be?

22       A    Report on the missing.

23       Q    Does that also show an interest of the

24   young lady?

154

1      A     Yes.

2      Q     What was her interest?

3      A     It says men.

4      Q     Thank you.

5           By the way, showing you again No. 7.

6   Does that report purport to say who in fact the

7   guardian of the young lady is?

8      A     Estella Fields.

9      Q     Thank you.

10         As a matter of fact, isn't it correct

11  that you had information at the time of your

12  investigation that in fact when Jerome Hendricks

13  was on the porch on the 1st, and told to go away,

14  he simply went away?

15      A    That is correct.

16      Q    There was no fight between him and

17  Yolanda Hill, or -- excuse me, Estelle Hill and

18  Yolanda Hill about him staying, correct?

19      A    That is correct.

20      Q    As a matter of fact, the only fight was

21  between the aunt and the young girl, is that

22  correct?

23      A    I don't know anything about the fight,

24  other than what was in that report.

1   Q  Well, the fight is not with Jerome

2 Hendricks present, correct?

3   A  I don't know.

4     I would have to look at the report,

5 ma'am.

6   Q  As a matter of fact, would it also be

7 correct in saying that the Chicago Police at the

8 time knew that her male relatives, her step-

9 grandfather and her father would be uncooperative

10 because both Miss Hill and Miss Fields complained

11 that once she had gone away before and stayed with

12 them, that they in fact lied to the Fields, the

13 guardians, as to her whereabouts?

14   MR. RONKOWSKI:  Objection, compound question.

15   THE COURT:  It is compound.

16   MS. PLACEK:  I will withdraw it.

17   THE COURT:  You don't have to withdraw it.

18     If the witness understands, he may

19 answer.

20   THE WITNESS:  I don't understand.

21   MS. PLACEK:  Surely.

22   Q  Did you know whether or not there was a

23 grandfather involved in this case?

24   A  I don't recall.

1          Q      Officer, do you know what the Chicago

2     Police Department did?

3          A      I don't know, ma'am.

4          Q      Showing you what would be marked as

5     Petitioner's Exhibit No. 9 for Identification.

6     What does that purport to do?

7                 Is this the same missing --

8          A      No, it isn't.    It is a different

9     missing report.

10         Q      Showing you the back of that report,

11    doesn't it show that in fact the Chicago Police

12    Department had information about this young lady

13    not only liking the company of older men --

14         A      I would have to read it first.

15         Q      Go ahead.

16                Have you read it now?

17         A      No, I have not.

18         Q      Well, not meaning to interrupt your

19    reading.

20                But would it be correct in saying that

21    at the time you felt the defendant was supposed to

22    be talking to you, that you had none of this

23    information?

24         A      I don't remember seeing this at all.

157

1      Q    Or the other report about her being

2    interested in men?

3      A    No.

4      Q    Or about her mother being a drug addict?

5      A    I don't even remember seeing all these

6    reports yet, no.

7          I may have gotten them later.

8      Q    So you felt that the defendant had to be

9    talked to without all of this information,

10   correct?

11      A    If he was seen with her on the 1st,

12   maybe he had seen who she left with.   Not

13   necessarily he was the last to see her alive,but

14   maybe the last one I knew.

15      Q    So now you are saying that maybe he was

16   not the last one that saw her alive?

17      A    The last one I know.

18      Q    Now, you know the Chicago Police

19   Department knew differently now, don't you?

20      A    According to these.

21      Q    Thank you.

22      A    I don't know if they are accurate or

23   not.

24      Q    Oh, they might be mistaken, correct?

1          A     I --

2          MR. RONKOWSKI:  Objection.  Counsel is

3     arguing with the witness.

4          THE COURT:  Sustained.

5          MS. PLACEK:  Q  Officer, isn't it correct

6     that there is information in that report that the

7     victim had male relatives who would not cooperate

8     with her guardian?

9          A     That's what it says.

10          Q     Not only that, but sheltered her when

11     she ran away?

12          A     I don't remember seeing that.

13              Is that in there, too?

14          Q     It states having previously assisted

15     Denise, Mrs. Fields wishes --

16          MR. RONKOWSKI:  Objection.

17          THE WITNESS:  I don't remember if it says

18     anything about shelter in there.

19          MS. PLACEK:  I'm sorry.

20          Q     Then let me withdraw and rephrase.

21              Shelter --  Or, excuse me, assisting

22     Denise.

23              Isn't it correct that the Chicago Police

24     Department that time knew that there was, or was

159

1    told by her legal guardian, that there were male

2    relatives who they might as well not even bother

3    speaking to, because they in fact assisted Denise

4    against Mrs. Fields' wishes?

5        MR. RONKOWSKI:  Objection.

6        THE COURT:  Basis?

7        MR. RONKOWSKI:  First of all, you can't

8    impeach an officer with another officer's report.

9         Second of all, that piece of information

10    does not negate any probable cause.

11        MS. PLACEK:  Judge --

12        THE COURT:  The objection is overruled.

13        MS. PLACEK: Thank you.

14        Q   Correct?

15        THE WITNESS:  A   Assist?  I don't know what

16    you mean by assist.

17        I don't know what the assist was.

18        Q   Well, isn't it correct that Mrs. Fields

19    says that as a matter of fact, you might as well

20    not even talk to them, correct, if you know, Mrs.

21    Fields?

22        A   I don't know.

23        Q   Well, let's go further.

24        According to your statement when you

160

1    came in fact to the home of Jerome Hendricks, who

2    was present?

3        A    Who was present when I got there?

4        Q    Yes.

5        A    I don't know, ma'am.  He was home.

6        Q    Besides him?

7        A    I don't know who the people were.

8        Q    Was his mother home?

9             How many people were present in the

10   house?

11       A    There were several people there.

12       Q    How many were women?

13       A    I don't know.

14       Q    By the way, are you the supervising

15   officer in this case?

16       A    I don't know what you consider

17   supervising officer.

18       Q    Are you the investigating officer in

19   this case?

20       A    I am a detective, right.

21       Q    Let me ask you this.

22            You didn't take any names of anyone

23   present at that time?

24       A    No.

161

1      Q     You don't know whether they were women?

2      A     Correct.

3      Q     Did you Mirandize him at his home?

4      A     No.

5      Q     Officer, when do you Mirandize people?

6            May I withdraw?

7            Isn't it correct that you Mirandize

8      people as incidents of an arrest?

9      MR. RONKOWSKI:  Objection.

10     THE COURT:  Sustained.

11     MS. PLACEK:  Q   Well, when do you Mirandize

12     people?

13     MR. RONKOWSKI:  Objection, irrelevant.

14     THE COURT:  Sustained.

15           Well, I don't know.  It may go to his

16     state of mind.

17           I will overrule your objection.

18     MS. PLACEK:  Q   Well, Judge, I will move

19     away.

20     THE COURT:  The objection is overruled.

21     MS. PLACEK:  Q   You said the defendant

22     attempted to call Russ Ewing from the police

23     station?

24           THE WITNESS:  A   He told me.  I don't know

162

1    if he did or not.

2        Q    Well, you said to the Assistant State's

3    Attorney, you said you were close to him when he

4    was making the call?

5        A    I was not listening to who he was

6    talking to.

7        Q    What time of the day or night was that?

8        A    I think it was -- In my notes, it was

9    two hundred -- It would be about 9:15, I think,

10   9:30.

11       Q    That's 9:30 in the evening, correct?

12       A    9:15 or 9:30.

13       Q    Was he arrested?

14       A    No.

15       Q    Did you ask him why he wanted to call a

16   newspaper man -- Strike that -- a TV man, when

17   there was no problem at the police station and he

18   was there consentually?

19       A    Yes, I did ask him why.

20       Q    And did he in fact not call Russ Ewing

21   there, but had someone call Russ Ewing at the

22   house?

23       A    He made two phone calls.

24            He told me he called Ewing and his

163

1    mother.    Now, whether he did or not,    I don't

2    know.

3         Q    Well, Russ Ewing did show up eventually,

4    did he, at the police station --    If you know.

5         A    I don't recall seeing him at the police

6    station.

7         Q    But you do know that Russ Ewing did in

8    fact get in contact with the police?

9         A    I seen Russ Ewing on the scene before I

10   came into the office.

11            Before I went to his house, to Jerome's

12   house.    I saw him earlier around 6:00 o'clock or

13   so.

14        Q    As a matter of fact, the real time you

15   saw Russ Ewing is after the arrest of the

16   defendant, is that correct?

17        MR. RONKOWSKI:    Objection.

18        THE COURT:    Overruled.

19            Well, you are talking about after his

20   arrest?

21        MR. RONKOWSKI: Yes.

22        MS. PLACEK: Withdraw it.

23        Q    Isn't it in fact true that you in fact

24   saw Russ Ewing at the police station between about

164

1    8:00 o'clock and 8:30 at night?

2        THE WITNESS:   A   Isn't it a fact?

3        Q    Yes. If you can recall.

4        A    No, it is not a fact.

5        Q    Thank you.

6            By the way, did you wonder why he was

7    calling Russ Ewing from the police station, since

8    you had treated him so well, and he was not under

9    arrest, and free to leave, is that correct?

10       A    Yes.

11       Q    What was his answer?

12       A    He wanted to ask Russ if he should take

13   a lie detector test or not.

14       Q    Well, did you ask whether he was

15   personal friends with Russ?

16       A    No.

17       Q    Did you ask why not call a lawyer

18   instead?

19       A    I had no idea why he wanted to call

20   Russ, and it didn't matter to me who he wanted to

21   call.

22           If he wanted to call someone, he was

23   going to call them.

24       Q    Officer, isn't it correct that the

165

1    defendant was arrested at his house?

2         A    No, it is not, ma'am.

3         Q    Isn't it correct that his mother, in

4    fact, fought you and the other Chicago police

5    officers, asking why you were handcuffing her boy?

6         A    No, ma'am.

7         Q    Isn't it correct in fact that you pushed

8    past his mother and his sister into the living

9    room during the altercation with the defendant?

10        A    No, ma'am.

11        Q    Isn't it correct that in fact, during

12   this altercation, that you and other members, you

13   and other members of the Chicago Police

14   Department, in an effort to handcuff him, swore at

15   him and in fact engaged in a physical struggle?

16        A    No, ma'am.

17        MS. PLACEK:  May I have a moment, Judge?

18        THE COURT:  Surely.

19                  (After a short period of time)

20        MS. PLACEK:  Q   By the way, you never

21   interviewed the defendant, did you?

22        A    Yes, I did.

23        Q    Who are Baker and Sorany (phonetics)?

24        A    They are detectives in Area 2.


                              166

1  Q Showing you what would be marked as

2 Defendant's Exhibit No. 11, I believe you

3 previously identified this as your report,

4 correct?

5  A That's only page 2.

6   No, this is not my report.

7  Q Well, doesn't it in fact state that the

8 defendant was interviewed by Detectives Sorany,

9 and Baker, after first being advised of his

10 rights?

11  A It says that.

12  MS. PLACEK: That's all.

13  THE COURT:  Redirect?

14

15    REDIRECT EXAMINATION

16      BY

17     MS. MALLO:

18  Q You testified that the victim was

19 staying with a Carolyn McCoy?

20  A Yes.

21  Q Where was Carolyn's home from the body,

22 where the victim was found?

23  MS. PLACEK:  Objection.

24  MR. RONKOWSKI:  Probable cause, the

167

1    proximity of the location to where the body was

2    found.

3          MS. PLACEK:   Improper redirect.

4          THE COURT:   It was brought up.

5                We went over this in direct examination,

6    did we not?

7                I will let you answer the question.   But

8    we can be here all night answering redirect

9    questions.

10               I understand the direct testimony.   The

11   objection is overruled.

12         THE WITNESS:   A   The body was located

13   next door to where Jerome Hendricks lived.

14         MS. MALLO:   Q   And had the victim been dead

15   for a while?

16         A   Yes.

17         MS. PLACEK:   Objection.

18         THE COURT:   Sustained.

19         MS. MALLO:   And Detective, was the family

20   altercation you spoke of because the victim was

21   seeing the defendant?

22         MS. PLACEK:   Objection.

23               He said he didn't know what it was

24   about.

168

1      THE COURT:  Sustained.

2      MS. MALLO:  Q   And, Detective, you testified

3  on cross examination that the defendant made two

4  phone calls?

5      A   That is correct, at the Area.

6      Q   And after he made those phone calls, did

7  he then tell you that he wished to take a

8  polygraph test?

9      A   Yes, he did.

10     MS. PLACEK:  Objection, irrelevant, Judge.

11     MR. RONKOWSKI:  Goes toward his consent to be

12  there.

13     MS. PLACEK:  Judge --

14     THE COURT:  No, that is precisely what the

15  cases hold.

16       The objection is overruled nonetheless.

17  But the fact that he agreed to take the polygraph

18  does not relate back and make what was otherwise

19  an illegal arrest legal, or anything that flowed.

20       In other words, it doesn't attenuate

21  the taint.

22       As a matter of fact, the cases hold in

23  People versus Franklin, in Illinois, hold that the

24  agreement to take the polygraph is a part of the

1    taint, as opposed to attenuating.    It flows

2    naturally from the taint of the illegal arrest.

3    So says Franklin.

4              But I will let you answer the question.

5    Let him answer the question for whatever it is

6    worth.

7         THE WITNESS:    A    He said he wanted to take

8    the polygraph exam to clear his name so he could

9    tell the people in the neighborhood that he did

10   not have anything to do with this crime.

11        MS. MALLO:    Nothing further.

12        THE COURT:    Recross?

13        MS. PLACEK:    Not a thing, Judge.

14                   (Witness excused)

15        THE COURT:    Ladies and gentlemen, I am going

16   to continue this matter for another date.

17              Can you agree on a date?

18        MR. RONKOWSKI:    I can agree on any day that

19   Counsel wants to come back to this courtroom.

20              I will check with the witnesses before

21   they leave to make sure they can be back here.

22        MS. PLACEK:    March the 7th?

23        THE COURT:    March the 7th?

24        MS. PLACEK:    Yes.

170

1          Is that okay?

2      MR. RONKOWSKI:  March the 7th is fine.

3      THE COURT:  Order the Court, March the 7th,

4  with subpoenas.

5          (Thereupon, said cause was continued

6      to Wednesday, March 7, 1990, at 9:30

7      o'clock a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1  STATE OF ILLINOIS    )
                        )   SS:
2  COUNTY OF C O O K    )

3      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT-CRIMINAL DIVISION

4

5  THE PEOPLE OF THE        )
   STATE OF ILLINOIS        )
6                           )
        -vs-                )      No.  88 CR 12517
7                           )
   JEROME HENDRICKS         )

8

9          REPORT OF PROCEEDINGS had of the hearing

10  of the above-entitled cause, before the Honorable

11  LEO E. HOLT, Judge of said court, on the 7th day

12  of March, A. D. 1990.

13      APPEARANCES:

14          HON. CECIL A. PARTEE,
               State's Attorney of Cook County, by:
15          MR. EDWARD RONKOWSKI,
               Assistant State's Attorney,
16
            appeared on behalf of the People;
17
            HON. RANDOLPH N. STONE,
18             Public Defender of Cook County, by:
            MR. VINCENT LUFRANO,
19             Assistant Public Defender,

20          appeared on behalf of the Defendant.

21

22

23

24

mbg     1

1        THE CLERK:  Sheet 1, Line 21, Jerome Hendricks

2   in custody.

3        MR. RONKOWSKI:  Your Honor, I had two phone

4   conversations with Marijane Placek, the attorney

5   representing Jerome Hendricks.  She got tied up on

6   a hearing that she thought she could finish this

7   morning.  She hadn't even started when I talked

8   to her at lunch time.

9            She's requesting a Motion Defendant to

10  3-13-90, for one o'clock in the afternoon.

11       THE COURT:  Do you understand, Mr. Hendricks?

12       DEFENDANT HENDRICKS:  Yes, sir.

13       THE COURT:  Motion Defendant March 13, one p.m.

14

15                          (Whereupon the matter was

16                           continued to March 13,

17                           1990, at 1:00 p.m.)

18

19

20

21

22

23

24

2                        173

1  STATE OF ILLINOIS )
                     )   SS:
2  COUNTY OF C O O K )

3

4          IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION

5

6  THE PEOPLE OF THE      )
   STATE OF ILLINOIS      )
                          )   NO. 88 CR 12517
7      VERSUS             )
                          )   CHARGE:  Murder
8  JEROME HENDRICKS       )

9              REPORT OF PROCEEDINGS

10         BE IT REMEMBERED that on the 13th day of

11  March, A. D., 1990, this cause came on before the

12  Honorable LEO HOLT, Judge of said Court, upon the

13  Information herein, the defendant having entered a plea

14  of not guilty.

15      APPEARANCES:

16          HON. CECIL PARTEE,
                State's Attorney of Cook County, by
17          MS. MARY MALLO,
                Assistant State's Attorney,
18              appeared on behalf of the People;

19          MR. VINCENT LUFRANO,
                Assistant Public Defender,
20              appeared on behalf of the Defendant.

21  Reported by:

22  MS. BETTE N. SACKS, C. S. R.
    Certified Shorthand Reporter,
23  Circuit Court of Cook County.

24
                        174

1      THE CLERK:  Jerome Hendricks, in custody.

2      THE COURT:  Good morning, Mr. Hendricks.

3      MR. HENDRICKS:  Morning.

4      THE COURT:  The Court is on trial, Mr. Hendricks,

5  with a jury, and will not be able to proceed further with

6  your motions today.

7      MR. HENDRICKS:  Yes, sir.

8      THE COURT:  Your attorney has called the court, and

9  has been advised of that, and I think has agreed to a

10  date where we can go back to the hearing in your case.

11      MR. HENDRICKS:  Okay.

12      THE COURT:  What date was agreed on?

13      MS. MALLO:  March 29, Judge.

14      THE COURT:  By agreement.  Mr. Lufrano is here on

15  this case.

16      By agreement March 29.  See you then, Mr.

17  Hendricks.

18                (Thereupon said cause was continued

19                to Marcy 29, 1990, at 9:30 o'clock a.m.)

20

21

22

23

24

175

1    STATE OF ILLINOIS    )
                          )  SS:
2    COUNTY OF C O O K    )

3

4            IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION

5

     THE PEOPLE OF THE        )
6    STATE OF ILLINOIS        )   NO.88 CR 12517
                              )
7        VERSUS               )   CHARGE:  Murder, Agg.
                              )   Crim. Conc. Hom. Death,
8    JEROME HENDRICKS         )   Agg. Kid., Unl. Rest.

9

10     MOTION TO QUASH ARREST AND SUPPRESS STATEMENTS

11           BE IT REMEMBERED that on Thursday,

12   March the 29th, A.D. 1990, this cause came on for

13   hearing before the Honorable LEO HOLT, Judge

14   of said Court.

15

16       APPEARANCES:

17           HON. CECIL PARTEE,
                 State's Attorney of Cook County, by
18           MR. EDWARD RONKOWSKI, MS. MARY MALLO,
                 Assistant State's Attorneys
19               appeared for the People;

20           MR. RANDOLPH STONE,
                 Public Defender of Cook County, by
21           MS. MARIJANE PLACEK, MS.PATRICIA COURSON
                 Assistant Public Defenders
22               appeared for the Defendant.

23   ROBERT LIEF,  C.S.R.,
     Official Court Reporter
     Markham, IL   60426
24

                        176

     1



1       THE CLERK:  Sheet 2, Line 18, Jerome

2   Hendricks, in custody.

3       MS. PLACEK:  Good afternoon. your Honor.

4           I'm sorry I was a little late this

5   morning.

6       THE COURT: That's all right.

7       MR. RONKOWSKI:  Can I get my file?

8       MS. PLACEK:  Your Honor, for the purpose of

9   the record, Marijane, M-a-r-i-j-a-n-e, Placek,

10  P-l-a-c-e-k, representing the defendant, Mr.

11  Hendricks, who is now standing before the Court.

12          To refresh your Honor's memory, on an

13  earlier court date, evidence was taken, in fact

14  taken on a Motion to Quash Arrest.

15          I believe we are in the middle of that

16  motion, the State's side.

17      THE COURT: Right.

18          We will see where we are going when Mr.

19  Ronkowski returns to the courtroom, which is

20  momentary.

21          Are you both ready?

22      MR. RONKOWSKI: The State is.

23      MS. PLACEK:  Yes, Judge.  I am also.

24      THE COURT:  You and Mr. Hendricks may be

177

3

1    seated at Counsel table while I see if I can

2    locate my notes.

3         MS. PLACEK:  Judge, I'm getting my briefcase

4    out of the conference room.

5         MR. RONKOWSKI:  The last witness that

6    testified was Larry Nitsche.

7         THE COURT: What date?

8         MR. RONKOWSKI:  February 27th.

9         THE CLERK:  Yes, Judge, it was February 27th.

10        THE COURT:  What was the name of your last

11   witness?

12        MR. RONKOWSKI:  Larry Nitsche.

13             He testified February 27th.

14        MS. PLACEK:  I also would be ordering a

15   transcript of the proceedings, if the Court has no

16   objection I would --

17        THE COURT:  I'm just trying to find out where

18   we are standing.

19        MS. PLACEK:  I understand.

20             Your Honor, for the purposes of the

21   record, if I may interrupt the Court, this is Miss

22   Pat Courson.

23             She is going to help me.  She is a

24   licensed attorney to practice law in the State of

4                        178

1    Illinois.  She is going to be helping me today

2    because I understand that Mr. Lufrano has a motion

3    himself today.

4          THE COURT: So you are new Counsel today.

5          MS. PLACEK: Thank you, your Honor.

6          THE COURT:  In whose court is the ball?

7          MS. PLACEK:  I believe it's the State's.

8          MR. RONKOWSKI:  I am ready to call two more

9    witnesses today.

10          THE COURT: Call your next.

11          MR. RONKOWSKI:  The State would call Jim

12   Hill.

13                     (Witness sworn)

14          MS. PLACEK:  If it pleases the Court, Judge,

15   Mr. Ronkowski, I believe is anticipating the

16   objection.

17               The gentleman who is about to testify

18   is, of course, a civilian.  Although, since we are

19   the movant, it would be our position at this

20   particular time that according to Illinois law the

21   relevant testimony goes, in fact, as is to what is

22   in the mind of the police at the time,  and I

23   believe that this is the issue that is outlined in

24   our motion.

5

179

1          We would ask, as an offer of proof, that

2     Mr. Ronkowski tell this Court how, in fact, this

3     gentleman's testimony goes relevantly at what is

4     in the mind of the Chicago Police Department when,

5     in fact, they arrested, at his house, my client.

6          THE COURT: Mr. Ronkowski.

7          MR. RONKOWSKI:  The defendant testified that

8     he was dragged out of his house in handcuffs.

9          Here is a witness that was part of the

10    crowd that observed the defendant walk to the

11    squad car without handcuffs, and can describe what

12    was happening at the scene when the defendant

13    requested from the police transportation from the

14    crowd that was outside of his house.

15         MS. PLACEK:  Well. Judge, if it pleases the

16    Court, I believe that the officer testified that

17    the conversation that the police allegedly stated

18    is that the request for transportation took place

19    inside the house.

20         Is Mr. Ronkowski now claiming that this

21    gentleman was, in fact, in the house?

22         And, secondly, Judge, if that's true, I

23    would suggest that the fact the police described

24    it not as a crowd but as a mob who was not only

6                          180

1   attacking the defendant, but as a crowd, this

2   gentleman who is testifying might, in fact, be

3   putting himself in jeopardy of incriminating

4   himself as to mob violence.

5        THE COURT: That's the witness' objection; not

6   yours.

7        MS. PLACEK:  I understand, Judge.

8        THE COURT:  I'm going to hear the testimony

9   of the witness.

10            If it turns out that it's not relevant,

11   I will entertain your motion to strike it.

12        MS. PLACEK:  Thank you.

13        THE COURT:  But until I hear it, it's rather

14   difficult for me to know whether it's going to be

15   relevant or not.

16            You may proceed.

17        MR. RONKOWSKI:  Has the witness been sworn?

18        THE CLERK:  Yes.

19        MR. RONKOWSKI:  Thank you.

20

21

22

23

24

7

1              JAMES CHRISTOPHER HILL,

2     a witness called by the Respondent on the Motion

3     to Quash Arrest, having been first duly sworn, was

4     examined and testified as follows:

5                    DIRECT EXAMINATION

6                           BY

7                    MR. RONKOWSKI:

8          Q     State your name, please.

9          A     James Christopher Hill.

10         Q     And spell your last name for the court

11    reporter.

12         A     H-i-l-l.

13         Q     And how old are you?

14         A     I'm 25 years of age.

15         Q     Where do you live, sir?

16         A     I live at 10530 South State.

17         Q     Now, referring your attention to August

18    8th, 1988, shortly after 8:30 p.m., do you recall

19    where you were at?

20         A     Shortly after 8:30?

21               I was -- We -- I was on my way over to

22    Mr. Hendricks' house because we had word --

23         MS. PLACEK:  Objection.

24         THE COURT:  The objection is sustained as to

8                        132

1   why.

2       MR. RONKOWSKI: Q    And did you arrive in the

3   vicinity of Mr. Hendricks' house?

4       THE WITNESS:  A    Yes, I did.

5       Q    Is that the defendant who is seated in

6   the courtroom?

7       A    Yes, it is.

8       Q    And did you arrive at that location with

9   anybody?

10       A    Just myself and an uncle of mine.

11       Q    What happened after you got there?

12       A    We got there in pretty much of an

13   uproar, there was a lot of guys --

14       MS. PLACEK:  Objection to uproar, Judge.

15       THE COURT:  Objection sustained.

16       THE WITNESS:  A    A lot of people gathered

17   around.

18       MR. RONKOWSKI: Q    And how many people were

19   gathering around outside of the defendant's house?

20       A    Had to be about two or three dozen, 25,

21   30 people.

22       Q    And after that crowd gathered around,

23   did any police arrive?

24       A    Yes, they did.

9          183

1      Q      Could you describe to the Court what you

2  observed after the police arrived?

3      A      When the police arrived, they came

4  through the crowd, proceeding to Mr. Hendricks'

5  home.

6             They got up to the door, there was a

7  lady that opened the door, and Mr. Hendricks was

8  coming out.

9             He came out into the police --  He

10  walked into the police, and they walked --

11  escorted him right to the car, to the police car.

12      Q      Did the defendant have any handcuffs on

13  at that time?

14      A      No, he did not.

15      Q      Did he have anything else in his hands?

16      A      Yes, he was smoking a cigarette.

17      Q      When you saw the defendant smoking a

18  cigarette, what did you do?

19      A      I was more or less upset because he --

20      MS. PLACEK:   Objection.

21      THE WITNESS:   A   In my opinion, he was --

22      MS. PLACEK:   Objection.

23      THE COURT:   The objection is sustained.

24      MR. RONKOWSKI: Q   Were you related to the

10                    184

1   victim in this case?

2       THE WITNESS:   A   Yes, I was.

3       Q    What's your relationship with the

4   victim?

5       A    She was my cousin.

6       Q    Where were you standing when the

7   defendant walked past you, smoking a cigarette?

8       A    I was standing on the inside of his

9   front lawn.

10      Q    Did you do anything as the defendant

11  walked past you?

12      A    Yes.

13           I had a board in my hand. I proceeded to

14  hit him.

15      Q    What happened?

16      A    Well, the policeman restrained me and

17  gave me a verbal warning.

18           And I stood back and watched him get in

19  the car.   Untouched, or anything else.

20      Q    And you remember what position in the

21  vehicle the defendant got in the car?

22      A    Yes, he got in the back seat.

23      Q    Was he alone?

24      A    Yes, he was.

**135**

11

1      Q    Okay.  And did some detectives sit in

2  the front seat?

3      A    Yes.

4      Q    Where did they go?

5      A    They left.

6      Q    Okay, were there other police officers

7  there besides those two?

8      A    Yes, it was.

9      Q    Approximately how many?

10     A    About four or five.

11     Q    Now, that crowd of two to three dozen

12  you described, was that crowd noisy?

13     A    Yeah, pretty much.  Pretty much noisy.

14  Everyone was more or less relieved that --

15     MS. PLACEK:  Objection.

16     THE COURT:  Objection sustained.

17     MR. RONKOWSKI:  Your witness.

18

19             CROSS EXAMINATION

20                 BY

21             MS. PLACEK:

22     Q    Mr. Hill, when were you contacted that

23  you testify in this motion?

24     A    I received a letter last week sometime.

12             **136**

1      Q    Sir, when you say you received a letter,

2  did you receive a letter from the police

3  department or the State's Attorney's office?

4      A    The State's Attorney's office.

5      Q    And you were never contacted to testify

6  in this motion before that time; correct?

7      A    No.

8      I received a letter, year, one before

9  that.

10     Q    Well, let me ask you this:  Where are

11  those letters today?

12     A    I have one now with me.

13     Q    Is that the one you received after

14  February 27th, 1990?

15     A    Yes.

16     Q    Thank you.

17     Let's also talk a little about your

18  assault of my client.

19     You hit him with a stick, according to

20  your testimony today; correct?

21     A    No, ma'am, I did not hit him with a

22  stick.

23     Q    You tried to hit him with a stick;

24  correct?

1      A    Yes, ma'am.

2      Q    And you know that's against the law,

3  didn't you?

4      A    Yes, ma'am.

5      Q    And you were ready to violate the law;

6  correct?

7      A    Yes, ma'am.

8      Q    And the police saw you violate the law;

9  correct?

10     A    Yes, ma'am.

11     Q    And you made yourself known to the

12  police at that time and date, didn't you?

13     A    Yes, ma'am.

14     Q    You told them your name, correct?

15     A    Pardon me?

16     Q    You told them your name?

17     A    At the time he was going to get hit with

18  the stick?

19     Q    That's right.

20     A    No, no.

21     Q    So in other words, when was the first

22  time you told anyone that on that date and time

23  that you tried to hit the defendant with a stick?

24     A    I'd say about last month.

14           188

1          Q      Last month?

2                 And who did you tell?

3          A      I told the State's Attorney.

4          Q      The State's Attorney, or the young lady

5    sitting with him?

6          A      The State's Attorney.

7          Q      This State's Attorney --  And were there

8    Chicago Police Officers there at the time when you

9    were having this conversation?

10         A      Yes, there were.

11         Q      And as a matter of fact you had heard

12   already that this defendant had testified that

13   there was no mob in front of his house; correct?

14         A      No, ma'am.

15         Q      Well, let's talk a little further.

16                When did you have this conversation with

17   Mr. Ronkowski?

18         A      It was during the first summons that I

19   had.

20         Q      The first --

21         A      The first court summons that I had, when

22   I came in.  It was last month.

23         Q      Last month?

24         A      Yes.

15                              189

1       Q     When, last month?

2       A     I think it was on the 27th. I'm not

3 sure.

4       Q     The 27th of February?

5       A     Right.

6       Q     When did you have the conversation with

7 Mr. Ronkowski?  What time?

8       A     I can't recall.

9       Q     Where was the conversation with Mr.

10 Ronkowski?

11      A     It was here.

12      Q     By the way, those police officers that

13 you were --  You saw police officers here when you

14 had that conversation with Mr. Ronkowski;

15 correct?

16      A     Uh-huh.

17      Q     Does "uh-huh" mean "yes"?

18      A     Yes, ma'am.

19      Q     Thank you.

20            Let me ask you also this:

21            Can you name any of those police

22 officers?

23      A     No, I cannot.

24      Q     Was one of them a Detective Malla?

16

1      A    No.  I can't name whoever those --

2      Q    Were they white or black?

3      A    They were white.

4      Q    Let me ask you this:

5           When you were attempting to hit my

6  client with a stick --  You are familiar with a

7  gentleman from TV called Russ Ewing;  correct?

8      A    Yes, ma'am.

9      Q    Did you see Russ Ewing present at that

10  time?

11     A    No, I can't recall now.

12     Q    Did you see anyone filming this

13  incident, sir, if you can recall?

14     A    No, ma'am, I can't recall.

15     Q    When you say you can't recall, does that

16  mean you don't know?

17          You didn't see it, or your memory is

18  exhausted?

19     A    I wasn't paying attention.

20     MR. RONKOWSKI:  Objection.  Compound

21  question.

22     THE COURT:  Objection overruled.

23     MS. PLACEK:  Q   Beg pardon?

24     THE WITNESS:  A   I wasn't paying any

17                    191

1    attention for any newspaper reporters or cameramen

2    there.

3        Q    Thank you.

4            By the way, it is your testimony today

5    that the door was not open, that someone opened

6    the door, a female;  correct?

7        A    Of his household.  Someone from his

8    household opened the door.

9        Q    And you saw, as soon as --  According to

10   what you are saying today, as soon as the female

11   of the household opened the door, you are --

12   according to your testimony --  the police didn't

13   even bother entering the house, that my client, Mr.

14   Hendricks, came right out of the house; correct?

15       A    Yes, ma'am.

16       Q    And not only that, but the police didn't

17   even bother coming in, but there was no one --

18   Well, may I withdraw and rephrase?

19           They went straight into the squad car;

20   correct?

21       A    Yes, ma'am.

22       Q    Thank you.

23           By the way, you stated that it was your

24   cousin who is the victim of this crime, correct?

18

1      A      Correct, ma'am.

2      Q      And you want to avenge your cousin,

3  don't you?

4      A      I want to see justice, ma'am.  Vengence

5  is not the point.

6      Q      Well, let's talk about that for a

7  second.

8             When you say you want to see justice,

9  name someone else besides a member of your family

10  who was a part of that alleged mob?

11      A      Larry Smith.

12      Q      And where does Larry Smith live?

13      A      11720 South Princeton.

14      Q      Thank you, sir.

15             When you first arrived, was the police

16  officers there?

17      A      No, they were not.

18      Q      Was there anybody preventing you from

19  going or knocking on the door of the house?

20      A      No, there wasn't.

21      Q      Were you throwing stones --  Were you

22  personally throwing stones at the house?

23      A      No, ma'am.

24      Q      Were you shouting when you first

19                    193

1    arrived?

2         A    No, ma'am.

3         Q    Did you ring the door bell and say:

4    Come on out, Jerome Hendricks, you killed my

5    cousin?

6         A    No, ma'am.

7         Q    So according to your testimony, as it is

8    today, you didn't start your action of trying to

9    assault my client until the police came; correct?

10   And brought him out of the --   Or rather, he came

11   out of the house;  correct?

12        A    Yes, ma'am.

13        Q    Where did you get the stick?

14        A    I don't know.  Maybe I picked it up on

15   the side, whatever.

16        Q    When you picked it up --  What kind of

17   stick was it?

18        A    It was a board.

19        Q    Where did you get the board?

20        A    I don't remember.

21        Q    How long of a board?

22        A    About seven inch board.

23        Q    Seven inches thick, seven inches long,

24   seven inches wide?

1       A    Seven inches long.

2       Q    Did you hold on to that board even after

3  the police drove away?

4       A    No, ma'am.

5       Q    Thank you.

6            You said you saw Mr. Hendricks come out

7  smoking a cigarette?

8       A    Correct.

9       Q    And when you say you saw him coming out

10  smoking a cigarette, I believe you also stated

11  that he did not have handcuffs on, is that

12  correct?

13      A    Correct.

14      Q    Well, let me ask you this, sir:

15           Where were the police officers in

16  relationship to Mr. Hendricks when he came out of

17  the house?

18      A    Pardon?

19      Q    Where were the police officers in

20  relationship to Mr. Hendricks, when he came out of

21  the house?

22      A    The police officers, they was in the

23  walkway.

24      Q    So they never even came out on the

1   porch?

2       A    Yeah, that was about two, three

3   scattered on the porch.

4       Q    But they never really completed being on

5   the porch; correct?

6       A    No -- correct.

7       Q    Thank you.

8       MS. PLACEK:  Thank you, your Honor.  That's

9   all.

10

11               REDIRECT EXAMINATION

12                      BY

13               MR. RONKOWSKI:

14       Q    Why did you swing this object at the

15   defendant?

16       MS. PLACEK:  Objection.

17       THE COURT:  The objection is sustained.

18       MR. RONKOWSKI:  Nothing further.

19

20                  EXAMINATION

21                      BY

22                  THE COURT:

23       Q    Mr. Hill, other than the members of your

24   family and Mr. Larry Smith, who else was a member

22                    196

1    of the mob that you say was outside the

2    defendant's home?

3         A    The majority of the neighborhood was

4    there.

5              The names --

6         Q    Do you know any of them?  Did you

7    recognize any of them?

8         A    Yes, I did.  But the names, as far as

9    first name and last name, I can't recall.

10             Everybody over there have nicknames.

11        Q    Well, do you know any of the nicknames

12   of any of the persons that were there?

13        A    Yes.

14             There was a young lady called Paulette.

15        Q    Where does Paulette live?

16        A    I don't know the precise address.

17        Q    In what vicinity?

18        A    She stays on the other side of 117th,

19   but it was on 117th.

20        Q    When you say the other side, be more

21   specific.

22        A    Say across the street, two doors --

23   two doors over and a street over from Jerome.  I

24   don't know the precise address.

1      Q    Can you be more specific than across the

2  street and two doors over?

3      A    It was on the southwest corner.

4      Q    Of what?

5      A    Of 117th.

6      Q    And what?

7      A    And Princeton.

8      Q    How long have you known her?

9      A    Not too long.

10     Q    How long is that?

11     A    About two years, one year.

12     Q    Do you know the house in which she lives

13  in?

14     A    Yes, I do.

15     Q    Have you ever been asked by anyone at

16  all to identify some of the other persons, or

17  locate some of the other persons that you say was

18  present at that time?

19     A    No.

20     Q    Where were you standing when you say the

21  defendant exited his house?

22     A    I was standing inside his gate.

23     Q    How far away from the door or the

24  entrance to his home?

24                   198

1        A    About 10 feet.

2        Q    You had a clear and unobstructed view of

3   his doorway, I take it?

4        A    Yes, sir.

5        Q    Who else did you see in the defendant's

6   home or exiting his home at that time?

7        A    No one but the defendant, your Honor.   I

8   seen him exiting by himself.

9             I seen the young lady open the door.

10       Q    Where were the police at that time?

11       A    They were standing right there, at the

12  door.

13       Q    Right where?

14       A    Right at the door.

15            As soon as you walk to the entrance,

16  it's like --

17       Q    He walked right out of the door into the

18  arms of the police; is that right?

19       A    Yes, sir.

20       Q    What did the police do when that

21  occurred?

22       A    Well, they just turned, walked with him

23  to the police car.

24            He exited --  When he came out, there

25

1   was a few words said that I couldn't hear.

2            When he came out, they turned and walked

3   to the car.

4        THE COURT:  Mr. Ronkowski, do you have

5   anything in relationship to what I have just asked

6   him?

7        MR. RONKOWSKI:  No.

8        THE COURT:  Ms. Placek?

9        MS. PLACEK:  No, your Honor.

10           Thank you.

11       THE COURT:  You may step down, Mr. Hill.

12           You may also remain in the courtroom if

13  you desire.

14                (Witness excused)

15           Call your next witness.

16       MS. MALLO:  Your Honor, at this time the

17  People would call Detective Mike Baker.

18       THE CLEKR:  Raise your right hand, sir.

19                (Witness sworn)

20       THE COURT:  You may proceed.

21       MS. MALLO:  Thank you, Judge.

22

23

24

26                    230

1

2                    DET. MICHAEL BAKER,

3    a witness called by the Respondent, the People of

4    the State of Illinois herein, having been first

5    duly sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7                            BY

8                    MS. MALLO:

9         Q    Detective, could you state your name and

10   spell your last name?

11        A    Detective Michael Baker, B-a-k-e-r, star

12   number 10414, City of Chicago Police Department,

13   Area 2, Violent Crimes Unit.

14        Q    And, Detective, on the 8th of August,

15   1988, you were then working as a detective in Area

16   2, Violent Crimes?

17        A    Yes, I was.

18        Q    At about 8:30 in the evening of August

19   8th, 1988, were you at Area 2?

20        A    Yes, I was.

21        Q    About 8:30, what happened?

22        A    There was a phone call came into the

23   office.  It was taken by Detective Nitsche.

24             It was a call from Jerome Hendricks --

27

1          MS. PLACEK:   Objection as to the content of

2     the conversation.

3          THE COURT:   Overruled.

4          MS. PLACEK:   (Continuing) -- of the

5     conversation, without foundation.

6          THE COURT:   Well, you can lay a better

7     foundation.

8          MS. MALLO:   Q   Yes, sir.

9               This was at Area 2, about 8:30 in the

10    evening on August 8th, 1988?

11         THE WITNESS:   A   Yes, it was.

12         Q    Do you recall what room you were in?

13         A    I was in our office;  no particular

14    room, just the office.

15         Q    And you were present, and Detective

16    Nitsche was present?

17         A    Yes, I was.

18         Q    And anyone else?

19         A    There was a lot of detectives in the

20    room.  I don't remember all of them.

21         Q    When Detective Nitsche answered the

22    phone --  He answered the phone?

23         A    Yes, he did.

24         Q    And did he --  What happened then?

1     A    He talked on the phone for a few

2  minutes, hung the phone up, and then I had a brief

3  conversation with him.

4     Q    What did he say to you?

5     A    He said that that was Jerome Hendricks,

6  and that he was home, wanted to talk to us.

7     Q    So after you received that phone call at

8  Area 2 Headquarters, what did you then do?

9     A    I went over to 255 West 117th Street, to

10  Jerome Hendricks' house.

11     Q    Once you arrived at that address,

12  Detective Baker, what happened next?

13     A    When I got there, there was a large

14  crowd there.

15     And I stayed out front, in front of the

16  house there.

17     Detective Nitsche walked up to the

18  house.  There was a woman in the doorway who

19  opened the door, and he went in and came back out

20  about 20 seconds with Jerome Hendricks walking

21  behind him.

22     Q    And when Jerome Hendricks walked from

23  that house, what happened then?

24     A    He was walking to the squad car with

29                             203

1    Detective Nitsche, and there was a large crowd had

2    gathered around, and someone in the crowd swung a

3    stick at him,  and he hurried over and got in the

4    back seat of Detective Nitsche's squad car.

5         Q    When you say he, you're referring to the

6    defendant, Jerome Hendricks?

7         A    Jerome Hendricks.

8         Q    Detective Baker, do you see Jerome

9    Hendricks in court today?

10        A    That gentleman on the end.

11        MS. PLACEK:   I would stipulate to the

12   identification of the defendant.

13        MS. MALLO:   Q   Your Honor, we would accept

14   that stipulation as the in-court identification of

15   the defendant.

16             After Hendricks got into the squad, then

17   what happened?

18        THE WITNESS:   A   He was transported into

19   Area 2.

20        Q    After he got to Area 2, what happened?

21        A    He was interviewed by Detective Nitsche

22   at that time.

23        Q    And you remained at Area 2 also?

24        A    Yes, I did.

30                     294

1        Q      After you arrived at Area 2 --

2               First of all, Detective, when you

3    arrived at Area 2, Detective Nitsche had

4    transported the defendant?

5        A      Yes, he did.

6        Q      And you arrived in another car?

7        A      Yes, I did.

8        Q      And when you got there, you stated that

9    Detective Nitsche had a conversation with the

10   defendant?

11       A      Yes, he did.

12       Q      And after that conversation what did you

13   do?

14       A      Well, after the conversation, Detective

15   Nitsche allowed him to use the phone, make several

16   phone calls.

17              Then after he was almost done with the

18   phone calls, I had a conversation with Detective

19   Nitsche and he told me that Jerome wished to stay

20   and help clear his name in this incident there,

21   and he wished to go to 11th and State to be

22   interviewed to further clear his name.

23       Q      Now, did you have anything to do with

24   transporting the defendant to 11th and State?

31                    205

1       A       Myself and my partner, Detective Rowan,

2   transported Jerome to 11th and State at that

3   time.

4       Q       What time did you arrive at 11th and

5   State?

6       A       I believe it was somewhere between 9:00

7   and 9:30.

8       Q       And when you -- Then once you got to

9   11th and State, did you then return to Area 2?

10      A       We stayed at 11th and State

11  approximately two hours or so.

12              Then we returned to Area 2, Violent

13  Crimes, about 1:00 a.m.

14      Q       And when you got back to Area 2, then

15  what occurred?

16      A       We had an interview -- We interviewed

17  Jerome Hendricks, myself and Detective Rowan.

18      Q       And at that interview -- Well, before

19  you ever spoke to him, was the defendant advised

20  of his rights per Miranda?

21      A       Before he was interviewed, I advised him

22  of his Rights from my FOP book.   And Detective

23  Rowan was present at that time.

24              He related he understood them, and he

32                      296

1    related --

2            We asked him about the missing girl, and

3    he told us he wished to help us clear up the

4    situation there and then.

5            He gave us his story concerning what he

6    knew about the incident.

7        Q    And at that time did he offer --  By he,

8    I mean the defendant, Jerome Hendricks.

9            Did he offer any information about his

10   whereabouts on the date the girl had been reported

11   missing?

12       MS. PLACEK:  Objection to the relevancy, as

13   to the motion to quash here.

14       THE COURT:  What is the relevancy?

15       MS. MALLO: Well, Judge, I was inquiring of

16   the defendant as to alibis.

17           I'm inquiring of the detective as to

18   alibis the defendant gave to the detectives, and

19   what the course of the investigation took after

20   that time.

21       THE COURT:  How is that relevant?

22           You know, what's raised here is the

23   question of the violation of the defendant's 4th

24   and 14th Amendment Rights, not 5th and 6th.


    33                    27

1     MS. MALLO:  Yes, sir.

2     THE COURT:  I don't understand how that's

3 relevant.

4     MR. RONKOWSKI:  According to the State's

5 theory of the case --

6       If I can interrupt --  and according to

7 the police reports, the defendant wasn't arrested

8 until the next day.

9       The defendant's statements to the police

10 prior to his arrest is admissible to show probable

11 cause.

12       It's also admissible to show why this

13 detective interviewed people and was not able to

14 verify what the defendant was claiming.

15     MS. PLACEK:  Well, besides --  excuse me --

16 the State's Attorney testifying as to that at this

17 matter, Judge, the suggestion  --

18       First of all if we are going to go into

19 what the detective is going to testify, I would

20 ask that he be removed from the room during this

21 argument.

22       But I would suggest that the relevancy,

23 even though what they have stated, is an incorrect

24 relevancy as to the points set out in the motion,

34

1  Judge.

2         As the Court correctly pointed out, we

3  are not dealing with what this information

4  supposedly at 11:00 o'clock in the morning showed.

5         I believe that what the State has to

6  show is when the actual arrest took place, and

7  what was the probable cause arising to it;  not

8  whether or not the defendant gave any kind of

9  exculpatory statements at that time, Judge.

10        THE COURT:  Exculpatory or inculpatory

11  statements, it does not appear to me to be

12  relevant to the motion at this point.

13        And let me suggest to you, Mr.

14  Ronkowski, that the evidence that I have heard, it

15  appears to me that one of two things is the end

16  result of the situation:  either the defendant was

17  or was not in the police station pursuant to a

18  valid arrest or a Constitutionally valid arrest,

19  or he was not.

20        If he was, then all that flowed from his

21  legally Constitutional arrest is admissible

22  against him.

23        It is uncontested insofar as the 5th

24  Amendment is concerned, that is Miranda, and

35

1    whether or not he made the statements.    The only

2    issue is whether or not he was there legally.

3            And we have him there about 8:30 or

4    shortly thereafter.

5            What happened later on, I don't see how

6    it is relevant.

7        MR. RONKOWSKI:  If the defendant is there

8    with his consent, voluntarily, due to sources

9    outside the police power, as has been testified to

10    as far --

11        THE COURT:  And he makes a statement, that

12    statement is admissible against him.

13            So again I am concerned with the

14    Constitutionality of his presence in the police

15    station.  And that's what I think the Defense is

16    raising here.

17            And you know, if we can center in on

18    that as opposed to what the defendant said -- I'm

19    not concerned with what he said, whether it

20    inculpated him or not or exculpated him, or gave

21    the police probable cause for the subsequent

22    arrest of him.

23            The question is, was he validly there?

24            Do you concur with me?  You look like if

36                    210

1    you disagree.

2           MR. RONKOWSKI:  That's one of the issues.

3           THE COURT:  That's the only issue.

4           MR. RONKOWSKI:  No, it isn't.

5               And we are entitled to make our own

6    record.

7           THE COURT:  Please tell me what the other

8    issue is.

9           MR. RONKOWSKI: Okay. I will repeat myself.

10              The defendant is down there consentually

11   because this crowd outside of his house is

12   accusing him of the crime.

13              While he is down there, he makes various

14   statements to the police, some of which are not

15   true.

16              Furthermore, he makes various admissions

17   to the police.

18              At a point, according to the police

19   report and the State's theory of the case, he

20   admits to having sex with a girl who is 12 years

21   old.

22          THE COURT: What does that mean?

23          MR. RONKOWSKI:  He is no longer free to go.

24              At that point the police have probable

211

37

1    cause to arrest him.  And the police at that point

2    do not let him go.

3        MS. PLACEK:  Well, Judge --

4        THE COURT:  The defendant is not in any way,

5    as I understand this motion, raising any question

6    as to the development of probable cause while he

7    is in the police station.

8            They are saying, as I understand it,

9    that his initial presence in the police station

10   was unconstitutional, and therefore everything

11   that flowed from it is void.

12           And on the converse of that, if he was

13   not, they don't make any challenge to what flowed

14   from it.

15           So again, what happened, what he said,

16   is totally irrelevant.

17     MR. RONKOWSKI:  The defendant is claiming

18   that he is down at the police station, number one,

19   he is claiming through his testimony that he was

20   arrested and not voluntarily down there.

21           Second of all, they are not conceding

22   the existence of probable cause at the time that

23   the defendant called the police,  and it was the

24   defendant that called the police.

1          If they concede probable cause at that

2     point, that's something else.

3          MS. PLACEK: Well, we are not.

4          THE COURT: What difference, Mr. Ronkowski,

5     whether they conceded or not.

6          Either the police arrested him validly,

7     which I will determine --

8          MR. RONKOWSKI: Right.

9          THE COURT: (Continuing) -- and if they

10    arrested him validly and took him into the police

11    station, everything that flowed is fine.

12         If he went there consentually, and had

13    conversations with the police officers, and which

14    helped them to develop probable cause, that's

15    fine.

16         Again, the whole issue here is how did

17    -- under what circumstances did he arrive in that

18    police station. That's all.

19         The objection is sustained.

20         MS. PLACEK: Thank you, your Honor.

21         THE COURT: Put another question.

22         MS. MALLO: Yes, sir.

23    Q    Detective, during the course of your

24    conversation with Jerome Hendricks, did he ever

39                    213

1    ask if he could leave?

2        MS. PLACEK:  Objection.

3        THE COURT:  Objection sustained.

4        MS. MALLO:  Judge, if I may have one minute?

5        MR. RONKOWSKI:  Your Honor, we are either

6    going to ask to proceed by an offer of proof with

7    this witness, or we will ask to bifurcate the

8    proceedings and make a separate factual finding.

9        THE COURT:  When you complete this witness'

10   testimony, I will allow you to make an offer of

11   proof for the record, Mr. Ronkowski.  You have a

12   right to do that.

13       In the event this becomes necessary by

14   either side, the record ought to be complete.

15       I again say to you, as I understand the

16   motion and a clear reading of the motion and the

17   colloquy that has gone on here in court,

18   unobjected to, in any way challenged by the

19   Defense, makes it even more clear to me that the

20   issue that we are dealing with is the defendant's

21   initial arrival in the police station,  and

22   whether, at that point, he was Constitutionally in

23   the police station, either having been arrested,

24   Constitutionally, or having arrived there

1    consentually and voluntarily.

2              Either of those two positions would make

3    him Constitutionally in the police station.

4              And thus, everything that occurred would

5    be perfectly admissible against him.

6              The converse, if he is not there

7    pursuant to the 4th Amendment, that is, the police

8    illegally arrested him, and he did not arrive

9    there consentually, then everything that flowed

10   from it is void.

11             And it could not -- nothing that he

12   said or did could attenuate back and validate the

13   arrest, unless you intend to show that somehow he

14   was --

15        MR. RONKOWSKI:  If your Honor would be

16   willing to bifurcate the proceeding, we would be

17   ready to rest in a few minutes.

18        MS. PLACEK:  I don't understand what you mean.

19        THE COURT:  I don't know what you mean by

20   bifurcate.

21             Tell me what you mean.  I don't

22   understand.

23        MR. RONKOWSKI: Well, it's the State's

24   position that the police had probable cause to

215

41

1    arrest the defendant from the get-go.

2        THE COURT:  Fine.

3        MR. RONKOWSKI:  The police did not, in fact,

4    arrest the defendant until the next day after he

5    admitted to part of the crime.

6        MS. PLACEK: Well, then, Judge, I would ask to

7    amend, if that's their position, that they had

8    probable cause at the time they came to the house,

9    that they should have got a warrant, if they're

10   holding him in custody at the police station.

11       THE COURT:  In either event, I don't see how

12   bifurcation has anything to do with it.

13           You may be right, and it may be that the

14   Court will determine that there was probable

15   cause.

16       MR. RONKOWSKI:  The reason why bifurcation

17   would be one way of doing this is that the State

18   also is entitled to go by the fact --  And I'm not

19   accepting the defendant's theory of the case;  I'm

20   accepting the theory or postulating the theory he

21   wasn't under arrest.

22           Consequently, the extra information

23   could be used for probable cause.

24           What happens if the State, your Honor,

1    intentionally misjudged the strength of their

2    case, and we were one iota short of probable

3    cause,  when the defendant called the police

4    station up?

5            That's why I'm trying to make a record.

6        THE COURT: Mr. Ronkowski, maybe I'm not

7    making myself clear to you.

8            But the Defense is not going to raise

9    the question of a subsequent arrest of the

10   defendant in the police station.

11           They are going to contend, and have

12   contended all along, that his arrival was

13   unconstitutional.

14           Now, they are not at all suggesting that

15   after he arrived, and after they had conversations

16   with him, that the police did not even then have

17   probable cause to arrest him the following

18   morning.

19           That's not their position.

20           Their position is that because they

21   talked to him and learned some things and had some

22   statements, all of that is unconstitutional and

23   impermissible.  So you don't have to worry about

24   the next day's arrest.

43                    217

1          Nobody's going to challenge it.

2      MR. RONKOWSKI:   I think I understand the

3  Court's position.

4      THE COURT:   Good.

5          I have tried to make it as clear as I

6  understand it.

7          You know, I have problems with the

8  language sometimes, Mr. Ronkowski, but that's the

9  best I can say it, to my mind.   And perhaps I am

10 incorrect.

11         But to my mind it's very clear what

12 they're saying.

13         And I understand it, and I would like to

14 discuss it with you further to help you understand

15 it, but I don't know if I can.   You may not be

16 able to do that.

17     MR. RONKOWSKI:   Well, I know whatever

18 happens one side or the other will be taking an

19 appeal,  and I want to make sure the Appellate

20 Court is aware of all the viable theories, whether

21 we are prosecuting the appeal or defending the

22 appeal.

23     THE COURT:   I understand.

24         And I'm going to give you an opportunity

44

218

1   to make an offer of proof when you finish the

2   examination of this witness.

3            Put another question.

4       MS. MALLO:   Judge, if I may have one minute?

5            Your Honor, I have no further questions

6   of Detective Baker.

7       MS. PLACEK:  May I inquire, Judge, very

8   briefly?

9       THE COURT:  You may.

10

11              CROSS EXAMINATION

12                   BY

13              MS. PLACEK:

14      Q    Detective Baker, I noticed when you

15  walked in the courtroom you were reading something

16  similar to the file that I am holding in my hand;

17  correct?

18           For the purpose of the record, the

19  witness held up the file.

20           Would I be correct in assuming that

21  those are, in fact, the police reports generated

22  by this case?

23      THE WITNESS:  A copy of some of them.

24      Q    A copy of some of them.

45                   219

1          Would it be correct in saying that you

2    read those police reports in order to refresh your

3    memory?

4          A    Yes, it would.

5          Q    Would it be correct in saying quite

6    frankly as you sit there now you have no additions

7    or corrections as to any of the police reports

8    that, in fact, you have read?

9          A    Correct.

10         Q    Now, let's talk about this for a minute:

11         Am I correct -- and please feel free to

12   correct me if I am wrong -- that in order to take

13   a police report correctly, you put down all

14   relevant and all important things?

15         A    Correct.

16         Q    And something like a mob of 30 or 40

17   people in front of a house of a suspect is an

18   important thing;  correct?

19         A    Depends on who the mob is after.

20         Q    Well, if they are after the defendant,

21   or the supposed suspect, or the reason that you

22   are there;  correct?

23         A    Correct.

24         Q    And as a matter of fact, isn't it true

220

46

1    and correct that in none of the Chicago Police

2    Department's reports generated off of this case,

3    there is no mention of any mob in front of the

4    house?

5        A    Correct.

6        Q    As a matter of fact, you yourself wrote

7    a report in this matter; correct?

8        A    Yes.

9        Q    And you don't mention any 30, 40 -- you

10   don't even mention any disturbance in front of the

11   defendant's house;  is that correct?

12       A    That's correct.

13       Q    It's not only correct, but you don't

14   even mention this incident about somebody holding

15   up a stick and trying to hit the defendant;

16   correct?

17       A    Correct.

18       Q    As a matter of fact, let me ask you,

19   Detective, when was the first time that you heard

20   anyone say that they were the one who held on to

21   the stick and tried to hit the defendant as he

22   left that house?

23       A    I didn't --

24       MR. RONKOWSKI:  Objection.

47

1        MS. PLACEK:  Q  If you heard it at all.

2        MR. RONKOWSKI:  Irrelevant, what he heard.

3   He saw it.

4        MS. PLACEK:  Judge, I'm asking, heard saying

5   that he did it.

6        THE COURT:  Objection overruled.

7        MS. PLACEK:  Thank you.

8        THE WITNESS:  A   I saw someone in the crowd

9   raise a stick.

10            I don't need to hear somebody say

11   anything;  I saw it.

12        MS. PLACEK:  Motion to strike, Judge, as not

13   responsive.

14        THE COURT:  The motion is sustained.

15   Stricken.

16        MS. PLACEK:  Thank you.

17        Q    Officer, when was the first time you

18   heard anyone admit that they were the person who

19   raised that stick and tried to hit that defendant?

20        THE WITNESS:  A   I don't think I have heard

21   anyone admit to that.

22        Q    By the way, do you know a gentleman, a

23   civilian, supposed witness in this case, by the

24   name of James Hill?

232

48

1          A     I know there is a witness, James Hill,

2     to this case, yes.

3          Q     And would it be correct that you and Mr.

4     Hill and your other brother-police officers were

5     sort of kept or sequestered or held in a

6     conference room back of this courtroom prior to

7     this hearing?

8          A     Correct.

9          Q     And would it be correct that Assistant

10    State's Attorney Ronkowski, in the course of his

11    job, asked each of you what happened and what did

12    you say, in preparation for testifying today?

13         A     I remember him talking to me.

14         Q     Well, let me ask you this:

15               You weren't -- Mr. Hill wasn't asked to

16    step out of the room when he was talking to you,

17    was he?

18         A     I was not in the room with Mr. Hill all

19    morning.

20         Q     Well, let me ask you this:

21               Did you ever know, or did you ever hear

22    Mr. Hill say that he was the one with the stick?

23         A     Not that I recall, no.

24         Q     As a matter of fact, being with Mr. Hill

1   in that room, did you ever say, my God, that's the

2   man I saw on that date and time, that's the man

3   with the stick?

4        A    No.

5        Q    As a matter of fact, you didn't

6   recognize Mr. Hill today, did you?

7        A    Not that I recall, no.

8        Q    Thank you.

9             But according to your testimony, you got

10  a clear and good look at the man who, in fact,

11  raised the stick to the defendant; correct?

12       A    No, that's incorrect.

13       Q    Well, let's talk a little further about

14  that.

15            You did see the incident as it occurred,

16  as you drove up at that time and date, didn't you?

17       A    Yes, I did.

18       Q    You saw what your brother Officer,

19  Nitsche, did?

20       A    Yes, I did.

21       Q    And you saw your brother Officer,

22  Nitsche, go in that house, didn't you?

23       A    Yes, I did.

24       Q    You saw him stay and remain in that

224

50

1    house for a while; correct?

2        A    No, that's wrong.

3        Q    Well, how long did you see your brother

4    Officer, Nitsche, in that house?

5        A    He went in and came out.  A matter of

6    seconds.

7        Q    When you say a matter of seconds, just

8    so we have it clear.  Did he walk all the way into

9    the house, and close the door behind him?

10       A    No, he didn't.

11       Q    Did he leave the door open?

12       A    The screen was open.

13       Q    Let me ask you this:

14       Was he on the porch of the house?

15       A    There is no porch;  there is just a

16   stoop.

17       Q    So was he on the stoop of the house?

18       A    Walked up on the stoop.  The door was

19   being held open, he stepped inside, he came back

20   outside.

21       Q    Who was holding open the door?

22       A    A woman.

23       Q    Do you know that woman?

24       A    No, I don't.

1          Q     Thank you.

2                Did you ever see him have conversation

3    with that woman?

4          A     He said something as he walked up.    I

5    don't know what.

6          Q     Okay.  How far away were you?

7          A     About 20 feet.

8          Q     How far was the nearest neighbor of this

9    crowd or mob?

10         A     I don't recall.    They were all over the

11   place.

12         Q     When you say all over this place, were

13   they in the yard or house?

14         A     The yard, the street,  the sidewalk, by

15   the fences.  People were milling about all over.

16         Q     When you say milling about, did they

17   have stones and bricks in their hands, and sticks?

18         A     I don't recall what every individual had

19   there.

20         Q     Well, did some of them?

21         A     I noticed a stick later on.

22         Q     Well, when you say later on, did you

23   hear them shouting and screaming as you drove up?

24         A     There was a lot of commotion and noise.

52

1      Q      And, by the way, part of your job as a

2    Chicago Police Officer is also to quiet such

3    situations; correct?

4      A      Depends on the situation.

5      Q      Well, you surely wouldn't want a mob to

6    invade a suspect's house or attempt to hurt him;

7    correct?

8      A      They didn't invade his house.

9      Q      Sir, do you understand my question?

10          Motion to strike the answer as not

11   responsive, Judge.

12      MR. RONKOWSKI:  Objection to the question as

13   argumentative.

14      THE COURT:  Sustained.

15          As to the striking, the objection is

16   sustained and the answer is stricken.

17          As to your objection, Mr. Ronkowski,

18   it's overruled.

19      MS. PLACEK:  Thank you, your Honor.

20      Q      Surely wouldn't let a mob attack a

21   person's house, correct, without doing anything in

22   the course of your employment?

23      THE WITNESS:  A   Not if I could help it.

24      Q      Not only that, but if you saw a mob

1    milling about with sticks or whatever, it would be

2    your job, as a Chicago Police Officer, to diffuse

3    the situation;  isn't that correct?

4        A    Depends on the situation.

5        Q    Well, the situation is of, in fact, a

6    mob around a supposed --  as you put it today --

7    suspect's house.

8             Wouldn't it be your job to break that

9    mob up?

10       A    Again depends on the situation.

11       Q    Would it be your job to break that mob

12   up as I have just described the situation, sir?

13       A    No.

14       Q    So am I correct in assuming that you, as

15   a Chicago Police Officer, would not deem it your

16   job to in fact break up a mob of 30 or 40 people,

17   some with sticks, yelling and screaming at a

18   supposed suspect's house?

19       A    I don't know.

20       Q    Thank you.

21            Let me also ask you this, sir:

22            How long previous to your arrival to

23   that house were you involved in the investigation

24   of this matter?

1        A       Several hours.

2        Q       When you say several hours, were you

3   aware that the alleged victim of this crime was

4   first reported missing on August 1st, 1988?

5        A       I don't remember exactly when I became

6   aware of that.

7        Q       Could there be anything in this report

8   that would refresh your recollection as to that?

9        A       Not the specific time, no.

10       Q       Well, and you say your report, of

11   course, wouldn't refresh your recollection

12   because, according to you,  there is nothing in

13   your report to reflect when she first became

14   missing?

15       A       I don't recall if there is or not.

16       Q       Would it be correct in saying that you

17   can't even recall what's in your report that you,

18   as you already stated, read to refresh your memory

19   a few minutes ago?

20       A       I don't understand the question.

21       Q       Well, sir, let's talk for a second.

22               Isn't it correct, showing you what has

23   been previously marked as Defendant's 4, a missing

24   person report,  could you tell his Honor, Judge

55                         229

1   Holt, what that is?

2        A    A supplementary report to a missing

3   person's report.

4        Q    Isn't it correct that that, in fact,

5   deals with the alleged victim of this case?

6        A    Yes, it does.

7        Q    And on that particular matter, does it

8   not state that the person was missing on, in fact,

9   August 1st?

10       A    Yes, it does.

11       Q    Thank you.

12            To the best of your knowledge, did the

13  Chicago Police Department have information that

14  this person was, in fact, alive on August 2nd,

15  1988?

16       A    No.

17       Q    No?

18       A    Not that I know of.

19       Q    To the best --   Thank you.

20            Showing you what would be marked as

21  Defense 5 for Identification.  Could you please

22  identify that?

23       A    Missing person's report.

24       Q    And on that missing person's report, am

1    I correct in assuming that that's also generated

2    with the stamp of Area 2, Violent Crimes?

3          A    No, it's not.

4          Q    Is there a stamp saying Area 2, Violent

5    Crimes?

6          A    No, there's not.

7          Q    I'm sorry, Officer, perhaps I'm

8    mistaken.

9               It says Youth Division, Area 2;

10   correct?

11         A    Correct.

12         Q    Calling your attention to the back of

13   that report, does that report not state, in fact,

14   that that victim was seen on August 2nd, 1988?

15         A    It says from an anonymous source, yes.

16         Q    The victim was seen on August 2nd, 1988,

17   correct?

18         A    From an anonymous source, yes.

19         Q    Thank you.

20              By the way, to the best of your

21   knowledge, you didn't --  Well, withdraw that and

22   rephrase, Judge.

23              You didn't speak to the gentleman on the

24   phone at the same time Officer Nitsche did, did

1    you?

2         A    No, I did not.

3         Q    To the best of your knowledge, on this

4    anonymous source, did the Chicago Police

5    Department -- speaking of the anonymous source

6    that stated that the alleged victim of this crime

7    was alive on August 2nd, 1988, did the Chicago

8    Police Department in fact take action?

9         A    I don't understand that question.

10        Q    Did the Chicago Police Department do

11   anything in response to this anonymous source on

12   August 2nd, 1988?

13        A    Area 2 Youth Division took some action.

14        Q    Is that part of the Chicago Police

15   Department?

16        A    Yes, it is.

17        Q    Did they, in fact, tour an area?

18        A    You have got the report, I don't.  I

19   don't know what they did.

20        Q    Calling your attention to that report --

21   By the way, you are familiar with 109th and

22   Indiana; correct?

23        A    I know where it's at, yes.

24        Q    Could you describe that -- Is that, in

232

58

1    fact, the area that they toured?

2          A     109th and Indiana and 105th and 6th and

3    Wabash.

4          Q     Is that, in fact, the area they toured?

5          A     Yes.

6          Q     And they, as a matter of fact, took the

7    complainant which, I believe would be the guardian

8    of the young lady; correct?

9          A     Yes.

10         Q     Could you describe that area for his

11   Honor, Judge Holt?

12         A     Residential area.

13         Q     When you say residential, is there any

14   truck stops, that sort of thing there?

15         A     No; residential area, homes.

16         Q     Is it ever known as the Strip?

17         A     Not that I ever recall.

18         Q     By the way, how far was that, in fact,

19   that area away from the defendant's house?

20         A     Probably about a mile.

21         Q     Thank you.

22               Did you ever, Mr. Baker -- excuse me,

23   Detective Baker -- see the defendant on the phone

24   in his house?

233

59

1        A      No, I did not.

2        Q      Did you ever see the defendant on the

3   phone in his house, call Russ Ewing?

4        A      No.

5        Q      Did you ever see --   By the way, when I

6   say Russ Ewing, you are familiar with who I'm

7   referring to?

8        A      Yes.

9        Q      Thank you.

10              Would it be correct to assume that prior

11  to the defendant being taken away in a police car,

12  that your involvement in this matter, be it a

13  missing person's investigation or whatever, was

14  minimal?

15       A      Yes.

16       Q      Would it be correct in saying that

17  according to your testimony, prior to the

18  defendant being taken away in a police car, that

19  all you did was more or less didn't enter the

20  house, and stood on the street?

21       A      Yes.

22       Q      You in no way, according to your

23  testimony, attempted to arrest this law breaker

24  who attempted to hit the defendant;   correct?

60                    234

1      A    That's true.

2      Q    You in no way attempted to try and break

3  it up;  correct?

4      A    Moved the crowd away to get Mr.

5  Hendricks into the squad car.

6      Q    Beg your pardon?

7      A    We moved the crowd back to allow Mr.

8  Hendricks to get into the squad car.

9      Q    When you say you moved the crowd away,

10  that also is not reflected in your police report;

11  is that correct?

12      A    No, it's not.

13      Q    Would it be correct in saying -- and I

14  believe you described the defendant as walking to

15  the squad car -- When you say walking, you, as a

16  trained observer, mean that, walking;  is that

17  correct?

18      A    Walking, walked.

19      Q    He didn't run; correct?

20      A    Well, he didn't sprint over there.

21      Q    Well, he walked; correct?  In a normal

22  way?

23      If you know.

24      A    What's a normal way?  You tell me.

235

61

1       Q      Well, even-paced.

2       A      He walked over, walked out of the house,

3   and right over, and got in the back of the squad

4   car.

5       Q      When you say got in the back of the

6   squad car, is that a marked or unmarked squad car?

7       A      Unmarked squad car.

8       Q      Am I correct in that when you spoke of a

9   squad car, would that be similar to a detective's

10  car?

11      A      Yes.

12      Q      Can you open the back door of that squad

13  car?

14             When I say you, if you're not a member

15  of the Chicago Police Department.

16      A      You're asking me, are you physically

17  able to do it?

18      Q      That's correct.

19      A      Yes, yes.  You take the handle and open

20  it up.

21      Q      Does it have a screen?

22      A      No, it doesn't.

23      Q      Can you open the back door from inside

24  the car?

236

62

1       A    Yes, you can.

2       Q    Would it be correct in saying before

3    going to the defendant's house, you made no

4    independent investigation of this case?

5       MR. RONKOWSKI:  Objection to independent.

6       MS. PLACEK:  He himself, Judge.

7       THE COURT:  Overruled.

8       THE WITNESS:  A   That's correct.

9       MS. PLACEK:  Q   Would it also be correct in

10   saying that before going to the --   Or the thing

11   that motivated you, so-to-speak, to go to the

12   defendant's house, was, in fact, a request by

13   Detective Nitsche?

14      MS. MALLO:  Objection to motivate.

15      THE COURT:  Overruled.

16      THE WITNESS:  A   I went with Detective

17   Nitsche, yes.

18      MS. PLACEK:  Thank you.

19          That's all, your Honor.

20      THE COURT:  Redirect.

21      MS. MALLO:  One minute, your Honor.

22

23

24


63                        237

1

2                    REDIRECT EXAMINATION

3                           BY

4                      MS. MALLO:

5       Q      Detective Baker, it wasn't Assistant

6    State's Attorney Ronkowski that talked to you

7    about this case;  it was myself, wasn't it?

8       MS. PLACEK:  Objection.

9            Impeaching their own witness, Judge.

10      THE COURT:  Overruled.

11      MS. MALLO:  Q   Well, I spoke to you about

12   this case;  is that correct?

13      THE WITNESS:  A   That's correct.

14      Q      When I spoke to you about this case at

15   lunch time and today, were there any civilians in

16   the room?

17      A      No, there weren't.

18      Q      And ASA Ronkowski then later joined us;

19   correct?

20      A      That's true.

21      Q      And when Ronkowski and I spoke to you,

22   were there any civilians in the room?

23      A      No, there weren't.

24      Q      And it was Assistant State's Attorney

6 4                          238

1    Ronkowski who had been with the detectives earlier

2    in the morning before I got there; correct?

3         A    That's correct.

4         Q    And at any time in your presence did you

5    ever hear Assistant State's Attorney Ronkowski

6    interview any civilian witnesses?

7         A    No, I did not.

8         Q    Detective Baker, on the night of August

9    8th, 1988, when you went into the home of Jerome

10   Hendricks, you had information about the case?

11        A    Yes, I did.

12        MS. PLACEK:  Objection, foundation.  Improper

13   as redirect, your Honor.

14        THE COURT:  I'm going to allow that answer to

15   stand, for what it's worth.

16             The objection is overruled.

17        THE WITNESS:  A   Yes, I did.

18        THE COURT:  He had information about the

19   case, period.

20        MS. MALLO:  Q   And at that time did you talk

21   to anyone about this case?

22        MS. PLACEK:  Objection.

23        THE COURT:  Overruled.

24        THE WITNESS:  A   Yes, I had.

239

65

1      MS. MALLO:   Q   And did you know who the

2  victim was last seen with?

3      MS. PLACEK:   Objection.

4        Foundation at this time, Judge.

5     THE COURT: The objection is sustained.

6      MS. MALLO:   Q   Prior to getting to the

7  defendant's house at about 8:30 on August 8th,

8  1988, who had you spoken to about the case?

9     THE WITNESS:   A   Other detectives that were

10  assigned to it previously.

11     Q   And when you spoke with those other

12  detectives, did they share with you information

13  they had gathered about the case?

14     A   Yes, they did.

15     Q   And when you went to the defendant's

16  home on the night of August 8th, 1988, did you

17  know who the defendant --   who the victim was last

18  seen with?

19     MS. PLACEK:   Objection.

20     THE COURT:   The objection is sustained.

21     MS. MALLO: Q   When you went to the

22  defendant's house on that night, you went there

23  with certain information?

24     A   Yes, I did.

```
 1          MS. MALLO:  Judge, if I may have a minute?

 2              Your Honor, I have no further questions

 3   of Detective Baker.

 4          THE COURT:  Recross.

 5

 6                   RECROSS EXAMINATION

 7                        BY

 8                   MS. PLACEK:

 9          Q     The Assistant State's Attorney, the

10   young lady mentioned three conversations you had

11   this morning with either them singly or together?

12          A     This morning and this afternoon, yes.

13          Q     Did you ever say:  By the way, that

14   civilian is the one with the stick, to either one

15   of them?

16          A     Not that I recall, no.

17          Q     And like you already told me, you

18   didn't even recognize him; correct?

19          A     That's true.

20          MS. PLACEK:  That's all, Judge.

21          THE COURT:  Anything further?

22          MS. MALLO:  No, sir.

23          THE COURT:  Mr. Baker, thank you very much.

24   You may step down.
```

1          THE WITNESS:  Thank you.

2                    (Witness excused)

3          MR. RONKOWSKI:  Your Honor, based on the

4     Court's ruling, I only have one more piece of

5     evidence I'm going to need.  And there is an

6     issue as to what it is.

7               It would be offered under Montgomery and

8     probably the best evidence would be the original

9     court file.

10              I have the case.  And this would be what

11    had been alluded to previously about the

12    defendant's background.

13              And if I could get a continuance to ask

14    the Clerk to bring the original court file, and

15    after the court file gets here I would ask the

16    Court to take judicial notice of the defendant's

17    prior conviction to impeach his testimony.

18         THE COURT:  Is that file here in this

19    building, or is it --

20         MR. RONKOWSKI:  No, it's probably in the

21    warehouse at 26th Street.

22         MS. PLACEK:  If you remember, Judge, there

23    was quite a bit to do about what was real and what

24    wasn't real, as to this.

68                     212

1          I believe that there was quite a bit of

2   hearsay which the Court eventually sustained my

3   objection, and quite frankly, this is why it gets

4   rather interesting in the case, Judge.

5          There was quite a few allegations, so --

6      THE COURT:  I'm not at all sure I'm following

7   you.

8      MS. PLACEK:  I understand, Judge.

9          But I believe for purposes of the

10  record, quite frankly, without hiding anything

11  from this Court, what Mr. Ronkowski wishes to do

12  is, I believe, there was a statement by the

13  detectives that --   rather, Detective Nitsche,

14  that he, in fact, was led to the defendant because

15  one of the neighbors had said that the defendant

16  was priorly --  you know, a prior convicted sex

17  offender.

18      THE COURT:  All right.

19          And I take it that he wants to impeach

20  the defendant by introducing a prior conviction.

21      MS. PLACEK:  Correct, Judge.

22      MR. RONKOWSKI:  Correct.

23      THE COURT:  And I take it also that you

24  don't choose to stipulate or cooperate in that in

69                       243

1    any way to obviate the necessity of a continuance?

2        MS. PLACEK: Well, if we're talking about

3    obviating, the interesting thing is this is under

4    Montgomery, of course, Judge.

5            We have more or less conceded that with

6    sidebars to the bench.

7        THE COURT:  I know about it.  But --

8        MS. PLACEK:  Judge, it's silly;  you know

9    about it already.

10       THE COURT:  So I don't see the point of

11   having to bring in the record.

12       MS. PLACEK: If this is the one, right.

13       THE COURT:  This is something I already know.

14       MS. PLACEK: Fine, Judge.

15           If that's under Montgomery --

16       THE COURT:  Is it admissible under

17   Montgomery?

18       MS. PLACEK:  I don't believe I have a problem

19   with that.  I have no problem stipulating.

20       THE COURT:  Why is that?

21       MS. PLACEK:  Well, number one, there was a

22   problem as to the year, and there was something as

23   to the rap sheet supposedly being wrong, if the

24   Court remembers as to certain cross examination.

1        A certified copy, of course, would have

2   obviated this.

3        I have no problem --  As a matter of

4   fact, since the majority of my time is spent at

5   26th Street,  and if this is the only witness, if

6   this is the only thing holding it up, I have no

7   real problem stipulating it.

8        But just for  --  you know, that he was

9   convicted at such and such a time.

10      THE COURT:  Well, if there is a genuine

11  Montgomery problem, that's one thing.

12      On the other hand, if this evidence is

13  ultimately going to be admitted, and it will be

14  admitted if it conforms itself to Montgomery's

15  dictates, I might as well do it.

16      MS. PLACEK:  Okay.

17      MR. RONKOWSKI:  Would it help if I made an

18  offer of proof?

19      MS. PLACEK: Judge, why don't we just trust

20  the rap sheet then, Judge?

21      THE COURT:  Fine.

22      Why don't you just put it in?

23      MR. RONKOWSKI:  By stipulation, Counsel?

24      MS. PLACEK:  That's fine.


245

71

1          MR. RONKOWSKI:  Okay.  Pursuant to People

2     versus Montgomery, the stipulation the People

3     would offer the Defendant's following felony

4     conviction within the last 10 years for the sole

5     purpose at this time to impeach him.

6               The additional information we'll rely on

7     for the reasons.

8               In that on October 18, 1985, the

9     defendant in Court, Jerome Hendricks, was

10    convicted of the crime of aggravated criminal

11    sexual assault, Case No. 84-10287.

12              On a finding of guilty he received six

13    years, Illinois Department of Corrections, by

14    Judge Boheric.   That would be in the County of

15    Cook, State of Illinois.

16         MS. PLACEK: So stipulated, your Honor.

17         THE COURT:  Do you have any further

18    witnesses?

19         MR. RONKOWSKI:  Based on the Court's previous

20    ruling limiting the issues, we would have no

21    further witnesses.

22         THE COURT:  You may make an offer of proof as

23    to the testimony of Mr. Baker that was not allowed

24    in evidence, if you desire to do so at this time.

1          MR. RONKOWSKI: Okay.

2              The Detective's -- Detective Baker

3     would testify as to the statements of the

4     defendant. And if the Court wishes to bifurcate

5     the hearing to settle the first issue, that's

6     fine.

7              If you want a full offer of proof, we

8     would prefer to do it with a live witness. And we

9     have two additional witnesses to put on.

10         MS. PLACEK: Is that today, or --

11         MR. RONKOWSKI: Yes, they are here.

12         MS. PLACEK: Okay.

13         MR. RONKOWSKI: Whatever the Court wishes,

14    bifurcated, or take a -- two more witnesses for

15    the offer of proof.

16         MS. PLACEK: Well, would these witnesses --

17    Can I just ask Counsel whether these witnesses

18    would go as to the heart of the motion, or as to

19    the bifurcation that he is requesting?

20         MR. RONKOWSKI: They would testify as to

21    the--

22         THE COURT: Well, as I have said, the whole

23    and only purpose of these witnesses is to make an

24    offer of proof in the event that review becomes

1    necessary by the State,  so that the Reviewing

2    Court will know what evidence the State sought to

3    proffer that the Court refused to consider.

4            And it may very well be that the

5    Reviewing Court will determine that that was

6    error, and the State was entitled to a full

7    hearing.

8            But I'm not going to consider whatever

9    the witnesses say as it bears on the motion before

10   me, because it is not relevant.  But you have the

11   right to make the offer of proof, and you also

12   have the right to make it with a live witness if

13   you choose to do so,  or you can recite into the

14   record what it is that these witness would

15   testify.

16           Either way is perfectly all right with

17   me.

18       MR. RONKOWSKI:  I will rely on the Court's

19   judgment whether we bifurcate the proceedings or

20   to get with live witnesses.

21       THE COURT:  I don't know what you mean by

22   bifurcate.

23       MS. PLACEK:  I don't, either, Judge.

24       THE COURT:  You will have to explain it to

74                        218

1    me.

2              I'm hearing this motion to suppress.

3         MR. RONKOWSKI: Right.

4         THE COURT:   And I don't consider bifurcation

5    as even remote issue in this case.

6              What are you trying to have me

7    understand you mean by bifurcating?

8         MR. RONKOWSKI:   Well, what the Court

9    previously stated on the record is the issue in

10   this case is the validity of the arrest.

11             And that means whether or not the

12   defendant was arrested at his house, and whether

13   or not the police had probable cause.

14        THE COURT: Right.

15        MR. RONKOWSKI:   Okay.

16             If that issue rules against us, if the

17   police do not have probable cause, and that the

18   defendant was not arrested, we are entitled to

19   introduce evidence of what the defendant stated,

20   and what other witnesses stated thereafter to show

21   that at some point thereafter the police had

22   probable cause.

23        THE COURT:   How would that cure the taint of

24   the primary illegality?

1          That's why I'm not admitting it. Because

2    what the defendant said subsequent thereto would

3    not cure the primary taint of the 4th Amendment

4    violation.

5          Unless -- Unless you could show some

6    attenuation, and you would have to have strong

7    evidence to show that it was attenuated by

8    somebody, some intervening circumstances.

9          But if the defendant went to the police

10   station and there protested his innocence and

11   there requested a polygraph, was there given a

12   polygraph, all of that would not attenuate.  And,

13   as a matter of fact, People vs. Franklin says that

14   the giving of a polygraph under those

15   circumstances exacerbates rather than attenuates

16   the illegality.

17          So what I'm saying to you, as I

18   understand the law, Mr. Ronkowski, and I could be

19   in error, and you know I understand and appreciate

20   your concept that I probably am --  But as I

21   understand, unless you have some strong and

22   convincing evidence that something occurred in the

23   police station other than the giving of Miranda

24   warnings, other than the defendant's voluntary

**250**

76

1    request to take a polygraph, something attenuated

2    this unlawful 4th Amendment violation, if, indeed

3    there was one, then everything that happened in

4    the police station is a nullity under the 4th

5    Amendment.

6            That's the way I understand the law.

7            Therefore, I don't see what you mean.

8    And I think I'm beginning to understand what

9    you're calling bifurcating.

10            You want me to go into a hearing to

11    determine whether or not what occurred in the

12    police station relates back, and cures the 4th

13    Amendment violation.

14            And I'm saying to you that that is a

15    burden that you could choose to undertake, and I

16    will hear you on it,  but it certainly wouldn't be

17    on the basis of what the defendant said at the

18    police station.

19       MR. RONKOWSKI:   No.

20            When I say bifurcate, terminate the

21    proceedings right now, and the Court can hear

22    arguments and decide whether or not the police had

23    probable cause, at the point the defendant called

24    the police and invited them to his house.

77                      251

1              If you rule in the State's favor, then

2      everything that occurred at the police station is

3      proper.

4              If you rule against the State, the State

5      would be entitled to show inevitable discovery,

6      all sorts of theories that, you know --

7          THE COURT: What would be discoverable?   The

8      statements of the defendant, or the --

9          MR. RONKOWSKI:  The other witnesses that we

10     talked to.

11         THE COURT:  What are we suppressing here?

12     The statement of the defendant?

13         MR. RONKOWSKI:  Yes.    This is a statement

14     case.

15         THE COURT:   How could a statement of the

16     defendant be inevitably discovered and be

17     Constitutionally violate after his

18     unconstitutional arrest?

19         MR. RONKOWSKI:  Very easy.

20             Because at some point thereafter, if the

21     police do develop probable cause that dissipates

22     the taint.

23         MS. PLACEK:  No, it doesn't.

24         THE COURT:  Come on, come on.

## 252

78

1          If you have any single case in any

2     jurisdiction at all that says that you have

3     probable cause after the defendant has been

4     unconstitutionally arrested and within a

5     relatively short period of time after his arrest

6     that that dissipates the taint of the un-

7     constitutional arrest, I would like to see it.

8          MR. RONKOWSKI:  How many cases do you want to

9     see?

10          I can cite two or three cases.

11          THE COURT: All right.

12          Start looking at Dunaway versus New

13     York, and the whole line of cases that tell us

14     very clearly that even the giving of Miranda

15     warnings --

16          Look at People versus Franklin, the

17     voluntary taking of a polygraph examination, all

18     of these things do not dissipate the taint of the

19     illegal arrest.

20          And simply because the investigation

21     goes on, and outside of any statement of the

22     defendant that causes them to acquire probable

23     cause, that doesn't relate back to the defendant

24     unless something else has happened.

1           He is continuously under the restraints

2    of this unconstitutional arrest when he makes a

3    statement, even if probable cause has been

4    developed in the interim between his arrest and

5    the statement.

6           And I know of no case anywhere that

7    suggests anything to the contrary.

8           Again, Mr. Ronkowski, my grasp of the

9    law around these 50 other jurisdictions in the

10   United States may not be that great, but I have

11   not seen any case.

12        MR. RONKOWSKI:  There are cases in Illinois

13   that allow the State to do that, and have

14   successfully allowed the State to do that.

15        THE COURT:  You're going to have to point

16   them out to me with great particularity, serve a

17   copy on the Defense, and we will see where we go

18   with that.

19          So in any event, we have not reached

20   that stage.

21          I assure you that if I come to the

22   conclusion that this defendant was

23   unconstitutionally arrested, I will allow you an

24   opportunity to make those cases before me and

80                    254

1    convince me that you should be allowed to show

2    that something happened after his unconstitutional

3    arrest, if indeed I determine that he was, that

4    attenuates the taint.

5         And I just don't see how that -- as I

6    said, I don't know of any cases like that, but I

7    am willing to learn, and I am willing to have you

8    teach me.

9         MR. RONKOWSKI: Well, my suggestion at 3:07,

10   rather than rush up and get you those cases, if we

11   can pick a short date that's agreeable to both

12   sides to conclude this hearing --

13        THE COURT: Both sides may consider wanting

14   to educate the Court.

15        MS. PLACEK: I agree with the Court, Judge,

16   so I will stand educated with the Court.

17        Judge, on the court date, next week is

18   fine, Judge, or --

19        THE COURT: You are pretty close to the point

20   of resting, absent this little problem that we

21   have; am I correct?

22        MR. RONKOWSKI: Well, if I don't change the

23   Court's mind, I'm resting.

24        THE COURT: Well, then I suspect, if we could

1    devote as little as an hour to this next week, one

2    day?

3        MR. RONKOWSKI:  Oh, yes, I have no problem

4    with that.

5        MS. PLACEK:  I have two rebuttals, Judge.

6        THE COURT:  You have two rebuttal witnesses?

7        MS. PLACEK:  Yes, Judge.

8        THE COURT:  How much time do you think?  Two

9    hours, maybe?

10        MS. PLACEK:  An hour and a half, Judge.

11        THE COURT:  Can you give us a date that we

12    can get in next week?

13        MS. PLACEK: Either next week or the following

14    week, later in the afternoon, I will be here.

15        THE COURT:  can you give us some help as to

16    what's going to go and not go?

17        MR. RONKOWSKI:  Call them out and I will tell

18    you.

19            (Whereupon, a discussion was

20            held off the record, after which

21            the following proceedings were

22            had:)

23        MS. PLACEK:  The 10th or the 11th, I have

24    motions before His Honor --  Or no, you are

82

```
 1    putting it on Wednesday.

 2              I'm sorry, the previous week.  I

 3    pre-supposed --  the 3rd, the 4th?

 4         THE COURT:  The 4th.

 5         MS. PLACEK:  Are you talking about the 4th?

 6         THE COURT:  I'm talking about the 4th.

 7                     Yes, that's the one.

 8         MS. PLACEK:  The 4th?  That's fine.

 9         MR. RONKOWSKI:  The 4th.

10         THE COURT:  The 4th.  Order of Court.

11         MS. PLACEK:  Thank you very much, Judge.

12         THE COURT:  April 4th.

13         MS. PLACEK:  Have a pleasant day.

14         THE COURT:  Thank you.

15                     (Whereupon, hearing in the

16                     above-entitled cause was

17                     continued to Wednesday, the

18                     4th day of April, A. D. 1990)

19

20

21

22

23

24
```

STATE OF ILLINOIS    )
                     )    SS:
COUNTY OF C O O K     )


        IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT—CRIMINAL DIVISION


THE PEOPLE OF THE        )
STATE OF ILLINOIS        )
                         )
    —vs—                 )    No. 88 CR 12517
                         )
JEROME HENDRICKS         )


        MOTION TO QUASH ARREST
        <u>AND SUPPRESS EVIDENCE</u>

            REPORT OF PROCEEDINGS had at the hearing

of the above-entitled cause on Thursday, the 31st day of

May, A. D., 1990, before the Honorable LEO HOLT, Judge of

said Court.



APPEARANCES:

        HON. CECIL PARTEE,
            State's Attorney of Cook County, by
        MR. EDWARD RONKOWSKI and
        MS. MARY MALLO,
            Assistant State's Attorneys,
            appeared on behalf of the People:


        HON. RANDOLPH STONE,
            Public Defender of Cook County, by
        MS. MARIJANE PLACEK and
        MR. VINCENT LUFRANO,

            Assistant Public Defenders,
            appeared on behalf of the Defendant.



1    THE CLERK:    Jerome Hendricks.

2    THE COURT:    Jerome Hendricks.

3    MS. PLACEK:    Mr. Hendricks is in custody.

4    THE COURT:    Was Mike Baker the last person

5    to testify, Mr. Ronkowski?

6    MR. RONKOWSKI: That was Detective Baker, on

7    March 29, and then there was a stipulation and I believe

8    the State has rested, and it was the Defense turn.

9    MS. PLACEK:    Judge, I believe, not necessarily

10   being our turn as a result of not --

11   THE COURT:  I'm sorry?

12   MS. PLACEK:  I don't believe it is quite our turn.

13   I believe we are in rebuttal now, Judge.

14   THE COURT:  All right, I'm sorry, you may proceed.

15   MS. PLACEK:  Thank you.

16

17

18

19                    (Witness duly sworn.)

20

21

22

23

24

2

DAVIDA HENDRICKS-HALLEY,

called as a witness on behalf of the Petitioner-Defendant

herein, having been first duly sworn, was examined and

testified as follows:

DIRECT EXAMINATION

BY MS. PLACEK:

Q    Ma'am, would you state your name for purpose

of the record, spelling your first and last name.

A    Davida Hendricks-Halley, D-a-v-i-d-a,

Hendricks, H-e-n-d-r-i-c-k-s, Halley, H-a-l-l-e-y.

Q    Now, you mentioned Hendricks; you are related

to the defendant, Jerome Hendricks, is that correct?

A    Yes.

Q    Would you tell his Honor, Judge Holt, exactly

how you are related.

A    I am his sister.

Q    Now, calling your attention to August 9, I

believe 1988, could you tell his Honor, Judge Holt,

where you are living?

A    255 West 117th Street.

Q    Were you living there alone or with someone?

A    My mother, my brothers and sisters.

Q    You mentioned your brother again.  Is Jerome

Hendricks that brother that you speak of?

3

A    Yes, one of them.

Q    One of them, thank you.

Calling you attention to the later afternoon hours, evening hours, did anything unusual happen?

A    I don't remember the dates any more.

Q    I understand about the dates and the time, but were you present during that time when anything unusual happened?

A    Yes.

Q    Could you tell his Honor, Judge Holt, exactly what you remember happening on that date?

A    The whole day?

Q    Well, let's start in relationship with your brother, Jerome.  Did you see your brother, Jerome, that day?

A    Yes.

Q    Could you tell his Honor, Judge Holt, if, during the afternoon or earlier evening hours, if that's when you saw him?

A    Early evening hours.

Q    I know you are a little nervous and I know, maybe you don't remember exact dates, but did anything unusual happen that evening, that would make it stand out

4

in your mind?

A    The police officers.

Q    Well, when you say police officers and, again, relax and just tell us what happened, what do you mean by police officers?

A    They wanted my brother to get in touch with them.

Q    When you say they wanted your brother to get in touch with them, would you tell his Honor, Judge Holt, the circumstances or how you came to see those police officers that date and time?

A    It was about the girl found in the garage next to our house.

Q    And when you say the police officers, did they come and talk to you or did you go and talk to them?

A    They came and talked to us.

Q    Now, when you say us, who do you mean?

A    My son and myself.

Q    Was your mother also present?

A    Yes.  Well, she wasn't there earlier at the time.

Q    And did the police officers leave you anything?

A    Yes.  They left their cards.

5

1    Q    When you say their cards, do you remember

2    those police officers' names?

3    A    No, I don't.

4    Q    Do you remember whether they were white or

5    black officers?

6    A    White.

7    Q    And do you remember whether they were in

8    uniform like the sheriffs or like police officers, or

9    were they in plainclothes?

10   A    They were in plainclothes.

11   Q    And you said they left their cards.

12        Did you have an occasion to have an

13   opportunity to see those officers later that day?

14   A    Yes.

15   Q    Could you tell his Honor, Judge Holt, under

16   what circumstances you saw those police officers?

17   A    They came back to pick up my brother.

18   Q    When?

19   MR. RONKOWSKI:  Objection.

20   MS. PLACEK:  Basis, Judge?

21   MR. RONKOWSKI:  Calls for a conclusion.  She can

22   testify what she saw.

23   MS. PLACEK:  That's what we are going into.

24   Those are her words.

6

THE COURT:  I understand that may be her words.
It is somewhat conclusionary, they came back.  I will
decide what it was they came back for.

Ms. PLACEK:  Perhaps I can clarify a bit, your
Honor.

Q    You mentioned they came back to
pick up your brother.  Could you describe exactly what
happened.

A    Jerome came in.  We gave him the card and he
phoned them.

Q    When you say we, who do you mean?

A    My mother and myself.

Q    Okay.  And when you say he phoned, I know
you probably lived this over and over, but this is the
first time his Honor, Judge Holt, is hearing it, who
did he phone?

A    We gave him the cards.  He called the people
that's name was on the card.

Q    Would that be the police officers?

A    Yes.

Q    And what happened after he phoned the police
officers?

A    He talked to my sister.

Q    And when you say your sister, was your sister

7

there?

    A    She was on the phone.

    Q    Okay.  So in other words, he made two phone calls, is that correct?

    A    Yes.

    Q    After he talked to your sister, what, if anything, happened?

    A    The officers came.

    Q    When you say the officers came, tell his Honor, Judge Holt, exactly what happened, as best you remember it.

    A    He was talking to my sister on the phone. About 15 or 20 minutes later, they were there.

    Q    Were those the same officers who were there in the morning?

    A    Yes.

    Q    Were there only two of them at that time?

    A    No.

    Q    How many police officers were there?

    A    Four.

    Q    And these other, these new two officers, were they men or women?

    A    I think one was a lady.

    Q    Okay.  Were they white or black?

1      A    White.

2      Q    And were they in uniform or were they in

3    plainclothes?

4      A    Uniform.

5      Q    Thank you.

6              And again, when you say they came,

7    tell his Honor, Judge Holt, exactly what you mean.  How

8    did they come?  Did they knock on the door?  Did --

9      MR. RONKOWSKI:  Objection, leading.

10     THE COURT:  I understand, Ms. Placek, it is

11   somewhat leading.

12             How did they come?  How did they gain

13   entry into your house?

14     THE WITNESS:  They came up and rang the bell.

15     MS. PLACEK:  Q    And what happened then?

16     A    They came in and they put cuffs on him and

17   took him out.

18     Q    When you say him, who do you mean?

19     A    Jerome.

20     Q    And when you say they put cuffs on him and

21   took him out, where was your brother when they put

22   these handcuffs on him?

23     A    In our living room.

24     Q    And how long were the police, in toto, in

9

your house?

    A    Maybe five minutes.

    Q    Did they show you a warrant?

    A    No.

    Q    Did they lead your brother out of the house?

    A    They cuffed him and took him out.

    Q    Okay.  They cuffed him and took him out.

        Let me ask you this, did you have an occasion, at that time, to look out at your front yard?

    A    Yes.

    Q    Did you watch your brother get in the car with the police officers?

    A    Yes.

    Q    Did you see any riot or any mob of people in the front of your house?

    A    No.

    Q    Did you see anyone attacking your brother with bricks or stones?

    A    No, I didn't.

    Q    Tell his Honor, Judge Holt, what you did see.

    A    Just the normal people that's out.

    Q    When you say the normal people that's out there, what exactly do you mean?

    A    Well, the neighborhood, the kids just hang out.

1    That's what they looked like to me.  The crowd had

2    died down.

3        MS. PLACEK:  Thank you very much.

4            That's all, your Honor.

5        THE COURT:  Cross, Mr. Ronkowski or Ms. Mallo.

6        MS. MALLO:  Yes, your Honor.

7                CROSS EXAMINATION

8            BY MR. RONKOWSKI:

9

10    Q    How much of the crowd died down?

11    A    Well, there are people hanging out all the

12    time.

13    Q    How much of the crowd died down?

14        MS. PLACEK:  Objection.  She answered that.

15        THE COURT:  Overruled.

16            Did you understand the question?

17        THE WITNESS:  Yes.

18        THE COURT:  Will you answer it.

19        THE WITNESS:  Just the normal amount of people

20    to me, that I always see out there.

21        MR. RONKOWSKI:  Q    Well, there was quite a few

22    people out there at this time, wasn't there?

23        MS. PLACEK:  Objection, presuming, Judge.

24        THE COURT:  Overruled.