CASE NO. _____O8cv1589_____

ATTACHMENT NO._____5_____

EXHIBIT _____

TAB (DESCRIPTION) _____

1          Did you understand his question?

2      THE WITNESS:  There is always a lot of people

3  out there.

4      MR. RONKOWSKI:  Q   How many people were out there,

5  in front of your house, when the police were there?

6      MS. PLACEK:  Objection, presuming.

7      THE COURT:  Overruled.

8      MR. RONKOWSKI:  Q   How many?

9      A   No one was in front of our house.

10      Q   You are not saying there was quite a few

11  people out?

12      A   They were just in the area,in the neighborhood.

13      Q   How many people out in front of your house, in

14  the area?

15      A   No one was in front of our house.  The people

16  were like across the street, on the corners.

17      Q   How many people?

18      A   I didn't count heads.

19      Q   Hundreds?

20      A   No.

21      Q   Dozens?

22      A   A few.

23      Q   Twenty to 30?

24      A   I don't even think it was that many.

1    Q    Would you say there was quite a few people

2    across the street?

3    MS. PLACEK:  Well, Judge, again, I am going to

4    object.

5    THE COURT:  The objection is sustained.

6    MR. RONKOWSKI:  Q    Now, you are saying that the

7    police handcuffed your brother inside the house?

8    A    Yes.

9    Q    Did they do anything, other than handcuffing

10   the police in -- handcuffing your brother inside the

11   house?

12   A    No.

13   Q    And all four of these officers were in

14   uniform?

15   A    No.  Two were in uniform.

16   Q    And two were in plainclothes?

17   A    Yes.

18   Q    Was the lady in uniform or in plainclothes?

19   A    Uniform.

20   Q    Where were those two officers?

21   A    They were inside the house.

22   Q    Now, when you said the police rang the door-

23   bell, how long before they entered the house?

24   A    A few seconds.  We were right there at the

13

door.

Q    Did you hold the door open for them?

A    We opened the door and they came in.

Q    And who was the person that opened the door for the police, after they rang the doorbell?

A    Myself.

Q    Did you have a conversation with the police at that time or did you just let them in?

A    I just let them in.

Q    When you opened the door for the police, did you see those people outside and across the street?

A    Yes.

MS. PLACEK:  Well, Judge, the witness spoke of people hanging out in the neighborhood.

THE COURT:  Those are the people she saw outside, across the street.  The answer will stand.  Your objection is overruled.

MR. RONKOWSKI:  Q    Did you recognize any of them?

A    I know the people.

Q    Who are they?

A    My neighbors.

Q    Do you know any of their names?

A    Yes.  They were kids.

Q    When you say kids, how old are they?

14

A     Fifteen, 16.

Q     Anybody older than that?

A     I don't know their ages, all their ages.

Q     And when you opened the door to allow the police in, how many kids did you see out in front of your house?

MS. PLACEK:  Judge, again, that's a misstatement of the evidence.

THE COURT:  The objection is sustained.

MR. RONKOWSKI:  Q   How many people were out there?

A     They were across the street.  It was a tavern across the street.  People hang in front of it.

Q     Listen to the question.

How many people were out there when you opened the door to the police?

MS. PLACEK:  Judge, we have been through this three times, with the State.

MR. RONKOWSKI:  I haven't got an answer, how many.

MS. PLACEK:  Just asked and answered.

THE COURT:  Overruled.

Do you know how many people were there?

THE WITNESS:  No.

THE COURT:  Put another question.

MR. RONKOWSKI:  Q   Was there more than 20?

15

1    MS. PLACEK:  Judge, again, --

2    THE COURT:  Overruled.

3    THE WITNESS:  I don't think so.

4    MR. RONKOWSKI:  Q    Was there more than ten?

5    A    It may have been about the number.

6    Q    Is this the crowd that diminished after the

7    police transported your brother from that scene?

8    A    The crowd had diminished.

9    Q    How many, how big did that crowd get at its

10   peak.

11   MS. PLACEK:  Objection, Judge.

12   THE COURT:  Overruled.

13          To the characterization of crowd, I will

14   sustain that objection.  There were people out in the

15   street.

16          At the maximum, how many people did you

17   see?

18   THE WITNESS:  About eight or nine.

19   THE COURT:  Put another question, please.

20   MR. RONKOWSKI:  Q    Where was your mother when you

21   opened the door for the police?

22   A    In the living room.

23   Q    Who else was in the living room?

24   A    Jerome.

16

Q    Anybody else?

A    Our neighbor.

Q    What is your neighbor's name?

A    Maria.

Q    What is her last name?

A    Fields.

Q    Anybody else?

A    No; that I remember.

Q    What was your brother doing when you opened the door for the police?

A    He was still on the phone with my sister.

Q    Did he hang up the phone then, when the police came in?

A    He was still talking to her.

Q    Well, didn't he get off the phone when the police walked up to him?

A    When they walked up to him, yes, he got off.

Q    Did the police have a conversation with your brother?

A    Not that I recall.

Q    Did your brother say anything to the police?

A    Not that I recall.

Q    And the police immediately left with your brother?

17

A    Yes.

Q    They were in your home for just a few seconds then?

A    Yes.

Q    Now, did you see your brother's wrist?

A    Yes.

Q    And was your brother handcuffed while he was in your house?

A    Yes.

Q    Was he handcuffed in front of him or behind him?

A    Behind him.

Q    Did all four of these police officers exit at the same time?

A    Yes.

Q    And did they enter at the same time?

A    No.

Q    Which two entered first?

A    The plainclothesmen.

Q    How long after they had entered did these uniformed officers enter?

A    A few seconds.

MR. RONKOWSKI:  If I could have a moment, your Honor.

1          Nothing further of this witness.

2      THE COURT:  Redirect.

3      MS. PLACEK:  Very briefly.

4                  REDIRECT EXAMINATION

5                  BY MS. PLACEK:

6

7      Q    Ma'am, when the Assistant State's Attorney

8  was asking you questions about the number of people,

9  that was the average number of people that was always

10 at that tavern, correct, in front of that tavern, across

11 your house, correct?

12     A    More or less.

13     Q    Beg your pardon?

14     A    More or less.

15     Q    You saw nothing unusual about that, correct?

16     A    No.

17     Q    They weren't screaming at your brother?

18     A    No.

19     Q    They weren't screaming at your house?

20     A    No.

21     Q    They weren't screaming before the police came,

22 were they?

23     A    No.

24     Q    They weren't screaming after the police came?

19

1    A    No.

2    MS. PLACEK:  Thank you.

3                That's all, judge.

4    THE COURT:  Recross.

5                    RECROSS EXAMINATION

6                    BY MR. RONKOWSKI:

7

8    Q    Of those people there, the most that was

9    there was nine?

10   MS. PLACEK:  Judge, we went through this as to

11   number.

12   MR. RONKOWSKI:  Foundation for the next series

13   of questions.

14   THE COURT:  Put your next series of questions.

15                Objection sustained.

16   MR. RONKOWSKI: Q    Was the oldest person there

17   17?

18   MS. PLACEK:  Objection.  She said she didn't know.

19   THE COURT:  Objection is sustained.

20   MR. RONKOWSKI:  Q    Did these kids that you say

21   were out in front of your house, did they all come out

22   of the tavern?

23   MS. PLACEK:  Objection again, out in front of

24   your house.  We have been through this three times.  It

20

1   isn't going to change.

2       THE COURT:  Out in front of the house is stricken.

3   They're in the area.

4               Did they all come out of the tavern, if

5   you know?

6       THE WITNESS:  No.  They were just really hanging

7   around the tavern, outside the door.

8       THE COURT:  Put another question.

9       MR. RONKOWSKI:  Q    How many people came out of

10  the tavern?

11      MS. PLACEK: Judge, there was never any evidence.

12      THE COURT:  Overruled.  If she knows, she may

13  answer.

14      THE WITNESS:  I didn't see them coming out.  They

15  were just hanging around the tavern door.  I didn't see

16  them go in or come out.

17      MR. RONKOWSKI:  Nothing further.

18      MS. PLACEK:  Nothing further, your Honor.  Thank

19  you.

20      THE COURT:  Thank you, ma'am.  You may also remain

21  in the courtroom, if you so desire.

22                  (Witness excused.)

23

24                  (Witness duly sworn.)

                        21

1    THE COURT:  Ma'am, that microphone is on.  If

2    you will draw up close, speak directly into it, keep

3    your voice up, we'll all be able to hear you.

4    MS. PLACEK:  May I proceed?

5    THE COURT:  You may.

6

7                         EARLINE HENDRICKS,

8    called as a witness on behalf of the Petitioner-Defendant

9    herein, having been first duly sworn, was examined and

10   testified as follows:

11                       DIRECT EXAMINATION

12                       BY MS. PLACEK:

13   Q    Ma'am, would you state your first and last

14   name, spelling both for the purposes of the record.

15   A    My name is Earline Hendricks, E-a-r-l-i-n-e,

16   Hendricks, H-e-n-d-r-i-c-k-s.

17   Q    Now, ma'am, you are the mother of Jerome

18   Hendricks?

19   A    I am.

20   Q    And calling your attention to 1988,

21   approximately August 9, was he living with you?

22   A    Yes, he was.

23   Q    Now, calling your attention to the afternoon

24   hours, early evening hours, did you know where Jerome

22

was?

    A    He had been out looking for a job.

    Q    Now, you say he was out looking for a job. From that job, did he have -- or from that task, did he have occasion to come back home?

    A    Yes, he did.

    Q    Could you tell his Honor, Judge Holt, at approximately what time he came home?

    A    I guess, about between 7:30 and 8:00 o'clock, around there.

    Q    Now, at that time, did you have a conversation with your son?

    A    Yes, I did.

    Q    Could you tell his Honor, Judge Holt, what that conversation consisted of?

    MR. RONKOWSKI:  Objection.

    THE COURT:  Overruled.  Hearsay is the basis of the objection?

    MR. RONKOWSKI:  The fact that what she says is irrelevant, unless the defendant relies on it.  The defendant hasn't testified to any of this.

    THE COURT:  Overruled.

    MS. PLACEK:  Judge --

    Q    Well, go on, ma'am, I'm sorry.

23

A    Well, when Jerome came in, I told him that the police was there and they left me a card and asked me to call -- asked him to call when he comes in.

Q    Now, let's talk a bit about the police.  When were the police there?

A    They were there earlier part of the day.

Q    Do you remember about what time?

A    Well, it had to be after I got off from work.

Q    And could you sort --

A    About, I guess about 4:30, 5:00 o'clock.

Q    You worked that day, correct?

A    Yes, I did.

Q    Could you tell his Honor, Judge Holt, where you worked?

A    I worked at my -- Weiss Memorial Hospital, at 4646 Marine Drive.

Q    What is your position at Weiss?

A    I was cashier there.

Q    Thank you.

    Now, Ma'am, when you told Jerome that the police had come and asked him to call, did he, in fact, make a phone call?

A    Yes, he did.

Q    Did you see him make a phone call?

24

A    Yes, I did.

Q    And what, if anything unusual, happened after he made that phone call?

A    Well, after he called the police, they came.

Q    When you say they, did you recognize those officers?

A    Well, it was four police that came, two in plainclothes and two in uniform.

Q    Were they white or black?

A    All of them were white.

Q    Did you recognize any of them from previous?

A    No, not really, no.

Q    And what, if anything unusual, happened at that time?

A    Well, after he called, it wasn't too long be-fore they came, and they came and they rang the bell, and we opened the door and let them in, and they asked where was Jerome. As soon as they identified themselves, they took him and put handcuffs on him. I asked them why were they putting handcuffs on him, if they were just going to talk to him.

Q    What did they say?

A    They didn't say anything to me. They just took him on out. The lady police told me don't worry.

25

Q    Now, ma'am, did you happen to see them when they took him out of your house?

A    Yes, I did.

Q    Was there a crowd screaming for Jerome's blood, in your yard?

A    No.

Q    Was there anyone throwing rocks or hitting him with boards, in your yard?

A    No.

Q    Did you see the police have to protect Jerome in any way, shape, or manner, after they had arrested him?

A    No.

MS. PLACEK:  Thank you, your Honor.  That's all I would have.

THE COURT:  Cross.

CROSS EXAMINATION

BY MR. RONKOWSKI:

Q    Ma'am, you were there when the police were let in?

A    Yes, I was.

Q    Was it you or your daughter that opened the door for the police?

A    I disremember.  I think it was my daughter,

26

1    I'm not sure.

2        Q    That was after they rang the doorbell?

3        A    Yes.

4        Q    The police were inside only a matter of a few

5    seconds, correct?

6        A    Correct.

7        Q    When you opened the door, how many people

8    could you see out in front of your house?

9        MS. PLACEK:  Objection, presuming, Judge.

10       THE COURT:  Overruled.

11       THE WITNESS:  We could see out our door, because

12   our front door was open and we had a screen door up, so

13   we could see out all the time.

14       MR. RONKOWSKI:  Q    How many people did you see

15   out there?

16       A    Nobody, really.

17       Q    The only people that were outside your house

18   was the police, which you let in?

19       A    Well, I guess it was people out there, but

20   they weren't around my house.

21       Q    How many people could you see out there?

22       MS. PLACEK:  Well, Judge, again, there would be an

23   objection as for clarification of the question.

24       THE COURT:  Overruled.  If she understands, she may

27

1    answer.

2         THE WITNESS:  You say how many people did I see

3    out there.  I really didn't pay any attention.  It wasn't

4    no mob or anything out there.

5         MR. RONKOWSKI:  Q    Where was the nearest person?

6         MS. PLACEK:  Objection.

7         THE COURT:  Overruled.

8         THE WITNESS:  The nearest person, I don't know where

9    the nearest person was, sir.

10        MR. RONKOWSKI:  Q    Now, the police left in a few

11   seconds.  Did you watch your son go with the police?

12        A    Yes, I did.

13        Q    Did you see anybody outside your house when

14   your son left the house with the police?

15        A     No, I didn't.

16        Q    Were there any kids across the street?

17        MS. PLACEK:  Objection.

18        THE COURT:  Overruled.

19        THE WITNESS:  I didn't pay any attention, sir,

20   whether there were children across the street.

21        MR. RONKOWSKI:  Q    Well, could you see your son's

22   wrists?

23        A    I could see -- you mean when they take him to

24   the police car?

28

1      Q      At any time after the police arrived, could

2   you view your son's wrists?

3      A      His wrists?

4      Q      His wrists.

5      A      Yes, I could.

6      Q      Was there anything on it?

7      A      Handcuffs.

8      Q      How was he handcuffed?

9      A      In the back, they put his hands in back and

10  handcuffed him.

11     Q      Who did that to him?

12     A      The police.

13     Q      Who was there when that happened?

14     A      My daughter and myself.

15     Q      Anybody else?

16     A      It was another lady named Marie was there.

17     Q      Do you know Marie's last name?

18     A      I don't know her last name.

19     Q      Where does she live?

20     A      I don't really know where she lives at.

21     Q      How long have you known Marie?

22     A      She's not a friend of mine.  She was a friend

23  of my daughter's.

24     Q      What was your daughter's name that was present?

1    A    Davida Hendricks.

2    Q    Anybody besides you, your son, Maria, and

3    Davida?

4    A    Was at the house?

5    Q    Yes.

6    A    That's all.

7    MR. RONKOWSKI:  Nothing further.

8    MS. PLACEK:  No rebuttal or redirect, your Honor.

9    THE COURT:  Thank you, Ms. Hendricks.  You may step

10   down.

11   MS. PLACEK:  May she remain in the courtroom?

12   THE COURT:  You may also remain in the courtroom,

13   if you so desire.

14                        (Witness excused.)

15   MS. PLACEK:  Your Honor, at this time, we would

16   rest in rebuttal.

17   THE COURT:  Petitioner rests in rebuttal.

18   MR. RONKOWSKI:  If I could have a brief recess

19   and get on the phone and check on Sergeant Wolf's

20   ability to testify.

21   MS. PLACEK:  Is he on standby, your Honor?

22   MR. RONKOWSKI:  He's been on standby for quite a

23   number of dates. I've got his home phone number, if

24   need be.

30

1    MS. PLACEK:  I would be real impressed if we knew

2    he was on standby, by phone, for today, instead of quite

3    a number.

4        THE COURT:  I can't answer that.

5        MS. PLACEK:  Thank you.

6        THE COURT:  This case is recessed.  We'll call it

7    back shortly.

8                          (Whereupon, a short recess was

9                           taken.)

10       THE CLERK:  Jerome Hendricks.

11       MR. RONKOWSKI:  We couldn't agree on a stipulation

12   and the officer is on his way here.

13       THE COURT:  You could not agree on a stipulation,

14   you say?

15       MR. RONKOWSKI:  Yes.  There was an offer of a

16   stipulation that Detective --

17       THE COURT:  No.  Do you have an agreement?

18       MR. RONKOWSKI:  No.

19       MS. PLACEK:  Judge, the stipulation --

20       THE COURT:  I am not interested in the contents

21   of the stipulation. I am only interested in whether or

22   not you and Mr. Ronkowski have agreed on a stipulation.

23       MS. PLACEK:  I asked him to rethink, because he

24

31

1  asked me to concur on what another officer testified

2  to as --

3       THE COURT:  You are not answering my question.

4            Do you have an agreement or don't you?

5       MS. PLACEK:  If the State would offer me something,

6  Judge, we might.

7       THE COURT:  Passed.

8                    (Whereupon, the above-entitled
9                     cause was passed, after which
                      the following proceedings were
10                    had:)

11      THE CLERK:  Jerome Hendricks.

12

13                   (Witness duly sworn.)

14

15      MR. RONKOWSKI:  May I proceed?

      THE COURT:  You may.

16

17

18

19

20

21

22

23

24

ALBERT WOLF,

called as a witness on behalf of the People of the

State of Illinois-Respondent herein, having been first

duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. RONKOWSKI:

Q    State your full name and spell your last name

for the Court Reporter.

A    Albert Wolf, W-o-l-f.

Q    How long have you been with the Chicago Police

Department?

A    Over 12 years.

Q    What is your current rank?

A    I am a sergeant.

Q    Now, referring your attention to August 8,

1988, where were you assigned?

A    Assigned as a detective in Area 2, Violent

Crimes.

Q    How long had you been a detective?

A    I was promoted detective in November, 1981.

Q    Now, referring your attention to August 8,

1988, at about 8:30 p.m., were you in Area 2?

A    Yes.

Q    Who was your partner that day?

33

1    A    Larry Nitsche.

2    Q    Did he receive a phone call?

3    A    Yes, he did.

4    Q    Pursuant to that phone call, did you go to a

5    location?

6    A    Yes, we did.

7    Q    Whose home was that?

8    A    To the house of Jerome Hendricks, 255 West

9    117th Street.

10    Q    Could you describe what you observed when you

11    arrived at that location on August 8, 1988?

12    A    It was a very sizeable crowd, very unruly,

13    intense crowd, scattered about the street, the sidewalk,

14    in the vicinity of the house.

15    Q    How many people in the crowd?

16    A    Maybe two, three dozen.

17    Q    What happened after you arrived there?

18    THE COURT:  Mr. Ronkowski, what is the relevance

19    of this testimony?

20    MS. PLACEK:  I was just going to object, Judge.

21    MR. RONKOWSKI:  It goes toward the mode of why the

22    defendant would call the police and voluntarily go with

23    the police.  It's the State's theory of the case.

24    Ms. PLACEK:  Judge, this is improper.  I'll make

1   the objection.  It is improper for surrebuttal.

2           THE COURT:  Overruled.

3                   Go ahead.

4       MR. RONKOWSKI:  Q   What happened after you arrived

5   there?

6       A    We exited our vehicle, walked through the

7   crowd and approached the front door of 255.

8       Q    Then what happened?

9       A    The front door was opened by a female and we

10  entered the house.

11      Q    And what happened when you entered the house?

12      A    We observed Jerome Hendricks on the telephone.

13  He observed us.  He put the phone down.  We told him we

14  were the detectives he had just called.  He stated he

15  wished to cooperate with the police and come with us to

16  Area 2.

17      MS. PLACEK:  There will be continuing objection,

18  Judge.

19      THE COURT:  Objection is overruled.

20      MR. RONKOWSKI:  Q   When what happened?

21      A    We walked out the front door and walked to our

22  squad car.

23      Q    And did the defendant have a seat in your

24  squad car?

35

1    A    Yes.  He opened the door and sat in the back

2    seat of the squad car.

3    Q    Where was the group of people outside, at

4    that time?

5    A    They were in very close proximity of our own

6    presence.  They were all around.

7    Q    Was the defendant handcuffed at any time?

8    A    No.

9    MR. RONKOWSKI:  Your witness.

10                   CROSS EXAMINATION

11                   BY MS. PLACEK:

12

13    Q    Officer, before you took the stand today,

14    you were in what is called a witness room outside of

15    this courtroom, correct?

16    A    That's correct.

17    Q    And, Officer, I'm going to ask you to speak

18    a little louder.  I am deaf in this ear.  Okay?

19    A    Sure.

20    Q    The microphone even works.

21                   When you were speaking to Mr. Ronkowski,

22    he was showing you reports and you were discussing your

23    testimony, correct?

24    A    I was reviewing my report.

1      Q    To refresh your recollection, correct?

2      A    That's correct.

3      Q    And in reviewing your report, in that report,

4 you never wrote any designation or any notation about

5 any kind of large crowd, did you?

6      A    No.

7      Q    Not only didn't you write any designation or

8 any sort of thing about any large crowd, but what you

9 told us today, from the stand, is what you're purporting

10 to say is what happened, correct?

11      MR. RONKOWSKI:  Objection, argumentative.

12      THE COURT:  Overruled.

13      MS. PLACEK:  Q    Correct?

14      A    Exactly what happened.

15      Q    Exactly what happened.

16          So nobody came from that crowd and hit

17 the defendant on the head or tried to hit him with a

18 stick or two-by-four, did they?

19      A    There was -- I walked out the door first,

20 walking to the car.  The crowd was all around us.  It

21 was a very intense, volatile crowd.  There was some kind

22 of physical scuffle.  I do not know what that involved.

23      Q    By the way, when you say you don't know that

24 that involved, you were with the defendant, weren't you?

1      A      Pardon me?

2      Q      You were with the defendant, weren't you?

3      A      I was walking first.

4      Q      So you didn't turn around when this crowd

5   attacked the defendant, you just kept walking forward?

6      A      We moved quickly through the crowd.

7      Q      By the way, that little part you had just

8   added, did I refresh your memory or did you just come

9   up with that?

10     A      I have a distinct recollection.

11     MR. RONKOWSKI:  Objection.

12     MS. PLACEK:  If I could finish -- I'll withdraw it,

13  Judge.

14          Q      You, when Mr. Ronkowski asked you

15  what happened, you didn't mention about anybody hitting

16  the defendant with anything, or any sort of confronta-

17  tion, attacking the defendant, did you?

18     A      I relayed the same facts to Mr. Ronkowski

19  that I am to you.

20     Q      So in other words, you said, on direct

21  examination, about these people attacking the defendant?

22     A      I have --

23     MR. RONKOWSKI:  Objection.

24     THE COURT:  The objection is sustained.  It is

38

1    argumentative.

2        MS. PLACEK:    Q    By the way, there is nothing

3    in your report about the crowd getting unruly and moving

4    in, correct?

5        A    That's correct.

6        Q    Thank you.

7            By the way, it is standard Chicago

8    operating, or standard procedure for the Chicago Police

9    Department to put all those things that are important

10   or vital or out of the ordinary in Chicago Police

11   reports, correct?

12       A    Police reports is a summary of the facts of

13   the investigation.

14       Q    Did you understand my question, Officer?

15       A    I certainly understand it.

16       Q    Would you answer it?

17       A    That case report is a summary of the facts

18   our investigation revealed and indicates, that report

19   indicates facts pertinent to the investigation.

20       Q    So there was nothing pertinent about a large

21   crowd of people attacking the defendant?

22       A    Unfortunately, I am not the one who authored

23   the report.

24       Q    Did you offer to change it?

39

1    A    No, I did not.

2    Q    Have you ever said to your partner, let's

3    change that report, let's make it correct?

4    A    No, I did not.

5    Q    I see.

6         By the way, there were people in the

7    house with the defendant, weren't there?

8    A    Yes.

9    Q    His mother?

10   A    Yes.

11   Q    His sister?

12   A    Several family members.  I don't recall if

13   his sister or not.

14   Q    Could you recognize them?

15   A    No.

16   Q    Look around the courtroom and see if you see

17   them.

18   MR.RONKOWSKI:  Objection.

19   THE COURT:  Overruled.

20   THE WITNESS:  I have already answered.

21   MS. PLACEK:  Q    So in other words, you can't

22   remember whether -- what his mother or his sister looked

23   like, correct?

24   A    At this point, I would be guessing.  I choose

40

1    not to.

2         Q     Thank you.

3              Officer, isn't it true that you went

4    there to arrest the defendant?

5         A     No, it's not.

6         Q     Isn't it true there is nothing about this

7    call for help, because of this impending crowd, in

8    the Chicago police reports?

9         A     I believe you already asked me that.   There

10   is nothing in the report about the crowd.

11        Q     Or the call for help to the station by the

12   defendant, in the Chicago Police Department report,

13   correct?

14        A     I don't know what call for help you are

15   referring to.

16        MS. PLACEK:   Exactly.   Thank you.

17              That's all, Judge.

18        THE COURT:   Redirect.

19                     REDIRECT EXAMINATION

20                     BY MR. RONKOWSKI:

21

22        Q     Your police reports show that the defendant

23   did call at 8:30, on August 8, doesn't it?

24        A     Called our station to let us know he was at

1    home, to speak to us.

2        Q    You are working with other detectives?

3        A    Numerous.

4        Q    And other detectives were at the scene?

5        A    Yes.

6    MR. RONKOWSKI:  Nothing further.

7                        RECROSS EXAMINATION

8                        BY MS. PLACEK:

9

10        Q    What other detectives?

11        A    Detective Baker was on the scene, whoever Baker

12    was working with.

13        Q    By the way, you did refresh your recollection

14    as to who was present at the scene, when you read the

15    reports, didn't you?

16        A    I have a distinct recollection of that scene.

17        Q    Then name your brother officers who were

18    present at that scene.

19        A    I'm telling you Baker was there.  I don't

20    recall if Baker was with anybody.  There were several.

21        Q    I beg your pardon, I missed the last part,

22    who was with Baker?

23        A    I don't recall if Baker was with somebody.

24    It's possibly Ryan was there.

                                42

1    Q    Possible.  Does that mean he may not have

2    been there?

3    A    I don't know for sure.  I know Baker was

4    there.

5    MS. PLACEK:  Thank you.

6    That's all, Judge.

7    MR. RONKOWSKI:  Nothing further by the State.

8

9    EXAMINATION

10   BY THE COURT:

11   Q    Mr. Wolf, from the date of this arrest, down

12   to and including today's date, have you authored any

13   police reports in this case?

14   A    Official police reports, Judge, or talking

15   about notes?

16   Q    Notes.

17   A    Yes.

18   Q    Authored reports or any other thing in writing

19   that memorializes the events of that day?

20   A    I have made notes regarding this case.  I

21   did not make a formal police report.

22   Q    Is there any note, document, or report, or

23   anything else, in writing, prepared by you, that

24   describes or comments upon this crowd that you say was

43

1    out in front of the defendant's house?

2        A    I would have to review all of the notes, your

3    Honor.  None come to my recollection.

4        Q    Was anyone arrested for mob action or any

5    other offense out in front of the defendant's house?

6        A    No.

7        Q    Have you read any police reports authored by

8    any other officer in this case that would mention the

9    crowd that you say was out in front of the defendant's

10   house?

11       A    None that I recall.

12       Q    Is there any report that indicates that when

13   the defendant called the police station, he mentioned

14   anything about a crowd gathered in front of his home?

15       A    None that I know of.

16       THE COURT:  Mr. Ronkowski.

17       MR. RONKOWSKI:  If I could have a moment.

18               Nothing further.

19       MS. PLACEK:  Nothing further, Judge.

20                   FURTHER EXAMINATION

21                   BY THE COURT:

22

23       Q    Let me ask you, Mr. Wolf, do I understand

24   correctly, that the defendant requested the police

                          44

department to transport him to a police facility because of this crowd?

A   Why he did what he did, I don't know.   I can only tell you what happened.

Q   Did he say that, you know, any words to that effect?

A   He didn't come out and say it.   I think that the environment -- I don't know.   I didn't tell him why he did what he did.

Q   What, if anything, did the police department do to protect the other members of Mr. Hendricks' family, who remained in the house?

A   I'm not aware of that.

Q   So the police just took Mr. Hendricks and all the police officers there left?

A   Mr. Hendricks, when he called us, when I approached him at his house, he did not convey to me that he was in fear of this crowd, that that was his main concern.   His main concern was that he was innocent and he wanted to cooperate.

Q   I understand, but when you say this crowd out in front of his house, you recognized that there was danger, perhaps, to Mr. Hendricks, did you?

A   It was a tense situation.   How far the crowd

45

1  was going to go, I don't know.  We had ample police

2  officers on the scene, to control the situation.

3      Q    All the police officers left with

4  Mr. Hendricks?

5   .   A    I can only tell you what I did.  I don't

6  know how long uniformed policemen stayed behind.

7      Q    But before you and the police officers, who

8  arrived at his home with you, left, nothing was done

9  to secure the person of the other people remaining at

10  the home, is that right?

11      A    No, that I am aware of.  I immediately left

12  the scene.

13      THE COURT:  Mr. Ronkowski?

14      MR. RONKOWSKI:  Nothing further.

15      THE COURT:  Ms. Placek?

16

17           FURTHER RECROSS EXAMINATION

18           BY Ms. PLACEK:

19      Q    Because of impending danger presented by this

20  crowd, did you ever speak to either the defendant's

21  mother or sister, or any other member of that household?

22      A    We were only in the house a very brief amount

23  of time.

24      Q    Does that mean no, you didn't?

**46**

A    Are you talking about when we took him?

Q    When you took him into custody, yes.

MS. MALLO:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I don't recall.

MS. PLACEK:  Q    Do you recall whether or not anybody, when you took the defendant into custody, asked the mother or the sister or anyone else present in that household, whether they might want to come along for their own personal safety?

MS. MALLO:  Objection.

MR. RONKOWSKI: Objection.  Assumes a fact not in evidence.

THE COURT:  Overruled.

THE WITNESS:  The subject was not taken into cus-tody. He agreed to accompany us. We left the scene. I do not recall any conversation with the mother at that time.

MS PLACEK:  Q    Or sister?

A    Or sister.

Q    Or any other member of the household?

A    Well, people were there, things were happening. You're asking me for a verbatim account of conversation, I cannot give it to you.

Q    Let me ask you, in your account, what was done

47

to secure the safety of other members of the household
and the children?

    A    Again, I can only state what I did and what
I am aware of.

    Q    What did you do to secure the safety of the
house and the mother, sister, other female members, and
the children in the household?

    A    Nothing.

    MS. PLACEK:  Thank you.

           That's all, Judge.

    THE COURT:  Thank you, Mr. Wolf.  You may step
down.


                 (Witness excused.)

    MR. RONKOWSKI:  The People rest.

    THE COURT:  Both sides rest?

    MS. PLACEK:  Yes, Judge.

    THE COURT:  I'll hear argument.

    THE COURT:  You may.

OPENING ARGUMENT

BY MS. PLACEK:

Your Honor, in this particular matter,
I won't be so bold, nor am I that young in the law
to cite the certain basic provisions of the United
States Constitution, all which have been trampled on
by, in fact, the police in this issue.

In trying to prepare this argument,
quite frankly, I have been trying to figure out what
exactly the theory of the probable cause or the
legitimacy of this arrest is and, quite frankly, I have
searched and I have searched in the light most favorable
to the State and found none.

If this does not fall into a classic
situation of Payton and its prodigies, then no other
case can.

Number one,  the suggestion -- well,
strike that.

The State, in their answer to our case,
has never shown you a defendant, who the police were
afraid of fleeing.  They never showed any exigent
circumstances that, in fact, would have prevented the
police from going into this man's house, into this man's
residence, without a warrant, serving it on this man and,

49

in fact, executing a proper arrest.

Since we are starting with a warrantless arrest, the idea becomes then what probable cause or what emergency did they have and what was presented to you. Quite frankly, the State will say, Judge, this is not an arrest at this time.  Quite frankly, what we have before the Court is we have, in fact, a consentual situation. After all, what you have is you have a consent of the mother and the sister, you have the consent of, supposedly, the defendant to go with them.

We point out that the prodigy of Payton says the police can't use deception and in the use of deception, quite frankly, all consent, is any, is vitiated.  In this case, there is no consent, because even if you place the arrest at a later time, no evidence has been introduced to the State that their case got any better.

First, let's deal with the situation at the house.  All of a sudden, out of thin air, the State would have you believe in the evidence, to their best light, that, in fact, this gentleman either called the police because he felt threatened by a crowd in the neighborhood, which the Court very kindly pointed out in all the parade of officers that we had, that the

50

police didn't even note any kind of crowd threatening

the defendant.  And we would point out that this becomes

more than a mere situation where, well, it wasn't really

that important, we handled the situation, for the simple

reason that this could have been used at trial by these

police officers, against the defendant.  What would be

more damaging, and this is why it should have been, if it

happened the way it was, it should have been in their

police reports, than tell you, Judge, or 12 members of

the jury, my, God, we were the protectors of this man.

We saved him because the neighborhood knew he did it.

It never happened.

You heard officer upon officer, and one

relative of the victim, who comes supposedly forward,

a day after -- a date, rather, after the motions have

began, and said yes, I was part of the crowd, and none

of the other police officers know his name, nor is there

any reason for him to come forward, other than a cross

examination of police officers, in the previous date,

by Defense Counsel.

Next, you have the credibility of police

officers.  Well, we went in there and we said come with

us, son, and he came willingly.  Well, did he?  We stand

unimpeached by the family members and by his own testi-

51

mony that, quite frankly, that they came in and when they

came in, they grabbed him and handcuffed and took him

out, and that's when the arrest took place. And upon

what information and what probable cause? Well, there

was a murder in the neighborhood and the defendant

stood convicted at some previous date, years before, of

a crime, not a violent crime. When I say violent, not

raising to a category of murder. Well, not only he

stood a convicted felon in the neighborhood, but also,

we must go one step further, he was the last one seen

with, in fact, the victim.

That would be fine for the State's

Attorneys to argue at this particular time, if that was

true, and that does not only come from the mouth of the

defendant, in our case in chief, but from the mouth of

the State's own witnesses and from the Chicago Police

Department. Because, quite frankly, I would point out

to the Court that he was not the last one to see the

victim alive, that her family members not only saw her

alive, but the following day, after this young girl,

who has been shown that she was a runaway, who engaged

in prostitution, who --

MS. MALLO:  Objection.

MS. PLACEK:  Judge, that was the testimony of the

. 52

police officer.

THE COURT:  Overruled.

MS. PLACEK:  From the Court's --

THE COURT:  Don't argue with Counsel.  Address your remarks to me.

MS. PLACEK:  I apologize, your Honor.

That she engaged in prostitution; that, in fact, she was habitually uncontrollable; that she had another male relative in the area who, in fact, lied to her legal guardian, not only lied to her legal guardian, but would take her in; that she was seen in the neighborhood and that she was seen in the neighborhood several days after she had run away.  Not only that, but that the police believed this report and took her guardian and went out looking for her in a well-known strip.

Now, this was some time after, so there goes their claim that he was, in fact, the last one to see this person alive.  So where is your probable cause?  I don't know.  I don't have to know.  Where is your mere suspicion?  I don't know.  My job is to present the Court with the motion.

Well, said the police officers, Defense Counsel is wrong, we didn't arrest him when we came to

53

1  this house.  Doesn't matter. It doesn't matter that

2  it seemed like an arrest.  It doesn't matter that we

3  stand uncontradicted that he was taken out and hand-

4  cuffed.  He consentually came with us. No, says the

5  State, the arrest happens later, later, when we had

6  probable cause.

7           Well, Judge, I would ask the Court, if

8  it needs transcripts.  The transcribed testimony has

9  been, in fact, prepared and can be given to you.

10          Other than the two facts, the facts

11  mentioned, what other probable cause have they pre-

12  sented for a later arrest at the station?  There is none.

13          So, Judge, under Payton and the prodigies,

14  under all case law, they have shown no exigent circum-

15  stances, no probable cause which, quite frankly, was

16  admitted by the State's Attorney at the first -- at the

17  time the Defense Counsel is claiming the arrest and

18  saying, as a matter of fact, in argument with the Court,

19  stated to this Court, well, Judge, there was no probable

20  cause at that time.  It wasn't until we got him down to

21  the station and when we got him to the station, that's

22  when we established probable cause.  But all we have

23  heard, time and time and time again, from the State]

24  is the two things I brought up.  Well, he was the

54

1   last known person, which is a lie and which is incorrect;

2   and secondly, Judge, that he has been convicted before,

3   something which cannot be used in Defense Counsel's

4   estimation through case law. And then they said, well,

5   when we got him to the station, we knew it, but there

6   was no evidence presented as to how that evidence, which

7   was nothing, had shifted.

8        For this reason, your Honor, we are

9   asking the Court to, in fact, sustain our motion.

10       THE COURT:  State.

11                    CLOSING ARGUMENT

12                    BY MS. MALLO:

13

14       Thank you, your Honor.

15       Judge, the People maintain that the

16   defendant, strike that, that the detectives, the

17   police department had probable cause for the arrest

18   at the time they arrived at the defendant's home, but

19   we also maintain, Judge, that the arrest didn't take

20   place until the 9th day of August, they day after the

21   defendant left his home and went to the police station,

22   Judge.

23       THE COURT:  After the defendant had voluntarily

24   been in the police station for how long?

55

1    MS MALLO:  Judge, for approximately 16 hours.

2              Judge, I am going to rely on a case,

3    People versus Johnson, that can be cited at 187 Il. App.

4    3d 756, and 554 -- 544 N.E. 2d 392.

5         THE COURT:  Just give me the Illinois cite.

6    187 Il. App. 3d?

7         MS. MALLO:  756.

8              It's a 1989 case, Judge.  I apologize

9    to both you and Counsel, I thought I had copies for both

10   of you.  I do not.  I will be more than happy to provide

11   those to you.

12             Judge --

13        THE COURT:  I have them in chambers.

14        MS. MALLO:  Thank you.

15             This is a First District, First Division

16   case, and as I said, it was decided in June of 1989.

17   The Appellate Court addresses, in this case, the issue

18   of arrest and in this case, specifically, at what time

19   the arrest took place.

20             In this case, Judge, the defendant --

21   the police officer went to the defendant's home and

22   asked the defendant if, in fact, he would come to the

23   station.  Unlike the case before your Honor, in the

24   Johnson case, the defendant -- the police officers

were not invited into the home by the defendant.    In

Johnson, the police went to the home and similarities

in the Johnson case and in the case before your Honor

are these, that the Johnson case, as in the case before

your Honor, the police never displayed a weapon.    In the

Johnson case, as in the case before your Honor, the

squad car used to transport the defendant to the police

station, there was no grill or no device separating the

front seat from the back seat of that police car.

And, Judge, another similarity between

these two cases is that neither situation was the

defendant taken from his home in handcuffs.    Judge, in

the Johnson case, the defendant went to the police

station with the police officers and the Court here

focused on the intent of the police officers in the

understanding of the individual being questioned.

Judge, I would ask you to consider here

the fact that the testimony from the defendant, from

his mother, from his sister, all was that the defendant

himself called the police, that the defendant himself

invited the police to his home and that the defendant's

family member, a female, went to the door, opened the

door and invited the police into the home of the

defendant and his family.    It was a consentual entry by

1    the police.

2    The other thing I would ask you to

3    consider, Judge, is whether other routine procedures

4    associated with arrests were present, such as searching,

5    booking, handcuffing, fingerprinting, and photographing.

6    Judge, I would ask you to consider the

7    facts of the case before your Honor, that in this case,

8    there is no evidence that the defendant was ever finger-

9    printed, handcuffed, booked -- well --

10    MS. PLACEK:  Objection.

11    MS. MALLO:  There is a dispute to handcuffing.
      Excuse me, I misspoke.

12    

13    There is no evidence that the defendant

14    was ever fingerprinted, photographed, any booking pro-

15    cess.  Judge, the officers testified the defendant was

16    taken from the home, smoking a cigarette, with his hands

17    at his side.  He opened the squad door by his own power,

18    got in the back seat of that squad and was transported

19    to the police station.  At the police station, he was

20    again allowed to sit in a room.  When he walked from

21    the squad into the police station, he was not handcuffed,

22    he was free to walk in of how own accord, into the

23    police station.

24    Judge, I would also ask you to consider

58

the facts of a recent decision.  It's the decision

that was a rule 23, from the Appellate Court, and I

have copies of this for your Honor.  I can also provide

Counsel with one.  And it is the case of the People ver-

sus Richard Crim.  Judge, Crim cites two cases, People

versus White and People versus Bean.  I would ask you

to consider the decision of the Appellate Court.  It

was appealed from the Circuit Court of Cook County,

No. 85-C-7618, and the number given this case in the

Appellate Court is 90-72. It was affirmed by the

Appellate Court on February 13 of this year.

Judge, in the case of Crim, the police

were admitted into Crim's house.  Again, a difference

between Crim and the case before your Honor is that

Crim did not invite the police to his home.  In this

case, the police went to his home and, again, the police

were given voluntary -- were invited in, voluntary

consent to enter, and when they were in there, they

spoke with the defendant's family members.  They were

told that the defendant was asleep.  They were told this

by the defendant's father.  And at that time, the police

officers informed the father that they were there to talk

to the defendant.  The defendant got up, dressed himself,

went into the living room.  He met the defendants and,

strike that, the detectives, and the detectives then

transported him to Area 2 Headquarters.

In this case, the difference between the

Crim case and the case before your Honor is the

detectives, at that time, arrested the defendant inside

his home.  They handcuffed him and told him he was under

arrest and transported him to Area 2.

Judge, I would say that those facts are

different than the case before your Honor.  And the

Appellate Court held that even in the absence of

exigent circumstances, voluntary consent to enter will

justify a warrantless in-home arrest.  Such consent

need not be given by the defendant but may be, instead,

obtained from a third party.

Judge, in the case before your Honor,

the defendant invites the police into his home, calls

the police, tells them to come over.  When the police

arrive, they meet with the defendant, allowed entry

by a family member, and the defendant voluntarily goes

with the police officers.

In this case before your Honor, there

is no indicia of arrest, no handcuffs, no statement by

the police, you are under arrest, as there was in the

the Crim case, and, Judge, at that time, the defendant

60

accompanies the officers to Area 2.

Judge, we argue the fact that there
is probable cause, plus a consentual entry to this
home, equals a legal, lawful arrest.  That's just
assuming arguendo that you do not agree with our
position that the arrest took place on the 9th day of
August, which is what we contend.  The arrest took
place the next day, after the defendant had already
been taken to Area 2.

Judge, I ask you to consider other cases
and, again, I apologize to both yourself and Counsel,
I thought my file contained copies of these cases.  It
does not.  And I would ask you to consider the case of
People versus Creach, C-r-e-a-c-h.  This case can be
found at 79 Il. 2d 96.  It's a 1980 case.  It was a case
decided by the Supreme Court of Illinois, in February
of 1980.

Judge, in this case, it, like the case
before your Honor, is a case involving a defendant
charged with murder.  In this case, the Supreme Court
of Illinois considers as one of the issues, in rendering
its decision, what probable cause was evident at the
time the defendant was taken into custody.

Judge, the facts of Creach were as

follows:  The defendant was charged with murder

of a woman whose body was found approximately 7:00 A.M.,

on the morning of September 25, 1973.  He body was

found near some CTA tracks in Evanston, and the victim

died as a result of stab wounds and a gunshot wound.

The defendants had an initial conversa-

tion with the police, at which time they were not

arrested, and the defendants were arrested at a later

time, when probable cause existed.  What happened is

Creach left the jurisdiction of the State of Illinois.

He fled and was in another part of the country.  At the

time the defendant was taken into custody, however, the

officers knew that the defendant had been living off and

on with the victim, that the victim was killed, most

likely killed after midnight on the date of September 25,

and also, Judge, that the last person the victim was

seen with -- well, strike that, Judge, I'm sorry, that

the defendant last saw the victim at 1:30 A.M., on the

date of Septembner 25, and that the victim's body was

found about five and a half hours later.  The last,

the fourth piece of probable cause the officers had

was that the defendant left for Ohio in the victim's

car.

The Supreme Court of Illinois held that

1    that was sufficient probable cause for the defendant's

2    arrest.   They reasoned that the victim's body was dry.

3    It had rained that night and it was dry, so that most

4    likely, she had been murdered after midnight.   That he

5    said in a conversation to his mother, which was reported

6    to the police, that he had seen the victim about 1:30

7    A.M.   Also, his mother knew that the victim, knew that

8    her son was, on and off, living with the victim and also,

9    Judge, knew that the defendant was driving the victim's

10   car, knew that because the defendant called her from

11   Ohio and told her.   When he talked to his mother from

12   Ohio, she asked the defendant to come home to Illinois to

13   talk to the police.   The defendant did.   He contacted

14   the police and the defendant was arrested for the murder

15   of the victim.

16          Judge, I would ask you to consider the

17   language of the Supreme Court in deciding the Creach

18   case.   When the Supreme Court decided that probable

19   cause existed for the arrest of the defendant in this

20   case, they said that probable cause for arrest exists

21   when the facts and circumstances, within the arresting

22   officer's knowledge, are sufficient to warn a man of

23   reasonable caution in believing that an offense has been

24   committed and that the person who has been arrested is

the one who's committed it.

Judge, I would also ask you to consider another case and this case is People versus Fetterman, F-e-t-t-e-r-m-a-n, 14 Il. App. 3d 120. Judge, this is a 1973 case decided by the Appellate Court of the Illinois First District, Third Division. It was decided in August of that year.

And, Judge, I think that the reason I find this case persuasive is because in the Fetterman case, the probable cause that the Appellate Court out-lined as sufficient for this arrest of the defendant, I think there are very many similarities between the Fetterman case and the case before your Honor. What happened in this case is that a woman and her infant child were found dead in their apartment. The woman's hands and feet were bound and she was naked from the waist down. The woman and child had been home alone. The husband had left for work in the morning and when he returned from work that afternoon, he found his wife and his child dead in their apartment.

The defendant, at the time, Fetterman, worked for Peter Pan studios and, at that time, went into homes of people to take photographs of their children, baby pictures or children's pictures.

64

When the husband found the bodies of his wife and child, the only thing that was different in the home was that there was a receipt in their home from the Peter Pan studios, a receipt that had not been there that morning. The husband did not have any reason to believe there would be a delivery from Peter Pan, but a neighbor said she saw that Mrs., the woman in this case, had had her child's picture taken about a month and a half before and that Mrs. Carella had expected to get the pictures, she didn't know when, but knew she expected to get the proofs of these pictures.

When the police officers arrested the defendant in this case, they knew that they were looking for -- they had reason to believe they were looking for someone who would have been a sex offender. The reason for this was that the victim's hands and feet were bound and that the victim, Mrs. Carella, was found naked from the waist down. They also knew that this person, Fetterman, as I have already informed the Court, had been in the home, in Carella's home, about one month before the murders and they knew that he was -- had been the person who had worked for Peter Pan, would have come in and taken the Carella baby pictures.

Also, Judge, the entry to the apartment

65

was not forced.  There was an inference the police
drew from that, that the person who had come into the
apartment and committed the murder was someone known
to Mrs. Carella.  And as I said, she was expecting these
baby pictures to be delivered.  No one knew what date.

And the other thing the police relied
upon was that there was pools of blood in the apart-
ment and that the defendant must have had blood on his
clothing from after committing these murders.

Judge, what I would ask you to consider
is that they didn't have a name or all they had was this
receipt for Peter Pan studios.  No photos, was it ever
mentioned in the transcript or this reporting in the
Appellate Case Reporter that there was any photos there.
The only thing they had was that one receipt from Peter
Pan Studios, but they did know, Judge, that the person
who probably committed this murder was a known sex
offender and Fetterman was on parole at the time of
these murders, for a sex offense he had committed.  He
had gone to the penitentiary for rape and was on parole
for rape when this murder, these murders I should say,
were committed.

Judge, in the --

THE COURT:  Does that mean, Ms. Mallo, that anyone

66

who has a prior conviction for a sex offense could have been arrested?

MS. MALLO: No. I'm not suggesting that. I'm suggesting that as other pieces of the puzzle go, to establish the probable cause.

And Judge, I am going to ask you now to consider the probable cause in the case before your Honor. That what the police officers was investigating was the murder of a 12-year-old girl, a 12-year-old female. There was ligature marks around the neck. Her body was found in an abandoned garage. The structure was next-door to the defendant's home. Carolina McCoy said that she last saw the victim with the defendant. Yolanda Hill gave the police the same story, that she last saw the victim with the defendant. Paula Townsend said that she heard the defendant say is that okay and the victim responded yes. Paula Townsend said that she saw the victim -- the last time she saw the victim, the victim was walking toward the defendant's house.

MS. PLACEK: Objection, Judge, incorrect testimony.

THE COURT: The police knew that the defendant was not the last person to see the victim alive, did they not?

MS. MALLO: Judge, the evidence -- what they had

67

was an anonymous tip.  The people they talked to said

the last person they saw the victim with was the

defendant, Paula Townsend, Yolanda Hill.

THE COURT:  But they had other evidence that that

was not accurate information, did they not?

MS. MALLO:  Judge, the police that testified said

that when they talked to those people, that's the

information they had.

THE COURT:  The information they had was that the

defendant was the last person to be seen with the victim,

but they also had information that that was not accurate,

didn't they?

MS. MALLO:  Judge, they had an anonymous tip that

someone had seen the victim on August 2.  They talked

to those other three people who said they had last seen

her on August 1, with the defendant.

THE COURT: Go ahead.

Ms. MALLO:  Judge, also consider the fact that the

police, while investigating this, ran a background check

of the defendant and they learned that the defendant was

a convicted sex offender, that he was on parole for that

offense, that he had that offense, that offense was that

he had raped a 15-year-old female, that there was a

choking incident involved in that rape.

MS. PLACEK:  Objection.  That's a misstatement of the testimony as it lies before the Court, as to what they knew, Judge.

THE COURT:  I will resolve any differences that you lawyers have, in regard to what the evidence shows.  This is argument.  This is her conception of what the evidence shows.  I'll resolve it.

The objection is overruled.

MS. MALLO:  Also, the evidence is the defendant was arrested for sexual assault on another young girl, a 13-year-old girl, and that sexual assault happened at 255 East 117th Street.

MS. PLACEK:  Excuse me, I have to object.  That was Mr. Ronkowski's testimony, not the officer's testimony.

MR. RONKOWSKI:  I didn't testify in this case.

MS. PLACEK: That was what he was attempting to bring in through a rap sheet.

THE COURT:  The objection is overruled.  I will resolve that, Ms. Placek.

MS. MALLO:  Judge, as I stated, the defendant lived next-door to the structure, to this garage, where the body of the victim was found, and the victim's there, were ligature marks around the victim's neck,

her hands were tied behind her back.

And I would ask you also to consider that James Hill told the police that the defendant had told him three different versions of the defendant's seeing the victim.

MS. PLACEK:  Objection, Judge.  That was never allowed into evidence.  That's a misstatement.

THE COURT:  The objection is overruled.

MS. MALLO:  Judge, James Hill stated that the defendant had said, first of all, that he had never seen the victim, that he had also told James Hill that the defendant saw the victim walking down the street, and the third thing the defendant told James Hill was that the defendant saw the victim talking to Mr. Chu.

Judge, the defendant, his background check revealed that he was a sex offender, that he had committed a rape, that he had served time for that rape and he was on parole.  The body was found next-door to the defendant's home.  Three people told the police that the last person they saw the victim with was the defendant, and the defendant gave these conflicting stories to James Hill.

Judge, the evidence is clear that the police were invited into the defendant's home.  There

1    was a consensual entry and that consensual entry,

2    coupled with the probable cause, is a basis for the

3    arrest.

4              Judge, I would also ask you, and this,

5    I have a copy for you and Counsel, of a decision

6    recently rendered by the Supreme Court of the United

7    States, and it is the case of People, or strike that --

8    New York is the petitioner.

9         THE COURT:  I have a copy of that.  New York versus

10   Harris.  Mr. Ronkowski was kind enough to provide me with

11   a copy, yesterday, of it.

12        MR. RONKOWSKI:  On a different case.

13        THE COURT:  On a different matter.

14        MS. MALLO:  In this case, the Supreme Court held

15   where the police have probable cause to arrest a suspect,

16   the exclusionary rule does not bar the State's use of a

17   statement made by the defendant, outside his home, even

18   though the statement was taken after arrest made in the

19   home, in violation of Payton.

20             Judge, that holding, I know that we

21   haven't discussed a statement, I know we haven't

22   discussed anything along those lines, but I think the

23   analogy, I think an analogy can be made.  The Supreme

24   Court talks about the integrity of Payton and what the

71

Payton decision was set down to protect, the integrity

of the defendant's home.

Judge, I argue that here, there was no

violation of Payton.  The defendant's home was not

violated.  The police were invited into the home of the

defendant.  The defendant called the police, invited

them into his home.  When the police got there, the door

was opened.  The door was opened and the police were

allowed in.

And, Judge, I would ask you to rely on

that, to determine that, yes, there was a consentual

entry.  It is also maintained that there is sufficient

probable cause, coupled with that consentual entry, to

establish the lawful arrest and, Judge, we still maintain

our position that arrest did not take place until the

9th of August.

Thank you, your Honor.

THE COURT:  Ms. Placek.

CLOSING ARGUMENT

BY MS. PLACEK:

Judge, both Crim and Fetterman, when

the Court reads those cases more closely, will see they

deal with exclusitivity.  In other words, essentially,

what the card in Crim -- the Peter Pan card in Fetterman

dealt with the fact that they speak of a pointing finger

almost, Judge, as to probable cause.  Now, in this

particular case, we don't even have a pointing finger.

We don't even have an accurate time of death.  And when

I say we don't have an accurate time of death, if the

Court will remember the original testimony of Detective

Nitsche, Detective Nitsche said that when he started out

this investigation and when, in fact, the body was found,

he wasn't even sure, number one, he identified it as a

female by the clothing; number two, he not only identi-

fied it as a female by the clothing, but he said he

couldn't even tell, necessarily, who it was.

          That's another thing that whittles away

about exclusivity.  There is absurdity for the State

to stand here and argue that this is the last person who

saw the victim alive because, quite frankly, even if you

forget about the impugned knowledge that she was seen

days, not one day, but at least two days later, on the

strip, the simplicity is that the people she talked to

and argued with were the last people who even in the

statement, closest to the State, saw her alive.  Her

guardian speaks of the fact that it was until about a

half an hour to an hour, and that's from the State's case,

73

1    that she left not in the direction or going to the

2    defendant's home, for there is no statement, other

3    than a leap of imagination, but she wasn't down the

4    street in a direction, in an easterly direction, and

5    I think if the Court will read the transcript, that's

6    what will be born out, after an argument.

7            As a matter of fact, quite frankly,

8    Judge, the statements that the State speaks of, were

9    taken no as a part of any kind of impugned knowledge of

10   a murder investigation, but as a missing person's

11   report, because, quite frankly, the victim's guardian

12   gave several males; one, I already touched on, Judge,

13   as a possible way, and the police questioned the

14   defendant when this was a missing persons and dismissed

15   it, and held it not reliable.

16           Next, where is the probable cause?  Well,

17   the defendant has a conviction.  I would point out that

18   what, essentially, the testimony of Nitsche, not as

19   clear-cut as an after-trial preparation of a State's

20   Attorney who tries to get certain evidence in a case,

21   because if the Court remembers, all the detectives

22   testified that they never went back, everything was

23   handled by telephone, about this conviction.  Therefore,

24   Judge, the idea of some sort of mirror image crime is

74

absurd and never, in fact -- well, let me put it this way, it's the same fertile imagination and whiff of smoke that the crowd came from, because that also is never contained within the pertinent summary prepared by the Chicago Police Department and if the Court reads the transcript as such.

Next, what the State doesn't mention is both Crim and -- Crim especially speaks of timing and when I speak of timing, the bodies were immediately found, a placement of a cause of death, a placement of the last person, the pointing finger.

In this instance, Judge, we have no time of death originated, we have no probable cause continued. Even under the report whittling away of Payton by the United States Supreme Court, what, essentially, we have is we have a defendant making statements, inculpatory, after an arrest. Where is the evidence that we have of this in this case, Judge? Not only that, but also, Judge, in the other case that the State cited in Fetterman, the consent was ruled to that the defendant willingly went with the police officers. They spoke of certain things as being inditia of arrest, but interestingly forgotten by the Assistant State's Attorney is that they also saw the Miranda Warnings as

75

an incident of arrest and they also saw the name and
the taking of certain vital information from the
defendant, at the station, as part of arrest. You have
the Mirandizing of the defendant, testified by Detective
Nitsche, and you have the age, the date of birth, the
full name, and the address of the defendant, taken from]
him when he is at the station. What more do you need
for booking information?

It may not quack -- strike that. It may
not be called a duck, but if it walks, if it waddles,
and if it quacks, it sure is a duck.

Next, the State says well, Judge, look
at all these cases, when people consensually came down
to the station and then, essentially, the probable cause
was established and an arrest was had. Read the cases
the State cites. And the one thing you will hear in
every one of the cases and the one phrase that will be
continually mentioned is the police continued their
ongoing investigation.

The State said that they disagree with
Defense Counsel, with, in fact, the arrest took place
at home. Fine. Then show me, excuse me, they should
show you were, in fact, the police, even after question-
ing this young man or where, in fact, the State's

76

Attorneys presented any evidence that was any more than the evidence they had when they came to the home. If they are conceding or if they are stating, well, no we didn't have enough to arrest him at the house, then, quite frankly, where did their case get any better.

Next, if all this information does, in fact, constitute probable cause and since no exigency was shown, where was their warrant, which is still required without a show of exigency? Quite frankly, there is no contest that, in fact, the defendant called the police, under the subterfuge of they wanted to talk to him in his house. He never consented to go with them. Therefore, since they knew they had a ready, willing, and able subject waiting for them at the house, who was cooperating and supposedly, in the words of Officer Nitsche in the transcript, when I asked him, well, when you were at the house, would you have let him go, he said no, then what more do you need for an arrest and why didn't they take that fact to a warrant.

The Courts have ruled that what is in the mind of the police at the time of custody is important. Let's see what was in their mind and let's deal with their credibility.

The State makes much, well, our case was

77



bolstered by the fact that the defendant, his sister

and himself -- well, Judge, if we were to lie in this

case, if we want to somehow fictionalize the true

account of it, the easiest thing we would have had is

we would have had the police kicking the door, pushing

it in with their shoulder and saying this is a raid,

you are under arrest. But instead, you have three people

who go up and didn't lie. They could have made the

police out some sort of devils who came and snapped the

defendant's neck back and beat him and forced him, with

his arms twisted behind him, to go. But they didn't,

because they told you what happened.

Now, what do we have on credibility on

the other side? We have a fictionalized crowd, we have

Miranda, not free for you to go, but still not under

arrest, we have officers stumbling back and forth on

their testimony as to who goes in the house, who doesn't

go in the house, how their progress is impeded by this

crowd. The plainclothesmen do go in, they don't step

in the house, they do go in. Judge, for professional

observers, you would have imagined they would have got

their stories straight. And then what do you have? At

that point in time, you have a cease of an investigation.

So quite frankly, Judge, in answer to the

**78**

State's argument in our final rebuttal, quite frankly,

if they didn't have probable cause at the house, they

sure didn't do any more investigation to get it later.

For these reasons, Judge, we are again

asking the Court to sustain our motion.

THE COURT: Ms. Placek, if you have the transcripts,

I would be delighted to have them.

MS. PLACEK:  I have them in my office.  I believe

the State also has their copy.

THE COURT:  I am not prepared to rule on this

motion, but I do want to make some observations about

it.

As I understand it, it is the position

of the police officers that they went to Mr. Hendricks'

home, in response to his telephone call, and when he

arrived -- when they arrived there, he consented to go

to the police station with them, either to discuss this

matter and thereby prove his innocence or out of fear

of this huge crowd that the police say was gathered out

in front of his home.  And when he arrived at the police

station, he agreed to remain there for 16 hours.

And I must tell you that I find that

position to be absolutely preposterous.  I find it to

be preposterous because it is inconceivable to me that

79

a raging mob, as I understood it to be described to me,

would be out in front of this man's house, because he

is, according to the police, the subject matter of an

investigation of what could only be described as a

heinous crime and the neighbors are aware of it and

they are obviously there, as I understood it, to be

threatening this defendant and perhaps other members of

his family.  In order to give him the protection that

he so rightfully deserves for his life and his bodily

safety, they take him into custody, contrary to the

obligations that they would have as police officers

to arrest the persons that are creating the disturbance,

to disburse the crowd, and to protect those who may be

endangered after they leave.

          But at the very least, at the very least,

you would expect to find at least a scintilla that re-

lates to that event in the police reports.  And to

suggest to me that it does not appear there because the

police reports are mere summaries of the events is to ask

me to divorce myself from all of the experience, all of

the training, all of the education that I have had and to

become the proverbial ostrich, with his head in the sand,

and I am not so naive.  I disbelieve it in its totality,

and the testimony of James Hill forces me, even more so,

1    to disbelieve it, rather than to corroborate the

2    police, in my judgement.  When I listen to his testimony,

3    along with theirs, I believe it even less.  I believe

4    that this defendant was arrested inside of his home,

5    handcuffed, and taken out of his home and taken to a

6    police facility, under arrest, and required to remain

7    there in excess of 16 hours.

8         Now the consequences of that may be

9    something altogether different, but to suggest to me

10   that that didn't happen, under the evidence that is

11   before me, seems to me, to ask me to just completely

12   abandon reasoning.

13        When the police arrived there, to be

14   sure, they were invitees.  The defendant does not

15   contend otherwise and I have no reason to doubt that

16   that's precisely the posture in which they arrived

17   there, and I don't have any doubt either that they were

18   admitted voluntarily into the home.  They were admitted

19   there obstensibly, for the purposes of talking to the

20   defendant and, normally, when we talk about consentual

21   waiver of constitutional rights, the parameters of the

22   consent dictate what can be done by the police, absent

23   process.  Whether it's true when we talk about Payton

24   or not, I am not certain, but, normally, the police can

go no further than the consent which was extended to
them, and the consent in this instance, as it's testified
to both by the police, as I understand it, and the
inferences to be drawn from their testimony and the
defendant's, that the police were at his home, they left
a card, they said they wanted to talk with him, he called
them up and invited them to his home to talk, and that
was the reason that they were admitted into his home.

Now, whether that can, after having
gained admittance into his home, the police could then
arrest him, without violating Payton, I need not, at
this point, decide.  I will, during the course of the
decision of this case, because I am not altogether sure
of what means in terms of whether the law will permit
that kind of consentual entry into the man's home and
then convert it into a full blown arrest.

But in any event, if they could arrest
him there or anyplace else, that arrest had to be
predicated on probable cause, and I have not read the
case that Ms. Mallo has cited to me, I intend to do
that perhaps tomorrow or as soon thereafter as is
reasonably possible, to determine whether, upon the
sparsity of the evidence that they had in this case,
the police had probable cause to arrest this defendant.

1    If they did not, then it would seem to me that whether

2    or not there was a Payton violation, that is the unlawful

3    entry into his home, is sufficient, in and of itself,

4    to suppress the arrest, without probable cause, would

5    be in spite of New York versus Harris, in spite of

6    New York versus Harris, because New York versus Harris

7    was an arrest predicated on probable cause, followed by

8    the giving of Miranda at a police facility, which is

9    wholly different from an arrest without probable cause

10   followed by a Payton violation, followed by Miranda

11   Warnings.

12                And so those are the issues which are

13   both factual and legal, that I intend to resolve.

14                Ms. Placek, when -- do you have the

15   transcripts, Mr. Ronkowski?

16       MR. RONKOWSKI:  Yes, I have the transcript of the

17   defendant and Detective Nitsche here.

18       MS. PLACEK:  I believe you have all of them.

19       MR. RONKOWSKI:  The transcript of Mr. Hill and

20   Detective Baker.

21       THE COURT:  Mr. Ronkowski, I don't need Mr. Hill's

22   testimony.  I took very good notes.  I've listened care-

23   fully.  I remember him well and I reject his testimony.

24       MS. Placek:  With all due respect, I believe

83

1    Mr. Hill's testimony has the police officer's testimony

2         MR. RONKOWSKI:  If yo want me to rip it in half.

3         THE COURT:  No.  I thought you had it as separate

4    but I'll take it.  I don't have to read it.  I already

5    know it.

6         MS. PLACEK:  I believe there are two days of

7    testimony and today.

8         THE COURT:  I don't need today's.

9         MS. MALLO:  There would be testimony from

10   February 27 of this year and there would be testimony

11   from March 29 of this year.

12        MS. PLACEK:  That would be two transcripts,

13   Judge.

14        MR. RONKOWSKI:  I have those two transcripts.

15        THE COURT:  Now, in the interim, if you care to

16   bring to my attention any additional authorities, I

17   want them.

18        MS. PLACEK:  The setting of limitations?

19        THE COURT:  I'm sorry?

20        MS. PLACEK:  The setting of limitations of issues

21   as established by the Court, Judge, and we still haven't

22   received the Court's cases.  What I would suggest, quite

23   frankly, is something akin to a briefing schedule. I can

24   talk to my co-counsel and have him directly give cases

84

both to yourself, but I suggest we have a cutoff point,

perhaps Monday of next week, to submit cases to the

Court on the issues, as established by the Court.

THE COURT:  Well, that would certainly be helpful

to me.  I don't know that I am going -- you know, well,

let me suggest to you the cases, as I understood them,

the factual scenarios that I understood Ms. Mallo to

give to me insofar as Fetterman and Creach were con-

cerned, and Johnson, I don't think you went into the

facts of any great extent, but those two cases do not

seem to be or seem to be my mind at this point, at any

rate, to be factually distinguishable.  But Peter Pan,

Peter whatever is was, receipt, in one instance, the

defendant being in Ohio with the victim's car, within a

relatively short time after she is dead, and those kinds

of things are much, much different from this case.

Essentially, what there is in this case

is the police awareness that the victim was found

next-door to where the defendant lives.  The defendant

had a prior conviction for some sort of sex crime.  And

there is a conflict as to whether or not the police

knew whether the defendant was the last person to see

her alive and where the police are in possession of

that kind of conflicting information as to who it was

85

that the victim was last with, whether they can ignore

that and hold up that portion of it, which affords them

probable cause and disregard and reject all of the

evidence that suggests that there might be some reason

to go slower, I'm not certain, but the concept, as

enunciated by Ms. Mallo, as enunciated by the Supreme

Court, is that probable cause is that degree of cause

which would cause a reasonably careful and prudent

person and a reasonably careful and prudent person would

take into consideration, it would seem to me, the fact

that his information that he is relying upon is conflict-

ing and to do something to straighten out that conflict,

rather than to simply say I have probable cause and

disregard everything that suggests you do not.  But

again, that's something else that I am going to have

to resolve and I don't know how that's going to come

down, but we shall see.

          In any event, Mr. Ronkowski, what is

your suggestion about a briefing schedule that would,

if you choose to do so, I am not ordering you to do

that, it would be helpful to have a full expression of

your views and the views of the Defense in this case,

to the fullest extent that you care to exercise your

right to do that, or exercise your option to do it.

MR. RONKOWSKI:  In a motion like this, the burden is with the defendant.  If they want to submit a brief, we'll submit something in response.

MS. PLACEK:  Judge, that's fine if we -- I am not going to get involved in who's got the burden of proof. If you want to submit simultaneous briefs on this issue, I will receive them.  If you don't, that's fine.

THE COURT:  I will receive whatever is submitted to me and if it's not submitted to me, that's fine.

MS. PLACEK:  May I suggest the Court set a deadline date.

THE COURT:  June 8.

I'm not going to put the case on the call.

MR. RONKOWSKI:  What date does the Court wish?

THE COURT:  I'm thinking about June 29, or some time during the week of June 25, whichever is more convenient to you.

MS. PLACEK:  How about the 27th of June, Judge?

THE COURT:  That's fine.

MS. PLACEK:  Thank you, Judge.

THE COURT:  Motion is taken under advisement. Order of Court, June 27.

(Which were all the proceedings had.)

1  STATE OF ILLINOIS    )
                        )    SS:
2  COUNTY OF C O O K    )

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT-CRIMINAL DIVISION

4

5  THE PEOPLE OF THE          )
   STATE OF ILLINOIS          )
6                             )
          -vs-                )    No.  88 CR 12517
7                             )
   JEROME HENDRICKS           )

8

9             REPORT OF PROCEEDINGS had of the hearing

10  of the above-entitled cause, before the Honorable

11  LEO E. HOLT, Judge of said court, on the 27th day

12  of June, A. D. 1990.

13       APPEARANCES:

14            HON. CECIL A. PARTEE,
                 State's Attorney of Cook County, by:
15            MR. DOUGLAS SIMPSON and
              MS. NANCY COLLETTI,
16               Assistant State's Attorneys,

17            appeared on behalf of the People;

18            HON. RANDOLPH N. STONE,
                 Public Defender of Cook County, by:
19            MS. MARIJANE PLACEK,
                 Assistant Public Defender,

20            appeared on behalf of the Defendant.

21

22

23

24

mbg    1

1          THE CLERK:  Sheet 1, Line 10, Jerome Hendricks

2    in custody.

3          THE COURT:  Mr. Simpson?

4          MR. SIMPSON:  Yes, your Honor.

5          THE COURT:  I have some of your transcripts.  There

6    might be a third one.  I'm not sure.  I'll have to

7    look in my briefcase, or either I may have left one

8    at home.

9          MR. SIMPSON:  Fine.

10          THE COURT:  The matter of Jerome Hendricks is

11   before the Court for ruling on the Defendant's Motion

12   to Quash his Arrest and Suppress certain statements

13   made by the defendant.

14          I have read the Defendant's Motion, and I

15   have read the transcript of the hearing on his Motion

16   to Suppress.

17          At the beginning, let me indicate to you

18   that I believe that the defendant was arrested at

19   his home in violation of Peyton versus New York.  I

20   reach that conclusion for several reasons, one of

21   which may not be accurate, but it is, in my judgment,

22   more probably than not the law, although I concede

23   very readily that there might be some authority to

24   the contrary, and I concede further that the way in

2                        346

1   which the law is developing, my concept in this

2   regard may be flawed.

3          There isn't any question but that the police

4   officers who entered the defendant's home were admitted

5   into his home voluntarily.  And to that extent,

6   Peyton versus New York may be inapplicable.  On the

7   other hand, the evidence in the case demonstrates to

8   me that the consentual admission of the police

9   officers into the defendant's home was for the

10  purposes of having a conversation, it appearing from

11  the evidence in the case that the police had left

12  a message at the defendant's home that they wished

13  to converse with him.

14         And upon receiving that message, the

15  defendant telephoned the police station and informed

16  the police that he was willing to have a conversation

17  with them.

18         Now, the general rule of law is that the

19  law abhors a waiver of constitutional rights, and

20  a consentual waiver restricts the police authorities

21  to the reasonable extent of the consent, that is, the

22  police cannot generally go beyond that which has been

23  consented to and still be within the consentual

24  agreement of the parties.  Whether that concept is

3

1    applicable to Peyton, I'm not altogether sure.

2              I reject the testimony of the police that

3    the defendant accompanied them to the police station

4    in order to be free from the potential threat of a

5    mob that had allegedly gathered in front of his house.

6    And I reject that because I do not think the factual

7    basis supports it, nor do I think that the police

8    believed at the time that the defendant was transported

9    to the police facility that that was the basis for

10   their transporting him.

11             I come to that conclusion because nowhere

12   in any police report is there any indication at all

13   that there was, one, a mob in front of the defendant's

14   home, or that the defendant requested or agreed to

15   be taken from his home to a police facility because

16   of the mob, or that the police themselves, being

17   fearful for the defendant, transported him to a

18   police facility for his own safety.

19             There is a proposition of law that, in

20   essence, says that the failure to recite that which

21   would have been recited under normal circumstances

22   amounts to an affirmative assertion to the contrary.

23   And it is inconceivable and inexplicable that if a

24   mob that had, in fact, attacked the defendant while

4

1   he was with police officials, and they had to scurry

2   him away for his safety and for theirs, it is

3   inexplicable to me that that would not have appeared

4   in some police recordation of that event. And so

5   I reject it as being a fact.

6          I haven't said that a Peyton violation took

7   place. It appears to me that it is of no consequence

8   at all. It is of no consequence that the police

9   violated the consentual entry into his home, and

10   it is of no consequence that they took him from his

11   home under arrest without benefit of a warrant because

12   under the holding of New York versus Harris, which is

13   applicable to this case, the Peyton violation, whether

14   it was a violation as a result of their entry into

15   his home by consent or whether or not it was the

16   classic Peyton violation of non consentual entry

17   into the defendant's home for the purposes of arresting

18   him, New York versus Harris teaches that rightly or

19   wrongly -- and I might suggest from my point of view,

20   wrongly, but my point of view is as relevant as

21   anything that I do imagine being since I think I

22   fully understand the holding in New York versus

23   Harris, whether I agree with it or not, I'm obliged

24   to apply it -- and Harris teaches us that the only

5

1    violation that could result would be the unlawful

2    entry into the defendant's home, but that did not make

3    his arrest unlawful if there was probable cause.

4         And the only thing that would be suppressable

5    as a consequence of the violation of Peyton would be

6    those statements made by the defendant while in the

7    confines of his home and/or physical evidence seized

8    from him while in the confines of his home.

9         And since neither of those are present in

10   this case, the violation of Peyton is not relevant.

11   And I must determine whether or not there was probable

12   cause for the defendant's arrest.

13        If there was probable cause for the

14   defendant's arrest, then the statements taken from

15   him in the police facility are not subject to being

16   suppressed.  Conversely, if there was no probable

17   cause, then the defendant was at the police facility

18   in violation of his 4th Amendment rights, and the

19   holding of Dunaway versus New York and Brown versus

20   Illinois and cases -- and its progeny would be applicable

21   to this defendant's Motion.

22        In determining whether or not there was

23   probable cause to arrest the defendant, scrutinized

24   the record in this case to determine whether or not

1   a reasonably prudent person operating under the same

2   circumstances and factual bases that the police were

3   operating from reasonably believed that a crime had

4   been committed and the defendant committed it.

5   The evidence which supports that, if it

6   does, need not be of the quality that would support

7   a conviction.  It may not necessarily rise to the

8   level where a preliminary hearing Judge would find

9   probable cause to bind the defendant over for trial.

10  It must simply be that level of cause that would

11  require a reasonably prudent police officer to

12  operate. That the police officers had reasonable

13  grounds to believe that a crime had been committed

14  can hardly be done.

15  The other aspect of it is whether or not

16  there was enough information for them to believe that

17  the defendant committed the offense.  In that regard,

18  the evidence indicates that the victim was found

19  dead in a garage next to the defendant's home, that

20  some five or six days earlier, maybe as much as seven

21  days earlier, the defendant and the victim were seen

22  in conversation with one another with some degree of

23  family opposition to the defendant conversing and

24  having some level of communication or contact with the

7

1    underaged victim.

2         There is also evidence that the victim's --

3    that the defendant's prior criminal background which

4    disclosed a number of criminal offenses similar in

5    nature, that is to say, that the defendant had been

6    involved with young girls in a criminally sexual

7    manner on one or more occasions.  The defendant,

8    also insofar as the police were aware was, if not the

9    last person to be seen with the victim, he was

10   certainly well within their knowledge of being one

11   of the last persons.

12        There is some evidence in this record

13   that the victim was seen alive after August 1, the

14   last day that the record indicates that this defendant

15   saw her.

16        Taking all of the information that the

17   police officers had together, not any one of which

18   in and of itself perhaps being sufficient, but in

19   the totality of the circumstances, it can reasonably

20   be said that the police had probable cause to arrest

21   the defendant for the offense which they had under

22   investigation.

23        Thus, the Court finds that his presence

24   in the police facility was not in violation of his

8

1   4th Amendment rights, there is no 5th Amendment

2   contention before the Court.  Therefore, I find that

3   the statements that the defendant made are not subject

4   to being suppressed, and the defendant's Motion to

5   Suppress is denied.

6        MS. PLACEK:  Thank you for your consideration,

7   your Honor.

8             May I suggest that there's certain motions

9   in limine that need be filed, and I prefer filing

10  some of them in writing in this matter.

11            May I suggest that a date be set for the

12  filing of those motions.

13       THE COURT:  I can give you a final status date

14  on the third, tenth, seventeenth, or thirty-first

15  of August.

16       MS. PLACEK:  May I get my book?

17       THE COURT:  Surely.

18       MS. PLACEK:  The 3d of August would be fine,

19  your Honor.

20       THE COURT:  By agreement date?

21       MS. COLLETTI:  Yes, Judge.

22       THE COURT:  By agreement August 3, final status.

23       MS. PLACEK:  Thank you, your Honor.

24            (Which were all the proceedings had.)

9

1  STATE OF ILLINOIS )
                     )  SS.
2  COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
4
   THE PEOPLE OF THE    )
5  STATE OF ILLINOIS    )
                        )
6          V            )   No. 88 CR 12517
                        )
7  JEROME HENDRICKS     )

8          REPORT OF PROCEEDINGS had in the above entitled

9  cause, before the Honorable LEO E. HOLT, Judge of said

10 court, on the 14th day of January, A.D., 1991.

11              APPEARANCES:

12              HON. JACK O'MALLEY,
                    State's Attorney of Cook County, by
13              MR. JOHN MURPHY,
                    Assistant State's Attorney,
14                  appeared for The People;

15              MR. RANDOLPH STONE,
                    Public Defender of Cook County, by
16              MS. MARIJANE PLACEK,
                    Assistant Public Defender,
17                  appeared for The Defendant.

18

19

20

21

22

23

24

ck1

1    THE CLERK:  Sheet 2, Line 16, Jerome

2    Hendricks, in custody.

3              (Defendant Present)

4         THE COURT:  All right.

5         MS. PLACEK:  Good morning, Your Honor.

6         THE COURT:  Good morning.

7         MS. PLACEK:  Your Honor, for the record,

8    Marijane Placek.

9              Judge, I called the State on Friday,

10   and I have a viral infection in my head which some

11   people might have said I've had for a long time and

12   just not known it.  Unfortunately, this one has

13   taken the matter of rendering my hearing twenty

14   percent for approximately-- Well, it's been going on

15   for two weeks.

16             I would be asking, since I don't

17   feel that under this condition, because of health

18   reasons, Mr. Hendricks' case, in fact, be continued

19   for whatever date the Court would, in fact, be

20   convenient.  I'm supposed to be over this, according

21   to my doctor, in approximately five days, and be

22   restored to what is normal for me.

23             THE COURT:  Miss Vrdolyak, do we have a case

24   set for trial on the 22nd of January?

ck2

1    THE CLERK:  Yeah, you have a few benches

2  on the 22nd.

3    THE COURT:  Is there a jury set?

4    THE CLERK:  I don't see one.  We have Virgil

5  Bass up.

6    THE COURT:  That's all right.

7    THE CLERK:  Probably the 23rd would be

8  better.

9    MR. MURPHY:  Judge, we have a murder case set

10  for jury on the 28th on Frank Williams, I think.  Is

11  that right, Deb?

12    THE CLERK:  Yeah.

13    THE COURT:  How long is it going to take to

14  try this case?

15    MS. PLACEK:  I'm sorry, Judge?

16    THE COURT:  How long will it take to try this

17  case, to the best--

18    MS. PLACEK:  Ten days.  I would expect about

19  ten working days, which will translate to two weeks.  I

20  will clear my-- Since this case has been on this Court's

21  docket for so long, I'm clearing my schedule with the

22  other judges, so whatever date is convenient with the

23  Court.

24    THE COURT:  January 22nd.

ck3

1    MS. PLACEK:  January 22nd?

2    THE COURT:  Yes.

3    MS. PLACEK:  Thank you, Judge.

4    THE COURT:  January 22nd.  By agreement,

5    Mr. Murphy?

6    MR. MURPHY:  Yes, Judge.

7    THE COURT:  By agreement.

8    MR. MURPHY:  Judge, if I may?  Counsel?

9    There's two other matters, Judge.

10        I didn't know counsel would be here

11    before lunch.  I'm going to file two motions in this

12    matter.  I will run upstairs and get them.  I will

13    give them to counsel.  It's a motion to amend our

14    answer to discovery to include another case, or

15    evidence of other crimes, and also our intention to

16    proceed under the felony murder theory.  I am

17    advising the defense of that at this time.

18        MS.PLACEK:  As of-- As with respect to both

19    my client and this Court, that's the reason I'm here,

20    I would ask counsel rather than-- If perhaps he could

21    tender those to Mr. Lufrano, who is the Public

22    Defender in this courtroom, who will be trying it

23    with me, and he will make sure that I get that because

24    I'd like to go home and get back into bed, Judge.

ck4

1        MR. MURPHY:  Okay.

2        MS. PLACEK:  And we will respond to those

3   motions, if necessary, with a written response before

4   the date set for trial, Judge.

5        THE COURT:  There are two felony murder

6   counts in your indictment.

7        MR. MURPHY:  Yes, Judge.  We are going to be

8   asking is that we be allowed to proceed on that

9   theory as to the other felony charges that are in

10  the indictment as well, and in addition to the two

11  that are charged.

12       MS. PLACEK:  What I would suggest--

13       THE COURT:  You are going to add additional

14  felony murder counts?

15       MR. MURPHY:  Not add.  I think when the Court

16  sees the motion and the cases cited, you will better

17  understand.  I don't believe they have to be charged

18  in order for us to proceed under that theory.

19       THE COURT:  All right.

20       MR. MURPHY:  There's case law that supports

21  that.

22       THE COURT:  We'll take that up on the 22nd.

23       MS. PLACEK:  Or if necessary, Judge, before,

24  and I will motion it up.

ck5

1          THE COURT:  Yeah, you can motion it up

2    before at any time and provide me with any authorities

3    that you choose, and I'll consider it at that time

4    prior to trial.

5          MS. PLACEK:  Thank you, Judge.

6          THE COURT:  All right.

7               (Whereupon the further proceedings in

8               the above entitled cause were continued

9               to January 22nd, 1991.)

ck6

1    STATE OF ILLINOIS    )
                          )    SS:
2    COUNTY OF C O O K    )

3              IN THE CIRCUIT COURT OF COOK COUNTY
               COUNTY DEPARTMENT-CRIMINAL DIVISION
4

5    THE PEOPLE OF THE    )
     STATE OF ILLINOIS    )
6                         )    Indictment No. 88 CR 12517.
              VS          )
7                         )    Charge:  Murder, etc.
     JEROME HENDRICKS     )
8
                    REPORT OF PROCEEDINGS
9

10       BE IT REMEMBERED that this cause came on to be

11   heard the 4th day of February, A. D. 1991, before

12   the Honorable LEO I. HOLT, Judge of said court.

13
         APPEARANCES:
14
              HON. JACK O'MALLEY,
15                State's Attorney of Cook County, by
              MR. MATTHEW COGHLAN,
16                Assistant State's Attorney,
                  appeared for the People;
17
              MR. RANDOLPH N. STONE,
18                Public Defender of Cook County, by
              MR. VINCENT LUFRANO,
19                Assistant Public Defender,
                  appeared for the defendant.
20

21

22   J. P. S. Washington, CSR
     Official Shorthand Reporter
23   Circuit Court of Cook Couty
     Criminal Division
24   2650 South California Avenue

360

1

1        THE CLERK:  Jerome Hendricks.

2                        (Defendant present.)

3        MR. LUFRANO:  Your Honor, I am standing in for

4    Miss Placek; she just called and told my secretary

5    that she was presently on trial before Judge

6    Karnezis.

7        THE COURT:  Order of court -- Strike that.

8    Motion defendant, February 5th, with subpoenaes,

9    for trial.

10                   You tell Miss Placek that I am going

11   to hold this case on call from day-to-day; if she

12   commences another trial or is not in my courtroom

13   the day after she completes her trial before Judge

14   Karnezis, I am going to hold her in contempt of

15   court.  This case is going to trial and it is going

16   to trial without any further delay.

17                   You may also tell Miss Placek, and I

18   will tell her if and when she comes into this

19   courtroom, that I think this is a very sloppy,

20   sloppy, unprofessional way to handle a man's

21   capital case.  I am thoroughly and absolutely

22   disappointed with her.  This case is going to

23   trial.

24       MR. LUFRANO:  I will so inform her, your

1    Honor.

2                          (Whereupon the proceedings

3                          in the above entitled cause

4                          were continued to the 5th

5                          day of February, A.D.,

6                          1991.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1    IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

2             COOK COUNTY, ILLINOIS

3

4

    THE PEOPLE OF THE    )

5    STATE OF ILLINOIS    )   CASE NO. 88-CR-12517
                        )

6       VERSUS        )   CHARGE:  Murder
                        )

7    JEROME HENDRICKS     )

8

9            REPORT OF PROCEEDINGS had on

10   the 5th day of February, A.D. 1991, before the

11   Honorable LEO E. HOLT, Judge of said Court.

12

13

14

15          HON. JACK O'MALLEY,
             State's Attorney of Cook County, by

16     MR. SCOTT CASSIDY, MR. JOHN MURPHY,
             Assistant State's Attorneys

17          appeared for the People;

18     MR. RANDOLPH STONE,
             Public Defender of Cook County, by

19     MS. MARIJANE PLACEK, MR. VINCENT LUFRANO
             Assistant Public Defenders

20          appeared on behalf of the Defendant.

21   SHIRLEY A. MITCHELL,  C.S.R.,
    Official Court Reporter

22   Markham, Il.  60426

23

24

                  363

    1

1          THE CLERK:   Jerome Hendricks.

2          THE COURT:   You can amend more informal

3     defects in this indictment, but not in such a way

4     as to bring a new charge.

5               If this brings about a new charge, it

6     changes the charge in this case; then, that's an

7     impermissible amendment.

8          MS. PLACEK:   We would ask the Court to make

9     its ruling before the selection of the jury.

10         THE COURT: I don't know whether that's going

11    to happen or not.   But we will see.

12              It's not going to be of any great

13    magnitude, it seems to me, if I don't get to it

14    before the commencement of the jury selection.

15    But we will see.

16              What other sections of the indictment

17    are we dealing with, Mr. --

18         MR. MURPHY:   That's all I have, Judge.

19         THE COURT:   Insofar as the other Counts are

20    concerned, Counts 3 and 4, leave is granted to the

21    State to amend Counts 3 and 4.

22              Anything else?

23         MS. PLACEK:   At the last court date, Judge,

24    the State, I believe, filed a motion which I

2                    364

1    received a copy of.

2            I have several motions in limine,

3    including a motion to dismiss.  But irrespective

4    of that, I don't know how in order the Court

5    wishes to take that.

6            Also, in this matter, Judge, we have in

7    answer to the Court's previously asked question --

8        THE COURT:  Which question is that?

9        MS. PLACEK:  Witherspoon.

10       THE COURT:  What's the defense's position?

11       MS. PLACEK:  We would prefer not

12   Witherspooning at this time, Judge.

13           For the purpose of the record, we would

14   suggest, and I believe that the Court heard by my

15   predecessor several death penalty motions previous

16   in this matter, and made rulings on same.

17           I believe in reading the transcript in

18   preparation for this trial, there was an argument

19   made by Mr. Gant, I believe, that a --  dealing

20   with a Witherspoon jury.  And this dealt with

21   generally not Witherspooning irrespective of the

22   decisions being made.

23           We would ask that the Court refuse to

24   Witherspoon same jury.

3                        355

1          MR. MURPHY:  It's my understanding, then,

2     that the defense is asking that the jury not be

3     Witherspooned, but the defendant is not going to

4     execute any waiver at the time?

5          THE COURT:  That's my understanding.

6          MR. MURPHY:  Then, we would object.

7               We may have a jury that is not requested

8     to make a determination as to capital sentence.

9          MS. PLACEK:  We would suggest, Judge, as

10    presented, I believe, in early arguments before by

11    my predecessors, Mr. Lemons and Mr. Gant, that a

12    Witherspoon jury is a guilt prone jury, statistics

13    have shown same.

14               I would suggest that, pursuant to the

15    Statute dealing with the death penalty, that, in

16    fact, there is nothing precluding, if in fact,

17    it's found that for some reason a scrupled juror

18    is present on the 12, or in the alternative, there

19    is not enough jurors to hear, if the guilty verdict

20    is returned, as to the so-called death phase, that

21    the Statute does not preclude the impaneling of a

22    new juror, specifically and only for the purpose

23    of hearing the death penalty.

24          THE COURT: I take it, Ms. Placek, for

4                        336

1    clarification, you're asking that I postpone

2    Witherspooning until after the jury has

3    deliberated on guilt/innocence.

4         MS. PLACEK:  That's correct, Judge.

5         THE COURT:  And should the jury return a

6    verdict of guilty of first degree murder, then to

7    Witherspoon the jury, if at all.

8         MS. PLACEK:  That's correct, Judge.

9              We would suggest that a Witherspoon

10   jury, in fact, puts an unfair burden on the

11   defendant, not only from a previous study cited

12   during the capital arguments not made by myself,

13   but by other members of my office.

14             But also, Judge, because of the fact

15   that it puts the jury in a guilt prone mood; that

16   is, the punishment is already in issue before the

17   evidence is, in fact, heard.

18             The State is allowed to take the

19   position psychologically and in reality because of

20   Witherspooning, that we are just going through the

21   formality of the trial, and now what we

22   essentially are dealing with is we are dealing

23   with the punishment, if you will.

24        MR. MURPHY:  Judge, if I may also indicate, I

857

5

1    have asked on numerous occasions since I have been

2    in this courtroom what the defendant's position

3    is, and I understand that is a difficult decision

4    to make.

5            At no time were we ever aware that the

6    defense ever intended to make this motion.  And

7    had we been given some case, we would have

8    prepared an appropriate response.

9            At this particular time, I'm not aware

10   of what the authorities are, because for the very

11   first time, to my knowledge, this has come up.

12   And we have no response.

13       THE COURT:  Well, I don't know that that's

14   going to disadvantage you, because for many, many

15   years I have taken the position that Miss Placek

16   asserts.  I think it's right.

17           And knowing nothing to the contrary, all

18   of the psychological and socialogical studies,

19   without a single study to the contrary, tends to

20   come to the conclusion that the death qualified

21   jury is also psychologically conviction prone, for

22   a bunch of reasons.  And the studies proliferate,

23   in a sense.

24           And the opponents to that proposition

6                         358

1   have not published a single study that I am aware

2   of to the contrary.

3            On the other hand, the fact that I am

4   impathetic to that proposition is of no

5   significant relevance, because the law is to the

6   contrary.

7            The United States Supreme Court in the

8   case of  --  the case escapes me, the name of it

9   -- but specifically rejected that approach,  in my

10  judgment, inappropriately.

11           It specifically rejected the validity of

12  the studies without anything to the contrary being

13  proffered to it on which it could reject those

14  studies; nonetheless, it did, or at least if it

15  didn't reject the conclusion of the study,

16  certainly rejected their applicability insofar as

17  it impenges upon the defendant's 8th Amendment

18  Right.

19           And the Illinois Supreme Court has done

20  likewise.  And so, there is not a single case in

21  Illinois that would support the proposition that

22  the Court can avoid the consequenses of Wither-

23  spooning on the ground that it diminishes either

24  the defendant's 14th Amendment Right, or his 8th

7                          359

1    Amendment Right.

2              And because the law is in that posture,

3    I am not only unwilling, but I am barred from

4    chartering new ground in that area.

5              If I were the sole determinate of this

6    issue, and without any studies to the contrary,

7    and given the number of studies that tend to

8    support your position, the situation might be

9    different.

10             But I am not out here free to pick and

11   choose which Court decisions I will follow and

12   which ones I will advocate.

13             So, on that basis, the defendant has a

14   hard choice to make.

15   MS. PLACEK:  With due respect to the Court,

16   but anticipating the Court's answer in this

17   matter, the only thing that I would point out to

18   the Court is the Supreme Court --  and I'm

19   speaking of the United States Supreme Court case

20   -- that, in fact, spoke of the prohibition and the

21   rejection of the so-called guilty prone studies in

22   Witherspoon did not deal with a state that, in

23   fact, dealt --  or where the Statute spoke of a

24   two-point jury, as in our death penalty Statute.

8                    370

1    I would point out, with due respect to

2  the Court, that although the request for a

3  so-to-speak double jury on the death phase, it

4  becomes necessary, has been heard by the Illinois

5  Supreme Court, I would suggest that this Court is

6  hearing it in a different ground in that this

7  Court is hearing it at a time never brought before

8  the Illinois Supreme Court.

9    Basically, the case which the Court

10  speaks of, those death penalty cases involving

11  requests by Defense Counsel for a second jury

12  based on the guilt prone decision, if you will, or

13  the guilt studies and surveys dealing with the

14  Witherspoon issue, deal when a guilty verdict has

15  come back from a Witherspoon jury, and it's at

16  that time Defense Counsel first makes a motion to

17  have that jury disimpaneled, and, in fact, another

18  jury seated.

19    I would suggest, and I would call the

20  Court's special attention to that part of the

21  Statute that does deal with death penalty and

22  suggest that it neither says same jury, the jury

23  who heard the evidence. It is still open.

24  Therefore, quite frankly, when the Court says that

9

371