CASE NO. _____08 cv 1589_____

ATTACHMENT NO. _____8_____

EXHIBIT _____

TAB (DESCRIPTION) _____

1    at all?

2              A      No, I don't.

3              Q      Could you have told an Officer that you

4    were, in fact, Denise's aunt?

5                            It goes as to impeachment.

6         MR. MURPHY:  Objection.

7         THE COURT:  Objection sustained.

8         MS. PLACEK:  Q  Let me ask you this.

9                            Isn't it true that, in fact, after

10   Denise came back into the house with you, that

11   you, in fact, had an altercation with her, a family

12   argument?

13             A      No, we didn't have a family argument.

14             Q      Do you remember me asking you about

15   speaking to that officer on August 7th of 19 -- or

16   August 2nd of 1988?

17        MR. CASSIDY:  Objection, Judge, form of the

18   question.

19        THE COURT:  Well, if the witness understands

20   it, she may answer.

21        MS. PLACEK:  Q  And do you remember me a few

22   seconds ago asking you whether you had a conversation

23   with an officer, a youth officer, Steven Martkovich,

24   M-a-r-k-o-v-i-c-h?  Star No. 4067?

     71

1          A       The 2nd?

2          Q       No, that is his star number, on the

3    2nd of August, correct?

4          A       No, I didn't talk to no police officer.

5          Q       Beg your pardon?

6          A       No, I didn't talk to any police

7    officer on May 2nd.

8          Q       Do you recall whether or not you told

9    him, at this time, that you ordered Denise into

10   the house where an altercation was engaged in both

11   over her, meaning Denise, talking with adult men?

12         A       No.

13         Q       No, you don't remember or no --

14         A       No, I don't remember.

15         Q       I am sorry.  No, you never made that

16   statement?

17         A       I don't remember talking to an officer

18   on the 2nd.

19         Q       Then is your answer to my question as

20   to whether or not you ever told the police, specifically

21   the officer that I talked about before, that you and

22   Denise, after you ordered her into the house, you had

23   an altercation, was because she was talking with adult

24   men?

72

1          A        What do you mean by an altercation?

2          Q        Well, what I am asking you is on

3     August 7th of 1988, you knew the police were

4     investigating the missing Denise Johnson, correct?

5          A        The 7th.

6          Q        August the 2nd, 2, I am sorry, August 2,

7     correct?

8          A        Okay.  You keep saying 7th.

9          Q        I am sorry, maybe I am not talking

10    clearly.  On the 2nd, correct, you knew the police

11    were investigating your missing niece, correct?

12         A        Yes.

13         Q        You not only knew that they were

14    investigating, as a matter of fact, you are the one

15    that called them, correct?

16         A        Yes.

17         Q        And you spoke to the police officers as

18    a result of your calling in order to find your niece,

19    correct?

20         A        Yes.

21         Q        And let me ask you this last.

22                  When I asked you whether you spoke

23    to this Officer Steven, and I believe it's pronounced

24    Martkovich, and I spelled out his name and gave you his

          73                    550

1   star number, you said you didn't remember, correct?

2          A       You said the 2nd.

3          Q       The 2nd, I am sorry, on the 2nd.

4          A       I spoke to an officer on the 1st, the

5   night she was missing.

6          Q       All right.  Let me ask you this.

7                  Did you ever tell the Officers that,

8   in fact, you ordered Denise off the porch when she was

9   talking to Jerome Hendricks?

10         A       I told her to go upstairs.

11         Q       Did you understand my question?

12         A       Yes.

13         Q       Then I would move to strike her answer

14  as non-responsive.

15         THE COURT:  The answer stricken.

16         MS. PLACEK:  Q   Okay.  Did you ever tell the

17  police that, in fact, you ordered Denise off the porch

18  when she was speaking to Jerome Hendricks?

19         MR. MURPHY:  Objection.

20         THE COURT:  What is the basis of your objection?

21         MR. MURPHY:  There is no basis, this is not

22  impeachment.

23         THE COURT:  It might be foundational for

24  admissibility of the statement under 115-10-1.1 as

74                     581

1  substantive evidence.

2            It's only foundational at this

3  point and that is what she is relying on, whether she

4  can prove it up, whether she can close up the impeachment

5  or establish it as a basis for admissibility as

6  substantive evidence, I cannot yet tell.

7            If she doesn't make the foundation

8  with this witness, when she is on the stand, when will

9  she make it?

10  MR. MURPHY:  I understand that, but she is asking

11  -- but it would appear, at best, for the defense, a

12  prior consistent statement.

13            She said she told her to get

14  off the porch.

15  THE COURT:  No, no, no,  this witness has

16  consistently said that she does not recall ever telling

17  the police officer anything about that.  That is what

18  she is asking her about, not what she -- not the

19  conversation thatthe witness had with Denise, she is

20  talking about the conversation with the witness, the

21  witness had with thepolice officer.

22  MR. MURPHY:  She said, did you ever tell the

23  police --

24            THE COURT:  And the witness says she doesn't

75

582

1  know, she didn't recall having told the police anything

2  so far.  She hasn't recalled, so far, as I can

3  recall her testimony, she has not acknowledged telling

4  the police a single thing.

5      MR. CASSIDY:  So the record is clear, she has

6  not been asked the proper date, I believe.

7      THE COURT:  That may be, Mr. Cassidy, she

8  hasn't, she has indicated she is confused about

9  the dates, but that is not the issue we are talking

10  about now, that is not the basis of your objection.

11          The basis of your objection was

12  a response to what this witness had said to

13  Denise and we are not asking her that, that is why

14  I struck the answer as not being responsive.

15          Put another question.  Your

16  objection is overruled.

17      MS. PLACEK:  Q  Did you ever tell the police

18  that you, in fact, ordered Denise off the porch when

19  she was speaking to Jerome Hendricks?

20      A      When Denise was speaking to Jerome

21  Hendricks, I told her to go upstairs.

22      MS. PLACEK:  Motion to strike as non-responsive.

23      THE COURT:  Would you listen to the question

24  and see if you can answer the question that is being

76

1   put to you.

2                   If you do not understand the

3   question, if you will say so, I will have her put

4   another question to you.

5                   Do you understand?

6           THE WITNESS:  Yes.

7           THE COURT:  Put another question.

8           MR. PLACEK:  Thank you, your Honor.

9                   Did you ever tell the police

10  that you ordered Denise off the porch when she

11  was speaking to Jerome Hendricks?

12          THE WITNESS:  I don't understand what you mean

13  by "order her."

14          MS. PLACEK:  Q  Did you ever tell the police

15  that you ordered Denise off the porch, ordered,

16  comanding her off the porch when she was speaking to

17  Jerome Hendricks?

18          THE COURT:  Did you tell the police that?

19          THE WITNESS:  I don't understand what she is

20  saying.

21          THE COURT:  She is asking you, did you ever

22  tell a police officer that you told Denise to get off

23  the porch?

24          THE WITNESS:  No.

77                    584

1    THE COURT:  You never told that to a police

2  officer?

3    THE WITNESS:  No.

4    THE COURT:  Put another question.

5    MS. PLACEK:  Thank you.

6    Did you ever tell the police that

7  because of your ordering Denise off the porch to

8  stop talking to Jerome Hendricks, that you and Denise

9  got in a fight?

10    THE WITNESS:  No.

11    MS. PLACEK:  Q  Thank you.

12    Did you ever tell the police that

13  as part of the fight that you fought with Denise over

14  her seeing adult men --

15    A    Could you repeat that?

16    Q    Surely.

17    Did you ever tell the police

18  that as part of the fight, you spoke to Denise about

19  her seeing adult men?

20    MR. MURPHY:  Objection.

21    THE COURT:  Basis?

22    MR. MURPHY:  Relevance.

23    THE COURT:  Overruled, on the relevancy

24  grounds.

78

1          THE WITNESS:  I just told her she couldn't see

2     the mens.

3          MS. PLACEK:  I move to strike.

4          THE COURT:  Strike.

5          MS. PLACEK:  Q  Did you ever tell the police,

6     as part of the fight in the house, that you argued about

7     Denise seeing adult men?

8          A        I don't understand.

9          Q        I am sorry?

10         A        I don't understand you.

11         Q        Did you ever tell the police that you

12    had a fight with Denise in the house and as part of

13    the fight, you fought with her about her seeing adult

14    men?

15         A        No.

16         Q        Thank you.

17                  Now, isn't it correct that

18    Denise then returned after she was in the house

19    with you, back to the porch?

20         A        Yes.

21         Q        And you want to look for her about 20

22    minutes later, is that correct?

23         A        No.

24         Q        About how long later -- I apologize, about

79                                586

how long before you went back to find Denise -- I

am sorry, did you ever -- Let me rephrase.

Did you ever go looking for

Denise after you were in the house with her?

A       After I was in the house with her?

Q       Yes?

A       'She was in the house with me.

Q       Well, she left the house, didn't she?

I withdraw and rephrase.

You stated for the Assistant State's

Attorney that you and Denise went in the house,

correct?

A       Yes.

Q       How long did you and Denise stay in the

house?

A       Denise stayed in the house five minutes.

Q       Beg your pardon?

A       Five minutes.

Q       How long did you stay in the house?

A       Five minutes.

Q       Well, isn't it correct that Denise

left the house before you did?

A       Yes.

Q       Isn't it correct that Denise told you

1      that she was going back to the porch?

2            A      Yes, she asked.

3            Q      How long -- Withdraw.

4                   Did you return to the porch with

5      her?

6            A      No.

7            Q      How long after Denise returned to

8      the porch did you return to the porch, if ever?

9            A      Could you repeat that for me?

10           Q      Surely.

11                  After Denise left, how long until

12     you returned to the porch, if ever?

13           A      Five minutes.

14           Q      So, would it be correct in saying

15     that you, in fact, stayed in the house ten minutes?

16           A      Five minutes, I stayed in the house

17     five minutes.

18           Q      Well, would that -- Excuse me?

19           A      Five minutes.

20           Q      And that would be in total, correct?

21           A      Yes.

22           Q      Okay.   Thank you.

23                  Now let me ask you this.

24                  You stated that Denise was living

81                          588

with your mother, correct?

A    Yes.

Q    Do you know whether Denise's natural mother was, in fact, alive?

MR. MURPHY:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.

MS. PLACEK: Q  As a matter of fact, isn't it correct that you know of your own personal knowledge that your mother, or strike that, I am sorry, your mother, Mrs. Fields, was appointed Denise's guardian, correct?

A    Yes.

Q    Thank you.

Do you know who Hardy Johnson is?

A    Yes.

Q    Would you tell his Honor, Judge Holt, who Hardy Johnson is?

A    Her grandfather.

THE COURT:  I am sorry?

THE WITNESS:  Denise's grandfather.

MS. PLACEK:  Q  Do you know where Hardy Johnson lives?

A    No, I don't.

82

539

1      Q      Do you know who William McGoy is?

2      A      Yes, I do.

3      Q      Would you tell his Honor, Judge Holt,

4 who William McGoy is?

5      A      He is my grandfather.

6      Q      Isn't it correct William McGoy is,

7 in fact, Denise's father?

8      A      No.

9      Q      All right.  Thank you.

10            Now, your niece was a small

11 girl, wasn't she?

12      A      Yes.

13      Q      She wasn't quite five feet, was she?

14      A      She was about five.

15      Q      Did she weigh yet 100 pounds?

16      A      Yes.

17      Q      But she was small boned, not a fat person

18 like myself, correct?

19      A      She was small.

20      Q      Okay.  Thank you.

21            Do you know a gentleman by the

22 name of Gregory Waters?

23      A      No, I don't.

24      Q      Do you know a gentleman by the name of

Gregory Wilson?

     A     No.

     Q     Did you ever tell the police -- Withdraw.

                 Isn't it correct that, in fact, that Denise had been staying at your house several days before the date of August 1st?

     A     Repeat that for me, please?

     Q     Isn't it correct that Denise had been staying at your house several days before August 1st?

     A     No.

     Q     Did you ever tell the police that Denise had been living at your house for several days before August 1st?

     A     No.

     Q     Thank you, Ma'am.

                 Isn't it correct that Denise said that she wanted to see Jerome Hendricks?

     A     No.

     MR. CASSIDY:  Objection, Judge, foundation.

     THE COURT:  The objection is sustained.

     MS. PLACEK:  Withdraw.

                 Isn't it correct, when you were fighting with Denise in the house, she stated to you that she, in fact, wanted to see Jerome

84

1    Hendricks?

2              THE WITNESS:  No.

3              MS. PLACEK:  Q  Isn't it correct that, in fact --

4    Withdraw.

5                        How long did you know your

6    niece?

7         A     Since she was a baby.

8         Q     How long had she been living with your

9    mother?

10        A     A year and a half.

11        Q     How long had she been babysitting for

12   you?

13        A     Denise?

14        Q     Yes?

15        A     Off and on.

16        Q     Would it be correct in saying that you

17   knew that Denise ran away?

18             MR. MURPHY:  Objection.

19             MS. PLACEK:  Of her own personal knowledge?

20             THE COURT:  What is the basis?

21             MR. CASSIDY:  Calls for a conclusion and

22   relevance.

23             THE COURT:  Relevance.

24             MR. CASSIDY:  Form of the question, calls for

85

1 a conclusion and relevance.

2   THE COURT:  The objection is overruled as to

3 all three grounds.

4     It neither calls for a conclusion

5. that she is incapable of drawing, it's not irrelevant,

6 but it might be, I can't tell.

7   MR. CASSIDY:  Offer of proof, then, Judge.

8   THE COURT:  What offer of proof?

9     If there were a jury out here,

10 maybe an offer of proof would make some sense, but after

11 she tells me what she is going to tell me, what

12 difference does it make?

13     I can hear it now and decide

14 whether or not it's relevant, just as well as I can

15 hear it off the record and decide whether it's

16 relevant and then put it on the record.

17     Let's make sense.

18     Objection is overruled.

19   MR. MURPHY:  Judge, if I may pursue that,

20 Judge.  What relevance does it have if she, even

21 assuming it were true, if it were --

22   THE COURT:  Mr. Murphy, if it doesn't have

23 any relevance, it won't have any credence, it won't

24 have any weight, but because you say it's not relevant,

86

1   I cannot tell whether it's going to be relevant and

2   it may become terribly relevant.

3                          Objection is overruled.

4          MR. CASSIDY:  Thank you, Judge.

5          MS. PLACEK:  Q  Isn't it correct that you knew

6   Denise was a runaway?

7          A       She never ran away.

8          Q       When you say she never ran away, is it

9   your testimony that to the best of your knowledge you

10  knew Denise never ran away from your mother?

11         A       Never.

12         Q       You knew that Denise -- Well, let me ask

13  this.

14                         Isn't it true that Denise often

15  stayed at the, when she ran away, stayed at her

16  step-grandfather's apartment?

17         MR. MURPHY:  Objection.

18         THE COURT:  Overruled.

19         MR. MURPHY:  Objection, form of the question.

20         THE COURT:  Mr. Murphy, as I understand what

21  you told me in the opening statement, albeit it's your

22  opening statement and is not evidence, you are going to

23  have me infer from this evidence that this, because as

24  I understand your opening statement, that there will

87                          504

1    be no direct evidence that places this Defendant in

2    the company of the victim at the time of the death,

3    and you are going to, therefore, ask me to infer that

4    she was with the Defendant.

5    The Defendant has a right to ask

6    me to infer that she may have been with any number of

7    other people on the same foundational basis that you

8    are going to ask for me to infer the contrary, and

9    that is all it's being offered here for is to show a

10   pattern of conduct by this victim, and that would

11   allow another inference that you champion for and it's

12   relevant, it's as relevant as the testimony that you

13   are going to offer and ask me to conclude that, therefore,

14   the victim was within, was with the Defendant.

15   Objection overruled.

16   MR. MURPHY:  That was not the basis of my

17   objection, though.

18   The basis of my objection was assuming

19   a fact not in evidence.

20   The witness said she was, did not

21   show -- she ran away, the next question was when she

22   ran away, did she go to her grandfather's.  It's

23   improper.

24   THE COURT:  Mr. Murphy, the objection is overruled.

88                              595

1        MS. PLACEK:  May I proceed, your Honor?

2        THE COURT:  You may.

3        MR. PLACEK:  Thank you.

4                 Isn't it correct that when

5    Denise ran away, she went to her step-grandfather's

6    apartment and stayed there?

7        A       She never ran away.

8        Q       Thank you.

9                 To the best of your knowledge, did

10   you ever make that statement to the police?

11       A       Yes.

12       Q       That, in fact, she went, she ran away,

13   could be found at the apartment of her step-grandfather?

14       A       No, I didn't.

15       Q       Okay.  Thank you.

16                Now, calling your attention to what

17   has been marked as People's No. 7 -- Can I?

18   It's the picture.

19       THE COURT:  I see it.

20       MR. PLACEK:  Q   How old was Denise when that

21   picture was taken?

22       A       She was 12.

23       Q       Thank you.

24       THE COURT:  How old?

89

1       THE WITNESS:  12.

2       MS. PLACEK:  Q  Now, calling your attention to

3 the diagram presented, when was the first time that you

4 saw this diagram?

5       A     When I came here.

6       Q     When you say when you came here, does that

7 mean, does that "here," mean in this courtroom?

8       A     No, the State's Attorneys'.

9       Q     Pardon?

10       A     The State's Attorneys'

11       Q     Over at the State's Attorney's Office,

12 is that correct?

13       A     Yes.

14       Q     How many times had you been at the

15 State's Attorney's Office?

16       A     Twice.

17       Q     Were you there during, in fact -- Excuse

18 me, withdraw.

19               When were these two times?

20       A     Today and last week.

21       Q     Were you ever there in the year of 1990

22 with two different State's Attorneys?

23       A     No.

24       Q     Thank you.

1       Q      Now, you described certain clothing

2   that your niece had on, correct?

3       A      Yes.

4       Q      And when we speak of clothing that your

5   niece wore, I believe you described certain shoes,

6   correct?

7       A      Yes.

8       Q      How long had she had those shoes?

9       A      Not too long.

10      Q      How long is "not too long," to you?

11      A      Three months.

12      Q      And let me ask you this.

13                  I believe you described a color,

14  correct?

15      A      Yes.

16      Q      What color were they?

17      A      White.

18      Q      Thank you.

19                  May I have one moment, Judge?

20                  To the best of your knowledge, on

21  August 7th of 1988, do you know whether or not a

22  report of Denise being seen alive at approximately,

23  well, let me just start there.

24                  Do you know whether or not on

91

1    approximately, between the time of August 1st and

2    August 7th of 1988 there was reported to you by the

3    Chicago Police Department or Youth Officers investigating

4    Denise's missing, that she was, in fact, seen alive?

5            MR. MURPHY:  Objection.

6            THE COURT:  Objection is sustained.

7            MS. PLACEK:  Your Honor, that is all I have.

8                    Thank you, M'am.

9            THE COURT:  Redirect?

10           MR. CASSIDY:  May I approach the bench, Judge?

11                    REDIRECT EXAMINATION

12                    BY

13                    MR. CASSIDY:

14    Q        I will show you what will be marked as

15    People's Exhibit No. 12 for identification.

16                    Do you recognize what these are?

17    A        Yes.

18    Q        What do you recognize them to be?

19    A        Denise's shoes.

20    Q        Are those the shoes that you last

21    seen her wearing on August 1st of 1988?

22           MR. LUFRANO:  Objection as to whether they are

23    the same or similar.

24           THE COURT:  What is the basis of that objection?

92

1        MS. PLACEK: Withdrawn, Judge.

2        MR. CASSIDY:   Q   These are shoes?

3        A        Yes.

4        Q        She was wearing on August 1st of 1988?

5        A        Yes.

6        MR. CASSIDY:   No further questions, Judge.

7                         RECROSS EXAMINATION

8                         BY

9                         MS. PLACEK:

10       Q        And those are the same shoes that

11  you described with the State's Attorney, and we can

12  mark these, Counsel, what marking?

13       MR. CASSIDY: 12.

14       MS. PLACEK:   Q   Those are the same shoes that

15  you described when this Assistant State's Attorney

16  asked you questions, correct?

17       A        Yes.

18       Q        And you described, as a matter of fact,

19  the name, "Denise," being in green, correct?

20       MR. CASSIDY: Objection, Judge.  She didn't

21  say green.

22       THE COURT:  The objection is sustained.

23       MS. PLACEK: Q   Well, let me ask you this.

24                         Did you, in fact, when this gentleman

93

was asking you questions, describe the name of Denise

being in green on those shoes?

A        Can you repeat that?

Q        When this gentleman was asking you questions

about 15 minutes ago and asked you to describe the

shoes, did you, in fact, describe those shoes as

having Denise's name written in green?

A        No.

MS. PLACEK:   Thank you.

That is all, Judge.

THE COURT:   Anything further, Mr. Cassidy?

MR. CASSIDY:   No.

THE COURT:   Thank you, Ms. Hill, you may step

down.

(Witness excused.)

THE COURT:   Mr. Cassidy, I would -- Are we likely

to get another witness on or off before 5:00 o'clock?

MR. CASSIDY:   It's John's witness.

MR. MURPHY:   I think, you know, it really

depends on cross.

I would say that the direct of

this next witness would be no more than five to seven

minutes.

THE COURT:   Well, let's try.  He will have to come

94

back if we don't finish.

        MR. MURPHY:  People would call Larry Nitsche.

                Judge, if I may, some of the
witnesses are being called out of order, I would
like to call them in for their convenience.

        MS. PLACEK:  We previously spoke of that.
Since this is a benc trial, certainly, your Honor.

                        (Witness sworn.)

        THE COURT:  You may be seated.

                Good afternoon, how are you?

        THE WITNESS:  Good.

        THE COURT:  You may proceed, Mr. Murphy.

        MR. MURPHY:  Thank you, Judge.

95

1

                    DET. LAWRENCE NITCHE,

2

   called as a witness herein, after having been first

3

   duly sworn, was examined and testified as follows:

4

                         DIRECT EXAMINATION

5

                         BY

6

                         MR. MURPHY:

7

        Q        Would you state your name and spell

8

   your last name for the Court Reporter?

9

        A        My name is Lawrence Nitche, N-i-t-c-h-e.

10

        Q        Mr. Nitche, by whom are you employed?

11

        A        City of Chicago.

12

        Q        And in what capacity are you employed

13

   now?

14

        A        I am now with the truck investigations

15

   for the Corporation Counsel.

16

        Q        Were you employed with the Chicago Police

17

   Department at one time?

18

        A        Yes.

19

        Q        In what capacity were you employed there?

20

        A        As a Detective With Area 2 Violent

21

   Crimes.

22

        Q        How long did you work for the Chicago

23

   Police Department?

24

        A        Approximately 20 years.

   **96**                        693

1       Q       And in your capacity now, you are also

2  employed by the Chicago Police Department?

3       A       I am officially on a leave of absence with

4  the Chicago Police Department.

5       Q       And, Mr. Nitche, you said you were a

6  Detective in Area 2?

7       A       Yes.

8       Q       I would like to direct your attention to

9  the date of August 8th of 1988, were you working on

10  that particular day?

11       A       Yes.

12       Q       On that particular day, did you have an

13  occasion to come into contact with any individuals

14  that you see in Court today?

15       A       Yes, sir.

16       Q       Would you please point to that person

17  and indicate an article of clothing?

18       A       He is --

19       MS. PLACEK:  Stipulate he would be pointing

20  to Jerome Hendricks.

21       MR. MURPHY:  So stipulated, your Honor.

22       THE COURT:  Let the record so reflect.

23       MR. MURPHY:  Q  And, Detective Nitche, was the

24  Defendant, on August 8th of 1988, brought to Area 2

97

Violent Crimes?

A        Yes, sir.

Q        And where is that located?

A        727 East 111th Street.

Q        And is that -- Did you speak to him there?

A        Yes, I did.

Q        And where did you speak to him at?

A        I spoke to him in one of the interview rooms located on the second floor in the Violent Crimes Office of Area 2.

Q        Approximately what time did that conversation begin?

A        Approximately ten minutes to nine that night.

Q        And do you recall who else was present that night, besides yourself and the Defendant?

A        Just myself and the Defendant.

Q        And could you describe how that interview began?

A        Yes, I read him his Miranda Rights.

Q        And how did you give him his Miranda Rights?

A        I read them from a pre-printed form.

98

1          THE COURT:  Excuse me, Mr. Murphy, this witness

2     testified on the suppression hearing, didn't

3     he?

4          MS. PLACEK:  Yes, he did, Judge.

5          THE COURT:  Are we going to go back through his

6     whole testimony again?  I heard it once.

7                    If you are seeking to lay a

8     foundation for the admissibility of the written

9     document, can't we just assume that his

10    testimony or stipulate his testimony given at the

11    suppression hearing would be the testimony that I

12    would hear now, or is there something new that you

13    are going into?

14         MS. PLACEK:  I suggest, also, that if the State

15    is going about it this way, this gentleman isn't

16    going to be off by 5:00, even with the State's testimony

17    on direct.

18         THE COURT:  You know, you can do it, Mr. Murphy,

19    I don't know what the purpose is, I heard his testimony

20    once and I remember it and I have notes on it, I don't

21    know why I need to hear it all over again.

22         MR. MURPHY:  I believe the substance of the

23    statement will be gone into by the Detective and also

24    at this point, it's my understanding that unless both

99

1    parties stipulate to evidence, we are starting from

2    point zero in this trial.

3            THE COURT:  I know.

4            MR. MURPHY:  I can't assume that evidence came

5    out during the trial hearing is true.

6            THE COURT:  I thought, maybe --

7            MS. PLACEK:  There is a transcript in

8    existence.

9            THE COURT:  Is there any possibility that we

10   don't have to go through this, because we might as

11   well take him off the stand now and bring him back

12   Monday, because we are are not going to get through

13   by 5:00 o'clock.

14           MS. PLACEK:  I know the State has a copy of the

15   transcript.

16           MR. MURPHY:  Well, Judge, what I intend to go

17   into is an oral statement.

18           THE COURT:  I understand what you are going

19   into, Mr. Murphy, and I anticipate precisely that the

20   Defense will do as much of a cross examination around

21   that as they did on the motion to suppress and that

22   is going to keep us here well beyond 5:00 o'clock and

23   I just wondered out loud whether that could be

24   avoided, since I have heard this testimony before.

100

1    MS. PLACEK:  And there is a transcript.

2    THE COURT:  On the other hand, if it can't, then

3    I would suggest that we recess Mr. Nitche from the

4    stand and ask him if he could kindly return on Monday.

5    MR. MURPHY:  If there is a way to shorten it,

6    we are open to it.

7    MS. PLACEK:  I will stipulate to the transcript,

8    to the point of the transcript, Judge.

9    THE COURT:  And then I have his testimony,

10   direct and cross.

11   MR. MURPHY:  What you don't have is the substance

12   of the statement and the fact that the Miranda

13   Rights were given.

14   MS. PLACEK:  Miranda Rights were spoke of,

15   Judge.  I will do whatever the Court --

16   MR. MURPHY:  At the point they were asked about

17   it, there was an objection, whether the Court will

18   assume they are correctly given.

19                      There was an objection sustained.

20   THE COURT:  Is there going to be an issue

21   about the Defendant given Miranda Warnings?

22   MS. PLACEK:  The Court ruled on my motion.

23   MR. MURPHY:  I don't know what that means

24   because at this point, there is no evidence that

101

Miranda Rights were given.

THE COURT:  Proceed, Mr. Murphy.

MS. PLACEK:  I suggest this is going to take a very long time, then.

THE COURT:  5:00 o'coock we will release Mr. Nitche from the stand.

MS. PLACEK:  I have a real problem with piecemeal, I will do whatever the Court wnats, Judge.

MR. MURPHY:  Whatever you want to do.

THE COURT:  Proceed.

MR. MURPHY:  Q  Detective Nitche, you testified you gave the Defendant his Miranda Rights?

A       Yes.

Q       How did you give his Miranda Rights?

A       I read them from a pre-printed card, an FOP calendar book.

MR. MURPHY:  Do you want to stipulate they were given?

MS. PLACEK:  There would be such a stipulation that those rights were given.

MR. MURPHY:  So stipulated, your Honor.

Now, Detective Nitche, after you gave the Defendant his Miranda Rights, could you tell Judge Holt what, if anything, was said between you

102

1    and the Defendant?

2        THE WITNESS:  Yes.  The Defendant indicated to

3    me that he wanted to do everything possible to clear

4    his name and he would cooperate completely with the

5    investigation.

6

7        Q        Did you have an occasion to ask him about

8    any particular dates?

9        A        Yes, I did.  I asked him about the

10   1st of August, 1988, could he give me his whereabouts

11   for that night.

12       Q        What did he tell you?

13       A        He stated that around from 6:00 o'clock

14   to approximately quarter to 9:00 he was across the

15   street at a guy's, a friend of his named Tom, I

16   believe it was, 244 West 117th Street.

17       Q        That would have been across the street

18   from his house?

19       A        From his house.

20       Q        What else did he tell you that night?

21       A        After he left Tom's house, he came home

22   for ten minutes and had something to eat.  He left

23   his house sometime before 9:00 o'clock and walked

24   to West Pullman Park.  He said along the way he ran

     into James Walker and I think --

     103

1   Q      Is that James Walker or Michael Walker?

2   A      Michael Walker.

3   MS. PLACEK:  Objection, Judge.

4   THE COURT:  Objection is sustained.  Leading.

5   MR. MURPHY:  Q  What is the name of the

6   individual?

7   A      He said it was Michael Walker and it

8   was Tina, I can't think of her last name, it slips

9   my mind right now, but he did see these people along

10  the way as he walked to West Pullman Park.

11  Q      Approximately what time was this about?

12  A      Approximately 9:00 o'clock.  He said

13  he stayed at West Pullman Park for some time around

14  9:30 when he left and went to a school playground, I

15  think it was White.

16  Q      Is that at White's School?

17  A      At White's School Playground.

18  MS. PLACEK:   Judge.

19  THE COURT:  Objection sustained.   Do not lead.

20  MR. MURPHY:  Q  And what else did he tell you

21  that night?

22  A      He met a couple more of his friends

23  there and a guy named Shorty Mack and one other fellow,

24  the name slips my mind, but they played basketball and

104

1    drank a few beers until about 4:30 in the morning,

2    at which time they returned home.

3         Q       And at this time, anytime -- Detective

4    Nitche, strike that.

5                        How long did this conversation

6    with the Defendant last?

7         A      . Approximately 20 minutes or so.

8         Q       And at any time, did the Defendant ever

9    tell you that he observed the victim, Denise Johnson?

10        MS. PLACEK:   Objection, leading and suggestive.

11   Also foundational as to prior conversation.

12        THE COURT:   Objection is sustained.

13        MR. MURPHY:   Q  Detective Nitche, during any

14   time during this 20 minute conversation, did he ever

15   tell you that after 6:00 o'clock in the evening until

16   approximately 4:30 in the morning on August 1st and

17   August 2nd of 1988 that he was with or saw Denise

18   Johnson?

19        A       No, he did not.

20        MS. PLACEK:   Continuing objection as to the

21   foundation.   Not only the foundation, Judge, but it's

22   improper as to leading and suggestive nature.

23        THE COURT:   The objection is sustained.   The

24   answer will stand.

105

MR. MURPHY:  May I ask what the basis is?

THE COURT:  If you are going after an admission,
an admission by omission, you have to personally lay
a foundation that would have given the Defendant a
reasonable opportunity to make the statement you are
saying he didn't make.

You just can't ask him didn't he
tell you something.  He may not have been asked
or not asked any question at all that would have
elicited the response that you say he should have
made.

Your objection is sustained.

MR. MURPHY:  Detective Nitchs, at any time when
the Defendant was in your presence, did he have occasion
to make any phone calls?

THE WITNESS:  Yes, he did.

MR. MURPHY:  Q  Who did he call?

A       He told me he was calling T.V. Reporter
Russ Ewing and he also made a phone call to his mother.

Q       Approximately what time did he make those
phone calls?

A       I believe one was 9:15 and the other one
was around 9:20.

Q       Was that the extent of the contact you

106                          613

1   had with the Defedant  after 9:00 o'clock that

2   evening?

3           A       Yes, sir, I did.

4           Q       After 9:15 or 9:20?

5           A       He was turned over to a couple other

6   detectives and he was taken someplace else for a test.

7           MS. PLACEK:  Objection.  Motion to strike the

8   last part.

9           THE COURT:  Overruled.

10          MR. MURPHY:  No further questions, Judge.

11          MS. PLACEK:  Motion to strike the entire

12  testimony of the Officer as irrelevant to the matter

13  at hand, August the 1st is the day, Judge.

14                          If the Court will read the

15  Indictment, I believe it doesn't deal with the afore-

16  mentioned charge, no alibi, Judge, has, in fact, been

17  filed by the Defense in this matter.

18                          Therefore, it becomes irrelevant.

19          THE COURT:  Overruled.

20

21

22

23

24

    107

**CROSS EXAMINATION**

**BY**

**MS. PLACEK:**

Q      Let me ask you this, Officer, when you were questioning the Defendant on all the events that you testified to, those dealt with, in fact, his actions on August 1st of 1988, correct?

A      That is correct, Ma'am.

Q      And let me ask you this, also.

What date were you questioning the Defendant?

A      The 8th of August, Ma'am.

MS. PLACEK:  Thank you, Judge.

If the State wishes, we can stipulate that this Officer did testify, there is no issue of force, we would ask that the State accept our stipulation as to the adoption of this Officer's previous testimony.

THE COURT:  State?

MR. MURPHY:  Judge, we would decline.

THE COURT:  The stipulation is declined.

MS. PLACEK:  Then I have no further questions of this Officer, Judge.

THE COURT:  Thank you, Ms. Placek.

108

1                Do you have any redirect?

2       MR. MURPHY:  No, Judge.

3       THE COURT:  Thank you, Mr. Nitche, you may step

4 down.

5                     (Witness excused.)

6       THE COURT:  The matter of Jerome Hendricks is

7 continued order of Court February 8th at 1:00 p.m.

8                Only for the one matter we

9 discussed.

10      MS. PLACEK:  With all due respect, Judge, the

11 Court intends to go on this case?

12      THE COURT:  I am sorry, I didn't quite hear

13 you.

14      MS. PLACEK:  I am sorry, Judge.  The Court

15 intends to go on this case as to Monday, correct, to

16 take evidence?

17      THE COURT:  Yes, that is my intention.

18      MS. PLACEK:  Is that just -- I have to inform

19 other judges I will not be available.

20      THE COURT:  It's my intention to work Monday.

21      MR. MURPHY:  If I can ask, do you know what

22 time?  Do you have any idea when you want to, when

23 you anticipate we will start on Monday?

24      THE COURT:  I venture to say 1:00 o'clock.

109               c16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

(Which were all the

proceedings had in this

matter at this time.)

1          IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

2                      COOK COUNTY, ILLINOIS

3     THE PEOPLE OF THE        )

4     STATE OF ILLINOIS,       )    CRIMINAL DIVISION

5              Plaintiff,      )       .  .

6          VS.                 )    CASE NO. 88-CR-12517

7     JEROME HENDRICKS,        )    CHARGE: MURDER, ETC.

8              Defendant.      )

9          REPORT OF PROCEEDINGS of the hearing had

10    before the Honorable LEO E. HOLT, Judge of said

11    court, on the 8th day of February, 1991.

12        .  APPEARANCES:

13               HONORABLE JACK O'MALLEY,

14                  State's Attorney of Cook County, by

15               MR. JOHN MURPHY,

16               MR. SCOTT CASSIDY,

17                  Assistant State's Attorneys,

18                  for the People of the State of Ill.

19               MR. RANDOLPH N. STONE,

20                  Public Defender of Cook County, by

21               MS. MARIJANE PLACEK,

22               MR. VINCENT LUFRANO,

23                  Assistant Public Defender,

24                  for the defendant.

1        THE CLERK:   Sheet 12, line 12; Jerome
2   Hendricks.
3        THE COURT:   Where is Mr. Murphy?  Do you
4   know, Mr. Coleman?
5        MR. COLEMAN:   I thought I saw him when I
6   came down.
7        THE COURT:   They may be in the jury room.
8        MR. COLEMAN:   Let me check there.
9        THE COURT:   Does the interview with the
10  officer Obviate the necessity of a hearing?
11       MR. LUFRANO:   No, it did not, your Honor.
12     . THE COURT:   I have before me the motion of
13  the defendant, which is entitled a Motion to
14  Dismiss.  And I take it, while the motion doesn't
15  tell me with particularity, I take it that the
16  defendant complains that the conduct of the
17  police violates his Fourteenth Amendmend right to
18  due process; that's as a result of the failure of
19  the State, through its agent, law enforcement
20  agents, failed to disclose matters which would
21  have been exculpatory or which bear upon the
22  guilt or innocence of the defendant, resulting in
23  a Brady violation, in contravention of his
24  Fourteenth Amendment rights.

2

619

1          I have also been tendered a copy

2    of a document wherein it is stated that a police

3    officer came in to information from an anymous

4    informant, and I'm not using that word as a word

5    of art, but rather as a characterization, which

6    may not be entirely accurate, but in any event,

7    the police officer came in to information from

8    some anonymous source, the anonymous source

9    residing at a specific location, thereafter, the

10   identity of that source is silent or efforts to

11   identify that source are nonexistent.

12          Further, I understand the

13   defense's position to be that if the identity of

14   that source were known, that it is probable that

15   that source would have information to the effect

16   that the decedent in this case was seen alive

17   subsequent to the time that the State contends

18   she was last seen with the defendant, or at least

19   the very least, as I understand it, the defendant

20   would be able to utilize that person's

21   information to raise a reasonable doubt as to

22   whether or not the defendant was the last person

23   to see the victim alive.

24          It's around the identiy of that

3

1    person that this hearing concerns itself. What is

2    meant by the statement in the police report and

3    who the source of that information is the

4    totality of the inquiry that I perceive this

5    inquiry to be about.  If I'm incorrect on that,

6    from either side's perpective, I'd like to know

7    about that now so that we can set the parameters

8    for this hearing.

9         MS. PLACEK:  The Court is correct from the

10   defense's standpoint as to the statement of our

11   argument, Judge.

12     . MR. MURPHY:  Judge, I believe that's

13   accurate, as far as we know.

14        THE COURT:  Miss Vrodolyak, call Mr. --

15        MR. MURPHY:  Judge, if I may?  You intend to

16   put him on the witness stand now, Judge?

17        THE COURT:  Let me handle this other matter,

18   and then we will come right back to this.

19                        (Whereupon, the case was

20                         passed and other proceedings

21                         had, after which the case

22                         was recalled and the

23                         following proceedings were

24                         had:)

4

621

1       THE CLERK:   Jerome Hendricks.

2       THE COURT:   I'm sorry, Mr. Murphy.   I wanted

3   to get that matter out of the way.

4               You asked me if I was going to put

5   the officer on the stand, and my answer to that

6   was yes.

7       MR. MURPHY:   Your Honor, may I make a

8   comment to the Court before you proceed?

9       THE COURT:   Sure.

10      MR. MURPHY:   Your Honor, I believe,

11  accurately summed up what has gone on before with

12  regard to this motion.   I understand your Honor

13  is in a difficult position in one sense, because

14  there's a report that makes reference to an

15  anonymous source with no person's name.   And at

16  this point, the Court has no indication what has

17  happened further between the parties.

18               Your Honor, this officer was

19  brought in to court yesterday.   The defendant had

20  an opportunity, through his attorneys, to

21  interview the officer.

22               And in addition to that, the

23  officer was also brought into court today.   And

24  the defensne attorneys have again, had an

5

1    opportunity to, and in fact on yesterday's date

2    and today's date, interviewed the police officer.

3             I'm sure that the defense

4    attorneys will correct me if I'm wrong, but I was

5    present during both of the interviews, and the

6    officer told counsel that the anonymous souce was

7    a reference to two women who gave him the

8    information which is in the report; that those

9    two women refused to give him their names.

10   MR. LUFRANO:  He didn't say they refused to

11   give him their names.  I never asked him about

12   that.

13   MR. MURPHY:  That's something that I'm aware

14   of, that's my information.  All of the

15   information he has is within the reports.  The

16   officer would say he has never been contacted

17   before this week by defense or anybody else with

18   regard to eliciting information about that

19   report, which was in their posession.

20            Your Honor, there's been no

21   showing at all that the State's Attorney's Office

22   or that the police have withheld any information.

23   In fact, at the time the officer prepared this

24   report, it was not known to him that this was a

6

623

1    homicide.  This report was prepared the day

2    before the body was discovered.

3              Your Honor, we cannot understand

4    why the officer should be put on the witness

5    stand.  I don't believe there's any authority for

6    that.  The defense attorneys have been given the

7    reports with all of the information he has.  They

8    have been given an opportunity, I think, to

9    unusually interview him about that report.  We

10   have made him available for that.  How they

11   choose to handle that interview and what

12   information they choose to elicit is up to them.

13   But he's available, and he's spoken to them

14   willingly on two occasions.  We don't understand

15   the necessity of having to put him on the witness

16   stand and have him asked questions under oath.

17   What purpose does that serve?

18        MS. PLACEK:  To show the Court that harm

19   was, in fact -- the representation nor the right

20   to interview doesn't make the record.

21        THE COURT:  My understanding of Brady and

22   it's progeny is that a Brady violation occurs

23   whether the failure to disclose is advertent or

24   inadvertent.  Good-faith disclosure does not

7

1    vitiate a Brady violation.

2             Brady is not predicated upon fault

3    either by the law enforcement policing agency or

4    the prosecutorial arm of the State or anybody

5    else.  It has nothing to do with fault.

6             As a matter of fact, Brady

7    violations can occur under the most scrupulous

8    and diligent efforts to disclose.  The question,

9    however, becomes whether or not, in fact, there

10   was anything to disclose.  And in the posture in

11   which you have postulated, there's nothing to

12   disclose.

13            On the other hand, there appears

14   to be something to disclose.

15            My further understanding is that

16   the defense makes out its Brady violation if they

17   establish that it is probable that a violation

18   has occurred.  They don't have to prove it beyond

19   a reasonable doubt or by a preponderance of the

20   evidence or anything of that nature.

21            Thus, I can find no way to resolve

22   what appears to be a conflict.  Maybe it's not a

23   conflict, Mr. Murphy and Mr. Cassidy.  Maybe it's

24   perfectly consistent, but I can't tell without a

8

1    hearing.  And that's why it's necessary to put

2    the police officer on the stand.

3              Not that what you say is

4    incorrect, but the record doesn't show what you

5    have said.  All the record shows is I have got a

6    motion to dismiss alleging certain facts, and no

7    facts have been elicited on which to either grant

8    or deny that motion with the defendant insisting

9    that his Fourteenth Amendment rights have been

10   violated.  And it would be, in my judgment,

11   ludicrous to have this case come back for want of

12   a ten minute hearing to determine with

13   particularity what's going on with this

14   situation.

15        MR. MURPHY:  Judge, it just seems ironic

16   that because of the defendant's failure to follow

17   through on whatever report they may have had in

18   their possession on previous dates and even

19   today's date and asking the appropriate questions

20   this officer has to be put on the stand and be

21   subject to questioning.  I don't know even if the

22   Court is going to allow cross examination or how

23   this is going to be handled.

24        THE COURT:  I don't find that a hardship on

9

1    the officer to be asked questions under oath.

2    He's going to tell the truth.

3         MR. MURPHY:  I understand that, Judge.

4         THE COURT:  What hardship is that to him?

5    And how does that in any way demean him or harass

6    him or anything else.

7         MR. MURPHY:  Because it's like a deposition.

8    And why should the officer subject himself or any

9    witness.  This is not a criminal proceedings at

10   this point.  And the basis for conducting this

11   hearing is primarily because the defendant has

12   failed to follow through on a report that they

13   received, they never addressed.  They could have

14   contacted the officer.

15        THE COURT:  Probably not, Mr. Murphy.  And

16   timeliness may be a question here.  But I have

17   decided not to concern or address the question of

18   timeliness, because it is of such overriding

19   importance that timeliness seems to be an

20   inappropriate way to resolve this constituional

21   issue that the defendant has raised.

22             But on the other hand, it does not

23   appear that even timeliness would have obviated

24   this hearing, because presumptively, at least,

10

1    you   may say it's speculative, but it seems to me

2    that presumptively, had they gone to the officer

3    six months ago or a year ago, he would have told

4    them the same thing that he told them today and

5    yesterday, which would not Have resolved this

6    issue.  So, we would still be right in the same

7    place.

8                    It is true that this issue need

9    not have emerged at this late stage, but it would

10   have emerged under any circumstances and in the

11   identical posture in which it now emerges, it

12   seems to me.

13       MR. CASSIDY:  So, the record is clear, I

14   believe the issue is whether any harm has been

15   brought to the defendant, is that correct, Judge?

16       THE COURT:  Well, -- whether there has been

17   a Brady violation and whether it is material.

18       MR. CASSIDY:  I believe counsel said she had

19   this when we tendered our discovery material.

20       THE COURT:  She had the document.  And

21   there's no question that she had the document for

22   a number of months.

23       MR. CASSIDY:  And there's an address on the

24   document.  Defense has presented no evidence

628

11

1   whatsoever -- after arraignment when we tendered
2   our discovery material, that she sent anybody out
3   to this address or made any steps to go to this
4   address.  The last minute, two years later, she
5   comes before the Court and says it's very
6   important to our case, right before the jury is
7   about to walk in, it's very important to our
8   case.

9                    She had this address.  They had
10  investigators.  They could have gone out there to
11  the house.

12          .            I know you say there's a
13  probability that something might have went on
14  here.  But there's nothing supporting their
15  motion by affidavit saying what the probabilities
16  are in this case, what harm has possibly been
17  brought to the defendant.  There's nothing to
18  support by affidavit in their motion.  And they
19  had a chance to talk to the officer about why
20  they think harm has been brought.  So, all of
21  this is speculation on the Court's part.  Even
22  after talking to the officer, nothing is
23  contained in the motion what they expect the
24  ofifcer can say; so, we can do this in every

12

1   situation, Judge.  They could bring a motion in
2   front of your Honor and you can call witnesses
3   any time you want.
4             And I understand your reasoning.
5   And I like your reasoning, you know -- why try a
6   case again.  To me that begging the question.
7   It's hard to respond to that question.  We can do
8   this every time we have a trial.  We can bring a
9   witness out, based upon their skimpy evidence
10  that they present to the court.  That's all I
11  have to say, Judge.
12     · THE COURT:  Mr. Cassidy.
13       MR. CASSIDY:  Yes.
14       THE COURT:  It is true what you are saying
15  is that the defendant has not been as diligent as
16  he might have been in following up the sparsity
17  of the information he had.  That does not obviate
18  a Brady violation.  It does not obviate it,
19  because the onus of Brady is on the State, not on
20  the defense.  And what I'm looking for is not to
21  see whether or not the defendant has made
22  meaningful use of information that was supplied
23  to him, but whether or not there was meaningful
24  information which was not supplied.  That's all.

13                        630

1    That's the extent of my inquiry.

2         MR. CASSIDY:  Okay.

3         THE COURT:  Once I haev satisfied myself

4    that there has been no failure to disclose

5    advertently or inadvertently, the inquiry comes

6    to a close.

7         MR. CASSIDY:  Sure.  But my second point is

8    this.  Any motion should be supported by --

9    Strike that.

10                   They had a chance to talk to the

11   officer.  They could have cleared up what the

12   officer was going to say, and they could have

13   presented that in a written motion, what they

14   expect the officer to say, and then you could

15   have ruled upon it.

16        THE COURT:  Well, unfortunately,

17   Mr. Cassidy, here's how I view that.

18        MR. CASSIDY:  Sure.

19        THE OCURT:  Circuit Court rule -- whatever

20   it is, requires that matters which do not appear

21   of record, that a motion be supported by -- under

22   affirmation or by -- under oath or by an

23   affidavit or something of that nature.  That rule

24   can only be applicable to matters which are not

14                      631

1    of fundamental constitutional magnitude, because
2    neither a statute or a court ruling can impede
3    the full excercising of the defendant's
4    constitutional rights.
5              Thus, the failure to put under
6    oath or to make an affidavit, unless in some very
7    narrow circumstances, don't operate to bar a
8    hearing.
9              For instances, Circuit Court Rules
10   would seem to require that a motion to suppress
11   statements or evidence or to quash an arrest be
12   under oath, and the failure to place it under
13   oath obviates the necessity for a hearing, and
14   some cases in Illinois have so held.
15             There are other cases, including
16   an Illinois Supreme Court case, which says that
17   the Circuit Court rule is not applicable, because
18   we deal with a defendant's constitutional right,
19   and court rules cannot abrogate his rights under
20   the constitution.  That's what I have here,
21   because I have a clear -- if there was a Brady
22   violation, you would agree with me, I'm sure,
23   that that Brady violation constitutes a
24   demunition of the defendant's Fourteenth Amend

c32

15

1     rigts.   Thats' what Brady is predicated upon.

2     That's how Brady emerged, that it's base.

3                And so, therefore, I'm not

4     terribly concerned about, again, the procedural

5     defaults, if there be any.

6        MR. CASSIDY:  Okay.

7        THE COURT:  What I want to do is get to the

8     substance of this problem, which we could have

9     done, perhaps, a half hour ago, after we

10    discussed the procedural things.  But I

11    understand.  The record is now clear what my

12    thinking is.  And if you will call your witness,

13    we will proceed.

14       MR. MURPHY: He's present.

15       THE COURT:  Miss Placek, if you're going to

16    call him, you should do so.

17       MS. PLACEK: The only thing I would like to

18    correct the record for is that I have been the

19    defendant's attorney for less than a year,

20    although, there would be imputed knowledge,

21    because my office represented.

22              I'd ask that he be made the

23    Court's witness, Judge.

24       THE COURT:  On what basis?

16

c33

1          MS. PLACEK:  On the basis, Judge, as the

2     Court has pointed out, this is a constitutional

3     issue, and in fact, not in my basis an advisory

4     procedure.  I would suggest, Judge, that the

5     Court has limited the parameters rightly so, of

6     the interrogation of the witness.

7                    My suggestion, the reason for the

8     Court's witness is that it's my understanding

9     when such motions raise to the scope as we have

10    risen it to of a constitutional issue, the Court

11    should also be directly involved with the

12    inquiry.

13         THE COURT:  State.

14         MR. MURPHY:  Judge, we would object.  The

15    defendant -- this is the defendant's request.  If

16    the defendant wants to put them on, I think they

17    have the opportunity.  The Court is allowing them

18    to do that.

19         THE COURT:  I'm going to decline to call the

20    witness as a Court witness.  If it appears that

21    this witness is hostile to either side, that

22    determination may change.

23                    In any event, the latitude of this

24    hearing is pretty broad, and if I find that the

17

634

1    respones of the witness neeed to be probed

2    further, or in areas that neither the State nor

3    the defense have gone into, I have the option of

4    putting further questions to him in furtherance

5    of the truth, any way.  So, 'there is no reason

6    for me to call him as a Court's witness at this

7    time.

8                    If you wish to call him, please do

9    so.

10         MR. MURPHY:  Judge, also, we would ask that

11   the police report, which is in question, remain

12   part of the court file so the court will have an

13   opportunity of viewing at the time of the

14   examination.

15         MS. PLACEK:  I have no objection to it.

16         THE COURT:  I have read it.

17         MR. MURPHY:  For the record, I'm tendering a

18   copy.  We have extra copies if the Court wants to

19   keep that copy.

20         THE COURT:  We're going to make it part of

21   the court file.

22         MS. PLACEK:  Quite frankly, it can go in as

23   a joint exhibit or either as the defendant's

24   exhibit on the motion.

18

1    THE COURT:  Call your witness.

2    MS. PLACEK:  Officer Kaddigan.

3              (Witness sworn.)

4    THE COURT:  Officer, that microphone is on.

5    If you will pull it over in front of you and

6    speak directly into it, we will all hear you.

7              You may proceed.

8    MS. PLACEK:  Thank you.

9              DAVID KADDIGAN,

10   called as a witness on behalf of the Defendant,

11   having been first duly sworn, was examined and

12   testified as follows:

13              DIRECT EXAMINATION

14              BY

15              MS. PLACEK:

16   Q    Sir, state your name, please.

17   A    David kADDIGAN, K-a-d-d-i-g-a-n.

18   Q    How are you employed?

19   A    Chicago Police Department.

20   Q    Calling your attention to the date of

21   August 7, 1988, were you likewise employed?

22   A    Yes, I was.

23   Q    What exactly were your duties or

24   assignment?

19                    636

1          A     I was a youth officer assigned to the

2     youth division.

3          Q     When you say you were a youth officer,

4     what were your duties as a youth officer?

5          A     My duties as a youth officer involved

6     investigating child abuse complaint,

7     investigating missing persons and handling

8     juvenile arrest cases.

9          Q     Specifically, when you say your duty

10    was investigating missing persons, am I correct

11    in assuming that those would, in fact, be minors,

12    correct?

13         A     All missing persons.

14         Q     So, in other words, that's not limited

15    to children or adults, correct?

16         A     Correct.

17         Q     Calling your attention to that same

18    time and date, did you eventually become involved

19    with the report of a missing person of a

20    Denise Johnson?

21         A     Yes.

22         Q     How long previous to the August 7th

23    date were you, in fact, involved in that

24    investigation?

20

1    A    I think I had that case assigned to me

2    one day previously.

3    Q    So, would it be correct to say that

4    that would be August 6th?

5    A    No, it was a couple of days before

6    that, I believe.  I'm not sure.

7    Q    When you say a couple of days, would it

8    be between the range of August 5th to the 6th to

9    the eventual 7th, correct?

10    A    I think she was reported on the 1st,

11    so, somewhere between the 1st and the 7th.

12    Q    In your employment, did you try and

13    develop certain sources to find the whereabouts

14    of this young lady?

15    A    I don't understand the question.

16    Q    As part of your job, did you try and

17    develop certain sources to find the whereabouts

18    of this young lady?

19    A    What do you mean by develop sources?  I

20    went out and talked to people to see if they had

21    seen the girl.

22    Q    Did you know these people before?

23    A    No.

24    Q    Were these complete strangers?

21                          638

1          A      Strangers on the street.

2          Q      When you say strangers on the street,

3     did you do this in a hit-and-miss manner?

4          A      Pretty much so, yes.

5          Q      When you say you did it on a

6     hit-and-miss manner, would it be correct in

7     saying that you went primarily around the girl's

8     house?

9          MR. CASSIDEY:  Objection.  I know your Honor

10    doesn't want us objecting during the whole stage

11    of the trial, but I believe the motion is

12    centered upon the police report.  And she's

13    alleging certain Brady violations within what's

14    contained in the police report.

15         THE COURT:  Your objection is sustained.

16         MS. PLACEK:  Q  Let me ask you this,

17    officer.  Calling your attention to, in fact,

18    your investigation, how many sources did you, in

19    fact, investigate?

20         MR. CASSIDY:  Objection, same basis.

21         THE COURT:  I'm going to allow this one to

22    be answered.

23         THE WITNESS:  A  On my report dated the 7th

24    of August?

22

1          MS. PLACEK:  Q  I'm asking at any time?

2          A    At any time?

3          Q    Yes.

4          A    I couldn't say.

5          Q    When you say you just went in this

6     haphazard manner to find these sources, in what

7     area did you look?

8          A    The area of --

9          MR. CASSIDY:  Objection, Judge.  You know

10    how we feel about it.  I'm not going to make

11    objection after objection.  The motion was

12    directed to August 7th, 1988, to a certain time,

13    location, contained in the police report.

14         THE COURT:  I'm going to permit some

15    latitude.  The objection is overruled.

16         MS. PLACEK:  Q  In what area did you look?

17         A    In the area from which hse was reported

18    missing.

19         Q    What area was that?

20         A    105th and State.

21         Q    Did you know where the girl lived at

22    that time?

23         A    I believe she lived in the suburbs.

24         Q    When you say in the suburbs, do you

23

1    know how far away from that State address you

2    gave that she lived?

3          A    Specifically in miles

4          Q    Miles, yes.

5          A    No, I don't know that.

6          Q    Well, more than one, more than two,

7    more than three?

8          A    Obviously more than one.  A few miles.

9          Q    Am I correct in assuming that when you

10   said you investigated at that State Street

11   address, that's because you had information

12   that's where she disappeared from, correct?

13         A    Correct.

14         Q    Thank you.  Now, let me ask you this.

15   When, in fact, you were investigating on that

16   State address, you had information given to you,

17   correct, concerning the whereabouts of this young

18   lady?

19         A    Excuse me.

20         Q    You had information given to you

21   concerning the whereabouts of this young lady?

22         A    Well, I had information from the other

23   police reports, is that what you mean?

24         Q    I'm sorry.  I did interrupt you.

24

1      A     I don't understand the question

2   completely.

3      Q     I will rephrase.  You said you had

4   information from the other police reports,

5   correct?

6      A     Yes.

7      Q     And part of that information, and I

8   take it these were from missing persons reports,

9   is that she disappeared from the State address

10  you gave, correct?

11     A     Relative lived there.  She spent a lot

12  of time there.  That's where she was reported

13  missing from, and that's why the Chicago Police

14  were investigating it.

15     Q     In that area, correct?

16     A     In that area, correct.

17     Q     In relationship to this investigation,

18  did you receive any information about her

19  whereabouts from any people?

20     A     On the 7th of August, I talked to two

21  people who said they had seen her around 103rd

22  and Michigan about five days earlier.

23     Q     And, as a matter of fact, am I correct

24  in assuming that you saw those people face to

25

1    face, correct?

2         A    That's correct.

3         Q    And do you know whether they were men

4    or women?

5         A    They were two women.

6         Q    Were they living in a residence?

7         A    In front of a residence at 10537 South

8    State.  I asked them if they lived there, and

9    they said yes.

10         Q    By the way, on August 7th, is that when

11    this happened, or when you wrote your report?

12     ·   A    That's I -- the report was made the day

13    of the investigation.  That's a day-to-day

14    report.

15         Q    And at that time, am I correct in

16    assuming that you didn't know whether this was a

17    homicide or missing person report, correct?

18         A    To my knowledge, it was a missing

19    persons report.

20         Q    Thank you, officer.  And let me ask you

21    this.  Did you ever inquire of those two women

22    whose address you knew, their names?

23         A    I'm sure I did.

24         Q    And did you ever record their names?

26

1      A    No.   If I did, it would have been in my

2  report.

3      Q    And when you say it would have been in

4  your report, you eventually did find out this was

5  a homicide, correct?

6      A    I heard about it two days later that

7  the victim had been found murdered.

8      Q    Let me ask you this.  Am I correct,

9  also, in assuming that you passed on your report

10  to yor brothers in the Chicago Polie Department?

11      A    To my brothers, I don't have any

12  brothers.

13      Q    To your fellow officers.

14      A    The reports stay within the youth

15  division, so it was passed on to another youth

16  officer.

17      Q    Did you ever return to the State Street

18  address to find out who these people were?

19      A    No, I never did.

20      Q    To the best of your knowledge, did any

21  Chicago Police Officer do that?

22      A    I couldn't say.

23      Q    Let me ask you this.  Am I correct in

24  assuming that as you testify here today, what

27

1    you're basically testifying from is you're

2    testifying from your conversation with the

3    State's Attorney and from reviewing your reports?

4        A    I'm testifying from the report I

5    reviewed.

6        Q    When you say the report you reviewd,

7    before you reviewed that report, am I correct in

8    assuming that your memory was, in fact,

9    exhausted?

10        MR. MURPHY:  Objection, Judge.

11        THE COURT:  Sustained.

12        MS. PLACEK:  Q  In connection with that

13    report and with these two sources you spoke with,

14    approximately how long did you speak to them?

15        A    A minute maybe.

16        Q    Well, officer, in that minute, how many

17    addresses did they give you as to where this

18    young lady might be located?

19        A    I believe they said three, 103rd and

20    Michigan, then on Wabash around 109th, and

21    Wabash, and you know --

22        Q    Any other?

23        A    I think on Michigan.  I think they said

24    like 104th.

28

1      Q    Could it be 109th and Indiana?

2      A    It could be, yeah.

3      Q    That could -- that's, in fact, where

4  you found out she had been missing from, the

5  general area?

6      A    She was reported from 105th and State,

7  not 109th and Indiana.  It's about six blocks

8  away.

9      Q    Let me ask you this in one final

10  question, officer.  Could you describe these

11  ladies to us?

12      A    I remember that they were Black women.

13  That's all I can tell you.

14      Q    Can you give us an age?

15      A    No, I couldn't.

16      Q    Can you give us a height?

17      A    No, I couldn't.

18      Q    Can you give us a weight?

19      A    I'd have to say probably -- I'd have to

20  say they are probably medium build.

21      Q    Is that a guesstimate?

22      A    That's a guesstimate.

23      Q    That's your memory, filling in from

24  what you don't remember or what you imagine you

29

1   remember, is that correct?

2        MR. MURPHY:  Objection.

3        MS. PLACEK:  Withdrawn.

4                 If it pleases the Court, Judge,

5   based on the Court's restictions previously

6   stated, that would be all of the questions of

7   this officer.

8        THE COURT:  Thank you.

9                      CROSS EXAMINATION

10                     BY

11                     MR. MURPHY:

12   · Q    Officer Kaddigen, you testified there

13   were two women you spoke to on that date,

14   correct?

15        A    That's correct.

16        Q    And these women didn't give you their

17   names, is that correct?

18        A    That's correct.

19        Q    And, therefore, you didn't put their

20   names in your report, is that correct?

21        A    That's correct.

22        Q    And officer, in your report, there's a

23   reference to a Hardy Johnson, is that correct?

24        MS. PLACEK:  Objection.

30

1          THE COURT:  No.  Overruled at this point.

2          MS. PLACEK:  If it pleases the court, Judge,

3     I would point out that this is beyond the scope.

4     Never mind, Judge, I will withdraw that.  I'm

5     sorry.

6          MR. MURPHY:  Q  Is that correct, officer?

7          THE WITNESS:  A   Right, there is a

8     reference to Hardy Johnson?

9          Q    And he's a stepfather of the victim's

10    mother?

11         A    Thats's correct.

12         Q    And he lives at 105th and State in that

13    block, according to your understanding of this

14    case, is that correct?

15         A    That's correct.

16         Q    And officer, you testified that it was

17    your understanding that the victim was missing

18    from that area, is that right?

19         A    That's correct.

20         Q    Is it possible that you're confusing

21    the stepfather's address, 105th and State, with

22    the actual area where the victim was missing

23    from?

24         MS. PLACEK:  Objection, leading and

31                        648

1    suggestive and form.

2         THE COURT:  Sustained.

3         MR. MURPHY:  Q  Is it possible that you're

4    not accurate as to the area where the victim was

5    missing?

6         MS. PLACEK:  Objection.

7         THE COURT:  Sustained.  It's not relevant

8    where she was missing from.

9         MR. MURPHY:  Fine, Judge.

10        Q    Officer Kaddigan, based on the review

11   that you did in this case or the investigation

12   you did in this case and the information you

13   learned, is that information contained in the

14   report that you prepared on August 7th, 1988, to

15   you knowledge?

16        MS. PLACEK:  Objectyion, learned when,

17   Judge?

18        THE COURT:  No.  Overruled.

19        THE WITNESS:  A  What was the question

20   again?

21        MR. MURPHY:  Q  Is the information you

22   learned with respect to the investigation of this

23   missing person, Denise Johnson, is all of that

24   information contained within your August 7th,

32

1  1988 report?

2      A     Everything I learned that date I put in

3  that report dated Augsut 7th, 1988.

4      MR. MURPHY:  Nothing further, Judge.

5                       REDIRECT EXAMINATION

6                       BY

7                       MS. PLACEK:

8      Q     Your report is a summary and not a

9  verbatim account, correct?

10     A     Yes.

11     MS. PLACEK:  Thank you.  That's all, Judge.

12     THE COURT:  Officer Kaddigan, when you had

13  the conversation with these Black females, did

14  they or -- did either one of them tell you that

15  they had seen the missing person, the missing

16  girl at 103rd and Michigan at 1400 hours on

17  August 2, 1988?

18     THE WITNESS:  Yes, they did, your Honor, if

19  that's what I put in my report, they did.

20     THE COURT:  And it was they who personally

21  saw the girl?

22     THE WITNESS:  Correct.  This is done from a

23  picture.  I showed them the picture, and they

24  said they had seen the girl around 103rd and

33                      650

1    Michigan.

2         THE COURT:  Would you or do you think that

3    you would be able to recognize either of the two

4    Black women if you saw them again?

5         THE WITNESS:  No, your Honor, I wouldn't.

6         THE COURT:  Were you alone at the time that

7    you had this conversation with them?

8         THE WITNESS:  Yes, I was, your Honor.

9         THE COURT:  Other than the two Black women,

10   was there anyone else present other than the

11   three of you?

12         THE WITNESS:  No, your Honor, there wasn't.

13         THE COURT:  Other than the report that you

14   have made, did you convey to any police officer

15   verbally, the conversation or the substance of

16   the conversation that you had with the two Black

17   females?

18         THE WITNESS:   No, I didn't, your Honor.

19         THE COURT:  Mr. Murphy, do you have any

20   questions based on what I have asked Officer

21   Kaddigan?

22         MR. MURPHY:  Yes, Judge.

23                      FURTHER CROSS EXAMINATION

24                      BY

34

1          MR. MURPHY:

2          Q    Officer Kaddigan, did, in fact, these

3    two people you spoke to -- you said you used a

4    picture of Denise Johnson to show them, is that

5    correct?

6          A    That's correct.

7          Q    In fact, to your knowledge, did they,

8    in fact, know Denise Johnson or did they

9    recognize the picture as looking like somebody

10   they saw or thought they saw?

11         A    I'm assuming -- the person they saw was

12   based on the picture I had shown them.  Whether

13   or not they knew Denise Johonson, I wouldn't

14   know.

15         Q    When they said they had seen her on

16   August 2nd, did they actually tell you August

17   2nd?  Did they say five days earlier?  Or did

18   they say approximately five days?  Do you recall?

19         MS. PLACEK:  Objection.

20         THE COURT:  Basis?

21         MS. PLACEK:  Basis is incorrect as to the

22   statement of the evidence.

23         THE COURT:  Overruled.

24         MR. MURPHY:  Q  In other words, officer,

35

652

1    what did they tell you about the date that they

2    had ssen her or thought they had seen her?

3        A     They probably said five days previous,

4    and what I --

5        MS. PLACEK:  Objection, conclusion as to

6    what they probably said, Judge.

7        THE COURT:  Overruled.

8        THE WITNESS:  Q  What I did was back date

9    it, count backwards from the present date and

10   used that in my report.

11       MR. MURPHY:  Q  So, officer, to your

12   knowledge, that may not be the exact day then, is

13   that correct?

14       MS. PLACEK:  Objection.

15       THE COURT:  Sustained.

16       MR. MURPHY:  Nothing further.

17                   FURTHER REDIRECT EXAMINATION

18                   BY

19                   MS. PLACEK:

20       Q     Officer, are you in the habit of

21   putting inaccurate information in your report?

22       MR. CASSIDY:  Objection.

23       THE COURT:  Sustained.

24       MS. PLACEK:  Q  Did you put the date of

36

1    August 2nd in your report?

2        A    Yes, I did.

3        Q    To the best of your knowledge, that's

4    the correct date, is that correct?

5        A    Yes.

6        Q    as a matter of fact, you never tried to

7    alter or correct your report in any way, is that

8    correct?

9        A    That's correct.

10       MS. PLACEK:    As to the Court's questions,

11   Judge, May I inquire?

12       THE COURT:    You may.

13       MS. PLACEK:    Where did you receive the

14   picture from?

15       A    From Estelle Fields, the person who

16   reported the girl missing.

17       Q    To the best of your knowledge, that was

18   a true and accurate picture of how she looked at

19   that date?

20       A    That's how she looked the date the

21   picture was taken.    I never saw the victim

22   myself.

23       Q    By the way, when you said you assumed

24   they recognized her from the picture, you never

37                     654

1    made further inquiry of them as to how they knew

2    her, correct?

3         A    That's correct.

4         MS. PLACEK:  Thank you.  Nothing further,

5    Judge.

6         THE COURT:  Anything further?

7         MR. MURPHY:  No, Judge.

8         THE COURT:  Thank you, Officer Kaddigan.

9    You may step down.

10        THE WITNESS:  The subpoena for Wednesday, do

11   I have to disregard that now?

12        MS. PLACEK:  No, Judge, because of the

13   limitations of the motion that we anticipated the

14   Court would set in this matter, there's evidence

15   other than the matter in the motion that we would

16   call this officer for the defendant's case.

17        THE COURT:  Is he subpoenaed in here for

18   Wednesday?

19        MS. PLACEK:  Yes, Judge.

20        THE COURT:  I suppose if you maintain

21   contact with the defense or the State, they will

22   tell you at what stage of the trial they are in.

23   You will be required to come back, but whether

24   it's going to be Wednesday --

38

1     MS. PLACEK:  For the purpose of brevity and
2  not wasting this officer's time, the State wishes
3  me to direct them as to the evidence we would
4  call him on.
5     THE COURT:  That's up to the State, and I'm
6  not going to anticipate that.  As far as I'm
7  concerned, you're under subpoena.  The subpoena
8  is continued.  You will have to return.
9  Mr. Murphy can keep you informed as to whether it
10  will be Wednesday or not.
11     MS. PLACEK;  For purposes of the record, we
12  would file a copy of the subpoena with the Court.
13  There's been an acknowledgement of receipt.
14     THE COURT:  All right, you're excused.
15                    (Witness excused.)
16     THE COURT:  Before I hear your comments and
17  arguments on this motion, take about a two minute
18  recess.
19                    (Whereupon a brief recess
20                     was had, after which the
21                     following proceedings were
22                     had:)
23     THE COURT:  Miss Placek.
24     MS. PLACEK:  Yes, Judge.

39

1        THE COURT:  I will hear any further

2   witnesses or argument.

3        MS. PLACEK:  There would be no further

4   witnesses at this time.  The only thing we would

5   point out to the Court, as the movant, is that

6   what essentially we have here is stated in our

7   motion.  We have, at best, a crime of laxity

8   committed to the defendant.  And at best a crime

9   of ommission.

10            I would point out to the Court

11   that, in fact, the witness testified that because

12   of his actions, either by not passing on the

13   report to his brother officers or in the

14   alternative, Judge, by not taking a more careful

15   representational investigation two days later,

16   when he said he found out it was a homicide, the

17   identity of the two witnesses who stated that

18   they personally saw this girl at that address,

19   would be available to the defendant.

20            We would point out that, number

21   one, this wasn't done by name, but since the

22   family gave him a picture and reason and logic

23   would lead one to believe that they were, in

24   fact, interested in the returning of this love

40

1  one back to their bosom, that they would have

2  given him the best possible picture.

3              Therefore, Judge, we have a

4  recognition long after the State alleges that my

5  client was the last person to see her alive.

6              And I would point out that it

7  stands currently uncontradicted by the State that

8  we have a new issue coming up, and that is the

9  fact that the young lady did not truly or

10  accurately, as stated within, so far, the

11  evidence of this trial, disappear from the porch,

12  as was their contention in opening statements,

13  but rather, Judge, and I would simply point out

14  that this officer was present yesterday and was

15  spoken to as stated by the Sate, before openings

16  were made in this case, this officer testified,

17  Judge, that she didn't disappear, according to

18  Estelle Fields from the place she said, that was

19  originally put out in this trial, Judge, but from

20  an area some distance away from that which was

21  testified to.

22              It's our suggestion, Judge, that

23  irrespectively of what other sort of timing issue

24  the Court deals with, this defendant, because the

1    only one who saw those women, this officer, has,

2    in fact, stated under oath, that he cannot help

3    with the identity of same.  He stated again in

4    the motion it was never passed on.  And again, he

5    stated that these witnesses would not fall in the

6    realm of hearsay witnesses, Judge, but would

7    rather fall in the realm of eye witnesses.

8                    Therefore, their testimony would

9    be accessible and possible to the Court.

10                   We would suggest that the

11   defendant has irreparably harm.  It was shown

12   during the first part of the questioning that

13   this gentleman is an agent of the State.  The

14   suggestion that the investigation could have

15   continued if, in fact, his report was passed

16   on.   He said, in fact, it never was.  For this

17   reason, Judge, we would suggest a Brady

18   violation, in fact, exists.

19        THE COURT:  State.

20        MR. MURPHY:  Judge, I don't know, frankly,

21   what the defense is talking about.  I still can't

22   understand and fail to see that Brady has been

23   violated in any way.

24                    Now, at this point, not only do

42                            659

1    they have the reports in their hands, but we also

2    have the testimony of the police officer who

3    testified that he didn't have the names of these

4    people that he talked to.  All of the information

5    he had was in the report.  And if he had their

6    names, they would have been in the report.

7                    Counsel attempts to use this to

8    create a new issue or an issue in the case.  And

9    your Honor, it's ridiculous.  I'm sure if someone

10   walked around with a picture of the person, there

11   might be people who might say, "yeah, I saw this

12   person here or that person there."  A good idea

13   of that is John F. Kennedy and Elvis Presley.

14       MS. PLACEK:  With all due respect, the State

15   can't challenge the credibility of what a witness

16   could or could not state, Judge.  As I understand

17   it, Judge, from, in fact, the Wilkins case, the

18   Court must accept these witnesses as possible

19   witnesses.  I believe the Court's questions as to

20   whether or not they were, in fact, eyewitnesses

21   or hearsay witnesses cleared up any issue, and

22   credibility is not to be argued at this time, I

23   believe, Judge.

24       THE COURT:  Overruled.

43

1       MR. MURPHY:  No further argument, Judge.

2       THE COURT:  Miss Placek.

3       MS. PLACEK:  Your Honor, the only think we

4  would state is that we brought up omission.  The

5  gentleman testified from the stand that he could

6  have gone out on, -- Strike that.  He knew on

7  August 9th of that same year that this became a

8  homaicide.  He knew that, in fact, he had

9  evidence dealing with this homicide.  He not only

10  knew, but I would suggest that this no longer was

11  stale dated evidence, and for this reason, Judge,

12  I would suggest, by his ommission, he, in fact,

13  destroyed evidence that is potentially

14  exculpatory to the defendant.  And I would

15  suggest that that evidence can never be retrieved

16  at this timne.

17       THE COURT:  There are a lot of things which

18  are going through my mind right now, some of

19  which are probably grossly irrelevant to the

20  issues before me.  It is easy in retrospect to

21  say what should have been done in an

22  investigation.  And even easier to criticize

23  what was not done in an investigation.

24           As I look back upon it with 20/20

44

651

1    hindsight.  And thus, I can tell that according

2    to the bill of particulars enunciated on two

3    separate occasions, once in December of 1988, and

4    again in February of 1989, in it's answer to

5    discovery, where they place the time of the event

6    in question to have been sometime between 9:30

7    p.m. On August 1st, 1988, through 3:00 a.m. On

8    August 2nd, 1988.

9            According to Officer Kaddigan's

10   report, the victim was seen some eleven hours

11   after the last time mentioned in the State's

12   answer to discovery.  But the identity of the

13   person who saw her is unknown.

14           Miss Placek says that that is a

15   Brady violation for the police not to know.  But

16   the problem is that I don't know of any authority

17   or any language in any authority that requires

18   the police to know.   It's an interesting concept

19   and punishes the police investigation for the

20   incompentence, if that is what you would choose

21   to call it, or whatever reason that they failed

22   to know.

23           It may well be that something

24   should have alerted Mr. Kaddigan or the police

662

45

1    department once he filed his report, or the

2    detecives who investigated this occurrence, all

3    of those things may well be said that somebody

4    should have known.  But the fact of the matter is

5    the evidence before the court indicates that no

6    one knows.  And no one saught with particularity

7    to relate the significance of the observations

8    made by these two unknown Black females to this

9    case.  And I suppose it might be fair to say that

10   Officer Kaddigan was in the best position, once

11   he determined or once he learned that a homicide

12   was. involved in this occurence, he may have been

13   in the best position to make that connection.

14   Although, there's nothing in this record yet that

15   would indicate that he knew when the homicide

16   took place or what time of the day, when in terms

17   of the date of the homicide or what time of the

18   day, so as to necessarily make the connection.

19              In any event, absent some

20   authority enunciating the proposition that a

21   Brady violation can take place out of

22   incompetentance, I'm constrained to say that no

23   violation has taken place here.  And I suppose --

24   I suppose a willful failure to know, a studied

46

1    rejection of that which is patently obvious, so

2    as to avoid coming into the knowledge, which

3    would exculpate could constitute a Brady

4    violation, but there doesn't seem to be anything

5    in this evidence that would suggest that that is

6    what has taken place here, the Defendant's motion

7    to dismiss is denied.

8         MS. PLACEK:  Judge, for the purposes of the

9    record, we would thank the Court for hearing said

10   motion.  We would ask, so that we don't have to

11   go over the same matter, when we do request that

12   this officer testify for the defendant, that we

13   incorporate today's activities into the trial.

14        THE COURT:  Well, we will deal with that at

15   the time that this officer is called to testify,

16   if he is, in fact, called to testify.  If he's

17   not called to testify when the defense wishes to

18   proffer that evidence by way of stipulation,

19   we'll take care of that matter.

20        MS. PLACEK:  Fine, Judge.

21        THE COURT:  For purposes of this record, I'm

22   marking this police report of Officer Kaddigan as

23   Defendant's Exhibit No. 1 on the Motion to

24   Dismiss and making it a part of the common law

47

1    record in this case.

2                    Anything further in this matter?

3         MS. PLACEK:  Eleven o'clock on Monday,

4    Judge?

5         THE COURT:  By agreement --- or order of

6    Court?

7         MR. MURPHY:  I thought it was going to be

8    1:00.

9         THE COURT:  Well, I'm afraid that it's going

10   to have to be 1 o'clock, because I don't see any

11   realistic way of getting through the call by 11

12   o'clock.  So, 1 o'clock On February 11th, for

13   further testimony.

14                    Have a nice weekend.

15                    Ladies and gentlemen, the court is

16   adjourned until 9:30 Monday morning.

17                         (Whereupon, the above-

18                          entitled cause was continued

19                          to 1:00 p.m., February 11,

20                          1991.)

21

22

23

24

48

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS, )
) Criminal
Plaintiff, )
) No. 88 CR 12517
vs. )
)
JEROME HENDRICKS, )
)
Defendant. )

BENCH TRIAL

REPORT OF PROCEEDINGS had at the hearing

in the above-entitled cause before the HONORABLE

LEO E. HOLT, Judge of said court, on the 11th

day of February, 1991.

APPEARANCES:

HONORABLE JACK O'MALLEY,
State's Attorney of Cook County, By:

MR. SCOTT CASSIDY and
MR. JOHN MURPHY,
Assistant State's Attorneys,
for the People of the State of IL.

MR. RANDOLPH N. STONE,
Public Defender of Cook County, By:

MS. MARIJANE PLACEK and
MR. VINCENT LUFRANO,
Assistant Public Defenders,
for the Defendant.

L. B. STONE, CSR
Official Court Reporter

THE COURT:  Both sides ready?

MR. CASSIDY:  Yes.

THE COURT:  Call your next witness, State.

MS. PLACEK:  We will point out there was a
Motion to Exclude.

MR. CASSIDY:  Judge, I will bring the witness
out because I don't know how to pronounce her name.

        (Whereupon the following pro-

        ceedings were had in the pres-

        ence and hearing of the jury:)

THE CLERK:  Raise your right hand.

        (Witness sworn)

THE COURT:  You may be seated, ma'am.  That
microphone is on.  If you will speak directly into
it, keep your voice up so we will all hear you.

MR. MURPHY:  May I proceed, Judge?

THE COURT:  You may.

             CAROLYN STRONG,

a witness herein, called on behalf of the People of
the State of Illinois, after being first duly
sworn, was examined and testified as follows:

           DIRECT EXAMINATION

              BY

           MR. MURPHY:

Q    Could you state your name and spell your

1   last name, please?

2       A    Carolyn Strong, S-t-r-o-n-g.

3       Q    And, ma'am, by whom are you employed?

4       A    Roseland Community Hospital.

5       Q    And what capacity are you employed there?

6       A    X-ray technologist.

7       Q    How   long   have   you   been   an   X-ray

8   technologist?

9       A    Seven and a half years.

10      Q    And   before   you   became   an   X-ray

11  technologist,   were   you   employed   at   Roseland

12  Community Hospital?

13      A    Yes, I was.

14      Q    And how long were you employed -- How long

15  have you been employed by Roseland Hospital?

16      A    Eighteen years.

17      Q    What did you do before you were an X-ray

18  technologist?

19      A    Clerk-typist.

20      Q    Now, Carolyn Strong, can you describe what

21  your duties are as an X-ray technologist?

22      A    My duties are to take X-rays.

23      Q    And you work in the radiologist program

24  there?

        A    Yes.

3

1   Q What training or education have you had in
2 order to become an X-ray technologist?

3   A Two years training.

4   Q You went to a program that was
5 administered by Roseland Community Hospital?

6   A No, by another hospital.

7   Q What hospital was that?

8   A Henrotin Hospital.

9   Q And did you successfully complete that
10 training program?

11   A Yes, I did.

12   Q And at the completion of that program, did
13 you take any tests?

14   A Yes, I did.

15   Q And as a result -- Did you pass the test
16 you took?

17   A Yes.

18   Q And did you receive any certifications?

19   A Yes.

20   Q Could you tell the Court exactly what your
21 certification is in?

22   A Radiologist technologist.

23   Q Thank you.  In addition to the training
24 that you received at Henrotin, had you received any
 other training in the area of X-rays?

A     Ultra grapher (Phonetic).

Q     Are you in the process of receiving that training in that area at this time?

A     Yes, I am.

Q     Carolyn, I'd like to direct your attention to the date of August 19, 1986, do you recall if you were working on that particular day?

A     Yes, I was.

Q     And where were you working?

A     In the Radiologist Department.

Q     That would be at Roseland Community Hospital?

A     Yes.

THE COURT:   What date was that again.

MR. MURPHY:   August 19, 1986, Judge.

THE COURT:   '86?

MR. MURPHY:   Yes, Judge.

THE COURT:   Okay.  You may proceed.  I'm sorry.

MR. MURPHY:   Thank you, Judge.

Q     And what if anything happened on that particular day?

A     Well, I took X-rays on Denise Johnson.

MR. LUFRANO:   Objection.

THE COURT:   What's the basis?

MR. LUFRANO:   She's saying that she took X-rays

of a named individual. There is no basis, no
foundation for how she knew that was the name of
the individual.

THE COURT: Objection sustained.

MR. MURPHY  Q  You took X-rays of a young girl,
is that correct?

MS. PLACEK: Objection, continuing in leading.

THE COURT: Overruled. It's preliminary.

MR. MURPHY  Q  And with regard to one
particular person, did you take specific X-rays?

A  Yes.

MS. PLACEK: Objection. Foundational, also, as
to form.

THE COURT: Yes.

MR. MURPHY  Q  Is that correct?

A  Yes.

Q  What X-rays did you take?

A  I took a wrist.

Q  And could you describe to Judge Holt where
you took those X-rays at?

A  It was in the Radiologist Department, X-
ray room.

Q  And the person whose X-rays you took, when
she arrived, what did you do?

A  Well, the receptionist.



1      MR. LUFRANO:  Objection.  He's assuming she

2   only took one X-ray all day long.

3      THE COURT:  Overruled.

4      MR. MURPHY  Q  Can you describe the procedure

5   that you used when you met this individual whose

6   X-ray you took?

7      A   Yes,   the   receptionist   logged   the

8   individual's name in the book, and I in turn --

9      MR. LUFRANO:  Objection.  She wasn't present.

10  This is totally hearsay.

11     THE COURT:  The objection is sustained.

12     MR. MURPHY  Q  Carolyn, if I could, I will just

13  take you up to the point where you met this person.

14  Could you describe what happened when you met this

15  person?  What did you do?

16     A   Well, I took her in the room for X-rays.

17     Q   What room did you take her into?

18     A   In one of the X-ray rooms.

19     Q   And can you tell Judge Holt what is in the

20  X-ray room, what equipment do you have there?

21     A   Well, we have General Electric equipment,

22  we have X-ray table, X-ray tube, and we have the

23  machinery.

24     Q   And that's the X-ray machine?

       A   Yes.

Q    Can you describe that machine to Judge holt?

A    It has a lot of numbers on it, on and off button on it, X-ray button on it, X-ray exposure switch for producing the X-ray.

Q    Thank you.  And when this person arrived at -- By the way, was this person a male or female?

A    Female.

Q    And when she -- When you spoke to her, what did you have her do when she went into the room with you?

A    Well, I had her -- I had my cassettes there.  I was going to use tape X-rays, place her hands on the cassettes, and I positioned it for the first X-ray.

Q    And when you placed her hand in position, did you put it on the table?

A    Yes.

Q    And what did you do after you placed her hand on the table?

A    Well, I went behind the X-ray panel and took the X-ray.

Q    Now, the equipment that you used, the X-ray machine that you used, you used the word cassette, what is a cassette?



A    That would be the film that the X-ray is being done on.

Q    And did they cassette have an identification assembly attached to it?

A    Yes, it was what's known as a blocker.

Q    What's a blocker?

A    It's a part of the film that we use to stamp for the name and stuff to come out.

Q    And in this particular case, this is the way this particular cassette was set up, then, is that correct?

A    Yes.

Q    And in this particular case, did you also have an identification -- or some way of identifying the X-ray?

A    Yes, once we take the film, we have what's known -- what we call a flashcard with the patient's name, date, that she was there, and a log number where we put it in the log book.

Q    In addition to that information, is there any other information on that card?

A    Usually when the examine was done.

Q    And is the hospital name also on there?

A    Yes, it is.

Q    Now, Carolyn, did you use an

1  identification   card   on   a   flashcard   in   this

2  particular case?

3      A    Yes, I did.

4      Q    And how was that flashcard reflected on

5  the X-ray?

6      A    Well, once you took the film into the dark

7  room, the blocker, I was telling you about on the

8  side?

9      Q    Yes.

10     A    Shows you where to stamp the film into

11  this flasher, and it comes out on the film.   Once

12  it's developed after you stamp it.

13     Q    And did you do that in this particular

14  case?

15     A    Yes.

16     Q    Now, Carolyn, approximately -- Did you

17  take more than one X-ray in this case?

18     A    Two X-rays, but three views.

19     Q    And after you took those X-rays, what did

20  you do?

21     A    Well, once I made sure I had the right

22  amount of film, I took them to the radiologist to

23  be read.

24     Q    To be what?

       A    To be read.

10  678

Q    Before you took them to be read, after you actually took the photographs, the shots, did you develop those?

A    Yes, I did.

Q    Could you describe to Judge Holt what you did?

A    You go into the dark room, you have to do this in the dark, you took the flashcard with you because that's how you're going to stamp the film of who you are doing.  You take the film out of the cassette, and you stamp with the card, and you put it through the process.

Q    And did you develop, then, these X-rays?

A    Yes.

Q    And are they marked accordingly with the identification which you described?

A    Yes, once they come out of the processor, you have to check it to make sure the name, what you do, and the slides mark correctly on the film.

Q    Have you had any training in developing that?

A    Yes, that's part of the school training.

Q    And you satisfactorily completed that training as well?

A    Yes.

Q    That's the two-year training program you described?

A    Yes.

Q    Carolyn, this X-ray machine that you used, was that machine in proper working order?

A    Yes, it was.

Q    How did you know that?

A    Well, number one, we have a warm-up procedure that we follow in the morning, and also if it's not working, you won't get no film.

Q    Is it customarily inspected as well?

A    Yes, it is.

MR. MURPHY:  Could I have a moment, Judge?

THE COURT:  Sure.

              (Whereupon there was a short

              pause in the proceedings)

MR. MURPHY:  May I approach, Judge?

THE COURT:  You may.

MS. PLACEK:  I ask for a sidebar, Judge.

THE COURT:  Miss Strong, would you step down from the witness stand?  Step into the adjoining conference room for a moment, please.

              Miss Placek?

MS. PLACEK:  Very briefly, Judge, and very quickly, I anticipate that the State was about to

1    show what they came over to counsel's table and

2    showed us which purports to be different X-ray

3    shots. With all due respect, Judge, and with my

4    limited knowledge of x-ray and perhaps now proven

5    from the State, one of them strikes me definitely

6    not as an X-ray of a hand, which I suggest the

7    foundation has been only laid as to that, and the

8    other, Judge, is, of course, questionable, that's

9    why I asked the Court for proof as to whether or

10   not the State was going to attempt to have this

11   young    lady    from    Roseland    Community    Hospital

12   identify all four shots as shown within that.

13       THE COURT: Mr. Murphy?

14       MR. MURPHY: Judge, actually, there's three

15   different exhibits. One of the exhibits that's two

16   X-rays on it, so there's actually two shots on that

17   one exhibit. Those both corresponds to the date in

18   which this witness was working, and she will

19   identify them as X-rays that she took. The other

20   exhibit is an X-ray that was also taken at Roseland

21   Community hospital. However, this witness will not

22   testify that she took that X-ray. She will

23   identify it, though, as an X-ray that was taken at

     Roseland community Hospital.

24       MR. LUFRANO: Objection, your Honor. It's not

                          13

a document where other material that's under her care, custody, or control. She's not the record keeper nor is she the person who holds X-rays in some filing capacity.

MR. MURPHY: Judge, I don't think she has to be the record keeper. I think it can be -- In fact, cases are clear that it doesn't have to be a record custodian. It could be another qualified witness, and at this point, we have established that she was a qualified witness.

MS. PLACEK: With all due respect, Judge, she's just qualified with the three pictures she's taken, which are the ones State spoke of, the one and the two separate views, Judge.

THE COURT: What do you contend is the basis for admissibility of these documents, Mr. Murphy?

MR. MURPHY: Well, Judge, as to the -- You're talking about the last document now, Judge?

THE COURT: I'm talking about all of them. If some of those documents, I take it, you're saying are within this witness' knowledge as having been made or taken, made at the time at Roseland Hospital on the 19th of August, 1986, that's one basis for admissibility.

MR. MURPHY: Right.

THE COURT: The other is what?

MR. MURPHY: Well, Judge, as to the other X-ray, our basis is business record, not the one obviously she's dealt with, but the other one she does not have direct involvement in.

THE COURT: It isn't your contention you have laid a foundation to make this X-ray a business record?

MR. MURPHY: Well, Judge, that's how we are seeking to introduce the last X-ray.

THE COURT: You're saying the foundation you have laid is sufficient to establish this document as a business record?

MR. MURPHY: No, at this point, Judge, I intend to do it when I approach her, not at this point.

MS. PLACEK: That would be letting the horse out of the barn, and then locking the barn door.

THE COURT: How would one go about doing it otherwise than to show -- to establish if he can that the document is, in fact, a business record, and then seek its admission into evidence? He has to show it to the witness it seems to me.

MS PLACEK: He would also have to show that there is a purview of knowledge other than taking the remote matter she testified to.



1    THE COURT: Well, what you're simply saying he

2    may not be able to make the foundational base for

3    admissibility?

4    MS. PLACEK: The Court is correct, Judge.

5    That's what I am saying, not with this witness, not

6    with the questions he's asked her so far.

7    THE COURT: That's why he's going to ask her

8    some more questions.

9    MS. PLACEK: With all due respect, Judge, I

10   have a feeling, and accuse me of being a little

11   skeptical of my feelings, I have a feeling, Judge,

12   that what the State is about to say is about to

13   have her identify the identification point of the

14   X-ray and say, "Do you recognize that?" Referring

15   to the third X-ray not taken by her, and she will

16   say, "Oh, yes, that's the blank tape that we put on

17   all our X-rays," and have it justified like that.

18   My position, Judge, quite frankly, is that that's

19   not quite enough as established by law not only

20   quite enough to establish by law, Judge, but I

21   would suggest that even a little more has to be

22   done, and the reason I am speaking somewhat

23   haltingly, Judge, is that I am not going to teach

     them how to try their case --

24   MR. MURPHY: We appreciate that.

MS. PLACEK:   Please address your comment to the Court, counsel.

THE COURT:   What are you saying?

MS. PLACEK:   Judge, it's distracting when counsel is referring that I come from a kennel.

Judge, in this particular matter, what I am suggesting to the court it's not my duty to teach them how to try a case, and I am saying it's my duty, in fact, to instruct the Court when I feel an objection lies.

THE COURT:   Mr. Sheriff, will you ask the witness to return?

You may be seated.

All right.   At this point, the objection of the defendant is overruled.   You may proceed.

MR. MURPHY:   Thank you, Judge.

May I approach, Judge?

THE COURT:   You may.

MR. MURPHY   Q   Carolyn, I am going to show you what we have marked as People's Exhibit No. 13. I'm going to ask you to look at this and tell me if you recognize what it is?

A   Okay, this is what we all the lateral view of the wrist.

17

MS. PLACEK:  Objection.  I believe the witness is not qualified to read the X-ray.

MR. MURPHY:  Judge, I will qualify her if it would help in this area.

Q     Carolyn,  have  you  had  any experience and/or training in looking at X-rays and determining generally what they portray?

A     Yes.

Q     How much training or experience have you had?  Could you tell Judge Holt?

A     Well,  it goes along with the training. You have to know what you're taking, what views are required.

Q     And approximately how many X-rays have you taken in your career?

A     A lot of them, quite a few, over -- It's too many to put a number on it.

Q     Would you say more than 500?

A     Yes.

Q     More than a thousand?

A     Yes.

Q     Carolyn, when you take those X-rays, do you have to look at those X-rays initially before you give them to the doctor who requested them?

A     Yes.



1    Q    To show what the doctor wants --

2    MR. LUFRANO:    Objection.    She wouldn't know

3    what the doctor is looking for.

4    THE COURT:    Overruled, Mr. Lufrano.    She cannot

5    read an X-ray, but she can look at an X-ray to see

6    if it's the lateral view of the hand or posterior

7    view of the hand.

8    MR. LUFRANO:    Your Honor, she's indicating if

9    she place it in a lateral position, she gets a

10    lateral view.    It's a view of the arm that she's

11    able to distinguish whether or not it was moved or

12    not moved after the X-ray was taken.

13    THE COURT:    Overruled.

14    MR. MURPHY    Q    Carolyn, you can answer that

15    question.    Do you remember the question I asked?

16    A    No.

17    MR. MURPHY:    Judge, I forgot my question, too,

    I'm sorry.

18    (Whereupon question read back)

19    THE WITNESS:    Yes, I do.

20    MR. MURPHY    Q    At this time I ask you to look

21    at People's Exhibit No. 13 and tell me what that

22    is.

23    A    This is the lateral view of the wrist.    It

24    has the --

1  MR. LUFRANO:  Objection to what it has.

2  THE COURT:  Overruled.

3  THE WITNESS:  Okay, it has a left what we call

4  an X-ray left marker indicated on the left wrist

5  that was done, it has my initials on it, C.S.

6  MR. MURPHY  Q  And where are your initials at?

7  A    It's right next to the "there."

8  Q    And you customarily place your initials on

9  X-rays that you take at Roseland Hospital as part

10  of your regular practice or procedures?

11  A    Yes.

12  Q    And are those initials that are on that X-

13  ray the same initials or in the same form that you

14  place  your  initial  --  which  you  placed  your

15  initials on X-rays?

16  A    Yes.

17  Q    And  you  testified  that  you  used  what's

18  called a -- an information plate, is that what you

19  call it?  What do you call it?

20  A    Flashcard.

21  Q    And  is  there  a  flashcard  on  this

22  particular X-ray?

23  A    Yes, it is.

24  Q    And  does  that  flashcard  reflect  the

information with respect to this patient which you

recorded at the time you prepared that X-ray?

A    Yes, it does.

Q    Thank you, and that's an X-ray that you took, is that correct?

A    Yes.

Q    I'm also going to show you what's been marked as People's Exhibit No. 14 for identification purposes. Do you recognize that?

A    Yes.

Q    What is shown in People's Exhibit No. 14?

A    It would be an A P view and -- bleak view.

Q    And there's two different shots on that X-ray, is that correct?

A    That's correct.

Q    And, again, is your -- is there any reason that you recognize what's portrayed in that particular exhibit, People's Exhibit No. 14? Let me rephrase that question. How do you recognize that X-ray?

A    How did I recognize it?

Q    Yes.

A    As what it is?

Q    Yes. Let me rephrase it. How do you recognize that as an X-ray that you took?

A    Because of my marker and initial.

so to do, but I'm sitting here in order to help put this in a frame where I can deal with it and understand it, anticipating where you're going, and I anticipate that you're trying to show the identification of Denise Johnson through the earlier X-rays taken of her in 1986, that they were comparing with X-rays from the body and concluded that they are one in the same. The question of whether or not the X-rays or any medical records constitute a business record is what has been running through my head since Miss Placek raised the objection, and I have to have recourse to develop books or your help, one or the other because I didn't do a lot of PI work, okay, so, therefore, a lot about the medical records and that kind of thing, but my recollection of the medical record is an exception to the business record. It's one of the exception -- It is not a business record, thus it requires different kinds of proof than does a business record in a classic sense, if I understand the classic sense. That's what I'm thinking up there on the bench, figuring out where you people are going, but if I am wrong on that, my head can go back to listening to something better than what's rattling around in my head making

24

1  noises.

2  MR. MURPHY:  Judge, first of all as to the

3  first two exhibits which the witness identified, we

4  are not offering those as business records.  We

5  don't have to because she's already identified them

6  as X-rays that she took.

7  THE COURT:  Yes, but we don't know who she took

8  them of, and you're going to ask me to conclude

9  that those are X-rays of Denise Williams -- Denise

10  Johnson, and there's no way that witness can know

11  that.

12  MS. PLACEK:  Or this particular Denise Johnson.

13  MR. CASSIDY:  Just a piece of circumstantial

14  evidence, Judge, that we are offering, that's all.

15  MR. PLACEK:  Judge, circumstantial evidence

16  even still has to be based on foundation.

17  MR. MURPHY:  Judge, I don't have a case I can

18  hand you, and I don't know if defense counsel has

19  any or not, but Court can allow X-rays as business

20  records, and I'm primarily concerned with --

21  THE COURT:  Do you have the case?

22  MR. MURPHY:  No, just from reading -- Do you

23  want this on the record, Judge.

24  THE COURT:  Not necessarily, but it can be.

MR. MURPHY:  I don't really care if it's on the

record or not at this point, Judge.

THE COURT:  She wants it on the record.

MS. PLACEK:  We might as well stay on the record.

MR. MURPHY:  Judge, I can't give it to you at this point, but what I've read primarily are trial techniques manuals in preparation of this witness. Now, from what I read the Court's take notice that business records can be used.  I don't know if that's reference to Illinois Courts or not.  I have to do some research in the area.

THE COURT:  You got a copy of 38?

MS. PLACEK:  That's the one I have before me.

THE COURT:  That one is old.

MS. PLACEK:  I took it to read because that's one of the reasons you were overruling my objection, Judge.  I got one in my bag.  Which section.

THE COURT:  115 dash 5.

MS. PLACEK:  It talks about coroner's record. I suggest that's probably the same thing.

THE COURT:  Okay, they make coroners admissible.

MS. PLACEK:  That's the exception.  I'm referring to 15-5 not five point one, no writing or

26