CASE NO. _____ O8 cv 1589 _____

ATTACHMENT NO. _____ 9 _____

EXHIBIT _____

TAB (DESCRIPTION) _____

record made in the regular course of business shall

become admissible as evidence by application of

this section and such record or writing have been

made by anyone in the regular course or form of

hospital or medical records.

THE COURT:  That is?

MS. PLACEK:  15 dash 5-C-1.

THE COURT:  That's kind of what I thought.  No

writing or record made in the regular course shall

be admissible as evidence by the application of

this section if, one, such writing or record has

been made by anyone in the regular course of any

form of hospital or medical business.

MS. PLACEK:  And next is the police report

exception I think.

MR. MURPHY:  Well, how does that differentiate

-- Isn't that different than from an X-ray?  I made

a reference  to medical reports just like police

reports.

THE COURT:  I think that -- that includes the

medical record on a patient admitted into the

hospital on all of its form which would include a

person's X-rays, lab reports.

MS. PLACEK:  Lab workup.

THE COURT:  Nurses' notes.  The whole thing

1    that's called the patient's medical record is the

2    way I read that.   Now, I may be wrong, but that's

3    the way I understand the rule, and that's what was

4    bothering me as I was sitting there on the bench

5    trying to figure out what the hell we are doing .

6              Are there any cases --

7         MR. MURPHY:   There's not much in here.   There's

8    one page of cases, and the cases deal with medical

9    reports, hospital records.

10        MS. PLACEK:   So the Court knows, there's a way

11   of doing this, Judge, and the Court knows that this

12   was the status of my objection outside that this

13   isn't the way of doing it.   I am speaking of the

14   way the State's examination is going, thus, Mr.

15   Lufrano and my objections as to it.

16        THE COURT:   Well, you may -- You may very well

17   be right.

18        MS. PLACEK:     Here it says medical records

19   (Indicating), Judge.

20        MR. MURPHY:   Do you mind if I read over your

21   shoulders, your Honor?

22        THE COURT:   No, of course not.

23              Can you quickly find the last question

     that was posed to the witness?

24              (Whereupon question read back)

MR. MURPHY:  Judge, are you going to let me question her with respect to the last X-ray?

THE COURT:  What are you going to ask her?

MR. MURPHY:  I'm going to ask her what it is. I'm going to ask her to identify it.  I'm going to ask was the record made by a person with knowledge of the information that's transmitted.  I'm going to offer it as a business record.

MS. PLACEK:  Judge, that's absurd.

THE COURT:  No, I'm not going to let you do that.

MR. MURPHY:  Well, Judge, that's the procedures followed as a business record.

THE COURT:  Well, it's not a business record.

MR. MURPHY:  We're taking a position that it should be admissible.

THE COURT:  If there is any way they can exhaust that, I don't know how they can exhaust that because I suspect you're going to object, and I'm going to rule on the objection, and then if there is anything that's admitted around that, that helps to exhaust her recollection, if she has any recollection that comes into evidence, we will use it.

MS. PLACEK:  So as to the third X-ray, you're

going to give them a break?

THE COURT:   What do you mean a break?   They can ask the questions, and you object, I will rule on it.   I don't know how they can make a record, that the Court erred if I don't allow them to ask a question, so I need to allow them to ask the questions as an offer of proof or as a voir dire examination, and since it is a bench trial, it doesn't make any difference, so we will hear it at one time, and I will rule on the objection.

(Whereupon the following pro-
ceedings were had in the court-
room:)

MR. MURPHY   Q   Are those the X-rays you took on August 19, 1986?

A     Yes.

Q     And is the name of the person whose X-rays you took indicated on the plate, identification plate?

MS. PLACEK:   Objection.

THE COURT:   Overruled.

THE WITNESS:   Yes, it is.

MR. MURPHY   Q   I'm also going to show you what's marked as People's Exhibit No. 15.   I'd ask you to look at that and tell me if you recognize

1    that?

2         A    This is an X-ray of the pelvis --

3         MR. LUFRANO:   Objection to her identifying the

4    X-ray that she didn't take.

5         THE COURT:   People's Exhibit 15 was taken by

6    this witness?

7         MR. MURPHY:   No, Judge.

8         THE COURT:   The objection is overruled.

9         MR. MURPHY   Q   I'm sorry, you can answer the

10   question.

11        A    This would be a pelvic X-ray.

12        Q    And you recognize that X-ray?

13        MS. PLACEK:   Objection.   Foundation.

14        MR. MURPHY:   I will rephrase the question,

15   Judge.

16             Q    You did not take that X-ray, is

17   that correct, Carolyn?

18        A    No, I did not.

19        Q    Do you recognize that X-ray as an X-ray

20   that was taken at Roseland Community Hospital?

21        MS. PLACEK:   Objection.   Foundation.

22        THE COURT:   The objection is sustained.

23        MR. MURPHY:   I'm trying to lay a foundation,

24   Judge.   I will rephrase the question.

             Q    Carolyn, do you recognize that

X-ray?

MS. PLACEK:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Yes, I do.

MR. MURPHY  Q  And what do you recognize that X-ray to be?

MS. PLACEK:  Objection.  Asked and answered. She stated it was a pelvic.

THE COURT:  Overruled.

MR. MURPHY  Q  Apart from being a pelvis, what else do you recognize with regard to that X-ray?

A    That it has -- the identification of whose X-ray it is, and that's it.

Q    Is there a flashcard in that X-ray, then, ma'am?

A    Yes, it is.

MS. PLACEK:  Objection.

THE COURT:  That's leading.  Please don't lead.

MR. MURPHY  Q  What are you looking at to cause you to recognize that X-ray?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  To recognize what it is or whose it is.

MR. MURPHY  Q  What it is and whose it is.  How

are you able to recognize what that is?

MS. PLACEK:  Objection, your Honor.  Compound.

THE COURT:  Objection is sustained.

MR. MURPHY  Q  how are you able to recognize what that is?

A    Because I know what it is.

Q    You're referring to the fact that this is a pelvis?

MR. LUFRANO:  Objection.

THE COURT:  Overruled.

MR. MURPHY  Q   And how are you able to recognize who it is or what information -- whatever information you know about that X-ray, how are you able to recognize that?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  By the stamp in the upper left-hand corner.

MR. MURPHY  Q  And is that the flashcard you refer to?

A    Yes.

Q    And, Carolyn, is that flashcard -- Does that flashcard that you see there familiar to you?

A    Yes, it is.

MS. PLACEK:  Objection.



THE COURT:  Overruled.

MR. MURPHY  Q  Is it?

A    Yes, it is.

Q    And, in fact, at Roseland Community Hospital, do you use customarily the same proce- dure -- Do all the technicians there use the procedure of taking of the X-ray?

MS. PLACEK:  Objection.

THE COURT:  Objection sustained.

MR. MURPHY  Q  Are you familiar with the procedure you use at Roseland Community Hospital as to taking X-rays?

MS. PLACEK:  Objection as to lack of knowledge, Judge.

THE COURT:  Overruled.

MR. MURPHY  Q  Are you familiar with the procedure?

A    Yes.

Q    And the procedure that you described before, the one that you used on August 19, 1986, is that the procedure you customarily use at Roseland Community Hospital?

THE COURT:  Objection is sustained.

MR. MURPHY  Q  What is the procedure you use at Roseland Community Hospital in taking X-rays?

1    MS. PLACEK: Objection.

2    THE COURT: Overruled.

3    THE WITNESS: The procedures that's used would

4    be all films that's taken must have the

5    identification of the patient that you've done the

6    examine on, and the date and the age of the

7    patient.

8    MR. MURPHY  Q  And that information is put on

9    the flashcard which is placed on the X-ray?

10    A    Yes.

11    MS. PLACEK: Again, objection.

12    THE COURT: Overruled.

13    MR. MURPHY  Q  And who places that information

14    on the X-ray?

15    A    That on the X-ray, that would be the

16    technologist that done the case.

17    Q    Such as yourself, a person like yourself,

18    is that right?

19    MS. PLACEK: Objection to such as yourself,

20    Judge.

21    THE COURT: Overruled.

22    MR. MURPHY  Q  And is that record, that X-ray,

23    People's Exhibit No. 19, is that made by a person

    with knowledge of or made by --

24    THE COURT: People's Exhibit what?

1    MR. MURPHY:  I'm sorry, Judge, that's 15.

2         Q   Is that record made by a person

3    with knowledge of or made from information

4    transmitted from a person of knowledge of the acts

5    or events --

6         MS. PLACEK:  Objection, Judge.

7         THE COURT:  The objection is sustained.

8         MS. PLACEK:  Thank you.

9         MR. MURPHY  Q  Is the information that appears

10   on the flashcard a reference to the patient who's

11   X-rayed?

12        MS. PLACEK:  Objection.

13        THE COURT:  The objection is sustained.

14        MR. MURPHY:  May I have a moment, Judge?

15             (Whereupon there was a short

16             pause in the proceedings)

17        MR. MURPHY  Q  Is the X-rays that you're

18   looking at now People's Exhibit No. 15, is that X-

19   ray made near or the time that the X-ray is taken?

20        MS. PLACEK:  Objection.

21        THE COURT:  I'm sorry.  I don't quite -- I

22   didn't understand the question.

23        MR. MURPHY:  Judge, the question was was the X-

24   ray made at or near the time it was taken.

         MS. PLACEK:  Objection.

MR. MURPHY:   I will rephrase the question, Judge.  I believe the question is unclear.

    Q   Is there a date indicated on that X-ray?

MS. PLACEK:  Objection.  The exhibit speaks for itself, Judge.

THE COURT:  Overruled.

MR. MURPHY  Q  And what's the date?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:   The date is, it looks like 1/10/87.

MS. PLACEK:  Excuse me.  A continuing objection as to the date, Judge.

MR. MURPHY  Q  And is it a practice there to put the date on the X-ray reflecting the date that the X-ray is taken?

MS. PLACEK:  Objection.

THE COURT:   In the normal, custom -- The objection is sustained.

MR. MURPHY:  Your Honor, she talked about the procedures in August of '86.  This is January of '87.

THE COURT:  The objection is sustained.

MR. MURPHY  Q  Were the procedures that you

described in 1986 for taking of X-rays, did they change at all to January of 1987?

A    No.

MS. PLACEK:  Objection.

THE COURT:    Are you talking about her procedures or the procedures generally of the X-ray Department?

MR. MURPHY:    I will rephrase the question, Judge.

Q    Carolyn, the X-ray procedures in the X-ray Department -- Strike that.  The procedure you described, are those the general procedures, customary procedures that are used in the X-ray Department?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes, they are there.

MR. MURPHY  Q  And were those procedures the same in 1987 and January of 1987 as they were in August of 1986?

MS. PLACEK:  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes, they are.

MR. MURPHY  Q  And is it the regular prac-tice -- Was it the regular practice at Roseland

36

1    Community Hospital to place information about the

2    patient's name, the date that the X-ray was taken,

3    the hospital where the X-ray was taken on the

4    flashcard of the X-ray.

5        MS. PLACEK:  Continuing objection, Judge.

6        THE COURT:  The objection is overruled.

7        THE WITNESS:  Yes.

8        MR. MURPHY   Q   And was that done in the

9    exhibits which you're looking at?

10       MS. PLACEK:  Objection.

11       THE COURT:  Objection is sustained.

12       MR. MURPHY   Q   Is there a flashcard with that

13   information on the X-ray which you're looking at

14   now, People's Exhibit No. 15?

15       MS. PLACEK:  Objection.

16       THE COURT:  Overruled.

17       THE WITNESS:  Yes.

18       MR. MURPHY   Q   And is the X-ray that's prepared

19   in relation -- Is the X-ray that's prepared made at

20   the time that the X-ray was taken, developed at the

21   time that the X-ray was taken?

22       MS. PLACEK:  Objection.  Beyond the scope of

23   the witness, Judge.

24       THE COURT:  As to Exhibit 15?

         MS. PLACEK:  That's what I think counsel is

1    speaking of, yes.

2        MR. MURPHY:  Is the objection sustained, Judge?

3        THE COURT:  As to Exhibit 15, the objection is

4    sustained.

5        MR. MURPHY  Q  Is it the regular customary

6    practice of Roseland Hospital to develop the X-ray

7    immediately on the same day the X-ray is taken?

8        A    Yes.

9        Q    And was that record made to your knowledge

10   at or near the time that it was taken?

11       MS. PLACEK:  Objection.

12       THE COURT:  Objection sustained.

13       MR. MURPHY:  No further questions, Judge.

14       THE COURT:  Cross.

15       MS. PLACEK:  Thank you.

16                      CROSS-EXAMINATION

17                            BY

18                        MS. PLACEK:

19       Q    Ma'am, calling your attention to the date

20   and time in 1986 when you took the X-ray that you

21   testified about, how many X-rays did you take that

22   day?

23       A    Of patient --

24       Q    Of anybody, how many X-rays of people did

you take that day?

1    A    Well, I don't remember how many I took

2    that day.

3    Q    How many did you take of females?

4    A    I don't remember that either.

5    Q    How many did you take of males?

6    A    I don't remember.

7    Q    Am I correct to assume you're not a record

8    keeper, correct?

9    A    No.

10    Q    I'm incorrect, or are you a record keeper?

11    A    Of what?

12    Q    Beg your pardon?

13    A    I don't understand the question.

14    Q    At Roseland Hospital, do you keep records?

15    A    The records I kept.

16    Q    When you say you kept, are those the X-

17    rays that the State showed you that would be

18    State's Exhibit No. --

19    A    They are logged in a log book, yes.

20    Q    When you say they are logged in a log

21    book, do you have sole care and control of that

22    locker?

23    A    No, I do not.

24    Q    So even the X-rays you take you don't have

sole care and control after you take them and

41

deliver them to the doctor, correct?

A    Correct.

Q    Thank you.  Not only that, but let's go one step further, ma'am, am I correct, in dealing with the X-rays, you did state your memory had to be refreshed?

A    Yes.

Q    Am I correct in assuming you have -- before you were called by these gentlemen, no independent recollection of the events or the matters that happened on that date in 1986?

A    Correct.

Q    Am I correct in saying that as a matter of fact, what you're testifying to is a combination of what you were told to testify to and send your X-rays, correct?

A    I would say the X-rays is what I was testifying to.

Q    When you say the X-rays are what you were testifying to, you have no independent memory of these X-rays, correct?

A    I can't remember I do.

Q    I'm not blaming you, ma'am.  You have no independent memory of these X-rays, correct, taking these X-rays, correct?

42

1     A    Correct.

2     Q   And  I  am  referring  specifically  to

3 People's No. 14 and People's No. 13.  And to the

4 best of your knowledge, these -- and referring to

5 People's No. 14 and People's No. 13 -- were kept

6 out of -- Well, put it this way bluntly, they were

7 kept in that same locker that we talked about

8 earlier, correct?

9     A    Yes.

10    Q    To the best of your knowledge, correct?

11    A    Correct.

12    Q    As a matter of fact, am I correct in

13 assuming that the only reason that you say they

14 were kept in the locker is because you conclude

15 they were, correct?

16    MR. MURPHY:  Objection.

17    MS.  PLACEK:   It goes  to  personal  opinion,

18 Judge, and basis for testimony.

19    THE COURT:  The objection is overruled.

20    MS. PLACEK  Q  Isn't it correct that the only

21 reason you say these X-rays were kept in that

22 locker is because you conclude, you assume, you

23 imagine they were, correct?

24    A   Excuse me, what locker are you talking

about?

1      Q    The lockers where all the X-rays are kept,

2  correct?

3      A    Correct.

4      Q    So you have no idea, as a matter of fact,

5  whether these two X-rays, again referring to

6  People's 13 and 14, were even kept there, you just

7  assumed that, correct?

8      A    Correct.

9      Q    Thank you.  Now, ma'am, let me ask you

10  this just as a matter of course, you've been

11  working some seven years at Roseland Community

12  Hospital, correct?

13      A    Yes.

14      Q    In those seven years at Roseland Community

15  Hospital, made a mistake, haven't you?

16      MR. MURPHY:  Objection.

17      THE COURT:  Overruled.

18      MS. PLACEK  Q   Correct?

19      A    Correct.

20      MS. PLACEK:  No further questions.

21      THE COURT:  Any further questions?

22      MR. MURPHY:  No.

23      THE COURT:  Thank you, Miss Strong, you may

    step down.

24              (Witness excused)

44

1    THE COURT:  Call your next witness.

2    MR. CASSIDY:  Michael Walker.

3    MS. PLACEK:  Your Honor, there is a rap sheet

4    involved with this witness, the Court notices, and

5    the Court has signed a rule to show cause --

6    THE COURT:  Did you --

7    MS. PLACEK:  We've been tendered one.

8    MR. CASSIDY:  I thought we tendered one.

9    MS. PLACEK:  We ask before examination that a

10   rap sheet be given, Judge.

11   THE COURT:  I will certainly see to it that you

12   get a rap sheet before you commence your cross, but

13   I don't know if it's fatal to you that you have it

14   before they commence their direct, but I will

15   certainly make certain that a rap sheet be given to

16   you if such a thing exist.

17   MS. PLACEK:  I just guess so since I see where

18   he's coming from.

19   THE COURT:  That's a reasonable conclusion or

20   speculation that you reach.

                  Bring the witness out of your lock-up.

21   MR. CASSIDY:  Didn't we tell you beforehand?

22   MS. PLACEK:  When you told me, why didn't you

23   give me a rap sheet?

24   MR. CASSIDY:  Because I thought we already gave

                      **45**

1    you one.

2        THE CLERK:   Raise your right hand, sir.

3                    (Witness sworn)

4        THE COURT:   You may be seated.   That microphone

5    is on.   If you will speak directly into it, keep

6    your voice up, we will all hear you.

7                    You may proceed.

8        MR. CASSIDY:   Thank you, your Honor.

9                    JEROME WALKER,

10   a witness herein, called on behalf of the People of

11   the State of Illinois, after being first duly

12   sworn, was examined and testified as follows:

13                  DIRECT EXAMINATION

14                        BY

15                  MR. CASSIDY:

16       Q    Sir, can you please state your name and

17   spell your last name?

18       A    My name is Michael, my last name, Walker,

19   W-a-l-k-e-r.

20       Q    Michael, what's your date of birth?

21       A    9/'63 -- 1963.

22       Q    And what month and what day?

23       A    September 14.

24       Q    September 14 of 1963?

         A    (Nodding affirmatively)

46

1    mistrial, and there is severe violation.

2       THE COURT:  Miss Placek, I have no way of

3    knowing that, and that's not what I'm ruling on,

4    the objection on the basis of hearsay is overruled.

5    If something occurs that give rise to another

6    basis, we will hear that at that time.  The objec-

7    tion is overruled.

8       MR. CASSIDY:  Thank you, your Honor.

9          Q  The question is, Michael, what did

10   he say to you, and what did you say to him during

11   this conversation?

12      A  He said a policeman was looking for him

13   for -- He said that the police were looking for him

14   because Carlina (Phonetic) and them said he was the

15   last one who seen him with the little girl.

16      Q  And did he say anything to you about that?

17      A  He told me to tell the police that he been

18   with me.

19      Q  And had he, in fact, been with you?

20      A  No.

21      MS. PLACEK:  Objection.  When?

22      THE COURT:  The objection is sustained.

23   Foundation, when?

24      MR. CASSIDY  Q  Did he tell you when you should
     tell the police that he was with you?

                         50715

A    No, he didn't exactly tell me when.

Q    Okay, what did he say to you then if the police ask you?

A    What?

Q    What did he say to you about telling the police?

A    He told me to tell the officer that he was with me.

Q    When, though, when was he with you?

A    That morning.

MS. PLACEK:  Objection.

THE WITNESS:  About 10:00 o'clock.

THE COURT:  The objection is overruled.

MR. CASSIDY  Q  He told you to tell the police to tell them the defendant was with you if they asked you that question, is that what you are saying?

A    Yes.

MS. PLACEK:  Objection as to foundation, Judge, when.

THE COURT:  When what?

MS. PLACEK:  When the defendant supposedly proffer the statement.

THE COURT:  Lay a foundation.  This conversation is taking place between 10:30 and

1    11:00 and at 12013 South Princeton on the porch

2    between this witness and this defendant.  This is

3    when he's telling him that.

4        MS. PLACEK:  I understand that, but at what

5    time was there a proffer that the defendant was

6    made this request.

7        THE COURT:  On August 2.

8        MS. PLACEK:  No, as to -- I take it they are

9    getting into false alibi.  This is the exculpatory

10   they are getting in.

11       MR. CASSIDY:  Judge, the witness testified if

12   the police asked him if he was with him, tell them

13   he was.

14       MS. PLACEK:  When, though, that's the point.

15       THE COURT:  When?

16       MR. CASSIDY:  He didn't say when.  He just said

17   if the police asked him --

18       THE COURT:  All right.  That goes to weight,

19   which is not admissible.  The objection is

20   overruled.

21            You may cross-examine him on it.

22       MR. CASSIDY  Q  When the defendant told you to

23   tell the police that you were with him, what if

24   anything did you say to him?

         A    I told him that I didn't have nothing to

do what he was doing, what was going on.

Q    Did you say anything else to him?

A    No, I just continued painting my porch, and he left.

Q    And he told you this right after he talked about the missing girl, is that correct?

A    Yes.

MS. PLACEK:  Objection -- I will withdraw it, Judge.

MR. CASSIDY:    Could I have just a minute, Judge?

                (Whereupon there was a short
                 pause in the proceedings)

MR. CASSIDY  Q  How long had you known Jerome Hendricks prior to that?

A    I have known Jerome for 13, 14 years.

Q    In August 9, 1988, did you have a conversation with Chicago police officers?

A    Yes, they took me down to the station. They talked to me and talked to Carlina and a lot more girls.

Q    On the night of August 1, 1988, where you with the defendant that night?

MS. PLACEK:  Objection.

THE WITNESS:  I seen Carlina.

53

THE COURT:  Just a minute.  What's the basis of your objection.

MS. PLACEK:  The basis of the objection, Judge, is again as to foundation, when.

THE COURT:  August 1.

MR. CASSIDY:  I thought I said on the night of August 1, 1988, Judge.

MS. PLACEK:  The time, Judge.

THE COURT:  Overruled.

MR. CASSIDY  Q  On August 1, 1988, the night of August 1, 1988, were you with the defendant or were you with Carlina and Yolanda?

MS.  PLACEK:   Objection  to  leading  and suggestive.

THE COURT:  The objection is sustained.

MR. CASSIDY  Q  Who were you with on the night of August 1, 1988?

A    I was with Carlina, we were walking our neighborhood looking for her.

Q    Looking for who?

A    The little girl, her little cousin.

Q    Would that be Denise Ann Johnson?

A    Yes.

Q    Were you ever with Jerome Hendricks that night?

1          A     No, sir.

2          MR. CASSIDY:  I have no further questions, your

3     Honor.

4          MS. PLACEK:  Could I have a rap sheet, Judge?

5          THE COURT:  Mr. Cassidy?

6          MR. CASSIDY:  We ordered it.

7          THE COURT:  You just ordered it?

8          MR. CASSIDY:  Judge, I believe we tendered it

9     before.

10         MS. PLACEK:  Judge, I --

11         THE COURT:  Just a moment.

12         MR.  CASSIDY:   It  should  be  over  in  a  few

13    minutes, faxed or whatever.

14         THE  COURT:   That's  what  I  was  trying  to  get

15    out.

16         MR. CASSIDY:  I'm sorry, Judge.  I should have

17    made that clear.

18                    (Whereupon a recess was taken

19                    after which the following pro-

20                    ceedings were had:)

21         THE COURT:  Court is back in session.

22         MS. PLACEK:  May I proceed, Judge?

23         THE COURT:  You may.

24

CROSS-EXAMINATION

BY

MS. PLACEK:

Q    Sir, I noticed you came in with two gentlemen in a green uniform. Does that mean you are currently incarcerated?

A    Yes.

Q    As a matter of act, quite frankly you're in the State prison, is that correct?

A    Yes.

Q    Do you want to tell his Honor what you're in the State prison for?

A    For drugs.

Q    State prison for drugs. When you say drugs, are you an addict?

A    No, ma'am. I was selling.

Q    When you say you were selling, how many times were you, in fact, convicted for selling drugs?

A    Just twice.

Q    Just twice. What kind of drugs just twice were you convicted of?

A    Drugs.

Q    What kind?

A    Cocaine.

Q    Thank you.   Were you ever convicted of heroin?

A    No, ma'am.

Q    Let me ask you this:   Have you been promised any money for your testimony today?

A    No, ma'am.

Q    Haven't you been promised money by the State's Attorney for possibly helping you when you got out of prison?

A    No, ma'am.

MS. PLACEK:   For an offer of proof, Judge, at the end of this witness' testimony, I would like to put on Mr. Lufrano.

Q    Let me ask you this, sir:   Have you been promised anything for testifying?

A    No, ma'am, I wasn't promised anything.

Q    You weren't promised anything?

A    No, ma'am.

Q    Calling your attention specifically to August 9, 1988, you were brought down to the police station, weren't you?

A    Yes, ma'am.

Q    As a matter of fact, you were brought down there by the police, correct?

A    Yes, ma'am.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Q    As a matter of fact, when you were brought
down there by the police, you were, in fact,
questioned about the disappearance of Denise
Johnson, correct?

A    They was talking to me about it.

Q    You were questioned about the
disappearance of Denise Johnson, weren't you?

A    What do you mean by that.

Q    You were asked questions about where you
were at the time Denise Johnson disappeared,
correct?

A    No, ma'am.  I wasn't questioned like that.

Q    When you say "No, ma'am, you weren't
questioned," let me ask you this:  Isn't it correct
that the  --  By the way, when I say Miranda
warnings, you know what these are, don't you?

A    What?

Q    The Miranda warnings?

A    No, ma'am.

Q    You don't know what the Miranda warnings
were?

A    Ugh-ugh.

Q    So in other words, when you were arrested
and convicted twice  --  By the way, you were
arrested when you were convicted, right?

58

A    Yes, ma'am.

Q    The police never told you any Miranda warnings, correct?

MR. CASSIDY:  Objection, Judge.

THE COURT:  The objection will be sustained.

MS. PLACEK  Q  Well, let me tell you this -- Let me ask you this:  You know you have a right to remain silent under police questioning, right?

A    Right.

Q    You know you have a right to have an attorney present when you're being questioned by the police, correct?

A    Yes, ma'am.

Q    You know that if you make a statement, in fact, that -- to the police when they're questioning you, that, in fact, that can be used against you by a court of law, correct?

A    Yes, ma'am.

Q    Isn't it correct, in fact, that on the date and time in question, I am speaking of August 9, 1988, the police gave you those warnings?

A    Yes, ma'am.

Q    Isn't it correct that the reason they gave -- Strike that.  I will withdraw that.  Isn't it correct that after they gave you those warnings,

1    that's when they questioned you about the

2    disappearance of the little girl, correct?

3        A    Yes, ma'am.

4        Q    And isn't it correct that the reason they

5    gave you the warnings is because they suspected you

6    were somehow involved in the disappearance of the

7    little girl?

8        MR. CASSIDY:  Objection, your Honor, as to what

9    the police suspected.

10       THE COURT:  The objection is sustained.

11       MS. PLACEK  Q  Isn't it correct that, in fact,

12   they asked you questions after they gave you those

13   warnings, correct?

14       A    They didn't ask me like that.

15       Q    They didn't ask you any questions?

16       A    They didn't ask me whether I was involved

17   with the little girl's murder.

18       Q    Well, let me ask you this, sir:  You said

19   that you knew Carlina, correct?

20       A    Carlina, correct.

21       Q    And you said this was a cousin of the

22   little girl, correct?

23       A    Yes, ma'am.

24       Q    And you say that -- Well, let me ask you

     this:  Were you close friends with this young lady?

A    What young lady, Carlina?

Q    Carlina?

A    Yes, ma'am.

Q    And you say that on the second that Jerome Hendricks, in fact, made certain statements to you, correct?

A    Yes, ma'am.

Q    Did you tell Carlina?

A    No, ma'am.

Q    Did you tell any of the little girl's family about these statements?

A    No, ma'am, not at that time.

MR. MURPHY:  Objection.  I ask that be stricken.

THE COURT:  What be stricken?

MR. MURPHY:  The last two questions and answers about whether the witness told the people or the family.

THE COURT:  It may be, Mr. Murphy, it's just as impeaching as the failure of the defendant or the alibi witness to inform the police about an alibi that they testified to in court.  He has contact with these people.  He has a relationship with them, and he receives information about the whereabouts of the person he said they were looking

61

1  for, and he never informed them.  So I'm taking

2  that it's admissible of the weight to be given to

3  it.

4          The objection is overruled.

5      MS. PLACEK  Q  And isn't it correct, the only

6  time you told the story that you told in court was,

7  in fact on August 9 when you were being questioned

8  by the police, correct, isn't that correct, sir?

9      A    Yes, ma'am, I talked to the police.

10     Q    And that's the first time you told anybody

11  the story you told today in court, correct?

12     A    Yes, ma'am.

13     MS. PLACEK:  May I have one moment, Judge, to

14  examine the rap sheet?

15                  (Whereupon there was a short

16                  pause in the proceedings)

17     MS. PLACEK  Q  Sir, let me ask you this:  You

18  mentioned  that  the  only  time  you  were  ever

19  convicted  was,  in  fact,  dealing  with  drugs,

20  correct?

21     MR. CASSIDY:  Objection, Judge.  That's not

22  what he testified to.

23     THE COURT:  The objection will be sustained.

24     MS. PLACEK  Q  Well, sir, is that the only time

   you have been convicted for dealing drugs?

62

1          A    No, ma'am.

2          Q    As a matter of fact, why don't you tell

3   now  Judge  Holt  all  the  things  you  have  been

4   convicted of?

5          A    Just burglary and drugs.

6          Q    Just burglary and drugs?  Well --

7          A    That's all you asked me about.

8          Q    Let  me  ask  you  this:    Weren't  you

9   convicted  in  1984  of  the  crime  of  residential

10  burglary, correct?

11         A    Yes, ma'am.

12         MR.  CASSIDY:      Objection,  Judge,  not

13  impeachment.

14         THE COURT:  Overruled.

15         MS. PLACEK  Q  What did you get?

16         MR. CASSIDY:  Objection, Judge.

17         THE  COURT:    What  is  your  basis  of  the

18  objection?

19         MR. CASSIDY:    It's not relevant what he got

20  sentenced to.

21         THE COURT:    This is the witness and not the

22  defendant?

23         MR. CASSIDY:  Correct.

24         THE COURT:  And the rules that apply to cross-
    examining  witness  in  regard  to  prior  convictions

PENGAD/INDY. MUNCIE IN 47302

SF-IL-24A

are distinctly different from the rules that are

applied to the defendant, and the question of his

incarceration, whether or not he was incarcerated

are admissible.

              The objection is overruled.

    MS. PLACEK   Q   What did you get?

    A     I got seven years.

    Q     Was that for one residential burglary or

how many?

    A     One.

    Q     Let me ask you this:   Were you ever

convicted after that -- Strike that -- before that?

    A     Yes, I had a case in '82.

    Q     And why don't you tell his Honor, Judge

Holt, about that case in '82?

    A     It was a burglary.

    Q     And what did you get?

    A     Four years.

    Q     Did you ever get convicted of burglary

tools?

    A     No, not that I remember, no.

    Q     Well, let me ask you this:   On 9/9/82,

didn't, in fact, you get found guilty of possession

of burglary tools and get sentenced to imprisonment

four    years    in    the    Illinois    Department    of

Corrections?

A    I got a sentenced to a burglary, yes.

Q    Well, let me ask you this --

A    I don't know if it was two, it was a long time ago.

Q    Didn't in 1982 you get two separate sentences?

A    No, ma'am.

Q    So in other words, you were just, according to your testimony, sentenced to burglary for three years and possession of burglary tools for four years in 1982?

MR. MURPHY:  Objection, Judge.  That's the same question.

MS. PLACEK:  He gets a chance to deny what I could possibly impeach, Judge.

THE COURT:  Overruled.

MS. PLACEK  Q  Is that your testimony?

A    I just know I was sentenced to a burglary.

Q    Just a burglary?  Thank you.  So possession of burglary tools for four years would be incorrect, correct?

A    I don't know nothing about no --

Q    Sentenced to three years for burglary would be correct?

1     A    I got a four-year sentence.

2     MR. CASSIDY:  Objection.

3     THE COURT:  Sustained.

4     MS. PLACEK   Q   Let me ask you this:  Calling

5 your attention to 1980, were you ever sentenced

6 there?

7     A    No, ma'am.

8     Q    Well, let me ask you this:  On 12/2/1980,

9 were you, in fact, sentenced to probation and

10 imprisonment for burglary, then?

11     A    Not imprisonment, but I was on probation.

12     Q    Did you receive a sentence for probation

13 imprisonment two years?

14     A    I got probation for two years.

15     Q    Thank you.  And that was for what?

16     A    I think a burglary.

17     Q    How many names do you use?

18     MR. MURPHY:  Objection.

19     THE COURT:  Overruled.

20     MS. PLACEK   Q   How many names do you use?

21     A    I use my name and my nephew name.

22     Q    Your nephew's name by the way isn't your

name, that's a lie?

23     A    Yes.

24     Q    Not only that, you used it so you can

PENGAD/INDY, MUNCIE, IN 47302

SF-IL-24A

1    mislead, correct?

2        MR. MURPHY:  Objection.

3        THE COURT:  Overruled.

4        MS. PLACEK  Q  Correct?

5        A    Yes, ma'am.

6        Q    You used it to lie to the authorities,

7    correct?

8        A    Yes, I did.

9        Q    You used it to lie to the authorities to

10   get out of punishment, correct?

11       A    Yes, I did.

12       Q    Thank you.  By the way, Darnel, is that

13   your nephew's name?

14       A    Yeah.

15       Q    Do you have any tattoos?

16       A    Yes, ma'am.

17       Q    Are those gang tattoos?

18       A    No, ma'am.

19       MR. MURPHY:  Objection.

20       THE COURT:  Overruled.

21       MS. PLACEK  Q  You have a tattoo on your left

22   and right arm?

23       A    Yes, ma'am.

24       Q    You can see them, correct?

         A    Yes, ma'am.

67

Q    Will you show them to his Honor, Judge

Holt for the purpose of the record?

MR. CASSIDY:  Objection, Judge.

THE COURT:  What's the basis of your objection?

MR. CASSIDY:  What relevance?

THE WITNESS:  (Indicating)

THE COURT:  Objection is overruled, Mr. --

MR. CASSIDY:  It isn't relevant --

THE COURT:  It is relevant whether or not a

person has a --

MR. CASSIDY:  A tattoo.

THE COURT:  It depends on what the tattoo

depicts.  A simple tattoo may be of no relevance.

The pitch fork may very well be of some relevance,

and I think you pretty well know that.

MR. CASSIDY:  I don't know that, but now I do.

MR. MURPHY:  It could be an affiliation just

like anything else.

MR. CASSIDY:  Maybe he's a farmer.

THE COURT:  It could be just an affiliation or

membership in an association or club, and it is for

the trier of fact to determine what if any weight

to be given to the fact of that association and

membership in that glee club or boy's club or

whatever other organization you may choose to

associate it with.

MR. CASSIDY:  Judge, for the record, would you --

MS. PLACEK  Q  Why don't you show your glee club tattoo to the Judge.  By the way, they're not from a glee club, are they?

A    No.

Q    They're not from a boy scout club?

A    No.

MR. CASSIDY:  Farmer's club.

MS. PLACEK  Q  Farmer's club, you're not a farmer, are you?

MR. MURPHY:  Objection, Judge.

THE WITNESS:  Indicating)

THE COURT:  One on his right arm appears to be a dollar sign with an S and a G on either side of it.  The one on the right arm seems to be a skull and cross bones or whatever.

MR. CASSIDY:  Thank you, your Honor.

MS. PLACEK  Q  That's all, your Honor.

THE COURT:  Redirect?

MR. CASSIDY:  Thank you, your Honor.

MS. PLACEK:  Excuse me, your Honor.  May I reopen for a moment?

THE COURT:  Yes.

1    MS. PLACEK   Q   You knew the little girl was

2    missing on the 2nd, correct?

3        A    Because Jerome told me that the police

4    were looking for the little girl.

5        Q    When you say they were looking, didn't you

6    just tell his Honor, Judge Holt, that on the 1st,

7    you were looking for her, too?

8        A    Yes.

9        Q    Well, you really knew she was looking,

10    correct?

11       A    No --

12       Q    Missing, correct?   Let me ask you this:

13    You knew her relatives, correct?

14       A    Yes, I knew some of them.

15       Q    Well, you knew --

16       A    Just Carlina.

17       Q    You knew Carlina pretty well, correct?

18       A    Right.

19       Q    And according to your testimony, what

20    you're saying today for that man, you said Jerome

21    said that the police were involved, correct?

22       A    The police were involved.

23       Q    The police were looking for her, too,

24    correct?

        A    Jerome told me that the police were

looking for him.

Q    Involving the little girl, correct, that's
what you're saying today, correct?

A    That's what it's supposed to be, yes.

Q    Let me ask you this:  It wasn't until the
9th that you were brought down to the station and
questioned by the police that you let anybody know,
right?

A    Let anybody know?

Q    About this conversation that allegedly
took place with Jerome, correct?

A    Because I didn't want nothing to do with
it then.

Q    Right.  Thank you.

          That's all, Judge.

THE COURT:  Redirect?

MR. CASSIDY:  May I proceed, your Honor?

THE COURT:  You may.

                    REDIRECT EXAMINATION

                              BY

                    MR. CASSIDY:

Q    Now, the first time you met me was today,
is that correct, Michael?

A    Yes, sir.

Q    And what I told you was that if you

testified truthfully today that myself and John Murphy would write a letter to the warden where you are staying and tell him that you testified truthfully today and leave it up to him what will take place with you, is that correct?

A    Yes, sir.

Q    Now, we didn't promise you anything about us reducing your sentence, correct?

A    No, sir.

MS. PLACEK:  Objection.

THE COURT:  I'm sorry?

MS. PLACEK:  No questions asked, Judge.

THE COURT:  Overruled.

MR. CASSIDY  Q  We would write a letter to the warden to tell him you testified in court truthfully and ask him to take into consideration any parole or anything like that, is that correct?

A    Yes, sir.

Q    And Mr. Murphy also told you that upon your release, if he's still with the office and if you got a hold of him, he may, if it's okay with our office, give you one-month's rent to relocate, is that right?

A    Yes, sir.

MS.  PLACEK:   Objection.   The State is now

1    impeaching his own witness, Judge.

2       THE COURT:  Overruled.

3       MR. CASSIDY    Q   Not money to you, but just

4    money for you to relocate, isn't that correct, for

5    one month?

6       A    That's right, sir.

7       Q    Now, Jerome, you told the police, did you

8    not, on August 9th -- I'm sorry -- Michael, you

9    told the police on August 9 that Jerome came to

10   your house while you were painting, right?

11      A    Right.

12      MS. PLACEK:  Objection.  Improper for redirect,

13   Judge.

14      THE COURT:  What's the purpose?

15      MR. CASSIDY:    Judge, prior consistent

16   statement.

17      THE COURT:  Prior consistent statement?

18      MR. CASSIDY:  Right, what he's testified to

19   today.

20      THE COURT:  How is a prior consistent statement

21   admissible?

22      MR. CASSIDY:  I believe counsel brought out

23   possible motive for Michael Walker here to be

24   fabricating his testimony today based upon us, the

     State and with all the prior convictions and

promises made.

THE COURT:  It seems to me what she brought out was the fact that the witness made a prior consistent statement on August 9.

MR. CASSIDY:  Correct, but she really didn't go into details.

THE COURT:  I know, but the details are not admissible of his prior consistent statement unless there is an inference or an insinuation that his testimony has recently been fabricated.  She's not doing that.  She's saying that he didn't, in fact, tell the police what he said he told the police.

MR. CASSIDY:  I believe or more or less showing that, but I would like the details -- Just because she's not contesting it, she did contest his motive to be testifying.

THE COURT:  Prior consistent statements are not admissible evidence, Mr. Cassidy, except under certain circumstances, and the circumstances are not present here.  The objection is sustained.

MR. CASSIDY:  I have no further questions, thank you, your Honor.

THE COURT:  Recross?

RECROSS-EXAMINATION

BY

MS. PLACEK:

Q    Do you remember when I asked you had you
been promised anything for testifying?

A    Yes, ma'am.

Q    You forgot to tell his Honor, Judge Holt,
under my questioning about that letter, correct?

MR. CASSIDY:  Objection.

THE COURT:  Sustained.

MS. PLACEK    Q    Did you remember that letter
when I asked you that question?

MR. CASSIDY:  Objection, your Honor.

THE COURT:  Sustained.

MS. PLACEK    Q    Did you tell me about the letter
when I asked you about it?

MR. CASSIDY:  Objection.

THE COURT:  Objection is sustained.

MS. PLACEK    Q    How much money are you getting
for this relocation?

A    It wasn't no promises of giving me.
They're saying what they probably could do for me.

Q    I see.  Did they say anything else besides
those things that you now remember that they can do
for you?



1    MR. CASSIDY:    Objection, your Honor.

2  Argumentative.

3    THE COURT:  Overruled.

4    THE WITNESS:  The thing he said out of his

5  mouth is what he said to me.

6    MS. PLACEK  Q  Out of his mouth?  Thank you.

7        That's all, Judge.

8    THE COURT:  Anything further?

9    MR. CASSIDY:  No, Judge.  Thank you.

10    THE COURT:  Thank you, Mr. Walker, you may step

11  down.

12        (Witness excused)

13    THE COURT:  Call the witness.  He will have to

14  come back if we don't finish.

15    THE CLERK:  Raise your right hand, sir.

16        (Witness sworn)

17    THE COURT:  That microphone is on.  If you will

18  speak directly in this, keep your voice up, we will

19  all hear you.

20        You may proceed.

21        ROBERT TOVAR,

22  a witness herein, called on behalf of the People of

23  the State of Illinois, after being first duly

24  sworn, was examined and testified as follows:

1                    DIRECT EXAMINATION

2                            BY

3                      MR. MURPHY:

4        Q    Would you please state your name and spell

5   your last name?

6        A    Robert Tovar, T-o-v-a-r.

7        Q    And by whom are you employed?

8        A    Chicago Police Department.

9        Q    And how long have you been employed with

10   the Chicago Police Department?

11        A    Approximately 25 years.

12        Q    And what's your position with the  Chicago

13   Police Department?

14        A    I'm   a   technician   with   the   crime

15   laboratory.

16        Q    And where do you work at, Mr. Tovar?

17        A    In the crime laboratory, 1121 South State.

18        Q    Officer Tovar, I'd like to direct your

19   attention to the evening hours of August 8, 1988,

20   late  in  the  evening,  were  you  working  that

    particular day?

21        A    Yes.

22        Q    And did you come into contact with any

23   individual that you see in court today?

24        A    Yes.

Q    Could you please point to that individual and  indicate an article of clothing?

A    The gentleman with the sweater and his hands clasped (Indicating).

MR. MURPHY:  May the record reflect in-court identification of the defendant, Jerome Hendricks, your Honor?

THE COURT:  Yes, it may.

MR. MURPHY  Q  Officer Tovar, could you explain to Judge Holt when you came into contact with the defendant?

A    At about 10:30 at night.

Q    And where was that at?

A    At the crime lab.

Q    That would have been at 11th and State?

A    Yes.

Q    Who was with the defendant at the time you observed him?

A    There were two detectives.

Q    Would that be Detective Michael Rolland and Michael Davis?

A    Yes.

Q    Officer Tovar, when you observed the defendant around 10:30, can you explain what happened?

1    A    When I talked to the defendant, I gave him

2    a form, with respect to his rights, I guess you

3    want to use that before I talked to him.

4    Q    And when you gave him that form -- Strike

5    that.

6    MR. MURPHY:  For the record, I'm going to mark

7    People's Exhibit No. -- mark People's Exhibit No.

8    16, Judge.

9            May I approach?

10    THE COURT:  You may.

11    MR. MURPHY  Q  Officer Tovar, I'm going to show

12    you what's been marked as People's Exhibit No. 16,

13    do you recognize what that's a copy of?

14    A    Yes.

15    Q    What is that?

16    A    That's the form I gave Mr. Hendricks.

17    Q    Now, the original census that day has been

18    destroyed, has it not?

19    A    Yes.

20    Q    That's a copy made from the microfiche?

21    A    Yes.

22    Q    Officer Tovar, could you describe what you

23    did with the defendant with relation to that form?

24    A    I read the form to him before I talked to

him.

79

1

2          Q    And could you read to Judge Holt what --

3     from the form the portions you read to the

4     defendant exactly as you read them to the

      defendant?

5          A    Yes, I said several times you go through

6     a ritual with any --

7          MR. LUFRANO:    Objection to what he goes to.

8     He's asked what he did.

9          THE COURT:    The objection is sustained.

10         MR. MURPHY   Q   Just describe what you did in

11    this case?

12         A    Sure.   I used my finger and went through

13    line by line, and I read to the subject from the

14    form, and I put the form directly in front of him.

15    I read is your name Jerome Hendricks?   I have your

16    name down here, Jerome Hendricks.   It was corrected

17    because I misspelled it.   I have today's date,

18    8/August, '88.   I have the address, the location

19    where you're at, 1121 South State Street, Chicago,

20    Illinois, and the reason why he's here, and I have

21    it's the death of a Denise Johnson, which occurred

22    on 8/August, 1988 at 251 West 117th Street.   Then I

23    read the paragraph here, and the first line it

24    says, "I understand I have a right to remain

      silent, and then anything I say can be used against

me in a court of law." I asked him if he understood that. He acknowledged he did. I went to the next line again with my finger under the line, and I read, "I understand I have a right to talk to a lawyer and have him present with me during questioning. If I could not afford a lawyer, one would be appointed from the court to represent me before any questioning." I asked him if he understood that. He acknowledged he did. Then I read the next line again with my finger going across the line. It says, "I understand I have a right to stop the questioning anytime and stop the questioning for the purpose of consulting a lawyer," and I asked him if he understood that, and he said he did.

Q   Now, there's other things contained in that form, and I won't ask you to go through that, but if you could bypass that and tell me did you have a conversation with the defendant after -- Strike that. If I can at some point when you got near the bottom of this form, you had him sign the form, is that correct?

A   That's correct.

Q   And after he signed the form, what did you do?

81

1          A    I signed it.

2          Q    And   is   that   your   signature   and   his

3     signature on the form?

4          A    Yes.

5          Q    And is this exhibit People's Exhibit No.

6     6 a true and accurate copy of the form that you

7     used?

8          A    Yes.

9          Q    And, Officer Tovar, did you at this time

10    ask the defendant certain questions?

11         A    I did.

12         Q    With respect to this incident?

13         A    Yes.

14         Q    And when you asked those questions, did

15    you receive any answers from him?

16         A    Yes.

17         Q    And what questions did you ask him?

18         MS. PLACEK:  Objection, and I ask to be heard

19    outside the presence of the witnesses.  This is

      what I anticipated taking the time, Judge.

20         THE COURT:  Tell me what the basis of your

21    objection is.

22         MS. PLACEK:  The basis of the objection, Judge,

23    and it's no secret to the Court because the Court

24    heard  the  motion  because  this  gentleman  is  a

polygraph operator.  What the State is seeking to

introduce,  and  the  answers  they  are  seeking  to

introduce was taken as part of a polygraph test.

This would be the assumption I am making at this

time, and I was led to believe, it's part of the

motion.  The defense's --

THE COURT:  Mr. Murphy?

MR. MURPHY:  Judge, we are not -- Obviously

we're aware of what the Court's rulings are with

respect to polygraph testing, and we specifically

instructed the officer to stay away from that area.

That was brought up by counsel.  All we intend to

get into is the content of the conversation, not

anything with regard to the taking of the test,

what the result of the test was or anything along

those lines.  We are aware of the Court's ruling.

THE COURT:  Under what circumstances did these

questions -- this question and answer -- Under what

circumstances did this question-and-answer session

arise?

MR. MURPHY:  I am not sure if I understand your

question, Judge.

THE COURT:  What was the circumstances which

give rise to the question-and-answer session that

the witness and the defendant were having?  Is he

1   being subjected to a polygraph examination at this

2   time?

3        MR. MURPHY:  Yes, Judge.

4        THE COURT:  He's hooked up to a polygraph

5   machine?

6        MR. MURPHY:  That's my understanding.

7        THE COURT:  And he's asking him questions, and

8   the defendant is making answers, and the polygraph

9   machine is running and recording the answers?

10        MR. MURPHY:  That's my understanding, Judge.

11        THE COURT:  I don't know the answer to it,

12   Mr. Murphy, and I don't think we are going to

13   resolve it tonight within the next five to ten

14   minutes.

15        MS. PLACEK:  This is the point where I

16   suggested, Judge, that we would have a problem.  It

17   would be the defense's contention, Judge, that the

18   Illinois law for business such --

19        THE COURT:  I understand what you contention

20   is, and whether or not it goes as far as you say it

21   goes, I don't know that off the top of my head at

22   any rate.  That's where I am going to try to rule

23   on it tonight.  I can tell you what my general

24   impression is of the law which has nothing

whatsoever to do with the area that we are in now

84

because i don't recall ever having seen a case quite like this, quite under these same circum- stances, but every case that I've ever seen which deals with anything at all regarding polygraph and you -- I know you haven't mentioned polygraph, but the failure to mention it doesn't -- may not be sufficient because once the defendant starts to meet it, if you never mentioned polygraph, it's going to emerged, and once polygraph emerges, you've got the problem, you may have, I don't know.

MR. CASSIDY:  We haven't finished our direct.

THE COURT:  if they don't cross-examine him, it will never come up.

MR. CASSIDY:  They can cross-examine all they want.

THE COURT:  The point is this, gentlemen, and I'm being a little levitied (Phonetic) into the situation, which probably has no levity -- no place as levity at all.  I don't know the answer, but I have not seen a case which has questioned the polygraph on any level, and so your task, Mr. Murphy and
Mr. Cassidy, overnight with your access and law and all those good things you have in your office to aid and research is to conference me that this

85,

1    testimony is admissible evidence.

2            The defense, on the contrary, has the

3    burden of helping me to -- if they choose to, of

4    showing me that this is not proper evidence, and I

5    will do whatever I can to help resolve it, also,

6    but I'm not going to have as much time as you folks

7    have.

8        MR. MURPHY:  Judge, I understand what the Court

9    is indicating, but the defense is making a motion

10   here, and we will do some research on this.

11   There's no authority to what they are saying --

12       THE COURT:  They are saying the polygraph

13   testimony is inadmissible in Illinois in any form

14   and any fashion, and you're saying we're not

15   talking about polygraph, we are just talking about

16   a conversation that the fellows were having down at

17   the ranch one night, and, of course, the defense

18   says that what you can't do, you cannot do

19   indirectly and by subterfuge.

20       MR. CASSIDY:  No, that's not the case.  I think

21   you're viewing it that way, Judge, you're drawing

22   the conclusion.  I mean it's a straight question

23   and answer.  If you look at it that way, a trier of

     fact with your experience --

24       THE COURT:  Down at the ranch with the boys.

1    MR. CASSIDY:  With your experience and trier of
2    fact, they wouldn't consider polygraph, and I
3    believe with all due respect, that's how you should
4    be viewing it.

5    THE COURT:  You may be right, Mr. Cassidy.

6    MR. CASSIDY:  But there appears to be a Motion
7    in Limine at this point by the defense.

8    THE COURT:  No, it appears to be a motion that
9    says -- The objection that says, Judge, this
10    violates the law in Illinois, and I'm simply saying
11    to you --

12    MR. CASSIDY:  I understand what you're saying.
13    I am just saying you're jumping to a conclusion
14    which the defense put in your mind.

15    THE COURT:  Maybe.  I thought the Supreme Court
16    of Illinois put into my mind --

17    MR. CASSIDY:  Judge, you wouldn't have known
18    what was going on here if they didn't tell you.

19    THE COURT:  Mr. Cassidy, I'm not required, I
20    don't think, to be any dumber than the average
21    juror.  I am as dumb as the box of rocks, but I am
    not required to be any dumber than any juror.
22
23    MR. CASSIDY:  I think you are, Judge.  You're
    jumping to a conclusion.
24
    THE COURT:  When he tells me he's down at the

87

1  ranch   at   11:00   o'clock   at   night   having   a

2  conversation with the defendant after having him

3  sign  forms,  what  do  you  think  I  am  going  to

4  conclude he is?

5      MR. CASSIDY:   The  same  form  that  any  police

6  officer gives him.

7      THE   COURT:    All   right.    Order   of   Court,

8  February 13.

9              Mr. Tovar, I'm afraid you will have to

10  return.

11              (Which were all the proceedings

12              had in the above-entitled cause

13              and the case continued to Wednesday,

14              the 13th day of February, 1991.)

15

16

17

18

19

20

21

22

23

24

1     IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

2                COOK COUNTY, ILLINOIS

3

4    THE PEOPLE OF THE     )
     STATE OF ILLINOIS,    )    Criminal
                     )

5        Plaintiff,     )    No. 88CR12517
                     )

6     vs.              )    Charge: Murder
                     )

7    JEROME HENDRICKS,     )
                     )

8        Defendant.     )

9

                      JURY TRIAL

10             Court commenced pursuant to

11 continuance, February 13, 1991, before the

12 Honorable LEO E. HOLT and a jury, at 2:00

13 o'clock p.m.

14

15    PRESENT:
          MR. SCOTT CASSIDY,

16           MR. JOHN MURPHY,
           assistant State's Attorneys,

17                for the People;

18            MS. MARIJANE PLACEK,
          MR. VINCENT LUFRANO,

19            assistant Public Defenders,
              for the Defendant.

20         --------------------------

21

22

23 Rella R. Jordan,
    Official Court Reporter
    Markham, Illinois, 60426

24

```
1              THE COURT:  Both sides ready?
2              MR. MURPHY:  Yes.
3              MS. PLACEK:  Yes.
4              THE COURT:  Last Thursday when we
5        recessed the trial of this case, the witness,
6        Robert Tovar, was on the stand.
7              MR. MURPHY:  That was Monday, Judge.
8              THE COURT:  All right, Monday.
9              Okay.  The intervening holidays threw me
10       off a bit.
11             When Mr. Tovar was here, the defense
12       raised an objection that his testimony instigated
13       a devor prolig{} testimony and I have tried to
14       look up that proposition and have identified as
15       nearly as I can certain propositions.  And
16       according to Grahams Handbook of Illinois 5th
17       edition, Section 403.2, Page 173, the following
18       appears:
19                        Quote:  Statements made by
20                        a person before, during or
21                        after being administered a lie
22                        detector test are admissible.
23             "People versus Sickley, S- I- C- K- L- E-
24       Y- 114 Illinois Appellate 3rd, 167, 69 Illinois
```

1    decision, 94, 448 Northeast 2nd, 612, 1983, closed

2    quote.

3                And so I hasten to read what the Court

4    said in People versus Sickley, and People versus

5    Sickley which appears at 114 Illinois Appellate

6    3rd and 167, we find the following at Page 172:

7                Quote, the State argues that despite the

8    fact that our Supreme Court has held that

9    polygraph results are not admissible, (People

10   versus Baines, B- A- I- N- E- S-), 88 Illinois 2,

11   235, Northeast, 1070, closed paren.  This does not

12   preclude the introduction into evidence of

13   statements obtained after a polygraph examination

14   is administered.  We agree.  Closed quote.

15               That's the extent to which Sickley

16   corroborates or supports, it supports, what Cleary

17   and Graham said in their treatises on Illinois

18   evidence.

19               I turn then to Mr. Hunter's Trial

20   Handbook for Illinois lawyers criminal, the 6th

21   edition, Section 38.18, at Page 509, where the

22   following is found:

23               Quote:  While the results of

24                    a polygraph test are not

1                         admissible, that does not

2                         preclude the introduction into

3                         evidence of statements

4                         obtained after the  polygraph

5                         examination is administered

6                         provided they are given

7                         voluntary, closed quote.

8               And they cite again People versus

9       Sickley.

10              That's the extent to which I can find any

11      support for the proposition that a conversation

12      had by a polygrapher with a defendant before,

13      during or subsequent to the administering of a

14      polygraph examination that that conversation is

15      admissible in evidence.

16              The other cases tend to suggest to me, at

17      least, that if admissible, it is frought with

18      danger.  I invite your further educating me.  If

19      you have had an opportunity to look at this

20      subject matter, it's all that I can find in the

21      limited time that I had to deal with it.  Some

22      states, maybe most, maybe a majority of the states

23      tend to follow the Illinois rule.  There are some

24      exceptions, however, but Illinois is, as far as I

1    have been able to determine, what one might

2    characterize as being vehemently anti-polygraph.

3    So I invite you to address that problem, if you

4    choose to.

5         MS. PLACEK:  The State was going to brief

6    that, Judge, so I was waiting for them.

7         THE COURT:  Well, the State is proffering

8    the evidence so you have got the burden to

9    overcome.

10        So I will hear from the State.

11        MR. MURPHY:  Well, Judge, at this point,

12   if I may, perhaps, I didn't understand the Court.

13   Will the Court allow the evidence in then?

14        THE COURT:  Not unless you can show me

15   how it's going to be admissible.  I don't think

16   what I read to you and certainly Shipley, Shipley

17   doesn't stand for the proposition that a

18   conversation by a polygrapher and the defendant

19   before, or during the administering of the

20   examination is admissible.

21        Shipley -- Sickley, I mean, may at best

22   stand for the proposition that subsequent to a

23   polygraph examination, and the defendant having

24   been confronted with the results of the

1    examination may thereafter have a conversation

2    with a polygrapher which will become admissible.

3    That is the best that I can get out of Sickley,

4            And given -- I don't know -- the rules of

5    evidence don't change because of the form that the

6    defendant is being tried in changes.  If this were

7    a jury trial, I have almost no doubt in my mind

8    that you couldn't proffer this evidence to the

9    jury and thereby bar the defendant from showing to

10   the jury the circumstances under which the

11   statement was taken, which would immediately evoke

12   conversations about polygraphs, which is

13   inadmissible.

14           Showing the fact-finder that the

15   defendant took the polygraph examination is

16   reversible error, because the inference is, of

17   course, that he failed it.  And I don't know how

18   the defendant would cross examine this polygrapher

19   in order to show the totality of the circumstances

20   without showing that he was being polygraphed.

21   But if you know of some authority that is to the

22   contrary of what I just suggested, I will hear it

23   and further consider it, but right now my

24   inclination is to say to you that the conversation

1    is not admissible.

2            MR. MURPHY:  Judge, our position is

3    simply this:  I'm aware of some legal authority on

4    polygraph testing and, first of all--   and I'm

5    aware also that the case law clearly hold that the

6    result of a polygraph test or the fact that a

7    polygraph test was taken is clearly inadmissible.

8            And, I'm sure your Honor is well aware

9    that we had no intention of eliciting that

10   evidence.  That was brought to your attention not

11   by us but by the defense when the witness was

12   testifying.

13           Your Honor, I am not aware of any case

14   law that precludes the State from introducing a

15   statement that was made by the defendant.

16   Whatever the circumstance may be we do not intend

17   to get into a situation where he's got to and has

18   taken a polygraph test.

19           And, therefore, your Honor, it's our

20   position we are not precluded from introducing

21   into evidence statements which the defendant made.

22   Other than that, Judge, I would have no further

23   argument.

24           If the Court is going to reject--.

1              THE COURT:  Do you know of any case in

2      this jurisdiction or any other jurisdiction that

3      has accepted that proposition?

4              MR. MURPHY:  No, Judge, but I know of no

5      case that precludes it.

6              THE COURT:  I don't know either, but then

7      I haven't looked.  But it would seem to me that

8      the frequency with which the questions posed and

9      the answers made during a polygraph examination

10     are so likely to be inculpatory that you would

11     find the Courts resolving that issue.  If trial

12     courts have been allowing it in with any degree of

13     frequency, it clearly would be reported somewhere

14     in the Illinois Reports.

15             One of the reasons that it may not appear

16     is because trial courts have adhered strictly to

17     the Supreme Court's ban on any evidence even

18     remotely alluding to the proposition that the

19     defendant has been the subject of a polygraph

20     examination.  So the dirth of cases or the failure

21     follow cases, find cases may be of some value in

22     the absence of a -- you know one of the cases that

23     I read, I didn't read the case, but I was reading

24     Mr. Cleary's work, talked about the dangerousness

1          of even alluding to the proposition of polygraph.

2                    Ms. Placek, what does your research if

3          any show on this area.

4                    MS. PLACEK:   Judge, I too went to Cleary

5          as a starting point.

6                    In the Sickley Case, I believe exactly it

7          discussed the fact with the defendant's right of

8          due process being cut off by, in fact, the

9          inability to cross examine without bringing up the

10         circumstances of the statement, therefore, it must

11         be brought out that it was done in a question and

12         answer period with answers being -- if you will

13         suggested to a yes-no circumstance involving the

14         material of a polygraph test itself.

15                   We have read the cases this morning, as a

16         matter of fact, which the Court referred to.   It

17         would be our contention, as we objected at the

18         last court date, Monday afternoon, that this

19         gentleman because of the nature of work and

20         because of the status of Illinois case law should,

21         in fact, be barred from testifying.

22                   MR. MURPHY:   Judge, may I make one brief

23         argument in response?   Something, I really should

24         have addressed initially.

1          Judge, one witness testified with regard
2     to the statements, a witness, by the name of Larry
3     Nitsche, N- I- T- S- C- H- E-, I believe, and this
4     does not help the Court in terms of polygraph
5     questions, but certain questions were asked by
6     myself and he was not allowed to answer those
7     questions because the defendant did not give
8     information in certain areas, where he was not
9     asked certain questions.
10         One of the purposes of introducing
11    testimony of this specific witness is to show the
12    various specific questions were asked to the
13    defendant and the nature of the statement.  This
14    does not help the Court in resolving that issue
15    but that is the purpose of this witness testifying
16    at this point in the trial.
17         THE COURT:  Well, I'm going to allow you
18    to make an offer of proof as to what your evidence
19    would show for whatever value it may become to you
20    at some subsequent date but it doesn't seem to me
21    that you are right that does not answer or aid me
22    in trying to resolve this problem.
23         I'm more concerned with the artificial
24    nature of what the defendant has to do in this

1    situation in trying to meet this testimony.

2           This testimony is not just out there in a

3    vacuum and it is not as to two of the boys down at

4    Joes's Place having a conversation, and since the

5    defendant would have, I would assume, be entitled

6    to show all of the circumstances around this

7    conversation in order for me to assess, One, it's

8    voluntariness; and 2, whether or not, it's weight,

9    it's credibility, and as soon as he undertakes to

10   do that, he's going to start having to talk about

11   polygraph examinations, and that's what the

12   Illinois Courts have, as I understand it, they are

13   strictly forbidden.

14          So the defendant's objection is sustained

15   and I'll not permit Mr. Tovar to testify about a

16   conversation that he had with the defendant on

17   August 8, 1988, on the evening hours at

18   approximately 10:30 p.m. during the time that the

19   defendant was hooked to a polygraph machine.

20          MR. MURPHY:  Judge, what about pretest

21   questions?  Do you have any problem with that?

22          THE COURT:  Yeah.

23          I suppose Sickley would, at least, stand

24   for the proposition that subsequent to the

1    polygraph examination, statements made by the

2    defendant would be admissible, but prepolygraph

3    statements are just as much barred because they

4    are in preparation for the polygraph. It is in

5    some respect, even if he's not hooked up to the

6    machine, as of yet, whether he's being asked

7    questions for representative samples of

8    configurations, for lack of a better term, he is,

9    at least, in the process of aiding the polygrapher

10    in formulating questions and otherwise assisting

11    in the presentation of the examination. It's the

12    same thing.

13            As I said, when I saw Cleary's

14    proposition in Mr. Cleary's book, I thought

15    perhaps that the Sickley Case was going to resolve

16    it for me. And unfortunately, I think Mr. Cleary

17    just overstated the reach of the Sickley Case, as

18    is often the case, and the cite in the case goes

19    much further in his book than the case actually

20    goes.

21            Or call Mr. Tovar back, if you have some

22    other questions, or call your next witness.

23            MR. MURPHY:  I do have some other

24    questions.

1           MS. PLACEK:  If it pleases the Court, if

2     the State is alleging that the defendant made a

3     statement after this testing, then we would be

4     objecting on Discovery.

5           THE COURT:  I don't know if that's what

6     they are doing.

7           MR. MURPHY:  Judge, I don't know what

8     Counsel is referring to.

9           THE COURT:  I don't know either, so we'll

10    have to wait and see.

11          MS. PLACEK:  I am just informing this

12    Court, Judge, that the objection would be made at

13    this time that we haven't been tendered any

14    statements made after the matter as requested by

15    our Motion for Discovery.

16          MR. MURPHY:  Judge, there were statements

17    made at other times by two other police officers.

18          THE COURT:  Mr. Murphy and Ms. Placek,

19    we'll deal with that when we see what this witness

20    is going to testify to.

21                         (Whereupon the following

22                          proceedings were had in

23                          the hearing and presence

24                          of the jury:)

1                R O B E R T     T O V A R, {}

2    called as a witness herein for the People of the

3    State of Illinois, having been previously duly

4    sworn, resumed the stand and testified as follows:

5                   DIRECT EXAMINATION{}

6                   BY MR. MURPHY:

7        Q.    Officer Tovar, you testified you began

8    your conversation with the defendant approximately

9    10:30, August 8, 1988, is that correct?

10       A.    No, later than that.

11       Q.    That is what time he arrived at the

12   police station?

13       A.    Yes.

14       Q.    And, that was at 11th and State?

15       A.    Yes.

16       Q.    That was 10:30 p.m.?

17       A.    Yes.

18       Q.    Approximately how long did you begin

19   speaking with the defendant, if you recall?

20       A.    I would say some time after 11:00

21   o'clock.

22       Q.    And how long did you speak to him?

23       A.    I would say the entire time I was with

24   the defendant, might be a little over an hour.

1        Q.    And so you went passed midnight then

2    approximately?

3        A.    No.   I think just before midnight, about

4    ten to 12,.

5        Q.    And that at the termination of that

6    conversation was that the extent of your contact

7    with the defendant?

8        A.    Yes.

9        Q.    And to your knowledge was he then taken

10   from 11th and State by Det. Ryan and Det. Baker?

11       A.    Yes.

12       Q.    And, Officer, I believe you have already

13   identified the person in court who you spoke to,

14   is that correct?

15       A.    Yes.

16       Q.    And so it is clear --

17       MS. PLACEK:   Stipulate that he would

18   identify the defendant.

19       MR. MURPHY:   I believe he already did.

20       THE COURT:   Stipulation so noted.

21       MR. MURPHY:   No further questions.

22       MS. PLACEK:   Motion to strike is

23   irrelevant the matter before the Court, the entire

24   testimony.

1              THE COURT:  No.

2              The testimony will stand, the objection

3    is overruled.

4                    CROSS EXAMINATION()

5                    BY MS. PLACEK:

6       Q.   Officer, would it be correct in saying

7    that on that August date when you talked to the

8    defendant in 1988 it was about in the 90's, if you

9    can recall?

10      A.   I can't recall at that time.

11             MS. PLACEK:  Thank you.

12             That's all, Judge.

13             THE COURT:  Redirect?

14             MR. MURPHY:  No further questions, Judge.

15             THE COURT:  Thank you, Mr. Tovar.

16             You may step down.

17                 (Witness was excused.)

18             THE COURT:  Call your next witness.

19             MR. MURPHY:  The People call Harding

20   Johnson.

21             THE COURT:  There will be a short recess.

22                    (Whereupon there was a brief

23                     recess, after which the

24                     following proceedings were had:)

1                    (Witness was sworn.)

2                    THE COURT:  You may proceed.

3                    MR. MURPHY:  Thank you, Judge.

4              H A R D I N G    J O H N S O N, {}

5        called as a witness herein for the People of the

6        State of Illinois, having been first duly sworn,

7        was examined and testified as follows:

8                    DIRECT EXAMINATION {}

9                    BY  MR. MURPHY:

10            Q.    Sir, would you state your name and spell

11       your last name, first and last names?

12            A.    My first name is Harding Johnson.

13            Q.    H- A- R- D I- N- G-?

14            A.    Right.

15            Q.    J- O- H- N- S- O- N-?

16            A.    Right.

17            Q.    Mr. Johnson, do you know Denise Johnson?

18            A.    Yes, I do.

19            Q.    What is your relationship to her, sir?

20            A.    That is my granddaughter.

21            Q.    Mr. Johnson, 1986 and is it '87, where

22       was Denise Johnson living?

23            A.    She was living with me.

24            Q.    And where was that at, sir?

1   A. On State Street.

2   Q. And who else was living there besides you

3 and her?

4   A. My wife and I.

5   Q. Now, Mr. Johnson, I'm going to show you

6 what has been marked People's Exhibit Number 7 for

7 identification purposes, do you recognize the

8 person in that picture?

9   A. That is my granddaughter.

10   Q. Is that Denise Johnson?

11   A. Yes.

12   Q. Mr. Johnson, when she was living with you

13 and your wife were you responsible for her care?

14   MS. PLACEK: Objection, form.

15   THE COURT: Overruled.

16   MR. MURPHY:

17   Q. Were you and your wife responsible for

18 her medical care, sir?

19   A. Yes.

20   Q. And, Mr. Johnson, I would like to direct

21 your attention to the date of August 19, 1986, do

22 you remember that day, sir?

23   A. Yes, I do.

24   Q. And did anything unusual happen that day?

1          A.    Yes.  She fell and hurt her wrist.

2          Q.    And which wrist did she hurt?

3          A.    Her left wrist .

4                MR. LuFRANO:   objection, unless he was

5      present at the time she fell.  It's hearsay, your

6      Honor.

7                THE COURT:  How about that, Mr. Murphy?

8                MR. MURPHY:  Judge, it's subject to

9      cross.

10                THE COURT:  That's not the question of

11     whether it's subject to cross, the question is

12     whether it's hearsay.

13                MS. PLACEK:  Motion to strike.

14                THE COURT:  Stricken.

15                MR. MURPHY:

16          Q.   Mr. Johnson, what do you remember about

17     her wrists?

18                MS. PLACEK:  Objection, leading and

19     suggestive.

20                THE COURT:  Overruled.

21          Q.   Did you see her hurt her wrist?

22                MS. PLACEK:  Objection.

23                THE COURT:  Overruled.

24                MR. MURPHY:

1       Q.  Did you see her hurt her wrist, Mr.

2  Johnson?

3       A.  No, I didn't see when she hurt her wrist.

4       Q.  What do you remember about her hurting

5  her wrist that day?

6         MS. PLACEK:  Objection.

7         THE COURT:  Overruled.

8         MR. MURPHY:

9       Q.  What do you remember about that day, sir,

10  with regards to her wrist?

11       A.  When I came in from work about 11:30 or

12  twelve clock at night, I taken her to the

13  hospital.

14       Q.  And do you remember what hospital you

15  took her to?

16       A.  I taken her to Roseland Hospital.

17       Q.  And why did you take her to Roseland

18  Hospital, Mr. Johnson?

19       A.  She was crying and said she had broke her

20  wrist.

21         MS. PLACEK:  Objection.

22         THE COURT:  Objection sustained, hearsay.

23         MR. MURPHY:  That is the statement alone,

24  Judge.

1          THE COURT:  That is the statement alone.

2      Well, no.

3          I'm going to retract that, that comes in

4   as an exception of the Hearsay Rule being offered

5   not for the truth of the matter asserted but

6   rather to show what this witness did.

7          Objection overruled.

8      MR. MURPHY:  Thank you, Judge.

9      Q.   And you took her to Roseland Hospital?

10     A.   Yes.

11     Q.   Did you wait for her when she was at

12  Roseland Hospital?

13     A.   Yes.

14     Q.   Did you wait for her when you took her

15  home??

16     A.   Yes, I did.

17     Q.   Did Denise look any different when you

18  took her home from Roseland Hospital?

19     A.   Yes.

20     Q.   How did she look different?

21     A.   Her wrist was wrapped up.

22     Q.   Was that with a bandage?

23     A.   With a bandage.

24     Q.   Now, Mr. Johnson, did you take Denise

1    your granddaughter to Roseland Hospital any other

2    time beside that time?

3        A.    Yes, I did.

4        Q.    When was that, sir?

5        A.    January 10, 1987.

6        Q.    And why did you take her on that

7    particular day, sir?

8        A.    She had fell out in front there.

9            MR. LuFRANO:  Objection to what she had

10   done unless he saw it.

11           THE COURT:  The objection is sustained.

12           MR. MURPHY:

13       Q.    Did you see her fall that day, sir?

14       A.    I was in the house and I heard her

15   hollering.

16       Q.    And, when she hollered, could you tell

17   Judge Holt what happened, what she did?

18           Did she come into the house?

19       A.    She couldn't even open the door because

20   she crawled up on the porch.

21       Q.    And when she crawled up on the porch,

22   what did you do, Mr. Johnson?

23       A.    I opened the door for her.

24       Q.    And did you?

1        A.    Yes, I did.

2        Q.    And where did you go from there, sir?

3        A.    I taken her to Roseland Hospital.

4        Q.    When you got to Roseland Hospital, sir,

5    did you take her anywhere inside Roseland

6    Hospital?

7        A.    Well, when the nurse told me to come in

8    and take her into the X-ray room.

9        Q.    Did you do that?

10        A.    Yes, I did.

11        Q.    When you got to the X-ray room, what did

12    you do with her, sir?

13        A.    Put her in a wheel chair.

14        Q.    And did you leave her in the X-ray room?

15            Or do you remember what happened when you

16    got to the X-ray room?

17        A.    They told me to step outside the door.

18        Q.    Okay.

19            And on that particular date, sir, did you

20    wait for Denise to get finished at Roseland

21    Hospital?

22        A.    Yes, I did.

23        Q.    And when she was finished at Roseland

24    Hospital did she have anything with her that she

1    didn't have when she went in?

2        A.    She had a crutch with her.

3            MR. MURPHY:    Thank you, Mr. Johnson.

4            THE WITNESS:    That is all?

5            MR. MURPHY:    The attorney may have some

6    questions for you, sir.

7                    CROSS EXAMINATION ( )

8                    BY MS. PLACEK:

9        Q.    Mr. Johnson, if I say anything that

10   confuses you or you don't understand, you will ask

11   me about it, correct, you will ask me to just

12   straighten out the question, right?

13       A.    (Indicating.)

14       Q.    You have got to say "yes" because that

15   young lady over there has to take down your

16   testimony.  Okay?

17       A.    Yes.

18       Q.    During the time Denise was living with

19   you she was also a ward of the State, the

20   Department of Children and Family Services.

21           MR. MURPHY:    Objection, it's irrelevant.

22           THE COURT:    It may be relevant to the

23   term of who had responsibility for her care.

24               Objection overruled.

1          MS PLACEK:  Correct..

2     Q.   She was a ward of the State, as you got

3    paid by the State to take care of her, correct?

4     A.   Yes.

5     Q.   As a matter of fact, when the State's

6    Attorney sort of asked you about when you took her

7    to Roseland Hospital the first time, I think you

8    were going to say, yes, she had a green card or

9    the State paid for it, right?

10          MR. MURPHY:  Objection, Judge.

11          THE COURT:  Yes, what is the relevance,

12   Ms. Placek?

13          MS. PLACEK:  Judge, I'm going to go into

14   a certain matter that was brought up, not to

15   embarrass this gentleman, but as to change of

16   residency, unless the State is willing to

17   stipulate that this young lady was, in fact, a

18   ward of the department at the time.  I believe the

19   starting time they mentioned with this witness

20   would be 1986.

21          I'm trying to finish up just so in

22   closing remarks they will say that that wasn't

23   shown.

24          THE COURT:  The objection's--.

1                  MS. PLACEK:  I will withdraw it, Judge.

2          Q.    Let me ask you this, sir:

3                Her mother was alive at that time,

4      correct, Denise's mother was alive when she was

5      living with you, correct?

6          A.    Yes, she was.

7          Q.    And let me ask you this:  Isn't it

8      correct that Denise eventually left your home and

9      went to Mrs. Fields' home, correct?

10                 MR. MURPHY:  Objection, Judge, beyond the

11     scope.

12                 THE COURT:  Objection is sustained.

13                 MS. PLACEK:  Well, sir, let me ask you

14     this:  Calling your attention to 1987, did Denise

15     live with you that entire year?

16                 MR. MURPHY:  Objection.

17                 MS. PLACEK:  The State asked about 1987,

18     Judge.

19                 THE COURT:  I don't see how it's relevant

20     in connection with -- the objection is sustained.

21                 MS. PLACEK:

22         Q.    Sir, when you took her to Roseland

23     Hospital on January 10, 1987 you said that they

24     told you to take her in the X-ray room, correct?

1          A.    Right.

2          Q.    Describe the X-ray room?

3          A.    It's just like going through that door

4     and they had curtains and I just pushed her

5     wheelchair and they told me to step back.

6          Q.    When you say "curtains," approximately

7     where in the hospital, when you came in the door

8     and I'm speaking of the outside door or where?

9          A.    No.   It was about 2 rooms back further.

10          Q.    Further from what, sir?

11          A.    From the front door.

12          Q.    Thank you.

13                And what was in there besides the

14     curtains?

15          A.    (No response.)

16          Q.    What was in there besides the curtains?

17          A.    I don't know what all was in there.

18          Q.    Thank you very much, sir.

19                And you stepped outside of that door,

20     correct?

21          A.    Right.

22          Q.    And, you, as a matter of fact, didn't see

23     Denise for some time after that, correct?

24          A.    (No response.)

1        Q.    Is that correct, sir?

2        A.    Yes.

3        Q.    And let me show you what was previously

4    marked as People's Exhibit Number 8 for

5    identification, you identified that as Denise,

6    correct?

7        A.    Yes, it is.

8        Q.    Is that what Denise looked like when she

9    was living with you?

10       A.    (No response.)

11       Q.    Is that what she looked like when she was

12   living with you, sir?

13       A.    Yes, it is.

14       Q.    Tell me about how old is she in that

15   picture?

16       A.    She's about 11 years old.

17       Q.    Thank you.

18             Now, sir, in answer to the State's

19   questions, I believe you said that during 1986 to

20   '87, she was living with you, correct?

21       A.    Yes.

22       Q.    Did she live with you all of 1987?

23             MR. MURPHY:  Objection.

24             THE COURT:  I'm sorry, Ms. Reporter, can

1       I have the question back.

2               I think it was did she live with you.

3               MS. PLACEK:  All of 1987.

4               THE COURT:  The objection is sustained.

5               MS. PLACEK:

6       Q.    In this X-ray room were there several

7       beds in this X-ray room?

8       A.    Yes, it was.

9               MS. PLACEK:  Thank you very much.

10              That is all, Judge.

11              THE COURT:  Redirect?

12              MR. MURPHY:  I have no further questions.

13              THE COURT:  Thank you, Mr. Johnson, you

14      may step down.

15              MS. PLACEK:  Your Honor, for the purposes

16      of the record because of the court's ruling on

17      certain matters, my associate has gone out to have

18      a subpoena drawn for this gentleman, Judge.  So I

19      would just ask, Judge, since there is a motion to

20      exclude that let's put it this way so we don't

21      have a problem serving him so there is an

22      objection at a later time that he either be put in

23      a witness room or back to where he was staying,

24      Judge.

```
1              THE COURT:  Mr. Murphy?

2              MS. PLACEK:  Or we can go through his

3     testimony to save the gentleman a trip right now,

4     Judge, and I'll put him on.

5              MR. MURPHY:  Judge, I know that the

6     witness wants to quash the proceedings, I don't

7     know how that will go with the Court's ruling.

8              THE COURT:  I'll allow him to remain in

9     the courtroom but I will not entertain an

10    objection that he has been in the courtroom all

11    along and if Counsel wants him out of the

12    courtroom, I will order him out too, because he's

13    still a potential witness and falls under the

14    exclusionary rule.

15             MS. PLACEK:  .

16             THE COURT:  There is another matter if

17    the --

18             MR. MURPHY:  Judge, we will not raise an

19    objection to him being in the courtroom.

20             MS. PLACEK:  Judge, I have no objection

21    to him being in the courtroom, just as long as at

22    a later time there is not an objection from there.

23             MR. MURPHY:  James Hill.

24             May we proceed, Judge?
```

1          THE COURT:  Yes.

2          MR. MURPHY:  The State would call James

3     Hill.

4          THE CLERK:  Raise your right hand, sir.

5          THE COURT:  Sir, that microphone is on,

6     if you will speak directly into it and keep your

7     voice up, we'll all be able to hear you.

8          You may proceed, Mr. Cassidy.

9          J A M E S    H I L L, {}

10    called as a witness herein for the People of the

11    State of Illinois, having been first duly sworn,

12    was examined and testified as follows:

13              DIRECT EXAMINATION {}

14              BY MR. CASSIDY:

15    Q.    Sir, please state your name?

16    A.    James Christopher Hill, H- I- L- L-.

17    Q.    And how old are you, Mr. Hill?

18    A.    26 years old.

19    Q.    Where do you work?

20    A.    T.  Force Security.

21    Q.    What do you do for them?

22    A.    I am an assistant supervisor.

23    Q.    Calling your attention to August 2, 1988,

24    at approximately 9:30 in the morning, could you

1   please tell the Court where you were at that time?

2       A.   I was at 11720 South Princeton.

3       THE COURT:  11720 South Princeton.

4       MR. CASSIDY:  That is located in Chicago,

5   Cook County, Illinois?

6       A.   Yes, sir.

7       Q.   And how did you get there?

8       A.   I drove my mother there.

9       Q.   And what happened when you arrived there?

10      A.   When I an arrived there, I was there to

11  pick up my cousin Carlina and I seen Mr. Hendricks

12  coming down the street.

13      Q.   The person you refer to as Mr. Hendricks,

14  do you see him in court today?

15      A.   Yes, I do.

16      Q.   Please point to him and describe what he

17  is wearing?

18      A.   He is wearing a gray sweater with a black

19  streak down the sleeve.

20      MR. CASSIDY:  Let the record reflect he

21  has indicated the defendant.

22      THE COURT:  It may so reflect.

23      MR. CASSIDY:

24      Q.   Was anyone with Mr. Hendricks?

1       A.    Yes, he had a young lady with him.

2       Q.    What happened when you saw him?

3       A.    When I saw him my cousin Carlina told

4    me--

5             MS. PLACEK:  Objection.

6             THE COURT:  Objection sustained.

7             MR. CASSIDY:

8       Q.    After your cousin said something to him

9    what happened?

10      A.    I walked up to him and asked him had he

11   seen my cousin Denise.

12      Q.    Who was present?

13      A.    Myself, my mother, my cousin Carlina and

14   the young lady that he was with.

15      Q.    When you asked him that question, what,

16   if anything, did he say?

17      A.    He said no, he hadn't seen her.

18      Q.    What, if anything, did you say?

19      A.    I told him that my cousin Carlina --

20      Q.    Please continue, Mr. Hill?

21      A.    I told him that my cousin Carlina and my

22   sister Yolanda had said that they saw him with

23   her.

24            MS. PLACEK:  Well, now we are getting

1    into double hearsay.

2             THE COURT:  This is conversation that he

3    had with the defendant.

4             MS. PLACEK:  I apologize, Judge.

5             MR. CASSIDY:  Please continue, Mr. Hill.

6        A.    That they had seen him with my cousin

7    Denise the day before.

8        Q.    And what, if anything, then did he say?

9        A.    He said no he hadn't seen her.  Then I

10   described her to him.  I said the young lady that

11   was sitting on the porch and he said yes, I seen

12   her at or about 9:30 that night on my porch with

13   my nephew, Chew.

14       Q.    And, what happened then?

15       A.    He said that he was going to walk the

16   girl that he was walking with to the corner and he

17   would be right back.  He left then came back.

18       Q.    Did he then walk to the corner with the

19   girl?

20       A.    Yes.

21       Q.    What happened then?

22       A.    He later then came back.

23       Q.    Did the same girl come back with him?

24       A.    No, he came back alone.

1    And I asked him, I said, "You are sure

2 you haven't seen her?" He said, "No." I said,

3 Well, we are looking for her and the police are

4 looking for her, if you seen her or know anything

5 will you let us know?" He said he seen her on

6 119th Street and when he seen her he asked her

7 what was she doing there and he told her to go

8 home.

9   Q. Did he say when he saw her other than

10 119th Street?

11   A. No, he didn't give me any time at all.

12   Q. And when he told you he saw her talking

13 to Chew on his front porch was he referring to his

14 front porch, Hendricks's front porch?

15    MS. PLACEK: Objection.

16    THE COURT: The objection is sustained.

17    MR. CASSIDY:

18   Q. Did he tell you whose front porch he seen

19 her talking to Chew?

20    MS. PLACEK: Objection.

21    THE COURT: Overruled.

22    THE WITNESS: He said it was his front

23 porch that he seen Chew talking to Denise on.

24    MR. CASSIDY:

1          Q.    And he said at 9:30.

2                Did he say 9:30 a.m. or 9:30 p.m.?

3          A.    9:30 p.m..

4                MR. CASSIDY:  May I have just a moment,

5     please, Judge?

6                THE COURT:  Sure.

7                    (There was a brief pause.)

8                MR. CASSIDY:  No further questions.

9                THE COURT:  Cross?

10                   CROSS EXAMINATION{}

11                   BY MS. PLACEK:

12         Q.    Mr. Hill, you were the gentleman who

13    previously testified, I believe, on this summer on

14    motions concerning this same matter, correct?

15         A.    Yes, ma'am.

16         Q.    Mr. Hill, approximately what time did you

17    have this conversation with Mr. Hendricks?

18         A.    About 9:30 a.m..

19         Q.    So 9:30 a.m. hadn't passed that day,

20    correct?

21         A.    I didn't understand the question..

22         Q.    Well, sir, you had it at Nine o'clock in

23    the morning, correct?

24         A.    I had the conversation with Mr. Hendricks

1    at Nine o'clock that morning.

2        Q.   So 9:30 in the morning hadn't come yet,

3    correct?

4        A.   9:30 p.m.?

5        Q.   On August 2 hadn't come yet?

6        A.   No.  I talked to him Nine o'clock a.m. on

7    August 2nd.

8        Q.   So 9:30 in that morning hadn't come yet,

9    correct?

10            MR. MURPHY:  Objection.

11            THE COURT:  Do you really need that

12   answer?

13            MS. PLACEK:  No, Judge.  I think the

14   Court can tell.

15       Q.   Sir, let me ask you this:  You said

16   Mr. Hendricks had said that he had seen the young

17   lady at approximately 9:30 in the evening,

18   correct?

19       A.   Yes, ma'am.

20       Q.   What date?

21       A.   August 1st.

22       Q.   Did you ask him the date or is that your

23   assumption?

24       A.   No, I did not ask him the date.

1      Q.   Did he give you the date or was the

2   conversation similar to the way you explained it

3   to the State's Attorney while testifying for his

4   Honor Judge Holt?

5      A.   He did not give me a date.

6      Q.   So in other words when you say 9:30, that

7   is your assumption.

8           9:30, August 1st that's your assumption,

9   correct?

10          MR. CASSIDY:   Objection, Judge, he didn't

11   offer an assumption.

12          THE COURT:   Overruled.

13          MS. PLACEK:   That's your assumption,

14   correct?

15     A.   Yes, ma'am.

16     Q.   Now, calling your attention to this next

17   conversation, the one when Mr. Hendricks had

18   walked this girl to the corner and then came back

19   to where you and your other relatives were

20   standing, did you ask him what date he supposedly

21   told you that he saw the girl on 119th Street?

22     A.   No, ma'am.

23     Q.   Thank you.

24          One final question:

1              Do you know a gentleman by the name of

2    Michael Walker?

3         A.   I know a Michael but I'm not familiar

4    with last names.

5         Q.   Let me ask you this:  You mentioned that

6    you were out with a certain relative that morning

7    looking for the young lady, correct?

8         A.   Yes, ma'am.

9         Q.   One of them was your cousin Caroline?

10        A.   Carlina.

11        Q.   What's her last name?

12        A.   McCoy.

13        Q.   Now, Carlina McCoy to the best of your

14   knowledge do you know where she was the night

15   before?

16        A.   Yes, ma'am.

17        Q.   Was she looking for Denise?

18        A.   Yes, ma'am.

19        Q.   Was she looking for Denise with you?

20        A.   No, ma'am.

21        Q.   Let me also ask you this, sir:  This

22   conversation that you allegedly had with

23   Mr. Hendricks, would it be correct in saying that

24   both of them put together took no more than about

```
1     two or three minutes?

2          A.    Give or take five minutes.

3          Q.    Two or three minutes?

4          A.    Yeah, about five.

5               MS. PLACEK:  Thank you, that's all.

6               Motion to strike, Judge, as to the prior

7     party as to a conclusion as to dates, Judge, and

8     relevancy.

9               THE COURT:  Overruled.

10               Redirect?

11               MR. CASSIDY:  No; no questions.

12               THE COURT:  Thank you, Mr. Hill, you may

13     step down.

14               (Witness was excused.)

15               MR. MURPHY:  Your Honor, the People would

16     call John Fassl.

17               MS. PLACEK:  Judge, for the purposes of

18     the record, we now have a subpoena for Mr.

19     Johnson.  If we can go through the niceties of

20     asking him to step outside of the courtroom and

21     serving him there. .

22               It's set for the 19th.

23               THE COURT:  Do what you have to do,

24     Mrs. Placek.   When you have him served with a
```

1    subpoena, I'll take steps to enforce your

2    subpoena.

3              THE COURT:  Raise your right hand.

4                   (Witness was sworn.)

5              THE COURT:  Sir, that microphone is on,

6    if you will speak directly into it, we'll all be

7    able to hear you.

8              THE WITNESS:  Yes, sir.

9                 J O H N    F A S S L, {}

10   called as a witness herein for the People of the

11   State of Illinois, having been first duly sworn,

12   was examined and testified as follows:

13                   DIRECT EXAMINATION

14                   BY MR. MURPHY:

15       Q.    Would you please state your full name?

16       A.    Officer John Fassl, F- A- S- S- L-; Star

17   3142, assigned to the Chicago Police Department.

18       Q.    And how long have you been with the

19   Chicago Police Department?

20       A.    Five years.

21       Q.    And what is your assignment now?

22       A.    Currently I am assigned to the Gun Task

23   Force South.

24       Q.    And, Officer Fassl, I would like to draw

1    your attention to the date of August 8, 1988, do

2    you recall that particular day?

3        A.    Yes, I do.

4        Q.    Do you recall what your assignment was on

5    that day?

6        A.    That date I was assigned to uniform

7    patrol beat 356 on the second watch, would be the

8    day shift, normally runs 8 in the morning to 4:30

9    in the afternoon.

10       Q.    And, Officer Fassl, some time during your

11   shift did you have occasion to receive a call to

12   go to 251 West 117th Street?

13       A.    Yes, I did.

14       Q.    Were you with a partner on that date?

15       A.    No.    That date I was working alone, I was

16   assigned with another officer, Officer Tom Hughes

17   was working uniform beat, 3532 and we were

18   assigned to the same assignment at 251 West 117th

19   Street.

20       Q.    That is one of the areas at that time

21   that you patrolled?

22       A.    That is correct, that is within the

23   boundaries of a police District.

24       Q.    Are you familiar with the address of 251

1    West 117th Street?

2        A.    Yes, I am.

3        Q.    Can you describe that area?

4        A.    The area of 251 West 117th Street is just

5    east of the corner of 117th and Princeton Street

6    in the City of Chicago.  Located at that address

7    at the time was an abandoned house with a garage

8    in the rear.

9        Q.    Was the garage attached or unattached?

10       A.    It's an unattached garage.

11       Q.    Officer Fassl, when you arrived at that

12   location, could you tell Judge Holt what you did?

13       A.    At the time of arrival, the nature of the

14   call was suspicious odor.  We arrived at that

15   location in the rear, pulled in the alley, and I

16   did detect a suspicious odor coming from that

17   location.

18       Q.    And when you detected that odor, what did

19   you do?

20       A.    Exited my vehicle and was directed to the

21   garage by a witness who had called the police.

22   Went in that garage and observed a body in the

23   southeast corner of that garage.

24       Q.    And when you refer to the garage, what

1    garage are you referring to?

2         A.    The garage at the rear of 251 West 117th

3    Street.

4         Q.    This is the abandoned house?

5         A.    That is correct.

6         Q.    Can you describe what you observed when

7    you saw the body?

8         A.    At the time I observed the body it was

9    laying in the southeast corner of the garage with

10   the head of the body pointed south?

11        A.    The victim was laying on her stomach, her

12   hands bound behind her back, she was partially

13   disrobed.

14        Q.    And, Officer Fassl, when you say her

15   hands were bound behind her back, can you describe

16   how they were bound?

17        A.    Yes.  I looked down and I observed that

18   they were bound by what appeared to be a set of

19   shoe laces.

20        Q.    Now you also testified that the victim

21   appeared to be disrobed, can you describe?

22        A.    Partially disrobed, the victim had on a

23   pair of pants, she had a bra, that was on, she was

24   laying face down, the straps on the bra were

1    partially pulled down off of her shoulders.

2          She had what appeared to be an article of

3    clothing tied around her neck and there was also

4    appeared to be a second shoe lace also tied around

5    her neck.

6       Q.   Now, what observations did you make of

7    the victim with regards to the pants she was

8    wearing?

9       A.   The pants appeared to be white or light

10    in color and they appeared to be knee length, what

11    are commonly referred to as pedal pushers.

12       Q.   Officer, was there anything about the

13    condition of the pants?

14       A.   They were soiled and the pants were also

15    unfastened.

16       Q.   Can you tell us how they were unfastened?

17       A.   At the time the victim was face down but

18    the pants were open.

19       Q.   Where were they open?

20       A.   At the front.

21       Q.   Were you able to determine what was

22    around the victim's neck, other than you describe

23    what you indicated was a shoe lace, you also

24    described another item, were you able to determine

1    what that item was?

2         A.    It was a dark-colored object of clothing,

3    I believe it to be the victim's top since she was

4    partially disrobed.

5         Q.    In addition to the items that you

6    described, did you see any other clothing items

7    around the area where the victim was at?

8         A.    At the time the victim had one shoe on.

9         Q.    Which one?

10        A.    The right shoe and I also observed the

11   left shoe was off the victim's foot and it was

12   lying up near the victim's head on what would be

13   the left side of the body.

14        Q.    Were there any shoe laces in those shoes?

15        A.    No.  Both shoes had no shoe laces in

16   them.

17        Q.    Was anything unusual or that you noted

18   about the shoes themselves?

19        A.    I noted the left shoe which was up by the

20   victim's head would appear to be red magic marker

21   had the name "Denise" written on the side of the

22   shoe.  I also noted a brand name of "Princes" on

23   the right shoe.

24        Q.    And what color were those shoes at the