CASE NO. _O8cv 1589_

ATTACHMENT NO. _10_

EXHIBIT _____

TAB (DESCRIPTION) _____

1    time?

2         A.    They were white, light-colored shoes.

3         Q.    Officer Fassl, at the time when you

4    observed the victim, were you able to observe what

5    condition she was in?

6         A.    At the time we discovered the body it was

7    in an high state of decomposition, there was

8    slippage of skin from the face and large

9    infestations by maggots on the body.

10        Q.    Officer Fassl,  were you one of the

11   original officers, if not one of the originals,

12   the original officer on the scene?

13        A.    Yes, Officer Hughes and I arrived

14   simultaneously.

15        Q.    As one of the original officers

16   on a crime scene, what is your duty?

17        A.    The main responsibility of the initial

18   officer is protection of the crime scene until

19   Area 2 violent crime detectives can arrive, crime

20   personnel is also responsible for logging who

21   arrived on the crime scene and then to protect our

22   crime scene.

23        Q.    Officer, approximately what time did you

24   arrive, do you recall?

1          A.    It was approximately 2:24 p.m..

2          Q.    That's in the afternoon?

3          A.    On the afternoon of 8, August, '88.

4          Q.    Officer, you testified that there were

5     two items of clothing around the neck, a shoe lace

6     and what you believe was a top, is that correct?

7          A.    That is correct.

8          Q.    Could you describe the top itself, was

9     there anything unusual about the way that top

10    appeared--

11              Strike that.

12              Let me rephrase the question.

13              Was the top pulled up?

14              MS. PLACEK:  Objection.

15              THE COURT:  Objection sustained.

16              MR. MURPHY:  I will withdraw it.

17         Q.    Can you describe where the shoe laces and

18    the top were in relation with being around the

19    neck?

20         A.    The shoe laces appeared to be at the base

21    of the neck closest to the shoulder, where as the

22    top it appeared to be higher at the top of the

23    neck.

24         Q.    And what would be just below the chin?

1        A.    At the back of the neck but it appeared

2    to be at the chin and just below the chin level.

3        Q.    The top was noted then?

4        A.    That is correct.

5        Q.    When you say noted, what happened?

6        A.    There was a large, what would be a common

7    knot, a large knot tied at the rear at the back of

8    the neck.

9        Q.    And, Officer Fassl, you testified in

10   describing the state of decomposition you

11   described maggot infestation, is that correct?

12       A.    That is correct.

13       Q.    Was that in and around the area of the

14   body?

15       A.    Yes.

16       Q.    There were garbage bags near the victim

17   as well?

18       A.    When I initially discovered the body of

19   the victim, there were garbage bags actually on

20   top of the victim.

21       Q.    Was that maggot infestation in and around

22   those garbage bags as well?

23       A.    Yes, it was.

24            MR. MURPHY:   May I approach the witness,

1    Judge?

2            THE COURT:  You may.

3            MR. MURPHY:

4        Q.    Officer Fassl, I'm going to show you what

5    has been previously marked as People's Exhibit

6    Number 1, do you recognize the person shown in

7    that photograph?

8        A.    Yes, I do.

9        Q.    Who do you recognize that person to be?

10       A.    The body.

11            MS. PLACEK:  I would like to see it.

12            You had asked who it was.

13            MR. MURPHY:

14       Q.    Officer, could you please describe what

15    is shown in People's Exhibit Number 1?

16       A.    This is the photo of the body that I

17    discovered in the garage at the rear of 251 West

18    117th Street.  This would be a morgue photo that

19    was taken later, the body is turn over on it's

20    back and the body has also been cleaned up.

21            MS. PLACEK:  With all due respect, -- no

22    knowledge of testifying as to the matter stated.

23            THE COURT:  The objection's overruled.

24            MR. MURPHY:  Thank you, Officer.

1          Q.    Officer, I'm also going to show you what

2     has been marked People's Exhibit Number 17 for

3     identification, could you please describe?

4          A.    What is shown in this photo would be the

5     south alley of 250 West block of 117th Street.

6     This photo would be taken from west to east, it

7     shows the alley from Princeton, eastbound to the

8     T.

9               On the left is the shrubbery that

10    surrounded the garage at the area of 251 West

11    117th Street.

12         Q.    Officer, I'm going to ask you to take

13    this marker, please mark the area where the garage

14    is shown on this photograph, as best you can.

15              THE WITNESS:   (Indicating.)

16              MR. MURPHY:   Thank you.

17         Q.    I'm also going to show you what has been

18    marked as People's Exhibit Number 18, could you

19    please look at that and describe it please?

20         A.    This is the south alley of 25000 block of

21    117th Street of west Chicago.  This photo would be

22    taken from east to West looking toward Princeton

23    just from the T-alley.

24              The garage which was at the rear of 251

1    West 117th Street is on the right of this photo

2    behind some dense shrubbery.

3        Q.    Again, Officer, I would ask you to mark

4    the area of the garage?

5        A.    You can see a portion of the garage in

6    this photo through the leaves there.

7        Q.    Thank you.

8            Officers, I'm also going to show you what

9    I'm marking as People's Exhibit Number 19 for

10   identification purposes.

11           I would ask you to look at this

12   photograph and tell me what is depicted?

13       A.    This is the rear, what would normally be

14   an overhead door of the garage at the rear of 251

15   West 117th Street.  This photo would be taken from

16   the south looking north, that is the door faced

17   south towards the T-alley.

18           At the time the discovery of the body

19   this was the condition of which the garage door

20   was found, which was boarded up.

21       Q.    Was the condition of that door ever

22   altered during the time you were at the scene?

23       A.    Yes, later time at the request of Area 2

24   violent crimes and officers from the crime lab

1    this door was pulled down for better access to the

2    garage.

3         Q.   Thank you.

4              I'm also going to show you what has been

5    marked People's Exhibit Number 20 for

6    identification purposes.

7              Would you please describe to Judge Holt

8    what is shown in that photo?

9         A.   This photo on the left side of this

10   photograph shows the garage at the rear of 251

11   West 117th Street.

12             This photo was taken from east to west,

13   it also shows the rear of the house at 251 West

14   117th Street.  What you see here shows the

15   boarded-up window on the south of that abandoned

16   residence.

17        Q.   Thank you.

18             Also showing you what has been marked as

19   People's Exhibit Number 21 for identification

20   purposes.

21             Could you please describe what is shown

22   in that photo?

23        A.   This is again what was the overhead door

24   on the south side of the garage at the rear of 251

1    West 117th Street after the boards that were

2    initially covering that had been removed at the

3    request of Area 2 violent crimes.  Now the door is

4    completely open and you can see what the boards

5    that were covering that, we placed to the right of

6    the garage.

7         Q.    Thank you.

8              I'll also show you what has been marked

9    as People's Exhibit Number 22 for identification

10   purposes.

11             Would you please describe what's shown in

12   that photo?

13        A.    Here in this photo it shows the rear

14   which would be the south side of the house at 251

15   West 117th Street.  It also shows the garage,

16   which is to the right here at the rear of 251 West

17   117th Street.

18             When I arrived on the scene, this would

19   be the alley right here, the south alley of West

20   117th Street.  The garage door was open as in the

21   manner it is right now when we arrived on the

22   scene.

23        Q.    Thank you.

24             I'm also going to show you what has been

1      marked People's Exhibit Number 23 for

2      identification purposes and please describe what's

3      shown in that photo?

4          A.    This is the garage at the rear of 251

5      West 117th Street.  It shows this service door

6      which would be on the West side.  That door was

7      open when we initially arrived.  It also shows the

8      boarded-up window on the north side and the second

9      boarded-up window on the West side of the garage.

10         Q.    Thank you.

11               And, Officer, in the photographs I have

12     shown you People's Exhibits 17, 18, 19, 20, 21, 22

13     and 23, do those photographs truly and accurately

14     portray the home at 251 West 117th Street and the

15     garage exterior area as it appeared on August 8,

16     1988?

17         A.    Yes they do.

18         Q.    I'm also going to show you now what has

19     been marked as People's Exhibit Number 24 for

20     identification purposes.

21               Would you please look at that and tell

22     the Judge what's shown in that photo?

23         A.    This is the shot of the interior of the

24     garage at the rear of 251 West 117th Street after

1    the rear doors which had been boarded-up had been

2    removed.

3              At this time the body of the victim has

4    been removed, this area here in the lower right is

5    approximately where the body of the victim had

6    been located.  As you can see there is still some

7    garbage and there's what appears to be maggot

8    infestation on the floor and bodily fluids.

9        Q.    Officer, would you please circle that

10   area.

11             Thank you.

12             I'm also showing you what I am marking as

13   People's Exhibit Number 25 for identification

14   purposes.

15             Could you please describe what's shown in

16   that photo?

17       A.    This is the interior of the garage at the

18   rear of 251 West 117th Street with the rear door

19   on the south of the garage still ·in place.

20    Here's the body of the victim.  This photo would

21   have been taken from the service door which is

22   located on the West side of that garage.

23             As I entered the garage this would be

24   what was first seen.  As you can see the body of

1      the victim is laying there, 3 bags of garbage, one

2      near the victim's head, one by the side and one

3      near the victim's side.

4              In this photo you can see the victim has

5      a gym shoe on the right foot and no shoe on the

6      left foot.  There is seepage of bodily fluid at

7      the rear of the victim's body near the feet.

8          Q.   Thank you.

9              I'm also going to show you what has been

10     marked, People's Exhibit Number 26, can you

11     describe that to us?

12         A.   This would be a photo of the victim in

13     the original position as what she was found.  That

14     is the southeast corner of the garage at the rear

15     of 251 West 117th Street with the head of the

16     victim pointing to the south.

17             It further illustrates the 3 bags of

18     garbage that were located on the victim.  These

19     are the victim's head, these are the victim's arms

20     which were tied behind her back, the victim's

21     buttocks.  You can see the victim's feet, here and

22     there, one with the right shoe on, left with no

23     shoe.  You can see the high state of decomposition

24     of the victim at the time, and the maggot

1    infestation around the victim, on top of the
2    victim and near the garbage.
3        Q.   I'm also showing you what has been marked
4    previously as People's Exhibit Number 27.
5             What is shown in that photo?
6        A.   That is a close up of the victim, same
7    photo.  As you can see here the victim is lying
8    face down, with an arm tied behind the victim's
9    back, thumb up, the victim's buttocks and rear
10   leg.
11            White gym shoe on left foot without shoe,
12   that shoe is located up here.  You can see the
13   heel of that shoe.
14            You can see the maggot infestation all
15   along the back of the victim, heavy infestation on
16   the right leg and all around the rear of the
17   victim and the victim's left side.
18       Q.   I'm also showing you what has been
19   marked, People's Exhibit Number 29.
20            THE COURT:  28.
21            MR. MURPHY:  Twenty-eight, Judge, I'm
22   sorry.
23       Q.   Could you please tell Judge Holt what is
24   depicted in this photo?

1          A.    Shown here is a close up of the victim,

2     concentrated on the head, the back, the arms and

3     the buttocks of the victim.

4               You see the victim's face down with the

5     head partially resting on a piece of wood, the

6     victim's left arm tied to the lower, the right arm

7     comes down to the bag of garbage, the victim's

8     buttocks where the pants are open, and the back

9     because they were open down in the front and the

10    space and the heavy maggot infestation all around

11    the victim and on the victim.

12         Q.    Officer Fassl, I will also show you what

13    has been marked previously People's Exhibit Number

14    29, can you tell Judge Holt what is depicted in

15    this photo?

16         A.    This is a close up of the victim showing

17    the victim's face down, head turned to the right.

18    You can see the victim's hair.  The victim's face

19    with skin slippage showing.

20              There is an article of clothing which was

21    located around the victim's neck with the knot

22    tied in the rear of that clothing, it shows the

23    victim's back.  The victim had a bra on.  As I

24    said earlier, the straps of the bra partially

1    pulled down off the victim's shoulders.  Also

2    shows her hands tied around her back.  There you

3    can see the shoe lace, and there it shows the

4    advanced state of decomposition and heavy

5    infestation of maggots.

6           Also on the left side of the victim near

7    her head you can see her left gym shoe in this

8    photo where it says "Denise" and what appears in

9    red magic marker written along the side of the

10    shoe.

11       Q.   Officer, could you please circle the area

12    on the shoe where you see the name Denise?

13       A.   (Indicating.)

14       Q.   Will you also circle the area where you

15    described the top, could you please circle where

16    that's shown in the photo?

17       A.   (Indicating).

18       Q.   Thank you.

19           I'm also showing you what has been marked

20    as People's Exhibit Number 30 for identification

21    purposes.

22           Can you tell Judge Holt what that

23    photograph depicts?

24       A.   This is a photo of the victim, standing

1    over the victim.  Shows the back of the victim's

2    head, it shows the top with the knot that was tied

3    at the rear of the victim's neck.

4           Below that, lower than the top, you can

5    see the shoe lace that was also tied around her

6    neck but at a lower point than the top.

7           In this photo you also see the shoe which

8    is on the left side of the victim.  You can see

9    from the angle of this photo you can see the "D-

10    E- N-" the start of "Denise" on the white shoe

11    here.  Shows the victim's bra strap pulled down

12    and where one of the bags of garbage was located.

13        Q.   Thank you.

14           Also showing you what has been marked

15    People's Exhibit Number 31 for identification

16    purposes.

17           Do you recognize that photo?

18        A.   Yes, I do.

19        Q.   What does that show?

20        A.   This shows the victim.  This was also

21    taken from a position standing above the victim,

22    the victim laying on her back, her hands tied

23    behind her back.  This is the victim's buttock

24    area where you can see where the pants had been

1    undone at the front.  There is room in here where

2    they have come away from the back of the victim.

3    And you can also see where the victim is found

4    there is a bag of garbage that was thrown

5    partially on top of the victim's head and another

6    one thrown on the right side of the victim.

7        Q.    I'm also going to show you what has been

8    marked as People's Exhibit Number 32.

9              Can you tell Judge Holt what that

10   photograph shows?

11       A.    This is a photograph taken from above the

12   victim.  It shows the back of the victim's head,

13   you can clearly see the top is tied, the knot in

14   the rear, below that you see the shoe lace that

15   was also tied around the victim's neck.

16             To the left of the victim's head is the

17   left shoe with the name "Denise" printed in a red

18   marker along the side of the shoe.

19       Q.    And, Officer, I'm going to ask you at

20   this time to circle the area showing both the top

21   tied around the victim's neck and also the shoe

22   lace which you observed around the victim's neck?

23       A.    (Indicating.)

24       Q.    Thank you.

1          I'm also going to show you what has been
2      marked as People's Exhibit Number 33 I'm going to
3      ask you to look at this photo and tell me what it
4      shows?
5          A.    This is a photo again taken from above
6      the victim at a closer angle.  It shows the back
7      of the victim's head, top tied around the victim's
8      head, see the shoe lace which is tied lower than
9      the top, just below that.
10          Also shows a closer angle of the gym shoe
11      the left of the victim's name, the name "Denise"
12      in red magic marker on the side of that gym shoe.
13          Q.    Officer Fassl, could you please circle
14      the area on the gym shoe which shows the name
15      "Denise"?
16          A.    (Indicating.)
17          Q.    I'm also showing you what has been marked
18      as People's Exhibit Number 34 for identification
19      purposes, would you please look at that photo and
20      tell Judge Holt what's shown in that photo?
21          A.    Shown here is a close up of what would be
22      the back of the head and the neck and the upper
23      back of the victim.
24          This shows the top that had been tied

1     around the victim's neck, noted in the rear, is

2     directly below that is what appears to be a shoe

3     lace of the victim also tied in a knot in the rear

4     which is lower than the top, closer to the base of

5     the neck.

6          Q.    I am also showing you what has been

7     marked as People's Exhibit Number 35.

8               Officer, would you look at that

9     photograph and tell Judge Holt what that shows?

10         A.    This is again a photo of the rear of the

11    victim's head, neck and upper back.  It shows the

12    top, which is on the top of the victim's neck, the

13    knot at the rear, below that at the base of the

14    victim's neck, shows a shoe lace, there's heavy

15    maggot infestation, the victim's back, and here is

16    the bra strap of the victim that was pulled down

17    off her shoulder.

18         Q.    Officer, if you would, I would like you

19    to mark separately the area where the top is on

20    the victim' neck and also the area where the shoe

21    lace is, if you can. do that?

22         A.    This is the area of the top with a knot

23    here, below that is the shoe lace.

24         Q.    Thank you.

1          I'm also showing you what has been marked

2     as People's Exhibit Number 36.

3          Do you recognize who is shown in that

4     photo?

5          A.   Yes, I do.

6          Q.   What is that?

7          A.   This is the victim facing face down as

8     she was found face down.  It shows the lower part

9     of the neck of the victim, the back and the

10    buttocks.  It illustrates how the victim's hands

11    were tied behind her back, it illustrates the shoe

12    laces that were used to bond the victim's hands,

13    also visible are the pants that the victim was

14    wearing at the time she was found and the bra,

15    which was pulled down off her shoulders.

16         Q.   Officer, would you mark the area where

17    the shoe lace is shown tying the victim's hands?

18         A.   (Indicating.)

19         Q.   Thank you.

20         I'm also going to show you what I'm

21    marking as People's Exhibit Number 37.

22         Would you tell Judge Holt who is shown in

23    that photo?

24         A.   This is a close up photograph of the

1    victim's bound hands.  It shows the victim's back,

2    the hands, that they are bound.  Also illustrated

3    here is the shoe lace which the victim hands were

4    bound.  It also shows the victim's pants and the

5    top of the pants and as they are pulled away as

6    they are unfastened in the front.  You can also

7    see the advanced state of decomposition, the

8    slippage starting, the victim's hands.

9        Q.    Officer Fassl, I'm also showing you what

10   has been marked as People's Exhibit Number 30, at

11   least I'm marking People's Exhibit Number 30A,

12   would you please look at that photo and tell the

13   Judge what that photo shows?

14       A.    This is again a close up of the victim's

15   hands with the hands bound behind the victim, it

16   shows the shoe lace that was used to bind the

17   victim's hands, evident of the photo above that is

18   the victim's bra partially pulled up off her

19   shoulders.

20       Q.    I am also showing you what is being

21   marked as People's Exhibit Number 39.  Would you

22   please describe what that photograph shows?

23       A.    This is a photograph that was taken after

24   the victim was turned over when found laying on

1    her stomach.  She was rolled over onto her back.

2    This is a photo, shows the victim's bra partially

3    pulled down off the victim's shoulder, shows

4    advanced state of decomposition, slippage skin

5    of the victim's face, the top, noted around the

6    victim's neck is illustrated in the photograph.

7    It shows the pants the victim had on, the pants

8    that are open in the front, unfastened.

9        Q.    And that photograph shows the pants as

10   they were unfastened as they appeared on August 8,

11   '88?

12       A.    That is correct.

13       Q.    Could you please mark that with the

14   marker that you have.

15            I'm also going to show you what I'm

16   marking as People's Exhibit Number 40 and ask you

17   to look at that photograph and tell me what that

18   shows?

19       A.    This photo was taken after the officers

20   from the crime lab had lifted the victim.  She was

21   laying face forward, laid it back and then rolled

22   the body over, it shows the advanced stages of

23   decomposition, the slippage on the victim.  Again

24   it illustrates the top tied around the victim's

1    neck.  It shows a high level of infestation by

2    maggots, and this is the victim's bra, which had

3    been partially pulled off her shoulders.  As I

4    said, there was an advanced state of slippage in

5    the facial area.

6        Q.  When you refer to that, the face was, in

7    fact, no longer there?

8        A.  In this photo as you can see there is

9    basically no facial features left.

10        Q.  I'm also showing you what has been marked

11    as People's Exhibit Number 41.

12        Do you recognize what is shown in that

13    photo?

14        A.  Yes.  This is a photo of the victim, the

15    victim has now been turned over and laying on her

16    back, there is evidence the victim's hands is

17    still bound behind her back, then here it shows

18    the victim with her pants, the pants are open and

19    the front unfastened in the front.

20        Q.  Is that the condition she was in when

21    you-- although she has been cleaned up a little

22    bit, does that portray the condition she was in

23    when you observed her?

24        A.  Yes.

1    Q.   I'm also showing you what has been marked

2    as People's Exhibit Number 42, could you please

3    tell Judge Holt what that photograph shows?

4    A.   This is a photograph of the top that had

5    been tied around the victim's chin and upper neck,

6    showing the knot that was at the rear of the

7    victim's neck, which that's the way she was found

8    and you can look down and see the knot.

9    Q.   Also showing you what has been marked as

10   People's Exhibit Number 43, do you recognize what

11   that photograph shows?

12   A.   This is a photograph of the victim, shows

13   the victim's head, the victim's right ear, what

14   had been the victim's face.  It shows the shoe

15   lace across the victim in the neck area and the

16   top which was around the victim's neck, noted in

17   the rear.

18   Q.   I am also showing you what has been

19   marked as People's Exhibit Number 44.

20        Do you recognize what has been shown in

21   that photo?

22   A.   This is a photo taken from the left side,

23   it shows the victim's head, neck and shoulder

24   area, advanced state of decomposition of the

1    victim, slippage on the face.  It again shows the

2    shoe lace which was tied and knotted around the

3    victim's neck and the top that was tied and

4    knotted at the rear of the victim's neck.

5        Q.    And finally, I am going to show you what

6    I will mark as People's Exhibit Numbers 45 and 46,

7    can you describe to Judge Holt what's shown in

8    those 2 photographs?

9        A.    What's shown in these photographs, the

10   shoe laces that were found, one tied around the

11   victim's hands, because the victim's hands were

12   bound behind her body and the other one is a shoe

13   lace that was found tied, a knot around the

14   victim's neck.

15       Q.    Officer Fassl, with respect to these

16   photos, which I have shown you, People's Exhibit

17   24 up to and including People's Exhibit Number 46,

18   do those photographs truly and accurately show the

19   scene inside the garage at 251 West 117th Street,

20   the condition of the victim that was found there,

21   and the condition of various items of clothing as

22   they appeared and as she appeared on the date of

23   August 8, 1988?

24       A.    They do.

1          Q.   Officer Fassl, I'm also showing you what

2     has been marked as People's Exhibit Number 12 for

3     identification purposes, do you recognize what

4     Group Exhibit Number 12 -- Do you recognize what

5     those items are?

6          A.   Yes, I do.

7          Q.   What are they?

8          A.   These are the shoe, the right shoe, which

9     was found on the right foot of the victim, and the

10    left shoe was found on the left side of the head

11    of the victim on August 8, 1988 in the garage at

12    251 West 117th Street.

13         Q.   And are those shoes, do those shoes show

14    anything that you recognize from when you observed

15    the shoes on August 8, 1988?

16         A.   These shoes, as I found them on that

17    date, are without laces.  As I stated earlier, the

18    right shoe appears to be a name brand of "Princes"

19    on the side of the shoe.

20              The left shoe, which was illustrated in

21    quite a few of the photographs was found on the

22    left side of the body next to the head.  It shows

23    a marker the name "Denise" on the left side of the

24    shoe.

1          Q.   And, Officer Fassl, are those shoes

2     exactly the same as they appeared on August 8,

3     1988?

4          A.   No.  At that time, when I saw the shoes

5     they appeared a much lighter color, more white.

6          Q.   Since then they have deteriorated to some

7     extent?

8          A.   I would imagine being in the plastic bag.

9               MS. PLACEK:  Objection to what he

10    imagined.

11              THE COURT:  That part will go out.

12              MR. MURPHY:

13         Q.   Other than that they appeared to be the

14    same or substantially the same?

15         A.   Substantially the same, yes.

16         Q.   Officer, you testified that you are

17    familiar with the area in and around 251 West

18    117th Street, is that correct?

19         A.   That is correct.

20         Q.   Are you also familiar with 11720

21    Princeton?

22         A.   Yes, I am.

23         Q.   I am showing you a photograph which has

24    been marked as People's Exhibit Number 47.

1           Do you recognize what is shown in that

2    photo?

3      A.   Yes, it's a photo of the front of the

4    house and the front porch at 11720 South

5    Princeton, which the house here faces east, so the

6    picture would be taken from east to west.

7      Q.   I'm also going to show you what has been

8    marked as People's Exhibit Number 11, do you

9    recognize the area that's shown in that particular

10   photograph?

11     A.   The area that's shown here, this

12   photograph will be taken from approximately 11720

13   Princeton looking in what would be a northeasterly

14   direction.

15         MR. LuFRANO:  Objection to what it's

16   taken from unless he took it.

17         THE COURT:  No, overruled.  He can tell.

18         THE WITNESS:  Taking from a northeasterly

19   direction looking from the south alley of 117th

20   Street and which would be the alley between

21   Princeton and south alley between Princeton and

22   Yale.

23         It shows the areas -- this here is the

24   rear of the house at 251 West 117th Street.

1          Q.    And, Officer, does that, in fact, that

2    area as it exists today, at this time, there is no

3    garage located 251 West 117th Street, is that

4    correct?

5          A.    That is correct.

6          Q.    What is located there?

7          A.    Now, I believe all there is left is a

8    cement pad.

9          Q.    What if anything does that photograph

10    show in regards to the garage at 251 West 117th?

11          A.    It shows the actual garage, the garage at

12    the time of August, '88 would have been standing

13    approximately right here in the photograph, you

14    would be able to see it between the houses here

15    and the 2-flat on the right.

16          Q.    Could you please mark that on the photo

17    where the garage was approximately?

18          A.    (Indicating.)

19          Q.    And where's the house at 251 West 117th

20    Street, is that shown in this photo?

21          A.    This here with the dormer and the window

22    would be the house of 251 West 117th Street.

23          Q.    And the address of 251 West 117th Street,

24    where is that in relation to this house?

1        A.    That would be the house just west of 251

2    West 117th Street.

3        Q.    In fact, is that portion of that house

4    shown in the photograph?

5        A.    Yes, you can see the top of the roof

6    there.

7        Q.    I would ask you to mark that as well.

8        A.    (Marking.)

9        Q.    Officer, showing you what has been marked

10   People's Exhibit Number 9 for identification

11   purposes, do you recognize what is shown in that

12   photo?

13       A.    This is a photo of the rear, 251 West

14   117th Street.

15       Q.    Showing the residence and the pad where

16   the garage had been located and the photo also

17   depicts 255 West 117th Street and 259 West 117th.

18   In fact, 259 is right next door?

19            MS. PLACEK:   I am sorry, Mr. Murphy, I

20   thought the witness indicated 259 West 117th

21   Street ?

22            MR. MURPHY:   Judge, he did.  He said the

23   3 houses over was 259.

24       Q.    Officer, where is 255 West 117th?

1          A.    255 West 117th Street is the house

2     depicted here in the photograph directly west of

3     251 West 117th Street.

4          Q.    Would you please mark that?

5          A.    (Indicating.)

6          THE COURT:    What Exhibit?

7          MR. MURPHY:    Judge, this is People's

8     Exhibit Number 9, which had been previously marked

9     and identified on another day.

10         Q.    Also, Officers, you testified on the area

11    of the garage that is located in this photo, is

12    that correct?

13         A.    That is correct.

14         Q.    Could you please show that as well with

15    this marker?

16         A.    Certainly; the pad here where this garage

17    was located, this photo is taken from the south of

18    the alley.

19         Q.    I am also showing you People's Exhibit

20    Number 10 for identification purposes, do you

21    recognize what is shown?

22         A.    This photo shows the rear of the house at

23    251 West 117th Street.  It shows the side and the

24    rear of the residence located 255 West 117th

1    Street.

2              It also shows the pad where the garage

3    had been located at the rear of 251 West 117th

4    Street.

5         Q.   And finally, Officer, I am going to show

6    you what has been previously marked as People's

7    Exhibit Number 8, do you recognize what is shown

8    in that photo?

9         A.   This photo taken from the rear of 251

10   West 117th Street and the foreground of the

11   photograph you can see the cement pad where the

12   garage had been located, this would be the south

13   alley between Princeton, or Yale, Princeton, and

14   this depicts, this photograph here is the front of

15   the house, which faces east of 11720 South

16   Princeton showing the front of the house and the

17   front porch.

18        Q.   I am sorry for interrupting you.

19        A.   This photograph is taken from a

20   southwesterly direction from east to west.

21        Q.   Could you please mark where on that

22   photograph 11720 Princeton is shown?

23        A.   (Indicating.)

24        Q.   Now, Officer, with regards to this

1      particular photograph, People's Exhibit Number 47,

2      does that truly and accurately portray the way

3      11720 Princeton appeared on the date of August 8,

4      1988 to your knowledge?

5           A.    To the best of my knowledge, yes.

6           Q.    With respect to the other photographs

7      People's Exhibits 8, 9, 10 and 11, those

8      photographs do not portray the way the area in and

9      around 11720 Princeton at 251 West 117th Street

10     appeared on August 8, 1988, is that correct?

11          A.    That is correct.

12          Q.    In fact, these photographs were taken in

13     the winter time?

14          A.    Yes, they are taken in the wintertime.

15     The garage which on August 8, 1988 was located in

16     the area of 251 West 117th Street is now gone.

17          Q.    Other than the fact they were taken in

18     the winter and the garage is removed, do those

19     photographs truly and accurately portray the way

20     those buildings appeared on that date?

21          A.    Yes.

22          Q.    And the way they are related to one

23     another?

24          A.    Yes, they do.

1           MR. MURPHY:  Judge, I would ask that the

2    witness be allowed to step down from the witness

3    stand and approach the Exhibit, the diagram.

4           THE COURT:  Yes.

5           (Witness steps from the stand.)

6       Q.   Officer, I ask you to look at People's

7    Exhibit Number 6, do you recognize what this is?

8       A.   Yes.

9       Q.   What is this a diagram of?

10      A.   This is a diagram of the area from 117th

11   to 120 Wentworth to Harvard, located in the City

12   of Chicago.

13      Q.   Officer, does that diagram show the area

14   of -- perhaps not this scale -- but, at least,

15   show the area as it appears in open view?

16      A.   Yes.

17      Q.   Would that diagram aid you in describing

18   the area to Judge Holt?

19      A.   Yes, it would.

20      Q.   Officer Fassl,  if you would, would you

21   please use this marker and please mark the area

22   where the house is located, 11720?

23      A.   11720 South Princeton is approximately

24   here.  South on Princeton just south of the second

1    house south of the alley here.

2        Q.   If you could use a rectangle or whatever

3    it would take to show approximately the area that

4    the house filled?

5        A.   Indicate building.

6        Q.   And where is the front of the house,

7    would you make that with a "F."

8        A.   There would be the "F" of the house

9    facing east.

10       Q.   Now, Officer, I would also ask you to use

11   that marker you have and mark the area where the

12   house and garage were located at 251 West 117th

13   Street?

14       A.   The house would be located approximately

15   here, 3 houses east of the corner of 117th and

16   Princeton.  The garage is located at the rear of

17   251 West 117th Street here, just West of -- This

18   is a T.  The alley runs south, alley runs east and

19   west, the T-alley runs north and south, the garage

20   at that location is located just to the west of

21   that T-alley.

22       Q.   And, Officer Fassl, with the use of that

23   diagram, would you please mark the area where the

24   house is located at 255 West 117th Street?

1      A.    The house at 255 West 117th Street would

2   be directly next door just to the west of 251,

3   west 117th Street.

4                    (Witness resumes the stand.)

5             MR. MURPHY:

6      Q.    Officer, these photographs what I have

7   already identified, People's Exhibit Numbers 10

8   and 9, other than the distinctions that you have

9   already made, is there another distinction with

10  respect to the house that can be made in

11  comparison to August 8, 1988?

12     A.    The houses depicted in these photographs

13  is no longer abandoned, the windows are

14  unobstructed with shades.  On 8, August, '88, the

15  windows at the rear of the house and the rear had

16  been boarded over because the house was abandoned

17  at that time.

18             MR. MURPHY:    Thank you.

19     Q.    Officer Fassl, at some point after you

20  had taken control of the crime scene, was this

21  matter then turned over to Area 2 detectives to

22  your knowledge?

23     A.    That is correct.

24             MR. MURPHY:  No further questions, Judge.

1              THE COURT:  Before we commence cross

2      examination, we'll take a five-minute recess.

3                       (Whereupon there was a brief

4                        recess, after which the

5                        following proceedings were had:)

6              THE COURT:  Proceed, Counsel.

7                       CROSS EXAMINATION {}

8                       BY MS. PLACEK:

9          Q.    Officers you have identified quite a few

10     pictures in this court today?

11         A.    Yes.

12         Q.    And you have refreshed your memory with

13     your report?

14         A.    Yes.

15         Q.    Would it be correct to say that as you

16     sit there now and what you testified to with the

17     State's Attorney that actually what you are

18     testifying is your fresh memory and what you know

19     eventually happened in this case not on what you

20     recall or saw on the date in time?

21             MR. MURPHY:  Objection to the form of the

22     question.

23             THE COURT:  Overruled, if he answers it.

24             THE WITNESS:  My memory has been

1     refreshed from viewing the photographs and from my

2     original case report and that's the extent of my

3     presentation.

4              MS. PLACEK:

5        Q.    Well, aside from your preparation isn't

6     it correct that, in fact, what you have testified

7     today to is enhanced by what was later found out

8     by the Chicago police?

9        A.    Not at all.  My responsibilities and

10    duties at that time and in relation to the case

11    only relates to the Discovery of the body,

12    guarding the crime scene and my observations of

13    the crime scene at that time.  I had no further

14    interest in the case.

15       Q.    Well, let's talk about that for a moment.

16              Today you described for the State's

17    Attorney and for his Honor Judge Holt that you

18    clearly saw not only a piece of clothing, that is,

19    a blouse and shoe laces?

20              MR. MURPHY:  Objection, Judge.

21              MS. PLACEK:  Or shoe lace.

22              THE COURT:  What is the objection?

23              MR. MURPHY:  Well, the characterization

24    to the top as a blouse.

1          MS. PLACEK:  A top, and a shoe lace

2     around the victim's neck, correct?

3          A.   That is correct.

4          Q.   Isn't that correct, in fact, what you

5     have in your report, which was made on the date

6     and time in question, is that you saw a stocking

7     tied around the victim's neck, is that correct?

8          A.   Yeah, I believe that is what is stated in

9     the original case.

10         Q.   And as a matter of fact you mentioned

11    nothing about shoe laces or top, blouse or top

12    around the victim's neck, correct, in your report?

13         A.   That is correct, that is the initial case

14    report is just a summary.

15         Q.   I understand that, Officer, but in that

16    summary, what you have in there -- and correct me

17    if I'm wrong, is that, in fact, a stocking was

18    around her throat?

19         MR. MURPHY:  Objection asked and

20    answered.

21         THE COURT:  Overruled.

22         MS. PLACEK:  Is that correct?

23         A.   That is correct, Counsel.

24         Q.   Thank you.

1            And nothing about the top you described

2      or the shoe laces around her neck, correct?

3           A.    That is correct.

4           Q.    Now, also isn't it correct that at the

5      time, and I am speaking of the date and time in

6      question that you discovered the body, that the

7      body was in an advanced rate of decomposition,

8      that as a matter of fact you believed that the

9      body or the person might have been shot?

10               MR. MURPHY:  Objection, Judge.

11               THE COURT:  Basis?

12               MR. MURPHY:  Relevance.  What this

13     officer might have thought at that time.

14               THE COURT:  What difference would it make

15     what he thought?

16               MS. PLACEK:  Observations, Judge.

17               MR. MURPHY:  Objection, your Honor.

18               THE COURT:  The objection is sustained.

19               MS. PLACEK:  Well, Officer, isn't it

20     correct that when you came to the garage in

21     question you knew you were investigating a

22     homicide, correct?

23          A.    That's not correct.  We responded to a

24     call of a suspicious odor.

1          Q.    Well, once you got there you knew you

2     were investigating a homicide?

3          A.    At the time I was investigating the

4     discovery of a body.

5          Q.    Let me put it this way:

6                Isn't it correct that you thought an

7     instrumentality had been used on this body?

8                MR. MURPHY:  Objection.

9                THE COURT:  Overruled.

10               THE WITNESS:  As initial responding?

11               MS. PLACEK:

12         Q.    Did you understand my question, Officer?

13         A.    Yes, Counsel.

14         Q.    Can you answer it?

15         A.    Nowhere in my responsibilities --

16         Q.    Can you answer my question?

17         A.    I am trying to, Counsel.

18         Q.    Then isn't that correct that you thought

19    an instrumentality had been, in fact, used on the

20    body, yes or no?

21               MR. CASSIDY:  Objection; irrelevant of

22    what this officer thought.

23               THE COURT:  Overruled.  She's not asking

24    him about his thought process, even though that is

1        for the purpose of the question.

2                She is asking him about his observation,

3        his experience and interpretation of what he was

4        viewing, that's what the essence of her question

5        is.

6                And if you use the word "thought," that

7        does not include to me that he is speculating,

8        that he is guessing.  He is an expert.

9                MR. CASSIDY:  Judge, I understand; I

10       understand that.

11               THE COURT:  Your objection is overruled,

12       Mr. Cassidy.

13               MR. CASSIDY:  Judge, he is not testifying

14       to the cause of death.  What is the difference,

15       what is the relevance of it?

16               THE COURT:  It doesn't mean because he

17       can't testify to the cause of death that this

18       question is improper, it doesn't mean that the

19       question is improper.  It may not have much

20       probative value.

21               MR. CASSIDY:  Sure didn't.

22               THE COURT:  That may be, Mr. Cassidy,

23       that it may not have probative value but that

24       doesn't make it inadmissible.

1              MS. PLACEK:

2        Q.    Will you answer the question?

3              THE COURT:  Please read the question, Ms.

4    Reporter.

5                         (Whereupon the record was

6                          read as requested.)

7              THE COURT:  Isn't that true that you

8    thought that instrumentality had been used on this

9    body at the time you saw it?

10       A.    At the time I observed ligatures around

11   the neck, whether I made an inference from that, I

12   did not.

13       Q.    You did not think an instrumentality had

14   been used on the body?

15       A.    I observed ligatures about the victim's

16   neck.

17             MS. PLACEK:  Motion to strike, is

18   non-responsive, Judge.

19             THE COURT:  Motion is granted.

20             MS. PLACEK:  Isn't that correct you

21   thought an instrumentality had been used on the

22   victim?

23             MR. CASSIDY:  Objection, asked and

24   answered.

1              THE COURT:  He's not answered the

2      question.

3              Officer, if you can, you must answer it.

4              MS. PLACEK:  Isn't it correct that you

5      thought an unknown instrumentality was, in fact,

6      used on the victim, yes or no, Officer?

7          A.   Yes.

8          Q.   Isn't it true that you thought that

9      instrumentality was, in fact, a firearm?

10         A.   No.

11         Q.   Showing you -- well, let me ask you this:

12     Isn't it correct that you wrote a report dealing

13     with this matter?

14         A.   Officer Hughes prepared the report, I did

15     sign the report, yes.

16         Q.   When you signed it, did you adopt the

17     report as true and correct?

18         A.   Yes.

19         Q.   Isn't it correct that a portion of that

20     report deals with firearm use on the proposed

21     victim?

22         A.   Yes.

23         Q.   Isn't it correct, yes or no, Officer?

24         A.   Yes, it's a box for firearm.

1        Q.    Isn't it correct that there is a type of
2    weapon going down to type of gun, shotgun and also
3    DNA, meaning does not apply, correct?
4        A.    That is correct.
5        Q.    Is it correct that you marked "unknown
6    firearm?"
7              MR. MURPHY:  Objection, Judge.
8              THE COURT:  Objection sustained.
9              MS. PLACEK:  Wasn't it correct it's
10    marked on the report that you, in fact, adopted
11    "unknown firearm?"
12              MR. MURPHY:  Objection.
13              THE COURT:  Objection sustained.
14              MS. PLACEK:  Basis, Judge?
15              THE COURT:  It's collateral, Ms.  Placek,
16    it has no probative value.
17              MS. PLACEK:  I think it does, Judge.
18              THE COURT:  It's not collateral.
19    Mrs. Placek, ask another question.
20              MS. PLACEK:  Sir, at the time you
21    observed the body, did you believe the body to, in
22    fact, be shot?
23              MR. CASSIDY:  Objection, Judge.
24              THE COURT:  Objection sustained.

1          MS. PLACEK:  Well, you described the body

2     for the assistant State's Attorney?

3          A.   Yes.

4          Q.   Would I be correct in saying as part of

5     your description or part of what you saw on that

6     date and time you observed approximately a

7     five-foot-4 black female?

8          A.   That is correct.

9          Q.   Thank you.

10         Now, let me ask you this:  You spoke of

11    doors being broken open by the police or having it

12    broken by the police.  Am I correct in assuming

13    that the service door was, in fact, that is the

14    side door of the garage was open when you came?

15         A.   Yes.

16         Q.   Now let me ask you this, Officer:  You

17    mentioned the scene as you came upon it and you

18    described certain clothing you found there,

19    correct?

20         A.   Yes.

21         Q.   Isn't it correct that also found was a

22    purse with the word, "Las Vegas" on it, if you can

23    recall?

24         A.   I can't recall.

1        Q.    You cannot or can?

2        A.    I cannot.

3        Q.    Did you inventory any of the matters

4    found in the garage?

5        A.    No, I did not.

6        Q.    Approximately how long were you in the

7    garage?

8        A.    In the garage and in the area of the

9    crime scene for approximately 3 to 4 hours.

10        Q.    And you could still smell the body or an

11    odor coming from the garage, correct?

12        A.    That is correct.

13        Q.    And I believe you mentioned certain body

14    seepages, correct?

15        A.    That is correct.

16        Q.    And these were still moist, correct?

17        A.    Yes.

18        Q.    Now, I believe you identified certain

19    photos for the assistant State's Attorney,

20    correct?

21        A.    Yes, I did.

22        Q.    With the exception of the last two which

23    I believe were 45 and 46, were you present when

24    those photos were taken?

1      A.    The -- I was present for -- we have to go

2    photo by photo.

3           Some of the photos shown were morgue

4    photos which I was not present for.  Photos taken

5    which compare with the garage were done and in the

6    wintertime I was not present when those were

7    taken.

8      Q.    Were you present when the so-called scene

9    photos were taken?

10     A.    Yes.

11     Q.    Were you present when the body was turned

12    over?

13     A.    Yes.

14     Q.    So let me ask you this:  When you were

15    present when the body was turned over this is when

16    you saw the body seepage, correct, the fluids?

17     A.    Yes.

18     Q.    Thank you.

19           Now, I will also ask you this:  You

20    identified certain tennis shoes, correct?

21     A.    Yes.

22     Q.    And incidentally you described it as a

23    particular type, that they were whiter, correct?

24     A.    Yes, that is correct.

1         Q.    Did they look new?

2         A.    They appeared lighter color than they are

3    now.

4         Q.    Other than age when you saw them in the

5    garage did they appear to be new shoes?

6         A.    Fairly new shoes, they were still fairly

7    clean and light in color.

8         Q.    Thank you.

9               And by the way that "Denise" wasn't

10   written in green was it?

11        A.    No, it appeared to be red.

12        Q.    Now you mentioned that the winter

13   photographs were taken.  You, of course, were

14   present in August when the photos were taken,

15   correct?

16        A.    Yes.

17        Q.    By the way, am I correct in assuming that

18   one of the things that will enhance the smell in

19   the garage was the heat, if you can recall?

20        A.    Correct, it was August.

21        Q.    Well, besides being August, isn't it

22   correct that the outside temperature, when I speak

23   of outside temperature so we have it clear, that

24   the temperature outside of the garage was

1    approximately 90, if you can recall?

2        A.    It was warm, I can't make an

3    approximation .

4        Q.    Officer, isn't it right it was more than

5    warm it was actually hot?

6            MR. MURPHY:  Objection.

7            MS. PLACEK:  If he knows.

8            THE COURT:  If he knows, he may answer

9    that.

10           THE WITNESS:  Yes, it was hot, it was

11   August.

12       Q.    Not only that, but now we are speaking of

13   the temperature inside of the garage, the

14   temperature inside of the garage was even hotter

15   than the outside temperature, correct?

16       A.    Yes, that is correct.

17       Q.    Thank you.

18           Now, your attention was, in fact, called

19   to this diagram, referring to People's Exhibit

20   Number 6.  And I believe that you described a

21   T-alley, correct?

22       A.    That is correct.

23       Q.    And this T-alley, am I correct in

24   assuming that the garage where you went to that

1 day is at the end of the T-alley?

2   A. The garage is locate towards the West of

3 the T.

4   Q. Let's talk about that for a second.

5     How far to the west of the "T" would you

6 say?

7   A. There is no other garage there, so maybe

8 6 feet to the west of the "T".

9   Q. And calling your attention again to

10 People's Number 6.  You can see where I am

11 pointing, correct?

12   A. Yes.

13   Q. There seems to be a space here, correct?

14   A. Yes, that depicts the alley.

15   Q. That's another alley, correct?

16   A. That's the south alley of West 117th

17 Street, which runs east and west.

18   Q. So it would be correct that this garage

19 is not only boarded by an east and west alley but

20 a north and south alley, correct?

21   A. It is to the west of the T-alley, which

22 is the alley that runs north and south.

23   Q. I understand there is two alleys,

24 correct?

1          A.    That is correct.

2          Q.    Thank you.

3                Now you gave a certain physical

4    description, which I already asked you about.  To

5    refresh your memory, you said the person was

6    approximately 5-foot-4.  Am I correct to assume

7    also that this person was of slight build, that

8    is, the person you observed in the alley?

9          A.    The body of the victim I would not

10   characterize as slight.

11         Q.    How would you characterize it?

12         A.    Medium build.

13         Q.    When you say "medium" just so his Honor

14   Judge Holt and myself know what your speaking what

15   would you say the body in the garage weighed to be

16   a medium build and a five-foot-four height?

17         A.    Approximately 130 pounds.

18         Q.    More than at least 86 pounds, about 130

19   correct?

20         A.    More than 86.

21         Q.    About 130 would be your guesstimate, if

22   you will, correct?

23         A.    That's my guesstimate, yes.

24               MS. PLACEK:  I believe that's all, Judge.

| | |
|---|---|
| 1 | THE COURT:  Redirect? |
| 2 | REDIRECT EXAMINATION{} |
| 3 | BY MR. MURPHY: |
| 4 | Q.  Officer Fassl, when you went to the crime |
| 5 | scene did you ever weigh the body yourself? |
| 6 | MS. PLACEK:  Objection, we have no |
| 7 | problem that it's an estimate of what he saw, |
| 8 | Judge. |
| 9 | THE COURT:  Overruled. |
| 10 | THE WITNESS:  No, I did not. |
| 11 | Q.  So you really don't know what the weight |
| 12 | of the body is, is that correct? |
| 13 | A.  That is correct. |
| 14 | Q.  And, the weight that you came up with is |
| 15 | merely a guess, is that correct? |
| 16 | A.  Strictly a guess, right. |
| 17 | Q.  And also as to the size of the body, did |
| 18 | you ever take out a tape measure and measure the |
| 19 | body from head to toe? |
| 20 | A.  No, I did not. |
| 21 | Q.  And the questions you were asked with |
| 22 | respect to height, is that also a guess on your |
| 23 | part? |
| 24 | A.  Most definitely, yes. |

1          Q.    You really have no knowledge as to what

2     the exact height of this body from head to toe

3     was?

4                MS. PLACEK:  Objection to his vision.

5                THE COURT:  Overruled.

6                MR. MURPHY:  Is that correct, Officer?

7          A.    That is correct.

8                MR. MURPHY:  Nothing further, Judge.

9                     RECROSS EXAMINATION {}

10                    BY MS. PLACEK:

11         Q.    And these guesses were made on what you

12    saw in the garage on the date and time in

13    question, yes?

14         A.    Yes.

15               MS. PLACEK:  Thank you, that is all.

16               THE COURT:  Anything further?

17               MR. MURPHY:  No.

18               THE COURT:  Thank you, Mr. Fassl.  You

19    may step down.

20                    (Witness was excused.)

21               THE COURT:  Mr. Murphy, can we put

22    another witness on and off in 30 minutes?

23               MR. MURPHY:  Judge, I would say that I

24    can do the direct examination in 15 or 20 minutes,

1    where that would leave us for cross, I don't know.

2             THE COURT:  Your witness may have to

3    return tomorrow but he or she will have to return

4    tomorrow anyway.

5             THE CLERK:  Raise your right hand.

6             M I C H A E L    B A K E R, {}

7    Called as a witness herein for the People of the

8    State of Illinois, having been first duly sworn,

9    was examined and testified as follows:

10                    DIRECT EXAMINATION{}

11                    BY MR. MURPHY:

12        Q.    Would you please state your name?

13        A.    Detective Michael Baker, B- A- K- E- R-,

14    Star 10414; Chicago Police Department.

15        Q.    And, Detective, you testified you are

16    employed with the Chicago Police Department.  How

17    long have you been employed with the Chicago

18    Police Department?

19        A.    18 years.

20        Q.    And how long have you worked as a

21    Detective?

22        A.    Nine years.

23        Q.    Detective Baker, I would like to direct

24    your attention to the date of August 8, 1988 do

1    you remember if you were on duty on that

2    particular date?

3        A.    Yes, sir, I was.

4              I had been working from 4:30 a.m. to one

5    a.m..

6        Q.    That was your assigned shift?

7        A.    Yes.

8        Q.    And did you work pass that shift?

9        A.    Yes, I did.

10       Q.    During the course of that shift, did you

11   have occasion to come in contact with any

12   individual that you see in Court today?

13       A.    Jerome Hendricks.

14       Q.    Could you please point to him and

15   indicate an article of clothing?

16       A.    Gray top.

17             MR. MURPHY:  May the report reflect

18   in-court identification of the defendant, your

19   Honor?

20             THE COURT:  It may so reflect.

21             MR. MURPHY:

22       Q.    Det. Baker, I would like to direct your

23   attention to that evening approximately 9:30 p.m.,

24   did you have occasion to take the defendant

1    anywhere?

2         A.   Yes, I did.

3         Q.   Where did you take him?

4         A.   To 11th and State .

5         Q.   And who else was with you at that time?

6         A.   Det. Roland.

7         Q.   Was the detective at 11th and State for a

8    period of time?

9         A.   Yes, he was.

10        Q.   Was he subsequently taken from 11th and

11   State to another location?

12        A.   After we were through at 11th and State,

13   he was returned to Area 2 violent crimes.

14        Q.   And approximately what time was that?

15        A.   Approximately 1 a.m..

16        Q.   And Det. Baker, when you arrived back to

17   Area 2 violent crimes, what, if anything, did you

18   see?

19        A.   At that time Jerome Hendricks was advised

20   of his rights again by myself, at the time we took

21   a detailed account of his activities on the date

22   in question.

23        Q.   And, this was approximately one in the

24   morning?

1      A.   Yes.

2      Q.   And Det. Baker, where did that interview

3  take place?

4      A.   In the interview room Area 2 violent

5  crimes.

6      Q.   And who else was present?

7      A.   Besides myself and Jerome Hendricks, Det.

8  Roland was present.

9      Q.   And now you testified that you advised

10  the defendant of his rights?

11      A.   Constitutional rights per Miranda.

12      Q.   How's that?

13      A.   From my FOP book.

14          MS. PLACEK:  Judge, we have a motion

15  already, no motion.

16          MR. MURPHY:  Your Honor, for the record,

17  there would be a stipulation between the parties

18  that Detective Baker would testify he gave the

19  defendant his Miranda Rights consistent with

20  People versus Miranda.

21          THE COURT:  The stipulation will be

22  received.

23          So stipulated Counsel?

24          MS. PLACEK:  Yes, Judge.

1          MR. MURPHY:

2      Q.    Now at that time after you gave the

3    defendant his Miranda Rights, what, if anything,

4    did you say to him or did he say to you?

5      A.    I asked him if he would give us an

6    account of his activities on the 1st of August.

7      Q.    That was the 1st of August, 1988?

8      A.    Yes.

9      Q.    And what, if anything, did the defendant

10   tell you?

11     A.    He told us at that time we asked him

12   particularly if he had seen the victim on that

13   date.  He told us that he had.  He asked her to

14   get him some candy or some ice cream from the

15   candy lady on the street.

16     Q.    How was the victim referred to in this

17   conversation?

18     A.    Denise.

19     Q.    Okay.

20     A.    And, he said that he talked to her that

21   day, that was the first day he had met her and he

22   asked her to get him some candy, some ice cream.

23   He said she was going for someone else and she

24   brought something back for him.  He stated later

1 on he went home and went to some friend's house

2 and he came back out later in the evening some

3 time after dark and he saw the victim talking to

4 his nephew on the street.

5   Q. Now, if I may, Detective-- I don't want

6 to interrupt you--  did he tell you approximately

7 when he had the contact with the victim regarding

8 the ice cream?

9   A. Some time in the early afternoon.

10   Q. And when is the next time he told you he

11 saw the victim?

12   A. Some time late in the p.m., some time he

13 said it was after dark and he said he saw her by

14 the front of his house and she was talking to his

15 nephew.  He related then he went to play

16 basketball on numerous locations.

17   Q. And, did the defendant tell you anything

18 else at that time?

19   A. He told us that he went to West Pullman

20 Park and played basketball.  He told us he went

21 to Everett White School and played basketball.

22   I asked who with, he said a fellow by the

23 name of Mike who he went to high school and a

24 subject by the name of "Shorty Mac" who he went to

1      high school, and a fellow that he walked out with

2      by the name of Michael Walker.

3          Q.    And, what, if anything, else did he tell

4      you?

5          A.    We asked him to account for his

6      activities the rest of the night and he said after

7      playing basketball numerous places and having a

8      few beers talking to people he told us that he had

9      to meet his girlfriend at the bus stop 119th and

10     Michigan approximately 3:30 a.m..  He told us he

11     left after playing basketball, he wasn't sure

12     about the time, but he walked down 119th and

13     Michigan.  He told us when he got there he had

14     missed his girlfriend so he walked home.

15              He told us when he got home his

16     girlfriend Jackie was there and his sister and she

17     told him that the police had been by looking for

18     him.

19              MS. PLACEK:  Objection to out-of-court

20     statement and other party, Judge.

21              THE COURT:  No.  Overruled.

22              THE WITNESS:  His sister told him the

23     police had been looking for him and at that time

24     he went to bed.

1              MR. MURPHY:

2        Q.   What time was it that he said this

3    conversation occurred?

4        A.   He wasn't sure of the time but he said

5    the sun was up.

6        Q.   So this was early morning hours of August

7    2, 1988?

8        A.   That would be correct.

9        Q.   And did he say anything else to you

10   during that conversation that you can recall?

11       A.   Yes.

12            He went on to say that later on when he

13   got up he walked his girlfriend Jackie home and in

14   walking her home he ran into relatives of the

15   victim, and at that time the relatives questioned

16   him about how old he thought she was if she was 17

17   and he stated that, "No, he didn't think she was

18   that old," that, at least, that is what he told

19   them at that time.

20       Q.   Now, Det. Baker, how long did this

21   conversation you had with the defendant last until

22   approximately?

23       A.   Approximately an hour and-a-half.

24       Q.   So it was about 2:30 in the morning?

1          A.    Approximately 2:30, yes.

2          Q.    And, Detective, at the time while the

3     defendant was in your presence was he ever allowed

4     to use the bathroom?

5          A.    Yes, he was allowed to use the facility

6     and he was also given a sandwich.

7          Q.    Now, Det. Baker, at the particular time

8     did you make any attempts to verify what the

9     defendant had told you?

10         A.    Yes, we did.

11              MS. PLACEK:   Objection to the form.

12              THE COURT:   Overruled.

13              MR. MURPHY:   Could you tell Judge Holt

14     what, if anything, you and other police officers

15     did with respect to the statement which the

16     defendant gave you?

17         A.    Well, we specifically went to the West

18     Pullman Park--

19              MS. PLACEK:   With all due respect, Judge,

20     as to other police officers, there would be an

21     objection.

22              THE COURT:   Mr. Murphy, if you can would

23     you direct the officer's attention to what he

24     would respond to what he did only?

1          MR. MURPHY:  Yes, Judge, I will.

2      Q.  Detective Baker, perhaps I will rephrase

3  this question:  Could you tell Judge Holt what, if

4  anything, you did after you received this

5  statement from the defendant with respect to

6  verifying the statement that he gave to you?

7      A.  Yes.

8          I went to West Pullman Park, and I went

9  to the Edward White School looking for this Mac or

10  "Shorty Mac" or anyone who might have seen the

11  victim or known the victim who could verify on the

12  date and time he told us he was there if he was,

13  in fact, there.

14          I also attempted to locate Michael Walker

15  who he supplied us that he had met during the

16  evening there.

17      Q.  What, if anything, did you find?

18      A.  We were unable to find anyone at West

19  Pullman or Edward White School that knew the

20  victim or remember seeing him up there.

21      Q.  The victim or the defendant?

22      A.  Excuse me, the defendant.

23          MS. PLACEK:  With all due respect,

24  objection as to hearsay.

1              THE COURT:   The objection is sustained.

2              MS. PLACEK:   Motion to strike.

3              THE COURT:   Stricken.

4              MR. MURPHY:

5         Q.   What else did you see, Detective?

6         A.   I attempted to locate the Michael Walker

7    that he told us he had met.  At the time I spent

8    quite a bit of time looking for him and met with

9    negative results.

10        Q.   What else did you see Detective?

11        A.   In our investigation we received--

12             MS. PLACEK:   With all due represent "we"?

13   Objection to other investigators and as to

14   information received.

15             THE COURT:   Overruled, we will see what

16   it is first.

17             THE WITNESS:   Our investigators -- we

18   were supplied information concerning a possible

19   crime that had been committed in the area where

20   the victim was a young female black.

21             MR. MURPHY:   And at this time, Det.

22   Baker, did you believe that the information that

23   you received was related to this particular case

24   that you were investigating or perhaps could be

1    related?

2         A.   We were unsure but we had to check it

3    out.

4         Q.   What did you do?

5         A.   We followed up on that information.  We

6    subsequently learned that there had been a crime

7    committed, that there was a young female black.

8    After investigation, we found out the two

9    incidents were unrelated.

10             MS. PLACEK:  Objection, motion to strike.

11             THE COURT:  Overruled.

12             MR. MURPHY:  Does that describe a number

13   of activities that you were engaged in during the

14   early morning hours of August 2, 1988 after the

15   defendant gave you the statement that you

16   described?

17        A.   It was in the early morning hours of

18   August 9.

19        Q.   I am sorry, August 9, 1988?

20        A.   Yes.

21             MR. MURPHY:  Could I have a moment,

22   Judge?

23             THE COURT:  You may.

24             MR. MURPHY:

1          Q.   And, Det. Baker, subsequently was Michael

2     Walker, in fact, located by the police?

3          A.   Yes, he was.

4               MS. PLACEK:  Objection, foundation, if he

5     did it himself, Judge; foundation.

6               THE COURT:  Overruled.  If he knows, he

7     may answer.

8               MR. MURPHY:

9          Q.   Was Michael Walker located?

10         A.   Yes, he was.

11              MR. MURPHY:   No further questions,

12    Judge.

13              THE COURT:  Cross examination.

14                   CROSS EXAMINATION[ ]

15                   BY MS. PLACEK:

16         Q.   Sir, am I correct that you Mirandize

17    suspects, true?

18         A.   Yes.

19         Q.   Thank you.

20              Now drawing your attention to the evening

21    hours of the date and time in question, how long

22    were you at Area 2 before you took the defendant

23    somewhere?

24         A.   I don't understand your question there.

1          Q.    Well, before taking the defendant

2     somewhere, how long were you in Area 2?

3          A.    Since I started work at 4:30, I was out,

4     I came back in with him and we left at

5     approximately 9:30.

6          Q.    Well, would it be correct in saying that

7     you were there from 4:30 to approximately 9:30?

8          A.    I came to work and left at 9:30.

9          Q.    You left at 9:30?

10         A.    The office, yes.

11         Q.    So from 4:30 to 9:30 you were at Area 2?

12         A.    No, I came to work at 4:30.  Some time in

13    the evening we came back in at approximately Eight

14    o'clock or so, went back out.  We came back and

15    subsequently left again with Jerome at 9:30.

16         Q.    Let me ask you this:  Did you see Michael

17    Walker in Area 2 being Mirandized and being

18    questioned about this same event?

19         A.    No.

20              MR. MURPHY:  Objection to the form of the

21    question.

22              THE COURT:  No.  Overruled.

23              MS. PLACEK:  Thank you.

24         Q.    To the best of your knowledge do you know

1      whether Michael Walker was Mirandized and

2      questioned to the same event?

3              MR. MURPHY:  Objection to the form of

4      that question, it's a double question.

5              THE COURT:  If the witness understands

6      it, he may answer.  I don't find it to be a

7      compound question as to have to answer

8      unintelligently.

9              Mr. Cassidy?

10             MR. CASSIDY:  Judge, I have a question.

11             MS. PLACEK:  Judge, if it's a question to

12     instruct the officers --

13             MR. CASSIDY:  No, your Honor.

14             I am making an objection.  I don't

15     believe the officer can testify unless he has

16     personal knowledge whether Michael Walker was

17     Mirandized.  I understand we asked the question

18     that was only to find out what he did next.  I

19     don't think Counsel was offering it as to the

20     truth of the matter asserted.

21             THE COURT:  No, I don't think she cares

22     one way or the other whether Mr. Walker was

23     Mirandized since it's not relevant to anything.

24             MS. PLACEK:  It may be, Judge.

1          Q.    Was Michael Walker Mirandized in the

2     station do you know on the night in question?

3                THE COURT:  You are talking about August

4     8?

5                MS. PLACEK:  That is correct.

6          A.    We didn't know Michael Walker.

7          Q.    So you didn't even know Michael Walker.

8                According to your testimony, you are

9     speaking, I take it, when you say "we," you mean

10    the Chicago Police Department, didn't know Michael

11    Walker may be involved in this case?

12               MR. MURPHY:  Objection.

13               THE COURT:  That's too many questions.

14               MS. PLACEK:  Before we go into the

15    statement, we have a motion as to the testimony as

16    to the alleged statement as prior consistent

17    testimony, Judge.

18               THE COURT:  I'm afraid, I don't

19    understand the nature of what you just said.

20               MS. PLACEK:  I bring the Court's

21    attention to the first day of this trial when Det.

22    Nitsche testified and, I believe, Judge, that a

23    similar matter was brought out.  I would suggest,

24    Judge, that this is a prior consistent statement

1    given by the defendant.  We would have a motion to

2    strike.

3           THE COURT:  I don't have the foggiest

4    notion of what you are talking about.

5           Put a question to the witness.

6           MS. PLACEK:  Sure, Judge.

7           Officer, drawing your attention to the

8    questioning of the defendant, you said that he saw

9    someone by the name of Michael Walker, correct?

10    A.    Yes.

11    Q.    And he played basketball with somebody by

12    the name of Mike, right?

13    A.    Several people.

14    Q.    So Michael Walker, it was your

15    understanding and someone by the name of Mike were

16    two distinct people, correct?

17    A.    Yes.

18    Q.    Thanks.

19           Now, incidentally you said that in the

20    early morning hours of the 9th you went to certain

21    places, correct?

22    A.    Yes.

23    Q.    What was the first place that you went on

24    the early morning hours of the 9th?

1        A.    I believe the first place was West

2   Pullman Park.

3        Q.    What time?

4        A.    The exact time, I don't remember.

5        Q.    Was it before 2 a.m. or after 2 a.m.?

6        A.    Well, we didn't get through talking to

7   Jerome until after 2:30, so it was after 2:30.

8        Q.    Was it before or after the sun went

9   up?

10       A.    It was before the sun came up.

11       Q.    Did you go especially to the basketball

12  court?

13       A.    Yes, I did.

14       Q.    How many people did you see on the

15  basketball court?

16       A.    I don't recall.

17       Q.    Did you see anyone off the basketball

18  court?

19       A.    Yes, I did.

20       Q.    When you say you saw some people, how

21  many did you see?

22       A.    I don't recall.

23       Q.    Was it more than five?

24       A.    Five, 6, maybe a half dozen.

1        Q.    Maybe a dozen?

2        A.    No, it wasn't that many.

3        Q.    How many of them did you talk to?

4        A.    I talked to several of them.

5        Q.    How many is several?

6        A.    Two or three.

7        Q.    Let me ask you this.  What was the next

8    stop you made?

9        A.    Edward White School.

10        Q.    Is that a grammar or high school?

11        A.    Grammer school.

12        Q.    Did you go to a court or is there a

13    basketball court there?

14        A.    There is an exercise facility on the

15    outside, basketball court.

16        Q.    What time did you go there?

17        A.    It was some time just before the sun came

18    up.

19        Q.    So it was still dark?

20        A.    Just turning light, yes.

21        Q.    How many people did you see there?

22        A.    Didn't see anyone there.

23        Q.    So you couldn't talk to anyone at that

24    hour of the morning, could you?

1       A.   If I didn't see anyone, I couldn't talk

2   to them.

3       Q.   Thank you, Officer.

4            But when you did talk to these several

5   people, did you identify yourself as a police

6   officer?

7       A.   Yes, I did.

8       Q.   Did you give them their Miranda Warnings?

9       A.   No.

10           MR. MURPHY:  Objection.

11           THE COURT:  Overruled.

12           MS. PLACEK:  Thank you.

13           May I have one moment, Judge?

14                    (There was a brief pause.)

15           MS. PLACEK:

16      Q.   By the way, I believe you said that as

17   part of the conversation you had with the

18   defendant, that the defendant, in fact, said that

19   on a later date, I believe on the 2nd, he met some

20   of the family, correct?

21      A.   That is correct.

22      Q.   Did he name what family members?

23      A.   Not that I recall, no.

24      Q.   Did you ask him?

1      A.   I don't remember.

2      Q.   Well, do you remember whether or not you

3 asked him at approximately what time he saw these

4 family members?

5      A.   He told me he saw them some time when he

6 was walking his girlfriend Jackie home.

7      Q.   Do you remember whether or not you asked

8 him what time that was?

9      A.   No, I don't remember.

10      Q.   Whether or not-- and I am speaking of

11 the event of August 1st-- you asked him

12 approximately what time he saw the young lady and

13 asked her to get some candy from the candy man?

14      A.   That was some time around noon.

15      Q.   When you say, "around noon" is that what

16 he said or what you remember?

17      A.   That is what I remember him saying.

18      Q.   Do you remember where he saw her at?

19      A.   Somewhere on the street where he lives.

20      Q.   When you say, "somewhere on the street

21 where he lives," do you remember whether or not

22 you asked him exactly where it was?

23      A.   I don't remember if I asked the exact

24 address, no.

1          Q.   Do you remember whether or not you asked

2     him at all exactly where it was?

3          A.   I asked him where he saw her at.  He told

4     me on the street by his house.

5          Q.   Thank you.

6               Would I be correct in assuming that

7     likewise I believe you said on August 1, he

8     allegedly saw her again, right?

9          A.   That is right.

10         Q.   Am I correct in assuming that your

11    investigation and your questioning proceeded like

12    you have been describing, you didn't ask him the

13    exact location, correct?

14         A.   Yes, I did.

15         Q.   I had asked him where he saw her.

16         Q.   And what did he say?

17         A.   He said he saw her in front of his house,

18    she was talking to his nephew.

19         Q.   And did you ask him his nephew's name?

20         A.   I don't remember if I did or not.

21         Q.   Could his nephew have been named Chew?

22         A.   As well as any other name, yes.

23         Q.   When you say, "as well as any other

24    name"--

```
 1                   MR. MURPHY:  Objection.

 2                   THE COURT:  Overruled.

 3                   MS. PLACEK:  In this investigation of a

 4     murder, did you ask whether or not his nephew--

 5     for his nephew's real name?

 6          A.    I don't recall.

 7          Q.    Do you recall whether or not you asked

 8     him where his nephew lives, or was that as well as

 9     anyplace else?

10          A.    I don't remember.

11          Q.    Well, would I be correct in saying--  and

12     let me also ask you this:  Whether you asked

13     Mr. Hendricks whether or not he saw the girl after

14     that date and time, I'm speaking of August 1st?

15                   MR. CASSIDY:  Objection.  This is several

16     questions.  I don't mean to be objecting to

17     interrupt but there are several compound

18     questions.

19                   THE COURT:  Do you understand the

20     question, Mr. Baker.

21                   THE WITNESS:  No, Judge, not the entirety

22     of it.

23                   MS. PLACEK:  Let me ask you this:  In

24     your investigation did you ask Mr. Hendricks
```

1    whether or not he saw the girl after 9:30, if you

2    recall?

3         A.    What happened after 9:30, I don't

4    understand?

5         Q.    After 9:30, August 1st?

6         A.    After I talked to him I asked him if he

7    saw her again, he said no.

8         Q.    Did you make question of that fact?

9         A.    Make question?

10        Q.    Simple, Officer--

11             MR. CASSIDY:  Objection, Judge, relevance.

12             THE COURT:  And argumentative.

13             MR. CASSIDY:  Sure is.

14             MS. PLACEK:  Officer, let me ask you

15    this:  In this investigation, approximately how

16    long did you speak to the defendant?

17        A.    Approximately an hour and-a-half.

18        Q.    And in that hour and-a-half, am I correct

19    in saying that you didn't put down with accuracy

20    of where he actually saw the girl?

21             MR. CASSIDY:  Objection.

22             THE COURT:  Objection sustained.

23             MS. PLACEK:  Officer,  did you ever ask

24    the defendant what the girl was wearing when, in

1    fact, he saw her?

2         A.   I don't recall if I asked him what

3    clothing she was wearing, no.

4         Q.   Do you recall whether or not you ever

5    asked the defendant whether or not she had changed

6    her clothes between the Twelve o'clock and the

7    9:30 sightings?

8         A.   I don't recall ever asking him if she

9    changed her clothes, no.

10        Q.   Do you ever recall whether or not you

11   checked out whether the defendant went to the high

12   school where he said he went?

13             MR. CASSIDY:  Objection, Judge, to the

14   form of the question.  I don't understand it.

15             THE COURT:  If the witness understands,

16   he may answer.

17             THE WITNESS:  Which high school?

18             MS. PLACEK:  Well, the defendant did give

19   you a name of a gentleman he went to high school

20   with, correct?

21        A.   He said he knew him from high school.

22        Q.   Did you ask what high school the

23   defendant went to?

24        A.   I asked him what high school and he said

1    Harlan.

2         Q.    Did you ever check that out?

3         A.    By going back to the basketball courts,

4    yes.

5         Q.    When you say you checked it, that's how

6    you checked it out?

7         A.    When it's 3 in the morning and he said he

8    saw them at a basketball court that is where I go

9    to check.

10        Q.    So am I correct in saying, as the State's

11   Attorney pointed out, your entire investigation,

12   quite frankly, consisted of going places where

13   there might or might not be people there to check

14   out what you found out from the defendant during

15   the interrogation, correct?

16        A.    Since they were his alibi, yes.

17        Q.    Let me ask you this:  When you say "since

18   they were his alibis" after that Three o'clock

19   time did you ever go back and try and check it out

20   further, yes or no, Officer?

21        A.    No.

22        Q.    Let me ask you this:  Did you ever check

23   out where the defendant, in fact, and I am

24   speaking of going to the high school possibly when

1    it's opened, going to the high school he said he

2    went to and try and find out who Mike was??

3         A.    Harlan High School is--

4              MS. PLACEK:   Motion to strike.   It's

5    non-responsive.

6              MR. CASSIDY:   Judge, may he be able to

7    answer the question?

8              THE COURT:   Miss Placek, there has been

9    an objection.

10             Can I hear the question again, Ms.

11   Reporter?

12                       (Whereupon the record was

13                        read as requested.)

14             THE COURT:   Do you have an objection to

15   that question?

16             MR. MURPHY:   Judge, we don't object to

17   the question.   The officer was in the process of

18   answering it and Counsel interrupted.

19             MS. PLACEK:   I will withdraw and

20   rephrase, Judge.

21             THE COURT:   Put another question.

22             MS. PLACEK:   Did you ever go to the high

23   school the defendant said he attended and find out

24   if, in fact, he went there?

1          A.    No.

2          Q.    Did you ever, in fact, ever go to that

3     high school with an idea to find out who Mike was?

4          A.    No; no, I did not.

5          Q.    Let me ask you this:  You spoke of going

6     to two schools, correct?

7          A.    No, I spoke of going to two places where

8     basketball courts were at.

9          Q.    Well, in those two places, how long of a

10     time were you at the first place?

11          A.    Ten minutes.

12          Q.    Did you have a picture of the defendant?

13          A.    Yes, I did.

14          Q.    And when you had a picture of the

15     defendant, did you, in fact, ask those several

16     people for their names?

17          A.    No, I didn't.

18          Q.    Thank you.

19               The second place there was no one there,

20     correct?

21          A.    Right.

22          Q.    Officer, how long were you totally

23     including the ten minutes you were at the place

24     where there was people involved that morning with

1      looking for people that the defendant had told you

2      about?

3          A.    Several hours.

4          Q.    When you say "several hours" we have ten

5      minutes accounted for at the first place, correct?

6          A.    That is correct.

7          Q.    Well let's talk about the second place.

8      How long did you spend there?

9          A.    I just don't remember.  It takes time to

10     travel.

11         Q.    Would it be correct in saying that in

12     truth the majority of those several hours that you

13     spent weren't in speaking to people or going to

14     people's homes or even in asking people on the

15     street, but in travel time?

16         A.    Yes.

17         Q.    So actually would it be correct in saying

18     that in total ten minutes of those several hours

19     was all you did in the real investigation

20     involving this case, the rest was spent in travel

21     time?

22              MR. CASSIDY:  Objection, Judge,

23     argumentive.

24              THE COURT:  Overruled.

1             MS. PLACEK:  Is that correct?

2        A.   No.

3        Q.   Well, let's talk about it.  You didn't

4   talk to anybody at the second place, correct?

5        A.   That is correct.

6        Q.   How long were you at the second place?

7        A.   There was no one there. Two minutes.

8        Q.   So now we have twelve minutes.

9             MR. CASSIDY:  Objection, Judge, to her

10   comment.

11             THE COURT:  You can calculate it in your

12   head.

13             MS. PLACEK:  I will try, Judge; I will

14   try.

15        Q.   Twelve minutes you were in total at the

16   two places, is that correct?

17        A.   Approximately.

18        Q.   Now, I believe you said the sun was

19   dawning in the sky when you were at the second

20   place, correct?

21        A.   That is correct.

22        Q.   Approximately what time did you get off

23   work that date, time in question?

24        A.   I didn't.

1          Q.    You stayed all way?

2          A.    Day.

3          Q.    Yes.    Am I correct in assuming that you

4     didn't leave until 12 midnight?

5          A.    No, I said longer than that.

6          Q.    Well, you stayed the following day,

7     correct?

8          A.    That is correct.

9          Q.    So am I correct in saying that, in fact,

10    you started work at approximately Four o'clock on

11    August 8, 1988 and you stayed until the hours of

12    August 10, correct?

13         A.    That is correct.

14         Q.    And you were without sleep, correct?

15         A.    Correct.

16         Q.    And you functioned fine, correct?

17              MR. CASSIDY:  Objection.

18              THE COURT:  Overruled, he can tell us.

19              THE WITNESS:  Yes.

20              MS. PLACEK:  Would it be correct in

21    saying on August 10th you not only functioned

22    fine, but you didn't leave until 11:30 at night.

23              MR. CASSIDY:  Objection, relevance.

24              THE COURT:  Well, we are trying to find

1       out whether his mind was functioning after being

2       up 36 hours or so, which is relative to the

3       quality of his investigation and the credibility

4       of it.  Now, it may not have much, but it is

5       relevant, just as relevant.

6              MR. CASSIDY:  Sure, Judge, if he is doing

7       something.

8              THE COURT:  Well, he didn't stay up just

9       to see if he could be awake all that time, Mr.

10      Cassidy.

11             MS. PLACEK:  Is school over, Judge?

12             MR. CASSIDY:  Objection.

13             THE COURT:  Ms. Placek, those comments

14      are not necessary.

15             MS. PLACEK:  I apologize, Judge.

16      Q.     On August 10th, would it be correct in

17      saying did you sign out August 10th or did you

18      continue working August 10?

19      A.     No.

20      Q.     What time did you sign out August 10?

21      A.     About 1 a.m..

22      Q.     So at 1 a.m. August 10 would it be

23      correct in saying that you have worked straight on

24      this case alone from approximately 4 when you

1   checked in on August 8?

2          A.    This case with all its variations, yes.

3          Q.    And you had gone without sleep?

4          A.    Yes.

5          Q.    As you testified, and you had gone

6   without food?

7          A.    I didn't starve myself, I stopped and

8   ate.

9          Q.    How many times?

10         A.    I don't remember.

11         Q.    And by the way the August--   Well, let

12  me ask you this:   By the way, you haven't been up

13  36 hours today, have you?

14             MR. MURPHY:   Objection.

15             THE COURT:   Objection sustained.

16             MS. PLACEK:   Well, let me put it this

17  way, Officer, calling your attention to the

18  testimony today, am I correct in assuming that

19  there were certain things you couldn't remember?

20             MR. MURPHY:   Objection, Judge.

21             THE COURT:   Overruled.

22             MS. PLACEK:   There are certain things you

23  couldn't remember?

24         A.    Certain things, yes.

1      Q.   Am I correct in assuming in order to

2   prepare yourself for testifying today that, in

3   fact, you read your reports, correct?

4      A.   Correct.

5      Q.   Several times, correct?

6      A.   Correct.

7      Q.   Not only several times, but you

8   overlooked the whole investigation of the Chicago

9   Police Department to prepare for any questions

10  that might or might not be asked, correct?

11     A.   I looked over reports that I had

12  available, yes.

13     Q.   Thank you.

14          By the way, again am I correct in

15  assuming that you have not been up 36 hours today?

16     A.   That is correct.

17     Q.   By the way, when we speak of 36 hours

18  previous to this four p.m.  starting time, when

19  was the last time-- I'm not meaning to get

20  personal, so I will say sleep-- when was the last

21  time you went to sleep prior to the time you

22  started work on August 8th?

23     A.   I don't know.  I probably got up around

24  noon on that day.

1              MS. PLACEK:  Thank you, Officer.

2              THE WITNESS:  You are welcome.

3              MS. PLACEK:  That's all, Judge.

4              THE COURT:  Redirect?

5                  REDIRECT EXAMINATION ( )

6              BY MR. MURPHY:

7         Q.    Det.  Baker, during the course of the

8    conversation you had with the defendant, you asked

9    him what contact he had with the victim on the

10   date of August 1, 1988 and early morning hours of

11   August 2, 1988, is that correct?

12        A.    That is correct.

13        Q.    And the extent of contact he had with her

14   was on two separate occasions that he described

15   them to you, is that correct?

16        A.    That is correct.

17        Q.    That was it?

18        A.    That is correct.

19        Q.    And that was the focus of your

20   questioning you had with him as to what contact he

21   had with this girl, Denise?

22             MS. PLACEK:  Objection, prior

23   consistency, Judge.

24             THE Court:  Overruled.

1              MR. MURPHY:

2         Q.   Is that correct?

3         A.   That is correct.

4         Q.   After he gave you this statement, you

5    attempted to verify it by going to these parks to

6    see if anybody saw him on the night before, is

7    that correct?

8              MS. PLACEK:  Objection to the word

9    "verify," Judge.

10             THE COURT:  Overruled.

11             THE WITNESS:  That is correct.

12             MS. PLACEK:

13        Q.   Were you able to find anybody who saw him?

14        A.   No, I was not.

15        Q.   Did you find people who were at the West

16   Pullman Park the night before?

17             MS. Placek:  Objection.

18             THE Court:  The objection is sustained.

19             MR. Murphy:

20        Q.   Now, during the course of this statement

21   he gave you, he told you me met Michael Walker, is

22   that correct?

23             MS. Placek:  Objection, that's not what

24   he stated, Judge.  He said he saw Michael Walker.

1              THE Court:   The objection's overruled.

2              MR. Murphy:

3         Q.   What did he tell you with regards to

4    Michael Walker?

5         A.   He had met Michael Walker during the

6    evening.

7         Q.   And when did he say he saw-- met Michael

8    Walker?

9         A.   Between traveling between basketball

10   games.

11        Q.   That would have been on August 1, 1988 or

12   August 2nd?

13        A.   No.   That would have been August 2nd.

14        Q.   And Det.  Baker, you have been asked a

15   lot of questions about how much sleep you had this

16   particular night.  You, in fact, worked past your

17   normal shift, is that correct?

18        A.   That is correct.

19        Q.   And when you worked past the time your

20   shift was supposed to end, why did you do that?

21              MS. Placek;  Objection.

22              THE Court:  The objection is sustained.

23              MR. Murphy:

24        Q.   Well, during the time you stayed on past

1    the normal time your shift would end, did you work

2    on only one case?

3            MS. Placek:  Objection.

4            THE Court:  Overruled.

5            MR. Murphy:

6        Q.    In fact, you worked on that other matter

7    which you described, is that correct?

8        A.    That is correct.

9        Q.    At the time that you handled that matter,

10   you thought there might be a relationship between

11   that matter and this matter, is that correct?

12           MS. Placek:  Objection.

13           THE Court:  Overruled.

14           THE Witness:  That is correct.

15           MR. Murphy:

16       Q.    Other than that matter and this case, did

17   you work on any other cases?

18       A.    No, I did not.

19       Q.    And during the course of time you were

20   completing your investigation or doing your

21   investigation on August 8th and August 9th, did

22   you prepare reports summarizing your activities

23   and the statement you received?

24       A.    Yes, I did.

1          Q.    And did you do that August 8th and August

2     9th?

3          A.    Yes, I did.

4               MR. MURPHY:   Nothing further, Judge.

5               THE Court:   Recross?.

6               MS. Placek:   A few questions.

7                    RECROSS EXAMINATION {}

8                    BY MS. PLACEK:

9          Q.    So, it's not unusual for you to work

10     twenty-four hours past your shift?

11               MR. Murphy:   Objection.

12               THE Court:   Sustained.

13               MS. Placek:

14          Q.    Well, Officer, do you remember when the

15     assistant State's Attorney was asking you

16     questions on direct examination?

17          A.    Yes.

18          Q.    Do you remember you saying that the

19     defendant told you he saw Michael Walker?

20          A.    Yes.

21          Q.    And at that time you used the word not

22     "met" but you used the word "saw" in answer to the

23     State's Attorney's questions?

24          A.    He said he met Michael Walker.

1      Q.   Did you understand my question?

2          Motion to strike; it's not responsive.

3          THE Court:  The motion is granted.

4          MS. Placek:

5      Q.   Isn't it correct that at that time under

6  questioning of the State's Attorney on direct

7  examination, you used the word "saw," correct?

8      A.   I believe so.

9      Q.   And do you remember about five seconds

10  ago, or even less, that I asked you whether or not

11  the defendant told you he saw Michael Walker, you

12  answered my question as "yes," correct?

13     A.   Yes.

14        MS. Placek:  Thank you.

15        Nothing further, Judge.  Thank you.

16        THE Court:  Anything further?

17          RE-REDIRECT EXAMINATION {}

18         BY MR. MURPHY:

19     Q.   Det.  Baker, when you prepared your

20  report summarizing the statement the defendant

21  gave you, did you write in your report--.

22        MS. Placek:  Objection to anything he

23  wrote in the statement.

24        THE Court:  Objection sustained.

1               MR. Murphy:  No further questions.

2               THE Court:  Anything further?

3               MS. Placek:  No.

4               THE Court:  Thank you, Mr. Baker.  You

5       may step down.

6               THE Witness:  Thank you, Judge.

7               THE Court:  This matter is continued

8       order of court, February 14, One p.m..

9               MS. Placek:  Your Honor, we've

10      subpoenaed, and we are telling you this for the

11      simple reason--  We filed a subpoena, we also

12      subpoenaed, if the Court remembers Officer

13      Kaddigen from the other day, the subpoena was

14      issued for today.  We attempted to contact him.

15      If you remember the Court's comment to him is try

16      and keep in contact.  I just ask if the State had

17      any contact?

18              MR. CASSIDY:  I got a message that he

19      called.  He left a number and asked did we need

20      him for today, I told him no.

21              MS. Placek;  Well, I'm glad the State is

22      taking good care of our witnesses.

23              THE Court:  Well, your case is ready to

24      go forth.

1              MS. Placek:  I understand.  But I would

2      like to talk to him before.

3              THE Court:  Well, you didn't inform us of

4      that.

5              MS. Placek:  Judge, we expected him to

6      call us.

7              THE Court:  Mrs. Placek, if you expect a

8      Chicago Police Officer to call you in response to

9      your subpoena, you haven't been around very long.

10             MS. Placek:  Judge, I'm glad the Court

11     knows where the bias is.

12             THE Court:  The Court's adjourned until

13     tomorrow.

14                          (WHEREUPON the trial of this

15                          cause was adjourned and

16                          continued to tomorrow, February

17                          14, 1991.)

18

19

20

21

22

23

24

STATE OF ILLINOIS    )
                     )    SS:
COUNTY OF COOK       )


### IN THE CIRCUIT COURT OF COOK COUNTY
### COUNTY DEPARTMENT-CRIMINAL DIVISION


THE PEOPLE OF THE        )
STATE OF ILLINOIS        )
                         )
        vs               )        No.   88-CR-12517
                         )
JEROME HENDRICKS         )

### REPORT OF PROCEEDINGS

            BE IT REMEMBERED, that on the 14th day

of February, A.D., 1991, this matter came on for

hearing before the Honorable LEO HOLT, Judge of

said Court.


        APPEARANCES:


            (As heretofore noted.)

THE CLERK:   Sheet 7, Line 1, Jerome Hendricks

THE COURT:   Mr. Hendricks.

Both sides ready?

MS. PLACEK:   Yes, Judge.

THE COURT:   Are we waiting for Mr. Lufrano?

MR. PLACEK:   I believe Mr. Lufrano is a little detained, Judge.  He is in the lockup.

THE COURT:   Are you ready to proceed, Mr. Cassidy?

MR. CASSIDY:   Yes, Judge.

THE COURT:   Call your next witness.

MR. CASSIDY:   Thank you, your Honor.

(Witness sworn.)

THE COURT:   That microphone is on.  If you will pull it over in front of you, speak directly into it, keep your voice up, we will all hear you.

You may proceed, Mr. Cassidy.

MR. CASSIDY:   Thank you, your Honor.

2

1                        DET. JOHN YUCAITIS,

2    called as a witness herein, after having been first

3    duly sworn, was examined and testified as follows:

4                        DIRECT EXAMINATION

5                        BY

6                        MR. CASSIDY:

7

8         Q      Please state your name and spell your last

9    name?

10        A      My name is John Yucaitis, Y-u-c-a-i-t-i-s.

11        Q      And whom are you employed by?

12        A      I am employed by the Chicago Department

13   of Police.

14        Q      And what is your current assignment?

15        A      Currently assigned to Area 2 Violent

16   Crimes.

17        Q      How long have you been assigned there?

18        A      I have been assigned there since February

19   of 1968.

20        Q      And how long have you been a Police

21   Officer?

22        A      26 and a half years.

23        Q      Calling your attention to the date of

24

3