CASE NO. _O8 cv 1589_

ATTACHMENT NO. _11_

EXHIBIT _____

TAB (DESCRIPTION) _____

August 9th of 1988, did you work that day as a Chicago

Police Officer, Detective?

A       Yes, sir, I did.

Q       And what watch were you on that day?

A       The second watch, days.

Q       And who is your partner?

A       Detective Steve Brownfield.

Q       When you started working that day, did you

have occasion to take part in an investigation of the

victim named Denise Johnson?

A       Yes, sir, I did.

Q       And did you have occasion, then, to go an

interview possible witnesses or go to certain

locations?

A       Yes, sir.

Q       And can you please tell the Court what

you did when you went to work that day?

A       Basically after arriving to work that day,

I had been off on the 8th, the 9th, after rollcall, we

were apprised of the investigation at hand, the young

female that was found in the garage.

                    We talked with some of the investi-

4



gating officers that had been on overtime and

at approximately 10:00 o'clock, maybe some time after

10:00 that morning, my partner and I went to the area

of 117th and Princeton where we began just canvassing,

trying to talk to people, seeing if we could find

something that could aid us in our investigation.

    Q    And then did you then canvass the

area?

    A    Yes, we did.

    Q    Calling your attention, then, to

approximately 4:15 in the afternoon of the same

date, were you at Area 2 at this time?

    A    Yes, sir, I was.

    Q    And did you have occasion, then, to meet

a person now known to you to be Jerome Hendricks?

    A    Yes, I did.

    Q    Could you look around the court, Detective,

and see if you see Jerome Hendricks?

    A    Jerome is seated with that multi-colored

sweater and black shirt, hand on chin.

    MR. CASSIDY:  Let the record reflect an in-court

identification of the Defendant, your Honor.

5



1      THE COURT:    The record may so reflect.

2      MR. CASSIDY:  Q  And did you talk to Mr.

3  Hendricks?

4

5      A      Yes, sir, I did.

6      Q      And who was present for that conversation?

7      A      Initially, at this time, myself,

8  Detective Brownfield and Mr. Hendricks.

9      Q      And where did the conversation take

10  place?

11

12      A      The conversation took place in Interview

13  Room No. 1.

14      Q      Which is in Area 2?

15      A      Yes, sir.

16      Q      And that would be approximately 4:15

17  p.m.?

18      A      Yes.

19      Q      Can you please tell the Judge how this

20  conversation then began?

21

22      A      Basically after entering in the room,

23  I introduced myself and my partner to Mr. Hendricks

24  and informed him then of his rights and I did this

from my FOP book, I believe it's Page 79.

6

1    Q      Do you have your FOP book on you?

2    A      Yes.

3    Q      Can you please produce it?

4    A      Yes, sir.

5

6    Q      Can you please read the rights as you

7    read them to Mr. Hendricks that day?

8    A      I began by saying, do you understand

9    that you have the right to remain silent?  And there

10   was no response, and I asked him, I said, could you

11   answer whether you understand after each right I

12   give you.

13

14   Q      Did he respond?

15   A      Yes, he did.  He responded in the

16   affirmative.  I don't recall if he used the

17   terminology "yeah," or "yes," but it was

18   affirmative.

19

20         I then said do you understand that

21   anything you say can and may be used against you in

22   Court or other proceedings.

23         I said do you understand that, again

24   he answered in the affirmative.

          I then said, do you understand you

7

have a right to have a lawyer before we ask you any
questions and have him during questioning, and, again,
Mr. Hendricks answered in the affirmative.

I then said, if you could not
afford or otherwise obtain a lawyer and you
want one, a lawyer will be appointed for you and we
will not ask you any questions until he has been
appointed.

Do you understand that?  And he
answered in the affirmative.

I then said if you decide to
answer now with or without a lawyer, you
still have the right to stop the questioning at any
time or to stop the questioning for the purpose
of consulting a lawyer, and he again answered in the
affirmative.

I then said you may waive the right
to advise of counsel and your right to remain silent
and you may answer questions or make a statement without
consulting a lawyer if you so desire.

Again, Mr. Hendricks answered in the
affirmative.

8

1

2          I then asked him do you understand

3    all of these rights that I have just read to you,

4    he again said yes.

5          I said do you wish to answer

6    questions at this time?  He said yes.

7     Q      Then what happened?

8     A      At this time I said, Jerome, I said my

9    partner and I and everybody in this unit, the

10   exact words I don't recall, but just that we had

11   been checking your alibi that you gave us.

12

13   MS. PLACEK:  Objection.

14   THE COURT:  What is your objection?

15   MS. PLACEK:  At this point it's a conclusion that

16   he made.

17

18   THE COURT:  This is a conversation, this is

19   what he told and said to the Defendant.  Whether

20   or not there is substance or truth what he is telling

21   the Defendant is another matter.

22          The objection is overruled.

23   THE WITNESS:  He says we have been out in the

24   street all day and the one alibi, alleged alibi that

     you gave, I said, is wrong.  Detective Ryan had talked

9

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1636 IN ILL. (312) 421-0650

1    to him and it doesn't verif y your account. He

2    allegedly told Joanna Ryan that --

3

4      MS. PLACEK: Objection. Conversation between

5    Detective Ryan, Judge.

6      THE COURT: That part of it is sustained.

7      MR. CASSIDY: Q So, basically, you told him you

8    didn't believe his story?

9      A      That is correct.

10      Q      What, if anything, happened then?

11      A      I asked him if he was hungry and he said

12    he was and I said, well, we will get something to

13    eat, because we were going to be working overtime

14    that day and I believe we got chicken, we ordered

15    chicken. I gave him a cigarette, I asked him if he

16    wanted coffee, he declined coffee, he wanted water,

17    I gave him cold water.

18      I said, Jerome, you haven't been

19    telling us the truth, you are holding something back,

20    and food and come at this time, he was eating.

21      I stopped asking him questions

22

23    regarding the homicide investigation while I was

24    eating, there was smalltalk about the weather and

10

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1636 IN ILL. (312) 421-6550

incidental things.

I then began, I said you know you haven't been telling us the truth, Jerome. He said you are right, he said, but my past, if I told the truth, my past would screw me up.

I said what do you mean? He said, well, you know I have been in the penitentiary, I just got out, I am on parole for rape now and people in the neighborhood saw me with the girl.

I said what are you driving at, Jerome? And he stated that it was either, I believe it was Wednesday or Thursday or Tuesday or Wednesday, which wouldhave been the 3rd or 4th of August that he was in the rear yard and he had been cleaning up brnaches and trash that was in the back yard and next door to him there is an abandoned garage and he noted a cat on this abandoned garage and when he got near the garage he said there was a very strong odor emitting from this garage.

He says that he opened the service door to this garage, looked inside and that he observed the girl that was missing laying in the

11

1    corner.

2              He then said that he entered the

3    garage, he went up to her, he may have touched her, he

4    moved some bags but he couldn't tell anybody about

5    it because of his past, the fact that he was on

6    parole for rape and I said, Jerome, I still think

7    you are holding something back, I said did you

8

9    ever have sex with her, and he sort of started

10   thinking, didn't want to answer and then he said --

11         MS. PLACEK:  Objection.

12         THE COURT:  The objection is sustained.

13         MR. CASSIDY:  Q  Well, after you asked him the

14   question about whether or not he had sex with the

15   girl or not, did he answer your question immediately?

16         MS. PLACEK:  Objection.

17         THE COURT:  Overruled.

18         THE WITNESS:  As to having sex with the girl?

19         MR. CASSIDY:  Q  Did he answer that question

20   immediately?

21

22         A      No, he did not, sir.

23         Q      How long -- Did he eventually say anything

24   after you asked him that question?

     12

1    A    Yes.

2    Q    Approximately how much time lapsed from

3    the time that you asked him the question to the

4    time that he gave the response to that question?

5

6    A    He had asked me and Steve, my partner,

7    Brownfield, that he wanted to think about it for a

8    while.  I said fine.  I closed the door, the door

9    is not going to be locked, I will be sitting by the

10   desk, either call me, if I don't hear you open the

11   door and stick your head out and let me know.

12

13   Q    Did you tell him anything that he could have

14   possibly done as far as tests to the victim?

15   A    Yes.

16   Q    What was that?

17   A    I told him that the young girl would be

18   posted and the results of an autopsy could and would

19   indicate possibly the presence of sperm if she had

20   sexual intercourse.

21

22   Q    Did you tell him this before you left the

23   room?

24   A    I believe I did, yes.

     Q    Okay.

13

1          And then you and Detective Brownfield

2  left the room?

3

4     A     Yes, sir.

5     Q     Did you close the door, then?

6     A     Yes, I did.

7     Q     Okay.

8          And then what happened?

9     A     I think it was somewhere around 7:00,

10  a little after 7:00, the door opened and Jerome

11  pointed to me, "John," he said, "I want to talk to

12  you."

13

14     Q     So what did you do, then?

15     A     I says fine, I walked in the room and --

16     Q     Did you go in by yourself?

17     A     Yes. He didn't want to talk to Steve, he

18  just wanted to talk to me and I went in the room.   I

19  closed the door, I said is there anything you want to

20  tell me?  He says yeah, but he says can I get in trouble,

21  the exact words I don't recall, he inquired could he get

22  in trouble if he admitted to having sex with the

23  girl and I believe I responded to him by

24  saying in all probability, you are going to have some

14

JOURNAL MFG. CO.  CHICAGO, IL 60607  1-800-323-1635 IN ILL (312) 421-0590

problems.

With that, he then said that, well,
he said, well, I did have sex with her and he went on
to say that on Monday, which would have been the
first that he had left his home and he had met the
girl, Denise, and she had made a pass towards him
and told him how much she liked him and began hugging
and kissing him and pulled him into her gangway.

Once in the gangway, he says
she squeezed me and hugged and kissed me and took me
in the back yard and he described the back yard as
an abandoned car alongside a fence and he says
that Denise lead him to this location, that Denise
then dropped her pants and he dropped his pants to
his ankles and the two of them engaged in sexual
relations.

And I asked him if he had
ejaculated in her, and he said no, he did not,
that he withdrew and then I told him, you know,
Jerome, I explained to you before, I says the girl is
going to be posted in an autopsy, in all probability
it would reveal that there is a presence of sperm in
her and I think it was at this point where he was

15

saying if I tell you what really happened now, you

won't believe me, and I says, Jerome, all we want is the

truth, and he says, well, let me -- again he says

let me think about it. I said fine, I will be

outside the door, and I left him alone in the

room and I left.

Q    Now, after some time or a short period

of time, did anything happen, then?

A    Well, in between when I left the room the

second time, I had made, you know, the powers to be and

the other investigating officers aware of my conversa-

tions and what he had been telling me, each time telling

me a little bit more, little bit more, and it was

some time, I would say closer to 8:30 in the

evening, that he, again, called me and at that time

I had just got done explaining to Detective Joanne

Ryan that Jerome was coming around.

MR. PLACEK:  Objection to what he said to

Joanne Ryan. It's irrelevant at this point. Also

hearsay at this time.

THE COURT:  Not what he said, what this witness

said is not hearsay. Objection is overruled.

16

1      MR. CASSIDY:  So what did you and Joanne

2  Ryan do?

3      A    I, at this time, I then entered the

4  room, Interview Room No. 1, again, and I

5  brought Joanne Ryan with me and I introduced

6  Jerome to Joanne Ryan and I said Joanne is

7  working on the case along with me and I says do you

8  want to say anything else, and he says yes, I have been

9  thinking about it, I will tell you.

10          So Joanne and I sat down at the

11  table, Jerome, I believe, was seated on the bench and

12  Jerome began explaining that basically what he had

13  said to me earlier about having sex with the girl

14  in the back yard and after the sex act, he had gone out

15  on the street and allegedly the girl had followed

16  him out there.

17      Q    While you were explaining this or while

18  he was explaining this, was he doing anything at this

19  time?

20      A    To me he seemed like --

21      MR. PLACEK:  Objection.

22      MR. LUFRANO: Objection.

17

1    MS. PLACEK:  Conclusion, to me it seemed as.

2    THE COURT:  Well, I take that as being a figure

3    of speech, but it will go out.

4

5    Just tell us what you noticed him

6    doing, not what it seemed to you.  You can do that.

7    THE WITNESS:  Okay, your Honor.

8    While Joanne and I were seated at

9    a table and talking to Jerome and he began relating,

10   again, the sex act in the back yard and leaving the

11   yard and the girl following him, he kept looking at

12   me and like putting his head down.

13

14   MS. PLACEK:  Objection, like putting his head

15   down.

16   THE COURT:  That is an observation that he could

17   well observe with his sense of sight.  Objection is

18   overruled.

19   THE WITNESS:  And I saw that he was starting

20   to communicate pretty well and I asked him, I said,

21   Jerome, am I making you uncomfortable, would you

22   feel better if I left the room, and he said yes, I

23   said okay.

24   Like I explained to you, Joanne is

18

1  working on the case, so I left Joanne Ryan alone with

2  him and at this time left the room.

3      MR. CASSIDY:  Could I have just a moment,

4  Judge, please?

5      THE COURT:  Sure.

6      MR. CASSIDY:  No.  One minute, Judge, please.

7

8          Thank you, Judge.  Thank you,

9  Detective.

10     THE COURT: Cross?

11          CROSS EXAMINATION

12          BY

13          MS. PLACEK:

14

15     Q      Detective, how long have you been a

16  Chicago Police Detective?

17     A      Chicago Police Detective, since February

18  of 1968, Ma'am.

19     Q      And how long have you been a member of the

20  police force, all together?

21     A      26 and a half years, Ma'am.

22     Q      Now, in your 26 and a half years, I take

23  it you have worked a lot of overtime, like you

24  already mentioned, is that correct?

19

1    A    Yes.

2    Q    Would it be correct in saying, well, let

3

4    me ask you this.

5    How long have you worked in Area 2?

6    A    Since February of 1968.

7    Q    And would it be correct in saying that there

8    is nothing wrong with officers working in Area 2

9    who have been away for approximately 36 hours straight?

10

11    A    Yes, Ma'am, that is true.

12    Q    So, in other words, Officer, the Chicago

13    Police Department takes no care about whether or not

14    an Officer works without sleep for 36 hours, correct?

15    MR. CASSIDY:  Objection, your Honor,

16    argumentative.

17    THE COURT:  The objection is sustained.

18    MS. PLACEK:  I will withdraw.

19    Officer, when officers work 36

20    hours without sleep, do they ever hallucinate or have

21    any ill effects?

22

23    MR. CASSIDY:  Objection, speculative.

24    MS. PLACEK:  If he knows?

THE COURT:  I can only speak for myself and

20

1    I have never hallucinated, Ma'am.

2           Q      And let me ask you this.

3                         When you worked for some hours, I

4    take it you weren't taking any naps, this is

5    without sleep, correct?

6           A      I catnap in the office.

7           Q      I am speaking of 40 hours straight,

8    without any sleep whatsoever?  Let's say 36 hours

9    straight without any sleep whatsoever, without these

10   catnaps, have you ever worked that long?

11          A      Yes, Ma'am.

12          MR. CASSIDY:  Objection, please.

13          THE COURT:  The objection is usstained, Ms.

14   Placek.  I don't understand the relevance.  The

15   Officer didn't say he worked 36 hours.

16          MS. PLACEK:  The State mentioned overtime and I

17   want to see exactly how much overtime we are

18   speaking of in this case.

19          THE COURT:  Ask him.

20          MS. PLACEK:  Q  How much overtime did you put

21   in on this case?

22          A      Well, I was still on --

23

24

21

1      Q     Straight, I am speaking of straight?

2      A     Can I answer the question?

3      Q     Surely, Officer?

4      A     When I began my initial interview with

5 Jerome, I was still on my regular shift.  I am not

6 through until 5:00 p.m., Ma'am.

7      Q     Did you leave at 5:00 p.m.?

8      A     No, Ma'am, I did not.

9      Q     How long did you stay?

10     A     I stayed until, Oh, I would say about

11 midnight, maybe later.

12     Q     How long, straight, were you up?

13     A     Well, I believe if my memory serves me

14 right, I probably got up at 7:00 o'clock in the

15 morning on the morning of the 9th, I got to the

16 Office at 8:30 in the morning, probably 17 hours

17 before I left, I was up.

18     Q     Straight, correct?

19     A     Up, I got up.

20     Q     Without sleep?

21     A     Yes, correct.

22     Q     Did you have any catnaps in the office?

22

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1636 IN ILL (312) 421-0560

1    A        No, not during the daytime.

2    Q        Let me ask you this, Officer.

3                Is Area 2 short of police officers

4    that it requires its officers to work, let's say,

5    36 hours straight?

6    MR. CASSIDY:  Objection.  Argumentative.

7    THE COURT:  Sustained.  Not relevant.

8    MS. PLACEK:  Q  Did you see shift changes?

9    A        Did I see shift changes?

10   Q        Yes, Detectives coming in and off duty?

11   A        When I got in there in the morning, I

12   saw some midnight officers leaving.  At 4:30 I seen

13   some afternoon Officers coming and when I left I

14   saw midnight men coming on.

15   Q        Would that be Detectives, also?

16   A        Yes, Ma'am.

17   Q        Thank you.  That is all on that.

18                Now, let me ask you this.

19                When you had a conversation with the

20   Defendant, am I correct in saying that the Defendant was

21   not under arrest?

22   MR. MURPHY:  Objection, Judge.

23

THE COURT:  Sustained, not relevant.

MS. PLACEK: It goes to the Defendant's cooperation
and motive.  I present to the Court People versus
Lambert.

THE COURT:  The objection is sustained.

MS. PLACEK:  Q  Well, Officer, was the Defendant
cooperating with you?

A     He cooperated with me, yes, Ma'am.

Q     You weren't forcing him in any way, were
you?

A     No, Ma'am.

Q     As a matter of fact, am I correct in saying
that before that date and time, you didn't know the
Defendant?

A     I don't believe I did know.

Q     And not only that, but the Defendant kept
saying to you that what he was worried about is that
if he admitted having sex with the girl, becauseof
his background, people would assume the worse, correct?

A     No, you take that out of context, Counsel.
                May I explain?

MS. PLACEK:  I withdraw the question, Judge.

24

1      THE COURT:  When he starts to answer, you can't

2  withdraw, but he has completely answered the question,

3  his answer was no, you took him out of context, that is

4  a complete answer.

5

6           Put another question.

7      MS. PLACEK:  Q  Let me ask you this, Officer.

8           How long, in total, did you speak

9  to the Defendant?

10     A      I began, I believe, my initial conversation

11 with Jerome about 4:15.  It wasn't a straight conversation

12 as I testified, I got him food and there was smalltalk,

13 there was no talk on the case in, I would have to guess,

14 maybe a half an hour, maybe 45 minutes, I don't know.

15

16     Q      In total?

17     A      I don't know, Ma'am, I am just guessing.

18     Q      And when you spoke to him for a

19 half an hour or 45 minutes in total that night, am

20 I correct in saying that to the best of your knowledge,

21 he didn't know, I believe, the other Chicago Police Officer

22 you referred to as Joanne Ryan --

23

24     A      Could I clarify, ask you a question,

Ma'am?  When you are saying in total, I am confused

25

1    here.

2         Q     Okay.  Let me ask you this, then,

3    Officer.

4                    When you state 45 minutes, was that

5    the 4:15 conversation?

6

7         A     Yes, Ma'am.

8         Q     Then after the 4:15 conversation, which

9    was approximately 45 minutes, when did you next see

10   him?

11        A     As I stated, I believe it was shortly

12   after 7:00 p.m..

13        Q     And at 7:00 p.m., do you know where the

14   Defendant was?

15

16        A     Room 1.

17        Q     And were you watching Room 1?

18        A     I was in the immediate area, yes.

19        Q     Was anybody speaking to him, at this

20   time?

21        A     No.

22        Q     So the Defendant was alone in Room No. 1,

23   correct?

24

          A     That is correct.

26

1     Q     And you were watching the room, correct?

2     A     Yes, Ma'am.

3     Q     And while you were watching the room,

4     let me ask you this.

5

6                     The Defendant wasn't handcuffed

7     at this time, was he?

8     A     No, he was not.

9     Q     How long did you speak to the Defendant at

10    7:00 o'clock concerning this case?

11    A     I would have to guess maybe 15, 20 minutes.

12    Q     After that, did you have an occasion to

13    speak to the Defendant about this case again?

14

15    A     Yes, Ma'am.

16    Q     When did you next speak to the Defendant?

17    A     Next time was when I brought Joanne Ryan

18    in, which I think it was some, it was after 8:00,

19    maybe closer to 8:30.

20    Q     Now, do you know how long the Defendant had

21    been at the station?

22

23    A     Honestly, Ma'am, I do not.

24    Q     Did you ask any of your brother officers,

      before you started speaking to the Defendant, how long

27

1    the Defendant had been in the station?

2         A    No, Ma'am, I did not.

3         Q    Let me ask you this, also, Officer.

4              Am I correct in assuming that

5    it's at the 7:00 o'clock conversation when

6    you spoke to the Defendant alone, correct?

7         A    Could you repeat that, please?

8         Q    Am I correct in assuming it's at the

9    7:00 o'clock conversation that you spoke to the

10   Defendant alone?

11        A    That is correct, Ma'am.

12        Q    And am I also correct in assuming

13   that that is when he said I want to speak to John,

14   not Steve, correct?

15        A    Ye called me John, yes.

16        Q    Well, John is your name, correct?

17        A    Yes, it is.

18        Q    And Steve is your partner's name, right?

19        A    Yes, it is.

20        Q    And he didn't want to speak in front of

21   Steve, but he wanted to speak in front of you or talk

22   to you, correct?

23

24

28

A        He asked for me only.

Q        And let me ask you this.

          To the best of your knowledge, before you had any conversation with the Defendant, did he know this young lady by the name of Joanne Ryan?

A        I don't know if he did or not, Ma'am.

Q        Well, you were in there when -- and I am speaking about the little after 8:00 conversation when she entered the room, did you introduce her to the Defendant?

A        Yes, I did.

Q        Thank you.

          Now, at that particular time, he ejected you and wanted to speak to Joanne Ryan?

A        I don't think he ejected me.

Q        Let me ask you this.

          Did he ask you to leave the room and ask to speak to Joanne alone?

A        No.

Q        Did you leave the room?

A        I asked him if he was unconfortable, it seemed to me --

29

1        MS. PLACEK:   Motion to strike, non-responsive,

2  Judge.

3        THE COURT:   The objection is sustained.

4

5        MS. PLACEK:   Thank you.

6             Did you leave the room?

7       A    Yes, Ma'am, I did.

8       Q    Thank you.

9             By the way, the Defendant wasn't

10  handcuffed with Joanne Ryan, correct?

11

12      A    No, Ma'am, he was not.

13      Q    Now, calling your attention to approximately

14  the 4:15 conversation, I believe that you said that

15  this is the time and the longest conversation you had

16  with the Defendant when the Defendant spoke about

17  going in the garage, correct?

18      A    Yes, Ma'am.

19

20      Q    And I believe you said that you weren't

21  quite sure of the date that he said he went into the

22  garage?

23      A    That is correct, Ma'am.

24      Q    And am I correct in assuming that at

that particular time, you gave the Defendant nothing

30

to write on to write down what he was saying to you, correct?

A    That is correct.

Q    And you gave him nothing to sign, correct?

A    That is correct, Ma'am.

Q    And am I correct in assuming that also you didn't have a tape recorder going in the room just so you could get verbatim down the conversation as it was stated?

A    That is against police department policy, Ma'am.

Q    Officer -- Motion to strike as non-responsive.

THE COURT:  The objection is sustained.

MS. PLACEK:  Q  Officer, I take it you didn't have a tape recorder going down to make sure that you had put down or at least you had a verbatim conversation?

A    That is correct, Ma'am.

Q    Now, Officer, calling your attention, again, to the 4:15 conversation, am I correct in saying that you made a written report of this conversa-

31

tion?

     A      Yes, Ma'am.

     Q      And am I correct in saying that you hand-
wrote this written report?

     A      The written report was typed, it wasn't
hand written.

     Q      Typed, so I take it you weren't doing
it in the room when you were speaking to Jerome
Hendricks, typing while you were talking, correct?

     A      No, Ma'am, I was not.

     Q      And let's go one step further.

            I take it that that typewritten
conversation that you did to memorialize this was done
some time after the conversation, correct?

     A      Yes, Ma'am.

     Q      Approximately how long after the
conversation?

     A      I believe the report was done about four
days after my conversation with Jerome.

     Q      Now, am I correct in assuming that that
report, done approximately four days after your
conversation with Jerome, was done from your memory,

32

1   correct?

2       A       No, Ma'am, it was not.

3       Q       Well, was it done from notes?

4       A       Yes, Ma'am.

5       Q       Well, you say notes.  Where are those

6   notes today?

7       A       I believe you have them.  I don't have

8   them.

9       Q       Well, when you say you believe I have them,

10  in other words, am I correct in saying that you

11  wrote down everything Jerome said and everything that

12  you said?

13      A       I wrote and took notes, yes, Ma'am.

14      Q       Well, -- Motion to strike as non-

15  responsive, Judge.

16      MR. MURPHY:  Judge -- Withdraw, Judge.

17      THE COURT:  The motion is sustained.

18      MS. PLACEK:   Q  I take it in those notes, you

19  didn't write down everything that Jerome said to

20  you and everything that you said to Jerome, correct?

21      A       Yes, Ma'am, you are correct.

22      Q       And am I correct in assuming that those

33

notes, for approximately the 45 minute conversation,

and I am speaking of the 4:15, is less than a page

and a half?

     A     Yes, Ma'am.

     Q     Would you say it's less than a page?

     A     I don't know, I haven't looked at

them in some time.

     Q     Well, Officer, did you look at those

notes in preparation for your testimony today?

     A     No, Ma'am, I did not.

     Q     Well, let me ask you this.

     Officer, would it be correct in

saying that you summarized, even to give you the

benefit of the doubt -- Strike that.  I will withdraw

that, Judge, that statement.

     Officer, am I correct in assuming

that at best, you summarized the 45 minute conversation

in less than a page of hand-written notes, correct?

If you can recall?

     A     It's not what I can recall, it's my

answer.

     Q     Motion to strike as non-responsive.

34

1    THE COURT:  Sustained.

2    MS. PLACEK:  Q  Officer, am I correct in assuming,

3
and, again, that you summarized, as you stated, a

4
45 minute conversation in less than a page and a half

5
of notes?

6

7    A    No, Ma'am.

8    Q    Well, was there more pages involved with

9
this 45 minute conversation?

10

11    A    No, Ma'am.

12    Q    So, in less than a page of notes, you

13
summarized that conversation, correct?

14    A    No, Ma'am.

15    Q    Well, Officer, was there more than a page

16
and a half?

17    A    No, Ma'am.

18    Q    Thank you.

19
Now, Officer, your page and a half of

20
notes is, in fact, a summary of your conversation that

21
you had with Jerome, correct?

22

23    A    No, Ma'am.

24    Q    It's the exact words?

    A    No, Ma'am.

35

Q    Well, if it isn't the exact words question by question, am I correct in assuming that it's a summary of what you felt or you thought he said and what you said to him?

A    No, Ma'am.

Q    You quoted his exact words?

A    Yes, Ma'am.

Q    When you say you quoted his exact words in 45 minutes, it went down to approximately a page and a half of notes?

A    I didn't say that, Ma'am.

Q    Well, in your written notes, did you quote his exact words?

A    I believe I quoted some of his exact words.

Q    So, in other words, am I correct in assuming when you say you quoted some of his exact words, you chose which words you were to quote and which words you weren't, correct?

A    I would say yes.

Q    Well, let me ask you this.

          You stated that you were taking

36

1    these notes -- By the way, are these the general progress

2    notes, so-called?

3        A      Yes, Ma'am.

4        Q      Were you writing them out when you

5    were speaking to Jerome?

6

7        A      Not the whole time, no, Ma'am.

8        Q      Well, let me ask you one step further.

9               Isn't it correct that you were

10   actually writing in your notebook when you were speaking

11   to jerome and filled out these G.P. notes or the

12   General Progress NOtes at a later time?

13

14       A      Only when we are talking about the

15   incident.

16       Q      Let's go one step further.

17              Officer, after you summarized in

18   the G.P. notes the 45 minute conversation with

19   Jerome, did you ever show those notes to Jerome and

20   ask him to sign it to say if that is a true

21   representation of the summary?

22

23       MR. CASSIDY:   Objection, assumes a fact not in

24   evidence.

              The Officer denies there was a

37

1   summarization of it.

2        THE COURT:  Well, I don't suppose that that

3   impedes or means that this question is improper.

4        Some characterization has to be put

5   on and the objection is overruled.

6

7        MS. PLACEK:  Q  Officer, did you ever show the

8   summary of those notes to Jerome and, in fact, make

9   sure that you got it right?

10       A     No, Ma'am.

11       Q     Thank you.

12       Now, Officer, calling your attention,

13  again, to the 7:00 o'clock conversation, the 15 minute

14  conversation you had with Jerome --

15

16       A     Yes, Ma'am.

17       Q     Officer, did you also write notes on that

18  conversation?

19       A     I took some notes, yes, Ma'am.

20       Q     When you say "some notes," was that like

21  procedure with you deciding what was going down on

22  paper and without Jerome knowing what notes you took?

23       A     I don't -- Could you repeat the question?

24       Q     Surely, Officer.


38

1

2          The 15 minute conversation at

3  approximately 7:00 o'clock, was that conducted in the

4  same manner as the conversation at 4:15?

5          A      No, Ma'am.

6          Q      Well, Officer, let me ask you this.

7                 Did you take notes?

8          A      Yes, Ma'am.

9          Q      Did you show those notes to Jerome?

10         A      No, Ma'am.

11         Q      Would it be correct in saying that those

12

13  notes cover a little less than a third of a page?

14         A      I don't know how much they covered, Ma'am.

15         Q      Well, let me ask you this.

16                When you say you don't know how

17  much they cover, to the best of your knowledge, did they

18  cover more than a third of the page?

19

20         A      I can't answer that question, Ma'am.

21         Q      Let me ask you this, also.

22                This is not a verbatim statement of

23  what was said during the conversation, correct?

24         A      That is correct, Ma'am.

           Q      And likewise, am I correct in assuming that,

39

1    in fact, you never showed that note to Jerome and

2    asked him to sign it to see if you had, in fact,

3    accurately used the right words to summarize?

4         MR. CASSIDY:  Argumentative.

5         THE COURT:  Overruled.

6         THE WITNESS:  No, Ma'am.

7

8         MS. PLACEK:  No, am incorrect or no, you never

9    showed it to him?

10        A    I never showed it to him.

11        Q    Would it be correct in saying that the

12   two processes, that is the 45 minute and the 15 minute

13   conversation that you had with Jerome covered less than

14   two pages of notes?

15        A    I have to agree with you, I haven't seen

16   the notes in a long time, I don't recall exactly how

17

18   much space they covered.

19        Q    As a matter of fact, would it be correct

20   in saying that not only that, but you abbreviated

21   words on this note-taking procedure,

22   correct?

23

24        A    I always abbreviate.

          Q    And those abbreviations are known, they

     40

are personal only to you?

    A    Only to me.

    Q    So, they are only known to you, they can't be challenged in any way, is that correct?

    MR. CASSIDY:  Objection.

    THE COURT:  Sustained.

    MS. PLACEK:  Officer, as you stated, abbreviations are only known to you, is that correct?

    A    I think any intelligent person looking at the notes could decipher what I am trying to say.

    MS. PLACEK:  Motion to strike as non-responsive.

    THE COURT:  Overruled.

    MS. PLACEK:  Q  Officer, when you say that, you, at that time, considered Jerome an intelligent person, didn't you?

    A    Yes, Ma'am.

    Q    And, so -- But yet you never gave him the right to, in fact, look at those notes and okay them to make sure that you got everything down right, correct?

    MR. CASSIDY:  Objection, argumentative.

    THE COURT:  Overruled.

41

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1636 IN ILL (312) 421-0550

1

2      MS. PLACEK:   Q   Correct?   Is that correct,

3  Officer?

4      A      Yes, Ma'am, that is correct.

5      Q      Now, Officer, you stated that, in

6  fact, the formal report that you spoke of earlier

7  as being typed was done some time later, correct?

8      A      That is correct, Ma'am.

9

10     Q      Approximately when was it done?

11     A      I believe it was done on the 13th.

12     Q      And the 13th, between the 13th and the 9th,

13  let me reverse that, Judge, just for the sake of

14  clarity, between the 9th and the 13th, I take it you

15  were also working on other cases?

16     A      I will tell you very honestly, I don't

17  know what I was doing between the 9th and the 13th.

18

19     Q      To the best of your knowledge and the

20  best of your experience, were you, in fact, working on

21  other cases?

22     A      If I was at work, I would have been,

23  yes.

24     Q      Okay.   Thank you.

            Now, Officer, am I correct in assuming

42

that it was not until the 13th that you sat down
and wrote your formal report, memorializing this
conversation, correct?

A     Yes, Ma'am.

Q     And am I also correct in assuming that since
Jerome was no longer -- Well, may I withdraw and re-
phrase, Judge?

Am I correct in saying that this
conversation that you had with Jerome, that you wrote
in, or excuse me, typed in your formal report, was,
in fact, a summarization of the summary that
was contained on the notes?

A     No, Ma'am.

Q     Well, Officer, let me ask you this.

As stated before, you stated
that, in fact, you took, typed on the 13th from the
notes that you took, correct?

A     Could you repeat that question, please?

Q     As you stated before, Officer, am I
correct in assuming that you based, typed upon,
in fact, the notes you took when you were speaking to
Jerome?

43

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1636 IN ILL. (312) 421-0560

1      A      I didn't understand.  Based the type or

2  case the type?

3      Q      You took the type and based what was

4  stated within on the summary -- I am sorry, Officer,

5  are you ill?

6

7      A      I don't understand what you are saying.

8      Q      Let's start over.

9              You made a typed report,

10 correct?

11     A      Yes, Ma'am, I did.

12     Q      And you said to me a few seconds ago

13 that, in fact, you made the typed report based upon

14 the written notes of the 7th, or strike that, the

15 9th, correct?

16

17     A      Yes, Ma'am.

18     Q      And am I correct in assuming that you

19 stated that these notes, the notes of the 7th were not

20 verbatim, correct?

21

22     A      Notes from the 9th?

23     Q      The notes from the 9th, that they were

24 not verbatim?

           A      Yes, Ma'am.

44

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1635 IN ILL. (312) 421-0550

Q    And not only were they not verbatim, but am I correct in saying that the report, and I am speaking of the typed report, was not in fact a verbatim report, correct?

A    No,

Q    No, I am incorrect or no, I am correct?

A    No, Ma'am, it's not a verbatim report.

Q    As a matter of fact, am I correct in assuming that although typed, it is a shorter, if you will, paper space than the notes that you took when you were actually speaking to Jerome?

A    I don't think so.

Q    Well, let me ask you this.

How many pages did they contain?

A    What pages?

Q    The typed pages?

A    I don't know, Ma'am.

Q    By the way, Officer, when you say you don't know, thisis the report that you, in fact, typed?

A    I didn't type the entire report.

Q    I see.

45

1          So this is only a portion of the

2    report?  Am I correct?  And if you know or don't

3    know whether or not on the typed report there is any

4    quotation marks on that report?

5

6          A     I believe there is.

7          Q     And where are those quotation marks

8    located?

9          A     I have to see the report to give you that

10   answer, Ma'am.

11          Q     Okay.  Thank you.

12

13          Now, Officer, calling your attention

14   again to that report, and I am speaking of the report

15   that was later typed, was it, in fact, based upon the

16   notes?

17          A     In part, yes.

18          Q     And am I correct that, in fact, the words

19   contained on the typed report are not verbatim of

20   the words contained on the notes?

21

22          A     My notes you are referring to?

23          Q     Your notes, Officer?

24          A     I would have to answer that question

yes.

          Q     So, in other words, the words are

46

1   different, correct?

2       A       Yes, Ma'am.

3       Q       So, am I correct in saying that you,

4   again, summarized your notes in type?

5

6       A       I don't know how wo answer that question.

7       Q       Well, yes or no, Officer, that is how

8   you answer it.

9       MR. MURPHY:   Judge, I will object.

10      THE COURT:   The objection is sustained.

11      MS. PLACEK:   Q  Officer, are the words contained

12  within the typed report the same as the written

13  notes?

14

15      A       No, Ma'am.

16      Q       Am I correct in saying that they are not

17  the verbatim words used by yourself or Jerome

18  Hendricks?

19      A       Some are.

20      Q       When you say "some are," are there

21  complete sentences in fact quoted?

22

23      A       I don't recall, Ma'am, I believe there is.

24      Q       Officer, would it be correct in saying,

    in fact, that you summarized your notes on the

    **47**

1    typewritten page?

2        A    I don't know how to answer that question,

3    Ma'am.

4        Q    Well, let me ask you this.

5                Did you write the typewritten page,

6    did you compose the typewritten page?

7        A    Which page?

8        Q    The typewritten page contained in the

9    statement?

10       A    Which statement?

11       Q    Ovvier, how many statements did you

12   take that night?

13       A    I took two statements.

14       Q    And after taking those two statements, did

15   you, in fact, summarize them on the typewritten

16   page?

17       A    I typed them on a typewritten paper.

18       Q    And they are not verbatim, the words of

19   yourself or the Defendant, is that correct?

20       A    Yes, Ma'am.

21       Q    And they are not the verbatim copy of your

22   notes, correct?

48

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1636 IN ILL (312) 421-0590

1      A      No, Ma'am, they are not.

2      MR. MURPHY:  Objection.  This is the fourth

3  time this question is asked.

4

5      THE COURT:  Sustained.

6      MS. PLACEK:  Q  I take it you didn't give,

7  in fact, that typewritten page to Mr. Hendricks to

8  look at?

9      A      No, Ma'am, I did not.

10     Q      And I take it you never gave that typewritten

11 page to Mr. Hendricks to sign, correct?

12

13     A      No, Ma'am, I did not.

14     Q      In other words to make sure that you

15 wrote down everything he actually did say, correct?

16     A      No, Ma'am, I did not.

17     Q      Thank you.

18              Now, Officer, your partner was, in

19 fact, Officer Brownfield, correct?

20

21     A      Yes, Ma'am.

22     Q      To the best of your knowledge, did he

23 sign the general progress report?  The notes?

24     A      I don't know if he did or not.  I usually

   sign the form.

   49

Q    So, in other words, you affixed his name down, correct?

A    Yes, Ma'am.

Q    And is it correct that his name is affixed to the same part dealing with the 15 minute conversation that you say you had with Jerome Hendricks?

A    I don't know if it is.  Possibly it is.

Q    And, Officer, if you say possibly it is, let me ask you this.

That would be incorrect because Officer Brownfield wasn't even present when you had this alleged 15 minute conversation with the Defendant, Jerome Hendricks, correct?

A    No, he was not.

MR. MURPHY:  Objection.

THE COURT:  The objection is sustained.

MS. PLACEK:  Q  Well, was Officer Brownfield present for the 15 minute conversation with Jerome Hendricks?

A    No, Ma'am, he was not.

Q    Thank you.

On your notes, since you affixed

50

1    Officer Brownfield's name on it, would it have, in

2    fact, reflected that he was present for the 15 minute

3    conversation?

4        A    No, Ma'am, it would not.

5        Q    So, his signature on the bottom, either

6    by you or himself, is not an attestation or a

7    confirmation of the report as being true and

8    correct?

9

10       A    No, Ma'am, it is not.

11       MR. CASSIDY:  Objection.

12       THE COURT:  Objection is sustained.  The answer

13   of the witness is stricken.

14       MR. CASSIDY:  Thank you.

15       MS. PLACEK:  Q  Am I correct in assuming -- Well,

16   let me ask you, am I correct in saying that according

17   to your testimony today, Jerome Hendricks admitted

18   having sex with the girl, correct?

19

20       A    Yes, Ma'am.

21       Q    And he admitted having consentual sex,

22   correct?

23

24       A    Yes, Ma'am.

     Q    Never during the conversations did he

say he forced the girl, did he?

51

1      A      No, he did not.

2      Q      He admitted not only having consentual

3   sex with the girl, he never admitted hurting the girl,

4   did he?

5

6      A      No, Ma'am.

7      Q      No, I am incorrect or no, he never --

8      A      He never, did not.

9      Q      He never said he killed the girl?

10     A      Not to me, Ma'am, no.

11     THE COURT:  I am sorry?

12     THE WITNESS:  Not to me he did not.

13     MS. PLACEK:  Q  Now, also -- May I have one moment,

14   Judge?

15

16     THE COURT:  You may.

17     MS. PLACEK:  Thank you.

18            During your conversation with

19   Jerome Hendricks, and I am speaking specifically of

20   the 4:15 conversation, if Jerome Hendricks, and I am

21   speaking only of your action, would have got out of the

22   chair and left, would you have stopped him?

23

24     THE WITNESS:  Yes, Ma'am.

       MR. MURPHY:  Objection.

52

1    THE COURT:  Objection is sustained.  Not

2 relevant.

3    MS. PLACEK:  Q  By the way, did you inventory

4 anything involving this matter?

5

6    A    I don't believe I did, Ma'am.

7    Q    That was Officer Ryan, if you know?

8    A    I don't know.

9    Q    You stated that you had Mr. Hendricks

10 in Interview Room 1, correct?

11

12    A    Yes, Ma'am.

13    Q    And Interview Room 1, is there a round

14 ring on the door -- or strike that.  Is there a

15 round ring on the wall?

16    A    Yes, Ma'am.

17    Q    And that is used to handcuff people,

18 correct?

19

20    A    Yes, Ma'am.

21    Q    And as you stated, Mr. Hendricks was

22 not handcuffed in any way, is that correct?

23    A    That is correct.

24    Q    And is there, in fact, is there a doorknob

on the inside door?

   A    Yes, Ma'am.

53

1          Q      Thank you.

2                       By the way, Officer, at the particular

3    time that you were speaking to Mr. Hendricks about

4    the post, and I am speaking of the autopsy, you

5    talked about autopsy procedures, correct?

6

7          A      Yes, Ma'am.

8          Q      And you spoke, I believe, of the chances

9    of finding sperm, correct?

10         A      Yes, Ma'am.

11         Q      Officer, at this time, the autopsy

12   wasn't done, was it?

13

14         A      To my knowledge, it was not done.

15         Q      And, Officer, of your own personal

16   knowledge, you know now that no sperm was found inside

17   of the girl, is that correct?

18         MR. CASSIDY:  Objection.

19         THE COURT:  Objection sustained.

20         MS. PLACEK:  If he knows?

21

22         THE COURT:  How could he know, other than by

23   hearsay?

24         MS. PLACEK: Personal knowledge, if he read it

     at a later date.

     54

1        THE COURT:  The objection is sustained.

2        MS. PLACEK:  Thank you, your Honor.  I believe

3  that is all we have.

4        THE COURT:  Redirect?

5        MR. CASSIDY:  No further questions, Judge.

6        THE COURT:  Thank you, Mr. Yucaitis, thank

7  you very much.

8        MR. YUCAITIS:  Thank you, your Honor.

9  Thank you.

10                  (Witness excused.)

11        THE COURT:  Call your next witness.

12                  (Witness sworn.)

13        THE COURT:  You may be seated, Ma'am.

14        That microphone is on.  If you

15  will speak directly into it and keep your voice up,

16  we will all hear you.

17        You may proceed.

18        MR. CASSIDY:  Thank you, your Honor.

55

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1636 IN ILL (312) 421-0550

DET. JOANN RYAN,

called as a witness herein, after having been first

duly sworn  was examined and testified as follows:

DIRECT EXAMINATION

BY

MR. CASSIDY:

Q    Would you please state your name and spell

your last name?

A    Detective Joann Ryan, R-y-a-n.  Star

4593, I am assigned to Area 2 Violent Crimes

Section of the Chicago Police Department.

Q    And how long have you been so employed

there?

A    I have been a police officer for 25 years.

Q    And how long have you been in Area 2?

A    13 years.

Q    Calling your attention to August 9th of

1988, were you working that day?

A    Yes, I was.

Q    And as a Chicago Police Detective?

A    Yes.

Q    What watch were you working that day?

56

1    A    The afternoon shift.

2    Q    Approximately some time in the afternoon,

3    did you have an occasion to interview a person known

4    to you then as Michael Walker?

5

6    A    Yes, I did.

7    Q    And later on in the afternoon, did you

8    have a conversation with Detective Yucaitis?

9    A    Yes, I did.

10    Q    Did you relate the contents of the

11    conversation to him?

12

13    A    Yes, I did.

14    Q    Calling your attention to approximately

15    8:30 p.m. on August 9th of 1988, were you

16    at Area 2 located in the City of Chicago?

17    A    Yes, Ma'am

18    Q    Can you please tell the Judge what happened

19    approximately that time?

20

21    A    At 8:30 that night?

22    Q    Yes?

23    A    I was, I spoke, I had spoken with

24    Det. Yucaitis and he asked me, he was talking to us

about a suspect in the case of Jerome Hendricks and

57

1    Det. Yucaitis asked me if I would go into

2    the room and be introduced to Mr. Hendricks and speak

3

4    with him.

5         Q    Did you then go into the interview room?

6         A    Yes, I did.

7         Q    Which interview room was this?

8         A    Interview Room 1 located in Area 2.

9    Area 2 Violent crimes.

10        Q    Then what happened when you entered the

11   room?

12

13        A    Det. Yucaitis indicated to me that

14   Jerome had --

15        MS. PLACEK:  Objection.  Conversation.

16        THE COURT:  The objection is sustained.

17        MR. CASSIDY:  Just what happened, if you would,

18   Det. Ryan, when you entered the room.

19        A    Det. Yucaitis introduced me to Jerome

20   Hendricks.

21

22        Q    The person you refer to as Jerome Hendricks,

23   do you see him in Court today?

24        A    Yes, I do.

         Q    Could you please point him out?

58

1    A    Yes, the gentleman in the gray sweater.

2    MR. CASSIDY:  Let the record reflect an in-

3  court identification of the Defendant.

4    THE COURT:  The record may so reflect.

5    MR. CASSIDY:  Q  After this introduction, then

6  what happened?

7    A    We began speaking with Jerome and Detective

8  Yucaitis was talking with him about being with the

9  victim on the day of the 1st of August, or the

10  evening.

11    Q    All right.

12    A    And Jerome indicated to us that he did, he

13  would rather talk with me alone than with both of

14  us.

15    Q    After he indicated this, what happened?

16    A    Detective Yucaitis left the room.

17    Q    It was just you and the Defendant, then,

18  who were present in this interview room?

19    A    Yes, that is correct.

20    Q    What happened, then?

21    A    I had known that he had been with the

22  victim, I don't recall that he knew her name.

23  59

1    MS. PLACEK:  Objection as to past knowledge,

2  Judge.

3    THE COURT:  The objection is sustained.

4    MS. PLACEK:  Motion to strike.

5    THE COURT:  That portion stricken.

6

7    MR. CASSIDY:  Q  Did the Defendant then tell

8  you what happened?

9    A    Yes, he told me he had been with the victim

10  during the evening of the 1st of August, that he had

11  taken her down a gangway near her home at 11720

12  Princeton, there was a car parked behind that

13  address, he told me that he had sex with her at that

14  location.

15

16    He also told me that he had -- she

17  had been hitting on him all day and she had told him

18  that she wanted him and that she wanted to be with

19  him.

20

21    He said that after they had sex at

22  the car, he left and the victim followed him and ran

23  chasing him around the corner and said, "Come on with

24  me," and he said she ran ahead of him and went -- the

    garage was located at 251 West 117th Street, he said

60

he walked up behind her, behind the garage.  When he

got there, she opened the door and was inside and

when he went inside, she started to hug and kiss him

and she was squeezing his penis.

She then told him not to tell

anybody that she was with him, with her, or anything

was happening.

She then took off her, pulled down

her pants, he said she had one leg out of her pants

and pulled down her underwear and pulled her shirt off

her head.

He said that he removed his -- dropped

his shorts and undershorts to below his knee and that

he, again, had sex with her, entering her vaginally

from the rear and he told her that he -- he told me

that she had pulled the shirt up over her head and

she had something else, he didn't know if it was her

top or if it was just -- just what it was, because he

said it was very dark in there, but she had used

something to put around her mouth in sort of a gag

fashion and she wanted him to hold it and to pull on

it and to ride her like a horse.

61

He said **that she was bent over from**
the knees, he did **enter her and he ejaculated inside**
of her.

Once again she asked him **not**
to say anything to anyone.

He said that he **left the garage and**
went to a park, I believe at 123rd **Street.**

Q    And did he say what he **was going to do**
there at the park, then?

A    I don't know if he told me **that.**

MR. CASSIDY:  No further questions, **Judge.**

THE COURT:  Cross?

CROSS EXAMINATION

BY

MS. PLACEK:

Q    Officer, approximately how long did **you**
speak to Mr. Hendricks?

A    Probably about a half an hour.

Q    And, Officer, am I correct **that assuming,**
or let me ask you this.

Is it correct in saying that Mr.
Hendricks admitted having consentual sex with the girl,

62

1    is that correct?

2        A    Yes.

3        Q    She admitted that she went with him

4    voluntarily, correct?

5

6        A    Yes, she did.

7        Q    He never admitted killing her?

8        A    No, he didn't.

9        Q    He didn't say anything about that, did he?

10       A    No, he didn't.

11       Q    He said he went freely into the garage,

12   correct?

13

14       A    Yes.

15       Q    And did he give an address for the

16   garage?

17       A    I don't believe he gave the exact address,

18   but the garage that we were talking about, he said

19   later he had seen the following week, he had seen

20   her body in that garage.

21

22       Q    When you say the following week, did he

23   give you a day?

24       A    Yes, Wednesday or Thursday, which would

have been the week prior to the day, or I am sorry, the

63

week after she was reported missing.

    Q    So, he said that actually that he didn't see her until approximately a week after she was reported missing, correct?

    A    He saw her on the day that she was reported missing and then the next time he saw her body was in the garage and that was either Wednesday or Thursday on the week following her being reported missing.

    Q    Thank you.

    Now, Officer, as a matter of fact, when you spoke to the Defendant for the half an hour, he never said he harmed the girl in any way, did he?

    A    No.

    Q    No, I am incorrect or no, I am correct?

    A    No, you are correct.

    Q    And, Ma'am, I take it likewise that you never made a report in this -- Well, when I say you never made a report, you never made a verbatim report of this conversation you had with the Defendant, did you?

    A    No, I have notes that were written during

64

the conversation with him.

    Q    When you say "notes that were written,"
would those be the general progress report?

    A    Yes, it would.

    Q    How many pages or page is reflected by that
15 minute conversation?

    A    I believe there are two pages.

    Q    And am I correct in saying that,
in fact, you were writing while Jerome was
speaking?

    A    At some times, yes.

    Q    And am I correct in saying, quite
frankly, your G.P. notes or General Progress Notes,
like most G.P. Notes, are partial sentences?

    A    Yes.

    Q    Abbreviations?

    A    Yes.

    Q    Never verbatim?

    A    No, they are verbatim statements.

    Q    When you say "verbatim," did you ever
say I said this to him, to which he responded this?

    A    No, I didn't.

65

1    Q    As a matter of fact, it's a summary of

2  your conversation with him, correct?

3    A    Yes.

4    Q    Did you ever, as a matter of fact, when

5  Mr. Hendricks said that he saw Ms. Johnson on

6  August 1st, he said he saw her before she was

7  reported missing, correct?  If you can recall?

8

9    A    I didn't recall.

10    Q    And let me also ask you this.

11        To the best of your knowledge, you

12  said that he said after he had sex with her, that

13  he went to a park, correct?

14

15    A    He said he went, I don't know if he said

16  he went to the park or he was on his way to the

17  park.

18    Q    I think you mentioned 123rd, a park on 123rd?

19    A    That is what is written there, that

20  is correct.

21    Q    If you say that is what is written there,

22  are you saying that you are basing your testimony, and

23  after refreshing it, off of your notes?

24

    A    Yes.

66

1   Q      Am I correct in saying that the park on

2   123rd is West Pullman Park?

3

4   A      That is correct.

5   Q      Thank you.

6          By the way, do you know how many

7   police officers spoke to the Defendant before you spoke

8   to the Defendant, if you remember?

9   A      I don't recall, no.

10  Q      Do you recall whether or not you would

11  have known such information at the time that you

12  spoke to him that date and time in question?

13

14  A      Well, at that date and time, I knew he

15  had been arrested the night before and I knew that

16  there were Detectives involved in that.  I knew he

17  had been to the Polygraph Section

18  MS. PLACEK:  Well, motion to strike as to the

19  Polygraph, Judge.

20

21  THE COURT:  Answer not responsive, so it's

22  stricken.

23  MS. PLACEK:  Q  By the way, you said that

24  he was arrested the night before.  Approximately what

    time?

67

1    MR. MURPHY:  Objection, Judge.

2    MS. PLACEK:  If she knows.

3    THE WITNESS:  I don't recall.

4    THE COURT:  What is the basis of the objection?

5    MR. MURPHY:  Withdrawn, Judge.

6

7    MS. PLACEK:  Q  And to the best of your

8  knowledge, Mr. Hendricks, from the night before until

9  until you saw him the subsequent evening, some 24

10  hours later, was in continuous police custody, correct?

11    MR. MURPHY:  Objection, Judge.

12    MS. PLACEK:  If she knows.

13    THE COURT:  What is the basis of your objection?

14    MR. MURPHY:  Relevance, Judge.

15    MS. PLACEK:  As to the weight to put on the

16

17  statement.

18    MR. MURPHY:  Whether he is in custody or not in

19  custody?

20    THE COURT:  Well, I sustained a number of

21  objections along that line, Mr. Murphy, on the grounds

22  that there is no Fourth Amendment violation that is

23  still alive in this case, but on the other hand, the

24  Defendnat has a right to ask the trier of fact to take

68

into consideration the circumstances under which

the statement was made in order to assess what weight to

be given to it and in assessing the totality of the

circumstances surrounding the giving of the

statement, whether or not he was in custody and

coerced, if there was any, or whether or not he

was arrested or not arrested or his circumstances of

being in the police facility could become relevant to

that and after further reflection on that

aspect of the relavancy of the question, the objection

is overruled.

MS. PLACEK:  Thank you, your Honor.

You knew that by thetime that you

got him, he was in continuous police custody for over

24 hours, corract?

THE WITNESS:  That is correct.

MS. PLACEK: Q    You knew he was being constantly

questioned, corract?

A       Not constantly quastioned, no.

Q       Well, let me ask you this.

Do you know whether or not five or

six or seven Officers had questioned him before you

69

1    questioned him?

2          A      I don't know the exact number, no.

3          Q      But you knew there was more than, let's

4    say, four?

5

6          A      Yes, I knew that because I knew of the

7    Officers that were involved in the investigation.

8          Q      By the way, approximately how many

9    officers were involved in this investigation?

10         A      From our unit or --

11         Q      If you know, in total?

12

13         A      In total, I haven't any idea.

14         Q      By the way, after your conversation with

15   the Defendant, did you have an opportunity to

16   call the State's Attorney?

17         A      Yes.

18         Q      Thank you.

19                That is all I have, Judge.

20         THE COURT:   Redirect?

21         MR. CASSIDY:   No further questions, Judge.

22

23         THE COURT:   Thank you, Ms. Ryan, you may step

24   down.

                         (Witness excused.)


70

THE COURT:  Before you call your next witness,
we will take a five-minute recess.

MR. MURPHY:  Judge, actually we have no more
witnesses.

THE COURT:  You don't have any more witnesses
for today?

MR. MURPHY:  We had a witness that was here
today, we expected to call.

THE COURT:  I saw her and she told me she
had an obligation at the Civic Center.

            You are talking about Demacopoulos?

MR. MURPHY:  Yes.

THE COURT:  Assistant State's Attorney?

            Counsel, would you approach the
Bench.

                        (Whereupon, a discussion
                        was had off the
                        record.)

THE COURT:  As to Mr. Hendricks, Order of
Court, February the 19th.

            See you then, Mr. Hendricks.

71

1

2

3

4

(Which were all the pro-

ceedings had in this

matter at this time.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CCCR-310

# Transcript of Record
# Appeal
# to

APPELLATE    **Court of Illinois**

FIRST    **District**

POST-CONVICTION

**Circuit Court No.** 88 CR 12517

**Trial Judge** LEO E. HOLT

**Reviewing Court No.** 95-0474

THE PEOPLE OF THE STATE OF ILLINOIS

## VS.

JEROME HENDRICKS

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

VOLUME TWO

REPORT OF PROCEEDINGS, ONLY

ORDER ENTERED

JAN 1 7 2007

APPELLATE COURT, FIRST DISTRICT

FILED APPELLATE COURT
1ST DIST.
'96 AUG 14 P3:52

**AURELIA PUCINSKI**

**Clerk of Court**

Per    AP/GL

**Deputy**

FILED

MAR 0 3 1995

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

1   STATE OF ILLINOIS     )
                           )  SS:

2   COUNTY OF C O O K    )

3              IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION

4

    THE PEOPLE OF THE      )
5   STATE OF ILLINOIS      )
                         )
6        VS           )   No.  88 CR 12517
                         )
7   JEROME HENDRICKS      )

8                    __REPORT OF PROCEEDINGS__

9                   BE IT REMEMBERED that this cause

10   came on for hearing before the Honorable LEO E. HOLT,

11   on the 16th day of December, A.D., 1994.

12   PRESENT:

13         HON. JACK O'MALLEY,
           State's Attorney of Cook County, by:
14         MR. JOHN HASKINS,
           Assistant State's Attorney,
15            appeared on behalf of the People;

16

17         MS. RITA FRY,
           Public Defender of Cook County, by:
18         MS. DIANE SLOCUM,
           Assistant Public Defender,
19            Appeared on behalf of the Defendant.

20

21

    JANYCE W. BOOTH, CSR.
22   Official Shorthand Reporter
    CSR License No. 084-002097
23   Criminal Division

24

```
 1    DATE      :    12-16-94

 2    PAGES     :    A-1 through A-5

 3    MOTION

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1          THE CLERK:  Sheet 1 line 9.  Jerome Hendricks.

2          MR. HASKINS:  Your Honor, on this particular

3    case, I filed an Amended Motion to Dismiss this

4    morning.  You can see my copy if you want.

5                    Your Honor, this case you

6    litigated -- actually February 24th, 1994, Defendant

7    filed a pro se petition which the trial court summarily

8    dismissed on March 24, 1994.  For that reason, there is

9    no collateral relief.  Here is the opinion.  It just

10   came back.  He filed this like three weeks after you

11   denied the first one.

12         MS. SLOCUM:  Your Honor, this is my case.  I'm

13   asking that our office be granted permission to

14   withdraw.  The PC date that was filed April 19th is

15   identical.  In fact, I think it's a Xerox copy of the

16   one that was filed February 24th which was dismissed,

17   and as Mr. Haskins said, the dismissal was affirmed on

18   appeal.

19         THE COURT:  I am going to grant the State's

20   Motion to Dismiss.  I'm just wondering in my mind why I

21   didn't summarily dismiss this.

22         MR. HASKINS:  I think you did.

23         THE COURT:  No.  Then it was refiled, was it

24   not?

1          MS. SLOCUM:  On April 19th.

2          MR. HASKINS:  It was filed and dismissed within

3     six weeks.  It was filed February 24th, and it was

4     denied March 21st.  So it was three weeks.

5          THE COURT:  Then was another one filed?

6          MR. HASKINS:  Yeah, the same one.  That's the

7     one in front of you now.

8          THE COURT:  That's why I'm wondering why I

9     didn't dismiss the second one.  I'm aware I summarily

10    dismissed the first one and that it went up to the

11    Appellate Court and came back affirmed.  I just thought

12    maybe there might have been some variance or difference

13    that required it to go forward.

14               Motion State to dismiss is allowed.

15               Counsel, have you complied with Rule

16    609.

17          MS. SLOCUM:  Your Honor, my position is it's not

18    a valid petition to begin with.  It's an exact Xerox

19    copy of the one that was dismissed.

20          THE COURT:  So be it.

21               (WHICH WERE ALL THE PROCEEDINGS HAD)

22

23

24

1    STATE OF ILLINOIS   )

2    COUNTY OF C O O K   )   SS:

3

4

5

6                    I, JANYCE W. BOOTH, Official Court

7    Reporter of the Circuit Court of Cook County, do hereby

8    certify that I reported in shorthand the proceedings

9    had in the above-entitled cause, that I thereafter

10   caused the foregoing to be transcribed into

11   typewriting, which I hereby certify is a true and

12   correct transcript of the proceedings.

13

14

15                    _____

16                    CSR License No. 084-002097

17

18

19

20

21   Dated this 27th day of

22   February, 1995.

23

24

FILED

MAR 03 1995

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

STATE OF ILLINOIS     )
                      )  SS.
COUNTY OF C O O K      )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE          )
STATE OF ILLINOIS          )
                           )
        -vs-               )    No.    88 CR 12517
                           )
                           )
                           )
JEROME HENDRICKS           )

REPORT OF COMPLIANCE


         I, FRED PANOZZO, Supervisor, Official Short-
hand Reporter of the Circuit Court of Cook County, County
Department- Criminal  Division, do hereby certify that on
the  3  day of _____March_____, 19 95, the original and a
carbon copy of the Report of Proceedings in the above-
entitled cause were filed with the Clerk of this Court.


                                _____
                                Fred Panozzo, Supervisor
                                District Six

(Rev. 4/2 /92) CCCR 0056

STATE OF ILLINOIS  )
                   )  ss.
COOK COUNTY        )

I, AURELIA PUCINSKI, Clerk of the Circuit Court of

Cook County, in said County and State and Keeper of the Records and Seal thereof, do hereby certify the

above and foregoing to be a true and complete copy of A (ONE) VOLUME RECORD CONSISTING OF

THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE

NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO.   95-0474

in a certain cause. . . . . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . pending in said Court, between

The people of the State of Illinois . . . . . . . . . . . . . . WERE . . . . . . . . . . . . . . . . . . RESPONDENTS and

JEROME HENDRICKS . . . . . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . PETITIONER



Witness, AURELIA PUCINSKI, Clerk of the Court
and the Seal thereof, at Chicago,. In said

County, . . . . . . . . . . . . MARCH 13 . . . . . . . . , 19.95. .

CCCR-310

# Transcript of Record

## Appeal
to

APPELLATE _____ Court of Illinois

FIRST _____ District

POST-CONVICTION

**Circuit Court No.** _____ 88 CR 12517 _____

**Trial Judge** _____ LEO E. HOLT _____

**Reviewing Court No.** _____ 94-1570 _____

THE PEOPLE OF THE STATE OF ILLINOIS

## vs.

JEROME HENDRICKS

## from
# CIRCUIT COURT
## of
# COOK COUNTY, ILLINOIS

## COUNTY DEPARTMENT, CRIMINAL DIVISION

**VOLUME TWO**

**REPORT OF PROCEEDINGS**

**AURELIA PUCINSKI**

**Clerk of Court**

Per _____ AP/GL _____

**Deputy**

GILBERT S. MARCHI
CLERK OF COURT

'94 SEP 16 P3:?2

FILED APPELLATE COURT
1st DIST.

ORDER ENTERED
JAN 17 2007
APPELLATE ONLY
APPELLATE COURT, FIRST DISTRICT

FILED

AUG 1 9 1994

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

v37

1          IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

2                    COOK COUNTY, ILLINOIS

3     THE PEOPLE OF THE              )

4     STATE OF ILLINOIS,             )    CRIMINAL DIVISION

5          Plaintiff,                )

6          VS.                       )    CASE NO. 88-CR-12517 (PC)

7     JEROME HENDRICK,               )

8          Defendant.                )

9          REPORT OF PROCEEDINGS of the hearing had before the

10    Honorable LEO E. HOLT, Judge of said court, on the 21st

11    day of March, 1994.

12         PRESENT:

13             HONORABLE JACK O'MALLEY,

14                 State's Attorney of Cook County, by

15             MR. PATRICK FINLEY,

16             MS. KARLA OSANTOWSKI,

17                 Assistant State's Attorneys,

18                 for the People of the State of Illinois;

19

20

21

22

23

24

                            1

1          THE CLERK:   Sheet 5, line 19; Jerome Hendricks.

2               Judge, this is a motion to advance.

3          THE COURT:   Motion to advance sustained.   Petition

4    for post conviction relief is dismissed.

5          THE COURT:   Draft order is entered.

6

7

8                    (Which were all of the proceedings

9                     had in the above-entitled cause on

10                     the above date:)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

2

1          IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

2                      COOK COUNTY, ILLINOIS

3

4

5

6

7

8        I, SHIRLEY A. MITCHELL-WINTON, an Official Court

9    Reporter for the Circuit Court of the Cook Judicial

10   Circuit, Cook County, Illinois, do hereby certify that I

11   reported in shorthand the proceedings had in the

12   above-entitled cause; that I thereafter caused the

13   foregoing to be transcribed into typewriting, which I

14   hereby certify to be a true and accurate transcript of

15   the proceedings had in the above-entitled cause.

16

17

18

19

20                      Official Court Reporter

21

22   Dated this 5th day

23   of August, 1994.

24   License No. 084-001406

3

~FILED

STATE OF ILLINOIS   )
                     ) SS:
COUNTY OF C O O K  )

AUG 1 9 1994

**AURELIA** PUCINSKI
CLERK OF CIRCUIT COURT

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE   )
STATE OF ILLINOIS   )
                   )
    -vs-       )   **No.**   88 CR 12517  PC
                   )

JEROME HENDRICK

REPORT OF COMPLIANCE

        I, FRED PANOZZO, Supervisor, Official short-hand Reporter of the Circuit Court of Cook County, County Department- Criminal Division, do hereby certify that on the _19_ day of _August_, 19.94 the original and a carbon copy of the Report of Proceedings in the above-entitled cause were filed with the Clerk of this Court.


Fred Panozzo, Supervisor
District Six

(Rev. 4/2 /92) CCCR 0056

STATE OF ILLINOIS ) ss.
COOK COUNTY )

I, AURELIA PUCINSKI, Clerk of the Circuit Court of

Cook County, in said County and State and Keeper of the Records and Seal thereof, do hereby certify the

above and foregoing to be a true and complete copy of . . . . A (ONE) VOLUME RECORD CONSISTING . . . .

OF THE REPORT OF PROCEEDINGS, ONLY.  NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE

NOTICE OF APPEAL FILED IN THE APEPLLATE COURT UNDER APPELLATE COURT NO.    94-1570

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause. . . . . . . . . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The people of the State of Illinois . . . . . . . . . . . . ARE RESPONDENTS AND . . . . . . . . . . . . . XXXXXXXXX
JEROME HENDRICKS                        IS PETITIONER
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XXXXXXX . . . . .



Witness, AURELIA PUCINSKI, Clerk of the Court
and the Seal thereof, at Chicago,.  In said

County, . . . . . . . SEPTEMBER 7 . . . . . . . . . . . . , 19. 94.

*Aurelia Pucinski /Gr*

```
STATE OF ILLINOIS   )
                    )   SS:
COUNTY OF C O O K   )
```

            IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION

```
THE PEOPLE OF THE   )
STATE OF ILLINOIS   )
                    )
        vs.         )        88 CR 12517 01
                    )
                    )
JEROME HENDRICKS    )
```

                    REPORT OF PROCEEDINGS had at

the hearing of the above-entitled cause, before

the Honorable LEO E. HOLT, Judge of said court;

on the 19th day of February, A.D., 1997.

            APPEARANCES:

                    HON. RICHARD A. DEVINE,
                    State's Attorney of Cook County, by
                    AIDAN O'CONNOR a n d
                    PATRICIA McLAUGHLIN,
                     Assistant State's Attorneys,
                     appeared on behalf of the People;

                    No one appeared in open court
                     on behalf of the Defendant.



Date of Hearing:  2/19/97

Pages:  B-1 through B-4

                    I    N    D    E    X

Continuance

IN THE CIRCUIT COURT OF COOK COUNTY

COUNTY DEPARTMENT-CRIMINAL DIVISION

OFFICE# 145

THE PEOPLE OF THE  )
STATE OF ILLINOIS  )
                   )
                   )
        Jerome     )          No. 88 CR. 12517-01
  vs.              )
        Hendricks  )
                   )
                   )

REPORT OF COMPLIANCE

I, Pamela C. Taylor, Assistant Administrator of the Official Court Reporters of the Circuit Court of

Cook County, County Department - Criminal Division, do hereby state that on the

6th day of April 06 , the original Report of

Proceedings was filed with the Clerk of the Circuit Court, Criminal Division.

PD (or SAD) or SAO

Pamela C. Taylor
Assistant Administrator,
Criminal Division

Received by: _____
             Deputy Clerk, Criminal Division

             245 Number of pages

VOL. 1 OF 1

1                          I N D E X

2    Date: March 4, 1997

3    Pages: C-1 through C-4

4

5

6

7

8

9

10   Continuance.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## I n d e x

**3-14-97**

Pgs D1 & 2

Continuance

Index

3-17-97

Pgs E1 & 2

Continuance

1                           I N D E X

2
      Date of Hearing: March 21, 1997
3     Page Numbers:  F-1 to F-4
      Proceedings:   Continuance
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    I N D E X

2

3   SHARON WASHINGTON WINN

4   DATE OF PROCEEDINGS:  5-23-97

5   G-1 THROUGH G-6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                        G-2

# Index

**8-29-97**

Pgs H1 & 2

Continuance

1                          I N D E X

2      DATE:    12-5-97

3      PAGES:   I-1 through I-5

4

5      Continuance

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## I n d e x

**1-14-98**

Pgs J1 through J4

Continuance

```
1                    I    N    D    E    X

2

3

4   DATE:      March 20, 1998

5   PAGES:     K-1 through K-4

6   Report of Proceedings

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

K

```
 1                    I N D E X

 2   NAME OF CASE:  Jerome Hendricks

 3   DATE OF HEARING:  May 29, 1998

 4   Continuance

 5   L-1 through L-5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                          I N D E X

2    NAME OF CASE:  JEROME HENDRICKS

3    DATE OF HEARING:  August 21, 1998

4    Continuance

5    M-1 through M-4

6

7

8

9

10

11        THE CLERK:  Jerome Hendricks.

12        MS. OPP:  Good morning, your Honor, for the record,

13   Christine Opp, O-p-p, Assistant public defender.

14        THE COURT:  Mr. Haskins is not handling this case?

15        MS. OPP:  He's handling it, but he went to another

16   courtroom.

17        THE COURT:  My court call is being dismantled an

18   will not be in existence after September 4.  Accordingly,

19   I am going to transfer this case back to the presiding

20   judge for reassignment.  I suspect that it will be

21   reassigned to me, but I'm not certain that that's going

22   to happen.

23             In any event, I spoke to Mr. Haskins this

24   morning, and he indicated that September 8 would be an
```

1                            I N D E X

2

3      Date of Hearing:  September 17, 1998

4      Pages:  N-1 through N-5

5

6                          PROCEEDINGS:

7

8      Continuance    N-3

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1      Proceedings of 12-8-98
       Pages O-1 through O-5
2
                        I N D E X
3
       continuance            O-3
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                          <u>INDEX</u>

2

3     DATE:   JUNE 3, 1999

4

5     PAGES:   R 1 TO R 5

6

7     CONTINUANCE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                            <u>INDEX</u>

2

3        Date of Hearing:   September 1, 1999

4        Pages:             S-1 through S-6

5

6

7        Case continued to 11-2-99

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DATE:    1-20-99

PAGES:   P1-P8

I N D E X

Continuance                        7