

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | **FILED** |
| JEROME HENDRICKS, | ) | Jun 13, 2008 |
| | ) | JUN 13 2008  EA |
| Petitioner, | ) | |
| | ) | **MICHAEL W. DOBBINS** |
| vs. | ) | **CLERK, U.S. DISTRICT COURT.** |
| | ) | No. 08 C 1589 |
| | ) | |
| DON HULICK, Warden, | ) | The Honorable |
| | ) | Matthew F. Kennelly, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

In compliance with Rule 5 of the Rules Governing Section 2254 Cases in the

United States District Courts, and this Court's order of May 29, 2008, respondent

files the attached transcript of trial court proceedings in *People v. Hendricks*, No.

88-CR-12517, in support of respondent's Motion to Dismiss the above-captioned

petition for writ of habeas corpus.

June 13, 2008                                    Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By:

GARSON FISCHER, Bar # 6286165
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
TELEPHONE: (312) 814-2566
FAX: (312) 814-2253
E-MAIL: gfischer@atg.state.il.us

2 of 2

CCCR-310

95 4474

# Transcript of Record
## Appeal
## to

APPELLATE

**Court of Illinois**

FIRST

**District**

SUPPLEMENTAL RECORD

# Circuit Court No. _88 CR 12517_

# Trial Judge _LEO HOLT_

FILED
APP~
JUL 1 6 1996
GILBERT O. MARCHMAN
CLERK

# Reviewing Court No. _95-0474_

THE PEOPLE OF THE STATE OF ILLINOIS

# VS.

JEROME HENDRICKS

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS

## COUNTY DEPARTMENT, CRIMINAL DIVISION

ORDER ENTERED
JAN 1 7 2007
APPELLATE COURT, FIRST DISTRICT

**AURELIA PUCINSKI**

**Clerk of Court**

VOLUME ONE    OF FIVE VOLUMES
SUPPLEMENTAL RECORD

**Per** AP/nd

**Deputy**

(Rev. 4/8 /92) CCCR 0051

# UNITED STATES OF AMERICA

State of Illinois    )
Cook County    )  ss.

Pleas, before a branch of the Circuit Court of Cook County, in said County and

State, begun and held at the Circuit Court, in said County,

one thousand nine hundred and    NINETY SIX                          AND OF THE INDEPENDENCE

OF THE UNITED STATES OF AMERICA, TWO HUNDRED AND NINETEENTH YEAR.

Present: Honorable

THOMAS R. FITZGERALD........Judge of the Circuit Court of Cook County

JACK M. O'MALLEY.................................State's Attorney

MICHAEL F. SHEAHAN..........................Sheriff of Cook County

AURELIA PUCINSKI.........................................Clerk

Attest:

And afterwards, to-wit: on

JUNE 26            , 19 96        ,    there was RECEIVED and FILED

in the Office of the Clerk of the Clerk of the Circuit Court of Cook County, Illinois. COUNTY DEPARTMENT,
CRIMINAL DIVISION, A (ONE) VOLUME SUPPLEMENTAL RECORD CONSISTING OF (EXHIBITS) ONLY.
AN INFORMATION GEN. NO. 88 CR 12517      FOLLOWING TO WIT:

FILED

STATE OF ILLINOIS )
                  )  SS.
COUNTY OF C O O K )

           IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE       )
STATE OF ILLINOIS       )
                        )
        V               )   No. 88 CR 12517
                        )
JEROME HENDRICKS        )

        REPORT OF PROCEEDINGS had in the above entitled

cause, before the Honorable LEO E. HOLT, Judge of said

court, on the 19th day of February, A.D., 1991.

        APPEARANCES:

                HON. JACK O'MALLEY,
                    State's Attorney of Cook County, by
                MR. JOHN MURPHY and
                MR. SCOTT CASSIDY,
                    Assistant State's Attorneys,
                    appeared for The People;

                MR. RANDOLPH STONE,
                    Public Defender of Cook County, by
                MS. MARIJANE PLACEK,
                    Assistant Public Defender,
                    appeared for The Defendant.

ck7

887

# I N D E X

1   DATE OF HEARING:  March 29, 1989..............Page 1

2   DATE OF HEARING:  February 27, 1990..........Page 68

3     OPENING STATEMENT EY MS. PLACEK............Page 71

4     OPENING STATEMENT BY MR. RONKOWSKI.........Page 75

5   WITNESSES:              DX       CX      RDX    RCX

6     JEROME HENDRICKS      78       88      96

7     LAURENCE NITSCHE      99      133     167

8   DATE OF HEARING:  March 7, 1990..............Page 142

9   DATE OF HEARING:  March 13, 1990............Page 174

10  DATE OF HEARING:  March 29, 1990............Page 177

11  WITNESSES:              DX       CX      RDX    RCX

12    JAMES C. HILL        182      186     196

13    DET. MICHAEL BAKER 201        219     238    241

14  DATE OF HEARING:  May 31, 1990..............Page 251

15  WITNESSES:              DX       CX      RDX    RCX

16    DAVID HENDRICKS HALLEY 260   263     276    277

17    EARLINE HENDRICKS 279        283

18    ALBERT WOLF          290      293     298    299

19    OPENING ARGUMENT BY MS. PLACEK.............Page

20    CLOSING ARGUMENT BY MS. HALLO..............Page

21    CLOSING ARGUMENT BY MS. PLACEK.............Page

22  DATE OF HEARING:  June 27, 1990.............Page

23  DATE CF HEARING:  January 14, 1991..........Page 351

24  DATE OF HEARING:  February 4, 1991..........Page

DATE OF HEARING:  February 5, 1991..........Page 353

DATE OF HEARING:  February 6, 1991..........Page 479

DATE OF HEARING:  February 7, 1991..........Page 509

   OPENING STATEMENT BY MS. PLACEK............Page 526

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| MICHAEL GATTO | 531 | 543 | 545 | |
| YOLANDA HILL | 547 | 575 | 599 | 600 |
| LAWRENCE NITCHE | 603 | 615 | | |

DATE OF HEARING:  February 8, 1991..........Page 618

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| DAVID KADDIGAN | 636 | 647 | 650 | |

DATE OF HEARING:  February 11, 1991..........Page 665

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| CAROLYN STRONE | 667 | 705 | | |
| JEROME WALKER | 711 | 733 | 780 | |
| ROBERT TOVAR | 741 | | | |

DATE OF HEARING:  February 13, 1991..........Page 764

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| ROBERT TOVAR | 767 | 769 | | |
| HARDING JOHNSON | 770 | 777 | | |
| JAMES HILL | 784 | 789 | | |
| JOHN FASSL | 794 | 835 | 851 | 852 |
| MICHAEL BAKER | 853 | 885 | 887 | 890 |

DATE OF HEARING:  February 14, 1991.........Page 895

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| JOHN YUCAITIS | 897 | 913 | | |
| JOANN RYAN | 950 | 956 | | |

DATE OF HEARING:  February 19, 1991.........Page 967

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| MICHAEL BAKER | 968 | 971 | 973 | |
| MARY JUMBELIC | 974 | 988 | 1010 | 1027 |
| ANNA DEMACOPOULOS | 1033 | 1049 | | |

DATE OF HEARING:  February 20, 1991.........Page 10

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| JOHN FITZPATRICK | 1091 | 1129 | 1139 | 1140 |
| PHYLLIS WILLIAMS | 1141 | 1191 | 1189 | 1191 |
| STEPHANIE SMITH | 1202 | 1209 | | |

DATE OF HEARING:  February 21, 1991.........Page 121

DATE OF HEARING:  March 25, 1991.........Page 1271

DATE OF HEARING:  March 26, 1991.........Page 128

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| STEVE MATKOVICH | 1300 | | | |
| ESTELLE FILLES | 1314 | 1338 | 1340 | |
| JOHN BLACKMAN | 1343 | 1358 | 1371 | |
| DAVID KADDIGAN | 1360 | 1366 | | |

DATE OF HEARING:  April 16, 1991..............Page 1423

   WITNESSES:         DX     CX     RDX    RCX

    DAN GRZYB      1424

    DOHLIA PADGURSKIS 1433    1445    1445

DATE OF HEARING:  May 29, 1991................Page 1451

CLOSING ARGUMENT BY MR. CASSIDY...............Page 1492


DATE OF HEARING:  May 30, 1991................Page 1506

DATE OF HEARING:  August 20, 1991.............Page 1547

DATE OF HEARING:  August 22, 1991.............Page 1632

DATE OF HEARING:  August 26, 1991.............Page 1700

1    THE CLERK:  Sheet 7, Line 20, Jerome

2  Hendricks, in custody.

3              (Defendant Present)

4        THE COURT:  All right.  Both sides ready?

5        MR. MURPHY:  Yes, Judge, we are ready.

6        THE COURT:  Call your next witness.

7        MR. MURPHY:  The State would be recalling

8  Michael Baker.

9        MS. PLACEK:  Objection.

10       THE COURT:  No, the objection is overruled at

11  this time.  You may proceed.

12       MR. MURPHY:  Thank you, Judge.

13            M I C H A E L    B A K E R,

14  called as a witness on behalf of The People of the State

15  of Illinois, having been first duly sworn, was examined

16  and testified as follows:

17              DIRECT EXAMINATION

18            By Mr. Murphy:

19       Q  Detective Baker, you have already testified

20  in this trial, is that correct?

21       A  That's correct.

22       Q  And you have already identified the

23  defendant in open court?

24       A  Yes, I have.

ck8

958

1      Q   For the record please identify him

2  again and indicate an article of clothing.

3      A   Wearing the gray suit. (Indicating)

4      MR. MURPHY:   For the record the in-court

5  identification of the defendant?

6      THE COURT:   The record may so reflect.

7      MR. MURPHY:   Detective Baker, at any time when

8  you spoke to the defendant did he ever tell you what

9  his date of birth was?

10      A   Yes.

11      MS.PLACEK:   Objection.

12      THE COURT:   What's the objection?

13      MS. PLACEK:   Neither new matter, Judge, to

14  precipitate a recall, nor a fact matter that couldn't

15  have been asked of him at the time, nor surprise as

16  would have come up with other witnesses in this

17  proceeding.

18      THE COURT:   No, objection overruled.

19      THE WITNESS:   Yes, I did ask him.

20      MR. MURPHY:   When was that?

21      A   His birthdate is 6 April, 1961.

22      Q   And in addition to that did you ever

23  ask the defendant what his address was on the date

24  of August-- Before he came to the police station on

ck9

1    August 8th, 1988?

2         MS. PLACEK:  Continuing objection as to

3    foundation, Judge.

4         THE COURT:  Well, the objection is overruled

5    at this stage.  Objection overruled.

6         MR. MURPHY:  Did you ask the defendant what

7    his address was?

8         A   Yes, I did.

9         Q   What, in fact, did he tell you?

10        A   He stated--

11        THE COURT:  The objection is sustained as to

12   that question.  Without foundation.

13        MR. MURPHY:  Well, Detective Baker, when did

14   you have this conversation with the defendant?

15        A   Area 2 Violent Crimes.

16        Q   Approximately what time?  What date?

17        A   Approximately one A.M. on the 9th.

18        Q   And who else was present?

19        A   Myself and my partner, Detective Rowan.

20        Q   What did the defendant tell you-- Where did

21   the defendant tell you he lived before he came to the

22   police station on August 8th, 1988?

23        MS. PLACEK:  Continuing objection.

24        THE COURT:  Objection overruled.

ck10

970

1          THE WITNESS:  He lived at 255 West 117th

2  Street.

3          MR. MURPHY:  No further questions, Judge.

4          THE COURT:  Cross?

5                  CROSS EXAMINATION

6          By Ms. Placek:

7          Q   Detective Baker, am I correct in assuming

8  that you gathered this information at the same time

9  you had your other conversation with the defendant?

10         A   Yes, it is.

11         Q   And am I correct in assuming that in your

12  report, you wrote a report containing said information?

13         A   I don't understand the question.

14         Q   Did you write a report?

15         A   Yes, I did.

16         Q   Did you write a report memorializing the

17  conversation you testified to in court?

18         A   You mean his birthdate, address, and what-

19  not?

20         Q   Did you write a report concerning the

21  conversation you had with the defendant?

22         A   Yes, I did.

23         Q   And approximately when did you write that

24  report?

ck11

1     A   Prior to talking to him.

2     Q   When you say-- So, in other words, you wrote

3  a report about the information that you gathered

4  from the defendant before you spoke to him, correct?

5     A   As far as his--

6     Q   Prior?

7     A   As far as his personal information, yes, I

8  did.

9     Q   Prior to talking to him, correct?

10    A   Yes.

11    Q   Thank you.

12       And as to the rest of the report, when did

13  you write the rest of the report?

14    A   There was no rest of the report.

15    Q   So am I correct in saying all your report

16  dealt with was the name and address?

17    A   There is a report dealing with just his

18  personal information, yes.

19    Q   Did you write another report?

20    A   Yes, I did.

21    Q   When did you write that other report?

22    A   Approximately one A.M.

23    Q   At the same time you were speaking with the

24  defendant?

12

1        A   Yes, I did.

2        Q   So you were doing the two things

3    simultaneously, correct?

4        A   I did one right after the other.

5        MS. PLACEK:  Thank you.

6               That's all, Judge.

7        THE COURT:  Redirect?

8                    REDIRECT EXAMINATION

9                    By Mr. Murphy:

10        Q   Detective Baker, the report that you

11    referred to which contains the information with

12    regard to the defendant's date of birth and address,

13    would that be the arrest report?

14        A   Arrest report and arrest card.

15        MR. MURPHY:  Nothing further, Judge.

16        THE COURT:  Recross?

17        MS. PLACEK:  Nothing on that.

18        THE COURT:  Thank you, Mr. Baker.  You may

19    step down.

20               (Witness Excused)

21        MS. PLACEK:  I renew my motion to strike,

22    Judge.  At this particular time the foundation for the

23    conversation hasn't been established.  Per the officer

24    he got the information prior to speaking to the

13

PENGAD/INDY. MUNCIE, IN 47302    SF-IL-24A

1   defendant, Judge.  The suggestion that this was not

2   gathered either from a foundational conversation is

3   established at any earlier date or, in the alternative,

4   Judge, that it was gathered from some other means

5   not testified to, which would have put it in the

6   realm of hearsay.

7           THE COURT:  The objection is overruled.  Call

8   your next witness.

9           MR. CASSIDY:  Thank you.

10          D R.   M A R Y   J U M B E L I C,

11  called as a witness on behalf of The People of the State

12  of Illinois, having been first duly sworn, was examined

13  and testified as follows:

14                    DIRECT EXAMINATION

15                    By Mr. Cassidy:

16          THE COURT:  That microphone is on.  If you

17  will move it over in front of you, speak directly

18  into it, keep your voice up, we'll all be able to

19  hear you.

20          THE WITNESS:  Okay.

21          THE COURT:  You may proceed, Mr. Cassidy.

22          MR. CASSIDY:  Thank you, Your Honor.

23                   State your name and spell your last

24  name.

14

1    A   Yes, Mary I. Jumbelic, J-u-m-b-e-l-i-c.

2    Q   What is your occupation?

3    A   I'm a forensic pathologist.

4    Q   And are you a licensed doctor in the State

5    of Illinois?

6    A   Yes.

7    Q   And how long have you been so licensed?

8    A   Since 1985.

9    Q   And can you please tell His Honor where

10    you did your graduate work?

11    A   Yes, I attended The University of Maryland

12    in Baltimore County and received my Bachelor of

13    Arts Degree in Biology in 1979.  Then I attended the

14    University of Maryland Medical School, where I

15    received my M.D. Degree in 1983.

16    Q   Following that, ma'am, did you do an intern-

17    ship?

18    A   Yes, I did.  I did a general surgery

19    internship at the Union Memorial Hospital in Baltimore

20    for one year and then I transferred into the Pathology

21    Program at the same hospital.  I then came to

22    Northwestern University and completed my pathology

23    training.

24    Q   What year was that?

15

1      A    1984.

2      Q    What did you do following that then?

3      A    Following that I did a year of forensic

4  pathology at The Cook County Medical Examiner's

5  Office.

6      Q    And when did you begin employment there?

7  Or what did you do after that?

8      A    And then following my fellowship in forensic

9  pathology at the Cook County Medical Examiner's Office,

10  I was hired on staff and I worked there for two

11  additional years.

12      Q    And what did you do there?

13      A    I was an Assistant Medical Examiner.

14      Q    And are you board certified?

15      A    Yes, in both anatomical pathology and

16  forensic pathology.

17      Q    Please explain to His Honor what it means

18  to be board certified.

19      A    Board certification is a process where a

20  physician that is eligible, meaning they did the

21  appropriate number of years training and the appropriate

22  experience, can apply to take an exam which is then

23  given.  It's a three day exam with all kinds of

24  questions concerning the specialty being asked in both

16

1    a written and visual format, and then provided that

2    you answer all the questions appropriately, then

3    you pass and become board certified in that specialty.

4         Q   Approximately how many autopsies have you

5    performed with the Cook County Medical Examiner's

6    Office?

7         A   Approximately nine hundred and fifty.

8         Q   Okay.  Have you ever been qualified as

9    an expert in court of law as an expert in forensic

10   pathology before?

11        A   Yes.

12        Q   And have you ever been qualified as an

13   expert in anatomical pathology?

14        A   Yes.

15        MR. CASSIDY:  Your Honor, at this time I would

16   pass the witness, or ask the witness be qualified

17   in the area of-- As an expert in forensic pathology.

18        THE COURT:  Defense?

19        MS. PLACEK:  May I have one moment, Judge?

20             Judge, we ask for a side-bar as to

21   additional information.

22        THE COURT:  All right.  Mr. Reporter?

23             (The following proceedings were had

24             in Chambers:)

17

977

1       THE COURT:  All right.

2       MS. PLACEK:  Your Honor, the reason for

3   calling for a side-bar was to go into a line of

4   questioning which we recently became aware of.  This

5   young lady is no longer with the Medical Examiner's

6   Office.

7                   In an attempt over the break in this

8   trial to find out why, we learned-- And again I asked

9   for a side-bar not to embarrass her in the courtroom

10  as to these questions, but the basis is this.  We

11  believe Doctor Stein felt she made a misdiagnosis of

12  a sudden infant death syndrome.  In other words, she

13  found it to be a homicide in several cases, more than

14  one, and he found, in fact, the syndrome, the so-

15  called S.I.D.S. Syndrome, to be present.

16                  It would be the defense's intention

17  at this particular time-- And also we believe it

18  would be the foundation of possibly a Brady Motion

19  in this time, and I would just ask the State either

20  whether they know of any information, or I also ask

21  the Court, without going into embarrassment of another

22  professional, that is the doctor, whether or not

23  the Court would find this:  That is that there was

24  a disagreement to the degree that she, in fact, left the

18

578

1    Medical Examiner's Office, where she is no longer

2    at, because of what Doctor Stein called a mis-

3    ~~apprehension~~    And, two, whether the Court would

4    allow me to go into such a questioning at this

5    time as to the expertise.

6              THE COURT:  State?  I guess it's your

7    witness, Mr. Cassidy, so--

8              MR. CASSIDY:  Judge, first of all--

9              THE COURT:  But either one of you can respond.

10             MR. CASSIDY:  Judge, we don't know why this

11   witness no longer works for the Medical Examiner's

12   Office.

13             THE COURT:  Assuming the correctness of

14   what Ms. Placek says, that she is not there either

15   because of a severe disagreement growing out of

16   quote-unquote, and I use the word advisedly, what

17   ~~Doctor Stein~~ considered to be ~~incompetent~~ performance,

18   do you agree or disagree that counsel has a right

19   to inquire into it on cross examination for the

20   purpose of affecting her credibility?

21             MR. CASSIDY:  Well, first of all for

22   purposes of being qualified we definitely disagree.  It

23   makes no difference.  And, secondly, if she is

24   qualified, then just to somehow attack her credibility,

19

870

1  we would be objecting because it's really not

2  relevant whether she had a disagreement with another

3  doctor regarding one diagnosis.  It's not relevant.

4  THE COURT:  Well, if it's just a disagreement,

5  yeah, you're right.  If it's a disagreement which is

6  fundamental to employment and brings about a separation

7  of the employ, you may not be right.

8  My understanding is, Mr. Cassidy, is

9  that an expert professional who has had his or her

10  professional competency called into question is a

11  proper subject for cross examination so that the fact

12  finder can have that information in assessing the

13  weight to be given to the testimony that the witness

14  offers in his or her field of expertise.

15  That is what I understand the law to

16  be.  Do you have a different understanding?  Whether

17  Miss Placek will be able to raise this to that level,

18  I don't know, but that's where I think she's coming

19  from.

20  MR. CASSIDY:  Judge, I really don't know.

21  John, do you know?

22  MR. MURPHY:  Judge, in other words, you're

23  saying that assuming what counsel says is true, it

24  raises a question as to her competence?

20

1    THE COURT:  It raises a question as to her

2  competence and it may, it may, if Stein said-- And

3  it doesn't have to go quite this far perhaps, but

4  let's assume for the sake of this scenario that

5  Stein said to her, "I will accept your resignation or

6  I'll bring charges for your removal." You are grossly

7  incompetent to work in my office." And she tendered

8  her resignation.

9    That, I think, is relevant evidence

10  for the fact finder to have to then judge what weight

11  to give to the expert testimony that she is going to

12  offer.  It doesn't prevent her from giving the

13  testimony, but there-- It should be brought out to

14  help the fact finder weigh it.

15    MR. CASSIDY:  Okay.

16    MR. MURPHY:  Judge, we would object to this

17  line of questioning.

18    THE COURT:  Well--

19    MR. CASSIDY:  What I'm saying is, okay.  Fine.

20  If that's the understanding, fine.  But don't you have

21  to have some type of offer of proof as to how--

22    THE COURT:  She's going to have to do something

23  to get to that stage.

24    MR. CASSIDY:  Okay.

21

1    THE COURT: And you know, one of the things

2    that you can get-- You can get to it by saying, "Hey,

3    I have a good faith belief," you know, because I

4    can't simply ask them to lay a foundation, you

5    know; the foundation of the very question she is

6    to put to the witness. And it's like any other area

7    of cross examination. Counsel has an obligation

8    not to cross examine for the purpose of embarrassing

9    the person, and you have to have some kind of good

10    faith belief that what you're doing is proper, and

11    she says she's got that so I'm going to let her--

12    MR. CASSIDY: Judge, is there any-- In

13    that regard, though, I would ask if she has any

14    reports or material. I think we should receive that.

15    THE COURT: Yeah, if they have reports.

16    MR. CASSIDY: Because we don't have any

17    reports.

18    MS. PLACEK: The-- Judge, we have no reports,

19    and this is one of the reasons that we brought this to

20    the Court's attention.

21    We would further state, Judge, that

22    we believe that this is ~~Brady Material~~. We would

23    further state, Judge, that we believe since the

24    witness, quite frankly, is being offered by the State,

22

1   and again I have no reason to either want to

2   embarrass the doctor in public to go into this,

3   Judge, but the suggestion that just because they

4   don't know relieves government action--

5           THE COURT:  Well, you're going to have a

6   little uphill crawl on this one.  You're going to

7   have to establish something other than a mere

8   suspicion that there is material out there that you

9   should have.

10          MS. PLACEK:  The material I would suggest--

11          THE COURT:  I'm not going to send them on a

12  fishing expedition.

13          MS. PLACEK:  I'm not looking for a fishing

14  expedition, Judge.  I believe, Judge-- And, quite

15  frankly, this witness was, I believe, part of a-- The

16  subject of a special.  And when I say "special," I

17  use that advisedly, done by Carol Maureen of the

18  Channel 5 News, involving the sudden infant death

19  syndrome.

20          And I believe again that this is

21  what, in fact, lead to the disagreement and the

22  problem with Doctor Stein.  And again in no way am

23  I wishing to embarrass a professional or, for that

24  matter, anyone on cross examination, with these sort

23

PENGAD/INDY, MUNCIE, IN 47302    SF-IL-24A

1   of accusations.

2           It would be the defense's position,

3   quite frankly, that one, if, in fact, since no

4   curriculum vitae was given to us, in fact, for

5   this witness, that it should have been established,

6   or questions can be asked by the State, to fulfill

7   this information to us.

8           In the alternative, Judge, this, again,

9   being the Medical Examiner's Office, is a governmental

10  body where, quite frankly, we are wondering whether

11  or not, since they are linked by their association with

12  the government to the State's Attorney's Office, that

13  this information should have been either known, or is

14  it known  to them through other trials.

15          THE COURT:  What information?

16          MS. PLACEK:  Known to the Office of the State's

17  Attorney.

18          THE COURT:  What information are you talking

19  about?

20          MS. PLACEK:  The information, Judge, that

21  somehow she was either fired or asked to resign by

22  Doctor Stein.

23          THE COURT:  Well, you're making the assumption

24  that that has happened.

24

1      MS.PLACEK:  Let me put it this way, Judge.

2   One of the ways I was sort of brought in on this, or

3   got to know this information, was from another

4   defense counsel from a trial that took place in

5   Skokie.

6      THE COURT:  Then you may very well have to

7   ask her some questions that will bring those things

8   out.  I'm not concerned about your embarrassing

9   a witness on trial.  Cross examination is designed to

10  discredit a witness.  Whether this witness be a

11  professional or not, that's your obligation.

12         But I know of nothing that you have

13  said to me at this point that would lead me to say

14  to the State, "Go out and get this information,

15  whatever it might be, and turn it over."  Now, I

16  don't know what we are talking about, and it may

17  very well be that if you put pointed questions to

18  this witness they will be denied categorically and

19  that will be the end of it.

20         Now, you can impeach her, you know,

21  straight out, but--

22      MS.PLACEK:  In good faith, Judge, at this-- On

23  this particular issue, and again I'm being totally

24  honest with the Court, other than knowing about the

25

1  existence of a tape of the documentary, I cannot at

2  this time--

3        THE COURT:  Well, if there was a tape shown

4  on the air, it's reachable by subpoena power.

5        MS. PLACEK:  That's what I'm trying to get,

6  Judge, yes.

7        THE COURT:  So you can cause that to be

8  produced.  If it isn't produced by the time this

9  witness gets off the stand, you know, we'll try to

10  deal with that and accommodate it.  But that's-- You

11  know, that's something that the station doesn't have

12  a First Amendment Right to hide.

13        MS. PLACEK:  No, I understand what you're

14  saying.  The point that I'm trying to make to the Court

15  is that the memo or whatever you-- Well, I understand

16  what the Court is getting at.

17        The other objection we have is since

18  there has been no proving of the identity of, in

19  fact, the alleged victim in this case, we would

20  have an objection without waiving same and--

21        THE COURT:  We're not at that stage yet.

22        MS.PLACEK:  I understand.

23        THE COURT:  We will deal with one thing at

24  a time.  You are at the point where whether or not you

26

1    want to cross examine this witness as to her qualifications

2    and then whether you want to proceed with her testimony

3    and do all of your cross examining, or however you

4    want to handle it.

5                MS. PLACEK:  Well--

6                THE COURT:  My saying that she is qualified

7    to give an opinion doesn't stop you from cross

8    examining her on her qualifications.

9                MS. PLACEK:  I understand.  The point we

10   just would be making is since there's been no

11   identification of the victim, we would suggest this

12   witness is, at best, testifying at the wrong time

13   and is irrelevant to the case at bar.

14               THE COURT:  Well, that's going to be denied.

15   I'm going to let her testify as to what, if anything,

16   she did with the body which she knew to be known by

17   any-- By any-- Well, Johnson, or whatever it might be.

18   Whether that has anything to do with this case or

19   not, we'll see.

20               MS. PLACEK:  Okay.  Subject to further

21   motion.

22               THE COURT:  Okay.

23               MS.PLACEK:  Okay.  Got it.

24               THE COURT:  Let's go.

27

1              (The following proceedings were had

2              in open court, in the presence and

3              hearing of the witness:)

4       THE COURT:  Miss Placek?

5       MS. PLACEK:  Yes, Judge.

6       THE COURT:  Did you wish to examine the

7  witness?

8       MS. PLACEK:  Just a few questions, Judge.

9       THE COURT:  Go ahead.

10      MS. PLACEK:  Thank you.

11              CROSS EXAMINATION

12              By Ms. Placek:

13      Q   Doctor, you stated that you are now

14  certified, correct?

15      A   I am board certified.

16      Q   Board certified.  Were you board certified

17  in 1988?

18      A   In 1988?  I had received my board

19  certification in anatomical pathology, yes.

20      Q   And when you say "anatomical pathology,"

21  I believe that you said that you are board certified

22  currently in both fields, correct?

23      A   Yes.

24      Q   But in 1988 you were not, correct?

28

1          A   In May of 1988 I had received my

2   anatomical certification, yes.

3          Q   Thank you.  And that's the only thing

4   you were board certified in in May of 1988?

5          A   Right.

6          Q   Doctor, let me also ask you this.  Am I

7   correct in assuming that you are no longer with the

8   Cook County Medical Examiner's Office?

9          A   Yes, that's correct.  I'm sorry.  If I

10  may?

11         Q   Sure.

12         A   May just explain something?  Because

13  sometimes the dates are a little hard to keep straight

14  in my mind, so I'm just going to go through the time

15  period.

16         Q   Do you have your curriculum vitae?

17         A   Not with me, no.

18         Q   All right.

19         A   I did not bring it with me.

20             In 1985 I began my Northwestern University

21  training, and in 1987 I completed that training.  Then

22  I began my forensic pathology training at the Cook

23  County Medical Examiner's Office in that year.

24         Q   1985?

PENGAD/INDY. MUNCIE, IN 47302

SF-IL-24A

29

1        A    1987.

2        Q    I'm sorry.   1987?

3        A    Yes.

4        Q    So that's a little different than what

5    you-- It's hard to keep these dates in line, correct?

6        A    Right.  So that's why I'm going through

7    it so I dont make any mistakes right now.

8        Q    Fine.

9        A    And in '87 I began forensic pathology

10    training at the Cook County Medical Examiner's Office

11    and in June of 1988 I completed that.  So I was in--

12    Like I said, I was not board certified.  I was board

13    certified in forensic pathology in that year, and

14    in anatomic the year before that.  Iwas board certified

15    in 1988.

16        Q    So you were incorrect when you were speaking

17    of the chronological order that you gave to the State's

18    Attorney, am I correct?

19        A    No.

20        Q    Well, did you tell the State's Attorney

21    when he was asking you questions about that, the

22    exact same thing?

23        A    He didn't ask me what date I was board

24    certified.

30

1          Q    I'm not talking about board certified.

2    I'm talking about the chronological order.

3          A    No, the chronological order still is

4    the same.  It's the same as when I answered the

5    State's Attorney's questions, but I was in error

6    when I just answered your first question, and

7    that's what I wanted to clear up.

8          Q    Okay.  Let me ask you this, doctor.

9               The reason for leaving the Medical

10   Examiner's Office, am I correct that that might have

11   stemmed from a disagreement which you had with

12   Doctor Stein?

13         A    Oh, no, not at all.

14         Q    Did you have a disagreement with Doctor

15   Stein dealing with, in fact, the diagnosis of

16   what is normally called sudden infant death syndrome

17   in babies?

18              MR. CASSIDY:  Objection, Judge.  May I be

19   heard at side-bar?

20              THE COURT:  Come forward.

21              MR. CASSIDY:  Thank you.

22                  (The following sidebar was had outside

23                  the hearing of the witness:)

24              MR. CASSIDY:  Judge, in our side-bar you told

31

us that your understanding of the law is that proper

cross examination would be allowed if someone is

terminated as a result of a disagreement or because

of-- Now, the witness just testified that she was not

terminated as a result of a disagreement with Doctor

Stein.

Her follow-up question was, "Well, isn't

it true that you had a disagreement," and if I under-

stood your ruling correctly, Judge, this should only

go if she was terminated as a result of a disagreement

with someone of higher authority.  Now I believe

you're allowing counsel's cross examination as to

possibly any other disagreements she might have had

while she was employed there.

THE COURT:  No, I'm not going to get into

personal disagreements.  We're talking about things

that relate to this witness's professional performance.

MR. CASSIDY:  Right.

THE COURT:  The fact she denies being

terminated doesn't foreclose the inquiry.  It may

ultimately limit the number of-- The number and kinds

of questions, but a witness's denying doesn't mean

that you can't continue to probe and may ever set

her up for impeachment.  Now, how are you going to lay

32

1    a foundation for impeachment if you--

2         MR. CASSIDY:  I'm just going by what you

3    told me.

4         THE COURT:  Well, if I said that foreclosed

5    any further inquiry, I erred, or you construed what I

6    said too narrowly; one or the other.

7         MR. CASSIDY:  Sure.

8         THE COURT:  In any event, whichever it was,

9    I'm going to now broaden it and allow her to ask

10   questions that are relevant in this area.  The

11   objection is overruled.

12        MR. CASSIDY:  Thank you.

13             (The following proceedings were had

14             in the presence and hearing of the

15             witness:)

16        MS. PLACEK:  May I continue?

17        THE COURT:  You may.

18        MS. PLACEK:  Am I correct in saying that you

19   disagreed with Doctor Stein on several diagnoses of

20   what would be known as an S.I.D.S. baby, or sudden

21   infant death syndrome baby?

22        A  No, I did not.

23        Q  Are you familiar-- Or strike that.

24             I withdraw and I'll rephrase, Judge.

33

1                    Were you a subject, or did you, in

2    fact, take part in a Channel 5 special narrated

3    by Carol Maureen, involving homicide or S.I.D.S.

4    involving the sudden infant death syndrome?

5              A  I didn't take part in the television--

6              MR. MURPHY:  Objection.

7              THE COURT:  Overruled.

8              MS. PLACEK:  When you say you didn't take

9    part, to the best of your knowledge were you, in

10   fact, featured or mentioned as part of that television

11   show?

12             MR. MURPHY:  Objection.

13             MS. PLACEK:  If she knows.

14             THE COURT:  Overruled.  If she knows she may

15   answer.

16             THE WITNESS:  A report that I made was mentioned,

17   yes.

18             MS. PLACEK:  As a matter of fact, am I

19   correct in saying that that report that you made was

20   called into question?

21             MR. MURPHY:  Objection.

22             THE COURT:  Overruled.

23             THE WITNESS:  I don't know what you mean.

24             MS. PLACEK:  Well, am I not correct that--

34

1   May I withdraw and rephrase, Judge?

2            Am I correct in saying you saw the

3   show?

4            A   I saw a segment of Channel 5 News on

5   television on a nightly basis where, during one of

6   those episodes, my report was mentioned.

7            Q   And am I not correct in saying that

8   during those segments of the news you were, in

9   fact, accused of disdiagnoses?

10           MR. CASSIDY:  Objection, Judge.  By Carol

11  Maureen or--

12           THE COURT:  Overruled.

13           MS. PLACEK:  Isn't it correct that you were

14  accused of disdiagnoses?

15           A   No, I wasn't.

16           Q   Isn't it a fact that, in fact, during that

17  report several doctors were brought out as experts

18  looking as to your work in those cases?

19           MR. MURPHY:  Objection, Judge.

20           MR. CASSIDY:  Objection, Judge.  We don't

21  have the video-tape.

22           MS. PLACEK:  Well, Judge--

23           THE COURT:  The objection is overruled.

24           MS. PLACEK:  Thank you.  Isn't it correct

35

1    that several doctors were brought in to overlook

2    your diagnoses on several cases?

3              A   No.  In fact, you have it just the

4    opposite.  In fact, I was called in to look at other

5    doctors' work and make a report, which I did.

6              Q   Was that the Cook County Medical Examiner's

7    Office?

8              A   Yes.

9              Q   And was that correcting reports of, let's

10   say, your brother doctors of the Cook County Medical

11   Examiner's Office?

12             A   No, it wasn't checking their reports.  It

13   was reviewing cases as requested by Doctor Stein.

14             Q   So am I correct in saying that the Carol

15   Maureen report that we are speaking of was, in fact,

16   critical of the diagnoses of the Cook County Medical

17   Examiner's Office?

18             MR. MURPHY:  Objection.

19             THE COURT:  The objection is sustained.

20             MS. PLACEK:  Would you characterize the

21   tenor of this report as, in fact, critical of the

22   Cook County Medical Examiner's Office?

23             MR. MURPHY:  Objection.

24             THE COURT:  Objection sustained.

36

1          MS. PLACEK:  Doctor, am I correct in

2    saying that you were not, in fact, called by Channel 5

3    to look over those cases mentioned in this special?

4          MR. MURHY:  Objection, Judge.

5          THE COURT:  The objection is sustained.

6          MS. PLACEK:  As to what she's done, Judge?

7          THE COURT:  Yeah, the objection is sustained.

8          MS. PLACEK:  Am I correct in saying that,

9    in fact, the cases that were dealt with in the Channel 5

10   special, if you will, had several reverse diagnoses as to the

11   cause of death?

12         MR. MURPHY:  Objection, Judge.

13         THE COURT:  Mr. Reporter, can I hear the

14   question again?

15              (Record Read Back)

16         THE COURT:  The objection is sustained.

17         MS. PLACEK:  When were you called by Doctor

18   Stein-- Strike that.

19              When did you leave the Cook County

20   Medical Examiner's Office?

21         A   I'm sorry.  When did I what?

22         Q   When did you leave?

23         A   When did I leave employment there?

24         Q   Yes.

37

1    A   In June of 1990.

2    Q   When, in fact, was this report aired?

3    A   I think it was in April of 1990.

4    Q   Now, let me ask you.   Were you, in

5    regards to this report, ever contacted by Doctor

6    Stein?

7    A   Of course.   He asked me to do the report.

8    Q   Was that report in fact-- Did that report,

9    in fact, deal with the cause of death?

10   A   Yes.

11   Q   Was, in fact, the subject matter of that

12   report the changing of certain causes of death?

13   MR. MURPHY:   Objection.

14   MS. PLACEK:   In the cases examined?

15   MR. MURPHY:   Objection, Judge.

16   THE COURT:   The objection is sustained.

17   MS. PLACEK:   On any of the cases that you

18   reviewed as a result of that report, was the original

19   cause of death changed?

20   MR. MURPHY:   Objection.

21   THE COURT:   Objection sustained.

22   MS. PLACEK:   Did you do any of the cases

23   involved in that report?

24   MR. MURPHY:   Objection, Judge.

38

1      THE COURT:  No, the objection is overruled.

2  If the witness understands the question, she may

3  answer.

4      THE WITNESS:  Do you mean did I do the

5  autopsies on those cases?

6      MS. PLACEK:  Correct.

7      A  No, I did not.

8      Q  Did you, in fact, change any of the original

9  diagnoses of cause of death in those autopsies?

10      MR. MURPHY:  Objection.

11      THE COURT:  Sustained.

12      MS. PLACEK:  Did the report center on, in

13  fact, the changing from S.I.D.S. to homicide by the

14  Cook County Medical Examiner's Office?

15      MR. MURPHY:  Objection.

16      THE COURT:  Sustained.

17      MS. PLACEK:  Where are you currently working?

18      A  I am currently employed as a coroner's

19  physician in Peoria County.

20      Q  Are you, in fact, the coroner for Peoria

21  County?

22      A  No.

23      Q  How many-- In your experience at the

24  time you were working for the Cook County Medical

39

1    Examiner's Office, how many autopsies did you

2    perform?

3           A    Well, I did approximately nine hundred

4    fifty in the three years of my employment.

5           Q    Would it be correct in saying you did

6    approximately three hundred a year?

7           A    That seems correct.

8           Q    And currently in Peoria how many autopsies

9    do they do a year?

10          A    About two hundred and fifty.

11          Q    How many do you do a year?

12          A    I do them all.  Almost all of them.

13   Ninety-five percent of them.

14          Q    But you are not the coroner, correct?

15          A    No, the coroner is an elected official.

16          Q    Did you, yourself, participate in the

17   filming of the report previously mentioned on Channel 5?

18          A    No.

19   MR. MURPHY:  Objection, Judge.

20   THE COURT:  Overruled.  The answer may

21   stand.

22   MS. PLACEK:  Your answer was no?

23          A    Correct.

24          Q    Did you appear, to the best of your

40

1    knowledge, on camera on the report for Channel 5?

2            A    No.

3            Q    Would it be correct in saying that the

4    report dealt critically with the work of the Cook

5    County Medical Examiner?

6            MR. MURPHY:  Objection.

7            THE COURT:  Objection sustained.

8            MS. PLACEK:  Was Doctor Donaghue mentioned

9    as part of that report?

10           MR. MURPHY:  Objection.

11           MS. PLACEK:  If she knows.

12           THE COURT:  No, overruled.

13           THE WITNESS:  I don't know.

14           MR. MURPHY:  Judge, if I may, Judge, what's the

15    relevance of another doctor?

16           THE COURT:  I don't know, but--

17           MS. PLACEK:  Setting down the foundation,

18    Judge.

19           THE COURT:  Well, Mr. Murphy, I don't know, but

20    if she can't tie it up, then it--

21           MR. MURPHY:  All right.

22           MS. PLACEK:  How many autopsies concerning

23    this report were you asked to review?

24           A    Five.

41

1      Q   Did they all involve--

2      A   I'm sorry.  Six.

3      Q   Did they all involve homicides?

4      MR. MURPHY:  Objection, Judge.

5      THE COURT:  Where are you going, Miss Placek?

6      MS. PLACEK:  Judge--

7      THE COURT:  I'll try to give you some leeway,

8  but--

9      MS. PLACEK:  As possible impeachment, Judge,

10  in order to introduce the subject matter of the

11  report.  If the Court feels, again, that I can-- If

12  the report becomes available, or necessary to become

13  available, so it can be introduced and then I would

14  have no problem.  But I would hate to be precluded from

15  introducing the tape of the report because proper

16  impeachment foundation was not laid.

17          If the Court feels that's been done,

18  Judge, I have no problem.

19      THE COURT:  Can I hear the last question

20  again, Mr. Reporter?

21          (Record Read Back)

22      THE COURT:  The objection is-- Or there was

23  an objection and the objection is overruled.

24      MR. MURPHY:  Judge, I believe the

42

1   question-- Well, strike that, Judge.

2         THE COURT:  Do you understand the question?

3         THE WITNESS:  No.  Can I have it repeated

4   please?

5         THE COURT:  The question is did they all

6   involve homicides.

7         A   "They" referring to--

8         MS. PLACEK:  The autopsies that you, in fact,

9   reviewed.

10        A   In my opinion, yes.

11        Q   When you say your opinion, am I correct

12  in saying that your opinion differed from that of

13  the other pathologist?

14        MR. MURPHY:  Objection.

15        THE COURT:  No, overruled.

16        THE WITNESS:  Which other pathologists?

17        MS. PLACEK:  The pathologist who performed

18  the six reports that, in fact, you examined.

19        MR. MURPHY:  Objection, Judge.  Relevance.

20        THE COURT:  Overruled.

21        THE WITNESS:  Yes and no.

22        MS. PLACEK:  Approximately how many reports

23  out of the six that you examined were, in fact, disagreed?

24        MR. MURPHY:  Objection, Judge.  Judge--

43

1      THE COURT:  Overruled, Mr. Murphy.

2      MR. MURPHY:  Judge, if I may say for the

3   record, we are-- The witness is being asked about

4   five or six cases where she reviewed the work of

5   perhaps of-- Of other medical examiners, other

6   doctors, whatever the case may be, and is totally

7   unrelated to this case.  It has no bearing whatsoever

8   on her--

9      THE COURT:  Mr. Murphy, the whole of this

10  witness's testimony thus far has been totally

11  unrelated to this case.  That is the purpose of

12  this examination at this point, to determine whether

13  or not the witness possesses the qualification to

14  relate anything about this case.

15      So, of course, the entirety of the

16  cross examination at this point is totally unrelated

17  to this case, as was the direct, but it does bear

18  upon her ability and her expertise to testify about

19  this case.  That's why it's being received and that's

20  why it's being offered.

21      It may never ever come to the point

22  where the witness, through cross examination, is

23  going to be disclosed to be anything other than

24  what you offered her to be, but that does not mean

44

1004

1    that the defense doesn't have a right to put the

2    questions, and you say that they are irrelevant

3    because the defendant puts questions that don't

4    directly bear on the case. That is not the law.

5            MR. MURPHY: Judge, at the same time we

6    have a witness being asked questions perhaps to

7    reflect unfavorably on the Medical Examiner's

8    Office or doctors, and again--

9            THE COURT: So far I have sustained objections

10   that talk about the Medical Examiner's Office outside

11   of any connection to this witness, so we are talking

12   about this witness and this witness's relationship

13   to a report that she participated in making in some

14   way. That's all.

15           The objection is overruled.

16       MR. PLACEK: May I inquire, Judge?

17           Did you hear the last question? Or do

18   you remember the-- ·

19       A  I don't remember the question. Repeat it

20   please.

21       Q  To bring you up to date, you stated

22   that you examined approximately six of these reports,

23   correct?

24       A  Yes.

1      Q   And that your opinion differed on

2   certain ones of those reports, correct?  Or a

3   certain number of those reports?

4      A   Yes.

5      Q   How many did, in fact, your opinion differ

6   on?

7      A   Four.

8      Q   Am I correct in saying that on the four

9   reports that your opinion differed on, those reports

10  did not originally deal with homicide?

11     A   That's correct.

12     Q   Am I correct that those four reports dealt

13  with natural causes of death?

14     A   That's correct.

15     Q   Those were the pathologist conclusions

16  originally, correct?

17     A   That's correct.

18     Q   Am I correct in saying that you based

19  your opinion not on performing an examination of

20  the body, but rather upon the notes of the previous

21  pathologist?

22     A   The autopsy was one aspect of my review.

23  It was only one aspect.

24     Q   Am I correct in saying that you didn't

46

1   perform the-- Or you didn't examine the body in those

2   four cases?

3          A   That's correct.

4          Q   Am I correct in saying that the majority

5   of those cases were at least six months old at the

6   time that you offered your opinion?

7          A   That's correct.

8          MR. MURPHY:   Objection.

9          THE COURT:   Overruled.   The answer will

10  stand.

11         MS. PLACEK:   Am I correct that the four,

12  in fact, that you changed your-- Or, excuse me.   That

13  you had a different opinion than the original

14  pathologist, had all stemmed from the Cook County

15  Medical Examiner's Office?

16         MR. MURPHY:   Objection.

17         THE COURT:   No, overruled.

18         THE WITNESS:   I'm sorry.   Repeat the

19  question.

20         MS.PLACEK:   Am I correct in saying that the

21  four autopsies or pathology reports that you had

22  a differing opinion from the examining pathologist,

23  all came from the Cook County Medical Examiner's

24  Office?

47

1          A    That's correct.

2          MS. PLACEK:  Thank you.  May I have one

3    moment, Judge?

4          THE COURT:  You may.

5          MS. PLACEK:  Am I correct in saying that

6    the person or persons who were, in fact, the

7    examining forensic pathologists in these four

8    reports, to the best of your knowledge, is still

9    employed and working for the Cook County Medical

10   Examiner's Office?

11         MR. MURPHY:  Objection.

12         THE COURT:  The objection is sustained.

13         MS. PLACEK:  Do you remember as to the four

14   differing reports whether they were made by one

15   doctor, one forensic pathologist, or by a number

16   of forensic pathologists?

17         MR. MURPHY:  Objection.

18         THE COURT:  Overruled.

19         THE WITNESS:  They were different pathologists.

20         MS. PLACEK:  How many different pathologists,

21   in fact, were there?

22         A    Four.

23         Q    Of those four different pathologists, do

24   you have a number of how many still work today, to the

48

best of your knowledge, for the Cook County Medical

Examiner's Office?

        MR. MURPHY:  Objection.

        THE COURT:  Sustained.

        MS. PLACEK:  This goes as to, Judge--

        THE COURT:  Sustained, Miss Placek.  Put

another question.

        MS.PLACEK:  Okay.

        Am I correct in saying that the four

people, the four doctors whose work you reviewed,

were likewise forensic pathologists?

        A  I don't know all their qualifications.  I'm

not sure.

        Q  Do you remember any of their names?

        MR. MURPHY:  Objection.

        THE COURT:  Sustained.

        MS. PLACEK:  Based on the last two Court

rulings, Judge, I take it the Court will not allow

me to go into either the current--

        THE COURT:  Put a question, Miss Placek, and

we'll rule on the objections, if I hear any.

        MS. PLACEK:  Thank you, Judge.

        Was your changed diagnosis as to these

four forwarded to the Office of the State's Attorney?

1          MR. MURPHY:  Objection.

2          THE COURT:  The objection is sustained.

3          MS. PLACEK:  Goes to bias and--

4          THE COURT:  Objection sustained.

5          MS. PLACEK:  Thank you, Your Honor.  Thank

6    you, ma'am.

7          THE COURT:  You may proceed, Mr. Cassidy.

8          MR. CASSIDY:  Thank you, Your Honor.

9                    DIRECT EXAMINATION (Cont)

10                   By Mr. Cassidy:

11         Q   Doctor Jumbelic, did you have occasion

12   to perform an autopsy on a person you identified as

13   Denise Johnson on August 9th, 1988?

14         A   Yes.

15         Q   And where was that autopsy performed?

16         A   At the Cook County Medical Examiner's

17   Office.

18         Q   Please describe for Judge Holt how the

19   body appeared to you when you first saw it on August

20   9th of 1988.

21         A   When I first examined the body the body

22   was partially clothed.  There was a bra present.  There

23   were light colored pants present that were partially

24   pulled down and unzipped.  There were light colored

PENGAD/INDY. MUNCIE, IN 47302    SF-IL-24A

1    underpants on the body, and the body was in an

2    extensive state of postmortem decomposition with

3    extensive maggot infiltration.

4        MS. PLACEK:  Excuse me.  I'm not--

5        THE COURT:  I'm sorry?

6        MS. PLACEK:  I'm not objecting to what the

7    lady is saying, but I take it there was a request for

8    qualifications and I take it the Court is finding such?

9        THE COURT:  I find her to be qualified.

10        MS. PLACEK:  Thank you.  I just wanted to

11    protect the record, Judge.

12        THE COURT:  All right.  I'm not certain that

13    my finding her to be qualified means anything, but

14    you--

15        MS. PLACEK:  Well--

16        THE COURT:  But she has the requisite

17    expertise to testify to matters in this field.

18        MS. PLACEK:  I understand, Judge.

19        THE COURT:  Proceed, Mr. Cassidy.

20        MR. CASSIDY:  Can you please go on to

21    describe the area of maggot infestation which you began

22    describe?

23        A   Yes, as I said, the body was extensively

24    decomposed.  There was a drying and parchment change to

51

1911

1    the skin.  A lot of soft tissue of the skin and

2    underlying muscle and soft tissue was gone from

3    the neck area, the genital area, the area surrounding

4    the anus, and there was shoelace ligature tied around

5    the neck, and a black tank-top that was tied also

6    over the top of the shoelace ligature.  It was tied

7    around the neck with both knots at the back of the

8    neck.

9              The hands were behind the back with a

10   shoelace ligature tied, wrapped several times around

11   the wrist and tied in a tight fashion.

12        Q   Did you notice if this Denise Johnson

13   had any shoes on?

14        A   Shoes were brought in with the body.  They

15   were a light colored gymshoe with a name written on the

16   inside of the instep of the left shoe, "Denise."

17        Q   Does that mean on the outside of the shoe,

18   but on the inside of the--

19              MR. LUFRANO:  Objection.  Leading.

20              THE COURT:  Overruled.

21              THE WITNESS:  It's not in the shoe.  It's on

22   the outer aspect of the shoe, but on the-- On the instep

23   of the shoe.

24              MR. CASSIDY:  Thank you.  What did it say?

PENGAD·INDY, MUNCIE, IN 47302    SF-IL-24A

52

A   Denise.

Q   And the shorts you described, they were unbuttoned in the front?

A   And unzipped.

Q   Were they open in any way?

A   Yes, they were opened.

Q   Okay.  But they weren't pulled down, more or less?

A   They were pulled down slightly, but not all the way.

Q   Okay.  After first seeing the body then did you do-- Or please tell the Judge then what you did.

A   Well, I do an external examination, front and back, with the clothes still present on the body, and then I remove the clothes and photograph the body both before and after the clothes are removed, look carefully at the ligatures, cut them away from the knot and they again were photographed both before and after they were removed.

After all of this is completed and before anything else is done, X-rays are taken completely of the body from the head all the way down to the feet to see if there is any fractures present in the

53

bones.  After that then I begin the internal

autopsy examination.

Incisions are-- An incision is made

in the upper chest and extended down to the abdomen

and the skin is reflected.  Then the rib cage is

cut open and internal organs are looked at, the

heart, the lungs, all the organs within the abdominal

cavity are looked at in place, and also taken out,

weighed, measured to see if they are normal.

Any injuries are looked for internally.

After that is completed then the head is opened.  An

incision that goes from ear to ear on the back of

the scalp is made, the scalp is reflected forward,

the skull cap is then sawed and removed, and then the

brain is examined.  The dura is stripped off the base

of the skull and then the skull itself is looked

at carefully.

Q  Doctor Jumbelic, did you find any evidence

of injury?

A  Well, yes, the ligature was around the

neck causing a grooving to be made in the skin that

was left on the back of the neck.

Q  Did you have occasion to measure the

grooving that was caused by this?

54

1    A   Yes, it measured zero point two inches in

2  width.

3    Q   That would be around the neck?

4    A   The skin that was left on the back of the

5  neck showed the grooving. The skin on the front of

6  the neck was decomposed.

7    Q   Did you have occasion then to cut the

8  ligature and take it, remove it from the neck?

9    A   Yes.

10    Q   And after you did that did you have occasion

11  to measure the diameter of the opening of the ligature

12  around the neck?

13    A   Yes, it measured three inches.  It was

14  very tight.

15    Q   All right.

16    A   That is the ligature around the neck

17  measured three inches in diameter.

18    Q   Regarding the-- There was another ligature

19  around the neck, I believe you testified to, is that

20  correct?

21    A   Yes.

22    Q   And what did this appear to you to be?

23    A   A black tank-top.

24    Q   Please tell the Judge the position that was

1    in when you found it.

2         A   Yes, that was around the neck, overlying

3    the shoelace ligature, and this was knotted several

4    times also in the back of the neck.

5         Q   Did you then also have occasion to look

6    at the ligature that was holding the hands together

7    or the wrist rather?

8         A   Yes.

9         Q   Did you see any evidence of injury?  Or

10   describe how this ligature appeared to you.

11        A   Yes, this also was a shoelace ligature.  It

12   was wound several times around each wrist and tied

13   tightly, and grooves were present in both the front

14   and back of the wrist from this ligature measuring

15   zero point two inches in width.

16        Q   So both of them measured then point two

17   zero inches in width?  That is in regards to the injury

18   level?

19        A   Yes.

20        Q   Did you perform an internal examination

21   then?

22        A   Yes.

23   MR. CASSIDY:  Okay.  May I approach the

24   witness, Judge?

56

1          THE COURT:  You may.

2          MR. CASSIDY:  Doctor Jumbelic, I'm showing

3  you a series of photographs.  The first one will

4  be People's Exhibit Number 48 for Identification.  I

5  ask you to look at that photograph.

6          First of all, do you recognize it?

7      A  Yes.

8      Q  What do you recognize it to be?

9      A  This is a photograph of Case 262,

10  August of '88, left side of the face and neck, showing

11  the black tank-top, ligature around the neck, and

12  showing the state of decomposition and maggot

13  infestation.

14      Q  Would that be a photograph of Denise

15  Johnson?

16      A  Yes.

17      Q  Showing you what's been marked as People's

18  Exhibit Number 49 for Identification, I ask you if

19  you recognize what that photograph depicts?

20      A  Yes.

21      Q  What does it depict?

22      A  This is a front view of the head, chest,

23  and abdomen of Denise Johnson.

24          MR. LUFRANO:  Objection to the description of

1    Denise Johnson.  That part is hearsay.

2            THE COURT:  Overruled.

3            MR. CASSIDY:  And, Doctor--

4            MR. LUFRANO:  Your Honor, may the record

5    reflect we have a continuing objection to the use

6    of that name so we don't have to do it each and

7    every time?

8            THE COURT:  The record will so reflect.

9            MR. CASSIDY:  People's Exhibit Number 50.  Do

10   you recognize that photograph?

11           A  Yes, that's a view of the back of Denise

12   Johnson.

13           Q  Okay.  And what else-- What's depicted on

14   there besides the back?

15           A  Well, you can see the back of the neck

16   with the ligature in place.

17           Q  And is that how it appeared to be when

18   you received the body?

19           A  Yes.

20           Q  Showing you what's been marked already

21   as People's Exhibit Number 44, Doctor.

22           A  Yes.

23           Q  Do you recognize that, or what that

24   depicts?

58

1        A   Yes.

2        Q   What is that?

3        A   This is a view of the left side of

4   the face and neck of Denise Johnson showing the black

5   tank-top ligature pulled slightly down to expose

6   the shoelace ligature.  There is a portion of the

7   loose end of the shoelace ligature across--lying across

8   the face.

9        Q   All right.  And People's Exhibit Number 50.

10  Do you recognize what that photograph depicts?

11       A   Yes.

12       Q   What does that depict?

13       A   This is a front view of the body showing

14  the bra in place and showing the face and the neck

15  with the black tank-top ligature.

16       Q   Now, the bra.  Is that how it appeared

17  when the body arrived at the Medical Examiner's

18  Office?  Is that in the same position?

19       A   Yes.

20       Q   Okay.  I'm sorry.  Excuse me.  I'm sorry,

21  Judge.  That was Number 51 for the record.

22       THE COURT:  All right.

23       MR. CASSIDY:  Showing you what's been

24  marked as People's Exhibit Number 41 for Identification.

59

1          A   This is a front view of the abdomen,

2     the female genitalia region, and thighs of Denise

3     Johnson, showing the pants and the underpants in

4     place, as I found them.

5          Q   And People's Number 52 for Identification.

6     Do you recognize what that depicts?

7          A   Yes.

8          Q   What is that?

9          A   Okay.  This is the right back side of the

10    neck of Denise Johnson showing the tank-top ligature

11    and the shoelace ligature.

12         Q   Does that show-- Truly and accurately

13    depict the relationship they had to one another when

14    the body arrived?

15         A   No, the black tank-top ligature is pulled

16    down slightly to expose the shoelace ligature.   It

17    was overlying it.

18         Q   Okay. - And People's Exhibit Number 34 for

19    Identification.  Do you recognize that photograph?

20         A   Yes.

21         Q   What does that depict?

22         A   This is looking directly at the back of

23    the neck of Denise Johnson and here the black tank-top

24    ligature is pulled up to expose the shoelace ligature, and

60

1    both the knots in the black tank-top and the shoelace

2    can be seen.

3            Q   Okay.   And this is People's Exhibit

4    Number 46 for Identification.

5            A   Yes, this is the shoelace ligature after I

6    have cut and removed it from the neck of Denise Johnson.

7    The knot has been kept intact.

8            Q   Is that the-- then the ligature you

9    measured and after you cut it, to be three inches

10   in diameter?

11           A   Right, the diameter of the knotted portion

12   around the neck.

13           Q   Right.   And Number 42, doctor.   Do you

14   recognize that photograph?

15           A   Yes.

16           Q   What does that depict?

17           A   This is a close-up photograph of the

18   knots in the black tank-top.

19           Q   Now showing you People's Number 53.   Do you

20   reocnigze that photograph?

21           A   Yes.

22           Q   What does that photograph depict?

23           A   This is a view of the face of Denise

24   Johnson.

61

1          Q   People's Exhibit Number 54.  Do you

2    recognize what that's a photograph of?

3          A   Yes.

4          Q   What's depicted?

5          A   This is looking at the back of the neck

6    from the right side, and it shows the groove in

7    the skin of the neck caused by the shoelace ligature.

8          Q   Is that the groove that you measured

9    to point two inches in depth?

10         A   In width, yes.

11         Q   Okay.  People's Exhibit Number 55.  Do you

12   recognize that photograph?

13         A   Yes.

14         Q   What do you recognize that to be?

15         A   That's looking directly at the back of

16   the neck showing the groove caused by the shoelace

17   ligature.

18         Q   People's Number 36.  Do you recognize

19   that photograph?

20         A   Yes.

21         Q   What do you recognize that to be?

22         A   This is a photograph of the back of Denise

23   Johnson showing the hands bound behind the back with the

24   shoelace ligature wrapped around the wrist.

62

Q   People's Number 38 for Identification.
Do you recognize that photograph?

A   Yes.

Q   What's that?

A   This is a photograph close-up of the
ligature that's tied around the wrist showing the
tight knot.

Q   Showing you what's been marked People's
Exhibit Number 56 for Identification, do you
recognize that photograph?

A   Yes.

Q   What do you recognize that to be?

A   This is a photograph of the wrist showing
the grooving caused by the shoelace ligature.

Q   People's Exhibit Number 57 for Identification.
Do you recognize that?

A   Yes.

Q   What do you recognize that to be?

A   This is another view of the wrists again
showing the groove in the skin caused by the shoelace
ligature.

Q   People's Exhibit Number 58 for Identification.
What do you recognize that to be?

A   Again this is a different view showing
the grooves caused by the shoelace ligature.

63

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Q   Okay.   People's Exhibit Number 59?

A   Yes, this is a view of the hands with the shoelace ligature tied tightly around the wrists.

Q   People's Exhibit Number 60?

A   This is a slightly different view holding the hands up to expose the knot.

Q   And finally People's-- The last picture would be People's Exhibit Number 61.

A   This is a view of the female genitalia area with the thighs spread open, showing the extensive loss of tissue and the heavy maggot infiltration.

Q   Okay.

Do all this photographs which I showed you, Doctor Jumbelic, do they truly and accurately depict the condition of Denise Johnson when she appeared at the Medical Examiner's Office on the date you examined her?

A   Yes.

Q   Could you visually determine, by looking at the body visually, determine whether any sexual assault took place?

A   No, there was extensive loss of tissue in that region.   It was impossible to tell if there were any underlying injuries due to the loss of the

64

1    tissue because of the maggots.

2         Q   And did you reach an opinion, Doctor

3    Jumbelic, within a reasonable degree of medical

4    certainty, as to the cause of death?

5         A   Yes.

6         Q   What is that opinion?

7         A   Denise Johnson died as a result of the

8    ligature strangulation.

9         MR. CASSIDY:   Just a moment please, Judge.

10        THE COURT:   Yes.

11        MR. CASSIDY:   Doctor Jumbelic, was there any

12   evidence of gunshot wounds?

13        A   No.

14        Q   Any evidence of knife or stabwounds?

15        A   No.

16        Q   Was there any fractures of any kind?

17        A   No.

18        Q   Was there any evidence of any disease

19   this twelve year old girl may have had, Denise Johnson?

20        A   No.

21        MR. CASSIDY:   May I approach the witness

22   again?

23        THE COURT:   You may.

24        MR. CASSIDY:   Doctor, I believe you previously

65

1    identified this photograph, is that correct?

2              A  Yes.

3              MR. CASSIDY:  Judge, for the record I showed

4    her what I thought was People's Exhibit Number 49.

5    It was already marked People's Exhibit Number One.

6              THE COURT:  All right.  Number One?

7              MR. CASSIDY:  Yes.

8              THE COURT:  Okay.  So that means that you

9    had that exhibit marked twice?

10             MR. CASSIDY:  Yes.

11             THE COURT:  As Number One and 49?

12             MR. CASSIDY:  Yes.

13             THE COURT:  I will allow it to remain as

14   Number One then, and strike "49."

15             MR. CASSIDY:  Okay.  Thank you, Your

16   Honor.

17                   Doctor, could you determine, or did

18   you see any external bruises on the body?

19             A  No, there was extensive decomposition

20   and with that parchment change of the body that I

21   described that it wasn't possible to see any superficial

22   bruises.

23             MR. CASSIDY:  No further questions, Judge.

24             THE COURT:  Cross?

66

MS. PLACEK:   Very briefly.

CROSS EXAMINATION (Cont)

By Ms. Placek:

Q   Doctor, you described certain clothing that the body came in with, correct?

A   Yes.

Q   Am I correct in assuming that the date you received or the-- Or would you describe these pants as with the pockets turned out and torn?

A   Yes.

Q   Thank you.  And did you receive a purse that said "Las Vegas" on it?

A   No.

Q   To the best of your knowledge do you know if that was recovered from the scene?

A   I don't know.

Q   And do you know a gentleman by the name of Mike Gatto?

A   Yes.

Q   Is that, in fact, the gentleman who does the X-rays for the Cook County-- At the time you were working there at the Cook County Medical Examiner?

A   He's one of the X-ray technicians that we employed at that time, yes.

67

Q  And to the best of your knowledge
did he take the X-rays in the current issue case?

A  Yes.

Q  He did?

A  To the best of my knowledge, yes.

Q  Thank you.

Doctor, if I was to use the term
"autoerotocism," are you familiar with that term?

A  Yes.

Q  As a matter of fact, am I correct that
often when dealing with teen-agers, pathologists
are instructed or know by nature, or within their
experience, when you have a strangulation death, to,
in fact, look to that as a possible cause of death?

A  No, that's-- We don't have a hanging death.

Q  A hanging death, correct?

A  Right.

Q  And, quite frankly, autoerotocism, to put
it plainly before the Court, is a practice where a
person will tighten something around their neck to
enhance the sexual experience, correct?

A  Yes, but you never see it in females.

Q  Well, it's present, though-- When you say
you never, in your experience, am I correct to say that

68

it is, in fact, although more prevalent in males?
Or can be prevalent in-- Can be prevalent in females?

     A   I don't know.  I never heard of a case.

     Q   You say you never heard of a case.  Are
you familiar with Adelson's, "The Pathology of a
Homicide."

     A   Yes.

     Q   And would you, in fact, state that you
read that in-- Well, not in preparation for your
testimony here, but as a matter of fact, in preparation
for becoming a pathologist?

     A   I don't refer to that book very often, no.

     Q   Well, let me ask you this.  Am I correct
in assuming that in Adelson's--

     MR. MURPHY:  Objection, Judge.  May I approach
the bench?

     THE COURT:  You may.

     MR. MURPHY:  Judge, I just make an objection
at this time because counsel, I believe, is referring
to some treatise which, to my knowledge, there has
never been an indication to the State that this would
be used at any time.  There was no notice given
to us that the defense intended to rely on this.

     MS. PLACEK:  Judge, I believe that I can, in

69

fact, use any book to assist me in my cross examination which is recognized within the field, Judge.

MR. MURPHY: Judge, we are caught by surprise. We never were aware that this was intended to be used in cross examination. This is the very first time it came up during the trial, while the witness is on the stand.

MS. PLACEK: That's correct, Judge. I will conceded that Adelson's was never mentioned in discovery.

THE COURT: Not in your answer to discovery?

MR. MURPHY: No, it--

MS. PLACEK: No, Judge.

THE COURT: All right. Ladies and gentlemen, I'm going to take a short recess. You may step off the stand, doctor. Please don't discuss your testimony while--until it is completed. There will be a short recess.

MR. CASSIDY: Judge--

THE COURT: I'll be in chambers.

MR. CASSIDY: All right.

THE COURT: Mr. Reporter, please come in chambers.

(Whereupon the following proceedings

were had in Chambers, outside the
presence and hearing of the Witness:)

MR. MURPHY:  Judge, we are just going to
withdraw the objection, in the interest of moving
this thing along.

THE COURT:  All right.  That solves that
problem.

(Whereupon a recess was taken in the
above entitled cause, after which the
following proceedings were had in
open court:)

THE COURT:  All right.

MS. PLACEK:  May I continue, Judge?

THE COURT:  You may.

MS. PLACEK:  Thank you.

Doctor, just before the break I was
questioning you about autoerotocism, and I believe
that you stated that you had never personally seen a
case concerning a female, correct?

A  Correct.

Q  And I believe you said that you were
familiar with the treatise, Adelson's "Pathology of
a Homicide," correct?

A  Right.

71

Q   Would you agree that autoerotocism takes place usually involving boys between the age of nine and fourteen or fifteen?

A   Yes.

Q   Would you further agree that although known to accur, such deaths are extremely infrequent among girls or young women?

A   Yes.

MS. PLACEK:   Thank you.

That's all, Judge.  That's my final question as to the doctor.  Thank you, doctor.

THE COURT:   Redirect?

MR. CASSIDY:   No further questions.  Thank you very much.

THE COURT:   Thank you, doctor.  You may step down.

THE WITNESS:   Thank you.

(Witness Excused)

THE COURT:   Call your next witness.

72

1        **A N N A    D E M A C O P O U L O S,**

2    called as a witness on behalf of The People of the State

3    of Illinois, having been first duly sworn, was examined

4    and testified as follows:

5                        DIRECT EXAMINATION

6                        By Mr. Cassidy:

7            Q   Can you please state your name and spell

8    your last name?

9            A   Anna Demacopoulos, D-e-m-a-c-o-p-o-u-l-o-s.

10           Q   And are you a lawyer?

11           A   Yes, I am.

12           Q   And are you employed by the Cook County

13   State's Attorney's Office?

14           A   Yes, I am.

15           Q   Calling your attention to August 9th of

16   1988, were you employed as An Assistant State's Attorney?

17           A   Yes, I was.

18           Q   And at approximately quarter to ten, ten

19   o'clock P.M., were you in Area 2, which is located in

20   Chicago, Cook County, Illinois?

21           A   Yes, I was.

22           Q   And did you have occasion to meet a person

23   known to you--made known to you as being Jerome

24   Hendricks?

73

PENGAD/INDY, MUNCIE, IN 47302    SF-IL-24A

1    A   Yes, I did.

2    Q   Do you see him in court today?

3    A   Yes, I do.

4    Q   Would you point to Jerome?

5    MS. PLACEK:  We stipulate she'd point to the

6    defendant.

7    THE COURT:  All right.

8    MR. CASSIDY:  We accept the stipulation.

9         Now, are-- How were you introduced to

10   Jerome?

11   A   When I went to Area 2 Detective Yucaitis and

12   Detective Joanne Ryan and I went into the room together

13   and Detective Yucaitis introduced me to Mr. Hendricks.

14   Q   After he introduced you to Mr. Hendricks

15   what then did Detective Yucaitis do?

16   A   He left the room.

17   Q   Leaving you and Detective Ryan with Mr.

18   Hendricks?

19   A   Yes.

20   Q   What happened then?

21   A   At that time I then introduced myself

22   again to Mr. Hendricks.

23   Q   What exactly did you say to him?

24   A   I told him my name is Anna Demacopoulos, that

74

1   I was an Assistant State's Attorney, that I was a

2   lawyer, but not his lawyer, but rather a lawyer that

3   was working with the police.

4            I then explained to him what my

5   duties were as an Assistant State's Attorney.  I told

6   him that my job was to interview the witnesses, review

7   the facts of the case, determine who, if anyone, was

8   going to be charged and with what charge.

9        Q   After you told him that, what did he say?

10       A   I indicated to him I would have-- That he

11  would have an opportunity to speak with me, but before

12  he did that, that I was toing to advise him of his

13  Miranda Rights, and I then advised him of his Miranda

14  Rights.

15       Q   And, Miss Demacopoulos, how did you do

16  that?

17       A   I did that orally by memory.

18       Q   And what did you say to him?

19       A   I told him that he had the right to

20  remain silent, that anything he said could be used

21  against him in a court of law.  He then indicated to

22  me that he understood that right.

23            I then told him that he had the right

24  to an attorney, and he had the right to an attorney

75

before I questioned him, and he had the right to

an attorney during questioning, and he indicated

that he understood that.

        I then told him that if he couldn't

afford an attorney, one would be appointed for

him by the court, and he told me he understood that.

        Q  After informing him of his Miranda

Warnings, did he agree then to talk to you?

        A  Yes, he did.

        Q  Did you then proceed to tell-- Or did he

then proceed to tell you orally what occurred?

        A  Yes, he did.

        Q  Okay.  And approximately how long then

did he give you this oral statement?

        A  I had an oral conversation with him for

approximately twenty minutes to a half hour.

        Q  Following this conversation then what, if

anything, did you do then?

        A  After I had the conversation with him I

then indicated to him that there were different

ways that we could memorialize or write down what he

had told me.  I told him that I could either write

down everything that he had said and that he would

have an opportunity to then read over the written

1    statement and make any corrections that he wished

2    to make and then sign the statement if he wished to

3    sign it, or I could have a court reporter come in.

4         He then told me that he wasn't going

5    to talk to anybody else but Detective Tyan and myself

6    and he didn't want anybody else in the room.  I then

7    asked him if I could write down everything that he

8    said, and he said that would be fine.

9         Q  So after he agreed to write down everything,

10   what happened then?

11        A  I then left the room.  Detective Ryan

12   also left the room.  I then went back into the room

13   and I had occasion to have a conversation with

14   Mr. Hendricks alone.

15        Q  Just you and Mr. Hendricks?

16        A  Yes.

17        Q  In the same room?

18        A  Yes.

19        Q  What, if anything, did you say to him at

20   that time?

21        A  I then sat down and asked him whether or

22   not the police had treated him fairly, if he had any

23   complaints, and if he needed anything from me.

24        Q  And did he have any complaints?

77

1          A   No, he did not.

2          Q   Did he complain of any mistreatment by

3     the police?

4          A   No, he did not.

5          Q   Did he say whether or not he was fed or

6     not?

7          A   Excuse me?

8          Q   Did he say whether or not he was fed or

9     whether he was hungry or not?

10         A   I believe that he told me he had had

11    something to eat and drink.  I then asked him if he

12    wanted a cigarette.  I believe I gave him one of my

13    cigarettes.

14         Q   After this conversation then what, if

15    anything, did you do?

16         A   I then left the room and I went

17    outside and I wrote down what he had told me.

18         Q   This is outside the room you wrote this

19    down?

20         A   Outside of the room he was in, yes.

21         Q   Okay.  After writing this down then what,

22    if anything, did you do?

23         A   I then went back into the room with

24    Detective Yucaitis and Detective Ryan and myself.  I

78

then sat down at the table and indicated to Mr. Hendricks the procedure that we were going to follow at this point.

Q  What did you tell him?

A  I showed him the handwritten statement that I had written out.  I then read the top portion of the statement, which is basically a fill in the blanks format.  After that there is a typewritten form which has what is known as the Miranda Rights.

I asked him to read out the Miranda Rights out loud so that I could make sure that he could read and write English.

Q  When you asked him to read these rights out loud, did he read them out loud?

A  Yes, he did.

Q  And did he read them as they appeared on the page?

A  Yes, he did.

Q  After he read them out loud, then what if anything happened?

A  I then indicated to him that if he understood this Miranda Rights and wanted to continue, that he could sign the line underneath the typewritten form, at which time he signed that line.

1    Q   Okay.  After he signed that line, then

2    what happened?

3    A   Thereafter it was my handwriting and I

4    indicated to him that I was going to read the statement

5    out loud to him and he could follow along with me,

6    that he should stop me at any time when there was

7    a correction that needs to be made, and that then we

8    would-- Then we continued on to the statement.

9    After we had read each of the pages

10   and after any corrections had been made, I asked him

11   if everything on the pages was correct and he would

12   initial the bottom of each page and then he signed the

13   last page.

14   Q   Okay.  Did you, in fact, then read

15   the body of the statement to him?

16   A   Yes, I did.

17   Q   Did he, in fact, follow as you read it

18   to him?

19   A   Yes, he did.

20   Q   And did he make any corrections on the--

21   A   Yes, he did.

22   Q   And did he, in fact, initial each page?

23   A   Yes, he did.

24   Q   And did he, in fact, sign the last page of

PENGAD/INDY. MUNCIE. IN  47302

SF-IL-24A

1   the statement at the end?

2        A   Yes, he did.

3        Q   Who else signed the statement?

4        A   I signed the statement, Detective Joanne

5   Ryan signed it, and Detective John Yucaitis signed

6   the statement.

7        MR. CASSIDY:   May I approach the witness?

8        THE COURT:   You may.

9        MR. CASSIDY:   Miss Demacopoulos, showing you

10  what's been marked as People's Exhibit Number 49.

11           This is Number 49, Judge.

12       THE COURT:   All right.

13       MR. CASSIDY:   This will take the place of the

14  other exhibit.

15       THE COURT:   All right.   Do you understand,

16  Miss Placek?   That is 49 now.

17       MS. PLACEK:   Right.

18       THE COURT:   All right.

19       MR. CASSIDY:   Miss Demacopoulos, do you

20  recognize what's been marked People's Exhibit

21  Number 49?

22       A   Yes.

23       Q   What do you recognize that to be?

24       A   This is the original handwritten statement

81

1  that was written out on the 9th of August at Area 2

2  Violent Crimes.

3        Q   Did you have a chance to review that?

4        A   Yes, I did.

5        Q   Does People's Exhibit Number 49, does

6  that appear to be in the same or substantially the

7  same condition now as it was when you signed it,

8  the defendant signed it, Detective Yucaitis signed it,

9  and Detective Ryan signed it?

10       A   Yes, it is.

11       MR. CASSIDY:  Judge, at this time I would

12  request that Exhibit Number-- That the identification

13  mark be stricken and the witness be allowed-- That

14  it be made admitted into evidence and the witness be

15  allowed to publish it by reading it into the record.

16       MR. LUFRANO:  I think it ought to be in

17  reverse order.  I think she ought to read it first

18  and see if it coincides with the copy given to us.

19       THE COURT:  I'm not sure that I understand

20  what you're saying, Mr. Lufrano.

21       MR. LUFRANO:  He's asking that the identification

22  marks be stricken and it be received into evidence.

23       THE COURT:  Right.

24       MR. LUFRANO:  There is no way that we can

82

1  object or not object until we hear it.  It purports

2  to be exactly what we have been tendered earlier.

3      MR. CASSIDY:  Apparently, if I understand

4  that right, he says she might misread it, is that

5  correct?  And then he can cross examine her on it.

6      THE COURT:  I would think so.

7          The identification marks will be- - Unless

8  you have some other objection other than that, Mr. Lufrano,

9  the identification marks will be stricken and the

10 exhibit will be admitted into evidence over your

11 objection, and the witness will be allowed to publish

12 the document.

13     MR. CASSIDY:  Miss Democopoulos, please

14 read what's been marked as People's Exhibit Number 49,

15 the statement you took from the defendant.

16     A   Statement of Jerome Hendricks taken

17 9 August, '88 at ten forty-five P.M. at Area 2

18 Interview Room.  Present: Detective John Yucaitis, Star 7498

19 Joanne Ryan, Star 4593, ASA Anna Demacopoulos.

20         This statement taken regarding the

21 sexual assault-murder of Denise Johnson which occurred

22 on the 1st of August, '88 at 251 West 117th Street

23 at nine thirty P.M. through twelve o'clock.

24         I understand I have the right to remain

83

silent and anything I say can be used against me in
a court of law.  I understand that I have the right
to talk to a lawyer and have him present with me
during questioning, and if I cannot afford to hire a
lawyer, one will be appointed by the court to
represent me before any questioning.  Understanding
these rights I wish to give a statement, and then
Jerome Hendricks' signature appears.

          After being advised of his constitutional
rights and stating that he understood each of those
rights, and after being advised and stating that he
understood that I was an Assistant State's Attorney, a
lawyer working with the police and not his lawyer,
Jerome Hendricks-- And there is a correction that
appears there with my initials, agreed to give the
following summary, not verbatim, statement.

          Mr. Hendricks stated that on August 1st,
1988 he saw and met a girl that was staying at 11720
South Princeton.  He stated that he saw-- And there is
a correction made with my initials.  The girl a few
times during the time when she was babysitting over at
Carletta's house.  He further-- And that concludes
page one, with Mr. Hendricks' initials, my initials,
Detective Yucaitis' signature on it.  He further stated

1  that about nine thirty, when he came out of his house

2  and saw the girl leaning on his fence, as he came

3  out Mr. Hendricks stated that the girl wanted to

4  kiss him, and she started squeezing him.

5            At first Me. Hendricks said no, and

6  started walking away, but the girl followed him to

7  the back.  When they were by a car the girl said she

8  wanted to do it with him and be with him.  At that

9  time the girl took him over to a car behind 11720

10  and said she wanted to be with him, and took her

11  pants down.

12           Mr. Hendricks stated that he then

13  dropped his pants and stated that he had vaginal sex

14  with her, and a correction appears, from behind.  That

15  correcti n was "him," and Mr. Hendricks changed it to

16  "her."  My initials appear and his initials appear.

17           He stated that he did not cum at that

18  time.  Mr. Hendricks further stated that he then

19  pulled up his pants and started to walk away when

20  the little girl started following him and saying she

21  wanted more.  Mr. Hendricks stated that she then

22  followed him and went in the garage.

23           He stated that she told him to come

24  in the garage with him.  This garage is next door to

85

1  Mr. Hendricks' home.  He stated that he then-- A

2  correction appears with Mr. Hendricks' initials,

3  went in with her.  Again another correction appears

4  with Mr. Hendricks' initials.  And that again she

5  took her pants down.  Another correction appears

6  with Mr. Hendricks' initials.  One leg, and while

7  standing up she bent over.

8         Mr. Hendricks stated that he then

9  dropped his pants and began having vaginal sex with the

10  girl again.  That concludes page two, with my signature,

11  Mr. Hendricks' initials, and Detective JoAnne Ryan's

12  initials.

13         While they were having sex Mr. Hendricks

14  said the girl pulled her shirt from off her and--And

15  then a correction appears with the word "back."  And

16  pulled it over her head.  And a correction appears

17  with Mr. Hendricks' initials.

18         The shirt was completely over her

19  head.  The girl then put her hands under Mr. Hendricks'

20  butt and was pulling herself up.  Mr. Hendricks said

21  that at one point the girl wanted him, which there's

22  an addition that Mr. Hendricks made with his initials.

23  The girl wanted him to pull on something that was around

24  her face and she wanted him to ride her like a horse, and

86

that ride her like a horse appears in quotations.
Those were Mr. Hendricks' words.

Mr. Hendricks stated that he didn't
know what it was, and that it could have been a
rope or her shoelace. Mr. Hendricks said that he
did not pull on it, though, because he didn't get
into it. Mr. Hendricks stated that she had her
hands balled up like she was desperate, like a freak, and
the word freak appears in quotations as those being
Mr. Hendricks' exact words.

Mr. Hendricks stated that he didn't
say anything to her and that he-- And a correction
appears with his initials. Was grabbing her around
her waist and her shoulder. Mr. Hendricks stated
that he did cum and that he did cum inside of the
girl. After he came Mr. Hendricks stated that he
pulled up his pants and left, and that he did not
look back to see the girl.

He further stated that he knew she
did not come out with him. That concludes page three
with Mr. Hendricks' initials, my signature, and
Detective Ryan's initials.

Mr. Hendricks further stated that on
Wednesday or Thursday his family was complaining

about a smell coming from the garage and that he
thought the cat had killed a rat.

Mr. Hendricks stated that he was
cleaning up around the yard and was going to put some
garbage and branches in the garage. When he went
into the garage Mr. Hendricks stated that he saw
something that looked like a body and he went over to see
what it was. He said that it was the same girl that
he had sex with and that the shirt was still in the
same position over her head.

At that time Mr. Hendricks did not
want to say anything to anyone because of the trouble
he had had in the past. On August 8th, 1958 Mr. Hendricks
knew the police were looking for him and so he came
down to Area 2 to talk to the police.

Mr. Hendricks stated that he was
treated well by the police and then-- Then there is a
deletion made by myself, Assistant State's Attorney. He
also stated that he was not made any promises in return
for this statement and was not threatened in any way.

Mr. Hendricks stated that he was given
two meals to eat and was given water and cigarettes.
Mr. Hendricks was allowed-- And that concludes page four.
To use the bathroom. Mr. Hendricks appeared to be free

88

1    of the effects of drugs and alcohol.

2            Mr. Hendricks read this statement out

3    loud with the Assistant State's Attorney.  That

4    concludes page five with Mr. Hendricks' signature,

5    my signature, Detective Ryan's signature, and

6    Detective Yucaitis' signature.

7            MR. CASSIDY:  No further questions, Judge.

8            THE COURT:  Cross?

9            MS. PLACEK:  May I proceed?

10           THE COURT:  You may proceed.

11           MS. PLACEK:  Thank you very much.

12                   CROSS EXAMINATION

13                   By Ms. Placek:

14       Q  Ma'am, when you were a member of the Felony--

15   You were a member of the Felony Review Unit of the

16   State's Attorney's Office, is that correct?

17       A  In August of '88, yes.

18       Q  Pardon me?

19       A  In August of '88 I was, yes.

20       Q  Thank you.  And as a member of the

21   Felony Review Unit of the State's Attorney's Office

22   this wasn't the first statement that you took, correct?

23           A  That was the first handwritten statement

24   that I had taken, yes.

89

Q  Well, was this the first time you had
ever been confronted, let's say, by a defendant in
taking either an oral or written statement by him?

A  Not the first oral statement, no.

Q  But this was the first written statement
that you took, correct?

A  The first handwritten statement that I
had taken on a murder, yes.

Q  Well, let me ask you a couple of questions
about that.

You know that there is a certain
procedure used by Felony Review Assistant State's
Attorneys when they are, in fact, called by the police
for purposes of taking a statement, correct?

A  There are certain procedures, but each
Assistant State's Attorney uses their own discretion.

Q  Well, in your own discretion in-- Well,
I'll withdraw and rephrase.  I'll ask you this.

When you got to the police station
on the date and time in question, did you, in fact,
make yourself familiar with the case?

A  When I first arrived I read some of the
police reports that were available and I did talk to
Detective Ryan and Detective Yucaitis.

90

Q   So would I be correct in saying that you made yourself familiar with the case?  Correct?

A   Yes.

Q   And you knew certain facts of the case? Correct?

A   Yes.

Q   And you knew what you were investigating, correct?

A   I wasn't investigating.  I was there for purposes of interviewing the witnesses.

Q   I see.  So let me ask you this.  Other than Jerome Hendricks who else did you speak to that night?

A   I spoke to some of the witnesses of the family of the victim.

Q   When you say "witnesses of the family," could you name them?

A   I believe one of the girl's names was Paulette, I believe it was.

Q   Was this a family member?

A   I believe it was.  I'm not sure.

Q   And who else did you speak to?

A   I believe I spoke to a Charles Walker.

Q   Could that have been Michael Walker?

1          A   Michael Walker, yes.

2          Q   Thank you.

3              And who else did you speak to?

4          A   I would have to look at my notes to

5     determine anybody else that I spoke with.

6          Q   And that would be your Felony Review

7     notes, correct?

8          A   Correct.

9          Q   And that would be in your Felony Review

10    folder?

11         A   Yes.

12         MS. PLACEK:  Judge, at this time I would ask

13    permission to see the State's Attorney's Felony Review

14    folder.

15         THE COURT:  What's the purpose?

16         MS. PLACEK:  Based on certain lack of memory

17    of this witness, Judge, and also as to the basics

18    of the testimony of what she did prior to speaking

19    to the defendant.

20         THE COURT:  Mr. Cassidy, or Mr. Murphy?

21         MR. MURPHY:  Judge, we would object.

22         THE COURT:  In your judgment, Mr. Murphy, is

23    there any discoverable material contained in that

24    document or in that folder that falls properly within

92

1   your obligations under fourteen-twelve of The

2   Supreme Court Rules?

3          MR. MURPHY:  No, Judge.

4          THE COURT:  Do you have any information to

5   the contrary, Miss Placek?

6          MS. PLACEK:  From this witness's testimony,

7   Judge.

8          THE COURT:  This witness's testimony simply

9   says she made some notes which contains the names of

10  persons in the Felony Review Folder, which may-- What

11  is the-- Is this work product document?

12         MR. MURPHY:  That's our position, Judge.

13         THE COURT:  How do you deal with that contention,

14  Miss Placek?

15         MS. PLACEK:  Our position, Judge, is that

16  privilege, by the witness's testimony, has right now

17  been broken as per the request to say, "I would have

18  to look at my folder to refresh my memory."

19         THE COURT:  Well, I don't think so.  I don't

20  think so.

21              Do you agree that absent that

22  testimony from this witness that that document

23  is essentially work product?

24         MS. PLACEK:  No, Judge.

93

1          THE COURT:  Lawyer's work product?

2          MS. PLACEK:  No, Judge.

3          THE COURT:  Why not?

4          MS. PLACEK:  If I might be allowed to ask

5   one question of the witness?

6          THE COURT:  You may.

7          MS.PLACEK:  Did you refresh your memory

8   before testifying by using this felony review folder?

9          A   For purposes of this statement, no, I

10  did not.

11         Q   Did you see this felony review folder

12  before testifying in court today?

13         A   I did not see it today, no.

14         Q   Did you read it prior to testifying

15  today?

16         A   I saw it last week, yes, I did.

17         Q   And when you say you saw it last week, am

18  I correct in assuming that you were here in the Markham

19  Courthouse last week for the purpose of testifying?

20         A   I was here last Thursday, yes, I was.

21         Q   And that was for the purpose of testifying,

22  correct?

23         A   Yes.

24         Q   And am I correct in saying that you, in fact,

94

1    looked at that Felony Review folder for the

2    purpose of refreshing your memory as to the case

3    in preparation for your testimony?

4            A    I looked at the folder, yes.

5            Q    Am I correct-- Was that "yes" to that

6    question?

7            A    I did not need any of the information that

8    was in this Felony Review Folder for purposes of this

9    statement, no.

10            Q    But you still looked at it?

11            A    Correct.

12            MS. PLACEK:    Thank you.    Thus the basis,

13    Judge.

14            THE COURT:    State, is there anything-- Any

15    reason not to turn the document over?    If there isn't,

16    why are we, you know, going through this?    I'm not

17    ordering you to do it, but I don't think-- I think the

18    law is that if she used it for preparation for her

19    testimony and reviewed it, then it's disclosable.

20            MR. MURPHY:    Judge, our position is the

21    same in this case as it would be in any case.    Those

22    Felony Review folders are prepared as-- They are work

23    product.    They are prepared by the attorneys who are

24    going out and handling the cases.

95

1          THE COURT:  I'm sure that's generally the

2     case, but this witness has used this document in

3     preparation for her testimony.  That makes it a

4     different breed of animal.

5               Normally it's not the case, but here

6     the witness used it to prepare for testifying, and that

7     becomes discoverable.  Isn't that generally true,

8     Mr. Murphy?

9               The mere fact that it was an attorney's

10    document originally doesn't insulate it from discovery

11    when that attorney takes the witness stand and has

12    used that document to refresh her recollection.

13    If there is material in there which is condifential

14    and non disclosable under any circumstances, I will

15    review it in camera to determine that.  Otherwise, I

16    am going to ask you to disclose it.

17         MR. MURPHY:  Judge, could we have a two

18    minute recess then?

19         THE COURT:  Five minute recess.

20         MR. CASSIDY:  Thank you.

21         THE COURT:  Miss Demacopoulos, you may

22    step off the witness stand.  Please do not discuss

23    your testimony with anyone.  As a matter of fact,

24    don't talk to anyone period.  All right?

96

1          THE WITNESS:  All right.

2                (Whereupon the following proceedings

3                were had in chambers, outside the

4                presence and hearing of the witness:)

5          THE COURT:  All right.  How does this

6     document differ from any document that you have in

7     your file that contains your observations about a

8     witness?

9          MS. PLACEK:  First of all, Judge, I would

10    object to being here for the simple reason that it

11    was my understanding that, at the close of the proceedings,

12    the--

13         THE COURT:  Well, we're past that.

14         MS. PLACEK:  If I may make my record?  That

15    this was not to be an in camera proceedings.  As

16    to the Court's question, I don't know.  I haven't

17    seen it.  I don't know.

18         THE COURT:  Well, I don't know whether this is

19    a work product document or not.  I doubt it.  I also

20    doubt whether it has any relevance to anything either.

21               All right, gentlemen.  On The Handbook

22    of Illinois Evidence, Rule 504.1, page 266, in addition

23    the rule recognizes as privileged certain--as certain

24    matters in preparation for trial:  Material prepared

97

by or for a party in preparation for trial, is subject
to discovery only if it does not contain or disclose
the theories, mental impressions, or litigant's
plan of the party's attorney. Strike that. Litigation
plans of the party's attorney.

The term "work product" is--

(Pause)

THE COURT: All right. I come to the
conclusion that this is not work product. It is
simply a recitation of who this witness talked to
and what they said, and a very short summary of what
those witnesses told Miss Demacoploulos, and that
doesn't make it work product.

There is absolutely zero in here
that suggests any thought products of the lawyer
in her capacity as a lawyer one way or the other
either in terms of making a decision as to whether
a crime had been committed or anything else. It just
simply is not there. It's a recitation of a conversation
she had with somebody.

For those reasons I'm going to disclose
it, the document consisting of four pages, which I am
told are the inserts into Miss Demacopoulos' so-called
Felony Review folder.

98

MS. PLACEK:  Thank you, Judge.

(Whereupon a recess was taken in the
above entitled cause, after which the
following proceedings were had in open
court:)

THE COURT:  All right.  You may proceed,
Miss Placek.

MS. PLACEK:  Thank you, Judge.

Judge, for purposes of the record I
believe it will reflect we do have the work product at
this time.  To save the Court's time what I will do
is have my co-counsel read it and then return back
to the table in case there are other questions.

Now, after talking with the witnesses
you also examined police reports, correct?

A   I examined some of the police reports.

Q   Would I be correct to say that you
examined enough of the reports to, in fact, know
that a death was involved in this case?

A   Yes.

Q   Now, calling your attention to the statement
of the defendant, am I correct in saying that the
defendant, in his statement, never spoke of killing
the girl?

99

1    A  Mr. Hendricks denied actually killing

2   Denise, yes.

3    Q  The way you put it, am I correct that

4   no where within the contents of the statement does

5   it reflect that he was even questioned about the

6   killing of the girl?

7    A  I did question him about it, yes, I

8   did.

9    Q  Well, let me ask you this.

10   Is that reflected within the statement

11   which was previously marked as State's Exhibit Number

12   49, that you questioned him?

13    A  May I have a moment?

14    Q  Surely.

15    A  On the bottom of page three he indicated

16   to me that he further stated he knew she did not come

17   out with him.

18    Q  Is that your interpretation that he said

19   he killed the girl?

20   MR. CASSIDY:  Objection, Judge.  Argumentative

21   because she never said that he said that.

22   THE COURT:  The objection is sustained.

23   MS. PLACEK:  Let me ask you this.  He knew

24   that she did not come out with him.  Did you ask him

100

1   whether or not by that he meant-- He said he killed

2   the girl?

3      A During my oral conversation with Mr.

4   Hendricks--

5      Q Counsel, did you understand my question?

6      A Yes.

7      Q Did you understand that my question pertained

8   to the part of the statement that you just spoke of?

9      A Yes.

10     Q Does that part of the statement say he

11  did not look back to see the girl?  He further stated

12  he knew that she did not come out with him, is that

13  correct?

14     A That's what you're asking me, yes.

15     Q Am I correct in saying that that does not

16  say that Mr. Hendricks, in fact, in any way harmed

17  the girl?

18     A No.

19     Q Am I-- I'm incorrect?

20     A Yes.

21     Q The-- It does say he harmed the girl?

22     A You're--

23     Q In the written statement does it say

24  that Mr. Hendricks harmed the girl?

101

1        A   He raped a twelve year old, yes.

2        Q   When you say "raped," did he say she

3   consented?  Did she-- In this statement did it

4   contain the words that she consented?

5        MR. CASSIDY:  Objection, Judge.  Under Illinois

6   law a twelve year old cannot consent.  That's a rape.

7        THE COURT:  Overruled.

8        MS. PLACEK:  Did he say she consented?

9        A   In the statement?

10       Q   Yes.

11       A   In the statement Mr. Hendricks-- This

12  statement is in Mr. Hendricks' words.

13       Q   Well, let me talk about this.

14            So, in other words, am I correct in

15  saying that the Office of the State's Attorney will

16  write down what is true and false without any kind

17  of regard?

18       A   I don't know what--

19       MR. MURPHY:  Objection to that question.

20       THE COURT:  Objection is sustained.

21       MS. PLACEK:  Well, let me ask you this.

22            When you say it's Mr. Hendricks' words,

23  did Mr. Hendricks say the girl consented to have sex

24  with him?

102

A    He didn't use those words, no.

Q    Did he say the girl wanted to have sex with him?

A    Yes.

Q    Did he say he hurt the girl in that he killed the girl?

A    He would not say the word "killed" to me, no.

Q    As a matter of fact, what it says there was that he further stated she did not come out, correct?

A    That's what he told me, yes.

Q    As a matter of fact, no where on this statement does it say he would not say the word "killed," correct?

A    I wrote down what Mr. Hendricks told me to write down, and that's what I put down.  When he had the oral conversation with me he denied killing her and that's what I put down.

Q    Thank you.  He never said that he had secretly confined the girl against her will, did he?

A    No one talked like that, no.

Q    Did he say anything-- Did he say any words of that accord either in the oral or the

103

1    written statement?

2         A   He told me he took her, that they were

3    in the garage together, and--

4         MS. PLACEK:   Motion to strike as non-

5    responsive.

6         MR. CASSIDY:   Objection, Judge.   The question

7    was phrased, "Or words to that accord," so she's

8    trying to give the words of Mr. Hendricks and--

9         MR. LUFRANO:   Objection to counsel trying

10   to put words in his witness's mouth.

11        THE COURT:   Well, we don't need both lawyers

12   on the same side objecting.

13        The objection is overruled.

14        MS. PLACEK:   Thank you.

15        Did he say that he secretly confined

16   her against her will?

17        A   Mr. Hendricks did not use those words,

18   no.

19        Q   Did Mr. Hendricks ever say that he did

20   anything to the girl against her will?

21        A   He didn't tell me that, no, but--

22        Q   He didn't tell you that, correct?

23        A   No, no criminal tells me that.

24        Q   Well, when you say no criminal tells you

104

1    that-- Motion to strike "criminal," Judge.

2           THE COURT:  That portion of the statement-- Of

3    the answer is stricken.

4           MS. PLACEK:  Let me ask you this.

5           Did he ever say that, in fact, he did

6    anything to the girl that she didn't ask him to do?

7    A    No, he did not.

8    Q    As a matter of fact, he said that he

9    refused to do things that the girl wanted him to do?

10    A    That's what he told me, yes.

11    Q    Thank you.  Let me ask you this.  To the

12    best of your knowledge, when Mr. Hendricks said things

13    you wrote it down, correct?

14    A    I was not taking notes during the time

15    that I was  speaking to him, no.

16    Q    Well, to the best of your knowledge,

17    referring again to People's Number 49, is that a

18    correct representation of both the oral and the-- And

19    what Mr. Hendricks told you that day?

20    A    About the incident, yes.

21    Q    Thank you.  Mr. Hendricks used the word

22    "freak" in this statement, correct?

23    A    Yes.

24    Q    Isn't it correct that you asked him to

105

1  clarify what he meant by "freak?"   Or did you

2  ask him to clarify what me meant?

3      A   During the oral statement?

4      Q   During the oral or the written statement.

5      A   When he was describing the sexual act to

6  me he literally stood up and told me that his-- That

7  her hands were behind him on his but, and that she

8  was balling up, acting like a freak.

9      Q   Did you ask him what he meant by the word

10  "freak?"

11      A   No, I did not.

12      Q   Didn't Mr. Hendricks, in fact, say to you

13  that freak referred, in fact, to the fact of a sexual

14  practice of putting the shoelace around her neck?

15      A   No.

16      Q   Did Mr. Hendricks, in fact, tell you that

17  during the sex with the girl her hands were behind

18  him?

19      A   He had-- I had him demonstrate it, yes.

20      Q   And her hands, speaking of the girl's, were

21  behind him, correct?

22      A   Correct.

23      Q   Thank you.  Isn't it correct that Mr.

24  Hendricks only wished to speak to either you or

106

1    Detective Ryan?

2          A   When I was in the room and I asked him

3    about the court reporter, that's when he indicated

4    to me that he didn't want to talk to anybody else but

5    Detective Ryan and myself.

6          Q   Thank you.  By the way, Detective Ryan

7    and yourself are both women, correct?

8          A   Yes.

9    MS. PLACEK:  Thank you.

10               May I have a moment, Judge?

11   THE COURT:  Sure.

12   MS. PLACEK:  Am I correct in saying that

13   what Mr. Hendricks spoke of in the statement you took

14   on August 9th, 1938, at approximately ten forty-five

15   in the evening, dealt with certain details of the

16   August 1st, 1988 date, correct?

17               You have the statement before you,

18   correct?

19         A   Yes.

20         Q   Am I correct that no where during the

21   statement-- Am I correct in saying that in no where

22   during the statement that you asked Mr. Hendricks at

23   what time the sex act ended?

24         A   Which sex act?  The first one or the second one?

107

1      Q    Either one.

2      A    No, it's not in this statement.

3      Q    Am I correct in saying that at no time--

4  And I'm speaking again as to both sex acts, is it

5  contained within the statement how long this sex

6  act lasted?

7      A    The first sex act, no, there is no time

8  period, no.

9      Q    Am I correct in saying that you do set a

10  time that it started about at nine thirty, correct?

11      A    That's what Mr. Hendricks told me, yes.

12      Q    Am I correct that in the statement there

13  is no time as to when Mr. Hendricks allegedly left the

14  garage?

15      A    He left the garage after he ejaculated.

16      MS. PLACEK:    Motion to strike as not

17  responsive, Judge.

18      MR. CASSIDY:    Objection, Judge.    The witness

19  answered the question.

20      THE COURT:    I hardly think so, Mr. Cassidy.

21      MR. CASSIDY:    The witness was asked what time

22  and she's given the time.

23      THE COURT:    Well, she's talking about time

24  as we determine it by the clock.

108