CASE NO. _O8 cv 1589_

ATTACHMENT NO. ___1___

EXHIBIT _____

TAB (DESCRIPTION) _____

1            MR. CASSIDY:  That wasn't the question asked,

2      though, Judge.

3            THE COURT:  Well, I think it was fairly

4      implied in the question that was asked of the

5      witness.

6            MR. CASSIDY:  All right.

7            THE COURT:  The answer is non-responsive and

8      the objection is sustained.

9            MS. PLACEK:  Thank you.

10           Isn't it correct that in this statement

11     it is not contained a time when Mr. Hendricks, in fact,

12     left the garage?

13           A  He didn't give me a time, no.

14           Q  Thank you.  Approximately how long did it

15     take to get this statement?

16           A  How long did it take me to write it

17     out?  Or how long was the entire conversation?

18           Q  In total, the oral conversation, the writing

19     it out and Mr. Hendricks signing it.

20           A  I started talking to Mr. Hendricks about

21     ten o'clock that evening.  I started writing out the

22     handwritten at approximately ten forty-five.  It took

23     about ten to fifteen minutes to go through-- As long

24     as it would take me to read it and make the corrections

109

Mr. Hendricks wanted, so a total of about an hour.

     Q  Am I correct in saying that you wrote this statement?

     A  Yes, I did.

     Q  Am I correct in saying that it's a synopsis of what Mr. Hendricks told you as part of the oral statement?

     A  It's a summary, yes.

     Q  Am I correct in saying that only on two occasions you use quotations as to Mr. Hendricks' exact words?

     A  Yes.

     Q  Am I correct in saying that as a total of those quotations, they total approximately four words, "Freak," and "Look at the body?"

     A  No, the quotation marks are around the words, "Ride her like a horse."

     Q  "Ride her like a horse," and the other one would be "freak," correct?

     A  Correct.

     Q  And what was the other one?

     A  I believe those are the only two.

     Q  So instead of four words the quotations would be, in fact, around six words, correct?

1    A   Yes.

2    Q   As Mr. Hendricks' exact words, correct?

3    A   Yes.

4    Q   Am I correct in saying that you had

5    written-- Or in your opinion the statement was written as

6    accurately as you could?

7    A   Yes.

8    Q   But am I correct that on the very first

9    page, where the correct spelling of Mr. Hendricks'

10   name appears, you, in fact, misspelled Mr. Hendricks'

11   name?

12

13   A   That's correct.  That was a mistake that

     I had made writing out the statement and which I

14   corrected it.  That's why my initials are the only

15   ones that appear.

16   Q   Am I correct in saying that, as a matter

17   of fact, as to this statement, the manner and form

18   in which it was taken was, in fact, in pure summary

19   form?

20   A   I'm sorry.  I don't understand your

21   question.

22   Q   Sure.  Let me ask you this.  Am I

23   correct in assuming that there are numerous mistakes

24   in the statement?

111

1    A  There are numerous corrections that were

2  made, yes.

3    Q  Am I correct in saying that even some of

4  the corrections that you said you read over with

5  Mr. Hendricks have yet to be corrected?

6    A  The corrections that were made, if I made

7  a mistake during the time that I wrote them out, my

8  initials appear.  When Mr. Hendricks wanted to change

9  something, for example on page three he made the

10  corrections, and his initials appear.

11    Q  Am I correct in saying that there is

12  still corrections needed in this statement even after

13  the supposed two readings by yourself?

14    A  Corrections as to what?  Something should

15  be added?

16    Q  Well, let me ask you this.  How do you

17  spell the word "waist," as in "I grabbed her around the

18  waist?"

19    MR. CASSIDY:  Objection, Judge.  Argumentative.

20    THE COURT:  No.

21    MS. PLACEK:  It goes to the accuracy of

22  the statement.

23    THE COURT:  The objection is overruled.

24    THE WITNESS:  W-a-s-t-e is the way it's in here.

112

Q   And W-a-s-t-e is--

A   That's the way it is in the statement.

Q   So which is the correct way?  Is it correctly spelled in the statement or is it incorrectly spelled in the statement?

A   It's incorrectly spelled in the statement.

Q   Did you catch that when you supposedly read the statement over two times?

A   No, because I'm not a spelling whiz, as everyone knows that.

Q   Let's go one step further.

Am I correct in saying that, although not a spelling whiz, that the name Jerome Hendricks, as in "Statement of," is written on the top of the page?

A   That's correct.

Q   Was that written by yourself?

A   Yes.

Q   And I take it that supposedly all witnesses and all-- Withdraw that.

Am I correct in saying that the purpose of your investigation at the police station was a gentleman by the name of Jerome Hendricks?

A   Yes.

113

Q   Am I correct in saying that you knew
the defendant's name that night?

A   Yes.

Q   But am I correct in saying that not even
half the page down you referred to the defendant in
this statement as Jerome Hopkins?

A   That's correct, and that's where I have it
crossed out.

Q   Thank you.  But the original is Hopkins,
correct?

A   Yes.

Q   And am I correct in saying that you knew,
in fact, that you were investigating the death of a
female?

A   Yes.

Q   Am I correct in saying that there was
at the time, allegedly, no question as to both the
witnesses and your conversation with Mr. Hendricks, that
a female was involved in this matter?  Correct?

A   Yes.

Q   Am I correct in assuming, on the second
page, you, in fact, referred to the victom of this
crime not as a female, but as a male?

A   Yes, and there is a correction.

114

1          Q   Thank you.   But the correction was made

2    at a later time, correct?

3          A   Yes.

4          Q   Thank you.   By the way, these mistakes

5    weren't purposely made by you in order to authenticate

6    the statement, were they?

7          A   I'm sorry?

8          Q   These mistakes I'm speaking to here and

9    the miscalling of the defendant by another name,

10   weren't purposely made by you in order, for some

11   reason, to authenticate the statement in front of a

12   judge or jury if later called to testify, correct?

13         A   You're absolutely correct.

14         Q   You didn't intentionally make these

15   corrections?

16         A   No.

17         Q   Thank you.   Now, as to the statement

18   itself, you spoke of taking the statement and speaking

19   to witnesses, correct?

20         A   I'm sorry?

21         Q   You spoke of one of your reasons was for

22   only being there was to take a statement, but also

23   speaking to witnesses, correct?

24         A   Yes.

115

Q  To the best of your knowledge and experience as an Assistant State's Attorney, do your witnesses-- Are witnesses ever asked to make statements?

A  Make handwritten statements?

Q  That's correct.

A  Yes.

MS. PLACEK:  Thank you.

May I have one moment, Judge?

THE COURT:  You may.

MS. PLACEK:  Am I correct that in this statement Mr. Hendricks never stated that he forced the young lady to stay in the garage?

A  In the handwritten statement?  On the oral statement?

Q  That's correct.

A  He never used the word "forced," no.

Q  Am I correct in saying that Mr. Hendricks never stated that he forced the young lady to enter the garage?

A  Correct.

Q  At the time you took this statement did you know how long Mr. Hendricks had been in the police station?

116

1        A   I believe that he initially went to the police station the night before.

2        Q   Do you know what time the night before?

3        A   No, I don't.

4        Q   Thank you.

           At the time that you took the statement did you do it with the knowledge that the police had information that the alleged victim of this crime was seen alive on August-- During the early morning hours of August 2nd?

           MR. MURPHY:  Objection.

           THE COURT:  What's the basis?

           MR. CASSIDY:  Hearsay.  Calls for a conclusion.

           THE COURT:  Hearsay?

           MR. LUFRANO:  Your Honor, it's not hearsay. It's not requested to establish the truth of the matter asserted, merely whether or not, whether that is true or untrue, this witness heard it.

           MR. CASSIDY:  What's the relevance of it, Judge?

           THE COURT:  Well, it may bear upon-- It may bear upon the totality of the circumstances surrounding the taking of the statement from this witness, or from the defendant.

117

1           MR. CASSIDY:  State of mind, if I understand

2  you correctly, what the attorney's state of mind was?

3           THE COURT:  No, no, the totality of the

4  circumstances surrounding the circumstances under

5  which this defendant's statement was taken, and to

6  that extent what she knew about this investigation

7  may very well bear upon what she put into her handwritten

8  statement that she now attributes to the defendant.

9           MR. CASSIDY:  She said she didn't put it

10  in.  She said he did.

11           THE COURT:  Well, it's entirety of her

12  statement.

13           MR. CASSIDY:  But it was his words, not hers.

14           THE COURT:  Well, that's what she contents.

15           MR. CASSIDY:  Right.

16           THE COURT:  And to that extent I am going to

17  have to weigh the credibility of that.

18           MR. CASSIDY:  All right.

19           THE COURT:  And to weigh that I'm-- I must

20  know all of the circumstances around the giving of

21  the statement perhaps.  At least, certainly, that's what the

22  defendant is going to say to me.

23            The objection is overruled.

24           MS. PLACEK:  Ma'am, could you answer the

1    question?

2           THE WITNESS:  I'm sorry.  Repeat the question.

3           Q   Surely.  Did you have knowledge, at

4    the time when you were questioning the defendant,

5    that the Chicago Police had information that the

6    alleged victim of this crime was, in fact, seen

7    alive by two people during the early morning hours

8    of August 7th-- Or August 2nd?  Pardon me.  August

9    2nd, 1988?

10          A   I don't believe I did, no.

11          Q   Did you have knowledge, at the time you

12   were taking the statement, that, in fact, the family

13   of this young lady had problems with her running

14   away?

15          MR. MURPHY:  Objection, Judge.

16          THE COURT:  Objection sustained.

17          MS. PLACEK:  It goes again, Judge, as to--

18          THE COURT:  The objection is sustained.

19          MS. PLACEK:  All right.

20              Did you have knowledge, at the time

21   that you were taking the statement, that, in fact,

22   the young lady had an argument with, in fact, Yulanda

23   Hill?

24          A   No, I was not.

119

Q   Did you have knowledge, at the time of questioning the defendant, that the Chicago Police had information that, in fact, this argument was about the alleged victim being-- Or going with older men?

A   No.

Q   Did you have knowledge, when questioning this defendant, that on the 2nd of August, that the Chicago Police got the legal guardian to accompany them, one Mrs. Hill, and search an area where they believed that the young lady was, in fact, hiding?

Did you have that knowledge when you were questioning the defendant?

A   That the legal guardian had gone with the police to look at a place where she normally would hide?

Q   Yes.

A   No, I did not.

Q   Did you have knowledge that-- At the time when you were questioning the defendant, that the police had within their privy knowledge that Denise Johnson would often run to the home of her grandfather?

MR. CASSIDY:   Objection, Judge.

120

1      THE COURT:  Sustained.

2      MS. PLACEK:  Did you have knowledge that her

3  grandfather-- Strike that.

4           Did you have knowledge that the

5  Chicago Police had written their reports, knowledge

6  that the grandfather had often to call the police

7  to make Denise go home?

8      A  No.

9      Q  I believe that at the beginning of my

10  cross examination we spoke about a person by the

11  name of-- I think you identified him as Charles Walker,

12  and I said could it have been Michael Walker.  Correct?

13      A  Yes.

14      Q  Did Michael Walker ever tell you that

15  he had helped the family of the young girl look,

16  approximately on August 1st, for her when she first

17  became a missing person?

18      MR. MURPHY:  Objection, Judge.

19      THE COURT:  Sustained.

20      MS. PLACEK:  It goes to impeachment, Judge.

21      THE COURT:  Sustained.

22      MS. PLACEK:  Would the Court entertain

23  argument as to that?

24      THE COURT:  No.  Put another question.

121

1    MS. PLACEK:  Your Honor, we would have no

2    further questions.  Thank you.

3        THE COURT:  Redirect?

4        MR. CASSIDY:  No questions, Judge.

5        THE COURT:  Thank you, Miss Demacopoulos.  You

6    may step down.

7            (Witness Excused)

8        THE COURT:  Mr. Murphy, I suppose it would

9    be futile to call your next witness at this hour of

10   the day.

11       MR. MURPHY:  Judge, I don't think we'd even

12   finish the direct before five o'clock.

13       THE COURT:  Can we have any useful discussion of

14   the problem that's going to occur with your next

15   witness, or is the time also too short for that?

16       MR. MURPHY:  Well, Judge, I was under the

17   impression the Court was going to hear the testimony

18   of those witnesses and then make a determination

19   as to whether or not to consider it.

20       MS. PLACEK:  With all due respect to Mr. Murphy,

21   it was our understanding that, in fact, although the

22   Court was when this was originally a jury trial, one

23   of the reasons it was waived is that the Court was

24   going, in fact, to allow the the State to mention it

122

1    in opening, but before said witnesses were called

2    they would, in fact-- The Court would hear argument

3    as to same.

4          THE COURT:  The difficulty, obviously, is

5    that in order to rule on this question, I'm going

6    to have to hear the evidence.  And since there is

7    no jury sitting here, it seems rather ridiculous

8    to hear this evidence preliminarily, determine that

9    it is either admissible or not admissible, and then,

10   if admissible, to hear it over again.

11          Now, that's a foolish procedure.  I'm

12   going to hear this evidence one way or the other at

13   some point or another, and you're going to have to

14   trust me to use it for the proper purpose.  I've

15   got to hear it in order to know whether or not the

16   evidence is admissible.

17          If it were a jury, I would hear it

18   outside the presence of the jury and make preliminary

19   determinations of admissibility.  And if I

20   determined that it was admissible, I'd bring the

21   jury in and let them hear it.  But there is no jury

22   to hear it.  I'm going to hear it.

23          MS. PLACEK:  With all due respect, Judge,

24   although I talk as a stranger in a strange land, so

     to speak, and have not tried as many cases in this--

PENGAD•INDY. MUNCIE. IN  47302

SF-IL-24A

123

THE COURT: And I'm here as a stranger from a foreign land also. Sometimes I think not even from this earth.

MS. PLACEK: I've heard that rumor, Judge. But be that as it may, the point I would make to the Court is that although we have put, so to speak, this case in the Court's hands, my suggestion would be instead of hearing the evidence, that an offer of proof, in fact, be made as to why this evidence fits the so-called fingerprint category as required by Illinois law.

THE COURT: I fail to see what difference it makes. If they give me-- If the State gives me an adequate offer of proof, and I would let them prove that up by putting the witness on the stand and direct examine him for the offer of proof, or even assuming that they were to write out an offer of proof with detailed and explicite offers of proof, I still get all of the information that they would seek to deliver to me, and it's unavoidable.

But I hope, I hope, that I am intellectually gifted enough and intellectually honest enough to sift out that which is relevant and that which is admissible from that which is not,

124

1    and if I can't make that determination, then

2    your client is before the wrong forum.

3         MS. PLACEK:  With all due respect, I

4    would never insult a--

5         THE COURT:  Well, it isn't a matter of

6    insulting.  It's a very difficult mental gymnastics

7    sometimes to perform, but I'm going to undertake

8    it.  I don't suggest that you-- That I'm going to

9    be successful in doing it.  I am often not as

10   successful as I'd like to be, but I'm going to

11   give it my best shot and use it for its only

12   proper purpose, and I'm going to hear it, and if I

13   decide that it's not admissible, not relevant for

14   the purpose that it's sought to be offered, I'm

15   going to do my best to totally disregard it for any

16   purpose whatsoever.

17        MS. PLACEK:  With all due respect, Judge,

18   although we did receive a motion, the motion was

19   vague in nature.  I am speaking of the motion for

20   other crimes.  We would just ask, before the calling

21   of the witness, the State to give us the specifics

22   for this witness being called.

23        THE COURT:  Well, I already decided-- Well,

24   as I understand the law, there is only one way in which

125

PENGAD·INDY. MUNCIE, IN  47302

SF-IL-24A

this evidence can come before the fact finder, and that is under the so-called doctrine of modus operandi, signature crime, and if it-- If they meet the requisite for that, I'm going to hear it and use it for that purpose.

If they do not, I will hear it to determine that it does not, and disregard it. Now, other than that, Miss Placek, I don't know what you can do.

MS. PLACEK: Judge, I might need-- I would just suggest that I just take the Court's ruling and ask the Court whether or not-- I just ask the Court's permission to place my motion before it at the end of, in fact, the direct examination of the witness.

MR. MURPHY: Judge, for the record, perhaps counsel forgot, but we did tender police reports with respect to each/of these incidents well in advance before this trial began.

MS. PLACEK: I have no objection. That's why I-- As to the method used. I didn't mean to create confusion.

THE COURT: As to Mr. Jerome Hendricks, Order of Court, February 20th, 1991. Court stands

126

1    adjourned until nine thirty tomorrow morning.

2                     (Whereupon the further proceedings

3                     in the above entitled cause were

4                     continued to February 20th, 1991.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ck127

(Rev. 2/18/93)  CCCR-56

**STATE OF ILLINOIS** }
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME ONE . . . OF A FIVE VOLUME . . . . . SUPPLEMENTAL RECORD CONSISTING OF THE ( REPORT OF PROCEEDINGS) ONLY. NO PRAECIPE . HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT . . . . . UNDER APPELLATE COURT NO .95-0474. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . LATELY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois. . . . . WERE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and . JEROME HENDRICKS. . . . . . . . . . . . . . . . . . . . . . WAS. . . . . . . . . . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, JUNE .26 , . . . . . . . . . . . . . , 19 96 . .

*Aurelia Pucinski*

**Clerk**

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

CCCR-310



# Transcript of Record
## Appeal
## to

APPELLATE

FIRST

# Court of Illinois
# District

SUPPLEMENTAL RECORD

**Circuit Court No.** _88 CR 12517_

**Trial Judge** _LEO HOLT_

**Reviewing Court No.** _95-0474_

THE PEOPLE OF THE STATE OF ILLINOIS

FILED
APPELLATE COURT

JUL 15 1996

GILBERT C. MARCHMAN
CLERK

## VS.

JEROME HENDRICKS

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION



ORDER ENTERED
JAN 17 2007
APPELLATE COURT, FIRST DISTRICT

**AURELIA PUCINSKI**

**Clerk of Court**

**VOLUME TWO    OF FIVE VOLUMES**
**SUPPLEMENTAL RECORD**

Per _AP/nd_ _____

**Deputy**

STATE OF ILLINOIS )
               )  SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
       COUNTY DEPARTMENT - CRIMINAL DIVISION

THE PEOPLE OF THE        )
STATE OF ILLINOIS,       )
                         )    Criminal
              Plaintiff, )
                         )    No. 88 CR 12527
      vs.                )
                         )
JEROME HENDRICKS,        )
                         )
              Defendant. )

                    BENCH TRIAL

          REPORT OF PROCEEDINGS had at the hearing

in the above-entitled cause before the HONORABLE

LEO E. HOLT, Judge of said court, on the 20th

day of February, 1991.

          APPEARANCES:

              HONORABLE JACK O'MALLEY,
                 State's Attorney of Cook County, By:

              MR. SCOTT CASSIDY and
              MR. JOHN MURPHY,
                 Assistant State's Attorneys,
                 for the People of the State of IL.

              MR. RANDOLPH N. STONE,
                 Public Defender of Cook County, By:

              MS. MARIJANE PLACEK and
              MR. VINCENT LUFRANO,
                 Assistant Public Defenders,
                 for the Defendant.

L. B. STONE, CSR
Official Court Reporter

THE CLERK:  Jerome Hendricks.

THE COURT:  We need Mr. Lufrano.

MR. MURPHY:  Judge, may I address one preliminary matter regarding this matter?

THE COURT:  You want to wait for Miss Placek?

MR. LUFRANO:  I would rather, your Honor.

THE COURT:  Where is she?

MR. LUFRANO:  I thought I saw her come in.

THE COURT:  I thought I saw her just a moment ago, too.

Mr. Murphy?

MR. MURPHY:  Yes, Judge.

THE COURT:  You wanted to address the Court?

MR. MURPHY:  Yes, Judge.  Judge, on one of the previous dates, counsel had asked for the address of a witness that they might.  That address has been given to the defense.  The witness is in court today, and I was not aware that the defense intended to call her until they advised us the last day.  I don't know if that would create a problem. I'm referring to Estelle Fields, Judge.  She has been here on previous days, Judge, for the defense announced their potential -- to call her as a potential witness.

2

MS. PLACEK:  Judge, we would have an objection.

THE COURT:  All right.  The exclusionary rule is enforced here, Mr. Murphy, and I am not going to speculate as to, you know, any reasons that the parties wanted literally enforce their -- both sides are entitled to have it enforced, and so I am going to enforce the exclusionary rule.

MR. MURPHY:  Judge, if it would help, we would be willing to indicate who we are calling today.

THE COURT:  I don't know that that's the problem, and as I say, I'm not going to inquire into it.  If counsel wants to waive it, that's fine, I have no problem with it, but unless it's agreed upon, I'm going to enforced the rule.  It's the safest thing to do.

Both sides are ready to proceed?

MR. MURPHY:  Yes, your Honor.

THE COURT:  Call your next witness.

MR. MURPHY:  Judge, People call Doctor John Fitzpatrick.

THE CLERK:  Raise your right hand, sir.

(Witness sworn)

THE COURT:  Sir, that microphone is on.  If you will speak directly into it, keep your voice up, we

will all be able to hear you.

JOHN FITZPATRICK,

a witness herein, called on behalf of the People
of the State of Illinois, after being first duly
sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY

MR. MURPHY:

Q    Sir, would you please state your full
name?

A    John J. Fitzpatrick, M.D.

Q    What area do you live in?

A    Oak Lawn, Illinois.

Q    What's your occupation?

A    I am a physician.

Q    And are you licensed to practice medicine
in the State of Illinois?

A    Yes.

Q    How many years have you been licensed?

A    Since 1966.

Q    And where did you receive your
undergraduate education?

A    I went to high school in St. Ignatius, and
I went to Cincinnati, I got a B.S. in pre. med.  I

went to medical school in Loyola, graduated in 1966.

Q    And did you receive -- what type of degree did you receive from Loyola?

A    Medical doctor, M.D.

Q    Now, did you do an internship, doctor?

A    I did an internship in '66 to '67 at the Cook County Hospital.

Q    And what did that internship consist of?

A    Rotations through medicine, ob, I was on anesthesia, radiology.

Q    And, Doctor Fitzpatrick, afterwards, did you specialize in any particular fields of medicine?

A    Diagnostic radiology.

Q    Can you describe to the Court what diagnostic radiology is?

A    Radiology is broken up in three fields. One of them is radiation therapy in which people are treated with radioactive materials for cancer and other diseases, and the other one is nuclear medicines where medicine is injected into people for studies, and the third is diagnostics radiology, which would include nuclear medicines.

By using various techniques when the days before it was X-rays, but now we use ultrasound, magnetic resident, and we try to determine diseases that patients have, and it's even gone now that we start to treat patients.

Q    What, if any, training do you have in this particular field?

A    From '67 to '68, I did -- I did my first years of residency at Cook County Hospital.  Then I was called up in the service and serviced in Viet Nam, and then in California as a radiologist, and I finished my training at Indiana University between '70 and '72.

Q    And, Doctor Fitzpatrick, are you also board certified?

A    Yes, sir.

Q    And could you tell Judge Holt what are the requirements in order to become board certified?

A    When I took it, you had to complete a three-year -- three years of diagnostics radiology, and you had to take a written examine and pass that, and if you pass the written examine, you had to go for your oral boards, and once upon completing that, then you became board certified.

6

Q    And what are you board certified in?

A    Diagnostic radiology.

Q    Do you have any other certifications?

A    I am certified in basic life support as an instructor-trainer, certified in advanced cardiac life support.  I am certified as a "B" reader in occupation radiation chest diseases.  I mean those are official certifications, my examines.

Q    And, Doctor Fitzpatrick, with respect to your certification in diagnostic radiology, how long have you been board certified?

A    Since 1972.

Q    Doctor Fitzpatrick, are you on the staff of any hospitals?

A    Cook County Hospital.

Q    And do you -- In your work at Cook County Hospital, do you work in any specialized fields there?

A    Right now I am the division chairman of trauma and radiology and serve as the program director.  I have served as the acting chairman.  I am interested in chest; I was in charge of the GI section for years.

Q    And, doctor, have you had any teaching

7

positions in the area of diagnostic radiology?

    A    I am on a teaching staff at Cook County Hospital.

    Q    How long have you been there?

    A    Since 19 -- Let's see, I finished my training at Indiana in '72.   I was in private practice for 18 months, and then I joined the attending staff at Cook County Hospital in '74.

    Q    What position do you hold there?

    A    Right now I am the chairman of the division of radiology.

    Q    Now, doctor, is there a difference between diagnostic radiology and forensic radiology?

    A    Forensic radiology is kind of a subdivision of diagnostic radiology.   I got interested in that -- I got -- I don't know if you want to go in the whole story, but I have been doing forensic radiology since probably the early '70s.

    Q    Doctor, could you tell Judge Holt a little bit about your background in the area of forensic -- Strike that.   I am going to rephrase that question.   Could you describe to Judge Holt what if any education or experience you had in the area of

forensic pathology?

    A    Actually probably radiology is better.

    Q    I'm sorry, forensic radiology, I'm sorry.

    A    Somewhat in mid '70s, I met Doctor Stein. I did a talk, and he agreed to be on the panel and did the talk with me. I did some forensic radiology in Viet Nam. We had to go after pilots or someone who got shot down. Then I got involved to give this lecture, which Doctor Stein agreed to help me because I didn't have enough material, and I started giving lectures over at the Medical Examiner's Office. This was somewhere in the early '70s, and then the Flight 191 plane crash went down, and he invited me out to work on the crash, and while I was out there, I also became involved with the John Wayne Gacy case. I did some of the identifications on those. Subsequently, since that time I have been doing all the -- Well, they send me all the child abuse cases, the identifications, some of the accidents, and I've lectured -- I have flown to South America three times. I was part of the team that went down to Argentina to identify some of the disappeared -- If you ever saw the show, the show of the disappeared, I was involved

9

with that.   I was one of the six Americans

scientists and identified Josef Mengele.   We were

sent to El Salvador --

    MR. LUFRANO:   This goes to what he did, your

Honor.

    THE COURT:   No, overruled.

    MR. MURPHY   Q   Doctor, you may continue.

    A    Let's see, I have lectured to the F.B.I.

Academy, I've lectured to the Customs Agents for

drugs, given numerous other lectures.

    Q    And this would all be in the field of

forensic radiology?

    A    Yes, sir.

    Q    And, Doctor Fitzpatrick, what exactly is

forensic radiology as opposed to diagnostic

radiology?

    A    Well, diagnostic radiology, like I started

to say before, like other branches of medicine,

serves to indicate the nature or character such as

disease, and forensic radiology deals with the

application of medical knowledge and X-rays.   So I

do part time, and it consists -- mainly  I read

like the child abuse cases, looking for the skull

fractures, evidence of child abuse.   I am used

mostly in identification or whenever there's X-rays

I have been called in to make identifications.

Q    Thank you, doctor.    Are you a member of

any medical associations?

A    Yes, sir.

Q    Which ones?

A    American Academy of Forensic Sciences, the

American College of Radiology, the Illinois State

Radiology Society, the Radiology Society of North

America.    I can't think of any other ones, but

those are essentially the medical societies.

Q    Do you belong to any hospital -- Do you

have any hospital committee memberships?

A    I've had lots of them.

Q    Could you tell Judge Holt a little bit

about those memberships?

A    Well, I am on the life support -- the

Cardiac Life Support Committee, which have been on

the    Selection    Committee    for    the    Orthopaedic

Chairman for the Radiology Chairman, Utilization --

I can't remember some of the others.

Q    And, doctor, have you ever participated in

any panels as an expert in the field of radiology?

A    Yes.

11

Q    What panels?

A    There's a panel on the 191 crash that was presented at the American Academy of Forensic Sciences, the Mengele case was presented to the American Academy of Forensic Sciences Meeting, the John Wayne Gacy case, part of the task force, Illinois Task Force on child abuse after Channel 2 or whoever had the -- Actually it was before Channel 2, so they had nothing to do with it, but people who would be on the panel when they would talk about that, we put out several documents on that. I was part of the task force that met with members of the United Nations, Clyde Snow was there, some people from England, Jordan Thompson from Denmark. There's an international committee that was called the Minnesota Protocol for short, and I won't have the name right, but it's a protocol for people to be free from summary excursion (phonetic), and something else which is now going through the UN faster than any other thing, through the second stage, and it's expected in a year or two to be international law. It's now part of the common law, whatever it is, but it's in the UN now. It's no longer called the Minnesota

Protocol.

Q    Have you written any material that's been published?

A    Yes, sir.

Q    Could you tell Judge Holt a little bit about that?

A    There was a book put out by, I think -- Well, part of '84 and '85, there was Archeology Battle of Little Big Horn, and I am terrible on names, I think it was Fox who's the arthur, but there's a chapter by Clyde Snow of the Osteology of the Bones that were found at this last Big.

Q    What does that mean, doctor?

A    Osteo is bone. Anything with o-l-g-y is study, so it's the study of bones, so it had to do with the radiology of the bony fragments that were found as they went over the battle field. Other people did with firearms and buttons and other artifacts. I published an article on with some people from the Armed Forces Institute of Pathology on identification of mass disasters. I had another article on human rights, Radiology Human Rights, another article on special positioning for identifying people.

Q    And, doctor, during your career, have you ever won any awards?

A    Yes, sir.

Q    What awards have you won?

A    Well, I got the Air Force Commendation Medal. I gave a lecture, which was in Brazil, and I got a medal from the mayor. I gave a lecture on drugs, and they had a meeting on the West Africa Narcotics Trade, they gave me an award.

Q    How many times have you made comparisons of X-rays for identification?

A    In forensic areas?

Q    Yes, sir?

A    Years ago when I was with Cook County, and that was over 200.

Q    Have you ever been qualified as an expert in the field of either diagnostic or forensic radiology?

A    Yes.

Q    Approximately how many times?

A    For forensic, probably about 10.

Q    And how many times in the State of Illinois?

A    Most are in the State of Illinois.

14

Q   Have you been qualified as an expert in any other states?

A   Yes.

Q   What other states?

A   Delaware.

Q   And, doctor -- Strike that question.

MR. MURPHY:   I have no further questions, Judge.   At this time I would tender Doctor Fitzgerald as an expert.

MR. PLACEK: No questions.

THE COURT: You may proceed, Mr. Murphy.

MR. MURPHY: Thank you, Judge.

Q   Doctor, I'd like to direct your attention to early August, 1988, did you have an association with the Medical Examiner's Office?

A   Yes, sir. I am the consultant on staff at the Medical Examiner's Office.

Q   Are you still on staff there?

A   Yes, sir.

Q   And in what capacity do you work as a consultant with the Medical Examiner's Office?

A   I am their radiologist.

Q   On or about August 12, 1988, did you have occasion to work as a consultant on a case with the

15

Medical Examiner's Office?

     A    Yes, sir.

     MR. MURPHY:  May I approached the witness, your Honor?

     THE COURT:  You may.

     MR. MURPHY  Q  Doctor, I am going to show you various exhibits --

     MR. LUFRANO:  If we could see the exhibits.

     MR. MURPHY:  Counsel, you've previous seen them.

     MR. LUFRANO:  I know, but I don't know which ones you're showing.

     MR. MURPHY:  For the record I am showing the exhibits to counsel for the defendant.

     Q  Counsel, I'm going -- Doctor, I'm going to show you what's been marked as People's Exhibit No. 14 for identification.  I'm going to ask you to look at this particular exhibit and tell me if you recognize it.

     A    Yes, sir.

     Q    And how do you recognize it, doctor -- Strike it.  What do you recognize it to be?

     A    These are -- They are two radiographs of the hand of the child.

16

Q    Which hand is that?

A    The left hand.

Q    And how do you recognize that exhibit?

A    You mean the name or that it's a left hand or both?

Q    Both.   Well -- How do you recognize that that's, in fact, the left hand that's shown in that exhibit?

A    Well, there are several ways of doing it. One, this marker could only be in one of four places, here (Indicating), here (Indicating), here (Indicating), or here (Indicating).  Second of all, the filming on the left hand is shot this way (Indicating).

Q    And apart from recognizing --

THE COURT:  What exhibit is this, Mr. Murphy?

MR. MURPHY:  This is No. 14, Judge.

THE COURT:  All right.

MR. MURPHY   Q   Apart from being able to recognize that is an X-ray of a left hand, is there any other way that you're able to recognize what that exhibit is?

A    Well, the technician, but a left marker up here (Indicating).

17

Q    And what's the marker indicate, doctor?

A    This marker here (Indicating)?

Q    Yes.

A    This is a pitch radiograph of --

MS. PLACEK:  Objection as to what the marker indicates, Judge.

THE COURT:  Overruled.

THE WITNESS:  This is the left marker.  The C is probably the technician's name.  This was taken at Roseland Community Hospital.

MR. LUFRANO:  Objection where it was taken because he had no way of knowing where it was taken.

THE COURT:  Overruled.

MR. LUFRANO:  He's simply reading the label that's on that.

THE COURT:  Overruled.

THE WITNESS:  And the label says it's also Denise Johnson.

MR. MURPHY  Q  Doctor, I am also going to show you what's been marked as People's Exhibit No. 4 for identification purpose.  Do you recognize what that exhibit is?

A    Yes, sir.

18

Q    What do you recognize that to be?

A    This is a radiograph taken at the Medical Examiner's Office on 9, August, '88, on body number 262, August, '88, which also label Denise Johnson.

Q    And I'm also going to show you what has been marked as People's Exhibit No. 15.

MS. PLACEK:  Objection.

THE COURT:  What's the basis of your objection?

MS. PLACEK:  I believe, Judge, if I am not correct, that exhibit has never been identified or, in fact, entered into evidence as to the purpose of comparison.

THE COURT:  It was identified by the technician that took it.

MR. LUFRANO:  No, your Honor.  He said he did not take it.

THE COURT:  I am talking about the technician who too the -- What was her name?

MR. CASSIDY:  Carolyn Strong.

MS. PLACEK:  There was an objection, Judge, proffered at that particular time.  I believe at that particular time the Court barred the State from going into this particular area.  I believe there was a long discussion as to medical records.

19

The State said they could get it in under the
business -- medical records exception.  I believe
she stated that as a matter of fact, she didn't
take that particular exhibit, Judge.  This is of
the pelvic region.  I believe we went as to a
sidebar.

THE COURT:  Do you have the technician's name
on that --

MR. MURPHY:  Judge, as to that particular
exhibit, there was no technician called.

THE COURT:  The objection is sustained.

MS. PLACEK:  I ask that it be withdrawn from
the witness.

MR. MURPHY:  Judge, I believe the witness still
can identify the exhibit, and I would rely on
Wilson versus Clark.

MS. PLACEK:  There's no relevancy of the matter
or foundation established.

THE COURT:  Wilson versus Clark, how would
Wilson versus Clark allow it to come in,
Mr. Murphy?  I think I am relatively familiar with
Wilson verses Clark, and I think that that was the
reason for the overruling previous objections made
to the testimony of this witness in regard to the

1

2      other exhibits, but related specifically Wilson

3      versus Clark to this exhibit, Exhibit 15, that is.

4           MR.  MURPHY:    Judge, with respect to this

5      particular exhibit, in the Wilson versus Clark

6      case, certain exhibits were put into evidence:

7      Hospital records, which contained approximately a

8      hundred pages of technician medical inference

9      including the history sheets, laboratory reports,

10     administration sheets, X-ray reports, progress

11     reports, pathology reports, so on.   The Supreme

12     Court of Illinois determined that the admission

13     into evidence of those reports was in error.

14     However, the Court holds specifically in Wilson

15     versus Clark held that it was unnecessary for those

16     hospital records to be admitted into evidence in

17     order to elicit an expert medical opinion based on

18     those records.  Specifically, the Court stated in

19     the opinion, your Honor, and I am reading directly

20     from Page 312 of the Illinois decisions book, "We

21     hold that in the future as later stated due to the

22     high degree of reliability of hospital records, and

23     expert may give his response to a hypothetical

24     questions based on facts contained in those reports

       being even in the records, themselves, are not any

                              21

1   evidence."

2           And, your Honor, in Wilson versus

3   Clark, decision that they determined that it was a

4   high degree of medical reports. Your Honor, when

5   we get to the point where we would offer that

6   particular exhibit into evidence, there may be

7   other questions which may be asked with respect to

8   admitting them into evidence, but at this

9   particular point, Judge, I believe that since

10  Doctor Fitzpatrick has been qualified as an expert

11  in this area, he can certainly rely on an X-ray

12  report, which is a hospital record even if it is

13  not admitted into evidence, and I agree with the

14  defense at this point, we have not established a

15  foundation for that to be admitted into evidence,

16  but that does not bar Doctor Fitzpatrick from

17  rendering his opinion on that particular exhibit as

18  well.

19       THE COURT:  Defense?

20       MS. PLACEK:  Judge, I believe Wilson versus

21  Clark as counsel correctly stated, deals, in fact,

22  with the hypothetical bases on measured results,

23  with all due respect to the doctor, Judge. In the

24  current case, even as to the X-rays, which the

Court overruled the objection to, and I am referring to, I believe, State's number 14, there has been no nexus shown as to first, the alleged victim -- the named victim of the indictment, and, secondly, Judge, as to the pelvic region, I believe even under Wilson versus Clark, the reliability was, in fact, sheared up by certain foundational witnesses, with all, again, due respect to the doctor.

This gentleman, nor has it been shown by any foundational questions of the State that he was either the treating or, two, familiar with the procedures that led to what essentially is nowhere previous into evidence, that is the X-ray, which the State seeks to introduce.

THE COURT: Well, I don't know if that answers the question that's before me. As I understand Wilson versus Clark, the witness may testify and render his opinion based upon his expertise and examination of records, which under certain circumstances would be considered hearsay if, in fact, they are the kind of people that people in his areas of expertise rely upon in formulating their expert opinions. The case of a physician,

the reading of other medical records or the reading

of other documents, which are customarily used in

formulating, diagnosing, and treating patients,

then the physician can testify and render an

opinion based upon these documents, and that's true

whether or not they are admitting into evidence,

and the posture of this case, which is conceded by

Mr. Murphy, is the failure now to directly connect

them, 15, to the deceased in this case. That does

not mean that I can't receive this evidence subject

to it being connected. If it does get connected in

some kind of way, then, of course, it just stands

there with no relevance to it. But you might say

that the order of proof is reversed or not proper

or could be better presented, and I don't have any

problem with receiving this evidence out of order

if, in fact, it is out of order.

MS. PLACEK: Your Honor, as a matter of

question, and I do ask the Court's indulgence for a

second, I would just ask the Court to ask the State

whether or not since they are planning on resting

today or that was at least their premise, whether

or not they have something to --

THE COURT: I am not going to ask them,

Miss Placek.  If the State rest their case without putting in the proper proof, I know what to do with that.  The objection is overruled.

MR. LUFRANO:  Your Honor, there is also a difference between the hypothetical and use of documentation and results in a hypothetical, nd the use of documentation.

THE COURT:  Wilson versus Clark didn't deal with a hypothetical.  Wilson versus Clark stands for the proposition that the witness who has the expertise may testify by using any document that's normally and customarily used by persons with that degree of expertise in formulating opinions and in a -- we were talking about a physician.  You're talking bout medical records of a patient, all of them.

MR. LUFRANO:  Right, the ones he takes and the ones other treating physicians tendered to him.

THE COURT:  Wherever he receives it from.  It doesn't make any difference.  If it is the kind of record that he would normally rely upon in practicing his profession, then he can testify about that.  The other problems that you raise may deal with weight to be given to his testimony in

which you will have a right to cross-examine him
about, but that does not destroy admissibility.

The objection is overruled.

MR. MURPHY:  Thank you, Judge.

Q   Doctor, perhaps I could start over
with this exhibit showing you People's Exhibit No.
15, I believe you testified you recognized that, is
that correct?

A    Yes, sir.

Q    And what do you recognize that to be?

A    This is a radiograph of a young child.

Q    And how do you recognize that particular
exhibit?

A    Well, again, it's labeled from Roseland
community Hospital, and --

MS.  PLACEK:   With all due respect to the
doctor,   there   would   be   an   objection   to
authentication through the exhibit, itself.

THE COURT:  The objection is overruled.

You may proceed.

THE WITNESS:  And it has the patient's name on
it.

MR.  MURPHY   Q   What's the name?

A    Johnson, Denise, and it has the No. 692,

26

which I assume is the case number or some other number that they use for identification.

Q   In addition to that, doctor, is there also a date on the X-ray plate?

A   There's this one written -- I'd have to see.   There's one written here, 87 something, 15, 87.

Q   Would that be 1, 15 or 10, 87.

A   Something like that.

Q   And, doctor, I'm also going to show you what's been marked as People's Exhibit No. 2 for identification purposes, could you recognize that?

A   Yes, sir.

Q   And what do you recognize that to be?

A   This is a radiograph of a pelvic on a body, 262, August, '88 taken at the Medical Examiner's Office on 8/9/88.

Q   Now, doctor, before you came in today, did you have occasion to look at those four radiographs before?

A   Yes, sir.

Q   Approximately when did you look at those?

A   Sometime in August.

Q   Would that be August of 1988?

27

1

2          A    Whenever I did it, I report it right after
I read it.

3

4          Q    And, Doctor Fitzpatrick, when you looked
at those four particular radiographs -- Strike

5

that.  Let me rephrase that question.  Does those

6

exhibits that you've looked at, People's Exhibit

7

14, 15, and 2, do they fairly and accurately

8

portray the bones and other internal structures of

9

the person who's shown in those exhibits as they

10

appeared to you on August 12 or in early August,

11

1988?

12          MS. PLACEK:  Objection to the form, Judge.

13          THE COURT:  Overruled.

14          THE WITNESS:  They portray the skeleton on the

15

post-mortem film is a lot of decomposition gas, so

16

the muscles organ and a lot of the pelvic muscles

17

are not seen for the skeleton.

18          Q    Doctor, particularly with respect to

19

People's Exhibit No. 14 and No. 4, what if anything

20

did you do with those particular exhibits?

21          A    Well, I look at -- You mean to identify

22

them?

23          Q    Yes, what did you do when you received

24

them?

28

A     Usually what I do is I take out all of the films on the jacket, look at them, and pick the ones that I will be able to make the comparison the easiest and start with that set of film, which I did in this case.

MS. PLACEK:  Objection.

THE COURT:  Overruled.

MR. MURPHY    Q    Were these part of a larger package of films that you received?

A     Yes.

Q     What did you do after you received the packages then?  Did you pick out these particular exhibits, 14 and 4?

A     These and some other ones.

Q     What did you do with respect to 14 and 4?

A     I used them to compare.

Q     Could you describe to Judge Holt how you compared those exhibits?

A     Well, I usually use a view box.

Q     Doctor, is there anything that would assist you?

A     I look at the size, the hand, the position of the hand to prove the post-mortem films.  First, I look at the size, and I start looking for

individual characteristics of them.

Q    Doctor,   is   there   anything   that   would
assist   you   in   explaining   better   the   process   you
used in making those comparisons?

A    I made -- I didn't make them, but I had
someone   at   the   Medical   Examiner's   Office   make
slides of them.

Q    In fact, have slides been made of People's
Exhibit 14, 4, also People's Exhibit 2 and 15?

A    Yes.

Q    And   would   those   slides   help   you   in
explaining to Judge Holt the process you used and
the markings you found --

A    I think it would be a lot easier.

MR. MURPHY:   Judge, I ask that the witness be
allowed to step down from the witness stand.

THE COURT:  You may.

MR. LUFRANO:   Judge, we would object to the
slides.   The   existence   of   the   slides   were   never
made known to us nor were we given an opportunity
to review the copies.

THE WITNESS:  Okay, that's fine.   It makes no
difference to me.

THE COURT:  What's your response to that,

30

Mr. Murphy?

MR. MURPHY: Judge, our answer does list slides as one of the exhibits we would use. I agree counsel did not look at the slides before we proceeded today. We were down here going through the slides just before we started the proceedings, and the attorneys were going in and out of the courtroom, but the slides are exact duplicates or close to exact duplicates of the radiographs, which Doctor Fitzpatrick has already identified, and which have been made available to the defense.

THE COURT: Mr. Lufrano?

MR. LUFRANO: Your Honor, that being the case, the best evidence rule would still be appropriate. The doctor said that he could use the radiographs themselves. There's no reason for the slides.

THE COURT: No, that's not the valid objection, Mr. Lufrano. I also noticed that the State's amended supplemental Answer to Discovery filed on January 24, 1991 and the answer No. 6, 6-A. The State says that the following articles, if any, may or may not be offered into evidence by the people at the time of the trial of this cause, and thereafter follows a listing of certain materials

31

including slides, which is a sufficient response to alert the defense of what it is that the State intends to offer into evidence, whether the defense avails itself of an opportunity to view the documents or other physical evidence. It's left entirely in the description of the defense. There has been no assertion that the defense attempted to or requested and was denied permission to view these documents nor was any such denial brought to the attention of the Court in order to elicit the assistance of the Court in compelling the right to view these documents prior to trial. So the objection that the defense has not had an adequate opportunity to be informed that the State would use the documents or adequate opportunity to view the documents are overruled.

You may proceed.

MS. PLACEK; The only exception would be comparison between two and 15, Judge, based on previous lack of identification.

THE COURT: That objection is also overruled.

Doctor, you may step down.

MS. PLACEK: Judge, I think we are going to have to move. May we have your Honor's permission

32

to move?

THE COURT:  Mr. Johnson, you may want to turn the overhead lights off.

THE WITNESS:  The purpose of -- The purpose of the slides is to make things easier, but these are all on the films, everything I am showing you.

MR. MURPHY  Q  Doctor, how many slides do you have -- have you prepared in order to testify today?

A    In this one (Indicating).

Q    Yes.

A    Only four.

Q    Doctor, these four slides in the machine are duplicates of the exhibits you've previously identified?

A    Yes.

Q    And these slides --

For the record, Judge, the slides have already been previously marked by myself.  They have been marked as 14-A, 4-A, 15-A, and 2-A.

Q  And, doctor, do the slides, each of the slides that you previously placed in the machine correlate with each of the exhibits you've previously identified?

33

A    Yes.

Q    Doctor, what's -- For the record one slide is showing on the screen right now.  That would be People's Exhibit No. 14-A, is that correct?

A    It's easier for me to say this:  It's the ante-mortem film.  How you marked these things -- This is the ante-mortem film, so how do you mark it?

Q    Doctor, which slide is this (Indicating), do you know?

A    This is Case 264, and it's the ante-mortem film.

Q    Doctor, would that slide then be a duplicate of what's known as four -- I'm sorry, it's four?

A    This film, and this slide go together.

Q    So that would be 14, and that would be a duplicate, then, of the exhibit, which is marked Palos Community Hospital?

A    Roseland Community Hospital.

Q    I'm sorry, Roseland Community Hospital?

A    Yes, sir.

Q    And could you describe to Judge Holt with the use of the exhibit exactly what your

34

examination of the radiograph consisted of and what you found?

A     This is a film of the wrist, hand, and carpo bone, essentially this area from here to here (Indicating) instead of being like this and like this (Indicating), it's in between.

Q     And what exactly did you find when you examined that radiograph?

A     Well, this is the apepasis (Phonetic), this is where your bone go along, and these will eventually close, so you could see that this is close.    This is an abickular (Phonetic) bones (Indicating).    This is going to be hard for you to see, but there is a longitude abickular here (Indicating), and there is a tiny little dot here (Indicating), the cortex here (Indicating), the thickness of the cortex.    The three outstanding landmarks that I identified for this purpose, which are the easiest, there are others where these three, which I thought would be most easy for lay people to identify and be able to compare.

Q     Now, doctor, you compared that what's shown in that particular slide with another radiograph, is that correct?

35

1

2      A    Yes, sir.

3      Q    And was the radiograph that you compared
it with on another slide?

4

5      A    Yes, my radiograph is there, and I have
the slide radiograph.

6

7      Q    At this point, perhaps we could advance to
the next slide, and you can show what your

8      comparison graphs consisted of, what you found.

9      A    This is going to be hard.  This is the
10     post-mortem film.  It's in about the same condition
11     as the other one.  This area sclerosis, you see
12     here (Indicating), is what the child has grown, and
13     her and --

14     MR. LUFRANO:  Objection to the conclusion.  He
15     didn't treat the child.

16     THE WITNESS:  I said a child, but it's where
17     your normal plate close.  You can see this is
18     different than on the other film.

19     MR. MURPHY:  Judge, if I may, the exhibit is
20     fairly difficult to see.  Would it be possible to
21     turn off more lights?  It may show better if it's a
22     little darker in the room.

23     THE WITNESS:  This is a dense area of sclerosis
right here (Indicating).  You have got this light

24

line here, the cortexes are about the same, so the difference that you see here is due to natural aging of the child, the growth of the child, but these are very unusual characteristics, and there are others I could point out, and this is one set of the film like the hand and wrist have three films to this, and I am the one that put these arrows here (Indicating).

Q    Doctor, the light, which is shown on the screen at this particular time --

Which, for the record, Judge, has been marked as People's Exhibit No. 4-A.

Q    -- Would be a slide of what has been previously identified as People's Exhibit No. 4, is that correct?

A    Yes, the post-mortem film.

Q    Thank you.   And, doctor, based on the comparison that you did of the radiograph, People's Exhibit 4, and radiograph, People's Exhibit 14, based on your education, experience, and training, were you able to reach any conclusion within a degree of scientific certainty which respect to the person who's shown in each of those radiographs?

A    Yes, sir.   These studies alone would be

37

enough to make an identification.

    Q    What's your opinion with respect to these
two radiographs, which you've already identified?

    A    That they belong to the same individual.

    Q    Thank you, doctor. Did you do any further
examination even though you had determined that the
radiographs show the same individual?

    A    Yes, sir, I did the pelvis.

    Q    And do you have slides of the pelvis as
well?

    A    Yes, sir.

    Q    Could you -- Perhaps we could advance on
to the next slide. Can you describe to Judge Holt
what's shown in the next exhibit?

            For the record, Judge, that's marked
as People's No. 15-A.

    THE    WITNESS:    This    is    a    pelvic    bone
(Indicating).    These    are    your    hips    right    here
(Indicating),    lower    lumbar    spine,    this    is    an
examination of the pelvis, and it's an ante-mortem
radiograph.

    Q    And what if anything did you find peculiar
with respect to this particular radiograph?

    A    The    spine    process    and    the    transverse

38

process, as we go up, are like fingerprints.

MR. LUFRANO: Objection to just like fingerprints.

THE COURT: Overruled.

THE WITNESS: All right. I can -- Overruled.

THE WITNESS: All right. I can --

THE COURT: Overruled.

MR. MURPHY Q You may continue, doctor.

A This is a spinose process. The apeti (Phonetic) coils, which are -- the spine is built something like a church pew of the body where everybody go in. The peticles (Phonetic) is where the steeples go up, and up by the cross would be the spinose process. Over here (Indicating) we have what we call awkward lines, these are cortical bones where the nerves are coming out. This is the transverse process. We have canals in here (Indicating), and a lot of other things.

Q And, doctor, is that slide -- Does that slide show -- truly and accurately show what's shown in the radiograph marked People's Exhibit No. 15?

A Yes, sir.

Q And, doctor, did you compare that

radiograph, People's Exhibit No. 15 which another radiograph?

A    Yes, sir.

Q    And do you have a slide of that radiograph?

A    Yes, sir.

Q    Would you like me to advance it?

A    Sure, go ahead.  Again, I put the arrows on this one, and I put the arrows on that one, but you can't see them.

Q    For the record, this would be marked as People's -- this slide would be marked as People's Exhibit No. 2-A.  Does this slide show accurately what's shown in People's Exhibit No. 2, the radiograph which you looked at?

A    Yes, this is the post-mortem radiograph or the slide of the post-mortem radiograph.

Q    And with respect to People's Exhibit No. 15 and 2, can you show Judge Holt on that diagram what you found?

A    The transverse processes are the same. The spinose process, peticles, you can't really see the lines down here.   Unfortunately, the shape of the pelvis is there.

40

Q    Is there anything else that would assist you in describing that particular X-ray?

A    If you wanted to really see the details real well, I would have to possibly -- With the flashlight, I would see them.  It would be hard to see because of the post-mortem gas here.

Q    Doctor, when you compared People's Exhibit No. 15 and People's Exhibit No. 2, the two radiographs, were you able to reach a conclusion based on your experience, your training, your education to a degree of scientific certainty?

A    Yes, sir.

Q    And what conclusion did you reach?

A    That they belong to the same individual.

Q    Thank you, doctor.

A    You're welcome.

Q    You may step back to the witness stand.

Doctor, the conclusion you reached with respect to the examination that you performed of the radiograph of the wrist, the post and the ante-mortem radiographs, you were able to determine with those two -- with those two exhibits alone, that they show the same person, is that correct?

A    Yes, sir.

41

MS. PLACEK:  Objection.

THE COURT:  Overruled.

MR.  MURPHY:   I  have  no  further  questions,
Judge.

THE COURT:  Cross.

MS. PLACEK:  Very briefly without waiving the
objection as to the other matter.

CROSS-EXAMINATION

BY

MS. PLACEK:

Q   Doctor, as you already pointed out, part
of your work is not only with forensic radiology,
but also diagnostic, correct?

A   Yes, sir.

Q   Please, that's not a good exhibit.  Either
that or I have to start wearing darker lipstick.

A   I'm sorry.

Q   You examine what you refer to as the ante-
mortem X-ray of a wrist, correct?

A   The radiograph, correct.

Q   I'm sorry --

A   I used radiograph, but most people use X-
ray.

Q   I can use X-ray just in case I forget,

42

radiograph.

A    Yes, that's no problem.

Q    When you examined this, you had no idea of the person or the identity of the person which was presented in this X-ray, correct?

A    I mean people bring me the films for comparison, and that's all I do is compare them and say they are or are not the same.

Q    Exactly, and as to what would be the ante-mortem photo of the wrist, specifically referring -- and again, I am confused, I believe that would be People's 14, and I show you this. Do you want the flashlight?

A    No, that one is easy.

Q    I believe that's the correct one, correct, you have no idea, and when I say no idea as to -- other than the information contained on the identification plate under what circumstances of when and how it was taken, correct?

A    Correct.

Q    You have no independent personal knowledge, correct?

A    I mean it's probably taken for trauma, and I know it was taken at Roseland Community Hospital

43

from the label.

Q    Other than that, you have no independent knowledge, correct?

A    Right.

Q    Doctor, let me ask you this, and, again, being more or less novice, in your field in looking to that wrist, would there be any treatment given to the wrist?

A    I have no idea.

Q    So you really don't now whether or not they would or wouldn't, correct, give them any kind of casting or bandages, or do you see any injuries yourself that you would see any treatment?

A    For a fracture?

Q    For a fracture, for whatever.

A    I'd probably have to get a hot light to look at the tissue, but from what I see on these two, again, they are only two part of an examination, there should also be a lateral, the film look normal.

Q    So you wouldn't see any treatment that, in fact, were required by those two as they are shown to you?

A    Well, the area of treatment is really out

44

of my field.  I leave that to the orthopaedic

surgeon.  As for treatment, that's somebody else's

field, but if there's an injury there or arthritis

there, that's my field.

Q    I see, but other than that, you can't see

a treatment --

A    These two films, I would say the films are

normal.

MR. MURPHY:  Objection, Judge, because she's

continuously asking the same question.

THE COURT:  No, I think it's proper.  The

objection is overruled.

MS. PLACEK   Q  So when you see the films are

normal, the hands appear?

A    It appears to be okay, but it doesn't

necessarily have to be okay.

Q    But in these films, it appears to be okay?

A    Yes, if I was reading the film, I would

say it's normal.

Q    Thank you.  Again, calling your attention

to your actions on the night in August, 1988, am I

correct in assuming that you, in fact, based your

opinion on both the pelvic X-rays and the hand X-

rays?

45

1

2          A    You know I really don't remember.  I can

do it on either one.

3

4          Q    Well, let me ask you this:    Did you

prepare, in fact, a report in this matter?

5

6          A    Yes.

          Q    And on that report, specifically do you

7

speak of both the hand X-ray and the pelvic X-ray,

8

the comparison?

9

          A    Yes.

10

          Q    Would it be correct, and, again, not

11

meaning to correct you, but would it be correct in

12

saying in your report at the time of the making,

13

you didn't state I can do it in one or the hand X-

14

ray is expository or the hand X-ray is dispository

15

(sic)?  Quite frankly, you gave a report as to your

16

conclusion after reading both of those X-rays?

17

          A    Yes, but I -- See I don't know which one

18

I read first, number one.  Number two, my usual

19

routine, that's how I report it, but that doesn't

20

mean that's the way I look at it --

21

          Q    Let me ask you --

22

          A    -- and --

23

          Q    I'm sorry.

          MR. MURPHY:  Objection.

24

THE COURT:  Let her finish.

MS. PLACEK  Q  I'm sorry.  I thought you were finished.

A    When I dictate them is after I looked at the films, and which one I arrived at the conclusion, it doesn't matter.  Actually there were four films in this case, and I looked at the chest, and the other I could have also done it, but I would have -- She also had a knee and a chest.  I would have to do some other studies possibly on the chest, but I could have sat down and probably made the diagnosis on those, so either one, given either one of these cases, either the pelvic or the hands, I would have made the identification --

Q    I'm sorry.

A    -- and that's what I put my report on, and everybody that comes through, okay, if they have a series of four cases, I look at all four of them, but if two of them are going to be difficult, I may throw them out, I may arrive at one of them, or I may just use one of them.  One is adding frosting and candles and ice cream to the case; it's just in addition, overkill.

Q    But as you stated today, those are present

47

in your report of 8/9/88?

A    They're not present in any of my reports because that's the way I do my reports.

Q    Thank you.  Doctor, let me also ask you one further question as to your identification in this matter.  Am I correct in saying that you neither supervised the ante-mortem, the taking of the ante-mortem X-rays, correct?

A    I almost  never do.

Q    Correct, and you have no personal knowledge under what conditions they were taken, correct?

A    Correct.

Q    You have no personal knowledge as to when they were taken, correct?

A    You mean did I actually observe it?

Q    Yes.

A    No, but that's --

Q    I mean --

A    Even in my own private practice, the technicians take them, and the technician's name is usually not on the film, or when we have an idea --

THE COURT:  Mr. Lufrano, I can't hear you if you don't speak up.

1

2        MR. LUFRANO:  Objection to what happens in his

3   practice.

4        MS. PLACEK  Q  I'm sorry, doctor, continue.

5        A    What I am trying to say --

6        Q    Is the technician's name is very rarely on

7   the film, correct?

8        A    Yes, that's one of the things, and, two,

9   even those films I do not directly supervise.

10        Q    Would it be correct, say your practice,

11   and you've had quite a few experiences within the

12   field, is not unusual to what would be done in

13   other hospitals or by other physicians?

14        A    Correct.

15        Q    Thank you.  So would it be further correct

16   in saying just as you stated to me the technician's

17   name isn't on the X-ray, that there's nothing

18   unusual about that?

19        A    That's nothing unusual; that's very

20   common.  Probably that's the rule.

21        Q    That's the rule.  Thank you, doctor.

22   Doctor, let me just ask you this:  As a matter of

23   courtesy. is EEG ever used for --

24        A    You mean electroencephalogram, that's an

electrical current.

49

Q    Is that ever used in dating?  When I say dating, to determine either the age of bones or at the similarities to other bones?

A    Well, that's an -- that's your brain wave. As far as I know, I've never heard of it.

Q    Thank you, doctor.  I was just curious. Doctor, let me ask you this:  Also, as to what you did on that date and time, am I correct, that you're only called in to the pathology, the forensic medical examiners team, so to speak, when there's a question of identity?

A    No.

Q    Are you called in for other reasons?

A    Yes.

Q    And that would be for the ones where you speak of other bone fractures such as in cases of child abuse?

A    Correct, I mean that's some of them, but sometimes there's an automobile accident that they want me to look at the head and neck.

Q    Thank you, doctor.  By the way, we talked about a rule of thumb as to these X-rays, to the best of your knowledge, there's nothing unusual, as to this rule of thumb, as to the X-rays,

specifically as to 14 and 15 that you speak of, correct?

A    When you say rule of thumb, I am not sure --

Q    Well, I believe you stated there are certain things present on the X-rays done by the technician and certain things not done by the technicians.

A    I am not sure I said that.

Q    Well, let me ask you this:  I believe we talked about the technician's name being on the X-ray, correct?

A    Yes.

Q    And on 14 and 15, I believe you said that that was, in fact, generally the rule, correct?

A    It is at Cook County Hospital.

Q    Well, let me ask you this:  Is 14 and 15, did you find that that rule was, so to speak, broken, if you can recall?

A    If those are of the pelvis film, the technician's name is not on it, but that's no big deal.

Q    What about the 14?

A    The initials or somebody's initials are on

51

there or at least I assume those are the initials.

MS. PLACEK:  Thank you.  That's all.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY

MR. MURPHY:

Q    Doctor, you were asked a lot of questions about the rule of thumb regarding the taking of X-rays, in your experience as a radiologist, is the name of the patient usually put on the name plate on the X-ray?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.

MR. MURPHY  Q  Is the hospital where the X-ray is taken also put on the name plate of the X-ray?

A    Yes.

Q    Is the date that the X-ray is taken also put on the name plate?

A    Yes.

Q    And in your experience as an officer -- In your experience as a radiologist, as a rule of thumb, is it your experience the information contained on those plates is accurate?

52

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.

MR. MURPHY:  No further questions, Judge.

RECROSS-EXAMINATION

BY

MS. PLACEK:

Q    So mistakes are never made?

MR. MURPHY:  Objection.

THE COURT:  Objection sustained.

MS. PLACEK  Q  Let me ask you this:  As a rule
of thumb, have you ever known of mistakes being
made in labeling X-rays?

A    Yes.

MS. PLACEK:  Nothing further.

THE COURT:  Anything further?

MR. MURPHY:  No.

THE COURT:  Thank you, Doctor Fitzpatrick, you
may step down.

(Witness excused)

THE COURT:  And you may please remove that
screen and call your next witness.

MR. CASSIDY:  Judge, could we have about five
minutes?

53

1

2              THE COURT:  There will be a five-minute recess.

3                          (Whereupon a recess was taken

4                          after which the following pro-

5                          ceedings were had:)

6              THE CLERK:  Sheet 6, Line 1, Jerome Hendricks.

7                          Raise your right hand, please.

8                          (Witness sworn)

9              THE COURT:  That microphone is on.  If you will

10     speak directly into it, keep your voice up, we will

11     all hear you.

12                          You may proceed.

13             MR. MURPHY:  Thank you, Judge.

14                          PHYLLIS WILLIAMS,

15     a witness herein, called on behalf of the People

16     of the State of Illinois, after being first duly

17     sworn, was examined and testified as follows:

18                          DIRECT EXAMINATION

19                                  BY

20                             MR. MURPHY:

21         Q    Would you state your name and spell your

22     last name for the Court Reporter?

23         A    My name is Phyllis W-i-l-l-i-a-m-s.

24         Q    Phyllis Williams?

           A    Yes.

                          54

Q    And, Phyllis, how old are you?

A    I am 31 years old.

Q    What's your date of birth?

A    April 11, 1959.

Q    And, Phyllis, I'd like to direct your attention to the date of June 30, 1984 --

MR. LUFRANO:  Your Honor, we have an objection.

THE COURT:  June 30, 1984?

MR. LUFRANO:  Objection to the testimony and a continuing objection.  I know the Court wants to hear it first, but if the record would reflect a continuing objection?

THE COURT:  The record may so reflect.

You may proceed.

MR. MURPHY  Q  Do you remember that day, June 30, 1984?

A    Yes, I do.

Q    And, Phyllis, where were you living at that time?

A    I was staying 7416 Phillips.

Q    Would that be South Phillips?

A    South Phillips.

Q    And, Phyllis, on that particular day, during the evening hours, did anything unusual

happen?

A    Yes, it did.

Q    What happened?

A    I just got up, got myself dressed, was going out to make a telephone call, and I went through the hallway.  As I was coming out the door, I saw that gentleman there (Indicating).

Q    Could you please point to the gentleman you described as that gentleman and indicate an article of clothing that he is wearing?

A    Yes.

Q    What's he wearing?

A    He's wearing a sweater, white shirt, and gray and red sweater (Indicating).

MR. MURPHY:  May the record reflect in-court identification of the defendant.

THE COURT:  It may so reflect.

MR. MURPHY  Q  It was during the evening hours of June, 1984, is that correct?

A    Yes.

Q    And, Phyllis, you said you were in a hallway, is that right?

A    Yes.

Q    What hallway were you in?

A    I was in the hallway, as -- like if you're going in, and she's coming in.

Q    And can you describe what happened when the defendant, Jerome Hendricks approached you?

A    He was sitting on his stool right beside his door --

Q    Where was his door at?

A    His door is as you come in, it's a little basement apartment.

Q    He lived in the same apartment then, is that correct?

A    He lived in the same court-way building I live in.

Q    But in a different apartment?

A    A different apartment.

Q    The same apartment building?

A    Yes.

Q    Could you describe what he did at that time?

A    Well, he was staring with his legs crossed and arms crossed. As I am coming down the stairs, I saw him. He asked me for a cigarette. As I gave him a cigarette, I went to turn around to go out the door, that's when he grabbed me and hit me.

57

Q    And can you describe to Judge Holt exactly how he hit you?

A    Okay, he turned me back around, he hit me in my face, okay.

Q    What happened then, Phyllis?

A    Okay, that's when he put a knife up against my neck.

Q    And when he put that knife against your neck, where were you at?

A    We was still in the hallway.

Q    Was anybody else around there then?

A    No, it wasn't.

Q    What happened then, Phyllis?

A    Then he backed me back up into his apartment.  We went exactly into the front room, and he threw me on the couch.

Q    And can you describe what happened after the defendant got you into his apartment?

A    Okay, we went to the front room.  That's when he threw me on to the couch.  He reached on the side of the couch and got a rope.

Q    And could you describe that rope to Judge Holt?

A    It's like a rope that you tie up boxes

58

with, a cordless rope.

Q    And what did the defendant do with that rope, Phyllis?

A    He put it around my neck.

Q    And can you describe to Judge Holt how he put it around your neck or what he did with that rope around your neck?

A    He wrapped it twice -- After he put it around my neck, he wrapped it twice, and he still had a hold of the rope.

Q    After he put the rope around your neck, what happened?

A    Okay, that's when he told me to take one leg out of my pants.

Q    And, Phyllis, can you describe the knot that the defendant used to put -- when he put that rope around your neck?

A    No, I really can't, but all I know he had it around his hand twice, so if he pulled it, it tightened up on my neck.

Q    So the knot would tighten if he pulled on the rope, right?

A    Yes.

Q    And he had the rope in his hand?

1

2      A    Yes, he did.

3      Q    And, Phyllis, did you take one of your

pant legs down as he told you to do?

4

5      A    Yes, I did.

       Q    And after you did that, can you describe

6

to Judge Holt what happened?

7

       A    Okay, then we got up, he made me lie down

8

on the floor after I took my pants, one leg out of

9

my pants, then he got on top of me.

10

       Q    And, Phyllis, at anytime during this time,

11

did he ever say anything to you?

12     A    No, he didn't.

13     Q    Not at this time?

14     A    Not at this time.

15     MS. PLACEK:  Objection.

16     MR. MURPHY   Q  What happened next --

17               Excuse me, Judge, I'm sorry.

18     THE COURT:  The objection is overruled.

19     MR. MURPHY   Q  What happened then, Phyllis?

20     A    After he did that, okay, that's when he

penetrated himself into me.

21

22     Q    When you say he penetrated himself into

you, can you very explicitly tell Judge Holt what

23

he did?

24

A    Okay, after we was lying down, and he was on top of me, he took his penis out and stuck it into me.

MR. LUFRANO:  Your Honor, I can't hear.

THE COURT:  Miss Reporter, will you read back the witness' response to Mr. Lufrano?

(Whereupon question read back)

MR. MURPHY  Q  And what part of his body did he put his penis in?

A    In my vagina.

Q    So he put his penis in your vagina, is that right?

A    Yes, he did.

Q    And did he put his penis in your vagina one time?

A    No, he put it in there more than one.

Q    Approximately how many times did he do it?

A    He had to do it twice.

Q    So he took his penis out of your vagina and put it back in a second time?

A    Yes.

Q    Can you describe what else happened to Judge Holt?

A    Okay, then, he told me, "I know what

61

you're doing.  If you don't loosen up, I am going to choke you."

Q    And at the time that he had the rope -- at the time the rope was still around your neck?

A    Yes, it was.

Q    And was he still holding the rope?

A    Yes, he was.

Q    At anytime while this was going on, did he ever pull on the rope?

A    He pulled on it once.

Q    And can you describe what happened when he pulled on the rope?

A    Then I loosened myself up.

Q    And when he pulled on the rope, did the rope chock on your neck?

A    Yes, it did.

Q    And, Phyllis, at anytime did the defendant say anything else to you?

A    No, after that, no.

Q    At anytime did the defendant ever tell you he was going to kill you?

MS.  PLACEK:    Objection.    Leading and suggestive.

THE COURT:  Objection is sustained.

1

2      MR. MURPHY    Q    Phyllis, do you remember

anything else the defendant said to you?

3

4      MS. PLACEK:  Objection.

THE COURT:  Overruled.

5

THE WITNESS:  Yes, I do.

6

MR. MURPHY  Q  What's that?

7

8      A    He told me if I don't loosen myself up, he

will kill me.

9

10      Q    Now, Phyllis, after the defendant put his

penis in your vagina two different times, what

11

happened then?

12

A    After that, he took it out.

13

14      Q    And what happened after he took it out the

second time?

15      A    Okay, we got up.  He let me put my pants

16 on.  I asked if he's going to do this, why don't we

17 get something to get high off of, and we can do it

18 right.

19      Q    Is this you making this statement?

20      A    Yes.

21      Q    Why did you -- Did you have sex with him

22 willingly in his apartment?

23      MS. PLACEK:  Objection.

24      THE COURT:  What's the basis of your objection?

MS. PLACEK:   First of all, as to the leading and suggestive nature.  Secondly, Judge, as to the calling for conclusion or mental state in 1991 for 1984.

THE COURT:   The problem that I'm having, Mr. Murphy, is the limited purpose for which this evidence is to be receive if at all, and the explicit details of that 1984 occurrence is really not relevant to anything that's connected with this case except to show the similarities between the two events, and I don't see how that's being done by this question.  All it tells me is what happened in 1984.  It is not relevant here.

MR. MURPHY:   Well, Judge, I think what it tends -- what that question would tend to show is that the defendant had sex with a victim against her will.

THE COURT:   So what.

MR. MURPHY:   Well, Judge, that's one of the elements that I think one of the similarities between that offense and the offense for which he's on trial.

THE COURT:   You must distinguish the 1984 case from every other sexual assault case so as to be

64

able to say with a fair degree of certainty that the similarities distinguished between -- the similarities between '84 and '88 distinguished the '88 case from all other sexual assault cases, and sex against the will of the female involved is a norm in almost all sex cases until AIDS is a factor which makes it an assault case, so that's not relevant. It does not distinguish. In other words, Mr. Murphy, the occurrence that took place in '84 from any other occurrence that may have taken place so as to say the person who perpetrated the '84 incident perpetrated the '88 incident.

The objection is sustained.

MR. MURPHY   Q   Now, Phyllis, at the time you were brought into that apartment until the time you left, approximately how much time went by, do you remember?

A    About an hour.

Q    And, Phyllis, when you were in that apartment, were you in there against your will?

MS. PLACEK:   Objection.

THE COURT:   The objection is sustained.

MR. MURPHY:   Judge, again, I believe one of the similarities between this offense, the offense

which is on trial, and the other witness who will

testify in this case, next case, is that each of

these witnesses were not just held against their

will, but were kidnapped, taken off the street.

MS. PLACEK:    With  all  due  respect,  the

Assistant State's Attorney is now speaking, and we

would  have  serious  objection  to  this.    In  the

reports  tendered  by  the  State's  Attorney,  the

State's Attorney, themselves, at the time of the

incident refused to bring charges --

MR. CASSIDY:  Objection, Judge.

THE COURT:  The objection is overruled.  It's

argument, and she may proceed with her argument.

MS. PLACEK:    Thank you, your Honor.    For the

purpose of the record, Judge, the State's Attorney

at the time refused to charge --

MR. CASSIDY:  Objection, Judge.

THE COURT:  Objection has been overruled.

MS. PLACEK:  Refused to enter charges, and this

was, in fact, the subject of the Motion in Limine,

which was the battery SOL.  The suggestion that now

these State's Attorneys so far removed, Judge, and,

again,  I  take  it  that  counsels  are,  in  fact,

relying  specifically,  Judge,  on  People  versus

66

Philfums (Phonetic), to put up a young lady who was
25 at the time, ignoring Philfums as cited on Page
11, the similarities requirement, and then to try
to suggest that it was in any way a criminal sexual
assault, at that time a rape, when their own
office, after a hospital visit, after speaking to
the witnesses, and also after a Felony Review
Assistant was called to, in fact, refuse any felony
charges whatsoever. I would suggest, Judge, is
quite frankly not only a breech of the rules of
evidence, Judge, but it borders almost on a breech
of ethics.

MR. CASSIDY: Objection, Judge. Motion to
Strike. It's all argument. It's all hearsay.

THE COURT: It's nothing but argument.

MR. CASSIDY: It's hearsay, too.

THE COURT: It's not evidence, so it can't be
hearsay. Hearsay talks about evidence. That's
just her conclusions of what -- based on nothing.

MR. CASSIDY: Judge, I am surprised you
entertained the argument.

THE COURT: She has a right to make any
argument that she chooses. The fact that it's
irrelevant doesn't stop people from making

67

arguments.   I wish I could stop lawyers from making
irrelevant arguments.    That would be    fine   if  I
could.    I,  unfortunately,  don't  know  how  to  do
that.   In any event, the problem here is not the
relevancy of that argument.   The problem here is
whether or not you're within the limited scope that
you can raise this evidence in.   I'm not concerned
that  a  Felony  Review  Assistant  or  any  other
assistant rejected charging the defendant in 1984.
That's not relevant to me at all.   The question of
relevancy here  is  whether  or  not,  whatever  you
show,  charged  or  uncharged,  tried  or  untried,
convicted or not convicted, whether or not you're
going  to  show  a  set  of  facts  that's  so  clearly
distinguishable   from   any   other   normal  garden
variety if you choose, if that's an appropriate way
to phrase it, aggravated criminal assault, so as to
say  this  is  distinguishable  and  imprints  this
conduct on this defendant, and all you're telling
me  so  far  is  that  this  lady  had  a  horrible
experience with this defendant, which is precisely
what the rules of evidence prohibits you from doing
as  opposed  to  allowing  you  to  do.    That's  the
precise  bar  and  prohibitions  against  this  kind  of

evidence, that you cannot show that this defendant has a propensity to commit heinous acts against another person. That's not the purpose. The purpose is to show is what he did was so unique to him that one can say because of these similarities, there's a reasonable degree that the perpetrator is one in the same, and that has not been shown through this witness in my opinion up to now. There's nothing similar about the incidents except, perhaps, the use of a ligature. I hope that I am making myself clear to you, but I am listening and wanting to hear how it is unique. If it were not so remote, if it were not so remote, it may be relevant for other purposes such as identity or common design or scheme, but when you're talking about something that's four years, four years remote, the cases are very clear that you can't use it except in a very limited sort of way.

MR. MURPHY: Judge, obviously, your Honor has made your opinion clear --

THE COURT: I haven't reached an opinion. I have reached an opinion about what I've heard.

MR. MURPHY: Your Honor, we intend to argue once the evidence is before the Court whether or

not the Court should consider the evidence of these other crimes.

THE COURT: Well, I understand that, Mr. Murphy. The problem that I have, as I tried to articulate both yesterday and at other prior hearings where we discussed this, if there were a jury sitting before in this case, a jury sitting, hearing this evidence to determine whether or not the jury should hear it, at this point I would decline to present this evidence to the jury. Therefore, there's no reason unless we are going to get to something that brings it closer to the stage where it would have to be for the jury to hear it, there's no reason for me to continue to hear it either.

MR. MURPHY: Judge, first of all, I would think that the Court would agree that once situation can't be judged alone. We have another victim who we intend to call in this case, and I don't believe any conclusions can be drawn about the link between the cases until the Court has heard all the evidence, and I understand what the Court is indicating, but frank, Judge, I believe it's premature. We are not in a position where we

anticipate arguing in the middle of direct.

THE COURT:  Well, you have an obligation, Mr. Murphy rather than to put this evidence before a fact-finder including a judge to, as rapidly as you can, get to the issue of how it becomes admissible.  This is to by all standards  and by all persons who have reviewed this kind of evidence is highly prejudicial, it's inflammatory, and it is highly prejudicial to a defendant when a judge is hearing it.  It is still highly prejudicial, but the fact that it is prejudicial does not mean that it is inadmissible.  It means, however, that the Court ought to be very, very careful including the Court sitting alone without a jury in hearing this kind of evidence because my mind is not a slate either, and while I will do the best that I can, nonetheless, unless there's something very clear about this evidence that makes it obvious that it can be tied up in such a way as to make it admissible, then I should stop hearing it, and I am certainly saying to you that based upon what I heard so far, the only linkage, the only possible linkage is a use of ligature.  That's the only thing that's remotely similar in these two

occurrences that I am hearing, and I am saying to
you --

MR. MURPHY:    Judge, I have an argument
prepared.    I didn't think that we were going to
argue this until the Court heard the evidence.

THE COURT:    Well, I'm saying to you,
Mr. Murphy, you better tell me now as Miss Placek
suggested yesterday by way of an offer of proof as
what your evidence is going to show because I don't
want to hear this evidence only to find it's not
usable for any purpose, and then trust that I do
make the herculean task of exhuming it all from my
mind and from the recesses of my consciousness and
rule on this case without any affect of that
evidence on me at all.    That's not a fair position
to put a judge in unless it is unavoidable, and in
this instance, it is now apparent to me it is
unavoidable.    I don't have to be in that position.

MR. MURPHY:    Judge, even if we made an offer of
proof, we would still make the same evidence --

THE COURT:    That's quite a bit different also
than from hearing it from the witness who you will
call.    I become involved in the witnesses just as a
jury would.    You're not doing -- Mr. Murphy, tell

72

me what your evidence is going to show?

Miss Williams, would you please step down and step into the other room for a moment?

MR. LUFRANO:  Your Honor, we would ask they articulate the similarities.  That was the subject of our Motion in Limine, which was brief.

THE COURT:  Mr. Murphy, tell me, what you consider to be the aspects of the testimony that I've heard that imprint this defendant's signature on that 1984 crime or the 1988 crime?

MR. MURPHY:  Judge, first of all, your Honor, it's our position that the evidence in this particular case involving Phyllis Williams and also the evidence involving another victim who has not testified before your Honor should be admissible as evidence of other crimes, not only to show modus operati, but also to show intent, lack of consent and identification.

THE COURT:  Mr. Murphy, I'm going to deny that latter part up front.  I thought I did that a week or so ago, made clear that I will not receive this evidence for the purpose of identity, intent, lack of consent, or anything other than modus Operati, it's too remote, it's too remote or me to receive

73

it for that purpose.  I will receive it for modus operati.

MR. MURPHY:  Judge, you did make an indication what your feelings were, but I didn't think any party was barred from showing how it was relevant for other purpose, and, your Honor, I found one case, which I think is somewhat relevant, People versus Petervilt (Phonetic), which is at 139 IL App. 3, 868.  I'm tendering a copy to the defense and a copy to the Court.

MR. LUFRANO:  This could have been done without the testimony, without the prejudicial impact.

MR. MURPHY:  Judge, I thought arguments would be made after the Court heard the testimony.

THE COURT:  Tell me how you're going to get a 1984 case or occurrence to be relevant to identity or intent of the defendant?

MR. MURPHY:  Judge, in the Petervilt case, there was an offense in which was strikingly similar to the offense which the defendant was on trial, and that particular case the prosecution was allowed to introduce evidence of that offense not only to show modus operati, but also to show intent and lack of consent of the victim.  In this

74

particular    case,    Judge,    the    crimes    were

approximately three months apart from one another,

but I believe it was three and a half months, your

Honor --

THE    COURT:    You    consider    that    to    be    a

significant difference?

MR. MURPHY:  Compared to this case, Judge?

THE COURT:  Yes.

MR. MURPHY:  Judge, I do not, and I tell you

why.  Your Honor, I believe that the evidence in

this    particular    case    would    show    that    Phyllis

Williams  was  assaulted  on  June 30,  1984.    The

evidence will also show that in early September,

1984 another victim, Stephanie Smith was assaulted,

approximately  three  months  later.    The  evidence

will   show   the   defendant   was   in   custody   from

September 3, 1984 until he was released from the

Illinois  Department  of  Corrections  on  May  --  on

April 25, 1988, that's approximately three months

after  the  release,  he  committed  the  offense  for

which he's on trial now.  And, Judge, our position

is simply this:  Your Honor has looked at the dates

of the offenses and made a preliminary ruling that

because these occurred in 1984, therefore, they are

754

too remote from the offense for which the defendant

is on trial now to even be considered as evidence

of intent, evidence of identification, evidence of

lack of consent, but, your Honor, I don't believe

it is fair to hold the time against the State when

the defendant was in custody.   He was not in a

position to assault any female victims because he

was in jail, he was in jail, Judge.

MS. PLACEK:   Excuse me, Judge.   With all due

respect, as part of this trial, there would be

sincere objection at this time by the parties since

the defendant hasn't testified, since, in fact --

THE COURT:   Miss Placek, you knew that this

argument was going to emerge before your fact-

finder.   If you did not want the fact-finder to

know about the defendant's prior conviction, his

prior incarceration, the case should be tried

before a jury.   I have a right to know what's

relevant to make a decision in this case, and it's

quite common, quite normal, quite natural that a

trial court judge will hear evidence which a jury

would not be permitted to know.   I've known that

this defendant had a prior conviction for many

months now because I can read this court file that

76

I handle everyday and every time the case is on the call. Those are the considerations that go into the determination of trying the case before a court or jury so that no harm, no harm at all is being done to your defendant by this recitation that he was in custody during that period of time.

MS. PLACEK: With the assurance of the court, Judge, we would still make our objection for the record, but offer no argument.

THE COURT: Proceed.

MR. MURPHY: Judge, if you consider, if you exclude the time he's been in custody, he couldn't commit that offense, he couldn't because his freedom was restricted. If you exclude that time, Judge, there's approximately a three-month period between each offense, which I submit, Judge, is appropriate for you to consider for purposes of intent, for purposes of identification, and or purposes of lack of consent.

Now, with respect, Judge, of evidence of modus operati, your Honor has asked us to indicate now what our position is, and what we think the points of similarities are, and we will, Judge. Your Honor, we do not intend to offer this

evidence to show that the defendant had a propensity to commit crimes. We intend to offer it for purposes of describing modus operati, and, your Honor, I tendered a number of cases to your Honor, and another case, and your Honor made comments in this trial about those cases, which we tendered, and those cases, Judge, are inapplicable in this case for very important reasons. Those cases involved an armed robbery, and those particular cases, evidence of other crime was admitted -- evidence of their crimes was admitted primarily for two reasons, which was common in all those cases. One was time and place proximity, and the other one was design, and, again, Judge, those cases are slightly different than the case you have before your Honor, so to apply those cases to this case, I think is inappropriate. There's no way the State is saying to your Honor in this particular case that the two prior offenses that the defendant committed are being offered for time and place proximity. It does not apply. We admit that, Judge. However, for purpose of modus operati, they should be considered.

In Illinois, the standard is whether

78

or not -- and I am quoting from the Stanley Clausen case, Judge, which is a case that was decided in this building and can be found at 182 IL App. 268. The standard for modus operati only is whether there's been a showing, strong and persuasive showing of crime charged and separate offenses which established substantial link of the cases. The case states some distinguished features not common to most offenses of that type must be present to establish the link.

Your Honor, from the reading I have done in regard to this area, the common practice of the courts in the State of Illinois is to look at the points of similarity. This is not a test in which is a strict test. I believe the test is unique from case to case. The point should be similar and distinctive, and I think it's interesting to note, Judge, if you read the case law in the State of Illinois, the number of points of similarity, although may be helpful, are not conclusive. In fact, if you have one unique point, Judge, or two unique points, I think that's sufficient if they are very unique points. An example of that is People versus Coversich case,

which can be found at 10 IL App. 3rd, 797. Although that was a burglary, the court admitted evidence of other crimes only where there's two points of similarity: the manner of entry, and the use of gloves.

Judge, it's our position that we are not required to show that in Phyllis Williams' assault, and the assault of Stephanie Smith, which I believe you will hear testimony regarding her case this afternoon, that they were identical, and the characterization of these crimes, fingerprint is inaccurate.

I tender two cases, Judge, People versus Williams, People versus Philfums, which can be found at 95 IL App. 3rd, 801, and People versus Philfums, the docket number is 64506, and I believe these two cases demonstrate, Judge, that the standard that's applied by the court has changed over the years, and, in fact, the strict standard that the State was held to then is not the strict standard that we are held to today.

Your Honor, it's our position that if you look at the evidence in this case, you look at the evidence in Phyllis Williams' case, and you

80

1

2    look at the evidence that would be elicited through

3    Stephanie Smith, you will find a number of

4    similarities. Your Honor, perhaps the most unique

     distinction you will hear, and it's our position

5    that it is very unique is the ligature. Your Honor

6    heard in this particular case testimony that a

7    ligature was placed around the neck -- two

8    ligatures were around the neck of the victim, a

9    rope, a shoestring.

10        MR. LUFRANO: Objection. It wasn't a rope.

11        THE COURT: I heard the evidence.

12        MR. MURPHY: A shoestring. You heard Phyllis

13   Williams testify, and she testified that a rope was

14   placed around her neck. The evidence will also

15   show that Stephanie Smith will testify that she was

16   chocked during the act -- during the time that she

17   was victimized by the defendant. Your Honor, it's

18   our position that that factor alone is unique

19   enough for the Court to admit other evidence of

20   other crimes.

21        But, your Honor, there are other

22   similarities, and the Court does consider some of

23   these other similarities even though they may not

24   be as unique as the ligature around the neck or