CASE NO. _____08 cv 1589_____

ATTACHMENT NO._____2_____

EXHIBIT _____

TAB (DESCRIPTION) _____

some preoccupation with putting his hand or his arms around the victim's neck, the manner of attack is consistent in each particular case, Judge. In each case, the defendant tells the victim, Phyllis Williams and Stephanie Smith that he will kill them.

THE COURT: Is there a similarity?

MR. MURPHY: In the case at bar, he did kill the victim, Judge.

MS. PLACEK: Excuse me, Judge, there has to be an objection.

THE COURT: Objection sustained.

MR. MURPHY: The evidence in this case shows that the defendant killed the victim.

Judge, in addition to that, the evidence will show that the defendant used force in each of these offenses, used force against Phyllis Williams, used forced against Stephanie Smith, and again our position is that the defendant used force against Denise Johnson.

In addition, your Honor, the evidence on -- or similarities on each of these crimes is the nature of the sexual attack. There's a whole range of ways, as your Honor knows, a person can be

1

2    and is sexually assaulted.   In these particular

3    cases, Judge, the evidence -- the one similarity in

4    the  cases  is  that  the  victims  were  assault

     vaginally.   There was no force of anal intercourse,

5    there's no force of oral intercourse.   The evidence

6    will also show another similarity, each victim was

7    submitted to multiple acts of vaginal intercourse,

8    and, your Honor, Phyllis Williams will testify to

9    that  --  Phyllis  Williams  did  testify  to  that.

10   Stephanie  Smith  will  testify  to  that,  and  the

11   defendant  in  his  statement  admitted  to  having

12   numerous  acts  of  only  vagina  intercourse  with  the

13   victim, Denise Johnson.

14            The  evidence  will  also  show,  Judge,

15   that each of the victims -- and whether the Court

16   considers it a relevant factor, I don't know, but

17   each were kidnapped, were held, taken to a place,

18   and held against their will.

19            In  this  particular  case,  it's  our

20   position that the victim, Denise Johnson, was taken

21   to a garage next door to where the defendant lived,

22   and was held in that garage against her will, and

23   that's  supported  by  the  physical  evidence,  the

24   ligature around her neck, around her hand.

The evidence also shows that Phyllis Williams was taken out of the hallway into the defendant's apartment. The evidence will also show that Stephanie Smith was taken out of the hallway and taken into the defendant's apartment. Each of these victims were kidnapped, and I know the Court will say anytime the victim is assaulted, that they are taken against their will, but the defendant has gone beyond that. He's actually kidnapped these victims.

The evidence will also show, Judge, the relationship between the defendant and each of the girls who were victims is similar. The defendant had a casual relationship with Phyllis Williams. She saw him around a few times in the apartment and did not know him. The evidence will show that Stephanie Smith had a casual relationship with the defendant. She may have seen him around. The evidence did show that Denise Johnson did know the defendant, had just met him that day, a casual relationship.

MS. PLACEK: Objection, not in evidence, Judge.

THE COURT: Overruled.

MR. MURPHY: The information about the victim

84
571

is also similar.  Regarding Stephanie Smith, she was 15 years old when she was assaulted.  The evidence in this case has already shown that Denise Johnson was 12 years old when she was assaulted.

Further, Judge, the time of the offense, the time of the day when the offense occurs.  The evidence will show, in fact, does show that Denise Johnson was assaulted in the evening hours; that Phyllis Williams was assaulted in the evening hours; and the evidence will show that Stephanie Smith was assaulted in the evening hours.

Your Honor, it's our position that each of these factors should be considered by the Court.  Some of these factors the Court may not place great weight on, but I submit that some of them are very significant and very unique and should be considered.

Each case, Judge, as you know, is decided on a case by case basis.  When significant common features of each of these cases are considered together, a distinctive pattern becomes evident, and it's our position, Judge, that the Court would allow Phyllis Williams to complete her testimony, and we should be allowed to introduce

85

the testimony of Stephanie Smith as well.

                    May I have a moment, Judge?

                    (Whereupon there was a short

                    pause in the proceedings)

     MR. MURPHY:  I have nothing further, Judge.

     THE COURT:  You care to respond, Miss Placek or

Mr. Lufrano?

     MR. LUFRANO:  Yes, your Honor.  Your Honor, in

describing the status of Illinois law on this

subject, while Mr. Murphy did reiterate what this

Court has said time and time again, there has to be

something different than the usual circumstances of

the particular crime.   There's nothing that he

addressed that was unusual about the crime in

either of the cases he wishes to offer this court.

They may have some similarities between them.

Those similarities were not apparent from the

reports that we were given.

     MR. MURPHY:  Objection.

     MR. LUFRANO:  But neither of them have

similarities to the case at bar.  In the Philfums

case, which counsel has tendered, it describes what

similarities the Court found, time, 46 days.  The

number of similarities were 10 separate factors,

age, both women were placed in a running in that case. The place was almost identical, certainly identical in nature such as the case between these two ladies, which were an apartment. And between them, four years prior to this, counsel's argument may have had some weight, but at the case at bar, that weight has been dissipated by the amount of time, by the difference in age, activity. In the case that he uses to support his position, it was the prosperity that allowed it to be similar, not the lack thereof.

We would ask the Court to recognize that there's not a sufficient similarity to establish modus operati in any of the cases that counsel seeks to use, and we'd ask that our Motion in Limine earlier heard be sustained.

MR. MURPHY: Judge, may I make one additional argument, which I failed to make before?

THE COURT: You may.

MR. MURPHY: Judge, one additional factor that I had notes on, which I apparently skipped, it was location of the crime regarding the defendant's residence. The location was an abandoned garage next door to where the defendant lived. The

evidence in the two cases that we intend to introduce before your Honor with regard to Phyllis Williams, in fact, shows that the offense occurred in the defendant's apartment. Stephanie Smith will testify that the offense also occurred in the defendant's apartment showing that the offense did occur at or near the defendant's residence in each case.

Your Honor, what the defendant argues, Judge, they are asking you to make us -- to hold the State to a standard whereby each crime has to be identical. Obviously, Judge, in each particular crime, there's going to be some dissimilarities, we agree, but, your Honor, there are unique factors in these cases; one in particular, the defendant's fixation with the victim's neck, ligatures being wrapped around the neck, which makes each of these crimes distinctive in their own right, and, your Honor, we're not trying to prejudice the Court. Our position is these crimes, your Honor should hear the evidence with respect to these victims and should allow it.

THE COURT: Are you finished?

MR. MURPHY: I'm finished, Judge.

1

2      THE COURT:  All right.  I concluded during the

3   course of the argument in this case that I am going

4   to allow this evidence to proceed.  I do it with a

5   great deal of reservation, and I do it fully aware

6   of the fact that if this were a jury trial, I am

7   likely caught in error, I am also -- whatever it

8   was that the Supreme Court meant in Greg versus

9   Georgia when it says the capital defendant is

10  entitled to a higher standard of due process, that

11  language keeps getting itself repeated in just that

12  form also without much hallucination as to when the

13  defendant has received that higher standard or when

14  he or she has not.  Unfortunately, that doesn't aid

15  the trial courts at all, but when it comes to this

16  high prejudicial evidence, and what's wrong with it

17  is that it is so highly prejudicial, it ought to be

18  received with the utmost care and caution, and as I

19  understand the law in Illinois, so far what I've

20  heard does not meet the test to allow this evidence

21  to go before a jury, and I have no hesitancy of

22  telling you that if there were a jury sitting over

23  there in this box, there is almost no probability

24  that I will allow them to hear what I just heard

    from Phyllis Williams because the only similarities

89

between this case that distinguish it from any other aggravated criminal sexual assault case is the fact of the use of a ligature. I do not consider the argument that the time is so devoid of remoteness that the jury ought to be able to consider the offense, which are four years apart from one another. If what you have said is the status of the law based upon the fact that there has been an aggravated sexual assault committed on Phyllis Williams, and the other witness that you intend to prove; that, therefore, the fact-finder should consider those two pieces of evidence as being indicative of the defendant's identity, intent, design, or scheme, then we have substantially done away entirely with the rule that prohibits the introduction of prior and subsequent crimes, and the concept that a defendant -- that a fact-finder should not hear evidence that's designed merely to inform them of the defendant's propensity to commit crime becomes almost a joke, and the rule is not forcible because no one can intelligently enforce it if all of the things that you say are -- make this evidence admissible.

On the other hand, you're entitled to

90

that there's such a degree of similarity that the Court can use the evidence for a purpose, that's relevant, maybe.

On the other hand, if you have not, then I will simply disregard it hoping again that my intellectual abilities to do that are equal to the task that I'm called upon to do.

Call your witness.

MS. PLACEK: With all due respect, irrespective of the motion, is the Court allowing this to be subsequent evidence?

THE COURT: Prior and subsequent evidence is what we are talking about, yes.

MS. PLACEK: Let me ask you this: As to this young lady, is the Court contending or is the State contending, in fact, this defendant was found guilty of criminal sexual assault?

THE COURT: He doesn't need to have been found guilty, does not need to have been charged with the offense in order for it to be admissible evidence. That's clear. We're not talking about prior convictions. We're talking about prior bad acts, which do not have to be proven beyond a reasonable doubt.

Call your witness back, Mr. Murphy.

MR. MURPHY   Q   Phyllis, did you subsequently leave the defendant's apartment?  Did you leave the defendant's apartment?

A    Yes.

Q    And from the time that you went into his apartment  and  until  the  time  you  left  his apartment, how many times did he have sex with you?

A    Just that once.

Q    You mean there were two separate times?

MS. PLACEK:  Objection.  Leading.

THE COURT:  Objection sustained.

MR. MURPHY   Q   How many times did he put his penis into your vagina?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

MR. MURPHY   Q   Other than putting his penis into your vagina two times, were there any other sexual acts that he forced you to have with him?

MR. LUFRANO:  Objection.

THE COURT:  Overruled.

MR. MURPHY   Q   And did you know the defendant before he brought you into his apartment on that date?

93

A    No, I didn't.

Q    Did you ever see him around the apartment building?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes, I have.

MR. MURPHY  Q  Before that day?

A    Yes.

MR. MURPHY:  No further questions, Judge.

THE COURT:  Cross.

MS. PLACEK:  We would take exception without waiving said exception.

CROSS-EXAMINATION

BY

MS. PLACEK:

Q    How old were you at the time?

A    Twenty-five.

Q    And you didn't report this the same day it happened, did you?

A    Yes, I did.

Q    Well, ma'am, when did you report it?

A    Later that evening.

Q    When you say later that evening, did you go to the police?

A    No, I didn't.

Q    Well, as a matter of fact when was the first time you went to the police?

A    I went to the hospital.

Q    When did you come to the police?

A    And the police came to me.  They came to the hospital.

Q    Did you talk to an Assistant State's Attorney?

A    No.

Q    Well, didn't you, in fact, speak to an Assistant State's Attorney, and I believe it's Peigen, P-e-i-g-e-n?

A    At the hospital, yes.

Q    As a matter of fact, the defendant was never charged with rape or criminal sexual assault in your case, correct?

MR. CASSIDY:  Objection, your Honor.

THE COURT:  What's the basis of your objection?

MR. CASSIDY:  Relevance.

THE COURT:  The objection is sustained.

MS. PLACEK:  It goes to credibility.

THE COURT:  No.  Objection is sustained.

MS. PLACEK    Q    You talked to the State

95

Attorney, correct?

    A    Yes, I did.

    Q    And you told her your story, correct?

    A    Yes, I did.

    Q    And that was of the same office as these gentlemen, correct?

    A    No.

    Q    It wasn't the same State's Attorney's Office?

    A    No, it wasn't.

    Q    Well, let's talk about that for a moment. Did you ever receive a subpoena involving this matter to testify in a rape or criminal sexual assault trial?

    MR. CASSIDY:  Objection, Judge.

    THE COURT:  The objection is sustained.

    THE WITNESS:  Yes, I did.

    MS. PLACEK  Q  You did?  From who?

    MR. MURPHY:  Objection.

    THE COURT:  The objection is sustained.  The answer is stricken.

    MS. PLACEK:  Judge, if it pleases the Court, I'm forced to retry this matter.

    THE COURT:  The objection is sustained, and the

answer is stricken.

MS. PLACEK   Q   Isn't it correct that, in fact,
you went out drinking with the defendant after this
allegedly happened?

A   No, I didn't.

Q   Did you tell the police that you went out
to get some liquor?

A   Yes, I did.

Q   Did you say you then went to the game room
with the defendant?

A   No, I didn't, I -- Excuse me?

Q   Excuse me, ma'am.  Did you ever say that
you and the defendant then went to a game room?

A   Yes, we did.

Q   Thank you.  And this is after he allegedly
raped you, right?

A   Correct.

Q   Did you ever testify in any kind of trial
against the defendant in this matter?

MR. CASSIDY:  Objection.

THE COURT:  Sustained.

THE WITNESS:  No, I haven't.

THE COURT:  The answer is stricken.

MS. PLACEK   Q   Now, where were you living at

97

the time of this alleged incident?

A    7416 South Phillips.

Q    Did the defendant ever take you in a garage?

A    No.

Q    Did the defendant ever -- Well, let me ask you this:  Did you ever tell the police that the defendant allegedly wrapped the rope twice around your neck?

A    Yes, I did.

Q    And were they writing it down when you told them that?

A    I wasn't paying no attention if they was or wasn't.

Q    Do you remember whether or not during your conversation with the police you, in fact, stated that he tightened the rope around your neck?

A    Yes, I did.

Q    Were they writing it down when, in fact, you told them that?

A    I wasn't paying no attention.

Q    Thank you.  How long had you seen the defendant around previous to that incident?

A    I saw him twice.

98

1

2      Q    And what days were those?

3      A    I can't recall.

4      Q    Well, how long before?

5      A    Well, I seen him mostly like coming in and
going    out the building when I was coming in or

6 going out the door.

7      MS. PLACEK:  Motion to Strike as nonresponsive.

8            Q   When did you see him before?

9      A    I saw him a week before he did what he did

10 to me.

11      Q    Did you see him after that?

12      A    No, I didn't.  Excuse me, could I correct

13 that?

14      THE COURT:  Just answer the question that's put

15 to you, ma'am.

16      MS. PLACEK   Q   Did you ever tell the police

17 when they were asking you what happened that he

18 allegedly took one leg out of your pants?

19      A    Yes, I did.

20      Q    Were they writing it down at the time?

21      A    Not if I know of.

22      Q    Did you tell the Assistant State's

23 Attorney you spoke of that he took one leg out of

24 your pants?

99

A    Yes, I did.

Q    Thank you.  Was she or was he writing it down at the time?

A    I wasn't paying no attention.

Q    Did you ever tell the defendant that, in fact, he threatened -- Strike that.  Did you ever tell the police that he threatened you to bring you into the apartment?

A    Yes, he did.

Q    You told the police that?

A    Yes, I did.

Q    Did you tell the Assistant State's Attorney that?

A    Yes, I did.

Q    Thank you.  Did you ever say to the Assistant State's Attorney or the police -- Strike that -- to the police that, in fact, the defendant threatened to choke you?

A    No, I didn't.

Q    Thank you.  How far is where you were living on the time and date from 25 -- 251 West 117th Street?

A    Will you repeat that, please?

Q    How far is it from where you were living

100

at the date and time of this alleged incident is 251 West 117th Street?

A    That's a long ways from where I was living.

Q    And likewise, 11720 South Princeton would also be a long way, correct?

A    Uh-huh.

THE COURT:  Does that mean yes?

THE WITNESS:  Yes.

MS. PLACEK  Q  Did you appear in court in Branch 24 on July 22?

MR. MURPHY:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes, I did.

MS. PLACEK  Q  And isn't it true that, in fact, the case you told the State's Attorney at that time that the case wasn't real, and it was to be thrown out?

A    Yes, I did.

MS. PLACEK:  Thank you.  That's all. Motion to Strike.  The witness admits the case wasn't real.

THE COURT:  The motion is denied.

State, redirect?

REDIRECT EXAMINATION

BY

MR. MURPHY:

Q    Phyllis, what do you mean when she asked you that last question about it wasn't real?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I didn't understand what she was talking about.  She asked me two questions:  Was it real, or was it thrown out?

MR. MURPHY  Q  Did you, in fact, tell somebody from the State's Attorney's Office or anybody in Court that this case didn't happen?

A    No, I didn't.

Q    And that it wasn't real?  In other words, nothing happened to you like you described to Judge Holt?

A    No.

Q    So when you said in response to the attorney's question about the case wasn't real, you didn't mean that what you testified here today is not true?

MS. PLACEK:  Objection.

THE WITNESS:  No.

THE COURT: Overruled.

MR. MURPHY Q You didn't understand her question, is that right?

A No, I didn't.

Q And, Phyllis, you testified that you went to a game room with the defendant after you were assaulted by him, is that right?

A Yes, we did.

Q And, in fact, that was your suggestion, isn't that true?

A Yes, it was.

Q And why did you suggest that?

MS. PLACEK: Objection.

THE COURT: Overruled.

MS. PLACEK: Judge, we're going to be trying this thing --

THE COURT: That's the very nature of putting this kind of evidence before the Court. That's one of the reasons why courts try to avoid it because it's collateral, and it does require introduction of evidence that's time consuming, not probative to the issues before the Court -- all of those things are true. The objection is overruled.

MR. MURPHY Q Why did you suggest that you and

103

the defendant go to the game room?

    A    Where I could get out of his house.

    Q    And you made that suggest in his apartment, is that right?

    A    Yes, I did.

    Q    And at that time were you afraid of him?

    A    Yes, I was.

    MS. PLACEK:  Objection.

    THE COURT:  Overruled.

    MR. MURPHY:  Nothing further, Judge.

    THE COURT:  Recross?

                    RECROSS-EXAMINATION

                          BY

                    MS. PLACEK:

    Q    You went to the game room after you purchased liquor, correct?

    A    No.

    Q    Did you ever tell the police that you finished, you walked up to 75th Street where you purchased some liquor?

    A    Yes, I did tell the police that.

    Q    And that's when you went to the game room, correct?

    A    No.

                          104

Q    Did you ever tell the police that, in fact, you both walked up to 75th Street where you purchased liquor and then went to the game room?

A    No, I never told that.

Q    Okay, thank you, ma'am.  Let me ask you this:  When you want to Branch 34, you talked to the State's Attorney?

A    Branch 34?

Q    The court, did you talk to the State's Attorney?

A    No, I didn't talk to no one.

Q    Did you tell anybody your side of the story?

A    Yes, I did.

Q    Who did you tell your side of the story on that date, and I'm referring to July 2, 1984?

A    To an officer at the hospital.

Q    That was on July 2, 1984?

A    Yes.

Q    Am I correct in assuming you have no independent memory of this incident?

A    I remember.

Q    Well, let me ask you this:  Isn't it correct that you testified for this gentleman that

105

it didn't happen on July 2, 1984, it happened on another date?

MR. MURPHY:  Objection, Judge.

THE WITNESS:  No.

MS. PLACEK   Q   Did you ever testify that it happened in another month besides the month of July?

A    No.

Q    Isn't it correct that at Branch 34 when you were there on July 2, you talked to a State's attorney?

A    No, I didn't talk to anyone.

Q    Were you in court on July 2, 1984?

A    Yes, I was in court.

Q    Did you tell anybody when you were in court your side of the story?

A    Yes.

Q    You never got to testify before a judge, did you?

A    No.

Q    As a matter of fact, the case was thrown out, correct?

MR. CASSIDY:  Objection, Judge.

THE COURT:  The objection is sustained.

1

2      MS. PLACEK  Q  Ma'am, isn't it correct that

3   everything you've said, you've been prompted to

4   say?

5      A    No.

6      Q    Well, ma'am, give me the date of the

7   incident?

8      A    Okay, I will put it this way --

9      Q    No, excuse me.  Give me the date of the

10  incident?

11     MR. CASSIDY:  Objection.

12     THE COURT:  The objection is overruled.

13     MS.  PLACEK    Q   Give  me  the  date  of  the

14  incident?

15     THE COURT:  If you recall.

16     THE WITNESS:  Okay, the date that we went to

17  court -- the day he raped me.

18     MS.  PLACEK    Q   Give  me  the  date  of  the

19  incident?

20     A    It was in July.

21     Q    It was in July.  Isn't it correct, ma'am,

22  that the part about the two, the ropes being twice

23  put around your next, the first time you ever told

24  anybody about that was when you told his Honor,

    Judge Holt?

1

2          MR. CASSIDY:   Objection, Judge.   This is beyond

3   the scope of Mr. Murphy's redirect, Judge.

4          THE COURT:   Overruled.

5          MS. PLACEK   Q   Isn't that correct?

6          A     No.

7          Q     Well, ma'am, when was the first time you

    told anyone about that?

8          A     When I was standing in front of the Judge.

9          Q     And   that's   when   you   said   you   didn't

10  testify five seconds ago?

11         MR. CASSIDY:   Objection, Judge.

12         THE COURT:   Objection sustained.

13         MS. PLACEK   Q   Ma'am, when you say you were

14  standing before the judge, would that be in the

15  branch court in  1984?

16         A     Yes.

17         Q     And did you testify at that time?

18         A     Yes.

19         Q     Did you tell me five seconds ago -- Did

20  you  tell  me  five  seconds  ago  that  you  didn't

21  testify --

22         THE COURT:   It's argumentative.

23         MS.  PLACEK   Q   Didn't you testify before a

24  court?

MR. CASSIDY:  Objection.

THE   COURT:    Objection   sustained.    She's answered that two or three times.

MS. PLACEK  Q  Isn't it correct that you were told by Mr. Murphy the facts involved in the case currently at trial?

A    I don't understand you.  Repeat yourself, please.

Q    Surely.  How many times have you been down to this Markham Courthouse?

A    Three times.

Q    And  those  three  times,  that  was  all involving preparation for testimony in this case, correct?

A    Correct.

Q    Of  the  first  time,  the  first  of  those three times, how long were you in this courthouse?

A    Two hours and a half.

Q    And am I correct that you were on the second floor speaking with these State's Attorneys?

A    Yes, I was.

Q    And isn't it correct you were going over and over what you were going to say?

A    No.

Q    Well, were you talking about what you were going to testify to?

A    I was told what I was here for.

Q    For two and a half hours?  And so the only thing they did for two and a half hours is tell you why you were here?

A    Yes, and asked me what happened to me.

Q    And when they asked you what happened for two and a half hours --

A    Yes.

Q    -- you told them, correct?

A    Yes, I did.

Q    Did you have to come back again?

A    Yes, I did.

Q    When?

A    I'll say two weeks later.

Q    What date?

A    I'm not sure.

Q    What month?

A    This month, in February -- No, first time I came was January, that was the end of January, and then I came back again in February, and this is my, exactly my third time being here.

Q    The second time you were here, how long

110

were you here?

  A Well --

  MR. MURPHY: Objection, Judge.

  THE COURT: What's the basis of your objection?

  MR. MURPHY: Your Honor, it's beyond the scope.

  THE COURT: Overruled.

  MS. PLACEK Q How long were you here?

  A I got here around about 10:00 o'clock.  I left around about 1:00 something.

  Q And you spent that time also speaking in preparation for your testimony with these two State's Attorney?

  A Yes.

  Q And were you going over the same thing or were you going over something different?

  A The same.

  Q So in other words, you were again telling them for three and a half hours what happened to you?

  A Yes.

  Q Let me ask you this:  This would be the third time you were here?

  A Yes.

  Q How long were you here before taking the

stand?

A     About half an hour.

Q     Did you again go over what you were going to say?

A     No.

Q     Well, let me ask you this, ma'am:  Were you ever shown any reports, any words written down on a piece of paper?

A     No.

Q     Do you remember when the State's Attorney asked you as to certain dates and time about 15 minutes ago?

A     No, not really.  I don't know what she's talking about.

Q     Ma'am, isn't it correct that, in fact, you were told what to say and how to say it -- Strike that.  You were told what to say when you took the stand today?

A     No.

Q     Ma'am, isn't it correct that you were not only told what to say, but that you were told to say that you were -- that Mr. Hendricks threatened to kill you?

A     No.

1

2      THE COURT:   Miss Placek, are you going to

3  impeach her if she denies it, if she has, or are

4  you asking questions to receive a negative answer?

5      MS. PLACEK:   The only thing I can go by the

6  police report --

7      THE COURT:   You're talking about something

8  that's not a police report.  You're talking about a

9  conversation had between the State's Attorney and

10 this witness, which she consistently denied, and

11 you're in position to contradict the denial, and I

12 am wondering why you keep asking these innuendo

13 kind of questions.

14     MS. PLACEK:  For five hours, it strikes me --

15     THE COURT:   You can't spread that kind of

16 innuendo of record unless you have some basis for

17 it.  Put another question.

18     MS. PLACEK  Q  As a matter of fact, you bought

19 the liquor that night after this alleged rape, is

20 that correct?

21     A    Yes.

22     Q    By the way, in that liquor store, was

23 there someone else besides you and the defendant?

24     A    Me and the defendant never went to the

liquor store.

113

Q    So you went alone -- Where did you buy the liquor?

MR. MURPHY:    Objection.    This is beyond the scope.

THE COURT:    This is well beyond the scope, but it may be probative.    Objection is overruled.

MS. PLACEK    Q    Where did you buy the liquor?

A    I bought the liquor on 75th and Exchange.

Q    And you said the defendant wasn't with you when you bought the liquor?

A    No, the defendant wasn't.

Q    You never told anybody in the liquor store that you had allegedly been raped?

A    No, I didn't.

Q    And you were alone in that liquor store without him, correct?

A    Correct.

Q    You then went to a game room after you bought some liquor, correct?

A    No, I didn't.

MS. PLACEK:    Sorry.    I will withdraw it, Judge. That's all.

THE COURT:    Anything further, Mr. Murphy?

MR. MURPHY:    No further questions, Judge.

114

1

2          THE COURT:  Thank you, Miss Williams.  You may

3    step down.

4                    (Witness excused)

5          THE COURT:  Call your next witness.

6          MR. MURPHY:  Your Honor, People call Stephanie

7    Smith.

8          MS.  PLACEK:     There  will  be  a  continuing

9    objection based on the Court's ruling.

10         THE CLERK:  Raise your right hand, please.

11                    (Witness sworn)

12         THE COURT:  That microphone is on.  If you will

13   speak directly into it, keep your voice up, we will

14   all be able to hear you.

15                You may proceed, Mr. Murphy.

16         MR. MURPHY:  Thank you, Judge.

17                    STEPHANIE SMITH,

18   a witness herein, called on behalf of the People

19   of the State of Illinois, after being first duly

20   sworn, was examined and testified as follows:

21                    DIRECT EXAMINATION

22                          BY

23                    MR. MURPHY:

24         Q    Would you please state your name and spell

     your last name?

                          115

1

2          A     Stephanie Smith.

3          Q     Your first name is S-t-e-p-h-a-n-i-e?

4          A     Yes.

5          Q     Stephanie, how old are you right now?

6          A     Twenty-two.

7          Q     What's your date of birth?

8          A     1/12/69.

9          Q     And, Stephanie, I'd like to direct your

10    attention to September 3, 1984, do you remember

      where you were living at that time?

11         A     Yes.

12         Q     Where were you living?

13         A     7416 South Phillips.

14         Q     And --

15                     May I have a moment, Judge?

16                     (Whereupon there was a short

17                     pause in the proceedings)

18    MR. MURPHY   Q   And who were you living there

19    with, Stephanie?

20         A     My grandmother.

21         Q     And on that particular day during the

22    evening hours, did anything unusual happen?

23         A     Yes.

24         Q     Could you tell Judge Holt what happened?

A    Yes.  I entered the building and saw this man standing in the building.

Q    Do you see that man in court today?

A    Yes.

Q    Could you please point to him and indicate an article of clothing?

A    Sweater, maroon and gray (Indicating).

MR. MURPHY:  May the record reflect in-court identification of the defendant.

THE COURT:  The record may reflect.

What date are we talking about.

MR. MURPHY:  September 3, 1984.

Q  Is that right, Stephanie?

A    Yes.

Q    And, Stephanie, on this particular day, can you tell Judge Holt what happened when you stepped into the building?

A    I then tried to walk up the stairs, then he grabbed me from behind around my mouth, drug me into the basement apartment, then put me in a closet for about 10 to 15 minutes.  He left out the closet, left me in there, he came back into the closet, then he left out again, and then came back in, and then we left out the closet together, then

117

he told me to take off my clothes and lay in the bed and had sex with me two times.

Q    And what kind of sex did the defendant have with you?  Can you describe to Judge Holt?

A    He put his penis into my vagina two times.

Q    Was there any other type of sex other than that?

A    No.

Q    And, Stephanie, when you came out of the closet, was anything different about the apartment?

A    Yes, it was a bed let out.

Q    And was there anything else?

A    He had a crutch up against the door.

Q    What door was that?

A    The front door.

Q    And at the time you were with the defendant, did you and him have any conversation?

A    Yes.

Q    What if anything did he say to you or you say to him?

A    He asked my date of birth and how old I was.

Q    And what did you say?

A    My date of birth was January 12, and I was

118

15 years of age.

    Q    And you were 15 years old at that time?

    A    Yes.

    Q    Stephanie, can you tell Judge Holt what happened after that?

    A    After the sex acts took place, after that happened, I asked him could I put on my clothes. He let me put them on.  Then we proceeded to the front door, and he went into a room.  What he did in the room, I don't know; I was just standing in front of the door.  Then he came out the room and asked me was I coming back.  I said yes.  He said how long.  I said 10 minutes.

    Q    Did you leave the apartment then?

    A    No, I stood there.  I stood up by the front door.  Then he grabbed me around my neck like this (Indicating).

MR. MURPHY:  For the record, judge, the witness got her right arm around her neck, completely around her neck.

    Q    And when he grabbed you around the neck, what if anything did he do or say?

    A    It was like he put a little pressure on my throat.

Q    Did he choke you?

MS. PLACEK:  Objection, Judge.

THE COURT:  Objection is sustained.  Leading.

MR. MURPHY   Q   When he put this pressure on your neck, what did it feel like?

A    Like slight pressure.  It wasn't like I was gagging or anything.

Q    And what happened next?

A    He told me if I told anybody, he'll kill me.

Q    And, Stephanie,  did  you  leave  the apartment then?

A    Yes, and went upstairs to tell my mother, and she then called the police.

Q    Now, Stephanie, did you know the defendant before this?

A    No.

Q    Did you know his name even?

A    No.

Q    Had you ever seen him around the apartment building?

MS. PLACEK:  Objection.  Asked and answered.

THE COURT:  Overruled.

MR. MURPHY   Q   Had you ever seen him around the

building?

    A    Yes, one time.

    Q    And the police that the defendant took you, was that his apartment to the best of your knowledge?

    A    Yes.

    MR. MURPHY:  May I have a moment, your Honor?

    THE COURT:  You may.

            (Whereupon there was a short

            pause in the proceedings)

    MR. MURPHY  Q  Stephanie, how did the defendant get you into his apartment?

    MS. PLACEK:  Objection.  Asked and answered.

    THE COURT:  Overruled.

    MR. MURPHY  Q  How did you get from the hallway into his apartment?

    A    He grabbed me and drug me in there.

    Q    How did he drag you in there?

    A    Like, okay, he grabbed me from around my mouth and was just holding me and pulling me in.

    Q    And when he dragged you in, did you go in there willingly?

    A    No.

    Q    Did you stay in his apartment willingly?

121

MS. PLACEK:  There will be an objection, Judge.

THE WITNESS:  No.

THE COURT:  Your objection is overruled.

MR. MURPHY  Q  Stephanie, did you receive any injuries during the course of this incident?

A    Yes.

Q    What injuries did you receive?

A    I had a swollen lip and scar on my face.

Q    And that was from when?

MS. PLACEK:  Objection, Judge.

THE COURT:  I'm sorry?

MR. MURPHY:  I will rephrase that question.

Q  How did you sustain those injuries?

A    That's when he grabbed me from around my face.

MR. MURPHY:  No further questions, Judge.

THE COURT:  Cross.

MS. PLACEK:  Motion to strike again, Judge. This isn't even what the State promised in their argument.

THE COURT:  Denied.

CROSS-EXAMINATION

BY

MS. PLACEK:

122



Q    Ma'am, you had a conversation with the police involving this, correct?

A    Yes.

Q    And you had a conversation at the time it happened, correct, or near to the time it happened, correct?

A    Yes.

Q    And they were writing down things, correct?

A    Yes.

Q    Do you remember whether or not you spoke to a detective from Area 1, Leo Dorociak?

A    No, I don't.

Q    Okay, but you remember speaking to a police officer, correct?

A    Yes.

Q    And in answer to the State's Attorney's question, I believe you said the defendant allegedly put his arm around your throat after you had finished, and after you had been allowed to get dressed, correct?

A    Yes.

Q    You never told the police that at that time, did you?

123

A    You're saying after I got out?

Q    When you were having a conversation with the police, they asked you what happened, correct?

A    Yes.

Q    And you never told that to the police at that time, correct?

A    No, I told them at the hospital.

Q    Did you tell the police that?

A    Yes.

Q    Didn't you, in fact, said, "This time after he finished he allowed her to get dressed, he now acted as if nothing happened, and he told her not to tell her mother, and that he shouted come back to see him that night, and she wanted to be released, promised that she would return, he let her out of the apartment," did you make that statement to the police?

A    Yes.

Q    As a matter of fact, you never told them at that time anything about you had been dressed, that he put his arm and put a slight pressure around your throat?

A    No, I didn't tell them at that time.    I told them at the hospital.

124

Q    Did you tell the police at the hospital?

A    Yes.

Q    Was that the same officer -- Was the officer writing down things when you were telling that?

A    Yes.

Q    By the way, you were living on Phillips at that time?

A    Yes.

Q    How far away is that from 251 West 117th Street?

A    I have no idea.

Q    How far is that from 11720 South Princeton?

A    That's a long way, but I couldn't tell you how far.

Q    That's all right, Stephanie.  Thank you. By the way, this rape allegedly took place in a bed?

A    Yes.

MS. PLACEK:  Thank you, that's all I have.

THE COURT:  Redirect?

MR. MURPHY:  No further questions, Judge.

THE COURT:  Thank you, Miss Smith, you may step

1    down.

2                    (Witness excused)

3        THE COURT:  Call your next witness.

4        MR. MURPHY:  Judge, I believe we will have no

5    further witnesses to call.  We would be seeking

6    leave to offer our exhibits at this time.

7        MS. PLACEK:  We have a Motion to Strike, Judge,

8    as to the last two witnesses.

9        THE COURT:  The motion is denied.

10       MS. PLACEK:  We would also move -- Just for

11   clarity of the record, is the Court accepting this

12   as substantive evidence.

13       THE COURT:  Yes, I am accepting this for

14   whatever purpose it can be utilized.

15       MS. PLACEK:  Also, we would move to strike the

16   doctor's testimony, Doctor Fitzpatrick's testimony

17   as to the nontie-up of the testimony.

18       THE COURT:  I would cross that bridge --

19       MS. PLACEK;  They are resting --

20       THE COURT:  I understand what they're doing.

21   When they rest -- Prior to resting, they will offer

22   their exhibits into evidence.  We will deal with

23   that problem at that time.

24       MR. CASSIDY:  Judge, prior to resting, we will

126

offer all our exhibits into evidence.

MS. PLACEK:    Objection.    There may be objections to not all of the exhibits presented, Judge.

THE COURT:    Can you particularize which exhibits you are going to object to, or do you need to go through the State's exhibits one at a time?

MS. PLACEK:    Specifically, Judge, let's start with the X-rays.

THE COURT:    People's Exhibit 2, 3, 4, and 5, 13, 14, and 15.

State, what's the basis for the admissibility of those exhibits?

MR. MURPHY:    Judge, with respect to 2, 3, 4, and 5, those are X-rays taken of the victim while taking on the case at the Medical Examiner's Office, on Case No. 262, August, taken of Denise Johnson.    Your Honor, I think with respect to those particular exhibits, the basis is clear.    The technician testified, identified those X-rays.    I believe they are admissible.

THE COURT:    Miss Placek?

MS. PLACEK:    First of all, is that Denise Johnson?    Has Denise Johnson, in fact, been shown?

127

As for the contention that the X-ray technician identified them --

THE COURT: We're talking about 2, 3, 4, and 5, the coroner's --

MS. PLACEK: I understand that. There's been no identification that that person is the subject matter of the indictment before the Court. When the gentleman testified, Mr. Geto (Phonetic), I believe from the Medical Examiner's Office, there was, in fact, an objection proffered that no proper foundation had, in fact, been laid. Specifically, Judge, the questions on cross was that he took those X-rays where a question of identity was, in fact, present.

For the purpose of the record, Judge, they have not, as promised by the State, been tied up to the matter before the Court.

THE COURT: State?

MR. MURPHY: Judge, I believe counsel is asking two questions. One question is what weight to attach to the exhibits for purposes of identification, and I believe that's a question your Honor will resolve, but the question of admissibility in and of itself has been satisfied.

128

The defense has not addressed that.

THE COURT:  Well, People's Exhibit 2, 3, 4, and 5 will be admitted into evidence over the objection of the defendant.

What's the basis of the admissibility of 13, 14, and 15?

MR. MURPHY:  Judge, as to 13 and 14 -- Judge, as to People's Exhibit No. 13 and 14, those are X-rays with the date of August 19, 1986.  Again, Judge, with respect to those X-rays, the technician who took those X-rays has testified in this court, in this trial, and I think it's clear that the foundation has been established.  Those are the X-rays with the initial C.S. on them.  Carolyn Strong did testify that she took those X-rays on August 19, 1986, and those are the X-rays of the left wrist.

THE COURT:  Miss Placek?

MS. PLACEK:  Judge, if it pleases the Court, not only have they not tied it up to Denise Johnson contained in the indictment that it is, in fact, true, Judge, the X-ray technician testified no independent memory, Judge, of the person who came in on that particular date.  The testimony of the

doctor who testified today disproves, in fact, the foundation that the State said they laid.   I believe that the State's argument would be that they showed some kind of example or by some factual basis that that was the same person by showing of a guardian taking her to a hospital on that date and being treated.   Specifically without rebuttal, Judge, their only expert testified, Judge, that in his opinion, although limited, that he saw nothing wrong with the hand portrayed in the X-ray.

I would point out, Judge, that also as to the lady who took the X-rays, she, herself, testified she couldn't remember, there was no description, man, woman, who this Denise Johnson was and besides no independent memory that, in fact, hospitals do make mistakes.   This self-authenticating tag is not self-authenticating, Judge.

THE COURT:   State.

MR. MURPHY:   Judge, we take issue with the defense's claim that she had no independent memory. I believe it's clear from her testimony that her memory was refreshed by the documents, but in any event, she identified the document of the   -- X-ray

1   as an X-ray she took.   The foundation has been

2   laid.   The questions with respect to identification

3   goes to what weight should be attached to those

4   exhibits by the trier of fact, your Honor.   That

5   does not involve the question of admissibility.

6      THE COURT:   Well, I must say to you the

7   foundation for admissibility is laid, it's sparse,

8   or maybe it is laid, and the weight to be given to

9   it is sparse, whichever case it may be, but my

10  recollection of the testimony of Carolyn Smith, I

11  believe it is --

12     MR. MURPHY:   Strong.

13     THE COURT:   Strong, Carolyn Strong, was that

14  she had no independent knowledge of who this person

15  was.   All she knew was that, what the X-ray showed,

16  that she took an X-ray of somebody that was Denise

17  Johnson.   Rather, that's sufficient to identify

18  this as being the decedent in this case is the

19  issue that Miss Placek is raising, and she says

20  that the failure to make that identification

21  destroys admissibility of these X-rays.

22     I'm going to reserve ruling on that

23  issue to see whether or not I can discern whether

24  the foundation is complete enough for

admissibility, and that should take me a matter of
not long, so it is not necessary.  I think we can
proceed without resolution of that problem today.
We can come back to that problem at a later date,
and I don't think that destroys your ability to
proceed by either side how I ultimately resolve
that issue.

So exhibits 13 and 14 and 15 taken
under advisement.

MR. MURPHY:  Judge, 15 is an X-ray that was
taken on another day, January 10, 1987, which was
not identified by Carolyn Strong.

THE COURT:  That's the X-ray that was not
identified by anybody except Doctor Fitzpatrick
used to express an opinion?

MR. MURPHY:  Yes, Judge.

THE COURT:  That one is taken under advisement,
also.

The remaining exhibits, People's
Exhibit 1 and 6 through 12 and 16 through 61, do
you have any objection to any of those?

MS. PLACEK:  As to the pictures, Judge, which
I believe --

THE COURT:  The photographs.

132

MS. PLACEK:  The photographs --

THE COURT:  That's all of them, one or two of them -- the defendant's exhibit is exhibit No. 49. I think there's  a rights form that's 16.

MS. PLACEK:  I think that's attached the rights form.

MR. CASSIDY:  No, that was from Robert Tovar.

MS. PLACEK:  That we would move to strike because that testimony was not even accepted by this Court, Judge.

THE COURT:  Twelve are the shoes.

MS. PLACEK:  Twelve, we would have an objection. I would point out that as we've always contended and as what was pointed out in opening statements by the Court that the point of their argument was, one, the statement, and, two, the alleged statement that the defendant was, in fact, the last person to see her alive.

The alleged guardian testified, the niece/aunt testified she left the house with green on, and the shoes, Judge, as identified as the victim in the garage have red writing for what it's worth on it. We would suggest, Judge, again, the issue of relevancy becomes before the Court.

133

THE COURT:  State?

MR. CASSIDY:  Judge, I believe that one witness she's referring to is Miss Yolanda Hill, and I believe she didn't testify to green, she testified to pink or red.

MR. LUFRANO:  She said green.

THE COURT:  It doesn't matter.

MR. CASSIDY:  Anyway, she did identify the shoes when shown to her, and she said those were the shoes that the victim was wearing prior to disappearing.  So maybe she did say green, maybe she did say pink, but it goes to the weight of it anyway, not the admissibility of it, and I believe Mr. Lufrano has talked to the Court Reporter, I talked to the Court Reporter, and I will have that typed up, correct, Mr. Lufrano?

MS. PLACEK:  And he said green.

THE COURT:  In any event, discrepancies between -- the conflict between, and the evidence do not destroy the admissibility of the evidence, and Yolanda Hill is not the only one who testified in regards to the shoes.  Officer Nitsche testified with regard to the shoes and described them as having -- when recovered at the scene along side

134

the body.  So People's Exhibit 12 will be admitted over the objection of the defendant.

The diagram, People's Exhibit 16, do you have any objections to that?

MR. PLACEK:  For what it's worth, Judge, no.

THE COURT:  That will be admitted, also.

People's Exhibit 16, your objection will be sustained.  That exhibit will not be admitted.

Do you have any objection to any of the other exhibits, all of which appears to be photographs as nearly I can tell.

MS. PLACEK:  From the time of death, Judge, through the pathology's testimony or date of birth was never shown nor testified through their expert witness, the suggestion, Judge, that those photographs go in becomes a dichotomy or a problem for the defense for the single reason, Judge, that pursuant to case law, we would suggest that the probative value as to possibly the scene as to the shoes as it was discovered might be of some weight and will, in fact, concede same, but we would suggest, Judge, that, in fact, since they cannot go pursuant  to case law as to going to show either

day or time of death that our objection would be based as to matters never shown, as to the relevancy of same.

THE COURT: State.

MR. CASSIDY: We're seeking, Judge, to have them all admitted.

THE COURT: That's as much of a response, you care to make?

MR. CASSIDY: I didn't understand part of it, and I didn't want to tell the Court because obviously the Court didn't --

THE COURT: I take it your answer to my question is yes.

MR. CASSIDY: Correct.

THE COURT: Do you have anything further.

MS. PLACEK: The problem, Judge, as was previously expressed. There are obviously dead photos. They are obviously death photos of someone. There's been no nexus to show that's the person in the indictment. There's been no nexus as to the probative value of when this person died or even as to what date this person died, and as for this reason, Judge, because of the missing foundational questions, which would give light to

136

any probes that the State would, in fact, show through same, and they are, in fact, forbidden from establishing elements previously mentioned, we feel we would need to object as to their introduction.

THE COURT: All right. People's Exhibit No. 1, 7 through 11 and 17 through 61 will be admitted without objection -- will be admitted over the objection of the defendant.

THE COURT: State rest?

MR. CASSIDY: No, your Honor, I need a couple of minutes before we decide to rest.

MR. LUFRANO: Your Honor, I thought they already rested.

THE COURT: No, that's not correct.

MS. PLACEK: Judge, as to 49, excuse me, we're still dealing with that.

THE COURT: As to 49, what is it?

MS. PLACEK: Forty-nine is the statement.

THE COURT: Yes, I know.

MS. PLACEK: If it pleases the Court, your Honor, perhaps as to my own inarticulation, earlier I made an objection as to the testimony dealing with what can be classified as a false exculpatory statement going before this Court as substantive

137

evidence.  I suggested to the Court, and perhaps

ineptly at that time, that the standard as set by

People versus Gutierrez cited at 105 IL App. 3rd,

1059, People versus -- And if the Court pleases, I

will spell this -- P-a-c-u-t-e, cited at 98 IL App.

3rd, 936, and People versus Watson, 103 IL App.

3rd, 9092, and People versus Wilson, 8 IL App. 3rd,

421, that the standards set forth state in order to

introduce a false -- or whatever considered by them

in their case in chief and not in rebuttal -- a

false exculpatory statement that they must, in

fact, during their case in chief prove the

statement false.  We would suggest to the Court

that the attempt to do this was done only as to one

issue of that statement at best.  That would be

through the testimony of Michael Walker that he saw

supposedly the defendant.

We would point out to the Court in the

publishing of the statement that, in fact, the

name, Michael Walker, the name of a false alibi

supposedly or any sort of house of cards allegedly

brought in by the State by attempting to bring

Michael Walker in was never, in fact, mentioned or

shown.  The oral statement, pursuant to the cases

138

cited by the defendant, have not reached the standard of a false exculpatory statement in order for it to go in as part of the State's case in chief.

Relying on this case law, Judge, we would suggest to the Court that we would now renew our Motion to Strike that testimony involving both the oral statement and the written statement for the simple reason that it hasn't been shown to be false.

THE COURT: Mr. Cassidy?

MR. CASSIDY: Judge, it's our position it's inculpatory statement. It's up to the trier of fact to determine how they want to view the statement, and our position, it's inculpatory, and we don't necessarily agree with counsel, although she gives you the cite we do not believe her proposition that she offers as a matter of law. That's all we have, Judge.

THE COURT: Miss Placek?

MS. PLACEK: Judge, in response, questions were never proffered by the State of the witnesses dealing with the oral statement and its prodigy --

THE COURT: Let me ask you this to see if we

can get to the nuts and bolts of this.  What's the false exculpatory statement that you alluded to?

MS. PLACEK:    I am alluding to the written statement and supposedly the oral statement.    I believe State is presenting that as a false exculpatory to be taken as substantive evidence.

THE COURT:    No, I don't think so.  They are presenting the written statement as an inculpatory statement, an admission by the defendant, tantamount to a confession.  If I have to pin them down, they will tell me it's a confession.  Whether that's correct in the sense it annunciates all the essential elements of the crime, which is a confession is we need not decide, but it's certainly their position that if it is not a confession, it's an admission of criminality of the defendant and not an exculpatory statement.

MS. PLACEK: Then I would ask, Judge, that the Court, in fact, hold it, hold that statement  and that evidence dealing with same only against the defendant with that count of the indictment to which it speaks, which is the criminal sexual assault and stating, Judge, unless they are willing to concede that they see it as true and correct.

140

THE COURT: Well, they don't have to concede anything. I will give to the statement that which it is entitled to and no more and no less, but the question of its admissibility based upon it being an exculpatory statement is inaccurate. You may be accurate on what the law is if, in fact, it is an exculpatory statement, but it is not an exculpatory statement, and, therefore, we do not have to deal with whether or not they have proven it or not.

MS. PLACEK: We would suggest, of course, that it is because it meets, and there has been no argument to the contrary of the State, that it does not have the required elements of those charges other than one count of the indictment, which is before the Court.

THE COURT: Well, the State may very well argue that that statement is sufficient -- a confession as to that one count and which I can infer guilt as to all the other counts. I don't know how they are going to ask me to use it nor is it relevant for me to decide that issue at this point. The fact of the matter is that the statement is not exculpatory.

MS. PLACEK: We would, of course, take

141

exception with the Court, Judge.

THE COURT:  Anything further?

Are you now ready to rest,
Mr. Cassidy?

MR. CASSIDY:  We forgot the slides.  Today we
marked the slides as Exhibit --

THE COURT:  4-A and 14.

MR. CASSIDY;  And 15-A and 2-A, Judge.

THE COURT:  You were to give me the projector,
also.

MR. CASSIDY:  Judge, we will get you a
shadowbox, we will get you a projector or whatever
you like, or a flashlight.

THE COURT:  They will be received into
evidence.

MS. PLACEK:  Judge, I ask the Court has ruled
and reserved ruling as to the subject matter.

THE COURT:  All right.  We will take those
along with the others for consideration.  I will
rule on all of those X-rays, that is 13, 14, and
15.

MR. LUFRANO:  14-A --

THE COURT:  4-A is admitted, 14-A and 15-A will
be taken along with the others.

MR. LUFRANO:  Thank you.

MR. LUFRANO:  4-A is admitted over objection?

THE COURT:  4-A is admitted over objection.

MR. CASSIDY:  Have we covered all the exhibits then, your Honor?

THE COURT:  Yes, I think so.

MR. CASSIDY:  You're going to take under advisement People's Exhibit No. 13, 14, and 15?

THE COURT:  13, 14-A, 15, and 15-A.

MR. CASSIDY:  And then People's No. 16 has been refused by the Court?

THE COURT:  That's right.

MR. CASSIDY:  And all other exhibits which has been identified by the various witnesses are being admitted over objection or not?

THE COURT:  That's right.

MR. CASSIDY:  Judge, with that, then, people would rest.

THE COURT:  State rests?

MR. CASSIDY:  Yes, your Honor.

THE COURT:  Defense?

MS. PLACEK;  We wold have a Motion for Directed Judgement; the memorandum is being typed.  As a matter of fact, the young lady came to get the

143

final point.

Your Honor, we suggest that at best our evidence will take no more than a half hour, that we would just ask permission of the Court and especially in light of what we feel the incorrect ruling of the Court dealing with the matter of the other crimes evidence, Judge, permission to include that. We would ask, Judge, two things can be done: We will reserve our right to argue our Motion for Directed at the close of the defendant's case, or in the alternative, we would ask that we be allowed to argue it tomorrow.

THE COURT: Reservation of the right to move for directed finding at the close of the State's case probably acts as a waiver.

MS. PLACEK: Well, I understand that, Judge, and what I prefer to do at this particular time as I understand the Court's ruling because I believe that the State has a serious corpus delicti problem even at the time for the motion of the directed. Quite frankly, I would like some time to go into the matter. I can be here tomorrow at anytime the Court wishes.

THE COURT: Mr. Murphy and Mr. Cassidy, I'm

144

going to grant that request.  The question becomes
whether or not we can deal with this tomorrow,
Friday, or one day next week.  I am not very
optimistic that the time estimate of counsel in
terms of length of time for her case is accurate,
but nonetheless, I am going to allow them an
opportunity to communicate with them in writing if
they choose to.  I will even allow after that
communication an opportunity for you if you choose
to respond in writing, also.  Consequently, maybe
we might be just as well off to set this for
tomorrow, receive counsel's written communication
to the Court, and then you can make a realistic
evaluation as to whether we should proceed or
whether or not you want time to respond.

MR. MURPHY;  That's fine, Judge.

THE COURT:  The defendant's Motion for Directed
Finding is entered and continued.  Order of Court,
February 21.

MR. MURPHY:  Judge, is there any particular
time you want to set this?

THE COURT:  I will hear this first thing
tomorrow as soon as the defendant arrives.  Will
your memorandum be prepared tonight, or do you need

time tomorrow?

MS. PLACEK:  I can be here at anytime the Court suggest, but I would ask that perhaps we set the time at approximately 10:00 or 9:30.

THE COURT:  10:00 o'clock is good.

MS. PLACEK:  Thank you, Judge.  I would, of course, not be waiving right to argue same.

THE COURT:  No, you're not going to waive your right to argue.  I will give you an opportunity to argue for as long as you choose.

MS. PLACEK:  Judge, as for the first witness of other crimes for the purposes of the record, we would ask as part of the record the police report involving that case be made part of the court file.

THE COURT:  Well, we will deal with that, we will reach that stage when we get into your case. Bring that matter to the Court's attention.

(Which were all the proceedings had in the above-entitled cause.)

(Rev. 2/18/93) CCCR-56

**STATE OF ILLINOIS** } ss
**COUNTY OF COOK**

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . VOLUME TWO . . . OF A FIVE VOLUME . . . . SUPPLEMENTAL RECORD CONSISTING OF THE ( REPORT OF PROCEEDINGS) ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT . . . . . . . . . . . UNDER APPELATE COURT NO. 95-0474 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and
JEROME HENDRICKS                        WAS . . . . . . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  **AURELIA PUCINSKI,**

Clerk of the court, and the Seal thereof, at Chicago

In said County, JUNE 26, . . . . . . . . . . . . ., 19 96 . .

*Aurelia Pucinski*
Clerk

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

CCCR-310

# 95-474

## Transcript of Record
## Appeal
## to

APPELLATE          **Court of Illinois**

FIRST              **District**

SUPPLEMENTAL RECORD

**Circuit Court No.** __88 CR 12517__

**Trial Judge** __LEO HOLT__

**Reviewing Court No.** __95-0474__

FILED

JUL 15 1996

GILBERT S. MARCHMAN CLERK

### THE PEOPLE OF THE STATE OF ILLINOIS

### vs.

JEROME HENDRICKS

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION



ORDER ENTERED

JAN 1 / 2007

APPELLATE COURT, FIRST DISTRICT

**AURELIA PUCINSKI**

**Clerk of Court**

VOLUME THREE OF FIVE VOLUMES
SUPPLEMENTAL RECORD

**Per** AP/nd _____

**Deputy**

1    IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

2              COOK COUNTY, ILLINOIS

3

4    THE PEOPLE OF THE      )
     STATE OF ILLINOIS,     )    Criminal
5                           )
            Plaintiff,      )    No. 88CR12517
6                           )
         vs.                )    Charge: Murder
7                           )
     JEROME HENDRICKS,      )
8                           )
            Defendant.      )

9

10                    JURY TRIAL

11              Court commenced pursuant to

12   continuance, February 21, 1991, before the

13   Honorable LEO E.  HOLT and a jury, at 11:30

14   o'clock a.m.

15     PRESENT:
              MR. SCOTT CASSIDY,
16            MR. JOHN MURPHY,
               assistant State's Attorneys,
17                  for the People;

18            MS. MARIJANE PLACEK,
              MR. VINCENT LUFRANO,
19             assistant Public Defenders,
                  for the Defendant.

20            - - - - - - - - - - - - - - - - - - -

21

22

23   Rella R. Jordan,
     Official Court Reporter
24   Markham, Illinois, 60426

1          THE CLERK:  Jerome Hendricks.

2          THE COURT:  Both sides now ready on

3     Mr. Hendricks?

4          MS. PLACEK:  Your Honor, at this time if

5     the Court would hear argument on a Motion for

6     Direct Finding?

7          THE COURT:  Are you going to file a

8     memorandum?

9          Have you tendered a copy to the State?

10         MS. PLACEK:  I will at this time.

11         THE COURT:  State, are you ready for oral

12    argument or would you rather postpone this case

13    and file a responsive memorandum and argue all

14    after the responsive memos have been filed, or in

15    the alternative, I will hear Counsel's oral

16    motion.  I will continue the matter and allow you

17    to file a written response and follow it with oral

18    argument, or whatever other suggestion you and

19    Counsel have to make to the Court.

20         MR. MURPHY:  Judge, I would like an

21    opportunity to review the memorandum before we

22    proceed to oral argument.  We may file a written

23    response.

24         THE COURT:  Does that mean a momentary

1    continuance, Mr. Murphy?.

2              MR. MURPHY: No, Judge, I don't think we

3    will be prepared to respond to the motion today.

4              THE COURT: I think, then, Ms. Placek,

5    Mr. LuFrano and Mr. Murphy, what I will do is to

6    continue this matter for a period of time and let

7    you file a responsive memorandum, if you so

8    desire, at which time after both memorandums have

9    been filed, we'll hear oral arguments.

10             Would you desire an opportunity to reply?

11             MS. PLACEK: Yes, Judge, I would.

12             I would ask for a briefing schedule to be

13   established and I would, in fact, ask that the

14   Court set it and ask as the Court may or may not

15   know, Mr. LuFrano and myself and I'll tender the

16   Court a copy of this memorandum that was to be

17   some support of our motion.

18             I would most definitely like a chance to

19   write a reply brief in this matter. My

20   suggestion, as I stated is to set up briefing

21   schedule. I would ask that this be both done,

22   that the State either turn over to me or Mr.

23   LuFrano their memorandum at least two days before

24   the oral argument. And, judge, quite frankly, I

1    think I would need about a day to respond.

2            THE COURT:  Well, I'll gave you more time

3    than that.

4            Mr. Murphy, how much time do you

5    anticipate will be necessary consistent with your

6    other responsibilities for you to file your memo?.

7            MR. MURPHY:  Judge, it's difficult for me

8    to determine, I don't know what to respond to.  I

9    am aware of a case involving a jury trial next

10   week which will take a lot of my time.  In the

11   normal circumstances, if I had the time I think I

12   could probably respond in about a week or ten

13   days.

14            THE COURT:  What about 15 days?

15            MR. MURPHY:  Judge, that sounds adequate.

16   If I have a problem, could I let the Counsel and

17   the Court know before then, but I think we can

18   respond in that period of time.

19            THE COURT:  How about five days to

20   respond after that?

21            MS. PLACEK:  That would be agreeable,

22   Judge, as long as we get it on the 15th day or

23   before, if it's done before.

24            THE COURT:  How about March 25th for

1    arguments?

2           MR. MURPHY: That's fine, Judge.

3           That would also be completion of the

4    trial if the motion is denied.

5           THE COURT: The defense tells me they

6    only need 30 minutes. I suspect that that's

7    optimistic but assuming that that's reasonably

8    within the ballpark, yes, if the motions are

9    denied, we should be prepared to proceed to trial.

10    If you need subpoenas that are out, I will

11    continue the subpoenas until that day.

12           MR. LuFRANO: They are, your Honor.

13           The officers involved have been in touch

14    with the State as to which date they are to

15    appear. I presume.

16           MS. PLACER: I have no real problem with

17    putting the State in the care and custody of our

18    witnesses as long as they have them show up on the

19    date that they are needed.

20           MR. MURPHY: I have no objection to that.

21    It must be Scott Cassidy you are talking about.

22           THE COURT: In any event, to file his

23    memorandum in support of the motion for direct

24    finding.

1          MS. PLACEK:  When is the Court setting a

2     deadline for defense answer?

3          THE COURT:  15 days from today's date.

4          No, for the State.

5          MS. PLACEK:  15 true days, correct?

6          THE COURT:  I don't know what kind of

7     days.

8          MS. PLACEK:  Working days.

9          THE COURT:  15 calendar days.

10          Order of court.

11          MS. PLACEK:  And then five after that, is

12     that correct?

13          THE COURT:  That is correct.

14          March 25th for further proceedings.

15          Ms. Placek, do you have another

16     document--

17          MS. PLACEK:  Another copy?  Yes, Judge, I

18     do.

19          THE COURT:  -- for the Court file.

20          MS. PLACEK:  One of the reasons for this

21     being retyped, correct, I apologize for the

22     spelling, I will go through it again and try to

23     correct any spellings.

24                    (Whereupon the hearing of

1        this cause was continued

2        to March 25, 1991.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PEOPLE OF THE STATE  ]          Criminal Division
OF ILLINOIS,         ]
                     ]          No. 88 CR 12517
          Plaintiff, ]
                     ]          Before Judge Leo E. Holt,
     -vs-            ]          Monday, March 25, 1991,
                     ]          9:30 a.m.
JEROME HENDRICKS,    ]
                     ]
          Defendant. ]


PRESENT:

     MR. JOHN MURPHY, Assistant State's Attorney.

     MS. MARIJANE PLACEK, and
     MR. VINCENT LUFRANO, Assistant Public Defenders.


Mary A. Gleeson, CSR
James Donahue, CSR
Official Court Reporters

1241

2

1   THE CLERK:  Sheet 1, line 19:  Jerome Hendricks, in
2   custody.

3   MS. PLACEK:  Judge, for purposes of the record,
4   Marijane Placek with Vincent Lufrano, representing Mr.
5   Hendricks, before the Court.  It is my understanding
6   that we are here for directed finding and argument,
7   although I have been hearing rumors the state will
8   reopen.

9   THE COURT:  Did you file a response?

10  MS. PLACEK:  Yes, Judge.  I have my copy.  I have
11  it stamped.  Your Honor, for the purpose of the record,
12  I filed one on March 4, and had it stamped at 26th
13  Street -- March 14, excuse me.

14  THE COURT:  If you filed it at 26th Street, it is no
15  wonder that it didn't make it here.

16  MS. PLACEK:  Well, no one is as efficient as
17  Markham.

18  THE COURT:  It is not a part of the court file.  Did
19  you serve a copy on the state?

20  MS. PLACEK:  As a matter of fact, Mr. Lufrano saw me
21  here last week.  I went up to their office.

22  MR. MURPHY:  I haven't received it, Judge.

23  MS. PLACEK:  I have one final copy, if the state
24  wishes.  I also made copies of the cases cited therein,

3

1   which I don't -- I'll give one to the state at this

2   time, Judge.  I know my work.

3       THE COURT:  Are we then ready for hearing on the

4   arguments and ruling on the defendant's motion for

5   acquittal at the close of the state's case?

6       MS. PLACEK:  Defense stands ready, Judge.

7       MR. MURPHY:  Judge, I am asking this Court allow the

8   state an opportunity to reopen our case in chief.

9       MS. PLACEK:  I would have a severe objection after

10  they filed a brief on the matter, Judge.  Quite frankly,

11  Judge, I would ask the Court --if the Court is even

12  considering it -- or just for the purposes of the record

13  to ask the state on what matter and for what reason they

14  wish to reopen.

15      THE COURT:  Mr. Murphy.

16      MR. MURPHY:  Judge, although it is our contention

17  that we have established the identification of the

18  victim in this case beyond a reasonable doubt, the Court

19  has taken under advisement our offer of the x-rays which

20  were taken of the deceased in Roseland Community

21  Hospital.

22          Your Honor, it is our position that although we

23  have established the identifications specifically with

24  respect to these x-rays, that if the Court does have

**1243**

4

1    some reservations based on the ruling at this point,

2    that we would be prepared to call additional witnesses

3    from Roseland Community Hospital who would establish, in

4    fact, that on the date of January 10, 1987 that, in

5    fact, the x-ray that the Court has, which is in

6    evidence, is, in fact, the x-ray of Denise Johnson, the

7    same date of birth as the Denise Johnson who is the

8    deceased in this case.

9        MS. PLACEK:  With all due respect, Judge, just

10    basically on the state's argument, that is almost like

11    giving the state two bites of the apple -- no, I take

12    that back, Judge.  It is more than that.  It is letting

13    the judge become part of the prosecution.  In other

14    words, Judge, you tell me what I need to convict this

15    man, and then you allow me to do it.  If I'm

16    insufficient, then you come back and tell me again.

17    Then I will reopen and allow myself to work in concert

18    with the Court.

19        Judge, furthermore, we would suggest, Judge,

20    that our original objection to the personnel at Roseland

21    Community Hospital was based on a hearsay objection.  I

22    would suggest, Judge, that if the Court is considering

23    allowing the state to reopen, that, in fact, the state

24    be more specific that the evidence, in fact, that would

5

1    be allowed before this Court would, in fact, pass the

2    test of evidence.  In other words, they would be able to

3    call these people rather than waste the Court's time.

4         THE COURT:  Do you have anything else you would like

5    to state?

6         MR. MURPHY:  Judge, I would just indicate this:  I

7    am well aware during the course of this trial -- when

8    the Court referred the state to a section in Chapter 38

9    that prohibits using hospital records under the business

10   record exception as a business record.  However, there

11   are other ways that evidence can be offered outside of

12   that area.

13         Your Honor, it is our position that there has

14   been no evidence offered by the defense at this point.

15   The defendant is not prejudiced in any way by allowing

16   the state to offer additional evidence if we choose to.

17       MS. PLACEK:  Judge, I would point out --

18       THE COURT:  No.  Finally.  Otherwise we will be here

19   arguing back and forth.

20       MS. PLACEK:  Do I get one more bite of the apple,

21   Judge?

22       THE COURT:  No.

23       MS. PLACEK:  Oh, okay.

24       THE COURT:  Motion to reopen is addressed to the

6

1    sound discretion of the Court.  In 99.9 percent of the

2    instances, I allow the parties to reopen.  The

3    difficulty in this case is that the defendant has at

4    least on his motion for acquittal fully exposed their

5    position.  I am unable to tell whether or not the

6    request to reopen is predicated upon matters which the

7    defendant has brought to the attention of the

8    prosecution and the Court in his motion for acquittal.

9         While I agree that the trial of a lawsuit,

10   including a criminal case, is not a proceeding that

11   ought to be conducted on the basis of who is the more

12   gifted, who is the more -- can make the more sufficient

13   use of the rules of evidence and things of that nature,

14   but ought to be an in-depth exploration or exploration

15   for the truth.

16        Nonetheless where the defendant has fully

17   expressed his position, including issues that relate

18   directly to the proposed evidence that will be

19   introduced if allowed to reopen, it seems to me that

20   that is -- acts as everything else, a waiver.  It has

21   gone beyond a point of neutrality.  It is incorrect to

22   suggest that the defendant is not prejudiced.  It is

23   true that the defendant has not adduced evidence, but he

24   has made a material exposure of his strategy and his

7

1    defense.  The motion to reopen is denied.  I am going to

2    continue this matter until 1:45, at which time we will

3    hear arguments on the defendant's motion for acquittal.

4         MS. PLACEK:  Your Honor, with all due respect,

5    although the state said they did not get my copy, I have

6    enclosed the cases.

7         THE COURT:  I have them.

8                   (Noon recess taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

STATE OF ILLINOIS )
                  ) SS
COUNTY OF C O O K )

           IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE         )
STATE OF ILLINOIS,        )
                          )
            Plaintiff,    )
                          )   Case No.        88 CR 12517
        -vs-              )
                          )   Charge:      Murder, Etc.
JEROME HENDRICKS,         )
                          )
            Defendant.    )


           REPORT OF PROCEEDINGS had in the above-

entitled cause on the 25th day of March, A.D.,

1991, at 1:00 o'clock p.m. before the HON. LEO HOLT.

      APPEARANCES:

        HON. JACK O'MALLEY,
            State's Attorney of Cook County, By:
            MR. JOHN MURPHY, and
            MR. SCOTT CASSIDY,
               Assistant State's Attorneys,
               Appeared for the Plaintiff;

        MR. RANDOLPH N. STONE,
            Public Defender of Cook County, By:
            MS. MARIJANE PLACEK, and
            MR. VINCENT LUFRANO,
               Assistant Public Defenders,
               Appeared for the Defendants.

1

1      THE CLERK:  People versus Jerome Hendricks.

2      THE COURT:  Are both sides ready for argument

3  on the Defendant Hendricks' Motion for Acquittal

4  at the close of the State's case?

5      MS. PLACEK:  Yes.

6      MR. MURPHY:  Yes, Your Honor.

7      THE COURT:  Counsel, you may proceed.

8      MS. PLACEK:  To supplement what I have already

9  written, quite frequently during this trial I have

10  often made mention to this Court that in fact,

11  I've often felt, since I don't feel like this gentle-

12  man here before you, constantly like a stranger in a

13  strange land.  Although not meaning to question

14  this Court's courtesy to visiting counsel, perhaps

15  the best way I can move into my argument would be by

16  analogy.  In Switzerland, in front of the Rolex

17  factory, there's a great statue, a statue of a great

18  lion.  The lion is neither proud, but the lion has

19  died.  When I say the lion is dying, it's obviously

20  from the craftsmen of the statue that this lion

21  is dying because it's not only in a reclining

22  position, but the Court can see, if the Court would

23  go there, many wounds in the lion's body.  The

24  lion clutches one thing in his hands -- excuse me,

2

its paw, if you will, and that is the shield of the Swiss Guard.  When you see this lion you start wondering why it clutches the shield.  The Swiss Guard seems to be only those people who go to visit the Vatican, taking pictures of those cute men in uniform that represents some other time.  But this lion goes back to the French Revolution.  Evidently the Swiss were at one time mercenaries.  Evidently the Swiss Guards were the mercenary force during, in fact, the French Revolution, and while those loyal Frenchmen who swore upon their life to defend and stand by their king, ran in the face of the monarch during the revolution.  The Swiss Guard stayed.  They stayed and they guarded the king until every one of them was dead and the monarch eventually took the king.

I know quite openly I'm laying myself into ridicule by going into this story and the problem the State will say would -- what does this have to do with the murder and rape we are trying in this court.  It's simply this, Judge:  No more than those gentlemen in the 1700s believed in the French Monarchy or even believed that Louis was a good king.  Did they give up their lives for that?

3

They gave up their lives for an oath they took, an oath to in fact be faithful to their job and to the service of this job. An oath similar to what I have taken and to what you have taken, and that oath goes faithful to the law. And to be faithful to the law even when this Court may find the crime, it is in fact judging to be distasteful as in this case.

It is the Defendant Hendricks' suggestion at this current time that in fact the evidence presented by the State is so lacking and so shallow that it can't reach the burden it must reach and therefore, this Court has no other, no other consequence than in fact to acquit the Defendant.

In briefs and motions before the Court, many things have come out, but the evidence had been slowly stilled and the evidence which the Court has before it revolves around two matters. One, the circumstances of the finding of a body. And I say a body because the State, through their evidence and through questions not asked, through questions not revealed to this Court, has failed, either through preparation or their lack of ability to prepare, to present this Court with reasons why that body was present in that garage. When that

4

1    body first became present in this garage, and

2    secondly, how that body became present in that

3    garage.

4         The other piece of evidence that the

5    State has relied heavily on, and which the Court

6    has characterized through my motion, is of a

7    statement or confession by Mr. Hendricks.  Now,

8    the reason I give it the legal term confession

9    or statement is because if the Court remembers,

10   over the objection of the State, I objected at

11   the time of that statement originally being intro-

12   duced.  The statement is simply this:  that on

13   August 1st, during the early evening hours, I had

14   sex with the girl.  It was consentual sex.  I then

15   left the garage.  I never saw the girl leave the

16   abandoned garage.

17        The second part of the statement said,

18   "Several days later," again, there is an unclarity

19   or unsurety about, about the dates.  I went back

20   on an investigatory mission for my mother.  She

21   said that there's a bad smell.  I was taking out

22   the garbage.  I saw the same girl in the garage

23   then dead.

24        The reason I say that that in fact takes                5

the form of a statement or confession is because the Court denied my motion during this trial to strike that statement as an inconsistent statement or false alibi. Because the State failed to present witnesses, that in fact would prove that statement false. The Court stated to me, I believe to paraphrase, "No, Ms. Placek, the State isn't presenting this as a lie or a false alibi," which of course I could not admit at this time, and their one witness, the witness they brought in from Stateville who said he didn't see the Defendant, and the word again is see, wouldn't be enough to allow inadmissible. They are taking it as a confession. Therefore, I must take it as a confession, and according to the Court's ruling, I must deal so weakly as must the Court and as the State is faced to under Illinois law take it as a statement.

The interesting thing about this statement is this. It neither admits violence either in the sexual encounter or in any kind of result of the sexual encounter. In other words, to put it in plain, basic, blunt English, it never admits to murder. Now, what do we have here? Well, we have the State with circumstances. We have the State

6

1   with a confession that confesses to nothing.   The

2   legal significance is just as I previously stated;

3   nothing.   Because as the Court knows, according to

4   Illinois law, the State at this point of a trial

5   must in fact prove the corpus delicti of a crime.

6   I have run over what has been cited in both original

7   briefs over and over and this includes the criminal

8   agency that in fact the death was caused or that

9   the crime was caused by a criminal agency and the

10  Defendant was in fact the one who did it.   The

11  Court knows the law.   But when the State refused

12  to admit either in their presentation of the case

13  or in their reply brief to my original brief, is

14  that the statement itself can never border, hold

15  up in fact substantiate any sort of circumstantial

16  evidence needed to finish up this corpus delicti.

17          To go over briefly the evidence of the

18  case, they must prove the identity of the victim.

19  How have they done it in this case?   Well, quite

20  frankly, they haven't.   As a matter of fact the

21  evidence that they've proven contradicts, contradicts

22  the evidence of their expert Fitzpatrick.   And the

23  reason for this is quite simple.   Number one, there

24  is but one set of x-rays to be considered by the

7

1254

1   expert.  The one set of x-rays deals with the arm.  The

2   one set of x-rays that deals with the arm showed neither

3   fracture, a question asked by myself on cross examin-

4   ation, is there a fracture or any evidence of a past

5   fracture present within the x-ray?  The doctor said

6   no.  Yet in their case, to their leading, to in fact

7   their testimony, the grandfather of the girl testified

8   as to a fracture.  Judge, go one step further.

9   What has the State also failed to show?  The State

10  has failed to show as to the identity issue this,

11  and this simply:  That in fact the person named

12  within the Indictment was in fact somehow the

13  person who was the same person who was taken to

14  Roseland Community Hospital and who in fact

15  subject, and again I would point out subject,

16  because we are neither conceding nor has this Court,

17  with all due respect, and again I haven't had the

18  benefit of the transcript, admitted those x-rays into

19  evidence.  Is this in fact the same person who in

20  fact the doctor compared the x-rays of?

21          Now, much of their brief deals with the

22  Drake case.  In dealing with the Drake case, Judge,

23  the State didn't quote the one matter, and we

24  presented the Court with the Drake case and that was          9

1   so contra.  When in fact, looking at the corpus

2   delicti, when the evidence is pretty circumstantial

3   as in this case, as it is in the identification,

4   quite frankly the Court must look with an eye to

5   every reasonable hypothesis of innocence.

6       Judge, therefore, even under what seems

7   to be a contradictory standard, looking at it quite

8   frankly with an eye in the best of light and uncontra-

9   dicted to the State, that is the doctor's testimony,

10  all he identified is the fact that one x-ray, again,

11  not admitted into evidence and not proven to be the

12  named party in the Indictment, seems like the same

13  x-ray of the person involved.  Well, says the State,

14  we don't need that.  At the time of the writing of

15  the brief, and I apologize, I didn't have the benefit

16  of transcript, it was delivered to this office rather

17  than my office at 26th Street, but be that as it may,

18  we have proven by the clothing identification.  What

19  else could it be but that?

20      Well, Your Honor, let's go to the clothing

21  identification.  There is in fact, there is in

22  fact no other clothing identification except that of

23  the shoes.  With all due respect to the Court Reporter,

24  I would again take issue with the fact that she has

9

1    the writing being in fact, and I am speaking the

2    writing of the knees on both shoes.  I would suggest

3    to the Court that as I mentioned in my brief, they

4    were of different color.

5              Moving on from that, because the State,

6    with the pathologist present, has a vast space of

7    time that is from the first to the eighth, when

8    the body is discovered, Judge, in the garage, and

9    since again the State never bothered to ask the

10    pathologist to a reasonable degree of medical

11    certainty what was in her expert opinion the time

12    and date of death.  The suggestion, the suggestion

13    that in fact the identification can in fact over

14    this huge space of time be made simply by this one

15    piece of evidence.  In light of the Drake case and

16    in light of the cases cited by the Defense, it's

17    absurd and beyond the law of Illinois.

18              We would further find fault with the State's

19    brief.  I'm a little confused by the State's case,

20    that in the series of cases it's always been said

21    that the corpus delicti can only be proven by

22    independent evidence and that of independent evidence

23    other than confession.  Therefore, the statement

24    in their matter says, "Well, the Defendant even                10

admitted it was the same girl." It's an absurdity. Because, Judge, that was made again in this alleged statement made by the Defendant. We have relied heavily on the Kokoraleis case cited and delivered to the Court. The interesting thing about Kokoraleis and Lee is that the Court overturned the death penalty case based on the fact that although the Defendant had testified and had stated -- when I say testified, by way of statement, word-for-word, line-for-line, to the admission, to the admission of a crime, the Court still said it isn't enough.

I would suggest that if in fact they are relying on this Defendant's statement to be enough, again, we have no admission. We not only have no admission, Judge, but we have something further. We have a reasonable circumstance again presented by Perfecto, again presented by Drake. The cases cited by the State themselves whereby circumstances could happen. We have, during both cross examination and direct examination, the Court hearing a description of the circumstances and the place where the young lady was found. The Court has found that, or the Court has learned that it's a place of common area. When I say common area, it's an abandoned

11

garage.  Not only an abandoned garage, but an open garage.  The Officer testified he had no problem getting in the door; the door was wide open.  Not only was the door wide open, Judge, the State has shown us no evidence to the contrary in their case.

We would further point out, Judge, that in this wide-open place, the area of exclusivity is out of the reach of the argument of the State for the simple reason that through their charts and through their diagrams, they kept saying, well, it's right next door to the Defendant.  Well, Judge, even  according to their diagram and even according to their charts, it's just a tiny bit further than that of the house of the victim.

We would further point out, Judge, that not only that, but also, also from the testimony of their expert, and I'm speaking of the pathologist, and not rebutted in any way by any counter questions, we have a situation where in this open garage there is a dead body.  With all due respect, Judge, the legal significance of that is non-existent.  Because what you have is, you have a dead body in a perfectly open area without any substantiation presented within

12

1   the statement of the Defendant.  Well, says the

2   State, he talked about shoelaces.  He talked about

3   doing this, and he talked about doing this.  Nothing

4   except consentual sex.  And a reasonable hypothesis,

5   even under cases questioned by them, and even in

6   cases cited by them, was presented by their own

7   expert and not contradicted, nor were any questions

8   asked as to that.  I asked about certain adolescent's

9   sexual preferences.  I asked about the process and

10   I believe was their relying on, well, he said it

11   was this way and it was this way, which is incorrect.

12   When I speak of their reply, brief words, he said

13   she wanted me to put this around her neck.  Well,

14   look carefully.  Compare the testimony as it states

15   in the statement and the way the body was found,

16   and the Court will not only see the differences,

17   but also, Judge, the Court will see in fact the

18   testimony of the pathologist opened up sexual

19   practices, although not in fact widely adhered to

20   by young adolescent women.  In fact, Judge, there

21   is such a sexual practice about young adolescent

22   women to heighten sexual pleasures to put something

23   around their neck to heighten it.  The reasonable

24   hypotheses were presented not only in Drake or

13

1   Perfecto, but the cases suggested, and in fact quoted

2   heavily by the State's Attorney, is thereby met and

3   thereby established.

4         When I started my argument, Judge, I said

5   nothing is so disdainful as death and as rape.

6   Excuse me.  There is one more thing distasteful,

7   and that is the failing of the meeting of an oath.

8   The State has failed to meet its burden.  The Court

9   has taken an oath to uphold the law because the

10  Court has taken this oath.  The Court must hold

11  the State to the standard as established by Illinois

12  law.

13        The standard is simply this:  The corpus

14  delicti must in fact be proven.  According to People

15  versus Lee, at this stage it must be proven on each

16  element charged within the Indictment beyond a

17  reasonable doubt.  When in fact the circumstances,

18  when in fact the State chooses or views or uses

19  only circumstantial evidence to collaborate the

20  corpus delicti of a crime, the Court, before

21  allowing the State to go further, before allowing

22  the trial to go further, must in its mind examine

23  every reasonable hypothesis of innocence as meeting

24  the circumstantial evidence as quoted by the State          14

1      on cases.

2             For this reason, Judge, we would ask the

3      Court to sustain our motion for directed finding

4      and acquittal. We would of course reserve the right,

5      as the movant in this case, for a reply.

6             THE COURT: Thank you, Ms. Placek.

7             State?

8             MR. MURPHY: Judge, the issue that is raised by

9      the Defense in their brief which they filed --

10            THE COURT: Mr. Murphy, I don't mean to inter-

11     rupt you, but there is out there yet something that

12     should have been resolved, perhaps even before

13     Ms. Placek started her argument. The reason that it

14     wasn't simply was an oversight on my part. That is

15     the admissibility of People's 2, 3, 4, 5, 13, 14 and

16     16. The admission of 13, 14 and 15, I believe

17     that is an issue.

18            MR. MURPHY: That is my recollection, Judge.

19     I believe you took those under advisement, right?

20            THE COURT: I have concluded that pursuant to

21     the provisions of Section 115 -- 115-5, 115-5(B)

22     or (C) provides that and the entirety of the Statute

23     deals with the admissibility of business records

24     as evidence. 115-5(C)(1) provides that such writing          15

or record has been made by anyone in the course of

any form of hospital or medical business, and that

means that it's not admissible when it's in that

form.  That is medical records.

MR. MURPHY:  As a business record.

THE COURT:  As a business record are not admis-

sible.  Consequently, that does not, as you tend

to suggest by that remark, preclude the admissibility

of the records.  The record may be proven as any

other record may be proven.  The evidence in this

case as to 13, 14 and 15 is that the grandfather of

the decedent in this case, on two separate occasions,

once in '86 and once in '87, took her to Roseland

Community Hospital on the dates that hospital, that

x-ray records were made of a person by the name of

Denise Johnson.  The hospital records, the x-ray

records that are sought to be admitted has the name

of Pat, name of the hospital and date, and initials

of the technician too, who took the x-rays.  Nothing

further.  Nothing to connect the person that posed

for those x-rays, if you please, to the decedent

in this case, except that the decedent was in the

hospital on the same date.  The Court concludes that

that is an insufficient foundation to allow the

16

1    x-rays into evidence.  Accordingly, Exhibits 13, 14

2    and 15 will not be admitted into evidence.

3            Mr. Murphy, you may proceed.

4        MR. MURPHY:  Judge, may I address the Court's

5    ruling?

6        THE COURT:  Mr. Murphy, I thought about the

7    ruling since this case was last before me.  You are,

8    of course, entitled, and I will hear you and I will

9    hear you with as much of an open mind as I can, but

10   I want you to understand that I thought about it

11   for some time.

12       MR. MURPHY:  Judge, if I may address, just that

13   ruling.

14           Your Honor has before you the Exhibits

15   which consist of x-rays, x-rays taken on August 19th,

16   1986, and x-rays taken on January 10th, 1987.  Your

17   Honor, the x-rays, as you have already indicated,

18   both indicate the name of Denise Johnson on them

19   who coincidentally is the victim in this case. Both

20   sets of x-rays are from Roseland Hospital.  The

21   x-rays of August 19, 1986, are of the left wrists.

22   The x-rays from January 10th, 1987 are of the

23   pelvis area.

24           Your Honor has heard testimony from                    17

the evidence, from the x-ray technician at Roseland
Hospital regarding the taking of x-rays on August
19th, 1986.  Your Honor has not heard any testimony
from an evidence technician involving the taking
of an x-ray taken on January 10th, 1987.  If I under-
stand the Court's ruling, the Court is saying that
there is not a sufficient connection between the
x-rays, and on those dates and the victim in this
case, Denise Johnson.  However, Your Honor, what
I would ask the Court to consider is this.  We
have x-rays taken of Denise Johnson on each of
those two days.  We have evidence that Denise Johnson
went to the same hospital on each of those two days,
that on the first date, August 19th, 1986, she
injured her left wrist and she was in fact treated
and received a bandage on her left wrist. Coincidentally
there is an x-ray of the left wrist.  We also have
testimony, Your Honor, that coincidentally on the
date of January 10th, 1987, the same date an x-ray
was taken of Denise Johnson's pelvis, that Denise
Johnson injured her hip.  Not only was she taken
into that hospital, that her grandfather carried her
in and sat her down on a table within the radiology
room.

18

MS. PLACEK:  Objection.

THE COURT:  Overruled.

MR. MURPHY:  Your Honor, the coincidence is amazing.  It's circumstantial evidence, that's true, but nonetheless, Judge, what you have before you is evidence in which you can infer that the x-rays that were taken are the x-rays of Denise Johnson. What are the odds, Your Honor, that a person named Denise Johnson had her left wrist x-rayed in the same hospital on August 19th, 1986, and her pelvis x-rayed on January 10th, 1987?

Your Honor, it's our position that if anything, the evidence regarding the time between these x-rays and Denise Johnson goes to what weight should be attached to the consideration of those exhibits.  However, it's our position that clearly where the x-ray technician testified, that x-ray is admissible.  And it's also our position, and the Court should only consider those Exhibits as to what weight should be attached to them.

THE COURT:  The admissibility of 13, 14 and 15 is denied.

You may proceed with your argument, Mr. Murphy.

19

1    MR. MURPHY: Your Honor, the Defendant, in

2    both the brief and the supplemental or additional

3    brief that was tendered today, has raised the issue

4    of corpus delicti. The case law is pretty clear

5    in this case as to what must be established in

6    order for the State to prove corpus delicti. One

7    element that is fairly in the case law is proof

8    of death. Whether the Court considers this

9    identification as part of that or not, I will

10    address it at this particular point. Much in this

11    case has been made by the Defense as to whether or

12    not identification has been proven by the State.

13    The case law again is clear as to what evidence

14    can be considered by the Court. Circumstantial

15    evidence of identification can be considered. The

16    evidence in this case shows, Judge, that on August

17    1st, 1988, Denise Johnson disappeared. She was

18    never seen alive from that date to the present, or

19    at least to the date the Court heard evidence in

20    this case. She was never found alive by her family.

21    The body of a girl was found less than one-half

22    block from where she was last seen. The body was

23    that of a Black female who was the same height and

24    the same weight as Denise Johnson.                    20

1    MS. PLACEK:  Objection.  Misstatement.

2    THE COURT:  Objection is overruled.

3    Ms. Placek, I have heard the evidence and

4    I will be the arbiter of whether the evidence,

5    of what the evidence shows.

6    MR. MURPHY:  Your Honor heard testimony regarding

7    Yolanda Hill, as to height and weight of Denise

8    Johnson.  The Medical Examiner testified regarding

9    the height and weight of the body on which she

10    performed the autopsy.  I would ask Your Honor to

11    go back and consider the evidence with respect

12    to those issues, if there is any question of fact,

13    and in addition, Your Honor, there was testimony

14    that the  clothing was the same.  Specifically,

15    Yolanda Hill described knee-length pants, light

16    colored and a black tank top.  The original officer

17    at the scene described the same type of clothing

18    on the victim.

19    I submit to Your Honor that the evidence

20    in this case shows that Denise Johnson was wearing

21    the same clothing.

22    In addition, Your Honor, we have something

23    more.  We have the shoes Denise Johnson was wearing.

24    The shoes were described as white shoes with Princess

21

1    brand name, with the name Denise written on it.

2    Throughout this trial, Judge, the Defense has made

3    much about the fact, well, the name was written

4    differently.  Well, Your Honor, I have a copy of

5    the transcript of the testimony of Yolanda Hill

6    and clearly in her testimony, she describes the

7    shoes as the name Denise being written in red ink.

8         Throughout this trial the Defense has

9    represented to this Court that she testified it

10   was green.  Your Honor, if you look at the shoes

11   that is in evidence in this case, her description

12   of the shoes is consistent with the shoes which

13   the victim in this case had on.  If that weren't

14   enough, Your Honor, there is more.  We have the

15   Defendant's statement.  His own statement, he says

16   that this is the girl that he was with.  I will

17   take you back, Judge, to that statement, and within

18   that statement he says at one point he met a girl

19   who was staying at 11720 Princeton, that he saw

20   the girl a few times during the day when he was

21   babysitting at Carlina's house.  We learned during

22   the course of this trial, Judge, the victim in this

23   case was babysitting at Yolanda Hill and Carlina's

24   house which is located at 11720 Princeton.  The same

22

1    statement, the Defendant goes on to say that on

2    Wednesday or Thursday, following Wednesday or

3    Thursday, his family was complaining about a smell

4    coming from the garage.  He says when he went to

5    the garage he saw something that looked like a

6    body.  He went over to see what it was.  He saw

7    it was the same girl he had sex with and that the

8    shirt was still in the same position over her

9    head.   Your Honor, from the Defendant's own

10   statement, he tells you and tells this Court

11   that in fact the body that is there is the same

12   body as the body of Denise Johnson, in the same

13   position, a position he describes consistent

14   with the position her body was found in when the

15   police found here there on August 8, 1988.

16   Whether the Court wants to consider the clothing

17   description and the shoes and the height and the

18   weight, that alone is enough but the Court can go

19   a step further and look at the Defendant's state-

20   ment which you can consider as part of the identification

21   and determine that identification was made in this

22   case.

23         The Defendant also argues that we have

24   not established as part of an element of corpus

23

1270

delicti that proof of death was produced by criminal

agency.  Well, clearly in this case, Judge, death

was established.  Clearly in this case, the cause

of death was strangulation.  That's what the

Medical Examiner testified.

Your Honor heard during this trial that

there were two ligatures that were found around

the victim's neck.  There was another ligature

found tying her hands together behind her back.

Clearly, Judge, the circumstances in this case

indicate that a criminal act had occurred.

The Defendant wants this Court to believe

something that is absolutely preposterous.  That

somehow she was engaged in some type of sexual act

by herself and that she inflicted death to herself.

Well, that's ridiculous.  Her hands were tied behind

her back.  She could not have done that to herself.

She couldn't have tied the other ligature around

her neck with her hands tied behind her back.  That

is absurd.  The Defendant also raises the issue

as to whether or not a connection has been established

between the crime in this case and him.  Whether

the Court considered this in terms of proof beyond

a reasonable doubt or whether the Court looks as an

24

1271

element of corpus delicti, either way, Judge, again, the tie has been made.

Your Honor, so many times in this courtroom we ask juries to use the common sense that God gave them in looking at evidence. The common sense that allows you as a person who has had various experiences in your life to listen to evidence and decide what is believable and what is not believable, and to make inferences as to what you hear. Well, Your Honor, I submit that if you consider your life experiences, the common sense that God gave you and consider the evidence in this case, there is only one conclusion that you can draw, and that is that the Defendant is directly tied to the victim in this particular case as both the person who sexually assaulted her against her will and her murderer.

Your Honor, we cited in our brief various cases just as an example of how, when a defendant gives a statement denying an offense such as murder, and that statement is considered in the light of other evidence that the Court can use that statement and can consider it in convicting the defendant, or the jury, or who ever the trier of fact may be. In our brief we cited the Murdock and the Moore cases.

25

1    I don't think it's important to go back over the

2    facts in those cases because the Court has had an

3    opportunity to read those cases.  What those

4    cases basically say is the Court can look, the

5    trier of fact can look and use your common sense

6    and look at those statements of denial and infer

7    and consider those statements and determine evidence

8    of guilt.

9         The Defendant's story is preposterous.

10   It's outrageous.  It's absolutely ridiculous.

11   The only inference that you can draw from that story

12   is that he assaulted this 12-year-old girl and he

13   murdered her.

14        In order to believe his story, Judge, you

15   have to believe that this girl led him to the garage

16   next door to his house, the girl who was babysitting.

17   Doesn't even live in the neighborhood.  That a girl

18   whom he had been propositioning earlier that night

19   suddenly turned around and wanted him.

20      MS. PLACEK:  Objection.

21      THE COURT:  The objection is overruled.

22      MR. MURPHY:  Your Honor heard evidence that

23   he was propositioning her or making some advances

24   at her in front of the porch at 11720 Princeton.

26

1  Your Honor has evidence, his statement that suddenly

2  she wanted him.  For you to believe what the

3  Defendant tells you, Judge, you have to believe

4  that this 12-year-old girl wanted to have sex

5  with him so badly that she would have sex with

6  him at a hard, dirty garage floor, that she

7  wanted to have sex with him in such a perverse way

8  that she wanted, as he described, a rope or a

9  shoelace around, somewhere near her head during

10  the sex act.  That this 12-year-old girl wanted

11  him to ride her like a horse during the sex act.

12  That this 12-year-old girl, who had had sex with

13  him two times, wasn't satisfied and wanted more.

14  He described her as acting like a freak.  And that

15  this man who had just had an intimate act of sex,

16  according to him, consentual sex, according to him,

17  just walked out and let this girl in the garage,

18  this 12-year-old in the garage by herself.  His

19  story isn't the truth, Judge.  It sounds like a

20  perverted sexual fantasy, the sexual fantasy of

21  Jerome Hendricks.  If that weren't enough, Judge,

22  it doesn't end there, it goes further.  The Defense

23  tells you that we misrepresented the facts in our

24  brief, Judge.  In his statement the Defendant says

27

that the shirt was in the same position over her head

when he saw her body a few days after he had consentual

sex with her in the garage, in the same garage where

the body was.  This is a guy, according to his state-

ment, who had just engaged in consentual sex a few

days earlier, just leaves her there, just left her

there, Judge, to rot in the garage.  And he goes out

to manufacture a defense, goes to one of his friends,

Michael Walker, and says, "How about giving me an

alibi for the night before?  How about telling the

police I was with you?"  But for the fact Michael

Walker, when the police called and asked him about it,

he said, "No, he tried to tell me, but I never was

with him."

        What does all that tell you, Judge, as a

trier of fact?  And here is the guy who wants to

clear himself on August 8th and August 9th when he is

at the police station.  But what does he do?  He lies.

One lie after the other.  No, I wasn't with her.

Well, I had a little sex.  Well, I had a little more

sex.  Well, I rode her like a horse on the garage

floor when I had sex with her.

        Judge, when you consider this statement,

when you consider the evidence in this case, it's

28

1    clear that we have maintained, we have established

2    that the Defendant is guilty of first degree murder,

3    that ie is guilty of all the other charges with

4    respect to this motion, and we would ask, when you

5    look at this evidence in the light most favorable

6    to the State, that you deny Defendant's motion

7    for directed finding.

8         THE COURT:   Thank you, Mr. Murphy.

9            Ms. Placek?

10        MS. PLACEK:   I take it by Counsel's argument

11   that he is conceding the State has failed to prove

12   both date of death and time of death.   And I take it,

13   Your Honor, that this is still a motion for acquittal

14   instead of a closing argument.   The reason I'm saying

15   this, Judge, is for the simple reason that rather

16   than prey on your emotions or your prejudice, or the

17   horror of the basic events, I would rather to stick

18   to both the law and the facts involved in the law

19   and as they are stated even by the State's own brief.

20            What we did in our reply brief, Judge,

21   is to go over the State's cases that they cited in

22   Illinois law.   In ever one of the cases cited by

23   Illinois law, there was either a witness present for

24   the actual killing or identification, or there was a

29

1   witness who saw a defendant go into  where the victim

2   was and then come out bloodied and scratched, and then

3   lo and behold the body was discovered.  The suggestion

4   that this is somehow applicable is somehow absurd,

5   both in reason and logic.

6            When you're using your common sense, Judge,

7   which the State just bid you to do in applying the

8   factual evaluation of the case, then the suggestion

9   would be that when the State asked questions as to

10   the evidence as presented within the witness stand,

11   the Court should ask itself that when the same

12   witnesses were cross examined, why in fact in rebuttal

13   didn't the State clear up the misconception or the

14   misunderstanding?

15            Now, this is not the time by loud voice

16   or by screaming or by yelling to clear up misconcep-

17   tions.  That should have been done then.  The

18   misconceptions I speak of first is the one dealing

19   with the identification.  The State says, "Yes,

20   they were the same things.  They were described.

21   They were the exact same clothes.  We know that they

22   were."  Such huge leaps of the identification has

23   been made for the simple reason, Judge, that number

24   one, number one, there was never an identification

30

1    of the clothing made or possibly was able to make or

2    was shown from the witness stand from the first to

3    who was found on the eighth.  Secondly, said the

4    State, well, forget all that.  The description was

5    exactly the same.

6    I would ask the Court, and I apologize

7    for in fact interrupting the Court and the State

8    during its argument, but the pathologist, as shown

9    by the protocol, stated that in fact the person

10    found within the garage was approximately, and later

11    done by her as part of the protocol, was approximately

12    five feet eight inches, approximately 86 pounds.

13    When the family member was in fact on the night,

14    I would ask the Court to check its notes on direct

15    examination, she always stated that Denise Johnson

16    was over the height of five feet.  Not only over

17    the height of five feet, but over some 100 pounds.

18    Not only that, Judge, but the comparison goes even

19    further to absurdity when their own officer states

20    that in fact the person found in the garage, and

21    again perhaps my notes are sketchy, I would ask the

22    Court to rely on its own memory and notes, was

23    approximately five feet six and 120 to 130 pounds.

24    If this is conclusive within that finding of the law,    31

1278

Judge, I would suggest that it would indeed be a surprise, and I would be indeed saying that this is not the time, either by a great show of passion or a great show of prejudicial screaming, is it a time of clearing up the issues.

I would further point out to the State an attempt by my old corrections to show up, that they say we have proven the corpus delicti by the statement. Quite frankly, Judge, not meaning to be tiresome, not meaning to be boring, I would suggest that in every case, even the cases as cited by in fact the State in their own brief, constantly say that in fact the corpus delicti cannot be proven up by the statement. Corroborative evidence, independent evidence must be shown and the burden becomes stronger when it is in fact circumstantial evidence. Where is it? I don't know. I can tell you where it isn't. It isn't there.

Secondly, I make the statement that this isn't the time to clear up through loud voices or in fact by dramatics. The facts could have been cleared up on the stand. The simplicity is that the State is asking the Court to take approximately a seven-day leap of mind, a seven-day leap of mind

32