CASE NO. _____ 08cu 1589 _____

ATTACHMENT NO. _____ 3 _____

EXHIBIT _____

TAB (DESCRIPTION) _____

1    that could have been cleared up by either of them

2    standing at this podium and simply saying, Doctor,

3    do you have a reasonable degree of medical certainty

4    and approximately  the date of death of this young

5    lady.  Why wasn't it done?  The State has asked you

6    to use your common sense, this Court's common sense.

7    I would suggest since it's the beginning of this

8    case, every argument hedged upon the State saying

9    that this man, and I am speaking not only emotion,

10   but I'm stating in fact, in the Bill of Particulars,

11   I'm stating even in their opening statements they

12   would say that my client, Jerome Hendricks, was

13   the last one to see her alive.  Well, Judge, if they

14   are that sure, and if they are that honorable and

15   they have put that much attention to this through

16   preparation of the case, when you have the person

17   on the stand who could tell you, not only because

18   of her expertise, date of death and time of death

19   through scientific evidence, and bring it down,

20   then common sense would say that unless you have

21   something to hide, or unless you are unsure, or

22   unless you don't know, or unless your whole case is a

23   sham, you ask that question.  Furthermore, Judge,

24   I would suggest to the Court that since this                    33

1  question is in fact never asked, it cannot be supplied.

2         For these reasons, Judge, and the reasons

3  suggested in our brief, and the reasons enumerated

4  under Illinois law, we would suggest that the

5  motion for acquittal is in order at this time.

6  We would suggest to the Court that the only

7  evidence of in fact the statement that the Defendant

8  made to anything in this crime that on the first he

9  saw the young lady, as for their witness Michael

10  Walker who it was proven lied to us on the stand,

11  who it was proven that he not only didn't remember

12  his criminal record, who it was proven they brought

13  him in from Stateville, it was proven when they asked

14  him have we promised you anything, they said, oh,

15  no; and when I asked him, he said well, maybe.  When

16  they stated, you said you would write a letter.

17  That the reliability, combined with the time that

18  the first time he said anything about Jerome Hendricks

19  supposedly alibi'ing out to him was when he himself

20  had been Mirandized, and common sense would say,

21  since their own officer said we Mirandize suspects,

22  was in fact a suspect of the crime, that this man

23  was doing the same thing that they are now accusing

24  Mr. Hendricks with.  As a matter of fact, they might

34

1  have indicted the right man and like bulldogs on a

2  bone they hold on to Mr. Hendricks when in fact

3  Mr. Walker who can't even remember his own criminal

4  record for convenience, suddenly realizes that there

5  is a rap sheet in the Defense Counsel's hands and

6  then his mind clears up, constitutes not, not enough

7  negative corroboration.

8          For these reasons, Judge, we would ask that

9  our motion in fact be stayed.

10          Thank you, Your Honor.

11      THE COURT:  Ms. Placek and gentlemen, I'm going

12  to take about a two-minute recess, organize my

13  thoughts, and I will be back and give you my opinion.

14                          (Whereupon, a short recess

15                          was had.)

16      THE COURT:  In ruling on the Defendant's motion

17  for acquittal at the close of the State's case, the

18  Court is obliged to construe the evidence in the

19  light most favorable to the State to determine whether

20  or not the State's evidence proved the Defendant

21  guilty beyond a reasonable doubt at this stage of

22  the proceedings.

23          Stated differently, the evidence must be

24  in a posture where it can be said that a rational

35

1282

fact finder from the evidence adduced could conclude

that the Defendant is guilty of the offenses charged

beyond a reasonable doubt.  This permits the Court

to look at the evidence and the reasonable inferences

to be drawn from the evidence.

It was originally my intention to write out

my findings of fact and conclusions of law and in

that vein, I started a memorandum which I have deter-

mined not to complete.  I want to, however, before

I go into the memo, as far as it has been developed,

to make some preliminary observations.  I will then

read so much of the memo as has been written and

then I will relate the law to the facts of this case

as I understand them to be.

First I would like to clear up what we are

talking about when we talk about a confession, because

the document attributable to the Defendant, in the

Court's judgment, is not a confession.  A confession

is a statement by the Defendant that admits all of the

material elements of an offense.  A statement by the

Defendant is a statement that contains within it

matters which could supply an element of the offense,

matters from which elements of the offense may be

inferred but need not admit every material element of

36

1  the offense.  So it is with an admission.  But for

2  the purpose of our discussion, insofar as the rules

3  of law apply to a confession or a statement or an

4  admission, the rule would not change insofar as

5  the corpus delicti is concerned.  So while we have

6  talked about this statement, or this document, as

7  being a confession of the Defendant, I do not think

8  that as a matter of law that is what it is.

9  Although I also have adopted that language and

10 I speak of the Defendant's statement as a confession,

11 but I want you to understand, as I understand, that

12 this document does not recite all of the elements

13 of an offense or of the offenses for which the Defendant

14 is charged.  I don't think that either side would

15 disagree with that.

16        For instance, this statement is wholly,

17 totally, absolutely devoid of any language wherein

18 the Defendant speaks of the offense of first degree

19 murder.  So it is not a confession, at least as to

20 that crime, and may and probably is not a confession

21 as to the other crimes for which he's charged.

22 Secondly, I have read all of the memos that have

23 been submitted to me and I think that there is some

24 misstatements of the facts by both sides and some

37

1284

1    misutilization of authority by both sides.  To that

2    extent, I have done some of my own research and at

3    least in my head have straightened out as nearly as

4    I can the misstatement of fact and the inappropriate,

5    if you please, utilization of the authorities.

6    I may fall also into that same area, but at least

7    I've tried to recognize where the proponents have,

8    in my judgment, stretched the fact either by

9    inferences to be drawn or by a statement of what a

10    fact is further than my recollection would permit

11    me to go.

12            So with that caveat, I started to write.

13    I said, the Defendant, Jerome Hendricks, is on trial

14    without a jury for multiple counts of murder,

15    paren, Chapter 38, Section 9-1A, paren 1, paren 2,

16    paren 3, close paren, multiple counts of aggravated

17    criminal sexual assault, paren, Chapter 38, Section

18    12-14A, paren 1, close paren, 2 close paren, 3 close

19    paren four, close, and Chapter 38, Section 12-14D(1).

20    Criminal Sexual Assault, Chapter 38, Section 12-13

21    paren A, close paren, 1, close.  Concealment of a

22    homicidal death, Chapter 38, Section 9-3.1A, paren A

23    point 1 paren A, close paren.  And kidnapping,

24    Chapter 38 Section 10-1 paren A close paren, paren 1          38

1    close paren.  Multiple counts of aggravated kidnapping,

2    Chapter 38 Section 10-2A, close paren A, close paren

3    2, close paren 3, close paren.  And unlawful restraint,

4    Chapter 38, Section 10-3 paren A, close paren.

5            The Defendant has moved for acquittal at the

6    close of the State's case in chief, and argues that

7    the State has failed to prove the corpus delicti of

8    the offenses and assuming arguendo that these elements

9    have been proven, the evidence fails to establish the

10   Defendant as the criminal agent.  Turning first

11   to the corpus delicti.  "The corpus delicti is a

12   crime of murder.  Consists of two elements.  The

13   fact of death and the fact that the death was produced

14   by the criminal agency of some person."  People versus

15   Holmes 67 Ill. 2d 236.  The corpus delicti of criminal

16   sexual assault and aggravated criminal sexual assault

17   consists of proof of sexual penetration and the fact

18   that the sexual penetration was accompanied by means

19   of the various criminal agencies alleged.  The corpus

20   delicti of concealment of a homicidal death consists

21   of proof of death by homicide and concealment of the

22   body by someone.  The corpus delicti of kidnapping

23   and aggravated kidnapping consists of proof of knowing

24   and secret confinement without consent.  The corpus

                                                              39

1   delicti of unlawful restraint consists of proof of

2   detainment without legal authority.  The corpus

3   delicti of these offenses must be established out-

4   side of the confession of the defendant or the

5   defendant's confession must otherwise be corroborated

6   and if so corroborated it may then be used to establish

7   the corpus delicti.

8           And ruling on the Defendant's motion for

9   acquittal, the evidence is viewed in the light most

10  favorable to the State.  When viewed in that light

11  it is clear that the evidence establishes the corpus

12  delicti of murder.  The deceased was found in an

13  abandoned garage.  The body was badly decomposed

14  and maggot infested.  There were two ligatures

15  around the neck.  The hands were tied behind the

16  back.  The cause of death was strangulation.  Thus

17  entirely independent of the statements of the Defendant

18  the corpus delicti was established beyond a reasonable

19  doubt.

20          The record is devoid of any evidence of the

21  corpus delicti of the criminal sexual assault

22  counts.  However, if the statement or confession

23  of the Defendant is sufficiently corroborated, then

24  the independent corroborating evidence, along with the        40

1287

1    statement of the Defendant, may establish the corpus

2    delicti beyond a reasonable doubt.    People versus

3    Webb, 153 Ill. App. 3d 1055.    In Webb, the Court

4    said, "The corpus delicti is the body or substance

5    of the crime which ordinarily includes the act and

6    the criminal agency."    (Citations omitted.)

7    As the Court stated in People versus Blamerick

8    (phonetically spelled), in order to establish

9    the corpus delicti, "There must be either some

10    independent evidence or corroborating evidence out-

11    side of the confession which tends to establish

12    that a crime occurred.    If there is such evidence,

13    and that evidence tends to prove that the offense

14    occurred, then that evidence, if it corroborates

15    the facts contained in the Defendant's confession,

16    may be considered, together with the confession

17    to establish the corpus delicti.    Further, the

18    corroborating evidence need not establish the corpus

19    delicti independent of the confession and need not

20    be direct and positive evidence."    (Citations

21    omitted.)    "The test for basing a conviction on

22    confession is whether the independent evidence shows

23    that a crime did occur although the evidence need

24    not establish that fact beyond a reasonable doubt,                41

1  and whether the independent evidence corroborates or

2  bolsters the circumstances of the confession."

3  (Citations omitted.)   "When the test is satisfied

4  both independent evidence and the confession may be

5  considered in determining whether the corpus delicti

6  is sufficiently proved."

7            In this case, the Defendant's confession

8  is corroborated sufficiently to permit useage of

9  the Defendant's confession and the corroborating

10 evidence establishes the corpus delicti of the

11 other offenses, other than the murder.  The murder

12 offense having been the corpus delicti, having been

13 established entirely outside of the confession of

14 the Defendant.  So we turn next then to see whether

15 or not the deceased in this case who met her death

16 by means of a criminal agency as established by the

17 evidence in this case is in fact the person named

18 in this Indictment.  And because the corpus delicti

19 of murder is established entirely independent of the

20 Defendant's statement, in determining whether or not

21 her identity has been proven, we can look to all of

22 the evidence in this case, including the statements

23 of the Defendant.  The evidence establishes that the

24 deceased in this case had a direct and strong tie to

                                                        42

1   the premises located at 11720 South Princeton, and

2   was there at that location on August 1st, 1988, at

3   about 9:00 a.m. in the morning.  The evidence tends

4   to indicate that she was then seen wearing a white

5   tank top, white shorts to the knees, and white gym

6   shoes with the word Princess or the Princess Shoes

7   with the word Denise on the left shoe.  The testimony

8   of Yolanda Hill was to the effect that she was

9   approximately four feet eleven inches tall, weighed

10  100 pounds.  That she was last seen at about 5:00

11  p.m. on the afternoon of August 1st, 1988.  And has

12  not been seen alive since that time by any member

13  of her family down to and including the date of

14  the testimony of Yolanda Hill.  The Defendant in

15  his statement acknowledges that the person that he

16  was talking about was attached to 11720 South Princeton.

17  As he puts it in the statement of August 1st, 1988,

18  he saw and met a girl that was standing at 11720 South

19  Princeton.  He further acknowledges that he and this

20  young girl went into the garage in which she was found

21  and engaged in an act of sexual intercourse; that he

22  left; when he left the garage, the young girl was

23  still there.  He further says that while in the act

24  of intercourse she pulled her shirt over her back and

43

1    and pulled up over her head, or completely over her

2    head.   On Wednesday or Thursday he said that he went

3    into the garage.   He saw something that looked like a

4    body and he said it was the same girl that he had had

5    sex with and that the shirt was still in the same

6    position over her head.

7              I conclude from that fact that this girl

8    was never seen alive after August 1st, the fact that

9    the Defendant identified the decedent in this case

10   as the same girl, and I take it by the same girl

11   he is referring and does explicitly refer to the

12   same girl to mean the girl that he had sex with on

13   August 1st in that garage.   I further take it that

14   that girl was the girl that he met at 11720 Princeton.

15   Thus, when viewed in the light most favorable to the

16   State, the identity of the decedent in this case,

17   it's fully established.

18             Having disposed of the question of the

19   identity of the girl and the corpus delicti of murder,

20   the issue then becomes whether or not the evidence in

21   this case proves beyond a reasonable doubt that the

22   Defendant in this case is the murderer or is respon-

23   sible for her death.   Again, viewing the evidence

24   in the light most favorable to the State, I conclude        44

1   that the State proves that fact beyond a reasonable

2   doubt.

3        Now, the fact of eight days or seven days

4   between the date of death and the date of finding

5   this decedent's body and the fact that the pathologist

6   failed to testify as to time or date of death does

7   not preclude a determination that this girl died

8   on or about August 1st, 1988, or in the early morning

9   hours of August 2nd, does not take any scientific

10  expert evidence to reach the conclusion that the

11  body of this young girl had been in that garage for

12  some period of time.  The degree of decomposition

13  of the body and the fact that it was maggot infested

14  aids us in determining that the decedent had been dead

15  for some period of time.  How long clearly is not shown.

16  But it did not occur on August 8th, August 2nd, August

17  6th, and probably occurred earlier than that.

18       But in any event, one does not have to be an

19  expert in anything to know that this girl had been dead

20  for some period of time.

21       It's the Defendant who tells us that the

22  shoelace found around the decedent was still in place

23  or substantially in place when he saw her at the time

24  that he discovered the body.  Thus, one can conclude

45

1  that the shoelace was the instrument of death.  That

2  is adduced from the testimony of the pathologist who

3  testified in this case, who described not only the

4  positioning of the ligature but the depth to which

5  the ligature had penetrated the skin and creased the

6  skin in that it was not a loosely tied ligature and

7  probably was the instrument that resulted in her

8  death.  It's the same shoelace that the Defendant

9  says the young girl wanted him to place around her

10  neck.

11      So I conclude that the State has proven

12  beyond a reasonable doubt at this stage the offense

13  of first degree murder.  The criminal sexual assault,

14  aggravated criminal sexual assaults are also deducible

15  from the evidence in this case because the

16  corroborating evidence of time, person, place,

17  coupled with the statement of the Defendant, clearly

18  shows an act of sexual intercourse and an act of

19  violence, either invited or consented to, or forced

20  upon the deceased in this case.  The Defendant's

21  assertion in his statement that this was invited

22  foreplay, if you please, can be used to determine

23  that the sexual acts were perpetrated through the

24  use of force or by threats of force.  So I conclude       46

that the State has proven the aggravated criminal
sexual assault counts.  The criminal sexual assault
count also is proven for the same reason.  The
concealment of a homicidal death which requires
proof beyond a reasonable doubt of concealment of a
body that meets its death by homicide.

I have already indicated that I believe
that the evidence in this case, independent of
the Defendant's statement, establishes a homicidal
death.  Leaving it in that garage covered as it was
is a sufficient concealment under the Statute to
prove beyond a reasonable doubt the offense of
concealment of a homicidal death.  Kidnapping is a
knowing and secret confinement against the will of
another.  That offense also must be established
beyond a reasonable doubt outside of the confession
of the Defendant, or the Defendant's confession must
otherwise be corroborated sufficiently for the
confession to be used to aid in establishing that
offense also.  I think that the confession is suf-
ficiently corroborated in many respects to say and
reach the conclusion that the Defendant knowingly
and secretly confined the victim in this case against
her will.  The aggravated kidnapping -- there is another    47

reason that one can conclude it was against her will

at this stage of the trial also, and that is because

the Statute provides that concealing or secreting or

confining a person under the age of 13 is prima facie

evidence of it being against the will, unless there

is the consent of the parent or guardian.  The aspect

of the Statute which allows that conclusion or that

inference, or makes such concealment prima facie

evidence gives rise to an affirmative defense and

does not require the State to show in its case in

chief that there was no consent but rather simply

means that it's prima facie evidence which is

subject to being rebutted but must be rebutted if

at all by the Defense.  That's also the case with

aggravated kidnapping, particularly the aggravated

kidnapping charged predicated upon the age of the

deceased in this case.  The Statute makes it aggra-

vated kidnapping to conceal a person under the age

of 13.

The evidence in this case clearly establishes

that the deceased in this case was under the age of 13

and that is established entirely outside of the state-

ment of the Defendant and establishes that charge beyond

a reasonable doubt.  The charges of aggravated

48

1  kidnapping and inflicting great bodily harm also is

2  proved beyond a reasonable doubt.  The charge of

3  aggravated kidnapping being aggravated, the predicate

4  for aggravation being the commission of a felony to

5  a first degree murder also is proven beyond a

6  reasonable doubt.  The charge of aggravated kidnapping,

7  the aggravating factor being the commission of the

8  offense of aggravated criminal sexual assault,

9  also is established beyond a reasonable doubt.

10  The offense of unlawful restraint, which requires

11  the detainment of another without legal authority,

12  also is established beyond a reasonable doubt.

13          Now, having said that, there are one or

14  two counts in this Indictment that seems to me cannot

15  stand.

16          The Defendant's motion for a directed

17  finding as to Count 1 is denied.  As to Count 2,

18  it's also denied.  As to Count 3, it's denied.

19  As to Count 4, it's denied.  As to Count 5, the

20  Defendant's motion for directed finding is sustained.

21  As to Count 6, this motion is denied.  As to Count 7,

22  this motion is denied.  As to Count 8, the Defendant's

23  motion is sustained.  As to Count 9, the motion is

24  denied.  As to Count 10, the motion is denied.  As to

49

Count 11, the motion is denied.  As to Count 12,

it's denied.  As to Count 13, it's denied.  As to

14, it's denied. 15, denied.  16 is denied.  17

is denied.  18 is denied.

Ms. Placek, are you ready to proceed?

MS. PLACEK:  No, Judge.  I have an out-of-state

fitness who needs seven days.  I can be ready next

week as per the Court's schedule.

MR. MURPHY:  Judge, there are various police

officers here pursuant to the Defendant's subpoena.

MS. PLACEK:  They have been in the State's

care, control and custody, so obviously we haven't

seen them.  If the Court wants to continue this

until tomorrow, I have no problem with continuing it.

MR. MURPHY:  These officers have been in the

building all day and available.

MS. PLACEK:  Well, Judge, it would have been

nice to know.  They didn't make themselves known

to the Office of the Public Defender or this court-

room, or it would have been nice if the State knew,

they could have let myself or my partner know.

We could start tomorrow at 9:00 if the

State will be ready.  I will not of course be able

to conclude because I was under the impression                50

1    we were going to go ahead with the jury, but I will

2    take the police officers tomorrow.

3        THE COURT:  Can your officers be here tomorrow?

4    We can put in some time on it tomorrow.

5        MR. MURPHY:  Whatever date the Court sets.

6        MS. PLACEK:  Can we start tomorrow at 9:00,

7    Judge?

8        THE COURT:  Well, I don't know whether we can

9    or not.  Starting at 9:00 proposes that the

10   Defendant will be here at 9:00.  I'm not sure

11   whether the Sheriff's Office will accommodate you

12   on that issue.  I will ask the Clerk to indicate

13   on the Defendant's mittimus to return him here at

14   9:00 a.m.  Whether he will be here or not, in my

15   judgment, is most doubtful; but when he arrives

16   we'll try to start hearing this case.

17       MS. PLACEK:  I appreciate that.

18       THE COURT:  Order of Court, March 26th at 9:00 a.m.

19                            (Which were all the proceedings

20                            had in the above-entitled cause

21                            on this date.)

22

23

24

                                                           51

1     IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

2                COOK COUNTY, ILLINOIS

3 THE PEOPLE OF THE     )

4 STATE OF ILLINOIS,    )   CRIMINAL DIVISION

5        Plaintiff,    )

6      VS.           )   CASE NO. 88-CR-12517

7 JEROME HENDRICKS,    )   CHARGE: MURDER, ETC.

8      Defendant.    )

9     REPORT OF PROCEEDINGS of the hearing had

10 before the Honorable LEO E. HOLT, Judge of said

11 court, on the 26th day of March, 1991.

12    APPEARANCES:

13         HONORABLE JACK O'MALLEY,

14            State's Attorney of Cook County,  by

15         MR. JOHN MURPHY,

16         MR. SCOTT CASSIDY,

17            Assistant State's Attorneys,

18            for the People of the State of Ill.

19         MR. RANDOLPH N. STONE,

20            Public Defender of Cook County, by

21         MS. MARIJANE PLACEK,

22         MR. VICENT LUFRANO,

23            Assistant Public Defenders,

24            for the defendant.

49                1299

1       THE CLERK:  Sheet 4, line 1;

2  Jerome Hendricks, in custody.

3       THE COURT:  Both sides ready?

4       MS. PLACEK:  Since, quite frankly, we ran

5  into quite a bit of a problems yesterday with the

6  State being in care of and custody of our

7  witnesses, as I understand, there is one witness

8  in court at this time.  I know of possibly no

9  others unless the State knows of some.

10                      (Witness sworn.)

11       MS. PLACEK:  Your Honor, may I proceed?

12       ·  THE COURT:  Yes.

13                      OFFICER STEVE MATKOVICH,

14  called as a witness on behalf of the Defendant,

15  having been first duly sworn, was examined and

16  testified as follows:

17                      DIRECT EXAMINATION

18                      BY

19                      MS. PLACEK:

20       Q    Sir, would you state your name,

21  spelling your last name for the purpose of the

22  record?

23       A    Officer Steve Matkovich,

24  M-a-t-k-o-vich?

50

**1300**

1      Q    Now, you use the word officer, are you

2   employed by the Chicago Police Department?

3      A    Yes, ma'am, I am.

4      Q    Could you tell his Honor, Judge Holt,

5   approximately how long have you been employed by

6   that organization?

7      A    Over thirty years.

8      Q    And what is your current assignment.

9   today?

10     A    I'm a youth officer in area two youth

11  with the City of Chicago.

12     Q    Calling your attention to August 1,

13  1988, do you recall whether or not you were a

14  youth officer at that time for that organization?

15     A    Yes, ma'am, I was.

16     Q    And as a part of your duty, did you

17  have occasion to become involved with a missing

18  person's investigation?

19     A    On the 2nd of August, I did, ma'am.

20     Q    And when you say the 2nd of Agusut, do

21  you remember what was the name of the person who

22  was, in fact, considered missing?

23     A    Denise Johnson.

24     Q    And as a result of that investigation,

51

1    did you have a conversation with a Yolanda Hill?

2        A    Yes, ma'am.

3        Q    And could you tell his Honor, Judge

4    Holt, when and where you had that conversation?

5        A    I had it over the telephone on the 2nd

6    of August, '88, in the a.m hours.

7        Q    Now, when you say you had it over the

8    telephone, did you later interview her?

9        A    I interviewed a group of people that

10   were out in front of the home at 11720 Princeton.

11   I don't know specifically if Yolanda was one of

12   them at this time.

13       Q    Would anything refresh your

14   recolledtion as to whether or not she was part of

15   that?

16       A    No, ma'am.

17       Q    Did you write a report in this matter?

18       A    Yes, ma'am.

19       Q    Did you write who you personally

20   interviewed as part of that report?

21       A    I wrote who I interviewed, including

22   the telephone conversation, that's how I worded

23   it in my report.

24       Q    You didn't separate it, saying personal

52                        1392

1    interview, etc.?

2        A    I don't believe so, no.

3        Q    Show you Defendant's Exhibit No. 5 for

4    identification.  I'd ask you to identify that.

5        A    Yes, ma'am, this is my report that I

6    made on the 2nd.

7        Q    Does it, in fact, contain a personal

8    interview with Yolanda Hill?

9        THE COURT:  Is that how it's worded?

10       MS. PLACEK:  That's correct, your Honor.

11       Q    Does it, in fact, contain a personal

12   interview with Yolanda Hill?

13       A    Yeah, if I put it down, sure.

14       Q    Was this on August 2, 1988?

15       A    Yes, ma'am.

16       Q    And at that time did you find out that

17   Yolanda Hill was, in fact, the aunt of

18   Denise Johnson?

19       MR. MURPHY:  Objection, Judge.

20       MS. PLACEK:  Impeachment, Judge.

21       THE COURT:  Who are we impeaching?

22       MS. PLACEK:  Yolanda Hill, Judge.

23       THE COURT:  The objection is overrruled.  I

24   will permit it at this point.  I don't know how

53

1    far this is going to go.

2        MS. PLACEK:   Q   Officer, do you remember

3    the question, or shall I repeat it for you?

4        A    Would you, please?

5        Q    Sure.  Did Yolanda Hill, in fact, tell

6    you that she was the aunt of Denise Johnson?

7        A    Yes, at that time she did.

8        Q    And, as a matter of fact, did she also

9    tell you that she had an altercation or an

10   argument with Denise Johnson before

11   Denise Johnson left the porch of Yolanda Hill's

12   home?

13       A    Yes, ma'am.

14       Q    Did she also tell you, speaking of

15   Yolanda Hill, that the argument involved

16   Denise Johnson talking to and dating adult men?

17       A    No, ma'am.

18       Q    Did she tell you what the argument

19   involved?

20       A    She said she had a talk with her.  And

21   she recognized Jerome Hendricks --

22       MS. PLACEK:  Motion to strike as

23   non-responsive.

24       MR. MURPHY:  Objection.

54                    1304

1  THE COURT:  The objection is sustained.  You

2 may complete your answer.

3  THE WITNESS:  A  She talked to her and said

4 that Jerome Hendricks had just got out of jail

5 for raping some girl, and don't be talking to

6 adults like that.  She could get in trouble.

7  MS. PLACEK:  Q  And that's an important fact

8 that she told you that, is that correct?

9  A Yes.

10  Q As an important fact, you would put

11 that in your report, wouldn't you?

12  A Yes.

13  Q Show you again Defendant's Exhibit No.

14 5.  It contains a conversation with you and

15 Yolanda Hill.  Please circle the part where you

16 say that Jerome Hendricks had just got out of

17 jail, and in fact, she had an altercation or she

18 talked to Yolanda Hill about not talking to

19 Jerome Hendricks because of him getting out of

20 jail dealing with rape.

21  MR. MURPHY:  Objection, Judge.

22  THE COURT:  Sustained.

23  MS. PLACEK:  Q  Officer, does it sate

24 anywhere in your conversation on your report

55

1    that, in fact, Yolanda Hill told you at the time

2    that Jerome -- that she had talked to Denise

3    Johnson and relayed as part of this talking to

4    that Jerome Hendricks had been convicted of rape?

5        MR. MURPHY:  Objection.

6        THE COURT:  The objection is sustained.

7        MS. PLACEK:  Q  Isn't it correct that what

8    it does say on your report is she, Yolanda Hill,

9    observed her neice Denice talking on the front

10   porch of her home with Jerome Hendricks, male

11   Black, twenty-seven?

12       MR. MURPHY:  Objection.

13       THE COURT:  Sustained.  The reason I'm

14   sustaining these objections is because you cannot

15   impeach this witness.  It is collateral.

16       MS. PLACEK:  I can impeach him as to his

17   statement, Judge.

18       THE COURT: You cannot impeach the impeacher.

19       MS. PLACEK:   Q   Did you write down the

20   statement on your report that Yolanda Hill told

21   you?

22       A    I -- not verbatim, but I did write it

23   on my report, yes.  I typed it on my report.

24       Q    And when you say not verbatim, you

56

1    included all of the important things, correct?

2         A    I don't know.

3         Q    When you say you don't know, how long

4    had you been writing reports?

5         A    A long time.

6         Q    Does the word "rape" appear on your

7    report?

8         MR. MURPHY:  Objection.

9         THE COURT:  Sustained.

10        MS. PLACEK:  Q  Officer, isn't it a fact

11   that what, in fact, Yolanda Hill told you was

12   that she ordered Denise into the house?

13        MR. MURPHY:  Objection, Judge.

14        MS. PLACEK:  Impeachment of Yolanda Hill,

15   Judge.

16        THE COURT:  Overruled.

17        MS. PLACEK:  Q  Isn't that correct?

18        A    She asked her to come into the house.

19        Q    Isn't that correct that she told you at

20   the time that she ordered her into the house?

21        A    I don't know what her exact terminology

22   was.  That was my interpetation of it.

23        Q    When you say the interpretation, I take

24   it those are the words within the report?

57                        1397

1        A     Yes.

2        MR. MURPHY:  Objection, Judge.

3        THE COURT:  Sustained.

4        MS. PLACEK:  Q  Isn't it correct that

5    Yolanda Hill also told you she had an altercation

6    with her neice?

7        A     Again, that's my choice in words, yes.

8        Q     And this was over her talking with

9    adult men, correct?

10       A     Over talking to Jerome --

11       MR. MURPHY:  Objection, Judge, this is not

12    impeaching.

13       MS. PLACEK:   Judge, she said she didn't

14    have a fight.  This goes to --

15       THE COURT:  Overruled.

16       MS. PLACEK:  Q  Isn't it correct that you

17    wrote in your report, officer, the altercation

18    was over her talking with adult men.

19       MR. MURPHY:  Objection.

20       THE COURT:  Overruled.

21       THE WITNESS:  A  With Jerome Hendricks.

22       MS. PLACEK:  Q  Officer, isn't it correct

23    that you wrote in your report over her talking

24    with adult men?

58

1          MR. MURPHY:  Objection.

2          THE COURT:  The objection is sustained.

3          MS. PLACEK:  Q  Officer, isnt' it correct

4     that Yolanda Hill told you at the time that she

5     had this fight with her neice over her speaking

6     with adult men --

7          MR. MURPHY:  Objection, Judge, this has been

8     asked and answered.  Now, this is the third time.

9          THE COURT:  The objection is sustained.

10         MS. PLACEK:  Q  Officer, would it be correct

11    in saying tht this conversation that you had with

12    Yol'anda Hill --  officer, and excuse me for using

13    the clarification question.  I believe you said

14    that the altercation was over Jerome Hendricks --

15    her talking to Jerome Hendricks and talking to

16    men, correct?

17         A    I said that by the use of the word men,

18    I meant her talking to Jerome Hendricks.

19         Q    Is Jerome Hendricks more than one man?

20         MR. MURPHY:  Objection, Judge.

21         MS. PLACEK:  I'm allowed to understand what

22    he meant by his report.  I'm not seeking to

23    impeach him.

24         THE COURT:  The objection is sustained.

59

1        MS. PLACEK:  Q  Well, officer, how many

2    people did you know Jerome Hendricks to be?

3        MR. MURPHY:  Objection, Judge.

4        MS. PLACEK:  Q  At the time.

5        THE COURT:  The objection is sustained.

6        MS. PLACEK:  Q  let me ask you this,

7    officer.  Did you describe Jerome Hendricks as

8    men?

9        MR. MURPHY:  Objection, Judge.

10       THE COURT:  Sustained.  Do you have any

11   further questins?

12        MS. PLACEK:  I'm waiting for your ruling,

13   Judge.

14       THE COURT:  Sustained.

15       MS. PLACEK:  I'm sorry.

16        Q    How would you describe Jerome Hendricks

17   as he sits before you today, as a man or men?

18       MR. MURPHY:  Objection, Judge.

19       THE COURT:  Sustained.

20       MS. PLACEK:  Officer, let me ask you this.

21   Where were you yesterday?

22       A    Here.  During the daylight hours?

23       Q    Yes.

24       A    Here.

60

1      Q    Did you come down to court after this

2    --  excuse me.  Were you in this is courtroom or

3    were you up in the State's Attorney's office?

4      A    I was in both places.

5      Q    How long were you in the State's

6    Attorney's office?

7      A    During the day, I didn't keep track of

8    the hours.

9      Q    Officer, did you go over your report?

10     A    I did, yes, ma'am.

11     Q    Did you speak with the State's

12   Attorneys about your report?

13     A    Yes, I believe I did.

14     Q    Did you go over your interpretation of

15   your report with the State's Attorney?

16     A    Not too much.  We did one word, yes,

17   the word "altercation," what I meant by it.

18     Q    Did you go over the words "adult men"

19   in your report?

20     MR. MURPHY:  Objection, Judge.

21     THE COURT:  The objection is sustained.

22     MS. PLACEK:  May I have a basis, Judge?

23     THE COURT:  You can't impeach the impeacher.

24     MS. PLACEK:  I'm not, Judge.

61

1     THE COURT:  That's all it could be.  If not,

2   it's not relevant.

3     MS. PLACEK:  No, Judge, I'm just confused

4   myself as to how he could testify differently

5   from his report.  Perhaps I don't understand his

6   terms, Judge.

7     THE COURT:  The objection is sustained.

8     MS. PLACEK:  Q  Did Yolanda Hill tell you

9   also at the time that the child returned to the

10  porch?

11    MR. MURPHY:  Judge, I'm going to object.

12  That is not even impeaching.  There's been no

13  foundation laid for that.

14    THE COURT:  Objection overrruled.

15    MS. PLACEK:  Q  Did she tell you that the

16  child returned to the porch?

17    A    Yes, ma'am.

18    Q    Did she say that she later went to

19  check the porch and the child was gone?

20    A    Yes.

21    Q    Did she then say she called the

22  guardian, Mrs. Fields, who then, in turn, called

23  the police?

24    A    Yes.

62

1       MR. MURPHY:  Objection, Judge.

2       THE COURT:  The objection is sustained.

3       MS. PLACEK:  Q  Did she tell you that -- did

4    she tell -- did she tell you at the time that

5    Denise had run away before?

6       MR. MURPHY:  Objection.

7       THE COURT:  Sustained.

8       MS. PLACEK:  Q  Approximately what time did

9    you speak to her?

10      A    I spoke to her in the -- on the 2nd of

11   August in the morning.  Exactly what time, I

12   don't know, around 10 o'clock, I would say.

13      Q    Approximately what time did she say she

14   left?  And I'm speaking of Yolanda Hill.  Did she

15   tell you that her neice left the home?

16      MR. MURPHY:  Objection, Judge.

17      THE COURT:  Sustained.

18      MS. PLACEK:  That's all, Judge.

19      THE COURT:  Cross.

20      MR. MURPHY:  No questions, Judge.

21      THE COURT:  Thank you, Mr. Matkovich.  You

22   may step down.

23              Call your next witness, please.

24                  (Witness excused.)

63

**1313**

```
 1        MS. PLACEK:  I don't have any, Judge.

 2        THE COURT:  There's a police officer in the

 3   courtroom that was on this case, I believe.

 4        THE COURT:  Judge, I would ask for a few

 5   minutes before we proceed to the next witness.

 6        THE COURT:  Mr. Coleman is right outside of

 7   the door.  Would you ask him to come in.  We can

 8   start the call.

 9                        (Whereupon, the above-

10                         entitled cause was passed

11                         and other proceedings had,

12                         after which the following

13                         proceedings were had:)

14        CLERK:  Sheet 4, line 1; Jerome Hendricks.

15                        (Witness sworn.)

16        THE COURT:  You may proceed.

17        MS. PLACEK:  Your Honor, under Chapter 13,

18   we would ask that she be considered as a hostile

19   witness.

20        THE COURT:  We'll proceed, and we'll see if

21   she turns out to be a hostile witness, if so, I

22   will allow you that.

23                        ESTELLE FIELDS,

24   called as a witness on behalf of the Defendant,
```

64

**1314**

1    having been first duly sworn, was examined and

2    testified as follows:

3                         DIRECT EXAMINATION

4                         BY

5                         MS. PLACEK:

6        Q    State your name, spell your last name

7    for the purpose of the record.

8        A    Estelle Fields, F-i-e-l-d-s.

9        Q    You, in fact, were the legal guardian

10   of Denise Johnson, is that correct?

11       A    Yes.

12       Q    Approximately how long were you the

13   legal guardian of Denise?

14       A    About a year and a half.

15       Q    Previous to the August 1st date, 1988,

16   had Denise ever disappeared before?

17       A    No.

18       Q    By the way, calling your attention to

19   August 3, 1988, did you have a conversation with

20   the Chicago Police officer by the name of Daniel,

21   and I will spell the name, G-r-z-y-b.

22       MR. MURPHY:  Counsel, what date is that?

23       MS. PLACEK:  August 3rd.

24       Q    Did you have a conversation with a

65

1    police officer of that name?

2        A    Not that I recall, not that name.

3        Q    Well, let me ask you this.  You did

4    have conversations in regards to your missing --

5    the missing Denise Johnson with the Chicago

6    police, correct?

7        A    I'm sorry.  You said August 3rd?

8        Q    August 3rd.

9        A    Of '88?

10       Q    Of '88.  Did you have a conversation

11   with a Daniel -- and I'd ask the Court's help --

12   G-r-z-y-b, common spelling, I supposed?

13       A    Not that I remember.

14   MR. MURPHY:  Judge, I believe counsel is

15   going to go into a report which we don't have

16   possession of.

17   MS. PLACEK:  Well, I find that hard to

18   believe, Judge, since all of the reportrs we

19   subpeonaed.  We hand no independent reports.  And

20   all of the reports that we have were given us by

21   the State's Attorney's Office, Mr. Ronkowski, who

22   was then assigned the case.

23                And Judge, Mr. Lufrano, at the

24   beginning of this case, when they claimed not to

66

1316

1  have the whole youth missing person's file, which
2  we were originally given by the State, opened our
3  file to them for xeroxing.
4      MR. MURPHY:  Judge, first of all,
5  Mr. Ronkowski did not give all of the files to
6  the defense, because based on what he told me, I
7  checked that, after it was represented to the
8  Court the last time.  But, in any event, Judge,
9  on one of the previous dates, there was a
10  reference made to another report we didnt' have,
11  and counsel did tender to us a package of
12  reports, which were purportedly the youth reports
13  on this case.  They were stapled together by us,
14  and that report was not in the package, Judge,
15  and we did not have that report before that.
16  I have not seen that report.
17      MS. PLACEK:  I find that --
18      THE COURT:  Mr. Murphy, these are police
19  reports.  The State normally has more access to
20  them than the defense.
21      MR. MURPHY:  Sure, Judge.
22      THE COURT:  And you would be tendering to
23  her.  How would she know that you don't have
24  copies of police reports, which you're required

67

1    to tender to her?

2         MR. MURPHY:  Well, Judge, we filed a motion

3    for discovery in this case, too.   There's a duty

4    imposed on the defense as well as the State.   And

5    just because we work with the police department

6    does not mean that every report that's generated

7    we get.

8         THE COURT:  Tell me which rule under Rule

9    414 requires the defense to tender to you police

10   reports, Mr. Murphy?

11             If you don't have a copy of the

12   rule, I have a copy of it.  I'm not certain that

13   the rule even invisioned that, because one would

14   contemplate that the police would turn over to

15   you all of the reports that are relevant to this

16   case.

17             Now, if you're asking me for an

18   opportunity to get the report, I will all you to

19   do that.  But I'm not going to sanction the

20   defense because you don't have a police report,

21   unless there's some clear indication that

22   something untold has gone on in the procurment of

23   this report.  And I can't see how that could

24   possibly be.

68

1        MR. MURPHY:  Yes, Judge, I can't tell you

2   that, because I don't know, except that I thought

3   we had received all of the youth reports in the

4   possession of the defense.  And apparently, we

5   didn't.

6        THE COURT:  In the possession of the police?

7   You should be receiving all of the reports in the

8   possession of the police department.

9        MR. MURPHY:  There's a duty that goes both

10  ways in these motions.

11        THE COURT:  Tell me where it is in Rule 414

12  that imposes the duty on the defense to turn over

13  police department records to the State?

14        MR. MURPHY:  When we file a motion for

15  discovery, that means something with respect to

16  any material.

17        THE COURT:  It means that you follow rules.

18  If you show me a rule that obligates the defense

19  to do that which you're asking, I will enforce

20  the rule.

21        MR. MURPHY:  I would ask that the case be

22  passed for a minute.

23        MS. PLACEK:  I ask that no State's Attorney

24  be allowed to talk to the witness.

69                    1319

1    THE COURT:  Miss Fields, do not discuss your

2    testimony in this case with anybody, any of the

3    lawyers during the recess of this case.

4    MR. MURPHY:  I'd ask that that report be

5    tendered.

6    THE COURT:  Pass.  Take care of your own

7    discovery.

8                      (Whereupon, the case was

9                      passed and other proceedings

10                      had, after which time the

11                      following proceedings were

12          .          had:)

13    THE CLERK:  Sheet 4, line 1;

14    Jerome Hendricks.

15    THE COURT:  Miss Fields, would you come back

16    and take the stand, please.

17              Miss Placek, you may proceed.

18    MS. PLACEK:  Thank you, very much.

19                   DIRECT EXAMINATION CONT'D

20                   BY

21                   MS. PLACEK:

22    Q    Miss Field, I believe the last question

23    I asked you was whether or not on August 3rd,

24    1988, concernign the disappearance of your

70                **1320**

1    guardian -- Strike that -- not your guardian, but

2    Denise Johnson, whether you spoke to

3    Officer Grzyb from the youth area of the Chicago

4    Police Department.  Do you understand where we

5    are now?

6         A    Yes.

7         Q    And did you have a conversation with

8    that gentleman.  And I will spell his last name,

9    G-r-z-y-b.

10        A    I had a conversation with a gentleman

11   from the youth office, but I can't recall his

12   name.

13        Q    And at that time isn't it correct that

14   you told him that Denise Johnson had run away

15   before, in 1987?

16        A    No, ma'am.

17        MR. MURPHY:  Objection.

18        THE COURT:  What's the basis of the

19   objection?

20        MR. MURPHY:  Well, Judge, first of all,

21   they have not -- the defense has not laid the

22   foundation for impeachment.

23        MS. PLACEK:  Before the State interrupted, I

24   thought we did, Judge.

71

1          THE COURT:  The objection is sustained.

2          MS. PLACEK:  Q  Did Denise Johnson ever run

3    away before August 1st, 1988 date?.

4          A    No, ma'am.

5          Q    Calling your attention, again, to the

6    conversation on August 3, 1988, did you have a

7    conversation with an Officer Grzyb of the Chicago

8    Police Department?

9          A    Is this the same officer?

10         Q    Same officer, same question.

11         A    Yes.

12         Q    And did you tell him at that time that

13   Denise had, in fact, been missing from home in

14   1987?

15         A    No, ma'am.

16         Q    And run away?

17         A    No.

18         Q    Did Denise haev any interests, hobbies?

19         A    Yes.

20         Q    And what were those?

21         A    Tennis, swimming.

22         Q    Is that all?

23         A    She sang in the church choir.  She

24   loved that.

72

1      Q    Isn't it, in fact, true that her

2   interest was, in fact, boys?

3      A    No, ma'am.

4      Q    Calling your attention to August 3,

5   1988, again, speaking of Officer Grzyb, did you

6   tell him at the conversation previously mentioned

7   that the only interest or the interest that

8   Denise had was boys?

9      A    No, ma'am.  No.

10      Q    Now, you stated previous to the

11   interruption that, in fact, you had been Denise's

12   guardian for some -- almost two years, is that

13   correct?

14      A    Yes.

15      Q    And isn't it correct that since the

16   death of her mother -- I believe that would

17   coincide with the death of her mother, correct?

18      A    Grandmother.

19      Q    Grandmother.  I do beg your pardon.

20   Grandmother, correct?

21      A    Yes.

22      Q    And would it be correct in saying that

23   since Denise's grandmother died or passed, Denise

24   had become a problem child?

73                    1323

1       A     No.

2       MR. MURPHY:  Objection.

3       THE COURT:  Overruled.

4       MS. PLACEK:   Q   Again, calling your

5   attention to that conversation with Officer Grzyb

6   on August 3rd, 1988, did you, in fact, tell him

7   that -- well, let me rephrase.  And may I

8   withdraw that question and ask another?

9       THE COURT:  You may.

10      MS. PLACEK:   Q   Would it be correct in

11  saying that previous to her disappearance that

12  Denise had become a problem child?

13      A     No.

14      Q     Calling your attention, again, to the

15  August 3rd, conversation with Officer Grzyb, did

16  you, in fact, tell him that Denise had become a

17  problem child?

18      A     No.

19      Q     Thank you.

20      THE COURT:  Cross.  Are you finished?

21      MS. PLACEK:  No, just dramatic effect,

22  Judge.

23      THE COURT:  You may continue.

24      MS. PLACEK:   Q   Now, calling your attention

74                      1324

1    to August 7th, 1988, did you have -- did you know

2    who Hardy Johnson was

3        A    Yes.

4        Q    And could you tell his Honor, Judge

5    Holt, who Hardy Johnson was?

6        A    My brother-in-law.

7        Q    Well, would it be correct in saying

8    that he was Denise's step-grandfather?

9        A    Yes.

10       Q    And would it be correct in saying that

11   in July of 1988, and on August 1st, 1988, that,

12   in fact, Denise wanted to stay with Hardy

13   Johnson?

14       THE COURT:  Do you understand the question?

15       THE WITNESS:  Yes, I understand the

16   question.

17       A    Well, yes.

18       MS. PLACEK:  Q  And isn't it correct she not

19   only wanted to stay at Hardy Johnson's, but she

20   often ran over to Hardy Johnson's address and

21   stayed there, correct?

22       A    No.

23       Q    Well, let me ask you this.  Am I

24   correct in saying that when Denise -- could it be

75                    1325

1  correct in saying that Hardy Johnson had helped

2  Denise against your wishes in these occasions?

3       MR. MURPHY:  Objection, Judge.

4       THE COURT:  The objection is sustained.

5       MS. PLACEK:  Q  Well, let me ask you this.

6  How would you describe your relationship with

7  Hardy Johnson?

8       MR. MURPHY:  Objection, Judge.

9       THE COURT:  No.  Overruled.

10      THE WITNESS:  A  It's okay.

11      MS. PLACEK:  Q  Well, when you say "okay,"

12  would it be correct that sometimes the two of you

13  -- and I'm speaking of yourself and

14  Hardy Johnson -- fought or had a dis -- may I

15  withdraw"fight," Judge -- had a disagreement over

16  the raising of Denise?

17      MR. MURPHY:  Objection, Judge.

18      THE COURT:  Overruled.

19      THE WITNESS:  A  Sometimes.

20      MS. PLACEK:  Q  Am I correct in saying that

21  Hardy Johnson often helped out Denise against

22  your wishes?

23      A    No.

24      Q    Calling your attention to August 3rd,

76                    1326

1    1988, did you have a conversation with an

2    Officer Padgurskis, P-a-d-g-u-r-s-k-i-s, of the

3    Chicago Police Department, Area Two Youth

4    Division?

5        A    I can't recall the dates or the names.

6    I have had conversations with several police

7    officer since this incident.  I could have.  I

8    can't say for sure.

9        Q    Well, at that time did you state that

10   Hardy Johnson had previously assisted Denise

11   against, Mrs. Fields's, your wishes?

12       MR. MURPHY:  Objection, Judge.

13       THE COURT:  Basis?

14       MR. MURPHY:  What's the relevance, Judge?

15       THE COURT:  I don't know.  It may develop to

16   be relevant.  The objection is overruled.

17       MS. PLACEK:  Q  Did you state at that time

18   that Hardy Johnson had previously assisted Denise

19   against your wishes?

20       A    No.

21       Q    Do you know where Hardy Johnson lived?

22       A    No, ma'am, not at this time.

23       Q    Well, at that time, on August -- around

24   August 1st, through 8th of 1988?

77

1         A    Yes.

2         Q    Could you tell his Honor, Judge Holt,

3    where he lived?

4         A    10530 South State.

5         Q    Thank you.

6              By the way, isn't it correct that

7    Denise had a habit of freely associating with

8    older men or boys in their late teens?

9         A    No, ma'am.

10        Q    Calling your attention, again, to that

11   August 3rd conversation with Officer Padgurskis,

12   P-a-d-g-u-r-s-k-i-s, do you remember having that

13   conversation?

14        A    I remember having a conversation with

15   an officer.

16        Q    Did you at that time tell him,

17   Mrs. Fields, that yourself, explained that Denise

18   had a habit of socializing freely with older men

19   or boys in their late teens?

20        A    No.

21        Q    Now, calling y our attention to the

22   address of 103rd and Michigan, do you know where

23   this is in relationship to 10530 South State?

24        A    No.

78                    1328

1      Q    Do you know where, in fact, 109th and

2  Indiana is in relation to 10530 State Street?

3      A    No.

4      Q    Calling your attention to August 7,

5  1988, did you have occasion to go anywhere with

6  the Chicago Police Department?

7      A    Pardon me?

8      Q    Did you have an occasion to go anywhere

9  with the Chicago Police Department?

10     A    I went with an officer.

11     Q    Would that be Officer Kaddigan?

12     A    It could be.  I can't recall those

13  names.  I'm sorry.

14     Q    Well, was Officer Kaddigan a White man?

15     A    Yes.

16     Q    And on August 7th, did he come to your

17  home?

18     A    Yes.

19     Q    And when he came to your home, did he

20  take you anywhere?

21     A    Yes.

22     Q    Where did he take you?

23     A    Took me on the next block on Wabash.

24     Q    And the next block on Wabash, did he

79                     1329

1    take you anywhere else?

2        A   He was -- he was just going on the next

3    block.  He was just riding around.

4        Q   When you say, "riding around," do you

5    know how far with Officer Kaddigan you went?

6        A   From State Street over on Michigan.  We

7    went down to 107th and Michigan.   And then back

8    around to the house.

9        Q   And could you describe what kind of

10    neighborhood this was?

11        MR. MURPHY:  Objection, Judge.

12      THE COURT:  Overruled.

13        THE WITNESS:  A  A regular neighborhood.

14        Q   When you say regular neighborhood, is

15    this a residential neighborhood?

16        A   Residential.

17        Q   And when -- did you know why

18    Officer Kaddigan was taking you around?

19        A   Yes, ma'am.

20        Q   Why was Officer -- why were you in the

21    car with Officer Kaddigan?

22        A   He said that someone had called the

23    police station on the phone and said that --

24        MR. MURPHY:  Objection, Judge, this is

1   hearsay.

2        MR. LUFRANO:  It's not for the truth of the

3   matter.

4        THE COURT:  What's the purpose?

5        MR. LUFRANO:  The purpose is to show why she

6   was in the car, the state of mind of the officer

7   and she --

8        THE COURT:  I will receive it for that

9   limited purpose.  Objection overruled.

10        MS. PLACEK:  Q  Continue your answer, ma'am.

11        A    He said that a guy had called down at

12   the police station and had said -- gave them some

13   information about that they had thought they had

14   seen Denise somewhere around in this area.

15        Q    And approximately -- did he say a guy

16   or two women?

17        A    He said a guy.

18        Q    And did he say when this guy, in fact,

19   had called?

20        A    That night or something.

21        Q    And did he say that this guy had, in

22   fact, seen Denise in the area that day?

23        A    He said that someone had told him that

24   they seen Denise.

81                      **1331**

1     Q   In the area that day?

2     A   Yes.

3     Q   Thank you.

4            How long did you ride around in

5 the car with Officer Kaddigan that night?  And

6 I'm speaking of the August 7th night.

7     A   It wasn't long.  About -- maybe five or

8 ten minutes.

9     Q   Beforfe that, had you given

10 Officer Kaddigan a picture of Denise?

11    A   Not that I can recall.

12   Q   Do you know whether or not he had a

13 photo of Denise?

14    A   Not that I can recall.

15   MS. PLACEK:  Thank you.  That's all, Judge.

16   THE COURT:  Cross.

17            CROSS EXAMINATION

18               BY

19            MR. MURPHY:

20    Q   Now, Mrs. Fields.

21    A   Yes?

22    Q   Mrs. Fields, Denise was what

23 relationship to you?  Besides you being her

24 guardian before she died, what other relationship

82

1332

1    did you have with her?

2         A    She was my niece.

3         Q    And Mr. Hardy Johnson, he was your

4    stepbrother, is that correct?

5         A    He's my brother in law.

6         Q    What relationship was he to Denise?

7         A    Her grandfather.

8         Q    Now, Denise was living with you at the

9    time that she disappeared on August 1st, 1988, is

10   that correct?

11        A    Yes.

12        Q    And before she moved in with you, she

13   had been living with her grandfather, is that

14   correct?

15        A    Yes.

16        MS. PLACEK:  Objection.

17        THE COURT:  Basis?

18        MS. PLACEK:  Beyond the scope.

19        THE COURT:  Overruled.

20        MR. MURPHY:  Q  In fact, she was living with

21   her grandfather and her grandmother?

22        A    Yes.

23        Q    And then her grandmother died?

24        A    Yes.

83                      1333

1          MS. PLACEK:   With all due respect, this is

2     continuing beyond the scope, Judge.

3          THE COURT:  Overruled.

4          MR. MURPHY:  Q  And after her grandmother

5     died, her grandfather couldn't handle her, and

6     she moved in with you and your family, is that

7     correct?

8          A    Yes.

9          Q    And approximately how long did she live

10    with her grandmother and grandfather before she

11    died?

12       .  MS. PLACEK:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  All of her life.

15          MR. MURPHY  Q  And that was her home before

16    she moved into your place, is that correct?

17          A    Yes.

18          Q    And she loved her grandfather and

19    grandmother.

20          A    Yes.

21          Q    When she moved into your home, would it

22    be fair to say that she missed her grandfather

23    and missed her home?

24          A    Yes.

84

```
1           MS. PLACEK:  Objection.

2           THE COURT:  Overruled.

3           MR. MURPHY:  Q  And counsel asked you that

4    when Denise was living in your home did she ever

5    want to stay at her grandfather's house, and you

6    said she did, is that true?

7           A    Yes.

8           Q    In fact, she told you at various times

9    that she wanted to go back and live with her

10   grandfather, whom she had lived with most of her

11   life, isn't that true?

12     .  A    She wanted her grandfather -- all of us

13   to live together.

14          MS. PLACEK:  Motion to strike.  Hearsay.

15          THE COURT:  Overruled.

16          MR. MURPHY:  Q  And Estelle, at any time

17   when Denise was living with you did she ever go

18   to her grandfather's house after she moved in

19   with you?

20          A    Yes.

21          Q    And at any time did she ever go to her

22   grandfather's house without you knowing about it?

23   Did that ever happen one time?

24          A    One time.
```

85

1    MS. PLACEK:  Objection.

2    THE COURT:  What's the basis of your

3    objection?

4    MS. PLACEK:  Beyond the scope, Judge, but

5    specifically as to foundation.

6    THE COURT:  Overruled.

7    MR. MURPHY:  Q  Did that ever happen one

8    time, Estelle?

9    A    Yes, once.

10   Q    And could you tell Judge Holt the

11   circumstances under which that happened

12   A    I had gone to the store, and when I

13   came back, my daughter was sleep.  And when I

14   came back, Denise was gone.  And I asked my

15   daughter where she was, and my daughter said that

16   she didn't know.

17                 Well, then, I called over her

18   grandfather's house, who was her second guardian,

19   and he wasn't there at the time.  And so, then, I

20   called the police.  And the police asked me to

21   call over their again.  When I did call again, he

22   was at home.  And he had picked her up, And we

23   had a disagreement over that.  He was supposed to

24   let me know when he's taking her, even though we

86

1    had the same guardianship.

2         Q    This was after she had moved into your

3    home, is that right?

4         A    Yes.

5         Q    And were you upset because Denise left

6    your home and went to her grandfather's house and

7    you were not aware of it, is that correct?

8         A    Right.

9         Q    Would it be fair to say at that time

10   that you may have been even a little upset at her

11   granfather?

12       MS. PLACEK:  Objection.

13       THE COURT: Overruled.

14       THE WITNESS:  A  Yes.

15       MR. MURPHY:  Q  To you knowledge, that was

16   the only time that she was in your home that she

17   ever left and went somewhere and you didn't know

18   where she was at, is that correct?

19       A    Yes.

20       Q    And on that particular occasion, she

21   went to her grandfather's house?

22       A    Yes.

23       Q    And her grandfather, in fact, picked

24   her up, at least drove her some of the way to the

87

1   house, is that true?

2        A    Yes.

3        Q    At any other time, either when Denise

4   was living with you or in your relationship with

5   Denise, did you ever know her to ever run away

6   from home?

7        A    No.

8        Q    At any time when she was in your home,

9   did she ever spend any nights out on the street

10  away from her bed?

11       A    No.

12       Q    Did you ever have any knowledge,

13  Estelle, of Denise wanting to be with men or

14  boys?

15       A    No.

16       Q    During the time that she was living in

17  your home, did you have any kind of difficulty

18  with her having relationship at all with men or

19  boys?

20       A    Never.

21       Q    And Estelle, to your knowledge, all of

22  the time that you knew Denise, would you say that

23  she was a typical twelve-year-old girl?

24       MS. PLACEK:   Objection.


1338

88

1      THE COURT:  Objection sustained.

2      MR. MURPHY:  Q  Did she do things with her

3  friends when she was living at your home?

4      A    Yes.

5      MR. LUFRANO:  Your Honor, this is way beyond

6  the scope.

7      THE COURT:  Overruled.

8      MR. MURPHY:  Q  She went out and played with

9  her friends at various times, is that true?

10     MR. LUFRANO:  Objection, asked and answered.

11     THE COURT:  Overruled.

12     THE WITNESS:  Yes.

13     MR. MURPHY:  Q  Did she help out around the

14  family in the home?

15     MR. LUFRANO:  Objection, irrelevant.

16     THE COURT:  That's irrelevant.  The

17  objection is sustained.

18     MR. MURPHY:  Q  Now, on this particular day,

19  August 1st, 1988, she went over to babysit at her

20  cousin's house, is that right?

21     MS. PLACEK:  Objection, beyond the scope.

22     THE COURT:  Sustained.

23     MR. MURPHY:  I have no further questions,

24  Judge.

89

```
1          THE COURT:  Redirect.

2                        REDIRECT EXAMINATION

3                              BY

4                        MS. PLACEK:

5      Q    By the way, who is Denise Wilson?

6      A    That's Denise's mother.

7      Q    And how are you related to

8  Denise Wilson?

9      A    I'm her aunt.

10     Q    So, you're both the aunt of Denise

11 Wilson and you're also the aunt of the child

12 Denise Wilson? (sic)

13     A    Yes.

14     Q    And by the way, you said Denise wasn't

15 habitually missing, correct?

16     A    Right.

17     Q    So, you would never tell Officer

18 Bernard Pistello, when he asked you how many

19 times she had been missing before, habitually,

20 correct?

21     MR. MURPHY:  Objection.

22     THE COURT:  Sustained.

23     MS. PLACEK:  Q  Did you ever tell, on August

24 5th, 1988, Officer Bernard Pistello that, in
```

90

1    fact, Denise was habitually missing?

2        MR. MURPHY:  Objection.

3        THE COURT:  Overruled.

4        THE WITNESS:  A  I never told him that she

5    was missing.

6        MS. PLACEK:  Q  Now, this one incident the

7    State's Attorney asked about involving the

8    grandfather, when was that?

9        A    About, maybe six months after my sister

10   died, I think.  I can't recall -- give you the

11   date or the time or the day.

12       Q    What year?

13       A    It was in '87.

14       Q    And the way you described it, once you

15   found out where -- well, let me ask you this.

16       MS. PLACEK:  May I withdraw that, Judge?

17       Q    How long was Denise missing?

18       A    On the date that I was talking about?

19       Q    Yes.

20       A    About fifteen minutes.

21       Q    She wasn't missing a day, was she?

22       A    No.

23       Q    By the way, isn't it correct that in

24   1987, Denise was, in fact, missing a day from

91                          1341

1    your home?

2         MR. MURPHY:  Objection, Judge.

3         THE COURT:  Sustained.  It's been asked and

4    answered.

5         MS. PLACEK:  I will withdraw on that basis,

6    Judge.  That's all.

7         THE COURT:  Anything further?

8         MR. MURPHY:  No, Judge.

9         THE COURT:  Thank you, Mrs. Fields.  You may

10   step down.

11                      (Witness excused.)

12      .  THE COURT:  Do you have any further

13   witnesses?

14        MS. PLACEK:  If the uniformed police officer

15   is still here, Judge.

16        THE COURT:  Is he still here?

17        MR. MURPHY:  Yes, sir.  And also, Officer

18   Kaddigan is here, too.  They are in the jury

19   room.

20                  Judge, may the witness remain in

21   the courtroom?

22        THE COURT:  She may remain.

23        MR. LUFRANO:  Q  We call Officer Blackman.

24        THE CLERK:  Raise your right hand, officer.

1342

92

```
 1                    (Witness sworn.)

 2         THE COURT:  You may proceed, Mr. Lufrano.

 3                    JOHN BLACKMAN,

 4    called as a witness on behalf of the Defendant,

 5    having been first duly sworn, was examined and

 6    testified as follows:

 7                    DIRECT EXAMINATION

 8                    BY

 9                    MR. LUFRANO:

10         Q    Good afternoon.  State your name and

11    occupation, please, spelling your last name.

12         A    John Blackman, B-l-a-c-k-m-a-n.

13         Q    Calling your attention to July, 1984,

14    do you recall speaking with a young lady by the

15    name of Phyllis Williams?

16         A    I'd have to refresh my memory, sir.

17         Q    Is there anything that would help you

18    refresh your recollection?

19         A    A copy of my case report would come in

20    kind of handy.

21         Q    Show you what is marked as People's

22    Exhibit No. 6 for identification.  Would you look

23    at this, please?

24         THE COURT:  This is in 1984?
```

93

1        MR. LUFRANO:  Yes, your Honor.

2        MS. PLACER:  This goes to impeachment.

3        MR. LUFRANO:  She had testified here.

4        THE WITNESS:  Okay.

5        MR. LUFRANO:  Q  Now, officer, does that

6    refresh your recollection to any degree?

7        A     Slightly, it does, sir.

8        Q     Now, do you recall the young lady?

9        A     Offhand, I couldn't identify her if she

10   stood before me right now.

11       Q     Now, from that report and what

12   recollection it refreshes, were you the first

13   officer on the scene there?

14       A     My partner and myself, yes.

15       Q     Now, you were at her home, correct?

16       A     Says we were called to 7415 South

17   Phillips.

18       Q     That is not a hospital, correct?

19       A     That is not a hospital, no.

20       Q     And at that time you had a discussion

21   with her concerning the allegations of rape.

22       A     Yes, we did.

23       Q     And to your recollection up until that

24   time, she had not gone to the hospital, correct?

94

1          MR. MURPHY:  Objection.

2          THE COURT:  What's the basis of your

3    objection

4          MR. MURPHY:  What's the relevance, Judge?

5    First of all, how does this officer know.  Number

6    two, what is the relevance of it?

7          MS. PLACEK:  Impeachment, Judge, of the

8    witness as to prior crimes.  If the officer would

9    step out of the courtroom.

10         THE COURT:  How does this impeach?

11         MS. PLACEK:  Judge, if the officer would

12    step out.

13         THE COURT:  That's not necessary.

14         MS.  PLACEK:  The witness testified that she

15    didn't know she was in the hospital when she was

16    speaking to the uniformed police officer, Judge.

17    The point is that according to his report, and

18    again --

19         THE COURT:  The objection is overruled.

20         MS. PLACEK:  Thank you.

21         MR. MURPHY:  Judge, It's collateral.  She

22    said she spoke to the police officer. If she

23    spoke that police officer at the hospital, what

24    does it matter whether it was this officer or

95

1     another officer?

2         THE COURT:  The objection is overruled.

3         MR. LUFRANO:  Q  Officer, do you remember

4     the question?

5         THE WITNESS:  A  You asked if this took

6     place in a hospital.

7         Q    Right.

8         A    It did not.

9         Q    To your knowledge, at the time you had

10    spoken to her, she had not been to a hospital,

11    correct?

12        A    To my knowledge, no.

13        Q    And you asked her that specifically,

14    did you not?

15        A    I asked her if she would like to go to

16    a hospital.

17        Q    What did she say?

18        A    I can't recall.

19        Q    Well, did you take her to the hospital?

20        A    Counselor, for the life of me, I

21    couldn't give you an answer one way or the other

22    right now.  It's been that long ago.

23        Q    If you had transported her to the

24    hospital, would that have appeared in your notes?

96

1      A    Yes, it would have.

2      Q    Does it appear in your notes?

3    MR. MURPHY:  Objection.

4    THE COURT:  Sustained.

5    MR. LUFRANO:  Q  Well, you have reviewed

6    your notes, correct?

7      A    I have reviewed them, yes.

8      Q    And there is nothing in those notes

9    that causes you to remember taking her to the

10   hospital, correct?

11   MR. MURPHY:  Objection.

12   .  THE COURT:  Sustained.

13   MR. LUFRANO:  Q  Well, at this point you

14   don't remember taking her to the hospital.

15     A    At this point, I don't.

16     Q    Now, did she inform you that she and

17   the defendant Jerome Hendricks went to a game

18   room after having sex?

19     A    I don't recall.

20     Q    Did she tell you anything about the

21   incident itself?

22     A    Counselor, I didn't write the report

23   here.  But she didn't tell me anything except,

24   basically, what is here right now.

97

1      Q    Right.  Had she done that, that would

2  have been included in the report, right?

3      A    It may or may not have, sir.

4      MR. MURPHY:  Objection, Judge.

5      THE COURT:  Sustained.· .

6      MR. LUFRANO:  Q  There was an allegation of

7  rape, correct?

8      A    Yes, there was.

9      Q    And there was an allegation of force,

10  correct?  It's inherent in the charge of rape.

11      A·    Yes, there was.

12  .  Q    And there's no weapon that you recall

13  mentioned to you after reading your report,

14  correct?

15      A    There in the report on line -- it says

16  -- 50, item 4, it's X'd with a knife.

17      Q    There's no mention in your report, nor

18  do you ever remember her telling you, that there

19  was a rope involved, correct?

20      MR. MURPHY:  Objection.

21      THE COURT: ·Sustained.

22      MR. LUFRANO:  Q  Officer, after refreshing

23  your recollection with the notes taken after

24  speaking with her on the date in questions, do

98

1    you recall whether or not she mentioned that a

2    rope was used?

3         A    I can't recall.

4         Q    Now, how long had you been an officer

5    when this report was written?

6         A    Sixteen years.

7         Q    Now, to the charge of rape, if somebody

8    had indicated to you, after sixteen years on the

9    police force, that as a part of that rape a rope

10   was used, would it not have been customary for

11   you to put that in the report?

12        ·   MR. MURPHY:  Objection.

13            THE COURT:  Sustained.

14            MR. LUFRANO:  Q  Would you not have, in

15   fact, put that in your report?

16            MR. MURPHY:  Objection.

17            THE COURT:  Sustained

18            MR. LUFRANO:  Q  You discussed with her the

19   entire incident, did you not?

20        A    I don't recall.

21        Q    Well, sir, what were you there for?

22            MR. MURPHY:  Objection, Judge.

23            THE COURT:  Sustained.

24            MR. LUFRANO:  Q   You were not there,

99

1    specifically, to gain information concerning the

2    charge that she was attempting to make at the

3    time?

4        MR. MURPHY:   Objection.

5        THE OCURTG:  Overruled.

6        THE WITNESS:  We were there to find out if,

7    in fact, a crime had been commited, as had been

8    alleged when the dispatcher gave us the

9    assignemtnt.

10       MR. LUFRANO:  Q  Right.  And you want the

11   details of that crime, correct?

12       A    That's correct.

13       Q    That is the duty of the first officer

14   on the scene, is it not?

15       A    That is the duty of the preliminary

16   investigator.

17       Q    And isn't he to be as thorough as

18   possible?

19       A    He is.

20       Q    And were you not, in fact, as thorough

21   as possible?

22       MR. MURPHY:  Objection, Judge.

23       THE COURT:  The objection is sustained.

24       MR. LUFRANO:  Q  Now, she never told you

100

1    anything about having one leg out of her pants,

2    did she?

3        A    Not that I recall.

4        Q    Now, officer, looking at the date, what

5    time was this alleged occurrence?

6        A    Looking at the date, the time was

7    18:30, which is 6:30 civilian time, in the

8    evening.

9        Q    And what time did you and your partner

10   arrive?

11       A    The next day at 2:25 hours, which is

12   2:25 in the morning.

13       Q    Now, that's approximately eight to ten

14   hours later, correct?

15       A    That's approximately.

16       Q    And you were the first officer there,

17   correct?

18       A    We were the first ones sent over to

19   that address, yes, sir.

20       Q    And she made no mention of talking to

21   anyone else prior to that, correct?

22       A    To the best of my knowledge, I don't

23   recall.

24       Q    And you did not talk to her at a

101

1    hospital nor transport her to a hospital,

2    correct?

3         A    Again, to the best of my knowledge, I

4    don't recall transporting her to the hospital or

5    talking to her in a hospital?

6         MR. LURANO:  No further questions.

7         THE COURT:  Cross.

8                    CROSS EXAMINATION

9                         BY

10                   MR. MURPHY:

11        Q    Officer, you testified you don't

12   remember anything about a hospital?  You were

13   only shown your case report.  Is there anything

14   else that would refresh your recollection other

15   than the case report?

16        A    Possibly.

17        Q    Would the Supplemental report refresh

18   your memory?

19        A    Possibly.

20        MR. LUFRANO:  Objection, he didn't prepare

21   it.

22        THE COURT:  It doesn't make any difference

23   what it was that refreshes his memory, whether he

24   prepared it or not.


102

1352

1          MR. MURPHY:  Thank you, Judge.  I'm sorry.

2     What number are we at at this point?  Do your

3     records indicate?

4          THE COURT:  Thirty-five.

5          MR. MURPHY:  Thank you, Judge.  For the

6     record, I will mark this exhibit People's Exhibit

7     No. 35.

8          Q    Do you recognize what that is?

9          A    It's a supplemental case report to the

10    original case report that my partner and myself

11    executed on the first of June.

12         Q    I'm going to ask you to look at that

13    report, look at both pages.  It's a two-page

14    report, is that correct?

15         A    Yes, it is.

16         Q    As you look at the supplemental report,

17    officer, is your memory refreshed as to whether

18    or not this woman, Phyllis Williams, was taken to

19    a hospital?

20         MR. LUFRANO:  Objection, because it's still

21    hearsay, your Honor.  No, withdrawn, Judge, not

22    at this time.

23         THE OCURT:  The objection is withdrawn.

24         MR. MURPHY:  Q  Take a few minutes, officer.

103

**1353**

1        A    Yes, sir.  The report would indicate

2    that --

3        MS. PLACEK:  Excuse me.  Volunteering,

4    Judge.

5        MR. MURPHY:  Q  Please read the report and

6    tell me if after you have read the report your

7    memory is refreshed then.  I'm not asking you to

8    tell me what the report says.

9        A    My memory has been refreshed.

10       MR. MURPHY:  Q  And was she, in fact, taken

11   to a hospital, officer?

12       A    She was.

13       Q    Where was she taken?

14       A    It would have been Jackson Park.

15       Q    And officer, you noted that she was

16   taken to a hospital.  Do you remember exactly

17   what hospital it was or are you guessing?

18       MS. PLACEK:  Objection, asked and answered.

19       THE COURT:  Objection overruled.

20       MR. MURPHY:  Q  Officer, do you remember

21   what hospital?

22       A    Not offhand, but most of our -- the

23   nearest hospital to that area would be Jackson

24   Park.

104

1        Q    Is there anything that would refresh

2   your memory as to the hospital she was taken to?

3        A    That would have been in the report, and

4   I possibly skipped right over it.

5        MR. LUFRANO:  Objection to refreshing his

6   recollection again.

7        THE COURT:  Overruled.

8        MR. MURPHY:  Q  Officer, look at the report.

9   And once you have looked at it, please give it

10  back to me.  Is your memory refreshed as to what

11  hospital?

12    .  A    Yes, it is.

13       Q    What hospital was that?

14       A    Southshore Hospital.

15       Q    Officer, you also testified that -- and

16  a question was asked you on direct examination

17  that there was an allegation of force, is that

18  correct?

19       A    That's correct.

20       Q    And the allegation of force was based,

21  at least as to what you recall, based at least

22  one weapon, is that correct?

23       A    That's correct.

24       Q    And the reason you know that it was a

105

1    weapon and that weapon was a knife is you looked

2    at your original report and refreshed your

3    memory, isn't that true?

4         A    Yes.

5         Q    Was there any other weapon inovled that

6    you remember as you sit here now?

7         A    Not that I could honestly say that I

8    remember, no.

9         Q    Is there anything that would refresh

10   your memory as to any other weapon involved in

11   the commission of this aggravated criminal

12   assault or rape?

13        A    It may be in the report -- in the

14   supplemental that we didn't include in our

15   original.

16        Q    Thank you.  Ask you to look at that

17   police report, please.  Read it and tell me if

18   your memory is refreshed as to whether another

19   weapon was used.

20        A    It's refreshed.

21        Q    And officer, what do you remember about

22   the use of another weapon and what that weapon

23   was?

24        A    Use of another weapon had been

106

**1356**

1  mentioned, and my partner did not put it in the

2  report, but --

3      Q    What was that weapon?

4      A    The other weapon was a rope.

5      Q    What is your recollection about that

6  weapon?

7      A    It had been placed around her neck and

8  used through out the act.

9      Q    Officer, would it be fair to say as you

10  sit here almost seven years later that a lot of

11  these incidents aren't clear in your mind?

12      A    A lot of them are not.

13      Q    And much of the conversation that you

14  had with the complaining witness in this case,

15  you don't recall except from reviewing the report

16  and refreshing your memory as to what is in there

17  and what is not in there, is that correct?

18      A    That's correct.

19      Q    And it would also be fair to say that

20  the one police report that is prepared in this

21  case that you were shown, the defense exhibit,

22  was not prepared by you, but was prepared by your

23  partner?

24      A    That's correct.

107

1  Q That police report contains a

2 three-line summary of this incident, is that

3 correct?

4  A That's correct.

5  Q And obviously that report doesn't

6 contain all of the information that you and your

7 partner learned with respect to this case, isn't

8 that true?

9  A Yes.

10  MS. PLACEK: Objection.

11  THE COURT: Overruled.

12  MS. PLACEK: Not authored, how does he

13 know?

14  THE COURT: Overruled.

15  MR. MURPHY: Q Is that true, officer?

16  A That's true.

17  Q And officer, in this particular case,

18 would you and your partner be the only officer

19 who would have contact with the victim in this

20 case?

21  A Throughout the whole investigation?

22  Q Yes.

23  A No, sir.

24  Q Would you tell Judge Holt what did

108

1    happen in this case, if you recall, after you and

2    your partner responded to the scene?

3         THE COURT:  What's the relevance?

4         MR. MURPHY:  They are trying to impeach the

5    witness with the fact that she didn't speak to

6    the officer at the hospital.

7         MS. PLACEK:  If it pleases the Court, she

8    said she spoke to the officer at the hospital.

9         MS. MURPHY:  I withdraw it, Judge.  No

10   further questions.

11        THE COURT:  Anything further?

12        MR. LUFRANO:  Yes, Judge.

13                        REDIRECT EXAMINATION

14                        BY

15                        MR. LUFRANO:

16        Q    Officer, do you remember the name of

17   your partner on that day?

18        A    Lawrence Terry.

19        Q    Now, the second report that that was

20   shown to you by the officer who spoke with her at

21   the hospital, that was the supplemental report,

22   correct?

23        A    That's correct.

24        Q    That was done after you and your

109

1    partner left, right?

2        A    That's correct.

3        Q    It was some other officers who brought

4    her to the hospital some ten hours after this

5    incident, right?

6        A    It would probably be the follow-up

7    investigators, which are commonly called

8    detectives, sir.

9        Q    Now, other than the two reports, you

10   really don't have any independent recollection,

11   right?

12       A    That's correct.

13       Q    One report, you and your partner did,

14   right?  That was Defendant's No. 6.  The

15   Supplemental report was done by two officers that

16   you didn't have any contact with, correct?

17       A    True.

18       Q    And the things that they were talking

19   about to the witness there being a rope involved

20   wasn't in your report, right?

21       MR. MURPHY:  Objection, Judge.

22       THE COURT:  Overruled.

23       THE WITNESS:  A  It wasn't in ours, no.

24       MR. LUFRANO:  And there was not rope or

110

1    knife ever recovered, correct?

2         A    Not to my knowledge.

3         MR. LUFRANO:  Q  Would anything refresh your

4    recollection to be sure?

5         MR. MURPHY:  Objection, Judge.

6         THE COURT:  What's the basis?

7         MR. MURPHY:  Q  He said there was no rope or

8    knife recovered to his recollection.

9         THE COURT:  Now, we're going to see if we

10   can refresh his recollection.

11        MR. LUFRANO:  Q  Show you what's marked as

12   Defendant's Exhibit No. 7 for identification,

13   which is a copy of the supplemental report.

14        THE COURT:  Objection overruled.

15        MR. LUFRANO:  Does that refresh your

16   recollection as to the evidence that was

17   recovered?

18        A    Yes, it does.

19        Q    And What was that, sir?

20        A    The evidence recovered was none.

21        Q    Now, did you notice the date of the

22   supplemental report?

23        MR. MURPHY:  Objection.

24        THE COURT:  Overruled.

111

1361

1          MR. LUFRANO:  Q  Show you again what's

2     marked as Defendant's Exhibit No. 3 -- I'm sorry

3      -- No. 7 for identification.  What is the date

4     that it bears?

5          MR. MURPHY:  Objection.

6          THE COURT :  The objection is sustained.

7          MR. LUFRANO:  Q  Now, supplemental reports

8     are written after the original case report,

9     right?

10         MR. MURPHY:  Objection.

11         THE COURT:  Sustained, not relevant.

12      .  MR. LUFRANO:  Q  Now, after reviewing the

13    supplemental report and the case report, do you

14    remember the victim Miss Williams telling you

15    that she and the perpetrator went to a liquor

16    store and a game room?

17         MR. MURPHY:  Objection, asked and answered

18    on direct.

19         MS. PLACEK:  State since refreshed his

20    memory, Judge.

21         THE COURT:  Overruled.  Could you repeat the

22    question, counsel.

23         MR. LUFRANO:  Q  After refreshing your

24    recollection with the supplemental report, do you

112

1    remember Miss Williams telling you and Officer

2    Terry that after the incident she and the

3    perpetrator left and went to a liquor store,

4    bought some liquor and then went to a game room

5    together?

6            A    I don't recall her saying that.

7            Q    Do you recall her saying that to you

8    yesterday when you were talking to me?

9            MR. MURPHY:  Objection.

10           THE COURT:  Sustained.

11           MR. LUFRANO:  Q  Officer, is there anything

12   that would refresh your recollection as to

13   whether or not that statement was made?

14           MR. MURPHY:  Objection.

15           THE COURT:  Overruled.

16           MR. MURPHY:  Judge, this is not impeachment

17   in any event, because the witness testified

18   consistent with those facts.

19           THE COURT:  It's not a question of

20   impeachment.  This witness is called in the

21   defense case in chief, and they are not trying to

22   impeach him, they are trying to refresh his

23   recollection and extract information from him if

24   they can.

113

1       MR. MURPHY:  What they are doing that for is

2  to offer a hearsay statement.

3       THE COURT:  Well, I'm not certain whether

4  it's hearsay or not.  It may be a lapse in his

5  memory of what Phyllis Williams told him.  And if

6  that's what it is, then the document is

7  appropriately used.

8              What's bothering me more than

9  anything else is an excursion into a crime which

10  took place four years before the event.  And it

11  is wholly collateral.  The problem is it was

12  introduced in your case in chief.  Now, we are

13  defending something that has long since go by.

14       MS. PLACEK:  Then we would ask for a ruling

15  on our motion in limine, ask that the testimony

16  of other crimes be stricken.

17       THE COURT:  That request is denied, and

18  therefore, they have a right to attack that

19  information.  However, it's going to go on,

20  because we're not going to defend that trial.

21  But that's the problem of introducing it.  You

22  get off into excursions that tend to distract and

23  in many instances utilize time inappropriately.

24       MR. MURPHY:  Judge, I understand that.  It's

114                    1364

1    just that from my recollection of

2    Phyllis Williams' testimony, this is not

3    impeaching.

4          THE COURT:  It isn't seeking to impeach.

5          MR. MURPHY:  Then they are trying to impeach

6    a perfecting witness.

7          THE COURT:  They are not trying to impeach

8    this witness.  They are trying to refresh  his

9    recollection as to things that Phyllis Williams

10   told him.

11         MR. MURPHY:   Okay, Judge.  Fine, Judge.

12         THE COURT:  If they can.

13         MR. LUFRANO:  Q  Officer show you what has

14   been earlier marked as Defendant's Exhibit No. 7.

15   And I ask you to look at page two, if that might

16   help refresh your recollection.

17         A    I see it, but it still brings -- I

18   can't actually theorize her saying this to me.

19         Q    You don't remember today that she said

20   that?

21         A    I don't.

22         Q    Now, do you remember speaking with me

23   yesterday?

24         A    Yes, I do.

115

1        Q     Do you remember indicating that you
2   remembered that last night?
3        A     That's what I was thingking.
4        Q     Now, what occurred between last night
5   and this morning, sir?
6        A     Nothing really.
7        Q     Did you have a conversation with the
8   State in this matter today?
9        A     No, I didn't.
10       Q     When you wree removed from the
11  courtroom and the State was allowed to speak with
12  you, did they or did they not speak with you?
13       A     Oh, yes.
14       Q     And was it not concerning this matter?
15       A     The matter that you just referred to,
16  as far as what she said?
17       Q     The matter with Phyllis Williams.
18       A     No, sir.
19       Q     And didn't the State tell you what
20  problem areas were in her testimony?
21       A     No, sir.
22       Q     Now, you did not understand that the
23  statements that she said were going to be
24  important --

116
                        1366

1    MR. MURPHY: Objection to that question,

2  Judge.

3    THE COURT: The objection is sustained.

4    MR. LUFRANO: Q If you might remember the

5  conversation we had last night, did that possibly

6  refresh your recollection?

7            Let me ask you this. Do you

8  remember me asking you questions as to whether or

9  not the charges was dropped in the case with

10  Phyllis Williams, that they were never -- that

11  the man was never charged?

12    A    I remember you asking that, yes.

13    Q    And do you remember your answer, sir?

14    A    I think I told you that --

15    MR. MURPHY: Objection, Judge.

16    THE COURT: Sustained.

17    MR. LUFRANO: Q I will ask if you remember

18  your answer.

19    A    I remember my answer.

20    Q    Do you remember that I then asked you

21  why -- what rationale might this have been?

22    A    Yes, I remember.

23    Q    Do you remember your telling me that it

24  was probably because she had not gone to the

117                     1367

1    hospital immediately and she waited and then she

2.   went out and had a couple of drinks with the

3    dude?

4        MR. MURPHY:  Objection, Judge.

5        THE COURT:  Sustained.

6        MR. LUFRANO:  Q  Well, does that prior

7    conversation refresh your recollection?

8        A    In regard to what, sir?

9        Q    In regard to what Miss Williams said to

10   you.

11       A    Yes, it does.

12       Q    And what is it that she said to you?

13       A    I asked her myself what had happened,

14   and I also asked her why it took her so long to

15   call the police.

16       Q    Okay.  And did she remark anything

17   about the trip to the liquor store to you?

18       A    Not at that time, no.

19       Q    Later on, did she tell you anything

20   about the liquor store?

21       A    The first contact I had with her was

22   the last contact I had with her, sir.  There was

23   no later.

24       Q    Now, when you had the conversation with

118

1    her in her home, did you believe what she was

2    telling you at the time?

3        MR. LUFRANO:  Goes to his notes, Judge, and

4    his frame of mind.

5        THE COURT:  Sustained.

6        MR. LUFRANO:  No further questions.

7        THE COURT:  Anything further?

8        MR. MURPHY:  No, Judge.

9        THE COURT:  Thank you, Mr. Blackman.  You

10   may step down.

11       THE WITNESS:  Thank you, your Honor.

12               (Witness excused.)

13       THE COURT:  Call your next witness.

14       MS. PLACEK:  Officer Kaddigan.

15       THE COURT:  Raise your right hand, officer.

16               (Witness sworn.)

17       THE COURT:  You may proceed.

18              DAVID KADDIGAN,

19   called as a witness on behalf of the Defendant,

20   having been first duly sworn, was examined and

21   testified as follows:

22              DIRECT EXAMINATION

23              BY

24              MS. PLACEK:

119

1        Q      Sir, state your name and employment.

2        A      My name is David Kaddigan, sergeant

3    with the police department.

4        Q      And spell your last name.

5        A      K-a-d-d-i-g-a-n.

6        Q      Officer Kaddigan, how long have you

7    been employed by the Chicago Police Department?

8        A      Over fourteen years.

9        Q      And that would make you still employed

10   by the Chicago Police Department during the week

11   of August 1st, to approximately August 7th of

12   1988, correct?

13       A      That's correct.

14       Q      Now, did you become involved in a

15   missing person's matter during that picticular

16   time?

17       A      I was involved in serveral.

18       Q      Well, specifically, were you, in fact,

19   involved in the missing person's matter involving

20   Denise Johnson?

21       A      Yes.

22       Q      When did you first become involved in

23   that?

24       A      I believe on the 6th of August.

120

1370

1      Q      And on the 6th of August, did you

2   receive anything in regard to this missing --

3   well, may I with draw and rephrase, your Honor?

4      THE COURT:  Yes.

5      MS. PLACEK:  Thank you.

6      Q      Did you receive a picture of Denise

7   Johnson?

8      A      I think I received a picture on the 7th

9   of August.

10     Q      Now, when you say on the 7th of August,

11  do you remember who you received that picture

12  from?

13     A      I believe it was the child's guardian,

14  Miss Fields.

15     Q      Would that be Mrs. Estelle Fields?

16     A      Yes, it would be.

17     Q      Do you see her in court?  Is that the

18  lady sitting right there with her hands folded

19  across her chest?

20     A      Yes.

21     Q      And that was on the 6th of August?

22     A      7th of August.

23     Q      I'm sorry.  7th of August.

24              Did she come down to the station,

121                    **1371**

1    or did you go there?

2         A    I met her at a relative's house, 10530

3    South State Street.

4         Q    When you went to that address on State

5    Street, was that during the early morning hours

6    or the afternoon, or approximately what time did

7    you go there?

8         A    It was in the afternoon.

9         Q    Do you remember approximately what

10   time?

11        A    I think maybe around two o'clock.

12        Q    And at that time did you have a

13   conversation with her?

14        A    Yes, I did.

15        Q    And when you had a conversation with

16   her, what exactly did you say to her, without

17   going into what she said to you yet.

18        A    I really can't recall what I stated to

19   her.  Most likely I asked her about the missing

20   person and who she might be staying with, if she

21   had -- I spoke with her telephonically, and she

22   brought her picture.  I asked her if she had the

23   picture.

24        Q    What time did you speak -- well, let's

122

1    start over.

2                    You spoke to her telephonically,

3    correct?

4        A    Yes.

5        Q    At approximately what time did you

6    speak to her telephonically?

7        A    Sometime during my tour of duty that

8    started that day at 8 o'clock in the morning.

9        Q    Would that be previous to the

10   conversation that you had in the early afternoon

11   hours, approximately 2 o'clock?

12       A    Yes.

13       Q    And did you find out certain things

14   about Denise Johnson?

15       A    Probably.  I can't really recall

16   specifically.

17       Q    Is there anything in court that would

18   refresh your recollection?

19       A    My report.

20       MR. MURPHY:  Objection, Judge.

21       THE COURT:  To whether or not his

22   recollection can be refreshed?

23       MR. MURPHY:  I will wait.

24       THE COURT:  The objection is overruled.

123                  1373

1          THE WITNESS:  A  It would be my report.  You

2    want me to look at my report?

3          MS. PLACEK:  Q  One step at a time, officer.

4                  Did you find out whether or not

5    the subject was a runaway or had been missing

6    before?

7          MR. MURPHY:  Objection.

8          THE COURT:  Overruled.

9          MR. MURPHY:  There's no foundation for that.

10         THE COURT:  What do you call foundation?

11         MR. MURPHY:  Well, Judge -- there is -- for

12   what reason can this come in, Judge? "Did you

13   find out if she was a runaway?"  We don't know

14   who it's from.

15         THE COURT:  We'll get to that before it

16   comes in.

17         MR. MURPHY:  And it's hearsay, Judge.

18         THE COURT:  It may or may not be.

19         MR. MURPHY:  Anything he finds out is

20   hearsay, Judge, from somebody else.

21         THE COURT:  It may or may not be,

22   Mr. Murphy.  I will give you recourse in Chambers

23   vs. Mississippi.

24         MS. PLACEK:  Q  Did you find out whether she

124

1374

1    was a runaway?

2        A    I can't recall.  I believe I had

3    learned from perusal of other reports that she

4    was missing once before.

5        Q    When you say perusal of other reports,

6    in your experience as a Chicago Police Officer,

7    would it be --

8        MR. MURPHY:  I would ask that that answer be

9    stricken, because it is hearsay.

10       MS. PLACEK:  Judge --

11       MR. MURPHY:  Or that it not be considered

12   for the truth of the matter asserted.

13       THE COURT:  Well, it's not being considered.

14   We're talking about what he did and how he

15   learned certain matters.  The objection is

16   overruled.

17       MS. PLACEK:  Thank you.

18       Q    In your experience as a Chicago Police

19   Officer, specifically, I believe you were in the

20   youth division at that particular time.

21       A    Thats's correct.

22       Q    You had looked for missing persons

23   before, is that correct?

24       A    That's correct.

125

1      Q    Am I also correct in saying that when
2   you were assigned a case, you went over to see
3   what other officers had done, correct?
4      A    That's correct.
5      Q    And had you done that in this csae most
6   likely.  Am I correct in assuming that at the
7   particular time you spoke to Mrs. Johnson that
8   you had, in fact, to the best of your knowledge,
9   read other Chicago Police officers reports?
10     A    Yes, I assume I might have.
11     Q    And would I be correct in saying that
12  you had read them with a view toward finding out
13  something about the person you were looking for
14  to better able to find them?
15     A    Are you asking me if I looked at these
16  report to determine if I could discover
17  personality traits of the missing victim?
18     Q    That's correct.
19     A    I can't really say that I did that.
20     Q    When you say you can't really -- I'm
21  sorry.  Could you repeat your answer?
22     A    I can't decide if I looked at the other
23  reports to determine any kind of particularities
24  of this individual subject's personality that

126

1   would help me in the investigation. Normally,

2   what I would do in looking at these reports would

3   be to see if there are any new leads or new

4   avenues with which I could approach my

5   investigation.

6       Q    And when you say you're not sure

7   whether you looked at these reports, is that

8   because your memory is exhausted?

9       A    No, what I'm saying is in some cases I

10  might have and in some cases I might not have.

11  To testify that in this instance I did, I can't

12  say with veracity.

13      Q    Is that because you don't remember

14  whether you did or didn't look at certain

15  reports?

16      A    I'm almost sure that I looked at other

17  reports. If you're asking me that, if I looked

18   -- my underlying motive for looking at those

19  reports.

20      Q    No, I'm asking you if you looked at

21  other reports?

22      A    Yes, I did.

23      Q    From these reports you found out

24  certain information, is that correct?

127

1          A    That's correct.

2          Q    And you were to use this information,

3     correct?

4          A    Correct.

5          Q    And as a matter of fact, would it be

6     correct in saying that you adopted these other

7     reports as your own?

8          MR. MURPHY:  Objection, Judge.  How can he

9     do that?

10         MS. PLACEK:  Judge --

11         MR. MURPHY:  A report that someone else

12    prepares.

13         THE COURT:  Sustained.

14         MS. PLACEK:  Q  Show you Defendant's Exhibit

15    No. 6 for identification.  Do you remember

16    whether or not you saw that report?

17         A    During the investigation?

18         Q    Previous to speaking to Mrs. Fields?

19         A    I really can't say whether I saw that

20    or not.

21         Q    Showing you what would, in fact, be

22    marked as Defendant's Exhibit No. 7.  Do you know

23     -- Strike that.

24              That's your own report.  Showing

128                        **1378**

1    you what has been marked as Defendant's Exhibit

2    No. 7, do you know whether or not you looked at

3    this report in preparation?

4         A    I might have.

5         Q    Thank you.

6                   By the way, at the time you went

7    to speak or on that August 7th date, of your own

8    personal knowledge, did you know whether or not

9    Denise Johnson had any interests?

10        A    Any interests?

11        Q    Yes.

12        MR. MURPHY:  Objection, Judge.  I will

13   withdraw that at this time.

14        THE WITNESS:  A  I can't recall any

15   interests that she might have had at this time.

16        MS. PLACEK:  Q  Well, isn't it correct that,

17   in fact, Denise Johnson was interested in men and

18   boys?

19        MR. MURPHY:  Objection, Judge.

20        THE COURT:  Sustained.

21        MS. PLACEK:  Q  On the 7th date, after you

22   received the picture from Mrs. Fields, what did

23   you do with that picture?

24        A    Repeat your question.

129                    1379

1      Q    On the date of August 7th, after

2   receiving that picture from Mrs. Fields, what did

3   you do with that picture?

4      A    I took it across the street where I saw

5   some people standing from 10530 State, and I

6   showed these people the picture of the missing

7   subject.

8      Q    And what did you do after that?

9      A    I asked those individuals if they had

10   possibly seen the person in that picture.

11      Q    And what did you do after that?

12      A    After showing them the picture, I went

13   back to my squad car and began a tour of the area

14   with Mrs. Fields.

15      Q    When you say you began a tour of the

16   area with Mrs. Fields, did you have to get

17   Mrs. Fields?

18      A    No, she was there.

19      Q    She was there when you were showing the

20   picture to the people?

21      A    I don't know if she was with me.  I

22   believe she was by 10530.  I dont' know if she

23   accompanied me across the street when I talked to

24   these people or not.

130                     1380

1        Q    And approximately what time did you

2   begin this tour of the area with Mrs. Fields?

3        A    Around the same time I picked her up.

4        Q    Approximately what time?

5        A    About two o'clock in the afternoon.

6        Q    And when you began this tour of the

7   area, why did you began with that particular area

8   tour?  Why did you pick that particular area?

9        A    Because I had developed information

10  from those people I spoke to that --

11       MR. MURPHY:  Objection, Judge, at this

12  point.

13       MS. PLACEK:  May I have the basis?

14       THE COURT:  Sustained.

15       MS. PLACEK:  Q  Officer, did you have

16  information that Denise Johnson had been seen in

17  that area?

18       MR. MURPHY:  Objection.

19       THE COURT:  Sustained.

20       MS. PLACEK:  Q  Officer, the people you

21  spoke to, were they women or men?

22       A    I can't recall really.  I believe it

23  might have been two women.

24       Q    By the way, officer, did you ever tell

131                    1381

1    Mrs. Fields that a man had called in and said

2    that he had heard that Denise was out on the

3    street or he had seen her, or he had heard that

4    somebody had seen her out on the street?

5         A    I don't believe I told her that.

6         Q    Did you ever tell Mrs. Fields -- and

7    I'm speaking of yourself, anything about anyone

8    seeing Denise?

9         A    I can't recall my conversation with

10   Mrs. Fields, ma'am.

11        Q    When you say you can't recall your

12   conversation with Mrs. Fields, isn't it correct

13   that you, in fact, told Mrs. Fields that an

14   anonymous source had told you that the victim was

15   seen on August 2nd?

16        A    I indicated that in my report, whether

17   or not I told her what this person -- I would

18   assume what those people I had talkd with said to

19   me --

20        MR. MURPHY:  Objection, as to what was

21   indicated in the report.

22        MS. PLACER:  That's his answer.

23        MR. MURPHY:  Ask that it be stricken.

24        THE COURT:  Sustained.  It will be stricken.

132

1382

1       MS. PLACEK:  Q  Did you tell Mrs. Fields

2   that two people had, in fact, seen Denise Johnson

3   on August 2nd?

4       A   I assume I did.

5       MR. MURPHY:  Objection, Judge.

6       THE COURT:  No, overruled.

7       MS. PLACEK:  Q  Now, as a Chicago police

8   officer, you told Mrs. Johnson what you believed

9   to be true, correct?

10      MR. MURPHY:  Objection, Judge.

11      THE COURT:  Sustained.

12      MS. PLACEK:  Q  Was the information, in

13  fact, that you told Mrs. Johnson about two people

14  seeing Denise alive on August 2nd, based on

15  information that you had received?

16      MR. MURPHY:  Objection, Judge.

17      THE COURT:  Sustained, calls for hearsay.

18      MS. PLACEK:  No, Judge, it goes to the basis

19  of him making the statement.

20      THE COURT:  Overruled.

21      MS. PLACEK:  Q  When you toured the area

22  with Mrs. Johnson, was this tour made with --

23      A   I didn't tour the area with

24  Mrs. Johnson.

133                    1383

1          Q    Mrs. Fields.  I do beg your pardon.

2                    When you toured the area with

3     Mrs. Fields, was that based on information that

4     you had earlier received?

5          A    Most likely, yes.

6          Q    Thank you, officer.

7                    You also had a conversation with

8     Mrs. Fields, correct?

9          A    Yes, I'm sure I conversed with her.

10         Q    And, isn't it correct that at that time

11    she said that Hardy Johnson would have knowledge

12    of the whereabouts of Denise Johnson?

13         MR. MURPHY  Objection.

14         THE COURT:  What's the purpose of that?

15         MS. PLACEK:  Basis of foundational question

16    as to hearsay, Judge, or rather as to impeachment

17    of previous witness.

18         MR. MURPHY:  I don't believe there were any

19    questions asked of Estelle Fields regarding

20    conversation with Officer Kaddigan.

21         MS. PLACEK:  Yes, Judge, there were.

22         MR. MURPHY:  Regarding impeachment, judge,

23    as to what she told Officer Kaddigan?  There were

24    questions asked about touring the area and what

134

1384

```
 1    Officer Kaddigan told her.

 2         THE COURT:  The objection is sustained.

 3         MS. PLACEK:  Q  Isn't it correct that Mrs.

 4    Fields told you that Hardy Johnson would be

 5    reluctant to provide information to the police?

 6         MR. MURPHY:  Objection.

 7         THE COURT:  Objection sustained.

 8         MS. PLACEK:  Q  If it please the court, I

 9    read exactly from the police report.

10         THE COURT:  I understand, but Mrs. Fields is

11    not the subject of that report.

12       · MS. PLACEK:  Yes, Judge, I believe she is.

13         THE COURT:  The objection is sustained.

14         MS. PLACEK:  Isn't it correct that

15    Mrs. Fields said, in fact --

16         THE COURT:  Further, I might also -- go

17    ahead, complete your question.

18         MS. PLACEK:  No, I withdraw, Judge.

19         THE COURT:  Complete your answer.

20         MS. PLACEK:  Q  Isn't it correct that

21    Mrs. Fields told you that Denise Johnson had run

22    away before and returned home after a day?

23         MR. MURPHY:  Objection.

24         MS. PLACEK:  The question was asked both in
```

135                    1385

1    direct and on redirect, Judge.

2        THE COURT:  I'm going to allow him to

3    answer.  Overruled.

4        THE WITNESS:  A  If that's indicated in my

5    report, I assume that I got that infromation from

6    her.

7        MS. PLACEK:  Thank you.

8        Q    Now -- and what relative -- you said

9    when you toured the area with Mrs. Johnson

10   (sic), she was where?

11       A    I met her at 10530 South State Street.

12       Q    Is that where she lived to the best of

13   your knowledge?

14       A    I believe she lived in Harvey.

15       Q    Did you ask her to be present pursuant

16   to a phone call?

17       A    Yes.

18       Q    Was that the earlier phone call?

19       A    It was sometime earlier, whether it was

20   in the morning, I don't know.

21       Q    What address did you say you met her in

22   front of, not in a house, correct?

23       A    I met at the house.  Whether it was in

24   front of or in, I can't recall.

136                    1386

1          Q    And so, I would be correct in saying

2    that when you told her to meet you at that

3    address, you already had the information that

4    Denise Johnson was seen alive on August 2nd?

5          MR. MURPHY:  Objection.

6          THE COURT:  Can I see counsel in chambers?

7          MS. PLACEK:  Yes, Judge.

8                         (Whereupon, a discussion was

9                          had in chambers off the

10                         record, after which further

11                         proceedings were steno-

12                         graphically recorded by

13                         Official Court Reporter

14                         James Dohnahue.)

15

16

17

18

19

20

21

22

23

24

137

(Rev. 2/18/93) CCCR-56

STATE OF ILLINOIS }
COUNTY OF COOK } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME THREE OF A FIVE VOLUME . . . SUPPLEMENTAL RECORD CONSISTING OF THE ( REPORT OF PROCEEDINGS) ONLY. NO PRAECIPE . . . HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT . . . UNDER APPELATE COURT NO. 95-0474. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

JEROME HENDRICKS . . . . . . . . . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, JUNE 26. . . . . . . . . . . . . . , 1996 . .

*Aurelia Pucinski*

Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

CCCR-310

# Transcript of Record
## Appeal
## to

APPELLATE

FIRST

# Court of Illinois
# District

SUPPLEMENTAL RECORD

**Circuit Court No.** 88 CR 12517

**Trial Judge** LEO HOLT

**Reviewing Court No.** 95-0474

THE PEOPLE OF THE STATE OF ILLINOIS

## vs.

JEROME HENDRICKS

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

ORDER ENTERED
JAN 1 / 2007
APPELLATE COURT, FIRST DISTRICT

**AURELIA PUCINSKI**

**Clerk of Court**

VOLUME FOUR   OF FIVE VOLUMES
SUPPLEMENTAL RECORD

**Per** AP/nd _____

**Deputy**

1    STATE OF ILLINOIS )
                      ) SS
2    COUNTY OF C O O K )

3              IN THE CIRCUIT COURT OF COOK COUNTY
               COUNTY DEPARTMENT-CRIMINAL DIVISION
4

     THE PEOPLE OF THE        )
5    STATE OF ILLINOIS,       )
                              )
6              Plaintiff,     )
                              )    Case No.      88 CR 12517
7        -vs-                 )
                              )    Charge:    Murder, Etc.
8    JEROME HENDRICKS,        )
                              )
9              Defendant.     )

10

11             REPORT OF PROCEEDINGS had in the above-

12   entitled cause, before the HON. LEO E. HOLT, Judge

13   of said Court, on the 26th day of March, A.D., 1991,

14   at 1:30 o'clock p.m., being the cross examination

15   of David Caddigan.

16        APPEARANCES:

17           HON. JACK O'MALLEY,
                State's Attorney of Cook County, By:
18           MR. JOHN MURPHY,
                 Assistant State's Attorney,
19               Appeared for the Plaintiff;

20           MR. RANDOLPH N. STONE,
                Public Defender of Cook County, By:
21           MS. MARIJANE PLACEK, and
             MR. VINCENT LUFRANO,
22               Assistant Public Defenders,
                 Appeared for the Defendant.

23

24

1388

1    THE CLERK:  People versus Jerome Hendricks.

2    THE COURT:  This is a continuation of a

3    witness by the name of David Caddigan.

4    Ms. Placek, you may proceed.

5    CROSS EXAMINATION

6    BY

7    MS. MARIJANE PLACEK:

8    Q    Officer Caddigan, just to bring you up to

9    speed where we more or less left off during the

10    lunch break, I believe I was directing questions

11    regarding the information that you had received

12    from individuals that they had seen Denise Johnson

13    alive on the morning hours of August 2nd, 1988.

14    MR. MURPHY:  Objection, Judge.

15    THE COURT:  Sustained.

16    Put a question.

17    MS. PLACEK:  Q  Officer Caddigan, the information

18    that you spoke of, the information regarding back

19    to the August 2nd date, did you receive that from

20    people who said that they saw Denise Johnson

21    themselves?

22    MR. MURPHY:  Objection.

23    THE COURT:  The objection is sustained.

24    MS. PLACEK:  Q  Officer, the information