CASE NO. _____08cv 1589_____

ATTACHMENT NO. _____6_____

EXHIBIT _____

TAB (DESCRIPTION) _____

1           THE CLERK:    Jerome Hendricks.

2           THE COURT:    Miss Placek, the Motion for New

3      Trial which I have, I assume, is going to become

4      the one that is a part of the Court file?    It

5      needs to be executed.

6           MS. PLACEK: Judge, I will most definitely

7      execute it.

8                I apologize, Judge.

9           THE COURT:    Are both sides ready for

10     sentencing hearing?

11          MR. MURPHY:    Yes, Judge, we are ready.

12          THE COURT:    State, I will hear you.

13          MR. MURPHY:    Well, Judge, there is a pre-

14     sentence investigation report that was returned,

15     and there's one error in that.

16                I would like to correct it, or at least

17     clarify it.

18                On page 2 of the pre-sentence

19     investigation under criminal history, it indicates

20     that the defendant was convicted of aggravated

21     criminal sexual assault, and sentenced to six

22     years Illinois Department of Corrections.

23                But that does not include also, and is

24     indicated on the State rap sheet, which is

**1615**

69

1    attached to the pre-sentence investigation, the

2    defendant was also convicted of the offense of

3    kidnapping.

4         THE COURT: In the same case?

5         MR. MURPHY:  Yes, Judge.

6         MS. PLACEK:  This was part of that case, I

7    believe, Judge.  Is that correct?

8            A new case?

9         THE COURT:  That is what I'm being told, it

10   is part and parcel of the same case.

11        MR. MURPHY:  That is my understanding, Judge

12   of the State rap sheet.

13           It indicates it is all under the same

14   case number, which is indicated on page 2 of the

15   criminal history as well.

16        MS. PLACEK:  So that will be the same victim,

17   is that correct?

18           Well thank you, Judge.

19        THE COURT:  Later in the proceedings, if you

20   wish, you can amend the pre-sentence report on its

21   face to reflect that charge also.

22           Anything further?

23        MR. MURPHY:  Yes, Judge.

24           I would mark as People's Exhibit No. 1 a

1    Certified copy of a birth certificate for the

2    defendant, Jerome Hendricks, indicating a date of

3    birth of April the 6th, 1961.

4              I ask leave to tender it.

5         MS. PLACEK:  No objection, Judge.

6         THE COURT:  Anything further?

7         MR. MURPHY:  Yes, Judge.

8              I would ask the Court to take judicial

9    notice of the proceedings that were had a trial,

10   and also your findings with respect to this matter

11   for purposes of the sentencing hearing.

12        THE COURT:  Defense.

13        MS. PLACEK:  I have no objection to that,

14   either.

15        THE COURT:  Anything further?

16        MR. MURPHY:  Nothing further by way of

17   evidence, Judge.

18             Judge, just for purposes of

19   clarification, is the Court proceeding on the

20   sentencing hearing separating it into two stages?

21        THE COURT:  Well, eligibility.  The State

22   rests on phase 1?

23        MR. MURPHY:  Yes, Judge.

24        THE COURT:  Defense.

1617

71

1    MS. PLACEK:  Judge, with the stipulation, we

2    would ask that the Court has taken into

3    consideration the finding in this matter,

4    therefore, Judge, we would also rest in this case

5    as to eligibility.

6        THE COURT:  Augument?

7        MR. MURPHY:  Your Honor, at this state the

8    Court is to determine the question of eligibility

9    and eligibility is the guidance in the issue of

10   eligibility that is under Chapter 38, Section 9-1

11   and it is the State's Position in this particular

12   care that the defendant is eligible for the death

13   penalty, and the reason being, and it is

14   specifically enunciated in the Statute, and I

15   would like to go through the Statute and indicate

16   what it says and how the defendant is eligible.

17       And, Judge, I am referring to Section

18   9-1 and I will initially address sub-section B in

19   the Statute.

20       In Section B one of the requirements is

21   the defendant at the time of the commission of the

22   offence has attained the age of 18 or more.  What

23   your Honor has before you is a certified copy of

24   the defendant's birth certificate, showing that on

**1618**

1    April the 6'th, 1961, he was born.

2            You also have evidence that was heard at

3    trial, the defendant told Detective Michael Baker

4    at the time of his arrest of his date of birth,

5    and that corroborates the birth certificate.

6            Clearly, Judge, the evidence shows the

7    defendant is 30 years of age at that time, and at

8    the time of this offense was at the age of 18 or

9    more.

10            The second requirement under

11    Sub-Section B is the defendant be found guilty of

12    the offense of first degree murder.

13            As the Court knows, the Court has

14    already found the defendant guilty of first degree

15    murder, having found the defendant guilty of

16    Counts 1 and 2 and 3 in this charge.

17            Under Sub-Section B6 the Court must also

18    find that the murdered individual in this case,

19    Denise Johnson, was killed in the course of

20    another felony, and with that section there are

21    three requirements which must be satisfied.

22            Sub-Section A1 states that the murdered

23    individual was actually killed by the defendant.

24    The Court is well aware that all the evidence and

**1619**

73

1    the Court findings were with respect to this

2    issue, and indicate that the only conclusion that

3    can be drawn is the defendant is the person who

4    killed Denise Johnson.

5          Under Sub-Section B the Statute

6    indicates that the defendant must be shown that

7    the defendant acted with the intent to kill the

8    murdered individual, or with the knowledge that

9    his act created a strong probability of great

10   bodily harm, in this case Denise Johnson.

11         Your Honor, in making a finding of

12   guilty, found the defendant guilty of the offense

13   of first degree murder based on the charge or

14   based on the language of the intent to kill, and

15   that is the language and the charge under Count 1,

16   which is used in Count 1 of the Indictment.

17         With respect to the other requirement,

18   or the Court could also conclude that the

19   defendant acted with knowledge that his actions

20   created a strong probability of death or great

21   bodily harm, and there has been a finding of

22   guilty with respect to that, as to Count 2.  And

23   that language is contained within count 2.

24         So we have satisfied that requirement as

1620

74

1    well.

2              And finally, with respect to this

3    particular issue, Judge, the Court must find that

4    the homicide was accompanied by another felony.

5    That it was committed during the course of a

6    felony.

7              There is specific felonies which are

8    enunciated in the Statute:  armed robbery,

9    robbery, aggravated criminal sexual assault,

10   aggravated kidnapping, forcible detention, arson,

11   aggravated arson --  the list goes on and on.

12             In this particular case there was

13   evidence that the defendant, during the commission

14   of the murder, also committed the offense of

15   aggravated criminal sexual assault --

16        MS. PLACEK:  Objection.

17             Misstating a finding.

18        THE COURT:  In what way does it misstate a

19   finding?

20        MS. PLACEK:  During the Court's finding, the

21   Court stated that it couldn't be sure whether or

22   not the killing in this matter took place as a

23   direct result or during the course of the

24   aggravated criminal sexual assault.

**1621**

7 5

1          The Court went on to say during this

2     matter, Judge, and during this Court's finding,

3     one of the reasons we asked for the order on the

4     current transcript that in fact the Court could

5     not tell, and thus dismissing the forcible

6     aggravated criminal sexual assault, and finding

7     rather, rendering judgments on the aggravated

8     kidnapping and the aggravated criminal sexual

9     assault based on age.

10         THE COURT:   That would be sufficient.

11    Aggravated criminal sexual assault based on any

12    other ways in any aggravated criminal sexual

13    assault.

14         MR. PLACEK:   I agree with the Court, Judge.

15         The point being, is that the language of

16    the Statute and the language that the State was

17    attempting to incorporate directly contradicts the

18    Court in its finding in this matter.

19         THE COURT:   How does that directly

20    contradict?   I don't understand that, inasmuch as

21    the Court found the defendant guilty of the

22    offense of aggravated criminal sexual assault,

23    does it make a difference how you committed that

24    offense for the purposes of this sub-section?

**1622**

7-6

1        MS. PLACEK:  Most definitely, Judge.

2              I would call the Court's attention to

3    certain cases.

4              First of all, People versus Morgan,

5    cited at 1112 Illinois 2d, 111.  It states in that

6    particular case, and it specifically speaks of

7    aggravating factors dealing as to the death

8    penalty, Judge.  It speaks that in fact in a

9    finding in judgment dealing with those aggravating

10   factors, they must be proven they were committed

11   during the course of one of the crimes mentioned.

12             If it pleases the Court, during the

13   Court's finding in the transcript both and when

14   the Court was making its finding, Mr. Lufrano and

15   myself, in our notes stated --  or excuse me --

16   took down the Court saying that the Court could

17   not be sure that this was this, that is, and I

18   agree with the Court.  The aggravated criminal

19   sexual assault would possibly be enough to sustain

20   if the Court then to go on to use the language, he

21   couldn't be sure whether or not this killing took

22   place during the course of or I believe, the other

23   thing was an an afterthought;  but, Judge, the

24   Court clearly in the transcript spoke of a

**1623**

1   separation of time.

2          We would bring also to the Court's

3   attention People versus Taylor, 101 Illinois 2d

4   508.  People versus Walker, that speaks

5   specifically again as to specificity needed.  I

6   believe that the amount was charged in that crime

7   That one is cited at 19 Illinois 2d 501 and 2.

8   People versus Brownwell, 79 Illinois 2d 508, and

9   People versus Lee, a copy which was submitted to

10  the Court during trial.

11         I believe --

12     THE COURT:  Your objection is overruled at

13  this point.

14         I will read the cases and we will see

15  whether or not they comply.

16         You may proceed.

17     MR. MURPHY:  Judge, as I was saying, the

18  final requirement under sub-section B6 is that the

19  victim was killed during the course of another

20  felony.

21         Those felonies specifically deliniated

22  in the Statute.  Two of those felonies which are

23  deliniated in the Statute, exist in this case.

24  There's evidence to support those felonies, and

1    there's a finding of guilty on each of those

2    felonies.

3          One felony being aggravated criminal

4    sexual assault, and the Court made a finding of

5    guilty on that count.  And that is strictly based

6    on the age of the victim and the age of the

7    defendant.

8          There is also additional felony which

9    can serve under a basis which is aggravated

10   kidnapping.  Your Honor found the defendant guilty

11   of aggravated kidnapping.  The defendant was found

12   guilty of Counts 14, 15, 16, and 17.  The

13   evidence in this case supports that.

14         As I understand what the defendant is

15   arguing to the Court with respect to this section

16   is that somehow the evidence would support the

17   defendant committing the offense of first degree

18   murder is separate and apart from the evidence

19   which supports his commission of the aggravated

20   criminal sexual assault, and the aggravated

21   kidnapping, to such an extent that they are so

22   distance from one another that he is not a

23   candidate for the death penalty.

24         Well, your Honor, there is absolutely no

1    evidence whatsoever in this case that supports

2    that argument in this case.

3         The evidence that we do have in this

4    case is that this was all part of at best -- this

5    is all one part of one transaction or occurrence,

6    and even in the argument he made, although they

7    are citing a number of cases, there's no

8    indication that those cases which are cited are

9    similar to this case in any respect and how they

10   apply.

11        So therefore, based on the fact the

12   defendant was in fact of age, that the defendant

13   was found guilty of the offense of first degree

14   murder, that the defendant committed the offense

15   of first degree murder when he committed the

16   offense of aggravated criminal sexual assault.

17   And when he committed the offense of aggravated

18   kidnapping, we would ask you find the defendant

19   eligible for a capital sentencing.

20        THE COURT:  Defense.

21        MS. PLACEK:  Your Honor, the particular issue

22   the State brings up is the fact they asked for a

23   stipulation dealing with the trial as a whole.

24        It was our contention, Judge, that by in

80

1    fact making that stipulation, which we have no

2    problem doing, it includes the whole trial and the

3    whole finder of facts' statement.   Since this

4    court was in fact the finder of fact, the Court

5    allowed us to look into its mind because the Court

6    made certain statements, and again those cases

7    deal strictly with statutory aggravating factors,

8    and again Morgan states that the aggravating

9    factor has to be there beyond a reasonable doubt.

10           Judge, this Court expressed a doubt when

11   the Court made its ruling.   The court spoke very

12   clearly that he could not tell whether or not the

13   murder was during the course of the felony, he was

14   not able to determine whether or not it might have

15   been an afterthought, or in furtherance of.

16           Judge, the idea that eligibility is just

17   some sort of mechanical thing, and that if charged

18   the right things and convicted, has been rejected

19   by the Court in these cases.

20           Our suggestion is quite frankly this:

21   One, the Court base its ruling as to the

22   aggravated criminal sexual assault on age.   We

23   would suggest that although we would agree on its

24   face that it is included among the same, that it

                        1627

     81

1    bears mention of those cases rather than it

2    setting out of statutory sections, we would take

3    objection on that grounds.

4              In the alternative, Judge, we feel that

5    a glimpse into this Court's mind during its ruling

6    with the phrase:  I cannot tell whether it was

7    during the course or in furtherance of.  It

8    completely is left out of the Statute.

9         THE COURT:  State?

10        MR. MURPHY:  Judge, whether the defendant, if

11   I understand the defendant's argument, whether the

12   defendant, Jerome Hendricks, intended to kill

13   Denise Johnson when he was committing the offense

14   of aggravated criminal sexual assault on her, or

15   when he was kidnapping her against her will, or

16   whether he did it as an afterthought, is

17   completely and totalluy irrelevant with respect to

18   this section.

19             It is absolutely outrageous that the

20   defendant would contend he is not eligible for the

21   death penalty because he decided to kill this girl

22   moments after he just assaulted her and held her

23   against her will.

24             That is outrageous, Judge.  And if that

**1628**

1   is not what the language intended when they

2   enacted the Statute, I would ask the Court

3   disregard that argument and find the defendant

4   eligible.

5       THE COURT:  My position is --  and my

6   understanding of the law is that the State has

7   proven beyond a reasonable doubt the eligibility

8   of the defendant for the imposition of capital

9   punishment.

10      I must frankly confess to you however

11  that before I rule in that way, that I will take a

12  look at the authorities that Miss Placek has

13  indicated to me.

14      My mind is not a computer and I don't

15  hold cases in my head that I can regurgitate or

16  call to the present consciousness at will.

17      I will take a look at them overnight.

18  If they hold what I presently have a mind to think

19  they hold, then my inclination would be to

20  determine the defendant's eligibility beyond a

21  reasonable doubt.

22      So I am going to continue this matter

23  for further proceedings until tomorrow, and I will

24  look at these authorities.

**1629**

1     MS. PLACEK: Can you make that Thursday,

2   Judge?

3          I do apologize to the Court.

4     THE COURT:   How long is this hearing likely

5   to go?

6          The reason I ask is because we could do

7   it tomorrow and Thursday if necessary.   But Friday

8   is impossible because I won't be on the bench.

9          I would rather do it tomorrow and

10  Thursday, and have it completed, even if I have to

11  take it under advisement, than to have it hang

12  over until some time next week or later, still

13  taking evidence.

14         Do you have any idea how much court time

15  you're going to take?

16    MR. MURPHY:   I have no idea what the defense

17  is doing; as to our portion of the remainder of the

18  case, I would say 20 minutes to half an hour at

19  the most.

20    THE COURT:   Do you have any notion of how

21  much court time?

22    MS. PLACEK:   No longer than that, Judge.

23         And I have a doctor coming in on another

24  case tomorrow.

**1630**

84

1          And I'm not trying to in any way

2     discourage this Court or Mr. Hendricks saying one

3     is more important than other.

4          THE COURT:  Order of Court, August 22nd.

5          MS. PLACEK:  Thank you, Judge.

6          THE COURT:  Can you be here at 10:00 a.m. on

7     the 22nd?

8          MS. PLACEK:  Yes, your Honor.

9          THE COURT:  Mr. Murphy, may I address the

10    Court before you adjourn this?

11         THE COURT:  Sure.

12         MR. MURPHY:  There's a possibility I may be

13    involved in a jury trial nextdoor tomorrow or

14    Thursday.

15         Would the Court consider setting this

16    matter at 9:30?

17         MS. PLACEK:  I can be here at 9:30, Judge,

18    out of courtesy to Counsel.  I can be here.

19         THE COURT:  9:30 it is.

20              (Whereupon, the above-entitled

21    cause was continued to August 22, 1991)

22

23

24



                    1631

85

1 STATE OF ILLINOIS        )
                          )    ss:
2 COUNTY OF C O O K        )

3              IN THE CIRCUIT COURT OF COOK COUNTY
               COUNTY DEPARTMENT-CRIMINAL DIVISION
4
  THE PEOPLE OF THE        )
5 STATE OF ILLINOIS        )
                          )    Case No.  88 CR 12517
6    -VS-                  )
                          )    Charge:  Murder
7 JEROME HENDRICKS.        )

8          <u>HEARING IN AGGRAVATION AND MITIGATION</u>

9          BE IT REMEMBERED that the above-entitled

10 cause came on for hearing before the Honorable LEO E.

11 HOLT, Judge of said court, on the 22nd day of

12 August, 1991.

13      PRESENT:

14          HON. JACK O'MALLEY,
              State's Attorney of Cook County, by:
15          MR. JOHN MURPHY, and
            MR. SCOTT CASSIDY,
16              Assistant State's Attorneys,
                on behalf of the People;
17
            MS. RITA FRY,
18              Acting Public Defender of Cook County, by:
            MR. VINCENT LUFRANO, and
19          MS. MARIJANE PLACEK,
                Assistants Public Defender,
20              on behalf of the Defendant.

21

22
  Nicola Peel Vogelgesang
23 Official Court Reporter
   16501 S. Kedzie Parkway
24 Markham, Illinois 60426


                    1632


1

1       THE CLERK:   Sheet nine, line one, Jerome Hendricks

2  in custody.

3                       (Case passed.)

4       THE CLERK:   Sheet nine, line one, Jerome Hendricks.

5       MR. LUFRANO:   May I approach the bench?

6       THE COURT:   You may.

7       MS. PLACEK:   We had passed the matter.   I was in

8  contact with the defendant's family two nights ago.   I

9  think they're going to be here.   I'm not sure where they

10 are.

11      THE COURT:   The matter was set for 9:30, Mr.

12 Lufrano.   And while I'd like to accommodate them, we're

13 going to proceed.   The matter was here on Tuesday.   I

14 heard arguments as to whether or not the defendant was

15 eligible pursuant to the statute for imposition --

16 Madame, whoever that is with the child, you have a right

17 to be in court.   This is a public court room, and you

18 have an absolute right to be here.   And I'm fully aware

19 of the fact that you cannot control the child.   But one

20 of the other -- thank you.

21           At that time, that is on Tuesday, the

22 defendant cited certain authorities to the Court for the

23 Court's consideration.   And I have read those

24 authorities.   If either side desires to make any further

                        1633

2

1  argument, although it has been argued to me, I will

2  allow you now an opportunity to address more fully your

3  positions, particularly in relationship to the

4  authorities that were cited to me, since I now have read

5  them and understand what they hold.

6          State, do you have anything additionally that

7  you would like to say to the Court in that regard?

8      MR. MURPHY:  No, Judge.

9      THE COURT:  Ms. Placek?

10     MS. PLACEK:  No, Your Honor.  No.

11     THE COURT:  May I see the defendant's file?

12         This defendant was found guilty of the offenses

13 of first degree murder as charged in counts one, two,

14 and three of this Indictment.  Count one of the

15 Indictment charging first degree murder in that the

16 defendant without lawful justification intentionally and

17 knowingly strangled and killed Denise Johnson.

18         Count two charges that the defendant committed

19 the offense of first degree murder in that without

20 lawful justification, he strangled and killed Denise

21 Johnson, knowing that such strangling created a strong

22 probability of death or great bodily harm to Denise

23 Johnson.

24         Count three of the indictment charges first

**1634**

3

1 degree murder in that without lawful justification,

2 while committing the forcible felony of kidnapping,

3 defendant strangled and killed Denise Johnson.

4         The defendant was also found guilty of

5 aggravated criminal sexual assault as charged in count

6 ten of the Indictment in that he, being 17 years of age

7 or over, committed an act of sexual penetration upon

8 Denise Johnson, and Denise Johnson was under the age of

9 13 when the act of sexual penetration was committed.

10         He was found guilty of the offense of

11 concealing of a homicidal death, charged in count 12 of

12 the Indictment in that he concealed the death of Denise

13 Johnson by hiding her body in an enclosed garage.

14         He was found guilty of kidnapping as charged

15 in count three -- count 13 of the Indictment.   Was found

16 guilty of the offense of aggravated kidnapping as

17 charged in count 14, 15, 16, and 17 of the indictment.

18 And he was found guilty of the offense of unlawful

19 restraint as charged in count 18 of the indictment.

20         The question then arises as to whether or not

21 the defendant, pursuant to the provisions of the

22 statute, is eligible for imposition of the death penalty

23 based upon the criteria set forth in the statute.

24         In order to find the defendant eligible for

1635

4

1  imposition of the death penalty, the State must prove

2  beyond a reasonble doubt the aggravating factors which

3  would give rise to that eligibility.  One of the factors

4  that the State must prove beyond a reasonable doubt,

5  that the defendant had attained the age of 18 years or

6  more, and that he had been found guilty of the offense

7  of first degree murder.

8          In this case, the basis for the eligibility of

9  the defendant is that the defendant was found guilty of

10 the offense of felony murder.  And in that regard, the

11 State must not only prove beyond a reasonable doubt that

12 the defendant committed the offense of murder, but must

13 prove several other factors enumerated in the statute.

14 To wit, that the deceased was killed in the course of

15 another felony.  And that is the issue that is contested

16 here, as I understand it, most vociferously by the

17 defendant.  Whether or not the defendant killed the

18 deceased during the course of another felony.

19         And it is contended, as I understand the

20 argument of the defendant, that because the defendant

21 was not found guilty of the aggravated criminal sexual

22 assault offense predicated upon force, because the Court

23 determined that it could not determine from the evidence

24 in this case whether the sexual contact had with the

1636

5

1  victim was a direct result of force or not, therefore,

2  the defendant cannot be found guilty or found eligible

3  for imposition of the death penalty.

4          And in that regard, the defense tendered to

5  the Court a number of authorities.  Taking those

6  authorities in the chronological order in which they

7  were decided by the Supreme Court, those cases are

8  People versus Brownell, B-r-o-w-n-e-l-l, which appears

9  at 79 Illinois Second 508.  People versus Walker, which

10 appears at 91 Illinois Second 502.  People versus

11 Taylor, which appears at 101 Illinois Second 508.  And

12 People versus Morgan, which appears at 112 Illinois

13 Second 111.  I have read each of those cases and find

14 them to be not applicable to the issue presently before

15 the Court.

16         The defendant was found guilty, as I

17 indicated, of the offense of felony murder as charged in

18 count three.  He was also found guilty of the predicate

19 offense of kidnapping as charged in count 13, and the

20 aggravated kidnapping offenses as charged in count 14,

21 15, 16, and 17 of the indictment.

22         Because those offenses, that is the aggravated

23 -- the kidnapping and the aggravated kidnapping offenses

24 of which the defendant was found guilty are predicate

6

1637

1  offenses to the felony murder, they merge into the

2  finding of guilty of murder.   Therefore, the Court did

3  not enter judgment on them.   But they stand as the basis

4  for finding that the defendant committed the offense of

5  murder during the course of a forcible felony, which is

6  enumerated in the statute as an aggravating factor,

7  giving rise to eligibility for the death penalty.

8         And in section 9 dash 1B, subsection C, the

9  felonies which give rise to the eligibility for

10  imposition of the death penalty are enumerated; and they

11  are armed robbery, robbery, aggravated criminal sexual

12  assault, aggravated kidnapping, and some others which

13  are not relevant to our conclusion.

14         It is the Court's determination, based upon

15  the evidence, that the defendant is eligible for

16  imposition of the death penalty, the Court -- the State

17  having established beyond a reasonable doubt the

18  requisite elements enumerated in the statute that make

19  the defendant eligible for such sentencing.

20         If both sides are ready, we can then proceed

21  to a hearing in aggravation and mitigation as to whether

22  or not the death penalty should be imposed on this

23  defendant.

24      MR. LUFRANO:  Your Honor, we would request again a

1638

7

1 continuance or at least hold the case till later. We're

2 awaiting the family of the defendant.

3     THE COURT:  Mr. Lufrano, I'm going to grant that

4 request for a very short period of time.  And I

5 understand the reason for the request.  And I'm going to

6 try my very best to accommodate it.  But this case was

7 set for 9:30.  I'm certain that that information was or

8 should have been, at least, conveyed to the defendant's

9 family.  And they should be here.

10         In any event I'm going to continue this case

11 while I complete the balance of my call, so much of it

12 as I can complete, and then we're going to return to

13 this case.

14     MR. MURPHY:  Before you adjourn the case, may I

15 have a moment to speak to Counsel?

16     THE COURT:  Sure.

17                   ( Pause.)

18     MS. PLACEK:  Judge, we have no objection to the

19 State, I understand has scheduling problems with one of

20 their witnesses.  Previously told the State we would

21 stipulate to the testimony.  Or in the alternative, if

22 it causes any kind of problem to have the gentleman

23 wait, because the Court was gracious enough to allow us

24 to pass for a short time.  I have no objection to it

8

1 being taken now.

2      MR. MURPHY:  We have one witness, Judge, we intend

3 on calling.  Proceed on that one witness, and then

4 adjourn.

5      MS. PLACEK:  Judge, I understand the nature of the

6 testimony.  Like I told Counsel, we'd either stip; or if

7 he wishes to call live testimony, that's fine.  We can

8 put him on now.

9      THE COURT:  The question is whether or not you want

10 the defendant's family here.  I'll hear the testimony by

11 way of stipulation or otherwise.  But I thought the

12 defense request was that the defendant's family wanted

13 to be present.

14      MS. PLACEK:  That's correct, Judge.  As the Court

15 said, I understand that this matter was to be set at

16 9:30.  I was here at 9:30, Your Honor.  You want to

17 stip?

18                          (Discussion held off record.)

19      MS. PLACEK:  Judge, I think we'd like to wait for a

20 bit, thank you.

21      THE COURT:  Pass.

22                          (Case passed.)

23      THE CLERK:  Sheet nine, line one, Jerome Hendricks,

24 in custody.

                          1640

9

1      THE COURT:  Mr. Cassidy, are you ready to proceed?

2      MR. CASSIDY:  Our assistant is coming down now,

3  Judge, from upstairs.

4      THE COURT:  Are you ready to proceed, Mr. Murphy?

5      MR. MURPHY:  Judge, we have one witness, who is on

6  his way down right now from the State's Attorney's

7  office.

8                        ( Pause.)

9      MR. CASSIDY:  May I apprise the Court while we're

10  waiting?  The impact statement submitted by our office,

11  Miss Estelle Fields, one of the Assistant State's

12  Attorneys, an assistant from our office, submitted, we

13  would ask you to consider what is contained only within

14  the purview of the recent Supreme Court case, decided

15  June 27, 1991.  And Payne versus Tennessee.

16      THE COURT:  Do you know, Mr. Cassidy, what

17  provision of the code is applicable to victim impact

18  statements under Illinois law?

19      MR. CASSIDY:  No, Judge.  I haven't looked at it.

20      THE COURT:  I found it.  It's chapter 38 section

21  1406.

22                        (Pause.)

23      THE COURT:  Mr. Cassidy, are you going to call the

24  author of that report?  Or the witness?

1641

10

1      MR. CASSIDY:  No, Judge.

2      THE COURT:  Can the Court consider it without your

3  calling the witness?  Pursuant to 1406, in your

4  judgment?

5      MR. CASSIDY:  Could I have just one moment, please,

6  Judge?

7                          (Pause.)

8      MR. CASSIDY:  Judge, I don't see reading

9  requirement that we have to call the victim to testify

10  or the witness to testify.

11      THE COURT:  About half way through the paragraph,

12  the sentence which begins, quote, if the victim chooses

13  to exercise this right, the impact statement must have

14  been prepared in writing in conjunction with the Office

15  of the State's Attorney prior to the initial hearing or

16  sentencing before it can be presented orally at the

17  sentencing hearing.  What does that mean in your

18  judgment?

19      MR. CASSIDY:  I believe it's saying that the

20  statement can be read into the record by either -- by

21  anyone.

22      THE COURT:  The rules of evidence are not strictly

23  enforced at this point in the proceedings, as we all

24  know.  The law, as I understand it, in this hearing

11

1 certainly is, if a jury were hearing this case, the

2 defendant would not be afforded a right of elocution.

3 He would, however, be permitted to take the stand and

4 testify to anything that he chose to, consistent with

5 the nature of the proceedings, and be subject to cross

6 examination.

7        Why should not any other witness, including

8 the victim impact witness, be subjected to cross

9 examination as would be the defendant?

10     MR. CASSIDY:  Well, Judge, if defense wishes, then

11 we will, based upon your question, Judge, we don't have

12 an answer to it.  So if the defense wishes, we will call

13 the author of the report.  Otherwise, I was going to

14 read portions of it.

15     THE COURT:  Ms. Placek or Mr. Lufrano?

16     MR. LUFRANO:  Your Honor, we have an objection to

17 the statement being considered at all.

18     THE COURT:  Well, you're aware of the case that Mr.

19 Cassidy just cited to me, are you?

20     MR. LUFRANO:  Yes, Your Honor, there they're

21 talking about victim impact statements, with some

22 limitation, this goes beyond.  And it goes beyond it,

23 because here there's simply emotion.  There isn't any

24 impact in this that wouldn't occur as a result of

**1643**

12

1 natural causes or that would make the death in this case

2 any different than the death in any other case.

3 Some of them, in addition, that this is simply

4 as it stands, is written, is unfounded hearsay under

5 oath. It is not subject to cross examination with any

6 significance, because in the cross examination process,

7 what Defense Counsel does is to exaggerate the

8 aggravation.

9 In addition, Your Honor, I don't believe that

10 the State has a right to draft a law which grants State

11 rights which contravene the Constitutional rights of the

12 defendant. And as such, this injects emotion. And I'm

13 talking about this document itself, not the victim

14 impact statement per se. There may be some victim

15 impact statements which do not do that.

16 But this one specifically interjects emotion.

17 And in a case which in and of itself, because of the

18 kind of case, already has enormous emotive value to it.

19 If the Court has to actively address and overcome,

20 because punishment is to be based on reason. There

21 isn't a single paragraph that isn't simply emotive in

22 nature. Some of the losses, the financial losses

23 addressed, are almost trivial and are the kind that

24 would not be cognizant at law in any event, in any case

**1644**

13

1    whatsoever.  For example, transportation costs, thrown

2    in as an added thought here.

3           The impact as described here, none of it is a

4    direct result of the felonious act.  They are all, each

5    and every one of them, very remote, almost totally

6    unperceivable by the perpetrator, and simply added to

7    get the Court's attention after it has once overcome the

8    emotional impact of the case itself, and pushed the

9    Court backwards towards an emotive setting instead of a

10   basis of reason.  And that's its only purpose.  That

11   addresses absolutely not a single other purpose.  There

12   is not a single statement in this document that is a

13   direct result of felonious injury.

14        MS. PLACEK:  Judge, please the Court, also, in

15   answer to the Court's question, I'm familiar with the

16   case recently Supreme Court case with which the Court

17   speaks of.  Particular problem I'm having, and I believe

18   that the first issue that the State has to overcome, in

19   review of the file in this matter, I believe that my

20   predecessors, Mr. Gant and Mr. Lemons, filed certain

21   pretrial motions dealing with Constitutionality and

22   discovery dealing with the death penalty.

23           In this particular matter, Judge, I believe

24   that one of the motions filed, at least pursuant to my

1645

14

1  file, was, so to speak, a discovery motion dealing with

2  the fact that we asked for notice for all those people

3  that the State intended to call as part of the death

4  hearing, as part of what we felt was our requirement.

5          In this particular matter, Judge, number one, we

6  feel that the "oral" in the statute as stated and read

7  by the Court, the Assistant State's Attorneys, deal not

8  with the State's Attorney or anyone orally reading a

9  victim impact statement to a Court, but rather, Judge,

10 the·victim impact statement is to be used more or less

11 as a tool of discovery to note what could or would be

12 said.

13         Therefore, Judge, I understand the Court's

14 concern and do agree with the Court's concern dealing

15 with the issue of hearsay.  As to the calling of the

16 witness, the particular problem I would have and the

17 first objection dealing with that deals specifically,

18 Judge, with my predecessors' motions as to knowledge or

19 a response to anyone who the State was willing to call

20 as part of the death penalty hearing, which I don't

21 believe has been complied with.

22      THE COURT:  State, do you care to respond?

23      MR. CASSIDY:  Judge, just briefly, Your Honor, at

24 the time, Your Honor, that motion -- when the motions

1646

15

1  were filed, Supreme Court case wasn't even decided at

2  that time.  At that time, we had no intention of using

3  the victim impact statement.  So we couldn't have

4  complied, if that is a discovery violation.  I think

5  that's what the defense argument is.  That's all I have,

6  Judge.

7          THE COURT:  All right.  On two grounds, the

8  discovery violation argument is not persuasive.  One,

9  because of what Mr. Cassidy has just indicated.  Booth

10 versus Maryland, which was to be sure, very short lived.

11 The Supreme Court held that victim impact statements on

12 a death hearing were not to be allowed.  Mr. Lufrano,

13 my understanding of Booth is that the Supreme Court

14 disallowed victim impact in a death sentencing hearing

15 for precisely the reasons that you suggest, that they

16 tended to reach to the emotional aspects of the case and

17 not to reason.  That may not have been entirely the

18 reasoning of the Supreme Court, but one cannot, it seems

19 to me, reading Booth, without coming to the conclusion

20 that that was of major concern to the Supreme Court.

21          As I say, Booth was probably one of the

22 shortest lived cases that the United States Supreme

23 Court has ever decided.  Then, within perhaps less than

24 five years, United States Supreme Court reversed Booth.

1647

16

1  And so the argument that an impact statement is more

2  emotional than factual doesn't seem to have much weight.

3  The fact of the matter is that victim impact statements

4  are permissible in jurisdictions that permit them,

5  without contravening the 8th and 14th Amendments of the

6  United States Constitution.

7        I haven't, I haven't read the latest Supreme

8  Court case.  I'm aware of a holding.  And I'm not

9  certain, and it could not be argued, it seems to me,

10 that the Supreme Court was unaware of what it was

11 permitting by, again, sanctioning victim impact

12 statements when in Booth they specifically addressed the

13 concerns that you have.  So they must have been aware

14 that that was going to be the end result of overruling

15 Booth.

16        And Illinois is a jurisdiction that permits

17 victim impact statements in a death sentencing hearing.

18    MR. LUFRANO:  I think Your Honor had misconstrued

19 what I was saying.

20    THE COURT:  No.  I have not misconstrued it.  We

21 were talking about the specifics of the particular death

22 impact statement in this case.

23    MR. LUFRANO:  Yes, where there is nothing but

24 emotion.

1    THE COURT:  I'm not certain that that has anything

2  to do with its admissibility.  It may very well mean

3  that little or no weight should be given to it.  But

4  that's different from whether or not it is admissible.

5    MR. LUFRANO:  What I'm suggesting is that the

6  weight that this type of statement ought have is so low

7  that it ought be considered for naught.

8    THE COURT:  The discovery violation, obviously, is

9  of no serious import to the Court, because at the time

10  that this case commenced and during all stages of the

11  pretrial matters, Booth was in effect.  And thus the

12  State could not have intended to offer a victim impact

13  statement and thus had no reason to notify the defense

14  that it intended so to do.

15    Secondly, while I'm aware of Taylor versus

16  Illinois, and I'm aware of that Taylor versus Illinois

17  applies with equal force to sanctions which could be

18  imposed upon the State as well as sanctions which can be

19  imposed on the defense for discovery violations, thus

20  far, and I think I'm accurate on this, I have not denied

21  either party an opportunity to call witnesses in support

22  of their case, because the discovery violation, within

23  the Court's judgment, was inadvertent.

24    I read Taylor to be a sanction which in my

1649

18

1  judgment was inappropriately applied to the defendant.

2  But what was going on in Taylor, as I understand Taylor,

3  who was a lawyer was engaged in unprofessional conduct;

4  and instead of sanctioning the lawyer, the Court

5  sanctioned the defendant by failing to allow, by

6  refusing to allow the defendant to call witness in his

7  defense.

8          The Supreme Court of the United States found

9  under the circumstances of Taylor, and I think you have

10 to read the factual background of the case in order to

11 understand Taylor, that there was no violation, that

12 there was no violation of that defendant's rights.  But

13 I don't read Taylor so broadly as to mean that any time

14 a discovery violation occurs that either side to a case

15 should be barred from calling witnesses.  That, in my

16 opinion, is perhaps the most draconion sanction that one

17 can impose in a criminal case.  It permits, perhaps, the

18 conviction of an innocent defendant, or permits the

19 acquittal of a guilty defendant, simply because a lawyer

20 made an inadvertent mistake.

21         Now, this victim impact statement has been in

22 your hands, I presume, for several days.  Not had an

23 opportunity to investigate it and avail yourself of the

24 opportunity to read it, that's one thing.  But simply

1650

19

1 because it was not listed in a document called Answer to

2 Discovery is insufficient for me to bar the State from

3 using it.

4          I'm not certain, Mr. Cassidy, what the

5 language in 1406 means in so far as it relates to being

6 presented orally. I am, however, extremely concerned

7 with the holding hearsay statement without any

8 opportunity to confront at all.

9     MR. CASSIDY: We understand that, Your Honor. And

10 if I may, Judge, just spoken with Miss Field, the author

11 of the report, and we will call her as a witness. And

12 she'll read just a short -- not the whole thing, just a

13 short part of it.

14     MS. PLACEK: If it pleases the Court, Judge, in

15 case Mrs. Fields is going to testify, we, of course,

16 would have an objection to reading.

17     THE COURT: The victim impact statement, unless you

18 can find something in 1406 that would tend to suggest

19 that the impact statement can't be presented in that

20 fashion --

21     MS. PLACEK: The problem I have, Judge, is that in

22 the State's Attorneys initial statement, I believe --

23 and perhaps I'm incorrect, he stated today that the

24 victim impact statement was prepared with help of their

20

1 office, and I believe a specific party was mentioned.

2 If this is incorrect, and I'd ask to be corrected now.

3     THE COURT:  Well, the statutes, Ms. Placek, seems

4 to contemplates that the victim impact statement must be

5 prepared in conjunction, as the language says,

6 specifically, must have been prepared in writing in

7 conjunction with the Office of the State's Attorney.

8     MS. PLACEK:  I have no objection to the statute,

9 Judge.  What I'm suggesting to the Court, quite frankly,

10 is this.  If that we're having a live witness present

11 it, and the State intends to only have something read, I

12 would like an assurance from the State that the person

13 reading it rather than, shall we say, being given the

14 means and method to do independent authorship of the

15 statement, was not in fact assisted to the point of

16 having, shall we say, words put in their mouth under the

17 excuse of these are better court words.

18     THE COURT:  That's what you're going to have an

19 opportunity to determine through your right of cross

20 examining the witness.

21         State, call your first witness.

22     MR. MURPHY:  Assistant State's Attorney Patrick

23 Finley.

24             (Witness sworn.)

**1652**

21

1        THE COURT:  Good morning.  It is afternoon.  That

2   microphone is on.  If you'll speak directly into it,

3   keep your voice up, we'll all hear you.

4        THE WITNESS:  Fine, Judge.

5                    PATRICK FINLEY,

6   called as a witness herein on behalf of the People of

7   the State of Illinois, having been first duly sworn, was

8   examined and testified as follows:

9                    DIRECT EXAMINATION

10                   BY  MR. MURPHY:

11       Q     Would you state your name, spell your last

12  name for the Court Reporter?

13       A     Patrick Finley.  F-as-in-Frank-i-n-l-e-y.

14       Q     By whom are you employed?

15       A     Cook County State's Attorney Office.

16       Q     And what is your position with the Cook

17  County State's Attorneys?

18       A     Currently assigned to felony review.

19       Q     Now, how long have you been with the Cook

20  County State's Attorneys Office?

21       A     Over two years.

22       Q     Now, are you licensed to practice law in the

23  State of Illinois?

24       A     Yes.

                          1653

22

1       Q       How long have you been licensed for?

2       A       May of 1985.

3       Q       Now, Assistant State's Attorney Finley, I'd

4  like you to look at this individual seated right here

5  with the light color jacket.  You recognize that

6  individual?

7       A       Yes, I do.

8       MR. MURPHY:   And for the record, Judge, I pointed

9  to the defendant, Jerome Hendricks.

10      THE COURT:  May so reflect.

11      MR. MURPHY:   Q     And how do you recognize the

12  defendant, Jerome Hendricks?

13      A       I met Mr. Hendricks March of this year at

14  26th and California.

15      Q       And where was that at 26th and California?

16      A       In Judge Fitzgerald's courtroom.

17      Q       And could you describe the circumstances

18  under which you met him at that time?

19      A       That was a Prisoner Review Board hearing

20  regarding an allegation of violations made by Mr.

21  Hendricks.

22      Q       Now, that was a parole hearing?

23      A       Correct.

24      Q       And could you tell Judge Holt what occurred

1654

23

1  during the course of that parole hearing?

2      A     Yes.    That courtroom that day were a number

3  of hearings going on with one particular Hearing

4  Officer.  I don't recall his name.  I believe he was an

5  Hispanic gentleman.  Mr. Hendricks' case was called.

6  When the Hearing Officer informed Mr. Hendricks of the

7  allegations against him, Mr. Hendricks told the Hearing

8  Officer before myself that he wished to be violated,

9  which I understood to mean his mandatory supervised

10 release or what we speak of as parole.

11     Q     Now, did you become familiar with the

12 defendant Jerome Hendricks' parole record, mandatory

13 supervised release record?

14     A     I knew he was on parole since about April of

15 1988.

16     Q     And was he on parole up to and including the

17 time that you came in contact with him in March of 1990?

18     A     Yes, he was.

19     MR. MURPHY:  I have no further questions, Judge.

20     THE COURT:  Cross.

21     MR. LUFRANO:  No questions, Judge.

22     THE COURT:  Thank you, Mr. Finley, you may step

23 down.

24     THE WITNESS:  Thank you, Your Honor.

24

1                    (Witness excused.)

2        THE COURT:  Call your next witness.

3        MR. CASSIDY:  Thank you, Your Honor.  Please the

4    Court, Your Honor, State would call Mrs. Estelle Fields.

5        MR. LUFRANO:  We would object.  She is not a family

6    member within the designation under the statute:

7    spouse, parent, or sibling.

8        THE COURT:  What section?  Swear her in.

9                    (Witness sworn.)

10       MR. LUFRANO:  I think it's in 1406, Judge.  I might

11   be wrong.  I'm taking the language by the State.  I

12   think it's in the Statute.

13       THE COURT:  There's nothing in the -- in the

14   statute, at least section 1406, that defines who is a

15   victim in this type of proceeding.  By definition, it

16   could not be the actual decedent, obviously.  So we

17   necessarily are talking about someone who has a

18   relationship to the decedent in such a way as to make

19   him or her a victim within the meaning of this language.

20   And I can't determine that without hearing the nature of

21   the relationship here, to determine whether or not,

22   given the lack of specificity in the statute in terms of

23   the defining who is a victim in case of a death penalty

24   hearing.  I would hear the relationship and determine

                    1656

25

1 for myself whether or not this person is a proper person

2 to testify.  You may proceed.

3      MR. MURPHY:  If I may address the Court on one

4 other matter.  If the record is not clear, the victim

5 impact statement was tendered to the defense on August

6 19th.  So if that this becomes an issue in this case.

7 And as I understand it, the defendant is not requesting

8 a continuance for the purpose of reviewing this victim

9 impact statement any further, since they are not

10 objecting on that basis to this witness testifying.

11      THE COURT:  You may proceed, Mr. Cassidy.

12                ESTELLE FIELDS,

13 called as a witness herein on behalf of the People of

14 the State of Illinois, having been first duly sworn, was

15 examined and testified as follows:

16                DIRECT EXAMINATION

17           BY  MR. CASSIDY:

18      Q      Can you state your name and spell your last

19 name?

20      A      Estelle Fields.  F-i-e-l-d-s.

21      Q      And, Miss Fields, what relationship did you

22 have with Denise Johnson?

23      A      I was her aunt.

24      Q      And did Denise Johnson ever live with you,

26                    1657

1 Miss Fields?

2     A     Yes, she did.

3     Q     Can you please tell His Honor, Judge Holt,

4 how long approximately did Denise Johnson live with you

5 prior to her dying?

6     MR. LUFRANO:  At this time, we object.  This is all

7 cumulative.  Miss Fields testified in the case in chief

8 all the questions now asked.

9     THE COURT:  Overruled.

10     MR. CAASSIDY:  Q  You understand the question?  You

11 want me to restate it?

12     A     She lived with me and in my home two years

13 before she, before she was killed.  But before that, we

14 lived together in my father's house when she was born.

15 My sister and her husband, Mr. Johnson, and Denise, my

16 children, we all lived in the same house.

17     Q     Do you know Denise Johnson's mother?

18     A     Yes, I do.

19     Q     And what is her name?

20     A     Denise Johnson.

21     Q     And can you please describe for His Honor her

22 physical condition?

23     A     She is deaf.

24     Q     Did you become somewhat of a mother figure or

1658

27

1  in fact were you her legal guardian of Denise Johnson?

2      A       Yes, I was.

3      Q       Did you, Estelle, did you prepare an impact

4  statement in this case?

5      A       Yes, I did.

6      Q       And did you prepare that with the help of Mr.

7  Murphy and myself?

8      A       No.  No.  No.

9      Q       Following that, did you give it to Mr. Murphy

10 after you prepared it, and myself?

11     A       Yes.

12     Q       You have that victim impact statement with

13 you?

14     A       Yes, I do.

15     Q       Are you prepared to read portions of that to

16 His Honor?

17     A       Yes.

18     MR. CASSIDY:  Your Honor, at this time I would

19 request the witness be allowed to read portions of it.

20     THE COURT:  Mark it as an exhibit.

21     MR. CASSIDY:  I'm sorry.  Mark it as State's

22 Exhibit Number One for this hearing.

23     MR. MURPHY:  Already marked the birth certificate

24 as number one, unless you consider this a --

28

1        THE COURT:  No.  Mark this as number two.

2        MR. CASSIDY:  Two, Judge?

3        THE WITNESS:  You want me to read it now?

4        THE COURT:  Yes, you may.

5        MR. CASSIDY:  Thank you, Your Honor.

6        THE WITNESS:  It seems that this tragedy is

7   something that will always haunt me.  My daily routine

8   changed a lot after Denise was killed.  I used to get up

9   in the morning, get a cup of coffee, get dressed, and go

10  to work.  I started waking up at night.  In the morning,

11  I wanted to stay in bed, not wanting to see or talk to

12  anyone.  The days I was able to pull myself out of bed,

13  I found myself cleaning the house every minute of the

14  day.  Tried to keep busy so I could try not to think

15  about what happened to Denise.

16            As time went by, I was a victim in my own

17  home.  Every time I walked past her room, it became more

18  unbearable.  I could see her clothes and smell her

19  scent.  My daughter shared a room with Denise.  She

20  thought at one time that she saw Denise in the room.  I

21  believe I had felt her presence.  I started sleeping in

22  her bed to feel close to her.  It got so bad, my

23  daughter had to leave.  And so did I.  We had to move to

24  try to let go and realize she was dead.

29

1          Even after moving, the sadness, anger, and
2   guilt all came back.  I need to be free.  How?  I
3   stopped dating.  I went in a shell trying only with one
4   concern, to protect the rest of my family.  More so the
5   girls, my daughters, and my granddaughters.  I don't
6   have a normal life.  I am still upset because I know
7   that other family members and her friends did not get a
8   chance to see her for the last time to say goodbye.  We
9   wanted to touch her, to look at her; but because her
10  body was so bad, we had to have a closed casket at her
11  funeral.  She wanted to be able to see her -- She won't
12  be able to see her family any more.  Nor will we be able
13  to see her.  She won't be able to wake up in the
14  morning.  She will never go on a family picnic.
15       MR. LUFRANO:  Objection, Your Honor.  This entire
16  colloquy that's continuing --
17       THE COURT:  Overruled.
18       MR. LUFRANO:  -- is a result of any other incident.
19       THE COURT:  Overruled.
20       THE WITNESS:  She will never go to high school.
21  She will never go on a prom.  She'll never know what
22  it's like, what it is like to fall in love.  She'll
23  never experience motherhood and the love of a child.
24  She'll never be able to make this world a better world,

1661

30

1  which is what she wanted to do.  She was ours, and now

2  she is gone.  She was true innocence.  And now it is

3  lost.

4       MR. CASSIDY:  No further questions.

5       THE COURT:  Cross.

6       MR. LUFRANO:  Nothing on cross.  Emotional value

7  being all --

8       MR. CASSIDY:  Objection, Judge.

9       THE COURT:  Do you have any cross examination you

10  want to ask of this witness?

11       MR. LUFRANO:  No, Your Honor.

12       THE COURT:  Thank you, Miss Field.  You may step

13  down.

14                          (Witness excused).

15       THE COURT:  Call your next witness.

16       MR. CASSIDY:  Judge, we have no further witnesses.

17       THE COURT:  State rest in aggravation.  Defense?

18       MR. CASSIDY:  Judge, we ask that you only consider

19  that portion of the victim impact statement which was

20  recited into the record.

21       THE COURT:  Defense?

22       MR. LUFRANO:  Your Honor, it's hard to do since

23  they tendered the entire thing.  We objected to it.

24  Unless the Court wishes to ignore the entire statement.

                           1652

31

1       THE COURT:  Defense?

2       MR. LUFRANO:  We renew the objection.

3       THE COURT:  Objection is overruled.

4       MR. LUFRANO:  Your Honor, we would ask for a date.

5  The family was contacted.  There was testimony -- we had

6  anticipated -- why they're not here, we have no specific

7  knowledge as to why they're not here.  There were

8  problems in the past with threats and certain other

9  instances which were earlier brought to the Court's

10 attention.  I don't know if that's what prevented them

11 from being here or not.  I did in fact talk with David

12 Hendricks two nights ago and left with the impression

13 that the family would be here this morning at 9:30.

14      THE COURT:  You have witnesses under subpoena, Mr.

15 Lufrano?

16      MR. LUFRANO:  No, Your Honor.  They were family.

17 We didn't anticipate a subpoena would be necessary.

18      THE COURT:  Motion for continuance is denied.

19      MR. LUFRANO:  In that case, we rest, Your Honor.

20      MR. MURPHY:  Judge, if I may just respond to one

21 thing Counsel stated for the record.  I have no

22 knowledge.  We have no knowledge whatsoever of any

23 threats.  First time I ever heard that come up at any

24 time is as Counsel said it just now for the record.

1663

32

1      MS. PLACEK:  To refresh both this Court and the

2   State's --

3      THE COURT:  If the record contains any indication

4   that the defendant or any member of his family was

5   threatened, it contains it.  If it doesn't, it doesn't.

6         Mr. Hendricks, you have a right to testify in

7   this case in your own behalf.  You also have a right to

8   call witnesses in your own behalf.  In making the

9   decision as to whether or not you choose to testify in

10  this case, because you also have a right not to testify,

11  you of course should be guided by, to some extent at

12  least, or if not guided by, you certainly have a right

13  to confer with your lawyer and receive the advice of

14  your lawyers and to receive the reasons pro or con why

15  you should or should not testify in these proceedings.

16         If you have not had a sufficient opportunity

17  to discuss the matter with your attorney, I will pass

18  this matter and allow you an opportunity to confer

19  further with your attorneys in regard to whether or not

20  you choose to testify in this case.  But in the final

21  analysis, Mr. Hendricks, the decision as to whether to

22  testify is yours.  It belongs to you, that is the right

23  to testify or not to testify belongs exclusively to you.

24  It is not your attorney's right.  Nor can your attorney

33

1 waive it for you.

2          If you desire the Court to pass this case,

3 I'll do so, allow you an opportunity to confer with your

4 attorneys to whether you intend to testify.  On the

5 other hand, if you are satisfied that you understand the

6 nature of your right and that you have made a decision

7 as to whether you choose to testify.  I will hear from

8 you what it is you desire the Court to do.

9      THE DEFENDANT:  I'd like to pass it, Your Honor.

10      THE COURT:  This case will be passed until 1:30

11 p.m..

12                    (Case passed.)

13      THE CLERK:  Sheet nine, line one, Jerome Hendricks.

14      THE COURT:  Mr. Hendricks, have you had an

15 opportunity to consider with your attorneys whether you

16 decide to testify in this case?

17      THE DEFENDANT:  Yes, I did.

18      THE COURT:  What is your decision, sir?

19      THE DEFENDANT:  Waive, Your Honor.

20      THE COURT:  The defense then rests.  State, I will

21 hear your arguments.

22      MR. LUFRANO:  Your Honor, prior, I did have one

23 correction.  We would ask the Court notice the PSI,

24 since the PSI --

34

1        THE COURT:  I'm not considering the presentence

2   investigation report, Mr. Lufrano.   The statute is

3   silent on whether or not at a death sentencing hearing

4   before the Court a presentence report is required or

5   should be considered.   It is clear from the law, though,

6   that if the death sentencing hearing were before a jury,

7   a presentence investigation report is not to be

8   submitted or considered by the jury.   And I see no

9   reason to consider it here.

10        Some ambiguity in that, in that the provisions

11   are not as clear as they might be as to whether or not

12   the prohibition against consideration of the presentence

13   report is applicable when the hearing is before the

14   Court as distinguished from the jury.   And that is the

15   reason why I ordered it.   But after considering it, I

16   have determined that I should not consider the

17   presentence investigation report.

18        Both sides ready for argument?

19     MR. MURPHY:  Judge, with respect to the ruling,

20   there is a conviction that we expected the Court to take

21   notice of that was contained within the report.

22     MR. CASSIDY:  Judge, we request the Court take

23   notice of that in the PSI, the fact that he's been

24   convicted.

35

1      THE COURT:  I am not taking notice of the PSI at

2  all.  For any purpose.

3                        ( Pause.)

4      THE COURT:  My recollection is that when I ordered

5  the presentence investigation report, I indicated the

6  ambiguity that I am speaking of in the statute as to

7  whether or not a presentence report is required in a

8  death sentencing hearing, so that both sides were aware

9  of the status of the law at that point.  I just simply

10 had not concluded at that point whether to utilize it or

11 not, and that's the reason that I ordered it.  Nobody

12 should be taken by surprise, plus both sides are

13 presumed to know the law, anyway.

14     MR. MURPHY:  Could I have a moment, Judge?

15             We're going to ask that this matter be set

16 over for a five-minute period.

17     MS. PLACEK:  State's rested, Judge.  And the

18 defense has rested.

19     THE COURT:  I know.  And I have the discretion to

20 allow them to reopen, should I choose to exercise that

21 discretion.  Pass.

22                     (Case passed.)

23

24

1667

36

1   STATE OF ILLINOIS   )
                        )  SS:

2   COUNTY OF C O O K   )

3

4          IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION

5

6   THE PEOPLE OF THE      )
   STATE OF ILLINOIS      )
                        )

7      -vs-           )  No. 88 CR 12517
                        )

8   JEROME HENDRICKS      )  Before Judge Leo Holt
                        )

9                        )  Thursday, August 22, 1991
                        )

10                     )  Afternoon Session

11

12

13          Court reconvened pursuant to recess.

14

15

16

17       APPEARANCES:

18

19         Same as heretofore noted.

20

21

22

23

24

1058

1    THE CLERK:  Jerome Hendricks.

2    THE COURT:  Mr. Murphy.

3    MR. MURPHY:  Judge, we will be asking the

4    Court leave to reopen the State's case for the

5    purpose of introducing a certified copy of conviction.

6    THE COURT:  Defense.

7    MS. PLACEK:  Your Honor, the certified copy of

8    conviction relevance is the problem we have in this

9    particular matter.

10   THE COURT:  Relevancy?

11   MS. PLACEK:  Dealing with, in fact, with the

12   identification of the certified copy of conviction

13   and the nexus of whether or not whatever certified

14   copy of conviction you are dealing with, and we

15   haven't seen it, is, first, a self-authenticating

16   document and, secondly, deals with this defendant.

17   THE COURT:  You'll have to run that past me

18   again.

19   MS. PLACEK:  Simply, Judge, whether or not the

20   document, one, the identification of the document is

21   identified with this defendant, Judge.

22   THE COURT:  State, what is your response?

23   MR. MURPHY:  Judge, first of all, I don't think

24   there has been any indication -- there has been any

21

1   indication thus far that this is not the defendant

2   and --

3     THE COURT:  The argument is that you have the

4   burden of showing that it is.  That's what she is

5   saying.  She doesn't have to disprove it.  You have

6   to prove it.

7     MR. MURPHY:  It is a certified record for

8   Jerome Hendricks, with a case number.  I believe

9   what weight should be attached to that would be for

10   the Court to determine.

11     MS. PLACEK:  We are suggesting foundation has

12   to still be properly laid, irrespective, Judge.

13     THE COURT:  In this phase of the hearing, the

14   rules of evidence are not in force and the Court may

15   consider anything, without regard to the rules of

16   evidence, so long as there is a sufficient inditia

17   of reliability.  A certified copy of a conviction

18   imports a sufficient inditia of reliability for the

19   Court to rely upon it.  The defendant may, if he

20   chooses, challenge that certified copy as being

21   related to him.  But in the first instance, the

22   document is sufficiently reliable for the Court to

23   receive it and I will so receive it.

24      Will you please mark it as Defendant's

22

1670

1    Exhibit No. 3.

2        MS. PLACEK:  It's not our exhibit.

3        THE COURT:  People's Exhibit, I'm sorry.

4        MR. MURPHY:  I am marking it as People's Exhibit

5    No. 3 and I am tendering to the Court.

6        MS. PLACEK:  Judge, may the record reflect,

7    in seeing the certified copy, that, in fact, the name,

8    Jerome Hendricks, is the only written matter, and I

9    am speaking of the rest of the document being typed

10   in the document.

11       THE COURT:  I beg your pardon?

12       MS. PLACEK:  On the top, Judge, the defendant's

13   name, Jerome Hendricks.

14       THE COURT:  Yes.

15       MS. PLACEK:  If I might be allowed to approach

16   the bench and show the Court what I mean.

17            Your Honor, the document is filled out

18   and what I am stating, Judge, is that Jerome Hendricks,

19   instead of the normal certified copy of conviction,

20   and perhaps I'm different, used to something different,

21   is not typed in, but, rather, written in.

22            Thank you, Judge.

23       THE COURT:  The point being?

24       MS. PLACEK:  Judge, the point being, number one,

23

in the matter of Jerome Hendricks and as to the

matter of the certified copy of conviction, we are

just asking whatever court reviews said hearing,

if the document doesn't make it into the file,

which sometimes happens, which sometimes happens,

that Jerome Hendricks' name is printed in box letters,

in what appears to be different writing than that

below.

THE COURT: Fine. The record may so reflect.

MS. PLACEK: Thank you.

THE COURT: State, I'll hear your argument.

MR. CASSIDY: Judge, I believe there are three

possible range of sentences. I believe the defendant

can be sentenced anywhere from 20 to 100 years; he

could be sentenced to a term of natural life

imprisonment; or he could be sentenced to death in

this case.

He could be sentenced anywhere from

20 to 100 years based on the fact that a murder

conviction in the State of Illinois carries with it

a term of 20 to 60 years and, in this case, because

there is aggravated factors present, the defendant

then can be sentenced to the extended term, and in

Illinois, extended term for this type of case would

24

1  be anywhere from 60 to 100 years.  And I believe

2  since his Honor found the defendant eligible for

3  the death penalty under Section 9-1 of Chapter 38,

4  I think Subsection C, he then, if his Honor decided

5  not to impose the death penalty, can sentence the

6  defendant to a term of natural life.  And I believe

7  the third possible, which your Honor has already

8  ruled upon, the defendant is eligible for the death

9  penalty.

10         Your Honor, the State submits that

11  the defendant should be sentenced to death.  And

12  the State submits, your Honor, that a sentence of

13  a term in the Illinois Department of Corrections,

14  or a sentence of life imprisonment for this defendant

15  would not be appropriate, your Honor.

16         The State has worked in front of

17  your Honor before.  The State realizes his Honor's

18  views on the penitentiary, that is a filthy, vile

19  place.  I heard you use that language many times

20  before, your Honor.  And I think people who do not

21  advocate the death penalty, the pro life people or

22  whatever, their argument runs along the lines of it

23  is better for someone to spend the rest of their

24  life or a good portion of their life in the

25

1673

penitentiary, so they can live like that, rather
than doing them a favor, it's a worse punishment
by spending a good portion of your life in the
penitentiary or life, rather than sentencing someone
to death.  And I think the underlying assumption
with that argument is that people, all people, the
assumption goes, appreciate or have values and we,
the people, value our liberty, our freedom, and we
value our little things in life, like the outdoors
and the changing seasons, watching one's children
grow, and things like that, Judge.

I think the fault with that assumption
is that all people are not like that.  All people
don't have values like that.  All people don't
appreciate things like that.

So I think for the most majority of
the population, that argument would be a good one,
except for people like Jerome Hendricks, because I
submit to your Honor that Jerome Hendricks does not
have those values.  He does not value the little
things in life.  He does not value freedom of choice.

It is obvious from the record, it is
obvious by his criminal history, it is obvious by
what he did to Stephanie Smith, Phyllis Williams, and

26

1    Denise Johnson, over a period of several years.

2    He does not value that, based upon his actions.

3    Here is a gentleman who ties people up and rapes

4    them.   Little Stephanie Smith, he puts his arm

5    around her, he chokes her while raping her.   Phyllis

6    Williams, he tied her with a rope and raped her.

7                      He was then sentenced to the

8    Department of Corrections, so this gentleman knows

9    what the Department of Corrections has to offer.

10   He is aware of what your Honor refers to.   He is

11   aware of the filthy, vile place that it is and, yet,

12   your Honor, since he has no values, he doesn't care

13   whether he goes back there.   Less than 90 days after

14   he's sentenced to six years, serves three years of

15   that time, less than 90 days later, he commits the

16   offense in front of your Honor.   So, obviously,

17   Judge, he does not appreciate those values, those

18   little things in life, and I believe your Honor

19   would have to recognize that some people are just

20   evil and some people can live in that environment

21   and live quite well, and I submit to your Honor that

22   Jerome Hendricks is one of those types of people,

23   that he can live in the penitentiary and survive

24   very well and, to him, it is not filthy and vile,

27

1   rather, it is his way of life.

2   And I say that, your Honor, based

3   upon his record, not just on the assumption I make,

4   not just speculation on my part. Your Honor, death

5   for Mr. Hendricks would still not be quite right,

6   because it still wouldn't be as bad as what Denise

7   Johnson went through. And after all, if Mr. Hendricks

8   was sentenced to death by your Honor, he would

9   probably not be executed, based upon our present

10  system of appeal, probably for another ten or 15 years.

11  I believe he is 30 years of age. That means he will

12  live to be 40 or 45. He will see his six-year-old

13  daughter grow into adulthood. He will be a better

14  father in the penitentiary than, I submit, he would

15  be on the street, because at least his daughter will

16  know where he is at and she could visit him, if she

17  so decides, and she will know where he will be. I

18  would submit that he will see -- he will grow to

19  middle age, into middle age. He will live at least

20  three times as long as Denise Johnson lived, because,

21  after all, Denise Johnson was 12 years old when she

22  died.

23  So I submit that death for Mr. Hendricks

24  is not good enough because, after all, your Honor,

28

Mr. Hendricks will be fed every day. When time does come, if it does come, if your Honor sentences him to death, he will have the advantage of having clergy there, if he so decides, something Denise Johnson did not have. He will allow himself to be at peace with himself and his God, if he so decides, something Denise Johnson never had a chance to do. He will be able to say goodbye to his loved ones and they'll have the opportunity to say goodbye to him. He'll have the opportunity to say those things that he maybe never said before to those people and they to him. Denise Johnson, Judge, never had that opportunity.

And when time comes, time for him to die, Judge, he will take and -- he will be given notice. He will be able to prepare for it. He'll be walked down a hallway with clergy and friends probably right there, up to the last minute, and will not be in a dirty, vile garage floor, where garbage bags are, and no one is going to pull his shirt up over and start choking him. No one is going to penetrate him anally, like was done to Denise Johnson. And no one is going to choke the life out of him. But, rather, he'll be taken in and injected with a

29

needle and he will pass away.  That's a nice, sterile environment.

So if you impose the death penalty on this man here, it still is not as bad as what happened to Denise Johnson.

Judge, I ask you to give death to this man because, first and foremost, I submit to you that the law requires it.  I submit to you that there are no sufficient mitigating factors sufficient enough to preclude him from dying.  And that's my primary argument and, Judge, I make that argument knowing full well that I am not the one who signs the order.  I don't have to put my signature on the half sheet and I go home tonight knowing that I'm not the one who sentenced someone to death.  But I make that argument in good faith, based upon the law, based upon his background, based upon the crimes he's committed, and I submit to you, Judge, that he was no little boy when he committed these crimes.  He committed them when he was 27 years of age.  He raped two other girls previous to this.  He was in the penitentiary.  His freedom of choice.  He knew what was going on.  He is no young man, Judge.

And I make the argument to you, Judge,

30

1    as if you were a jury.  I make the argument, asking

2    you not to feel guilty about it, because you should

3    not; I ask you to just follow the law, as I would a

4    jury, because you did not do anything to him, your

5    Honor.  Mr. Jerome Hendricks did everything to himself.

6    So I make the argument, Judge, to sentence him to

7    death, based upon the law and the facts, and feel no

8    guilt or remorse, because all you are doing is follow-

9    ing the law as if there were 12 jurors here, Judge.

10          I know full well that Jerome Hendricks

11   is a human being, Judge.  However, because he is a

12   human being does not make him humane.  He is a

13   person, but it does not mean he has a personality,

14   Judge.  Mr. Jerome Hendricks, your Honor, he is an

15   animal.  He is an animal of the worse type, because

16   he is cloaked in a human's body and he puts women

17   around him at ease and then he attacks.  So although

18   you have a human being in front of you, and I expect

19   you to consider it, although the law says you should

20   just consider the facts and the evidence and then

21   apply the law to the facts, I know you don't sit up

22   there in a vacuum, I know you are a human person, I

23   know you have feelings; but I know that Jerome

24   Hendricks had freedom of choice and he is not a

31

1    human being as we know one to be.

2              I am also aware, your Honor, that

3    now, you can consider, based upon the law, you can

4    consider Denise Johnson, Judge, because based upon

5    the Supreme Court case recently, the State has

6    legitimate interest in counteracting the mitigating

7    evidence, which the defendant is entitled to put in,

8    which there has been no mitigating evidence, I submit,

9    by reminding the sentencer that just as the murderer

10   should be considered as an individual, so too the

11   victim is an individual whose death represents a

12   unique loss to society and, in particular, to his

13   family or her family.  The victim, in her own words

14   and in the Court's own words, Judge, is no longer a

15   faceless stranger at the penalty phase of a capital

16   trial.

17             And, Judge, I say this to you, your

18   Honor, in good faith, but I ask you, when you do

19   decide what to do with Jerome Hendricks, I ask you

20   to consider that your sentence, Judge, you would

21   impose upon Jerome Hendricks would not only state the

22   law and the value you place on his acts, but also

23   the value you place on Denise Johnson.  It is a heavy

24   burden you have, your Honor, but I believe -- I don't

32

think you've ever run across a person, when you're

on the bench, your Honor, like Jerome Hendricks,

who shows no remorse, whatsoever, throughout every

stage of this proceeding.  Judge, death would be

too good for Jerome Hendricks, but that's all we have

in this state.

If you recall, your Honor, I believe

there was a lynch mob ready to get at Jerome Hendricks.

I think it came out during the motions, but they

didn't react, they waited, your Honor.  The family

waited, during the course of this trial.  The people

in the community have waited, your Honor.  They did

not take the law in their own hands.  I submit to

your Honor that the people await your sentence and

I submit to your Honor that the law mandates, based

upon the law and the facts of this case and the

criminal history of Jerome Hendricks, that he be

sentenced to death, Judge.

THE COURT:  Defense.

MS. PLACEK:  Very briefly, your Honor.

The Court knows this isn't the first

time I've gotten up and argued against the death

penalty.  Maybe not like Mr. Cassidy spoke before

your Honor and maybe I don't have the wealth of

33

experience that Mr. Cassidy spoke of, when he spoke

in his closing statements, but the simplicity of it,

Judge, is every time I stand before a court or a

jury and speak against the death penalty, I often

wonder if I was a better lawyer, whether we would

have even made this particular section of the case.

It is odd that I always hear the

State speak in terms of death, in terms of too good

for him or just let him sit on death row for ten or

15 years and, in fact, what we'll have is we'll have

him living some sort of very simple and easy life.

And what will happen is probably some -- strike that --

some higher court will come about and reduce the

sentence, and everything will be fine, because, you

know, what you do doesn't matter, Judge.

Well, Judge, this Court knows what

is happening and what trends are happening in the

law, and this Court knows that, number one, death

row is a place where a person sits in a place

smaller than the bench that encompasses your Honor,

for 23 of the 24 hours of the day, while awaiting

this appeal.

This Court also knows that the only

time that death row inmates are let out for exercise

34

1    is when they are completely shackled and then alone.

2             This Court also knows that the trends

3    in the law isn't necessarily for the lengthening of

4    these kinds of appeals, as speculated by the State,

5    but there is legitimate moves in Congress right now

6    to shorten them. So, therefore, the falacy that he

7    is going to somehow, if you sentenced him to death,

8    and by the way, it is your choice, it is your choice

9    to pick one of the three alternatives the law offers

10   you, so rather than saying that the law mandates it,

11   say that you want him to die, because that's the

12   very reality of it with the changes of the law, but

13   let's go one step further, why would you want to.

14            Well, because he killed a young girl.

15   The Court has found that to be true and since the

16   Court has found it to be true, let's go through what

17   good society, in fact, will have if this Court lowers

18   itself and lowers its own humanity to somehow kill

19   Jerome Hendricks.

20            Start, first, with the very obvious

21   thing.  Is there anything anyone in this courtroom

22   right now can do to lessen the pain of the last three

23   years that the family faced. There isn't. There is

24   no way humanly possible that that child can be put back

35

upon this earth.  So, therefore, by killing

Mr. Hendricks, this Court isn't accomplishing that.

Well, this Court, by killing

Mr. Hendricks, possibly, is somehow sending a message

to the community.  Let's go to the logical conclusion

of what that message is.  That message is simply

this, number one, it is wrong to kill and we are

going to show you that it is wrong to kill by killing

someone.  This sort of institutionalized murder is

simply that.  It shows that this society, like the

only other industrial countries of the world, Russia

and South Africa, hold human life in some sort of

contempt and that contempt is simply this, that we

admit that certain things are wrong and an abomination,

in admitting they're wrong and an abomination, what we

are going to do in some sort of false name of justice,

is get down with you, I'm speaking of the person that

we are saying, to characterize the State's Attorney's

words, is an animal, because he is not, he is a human

being just like you and I, and we are going to do to

him what he supposedly did to somebody else.

Well, let me put it this way, the

logic of that argument sort of falls flat, because

how can you tell anyone violence is wrong by doing

36

1   violence.

2            Mr. Cassidy said there was no

3   mitigation in this matter. I would point out that

4   the law takes in account anything that this Court

5   feels and even this Court's sentiments as mitigation.

6   I would further point out to the Court that, number

7   one, one of the things that the Court can take into

8   consideration is, in fact, the background of the

9   defendant and what exactly the Court has seen in

10   this particular case.

11            It is particularly strange and I con-

12   sidered it for awhile, except I do have a duty to

13   defend, just sitting there and allowing some higher

14   court to call me incompetent, because Mr. Hendricks'

15   family wasn't here, on the theory that possibly I

16   would be giving him another issue on appeal, stating

17   that Defense Counsel, myself and Mr. Lufrano, simply

18   sloughed off during the hearing and offered no

19   mitigation. I or Mr. Lufrano have no idea why the

20   family isn't here.

21      MR. CASSIDY: Objection, Judge.

22      THE COURT: The objection is sustained.

23      MS. PLACEK: The simplicity of the argument

24   goes like this, Judge. The Court, in experience,

37

and the Court, in its life, has seen things, and
the oddity and the key to this particular character
is simply this, Mr. Hendricks stands before you and
as he stands before you, he stands alone.  And in
this particular issue, you have heard of his child,
the State brought it up, and you also heard that he
does have a family.  The impact of this becomes that
you are taking out a member of the community, if you
do sentence him to death, and you are telling the
community what.  Well, I'm sure the State's constant
argument is the fact that you are telling them that
there is some kind of repercussion or there is, and
I'm sure it will come, something wrong with killing
someone by, in fact, punishing someone.

Punishment can be given in years.
We always spoke about the illogicalness of killing
someone for the idea, for the idea of telling them
that killing is wrong.  But as for the idea that
somehow you are going to send a message to the
community that, somehow, you are going to stop killing
by killing him is absurd.

The death penalty has been around
since the Code of Hammurabi.  The death penalty has
been in this country almost continuously for this

38

1696

1  country's entire history.  We used to execute people

2  for anything.  We used to execute people for the

3  color of their skin.  As a matter of fact, there is

4  some, because they are disproportionate in number,

5  the minorities on death row would say we still do

6  that.  But the point simply becomes this.  Every time

7  people talk about the argument about, somehow, if we

8  really kill someone and we send someone to whatever

9  sentence of execution we have, that the killing will

10  stop.  The absurdity of that argument is made a lie

11  by the headlines, because after almost 200 years of

12  continual state killing, then why, not one month ago,

13  there is Jeffrey Dahlmer and Evans, and why is there

14  this constant killing every Monday, when we pick up

15  the paper and we find out, in fact, that more and

16  more and more people have killed.  So, obviously, the

17  death penalty isn't a cure-all for that.

18          Then what good is it, and if this

19  Court sentences Mr. Hendricks to death, it isn't

20  mandated by the law, it isn't your only choice, it

21  isn't justice.  It's one thing, it's revenge and

22  that's all it is.  And when I say that's all it is,

23  I would ask this Court, when it makes its deliberation,

24  to look deep into its heart and when it looks deep into

39

1697

1   its heart, when this Court considers that one of the

2   mitigating factors is the fact that Mr. Hendricks --

3   that prison is not an alternative, the case law in

4   Illinois has said that, I would point out, Judge,

5   that Mr. Hendricks pled guilty to the certified copy

6   the Court has before it.

7        MR. CASSIDY:  Objection.

8        THE COURT:  No, overruled, Mr. Cassidy.  I'll

9   permit it.

10       MS. PLACEK:  That Mr. Hendricks pled guilty to

11   the charge for six years, that the Court has before

12   it.

13       MR. MURPHY:  Objection.  That argument is not

14   based on the evidence.  It's actually incorrect.

15   There was no plea of guilty on that case.

16       MS. PLACEK:  I am going by the presentence

17   investigation.

18       THE COURT:  The certified copy, which is what

19   I am going by, would tend to indicate that there was

20   a trial in the case.  The objection is sustained.

21       MR. CASSIDY:  Thank you.

22       MS. PLACEK:  The interesting thing, if there

23   was a trial and the presentence investigation is

24   incorrect, the point simply being this, Judge, if

    40

that's true, the Court knows and the Court can see and take judicial notice of the law and wonder why some other judge gave him the minimum.

MR. CASSIDY:  Objection.

THE COURT:  The objection is sustained.

MS. PLACEK:  The simple point being, Judge, that the State has presented no evidence in this case that simply Mr. Hendricks, and the State is quite right, prison is a filthy place, prison is a terrible place, prison is the type of place where people who kill children or molest children are made to suffer even more than that which is intrinsically horrendous about the prison itself, because every prisoner there has, in fact, family outside, every prisoner there, or at least the majority of the same has, in fact, children, and, in some way, they take out their frustrations on those who do children, more than they do about anyone else. So the idea that, somehow, Mr. Hendricks can adapt to this and it is correct, it is a filthy environment, is an absurdity, because if you can get along and if you can adapt somehow to a torture chamber, which is a matter of fact, you will be made to be the lead victim, then quite frankly, Judge, then quite frankly, the

41

1689

1   punishment of letting Mr. Hendricks live is far

2   greater than that of letting him die, because

3   besides accomplishing nothing and, again, the choice

4   is yours, no one else's, the simplicity is this,

5   if you sentence Mr. Hendricks to death, and the only

6   motive of it will be, and the only logical conclusion

7   of it will be, because as pointed out by the presentence

8   investigation, he can survive --

9        MR. CASSIDY:  Objection.

10       MS. PLACEK:  Strike that, I withdraw it.

11            As pointed out by the lack of evidence

12  by the State, meaning that they produced no one from

13  the prison to prove that he is a disruptive force;

14  that, in fact, they presented no one from the prison

15  to show that somehow he is unmanageable, that he

16  received what is commonly known as any tickets while

17  in the prison --

18       MR. CASSIDY:  Objection.  Improper argument.

19       THE COURT:  No, overruled.

20       MS. PLACEK:  That he can live in a prison

21  situation, without causing more of a burden to

22  society; not only that, but if we are going to give

23  the normal argument that's normally given in favor

24  of the death penalty, dealing, in fact, with expense.

42

1   Judge, the Court knows that if this Court gives it

2   and if this Court gives the defendant a death

3   sentence, that's an automatic appeal to the Supreme

4   Court.  Not only an automatic appeal to the Supreme

5   Court, Judge, but quite frankly, the Court knows

6   from its own background, that the costs, as I

7   previously described, to keep a man in the sort of

8   conditions death row has, and that the cost of the

9   appeals, which do go up, are far greater than, quite

10  frankly, the high cost of simply keeping a man in

11  prison.

12       MR. MURPHY:  Objection.

13       THE COURT:  Mr. Murphy, I am going to permit

14  it.  I am fully aware that, under normal circumstances,

15  that argument should not be allowed, but it seems to

16  me to be rationally responsive to Mr. Cassidy's

17  argument in regard to the defendant's ability to

18  survive within the penitentiary and other aspects

19  of it which, of course, are just as inappropriate,

20  in my judgment, and irrelevant, if you please, and

21  maybe not inappropriate, but irrelevant to the issues

22  before the Court, and the Defense has a right to

23  respond to it.  The objection is overruled.

24       MS. PLACEK:  So we come again, Judge, to one

43

motive.  The one motive is simply this, revenge.
Let's break that up into two ways.  Number one,
revenge would give the family any satisfaction, a
death for a death.  The obvious emotional answer is,
of course it will.  Death means death.

Does it, or does it take part of the
humaness out of all of us in that satisfaction of
the blood lust.  Haven't we gotten above that in
two thousand years.  Not only haven't we gotten above
it in two thousand years, but, quite rightly,
Mr. Cassidy asked you to look to the victim and
as part of the recent Supreme Court case, again, you
got to know her and saw her picture during the trial.
And believe me, no one wanted this to happen to her.

But on the other hand, Judge, while
being momentary satisfaction, she is in a place,
quite frankly, that, well, let's put it this way,
the revenge motive, because of the child's age, has
been purified and isn't present within that child.
But the point simply being is who then will the revenge
affect most.  And I am speaking of the blood lust.
Blood for blood.  And I would ask the Court to look
into its heart and I would ask the Court to consider
this for one moment, that if this Court kills Jerome

44

1    Hendricks, won't this Court be giving up part of

2    its humanness and in giving up part of its human-

3    ness, it is a decision, as spoke of by Mr. Cassidy,

4    that only this Court can give, but in somehow doing

5    this hardening, in somehow going through this

6    process, would this Court become less of a judge,

7    less of a human being, less of a man.  It's a question

8    only this Court can answer.

9        But just as this Court sits in

10    judgment on people and just as this Court, when

11    thieves, burglars, robbers, rapists and murderers

12    come before it and it's asked to sit in judgment

13    and say you are wrong because you violated the law

14    and, somehow, something clicks in the back of this

15    Court's mind and says to itself, and once it became

16    easier for you to violate the law, once you did it,

17    once you got over that initial threshhold, then it

18    became easier and easier and easier and easier, and

19    you lost something of your moral fiber.  You lost

20    something of yourself in your transgression of your

21    beliefs.

22        I am asking this Court to search its

23    own mind and if this Court kills Jerome Hendricks,

24    because that's what this Court will be doing, whether

45

1    this Court will lose something of its own principles,

2    something of its own moral fiber.

3              It's interesting, Mr. Cassidy said

4    there was a lynch mob.  Unfortunately, I'm too much

5    of an advocate to restrain this comment.  That's the

6    same lynch mob as described by the police, which

7    this Court, in the ruling of the motion, described

8    the police in the telling of it as being less than

9    credible.  In other words, quite frankly, we always

10   challenged that.  But even if there was, is that what

11   this Court wants to become, a lynch mob, with all the

12   connotations that come from it.

13             If that's what justice is, then we

14   might as well just simply do away with building and

15   we might as well simply go and not even start over,

16   but simply arm every citizen and say take right onto

17   your own self.  It's true this Court can examine the

18   victim and in the examination of the victim, I am not

19   saying that the minimum sentence is proper for

20   Mr. Hendricks.  But what I am saying, Judge, that in

21   this case and in many others, death is not the

22   sentence, because there has been no demonstration

23   that this man is an animal and when I say is an

24   animal, he will be caged like one.  He will be held

46

1   like one, no matter what the decision of this Court

2   is.

3                 But on the other hand, by the lack of

4   showing that he can't get along in prison, in prison,

5   it hasn't been shown that he is an animal, so rabid

6   that he has to be put to sleep like a dog.

7                 But go one step further. Reference

8   was made, well, he'll see his six-year-old daughter

9   grow up. Judge, as a man, I would ask the Court to

10  put yourself in Mr. Hendricks' place and I would ask

11  the Court, quite frankly, to look into its own mind

12  and ask whether or not, viewed from Statesville or

13  Menard or wherever, that's a way of watching your

14  six-year-old daughter grow up. I would ask, quite

15  frankly, because we're not speaking of the alternative

16  of either kill him or let him go, there is proper

17  punishment here, as enunciated by the statute, and

18  the proper punishment is present and just as painful,

19  and when I say just as painful, the years of longing

20  to touch his child and not being able to, the years

21  of longing to touch his wife and not be able to, the

22  years of wanting to touch his mother or hug them or

23  be with them, he is going to be missing those, no

24  matter what this Court is doing.

47

The obvious argument is, quite frankly, well, so did Denise Johnson, and that's correct. But then, again, no matter what you do will bring her back. But the decision is simply this, there will be Christmases when this Court will be with its family, there will be holidays when this Court will sit around with its family and feeling its warmth and feeling its love.

Now, when the Court sits back in its reflection with its family and feels this warmth, does the Court want to somehow think in the back of its mind that, somehow, he killed a man, because that's what it would be, your decision, and somehow, through this, there was a lessening of his own principles.

Thank you, your Honor.

THE COURT:  State.

MR. MURPHY:  Are you going to allow us the opportunity to respond, Judge?

THE COURT:  Yes, I will.

MR. CASSIDY:  Judge, the only thing I would like to comment upon is the attempt to make you feel guilty in some way and I think it is totally improper. It's unbelievable that that attempt would be made. You should never feel guilty for anything you do

48

1  up on that bench, your Honor.

2              A lot of times, you don't do what we

3  want, a lot of times, you do what we want; but never,

4  never should you feel guilty for what you do, Judge.

5  You took an oath, and I know you follow that oath.

6  I never had reason to believe that you didn't.  And

7  I'm sorry that you had it put to you that way, somehow,

8  some Christmas, you will be with your family and you

9  have to think back and somehow feel guilty for what

10 you're about to decide.  You do the best you can, your

11 Honor, and that's all we can ask.

12     THE COURT:  Sentencing decisions are the most

13 difficult when a capital sentence is even, not even

14 remotely involved.  Sentencing on a Class 4 Felony

15 is difficult, because, ultimately, we are talking

16 about the potential for depriving people of liberty

17 and/or in this case their life.

18              I have listened to the arguments of

19 Counsel in consideration of the facts underlying this

20 case.  And I can say to you that as I view this case

21 and the evidence that has been presented in this

22 phase of the hearing, that there are a number of

23 aggravating factors and no mitigating factors which

24 are sufficient to preclude the imposition of the death

49                     1037

1    penalty, that is no statutory mitigating factors.

2            But the inquiry doesn't stop there

3    and just as a jury is not bound to stop the inquiry

4    once it determines that there are no statutory

5    mitigating factors, neither is the Court, when it

6    sits without a jury, which even more compounds the

7    difficulty of the problem.

8            I'm going to take this matter under

9    advisement.  I would render a decision tomorrow, but,

10   unfortunately, I have another responsibility that

11   keeps me from sitting tomorrow.  Consequently, with

12   great reluctance, I'm going to have this case in my

13   head over the weekend, see if I can grapple with some

14   of the concepts that have been presented to me by

15   both sides.

16           Let me suggest to you, before we

17   part, this case for the afternoon, however, that

18   feelings of guilt are not remotely one of the things

19   that I will be considering.  I can abhore some of

20   the decisions that I make on the fact that I am

21   required to make them.  But if I come to the position

22   where they are so uncomfortable to me, I have an

23   alternative that no one can prevent me from exercising.

24   So if on a day to day basis, you see me here, you can

50

1    conclude that I am not suffering from pains of

2    guilt.

3                    If we can reconvene the hearing

4    on this case on Monday morning, I will be in a

5    position to render a decision.

6                    Are you available?

7        MS. PLACEK:  I will make myself available,

8    Judge.

9        THE COURT:  This matter is continued until

10   9:00 A.M., Monday morning, 9:30 A.M., Monday morning.

11   Order of Court, August 26.

12

13

14

15                    (Whereupon, the above-entitled

16                     cause was continued to the

17                     26th day of August, 1991.)

18

19

20

21

22

23

24

51

STATE OF ILLINOIS    )
                     )   SS.
COUNTY OF C O O K    )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE    )
STATE OF ILLINOIS    )
                     )
        V            )   No. 88 CR 12517
                     )
JEROME HENDRICKS     )

REPORT OF PROCEEDINGS had in the above entitled

cause, before the Honorable LEO E. HOLT, Judge of said

court, on the 26th day of August, A.D., 1991.

APPEARANCES:

HON. JACK O'MALLEY,
    State's Attorney of Cook County, by
MR. JOHN MURPHY and
MR. SCOTT CASSIDY,
    Assistant State's Attorneys,
    appeared for The People;

MR. RANDOLPH STONE,
    Public Defender of Cook County, by
MS. MARIJANE PLACEK and
MR. VINCENT LUFRANO,
    Assistant Public Defenders,
    appeared for The Defendant.

1      THE CLERK:  Sheet 6, Line 17, Jerome

2  Hendricks, in custody.

3           (Defendant Present)

4      THE COURT:  All right.  Mr. Cassidy, is

5  Mr. Murphy going to be joining you?

6      MR. CASSIDY:  Yes, Judge.  He should be

7  coming out that door in a moment.

8           (Pause)

9      MR. MURPHY:  Sorry, Judge.  I was in another

10  courtroom.

11      THE COURT:  This matter is here this morning

12  for sentencing pursuant to the provisions of

13  Section 9-1(b) of the Criminal Code.  The matter

14  was before the Court on Thursday of last week and

15  also on Tuesday of last week.

16           On Tuesday the Court found the defendant-- I

17  guess it was on Thursday, the 22nd, the Court found the

18  defendant eligible for the imposition of the death

19  penalty pursuant to the requisite provisions of

20  the Code.  The Court also heard evidence and

21  argument in aggravation and mitigation.

22           The lawyers who appear regularly in my

23  courtroom probably are aware of the fact that it's the

24  Court's opinion that in sentencing a defendant almost

1791

in any case, and certainly in a case such as this,
The Court has an obligation to articulate the basis
for the decision that it reaches.  In a case such
as this the defendant's right to his day in
court clearly encompasses his right to know the
reasons that the Court indulges in to reach the
decisions that it makes.

Counsel on both sides of this case
also have a right to know the reasoning process of
the Court.  The survivors of the victim in this
case have a right to know, and the public has a
right to know.

I have said many times that sentencing is
a difficult task for the Court.  I think that's true
not only of this Court, but of every Court that finds
itself confronted with this obligation of sentencing,
and particularly where the State has requested, pursuant
to the statute, that the Court impose a death sentence.
So I have spent a good part of the weekend since
Thursday reviewing the facts of this case and the
law, and searching the conscience of the Court and
trying as nearly as humanly possible to assess the
conscience of the community to see if I can come to
a decision that approximates as nearly as possible

ck3

the sense of this community.

The arguments made to me by the State and the defense were not particularly helpful. The argument of the State focuses primarily upon the worthlessness of the defendant. They characterize him as an animal who is quite capable of adapting his life to the lifestyle of the penitentiary and leading a lengthy life in that environment.

And I'm not at all certain that that approach to the problem is relevant in any way. On the other hand, the defense characterizes the proceedings as one in which the Court ought to take into consideration its own conscienceand to alleviate the Court's conscience of the guilt that is associated with sentencing a person to death.

That argument, of course, has no merit whatsoever. It's an argument which ought better be addressed to the legislature or the consciousness of the community. It invites the Court to nullify the capital sentencing structure of the state, which I have no right to do.

Some of you who are here today probably have heard me say that I share the view, legal view, of a number of other judges in this state, some of

1  whom sat on The Illinois Supreme Court, that the

2  capital sentencing structure of Illinois violates

3  the Constitution of The United States.  That is

4  my own legal view.

5  However, The Illinois Supreme Court,

6  The United States Court of Appeals for the 7th

7  Circuit, which has jurisdiction over Illinois

8  Courts, have not seen fit to declare this statute

9  unconstitutional, and for that reason, if no other,

10  I am bound to enforce this statute until The United

11  States Supreme Court or some other reviewing court

12  declares it to be unconstitutional, and I am not

13  permitted to nullify the statute because, in my

14  personal judgment, it offends the constitution.

15  The victim impact statement proferred

16  in this case likewise was of little help to the

17  Court.  It provides the Court with information which

18  seems to me to naturally flow from the circumstances

19  of this case, and is present in almost every case

20  of this nature.  It addresses the pain, the agony,

21  that the survivors suffer.  And I am fully aware

22  of that.

23  That's not only in this case.  That's

24  true in every murder case.  And I sympathize and empathize

ck5

1704

1    with the survivors of the victim of this case, but

2    that sympathy and empathy hardly justifies the

3    imposition of the death penalty.

4           Now, this defendant is eligible for

5    the death penalty in a number of different ways, it

6    seems to me. He's been found guilty of a felony

7    murder which is a qualifier. He qualifies by virtue

8    of the fact that murder in this case was committed

9    in what might--can only be characterized, it seems

10   to me, as exceptionally heinous and brutal, indicative

11   of wanten cruelty.

12          There are no statutory mitigating

13   circumstances that the Court can point to in this

14   case. And if that were the end of the inquiry, it

15   would seem to me that the death penalty would

16   naturally and normally flow from those facts alone.

17   But that's not the end of the inquiry.

18          As the sentencing body in this case I

19   have the same prerogatives that a jury has, and a

20   jury has wide latitude in determining whether or

21   not to impose the death sentence even though there

22   be no statutory mitigating factors.

23          And so for a moment I will address the--

24   Address part of the argument, part of the argument of the

6

State and part of the argument by the defense to
help you, if I can, to understand what it is that
has been motivating the Court. And I am fully
aware that some of you have heard me say some of
these things before, but bear with me if you please.

The philisophy of sentencing, it seems
to me, comes into sharpest focus when we are talking
about sentencing in a capital case, and if there is
ever a time when we ought to review the philosophical
underpinnings of sentencing it would seem to me that
this is the case in which to do it.

Starting with the prevelent recurring
theories in regard to sentencing, and taking a look
at them as it impacts on capital sentencing to see
what is appropriate here, we look, of course, to
deterence, rehabilitation, isolation, and retribution.

Mr. Murphy, I am fully aware that you and
I have discussed this deterence theory and we share
opposite views. I respect your view. As I indicated
to you, it is probably shared by more people than
not, but the fact that it is the majority view does
not make it a correct view.

It just means more people agree, but it
seems to me that the evidence is very clear that

capital sentencing is not a deterent to crime.
There is nothing about it-- There is no empirical
evidence down through the history of capital
punishment, which has been with us almost since
the beginning of time, that suggests that capital
sentencing will deter crime.

Throughout the history of man we have
imposed capital punishment on persons who have
violated rules of society, and some societies,
including the one from which your law cometh, all
crimes were capital crimes, early on.  And at one
time or another in England there were over two
hundred capital crimes on the books.

And capital punishment came to this country
along with the Pilgrims, and we have put people to
death for crimes which now would shock our conscience.
We've put people to death for blasphemy, adultery, witch-
craft. All sorts of victimless ideological positions
have resulted in death of human beings at the hands
of government with a view towards making a better
society.  And we have hung them, shot them, executed
them, beheaded them, poisoned them, gassed them, and
as nearly as we can determine the murder rate is
escalating rather than diminishing.

I woke up this morning to the television telling me that eight murders had been committed over the weekend. There are those who argue that the fault lies not with capital punishment, but the failure to use it frequently enough, and that if we used it more frequently it would bring about a diminution in the crime rate.

I doubt that very seriously, and we will have to probably wait and see what the next decade brings in that regard before we can make any definitive assertions about it, but it would seem to me that the evidence is not likely to support it, that an excalation in the execution of capital sentences is going to have a diminution in murder.

And so I do not think that the concept of deterence is of much value. I further think that it's immoral. It's immoral in the sense that a defendant ought to have punishment imposed upon him or her on the basis of his or her conduct and his or her character, and not with a view towards affecting the conduct of some unknown person at some unknown time.

And as difficult as that may be to do, nonetheless, to philosophically accept the proposition

that one can affect an unknown person's conduct
by what is done to a person before the Court, in
my judgment devalues the humanism of a person
before the Court and, indeed, perhaps maybe the
Court itself.

So I do not sentence with a view
towards deterring others, largely because I don't
think that's possible. I don't think it's possible
for a number of reasons, not the least of which is
the secrecy in which the punishment is carried out
so that the message, if there is to be one, is
demonstrated to a relatively insignificant portion
of the population.

Secondly, the concept of rehabilitation
obviously is of no significance whatsoever when one
talks about capital punishment. I'm certain that
we're not talking about efforts at rehabilitation. And
so it is not of much value to talk about the inability
of our penal system to rehabilitate because, in the
first instance, we are not talking about rehabilitating.

The question of isolation which, in my
judgment is the quintessential justification for
the criminal justice system, to take those persons
out of the community that have demonstrated either by

their repeated violation of the law, or by the
heinousness of the crime which they find themselves
guilty of, that they are a present and ongoing
danger to the rest of us, and their ability to
live harmoniously among us is so wanting, that we
have a right to prohibit their participation in an
organized civilized society-- And I suppose the
essence of isolation is capital punishment.

Whether that is justified in every
case where permanent isolation may be the answer
is highly doubtful, and the law does not mandate
such a result.

And such an isolation, at least in the
statute, that is to say once having determined that
a defendant meets the criteria for permanent isolation,
therefore, we ought to impose capital punishment
without any other considerations, violates the 8th
Amendment of The United States Constitution.  So
there is something other than isolation that has to
be taken into consideration.

The other sentencing criteria is
retribution, vengence, punishment, which I also
believe has a proper place and proper role to play
in the criminal justice system, and I take it that to

some extent at least that is what the State is talking about; retribution.

The difficulty that I have with that proposition, however, is I have an extremely difficult time rationalizing and equating death with punishment.

It strikes me as being quire curious, difficult to put in its perspective, how the natural termination of life, the end result of life, is a punishment. I find it inconsistent with most of the theological positions that exist around the world that I am aware of, and to be sure, I am not aware of all of them and not deeply inviewed with an understanding of any of them, but to the extent that I have an understanding of the theological and spiritual side of life, I know of none that champion death as being punishment.

Rather, as I understand it, death is characterized as being the exact opposite. In any event, I don't see how the maximum level of punishment can be imposed on a person by terminating their life. That does not mean, of course, that that degree of punishment I am speaking of, that is a continuing of life, necessarily follows because we seek to impose some measure of retribution on the defendant.

12

1711

The State argues to me that to incarcerate this defendant for any period of time would have no significant meaning to him. They judge that by virtue of the fact that he has been incarcerated once, and when released from the institution, and while on parole, and not having been out of the institution for any appreciable period of time, this offense was committed, thus indicating his lack of fear or trepidation in regard to being incarcerated.

And I take it from the way I understood Mr. Cassidy's argument to me, is that even assuming my characterization of what penitentiary life is as he understands my characterization, that also is not a sufficient punishment for this defendant.

That, however, does not seem to be the position of persons who have served lengthy sentences in the penitentiary, some of whom have served them here in Illinois. One of our oldest prisoners at the time of his release, at any rate, was Nathan Leopold, who went into the institution at seventeen or eighteen years of age and was paroled in his early sixties, having spent all of his youth in the penitentiary without ever giving up the desire to be released.

13

1712

1    We have another inmate in the Illinois

2 penitentiary system that is similarly situated, who

3 strives at every opportunity to be released.  And I

4 take that to mean that one does not accommodate

5 one's self to penitentiary life to the extent that

6 the desire to be free abates entirely.  It's always

7 an aspiration because it's consistent, I believe,

8 with the human personality.

9    Having said all those things, when you

10 turn to look at this defendant, the crime of which he's

11 found guilty of, it is clear, it seems to me, that

12 he clearly represents a defendant that society cannot

13 tolerate in our midst.

14    It clearly seems to me that he represents,

15 and likely will continue to represent, certainly to

16 the extent where society ought not run the risk of

17 being the kind of person who ought never be allowed

18 outside of the institution.

19    The defendant, in addition to being

20 eligible for capital punishment by virtue of having

21 committed an offense, or committed the offense of

22 murder while committing the felony offense of aggravated

23 kidnapping, also is eligible by virtue of the fact

24 that his crime is one which meets the definition of

14

being exceptionally heinous and brutal, indicative
of wanten cruelty, which qualifies him for a
natural life sentence and/or imposition of the
death penalty.

The definition of brutal, as used
in the context that I just used it, according to
People versus Lucas, is defined to mean grossly
ruthless, devoid of mercy or compassion, cruel
and cold blooded. And the term "heinous" is defined
also by People versus Lucas, means shockingly evil,
grossly bad, enormously and flagrantly criminal.

And it seems to me that this defendant's
crime meets the definitions. And so it is the
Court's intention not to mitigate the punishment
of this defendant, but to take the opportunity, as
I view it, to extract from him the retribution that
I think society is entitled to. And in doing that
it strikes me that that is inconsistent with taking
his life and short circuiting the retribution
that I think we are entitled to.

Were it within my personal provence
to do, I would try as nearly as is humanly possible
to make certain that the defendant enjoyed a long
life, and as he goes through the aging process that is

15

1    associated with a long life, and begins to find

2    the deterioration of body that is accompanied with

3    aging.

4          I would provide him with the very

5    best medical care available so that I could extend

6    his life for as long as possible.  During all that

7    period of time he would know that he is an

8    unacceptable member of our society, that he's

9    never going to reenter society, that all of the

10    things which go to make up life as we understand

11    it in view of--and given the differences in how we

12    individually approach life, nonetheless there are

13    some things which are consistent with it, and one

14    of them, or several of them, are the right to enjoy

15    the companionship of friend and family, to have love

16    and nurchering and caring, to be able to make decisions

17    about one's life on a minimal basis at least, that

18    are unaffected by the will of others.

19          Be able to come and go limitedly as one

20    pleases.  To make those kinds of fundamental decisions

21    on a day to day basis.  All of that he will not be

22    permitted to do.  And to know that no matter what

23    else happens the certainty of his life is that day

24    after day, week after week, month after month, year

after year, decade after decade, he will be in the Illinois State Penitentiary until he dies. Hopefully, of old age.

And so it is the judgment and sentence of the court that on Count One of the indictment charging the defendant with the offense of first degree murder, that the defendant be sentenced to a term of natural life in the Illinois Department of Corrections. The provisions of Section 1005-8-4(b) require the Court to impose consecutive-- To impose concurrent sentences on a defendant who is found guilty of multiple offenses; to impose concurrent sentences unless one of the offenses for which the defendant was convicted was a Class X or Class One Felony, and the defendant inflicted severe bodily injury or where the defendant was convicted of a violation of Section 12.13 or 12-14 of the code.

On Count 10 of the indictment charging the defendant with the offense of aggravated criminal sexual assault, the defendant is sentenced to a term of thirty years in the Illinois Department of Corrections, said sentence to run consecutive with the natural life sentence imposed in Count One.

On Count 12 of the indictment charging

17

the defendant with the offense of concealment of

a homicidal death, the defendant is sentenced to a

term of five years in the Illinois Department of

Corrections, said sentence to run concurrent with

the sentence imposed on Count 10, the aggravated

criminal sexual assault count, and consecutive with

the sentence imposed on Count One.

On Count 14, the aggravated kidnapping

offense, the defendant is sentenced to a term of

fifteen years in the Illinois Department of Corrections,

said sentence to run concurrent with the sentence

imposed on Counts 12 and 12, the aggravated sexual

assault count, and the concealment of a homicidal

death count, and consecutive with the sentence imposed

on Count One, the first degree murder count.

The mittimus is to issue.  Mr. Hendricks,

you have a right to appeal from the judgment and

sentence of the Court.  In order to do that you

must, within thirty days from today's date, file

with the clerk of the court a written notice of

appeal.

If you are indigent and cannot afford

counsel, I will appoint an attorney to represent you

without any cost to you whatsoever to assist you in

18

preparing your notice of appeal, to docket your

appeal, and to represent you in the prosecution

of your appeal.

I will also grant you a free transcript

of all of the proceedings in this case to further

assist you in prosecuting your appeal.  The most

important thing for you to remember if you intend

to appeal from the judgment and sentence of the

Court, you must, within thirty days from today's

date, file with the clerk of the court a written

notice of appeal.  If you fail to file such a notice

within thirty days from today's date, you will

probably lose your right to appeal.

Upon your request I will order the

clerk of the court to prepare for you and file a

written notice of appeal.  Do you understand your

right to appeal?

THE DEFENDANT:  Yes, I do.

THE COURT:  Is there anything about your

right to appeal that you do not understand?

THE DEFENDANT:  No, there is not.

THE COURT:  Is there anything about the

proceedings this morning that you did not understand?

THE DEFENDANT:  No, sir.

19

1    MS. PLACEK:  Your Honor, in that regard

2    we've discussed the matter of appeal with Mr. Hendricks

3    because the Court has, in fact-- Or more or less we

4    weren't sure which avenue this was to be appealed

5    to because of the implication of sentencing, and

6    we would ask the Court, at this particular time,

7    in speaking on behalf of Mr. Hendricks, to, in fact,

8    appoint the Office of the Public Defender.

9         Mr. Hendricks, in fact, remains

10   indigent and the papers, in fact, are being presented

11   to the Court in this regard.

12   THE COURT:  All right.  When you draft your

13   notice of appeal and an order appointing the Public

14   Defender, and also an order for a transcript, I will

15   sign such an order when you present it to me.

16   MS. PLACEK:  Thank you, Your Honor.  May

17   Mr. Hendricks be allowed to leave the room?

18   THE COURT:  He may.

19   MS. PLACEK:  Thank you, Your Honor.

20   THE COURT:  Ladies and gentlemen, there's going

21   to be a short recess.  We will reconvene in about five

22   or ten minutes and we will complete the call and hear

23   those matters that are ready for hearing.  Court's

24   in recess.

20

STATE OF ILLINOIS }
COUNTY OF C O O K } SS:

We, the undersigned, Official Court Reporters of the Circuit Court of Cook County, County Department- Criminal  Division, do hereby certify that we reported in shorthand the proceedings had in the above-entitled cause; that we thereafter caused to be transcribed into typewriting the foregoing transcript, which we hereby certify is a true and correct Report of Proceedings had in the above-entitled cause.

1721