CASE NO. _____08cv 1589_____

ATTACHMENT NO. _____7_____

EXHIBIT _____

TAB (DESCRIPTION) _____

(Rev. 2/18/93)  CCCR-56

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . . . . . . . . . . . . . . . . . . . . . . . . . . . VOLUME FIVE OF A FIVE VOLUME SUPPLEMENTAL RECORD CONSISTING OF THE ( REPORT OF PROCEEDINGS) ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 95-0474 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

JEROME HENDRICKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago
JUNE 26,                                        96
In said County, . . . . . . . . . . . . . . . . . . . . . . , 19 . . . .

*Aurelia Pucinski*

**Clerk**

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

95-

88CR
12517

# Transcript of Record
## Appeal
## to

| APPELLATE | **Court of Illinois** |
|---|---|
| FIRST | **District** |

SUPPLEMENTAL RECORD

**Circuit Court No.** 88 CR 12517

**Trial Judge** LEO H. HOLT

**Reviewing Court No.** 95-0474

### THE PEOPLE OF THE STATE OF ILLINOIS

**vs.**

JEROME HENDRICKS

FILED

APP

JUL 15 1996

GILBERT S. MARCHMAN
CLERK

ORDER ENTERED

JAN 17 2007

APPELLATE COURT, FIRST DISTRICT

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, CRIMINAL DIVISION

ORDER ENTERED
JAN
APPELLATE COURT, FIRST DISTRICT

88-12517

**AURELIA PUCINSKI**

**Clerk of Court**

Per    AP/nd

**Deputy**



(Rev. 4/8 /92) CCCR 0051

# UNITED STATES OF AMERICA

State of Illinois    )
                     )  ss.
     Cook County     )

Pleas, before a branch of the Circuit Court of Cook County, in said County and

State, begun and held at the Circuit Court, in said County,

one thousand nine hundred and    NINETY SIX                            AND OF THE INDEPENDENCE
OF THE UNITED STATES OF AMERICA, TWO HUNDRED AND NINETEENTH YEAR.

Present: Honorable

THOMAS R. FITZGERALD........  Judge of the Circuit Court of Cook County

JACK M. O'MALLEY..................................  State's Attorney

MICHAEL F. SHEAHAN...........................
                                            Sheriff of Cook County

AURELIA PUCINSKI.........................................
                                                        Clerk

Attest:

And afterwards, to-wit: on

JUNE 25    , 19 96    , there was RECEIVED and FILED

in the Office of the Clerk of the Clerk of the Circuit Court of Cook County, Illinois. COUNTY DEPARTMENT,
CRIMINAL DIVISION, A (SIX) VOLUME SUPPLEMENTAL RECORD CONSISTING OF (REPORT OF PROCEEDINGS)
ONLY. AN INFORMATION GEN. NO.              FOLLOWING TO WIT:

STATE OF ILLINOIS )
                ) SS:
COUNTY OF C O O K )

### IN THE CIRCUIT COURT OF COOK COUNTY
### COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS )
              ) NO. 88 CR 12517
              )
    VERSUS . )
              )
JEROME HENDRICKS and ) CHARGE: Murder
JULIUS CLAYBORN )

REPORT OF PROCEEDINGS

BE IT REMEMBERED that on the 29th day of

March A.D. 1989, this cause came on for

hearing before the Honorable Leo E. Holt,

Judge of said Court.


APPEARANCES:

      HON. RICHARD M. DALEY,
         State's Attorney of Cook County, by
      MR. CHARLES BOSKEY,
         Assistant State's Attorney,
         appeared for the People;

      MS. SHELBY KEISMAN and
      MR. ISIAH GANT,
         Assistant Public Defenders,
         appeared for the Defendant.

BEVERLY HOOKER, C.S.R.,
Official Court Reporter


1

I N D E X

1    DATE OF HEARING:  March 29, 1989.............Page 1

2    DATE OF HEARING:  February 27, 1990..........Page 68

3       OPENING STATEMENT BY MS. PLACEK............Page 71

4       OPENING STATEMENT BY MR. RONKOWSKI.........Page 75

5       WITNESSES:           DX      CX      RDX    RCX

6          JEROME HENDRICKS    78      88      96

7          LAURENCE NITSCHE    99      133     167

8    DATE OF HEARING:  March 7, 1990..............Page 172

9    DATE OF HEARING:  March 13, 1990.............Page 174

10   DATE OF HEARING:  March 29, 1990.............Page 176

11      WITNESSES:           DX      CX      RDX    RCX

12         JAMES C. HILL      182     186     196

13         DET. MICHAEL BAKER 201     219     238    241

14   DATE OF HEARING:  May 31, 1990...............Page 258

15      WITNESSES:           DX      CX      RDX    RCX

16         DAVIDA HENDRICKS HALLEY 260  268   276    277

17         EARLINE HENDRICKS  279     283

18         ALBERT WOLF        290     293     298    299

19      OPENING ARGUMENT BY MS. PLACEK.............Page 306

20      CLOSING ARGUMENT BY MS. MALLO..............Page 312

21      CLOSING ARGUMENT BY MS. PLACEK.............Page 329

22   DATE OF HEARING:  June 27, 1990..............Page 345

23   DATE OF HEARING:  January 14, 1991...........Page 35?

24   DATE OF HEARING:  February 4, 1991...........Page ?

DATE OF HEARING:  February 5, 1991...........Page 363

DATE OF HEARING:  February 6, 1991...........Page 479

DATE OF HEARING:  February 7, 1991...........Page 509

  OPENING STATEMENT BY MS. PLACEK...........Page 526

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| MICHAEL GATTO | 531 | 543 | 545 | |
| YOLANDA HILL | 547 | 575 | 599 | 600 |
| LAWRENCE NITCHE | 603 | 615 | | |

DATE OF HEARING:  February 8, 1991...........Page 618

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| DAVID KADDIGAN | 636 | 647 | 650 | |

DATE OF HEARING:  February 11, 1991.........Page 666

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| CAROLYN STRONE | 667 | 705 | | |
| JEROME WALKER | 711 | 721 | 786 | |
| ROBERT TOVAR | 741 | | | |

DATE OF HEARING:  February 13, 1991.........Page 754

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| ROBERT TOVAR | 767 | 769 | | |
| HARDING JOHNSON | 770 | 777 | | |
| JAMES HILL | 784 | 789 | | |
| JOHN FASSL | 794 | 835 | 851 | 852 |
| MICHAEL BAKER | 853 | 865 | 887 | 891 |

DATE OF HEARING:  February 14, 1991..........Page 895

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| JOHN YUCAITIS | 897 | 913 | | |
| JOANN RYAN | 950 | 956 | | |

DATE OF HEARING:  February 19, 1991..........Page 967

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| MICHAEL BAKER | 968 | 971 | 973 | |
| MARY JUMBELIC | 974 | 988 | 1010 | 1027 |
| ANNA DEMACOPOULOS | 1033 | 1049 | | |

DATE OF HEARING:  February 20, 1991..........Page 1088

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| JOHN FITZPATRICK | 1091 | 1129 | 1139 | 1140 |
| PHYLLIS WILLIAMS | 1141 | 1181 | 1189 | 1191 |
| STEPHANIE SMITH | 1202 | 1209 | | |

DATE OF HEARING:  February 21, 1991..........Page 1234

DATE OF HEARING:  March 25, 1991.............Page 1241

DATE OF HEARING:  March 26, 1991.............Page 1299

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| STEVE MATKOVICH | 1300 | | | |
| ESTELLE FIELDS | 1314 | 1332 | 1340 | |
| JOHN BLACKMAN | 1343 | 1352 | 1359 | |
| DAVID KADDIGAN | 1369 | 1389 | | |

DATE OF HEARING:  April 16, 1991..............Page 1423

   WITNESSES:         DX     CX    RDX    RCX

   DAN GRZYB       1424

   DOHLIA PADGURSKIS 1433    1445    1445

DATE OF HEARING:  May 29, 1991................Page 1451

CLOSING ARGUMENT BY MR. CASSIDY...............Page 1492


DATE OF HEARING:  May 30, 1991................Page 1506

DATE OF HEARING:  August 20, 1991.............Page 1547

DATE OF HEARING:  August 22, 1991.............Page 1632

DATE OF HEARING:  August 26, 1991.............Page 1700

 1       THE CLERK:  Julius Clayborn and sheet four,
 2   line one, Jerome Hendricks, in custody.
 3       MR. GANT:  If the Court please, before you
 4   stand Jerome Hendricks.  I am Isiah Gant.  Mr.
 5   Hendricks is represented by Randolph Stone, the
 6   Public Defender of Cook County.  I am here as an
 7   Assistant Public Defender on his behalf.
 8       MS. KEISMAN:  This is Julius Clayborn to my
 9   immediate right.  He is represented by myself,
10   Shelby Keisman, Assistant Public Defender, and
11   Michael Morrisey, Assistant Public Defender.
12       THE COURT:  Because there are motions in some
13   respects identical and in some respects very, very
14   similar in both of these cases, I have made the
15   decision to consolidate for the purposes of
16   argument and ruling on these pretrial motions.
17   Does anyone have any objection?
18       MS. KEISMAN:  No.
19       MR. BOSKEY:  No.
20       MR. GANT:  I do not.  However, when I filed
21   these motions, there's one that didn't get in the
22   file, which is similar to one Ms. Keisman has
23   filed.  It's a motion to declare the death penalty
24   unconstitutional.

**2**

1      MR. BOSKEY:  Mr. Gant showed it to me.  I

2  have no objection to it being filed today.

3      THE COURT:  What I suggest we do, because it

4  seems to me that the motion to compel disclosure,

5  which both sides have filed and raised basically

6  the same arguments, is to extent controlling on

7  some of the other motions that have been filed,

8  and so I would like to hear your arguments on that

9  one, because it will save us some time, depending

10  on how I rule on that.

11          The Defendants and Counsel may all be

12  seated at Counsel's table, and I would hear both

13  the Defense's and the State's argument on that

14  motion, as it applies to both Defendants.

15      MS. KEISMAN:  On December 14th I filed a

16  motion to compel the prosecution to disclose, and

17  also a motion to preclude the special procedures

18  necessary for capital sentencing.  That was

19  attached with a memorandum, that was filed on

20  December 14th of 1988.

21          On March 13th of 1989 I filed four

22  motions with the Court.  These four motions

23  supercede the motion that was filed on December

24  14th of 1988.  It somewhat incorporates that

3                              **3**

1    motion and makes a few changes. You can disregard

2    the motion filed on December 14th and consider the

3    four motions that were filed on the 13th.

4        THE COURT: You will have to tell me the

5    title of the motions.

6        MS. KEISMAN: The motion that was filed

7    December 14th, I will show you a copy. It's

8    probably got the longest title. It's motion to

9    compel the prosecution to disclose whether it

10   will request a death penalty hearing if the

11   Defendant is convicted of murder, and motion to

12   preclude the special procedures necessary for

13   capital sentencing.

14       THE COURT: So that one, we will -- he is

15   merged into the others that are filed, is that

16   correct?

17       MS. KEISMAN: Yes, Judge. I shortened

18   the title and hopefully made it more clear.

19       THE COURT: Did you also file a motion to --

20   you filed a motion to compel the disclosure.

21       MR. GANT: Yes.

22       THE COURT: The Defendants may be seated, and

23   I will hear your arguments in any order that you

24   desire to present them to me in terms of who's

4

1  going to proceed first.

2          Mr. Gant, these are Defense motions.

3  You may proceed, or however you want to do it.

4      MR. GANT:  If the Court please, I would defer

5  to Ms. Keisman for the similar motion.

6      MS. KEISMAN:  Judge, I am going to address

7  the motion, compel the prosecution as that first

8  motion.  I will be brief on this on what I have to

9  say because I think there's some overlapping

10  issues regarding all the motions.  But I guess the

11  most important thing I could say at this point is

12  -- would be that the other issues need not be

13  addressed if Your Honor grants the motion to

14  compel the prosecution, and they say no, we are

15  not seeking the death penalty.

16          I don't think I have to emphasize the

17  importance of defending a capital case.  There's a

18  lot that needs to be done.  There is a lot of

19  work.  And there's also a lot of motion.  A lot of

20  things will be necessary to protect Mr. Clayborn's

21  rights.

22          In terms of fairness, Mr. Clayborn needs

23  to know if he is facing a potential capital

24  sentence in this case.  In terms of notice, Mr.

**5**

1   Clayborn is entitled to know whether he's facing

2   a potential capital case sentence in this case.

3   In terms of preparation, in terms of what goes on

4   in this courtroom, I think the Court is entitled

5   to know whether this is going to be a case that

6   will be conducted with the special procedures

7   that are necessary for a capital case.  Are we

8   going to have a jury?  Is the jury going to be

9   Witherspoon?  Things like that.  There are

10  motions, maybe close to, up to a dozen motions, I

11  will be prepared to file if this were a capital

12  case.  I would not want to take up everybody's

13  time doing those motions if there is clearly no

14  intention to seek the death penalty in this case.

15         My written motion really does speak for

16  itself.  There's a lot of things I would like to

17  do for Mr. Clayborn that won't be necessary if

18  this is not going to be a capital case, Judge.  I

19  don't see the unfairness or the inequity in saying

20  to the State, Mr. State's Attorney, do you intend

21  to seek the death penalty in this case.  I don't

22  see that that puts them in any disadvantage.  I

23  don't see that makes them force their hands for

24  something they shouldn't have to.  I don't see the

**6**

6

1   inequity in it.

2          All the factors seem to point to the

3   bottom line that we should all know what this case

4   is about at the earliest possible moment.  For

5   that reason, Judge, we are asking now to know

6   whether we need to go on any further, or whether

7   we may proceed as we would in any other case.

8   Thank you.

9          THE COURT:  Mr. Boskey.

10         MR. BOSKEY:  Judge, a brief response.  I

11  believe we addressed this issue once before on

12  another case before Your Honor.  My understanding

13  of various Supreme Court decisions that have

14  scrutinized death penalty statutes continuously

15  for several years, one of the later cases, People

16  vs. Gaines, 109 Illinois 2nd page 514, again

17  addressed the issue on whether or not the

18  Defendant or defense is entitled to pretrial

19  notice, whether or not the State will seek the

20  death penalty.  Again the Supreme Court indicated

21  that there was no constitutional requirement that

22  the Defendant have pretrial notice that the State

23  would seek the death penalty if there should be a

24  finding of guilty of murder.  That again would be

7                              7

1    the State's argument, that they are not entitled

2    to that pretrial notice.  The only notice they

3    are required to have is that the case is before

4    Your Honor that encompasses both Mr. Hendricks and

5    Clayborn as they sit here today, they are

6    potentially death penalty statute, they are

7    potential death penalty cases.  They are on notice

8    that they are potentially death penalty cases.

9    And I don't believe constitutionally they have to

10   receive anymore information than that.

11          It would be our argument that they are on

12   notice that they are potential death penalty cases

13   and constitutionally I don't believe we are

14   required to give any further information at this

15   point.  I would rest at that.  And rest on all the

16   various Supreme Court cases that I know Your Honor

17   is aware of.

18          THE COURT:  Response?

19          MS. KEISMAN:  I would defer to Mr. Gant at

20   this time.

21          MR. GANT:  Your Honor, I think that all of us

22   who engage in defending capital cases are well

23   aware there is in fact lesions of case law that

24   say the State is not obligated to notify us, being

8

1    the Defense, whether or not they intend to seek

2    the death penalty.

3            But there is however the small provision

4    in the Constitution of the United States, as well

5    as the Constitution of the State of Illinois, that

6    talks about due process. And I think it was Felix

7    Frankford who said that due process is all about

8    what is fair. The appearance of being fair. And

9    I suggest to Your Honor due process would be

10   served well if you were to enter an order

11   directing the State to say now, to say whether

12   or not they are going to seek the death penalty

13   sentencing phase should the Defendants in these

14   two cases be convicted. I'm talking about

15   fairness. The State is not prejudice in any

16   manner by telling us right now whether or not

17   they intend to do it.

18           And there's at least one good reason

19   other than judicial economy for them having to do

20   this. It's not uncommon, Judge, in terms of

21   preparation that a lawyer has to go through in a

22   death penalty case that in your preparation for a

23   possible sentencing phase, your theory in that

24   portion of the bifurcated trial might well be

1    different or inconsistent than the Defense you

2    have taken in terms of guilt and innocence.  If

3    you know from the very beginning there is in fact

4    a possibility that the State will seek the death

5    penalty if the Defendant is convicted, at least in

6    terms of preparation on behalf of the Defense,

7    you can certainly avoid that charge that we so

8    often get about being ineffective, if you know up

9    front that there is the possibility of death or

10   death hearing.  You can then prepare you case

11   consistent with the dictates, I suggest to you, of

12   the Cannons of Ethics, Judge.  We can then sit

13   down and prepare a Defense of knowing this is the

14   way we must go, because if there is a finding of

15   guilty, there will be a death hearing.

16          I suggest the State is not hurt if they

17   tell us now, in no way.  For that reason, Judge,

18   due process reason, they ought to be directed.

19        MR. BOSKEY:  May I clarify one thing?  As

20   I sit here today, I don't have the authority --

21   and just to differ with Counsel -- whether or not

22   I will seek the death penalty on either of

23   these people.  I cannot say I have the authority

24   to say that as I sit here today.

1          THE COURT:  Well, Mr. Boskey, I don't think

2     the decision that I am called upon to make in any

3     respect returns upon your individual

4     understanding of the course of this case.  We are

5     talking about the State's Attorney of Cook County

6     and -- or even better than that perhaps the

7     administration of criminal justice systems in

8     Illinois, which has nothing to do with you

9     personally.  I understand full well that you

10    might not be personally in a position to make any

11    decisions in regard to the ultimate procedures

12    that this case will take.  I fully understand

13    that.

14          This case -- this motion bothers me.  It

15    bothers me considerably.  It bothers me for a lot

16    of reasons.  And I suspect really the more

17    significant reason is because I believe that it is

18    fundamentally unfair from a constitutional point

19    of view not to tell the Defendant what the name of

20    the game is.

21          And I'm fully aware that the Illinois

22    Supreme Court, in a 4 to 3 decision, has held that

23    the Illinios death penalty statute in face of

24    the argument that's being made to me is

11                        **11**

1 constitutionally valid.  I'm also aware that in

2 the change of the Court personnel, where the

3 personnel of the Court then was four Justices

4 who believed these statutes to be unconstitutional,

5 nonetheless, would not review the earlier

6 decisions in that regard, because of the

7 doctrine of stare decisis.  And I must tell you

8 that I don't quite understand that.  The highest

9 Court in the State, or the highest Court in the land,

10 judiciously reviews its own decisions to correct

11 itself and to correct a mistake in the law.

12 Illinois has chosen -- and I'm not in a position

13 to do more than express my observations about what

14 the Illinois Supreme Court has done -- but

15 nonetheless they have chosen not to review this

16 statute which I believe is unconstitutional.

17 That's not a belief that's unique to me.  Justice

18 Ryan in his dissent in People ex rel Carey vs.

19 Cousins, announced that in his opinion, the failure

20 to give the Defendant any notice at all rendered

21 the statute unconstitutional.

22    And Justice Simon in People vs. Lewis,

23 adopted the thinking of Justice Ryan.  And he

24 also was of the opinion that provision rendered the

**12**

1   statute unconstitutional.  So you have four

2   Justices of the Illinios Supreme Court who believe

3   the statute is unconstitutional, but nobody will

4   of yet do anything about it.  It's a frightening, to

5   me frightening, that a person might be put to

6   death under this statute which the majority of the

7   Supreme Court believes to be unconstitutional.

8            Every lawyer, Defense lawyer or

9   prosecutor that I have had occasion to speak to

10  that has been involved in a capital case knows

11  very clearly and very certainly that a capital

12  case is very different with every respect than any

13  other case.  Its impact upon the system, the

14  lawyers who are involved with it, the jurors who

15  must hear it, the Defendant and his family, the

16  victims of the alleged crime and family, everybody

17  is tremendously impacted by this critical decision

18  in more ways than I can probably enunciate.  Insofar

19  as the Defendant is concerned, the impact is

20  immediate.  It determines and weighs upon every

21  single decision that he or she must make in the

22  preparation of the case for trial and the trial of

23  the case, and everything else.  And the decisions

24  that are made as a pretrial matter, if they are

**13**

1    made in a vacuum, tend to be wasteful, time

2    consuming, unnecessary, and extremely costly.

3    Which is why for the most part the death penalty

4    cases in Cook County, to my personal observation

5    at least, and I'm safe in saying that I'm right,

6    for the most part most capital cases are tried by

7    governmental lawyers.  Or lawyers who have been

8    appointed by the Court.  Because those Defendant's

9    are economically incapable of retaining a lawyer

10   to represent them in a capital case.  Even though

11   there might be lawyer who will take the case

12   absent a capital sentencing possibility.  So the

13   very right of a Defendant to Counsel of his choice

14   becomes involved immediately when there's a

15   capital possibility.

16            And it never stops.  It never ceases

17   until the last day, the last sentence is uttered

18   in open court on the trial court level for that

19   Defendant.

20            All of those decisions flow from the

21   decision to convert a murder into a capital

22   murder.  And it is inconceivable to me that the

23   laws will keep the Defendant in the dark about

24   that until it's too late for him to meaningfully

14

**14**

1    protect himself.  It boggles my mind.  But, that's

2    what I understand the law is.

3         Now, the question of whether or not

4    based upon due process grounds I can overrule

5    in effect the Illinois Supreme Court is doubtful.

6    While due process is exactly what Mr. Gant says it

7    is in some senses, the fundamental fairness and

8    the appearance of fundamental fairness, yet it is

9    not out there in a vacuum.  And I can't use that

10   concept to simply disregard the clear holdings in

11   cases which have been decided by the Supreme Court

12   of Illinois.  I am bound by that, by those

13   decisions whether I agree with them or not.  And I

14   don't agree with them in any respect insofar as

15   keeping the Defendant in the dark.

16        And, it is not true, respectfully, Mr.

17   Boskey, that a Defendant can look at the indictment

18   and/or the statute or indeed at the facts of the

19   case and determine prior to trial whether or not

20   he has in fact a capital case.  He may be able to

21   look at the statute and the indictment and his

22   understanding of the facts that there is the

23   potential for it to become a capital case, but he

24   never knows what the real name of the game is

**15**

1    until it is much too late for him to meaningfully

2    protect himself.  And with that problem, of

3    course, whatever he fails to do in the trial court

4    level by pretrial motions may constitute a

5    waiver on appeal.

6            And so he's trapped in between a rock

7    and a hard place of having to go forward with a

8    multiplicity of motions that are totally moot if in

9    fact the case is not going to be tried as a

10   capital case.

11           In order to ensure that he has a perfect

12   record if in fact a death sentence needs to be

13   reviewed.

14           It is fundamentally unfair, it seems to

15   me, to Witherspoon a jury that may not be called

16   upon to decide the issue of life or death.  And

17   I'm fully aware that the United States Supreme

18   Court has held that Witherspooning does not create

19   an unconstitutional conviction prone or death

20   prone jury.  I'm aware that the Supreme Court has

21   said that.  They have said that in the face of all

22   the psychological studies that come to the

23   opposite conclusion.  And in the face of no study

24   that I'm aware of that comes to the conclusion

**16**

1   that Witherspoon does not produce a conviction

2   prone or death prone jury.  All the studies say it

3   does.  And yet the Supreme Court has said that

4   even if it does, it is not reached the level of

5   constitutional impermissability.

6           But, it seems to me that those of us who

7   have labored in the trial court with that

8   problem know full well that that's a fiction that

9   we utilize in the law and that the realities are

10  that you produce a jury that is askew insofar as

11  opinions in regard to capital punishment as they

12  exist in the larger community.  So it seems to me

13  that of course if we knew that it was not going

14  to be a death case, we would not permit the

15  Witherspooning of the jury.  And there's nothing

16  after the jury has been Witherspooned and a

17  conviction had for the State to say we are not

18  going to at this time seek a death penalty

19  hearing.  And then to say that the Defendant has

20  not in any way been disadvantaged, I think is to

21  close our eyes to the reality in defference to

22  form.

23          Now, having said all that, I say it

24  because if this case requires review at least the

17                  **17**

1   Supreme Court will know what one less surprise

2   judge has thought about this for whatever it is

3   worth.  I think the statute is unconstitutional.

4   I think it is unfair.  I think it offends my

5   constitutional sense of due process.  It offends

6   my concept of just basic fairness as what is

7   right in terms of relationships that we have with

8   fellow human beings.  Not to let them know what

9   the name of the game is.

10         As early on as possible so that he can

11   really have the effective assistance of Counsel.

12   And Counsel cannot, it seems to me, be effective

13   unless they know the name of the game.  And one

14   half of the participants at least is in a position

15   to know from the outset what the probabilities are

16   going to be.  While the Defendant must guess all

17   the way.  And given the number of potential

18   Defendants who have been found guilty in Cook County

19   without the invocation of a death penalty hearing,

20   it is facetious to suggest that the Defendant

21   read the statute in indictment and he or she can

22   determine ahead of time whether or not they have a

23   capital case on their hands.  That just simply is

24   not the case.  And they are entitled to more

**18**

1    notice, it seems to me, than that.

2              But as I say, faced with Carey versus

3    Cousins and faced with People versus Lewis and

4    faced with People versus Gaines, I am not certain

5    that there's anything that I can do.

6              I took a look at People versus Buckley.

7    I believe it is out of DuPage County.  To see

8    whether or not the Court's inherent power to

9    control the court call gave me any assistance in

10   ordering the State to make this disclosure.  I

11   concluded that it did not.  I conclude that it did

12   not because if the State declined to disclose, I

13   don't know what I can do.  I could possibly,

14   preclude a death penalty hearing.  And it seems to

15   me the status of the law now, I would promptly be

16   reversed.  I would think that if I did that, the

17   State would seek an original mandamus and

18   undoubtedly would be given leave to file it.  My

19   sense is that the Supreme Court would very shortly

20   remand it and order me to conduct a death penalty

21   hearing.  So that's a useless procedure.

22             But I'm deeply concerned that I may be

23   compelled to sit here and listen to motions as

24   complex as these are.  They are complex.  At least

19                    **19**

1    they are complex to me.  And cause me to do some

2    degree of agonizing and research to try to figure

3    out some of the issues and the laws that applies

4    to some of the motions that have been filed before

5    me, only to find that I have been spinning my

6    wheels because I don't have a capital case on my

7    hands.

8         Or the converse is equally devastating

9    too.  If I have a jury in the box that returns a

10   verdict of guilty and the guilty is of first

11   degree murder and the State's Attorney then asks

12   me to invoke the death penalty hearing phase and

13   Defense says, Judge, we are not ready; we want to

14   file motions for discovery; we want to investigate

15   the State's witnesses that will be called to testify

16   in this hearing; we want to go out and get

17   witnesses of our own; and there's a whole category

18   of things that must be done; we have not done them

19   because we did not know we were in that situation.

20   That's a reasonable position, it seems to me, for

21   Defense to take.   Unless I'm to say to them, you

22   should have spent thousands of dollars in

23   pretrial preparation for hearing that we did not

24   know we were going to have.  So then, I have to do

**20**

1    what with the jury, discharge that jury and

2    impanel another one, or send that jury home for a

3    month or two or whatever time period it takes to

4    allow the Defense become prepared for the hearing,

5    or to compel the defendent to go into a hearing

6    with his lawyer saying he's not prepared for it.

7    Which hearing could result in life or death of the

8    Defendant.

9         All of those things do oviate or

10   certainly ameliorate to a large extent if we knew

11   beforehand what the name of the game was.  Those

12   are the things that bother me about this provision

13   of the statute.  But I'm compelled, as reluctant

14   as I am, I'm compelled however, to deny the motion

15   of the Defendants to compel the State to disclose

16   whether or not they intend to seek the death

17   penalty if the Defendant is found guilty of the

18   offense of first degree murder.

19        Now, Ms. Keisman, your motion to -- I

20   think it is to declare the -- Your motion to

21   preclude the death penalty procedures to which you

22   have attached the opinion of Menard versus

23   Cartwright, I would like to hear from you on that

24   motion.

**21**

1              Mr. Gant, I don't believe you filed such

2      a motion.

3              MR. GANT:  I did, Your Honor.

4              THE COURT:  You did?

5              MR. GANT:  Yes.

6              THE COURT:  On the same grounds?

7              MR. GANT:  Same grounds, Your Honor.  I have

8      an extra copy, Your Honor.

9              THE COURT:  Yours is not predicated on the

10     same ground, I don't think, but you have filed a

11     motion to preclude the death penalty procedure,

12     but it is not based upon the holdings --

13             MR. GANT:  I'm sorry.  Not specifically, it

14     is not.

15             THE COURT:  I would like to hear from you,

16     Ms. Keisman, on your motion to preclude.

17             MS. KEISMAN:  Judge, I guess initially I

18     should say it is kind of a strange position to be

19     in here.  We are back where I was nine months ago,

20     left with not really knowing this is a death case

21     or not. I'm going to assume it's a death case.

22             THE COURT:  I think you have to.

23             MS. KEISMAN:  I have to assume it's a death

24     case.  I have a copy of the indictment which

**22**

1  charges Mr. Clayborn in two counts.  The first

2  count is the offense of first degree murder, and

3  it states, he without lawful justification

4  intentionally and knowingly beat and killed Tamar

5  Nelson with his hands, a violation of Chapter 38.

6          The second count of the indictment also

7  states that he is charged with the offense of

8  first degree murder, in that he without lawful

9  justification beat and killed Tamar Nelson with

10  his hands, knowing that such beatings with his

11  hands created a strong probability of death, or

12  great bodily harm to Tamar Nelson, in violation

13  of Chapter 38.

14          The Chapter 38 death penalty section,

15  section 9-1, contains a variety of phases that

16  would make any murder a potential capital case,

17  creating various aggravating factor.

18          There's nothing in the four corners of

19  these two pages which indicates to me that this is

20  a death case.  There's nothing on these two pages

21  which says there is an aggravating factor here as

22  contained in the statute.  And we are going to

23  tell you what that aggravating statute is.  We are

24  going to put you on notice of what that

1    aggravating provision is.  It's not in the

2    indictment.  It's a plain murder indictment.

3           So, I get the discovery and I read the

4    police reports, and I see that the victim in this

5    case is an infant, 18 months old.  And I go to

6    Chapter 38 and I read over the aggravating

7    factors, and I see that there is a provision that

8    says if the victim is under 12 years of age, and

9    the murder is accompanied by exceptionally brutal

10    or heinous behavior indicative of wanton cruelty,

11    this is a potential death case.  That is an

12    aggravating factor.

13           So, I go back to the indictment and I

14    don't see anything in the indictment.  I don't see

15    that she's under 12 years of age.  I don't see

16    what was brutal, what was heinous.  What shows

17    wanton cruelty.  I don't see anything in there.

18           So I say to myself, well, is this a

19    death case?  I don't know.  And I look back at

20    the record and I see that when Mr. Clayborn came

21    into Court for the first time after his arrest,

22    he was brought before a Judge for purposes of

23    setting a bond, and for purposes of having a

24    preliminary hearing.  And the State says, we are

24              **24**

1    not ready for a preliminary hearing.  And the

2    Defense say we are.  And the matter is continued

3    and within the 30 day time period, Mr. Clayborn is

4    indicted.  So there is no preliminary hearing.

5    There is no opportunity to find out what this

6    case is about.

7              But there is one thing that I do know.

8    I know that Mr. Clayborn is given a bond.  He's

9    given a $500,000 bond.  Under that statute the

10   State is entitled to ask for a no bail order in a

11   potential capital case.  And apparently they did

12   so here, initially, in Mr. Clayborn's first

13   appearance.  And we, on behalf of Mr. Clayborn,

14   objected to that request.  First of all on grounds

15   of notice.  We need some notice of this request.

16   And our objection was noted and sustained and the

17   issue was never litigated.  Mr. Clayborn has a

18   bond.  He has a $500,000 bond, Judge.  He has

19   always had that bond.  The State has never asked

20   for a no bail order.

21              When I look back on this case and I see

22   that, I say to myself, well, maybe this isn't a

23   death case.  If this was a death case, they should

24   have asked for the no bail order.  They didn't.

25                              25

1    They should be collaterally estopped now from

2    coming in and saying this is a death case.  What's

3    been happening for the last nine months?  So as we

4    are here today, I say, well, it seems it's going

5    to be a death case.

6         So, how am I going to defend Mr.

7    Clayborn?  And I read through the police reports.

8    And yes, it is clear the victim was under twelve

9    years of age.  But now I'm left to guess what

10    could possibly constitute exceptionally brutal or

11    heinous behavior indicative of wanton cruelty.

12    What is that?  I read the police reports.  They

13    are brief.  There's maybe twelve, fifteen pages of

14    police reports.  There's some medical reports.

15    And I look at the indictment.  That doesn't tell

16    me what the factors are.

17         What do I have to defend against?  What

18    actions did Mr. Clayborn specifically take that

19    were exceptionally brutal or heinous indicative of

20    wanton cruelty?  I don't know, Judge.  It's the

21    same issue as was raised in the motion to compel.

22    It's due process.  It's fundamental fairness.  We

23    must be prepared to defend this case.  There's

24    nothing that puts us on notice on what we are to

**26**

1  defend against.

2          I attached the case of Menard versus

3  Cartwright, found at 486 U.S., no page cite, 100

4  Lawyers Edition, 2nd 372.  That's a 1988 case,

5  June of 1988 decided by the United States Supreme

6  Court where they reviewed an aggravating

7  circumstance provision of Oklahoma death penalty

8  statute.  And the United States Supreme Court felt

9  that the term, especially heinous, atrocious, or

10  cruel murders was unconstitutionally vague under

11  the Eighth Admendment.

12          Without being facetious, Judge, if the

13  Supreme Court doesn't know what it is, how are we

14  supposed to know what it is?  I think there's some

15  serious doubt as to whether the State can come in

16  under this provision, under an indictment like

17  this, and ask for the death penalty.  They have

18  got the advantage of Witherspoon jury, of a death

19  qualifying jury, of a conviction prone jury.  They

20  had the advantage or the leverage, I should say,

21  of preventing us from any thought of a negotiation

22  in this case because of leverage they have by

23  being able to say this is a potential death case.

24          I think -- I have also attached the

1  citing which Your Honor referred to regarding the

2  conviction prone jurors, the death qualification

3  process.  All of that is tied into the indictment

4  and the lack of notice this indictment gives to

5  us.

6         Many jurisdictions including California,

7  and I cited the cases in my memorandum, provide

8  that the -- Or mandate that the charging

9  instrument set forth the aggravating factors that

10  the State is seeking for death.  Illinois does not

11  require that.  In those jurisdictions where the

12  aggravating factors are supposed to be in the

13  indictment, defense counsel has the opportunity to

14  come in pretrial and attack the indictment, the

15  sufficiency of the indictment as in any other

16  case.  The statute sets our reasons to attack a

17  motion to dismiss an indictment.

18         We can't do it here.  We can't do it

19  here because of the qualifying factors, the

20  aggravating factors are not in there.  I can't

21  come in and say this is a defective indictment

22  because it is not in there.

23         I think Your Honor has the authority to

24  say to the State, you have to tell them, you have

28                    **28**

1   to give them notice of what they are to defend

2   against.  I have no notice.  I don't know what the

3   facts are that will support exceptionally brutal

4   or heinous behavior indicative of wanton cruelty.

5   How can I defend the case without negligence of

6   those specific facts, Judge?  It's the same issue.

7   It's fundamental fairness.  It's due process.

8   This goes one step further because now we are

9   dealing with the piece of paper that supposed to

10  be the charging instrument.  It is supposed to put

11  the Defendant on notice.  We are not.  We are

12  still in the dark.

13          Based upon the case that the United

14  States Supreme Court has set down, and based on

15  the memorandum I attached, I know you reviewed it

16  carefully, I am asking you to ask the State to

17  tell the Court what evidence they have that would

18  support seeking the death penalty in this case.

19  And to determine whether the State actually has

20  such a good faith basis for asking for the death

21  penalty in this case.  Thank you.

22          THE COURT:  Mr. Gant.

23          MR. GANT:  Your Honor, insofar as Ms.

24  Keisman's comments are applicable to my motion, I

29                    **29**

1    have nothing further.  I will stand on my motion.

2         THE COURT:  Mr. Boskey.

3         MR. BOSKEY:  Thank you.  I will try to be

4    brief.  As to Ms. Keisman's argrument as to the

5    vagueness of the statute or the section of the

6    statute that charges Mr. Clayborn, the very issue

7    was decided by a recent Illinois Supreme Court

8    case, People vs. Odle.  I don't have a cite

9    published.  I don't have a cite.  I do have a

10   slip opinion for Your Honor.  But the Supreme

11   Court addresses the very issue, and addresses the

12   Illinois statute and compares it in relation to

13   the statute that was found unconstitutional in

14   the case cited by Counsel.  And it was -- The

15   Supreme Court of Illinois did rationalize it, and

16   did differentiate it, and did uphold Section

17   9-1-B7 of the Illinois statute holding in this very

18   statute if you are charged with murder and it is

19   found in the aggravating factors that the victim

20   is 12 years and under, indicative of wanton

21   cruelty, was sufficient constitutionally and did

22   uphold that section of the statute.

23        Again, the issue was addressed by the

24   Illinois Supreme Court.  Whether or not there is

1    notice, Judge, I believe -- obviously the

2    Defendant has been put on proper notice that this

3    is potentially a capital case, and why it is a

4    potential capital case, because of the mere

5    existence of Ms. Keisman to represent him.

6    The murder task force is assigned to represent

7    him. Obviously that is sufficient to be put on

8    notice.

9         THE COURT:  Oh, Mr. Boskey.

10        MR. BOSKEY:  I didn't mean that to be silly.

11   I wouldn't do that.  Your Honor knows me.

12        Obviously from the discovery and the

13   nature of the charges and who was the murder

14   victim, that the Defendant and Counsel has been

15   put on notice of what the aggravating factor is.

16   It doesn't have to be in the indictment itself,

17   as the Courts have held.  And the aggravating

18   factor part of the 12 year old or younger, and

19   the brutal and heinous and indicative of wanton

20   cruelty, but it does not have to be specific in

21   the indictment as Odle has held.

22        I didn't mean to be contrite and I would

23   not do that.  I believe the Defendant has been put

24   on proper notice to defend himself in what he is

31

**31**

1   being charged with and would be charged with.

2          As to the argument of whether a

3   Witherspoon jury is again pro State or not, again,

4   Your Honor, it refers to -- and Counsel refers to

5   the various studies, and I refer to it, as Your

6   Honor did earlier, to the various Supreme Court

7   cases that have held that.  Constitutionally, the

8   Witherspoon jury is not pro State or pro

9   conviction.  And I rest on the Supreme Court cases

10  that hold thusly.

11         With that, Judge, other than again

12  having a copy of Odle for Your Honor, I would

13  again ask that Your Honor, this motion be denied

14  also.

15         Does Your Honor want it?

16     THE COURT:  Yes, I do.  Thank you very much.

17  Response.

18     MS. KEISMAN:  Your Honor, under Chapter 38

19  section 11-3A, it states a charge shall be in

20  writing and allege the commission of the offense

21  by stating the name of the offense, citing the

22  statutory provision, setting forth the nature and

23  elements of the offense charged, the date, and the

24  count, the name of the accused, or any other name,

32

1   and the time as definitely as can be done.

2           The reason the law requires this is so

3   that again we are put on notice of what we must

4   defend.

5           Yes, the victim in this case was under

6   12 years old.  I know that.  What is it that was

7   exceptionally brutal or heinous?  What is it that

8   makes this case show that Mr. Clayborn acted in

9   such a way to exhibit wanton cruelty?  When did he

10  do what things?  Where did he do those things?

11  It's just as simple as the form of the charge.

12  It's just as simple if you got an indictment that

13  didn't set forth the charge, where it occurred, or

14  when it occurred, you can come in and ask to

15  dismiss this charge.  Or even after the trial, we

16  are moving in arrest of judgement.  It was a

17  defective indictment.

18          The reason we are allowed to do that is

19  so we can defend the case.  We don't get that far

20  because it's not in the indictment.

21          Now, it comes to my attention through

22  Mr. Boskey's argument about the Illinois Supreme

23  Court case, but I don't think it changes the fact

24  that the United States Supreme Court is unable to

**33**

1    define what is exceptionally brutal or heinous

2    behavior is.  That makes it still unclear as to that.

3    I don't see it changes things.  I think that State

4    still has to show us what the factors are.  And I

5    think they must show a good faith basis for asking

6    for death penalty in this case.  Thank you, Judge.

7        THE COURT:  This is another motion that gave

8    me some trouble.  Maybe People vs. Odle will

9    straighten it out.  I did not find Odle in my own

10   research.  And that may be because it's so recent

11   that I didn't.

12       I don't think that 111 has much to do

13   with the problem that we have here, because as I

14   understand the law in this area, the aggravating

15   factors or the precipitating factors that will

16   bring about a death penalty hearing, are not

17   required to be alledged in the indictment,

18   whatever aggravating factors they may be.  Which

19   perhaps is one of the problems with that statute,

20   but nonetheless our Court, our Supreme Court, has

21   consistently held to the best of my knowledge they

22   at any rate, that those factors need not be

23   alledged in the indictment.

24       What of course bothers me is whether or

1 not 9-1-B7, in the light of Menard vs. Cartwright,

2 was constitutionally void on its face.  And when

3 I read Cartwright or Menard, it would seem to me

4 -- and I did come to the conclusion that absence

5 some conduct by Illinois that 9-1-B7 is

6 constitutionally void.  The reason that I came to

7 that decision is because I could make no rational

8 distinction between the language of the Oklahoma

9 statute and that of the Illinois statute.

10 Oklahoma provided that if the death was

11 "especially heinous, brutal, and atrocious and

12 cruel".  Our statute says in addition to the age

13 limitation, especially brutal, especially heinous,

14 no, exceptionally heinous, brutal, indicative of

15 wanton cruelty.  Now that language is almost the

16 same and certainly for the purpose of trying to

17 grasp meaning from it, meaning that would be

18 sufficient to be applied in a even handed way, I

19 could not in my own mind make any distinction in

20 the language.  While I don't think it's so much

21 that the Supreme Court of the United States

22 couldn't define what the terms mean, as I

23 understood they found that it was not their

24 purview to define for the State what they mean in

35

1    their statutes.  And since Oklahoma has not
2    construed that language to narrow its scope and to
3    bring it into a constitutional permissible posture,
4    they avoided the death penalty in Menard.
5           On the other hand from a reading of the
6    opinion, it becomes very clear that had Oklahoma
7    made any narrowing construction of the statute it
8    could have perhaps rendered that language
9    sufficiently certain to avoid a declaration of
10   unconstitutionality.
11          And so I tried to make some
12   determination as to whether or not Illinois had
13   done so.  And I look not only at 91B7 but also at
14   1005-5-3.2, which is the extended term provision of
15   our statute, which carries the identical same
16   language.  When it talks about a Defendant being
17   susceptible to an extended term if the crime was
18   "exceptionally heinous, brutal, and cruel,
19   indicative of wanton cruelty."  And in reading those
20   cases I came to the conclusion that Illinois, the
21   statute of Illinois law in regard to that section
22   of the statute was hodgepodge.  That allowed me
23   not to be able to determine with certainty what it
24   was, that Illinois had defined these terms to me.

1   But rather it appeared to me on a case by case

2   basis, depending on whether or not the Court was

3   sufficiently offended by horrible conduct of the

4   Defendant, it fell within or without that

5   language.  Which of course was the precise reason

6   that the United States Supreme Court held the

7   language to be too vague to be applied in a death

8   case.  They talk in terms of runs through all the

9   death cases, I suppose.  That is that higher

10  degree of due process that is required in a

11  capital case than in others.  And because this

12  language was so loose the Court held that it

13  violated, not the due process clause of the

14  Fourteenth Admendment, but the Eighth Admendment,

15  cruel and unusual punishment provision.

16         So I had raised some questions which

17  perhaps the case that Mr. Boskey just tendered to

18  me will solve for me.  I am not certain.  But I

19  raised four questions that I was going to ask you.

20  lawyers to further explore for me.  And you very

21  well may want to do that in spite of Odle.  I am

22  going to read Odle and maybe I will come to the

23  conclusion that I don't need any further

24  assistance, but you are welcome to assist me

37

**37**

1    further if you think it is necessary.  The

2    questions that I raise are 1), whether Illinois has

3    provided a constitutionally adequate narrowing

4    construction to section 9-1-B7.  2) is, has

5    Illinois contrued these terms as used in the

6    Section 1005-5-3.2, B2.  3), and if so, is the

7    construction consistent and constitutionally

8    adequate for death penalty aggravating factor.

9    That is there are a lot of cases under the

10   extended term provision.  And it is my general

11   belief-- Well, I expressed my belief or my

12   analysis of those cases, but yours may differ as

13   to whether or not the construction there is

14   adequate for utilization in a death penalty case

15   in view of the Eighth Admendment.  And finally, if

16   not, can the trial court construe the statute in

17   such a manner as to avoid a declaration of

18   unconstitutionality.  That is if it's a case of

19   first impression for me, must I either declare the

20   statute unconstitutional or can I define these

21   terms in such a way as to make them constitutional

22   and hopefully the Supreme Court will agree.

23           Otherwise, we are -- All this could be

24   avoided if the Defendant knew the name of the

1 game.  But those are the questions that I have.

2 And of course, running with that motion is

3 counsel's motion to preclude a death penalty

4 procedure based on that section of the statute.

5 And what it is saying to me as I understand it is

6 that I should hold as a matter of a pretrial

7 procedure conduct a hearing to determine what it

8 is the Defendant allegedly did, falls within the

9 constitutionally  permissable utilization of that

10 language.  That seems to have some merit of that

11 motion.  Given again, as I say when I read Odle

12 that position may fall away also.  But given the

13 breath of the language used, it is quite possible

14 that reasonable people can differ severely as to

15 whether or not conduct is exceptionally heinous

16 and brutal and indicative of wanton cruelty.  And

17 if that's the case whether or not the state should

18 be permitted to engage in the death penalty

19 procedures which start with Witherspoon, only to

20 find out that the aggravating factor is not

21 sufficient on its face to justify submitting it to

22 the jury.

23   So, I would then at that point after

24 hearing the State's case achieve in aggravation

**39**

1   direct the jury to sign a verdict to find the

2   Defendant is not eligible for the death penalty

3   because his conduct did not fall within the

4   constitutional permissable purview of that lineup.

5   And the harm to the Defendant seems to me to be

6   Payton.

7           And that's what I understand Counsel to

8   be asking me to do as a pretrial matter.  And as

9   I said, I think there's great merit in that,

10  particularly as I understood the status of this

11  provision in Illinois law.

12          Again as I said, I will read Odle to

13  determine whether or not that straightens out any

14  portion of my fuzziness.  I would invite and

15  encourage you to help me in making that

16  determination, being mindful of the fact that I am

17  considering and favoring ordering the State to put

18  on some evidence as a pretrial matter as to

19  whether or not the alleged crime in this case

20  could, by reasonable people, be distinguishable

21  from all other murders and said to be one which

22  was exceptionally heinous, brutal, and indicative

23  of wanton cruelty.  For if it is not, we will

24  avoid the death penalty procedure in all respects

**40**

1    including Witherspoon.

2         Now, I note that that rubs against the

3    grain to some extent. And it may even rub against

4    some of the decided cases. I have not found a

5    case, however, that suggests to me that I am

6    totally impotent in assisting the Defendant in

7    receiving that degree of due process which the

8    Court seems to suggest he has the right to. The

9    highest standard of due process that our Courts

10   can award to him is what he is entitled to. In

11   doing that it seem to me that knowledge

12   beforehand that the State will never get off the

13   ground, in the only aggravating factor that

14   appears to be relevant, that it can never get that

15   kite off the ground. It would be fundamentally

16   unfair to involve ourselves in all of the other

17   death penalty procedures.

18        At any rate, that's your task, ladies

19   and gentlemen. I'm going to hold in abeyance

20   ruling on the Defendant's motion to declare the

21   Illinois death penalty Section 9-1-B7 of the

22   Illinois revised statute unconstitutional. And I

23   am going to hold in abeyance Julius Clayborn's

24   motion to preclude the death penalty procedures.


41                          **41**

1          Now, as to Mr. Gant's motion to preclude

2     the death penalty procedures, his is somewhat

3     different.  And as I understand his motion, he

4     says to me that under the holding, ▇▇▇▇▇▇▇.

5     ▇▇▇▇▇▇▇, that a Defendant cannot be sentenced to

6     death unless the State can prove that he ▇▇▇▇▇▇

7     ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ who was killed in this case.

8     And he says that the State does not have any

9     evidence which would indicate the Defendant had an

10    intent to kill.  Therefore, I should preclude them

11    from envoking the death penalty procedures.

12         Mr. Boskey, I gave Mr. Gant an

13    opportunity to address that problem.  And he

14    waived and relied on the motion as presented.  Do

15    you have anything you would like to say?

16         MR.BOSKEY:  I would in brief comment, Judge.

17    Obviously the factors that Counsel would mention

18    would be something that we would have to prove in

19    Court.  And to do it on a pretrial motion, to say

20    that we don't have some evidence or not, I don't

21    think is proper.  It holds for facts in evidence

22    to be presented during the course of trial.  We

23    have alleged in the complaint before Your Honor

24    what ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, intentionally and

42                    **42**

1   knowingly killed  the victim in this matter.  We

2   have also charged the aggravated criminal sexual

3   assault, which would be the death qualifier, if

4   you will.  I don't believe as a matter of law we

5   have to do anything further at this stage, Judge,

6   than to put the Defendant on notice what he is

7   being charged with, what we are in effect

8   expecting to prove, and to go further doing the

9   course of trial.  I don't think we are required by

10  any constitutional provision to do any more than

11  that at this stage.

12      THE COURT:  Mr. Gant.

13      MR. GANT:  I have no comment, Judge.

14      THE COURT:   All right.  I think that under

15  Enmund vs. Florida is distinguishable from Mr.

16  Hendricks.  To begin with, this Defendant is

17  charged with count one of the indictment with the

18  offense of first degree murder, in that he without

19  lawful authority strangled and killed Denise

20  Johnson.  Well that's count two.  In count one of

21  the indictment he's charged with unlawful

22  justification, intentionally and knowingly

23  strangled and killed.  He's charged with, in count

24  three, with the first degree murder, in while

43                    **43**

1    committing a forcible felony, he kidnapped,

2    strangled, and killed.  In count four he's charged

3    with first degree murder, while committing a

4    forcible felony, to-wit criminal sexual assault.

5    He's charged with a number of sexual assaults and

6    aggravating kidnapping, and things of that nature.

7    Which if proven beyond a reasonable doubt would

8    bring him within the purview of Section 9-1-B7.

9    That is the aggravating factors.  And I don't

10   think it's true that Enmund, as I read it,

11   provided that the Defendant had to intend to kill.

12        What I read in Enmund and the quote I

13   would like you to consider, which comes from

14   People vs. Jones at 94 Illinois 2nd 275, at page

15   299, the Illinois Supreme Court says in Enmund vs.

16   Florida, the Supreme Court held that the Defendant

17   could not be put to death for two killings that

18   he did not commit and had no intention of

19   committing or causing.  The operative language

20   there is did not commit or had no intention of

21   committing.  The indictment in this case

22   straightforwardly and without ambiguity charges

23   this Defendant with having committed the offense

24   of first degree murder.  Which of course is

**44**

44

1  different altogether from the holding of Enmund.

2         There's also another case, and the name

3  of it is trying to escape me.  It's a case out of

4  Arizona where two brothers broke their father and

5  another prisoner out of the Arizona State

6  Penitentiary.  At some point in time while they

7  were fugitives, the father killed two people

8  without cause or provocation.  And the Defendant

9  brothers did nothing.  They were not involved in

10 the killing.  And it doesn't appear they knew the

11 killing was going to take place.  And in a classic

12 sense aided or abetted.  Except that they had been

13 immensely involved in the original escape.  And

14 the Supreme Court upheld the death sentence in

15 that case.  Not withstanding the fact that there

16 was no intent on the part of those Defendants to

17 kill and no indication whatsoever that they had

18 been involved in the actual killing itself.

19         So I don't think that the argument in

20 the Hendricks case is well taken and consequently

21 his motion to preclude the death penalty

22 procedure is denied.

23         Now that then leaves insofar as the

24 Defendant Clayborn is concerned his motion to

45                    **45**

1   declare the Illinois death penalty statute

2   unconstitutional. And I'm not certain that the

3   motion is distinguishable from the motion that

4   addresses itself to the question of 9-1-B7. Is it?

5       MS. KEISMAN: It doesn't include 9-1-B7,

6   Judge. It attacks other provisions of the

7   statute.

8       THE COURT: I will hear your argument on

9   this one.

10      MS. KEISMAN; I waive argument and rest on

11   the allegation in the motion.

12      THE COURT: The State.

13      MR. BOSKEY: I would argue that the various

14   Illinois Supreme Court cases in the past few years

15   have upheld the constitutionality of the Illinois

16   statute. I would rest on that.

17      THE COURT: Yeah, the precedence is

18   overwhelming on me. Unless I'm going to -- which

19   I'm not -- undertake to decide that the Illinois

20   Supreme Court has been consistently wrong. I

21   would love an opportunity to do that. But I guess

22   the only way for me to do that is to wind up as a

23   Justice of the Illinois Supreme Court, which I'm

24   not and doesn't look very fruitful for that

1    happening.  So I am constrained by the law to deny

2    your motion for -- To declare the death penalty

3    statute unconstitutional.

4         Now, Ms. Keisman, I think that takes

5    care of all the motions.  Am I correct?

6         MS. KEISMAN:  Yes.

7         THE COURT:  What's the status of discovery so

8    far as Mr. Clayborn is concerned?

9         MR. BOSKEY:  We have obviously been tendering

10   documents and what have you during the course of

11   this.  This is a motion to quash arrest.

12        MS. KEISMAN:  That's correct.

13        MR. BOSKEY:  We can perhaps set that for the

14   same date Your Honor is going to make your final

15   ruling on one motion pending.  Perhaps a date

16   convenient to Ms. Keisman.  Judge, perhaps Tuesday,

17   April 11th will be best for both our schedules and Ms.

18   Keisman.  She will be on trial the following week.

19        THE COURT:  By agreement?

20        MR. BOSKEY:  By agreement.

21        MS. KEISMAN:  Yes, Judge.

22        THE COURT:  By agreement as to Mr. Clayborn,

23   April the 11th.  With subpeonas for hearing on the

24   Clayborn's motion.

47                           **47**

1                    (Thereupon, the case was passed

2                    and later recalled, at which

3                    time the following proceedings

4                    were had:)

5        THE CLERK:  People versus Jerome Hendricks.

6        THE COURT:  Mr. Gant, any remaining motions

7   which you have pending, you can address in any

8   order that you choose, informing us as to which

9   motion you are talking about before you proceed.

10       MR. GANT:  Very well, your Honor.

11            I will proceed on my motion that was

12   filed today.  A motion to declare the Illinois

13   Death Penalty Unconstitutional.

14       THE COURT:  Yes.  You did file that today,

15   didn't you?

16            Did you give me a copy of that motion?

17       MR. GANT:  Yes.

18       THE COURT:  Yes, you did.

19            I have it.

20       MR. GANT:  That motion is substantially

21   identical to the motion prepared on behalf of Mr.

22   Clayborn by Miss Keisman.

23       THE COURT:  You want to elaborate on your

24   motion at all?

48                    **48**

1           MR. GANT:  No.

2                I will stand on the motion.

3           THE COURT:  Mr. Boskey.

4           MR. BOSKEY: Again, Judge, briefly, as to the

5      constitutionality of the Death Penalty Statute has

6      been upheld by the various rulings of the Supreme

7      Court.

8                The Illinois Supreme Court has addressed

9      all the issues posed by Counsel in its -- in his

10     motion.

11                As to the sentencing hearing itself, as

12     to it was discretion on the part of the State's

13     Attorney.  We would rely on the various Illinois

14     Supreme Court rulings.  They have upheld the

15     constitutionality of the Death Penalty Statute.

16          THE COURT:  Mr. Gant, anything further?

17          MR. GANT:  No.

18          THE COURT:  The defendant's motion to declare

19     the Illinois Death Penalty Statute

20     Unconstitutional is denied.

21          MR. GANT:  Next, your Honor, is the motion to

22     prohibit death qualification of the jury in the

23     guilt/innocence stage of the trial.

24                THE COURT:  Since that would be particularly

49                        **49**

1    prejudicial in light of the proposed insanity

2    defense; you got that one, you can withdraw that.

3          You're going to withdraw that one?

4       MR. GANT:  Yes.

5          May I proceed, your Honor?

6       THE COURT:  Yes.

7       MR. GANT:  Your Honor, I would like to

8    direct, if I may, your attention to the second

9    page, paragraphs 4 and 5.

10          As a matter of fact, those two

11    paragraphs very succinctly set out our position in

12    this regard.

13          As your Honor well knows, the trial of

14    the capital murder case is divided into two

15    phases.  It's a bifurcated trial.

16          One of the things that your Honor is

17    going to have to do, assuming that there's a

18    finding of guilty in this case, and the State then

19    decides to proceed to a death penalty sentencing

20    hearing, you are going to have to instruct the

21    jury, assuming that there will be one, that their

22    concern about the death penalty can in no way, and

23    should in no way have any bearing on their

24    decision regarding the guilt or innocence stage of

1    the trial.

2                    And your Honor will be required to

3    instruct the jury to do that because the law quite

4    clearly says there are separate and distinct kinds

5    of burdens and kinds of decisions that have to be

6    made.

7                    I am suggesting to your Honor if that is

8    in fact the law, why then would it be necessary to

9    Witherspoon a jury at the guilt and innocence

10   phase?   Because once you start to Witherspoon

11   them at the guilt or innocence phase, right away

12   they realize that this is going to be a death

13   case.

14                   That in and of itself, just the

15   knowledge of that, may well tend to influence the

16   jury in terms of guilt and innocence insofar as

17   what they should do at that point, long before we

18   get to -- if we do at all --   long before we get

19   to a hearing on life or death.

20                   For that reason I am suggesting to your

21   Honor that since the sentencing phase has no

22   bearing on guilt or innocence, then the jury

23   should not be Witherspooned at that point, that is

24   at the guilt or innocence stage.

51

1           That's what this motion is directed at,

2   your Honor.

3           THE COURT:  Mr. Boskey.

4           MR. BOSKEY:  Judge, again, briefly, the

5   Illinois Supreme Court has addressed this very

6   issue on numerous, numerous occasions.  And has

7   held that Witherspooning, as a matter of law, is

8   not unconstitutional.

9           It doesn't call for a necessity pro-

10  conviction or pro-State jury.  And, in fact, the

11  Supreme Court even dictates that if we would be

12  seeking the death penalty, the jury would have to

13  be Witherspooned if we use that jury in the death

14  phase part of the capital case.

15          I believe the law is clear.  The Supreme

16  Court is clear.  And it dictates that

17  Witherspooning is proper and should be done in

18  capital cases.

19          We would rest on the various Illinois

20  Supreme Court cases, beginning with Gacey and

21  others that indicate that Witherspoon is proper in

22  death cases.

23          THE COURT:  Mr. Gant.

24          MR. GANT:  I have nothing further, your

1    Honor.

2         THE COURT:   In paragraph 8 of the Defendant's

3    motion, asserts that dispite the recent decision

4    in Lockhart versus McGee, this Honorable Court can

5    and should, as a matter of due process and equal

6    protection recognize that Witherspoon juries are

7    conviction prone.

8              The problem, however, is that he doesn't

9    tell me how I can do that in light of Lockhart,

10   without disregarding it.

11             And while I don't necessarily agree with

12   the Lockhart Court, nonetheless it is the highest

13   Court in the land, and nonetheless, I think the

14   evidence seems to proliferate in favor of the

15   argument that Witherspooning eschews the jury in

16   several respects.

17             Nonetheless the Supreme Court has held

18   that even if that is true, it does not reach to

19   the level of Constitutional impermissibility.  And,

20   of course, the cases in Illinois are numerous that

21   Witherspooning does not offend the Illinois

22   Constitution or the United States Constitution.

23   And, indeed, if we have a capital situation, the

24   jury must be Witherspooned.

1        There are some ways which are suggested

2    in the reports for the defendant to avoid that,

3    but the consequences of doing that requires the

4    relinquishment of other valuable Constitutional

5    Rights.    The defendant is perhaps placed upon the

6    horns of a dilemma.

7        But nonetheless if the defendant elects

8    to try his case to a jury, the jury is going to be

9    Witherspooned under the law of Illinois, and

10   there's nothing in the cases decided by the United

11   States Supreme Court or any other Federal Court

12   that I am aware of that would be sufficient to

13   overcome the status of the law in Illinois.

14       Accordingly, the defendant's Motion to

15   Prohibit Dealth Qualification of the jury during

16   the guilt/innocence stage of the trial is denied.

17   MR. GANT:  Your Honor, you have before you a

18   motion entitled:  Motion to preclude the State

19   from Death Qualifying a potential jury, or, in the

20   alternative, a motion or a hearing to determine

21   that there is a substantial probability that the

22   defendant is eligible for the death penalty.

23       THE COURT:  You may proceed.

24       MR. GANT:  In light of your Honor's ruling on

1   the previous motion, and in light of your Honor's

2   ruling on the motion entitled motion to preclude

3   the death penalty procedure, I will adopt the

4   arguments made on that motion, and incorporate

5   them by reference, to the present motion.

6           I have nothing further.

7       THE COURT:  Mr. Boskey.

8       MR. BOSKEY:  Again, for the same reason

9   stated, Judge, I believe death qualifying or

10  Witherspooning, if you will, the jury, on a

11  capital case is mandated by the Supreme Court of

12  Illinois.

13          In addition to that, Judge, I am aware

14  of no, nothing in the previous cases that's before

15  the Illinois Supreme Court that will indicate that

16  there should be a separate hearing to see if

17  there's a substantial probability that the

18  defendant is eligible for a death penalty.

19          Your Honor is aware of the charges that

20  Mr. Hendricks is charged with.  He's charged with

21  both murder, as well as various, quote, forcible

22  felonies, which would death qualify the defendant

23  if he was guilty.

24          I believe the State does not have a

**55**

1    burden to go further than that, Judge.  There's

2    nothing in the Constitution or in the Supreme

3    Court decisions that would indicate before we seek

4    the death penalty that we should have a separate

5    preliminary hearing, if you will, on that issue,

6    on whether or not there's a substantial

7    probability.

8          That is not mandated by the Statute or

9    by any of the court decisions.

10          We would ask that this motion also be

11    denied.

12        THE COURT:  Response, Mr. Gant.

13        MR. GANT:  I have nothing, your Honor.

14        THE COURT:  All right.

15          This motion is somewhat different, or

16    substantially different from the motion presented

17    by Mr. Clayborn.  In that this, the aggravating

18    factors that would make Mr. Hendricks eligible for

19    the death penalty, are apparent.  That is, he is

20    charged with felony murder and several counts of

21    the indictment -- He's charged with other

22    forcible felonies including aggravated sexual

23    assault, aggravated kidnapping, and one or two

24    others.

**56**

56

1        So that his ability to determine, if

2   convicted of all of those charges, whether or not

3   he would be death eligible, does not depend upon

4   his ability to construe language which the Supreme

5   Court has heretofore said is too broad to be

6   utilized in a capital sentencing hearing.

7        So this defendant's motion to prohibit

8   death qualifying of the jury is denied.

9        MR. GANT:  Your Honor, might we move now to

10  the series of motion that involve discoverable --

11  pardon me, discovery requests.

12        The first one, motion to produce the

13  record on all Juvenile Court proceedings.

14        I will then take the next motion, which

15  will be a motion to compel the Prosecution to

16  disclose any non-statutory aggravating factors.

17        And then, finally, the Motion for

18  Discovery and a Bill of Particulars as to

19  aggravation.

20        THE COURT:  All right.

21        MR. GANT:  Judge, with regard to motion to

22  discovery of Juvenile records, I haven't received

23  any recent response indicating the State's

24  objection.

1          I suggest it will be a number of
2    witnesses in this case, with at least two who are
3    juveniles and others who, through my own
4    investigation I have learned do have some prior
5    contact with the Juvenile Court.
6          I have listed the names of those
7    possible witnesses.  These witnesses undoubtedly
8    will be State witnesses.
9          Under Davis versus Alaska, in terms of
10   the Defense being in a position to impeach the
11   credibility of the witnesses, I don't think
12   there's any question but in a case, especially a
13   capital case, that this kind of information is
14   certainly discoverable.
15          Not only is it discoverable, Judge, but
16   given the facts and circumstances of this case, it
17   is extremely crucial.
18          For that reason and the argument set out
19   in the motion, we ask that your Honor grant our
20   request.
21       THE COURT:  Mr. Boskey.
22       MR. BOSKEY:  Judge, I will run the various
23   records that the People have put on his motion.
24   Depending on what shows up, there might be a

**58**

58

1  motion in limine.  But I will comply with this

2  motion.

3       THE COURT:  All right.   The Defense motion

4  to compel the disclosure of Juvenile Court records

5  regarding the witnesses is granted.

6       MR. GANT:  The next motion, your Honor, is a

7  motion to compel the Prosecution to disclose any

8  non-statutory aggravating factors that they intend

9  to present at the sentencing hearing, should there

10 be one.

11            And we rely specifically on Gardner

12 versus Florida in our request for that

13 information.

14      MR. BOSKEY:  I will comply with that motion,

15 and the motion to discovery and the Bill of

16 Particulars, as to aggravation.  I will comply to

17 both.

18      THE COURT:   Without objection both motions

19 are granted.

20            That is, the Defendant's Motion to

21 Compel the Prosecution to Disclose any non-

22 statutory aggravating factors that were --  they

23 will present at the sentencing hearing.  And the

24 defendant's motion to discovery and a Bill of

1    Particulars as to aggravation, are both granted

2    without objection.

3         MR. GANT:  Your Honor, the next series of

4    motions involve matters that might well best be

5    left until such time as we are on the eve of

6    trial.

7              Those three motions are motions for

8    certain orders regarding pre-trial publicity in

9    this case.

10        THE COURT:  All right.

11        MR. GANT:  Motion for attorney participation

12   that is his full participation in voir dire.

13        THE COURT:  All right.

14        MR. GANT:  And motion for individual

15   sequested voir dire.

16        THE COURT:  All right.  We might as well

17   decide them now.

18        MR. GANT:  We will stand on the motion as

19   drafted, your Honor.

20              Mr. Boskey.

21        MR. BOSKEY:  As for the motion regarding pre-

22   trial publicity, I have no objection.

23              I don't know if Counsel is referring to

24   a gag order type of situation.  I have no problem

1    with that.

2              Is that what you mean?

3         MR. GANT:  Yes.

4              And there was at the time of the offense

5    a good deal of print, publicity, your Honor.  I am

6    primarily concerned with that.    Any kind of

7    publicity that may arise once that case goes to

8    trial.

9         THE COURT:  As I read this motion, it is not

10   only directed towards Counsel in the case, but as

11   I understand it, he's asking me to bar the press

12   from pre-trial proceedings in this case.

13        MR. GANT:  Judge, if I may just address you

14   on that.

15             In light of at least two recent rulings

16   involving the Circuit Court of Cook County, I

17   don't know whether -- if you think -- I don't know

18   whether or not you would have the authority to do

19   that anyway.

20             I certainly would not be in a position

21   to ask your Honor to do something the Court didn't

22   have authority to do.

23             Insofar as the request, I request you to

24   do --  ask you to do that, at this point we ask

        61                    **61**

1  that portion be stricken.

2       THE COURT:  All right.  Then there's nothing

3  else left to this motion.

4            It seems to me that the rules of

5  professional responsibility, in particular Rule

6  7-107, covers this aspect insofar as Counsels are

7  concerned.

8            And without trying to verbatim state the

9  rule, essentially the rule says that neither

10 Counsel should indulge in any out-of-Court

11 statements that likely will impede the defendant's

12 ability to receive a fair and impartial trial.

13           That's a matter of disciplinary rule.

14 And I assume and I'm certain that both sides will

15 comply with the rules in all respects.

16      MR. BOSKEY:  Judge, as to the motion for

17 attorneys' participation in voir dire, obviously

18 that is discretionary within your Honor's

19 discretion.

20           My personal indication from my past

21 history is not my request, but I believe it is

22 under your Honor's discretion.  And I would leave

23 it up to your Honor's discretion, as to that

24 particular motion.

62                **62**

1          As to the defendant's other motion,

2     motion for individual voir dire and sequestering

3     of the jury during the voir dire process, it is

4     becomming more and more -- it's been done in this

5     very building twice in the last month.

6          I have no objection.

7     MR. GANT:   Again, on those two motions a lot

8     of that depends on the kind of publicity that may

9     or may not develop.   It may not be necessary. But

10    I thought that it was just the smart thing to do,

11    to put this request in writing before your Honor,

12    at this time, just to let the Court know that I am

13    at least cognizant of the possibility there may he

14    such publicity and if so, these requests might be

15    a way to obviate it.

16    THE COURT:   All right.   These motions also

17    have impact without regard to whether or not that

18    publicity emerges at trial.   It also has some

19    impact if the jury is going to be Witherspooned,

20    particularly, the motion for sequestered venire

21    examination.

22          It would be important in Witherspooning

23    the jury so as not to contaminate the jury by the

24    response of a few.

63                    **63**

1          I will grant both motions.  If they

2    become necessary for one reason or another, we can

3    always address it at the trial.  Right now they

4    are granted.

5          MR. GANT:  Your Honor, with that there is

6    presently pending before you a motion to waive

7    jury for death eligibility phase or sentencing.

8    We are withdrawing that at this time.

9          THE COURT:  All right.

10         MR. GANT:  Also a motion before you for

11   hearing on proportionality.  We are withdrawing

12   that at this time.

13         THE COURT:  All right.

14         MR. GANT:  And according to my tally sheet,

15   that is it.

16         THE COURT:  Well, your tally sheet is wrong.

17         MR. GANT:  That's why you are a Judge and I

18   am just a lawyer.

19         THE COURT:  You have a motion to allow Mr.

20   Hendricks the right of allocution.

21         MR. GANT:  That's correct.  You're absolutely

22   right.  My fault, Judge.

23            We will stand on the motion as drafted.

24         THE COURT: Mr. Boskey.

64                        **64**

1        MR. BOSKEY:  Again, we would oppose this

2   motion.

3            Whether or not a defendant in a capital

4   case has a right of allocution has been decided by

5   the Illinois Supreme Court, and various other

6   Supreme Court decisions.

7            Most recent that I'm aware of, People

8   versus Perez, that's 108 Ill. 2d, page 70.  I

9   believe the same issue has been addressed in

10  People versus O'Toole and several other Illinois

11  Supreme Court cases that indicate that the

12  Defendant does not have a Constitutional Right to

13  allocution, that is to give an unsworn statement to

14  the jury.

15           We would oppose this motion.

16       THE COURT:  Mr. Gant.

17       MR. GANT:  I have no response, Judge.

18       THE COURT:  All right.

19           At least in People versus Gaines, and in

20  a number of other cases, the Illinois Supreme

21  Court has ruled that an Illinois defendant has no

22  such right of allocution.  Although he or she would

23  have such a right in a non-capital case before the

24  jury that the defendant chooses, must take the

6 5                        **65**

1    oath and testify, otherwise he doesn't have a

2    right.

3            So your motion to allow the defendant

4    the right to allocution is denied.

5            You also have, Mr. Gant, a motion to

6    prohibit consideration of arrest not resulting in

7    convictions, during the aggravation and mitigation

8    phase of sentencing hearing, and a memorandum of

9    law in support thereof.

10           The memorandum of law did not accompany

11   the document.

12       MR. GANT:  I saw that in the file.

13           I don't have a copy of that motion

14   myself.  May I view it?

15           Your Honor, we would ask that motion be

16   withdrawn at this time.

17       THE COURT:  I have a motion to bar the death

18   penalty sentencing hearing under 9-1(b) and to bar

19   imposition of the death penalty.

20       MR. GANT:  You ruled on that one.

21       THE COURT:  I denied it.

22       MR. GANT:  Yeah, you denied that earlier.

23       THE COURT:  I have a motion to preclude the

24   death --  the State from death qualifying also.

66                   **66**

1          I ruled on that also.

2      MR. GANT:  You did earlier.

3      THE COURT:  I take it, Mr. Gant, that

4  concludes all of your motions now?

5      MR. GANT:  It does.

6      THE COURT:  Where do we stand with discovery?

7      MR. GANT:  We are still a number of pieces,

8  Judge, still missing.

9          If you will indulge us just one status

10  date so I can sit down and go over with Counsel my

11  list.   Then we can set if for trial.

12      MR. BOSKEY:  That's fine.

13      THE COURT:  What day would you like to come

14  back to visit us?   .

15      MR. GANT:  Friday, April 14th, your Honor.

16      MR. BOSKEY:  Fine.

17      THE COURT:  By agreement, April 14th.

18      MR. GANT:  Thank you, Judge.

19          (Whereupon, the above entitled cause

20          was continued, by agreement,

21          to April 14, 1989.)

22

23

24

67

1  STATE OF ILLINOIS    )
                        ) SS:
2  COUNTY OF C O O K    )

3

4          IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION

5  THE PEOPLE OF THE        )
   STATE OF ILLINOIS        )    IND. NO. 88 CR 12517
6                           )
       VERSUS               )    CHARGE: Murder, Agg.
7                           )    Crim. Sex. Ass., Agg.
   JEROME HENDRICKS         )    Kid., Unlaw. Restraint
8

9             REPORT OF PROCEEDINGS

10            BE IT REMEMBERED that on Tuesday,

11  February 27, A.D. 1990, this cause came on for

12  hearing before the Honorable LEO E. HOLT,

13  Judge of said Court, upon the Indictment herein,

14  the Defendant having entered a plea of not guilty.

15

16       APPEARANCES:

17            HON. CECIL PARTEE,
                 State's Attorney of Cook County, by
18            MS. MARY MALLO, MR. EDWARD RONKOWSKI,
                 Assistant State's Attorneys
19               appeared for the People;

20            MR. RANDOLPH STONE,
                 Public Defender of Cook County, by
21            MS. MARIJANE PLACEK, MR. VINCENT LUFRANO
                 Assistant Public Defenders
22               appeared for the Defendant.

23  BETTE N. SACKS, C.S.R.,
    Official Court Reporter
24


                        68

1          THE CLERK:  Jerome Hendricks.

2          MR. RONKOWSKI:  We are ready.

3              My partner is bringing the witnesses

4     down.

5          MS. PLACEK:  This is our motion to quash and

6     suppress.  And it is our burden to go ahead for

7     it.

8              Unless Counsel needs his partner down

9     here, we can go ahead right now.

10         THE COURT:  I need a five minute recess to

11    clear the cobwebs from my head, so I can give your

12    case my undivided attention.

13                       (Thereupon, a short recess

14                       was taken, after which the

15                       following proceedings were had:)

16

17

18

19

20

21

22

23

24

69

1      THE CLERK:  Jerome Hendricks.

2      THE COURT:  As I read the motion, the

3  defendant has the burden of going forward, and the

4  burden of persuasion.

5          I will hear any opening statements.

6      MS. PLACEK:  Judge, in this particular

7  matter, I notice that the State has brought

8  certain rebuttal witnesses down.

9          I believe they would be the police

10  officers that they would call when they feel

11  necessary to rebut our case.

12          I would, of course, make a motion to

13  exclude.

14          I have a note saying that although I am

15  a stranger in a strange land, and my practice is

16  not normally in this building, that it is

17  somewhat, since there is a back door, easy to be

18  heard and to hear.

19          Since I am also partially deaf and have

20  the occasion of speaking rather loudly, I would

21  ask that the --

22      MR. RONKOWSKI:  I have had some experience

23  with Ms. Placek.

24          I have never known her to be deaf. But

70

1    she does talk loudly.  And I have no objection

2    that they go into the jury room.

3         THE COURT:  Why don't you go put them in the

4    jury room or the State's witnesses' room around

5    the corner?

6         MR. RONKOWSKI:  That is kind of cold.  They

7    turned the heat off.

8

9                    OPENING STATEMENTS

10                   BY MS. PLACEK:

11                        Judge, in this particular

12   matter, the simplicity of the case hedges over one

13   issue and one only.  And that is when in fact the

14   arrest of my client, Jerome Hendricks, took place.

15                   The particular issue is that it is the

16   defendant's contention at this particular time,

17   and we believe that it will be shown through the

18   evidence that on August the 8th, the defendant was

19   in fact, during the evening hours, sitting in his

20   home.

21                   The evidence will further show that he

22   was told by his mother that the police had wanted

23   to speak to him.  He, quite frankly, wishing to

24   cooperate with the police, and there in fact being

                         71

1    no evidence to rise to the level of either

2    probable cause or for that matter serious

3    suspicion as to their investigation, called the

4    police and invited them to in fact his home for

5    the purpose of this conversation.

6            Now, when I say invited to his home, I

7    believe that the evidence from the stand will

8    further reveal that, number one, he never

9    consented to go anywhere with the police, because

10   that becomes the next issue.

11           Because as soon, almost as soon as he

12   put down that phone telling the police detective

13   in fact that he was at home and would be perfectly

14   willing to speak to him at his home, he then

15   picked up the phone again.  And while on the phone

16   with his sister, who happened to live in Maywood,

17   more or less discussing both family business and

18   the happenings of the day, there was a knock

19   almost immediately on the door.

20           Now, that knock at the door was opened

21   by his mother.  His mother opened the door, and

22   the police then ran upon the defendant, using

23   profanity, swearing at him, that he better put

24   down that phone,  and were ready to handcuff him

72

1    at that particular time.

2            When they were ready to handcuff him,

3    quite frankly the defendant looked at them in

4    somewhat of astonished amazement and said:  "Why

5    are you handcuffing me?  Why are you seeking to

6    possibly do anything to me, when ▓▓▓▓▓▓▓

7    ▓▓▓▓▓▓this house and in fact talk to you about

8    whatever you wanted to talk to me about?"

9            Again, we got a barrage of profanity

10   from the police and again we had what can be

11   likely called an altercation, because the police

12   did not come alone.

13            You will hear from the stand that

14   several people were in fact at this time involved

15   in this arrest, not only involved in this arrest,

16   but it took place in fact within the realm of the

17   defendant's own home while he was in the living

18   room, or living room area, after being pushed off

19   the phone and literally continuing and resisting

20   to be handcuffed, and continually saying to the

21   police, "I thought all you wanted to do was talk

22   to me.  Well, talk to me."

23            He was then ▓▓▓▓▓▓, taken to the

24   ▓▓▓▓▓▓▓▓, and at that particular time, after

73

1  several long hours, never consenting either to go

2  with them, never consenting to be handcuffed,

3  what happened was certain evidence was

4  in fact taken from the defendant.

5          This is the evidence that is a result of

6  the motion to quash that we are also seeking to

7  suppress before your Honor.

8          What we will show, and what we believe

9  the evidence will warrant from the stand, is,

10  number one, that the police had no cause to either

11  come into the defendant's house and arrest him in

12  that manner, for they had no warrant, nor in fact

13  did they have probable cause to make such an

14  arrest in the alternative.

15          The law also points that out in the

16  State of Illinois under existing factual

17  situations.

18          And the police will deign testify in

19  rebuttal to my client's statement that they did

20  not even have evidence enough where they could

21  take to a Judge and ask for a warrant for my

22  client's arrest for the simple reason, Judge, that

23  he had shown in the past no pattern for flight.

24  He had shown no exigent circumstance which would

74

1   in fact cause such arrival at his house at that

2   particular time.

3           At the conclusion of this evidence, your

4   Honor, we would ask for a finding sustaining our

5   motion and in fact suppressing the items that in

6   fact we spoke of earlier.

7           Thank you, your Honor.

8       THE COURT:  State.

9

10                  OPENING STATEMENTS

11              BY MR. RONKOWSKI:

12          Briefly, as Counsel indicates, there is

13  an issue as to when the police arrested the

14  defendant.

15          There is also the containing issue as to

16  whether or not probable cause existed at the time

17  of the arrest.

18          And as Counsel stated, you will hear

19  evidence that the defendant called the police and

20  initiated that contact.

21          Before the police even met the

22  defendant, they knew the following:  victim, age

23  12, was found dead with some ligatures around the

24  neck.  Citizens indicated to the police, numerous

75

PUBLIC OPINION IS NO BURDER OF PROOF

1    citizens, that the defendant was the last person

2    to be seen talking to the victim when she was

3    alive.    Her body had been discovered in the

4    vicinity of where the defendant lived.

5            Also, the police knew, based on

6    information that was given them, and a record

7    check, that the defendant had an arrest for

8    contributing to the sexual delinquency of a 13

9    year old victim.

10    MS. PLACEK:   Objection.

11    THE COURT:   If this is opening statements,

12    and the evidence doesn't show that, it doesn't

13    show it.

14            But he can state what he thinks the

15    evidence will show.

16            The objection is overruled.

17    MR. RONKOWSKI:   A 13 year old victim where

18    the crime occurred next door to where the body

19    was found.

20            Also, he was on parole for raping and

21    choking a 15 year old victim.

22    MS. PLACEK:   Continuing objection.

23    THE COURT:   The objection is noted for the

24    record, and it is overruled.

76

1      MR. RONKOWSKI:  Counsel also mentioned that

2   the defendant called the police.  She failed to

3   mention why.

4         There was a crowd outside that can be

5   described as unruly, and directed toward the

6   defendant's attention.

7         It was the defendant who called the

8   police, asking the police to clear his name.  The

9   defendant was unable to clear his name and

10  admitted to some sexual contact with the 12 year

11  old victim.

12         It was not until then that the defendant

13  was arrested.

14         At the conclusion of the case, we ask

15  you to deny the defendant's motion to suppress.

16      THE COURT:  Please call your first witness.

17      MS. PLACEK:  Judge, we would call Mr.

18  Hendricks.

19              (Witness sworn)

20

21

22

23

24


77

1                    JEROME HENDRICKS,

2     the Defendant herein, was called as a witness in

3     his own behalf, having been first duly sworn, was

4     examined and testified as follows:

5                    DIRECT EXAMINATION

6                         BY

7                    MS. PLACEK:

8         Q     State your name for the purposes of the

9     record, spelling the last name for the court

10    reporter, please.

11        A     Jerome Hendricks, H-e-n-d-r-i-c-k-s.

12        Q     How old are you today?

13        A     28.

14        Q     Calling your attention to August the

15    8th, 1989 (sic), during the early evening hours,

16    could you tell his Honor, Judge Holt, exactly

17    where you were?

18        A     Yes, ma'am.

19              I was at home.

20        Q     When you say at home, did anyone share

21    that home with you?

22        A     Yes, my mom.

23        Q     And what is your mother's name?

24        A     Earline Hendricks.

                        78

1      Q     Now, you say you were at home.  Did

2  anything unusual happen?

3            Excuse me.  May I withdraw and rephrase,

4  your Honor?

5      THE COURT:  You may.

6      MS. PLACEK: Thank you.

7      Q     Did you do anything unusual that

8  evening, on that August 8th date?

9      A     Well, I came in and I was told the

10 police wanted to talk to me.

11     Q     Now, when you say you were told the

12 police wanted to talk to you, who told you that?

13     A     My mom.

14     Q     And when you found that out, what, if

15 anything, did you do?

16     A     I called the Chicago police.

17     Q     And when you called the Chicago police,

18 what, if anything did you say to the police?

19     A     That I was home now, and that ~~I was~~

20 ~~willing to talk to them~~.

21     Q     And when you say you were willing to

22 talk to them, what, if anything, did you do after

23 you hung up the phone?

24     A     I waited on the police and called my

79

1   sister.

2        Q    When you say you waited on the police

3   and called your sister --

4             By the way, how soon after you called

5   the police did you call your sister?

6        A    Just minutes after.

7        Q    And did anything unusual happen while

8   you were on the phone with your sister?

9        A    Yes, it did.

10       Q    Could you tell his Honor, Judge Holt,

11  what exactly happened?

12       A    There was a knock at the door, and my

13  mom opened the door.

14       Q    Now, I am sure Judge Holt nor myself

15  have ever been in your house.

16            Could you tell his Honor, Judge Holt,

17  how far away this phone was from the door you

18  spoke of?

19       A    About maybe eight feet, nine feet..

20       Q    Would it be correct to say that the

21  door, the telephone is in front of the door in a

22  hall?

23       A    No, it wouldn't.

24       Q    Then describe it for us, please.


                        80

1        A      It would be a living room area and

2    dining room area and a kitchen area.

3        A      Okay.  And when you say about eight

4    feet, did you hear anything when the door --  or,

5    excuse me, strike that.

6               May I withdraw and rephrase, your

7    Honor?

8        Q      Who answered the door, if you know?

9        A      My mother did.

10       Q      And when your mother answered the door,

11   what, if anything happened?

12       A      Yes, it did.  The police rushed in the

13   house.

14       Q      And when you say the police rushed in

15   the house, how did you know they were police?

16       A      I would assume they were police.

17       Q      And tell his Honor, Judge Holt, why you

18   made that assumption?

19       A      Because I called them, and they said

20   they were on their way to come and talk to me.

21       Q      Now, you described them as rushing in

22   the house.

23               What was the first thing they did when

24   they in fact got in the house?

1          A        They ordered me to get off the phone.

2          Q        And what, if anything, did you do?

3          A        I hung up the phone.

4          Q        Now, when you say they, how many police

5     officers, at all, came into your house?

6          A        At that time it was three or four of

7     them.

8          Q        Now, were they in plain clothes, or in

9     uniform?

10         A        Plain clothes.

11         Q        And were they white or black?

12         A        They were white.

13         Q        And do you know any of their names?

14         A        Not that I recall.

15         Q        Thank you.

16                  Now, you said that they told you to get

17    off the phone.   And did you, in fact, get off the

18    phone?

19         A        Yes.

20         Q        And what happened after you got off the

21    phone?

22         A        They pulled me to the side.   One of them

23    pulled out his handcuffs.

24         Q        Now, you say one of them pulled out his

82

1    handcuffs.

2              Could you describe that man to his

3    Honor, Judge Holt, if you can?

4         A    Describe the manner?

5         Q    The man.

6         A    The detective.

7              He was a white guy, kind of tall.

8         Q    Now, I believe you said a gun, is that

9    correct?

10        A    No.  I said guy.

11        Q    Guy. I'm sorry.

12             Well, let me ask you this.  Did they

13   have their guns drawn at this time?

14        A    Not that I recall.

15        Q    But he pulled out his handcuffs?

16        A    Yes.

17        Q    And what, if anything, did you say to

18   him?

19        A    I stepped back and said I was not

20   willing to put handcuffs on.

21        Q    Now, when you say you were not willing

22   to put the handcuffs on, did this officer say

23   anything about you putting on handcuffs?

24        A    Yes.

83

1              He just told me to come on again.

2       Q    And when he said come on, did he put

3   forward his handcuffs in any way?

4       A    He reached for me like he was going to

5   put them on.

6       Q    And what happened after he did that?

7       A    At that time I stepped back toward the

8   living room where my mom was.

9       Q    And what happened after that?

10      A    A couple more police surrounded me.

11      Q    Were they saying anything to you at that

12  time?

13      A    I don't use profanity.  But they were

14  using certain words like --

15      Q    Were they swearing at you?

16      A    Yes, they were.

17      MS. PLACEK:  Instead of going into some sort

18  of colorful detail, could we just go on that?

19      THE COURT:  That is entirely up to you.

20      MS. PLACEK:  Q   You said they were using

21  profanity, is that correct?

22      A    Yes.

23      Q    And who were they using the profanity

24  toward?

84

1          A       Towards me.

2          Q       And when you say they surrounded you,

3     what happened after they surrounded you?

4          A       I tried to back up off of them again.

5          Q       When you say tried to back up off of

6     them again, tell his Honor, Judge Holt, what

7     exactly you did?

8          A       Well, I backed up.

9                  There was one behind me.  He sort of

10    walked up toward me.  And the other two were on

11    the side, walked in toward me.

12         Q       Would it be correct in saying that in

13    fact you got into a little scuffle with the police

14    at that time?

15         A       Yes, it would.

16         Q       And what happened after you got into

17    this little scuffle with the police?

18         A       Well, the result was I wound up with the

19    handcuffs on.

20         Q       And what were you saying to them while

21    they were trying to handcuff you during this

22    scuffle?

23         A       I didn't want to be handcuffed.

24         Q       Did they tell you anything?

1        A      Nothing.

2        Q      Did they continue swearing at you?

3        A      Swearing at me, and taking me toward the

4   door.

5        Q      And did you in fact leave your home that

6   day?

7        A      Yes, I did.

8        Q      Did you consent, or did you agree to

9   leave your home with the police?

10       A      No, I didn't.

11       Q      You did not?

12       A      I did not.

13       Q      Let me ask you this:

14              When in fact you left your home, you

15   were, of course, in the custody of the police and

16   handcuffed, is that correct?

17       A      Yes, ma'am.

18       Q      Did you feel that you were free to

19   leave?

20       A      No, ma'am.

21       Q      And, by the way, they took you in their

22   car handcuffed, is that correct?

23       A      Yes, ma'am.

24       Q      And they took you to a police station,

86

1   correct?

2        A    Yes.

3        Q    And did you feel that you were free to

4   leave?

5        A    No, ma'am.

6        Q    Also, let me ask you this:

7             At the time the police came to your

8   house, were you violating any city, State, or

9   municipal statute?

10       A    No.

11       Q    Were you violating any laws of the State

12   of Illinois?

13       A    No, I wasn't.

14       Q    Thank you.

15            By the way, at the time did the police

16   ever show you a warrant for your arrest?

17       A    Nothing at all.

18       Q    As a result of your arrest on August the

19   8th, did you make certain statements to the

20   police?

21       A    Yes, I did.

22       Q    And that was after, correct, your arrest

23   on August the 8th?

24       A    Yes, it was.

87

1        Q      Specifically that was on August 9th,

2    correct?

3        A      True.

4        Q      And to the best of your knowledge, those

5    statements are --   To the best of your knowledge

6    --   The police intended to use those statements

7    against you in court, correct?

8        A      Correct.

9        MS. PLACEK:  That's all, Judge.

10       THE COURT:  Cross.

11

12                   CROSS EXAMINATION

13                          BY

14                   MR. RONKOWSKI:

15       Q      What time did you get home that day?

16       A      Around 5:00 in the evening.

17       Q      How long had you been home before you

18    called the police?

19       A      I was home for five minutes.

20       Q      And who else was home when you arrived

21    there?

22       A      My mom and my sister and my brother.

23       Q      How old is your sister?

24.      A      32.

88

1          Q      And what is her first name?

2          A      Devita (phonetics) Hendricks.

3          Q      And your brother, how old is he?

4          A      John, he was 23 at the time.

5          Q      Okay.  And your mother's name?

6          A      Earline Hendricks.

7          Q      And this is when your mother said that

8    the police wanted to talk to you?

9          A      Yes.

10         Q      And you had no problems talking with the

11   police?

12         A      No, I didn't.

13         Q      And upon your mother's suggestion, you

14   called the police?

15         A      Yes, I did.

16         Q      And at the time you called the police,

17   do you remember anybody being outside the

18   premises?

19         MS. PLACEK:  Objection.

20         THE COURT:  Overruled.

21         MR. RONKOWSKI:  Q   Was there anybody

22   outside?

23         THE WITNESS:  A   No, there wasn't.

24         Q      How long before the police arrived in

89

1    response to your phone call?

2         A    Say minutes after the phone call.

3         Q    How many minutes, if you know?

4         A    Just about five.

5         Q    Okay.    And when the police arrived

6    there, did you see any other people outside your

7    house besides the police?

8         MS. PLACEK:   Objection.

9              Presuming, Judge, he first saw the

10   police in his house.

11        MR. RONKOWSKI:   I'm asking if he knows.   He

12   saw them.

13        THE COURT:   I am not quite certain I

14   understand the nature of the objection.

15        MS. PLACEK:   Assuming a fact not in evidence.

16   The defendant testified he was inside the house.

17   He never stated he saw the police outside when

18   they arrived.

19        MR. RONKOWSKI:   Let me rephrase it.

20        THE COURT:   All right. Rephrase it.

21        MR. RONKOWSKI:   Q   When the police arrived

22   and you saw the police, did you see anybody

23   outside of your house besides the police?

24        MS. PLACEK:   Same objection, Judge.   The

90

1    question is confusing.

2         THE COURT:  Overruled.

3              If he understands, he may answer it.

4         THE WITNESS:  A   I never looked out.

5         MR. RONKOWSKI:   Okay.

6         Q    Well, you went down with the police to

7    the police station?

8         A    Yes, I did.

9         Q    When you went to the car, did you see

10   anybody there that wasn't the police?

11        MS. PLACEK:  Objection.  Beyond the scope.

12        THE COURT:  Overruled.

13        MR. RONKOWSKI:  Q   Did you see anybody

14   outside your house when you walked from your house

15   to the police car that wasn't the police?

16        THE WITNESS:  A  Across the street from my

17   house, yes.

18        Q    How about anybody in the vicinity of

19   your house?

20        A    Not in the vicinity of my house, no.

21        Q    Anybody between you and the police car?

22        A    No, there was not.

23        Q    How many people could you see in that

2.4  vicinity when you walked to the police car?

91

1       MS. PLACEK:  Objection.

2               He already testified not in the

3    vicinity, Judge.

4       THE COURT:  Well, can you rephrase it?

5               I don't know what vicinity means --  Or

6    define it.  One or the other.

7       MR. RONKOWSKI:  Q   How many people could you

8    see as you walked from your house to the police

9    car?

10      THE WITNESS:  A   Quite a few people across

11   the street.

12      Q    How many people did you see across the

13   street?

14      A    I didn't count them.

15      Q    More than 20?

16      MS. PLACEK:  Objection.

17      THE COURT:  Overruled.

18      MR. RONKOWSKI:  Q   More than 20?

19      THE WITNESS:  A   I didn't count.

20      Q    Do you recall if they were saying

21   anything to you?

22      MS. PLACEK:  Objection.

23              This goes to the relevancy of the

24   motion, Judge.

92

1    THE COURT:  Overruled.

2    MR. RONKOWSKI:  Q  Do you recall if they

3    were saying anything to you?

4    A    No.  There was no one saying anything to

5    me.

6    Q    Were they saying anything to the police?

7    A    Not that I recall.

8    Q    Now, when you say you got a ride down to

9    the police station, how many police were in your

10   vehicle?

11   A    I recall three.

12   Q    Did you know any of their names?

13   A    No, I didn't.

14   Q    And were you in the front seat or back

15   seat of the police van?

16   A    I was in the back seat.

17   Q    Was there someone with you?

18   A    From my home?

19   Q    In the back seat?

20   A    Yes, there was.

21   Q    Who was that?

22   A    A plain clothes officer.

23   Q    Was there anyone in the front seat?

24   A    Yes, there was.

93

1     Q    How many?

2     A    Two officers.

3     Q    How long were the police with you inside

4 of your house?

5     A    I don't know.  It wasn't very long, just

6 enough time to handcuff me.

7     Q    A couple minutes?

8     A    I wasn't counting at the time.

9     Q    Besides calling your sister, did you

10 make any other phone calls while you were in the

11 house, from the time you entered until the time

12 you left?

13     A    From the time I left?

14     Q    From the time you entered your house and

15 your mother told you that the police wanted to

16 talk to you, until the time you left with the

17 police, did you make any other phone calls besides

18 calling your sister?

19     A    No, I didn't.

20     Q    You never called Russ Ewing?

21     A    No.  I wasn't the one that called.

22     Q    Did anybody else use the phone inside

23 your house?

24     MS. PLACEK:  Objection.

94

1        THE COURT:  Overruled.

2           If he knows, he may answer.

3        MR. RONKOWSKI:  Q   At the time you entered

4 and your mother told you the police wanted to talk

5 to you, did you see anybody else using the phone

6 other than at the time you called your sister?

7        A    Yes, there were.

8        Q    And who used the phone --

9        MS. PLACEK:  Objection.

10       THE COURT:  Overruled.

11       MR. RONKOWSKI: Q   Who used the phone?

12       THE WITNESS:  A  A friend of my sister's.

13       Q    And what was the name of this friend?

14       A    Maria.  I don't know her last name.

15       Q    Anybody besides Maria and you used the

16 phone?

17       A    Not that I recall.

18       Q    Do you know who Maria called?

19       A    She called Russ Ewing.

20       Q    Did you have any other conversation with

21 the police other than what you have testified at

22 the time you were inside your house?

23       A    No, I didn't.

24       MR. RONKOWSKI: Nothing further by the State.

95

1       THE COURT:  Redirect?

2       MS. PLACEK: Just a few.

3

4              REDIRECT EXAMINATION

5                    BY

6                MS. PLACEK:

7       Q    Mr. Hendricks,  the Assistant State's

8  Attorney asked you about people across the street

9  is that correct?

10      A    Yes, ma'am.

11      Q    Well, as a matter of fact there was

12  quite a struggle ensuing in your house when the

13  police broke in, wasn't there?

14      A    Yes.

15      Q    As a matter of fact, the Assistant

16  State's Attorney asked you about Russ Ewing.

17           Your mother was shouting for someone to

18  help, is that correct?

19      A    Yes.

20      Q    Because you were being dragged out of

21  the house, correct?

22      A    Yes, ma'am.

23      Q    And to the best of your knowledge, that

24  is why Maria called Russ Ewing, from your house?

1          A      Yes, ma'am, that is why she called.

2          Q      As a matter of fact, the Assistant

3    State's Attorney asked you about being transported

4    to the station.

5                 Could you describe the vehicle, or the

6    car that you were taken to the station in?

7          A      I was transported in a detective's car.

8          Q      When you say a detective's car, could

9    you tell his Honor, Judge Holt, how you knew it

10   was a detective's car?

11         A      (No response)

12         Q      Would it be --   May I withdraw and

13   rephrase, Judge?

14                Would it be correct in saying that

15   although they were supposed to be plain clothes

16   cars, everyone in the neighborhood knows what they

17   look like?

18         A      Yes.

19         Q      Because they were the same make?

20         A      Yes.

21         Q      They are the same model?

22         A      Yes.

23         Q      And they begin with the same letters of

24   the license plates?

97

1      A     License plates, yes, ma'am.

2      Q     Thank you.

3           And, by the way, would it also be

4 correct in saying that the neighborhood you were

5 living in at that time and date was primarily a

6 black neighborhood?

7      A     Yes.

8      Q     And it would be out of the ordinary to

9 see white men in that neighborhood?

10     A     Yes, it would be.

11     Q     Thank you very much.

12          That is all, Judge.

13   MR. RONKOWSKI: Nothing further by the State.

14   THE COURT: Thank you, Mr. Hendricks. You may

15 step down.

16            (Witness excused)

17   MS. PLACEK:  At this time the Petitioner

18 would rest on the motion.

19   THE COURT:  Petitioner rests.

20         State?

21   MS. MALLO:  Judge, we would ask that

22 Counsel's motion be denied.

23         No argument, Judge.

24   THE COURT:  Defense?