CASE NO. _____O8cv 1589_____

ATTACHMENT NO._____8_____

EXHIBIT _____

TAB (DESCRIPTION) _____

1      MS. PLACEK:  Does the Court wish me to

2  respond?

3      THE COURT:  If you choose.

4      MS. PLACEK:  I'd ask that the motion of the

5  State be denied.

6      THE COURT:  Motion denied.

7      MS. MALLO:  Your Honor, with that, the

8  People would call Detective Lawrence Nitsche.

9      (Witness sworn)

10     THE COURT:  Good afternoon.

11       That microphone is on, sir.    Will you

12  speak directly into it?

13       Keep your voice up.

14       You may proceed.

15

16     DET. LAWRENCE M. NITSCHE,

17  was called as a witness herein on behalf of the

18  People of the State of Illinois, having been

19  first duly sworn, was examined and testified as

20  follows:

21

22

23

24

DIRECT EXAMINATION

BY

MS. MALLO:

Q    Detective, would you state your name, please, and spell your last name?

A    Lawrence M. Nitsche, N-i-t-s-c-h-e, star number 15137, Chicago Police Officer, Area 2, Violent Crimes.

Q    And, Detective, was that your assignment on the 8th of August, 1988?

A    Yes, ma'am.

THE COURT:    '88 or '89?

MS. MALLO:    '88, Judge.

THE WITNESS:    '88.

MS. MALLO:    Q    Detective, on August the 8th, 1988, were you working in what is commonly called the third watch?

A    Pardon?

Q    What watch were you working?

A    Second.

Q    And what hours are they?

A    9:00 o'clock till 5:00 o'clock in the afternoon.

Q    And while on that watch, did you receive

1   an assignment to investigate a murder?

2       A    Yes, I did.

3       Q    And about --  Did you then go to the

4   area of 251 West 117th Street in Chicago?

5       A    Yes, ma'am.

6       Q    And at that location, you did some

7   investigation?

8       A    Yes, ma'am.

9       Q    And from there did you go and begin to

10  canvass that area, canvass that neighborhood?

11      A    Yes, ma'am.

12      Q    And specifically, Detective, did you

13  speak to any people that lived in that

14  neighborhood?

15      A    Yes, ma'am.

16      Q    And do you recall who the first person

17  you talked to was?

18      A    Yes.

19      Q    And who would that have been?

20      A    I believe it was Carolyn --  I can't

21  think of her last name.

22           Oh, I can't.

23      Q    Could it have been Carolyn McCoy?

24      A    Yes.


101

1      Q      And do you recall where she was when you

2   spoke to her?

3      A      Yes, ma'am.  She was on her porch.

4      Q      And when you spoke with her, Detective,

5   did you identify yourself as a detective?

6      A      Yes, I did.

7      Q      And when you spoke with her,

8   specifically what did you say to her?

9      A      I told her I was a police officer, and

10  we had just discovered a body after --  what we

11  believed to be a young girl in a garage near her

12  home, and from the people in the neighborhood, we

13  were told that there was a missing person from her

14  house.

15          And we talked to her.  We were asking

16  her when was the last time she had seen her niece.

17  I believe it was her niece.

18      Q      And when you asked her that, what did

19  she say to you?

20      A      She told me the last time she had seen

21  her niece was on the 1st of August of 1988.  And

22  it was around 6:00 o'clock that night,  and she

23  was on the porch with a Jerome Hendricks.

24          She said she went out of the house and

1   told Jerome to leave the porch, and not to be

2   talking to her niece because he was too old to be

3   talking to her niece.

4           And she further told me that Jerome

5   Hendricks had been arrested before for doing

6   something with a girl.

7       Q    And after you learned that information,

8   did you have any further conversation with Mrs.

9   McCoy at that time?

10      A    Not at that time, no.

11      Q    And after your interview with Ms. McCoy

12  what did you do at that time, Detective?

13      A    I -- Well, also I believe Yolanda was

14  on the porch, and she basically told me the same

15  thing.

16      Q    Would that have been Yolanda Hill?

17      A    Yes.

18      Q    And you spoke with her at approximately

19  the same time?

20      A    Yes.

21      Q    And did you ask her if she had seen this

22  young girl named Denise?

23      A    She had seen the same thing Mrs. McCoy

24  had seen.

103

1      Q      After you talked with Mrs. McCoy and Ms.

2   Hill, what then did you do?

3      A      There was also another woman, I can't

4   remember her name.  She had told me that she had

5   seen Denise.

6      Q      Would it be Paula Townsend?

7      A      That is correct, Paula Townsend.

8             Paula Townsend also told me that she had

9   seen Denise on the night of August the 1st talking

10  to Jerome Hendricks, and Jerome asked her would

11  that be okay.

12     Q      Asked who?

13     A      Asked Denise, Denise Johnson, the

14  deceased, would it be okay.

15            And she said yes.  And what that meant,

16  we really didn't know.

17     Q      And did Miss Townsend tell you anything

18  else?

19     A      She said she had seen Denise walk toward

20  119th Street, and Jerome walk toward his house.

21     Q      And on that day, on the 8th of August,

22  did you also have a conversation with a James

23  Hill?

24     A      Yes.

104

1       Q    And when you spoke with James Hill,

2    again did you tell him that you were a detective?

3       A    Yes, I did.

4       Q    And when you spoke with James Hill, what

5    did you tell him?

6       A    We told him that we were investigating

7    the homicide, what we believe now was Denise

8    Johnson.   And asked him the last time he had seen

9    her.

10           And he couldn't recall the last time he

11   had seen her, but he knew he had a couple

12   conversations with Jerome Hendricks, who

13   originally said he didn't see him.

14           And another time he said he saw her at

15   119th Street.   And another time at his house, at

16   255 West -- whatever street.

17      Q    And James Hill told you what Jerome

18   Hendricks had told James Hill?

19      A    Told James Hill those three different

20   versions of different places that he had seen her,

21   or hadn't seen her.

22      Q    Now, after you talked to Townsend,

23   McCoy, Hill, and that is Yolanda Hill and James

24   Hill, did you ever do anything with the

105

1    information you had learned?

2        A    I ran a background check.  I didn't

3    personally, I called our office, gave them the

4    information on Jerome Hendricks, and they ran a

5    background check on him to find out what his

6    criminal history was.

7        Q    And when you ran that background check,

8    did you also get an arrest report pertaining to

9    each entry on that background check?

10        A    Yes.

11             I didn't have them personally, but I was

12    told what he had been arrested for.

13        Q    And, Detective, did you also learn that

14    the defendant, Jerome Hendricks, had ever been

15    convicted of any felonies?

16        A    Yes.

17        MR. LUFRANO:  Objection, your Honor,

18    irrelevant.

19        THE COURT: Overruled.

20        THE WITNESS:  A    Yes.

21             We learned that he had been in fact and

22    he was on parole at that time.

23        MS. MALLO:  Q  For what?

24        A    For criminal sexual assault.

106

1        Q      And did you also learn any details of

2   that case?

3        A      Yes, I did.

4        Q      And what were those?

5        A      I learned that the victim had been

6   strangled and sexually molested.

7        Q      And did you learn of any other entries

8   on the defendant's rap sheet?

9        A      I believe there were two sexual attacks.

10        Q      And the other sexual attack, what were

11   the details of that, Detective?

12        A      That's supposed to have happened right

13   next door to the house where Denise was found at.

14              The victim was supposed to have lived

15   there, but had since moved into a house and now it

16   was an empty house.

17        Q      So that would have been the address, the

18   victim in that case lived at  251 West 117th

19   Street in Chicago?

20        A      Yes, that is correct.

21        Q      Now, after you had all this information,

22   what then did you do?

23        A      We then tried to locate Jerome

24   Hendricks.

107

1   Q    And where did you go to do that?

2   A    To his home.

3   Q    And when you went to his home, what --

4   When you say we, who are you referring to?

5   A    I'm talking about myself, other

6   officers.

7        I am not sure --  I think Wolf, and I'm

8   not sure if there were any other officers there

9   also.

10  Q    And when you went to Jerome Hendricks'

11  house, did you speak with anyone?

12  A    To his sister.

13  Q    And that would be Devita Hendricks?

14  A    Yes, that is correct.

15  Q    When you spoke to her, was the defendant

16  there?

17  A    No, he was not.

18  Q    And did you tell her that you were a

19  police officer?

20  A    We identified ourselves as police

21  officers.

22       She had also seen us out in the yard

23  next door.  I mean, she knew.  She had seen us in

24  the garage.

108

1        She knew we were the same police

2   officers who were next door.

3        Q    And you told her at that time that you

4   wanted to speak to her brother?

5        A    That is correct.

6             At that time we knew he was the last

7   person that we knew at that time was with the

8   victim -- that we knew of.

9        Q    Now, when the defendant, Jerome

10  Hendricks, was not there, what did you do?

11       A    We left a message that we would like to

12  talk to him, if he came home, to give our office a

13  call or whatever.

14       Q    And did you go back to Area 2?

15       A    Yes.

16       Q    And while at Area 2, did you ever

17  receive a phone call?

18       A    Yes, I did.

19       Q    And from whom did you receive the call?

20       A    From Jerome Hendricks, a person who

21  identified himself as Jerome Hendricks.

22       Q    Approximately what time was that?

23       A    Approximately 8:30 at night.

24       Q    And after you received that phone call,

109

1    what did you do?

2          A    I went to Jerome Hendricks' home.

3          Q    And what time approximately did you

4    arrive?

5          A    Approximately five, six minutes later.

6          Q    And when you arrived there, were you

7    alone or were you with Detective Wolf then?

8          A    I was with other detectives, yes.

9          Q    And when you pulled up in front of

10   Jerome Hendricks' house, or the address that he

11   had given you, did you notice anything unusual?

12         A    Yes.

13              There was a large amount of people in

14   front of the house, and, you know, all through the

15   street.

16              But there were probably 25, 30 people in

17   front of the house.

18         Q    And did they say or do anything when you

19   pulled up?

20         A    Not then, no, they didn't.

21              We went through the crowd and into the

22   house, and people in the house were waiting for

23   us.  They had the door open.

24              And we came in.  And that is the first

110

1    time that I had seen Jerome Hendricks.

2        Q    Do you see that person you called Jerome

3    Hendricks in court today?

4        A    Yes.

5        MS. PLACEK:  Stipulation.

6        THE WITNESS:  A   He is sitting over there.

7        MS. MALLO:  We would accept the stipulation,

8    your Honor, that the detective identified the

9    defendant, Jerome Hendricks.

10       Q    Detective, backing up for a minute, when

11   you received this phone call from the person who

12   identified himself as Mr. Hendricks, at Area 2,

13   did he say anything else to you besides the fact

14   that he wanted to speak to you?

15       A    He said he wanted to come into the

16   station.    He said he wanted to get this thing

17   cleared up.

18       Q    And did he tell you why he wanted to get

19   it cleared up?

20       A    Because he didn't do it, and he wanted

21   to clear his name.

22       Q    Now, you said that when you got to the

23   house -- Did you have to walk up to a porch, or

24   through a door?

111

1      A      Just one step, and another step is the

2  house.

3          It is not a full sized porch, you know.

4      Q      And when you got there, you testified

5  that the door was in what condition?

6      A      There was someone --  I can't remember

7  who --  but someone had the door open, and waving

8  us to come into the house.

9      Q      And you and Detective Wolf went in the

10  house?

11      A      Yes.

12          I went in first, and then Detective Wolf

13  was behind me.

14      Q      There were other detectives?

15      A      They didn't enter the house, though.

16      Q      Just you and Detective Wolf?

17      A      Yes.

18      Q      And when you got in the house, what did

19  you say?

20      A      I talked to Jerome, and he said he

21  wanted to come to the police station and get

22  himself cleared of this. *only said I'll Tolk,*

23          And he agreed to come in.  And we just

24  at that time, walked out of the house,  and that

*After a fight*
*And cuffs on me,*

112

1   is when the crowd was yelling that they wanted to

2   kill him, you know. *No crowd lied*

3            And I know there were some people who

4   had boards and sticks in their hands, and the

5   other detectives helped clear them away. *Lie*

6            And we got into the squad and drove

7   away.

8        Q    When you say helped clear away, what did

9   they do?

10       A    They ran toward Jerome and myself.

11       Q    The crowd did?

12       A    Yes.

13       Q    And what did the detectives do?

14       A    They more or less pushed everybody back

15   and cleared everybody away, so we could get from

16   the house to the car.

17       Q    Now, when you entered the home, you say

18   Jerome told you he wanted to go with you to Area

19   2?

20       A    Yes. *—No*

21       Q    Did you at that time put handcuffs on

22   Jerome?

23       A    *Yes.* No, we did not.

24       Q    When you walked from Jerome's house to

113

1    your squad car, did you at that time have Jerome

2    in handcuffs?

3        A    No, we did not.

4        Q    And how did you walk to that car?

5        A    We actually ran to the car. Run with police,

6        Q    And when you got to the car, was Jerome

7    then handcuffed?

8        A    No, he was not.

9            He got in the back seat with my partner,

10   and I got in the front seat and drove away.

11       Q    Was that car a marked car?

12       A    No, it was a '79 -- excuse me, an '86

13   four door Chevy.

14       Q    And when you say four door, would the

15   defendant have been able to open that door?

16       A    There are no locks on the inside.  There

17   are handles on the inside to get out, or whatever

18   --  What I can best say it is a normal passenger

19   automobile.

20       Q    Now, when you got to the area, did you

21   then --  To Area 2, did you then walk into Area 2

22   with the defendant, you and Detective Wolf?

23       A    Yes, we did.

24       Q    And at that time as you walked from your

114

1    squad car into Area 2 at that time was the

2    defendant handcuffed?

3        A    No, he was not.

4            Basically, there was no particular order

5    that we walked into the station.   I don't

6    remember if I walked in first, he walked in first,

7    or the two of us walked in together.   I don't

8    remember the order.   We just walked into the

9    station.

10        Q    And when you got to Area 2, did you go

11    upstairs to the Detective's area?

12        A    Yes.

13        Q    And when you got up there, where did you

14    go?

15        A    Myself and Jerome went into one of the

16    interview rooms.

17        Q    And when you got to that interview room,

18    what did you do?

19        A    I advised him of his rights, his Miranda

20    warnings, I guess it would be called. NoT!

21        Q    How did you do that?

22        A    I read them --

23        THE COURT: Excuse me just a moment, Officer.

24            Miss Mallo, I don't understand the

115

1  relevance.

2          This motion alleges an unlawful arrest,

3  not a violation of Miranda.

4          MS. MALLO:  Fine, Judge.

5          Judge, I just wanted to cover all the

6  events that occurred.

7          THE COURT:  Well, those which are relevant.

8          MS. MALLO:  Judge, fine.

9          I just didn't want that to be brought up

10  at a later date.

11          MS. PLACEK:  Judge, at this time I have no

12  problem.  That is why I didn't object to the

13  officer.

14          THE COURT:  I understand.

15          But I have a problem sitting here

16  listening to evidence that is irrelevant.  And

17  your motion doesn't raise a Miranda violation.  So

18  I assume that the defendant was Mirandized,

19  acknowledged his Miranda warnings, and waived

20  them.

21          Otherwise you would have told me about

22  them in the motion.

23          MS. PLACEK:  But it is interesting sometimes

24  the reasons and how and why Miranda warnings are

116

1    given.

2         THE COURT:   What difference does it make?

3         MS. PLACEK:  Pursuant to an arrest.

4         THE COURT:   What difference does it make?.

5              Are you suggesting that --   Is there a

6    contention by the State that the 5th Amendment

7    Rights were attenuated from the 4th Amendment

8    Rights?

9         MS.  PLACEK:  No, Judge.   Perhaps I

10   am making myself unclear.

11        THE COURT:   You are, to me.   That wouldn't

12   be my fault.

13        MS. PLACEK:  No, it's probably mine, Judge.

14   Let me make myself clear.

15              There are diametrically opposed views at

16   the present time as to when the arrest took place.

17              All circumstances congenial with in

18   fact, to our point of view, of course no objection

19   to --

20        THE COURT:  I'm not certain it got any

21   clearer.  But in any event, since both sides seem

22   to think it has some relevance, I will defer to

23   that.

24              And you may continue your examination

117

1    around the 5th Amendment.

2        MS. MALLO:  Q    Detective, when you spoke

3    with Jerome Hendricks at Area 2, did you at that

4    time --  Did Jerome Hendricks tell you why he

5    wanted to come to Area 2?

6        THE WITNESS:  A    He told me he wanted to be

7    completely cleared of this before he went home.

8    He didn't want anybody to think that he killed

9    this girl.

10       Q    Did the defendant tell you what he would

11   do?

12       A    He said he would do anything possible to

13   clear his name.

14       Q    And did he make a suggestion about

15   something he wanted to do to clear his name?

16       A    He said --

17       MS. PLACEK:  Objection.  Leading and

18   suggestive.

19       THE COURT:  No, overruled.

20       THE WITNESS:  A    Yes, he did.

21       MS. MALLO:  Q    And upon making that

22   suggestion, was the defendant transported to 11th

23   and State?

24       A    Yes, ma'am.

118

1      Q    And was he transported by you to 11th

2  and State?

3      A    No, ma'am, he was not.

4      Q    Now, Detective, prior to --  At about

5  2115 hours, did the defendant at that time ask you

6  if he could use the telephone?

7      A    Yes, he did.

8      Q    And did you allow the defendant to use

9  the telephone?

10     A    Yes, ma'am, he did.

11     Q    And at that time where were you, and

12  where was the defendant?

13     A    Well, the defendant was on the phone

14  that was located in the, I guess what is commonly

15  referred to as a work area, and on one of the

16  desks there was a phone.

17          And I told him to use our police phone,

18  or whatever.

19     Q    Did you sit with the defendant when he

20  made his calls?

21     A    No.

22     Q    Did you listen to his conversation?

23     A    No, I did not.

24     Q    Did the defendant tell you who he wanted

119

1   to speak to?

2       A   He told me he wanted to make calls.

3       Q   And did the defendant tell you who he

4   made the calls to?

5       A   He told me he called Russ Ewing from ABC

6   News, and he said he called his mother.

7       Q   And after he hung up the phone, was

8   there a second call to his mom?

9       A   I'm not sure.

10      Russ Ewing was the first call, and I

11   believe the second call was to his mother, yes.

12       Q   And after he hung up the phone, and

13   after the second phone call, did the defendant say

14   anything to you?

15       A   He said he was ready.

16       Q   Did he say what he wanted?

17       A   What he wanted to do, he was ready to

18   do.

19       Q   And did he say his desire was --

20       A   His desire was to completely clear

21   himself and for us to be able to tell the people

22   that he did not do this.

23       MS. MALLO:  Your Honor, may I have a moment?

24                  (After a short period of time)

1              MS. MALLO:   Thank you, Judge.

2        Q      Detective, you testified that on the 8th

3   of August, 1988, you were assigned to investigate

4   this homicide?

5        A      Yes.

6        Q      And you went to the scene of where the

7   body was recovered?

8        A      Yes, ma'am.

9        Q      And at that time did you view the body?

10       A      Yes, I did.

11       Q      And did you know the sex of the victim?

12       A      Not from basically viewing the body.   We

13   could tell by the clothing that we believed it was

14   a woman.

15       Q      And could you tell the age of that

16   victim?

17       A      We couldn't tell just by viewing the

18   body.

19              It was not until someone else told us

20   that they believed it was Denise.

21       Q      And did you learn Denise's age?

22       A      Yes.

23       Q      What was her age?

24

121

1      A    12 years old.

2      Q    And did you also learn anything about

3  any injuries to the victim?

4      MS. PLACEK:  Excuse me.

5         With all due respect, I am going to

6  object on foundation, Judge.

7      THE COURT:  What is the relevance?

8      MS. MALLO:  Judge, I am trying to show the

9  specific facts about this victim and the crimes to

10  this victim, and other arrests that the detective

11  has already testified to regarding this defendant.

12      THE COURT:  Well, for the purpose of

13  establishing probable cause --

14      MS. MALLO:  Yes.

15      MS. PLACEK:  Objection.

16      THE COURT:  What is the objection?

17      MS. PLACEK: First of all, unless the State is

18  going to show that these other arrests were

19  murders involving this case, Judge, I would

20  suggest that this sort of guilt by innuendo can be

21  used for nothing more than a ground of suspicion.

22      THE COURT: Well, as to the subject matter

23  that we are trying to elicit from this officer,

24  the objection to that is overruled.

122

1          As to the lack of any foundation for the

2    basis of his knowledge, that objection is

3    sustained.

4          In the event that this appears to be

5    nothing more than what you suggest, that is

6    innuendo, probable cause by innuendo, probable

7    cause and speculation, I will toss it out.

8       MS. PLACEK: I would move that at this

9    particular time, Judge.

10      THE COURT: Well, I can't tell whether it's

11   going to be relevant or not until I hear it.

12      MS. PLACEK:  That is one of the reasons the

13   foundational objection was made, Judge.

14      THE COURT:  And that objection on foundation

15   was sustained.

16      MS. MALLO:  Q   How did you determine the

17   victim's age?

18      THE WITNESS:  A   We determined the victim's

19   age by identifying who the victim was.

20          And what we identified there was tennis

21   shoes with her name, Denise, written on it, that

22   relatives identified were her shoes.

23          We could tell that it was, what we

24   believed was a female, because of the clothing.

123

1    She was wearing a brassiere, her shirt was up

2    around her neck, and the slacks and shoes -- and

3    according to the hair, from our own observations,

4    we believed it to be a woman.

5        Q    And when the victim's --  Did the

6    victim's family ever view the shoes and clothing?

7        A    They viewed the shoes and said they were

8    Denise's shoes.

9        MS. PLACEK:  Judge, can we get a time on

10   this?

11           When?

12       THE COURT:  The objection is sustained.

13   Foundation.

14       THE WITNESS:  A   This happened on the 8th of

15   August, between the hours of 2:30 in the

16   afternoon, and approximately 5:00 o'clock, some

17   time --  I can't remember the exact time that

18   these people actually viewed this stuff.  But it

19   was in that time frame.

20       Q    And when they viewed the clothing, did

21   you then ask them specific questions about Denise?

22       A    Yes.

23       Q    And did you ever ask them how old Denise

24   was?

124

1    MS. PLACEK:  Excuse me, Judge.

2    While we are talking about they, can we

3    find out who they were?

4    That is part of the foundation.

5    THE COURT:  Sustained.

6    THE WITNESS:  A  These were relatives of the

7    victim.

8    MS. MALLO:  Q    Can you tell us their names?

9    A    I believe Carolyn McCoy was one of the

10   ones we spoke to, and I can't think of the others.

11   There were several people out there at the time.

12   And I can't remember exactly.

13   But I know Carolyn McCoy definitely

14   identified the shoes.

15   Q    What was her relationship to the victim?

16   A    She was an aunt of the victim, and the

17   victim was staying at her house.

18   Q    And did Carolyn McCoy know the age of

19   the victim?

20   A    Yes, she did.

21   Q    And what did she tell you the victim's

22   age was?

23   A    She told me that the victim's age was 12

24   years old.

125

1         Q    Detective, you testified that the

2    defendant had also been involved in a case where

3    the victim lived in the vicinity of 251  West

4    117th Place in Chicago?

5         A    Yes, that is correct.

6         Q    And do you know the age of that victim?

7         A    I don't recall the age.  I know it was a

8    young girl, but I can't remember the exact age.

9         Q    And that also in that case, the

10   defendant was charged with a sex offense?

11        A    Yes, ma'am.

12   MS. PLACEK:  Well, Judge, again there would

13   be a continuing objection.

14   THE COURT:  The objection is overruled.

15   MS. MALLO:  Q  And, Detective, you testified

16   that the defendant had been convicted of another

17   sexual offense?

18        A    That is correct.

19        Q    And was that victim in that case a

20   female?

21        A    Yes, ma'am.

22        Q    And was that --  Do you recall the age

23   of that victim?

24        A    No, I do not.

126

1    Q    Is there anything that would refresh

2    your recollection?

3    A    A case report from that incident, or an

4    arrest report from that incident.

5    Q    Detective, did you determine the

6    condition of the neck of the victim, of the body

7    you viewed in August of 1988?

8    A    There were ligatures around the neck and

9    the hands were tied.

10    Q    And, Detective, you testified that in

11    the case where the defendant was convicted of a

12    sex offense, that in that case the victim also had

13    been choked in that case?

14    A    Yes.

15    MS. PLACEK:  Objection.

16    THE COURT:  Objection is sustained.

17    THE WITNESS:  A    Yes, ma'am.

18    MS. MALLO:  Q    You testified earlier about

19    the defendant being convicted of a sex offense?

20    A    Yes.

21    Q    And when you testified about that sex

22    offense, you also in that case, you knew of other

23    details of that case?

24    A    Yes.

127

1      MS. PLACEK:  Objection.

2      THE COURT:  The objection is sustained.

3      MS. MALLO:  Judge, he's already testified to

4  that.

5      THE COURT:  The objection is sustained.

6      MS. MALLO:  Your Honor, if I may approach the

7  defense?

8      MS. PLACEK:  Judge, may we have a sidebar for

9  a second?

10      THE COURT: · On or off the record?

11      MS. PLACEK: On the record.

12         I would ask the officer to just step out

13  of the room.

14      THE COURT:  All right.

15                (Thereupon, the following

16                proceedings were had outside

17                of the presence and hearing of

18                the witness:)

19      MS. PLACEK:  There has been a continuing

20  objection.

21         And I proffer what would be marked as

22  Defendant's Exhibit No. 1 for Identification.  It

23  seems to be what purports to be what in fact the

24  Assistant State's Attorney seeks.

1              And again, there has been a constant

2      objection to this sort of innuendo.

3              This is an '84 case, Judge. I am

4      showing you what has been previously marked as a

5      current rap sheet of the defendant.

6              Now, since this is an arrest report, you

7      can see that there is only one conviction listed

8      on there.

9              And again -- correct me if I am wrong

10     -- because I have been known to read those wrong.

11     But that is before His Honor, Judge Boharic.

12             There is a case in '84 before Judge

13     Sodini. Now, I don't see any outcome of that.

14     But I am sure --

15         THE COURT: Finding of guilty, six years

16     Illinois Department of Corrections, Judge Boharic.

17         MS. PLACEK:  Yes.

18             Now, the problem I am having, Judge, is

19     that the State is putting on essentially what is

20     supposed to be a competent witness without

21     foundation as to when he found out these things.

22         THE COURT:  That is precisely the point.  And

23     that is why I am sustaining your objection.

24         MS. PLACEK:  Thank you, Judge.

129

1       THE COURT:  Will you ask the witness to come

2   back in?

3       MS. PLACEK:  I will, Judge.

4

5                   (Thereupon, the following

6                   proceedings were had in

7                   the presence and hearing

8                   of the witness:)

9       THE COURT:  You may proceed, Ms. Mallo.

10      MS. MALLO:  Q  Detective, you testified that

11  after talking with Carolyn McCoy you learned the

12  defendant had had some prior arrest for sex

13  offenses?

14      A    That is correct.

15      Q    And after you learned that, was it then

16  that you called Area 2?

17      A    Right.

18      MS. PLACEK: Excuse me, Judge.   I am having a

19  continuing objection, especially as a result of

20  the sidebar.

21      THE COURT:  Overruled.

22      MS. MALLO:  Q  When you called Area 2, what

23  did you do?

24      A    I asked them to run a name check on --

1    Oh, God -- Jerome, Jerome Hendricks.   And they

2    ran a name check.

3              I gave them the information they needed

4    to run it.

5              And later on they called us and gave us

6    the information that they had received.

7         Q    Do you know what time that was

8    approximately that you received the call to call

9    in to the office?

10        A    I can't remember the exact time.

11        Q    Could it have been in the afternoon?

12        MS. PLACEK:   Objection.   Leading and

13   suggestive, Judge.

14        THE COURT:   Objection sustained.

15        MS. MALLO:   Q   Would it have been an August

16   date?

17        THE WITNESS:   A   Yes.

18        Q    Approximately what time?

19        A    Approximately between 2:30 and maybe

20   6:30, 7:00 o'clock at night.

21        Q    And when you spoke with detectives at

22   Area 2, what did you learn?

23        A    I learned he had been arrested previous

24   times and that they were sexual cases.

1          And he also gave a name of a parole

2     officer to call and talk to.   And he told me

3     that --

4          MS. PLACEK:  Objection.  No foundation,

5     Judge.

6          THE COURT: The objection is sustained.

7          THE WITNESS:   Okay.

8          MS. MALLO:  Q   When did you call the parole

9     officer?

10         A    Right after I talked to my office and

11    found out that he had been arrested for the other

12    offenses.

13         Q    And when you talked to the parole

14    officer, did you learn details of that case?

15         A    He told me of two other arrests that I

16    remember him telling me about;  one happened

17    next door, and I believe he told me that that was a

18    young girl.

19         And then the other one, he said happened

20    where the girl was choked and raped.

21         Q    And do you recall the sex and age of

22    that victim?

23         A    No, I don't.

24         MS. PLACEK:  Objection.

132

1    THE COURT:  The objection is sustained.

2    MS. MALLO:  Judge, if I may have one minute.

3              (After a short period of time)

4         Judge, we tender this witness for cross

5    examination.

6    MS. PLACEK:  I have a motion to strike as to

7    prior, Judge.

8    THE COURT: Overruled.

9    MS. PLACEK:  May I inquire, your Honor?

10   THE COURT:  You may.

11

12              CROSS EXAMINATION

13                   BY

14              MS. PLACEK:

15   Q    Officer, when did you first become

16   involved with this homicide?

17   A    August the 8th, at 2:30 in the

18   afternoon.

19   Q    And of course you had read all prior

20   reports involved in this homicide, and all prior

21   reports in preparation to testify in court,

22   correct?

23   A    I don't understand.

24        Are we talking about August the 8th?

133

1      Q    No, we are talking about today.

2      A    I didn't read all of them.  I read most

3  of the reports, yes.

4      Q    When you say most of the reports, I'm

5  showing you what would be marked as Defendant's

6  Group Exhibit No. 2 for Identification.

7          Would it be correct in saying that you

8  read those reports?

9          Take your time and go through them.

10     A    Every one of them, ma'am?

11     Q    Look at them, yes, please.

12     A    I didn't read the first one.

13     Q    Okay.

14     A    Or this second one --  Wait, excuse me.

15  I did read this.

16     Q    The first one we will take right off,

17  okay?

18     A    Okay.

19          I didn't recall this, no.

20     Q    But you read the ones prior to this?

21     A    Well --

22     Q    You didn't read the so-called street

23  files?

24     A    I didn't read the stuff that didn't have

1   my name on it, not all these.

2       Q    Well, the things that have your name on,

3   you did read, correct?

4       A    Yes.

5       Q    All right. Let's separate that.

6            Would it be true and correct in saying

7   that in reading those in preparation for

8   testimony, you would adopt as correct?

9       A    As much as I remember, yes.

10      Q    Thank you.

11           Showing you what has been marked as

12  Petitioner's Exhibit No. 3.

13           Would you look at those and tell me if

14  you have ever seen that before?

15      A    Yes, ma'am.

16      Q    And what does that purport to be?

17      A    This is the supplementary report that

18  myself and my partner --

19      Q    And likewise, you adopted that as true

20  and correct?

21      A    It is a summary of what happened.

22      Q    Exactly.

23           But there are no changes that you want

24  to make today?

135

1      MR. RONKOWSKI:  Objection.

2      THE COURT:  Sustained.

3      MS. PLACEK:  Q   Well, showing you

4   Petitioner's No. 4, the missing person's report.

5           Did you read that?

6      A    No, I did not, ma'am.

7      Q    Thank you.

8           Now, let's talk about a few things you

9   said today.

10          Officer, calling your attention to when

11  you said you first came up to Jerome Hendricks'

12  house.

13          I believe you said there was a mob in

14  front of the house, literally calling for Mr.

15  Hendricks' blood, is that correct?

16     A    There were people yelling for him.

17     Q    There was a disturbance, you believe you

18  saw people with sticks?

19     A    Yes.

20     Q    Making threatening gestures to the

21  house, correct?

22     A    No, toward Jerome.

23     Q    Toward Jerome Hendricks?

24     A    Yes.

136

1      Q    As a matter of fact, I believe you

2   described that you had to actually go out

3   protecting yourselves and run to the car, is that

4   correct?

5      A    That is correct.

6      Q    And, by the way, something like that

7   would have been mentioned in your report, correct?

8      A    Not necessarily.

9      Q    Well, as a matter of fact, isn't it

10  correct that in all reports you read, there is

11  nothing about a mob?

12     A    No.

13     Q    No,  I am incorrect?  Or no, I am

14  correct?

15     A    No, there is nothing in it about the

16  mob.

17     Q    And you said also that one of the

18  reasons that you felt that you were somewhat

19  suspicious of Mr. Hendricks is because Yolanda --

20  I am sorry --  what was her name, Officer,

21  Yolanda, the woman you spoke to?  What was her

22  last name?

23     A    Was it Yolanda or Carolyn?

24     Q    Yolanda Hill?

137

1          A      Yolanda Hill.

2          Q      Yolanda Hill, as you described, is the

3     aunt?

4          MS. MALLO:  Objection.  Yolanda Hill was not

5     described as the aunt.

6          THE COURT:  Overruled.

7               Put a question.

8          MS. PLACEK:  May I?

9          Q      Had Jerome Hendricks been described to

10    you as the last person in fact who saw the victim,

11    correct?

12         THE WITNESS:  A   He was one of the last

13    people that we know that had seen her alive and he

14    was with her, yes.

15         Q      Let's talk about -- That was not the

16    last person, was it?

17         A      I don't know.

18         Q      Do you know who the guardian of this

19    young lady was?

20         A      I am not sure.

21         Q      Was it her aunt?

22         A      No, she was visiting her aunt.

23         Q      Well, when you say --

24         A      I believe it was her grandparents.


138

1      Q    Denise Johnson?

2      A    Pardon?

3      Q    Denise Johnson?

4      A    The grandmother?

5      Q    Yes.

6      A    I am not sure what her name was.

7      Q    Officer, let me ask you this:

8      Did you, in fact, during your

9 investigation of this case, ever come across a

10 woman by the name of Fields, Estelle Fields?

11     A    Possibly.

12     Q    And as a matter of fact, wasn't Estelle

13 Fields described as the child's guardian?

14     A    Possibly.  I don't know.

15     Q    And in fact didn't Yolanda Hill --

16 Well, strike that.

17     May I withdraw and rephrase?

18     Didn't you have information that when in

19 fact, according to your investigation, the

20 defendant was speaking with the young lady on the

21 porch, that the young lady in fact returned back

22 into the house?

23     A    That which young lady returned back into

24 the house?

139

1      Q     The victim in this case?

2      A     That isn't what I was told, no.

3      Q     Beg your pardon?

4      A     I was told she walked away.

5      Q     When you say walked away?

6      A     Walked toward 119th Street.  I believe

7   that was what was said to me.

8      Q     Well, isn't it correct, Officer, that

9   what really happened, according to the report, was

10  that she in fact returned to the house and had an

11  altercation with Miss Fields?

12     A     I don't know.

13     Q     When you say you don't know, is that

14  because your memory is exhausted as to that fact?

15     A     I don't know that that happened, no.

16     Q     Well, when you say you don't know that

17  that happened, isn't it correct that Miss McCoy

18  said that it was Jerome Hendricks who walked

19  toward 119th Street?

20     A     That is what I wrote there in the

21  report, yes.

22     Q     Thank you.

23           Would it also be correct in saying that

24  when you testified to the Assistant State's

140

1          Q    Well, when you say it already was, would
2     it be correct that that parole officer's
3     information to you had no significance at all?
4          MR. RONKOWSKI:  Objection.
5          Counsel is arguing with the witness at
6     this point.
7          THE COURT:  The objection is sustained.
8          MS. PLACEK: Q    Well, let me ask you this.
9          What time did you speak to that parole
10    officer?
11         THE WITNESS:  A  I don't recall the time. I
12    think it was 4:30, 5:00 o'clock, though.
13         Q    What was his name?
14         A    I wrote it --  Birch, or Bouch,
15    something like that.
16         Q    Where did you call?
17         A    At 78th and Cottage.
18         Q    That's where he was?
19         A    That was his office, I believe.
20         Q    And this was about 5:00 o'clock?
21         A    Or earlier.  I'm not sure of the time.
22         Q    And you stated that at the time you were
23    aware that the defendant was on parole, is that
24    correct?


                        142

1        A      Yes.

2        Q      And when you say you learned the

3    defendant was on parole, did you also find out

4    certain other matters at that time?

5        A      I'm not sure.

6        Q      Well, let me ask you this:

7               Did you find out what year he was

8    originally convicted for the crime he was on

9    parole for?

10       A      I probably did, but I don't recall.

11       Q      Well, do you recall not only what year,

12   but do you remember what Judge he would have told

13   you?

14       A      No.

15       Q      Would it be correct in saying that when

16   you talked to this parole officer, that you were

17   in fact in your office, correct?

18       A      (No response)

19       Q      Or at a police station?

20       A      I know I was on the street still.

21       Q      When you say out on the street, was your

22   information relayed, or did you use a phone booth?

23       A      I was using a phone booth, or phone --

24   I can't remember if we were using someone's phone.

143

1    I think we were using a neighbor's phone.

2         Q    What was the neighbor's name?

3         A    I don't recall.

4              I know I used a couple phones that day.

5    I can't remember which one I used.

6         Q    What street did this neighbor live on?

7         A    As I said, I was not sure which house I

8    was in at the time, ma'am.

9         Q    Do you recall besides making the phone

10   call whether or not, with this information, you

11   felt that you should arrest the defendant?

12        A    I definitely felt that he should be

13   brought in to talk to, yes.

14        Q    Well, did you ever seek to, at that

15   time, to get a warrant?

16        A    No, I did not.

17        Q    When you say brought in and talked to,

18   let's talk a little further.

19        A    Maybe not --   Okay.

20        Q    When you started your investigation and

21   you first spoke to the people that the State's

22   Attorney characterized as the family, you had no

23   idea exactly whether or not you were investigating

24   the homicide of Denise Johnson, correct?


144

1      A      We were probably about as sure as we
2  could be without some formal identification, yes.
3      Q      Well, let's talk about that for a
4  second.
5          Officer, showing you what will be marked
6  as Group Exhibit No. 5.
7          Do those purport to be the death photos?
8      A      Yes, those are the photos.
9      Q      Thank you.
10          And would it also be correct in saying
11  that -- By the way, do you know when these photos
12  were taken?
13      A      Yes, ma'am.
14      Q      When?
15      A      On the 8th of August, between 2:30 in
16  the afternoon and 6:00 o'clock at night.
17      Q      Were you present when they were taken?
18      A      I can't recall if I was still standing
19  there or not.
20      Q      Would I be correct in saying that you
21  couldn't tell the age of the alleged victim by
22  those photos?
23      A      That is correct.
24      Q      Would it be correct in saying that you

145

1    would have a great deal of difficulty, other than

2    the clothing on the body, to tell the sex of that

3    victim?

4         A    Other than the clothing, yes, ma'am.

5         Q    Would it be correct in saying that

6    besides the age and the sex, that as you observed

7    there were maggots actually covering the body at

8    that particular time, correct?

9         A    Yes, ma'am.

10        Q    Not only are there maggots, would it be

11   correct in saying also that when you first

12   approached the members, or what essentially you

13   said Miss McCoy said, essentially what you said

14   was we heard that someone was missing in your

15   family, correct?

16        A    That is correct.

17        Q    And as you previously told me at that

18   time when you approached her you had no idea how

19   long this person had been missing, correct?

20        A    I am not sure, ma'am, if I did or not.

21            I know there was a missing case report

22   made on her.  And I am not sure if I was aware of

23   that.

24        Q    Well, as a matter of fact, I showed you

146

1    the missing case report, correct?

2         A    Yes, ma'am.

3         Q    And I believe you said that you didn't

4    see that case report before?

5         A    I didn't.

6         Q    Have you seen it since?

7         A    You just showed it to me.

8         Q    Other than my showing it to you?

9         A    I probably had seen it, you know, a

10   couple years ago.  But I don't recall.

11             I was aware that there was a missing

12   person because of the district personnel on the

13   scene were aware that they had been on the lookout

14   for a missing.

15        Q    Well, in that case report and the

16   personnel --  By the way, did you have a

17   conversation with those personnel on the scene?

18        A    Excuse me.  I don't know which personnel

19   you are talking about.

20        Q    The ones who were investigating the

21   missing person report.

22        A    Well, there were several people

23   investigating the missing report.

24        Q    Well, who were they?

147

1          A     Well, all the district personnel had a
2     lookout message.

3          Q     Were you part of that?

4          A     No.

5          Q     Would it be correct in assuming that
6     when in fact you were at the scene where the body
7     was found, that in fact certain people involved in
8     this missing person report were also present?

9          A     Police officers that were in the beat
10    car were aware of the missing.

11              No, there was no particular officer.
12    All officers in that section knew that there was a
13    missing person from that address.

14         Q     Isn't it correct that in fact Chicago
15    police had information that the victim of the
16    missing person report was in fact seen on the
17    2nd of August?

18         A     That is in one of the reports, that is
19    correct, ma'am.

20         Q     And as a matter of fact, when you speak
21    of this defendant supposedly being the last person
22    who saw this alleged victim, we are speaking about
23    the 1st of August, correct?

24         A     That is correct, ma'am.


148

1        Q    You have no information at all, as you

2   sit there at this time, or as you did that time,

3   that this defendant even saw this person on the

4   1st of August, correct?

5        A    (No response)

6        Q    Or the 2nd of August?

7        A    That he saw the person?

8        Q    On the 2nd of August?

9        A    The information I had was that he was

10  seen with her on the 1st of August.

11       Q    That is correct.

12            But you also had information that she

13  was seen alive on the 2nd of August, correct?

14       A    I did not have that.

15       Q    But the Chicago police had it, correct?

16       A    Well, that report says that, yes.

17       Q    So when you told the Assistant State's

18  Attorney that he was the last person who saw her

19  alive, you were mistaken, correct?

20       A    No.

21            At that particular time when I was

22  investigating --

23       MR. RONKOWSKI:  Objection --

24       THE WITNESS:  A   --  he was the last

149

1    person--

2         THE COURT:   Just a minute.

3              The objection is sustained.

4         MS. PLACEK:   Q    Well, let's go a step

5    further.

6              You found out about certain other male

7    relatives, correct, of this alleged victim,

8    correct?

9         A    I don't understand the question.

10        Q    Well, did you find out about a step-

11   grandfather?

12        A    I don't recall.

13        Q    Do you recall if you found out about the

14   name of Johnson?

15        A    Denise Johnson?

16        Q    No, Johnson.  George.

17        A    Oh, I don't know.

18             Can you refresh my memory on that?

19        Q    Well, did you find out about a Harding

20   Johnson (phonetics)?

21        A    Is that in my report there?

22        Q    I'm asking you, Officer:

23             In your investigation --

24        A    I don't recall.

150

1          But if you can show me something that I

2     did --

3          Q    Did you, in fact, find out from Carolyn

4     McCoy that in fact there was a family altercation

5     with Denise Johnson, between her and Mrs. Hill?

6          A    Did I find this out?

7          Q    Did you find that out?

8          A    Not that I know of.

9          Q    Officer, showing you what would be

10    previously marked --  And I believe this was part

11    of the group Exhibit referring directly to Carolyn

12    McCoy,  is that in fact contained within the

13    report?

14         A    This is not a report, no.

15         Q    Not your report.  But as a group of the

16    reports that you said you reviewed?

17         A    I don't remember seeing this one, no.

18         Q    Well, Officer --

19         A    If it was there, I don't remember seeing

20    this one.

21         Q    Officer, isn't it correct that Carolyn

22    McCoy told in fact the Chicago Police Department

23    that there was an altercation between Mrs. Hill

24    and the family and Denise Johnson, and that is

151

1    when she in fact walked off toward 119th Street?

2         MR. RONKOWSKI:  Objection.

3         THE WITNESS:  A   It doesn't say what the

4    altercation was.

5         THE COURT:  Wait a minute.

6         MR. RONKOWSKI:  She is trying to impeach this

7    officer with another officer's report.

8         THE COURT:  She is trying to elicit from him

9    substantive evidence, as I understand it.

10         And the knowledge of this police

11    officer, or any other police officer, is relevant

12    because this police officer can rely upon

13    information known to other police officers,

14    whether it had been communicated to him or not in

15    substantiating probable cause.

16         It can likewise be used by the Defendant

17    to show that the knowledge of the police

18    department and not just one particular police

19    officer disputed probable cause.

20         The pendulum swings both ways.  The

21    objection is overruled.

22         THE WITNESS:  A   The family altercation Mrs.

23    McCoy told us about, she told us that Jerome was

24    on the porch, and she told him not to talk to

152

1    her.

2    MS. PLACEK:   Q    When you say family

3    altercation, that is not what is down here, is it?

4    A    That is what she was talking about.

5    Q    Is that down there in black and white,

6    Officer?

7    A    That is what she considered a family

8    altercation.

9    Q    That is what you are telling us today?

10   A    What is it, then?

11   Q    Well, let's talk a little further.

12   Isn't it correct that, quote, Mrs. McCoy

13   and Miss Hill had told the Chicago Police

14   Department that this young lady was boy crazy, or

15   man crazy?

16   A    I don't remember that.

17   Q    Well, isn't it correct that in fact on

18   the missing person's report, where it says

19   interest, meaning the missing person, it is down

20   there, boys and men?

21   A    Not in my report.

22   Q    Well, Officer, do you know if it is down

23   there?

24   A    I don't know, ma'am.

153

1          Q    Officer, showing you what would be

2     marked as Defendant's Exhibit No. 7, or

3     Petitioner's No. 7.

4               Will you tell his Honor what this is?

5          A    This is a missing case report.

6          Q    Does that show an interest of this young

7     lady,  as put down by the Chicago Police

8     Department?

9          A    Yes.

10          Q    What is it?

11          A    It says boys.

12          Q    Officer, when was that report taken?

13          A    The report was originally taken on the

14     2nd of August.

15               This here is signed on the 5th of

16     August.

17          Q    Showing you what in fact would be marked

18     as Petitioner's No. 8.

19          A    Uh-huh.

20          Q    Does that in fact --   What does that

21     purport to be?

22          A    Report on the missing.

23          Q    Does that also show an interest of the

24     young lady?

154

1      A     Yes.

2      Q     What was her interest?

3      A     It says men.

4      Q     Thank you.

5            By the way, showing you again No. 7.

6      Does that report purport to say who in fact the

7      guardian of the young lady is?

8      A     Estella Fields.

9      Q     Thank you.

10           As a matter of fact, isn't it correct

11     that you had information at the time of your

12     investigation that in fact when Jerome Hendricks

13     was on the porch on the 1st, and told to go away,

14     he simply went away?

15     A     That is correct.

16     Q     There was no fight between him and

17     Yolanda Hill, or --  excuse me, Estelle Hill and

18     Yolanda Hill about him staying, correct?

19     A     That is correct.

20     Q     As a matter of fact, the only fight was

21     between the aunt and the young girl, is that

22     correct?

23     A     I don't know anything about the fight,

24     other than what was in that report.

155

1          Q    Well, the fight is not with Jerome

2    Hendricks present, correct?

3          A    I don't know.

4               I would have to look at the report,

5    ma'am.

6          Q    As a matter of fact, would it also be

7    correct in saying that the Chicago Police at the

8    time knew that her male relatives, her step-

9    grandfather and her father would be uncooperative

10   because both Miss Hill and Miss Fields complained

11   that once she had gone away before and stayed with

12   them, that they in fact lied to the Fields, the

13   guardians, as to her whereabouts?

14         MR. RONKOWSKI:  Objection, compound question.

15         THE COURT:  It is compound.

16         MS. PLACEK:  I will withdraw it.

17         THE COURT:  You don't have to withdraw it.

18              If the witness understands, he may

19   answer.

20         THE WITNESS:  I don't understand.

21         MS. PLACEK:  Surely.

22         Q    Did you know whether or not there was a

23   grandfather involved in this case?

24         A    I don't recall.

156

1       Q    Officer, do you know what the Chicago

2  Police Department did?

3       A    I don't know, ma'am.

4       Q    Showing you what would be marked as

5  Petitioner's Exhibit No. 9 for Identification.

6  What does that purport to do?

7          Is this the same missing --

8       A    No, it isn't.  It is a different

9  missing report.

10      Q    Showing you the back of that report,

11  doesn't it show that in fact the Chicago Police

12  Department had information about this young lady

13  not only liking the company of older men --

14      A    I would have to read it first.

15      Q    Go ahead.

16          Have you read it now?

17      A    No, I have not.

18      Q    Well, not meaning to interrupt your

19  reading.

20          But would it be correct in saying that

21  at the time you felt the defendant was supposed to

22  be talking to you, that you had none of this

23  information?

24      A    I don't remember seeing this at all.

1      Q    Or the other report about her being

2   interested in men?

3      A    No.

4      Q    Or about her mother being a drug addict?

5      A    I don't even remember seeing all these

6   reports yet, no.

7           I may have gotten them later.

8      Q    So you felt that the defendant had to be

9   talked to without all of this information,

10  correct?

11     A    If he was seen with her on the 1st,

12  maybe he had seen who she left with.   Not

13  necessarily he was the last to see her alive,but

14  maybe the last one I knew.

15     Q    So now you are saying that maybe he was

16  not the last one that saw her alive?

17     A    The last one I know.

18     Q    Now, you know the Chicago Police

19  Department knew differently now, don't you?

20     A    According to these.

21     Q    Thank you.

22     A    I don't know if they are accurate or

23  not.

24     Q    Oh, they might be mistaken, correct?

158

1        A    I --

2        MR. RONKOWSKI:  Objection.  Counsel is

3    arguing with the witness.

4        THE COURT:  Sustained.

5        MS. PLACEK:  Q  Officer, isn't it correct

6    that there is information in that report that the

7    victim had male relatives who would not cooperate

8    with her guardian?

9        A    That's what it says.

10       Q    Not only that, but sheltered her when

11   she ran away?

12       A    I don't remember seeing that.

13            Is that in there, too?

14       Q    It states having previously assisted

15   Denise, Mrs. Fields wishes --

16       MR. RONKOWSKI:  Objection.

17       THE WITNESS:  I don't remember if it says

18   anything about shelter in there.

19       MS. PLACEK:  I'm sorry.

20       Q    Then let me withdraw and rephrase.

21            Shelter --  Or, excuse me, assisting

22   Denise.

23            Isn't it correct that the Chicago Police

24   Department that time knew that there was, or was

159

1    told by her legal guardian, that there were male

2    relatives who they might as well not even bother

3    speaking to, because they in fact assisted Denise

4    against Mrs. Fields' wishes?

5         MR. RONKOWSKI:  Objection.

6         THE COURT:  Basis?

7         MR. RONKOWSKI:  First of all, you can't

8    impeach an officer with another officer's report.

9         Second of all, that piece of information

10   does not negate any probable cause.

11        MS. PLACEK:  Judge --

12        THE COURT:  The objection is overruled.

13        MS. PLACEK: Thank you.

14        Q    Correct?

15        THE WITNESS:  A   Assist?  I don't know what

16   you mean by assist.

17             I don't know what the assist was.

18        Q    Well, isn't it correct that Mrs. Fields

19   says that as a matter of fact, you might as well

20   not even talk to them, correct, if you know, Mrs.

21   Fields?

22        A    I don't know.

23        Q    Well, let's go further.

24             According to your statement when you

1    came in fact to the home of Jerome Hendricks, who

2    was present?

3        A    Who was present when I got there?

4        Q    Yes.

5        A    I don't know, ma'am.  He was home.

6        Q    Besides him?

7        A    I don't know who the people were.

8        Q    Was his mother home?

9             How many people were present in the

10   house?

11       A    There were several people there.

12       Q    How many were women?

13       A    I don't know.

14       Q    By the way, are you the supervising

15   officer in this case?

16       A    I don't know what you consider

17   supervising officer.

18       Q    Are you the investigating officer in

19   this case?

20       A    I am a detective, right.

21       Q    Let me ask you this.

22            You didn't take any names of anyone

23   present at that time?

24       A    No.

161

1     Q    You don't know whether they were women?

2     A    Correct.

3     Q    Did you Mirandize him at his home?

4     A    No.

5     Q    Officer, when do you Mirandize people?

6          May I withdraw?

7          Isn't it correct that you Mirandize

8  people as incidents of an arrest?

9     MR. RONKOWSKI:  Objection.

10    THE COURT:  Sustained.

11    MS. PLACEK:  Q   Well, when do you Mirandize

12  people?

13    MR. RONKOWSKI:  Objection, irrelevant.

14    THE COURT:  Sustained.

15     Well, I don't know.  It may go to his

16  state of mind.

17     I will overrule your objection.

18    MS. PLACEK:  Q   Well, Judge, I will move

19  away.

20    THE COURT:  The objection is overruled.

21    MS. PLACEK:  Q   You said the defendant

22  attempted to call Russ Ewing from the police

23  station?

24    THE WITNESS:  A   He told me.  I don't know

162

1      if he did or not.

2          Q     Well, you said to the Assistant State's

3      Attorney, you said you were close to him when he

4      was making the call?

5          A     I was not listening to who he was

6      talking to.

7          Q     What time of the day or night was that?

8          A     I think it was --  In my notes, it was

9      two hundred --  It would be about 9:15, I think,

10     9:30.

11         Q     That's 9:30 in the evening, correct?

12         A     9:15 or 9:30.

13         Q     Was he arrested?

14         A     No.

15         Q     Did you ask him why he wanted to call a

16     newspaper man --  Strike that --  a TV man, when

17     there was no problem at the police station and he

18     was there consentually?

19         A     Yes, I did ask him why.

20         Q     And did he in fact not call Russ Ewing

21     there, but had someone call Russ Ewing at the

22     house?

23         A     He made two phone calls.

24               He told me he called Ewing and his

1   mother.    Now, whether he did or not,   I don't

2   know.

3        Q    Well, Russ Ewing did show up eventually,

4   did he, at the police station --  If you know.

5        A    I don't recall seeing him at the police

6   station.

7        Q    But you do know that Russ Ewing did in

8   fact get in contact with the police?

9        A    I seen Russ Ewing on the scene before I

10  came into the office.

11            Before I went to his house, to Jerome's

12  house.  I saw him earlier around 6:00 o'clock or

13  so.

14       Q    As a matter of fact, the real time you

15  saw Russ Ewing is after the arrest of the

16  defendant, is that correct?

17       MR. RONKOWSKI:  Objection.

18       THE COURT:  Overruled.

19            Well, you are talking about after his

20  arrest?

21       MR. RONKOWSKI: Yes.

22       MS. PLACEK: Withdraw it.

23       Q    Isn't it in fact true that you in fact

24  saw Russ Ewing at the police station between about

164

1    8:00 o'clock and 8:30 at night?

2        THE WITNESS:   A   Isn't it a fact?

3        Q     Yes. If you can recall.

4        A     No, it is not a fact.

5        Q     Thank you.

6             By the way, did you wonder why he was

7    calling Russ Ewing from the police station, since

8    you had treated him so well, and he was not under

9    arrest, and free to leave, is that correct?

10       A     Yes.

11       Q     What was his answer?

12       A     He wanted to ask Russ if he should take

13   a lie detector test or not.

14       Q     Well, did you ask whether he was

15   personal friends with Russ?

16       A     No.

17       Q     Did you ask why not call a lawyer

18   instead?

19       A     I had no idea why he wanted to call

20   Russ, and it didn't matter to me who he wanted to

21   call.

22             If he wanted to call someone, he was

23   going to call them.

24       Q     Officer, isn't it correct that the

165

1    defendant was arrested at his house?

2         A    No, it is not, ma'am.

3         Q    Isn't it correct that his mother, in

4    fact, fought you and the other Chicago police

5    officers, asking why you were handcuffing her boy?

6         A    No, ma'am.

7         Q    Isn't it correct in fact that you pushed

8    past his mother and his sister into the living

9    room during the altercation with the defendant?

10        A    No, ma'am.

11        Q    Isn't it correct that in fact, during

12   this altercation, that you and other members, you

13   and other members of the Chicago Police

14   Department, in an effort to handcuff him, swore at

15   him and in fact engaged in a physical struggle?

16        A    No, ma'am.

17        MS. PLACEK:   May I have a moment, Judge?

18        THE COURT:   Surely.

19                     (After a short period of time)

20        MS. PLACEK:   Q   By the way, you never

21   interviewed the defendant, did you?

22        A    Yes, I did.

23        Q    Who are Baker and Sorany (phonetics)?

24        A    They are detectives in Area 2.


166

1      Q   Showing you what would be marked as

2 Defendant's Exhibit No. 11, I believe you

3 previously identified this as your report,

4 correct?

5      A   That's only page 2.

6        No, this is not my report.

7      Q   Well, doesn't it in fact state that the

8 defendant was interviewed by Detectives Sorany,

9 and Baker, after first being advised of his

10 rights?

11      A   It says that.

12     MS. PLACEK: That's all.

13     THE COURT:  Redirect?

14

15              REDIRECT EXAMINATION

16                    BY

17                MS. MALLO:

18      Q   You testified that the victim was

19 staying with a Carolyn McCoy?

20      A   Yes.

21      Q   Where was Carolyn's home from the body,

22 where the victim was found?

23     MS. PLACEK:  Objection.

24     MR. RONKOWSKI:  Probable cause,  the

1    proximity of the location to where the body was

2    found.

3         MS. PLACEK:   Improper redirect.

4         THE COURT:   It was brought up.

5              We went over this in direct examination

6    did we not?

7              I will let you answer the question.   But

8    we can be here all night answering redirect

9    questions.

10             I understand the direct testimony.   The

11   objection is overruled.

12        THE WITNESS:   A   The body was located

13   next door to where Jerome Hendricks lived.

14        MS. MALLO:   Q   And had the victim been dead

15   for a while?

16        A    Yes.

17        MS. PLACEK:   Objection.

18        THE COURT:   Sustained.

19        MS. MALLO:   And Detective, was the family

20   altercation you spoke of because the victim was

21   seeing the defendant?

22        MS. PLACEK:   Objection.

23             He said he didn't know what it was

24   about.

168

1        THE COURT:  Sustained.

2        MS. MALLO:  Q    And, Detective, you testified

3    on cross examination that the defendant made two

4    phone calls?

5        A    That is correct, at the Area.

6        Q    And after he made those phone calls, did

7    he then tell you that he wished to take a

8    polygraph test?

9        A    Yes, he did.

10       MS. PLACEK:  Objection, irrelevant, Judge.

11       MR. RONKOWSKI:  Goes toward his consent to be

12   there.

13       MS. PLACEK:  Judge --

14       THE COURT:  No, that is precisely what the

15   cases hold.

16            The objection is overruled nonetheless.

17   But the fact that he agreed to take the polygraph

18   does not relate back and make what was otherwise

19   an illegal arrest legal, or anything that flowed.

20            In other words, it doesn't attenuate

21   the taint.

22            As a matter of fact, the cases hold in

23   People versus Franklin, in Illinois, hold that the

24   agreement to take the polygraph is a part of the

169

1  taint, as opposed to attenuating.   It flows

2  naturally from the taint of the illegal arrest.

3  So says Franklin.

4          But I will let you answer the question.

5  Let him answer the question for whatever it is

6  worth.

7      THE WITNESS:   A   He said he wanted to take

8  the polygraph exam to clear his name so he could

9  tell the people in the neighborhood that he did

10  not have anything to do with this crime.

11      MS. MALLO:   Nothing further.

12      THE COURT:   Recross?

13      MS. PLACEK:   Not a thing, Judge.

14                  (Witness excused)

15      THE COURT:   Ladies and gentlemen, I am going

16  to continue this matter for another date.

17          Can you agree on a date?

18      MR. RONKOWSKI:   I can agree on any day that

19  Counsel wants to come back to this courtroom.

20          I will check with the witnesses before

21  they leave to make sure they can be back here.

22      MS. PLACEK:   March the 7th?

23      THE COURT:   March the 7th?

24      MS. PLACEK:   Yes.

170

1          Is that okay?

2      MR. RONKOWSKI:   March the 7th is fine.

3      THE COURT:   Order the Court, March the 7th,

4  with subpoenas.

5          (Thereupon, said cause was continued

6      to Wednesday, March 7, 1990, at 9:30

7      o'clock a.m.)

8

9

1 0

1 1

1 2

1 3

1 4

1 5

1 6

1 7

1 8

1 9

2 0

2 1

2 2

2 3

2 4

1   STATE OF ILLINOIS    )
                         )   SS:
2   COUNTY OF C O O K    )

3           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                 COUNTY DEPARTMENT-CRIMINAL DIVISION

4

5   THE PEOPLE OF THE          )
    STATE OF ILLINOIS          )
6                              )
         -vs-                  )      No.  88 CR 12517
7                              )
    JEROME HENDRICKS           )

8

9           REPORT OF PROCEEDINGS had of the hearing

10  of the above-entitled cause, before the Honorable

11  LEO E. HOLT, Judge of said court, on the 7th day

12  of March, A. D. 1990.

13      APPEARANCES:

14          HON. CECIL A. PARTEE,
                State's Attorney of Cook County, by:
15          MR. EDWARD RONKOWSKI,
                Assistant State's Attorney,

16
            appeared on behalf of the People;
17
            HON. RANDOLPH N. STONE,
18              Public Defender of Cook County, by:
            MR. VINCENT LUFRANO,
19              Assistant Public Defender,

20          appeared on behalf of the Defendant.

21

22

23

24                          172

mbg     1

1      THE CLERK:  Sheet 1, Line 21, Jerome Hendricks

2  in custody.

3      MR. RONKOWSKI:  Your Honor, I had two phone

4  conversations with Marijane Placek, the attorney

5  representing Jerome Hendricks.  She got tied up on

6  a hearing that she thought she could finish this

7  morning.  She hadn't even started when I talked

8  to her at lunch time.

9          She's requesting a Motion Defendant to

10  3-13-90, for one o'clock in the afternoon.

11      THE COURT:  Do you understand, Mr. Hendricks?

12      DEFENDANT HENDRICKS:  Yes, sir.

13      THE COURT:  Motion Defendant March 13, one p.m.

14

15                      (Whereupon the matter was

16                       continued to March 13,

17                       1990, at 1:00 p.m.)

18

19

20

21

22

23

24

  2                         173

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS }
COUNTY OF COOK   } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME  ONE  OF A SIX VOLUME . . . . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. . 95-0474. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . in a certain cause . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois. . . . WERE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and JEROME HENDRICKS . . . . . . . . . . . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, . . JUNE. 25, . . . . . . . . . . . ., 19 96. .

*Aurelia Pucinski*

Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

CCCR-310

95-474

# Transcript of Record
## Appeal
## to

APPELLATE _____ **Court of Illinois**

FIRST _____ **District**

SUPPLEMENTAL RECORD

**Circuit Court No.** _88 CR 12517_

**Trial Judge** _LEO H. HOLT_

**Reviewing Court No.** _95-0474_

THE PEOPLE OF THE STATE OF ILLINOIS

**vs.**

JEROME HENDRICKS

FILED
APPELLATE COURT

JUL 15 1996

GILBERT S. MARCHMAN
CLERK

## from
# CIRCUIT COURT
## of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

ORDER ENTERED

JAN 17 2007

APPELLATE COURT, FIRST DISTRICT

**AURELIA PUCINSKI**

**Clerk of Court**

**VOLUME TWO OF SIX VOLUMES**

**SUPPLEMENTAL RECORD**

**Per** _AP/nd_

**Deputy**

STATE OF ILLINOIS )
                  )   SS:
COUNTY OF C O O· K )


            IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION


THE PEOPLE OF THE       )
STATE OF ILLINOIS       )
                        )   NO. 88 CR 12517
     VERSUS             )
                        )   CHARGE:  Murder
JEROME HENDRICKS        )

                REPORT OF PROCEEDINGS

        BE IT REMEMBERED that on the 13th day of

March, A. D., 1990, this cause came on before the

Honorable LEO HOLT, Judge of said Court, upon the

Information herein, the defendant having entered a plea

of not guilty.

    APPEARANCES:

            HON. CECIL PARTEE,
                State's Attorney of Cook County, by
            MS. MARY MALLO,
                Assistant State's Attorney,
                appeared on behalf of the People;

            MR. VINCENT LUFRANO,
                Assistant Public Defender,
                appeared on behalf of the Defendant.

Reported by:

MS. BETTE N. SACKS, C. S. R.
Certified Shorthand Reporter,
Circuit Court of Cook County.

                        174

THE CLERK:  Jerome Hendricks, in custody.

THE COURT:  Good morning, Mr. Hendricks.

MR. HENDRICKS:  Morning.

THE COURT:  The Court is on trial, Mr. Hendricks, with a jury, and will not be able to proceed further with your motions today.

MR. HENDRICKS:  Yes, sir.

THE COURT:  Your attorney has called the court, and has been advised of that, and I think has agreed to a date where we can go back to the hearing in your case.

MR. HENDRICKS:  Okay.

THE COURT:  What date was agreed on?

MS. MALLO:  March 29, Judge.

THE COURT:  By agreement.  Mr. Lufrano is here on this case.

By agreement March 29.  See you then, Mr. Hendricks.

(Thereupon said cause was continued to Marcy 29, 1990, at 9:30 o'clock a.m.)

175

1   STATE OF ILLINOIS  )
                       ) SS:
2   COUNTY OF C O O K  )

3

         IN THE CIRCUIT COURT OF COOK COUNTY
4         COUNTY DEPARTMENT-CRIMINAL DIVISION

5

6   THE PEOPLE OF THE    )
   STATE OF ILLINOIS    )  NO.88 CR 12517
                    )
7     VERSUS         )  CHARGE: Murder, Agg.
                    )  Crim. Conc. Hom. Death.
8   JEROME HENDRICKS    )  Agg. Kid.. Unl. Rest.

9

10    MOTION TO QUASH ARREST AND SUPPRESS STATEMENTS

11         BE IT REMEMBERED that on Thursday.

12  March the 29th, A.D. 1990, this cause came on for

13  hearing before the Honorable LEO HOLT. Judge

14  of said Court.

15

16     APPEARANCES:

17        HON. CECIL PARTEE,
             State's Attorney of Cook County. by
18       MR. EDWARD RONKOWSKI, MS. MARY MALLO.
             Assistant State's Attorneys
19           appeared for the People;

20       MR. RANDOLPH STONE,
             Public Defender of Cook County.by
21       MS. MARIJANE PLACEK, MS.PATRICIA COURSON
             Assistant Public Defenders
22           appeared for the Defendant.

   ROBERT LIEF,  C.S.R.,
23  Official Court Reporter
   Markham, IL   60426

24

1

1       THE CLERK:   Sheet 2. Line 18. Jerome

2   Hendricks, in custody.

3       MS. PLACEK:   Good afternoon, your Honor.

4           I'm sorry I was a little late this

5   morning.

6       THE COURT: That's all right.

7       MR. RONKOWSKI:   Can I get my file?

8       MS. PLACEK:   Your Honor, for the purpose of

9   the record, Marijane, M-a-r-i-j-a-n-e, Placek,

10  P-l-a-c-e-k, representing the defendant. Mr.

11  Hendricks, who is now standing before the Court.

12          To refresh your Honor's memory, on an

13  earlier court date, evidence was taken, in fact

14  taken on a Motion to Quash Arrest.

15          I believe we are in the middle of that

16  motion, the State's side.

17      THE COURT: Right.

18          We will see where we are going when Mr.

19  Ronkowski returns to the courtroom, which is

20  momentary.

21          Are you both ready?

22      MR. RONKOWSKI: The State is.

23      MS. PLACEK:   Yes, Judge.  I am also.

24      THE COURT:   You and Mr. Hendricks may be

3

1    seated at Counsel table while I see if I can

2    locate my notes.

3        MS. PLACEK:  Judge, I'm getting my briefcase

4    out of the conference room.

5        MR. RONKOWSKI:  The last witness that

6    testified was Larry Nitsche.

7        THE COURT: What date?

8        MR. RONKOWSKI:  February 27th.

9        THE CLERK:  Yes. Judge, it was February 27th.

10       THE COURT:  What was the name of your last

11    witness?

12       MR. RONKOWSKI:  Larry Nitsche.

13           He testified February 27th.

14       MS. PLACEK:  I also would be ordering a

15    transcript of the proceedings, if the Court has no

16    objection I would --

17       THE COURT:  I'm just trying to find out where

18    we are standing.

19       MS. PLACEK:  I understand.

20           Your Honor, for the purposes of the

21    record, if I may interrupt the Court, this is Miss

22    Pat Courson.

23           She is going to help me.  She is a

24    licensed attorney to practice law in the State of

1    Illinois. She is going to be helping me today

2    because I understand that Mr. Lufrano has a motion

3    himself today.

4        THE COURT: So you are new Counsel today.

5        MS. PLACEK: Thank you, your Honor.

6        THE COURT: In whose court is the ball?

7        MS. PLACEK: I believe it's the State's.

8        MR. RONKOWSKI: I am ready to call two more

9    witnesses today.

10        THE COURT: Call your next.

11        MR. RONKOWSKI: The State would call Jim

12    Hill.

13                   (Witness sworn)

14        MS. PLACEK: If it pleases the Court, Judge,

15    Mr. Ronkowski. I believe is anticipating the

16    objection.

17            The gentleman who is about to testify

18    is, of course, a civilian. Although, since we are

19    the movant, it would be our position at this

20    particular time that according to Illinois law the

21    relevant testimony goes, in fact, as is to what is

22    in the mind of the police at the time, and I

23    believe that this is the issue that is outlined in

24    our motion.

1          We would ask, as an offer of proof, that

2     Mr. Ronkowski tell this Court how, in fact, this

3     gentleman's testimony goes relevantly at what is

4     in the mind of the Chicago Police Department when,

5     in fact, they arrested, at his house, my client.

6          THE COURT: Mr. Ronkowski.

7          MR. RONKOWSKI:  The defendant testified that

8     he was dragged out of his house in handcuffs.

9          Here is a witness that was part of the

10    crowd that observed the defendant walk to the

11    squad car without handcuffs, and can describe what

12    was happening at the scene when the defendant

13    requested from the police transportation from the

14    crowd that was outside of his house.

15         MS. PLACEK:  Well, Judge, if it pleases the

16    Court, I believe that the officer testified that

17    the conversation that the police allegedly stated

18    is that the request for transportation took place

19    inside the house.

20         Is Mr. Ronkowski now claiming that this

21    gentleman was, in fact, in the house?

22         And, secondly, Judge, if that's true, I

23    would suggest that the fact the police described

24    it not as a crowd but as a mob who was not only

6

130

1    attacking the defendant, but as a crowd, this
2    gentleman who is testifying might, in fact, be
3    putting himself in jeopardy of incriminating
4    himself as to mob violence.
5         THE COURT: That's the witness' objection; not
6    yours.
7         MS. PLACEK:  I understand, Judge.
8         THE COURT:  I'm going to hear the testimony
9    of the witness.
10         If it turns out that it's not relevant,
11    I will entertain your motion to strike it.
12         MS. PLACEK:  Thank you.
13         THE COURT:  But until I hear it, it's rather
14    difficult for me to know whether it's going to be
15    relevant or not.
16         You may proceed.
17         MR. RONKOWSKI:  Has the witness been sworn?
18         THE CLERK:  Yes.
19         MR. RONKOWSKI:  Thank you.
20
21
22
23
24

7

1          JAMES CHRISTOPHER HILL.

2    a witness called by the Respondent on the Motion

3    to Quash Arrest, having been first duly sworn, was

4    examined and testified as follows:

5                  DIRECT EXAMINATION

6                        BY

7                  MR. RONKOWSKI:

8          Q    State your name, please.

9          A    James Christopher Hill.

10         Q    And spell your last name for the court

11   reporter.

12         A    H-i-l-l.

13         Q    And how old are you?

14         A    I'm 25 years of age.

15         Q    Where do you live, sir?

16         A    I live at 10530 South State.

17         Q    Now, referring your attention to August

18   8th, 1988, shortly after 8:30 p.m., do you recall

19   where you were at?

20         A    Shortly after 8:30?

21              I was -- We -- I was on my way over to

22   Mr. Hendricks' house because we had word --

23         MS. PLACEK:  Objection.

24         THE COURT:  The objection is sustained as to

                        132

    8

1    why.

2         MR. RONKOWSKI:  Q   And did you arrive in the

3    vicinity of Mr. Hendricks' house?

4         THE WITNESS:  A   Yes, I did.

5         Q   Is that the defendant who is seated in

6    the courtroom?

7         A   Yes, it is.

8         Q   And did you arrive at that location with

9    anybody?

10        A   Just myself and an uncle of mine.

11        Q   What happened after you got there?

12        A   We got there in pretty much of an

13   uproar, there was a lot of guys --

14        MS. PLACEK:  Objection to uproar, Judge.

15        THE COURT:  Objection sustained.

16        THE WITNESS:  A   A lot of people gathered

17   around.

18        MR. RONKOWSKI:  Q   And how many people were

19   gathering around outside of the defendant's house?

20        A   Had to be about two or three dozen, 25,

21   30 people.

22        Q   And after that crowd gathered around,

23   did any police arrive?

24        A   Yes, they did.

9

1        Q    Could you describe to the Court what you

2   observed after the police arrived?

3        A    When the police arrived, they came

4   through the crowd, proceeding to Mr. Hendricks'

5   home.

6             They got up to the door, there was a

7   lady that opened the door, and Mr. Hendricks was

8   coming out.

9             He came out into the police --  He

10  walked into the police, and they walked --

11  escorted him right to the car, to the police car.

12       Q    Did the defendant have any handcuffs on

13  at that time?

14       A    No, he did not.

15       Q    Did he have anything else in his hands?

16       A    Yes, he was smoking a cigarette.

17       Q    When you saw the defendant smoking a

18  cigarette, what did you do?

19       A    I was more or less upset because he --

20  MS. PLACEK:  Objection.

21  THE WITNESS:  A  In my opinion, he was --

22  MS. PLACEK:  Objection.

23  THE COURT:  The objection is sustained.

24  MR. RONKOWSKI: Q   Were you related to the

**184**

10

1   victim in this case?

2       THE WITNESS:  A   Yes, I was.

3       Q    What's your relationship with the

4   victim?

5       A    She was my cousin.

6       Q    Where were you standing when the

7   defendant walked past you, smoking a cigarette?

8       A    I was standing on the inside of his

9   front lawn.

10       Q    Did you do anything as the defendant

11   walked past you?

12       A    Yes.

13       I had a board in my hand. I proceeded to

14   hit him.

15       Q    What happened?

16       A    Well, the policeman restrained me and

17   gave me a verbal warning.

18       And I stood back and watched him get in

19   the car.  Untouched, or anything else.

20       Q    And you remember what position in the

21   vehicle the defendant got in the car?

22       A    Yes, he got in the back seat.

23       Q    Was he alone?

24       A    Yes, he was.

1          Q      Okay.  And did some detectives sit in

2      the front seat?

3          A      Yes.

4          Q      Where did they go?

5          A      They left.

6          Q      Okay, were there other police officers

7      there besides those two?

8          A      Yes, it was.

9          Q      Approximately how many?

10          A      About four or five.

11          Q      Now, that crowd of two to three dozen

12      you described, was that crowd noisy?

13          A      Yeah, pretty much.  Pretty much noisy.

14      Everyone was more or less relieved that --

15          MS. PLACEK:  Objection.

16          THE COURT:  Objection sustained.

17          MR. RONKOWSKI:  Your witness.

18

19                      CROSS EXAMINATION

20                             BY

21                       MS. PLACEK:

22          Q    Mr. Hill, when were you contacted that

23      you testify in this motion?

24          A      I received a letter last week sometime.

1        Q      Sir, when you say you received a letter,
2    did you receive a letter from the police
3    department or the State's Attorney's office?
4        A      The State's Attorney's office.
5        Q      And you were never contacted to testify
6    in this motion before that time; correct?
7        A      No.
8               I received a letter, year, one before
9    that.
10       Q      Well, let me ask you this:    Where are
11   those letters today?
12       A      I have one now with me.
13       Q      Is that the one you received after
14   February 27th, 1990?
15       A      Yes.
16       Q      Thank you.
17              Let's also talk a little about your
18   assault of my client.
19              You hit him with a stick, according to
20   your testimony today; correct?
21       A      No, ma'am, I did not hit him with a
22   stick.
23       Q      You tried to hit him with a stick;
24   correct?

13                    **137**

1          A     Yes, ma'am.

2          Q     And you know that's against the law,

3     didn't you?

4          A     Yes, ma'am.

5          Q     And you were ready to violate the law;

6     correct?

7          A     Yes, ma'am.

8          Q     And the police saw you violate the law;

9     correct?

10         A     Yes, ma'am.

11         Q     And you made yourself known to the

12    police at that time and date, didn't you?

13         A     Yes, ma'am.

14         Q     You told them your name, correct?

15         A     Pardon me?

16         Q     You told them your name?

17         A     At the time he was going to get hit with

18    the stick?

19         Q     That's right.

20         A     No, no.

21         Q     So in other words, when was the first

22    time you told anyone that on that date and time

23    that you tried to hit the defendant with a stick?

24         A     I'd say about last month.


138

14

1        Q    Last month?

2             And who did you tell?

3        A    I told the State's Attorney.

4        Q    The State's Attorney, or the young lady

5   sitting with him?

6        A    The State's Attorney.

7        Q    This State's Attorney --  And were there

8   Chicago Police Officers there at the time when you

9   were having this conversation?

10       A    Yes, there were.

11       Q    And as a matter of fact you had heard

12  already that this defendant had testified that

13  there was no mob in front of his house; correct?

14       A    No, ma'am.

15       Q    Well, let's talk a little further.

16            When did you have this conversation with

17  Mr. Ronkowski?

18       A    It was during the first summons that I

19  had.

20       Q    The first --

21       A    The first court summons that I had, when

22  I came in.  It was last month.

23       Q    Last month?

24       A    Yes.

15

1   Q  When, last month?

2   A  I think it was on the 27th. I'm not

3 sure.

4   Q  The 27th of February?

5   A  Right.

6   Q  When did you have the conversation with

7 Mr. Ronkowski?  What time?

8   A  I can't recall.

9   Q  Where was the conversation with Mr.

10 Ronkowski?

11   A  It was here.

12   Q  By the way, those police officers that

13 you were -- You saw police officers here when you

14 had that conversation with Mr. Ronkowski;

15 correct?

16   A  Uh-huh.

17   Q  Does "uh-huh" mean "yes"?

18   A  Yes, ma'am.

19   Q  Thank you.

20     Let me ask you also this:

21     Can you name any of those police

22 officers?

23   A  No, I cannot.

24   Q  Was one of them a Detective Malla?

16       130

1          A     No.   I can't name whoever those --

2          Q     Were they white or black?

3          A     They were white.

4          Q     Let me ask you this:

5                When you were attempting to hit my

6      client with a stick --  You are familiar with a

7      gentleman from TV called Russ Ewing;  correct?

8          A     Yes, ma'am.

9          Q     Did you see Russ Ewing present at that

10     time?

11         A     No, I can't recall now.

12         Q     Did you see anyone filming this

13     incident, sir, if you can recall?

14         A     No, ma'am, I can't recall.

15         Q     When you say you can't recall, does that

16     mean you don't know?

17               You didn't see it, or your memory is

18     exhausted?

19         A     I wasn't paying attention.

20         MR. RONKOWSKI:   Objection.   Compound

21     question.

22         THE COURT:   Objection overruled.

23         MS. PLACEK:   Q    Beg pardon?

24         THE WITNESS:   A    I wasn't paying any

191

17

1    attention for any newspaper reporters or cameramen

2    there.

3         Q    Thank you.

4              By the way, it is your testimony today

5    that the door was not open, that someone opened

6    the door, a female;  correct?

7         A    Of his household.   Someone from his

8    household opened the door.

9         Q    And you saw, as soon as -- According to

10   what you are saying today, as soon as the female

11   of the household opened the door, you are --

12   according to your testimony --  the police didn't

13   even bother entering the house, that my client, Mr.

14   Hendricks, came right out of the house; correct?

15        A    Yes, ma'am.

16        Q    And not only that, but the police didn't

17   even bother coming in, but there was no one --

18   Well, may I withdraw and rephrase?

19              They went straight into the squad car;

20   correct?

21        A    Yes, ma'am.

22        Q    Thank you.

23              By the way, you stated that it was your

24   cousin who is the victim of this crime, correct?

**192**

18

1        A     Correct, ma'am.

2        Q     And you want to avenge your cousin,

3   don't you?

4        A     I want to see justice, ma'am.  Vengence

5   is not the point.

6        Q     Well, let's talk about that for a

7   second.

8              When you say you want to see justice,

9   name someone else besides a member of your family

10  who was a part of that alleged mob?

11       A     Larry Smith.

12       Q     And where does Larry Smith live?

13       A     11720 South Princeton.

14       Q     Thank you, sir.

15             When you first arrived, was the police

16  officers there?

17       A     No, they were not.

18       Q     Was there anybody preventing you from

19  going or knocking on the door of the house?

20       A     No, there wasn't.

21       Q     Were you throwing stones --  Were you

22  personally throwing stones at the house?

23       A     No, ma'am.

24       Q     Were you shouting when you first

1    arrived?

2        A    No, ma'am.

3        Q    Did you ring the door bell and say:

4    Come on out, Jerome Hendricks, you killed my

5    cousin?

6        A    No, ma'am.

7        Q    So according to your testimony, as it is

8    today, you didn't start your action of trying to

9    assault my client until the police came; correct?

10   And brought him out of the --  Or rather, he came

11   out of the house;  correct?

12       A    Yes, ma'am.

13       Q    Where did you get the stick?

14       A    I don't know.  Maybe I picked it up on

15   the side, whatever.

16       Q    When you picked it up --  What kind of

17   stick was it?

18       A    It was a board.

19       Q    Where did you get the board?

20       A    I don't remember.

21       Q    How long of a board?

22       A    About seven inch board.

23       Q    Seven inches thick, seven inches long,

24   seven inches wide?

1      A      Seven inches long.

2      Q      Did you hold on to that board even after

3  the police drove away?

4      A      No, ma'am.

5      Q      Thank you.

6             You said you saw Mr. Hendricks come out

7  smoking a cigarette?

8      A      Correct.

9      Q      And when you say you saw him coming out

10  smoking a cigarette, I believe you also stated

11  that he did not have handcuffs on, is that

12  correct?

13      A      Correct.

14      Q      Well, let me ask you this, sir:

15             Where were the police officers in

16  relationship to Mr. Hendricks when he came out of

17  the house?

18      A      Pardon?

19      Q      Where were the police officers in

20  relationship to Mr. Hendricks, when he came out of

21  the house?

22      A      The police officers, they was in the

23  walkway.

24      Q      So they never even came out on the

21

1    porch?

2        A    Yeah, that was about two, three

3    scattered on the porch.

4        Q    But they never really completed being on

5    the porch; correct?

6        A    No -- correct.

7        Q    Thank you.

8        MS. PLACEK:  Thank you, your Honor.  That's

9    all.

10

11                REDIRECT EXAMINATION

12                        BY

13                  MR. RONKOWSKI:

14        Q    Why did you swing this object at the

15    defendant?

16        MS. PLACEK:  Objection.

17        THE COURT:  The objection is sustained.

18        MR. RONKOWSKI:  Nothing further.

19

20                  EXAMINATION

21                        BY

22                  THE COURT:

23        Q    Mr. Hill, other than the members of your

24    family and Mr. Larry Smith, who else was a member

                        196

    22

1    of the mob that you say was outside the

2    defendant's home?

3         A    The majority of the neighborhood was

4    there.

5              The names --

6         Q    Do you know any of them?  Did you

7    recognize any of them?

8         A    Yes, I did.  But the names, as far as

9    first name and last name, I can't recall.

10             Everybody over there have nicknames.

11        Q    Well, do you know any of the nicknames

12   of any of the persons that were there?

13        A    Yes.

14             There was a young lady called Paulette.

15        Q    Where does Paulette live?

16        A    I don't know the precise address.

17        Q    In what vicinity?

18        A    She stays on the other side of 117th,

19   but it was on 117th.

20        Q    When you say the other side, be more

21   specific.

22        A    Say across the street, two doors --

23   two doors over and a street over from Jerome.  I

24   don't know the precise address.

1        Q     Can you be more specific than across the

2   street and two doors over?

3        A     It was on the southwest corner.

4        Q     Of what?

5        A     Of 117th.

6        Q     And what?

7        A     And Princeton.

8        Q     How long have you known her?

9        A     Not too long.

10       Q     How long is that?

11       A     About two years, one year.

12       Q     Do you know the house in which she lives

13   in?

14       A     Yes, I do.

15       Q     Have you ever been asked by anyone at

16   all to identify some of the other persons, or

17   locate some of the other persons that you say was

18   present at that time?

19       A     No.

20       Q     Where were you standing when you say the

21   defendant exited his house?

22       A     I was standing inside his gate.

23       Q     How far away from the door or the

24   entrance to his home?

**198**

24

1       A       About 10 feet.

2       Q       You had a clear and unobstructed view of

3   his doorway, I take it?

4       A       Yes, sir.

5       Q       Who else did you see in the defendant's

6   home or exiting his home at that time?

7       A       No one but the defendant, your Honor.   I

8   seen him exiting by himself.

9               I seen the young lady open the door.

10      Q       Where were the police at that time?

11      A       They were standing right there, at the

12  door.

13      Q       Right where?

14      A       Right at the door.

15              As soon as you walk to the entrance,

16  it's like --

17      Q       He walked right out of the door into the

18  arms of the police; is that right?

19      A       Yes, sir.

20      Q       What did the police do when that

21  occurred?

22      A       Well, they just turned, walked with him

23  to the police car.

24              He exited --  When he came out, there

25

1    was a few words said that I couldn't hear.

2          When he came out, they turned and walked

3    to the car.

4          THE COURT:  Mr. Ronkowski, do you have

5    anything in relationship to what I have just asked

6    him?

7          MR. RONKOWSKI:  No.

8          THE COURT:  Ms. Placek?

9          MS. PLACEK:  No, your Honor.

10          Thank you.

11          THE COURT:  You may step down, Mr. Hill.

12          You may also remain in the courtroom if

13    you desire.

14                    (Witness excused)

15          Call your next witness.

16          MS. MALLO:  Your Honor, at this time the

17    People would call Detective Mike Baker.

18          THE CLEKR:  Raise your right hand, sir.

19                    (Witness sworn)

20          THE COURT:  You may proceed.

21          MS. MALLO:  Thank you, Judge.

22

23

24

26

1

2                    DET. MICHAEL BAKER,

3    a witness called by the Respondent, the People of

4    the State of Illinois herein, having been first

5    duly sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7                           BY

8                    MS. MALLO:

9         Q    Detective, could you state your name and

10    spell your last name?

11        A    Detective Michael Baker, B-a-k-e-r, star

12    number 10414, City of Chicago Police Department,

13    Area 2, Violent Crimes Unit.

14        Q    And, Detective, on the 8th of August,

15    1988, you were then working as a detective in Area

16    2, Violent Crimes?

17        A    Yes, I was.

18        Q    At about 8:30 in the evening of August

19    8th, 1988, were you at Area 2?

20        A    Yes, I was.

21        Q    About 8:30, what happened?

22        A    There was a phone call came into the

23    office.  It was taken by Detective Nitsche.

24             It was a call from Jerome Hendricks --


                    201

    27

1          MS. PLACEK:  Objection as to the content of

2     the conversation.

3          THE COURT:  Overruled.

4          MS. PLACEK:  (Continuing) -- of the

5     conversation, without foundation.

6          THE COURT:  Well, you can lay a better

7     foundation.

8          MS. MALLO:  Q  Yes, sir.

9              This was at Area 2, about 8:30 in the

10    evening on August 8th, 1988?

11         THE WITNESS:  A  Yes, it was.

12         Q    Do you recall what room you were in?

13         A    I was in our office;  no particular

14    room, just the office.

15         Q    And you were present, and Detective

16    Nitsche was present?

17         A    Yes, I was.

18         Q    And anyone else?

19         A    There was a lot of detectives in the

20    room.  I don't remember all of them.

21         Q    When Detective Nitsche answered the

22    phone --  He answered the phone?

23         A    Yes, he did.

24         Q    And did he --  What happened then?

28                    202

1        A      He talked on the phone for a few

2    minutes, hung the phone up, and then I had a brief

3    conversation with him.

4        Q      What did he say to you?

5        A      He said that that was Jerome Hendricks,

6    and that he was home, wanted to talk to us.

7        Q      So after you received that phone call at

8    Area 2 Headquarters, what did you then do?

9        A      I went over to 255 West 117th Street, to

10    Jerome Hendricks' house.

11        Q      Once you arrived at that address,

12    Detective Baker, what happened next?

13        A      When I got there, there was a large

14    crowd there.

15              And I stayed out front, in front of the

16    house there.

17              Detective Nitsche walked up to the

18    house.   There was a woman in the doorway who

19    opened the door, and he went in and came back out

20    about 20 seconds with Jerome Hendricks walking

21    behind him.

22        Q      And when Jerome Hendricks walked from

23    that house, what happened then?

24        A      He was walking to the squad car with

1    Detective Nitsche, and there was a large crowd had

2    gathered around, and someone in the crowd swung a

3    stick at him,  and he hurried over and got in the

4    back seat of Detective Nitsche's squad car.

5        Q    When you say he, you're referring to the

6    defendant, Jerome Hendricks?

7        A    Jerome Hendricks.

8        Q    Detective Baker, do you see Jerome

9    Hendricks in court today?

10        A    That gentleman on the end.

11        MS. PLACEK:  I would stipulate to the

12    identification of the defendant.

13        MS. MALLO:  Q   Your Honor, we would accept

14    that stipulation as the in-court identification of

15    the defendant.

16            After Hendricks got into the squad, then

17    what happened?

18        THE WITNESS:  A   He was transported into

19    Area 2.

20        Q    After he got to Area 2, what happened?

21        A    He was interviewed by Detective Nitsche

22    at that time.

23        Q    And you remained at Area 2 also?

24        A    Yes, I did.

30                       294

1       Q    After you arrived at Area 2 --

2         First of all, Detective, when you

3 arrived at Area 2, Detective Nitsche had

4 transported the defendant?

5       A    Yes, he did.

6       Q    And you arrived in another car?

7       A    Yes, I did.

8       Q    And when you got there, you stated that

9 Detective Nitsche had a conversation with the

10 defendant?

11      A    Yes, he did.

12      Q    And after that conversation what did you

13 do?

14      A    Well, after the conversation, Detective

15 Nitsche allowed him to use the phone, make several

16 phone calls.

17         Then after he was almost done with the

18 phone calls, I had a conversation with Detective

19 Nitsche and he told me that Jerome wished to stay

20 and help clear his name in this incident there,

21 and he wished to go to 11th and State to be

22 interviewed to further clear his name.

23      Q    Now, did you have anything to do with

24 transporting the defendant to 11th and State?

1        A      Myself and my partner, Detective Rowan,

2    transported Jerome to 11th and State at that

3    time.

4        Q      What time did you arrive at 11th and

5    State?

6        A      I believe it was somewhere between 9:00

7    and 9:30.

8        Q      And when you -- Then once you got to

9    11th and State, did you then return to Area 2?

10        A      We stayed at 11th and State

11    approximately two hours or so.

12            Then we returned to Area 2, Violent

13    Crimes, about 1:00 a.m.

14        Q      And when you got back to Area 2, then

15    what occurred?

16        A      We had an interview -- We interviewed

17    Jerome Hendricks, myself and Detective Rowan.

18        Q      And at that interview -- Well, before

19    you ever spoke to him, was the defendant advised

20    of his rights per Miranda?

21        A      Before he was interviewed, I advised him

22    of his Rights from my FOP book.   And Detective

23    Rowan was present at that time.

24            He related he understood them, and he

32                    206