CASE NO. _O8cv 1589_

ATTACHMENT NO. _9_

EXHIBIT _____

TAB (DESCRIPTION) _____

1    related --

2          We asked him about the missing girl, and

3    he told us he wished to help us clear up the

4    situation there and then.

5          He gave us his story concerning what he

6    knew about the incident.

7      Q    And at that time did he offer --  By he,

8    I mean the defendant, Jerome Hendricks.

9          Did he offer any information about his

10   whereabouts on the date the girl had been reported

11   missing?

12     MS. PLACEK:  Objection to the relevancy, as

13   to the motion to quash here.

14     THE COURT:  What is the relevancy?

15     MS. MALLO: Well, Judge, I was inquiring of

16   the defendant as to alibis.

17          I'm inquiring of the detective as to

18   alibis the defendant gave to the detectives, and

19   what the course of the investigation took after

20   that time.

21     THE COURT:  How is that relevant?

22          You know, what's raised here is the

23   question of the violation of the defendant's 4th

24   and 14th Amendment Rights, not 5th and 6th.

277

33

1     MS. MALLO:  Yes, sir.

2     THE COURT:  I don't understand how that's

3 relevant.

4     MR. RONKOWSKI:  According to the State's

5 theory of the case --

6     If I can interrupt --  and according to

7 the police reports, the defendant wasn't arrested

8 until the next day.

9     The defendant's statements to the police

10 prior to his arrest is admissible to show probable

11 cause.

12     It's also admissible to show why this

13 detective interviewed people and was not able to

14 verify what the defendant was claiming.

15     MS. PLACEK:  Well, besides --  excuse me --

16 the State's Attorney testifying as to that at this

17 matter, Judge, the suggestion  --

18     First of all if we are going to go into

19 what the detective is going to testify, I would

20 ask that he be removed from the room during this

21 argument.

22     But I would suggest that the relevancy,

23 even though what they have stated, is an incorrect

24 relevancy as to the points set out in the motion,

34

1    Judge.

2              As the Court correctly pointed out, we

3    are not dealing with what this information

4    supposedly at 11:00 o'clock in the morning showed.

5              I believe that what the State has to

6    show is when the actual arrest took place, and

7    what was the probable cause arising to it;  not

8    whether or not the defendant gave any kind of

9    exculpatory statements at that time, Judge.

10         THE COURT:  Exculpatory or inculpatory

11   statements, it does not appear to me to be

12   relevant to the motion at this point.

13             And let me suggest to you, Mr.

14   Ronkowski, that the evidence that I have heard, it

15   appears to me that one of two things is the end

16   result of the situation:  either the defendant was

17   or was not in the police station pursuant to a

18   valid arrest or a Constitutionally valid arrest,

19   or he was not.

20             If he was, then all that flowed from his

21   legally Constitutional arrest is admissible

22   against him.

23             It is uncontested insofar as the 5th

24   Amendment is concerned, that is Miranda, and

1    whether or not he made the statements.    The only

2    issue is whether or not he was there legally.

3           And we have him there about 8:30 or

4    shortly thereafter.

5           What happened later on, I don't see how

6    it is relevant.

7    MR. RONKOWSKI:    If the defendant is there

8    with his consent, voluntarily, due to sources

9    outside the police power, as has been testified to

10    as far --

11    THE COURT:    And he makes a statement, that

12    statement is admissible against him.

13           So again I am concerned with the

14    Constitutionality of his presence in the police

15    station.    And that's what I think the Defense is

16    raising here.

17           And you know, if we can center in on

18    that as opposed to what the defendant said -- I'm

19    not concerned with what he said, whether it

20    inculpated him or not or exculpated him, or gave

21    the police probable cause for the subsequent

22    arrest of him.

23           The question is, was he validly there?

24           Do you concur with me?    You look like if

36

```
 1   you disagree.
 2        MR. RONKOWSKI:  That's one of the issues.
 3        THE COURT:  That's the only issue.
 4        MR. RONKOWSKI:  No, it isn't.
 5             And we are entitled to make our own
 6   record.
 7        THE COURT:  Please tell me what the other
 8   issue is.
 9        MR. RONKOWSKI: Okay. I will repeat myself.
10             The defendant is down there consentually
11   because this crowd outside of his house is
12   accusing him of the crime.
13             While he is down there, he makes various
14   statements to the police, some of which are not
15   true.
16             Furthermore, he makes various admissions
17   to the police.
18             At a point, according to the police
19   report and the State's theory of the case, he
20   admits to having sex with a girl who is 12 years
21   old.
22        THE COURT: What does that mean?
23        MR. RONKOWSKI:  He is no longer free to go.
24             At that point the police have probable
```

211

37

1    cause to arrest him.  And the police at that point

2    do not let him go.

3         MS. PLACEK: Well, Judge --

4         THE COURT:  The defendant is not in any way,

5    as I understand this motion, raising any question

6    as to the development of probable cause while he

7    is in the police station.

8              They are saying, as I understand it,

9    that his initial presence in the police station

10   was unconstitutional, and therefore everything

11   that flowed from it is void.

12             And on the converse of that, if he was

13   not, they don't make any challenge to what flowed

14   from it.

15             So again, what happened, what he said,

16   is totally irrelevant.

17        MR. RONKOWSKI:  The defendant is claiming

18   that he is down at the police station, number one,

19   he is claiming through his testimony that he was

20   arrested and not voluntarily down there.

21             Second of all, they are not conceding

22   the existence of probable cause at the time that

23   the defendant called the police,  and it was the

24   defendant that called the police.

### 212

38

1        If they concede probable cause at that

2   point, that's something else.

3        MS. PLACEK: Well, we are not.

4        THE COURT: What difference, Mr. Ronkowski,

5   whether they conceded or not.

6        Either the police arrested him validly,

7   which I will determine --

8        MR. RONKOWSKI: Right.

9        THE COURT: (Continuing) -- and if they

10  arrested him validly and took him into the police

11  station, everything that flowed is fine.

12       If he went there consentually, and had

13  conversations with the police officers, and which

14  helped them to develop probable cause, that's

15  fine.

16       Again, the whole issue here is how did

17  -- under what circumstances did he arrive in that

18  police station.  That's all.

19       The objection is sustained.

20       MS. PLACEK: Thank you, your Honor.

21       THE COURT: Put another question.

22       MS. MALLO: Yes, sir.

23       Q    Detective, during the course of your

24  conversation with Jerome Hendricks, did he ever

39

1   ask if he could leave?

2          MS. PLACEK:  Objection.

3          THE COURT:  Objection sustained.

4          MS. MALLO:  Judge, if I may have one minute?

5          MR. RONKOWSKI:  Your Honor, we are either

6   going to ask to proceed by an offer of proof with

7   this witness, or we will ask to bifurcate the

8   proceedings and make a separate factual finding.

9          THE COURT:  When you complete this witness'

10  testimony, I will allow you to make an offer of

11  proof for the record, Mr. Ronkowski.  You have a

12  right to do that.

13            In the event this becomes necessary by

14  either side, the record ought to be complete.

15            I again say to you, as I understand the

16  motion and a clear reading of the motion and the

17  colloquy that has gone on here in court,

18  unobjected to, in any way challenged by the

19  Defense, makes it even more clear to me that the

20  issue that we are dealing with is the defendant's

21  initial arrival in the police station,  and

22  whether, at that point, he was Constitutionally in

23  the police station, either having been arrested,

24  Constitutionally, or having arrived there

1    consentually and voluntarily.

2            Either of those two positions would make

3    him Constitutionally in the police station.

4            And thus, everything that occurred would

5    be perfectly admissible against him.

6            The converse, if he is not there

7    pursuant to the 4th Amendment, that is, the police

8    illegally arrested him, and he did not arrive

9    there consentually, then everything that flowed

10    from it is void.

11            And it could not -- nothing that he

12    said or did could attenuate back and validate the

13    arrest, unless you intend to show that somehow he

14    was --

15        MR. RONKOWSKI:  If your Honor would be

16    willing to bifurcate the proceeding, we would be

17    ready to rest in a few minutes.

18        MS. PLACEK:  I don't understand what you mean.

19        THE COURT:  I don't know what you mean by

20    bifurcate.

21            Tell me what you mean.  I don't

22    understand.

23        MR. RONKOWSKI: Well, it's the State's

24    position that the police had probable cause to

41                    **215**

1    arrest the defendant from the get-go.

2         THE COURT:   Fine.

3         MR. RONKOWSKI:   The police did not, in fact,

4    arrest the defendant until the next day after he

5    admitted to part of the crime.

6         MS. PLACEK: Well, then, Judge, I would ask to

7    amend, if that's their position, that they had

8    probable cause at the time they came to the house,

9    that they should have got a warrant, if they're

10   holding him in custody at the police station.

11        THE COURT:   In either event, I don't see how

12   bifurcation has anything to do with it.

13             You may be right, and it may be that the

14   Court will determine that there was probable

15   cause.

16        MR. RONKOWSKI:   The reason why bifurcation

17   would be one way of doing this is that the State

18   also is entitled to go by the fact -- And I'm not

19   accepting the defendant's theory of the case;   I'm

20   accepting the theory or postulating the theory he

21   wasn't under arrest.

22             Consequently, the extra information

23   could be used for probable cause.

24             What happens if the State, your Honor,

42                          **216**

1    intentionally misjudged the strength of their

2    case, and we were one iota short of probable

3    cause,  when the defendant called the police

4    station up?

5             That's why I'm trying to make a record.

6        THE COURT: Mr. Ronkowski, maybe I'm not

7    making myself clear to you.

8             But the Defense is not going to raise

9    the question of a subsequent arrest of the

10   defendant in the police station.

11            They are going to contend, and have

12   contended all along, that his arrival was

13   unconstitutional.

14            Now, they are not at all suggesting that

15   after he arrived, and after they had conversations

16   with him, that the police did not even then have

17   probable cause to arrest him the following

18   morning.

19            That's not their position.

20            Their position is that because they

21   talked to him and learned some things and had some

22   statements, all of that is unconstitutional and

23   impermissible.  So you don't have to worry about

24   the next day's arrest.

43                      **217**

1           Nobody's going to challenge it.

2       MR. RONKOWSKI:   I think I understand the

3  Court's position.

4       THE COURT:   Good.

5           I have tried to make it as clear as I

6  understand it.

7           You know, I have problems with the

8  language sometimes, Mr. Ronkowski, but that's the

9  best I can say it, to my mind.  And perhaps I am

10  incorrect.

11          But to my mind it's very clear what

12  they're saying.

13          And I understand it, and I would like to

14  discuss it with you further to help you understand

15  it, but I don't know if I can.  You may not be

16  able to do that.

17      MR. RONKOWSKI:   Well, I know whatever

18  happens one side or the other will be taking an

19  appeal,  and I want to make sure the Appellate

20  Court is aware of all the viable theories, whether

21  we are prosecuting the appeal or defending the

22  appeal.

23      THE COURT:   I understand.

24          And I'm going to give you an opportunity

44                    218

1    to make an offer of proof when you finish the

2    examination of this witness.

3              Put another question.

4        MS. MALLO:    Judge, if I may have one minute?

5              Your Honor, I have no further questions

6    of Detective Baker.

7        MS. PLACEK:  May I inquire, Judge, very

8    briefly?

9        THE COURT:  You may.

10

11                 CROSS EXAMINATION

12                        BY

13                  MS. PLACEK:

14       Q    Detective Baker, I noticed when you

15   walked in the courtroom you were reading something

16   similar to the file that I am holding in my hand;

17   correct?

18             For the purpose of the record, the

19   witness held up the file.

20             Would I be correct in assuming that

21   those are, in fact, the police reports generated

22   by this case?

23       THE WITNESS:  A copy of some of them.

24       Q    A copy of some of them.

1           Would it be correct in saying that you

2    read those police reports in order to refresh your

3    memory?

4           A     Yes, it would.

5           Q     Would it be correct in saying quite

6    frankly as you sit there now you have no additions

7    or corrections as to any of the police reports

8    that, in fact, you have read?

9           A     Correct.

10          Q     Now, let's talk about this for a minute:

11          Am I correct -- and please feel free to

12   correct me if I am wrong -- that in order to take

13   a police report correctly, you put down all

14   relevant and all important things?

15          A     Correct.

16          Q     And something like a mob of 30 or 40

17   people in front of a house of a suspect is an

18   important thing; correct?

19          A     Depends on who the mob is after.

20          Q     Well, if they are after the defendant,

21   or the supposed suspect, or the reason that you

22   are there; correct?

23          A     Correct.

24          Q     And as a matter of fact, isn't it true

220

46

1   and correct that in none of the Chicago Police

2   Department's reports generated off of this case,

3   there is no mention of any mob in front of the

4   house?

5       A    Correct.

6       Q    As a matter of fact, you yourself wrote

7   a report in this matter; correct?

8       A    Yes.

9       Q    And you don't mention any 30, 40 -- you

10  don't even mention any disturbance in front of the

11  defendant's house;  is that correct?

12      A    That's correct.

13      Q    It's not only correct, but you don't

14  even mention this incident about somebody holding

15  up a stick and trying to hit the defendant:

16  correct?

17      A    Correct.

18      Q    As a matter of fact, let me ask you,

19  Detective, when was the first time that you heard

20  anyone say that they were the one who held on to

21  the stick and tried to hit the defendant as he

22  left that house?

23      A    I didn't --

24      MR. RONKOWSKI:  Objection.

47                      221

1          MS. PLACEK:  Q  If you heard it at all.

2          MR. RONKOWSKI:  Irrelevant, what he heard.

3     He saw it.

4          MS. PLACEK:   Judge, I'm asking, heard saying

5     that he did it.

6          THE COURT:  Objection overruled.

7          MS. PLACEK:  Thank you.

8          THE WITNESS:  A   I saw someone in the crowd

9     raise a stick.

10              I don't need to hear somebody say

11     anything; I saw it.

12          MS. PLACEK:  Motion to strike, Judge, as not

13     responsive.

14          THE COURT:  The motion is sustained.

15     Stricken.

16          MS. PLACEK:  Thank you.

17          Q    Officer, when was the first time you

18     heard anyone admit that they were the person who

19     raised that stick and tried to hit that defendant?

20          THE WITNESS:  A   I don't think I have heard

21     anyone admit to that.

22          Q    By the way, do you know a gentleman, a

23     civilian, supposed witness in this case, by the

24     name of James Hill?

48                    232

1          A    I know there is a witness, James Hill,
2     to this case, yes.
3          Q    And would it be correct that you and Mr.
4     Hill and your other brother-police officers were
5     sort of kept or sequestered or held in a
6     conference room back of this courtroom prior to
7     this hearing?
8          A    Correct.
9          Q    And would it be correct that Assistant
10    State's Attorney Ronkowski, in the course of his
11    job, asked each of you what happened and what did
12    you say, in preparation for testifying today?
13         A    I remember him talking to me.
14         Q    Well, let me ask you this:
15              You weren't --. Mr. Hill wasn't asked to
16    step out of the room when he was talking to you,
17    was he?
18         A    I was not in the room with Mr. Hill all
19    morning.
20         Q    Well, let me ask you this:
21              Did you ever know, or did you ever hear
22    Mr. Hill say that he was the one with the stick?
23         A    Not that I recall, no.
24         Q    As a matter of fact, being with Mr. Hill

                         223
      49

1    in that room, did you ever say, my God, that's the

2    man I saw on that date and time, that's the man

3    with the stick?

4         A    No.

5         Q    As a matter of fact, you didn't

6    recognize Mr. Hill today, did you?

7         A    Not that I recall, no.

8         Q    Thank you.

9              But according to your testimony, you got

10   a clear and good look at the man who, in fact,

11   raised the stick to the defendant; correct?

12        A    No, that's incorrect.

13        Q    Well, let's talk a little further about

14   that.

15             You did see the incident as it occurred,

16   as you drove up at that time and date, didn't you?

17        A    Yes, I did.

18        Q    You saw what your brother Officer,

19   Nitsche, did?

20        A    Yes, I did.

21        Q    And you saw your brother Officer,

22   Nitsche, go in that house, didn't you?

23        A    Yes, I did.

24        Q    You saw him stay and remain in that

1    house for a while; correct?

2        A    No, that's wrong.

3        Q    Well, how long did you see your brother

4    Officer, Nitsche, in that house?

5        A    He went in and came out.  A matter of

6    seconds.

7        Q    When you say a matter of seconds, just

8    so we have it clear.  Did he walk all the way into

9    the house, and close the door behind him?

10       A    No, he didn't.

11       Q    Did he leave the door open?

12       A    The screen was open.

13       Q    Let me ask you this:

14            Was he on the porch of the house?

15       A    There is no porch;  there is just a

16   stoop.

17       Q    So was he on the stoop of the house?

18       A    Walked up on the stoop.  The door was

19   being held open, he stepped inside, he came back

20   outside.

21       Q    Who was holding open the door?

22       A    A woman.

23       Q    Do you know that woman?

24       A    No, I don't.

225

51

1          Q      Thank you.

2                 Did you ever see him have conversation

3     with that woman?

4          A      He said something as he walked up.    I

5     don't know what.

6          Q      Okay.  How far away were you?

7          A      About 20 feet.

8          Q      How far was the nearest neighbor of this

9     crowd or mob?

10         A      I don't recall.   They were all over the

11    place.

12         Q      When you say all over this place, were

13    they in the yard or house?

14         A      The yard, the street,  the sidewalk, by

15    the fences.   People were milling about all over.

16         Q      When you say milling about, did they

17    have stones and bricks in their hands, and sticks?

18         A      I don't recall what every individual had

19    there.

20         Q      Well, did some of them?

21         A      I noticed a stick later on.

22         Q      Well, when you say later on, did you

23    hear them shouting and screaming as you drove up?

24         A      There was a lot of commotion and noise.

5 2                        223

1          Q     And, by the way, part of your job as a

2     Chicago Police Officer is also to quiet such

3     situations; correct?

4          A     Depends on the situation.

5          Q     Well, you surely wouldn't want a mob to

6     invade a suspect's house or attempt to hurt him;

7     correct?

8          A     They didn't invade his house.

9          Q     Sir, do you understand my question?

10               Motion to strike the answer as not

11    responsive, Judge.

12         MR. RONKOWSKI:  Objection to the question as

13    argumentative.

14         THE COURT:  Sustained.

15               As to the striking, the objection is

16    sustained and the answer is stricken.

17               As to your objection, Mr. Ronkowski,

18    it's overruled.

19         MS. PLACEK:  Thank you, your Honor.

20         Q     Surely wouldn't let a mob attack a

21    person's house, correct, without doing anything in

22    the course of your employment?

23         THE WITNESS:  A    Not if I could help it.

24         Q     Not only that, but if you saw a mob

1    milling about with sticks or whatever, it would be

2    your job, as a Chicago Police Officer, to diffuse

3    the situation; isn't that correct?

4         A    Depends on the situation.

5         Q    Well, the situation is of, in fact, a

6    mob around a supposed -- as you put it today --

7    suspect's house.

8              Wouldn't it be your job to break that

9    mob up?

10        A    Again depends on the situation.

11        Q    Would it be your job to break that mob

12   up as I have just described the situation, sir?

13        A    No.

14        Q    So am I correct in assuming that you, as

15   a Chicago Police Officer, would not deem it your

16   job to in fact break up a mob of 30 or 40 people,

17   some with sticks, yelling and screaming at a

18   supposed suspect's house?

19        A    I don't know.

20        Q    Thank you.

21             Let me also ask you this, sir:

22             How long previous to your arrival to

23   that house were you involved in the investigation

24   of this matter?

228

54

1          A     Several hours.

2          Q     When you say several hours, were you

3    aware that the alleged victim of this crime was

4    first reported missing on August 1st, 1988?

5          A     I don't remember exactly when I became

6    aware of that.

7          Q     Could there be anything in this report

8    that would refresh your recollection as to that?

9          A     Not the specific time, no.

10         Q     Well, and you say your report, of

11   course, wouldn't refresh your recollection

12   because, according to you,  there is nothing in

13   your report to reflect when she first became

14   missing?

15         A     I don't recall if there is or not.

16         Q     Would it be correct in saying that you

17   can't even recall what's in your report that you,

18   as you already stated, read to refresh your memory

19   a few minutes ago?

20         A     I don't understand the question.

21         Q     Well, sir, let's talk for a second.

22               Isn't it correct, showing you what has

23   been previously marked as Defendant's 4, a missing

24   person report,  could you tell his Honor, Judge

229

55

1    Holt, what that is?

2         A    A supplementary report to a missing

3    person's report.

4         Q    Isn't it correct that that, in fact,

5    deals with the alleged victim of this case?

6         A    Yes, it does.

7         Q    And on that particular matter, does it

8    not state that the person was missing on, in fact,

9    August 1st?

10        A    Yes, it does.

11        Q    Thank you.

12             To the best of your knowledge, did the

13   Chicago Police Department have information that

14   this person was, in fact, alive on August 2nd,

15   1988?

16        A    No.

17        Q    No?

18        A    Not that I know of.

19        Q    To the best --   Thank you.

20             Showing you what would be marked as

21   Defense 5 for Identification.   Could you please

22   identify that?

23        A    Missing person's report.

24        Q    And on that missing person's report, am

56                            **230**

1    I correct in assuming that that's also generated

2    with the stamp of Area 2, Violent Crimes?

3         A    No, it's not.

4         Q    Is there a stamp saying Area 2, Violent

5    Crimes?

6         A    No, there's not.

7         Q    I'm sorry, Officer, perhaps I'm

8    mistaken.

9              It says Youth Division, Area 2;

10   correct?

11        A    Correct.

12        Q    Calling your attention to the back of

13   that report, does that report not state, in fact,

14   that that victim was seen on August 2nd, 1988?

15        A    It says from an anonymous source, yes.

16        Q    The victim was seen on August 2nd, 1988,

17   correct?

18        A    From an anonymous source, yes.

19        Q    Thank you.

20             By the way, to the best of your

21   knowledge, you didn't -- Well, withdraw that and

22   rephrase, Judge.

23             You didn't speak to the gentleman on the

24   phone at the same time Officer Nitsche did, did

1    you?

2         A     No, I did not.

3         Q     To the best of your knowledge, on this

4    anonymous source, did the Chicago Police

5    Department --  speaking of the anonymous source

6    that stated that the alleged victim of this crime

7    was alive on August 2nd, 1988,  did the Chicago

8    Police Department in fact take action?

9         A     I don't understand that question.

10        Q     Did the Chicago Police Department do

11   anything in response to this anonymous source on

12   August 2nd, 1988?

13        A     Area 2 Youth Division took some action.

14        Q     Is that part of the Chicago Police

15   Department?

16        A     Yes, it is.

17        Q     Did they, in fact, tour an area?

18        A     You have got the report, I don't.   I

19   don't know what they did.

20        Q     Calling your attention to that report --

21   By the way, you are familiar with 109th and

22   Indiana; correct?

23        A     I know where it's at, yes.

24        Q     Could you describe that --  Is that, in

58                    232

1    fact, the area that they toured?

2         A    109th and Indiana and 105th and 6th and

3    Wabash.

4         Q    Is that, in fact, the area they toured?

5         A    Yes.

6         Q    And they, as a matter of fact, took the

7    complainant which, I believe would be the guardian

8    of the young lady; correct?

9         A    Yes.

10        Q    Could you describe that area for his

11   Honor, Judge Holt?

12        A    Residential area.

13        Q    When you say residential, is there any

14   truck stops, that sort of thing there?

15        A    No;  residential area, homes.

16        Q    Is it ever known as the Strip?

17        A    Not that I ever recall.

18        Q    By the way, how far was that, in fact,

19   that area away from the defendant's house?

20        A    Probably about a mile.

21        Q    Thank you.

22             Did you ever, Mr. Baker -- excuse me,

23   Detective Baker --  see the defendant on the phone

24   in his house?

**233**

59

1      A    No, I did not.

2      Q    Did you ever see the defendant on the

3 phone in his house, call Russ Ewing?

4      A    No.

5      Q    Did you ever see -- By the way, when I

6 say Russ Ewing, you are familiar with who I'm

7 referring to?

8      A    Yes.

9      Q    Thank you.

10      Would it be correct to assume that prior

11 to the defendant being taken away in a police car,

12 that your involvement in this matter, be it a

13 missing person's investigation or whatever, was

14 minimal?

15      A    Yes.

16      Q    Would it be correct in saying that

17 according to your testimony, prior to the

18 defendant being taken away in a police car, that

19 all you did was more or less didn't enter the

20 house, and stood on the street?

21      A    Yes.

22      Q    You in no way, according to your

23 testimony, attempted to arrest this law breaker

24 who attempted to hit the defendant;  correct?

234

60

1    A    That's true.

2    Q    You in no way attempted to try and break

3    it up;  correct?

4    A    Moved the crowd away to get Mr.

5    Hendricks into the squad car.

6    Q    Beg your pardon?

7    A    We moved the crowd back to allow Mr.

8    Hendricks to get into the squad car.

9    Q    When you say you moved the crowd away,

10   that also is not reflected in your police report;

11   is that correct?

12   A    No, it's not.

13   Q    Would it be correct in saying --  and I

14   believe you described the defendant as walking to

15   the squad car --  When you say walking, you, as a

16   trained observer, mean that, walking;  is that

17   correct?

18   A    Walking, walked.

19   Q    He didn't run; correct?

20   A    Well, he didn't sprint over there.

21   Q    Well, he walked; correct?   In a normal

22   way?

23        If you know.

24   A    What's a normal way?  You tell me.

235

61

1   Q  Well, even-paced.

2   A  He walked over, walked out of the house,

3 and right over, and got in the back of the squad

4 car.

5   Q  When you say got in the back of the

6 squad car, is that a marked or unmarked squad car?

7   A  Unmarked squad car.

8   Q  Am I correct in that when you spoke of a

9 squad car, would that be similar to a detective's

10 car?

11   A  Yes.

12   Q  Can you open the back door of that squad

13 car?

14    When I say you, if you're not a member

15 of the Chicago Police Department.

16   A  You're asking me, are you physically

17 able to do it?

18   Q  That's correct.

19   A  Yes, yes. You take the handle and open

20 it up.

21   Q  Does it have a screen?

22   A  No, it doesn't.

23   Q  Can you open the back door from inside

24 the car?

62

1       A     Yes, you can.

2       Q     Would it be correct in saying before

3  going to the defendant's house, you made no

4  independent investigation of this case?

5       MR. RONKOWSKI:  Objection to independent.

6       MS. PLACEK:  He himself, Judge.

7       THE COURT:  Overruled.

8       THE WITNESS:  A    That's correct.

9       MS. PLACEK:  Q    Would it also be correct in

10 saying that before going to the --   Or the thing

11 that motivated you, so-to-speak, to go to the

12 defendant's house, was, in fact, a request by

13 Detective Nitsche?

14      MS. MALLO:  Objection to motivate.

15      THE COURT:  Overruled.

16      THE WITNESS:  A    I went with Detective

17 Nitsche, yes.

18      MS. PLACEK:  Thank you.

19           That's all, your Honor.

20      THE COURT:  Redirect.

21      MS. MALLO:  One minute, your Honor.

22

23

24

**237**

63

1

2                    REDIRECT EXAMINATION

3                              BY

4                        MS. MALLO:

5        Q     Detective Baker, it wasn't Assistant

6    State's Attorney Ronkowski that talked to you

7    about this case;  it was myself, wasn't it?

8        MS. PLACEK:   Objection.

9              Impeaching their own witness, Judge.

10       THE COURT:   Overruled.

11       MS. MALLO:   Q    Well, I spoke to you about

12   this case;  is that correct?

13       THE WITNESS:   A   That's correct.

14       Q     When I spoke to you about this case at

15   lunch time and today, were there any civilians in

16   the room?

17       A     No, there weren't.

18       Q     And ASA Ronkowski then later joined us;

19   correct?

20       A     That's true.

21       Q     And when Ronkowski and I spoke to you,

22   were there any civilians in the room?

23       A     No, there weren't.

24       Q     And it was Assistant State's Attorney

1   Ronkowski who had been with the detectives earlier

2   in the morning before I got there; correct?

3          A     That's correct.

4          Q     And at any time in your presence did you

5   ever hear Assistant State's Attorney Ronkowski

6   interview any civilian witnesses?

7          A     No, I did not.

8          Q     Detective Baker, on the night of August

9   8th. 1988, when you went into the home of Jerome

10  Hendricks, you had information about the case?

11         A     Yes, I did.

12         MS. PLACEK:  Objection, foundation.  Improper

13  as redirect, your Honor.

14         THE COURT:  I'm going to allow that answer to

15  stand, for what it's worth.

16             The objection is overruled.

17         THE WITNESS:  A    Yes, I did.

18         THE COURT:  He had information about the

19  case, period.

20         MS. MALLO: Q    And at that time did you talk

21  to anyone about this case?

22         MS. PLACEK:  Objection.

23         THE COURT:  Overruled.

24         THE WITNESS:  A    Yes, I had.

                         **239**

    6 5

1          MS. MALLO:  Q   And did you know who the

2    victim was last seen with?

3          MS. PLACEK:  Objection.

4               Foundation at this time, Judge.

5          THE COURT: The objection is sustained.

6          MS. MALLO:  Q    Prior to getting to the

7    defendant's house at about 8:30 on August 8th,

8    1988, who had you spoken to about the case?

9          THE WITNESS:  A    Other detectives that were

10   assigned to it previously.

11         Q    And when you spoke with those other

12   detectives, did they share with you information

13   they had gathered about the case?

14         A    Yes, they did.

15         Q    And when you went to the defendant's

16   home on the night of August 8th, 1988, did you

17   know who the defendant --  who the victim was last

18   seen with?

19         MS. PLACEK:  Objection.

20         THE COURT:  The objection is sustained.

21         MS. MALLO: Q  When you went to the

22   defendant's house on that night, you went there

23   with certain information?

24         A    Yes, I did.

**240**

66

1      MS. MALLO: Judge, if I may have a minute?

2          Your Honor, I have no further questions

3  of Detective Baker.

4      THE COURT: Recross.

5

6              RECROSS EXAMINATION

7                   BY

8              MS. PLACEK:

9      Q    The Assistant State's Attorney, the

10  young lady mentioned three conversations you had

11  this morning with either them singly or together?

12     A    This morning and this afternoon, yes.

13     Q    Did you ever say: By the way, that

14  civilian is the one with the stick, to either one

15  of them?

16     A    Not that I recall, no.

17     Q    And like you already told me, you

18  didn't even recognize him; correct?

19     A    That's true.

20     MS. PLACEK: That's all, Judge.

21     THE COURT: Anything further?

22     MS. MALLO: No, sir.

23     THE COURT: Mr. Baker, thank you very much.

24  You may step down.

                    241

   67

1          THE WITNESS:   Thank you.

2                    (Witness excused)

3      MR. RONKOWSKI:   Your Honor, based on the

4  Court's ruling, I only have one more piece of

5  evidence I'm going to need.   And there is an

6  issue as to what it is.

7              It would be offered under Montgomery and

8  probably the best evidence would be the original

9  court file.

10             I have the case.   And this would be what

11 had been alluded to previously about the

12 defendant's background.

13             And if I could get a continuance to ask

14 the Clerk to bring the original court file, and

15 after the court file gets here I would ask the

16 Court to take judicial notice of the defendant's

17 prior conviction to impeach his testimony.

18     THE COURT:   Is that file here in this

19 building, or is it --

20     MR. RONKOWSKI:   No, it's probably in the

21 warehouse at 26th Street.

22     MS. PLACEK:   If you remember, Judge, there

23 was quite a bit to do about what was real and what

24 wasn't real, as to this.

                        242

   68

1          ·I believe that there was quite a bit of
2    hearsay which the Court eventually sustained my
3    objection, and quite frankly, this is why it gets
4    rather interesting in the case, Judge.
5          There was quite a few allegations, so --
6          THE COURT:  I'm not at all sure I'm following
7    you.
8          MS. PLACEK:  I understand, Judge.
9          But I believe for purposes of the
10   record, quite frankly, without hiding anything
11   from this Court, what Mr. Ronkowski wishes to do
12   is, I believe, there was a statement by the
13   detectives that --  rather, Detective Nitsche,
14   that he, in fact, was led to the defendant because
15   one of the neighbors had said that the defendant
16   was priorly --  you know, a prior convicted sex
17   offender.
18        THE COURT:  All right.
19        And I take it that he wants to impeach
20   the defendant by introducing a prior conviction.
21        MS. PLACEK:  Correct, Judge.
22        MR. RONKOWSKI:  Correct.
23        THE COURT:  And I take it also that you
24   don't choose to stipulate or cooperate in that in

243

69

1   any way to obviate the necessity of a continuance?

2        MS. PLACEK: Well, if we're talking about

3   obviating, the interesting thing is this is under

4   Montgomery, of course, Judge.

5              We have more or less conceded that with

6   sidebars to the bench.

7        THE COURT:  I know about it.  But --

8        MS. PLACEK:  Judge, it's silly;  you know

9   about it already.

10        THE COURT:  So I don't see the point of

11   having to bring in the record.

12        MS. PLACEK:  If this is the one, right.

13        THE COURT:  This is something I already know.

14        MS. PLACEK:  Fine, Judge.

15              If that's under Montgomery --

16        THE COURT:  Is it admissible under

17   Montgomery?

18        MS. PLACEK:  I don't believe I have a problem

19   with that.  I have no problem stipulating.

20        THE COURT:  Why is that?

21        MS. PLACEK:  Well, number one, there was a

22   problem as to the year, and there was something as

23   to the rap sheet supposedly being wrong, if the

24   Court remembers as to certain cross examination.

1          A certified copy, of course, would have

2     obviated this.

3          I have no problem -- As a matter of

4     fact, since the majority of my time is spent at

5     26th Street, and if this is the only witness, if

6     this is the only thing holding it up, I have no

7     real problem stipulating it.

8          But just for -- you know, that he was

9     convicted at such and such a time.

10     THE COURT: Well, if there is a genuine

11     Montgomery problem, that's one thing.

12          On the other hand, if this evidence is

13     ultimately going to be admitted, and it will be

14     admitted if it conforms itself to Montgomery's

15     dictates, I might as well do it.

16     MS. PLACEK: Okay.

17     MR. RONKOWSKI: Would it help if I made an

18     offer of proof?

19     MS. PLACEK: Judge, why don't we just trust

20     the rap sheet then, Judge?

21     THE COURT: Fine.

22          Why don't you just put it in?

23     MR. RONKOWSKI: By stipulation, Counsel?

24     MS. PLACEK: That's fine.


245

71

1      MR. RONKOWSKI:  Okay.  Pursuant to People

2  versus Montgomery, the stipulation the People

3  would offer the Defendant's following felony

4  conviction within the last 10 years for the sole

5  purpose at this time to impeach him.

6           The additional information we'll rely on

7  for the reasons.

8           In that on October 18, 1985, the

9  defendant in Court, Jerome Hendricks, was

10  convicted of the crime of aggravated criminal

11  sexual assault, Case No. 84-10287.

12           On a finding of guilty he received six

13  years, Illinois Department of Corrections, by

14  Judge Boheric.  That would be in the County of

15  Cook, State of Illinois.

16      MS. PLACEK: So stipulated, your Honor.

17      THE COURT:  Do you have any further

18  witnesses?

19      MR. RONKOWSKI:  Based on the Court's previous

20  ruling limiting the issues, we would have no

21  further witnesses.

22      THE COURT:  You may make an offer of proof as

23  to the testimony of Mr. Baker that was not allowed

24  in evidence, if you desire to do so at this time.

1       MR. RONKOWSKI:  Okay.

2           The Detective's -- Detective Baker

3  would testify as to the statements of the

4  defendant.  And if the Court wishes to bifurcate

5  the hearing to settle the first issue,  that's

6  fine.

7           If you want a full offer of proof, we

8  would prefer to do it with a live witness.  And we

9  have two additional witnesses to put on.

10      MS. PLACEK:  Is that today, or --

11      MR. RONKOWSKI:  Yes, they are here.

12      MS. PLACEK:  Okay.

13      MR. RONKOWSKI:  Whatever the Court wishes,

14  bifurcated, or take a --  two more witnesses for

15  the offer of proof.

16      MS. PLACEK: Well, would these witnesses --

17  Can I just ask Counsel whether these witnesses

18  would go as to the heart of the motion, or as to

19  the bifurcation that he is requesting?

20      MR. RONKOWSKI:  They would testify as to

21  the--

22      THE COURT: Well, as I have said, the whole

23  and only purpose of these witnesses is to make an

24  offer of proof in the event that review becomes

73

1    necessary by the State,  so that the Reviewing

2    Court will know what evidence the State sought to

3    proffer that the Court refused to consider.

4            And it may very well be that the

5    Reviewing Court will determine that that was

6    error, and the State was entitled to a full

7    hearing.

8            But I'm not going to consider whatever

9    the witnesses say as it bears on the motion before

10   me, because it is not relevant.  But you have the

11   right to make the offer of proof, and you also

12   have the right to make it with a live witness if

13   you choose to do so,  or you can recite into the

14   record what it is that these witness would

15   testify.

16           Either way is perfectly all right with

17   me.

18       MR. RONKOWSKI:  I will rely on the Court's

19   judgment whether we bifurcate the proceedings or

20   to get with live witnesses.

21       THE COURT:  I don't know what you mean by

22   bifurcate.

23       MS. PLACEK:  I don't, either, Judge.

24       THE COURT:  You will have to explain it to

74                       218

1   me.

2          I'm hearing this motion to suppress.

3      MR. RONKOWSKI: Right.

4      THE COURT: And I don't consider bifurcation

5   as even remote issue in this case.

6          What are you trying to have me

7   understand you mean by bifurcating?

8      MR. RONKOWSKI: Well, what the Court

9   previously stated on the record is the issue in

10  this case is the validity of the arrest.

11          And that means whether or not the

12  defendant was arrested at his house, and whether

13  or not the police had probable cause.

14      THE COURT: Right.

15      MR. RONKOWSKI: Okay.

16          If that issue rules against us, if the

17  police do not have probable cause, and that the

18  defendant was not arrested, we are entitled to

19  introduce evidence of what the defendant stated,

20  and what other witnesses stated thereafter to show

21  that at some point thereafter the police had

22  probable cause.

23      THE COURT: How would that cure the taint of

24  the primary illegality?

219

75

1          Would it be correct in saying that you

2    read those police reports in order to refresh your

3    memory?

4          A    Yes, it would.

5          Q    Would it be correct in saying quite

6    frankly as you sit there now you have no additions

7    or corrections as to any of the police reports

8    that, in fact, you have read?

9          A    Correct.

10         Q    Now, let's talk about this for a minute:

11         Am I correct --  and please feel free to

12   correct me if I am wrong --  that in order to take

13   a police report correctly, you put down all

14   relevant and all important things?

15         A    Correct.

16         Q    And something like a mob of 30 or 40

17   people in front of a house of a suspect is an

18   important thing;  correct?

19         A    Depends on who the mob is after.

20         Q    Well, if they are after the defendant,

21   or the supposed suspect, or the reason that you

22   are there;  correct?

23         A    Correct.

24         Q    And as a matter of fact, isn't it true

46

1  and correct that in none of the Chicago Police

2  Department's reports generated off of this case,

3  there is no mention of any mob in front of the

4  house?

5       A   Correct.

6       Q   As a matter of fact, you yourself wrote

7  a report in this matter; correct?

8       A   Yes.

9       Q   And you don't mention any 30, 40 -- you

10  don't even mention any disturbance in front of the

11  defendant's house; is that correct?

12      A   That's correct.

13      Q   It's not only correct, but you don't

14  even mention this incident about somebody holding

15  up a stick and trying to hit the defendant:

16  correct?

17      A   Correct.

18      Q   As a matter of fact, let me ask you,

19  Detective, when was the first time that you heard

20  anyone say that they were the one who held on to

21  the stick and tried to hit the defendant as he

22  left that house?

23      A   I didn't --

24      MR. RONKOWSKI:  Objection.

47      231

1           MS. PLACEK:  Q   If you heard it at all.

2           MR. RONKOWSKI:   Irrelevant, what he heard.

3     He saw it.

4           MS. PLACEK:   Judge, I'm asking, heard saying

5     that he did it.

6           THE COURT:  Objection overruled.

7           MS. PLACEK:  Thank you.

8           THE WITNESS:  A   I saw someone in the crowd

9     raise a stick.

10              I don't need to hear somebody say

11    anything; I saw it.

12          MS. PLACEK:  Motion to strike, Judge, as not

13    responsive.

14          THE COURT:  The motion is sustained.

15    Stricken.

16          MS. PLACEK:  Thank you.

17          Q   Officer, when was the first time you

18    heard anyone admit that they were the person who

19    raised that stick and tried to hit that defendant?

20          THE WITNESS:  A   I don't think I have heard

21    anyone admit to that.

22          Q   By the way, do you know a gentleman, a

23    civilian, supposed witness in this case, by the

24    name of James Hill?

48                    232

1        A    I know there is a witness, James Hill,

2   to this case, yes.

3        Q    And would it be correct that you and Mr.

4   Hill and your other brother-police officers were

5   sort of kept or sequestered or held in a

6   conference room back of this courtroom prior to

7   this hearing?

8        A    Correct.

9        Q    And would it be correct that Assistant

10  State's Attorney Ronkowski, in the course of his

11  job, asked each of you what happened and what did

12  you say, in preparation for testifying today?

13       A    I remember him talking to me.

14       Q    Well, let me ask you this:

15            You weren't --, Mr. Hill wasn't asked to

16  step out of the room when he was talking to you,

17  was he?

18       A    I was not in the room with Mr. Hill all

19  morning.

20       Q    Well, let me ask you this:

21            Did you ever know, or did you ever hear

22  Mr. Hill say that he was the one with the stick?

23       A    Not that I recall, no.

24       Q    As a matter of fact, being with Mr. Hill

223

49

1    in that room, did you ever say, my God, that's the

2    man I saw on that date and time, that's the man

3    with the stick?

4        A    No.

5        Q    As a matter of fact, you didn't

6    recognize Mr. Hill today, did you?

7        A    Not that I recall, no.

8        Q    Thank you.

9             But according to your testimony, you got

10   a clear and good look at the man who, in fact,

11   raised the stick to the defendant; correct?

12       A    No, that's incorrect.

13       Q    Well, let's talk a little further about

14   that.

15            You did see the incident as it occurred,

16   as you drove up at that time and date, didn't you?

17       A    Yes, I did.

18       Q    You saw what your brother Officer,

19   Nitsche, did?

20       A    Yes, I did.

21       Q    And you saw your brother Officer,

22   Nitsche, go in that house, didn't you?

23       A    Yes, I did.

24       Q    You saw him stay and remain in that

50

224

1   house for a while; correct?

2        A    No, that's wrong.

3        Q    Well, how long did you see your brother

4   Officer, Nitsche, in that house?

5        A    He went in and came out.  A matter of

6   seconds.

7        Q    When you say a matter of seconds, just

8   so we have it clear.  Did he walk all the way into

9   the house, and close the door behind him?

10       A    No, he didn't.

11       Q    Did he leave the door open?

12       A    The screen was open.

13       Q    Let me ask you this:

14            Was he on the porch of the house?

15       A    There is no porch;  there is just a

16   stoop.

17       Q    So was he on the stoop of the house?

18       A    Walked up on the stoop.  The door was

19   being held open, he stepped inside, he came back

20   outside.

21       Q    Who was holding open the door?

22       A    A woman.

23       Q    Do you know that woman?

24       A    No, I don't.

225

51

1       Q       Thank you.

2               Did you ever see him have conversation

3       with that woman?

4       A       He said something as he walked up.    I

5       don't know what.

6       Q       Okay.  How far away were you?

7       A       About 20 feet.

8       Q       How far was the nearest neighbor of this

9       crowd or mob?

10      A       I don't recall.    They were all over the

11      place.

12      Q       When you say all over this place, were

13      they in the yard or house?

14      A       The yard, the street,  the sidewalk, by

15      the fences.   People were milling about all over.

16      Q       When you say milling about, did they

17      have stones and bricks in their hands, and sticks?

18      A       I don't recall what every individual had

19      there.

20      Q       Well, did some of them?

21      A       I noticed a stick later on.

22      Q       Well, when you say later on, did you

23      hear them shouting and screaming as you drove up?

24      A       There was a lot of commotion and noise.

1          Q     And, by the way, part of your job as a

2    Chicago Police Officer is also to quiet such

3    situations; correct?

4          A     Depends on the situation.

5          Q     Well, you surely wouldn't want a mob to

6    invade a suspect's house or attempt to hurt him;

7    correct?

8          A     They didn't invade his house.

9          Q     Sir,  do you understand my question?

10              Motion to strike the answer as not

11   responsive, Judge.

12         MR. RONKOWSKI:  Objection to the question as

13   argumentative.

14         THE COURT:  Sustained.

15              As to the striking, the objection is

16   sustained and the answer is stricken.

17              As to your objection, Mr. Ronkowski,

18   it's overruled.

19         MS. PLACEK: Thank you, your Honor.

20         Q     Surely wouldn't let a mob attack a

21   person's house, correct, without doing anything in

22   the course of your employment?

23         THE WITNESS:  A   Not if I could help it.

24         Q     Not only that, but if you saw a mob

53                       227

1    milling about with sticks or whatever, it would be

2    your job, as a Chicago Police Officer, to diffuse

3    the situation;  isn't that correct?

4         A     Depends on the situation.

5         Q     Well, the situation is of, in fact, a

6    mob around a supposed --  as you put it today --

7    suspect's house.

8              Wouldn't it be your job to break that

9    mob up?

10        A     Again depends on the situation.

11        Q     Would it be your job to break that mob

12   up as I have just described the situation, sir?

13        A     No.

14        Q     So am I correct in assuming that you, as

15   a Chicago Police Officer, would not deem it your

16   job to in fact break up a mob of 30 or 40 people,

17   some with sticks, yelling and screaming at a

18   supposed suspect's house?

19        A     I don't know.

20        Q     Thank you.

21              Let me also ask you this, sir:

22              How long previous to your arrival to

23   that house were you involved in the investigation

24   of this matter?

**228**

1          A       Several hours.

2          Q       When you say several hours, were you

3    aware that the alleged victim of this crime was

4    first reported missing on August 1st, 1988?

5          A       I don't remember exactly when I became

6    aware of that.

7          Q       Could there be anything in this report

8    that would refresh your recollection as to that?

9          A       Not the specific time, no.

10         Q       Well, and you say your report, of

11   course, wouldn't refresh your recollection

12   because, according to you, there is nothing in

13   your report to reflect when she first became

14   missing?

15         A       I don't recall if there is or not.

16         Q       Would it be correct in saying that you

17   can't even recall what's in your report that you,

18   as you already stated, read to refresh your memory

19   a few minutes ago?

20         A       I don't understand the question.

21         Q       Well, sir, let's talk for a second.

22                 Isn't it correct, showing you what has

23   been previously marked as Defendant's 4, a missing

24   person report, could you tell his Honor, Judge

229

55

1    Holt, what that is?

2         A    A supplementary report to a missing

3    person's report.

4         Q    Isn't it correct that that, in fact,

5    deals with the alleged victim of this case?

6         A    Yes, it does.

7         Q    And on that particular matter, does it

8    not state that the person was missing on, in fact,

9    August 1st?

10        A    Yes, it does.

11        Q    Thank you.

12             To the best of your knowledge, did the

13   Chicago Police Department have information that

14   this person was, in fact, alive on August 2nd,

15   1988?

16        A    No.

17        Q    No?

18        A    Not that I know of.

19        Q    To the best --   Thank you.

20             Showing you what would be marked as

21   Defense 5 for Identification.   Could you please

22   identify that?

23        A    Missing person's report.

24        Q    And on that missing person's report, am

1    I correct in assuming that that's also generated

2    with the stamp of Area 2, Violent Crimes?

3           A      No, it's not.

4           Q      Is there a stamp saying Area 2, Violent

5    Crimes?

6           A      No, there's not.

7           Q      I'm sorry, Officer, perhaps I'm

8    mistaken.

9                  It says Youth Division, Area 2;

10   correct?

11          A      Correct.

12          Q      Calling your attention to the back of

13   that report, does that report not state, in fact,

14   that that victim was seen on August 2nd, 1988?

15          A      It says from an anonymous source, yes.

16          Q      The victim was seen on August 2nd, 1988.

17   correct?

18          A      From an anonymous source, yes.

19          Q      Thank you.

20                 By the way, to the best of your

21   knowledge, you didn't --  Well, withdraw that and

22   rephrase, Judge.

23                 You didn't speak to the gentleman on the

24   phone at the same time Officer Nitsche did, did

57                    **231**

1   you?

2        A    No, I did not.

3        Q    To the best of your knowledge, on this

4   anonymous source, did the Chicago Police

5   Department -- speaking of the anonymous source

6   that stated that the alleged victim of this crime

7   was alive on August 2nd, 1988, did the Chicago

8   Police Department in fact take action?

9        A    I don't understand that question.

10       Q    Did the Chicago Police Department do

11  anything in response to this anonymous source on

12  August 2nd, 1988?

13       A    Area 2 Youth Division took some action.

14       Q    Is that part of the Chicago Police

15  Department?

16       A    Yes, it is.

17       Q    Did they, in fact, tour an area?

18       A    You have got the report, I don't.  I

19  don't know what they did.

20       Q    Calling your attention to that report --

21  By the way, you are familiar with 109th and

22  Indiana; correct?

23       A    I know where it's at, yes.

24       Q    Could you describe that -- Is that in

58                    **232**

1    fact, the area that they toured?

2         A    109th and Indiana and 105th and 6th and

3    Wabash.

4         Q    Is that, in fact, the area they toured?

5         A    Yes.

6         Q    And they, as a matter of fact, took the

7    complainant which, I believe would be the guardian

8    of the young lady; correct?

9         A    Yes.

10        Q    Could you describe that area for his

11   Honor, Judge Holt?

12        A    Residential area.

13        Q    When you say residential, is there any

14   truck stops, that sort of thing there?

15        A    No; residential area, homes.

16        Q    Is it ever known as the Strip?

17        A    Not that I ever recall.

18        Q    By the way, how far was that, in fact,

19   that area away from the defendant's house?

20        A    Probably about a mile.

21        Q    Thank you.

22             Did you ever, Mr. Baker -- excuse me,

23   Detective Baker -- see the defendant on the phone

24   in his house?

**233**

59

1          A     No, I did not.

2          Q     Did you ever see the defendant on the

3    phone in his house, call Russ Ewing?

4          A     No.

5          Q     Did you ever see --    By the way, when I

6    say Russ Ewing, you are familiar with who I'm

7    referring to?

8          A     Yes.

9          Q     Thank you.

10          Would it be correct to assume that prior

11   to the defendant being taken away in a police car,

12   that your involvement in this matter, be it a

13   missing person's investigation or whatever, was

14   minimal?

15          A     Yes.

16          Q     Would it be correct in saying that

17   according to your testimony, prior to the

18   defendant being taken away in a police car, that

19   all you did was more or less didn't enter the

20   house, and stood on the street?

21          A     Yes.

22          Q     You in no way, according to your

23   testimony, attempted to arrest this law breaker

24   who attempted to hit the defendant;    correct?

**234**

60

```
 1        A     That's true.

 2        Q     You in no way attempted to try and break

 3   it up;  correct?

 4        A     Moved the crowd away to get Mr.

 5   Hendricks into the squad car.

 6        Q     Beg your pardon?

 7        A     We moved the crowd back to allow Mr.

 8   Hendricks to get into the squad car.

 9        Q     When you say you moved the crowd away,

10   that also is not reflected in your police report:

11   is that correct?

12        A     No, it's not.

13        Q     Would it be correct in saying --  and I

14   believe you described the defendant as walking to

15   the squad car --  When you say walking, you, as a

16   trained observer, mean that, walking;  is that

17   correct?

18        A     Walking, walked.

19        Q     He didn't run; correct?

20        A     Well, he didn't sprint over there.

21        Q     Well, he walked; correct?  In a normal

22   way?

23              If you know.

24        A     What's a normal way?  You tell me.
```

61

1      Q    Well, even-paced.

2      A    He walked over, walked out of the house.

3  and right over, and got in the back of the squad

4  car.

5      Q    When you say got in the back of the

6  squad car, is that a marked or unmarked squad car?

7      A    Unmarked squad car.

8      Q    Am I correct in that when you spoke of a

9  squad car, would that be similar to a detective's

10  car?

11      A    Yes.

12      Q    Can you open the back door of that squad

13  car?

14      When I say you, if you're not a member

15  of the Chicago Police Department.

16      A    You're asking me, are you physically

17  able to do it?

18      Q    That's correct.

19      A    Yes, yes.  You take the handle and open

20  it up.

21      Q    Does it have a screen?

22      A    No, it doesn't.

23      Q    Can you open the back door from inside

24  the car?

**236**

62

1      A     Yes, you can.

2      Q     Would it be correct in saying before

3   going to the defendant's house, you made no

4   independent investigation of this case?

5      MR. RONKOWSKI:  Objection to independent.

6      MS. PLACEK:  He himself, Judge.

7      THE COURT:  Overruled.

8      THE WITNESS:  A    That's correct.

9      MS. PLACEK:  Q    Would it also be correct in

10   saying that before going to the --   Or the thing

11   that motivated you, so-to-speak, to go to the

12   defendant's house, was, in fact, a request by

13   Detective Nitsche?

14      MS. MALLO:  Objection to motivate.

15      THE COURT:  Overruled.

16      THE WITNESS:  A   I went with Detective

17   Nitsche, yes.

18      MS. PLACEK:  Thank you.

19          That's all, your Honor.

20      THE COURT:  Redirect.

21      MS. MALLO:  One minute, your Honor.

22

23

24

**237**

63

1

2                    REDIRECT EXAMINATION

3                              BY

4                        MS. MALLO:

5        Q     Detective Baker, it wasn't Assistant

6    State's Attorney Ronkowski that talked to you

7    about this case;  it was myself, wasn't it?

8        MS. PLACEK:  Objection.

9             Impeaching their own witness, Judge.

10       THE COURT:  Overruled.

11       MS. MALLO:   Q    Well, I spoke to you about

12   this case;  is that correct?

13       THE WITNESS:   A   That's correct.

14       Q     When I spoke to you about this case at

15   lunch time and today, were there any civilians in

16   the room?

17       A     No, there weren't.

18       Q     And ASA Ronkowski then later joined us;

19   correct?

20       A     That's true.

21       Q     And when Ronkowski and I spoke to you,

22   were there any civilians in the room?

23       A     No, there weren't.

24       Q     And it was Assistant State's Attorney

64

1    Ronkowski who had been with the detectives earlier

2    in the morning before I got there; correct?

3         A    That's correct.

4         Q    And at any time in your presence did you

5    ever hear Assistant State's Attorney Ronkowski

6    interview any civilian witnesses?

7         A    No, I did not.

8         Q    Detective Baker, on the night of August

9    8th, 1988, when you went into the home of Jerome

10   Hendricks, you had information about the case?

11        A    Yes, I did.

12        MS. PLACEK:  Objection, foundation.  Improper

13   as redirect, your Honor.

14        THE COURT:  I'm going to allow that answer to

15   stand, for what it's worth.

16             The objection is overruled.

17        THE WITNESS:  A    Yes, I did.

18        THE COURT:  He had information about the

19   case, period.

20        MS. MALLO:  Q    And at that time did you talk

21   to anyone about this case?

22        MS. PLACEK:  Objection.

23        THE COURT:  Overruled.

24        THE WITNESS:  A    Yes, I had.


                        **239**

     65

1          MS. MALLO:   Q   And did you know who the
2     victim was last seen with?
3          MS. PLACEK:  Objection.
4               Foundation at this time, Judge.
5          THE COURT: The objection is sustained.
6          MS. MALLO:   Q   Prior to getting to the
7     defendant's house at about 8:30 on August 8th,
8     1988, who had you spoken to about the case?
9          THE WITNESS:  A   Other detectives that were
10    assigned to it previously.
11         Q    And when you spoke with those other
12    detectives, did they share with you information
13    they had gathered about the case?
14         A    Yes, they did.
15         Q    And when you went to the defendant's
16    home on the night of August 8th, 1988, did you
17    know who the defendant -- who the victim was last
18    seen with?
19         MS. PLACEK:  Objection.
20         THE COURT:  The objection is sustained.
21         MS. MALLO: Q  When you went to the
22    defendant's house on that night, you went there
23    with certain information?
24         A    Yes, I did.

                    **240**

66

1      MS. MALLO: Judge, if I may have a minute?

2          Your Honor, I have no further questions

3 of Detective Baker.

4      THE COURT: Recross.

5

6            RECROSS EXAMINATION

7                BY

8            MS. PLACEK:

9      Q    The Assistant State's Attorney, the

10 young lady mentioned three conversations you had

11 this morning with either them singly or together?

12      A    This morning and this afternoon, yes.

13      Q    Did you ever say: By the way, that

14 civilian is the one with the stick, to either one

15 of them?

16      A    Not that I recall, no.

17      Q    And like you already told me, you

18 didn't even recognize him; correct?

19      A    That's true.

20      MS. PLACEK: That's all, Judge.

21      THE COURT: Anything further?

22      MS. MALLO: No, sir.

23      THE COURT: Mr. Baker, thank you very much.

24 You may step down.

67              **241**

1           THE WITNESS:   Thank you.

2                    (Witness excused)

3      MR. RONKOWSKI:   Your Honor, based on the

4  Court's ruling, I only have one more piece of

5  evidence I'm going to need.   And there is an

6  issue as to what it is.

7           It would be offered under Montgomery and

8  probably the best evidence would be the original

9  court file.

10          I have the case.   And this would be what

11 had been alluded to previously about the

12 defendant's background.

13          And if I could get a continuance to ask

14 the Clerk to bring the original court file, and

15 after the court file gets here I would ask the

16 Court to take judicial notice of the defendant's

17 prior conviction to impeach his testimony.

18     THE COURT:   Is that file here in this

19 building, or is it --

20     MR. RONKOWSKI:   No, it's probably in the

21 warehouse at 26th Street.

22     MS. PLACEK:   If you remember, Judge, there

23 was quite a bit to do about what was real and what

24 wasn't real, as to this.

242

68

1              I believe that there was quite a bit of

2    hearsay which the Court eventually sustained my

3    objection, and quite frankly, this is why it gets .

4    rather interesting in the case, Judge.

5              There was quite a few allegations, so --

6         THE COURT:  I'm not at all sure I'm following

7    you.

8         MS. PLACEK:  I understand, Judge.

9              But I believe for purposes of the

10   record, quite frankly, without hiding anything

11   from this Court, what Mr. Ronkowski wishes to do

12   is, I believe, there was a statement by the

13   detectives that --  rather, Detective Nitsche,

14   that he, in fact, was led to the defendant because

15   one of the neighbors had said that the defendant

16   was priorly --  you know, a prior convicted sex

17   offender.

18        THE COURT:  All right.

19             And I take it that he wants to impeach

20   the defendant by introducing a prior conviction.

21        MS. PLACEK:  Correct, Judge.

22        MR. RONKOWSKI:  Correct.

23        THE COURT:  And I take it also that you

24   don't choose to stipulate or cooperate in that in

**243**

69

1   any way to obviate the necessity of a continuance?

2        MS. PLACEK: Well, if we're talking about

3   obviating, the interesting thing is this is under

4   Montgomery, of course, Judge.

5             We have more or less conceded that with

6   sidebars to the bench.

7        THE COURT: I know about it. But --

8        MS. PLACEK: Judge, it's silly; you know

9   about it already.

10       THE COURT: So I don't see the point of

11  having to bring in the record.

12       MS. PLACEK: If this is the one, right.

13       THE COURT: This is something I already know.

14       MS. PLACEK: Fine, Judge.

15            If that's under Montgomery --

16       THE COURT: Is it admissible under

17  Montgomery?

18       MS. PLACEK: I don't believe I have a problem

19  with that. I have no problem stipulating.

20       THE COURT: Why is that?

21       MS. PLACEK: Well, number one, there was a

22  problem as to the year, and there was something as

23  to the rap sheet supposedly being wrong, if the

24  Court remembers as to certain cross examination.

70                        244

1              A certified copy, of course, would have

2     obviated this.

3              I have no problem --  As a matter of

4     fact, since the majority of my time is spent at

5     26th Street,  and if this is the only witness, if

6     this is the only thing holding it up, I have no

7     real problem stipulating it.

8              But just for  --  you know, that he was

9     convicted at such and such a time.

10        THE COURT:  Well, if there is a genuine

11    Montgomery problem, that's one thing.

12             On the other hand, if this evidence is

13    ultimately going to be admitted, and it will be

14    admitted if it conforms itself to Montgomery's

15    dictates, I might as well do it.

16        MS. PLACEK:  Okay.

17        MR. RONKOWSKI:  Would it help if I made an

18    offer of proof?

19        MS. PLACEK:  Judge, why don't we just trust

20    the rap sheet then, Judge?

21        THE COURT:  Fine.

22             Why don't you just put it in?

23        MR. RONKOWSKI:  By stipulation, Counsel?

24        MS. PLACEK:  That's fine.

245

71

1    MR. RONKOWSKI:  Okay.  Pursuant to People

2    versus Montgomery, the stipulation the People

3    would offer the Defendant's following felony

4    conviction within the last 10 years for the sole

5    purpose at this time to impeach him.

6            The additional information we'll rely on

7    for the reasons.

8            In that on October 18, 1985, the

9    defendant in Court, Jerome Hendricks, was

10   convicted of the crime of aggravated criminal

11   sexual assault, Case No. 84-10287.

12           On a finding of guilty he received six

13   years, Illinois Department of Corrections, by

14   Judge Boheric.  That would be in the County of

15   Cook, State of Illinois.

16       MS. PLACEK: So stipulated, your Honor.

17       THE COURT:  Do you have any further

18   witnesses?

19       MR. RONKOWSKI:  Based on the Court's previous

20   ruling limiting the issues, we would have no

21   further witnesses.

22       THE COURT:  You may make an offer of proof as

23   to the testimony of Mr. Baker that was not allowed

24   in evidence, if you desire to do so at this time.

72                        216

1          MR. RONKOWSKI:  Okay.

2              The Detective's --  Detective Baker

3    would testify as to the statements of the

4    defendant.  And if the Court wishes to bifurcate

5    the hearing to settle the first issue,  that's

6    fine.

7              If you want a full offer of proof, we

8    would prefer to do it with a live witness.  And we

9    have two additional witnesses to put on.

10         MS. PLACEK:  Is that today, or --

11         MR. RONKOWSKI:  Yes, they are here.

12         MS. PLACEK:  Okay.

13         MR. RONKOWSKI:  Whatever the Court wishes,

14   bifurcated, or take a --  two more witnesses for

15   the offer of proof.

16         MS. PLACEK: Well, would these witnesses --

17   Can I just ask Counsel whether these witnesses

18   would go as to the heart of the motion, or as to

19   the bifurcation that he is requesting?

20         MR. RONKOWSKI:  They would testify as to

21   the--

22         THE COURT: Well, as I have said, the whole

23   and only purpose of these witnesses is to make an

24   offer of proof in the event that review becomes

247

73

1   necessary by the State,  so that the Reviewing

2   Court will know what evidence the State sought to

3   proffer that the Court refused to consider.

4          And it may very well be that the

5   Reviewing Court will determine that that was

6   error, and the State was entitled to a full

7   hearing.

8          But I'm not going to consider whatever

9   the witnesses say as it bears on the motion before

10   me, because it is not relevant.  But you have the

11   right to make the offer of proof, and you also

12   have the right to make it with a live witness if

13   you choose to do so,  or you can recite into the

14   record what it is that these witness would

15   testify.

16          Either way is perfectly all right with

17   me.

18     MR. RONKOWSKI:  I will rely on the Court's

19   judgment whether we bifurcate the proceedings or

20   to get with live witnesses.

21     THE COURT:  I don't know what you mean by

22   bifurcate.

23     MS. PLACEK:  I don't, either, Judge.

24     THE COURT:  You will have to explain it to

74

me.

I'm hearing this motion to suppress.

MR. RONKOWSKI: Right.

THE COURT: And I don't consider bifurcation as even remote issue in this case.

What are you trying to have me understand you mean by bifurcating?

MR. RONKOWSKI: Well, what the Court previously stated on the record is the issue in this case is the validity of the arrest.

And that means whether or not the defendant was arrested at his house, and whether or not the police had probable cause.

THE COURT: Right.

MR. RONKOWSKI: Okay.

If that issue rules against us, if the police do not have probable cause, and that the defendant was not arrested, we are entitled to introduce evidence of what the defendant stated, and what other witnesses stated thereafter to show that at some point thereafter the police had probable cause.

THE COURT: How would that cure the taint of the primary illegality?

219

75

1          That's why I'm not admitting it. Because
2    what the defendant said subsequent thereto would
3    not cure the primary taint of the 4th Amendment
4    violation.

5          Unless --  Unless you could show some
6    attenuation, and you would have to have strong
7    evidence to show that it was attenuated by
8    somebody, some intervening circumstances.

9          But if the defendant went to the police
10   station and there protested his innocence and
11   there requested a polygraph, was there given a
12   polygraph, all of that would not attenuate.  And,
13   as a matter of fact, People vs. Franklin says that
14   the giving of a polygraph under those
15   circumstances exacerbates rather than attenuates
16   the illegality.

17         So what I'm saying to you, as I
18   understand the law, Mr. Ronkowski, and I could be
19   in error, and you know I understand and appreciate
20   your concept that I probably am --  But as I
21   understand, unless you have some strong and
22   convincing evidence that something occurred in the
23   police station other than the giving of Miranda
24   warnings, other than the defendant's voluntary

1    request to take a polygraph, something attenuated

2    this unlawful 4th Amendment violation, if, indeed

3    there was one, then everything that happened in

4    the police station is a nullity under the 4th

5    Amendment.

6            That's the way I understand the law.

7            Therefore, I don't see what you mean.

8    And I think I'm beginning to understand what

9    you're calling bifurcating.

10           You want me to go into a hearing to

11   determine whether or not what occurred in the

12   police station relates back, and cures the 4th

13   Amendment violation.

14           And I'm saying to you that that is a

15   burden that you could choose to undertake, and I

16   will hear you on it,  but it certainly wouldn't be

17   on the basis of what the defendant said at the

18   police station.

19       MR. RONKOWSKI:   No.

20           When I say bifurcate, terminate the

21   proceedings right now, and the Court can hear

22   arguments and decide whether or not the police had

23   probable cause, at the point the defendant called

24   the police and invited them to his house.

7 7                        251

1          If you rule in the State's favor, then

2    everything that occurred at the police station is

3    proper.

4          If you rule against the State, the State

5    would be entitled to show inevitable discovery,

6    all sorts of theories that, you know --

7         THE COURT: What would be discoverable?   The

8    statements of the defendant, or the --

9         MR. RONKOWSKI:  The other witnesses that we

10   talked to.

11        THE COURT:  What are we suppressing here?

12   The statement of the defendant?

13        MR. RONKOWSKI:  Yes.    This is a statement

14   case.

15        THE COURT:   How could a statement of the

16   defendant be inevitably discovered and be

17   Constitutionally violate after his

18   unconstitutional arrest?

19        MR. RONKOWSKI:  Very easy.

20          Because at some point thereafter, if the

21   police do develop probable cause that dissipates

22   the taint.

23        MS. PLACEK:  No, it doesn't.

24        THE COURT:  Come on, come on.

7 8                    252

1                  If you have any single case in any
2       jurisdiction at all that says that you have
3       probable cause after the defendant has been
4       unconstitutionally arrested and within a
5       relatively short period of time after his arrest
6       that that dissipates the taint of the un-
7       constitutional arrest, I would like to see it.
8            MR. RONKOWSKI:   How many cases do you want to
9       see?
10                 I can cite two or three cases.
11           THE COURT: All right.
12                 Start looking at Dunaway versus New
13      York, and the whole line of cases that tell us
14      very clearly that even the giving of Miranda
15      warnings --
16                 Look at People versus Franklin, the
17      voluntary taking of a polygraph examination, all
18      of these things do not dissipate the taint of the
19      illegal arrest.
20                 And simply because the investigation
21      goes on, and outside of any statement of the
22      defendant that causes them to acquire probable
23      cause, that doesn't relate back to the defendant
24      unless something else has happened.

1              He is continuously under the restraints

2     of this unconstitutional arrest when he makes a

3     statement, even if probable cause has been

4     developed in the interim between his arrest and

5     the statement.

6              And I know of no case anywhere that

7     suggests anything to the contrary.

8              Again, Mr. Ronkowski, my grasp of the

9     law around these 50 other jurisdictions in the

10    United States may not be that great, but I have

11    not seen any case.

12         MR. RONKOWSKI:   There are cases in Illinois

13    that allow the State to do that, and have

14    successfully allowed the State to do that.

15         THE COURT:   You're going to have to point

16    them out to me with great particularity, serve a

17    copy on the Defense, and we will see where we go

18    with that.

19             So in any event, we have not reached

20    that stage.

21             I assure you that if I come to the

22    conclusion that this defendant was

23    unconstitutionally arrested, I will allow you an

24    opportunity to make those cases before me and

254

1    convince me that you should be allowed to show

2    that something happened after his unconstitutional

3    arrest, if indeed I determine that he was, that

4    attenuates the taint.

5            And I just don't see how that -- as I

6    said, I don't know of any cases like that, but I

7    am willing to learn, and I am willing to have you

8    teach me.

9    MR. RONKOWSKI: Well, my suggestion at 3:07,

10    rather than rush up and get you those cases, if we

11    can pick a short date that's agreeable to both

12    sides to conclude this hearing --

13    THE COURT: Both sides may consider wanting

14    to educate the Court.

15    MS. PLACEK: I agree with the Court, Judge,

16    so I will stand educated with the Court.

17            Judge, on the court date, next week is

18    fine, Judge, or --

19    THE COURT: You are pretty close to the point

20    of resting, absent this little problem that we

21    have; am I correct?

22    MR. RONKOWSKI: Well, if I don't change the

23    Court's mind, I'm resting.

24    THE COURT: Well, then I suspect, if we could

255

81

1   devote as little as an hour to this next week, one

2   day?

3        MR. RONKOWSKI:  Oh, yes, I have no problem

4   with that.

5        MS. PLACEK:  I have two rebuttals, Judge.

6        THE COURT:  You have two rebuttal witnesses?

7        MS. PLACEK:  Yes, Judge.

8        THE COURT:  How much time do you think?  Two

9   hours, maybe?

10       MS. PLACEK:  An hour and a half, Judge.

11       THE COURT:  Can you give us a date that we

12  can get in next week?

13       MS. PLACEK: Either next week or the following

14  week, later in the afternoon, I will be here.

15       THE COURT:  can you give us some help as to

16  what's going to go and not go?

17       MR. RONKOWSKI:  Call them out and I will tell

18  you.

19                       (Whereupon, a discussion was

20                       held off the record, after which

21                       the following proceedings were

22                       had:)

23       MS. PLACEK:  The 10th or the 11th, I have

24  motions before His Honor --  Or no, you are

256

82

```
 1   putting it on Wednesday.

 2            I'm sorry, the previous week.   I

 3   pre-supposed --   the 3rd, the 4th?

 4        THE COURT:   The 4th.

 5        MS. PLACEK:   Are you talking about the 4th?

 6        THE COURT:   I'm talking about the 4th.

 7                     Yes, that's the one.

 8        MS. PLACEK:   The 4th?   That's fine.

 9        MR. RONKOWSKI:   The 4th.

10        THE COURT:   The 4th.   Order of Court.

11        MS. PLACEK:   Thank you very much, Judge.

12        THE COURT:   April 4th.

13        MS. PLACEK:   Have a pleasant day.

14        THE COURT:   Thank you.

15                     (Whereupon, hearing in the

16                     above-entitled cause was

17                     continued to Wednesday, the

18                     4th day of April, A. D. 1990)

19

20

21

22

23

24
```

## 257

83

1    STATE OF ILLINOIS    )
                          )        SS:
2    COUNTY OF C O O K    )


3                IN THE CIRCUIT COURT OF COOK COUNTY
                    COUNTY DEPARTMENT-CRIMINAL DIVISION
4


5    THE PEOPLE OF THE         )
     STATE OF ILLINOIS         )
6                              )
         -vs-                  )      No. 88 CR 12517
7                              )
                               )
     JEROME HENDRICKS          )
8


9                    MOTION TO QUASH ARREST
                     AND SUPPRESS EVIDENCE
10
                     REPORT OF PROCEEDINGS had at the hearing
11
     of the above-entitled cause on Thursday, the 31st day of
12
     May, A. D., 1990, before the Honorable LEO HOLT, Judge of
13
     said Court.
14

15

     APPEARANCES:
16
             HON. CECIL PARTEE,
17                  State's Attorney of Cook County, by
             MR. EDWARD RONKOWSKI and
18           MS. MARY MALLO,
                  Assistant State's Attorneys,
19                appeared on behalf of the People:

20
             HON. RANDOLPH STONE,
21                Public Defender of Cook County, by
             MS. MARIJANE PLACEK and
22           MR. VINCENT LUFRANO,

23                Assistant Public Defenders,
                  appeared on behalf of the Defendant.
24

THE CLERK:     Jerome Hendricks.

THE COURT:     Jerome Hendricks.

MS. PLACEK:     Mr. Hendricks is in custody.

THE COURT:     Was Mike Baker the last person to testify, Mr. Ronkowski?

MR. RONKOWSKI: That was Detective Baker, on March 29, and then there was a stipulation and I believe the State has rested, and it was the Defense turn.

MS. PLACEK:  Judge, I believe, not necessarily being our turn as a result of not --

THE COURT:  I'm sorry?

MS. PLACEK:  I don't believe it is quite our turn. I believe we are in rebuttal now, Judge.

THE COURT:  All right, I'm sorry, you may proceed.

MS. PLACEK:  Thank you.



                    (Witness duly sworn.)



2

1    DAVIDA HENDRICKS-HALLEY,

2  called as a witness on behalf of the Petitioner-Defendant

3  herein, having been first duly sworn, was examined and

4  testified as follows:

5    DIRECT EXAMINATION

6    BY MS. PLACEK:

7    Q   Ma'am, would you state your name for purpose

8  of the record, spelling your first and last name.

9    A   Davida Hendricks-Halley, D-a-v-i-d-a,

10  Hendricks, H-e-n-d-r-i-c-k-s, Halley, H-a-l-l-e-y.

11    Q   Now, you mentioned Hendricks; you are related

12  to the defendant, Jerome Hendricks, is that correct?

13    A   Yes.

14    Q   Would you tell his Honor, Judge Holt, exactly

15  how you are related.

16    A   I am his sister.

17    Q   Now, calling your attention to August 9, I

18  believe 1988, could you tell his Honor, Judge Holt,

19  where you are living?

20    A   255 West 117th Street.

21    Q   Were you living there alone or with someone?

22    A   My mother, my brothers and sisters.

23    Q   You mentioned your brother again.  Is Jerome

24  Hendricks that brother that you speak of?

3

A    Yes, one of them.

Q    One of them, thank you.

Calling you attention to the later
afternoon hours, evening hours, did anything unusual
happen?

A    I don't remember the dates any more.

Q    I understand about the dates and the time,
but were you present during that time when anything
unusual happened?

A    Yes.

Q    Could you tell his Honor, Judge Holt, exactly
what you remember happening on that date?

A    The whole day?

Q    Well, let's start in relationship with your
brother, Jerome. Did you see your brother, Jerome, that
day?

A    Yes.

Q    Could you tell his Honor, Judge Holt, if,
during the afternoon or earlier evening hours, if that's
when you saw him?

A    Early evening hours.

Q    I know you are a little nervous and I know,
maybe you don't remember exact dates, but did anything
unusual happen that evening, that would make it stand out

251

1   in your mind?

2       A    The police officers.

3       Q    Well, when you say police officers and, again,

4   relax and just tell us what happened, what do you mean

5   by police officers?

6       A    They wanted my brother to get in touch with

7   them.

8       Q    When you say they wanted your brother to get

9   in touch with them, would you tell his Honor, Judge Holt,

10  the circumstances or how you came to see those police

11  officers that date and time?

12      A    It was about the girl found in the garage

13  next to our house.

14      Q    And when you say the police officers, did

15  they come and talk to you or did you go and talk to

16  them?

17      A    They came and talked to us.

18      Q    Now, when you say us, who do you mean?

19      A    My son and myself.

20      Q    Was your mother also present?

21      A    Yes.  Well, she wasn't there earlier at the

22  time.

23      Q    And did the police officers leave you anything?

24      A    Yes.  They left their cards.

Q    When you say their cards, do you remember

those police officers' names?

A    No, I don't.

Q    Do you remember whether they were white or

black officers?

A    White.

Q    And do you remember whether they were in

uniform like the sheriffs or like police officers, or

were they in plainclothes?

A    They were in plainclothes.

Q    And you said they left their cards.

Did you have an occasion to have an

opportunity to see those officers later that day?

A    Yes.

Q    Could you tell his Honor, Judge Holt, under

what circumstances you saw those police officers?

A    They came back to pick up my brother.

Q    When?

MR. RONKOWSKI:  Objection.

MS. PLACEK:  Basis, Judge?

MR. RONKOWSKI:  Calls for a conclusion.  She can

testify what she saw.

MS. PLACEK:  That's what we are going into.

Those are her words.

THE COURT:  I understand that may be her words.
It is somewhat conclusionary, they came back.  I will
decide what it was they came back for.

Ms. PLACEK:  Perhaps I can clarify a bit, your
Honor.

Q     You mentioned they came back to
pick up your brother.  Could you describe exactly what
happened.

A     Jerome came in.  We gave him the card and he
phoned them.

Q     When you say we, who do you mean?

A     My mother and myself.

Q     Okay.  And when you say he phoned, I know
you probably lived this over and over, but this is the
first time his Honor, Judge Holt, is hearing it, who
did he phone?

A     We gave him the cards.  He called the people
that's name was on the card.

Q     Would that be the police officers?

A     Yes.

Q     And what happened after he phoned the police
officers?

A     He talked to my sister.

Q     And when you say your sister, was your sister

7384

1    there?

2       A    She was on the phone.

3       Q    Okay.  So in other words, he made two phone

4    calls, is that correct?

5       A    Yes.

6       Q    After he talked to your sister, what, if

7    anything, happened?

8       A    The officers came.

9       Q    When you say the officers came, tell his Honor,

10   Judge Holt, exactly what happened, as best you remember

11   it.

12      A    He was talking to my sister on the phone.

13   About 15 or 20 minutes later, they were there.

14      Q    Were those the same officers who were there

15   in the morning?

16      A    Yes.

17      Q    Were there only two of them at that time?

18      A    No.

19      Q    How many police officers were there?

20      A    Four.

21      Q    And these other, these new two officers,

22   were they men or women?

23      A    I think one was a lady.

24      Q    Okay.  Were they white or black?

8

A    White.

Q    And were they in uniform or were they in plainclothes?

A    Uniform.

Q    Thank you.

And again, when you say they came, tell his Honor, Judge Holt, exactly what you mean.  How did they come?  Did they knock on the door?  Did --

MR. RONKOWSKI:  Objection, leading.

THE COURT:  I understand, Ms. Placek, it is somewhat leading.

How did they come?  How did they gain entry into your house?

THE WITNESS:  They came up and rang the bell.

MS. PLACEK:  Q    And what happened then?

A    They came in and they put cuffs on him and took him out.

Q    When you say him, who do you mean?

A    Jerome.

Q    And when you say they put cuffs on him and took him out, where was your brother when they put these handcuffs on him?

A    In our living room.

Q    And how long were the police, in toto, in

9

1     your house?

2          A     Maybe five minutes.

3          Q     Did they show you a warrant?

4          A     No.

5          Q     Did they lead your brother out of the house?

6          A     They cuffed him and took him out.

7          Q     Okay.  They cuffed him and took him out.

8               Let me ask you this, did you have an

9     occasion, at that time, to look out at your front yard?

10         A     Yes.

11         Q     Did you watch your brother get in the car

12    with the police officers?

13         A     Yes.

14         Q     Did you see any riot or any mob of people

15    in the front of your house?

16         A     No.

17         Q     Did you see anyone attacking your brother

18    with bricks or stones?

19         A     No, I didn't.

20         Q     Tell his Honor, Judge Holt, what you did see.

21         A     Just the normal people that's out.

22         Q     When you say the normal people that's out

23    there, what exactly do you mean?

24         A     Well, the neighborhood, the kids just hang out.

10

1    That's what they looked like to me.  The crowd had

2    died down.

3         MS. PLACEK:  Thank you very much.

4              That's all, your Honor.

5         THE COURT:  Cross, Mr. Ronkowski or Ms. Mallo.

6         MS. MALLO:  Yes, your Honor.

7                   CROSS EXAMINATION

8                   BY MR. RONKOWSKI:

9

10        Q    How much of the crowd died down?

11        A    Well, there are people hanging out all the

12   time.

13        Q    How much of the crowd died down?

14        MS. PLACEK:  Objection.  She answered that.

15        THE COURT:  Overruled.

16              Did you understand the question?

17        THE WITNESS:  Yes.

18        THE COURT:  Will you answer it.

19        THE WITNESS:  Just the normal amount of people

20   to me, that I always see out there.

21        MR. RONKOWSKI:  Q    Well, there was quite a few

22   people out there at this time, wasn't there?

23        MS. PLACEK:  Objection, presuming, Judge.

24        THE COURT:  Overruled.

1123