CASE NO. _____O8cv 1589_____

ATTACHMENT NO. _____14_____

EXHIBIT _____

TAB (DESCRIPTION) _____

1    Q    Can you describe that machine to Judge

2    holt?

3    A    It has a lot of numbers on it, on and off

4    button on it, X-ray button on it, X-ray exposure

5    switch for producing the X-ray.

6    Q    Thank you.  And when this person arrived

7    at -- By the way, was this person a male or female?

8    A    Female.

9    Q    And when she -- When you spoke to her,

10   what did you have her do when she went into the

11   room with you?

12   A    Well, I had her -- I had my cassettes

13   there.  I was going to use tape X-rays, place her

14   hands on the cassettes, and I positioned it for the

15   first X-ray.

16   Q    And when you placed her hand in position,

17   did you put it on the table?

18   A    Yes.

19   Q    And what did you do after you placed her

20   hand on the table?

21   A    Well, I went behind the X-ray panel and

22   took the X-ray.

23   Q    Now, the equipment that you used, the X-

24   ray machine that you used, you used the word

cassette, what is a cassette?

A    That would be the film that the X-ray is being done on.

Q    And did they cassette have an identification assembly attached to it?

A    Yes, it was what's known as a blocker.

Q    What's a blocker?

A    It's a part of the film that we use to stamp for the name and stuff to come out.

Q    And in this particular case, this is the way this particular cassette was set up, then, is that correct?

A    Yes.

Q    And in this particular case, did you also have an identification -- or some way of identifying the X-ray?

A    Yes, once we take the film, we have what's known -- what we call a flashcard with the patient's name, date, that she was there, and a log number where we put it in the log book.

Q    In addition to that information, is there any other information on that card?

A    Usually when the examine was done.

Q    And is the hospital name also on there?

A    Yes, it is.

Q    Now, Carolyn, did you use an

identification card on a flashcard in this particular case?

A     Yes, I did.

Q     And how was that flashcard reflected on the X-ray?

A     Well, once you took the film into the dark room, the blocker, I was telling you about on the side?

Q     Yes.

A     Shows you where to stamp the film into this flasher, and it comes out on the film.  Once it's developed after you stamp it.

Q     And did you do that in this particular case?

A     Yes.

Q     Now, Carolyn, approximately -- Did you take more than one X-ray in this case?

A     Two X-rays, but three views.

Q     And after you took those X-rays, what did you do?

A     Well, once I made sure I had the right amount of film, I took them to the radiologist to be read.

Q     To be what?

A     To be read.

1    Q    Before you took them to be read, after you

2  actually took the photographs, the shots, did you

3  develop those?

4    A    Yes, I did.

5    Q    Could you describe to Judge Holt what you

6  did?

7    A    You go into the dark room, you have to do

8  this in the dark, you took the flashcard with you

9  because that's how you're going to stamp the film

10  of who you are doing.  You take the film out of the

11  cassette, and you stamp with the card, and you put

12  it through the process.

13    Q    And did you develop, then, these X-rays?

14    A    Yes.

15    Q    And are they marked accordingly with the

16  identification which you described?

17    A    Yes, once they come out of the processor,

18  you have to check it to make sure the name, what

19  you do, and the slides mark correctly on the film.

20    Q    Have you had any training in developing

21  that?

22    A    Yes, that's part of the school training.

23    Q    And you satisfactorily completed that

24  training as well?

     A    Yes.

1    Q    That's the two-year training program you

2  described?

3    A    Yes.

4    Q    Carolyn, this X-ray machine that you used,

5  was that machine in proper working order?

6    A    Yes, it was.

7    Q    How did you know that?

8    A    Well, number one, we have a warm-up

9  procedure that we follow in the morning, and also

10  if it's not working, you won't get no film.

11    Q    Is it customarily inspected as well?

12    A    Yes, it is.

13    MR. MURPHY:  Could I have a moment, Judge?

14    THE COURT:  Sure.

15              (Whereupon there was a short

16              pause in the proceedings)

17    MR. MURPHY:  May I approach, Judge?

18    THE COURT:  You may.

19    MS. PLACEK:  I ask for a sidebar, Judge.

20    THE COURT:  Miss Strong, would you step down

21  from the witness stand?  Step into the adjoining

22  conference room for a moment, please.

23              Miss Placek?

24    MS. PLACEK:  Very briefly, Judge, and very

   quickly, I anticipate that the State was about to

show what they came over to counsel's table and
showed us which purports to be different X-ray
shots.  With all due respect, Judge, and with my
limited knowledge of x-ray and perhaps now proven
from the State, one of them strikes me definitely
not as an X-ray of a hand, which I suggest the
foundation has been only laid as to that, and the
other, Judge, is, of course, questionable, that's
why I asked the Court for proof as to whether or
not the State was going to attempt to have this
young lady from Roseland Community Hospital
identify all four shots as shown within that.

        THE COURT:  Mr. Murphy?

        MR. MURPHY:  Judge, actually, there's three
different exhibits.  One of the exhibits that's two
X-rays on it, so there's actually two shots on that
one exhibit.  Those both corresponds to the date in
which this witness was working, and she will
identify them as X-rays that she took.  The other
exhibit is an X-ray that was also taken at Roseland
Community hospital.  However, this witness will not
testify that she took that X-ray.  She will
identify it, though, as an X-ray that was taken at
Roseland community Hospital.

        MR. LUFRANO:  Objection, your Honor.  It's not

1    a document where other material that's under her

2    care, custody, or control.  She's not the record

3    keeper nor is she the person who holds X-rays in

4    some filing capacity.

5        MR. MURPHY:  Judge, I don't think she has to be

6    the record keeper.  I think it can be -- In fact,

7    cases are clear that it doesn't have to be a record

8    custodian.  It could be another qualified witness,

9    and at this point, we have established that she was

10   a qualified witness.

11       MS. PLACEK:  With all due respect, Judge, she's

12   just qualified with the three pictures she's taken,

13   which are the ones State spoke of, the one and the

14   two separate views, Judge.

15       THE COURT:  What do you contend is the basis

16   for admissibility of these documents, Mr. Murphy?

17       MR. MURPHY:  Well, Judge, as to the -- You're

18   talking about the last document now, Judge?

19       THE COURT:  I'm talking about all of them.  If

20   some of those documents, I take it, you're saying

21   are within this witness' knowledge as having been

22   made or taken, made at the time at Roseland

23   Hospital on the 19th of August, 1986, that's one

24   basis for admissibility.

         MR. MURPHY:  Right.

1    THE COURT: The other is what?

2    MR. MURPHY: Well, Judge, as to the other X-

3    ray, our basis is business record, not the one

4    obviously she's dealt with, but the other one she

5    does not have direct involvement in.

6    THE COURT: It isn't your contention you have

7    laid a foundation to make this X-ray a business

8    record?

9    MR. MURPHY: Well, Judge, that's how we are

10   seeking to introduce the last X-ray.

11   THE COURT: You're saying the foundation you

12   have laid is sufficient to establish this document

13   as a business record?

14   MR. MURPHY: No, at this point, Judge, I intend

15   to do it when I approach her, not at this point.

16   MS. PLACEK: That would be letting the horse

17   out of the barn, and then locking the barn door.

18   THE COURT: How would one go about doing it

19   otherwise than to show -- to establish if he can

20   that the document is, in fact, a business record,

21   and then seek its admission into evidence? He has

22   to show it to the witness it seems to me.

23   MS PLACEK: He would also have to show that

24   there is a purview of knowledge other than taking

     the remote matter she testified to.

1    THE COURT:  Well, what you're simply saying he

2    may not be able to make the foundational base for

3    admissibility?

4    MS. PLACEK:   The Court is correct, Judge.

5    That's what I am saying, not with this witness, not

6    with the questions he's asked her so far.

7    THE COURT:  That's why he's going to ask her

8    some more questions.

9    MS. PLACEK:  With all due respect, Judge, I

10   have a feeling, and accuse me of being a little

11   skeptical of my feelings, I have a feeling, Judge,

12   that what the State is about to say is about to

13   have her identify the identification point of the

14   X-ray and say, "Do you recognize that?"  Referring

15   to the third X-ray not taken by her, and she will

16   say, "Oh, yes, that's the blank tape that we put on

17   all our X-rays," and have it justified like that.

18   My position, Judge, quite frankly, is that that's

19   not quite enough as established by law not only

20   quite enough to establish by law, Judge, but I

21   would suggest that even a little more has to be

22   done, and the reason I am speaking somewhat

23   haltingly, Judge, is that I am not going to teach

     them how to try their case --

24   MR. MURPHY:  We appreciate that.


161

1    MS. PLACEK:   Please address your comment to the

2  Court, counsel.

3    THE COURT:   What are you saying?

4    MS. PLACEK:   Judge, it's distracting when

5  counsel is referring that I come from a kennel.

6       Judge, in this particular matter, what

7  I am suggesting to the court it's not my duty to

8  teach them how to try a case, and I am saying it's

9  my duty, in fact, to instruct the Court when I feel

10  an objection lies.

11    THE COURT:   Mr. Sheriff, will you ask the

12  witness to return?

13       You may be seated.

14       All right.   At this point, the

15  objection of the defendant is overruled.   You may

16  proceed.

17    MR. MURPHY:   Thank you, Judge.

18       May I approach, Judge?

19    THE COURT:   You may.

20    MR. MURPHY   Q   Carolyn, I am going to show you

21  what we have marked as People's Exhibit No. 13.

22  I'm going to ask you to look at this and tell me if

23  you recognize what it is?

24    A    Okay, this is what we all the lateral view

of the wrist.

1732

1          MS. PLACEK:  Objection.  I believe the witness

2   is not qualified to read the X-ray.

3          MR. MURPHY:  Judge, I will qualify her if it

4   would help in this area.

5               Q     Carolyn,  have  you  had  any

6   experience and/or training in looking at X-rays and

7   determining generally what they portray?

8          A    Yes.

9          Q    How much training or experience have you

10  had?  Could you tell Judge Holt?

11         A    Well,  it goes along with the training.

12  You have to know what you're taking, what views are

13  required.

14         Q    And approximately how many X-rays have you

15  taken in your career?

16         A    A lot of them, quite a few, over -- It's

17  too many to put a number on it.

18         Q    Would you say more than 500?

19         A    Yes.

20         Q    More than a thousand?

21         A    Yes.

22         Q    Carolyn, when you take those X-rays, do

23  you have to look at those X-rays initially before

24  you give them to the doctor who requested them?

           A    Yes.

Q    To show what the doctor wants --

MR. LUFRANO:  Objection.  She wouldn't know
what the doctor is looking for.

THE COURT:  Overruled, Mr. Lufrano.  She cannot
read an X-ray, but she can look at an X-ray to see
if it's the lateral view of the hand or posterior
view of the hand.

MR. LUFRANO:  Your Honor, she's indicating if
she place it in a lateral position, she gets a
lateral view.  It's a view of the arm that she's
able to distinguish whether or not it was moved or
not moved after the X-ray was taken.

THE COURT:  Overruled.

MR. MURPHY    Q    Carolyn, you can answer that
question.  Do you remember the question I asked?

A    No.

MR. MURPHY:  Judge, I forgot my question, too,
I'm sorry.

        (Whereupon question read back)

THE WITNESS:  Yes, I do.

MR. MURPHY    Q    At this time I ask you to look
at People's Exhibit No. 13 and tell me what that
is.

A    This is the lateral view of the wrist.  It
has the --

1    MR. LUFRANO:  Objection to what it has.

2    THE COURT:  Overruled.

3    THE WITNESS:  Okay, it has a left what we call

4    an X-ray left marker indicated on the left wrist

5    that was done, it has my initials on it, C.S.

6    MR. MURPHY  Q  And where are your initials at?

7    A    It's right next to the "there."

8    Q    And you customarily place your initials on

9    X-rays that you take at Roseland Hospital as part

10   of your regular practice or procedures?

11   A    Yes.

12   Q    And are those initials that are on that X-

13   ray the same initials or in the same form that you

14   place  your  initial  --  which  you  placed  your

15   initials on X-rays?

16   A    Yes.

17   Q    And  you  testified  that  you  used  what's

18   called a -- an information plate, is that what you

19   call it?  What do you call it?

20   A    Flashcard.

21   Q    And  is  there  a  flashcard  on  this

     particular X-ray?

22   A    Yes, it is.

23   Q    And  does  that  flashcard  reflect  the

24   information with respect to this patient which you

20  C35

recorded at the time you prepared that X-ray?

A    Yes, it does.

Q    Thank you, and that's an X-ray that you took, is that correct?

A    Yes.

Q    I'm also going to show you what's been marked as People's Exhibit No. 14 for identification purposes.  Do you recognize that?

A    Yes.

Q    What is shown in People's Exhibit No. 14?

A    It would be an A P view and -- bleak view.

Q    And there's two different shots on that X-ray, is that correct?

A    That's correct.

Q    And, again, is your -- is there any reason that you recognize what's portrayed in that particular exhibit, People's Exhibit No. 14?  Let me rephrase that question.  How do you recognize that X-ray?

A    How did I recognize it?

Q    Yes.

A    As what it is?

Q    Yes.  Let me rephrase it.  How do you recognize that as an X-ray that you took?

A    Because of my marker and initial.

21

Q    Are your initials also on that X-ray as it is on People's Exhibit No. 13?

A    Yes.

Q    And in addition to that, is the -- Is there a flashcard on that X-ray?

A    Yes.

Q    In fact, there are two flashcards for each X-ray that was taken?

A    Correct.

Q    And what does the flashcard on that exhibit and also on People's Exhibit No. 13 reflect?

MS. PLACEK:  Objection.  The exhibit speaks for itself.

THE COURT:  Overruled.

MR. MURPHY   Q   What does the flashcard in that exhibit and also People's Exhibit No. 13 reflect?

A    It has the name of the patient.

Q    What is that name?

A    Denise Johnson --

MS. PLACEK:  Continuing objection.

THE COURT:  Objection is sustained.  It still does not obviate the hearsay nature of that response.  the objection is sustained.

MR.  MURPHY    Q    What other information is

22

637

indicated on that flashcard?

    A    The date that the X-ray was taken, the hospital where they was from and a number that we logged in the log book for each patient that was done that day.

    Q    And those X-rays you have identified in People's Exhibit No. 13 and 14, are these the exhibits you took on August 18, 1986?

    A    Yes.

    Q    And are these the X-rays you took of Denise Johnson?

    A    Yes.

    MS. PLACEK:  Objection.

    THE COURT:  Objection sustained.

        Counsel, come forward a moment.

        Miss Reporter.

        (Whereupon the following pro-

        ceedings were had in chambers:)

    THE COURT:  I don't know whether or not I am doing what Miss Placek accuses you of doing.  What it seems to me what I am doing is what I think I'm doing is anticipating what  this is all about, and what the problems are that I'm likely to encounter.

        You don't have to unfold your case before me, prematurely, and you're free to decline

so to do, but I'm sitting here in order to help put
this in a frame where I can deal with it and
understand it, anticipating where you're going, and
I anticipate that you're trying to show the
identification of Denise Johnson through the
earlier X-rays taken of her in 1986, that they were
comparing with X-rays from the body and concluded
that they are one in the same.  The question of
whether or not the X-rays or any medical records
constitute a business record is what has been
running through my head since Miss Placek raised
the objection, and I have to have recourse to
develop books or your help, one or the other
because I didn't do a lot of PI work, okay, so,
therefore, a lot about the medical records and that
kind of thing, but my recollection of the medical
record is an exception to the business record.
It's one of the exception -- It is not a business
record, thus it requires different kinds of proof
than does a business record in a classic sense, if
I understand the classic sense.  That's what I'm
thinking up there on the bench, figuring out where
you people are going, but if I am wrong on that, my
head can go back to listening to something better
than what's rattling around in my head making

noises.

MR. MURPHY:  Judge, first of all as to the first two exhibits which the witness identified, we are not offering those as business records.  We don't have to because she's already identified them as X-rays that she took.

THE COURT:  Yes, but we don't know who she took them of, and you're going to ask me to conclude that those are X-rays of Denise Williams -- Denise Johnson, and there's no way that witness can know that.

MS. PLACEK:  Or this particular Denise Johnson.

MR. CASSIDY:  Just a piece of circumstantial evidence, Judge, that we are offering, that's all.

MR. PLACEK:  Judge, circumstantial evidence even still has to be based on foundation.

MR. MURPHY:  Judge, I don't have a case I can hand you, and I don't know if defense counsel has any or not, but Court can allow X-rays as business records, and I'm primarily concerned with --

THE COURT:  Do you have the case?

MR. MURPHY:  No, just from reading -- Do you want this on the record, Judge.

THE COURT:  Not necessarily, but it can be.

MR. MURPHY:  I don't really care if it's on the

2590

record or not at this point, Judge.

THE COURT:  She wants it on the record.

MS.  PLACEK:   We might as well stay on the record.

MR. MURPHY:  Judge, I can't give it to you at this point, but what I've read primarily are trial techniques manuals in preparation of this witness. Now, from what I read the Court's take notice that business records can be used.   I don't know if that's reference to Illinois Courts or not.  I have to do some research in the area.

THE COURT:  You got a copy of 38?

MS. PLACEK:  That's the one I have before me.

THE COURT:  That one is old.

MS. PLACEK:  I took it to read because that's one of the reasons you were overruling my objection, Judge.  I got one in my bag.  Which section.

THE COURT:  115 dash 5.

MS. PLACEK:  It talks about coroner's record. I suggest that's probably the same thing.

THE COURT:  Okay, they make coroners admissible.

MS.  PLACEK:   That's the exception.   I'm referring to 15-5 not five point one, no writing or

record made in the regular course of business shall become admissible as evidence by application of this section and such record or writing have been made by anyone in the regular course or form of hospital or medical records.

THE COURT:  That is?

MS. PLACEK:  15 dash 5-C-1.

THE COURT:  That's kind of what I thought.  No writing or record made in the regular course shall be admissible as evidence by the application of this section if, one, such writing or record has been made by anyone in the regular course of any form of hospital or medical business.

MS. PLACEK:  And next is the police report exception I think.

MR. MURPHY:  Well, how does that differentiate -- Isn't that different than from an X-ray?  I made a reference  to medical reports just like police reports.

THE COURT:  I think that -- that includes the medical record on a patient admitted into the hospital on all of its form which would include a person's X-rays, lab reports.

MS. PLACEK:  Lab workup.

THE COURT:  Nurses' notes.  The whole thing

27

692

that's called the patient's medical record is the
way I read that.  Now, I may be wrong, but that's
the way I understand the rule, and that's what was
bothering me as I was sitting there on the bench
trying to figure out what the hell we are doing .

Are there any cases --

MR. MURPHY:  There's not much in here.  There's
one page of cases, and the cases deal with medical
reports, hospital records.

MS. PLACEK:  So the Court knows, there's a way
of doing this, Judge, and the Court knows that this
was the status of my objection outside that this
isn't the way of doing it.  I am speaking of the
way the State's examination is going, thus, Mr.
Lufrano and my objections as to it.

THE COURT:  Well, you may -- You may very well
be right.

MS. PLACEK:  Here it says medical records
(Indicating), Judge.

MR. MURPHY:  Do you mind if I read over your
shoulders, your Honor?

THE COURT:  No, of course not.

Can you quickly find the last question
that was posed to the witness?

(Whereupon question read back)

28

693

1    MR. MURPHY:   Judge, are you going to let me

2  question her with respect to the last X-ray?

3    THE COURT:   What are you going to ask her?

4    MR. MURPHY:   I'm going to ask her what it is.

5  I'm going to ask her to identify it.   I'm going to

6  ask was the record made by a person with knowledge

7  of the information that's transmitted.   I'm going

8  to offer it as a business record.

9    MS. PLACEK:   Judge, that's absurd.

10    THE COURT:   No, I'm not going to let you do

11  that.

12    MR. MURPHY:   Well, Judge, that's the procedures

13  followed as a business record.

14    THE COURT:   Well, it's not a business record.

15    MR. MURPHY:   We're taking a position that it

16  should be admissible.

17    THE COURT:   If there is any way they can

18  exhaust that, I don't know how they can exhaust

19  that because I suspect you're going to object, and

20  I'm going to rule on the objection, and then if

21  there is anything that's admitted around that, that

22  helps to exhaust her recollection, if she has any

23  recollection that comes into evidence, we will use

24  it.

    MS. PLACEK:   So as to the third X-ray, you're

1    going to give them a break?

2         THE COURT:  What do you mean a break?  They can

3    ask the questions, and you object, I will rule on

4    it.  I don't know how they can make a record, that

5    the Court erred if I don't allow them to ask a

6    question, so I need to allow them to ask the

7    questions as an offer of proof or as a voir dire

8    examination, and since it is a bench trial, it

9    doesn't make any difference, so we will hear it at

10   one time, and I will rule on the objection.

11                  (Whereupon the following pro-

12                  ceedings were had in the court-

13                  room:)

14        MR. MURPHY  Q  Are those the X-rays you took on

15   August 19, 1986?

16        A    Yes.

17        Q    And is the name of the person whose X-rays

18   you took indicated on the plate, identification

19   plate?

20        MS. PLACEK:  Objection.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes, it is.

23        MR. MURPHY  Q  I'm also going to show you

24   what's marked as People's Exhibit No. 15.  I'd ask

     you to look at that and tell me if you recognize

1    that?

2          A    This is an X-ray of the pelvis --

3          MR. LUFRANO:  Objection to her identifying the

4    X-ray that she didn't take.

5          THE COURT:  People's Exhibit 15 was taken by

6    this witness?

7          MR. MURPHY:  No, Judge.

8          THE COURT:  The objection is overruled.

9          MR. MURPHY  Q  I'm sorry, you can answer the

10   question.

11         A    This would be a pelvic X-ray.

12         Q    And you recognize that X-ray?

13         MS. PLACEK:  Objection.  Foundation.

14         MR.  MURPHY:   I will rephrase the question,

15   Judge.

16              Q   You did not take that X-ray, is

17   that correct, Carolyn?

18         A    No, I did not.

19         Q    Do you recognize that X-ray as an X-ray

20   that was taken at Roseland Community Hospital?

21         MS. PLACEK:  Objection.  Foundation.

22         THE COURT:  The objection is sustained.

23         MR. MURPHY:  I'm trying to lay a foundation,

24   Judge.  I will rephrase the question.

              Q  Carolyn, do you recognize that

1    X-ray?

2         MS. PLACEK:  Objection.  Asked and answered.

3         THE COURT:  Overruled.

4         THE WITNESS:  Yes, I do.

5         MR. MURPHY  Q  And what do you recognize that

6    X-ray to be?

7         MS. PLACEK:  Objection.  Asked and answered.

8    She stated it was a pelvic.

9         THE COURT:  Overruled.

10        MR. MURPHY  Q  Apart from being a pelvis, what

11   else do you recognize with regard to that X-ray?

12        A    That it has -- the identification of whose

13   X-ray it is, and that's it.

14        Q    Is there a flashcard in that X-ray, then,

15   ma'am?

16        A    Yes, it is.

17        MS. PLACEK:  Objection.

18        THE COURT:  That's leading.  Please don't lead.

19        MR. MURPHY  Q  What are you looking at to cause

20   you to recognize that X-ray?

21        MS. PLACEK:  Objection.

22        THE COURT:  Overruled.

23        THE WITNESS:  To recognize what it is or whose

24   it is.

          MR. MURPHY  Q  What it is and whose it is.  How

                              32
                              607

1    are you able to recognize what that is?

2    　　　MS. PLACEK:  Objection, your Honor.  Compound.

3    　　　THE COURT:  Objection is sustained.

4    　　　MR. MURPHY  Q  how are you able to recognize

5    what that is?

6    　　　A    Because I know what it is.

7    　　　Q    You're referring to the fact that this is

8    a pelvis?

9    　　　MR. LUFRANO:  Objection.

10    　　　THE COURT:  Overruled.

11    　　　MR. MURPHY  Q  And how are you able to

12    recognize who it is or what information -- whatever

13    information you know about that X-ray, how are you

14    able to recognize that?

15    　　　MS. PLACEK:  Objection.

16    　　　THE COURT:  Overruled.

17    　　　THE WITNESS:  By the stamp in the upper left-

18    hand corner.

19    　　　MR. MURPHY  Q  And is that the flashcard you

20    refer to?

21    　　　A    Yes.

22    　　　Q    And, Carolyn, is that flashcard -- Does

23    that flashcard that you see there familiar to you?

24    　　　A    Yes, it is.

25    　　　MS. PLACEK:  Objection.

33
698

1    THE COURT:  Overruled.

2    MR. MURPHY  Q  Is it?

3    A    Yes, it is.

4    Q    And, in fact, at Roseland Community

5  Hospital, do you use customarily the same proce-

6  dure -- Do all the technicians there use the

7  procedure of taking of the X-ray?

8    MS. PLACEK:  Objection.

9    THE COURT:  Objection sustained.

10    MR. MURPHY  Q  Are you familiar with the

11  procedure you use at Roseland Community Hospital as

12  to taking X-rays?

13    MS. PLACEK:  Objection as to lack of knowledge,

14  Judge.

15    THE COURT:  Overruled.

16    MR. MURPHY  Q  Are you familiar with the

17  procedure?

18    A    Yes.

19    Q    And the procedure that you described

20  before, the one that you used on August 19, 1986,

21  is that the procedure you customarily use at

22  Roseland Community Hospital?

23    THE COURT:  Objection is sustained.

24    MR. MURPHY  Q  What is the procedure you use at

Roseland Community Hospital in taking X-rays?

34

1    MS. PLACEK:  Objection.

2    THE COURT:  Overruled.

3    THE WITNESS:  The procedures that's used would

4  be  all  films  that's  taken  must  have  the

5  identification of the patient that you've done the

6  examine  on,  and  the  date  and  the  age  of  the

7  patient.

8    MR. MURPHY  Q  And that information is put on

9  the flashcard which is placed on the X-ray?

10    A    Yes.

11    MS. PLACEK:  Again, objection.

12    THE COURT:  Overruled.

13    MR. MURPHY  Q  And who places that information

14  on the X-ray?

15    A    That  on  the  X-ray,  that  would  be  the

16  technologist that done the case.

17    Q    Such as yourself, a person like yourself,

18  is that right?

19    MS. PLACEK:  Objection to such as yourself,

20  Judge.

21    THE COURT:  Overruled.

22    MR. MURPHY  Q  And is that record, that X-ray,

23  People's Exhibit No. 19, is that made by a person

24  with knowledge of or made by --

    THE COURT:  People's Exhibit what?

35

1    MR. MURPHY:  I'm sorry, Judge, that's 15.

2         Q   Is that record made by a person

3    with  knowledge  of  or  made  from  information

4    transmitted from a person of knowledge of the acts

5    or events --

6         MS. PLACEK:  Objection, Judge.

7         THE COURT:  The objection is sustained.

8         MS. PLACEK:  Thank you.

9         MR. MURPHY  Q  Is the information that appears

10   on the flashcard a reference to the patient who's

11   X-rayed?

12        MS. PLACEK:  Objection.

13        THE COURT:  The objection is sustained.

14        MR. MURPHY:  May I have a moment, Judge?

15             (Whereupon there was a short

16             pause in the proceedings)

17        MR.  MURPHY   Q   Is the X-rays that you're

18   looking at now People's Exhibit No. 15, is that X-

19   ray made near or the time that the X-ray is taken?

20        MS. PLACEK:  Objection.

21        THE COURT:  I'm sorry.  I don't quite -- I

     didn't understand the question.

22

23        MR. MURPHY:  Judge, the question was was the X-

     ray made at or near the time it was taken.

24

        MS. PLACEK:  Objection.

                        36

1    MR. MURPHY:   I will rephrase the question,

2  Judge.  I believe the question is unclear.

3         Q  Is there a date indicated on that

4  X-ray?

5    MS. PLACEK:  Objection.  The exhibit speaks for

6  itself, Judge.

7    THE COURT:  Overruled.

8    MR. MURPHY  Q  And what's the date?

9    MS. PLACEK:  Objection.

10   THE COURT:  Overruled.

11   THE WITNESS:   The date is, it looks like

12  1/10/87.

13   MS. PLACEK:  Excuse me.  A continuing objection

14  as to the date, Judge.

15   MR. MURPHY  Q  And is it a practice there to

16  put the date on the X-ray reflecting the date that

17  the X-ray is taken?

18   MS. PLACEK:  Objection.

19   THE COURT:   In the normal, custom -- The

    objection is sustained.

20   MR. MURPHY:  Your Honor, she talked about the

21  procedures in August of '86.  This is January of

22  '87.

23   THE COURT:  The objection is sustained.

24   MR. MURPHY  Q  Were the procedures that you

described in 1986 for taking of X-rays, did they

change at all to January of 1987?

A     No.

MS. PLACEK:  Objection.

THE  COURT:   Are  you  talking  about  her

procedures or the procedures generally of the X-ray

Department?

MR.  MURPHY:   I will  rephrase  the  question,

Judge.

Q    Carolyn, the X-ray procedures in

the X-ray Department -- Strike that.  The procedure

you described, are those the general procedures,

customary procedures that are used in the X-ray

Department?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes, they are there.

MR. MURPHY   Q   And were those procedures the

same in 1987 and January of 1987 as they were in

August of 1986?

MS. PLACEK:  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes, they are.

MR. MURPHY   Q   And is it the regular prac-

tice -- Was it the regular practice at Roseland

Community Hospital to place information about the patient's name, the date that the X-ray was taken, the hospital where the X-ray was taken on the flashcard of the X-ray.

MS. PLACEK:  Continuing objection, Judge.

THE COURT:  The objection is overruled.

THE WITNESS:  Yes.

MR. MURPHY   Q   And was that done in the exhibits which you're looking at?

MS. PLACEK:  Objection.

THE COURT:  Objection is sustained.

MR. MURPHY   Q   Is there a flashcard with that information on the X-ray which you're looking at now, People's Exhibit No. 15?

MS. PLACEK:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.

MR. MURPHY   Q   And is the X-ray that's prepared in relation -- Is the X-ray that's prepared made at the time that the X-ray was taken, developed at the time that the X-ray was taken?

MS. PLACEK:  Objection.  Beyond the scope of the witness, Judge.

THE COURT:  As to Exhibit 15?

MS. PLACEK:  That's what I think counsel is

3914

speaking of, yes.

MR. MURPHY:  Is the objection sustained, Judge?

THE COURT:  As to Exhibit 15, the objection is sustained.

MR. MURPHY  Q  Is it the regular customary practice of Roseland Hospital to develop the X-ray immediately on the same day the X-ray is taken?

A    Yes.

Q    And was that record made to your knowledge at or near the time that it was taken?

MS. PLACEK:  Objection.

THE COURT:  Objection sustained.

MR. MURPHY:  No further questions, Judge.

THE COURT:  Cross.

MS. PLACEK:  Thank you.

CROSS-EXAMINATION

BY

MS. PLACEK:

Q    Ma'am, calling your attention to the date and time in 1986 when you took the X-ray that you testified about, how many X-rays did you take that day?

A    Of patient --

Q    Of anybody, how many X-rays of people did you take that day?

A     Well, I don't remember how many I took that day.

Q     How many did you take of females?

A     I don't remember that either.

Q     How many did you take of males?

A     I don't remember.

Q     Am I correct to assume you're not a record keeper, correct?

A     No.

Q     I'm incorrect, or are you a record keeper?

A     Of what?

Q     Beg your pardon?

A     I don't understand the question.

Q     At Roseland Hospital, do you keep records?

A     The records I kept.

Q     When you say you kept, are those the X-rays that the State showed you that would be State's Exhibit No. --

A     They are logged in a log book, yes.

Q     When you say they are logged in a log book, do you have sole care and control of that locker?

A     No, I do not.

Q     So even the X-rays you take you don't have sole care and control after you take them and

41796

deliver them to the doctor, correct?

A   Correct.

Q   Thank you.  Not only that, but let's go one step further, ma'am, am I correct, in dealing with the X-rays, you did state your memory had to be refreshed?

A   Yes.

Q   Am I correct in assuming you have -- before you were called by these gentlemen, no independent recollection of the events or the matters that happened on that date in 1986?

A   Correct.

Q   Am I correct in saying that as a matter of fact, what you're testifying to is a combination of what you were told to testify to and send your X-rays, correct?

A   I would say the X-rays is what I was testifying to.

Q   When you say the X-rays are what you were testifying to, you have no independent memory of these X-rays, correct?

A   I can't remember I do.

Q   I'm not blaming you, ma'am.  You have no independent memory of these X-rays, correct, taking these X-rays, correct?

1    A    Correct.

2    Q    And   I   am   referring   specifically   to

3    People's No. 14 and People's No. 13.  And to the

4    best of your knowledge, these -- and referring to

5    People's No. 14 and People's No. 13 -- were kept

6    out of -- Well, put it this way bluntly, they were

7    kept  in  that  same  locker  that  we  talked  about

8    earlier, correct?

9    A    Yes.

10    Q    To the best of your knowledge, correct?

11    A    Correct.

12    Q    As  a  matter  of  fact,  am  I  correct  in

13    assuming that the only reason that you say they

14    were kept  in  the  locker  is  because  you  conclude

15    they were, correct?

16    MR. MURPHY:  Objection.

17    MS.  PLACEK:   It  goes  to  personal  opinion,

18    Judge, and basis for testimony.

19    THE COURT:  The objection is overruled.

20    MS. PLACEK  Q  Isn't it correct that the only

21    reason you say these X-rays were kept in that

22    locker is because you conclude, you assume, you

23    imagine they were, correct?

24    A    Excuse  me,  what  locker  are  you  talking

about?

437

1      Q    The lockers where all the X-rays are kept,

2  correct?

3      A    Correct.

4      Q    So you have no idea, as a matter of fact,

5  whether these two X-rays, again referring to

6  People's 13 and 14, were even kept there, you just

7  assumed that, correct?

8      A    Correct.

9      Q    Thank you.  Now, ma'am, let me ask you

10  this just as a matter of course, you've been

11  working some seven years at Roseland Community

12  Hospital, correct?

13      A    Yes.

14      Q    In those seven years at Roseland Community

15  Hospital, made a mistake, haven't you?

16      MR. MURPHY:  Objection.

17      THE COURT:  Overruled.

18      MS. PLACEK  Q  Correct?

19      A    Correct.

20      MS. PLACEK:  No, further questions.

21      THE COURT:  Any further questions?

22      MR. MURPHY:  No.

23      THE COURT:  Thank you, Miss Strong, you may

24  step down.

                    (Witness excused)

1    THE COURT:  Call your next witness.

2    MR. CASSIDY:  Michael Walker.

3    MS. PLACEK:  Your Honor, there is a rap sheet

4  involved with this witness, the Court notices, and

5  the Court has signed a rule to show cause --

6    THE COURT:  Did you --

7    MS. PLACEK:  We've been tendered one.

8    MR. CASSIDY:  I thought we tendered one.

9    MS. PLACEK:  We ask before examination that a

10  rap sheet be given, Judge.

11    THE COURT:  I will certainly see to it that you

12  get a rap sheet before you commence your cross, but

13  I don't know if it's fatal to you that you have it

14  before  they  commence  their  direct,  but  I  will

15  certainly make certain that a rap sheet be given to

16  you if such a thing exist.

17    MS. PLACEK:  I just guess so since I see where

18  he's coming from.

19    THE COURT:  That's a reasonable conclusion or

20  speculation that you reach.

21                Bring the witness out of your lock-up.

22    MR. CASSIDY:  Didn't we tell you beforehand?

23    MS. PLACEK:  When you told me, why didn't you

24  give me a rap sheet?

    MR. CASSIDY:  Because I thought we already gave

you one.

THE CLERK:  Raise your right hand, sir.

(Witness sworn)

THE COURT:  You may be seated.  That microphone is on.  If you will speak directly into it, keep your voice up, we will all hear you.

You may proceed.

MR. CASSIDY:  Thank you, your Honor.

JEROME WALKER,

a witness herein, called on behalf of the People of the State of Illinois, after being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY

MR. CASSIDY:

Q    Sir, can you please state your name and spell your last name?

A    My name is Michael, my last name, Walker, W-a-l-k-e-r.

Q    Michael, what's your date of birth?

A    9/'63 -- 1963.

Q    And what month and what day?

A    September 14.

Q    September 14 of 1963?

A    (Nodding affirmatively).

Q    Thank   you,   Michael.    Calling   your
attention  to  August  2  of  1988,  did  you  have  a
conversation  with  a  person  known  to  you  as  Jerome
Hendricks?

A    Yes, sir.

Q    Can  you  please  look  around  the  room  and
see if you see Jerome Hendricks in the courtroom?

A    Yes, sir.

Q    Please point him out.

MS. PLACEK:  We will stipulate he's pointing to
the defendant, Judge.

MR. CASSIDY:  Accept that stipulation, Judge.

THE COURT:  The record may so reflect.

MR.   CASSIDY   Q   On   August   2,   1988,
approximately 10:30, 11:00 o'clock in the morning,
did you have a conversation with Jerome?

A    Yes, sir.

Q    And  where  did  this  conversation  take
place?

A    At my father's house.

Q    Where is that located?

A    12013 Princeton.

Q    That's  located  in  Chicago,  Cook  County,
Illinois?

A    Yes, sir.

47

Q    And who was present for that conversation between you and Jerome?

A    Just me and Jerome were there.

Q    And prior to having this conversation, what were you doing at your house?

A    I was painting my father's front porch.

Q    And was Jerome there helping you paint?

A    No, sir.

Q    Jerome came upon your father's porch where you were painting?

A    Yes, sir.

Q    How did he get there?

A    On a bike.

Q    Was there anyone else present for the conversation?

A    No, sir.

Q    What did Jerome Hendricks say to you, and what did you say to him?

MS. PLACEK:  Objection.

THE COURT:  Basis?

MS. PLACEK:  Hearsay.

THE COURT:  Overruled.

MS. PLACEK:  Will the Court entertain argument? I believe what the State is attempting to show is -- And I believe prior inconsistent, I would say

48

this is a former impeachment or at least that's
what was suggested to us before this witness took
the stand --

MR. CASSIDY:  It's within --

MS. PLACEK:  Excuse me, counsel, may I finish?

MR. CASSIDY:  Oh, sure.

MS. PLACEK:  Thank you.  The point I am making,
Judge, the foundation under Gutierrez hasn't been
laid, your Honor.

THE COURT:  Well, I must tell you I am not
certain I understand -- know the case that you just
referred to, but it's my judgment and understanding
that whatever the defendant says, whether it's
inculpatory or exculpatory, it is admissible, is
that incorrect?

MS. PLACEK:  Judge, I would suggest it is.

THE COURT:  State?

MR. CASSIDY:  Judge, I believe the evidence
will be inculpatory.

MS. PLACEK:  Well, with all due respect, Judge,
I'd ask the Court when he says inculpatory, unless
there's a new statement coming up, and unless
there's a statement when we speak of inculpatory,
that this defendant somehow admitted he did it to
this witness, then I would suggest that this is a

mistrial, and there is severe violation.

THE COURT:   Miss Placek, I have no way of knowing that, and that's not what I'm ruling on, the objection on the basis of hearsay is overruled. If something occurs that give rise to another basis, we will hear that at that time.  The objection is overruled.

MR. CASSIDY:   Thank you, your Honor.

Q   The question is, Michael, what did he say to you, and what did you say to him during this conversation?

A   He said a policeman was looking for him for -- He said that the police were looking for him because Carlina (Phonetic) and them said he was the last one who seen him with the little girl.

Q   And did he say anything to you about that?

A   He told me to tell the police that he been with me.

Q   And had he, in fact, been with you?

A   No.

MS. PLACEK:   Objection.   When?

THE COURT:   The objection is sustained. Foundation, when?

MR. CASSIDY   Q   Did he tell you when you should tell the police that he was with you?

A    No, he didn't exactly tell me when.

Q    Okay, what did he say to you then if the police ask you?

A    What?

Q    What did he say to you about telling the police?

A    He told me to tell the officer that he was with me.

Q    When, though, when was he with you?

A    That morning.

MS. PLACEK:  Objection.

THE WITNESS:  About 10:00 o'clock.

THE COURT:  The objection is overruled.

MR. CASSIDY  Q  He told you to tell the police to tell them the defendant was with you if they asked you that question, is that what you are saying?

A    Yes.

MS. PLACEK:  Objection as to foundation, Judge, when.

THE COURT:  When what?

MS. PLACEK:  When the defendant supposedly proffer the statement.

THE COURT:  Lay a foundation.  This conversation is taking place between 10:30 and

51
716

1  11:00 and at 12013 South Princeton on the porch

2  between this witness and this defendant. This is

3  when he's telling him that.

4      MS. PLACEK:  I understand that, but at what

5  time was there a proffer that the defendant was

6  made this request.

7      THE COURT:  On August 2.

8      MS. PLACEK:  No, as to -- I take it they are

9  getting into false alibi. This is the exculpatory

10  they are getting in.

11      MR. CASSIDY:  Judge, the witness testified if

12  the police asked him if he was with him, tell them

13  he was.

14      MS. PLACEK:  When, though, that's the point.

15      THE COURT:  When?

16      MR. CASSIDY:  He didn't say when. He just said

17  if the police asked him --

18      THE COURT:  All right. That goes to weight,

19  which is not admissible. The objection is

20  overruled.

           You may cross-examine him on it.

21      MR. CASSIDY  Q  When the defendant told you to

22  tell the police that you were with him, what if

23  anything did you say to him?

24      A    I told him that I didn't have nothing to

do what he was doing, what was going on.

Q    Did you say anything else to him?

A    No, I just continued painting my porch, and he left.

Q    And he told you this right after he talked about the missing girl, is that correct?

A    Yes.

MS. PLACEK:    Objection -- I will withdraw it, Judge.

MR. CASSIDY:    Could I have just a minute, Judge?

                (Whereupon there was a short
                pause in the proceedings)

MR. CASSIDY    Q    How long had you known Jerome Hendricks prior to that?

A    I have known Jerome for 13, 14 years.

Q    In August 9, 1988, did you have a conversation with Chicago police officers?

A    Yes, they took me down to the station. They talked to me and talked to Carlina and a lot more girls.

Q    On the night of August 1, 1988, where you with the defendant that night?

MS. PLACEK:    Objection.

THE WITNESS:    I seen Carlina.

53

THE COURT:  Just a minute.  What's the basis of your objection.

MS. PLACEK:  The basis of the objection, Judge, is again as to foundation, when.

THE COURT:  August 1.

MR. CASSIDY:  I thought I said on the night of August 1, 1988, Judge.

MS. PLACEK:  The time, Judge.

THE COURT:  Overruled.

MR. CASSIDY  Q  On August 1, 1988, the night of August 1, 1988, were you with the defendant or were you with Carlina and Yolanda?

MS. PLACEK:  Objection to leading and suggestive.

THE COURT:  The objection is sustained.

MR. CASSIDY  Q  Who were you with on the night of August 1, 1988?

A    I was with Carlina, we were walking our neighborhood looking for her.

Q    Looking for who?

A    The little girl, her little cousin.

Q    Would that be Denise Ann Johnson?

A    Yes.

Q    Were you ever with Jerome Hendricks that night?

1        A    No, sir.

2        MR. CASSIDY:  I have no further questions, your

3   Honor.

4        MS. PLACEK:  Could I have a rap sheet, Judge?

5        THE COURT:  Mr. Cassidy?

6        MR. CASSIDY:  We ordered it.

7        THE COURT:  You just ordered it?

8        MR. CASSIDY:  Judge, I believe we tendered it

9   before.

10       MS. PLACEK:  Judge, I --

11       THE COURT:  Just a moment.

12       MR. CASSIDY:  It should be over in a few

13  minutes, faxed or whatever.

14       THE COURT:  That's what I was trying to get

15  out.

16       MR. CASSIDY:  I'm sorry, Judge.  I should have

17  made that clear.

18               (Whereupon a recess was taken

19               after which the following pro-

20               ceedings were had:)

21       THE COURT:  Court is back in session.

22       MS. PLACEK:  May I proceed, Judge?

23       THE COURT:  You may.

24

CROSS-EXAMINATION

BY

MS. PLACEK:

Q   Sir, I noticed you came in with two gentlemen in a green uniform. Does that mean you are currently incarcerated?

A   Yes.

Q   As a matter of act, quite frankly you're in the State prison, is that correct?

A   Yes.

Q   Do you want to tell his Honor what you're in the State prison for?

A   For drugs.

Q   State prison for drugs. When you say drugs, are you an addict?

A   No, ma'am. I was selling.

Q   When you say you were selling, how many times were you, in fact, convicted for selling drugs?

A   Just twice.

Q   Just twice. What kind of drugs just twice were you convicted of?

A   Drugs.

Q   What kind?

A   Cocaine.

1

Q    Thank you.    Were you ever convicted of

2    heroin?

3    A    No, ma'am.

4    Q    Let me ask you this:    Have you been

5    promised any money for your testimony today?

6    A    No, ma'am.

7    Q    Haven't you been promised money by the

8    State's Attorney for possibly helping you when you

9    got out of prison?

10    A    No, ma'am.

11    MS. PLACEK:    For an offer of proof, Judge, at

12    the end of this witness' testimony, I would like to

13    put on Mr. Lufrano.

14    Q    Let me ask you this, sir:    Have you

15    been promised anything for testifying?

16    A    No, ma'am, I wasn't promised anything.

17    Q    You weren't promised anything?

18    A    No, ma'am.

19    Q    Calling your attention specifically to

20    August 9, 1988, you were brought down to the police

21    station, weren't you?

22    A    Yes, ma'am.

23    Q    As a matter of fact, you were brought down

24    there by the police, correct?

A    Yes, ma'am.

57

1     Q    As a matter of fact, when you were brought

2  down  there  by  the  police,  you  were,  in  fact,

3  questioned  about  the  disappearance  of  Denise

4  Johnson, correct?

5     A    They was talking to me about it.

6     Q    You    were    questioned    about    the

7  disappearance of Denise Johnson, weren't you?

8     A    What do you mean by that.

9     Q    You  were asked questions about where you

10  were  at  the  time  Denise  Johnson  disappeared,

11  correct?

12     A    No, ma'am.  I wasn't questioned like that.

13     Q    When  you  say  "No,  ma'am,  you  weren't

14  questioned," let me ask you this:  Isn't it correct

15  that  the  --  By  the  way,  when  I  say  Miranda

16  warnings, you know what these are, don't you?

17     A    What?

18     Q    The Miranda warnings?

19     A    No, ma'am.

20     Q    You don't know what the Miranda warnings

21  were?

22     A    Ugh-ugh.

23     Q    So in other words, when you were arrested

24  and  convicted  twice  --  By  the  way,  you  were

arrested when you were convicted, right?

A    Yes, ma'am.

Q    The police never told you any Miranda warnings, correct?

MR. CASSIDY:  Objection, Judge.

THE COURT:  The objection will be sustained.

MS. PLACEK   Q   Well, let me tell you this -- Let me ask you this:  You know you have a right to remain silent under police questioning, right?

A    Right.

Q    You know you have a right to have an attorney present when you're being questioned by the police, correct?

A    Yes, ma'am.

Q    You know that if you make a statement, in fact, that -- to the police when they're questioning you, that, in fact, that can be used against you by a court of law, correct?

A    Yes, ma'am.

Q    Isn't it correct, in fact, that on the date and time in question, I am speaking of August 9, 1988, the police gave you those warnings?

A    Yes, ma'am.

Q    Isn't it correct that the reason they gave -- Strike that.  I will withdraw that.  Isn't it correct that after they gave you those warnings,

59
724

1    that's when they questioned you about the

2    disappearance of the little girl, correct?

3        A   Yes, ma'am.

4        Q   And isn't it correct that the reason they

5    gave you the warnings is because they suspected you

6    were somehow involved in the disappearance of the

7    little girl?

8        MR. CASSIDY:   Objection, your Honor, as to what

9    the police suspected.

10       THE COURT:   The objection is sustained.

11       MS. PLACEK   Q   Isn't it correct that, in fact,

12   they asked you questions after they gave you those

13   warnings, correct?

14       A   They didn't ask me like that.

15       Q   They didn't ask you any questions?

16       A   They didn't ask me whether I was involved

17   with the little girl's murder.

18       Q   Well, let me ask you this, sir:   You said

19   that you knew Carlina, correct?

20       A   Carlina, correct.

21       Q   And you said this was a cousin of the

22   little girl, correct?

23       A   Yes, ma'am.

24       Q   And you say that -- Well, let me ask you

25   this:   Were you close friends with this young lady?

60

A    What young lady, Carlina?

Q    Carlina?

A    Yes, ma'am.

Q    And you say that on the second that Jerome Hendricks, in fact, made certain statements to you, correct?

A    Yes, ma'am.

Q    Did you tell Carlina?

A    No, ma'am.

Q    Did you tell any of the little girl's family about these statements?

A    No, ma'am, not at that time.

MR. MURPHY:    Objection.    I ask that be stricken.

THE COURT:  What be stricken?

MR. MURPHY:  The last two questions and answers about whether the witness told the people or the family.

THE COURT:  It may be, Mr. Murphy, it's just as impeaching as the failure of the defendant or the alibi witness to inform the police about an alibi that they testified to in court.  He has contact with these people.  He has a relationship with them, and he receives information about the whereabouts of the person he said they were looking

61
726

for, and he never informed them.  So I'm taking

that it's admissible of the weight to be given to

it.

        The objection is overruled.

    MS. PLACEK  Q  And isn't it correct, the only

time you told the story that you told in court was,

in fact on August 9 when you were being questioned

by the police, correct, isn't that correct, sir?

    A    Yes, ma'am, I talked to the police.

    Q    And that's the first time you told anybody

the story you told today in court, correct?

    A    Yes, ma'am.

    MS. PLACEK:  May I have one moment, Judge, to

examine the rap sheet?

            (Whereupon there was a short

            pause in the proceedings)

    MS. PLACEK  Q  Sir, let me ask you this:  You

mentioned  that  the  only  time  you  were  ever

convicted  was,  in  fact,  dealing  with  drugs,

correct?

    MR. CASSIDY:  Objection, Judge.  That's not

what he testified to.

    THE COURT:  The objection will be sustained.

    MS. PLACEK  Q  Well, sir, is that the only time

you have been convicted for dealing drugs?

A    No, ma'am.

Q    As a matter of fact, why don't you tell now Judge Holt all the things you have been convicted of?

A    Just burglary and drugs.

Q    Just burglary and drugs?  Well --

A    That's all you asked me about.

Q    Let me ask you this:  Weren't you convicted in 1984 of the crime of residential burglary, correct?

A    Yes, ma'am.

MR. CASSIDY:    Objection, Judge, not impeachment.

THE COURT:  Overruled.

MS. PLACEK  Q  What did you get?

MR. CASSIDY:  Objection, Judge.

THE COURT:    What is your basis of the objection?

MR. CASSIDY:  It's not relevant what he got sentenced to.

THE COURT:  This is the witness and not the defendant?

MR. CASSIDY:  Correct.

THE COURT:  And the rules that apply to cross-examining witness in regard to prior convictions

1    are distinctly different from the rules that are

2    applied to the defendant, and the question of his

3    incarceration, whether or not he was incarcerated

4    are admissible.

5                The objection is overruled.

6        MS. PLACEK   Q   What did you get?

7        A    I got seven years.

8        Q    Was that for one residential burglary or

9    how many?

10       A    One.

11       Q    Let me ask you this:   Were you ever

12   convicted after that -- Strike that -- before that?

13       A    Yes, I had a case in '82.

14       Q    And why don't you tell his Honor, Judge

15   Holt, about that case in '82?

16       A    It was a burglary.

17       Q    And what did you get?

18       A    Four years.

19       Q    Did you ever get convicted of burglary

20   tools?

21       A    No, not that I remember, no.

22       Q    Well, let me ask you this:   On 9/9/82,

23   didn't, in fact, you get found guilty of possession

24   of burglary tools and get sentenced to imprisonment

     four   years   in   the   Illinois   Department   of

Corrections?

    A   I got a sentenced to a burglary, yes.

    Q   Well, let me ask you this --

    A   I don't know if it was two, it was a long time ago.

    Q   Didn't in 1982 you get two separate sentences?

    A   No, ma'am.

    Q   So in other words, you were just, according to your testimony, sentenced to burglary for three years and possession of burglary tools for four years in 1982?

    MR. MURPHY:  Objection, Judge.  That's the same question.

    MS. PLACEK:  He gets a chance to deny what I could possibly impeach, Judge.

    THE COURT:  Overruled.

    MS. PLACEK  Q  Is that your testimony?

    A   I just know I was sentenced to a burglary.

    Q   Just a burglary?  Thank you.  So possession of burglary tools for four years would be incorrect, correct?

    A   I don't know nothing about no --

    Q   Sentenced to three years for burglary would be correct?

1   A   I got a four-year sentence.

2   MR. CASSIDY:  Objection.

3   THE COURT:  Sustained.

4   MS. PLACEK   Q   Let me ask you this:  Calling

5   your attention to 1980, were you ever sentenced

6   there?

7   A   No, ma'am.

8   Q   Well, let me ask you this:  On 12/2/1980,

9   were you, in fact, sentenced to probation and

10   imprisonment for burglary, then?

11   A   Not imprisonment, but I was on probation.

12   Q   Did you receive a sentence for probation

13   imprisonment two years?

14   A   I got probation for two years.

15   Q   Thank you.  And that was for what?

16   A   I think a burglary.

17   Q   How many names do you use?

18   MR. MURPHY:  Objection.

19   THE COURT:  Overruled.

20   MS. PLACEK   Q   How many names do you use?

21   A   I use my name and my nephew name.

22   Q   Your nephew's name by the way isn't your

23   name, that's a lie?

24   A   Yes.

Q   Not only that, you used it so you can

mislead, correct?

    MR. MURPHY:  Objection.

    THE COURT:  Overruled.

    MS. PLACEK  Q  Correct?

    A    Yes, ma'am.

    Q    You used it to lie to the authorities, correct?

    A    Yes, I did.

    Q    You used it to lie to the authorities to get out of punishment, correct?

    A    Yes, I did.

    Q    Thank you.  By the way, Darnel, is that your nephew's name?

    A    Yeah.

    Q    Do you have any tattoos?

    A    Yes, ma'am.

    Q    Are those gang tattoos?

    A    No, ma'am.

    MR. MURPHY:  Objection.

    THE COURT:  Overruled.

    MS. PLACEK  Q  You have a tattoo on your left and right arm?

    A    Yes, ma'am.

    Q    You can see them, correct?

    A    Yes, ma'am.

Q    Will you show them to his Honor, Judge
Holt for the purpose of the record?

MR. CASSIDY:  Objection, Judge.

THE COURT:  What's the basis of your objection?

MR. CASSIDY:  What relevance?

THE WITNESS:  (Indicating)

THE COURT:  Objection is overruled, Mr. --

MR. CASSIDY:  It isn't relevant --

THE COURT:  It is relevant whether or not a
person has a --

MR. CASSIDY:  A tattoo.

THE COURT:  It depends on what the tattoo
depicts.  A simple tattoo may be of no relevance.
The pitch fork may very well be of some relevance,
and I think you pretty well know that.

MR. CASSIDY:  I don't know that, but now I do.

MR. MURPHY:  It could be an affiliation just
like anything else.

MR. CASSIDY:  Maybe he's a farmer.

THE COURT:  It could be just an affiliation or
membership in an association or club, and it is for
the trier of fact to determine what if any weight
to be given to the fact of that association and
membership in that glee club or boy's club or
whatever other organization you may choose to

1    associate it with.

2        MR. CASSIDY:  Judge, for the record, would

3    you --

4        MS. PLACEK   Q   Why don't you show your glee

5    club tattoo to the Judge.  By the way, they're not

6    from a glee club, are they?

7        A   No.

8        Q   They're not from a boy scout club?

9        A   No.

10       MR. CASSIDY:  Farmer's club.

11       MS. PLACEK   Q   Farmer's club, you're not a

12   farmer, are you?

13       MR. MURPHY:  Objection, Judge.

14       THE WITNESS:  Indicating)

15       THE COURT:  One on his right arm appears to be

16   a dollar sign with an S and a G on either side of

17   it.  The one on the right arm seems to be a skull

18   and cross bones or whatever.

19       MR. CASSIDY:  Thank you, your Honor.

20       MS. PLACEK   Q   That's all, your Honor.

21       THE COURT:  Redirect?

22       MR. CASSIDY:  Thank you, your Honor.

23       MS. PLACEK:  Excuse me, your Honor.  May I

24   reopen for a moment?

         THE COURT:  Yes.

MS. PLACEK   Q   You knew the little girl was missing on the 2nd, correct?

A   Because Jerome told me that the police were looking for the little girl.

Q   When you say they were looking, didn't you just tell his Honor, Judge Holt, that on the 1st, you were looking for her, too?

A   Yes.

Q   Well, you really knew she was looking, correct?

A   No --

Q   Missing, correct?  Let me ask you this:  You knew her relatives, correct?

A   Yes, I knew some of them.

Q   Well, you knew --

A   Just Carlina.

Q   You knew Carlina pretty well, correct?

A   Right.

Q   And according to your testimony, what you're saying today for that man, you said Jerome said that the police were involved, correct?

A   The police were involved.

Q   The police were looking for her, too, correct?

A   Jerome told me that the police were

looking for him.

    Q    Involving the little girl, correct, that's what you're saying today, correct?

    A    That's what it's supposed to be, yes.

    Q    Let me ask you this:  It wasn't until the 9th that you were brought down to the station and questioned by the police that you let anybody know, right?

    A    Let anybody know?

    Q    About this conversation that allegedly took place with Jerome, correct?

    A    Because I didn't want nothing to do with it then.

    Q    Right.  Thank you.

            That's all, Judge.

THE COURT:  Redirect?

MR. CASSIDY:  May I proceed, your Honor?

THE COURT:  You may.

            REDIRECT EXAMINATION

                  BY

              MR. CASSIDY:

    Q    Now, the first time you met me was today, is that correct, Michael?

    A    Yes, sir.

    Q    And what I told you was that if you

testified truthfully today that myself and John Murphy would write a letter to the warden where you are staying and tell him that you testified truthfully today and leave it up to him what will take place with you, is that correct?

A    Yes, sir.

Q    Now, we didn't promise you anything about us reducing your sentence, correct?

A    No, sir.

MS. PLACEK:  Objection.

THE COURT:  I'm sorry?

MS. PLACEK:  No questions asked, Judge.

THE COURT:  Overruled.

MR. CASSIDY  Q  We would write a letter to the warden to tell him you testified in court truthfully and ask him to take into consideration any parole or anything like that, is that correct?

A    Yes, sir.

Q    And Mr. Murphy also told you that upon your release, if he's still with the office and if you got a hold of him, he may, if it's okay with our office, give you one-month's rent to relocate, is that right?

A    Yes, sir.

MS. PLACEK:  Objection.    The State is now

72
737

impeaching his own witness, Judge.

THE COURT:  Overruled.

MR. CASSIDY  Q  Not money to you, but just money for you to relocate, isn't that correct, for one month?

A  That's right, sir.

Q  Now, Jerome, you told the police, did you not, on August 9th -- I'm sorry -- Michael, you told the police on August 9 that Jerome came to your house while you were painting, right?

A  Right.

MS. PLACEK:  Objection.  Improper for redirect, Judge.

THE COURT:  What's the purpose?

MR. CASSIDY:  Judge, prior consistent statement.

THE COURT:  Prior consistent statement?

MR. CASSIDY:  Right, what he's testified to today.

THE COURT:  How is a prior consistent statement admissible?

MR. CASSIDY:  I believe counsel brought out possible motive for Michael Walker here to be fabricating his testimony today based upon us, the State and with all the prior convictions and

promises made.

THE COURT:   It seems to me what she brought out
was the fact that the witness made a prior
consistent statement on August 9.

MR. CASSIDY:   Correct, but she really didn't go
into details.

THE COURT:   I know, but the details are not
admissible of his prior consistent statement unless
there is an inference or an insinuation that his
testimony has recently been fabricated.   She's not
doing that.   She's saying that he didn't, in fact,
tell the police what he said he told the police.

MR. CASSIDY:   I believe or more or less showing
that, but I would like the details -- Just because
she's not contesting it, she did contest his motive
to be testifying.

THE COURT:   Prior consistent statements are not
admissible evidence, Mr. Cassidy, except under
certain circumstances, and the circumstances are
not present here.   The objection is sustained.

MR. CASSIDY:   I have no further questions,
thank you, your Honor.

THE COURT:   Recross?

74739

1          RECROSS-EXAMINATION

2                   BY

3              MS. PLACEK:

4     Q    Do you remember when I asked you had you

5     been promised anything for testifying?

6     A    Yes, ma'am.

7     Q    You forgot to tell his Honor, Judge Holt,

8     under my questioning about that letter, correct?

9     MR. CASSIDY:  Objection.

10    THE COURT:  Sustained.

11    MS. PLACEK   Q   Did you remember that letter

12    when I asked you that question?

13    MR. CASSIDY:  Objection, your Honor.

14    THE COURT:  Sustained.

15    MS. PLACEK   Q   Did you tell me about the letter

16    when I asked you about it?

17    MR. CASSIDY:  Objection.

18    THE COURT:  Objection is sustained.

19    MS. PLACEK   Q   How much money are you getting

20    for this relocation?

21    A    It wasn't no promises of giving me.

22    They're saying what they probably could do for me.

23    Q    I see.  Did they say anything else besides

24    those things that you now remember that they can do

      for you?

                  75740

1    MR.   CASSIDY:        Objection,   your   Honor.

2  Argumentative.

3    THE COURT:  Overruled.

4    THE WITNESS:   The thing he said out of his

5  mouth is what he said to me.

6    MS. PLACEK  Q  Out of his mouth?  Thank you.

7         That's all, Judge.

8    THE COURT:  Anything further?

9    MR. CASSIDY:  No, Judge.  Thank you.

10    THE COURT:  Thank you, Mr. Walker, you may step

11  down.

12         (Witness excused)

13    THE COURT:  Call the witness.  He will have to

14  come back if we don't finish.

15    THE CLERK:  Raise your right hand, sir.

16         (Witness sworn)

17    THE COURT:  That microphone is on.  If you will

18  speak directly in this, keep your voice up, we will

19  all hear you.

20         You may proceed.

21              ROBERT TOVAR,

22  a witness herein, called on behalf of the People of

23  the  State  of  Illinois,  after  being  first  duly

24  sworn, was examined and testified as follows:

76 41

1    DIRECT EXAMINATION

2                BY

3    MR. MURPHY:

4    Q    Would you please state your name and spell

5    your last name?

6    A    Robert Tovar, T-o-v-a-r.

7    Q    And by whom are you employed?

8    A    Chicago Police Department.

9    Q    And how long have you been employed with

10   the Chicago Police Department?

11   A    Approximately 25 years.

12   Q    And what's your position with the  Chicago

13   Police Department?

14   A    I'm   a   technician   with   the   crime

15   laboratory.

16   Q    And where do you work at, Mr. Tovar?

17   A    In the crime laboratory, 1121 South State.

18   Q    Officer Tovar, I'd like to direct your

19   attention to the evening hours of August 8, 1988,

20   late   in   the   evening,   were   you   working   that

21   particular day?

22   A    Yes.

23   Q    And did you come into contact with any

24   individual that you see in court today?

     A    Yes.

1     Q   Could you please point to that individual and  indicate an article of clothing?

2     A   The gentleman with the sweater and his hands clasped (Indicating).

     MR. MURPHY:  May the record reflect in-court identification of the defendant, Jerome Hendricks, your Honor?

     THE COURT:  Yes, it may.

     MR. MURPHY  Q  Officer Tovar, could you explain to Judge Holt when you came into contact with the defendant?

     A   At about 10:30 at night.

     Q   And where was that at?

     A   At the crime lab.

     Q   That would have been at 11th and State?

     A   Yes.

     Q   Who was with the defendant at the time you observed him?

     A   There were two detectives.

     Q   Would that be Detective Michael Rolland and Michael Davis?

     A   Yes.

     Q   Officer Tovar, when you observed the defendant around 10:30, can you explain what happened?

1    A    When I talked to the defendant, I gave him

2   a form, with respect to his rights, I guess you

3   want to use that before I talked to him.

4    Q    And when you gave him that form -- Strike

5   that.

6    MR. MURPHY:  For the record, I'm going to mark

7   People's Exhibit No. -- mark People's Exhibit No.

8   16, Judge.

9               May I approach?

10    THE COURT:  You may.

11    MR. MURPHY  Q  Officer Tovar, I'm going to show

12   you what's been marked as People's Exhibit No. 16,

13   do you recognize what that's a copy of?

14    A    Yes.

15    Q    What is that?

16    A    That's the form I gave Mr. Hendricks.

17    Q    Now, the original census that day has been

18   destroyed, has it not?

19    A    Yes.

20    Q    That's a copy made from the microfiche?

21    A    Yes.

22    Q    Officer Tovar, could you describe what you

23   did with the defendant with relation to that form?

24    A    I read the form to him before I talked to

him.

79 14

Q    And could you read to Judge Holt what --
from   the   form   the   portions   you   read   to   the
defendant   exactly   as   you   read   them   to   the
defendant?

A    Yes, I said several times you go through
a ritual with any --

MR. LUFRANO:   Objection to what he goes to.
He's asked what he did.

THE COURT:   The objection is sustained.

MR. MURPHY   Q   Just describe what you did in
this case?

A    Sure.  I used my finger and went through
line by line, and I read to the subject from the
form, and I put the form directly in front of him.
I read is your name Jerome Hendricks?  I have your
name down here, Jerome Hendricks.   It was corrected
because I misspelled it.   I have today's date,
8/August, '88.   I have the address, the location
where you're at, 1121 South State Street, Chicago,
Illinois, and the reason why he's here, and I have
it's the death of a Denise Johnson, which occurred
on 8/August, 1988 at 251 West 117th Street.   Then I
read the paragraph here, and the first line it
says, "I understand I have a right to remain
silent, and then anything I say can be used against

me in a court of law." I asked him if he understood that. He acknowledged he did. I went to the next line again with my finger under the line, and I read, "I understand I have a right to talk to a lawyer and have him present with me during questioning. If I could not afford a lawyer, one would be appointed from the court to represent me before any questioning." I asked him if he understood that. He acknowledged he did. Then I read the next line again with my finger going across the line. It says, "I understand I have a right to stop the questioning anytime and stop the questioning for the purpose of consulting a lawyer," and I asked him if he understood that, and he said he did.

Q    Now, there's other things contained in that form, and I won't ask you to go through that, but if you could bypass that and tell me did you have a conversation with the defendant after -- Strike that. If I can at some point when you got near the bottom of this form, you had him sign the form, is that correct?

A    That's correct. .

Q    And after he signed the form, what did you do?

81

1      A     I signed it.

2      Q     And   is   that   your   signature   and   his

3   signature on the form?

4      A     Yes.

5      Q     And is this exhibit People's Exhibit No.

6   6 a true and accurate copy of the form that you

7   used?

8      A     Yes.

9      Q     And, Officer Tovar, did you at this time

10  ask the defendant certain questions?

11     A     I did.

12     Q     With respect to this incident?

13     A     Yes.

14     Q     And when you asked those questions, did

15  you receive any answers from him?

16     A     Yes.

17     Q     And what questions did you ask him?

18     MS. PLACEK:   Objection, and I ask to be heard

19  outside the presence of the witnesses.   This is

    what I anticipated taking the time, Judge.

20     THE   COURT:   Tell   me   what   the   basis   of   your

21  objection is.

22     MS. PLACEK:   The basis of the objection, Judge,

23  and it's no secret to the Court because the Court

24  heard   the   motion   because   this   gentleman   is   a

polygraph operator. What the State is seeking to introduce, and the answers they are seeking to introduce was taken as part of a polygraph test. This would be the assumption I am making at this time, and I was led to believe, it's part of the motion. The defense's --

THE COURT: Mr. Murphy?

MR. MURPHY: Judge, we are not -- Obviously we're aware of what the Court's rulings are with respect to polygraph testing, and we specifically instructed the officer to stay away from that area. That was brought up by counsel. All we intend to get into is the content of the conversation, not anything with regard to the taking of the test, what the result of the test was or anything along those lines. We are aware of the Court's ruling.

THE COURT: Under what circumstances did these questions -- this question and answer -- Under what circumstances did this question-and-answer session arise?

MR. MURPHY: I am not sure if I understand your question, Judge.

THE COURT: What was the circumstances which give rise to the question-and-answer session that the witness and the defendant were having? Is he

being subjected to a polygraph examination at this time?

MR. MURPHY: Yes, Judge.

THE COURT: He's hooked up to a polygraph machine?

MR. MURPHY: That's my understanding.

THE COURT: And he's asking him questions, and the defendant is making answers, and the polygraph machine is running and recording the answers?

MR. MURPHY: That's my understanding, Judge.

THE COURT: I don't know the answer to it, Mr. Murphy, and I don't think we are going to resolve it tonight within the next five to ten minutes.

MS. PLACEK: This is the point where I suggested, Judge, that we would have a problem. It would be the defense's contention, Judge, that the Illinois law for business such --

THE COURT: I understand what you contention is, and whether or not it goes as far as you say it goes, I don't know that off the top of my head at any rate. That's where I am going to try to rule on it tonight. I can tell you what my general impression is of the law which has nothing whatsoever to do with the area that we are in now

because i don't recall ever having seen a case
quite like this, quite under these same circum-
stances, but every case that I've ever seen which
deals with anything at all regarding polygraph and
you -- I know you haven't mentioned polygraph, but
the failure to mention it doesn't -- may not be
sufficient because once the defendant starts to
meet it, if you never mentioned polygraph, it's
going to emerged, and once polygraph emerges,
you've got the problem, you may have, I don't know.

    MR. CASSIDY:  We haven't finished our direct.

    THE COURT:  if they don't cross-examine him, it
will never come up.

    MR. CASSIDY:  They can cross-examine all they
want.

    THE COURT:  The point is this, gentlemen, and
I'm being a little levitied (Phonetic) into the
situation, which probably has no levity -- no place
as levity at all.  I don't know the answer, but I
have not seen a case which has questioned the
polygraph on any level, and so your task, Mr.
Murphy and
Mr. Cassidy, overnight with your access and law and
all those good things you have in your office to
aid and research is to conference me that this

testimony is admissible evidence.

The defense, on the contrary, has the burden of helping me to -- if they choose to, of showing me that this is not proper evidence, and I will do whatever I can to help resolve it, also, but I'm not going to have as much time as you folks have.

MR. MURPHY:  Judge, I understand what the Court is indicating, but the defense is making a motion here, and we will do some research on this. There's no authority to what they are saying --

THE COURT:  They are saying the polygraph testimony is inadmissible in Illinois in any form and any fashion, and you're saying we're not talking about polygraph, we are just talking about a conversation that the fellows were having down at the ranch one night, and, of course, the defense says that what you can't do, you cannot do indirectly and by subterfuge.

MR. CASSIDY:  No, that's not the case.  I think you're viewing it that way, Judge, you're drawing the conclusion.  I mean it's a straight question and answer.  If you look at it that way, a trier of fact with your experience --

THE COURT:  Down at the ranch with the boys.

86
731

MR. CASSIDY:  With your experience and trier of fact, they wouldn't consider polygraph, and I believe with all due respect, that's how you should be viewing it.

THE COURT:  You may be right, Mr. Cassidy.

MR. CASSIDY:  But there appears to be a Motion in Limine at this point by the defense.

THE COURT:  No, it appears to be a motion that says -- The objection that says, Judge, this violates the law in Illinois, and I'm simply saying to you --

MR. CASSIDY:  I understand what you're saying. I am just saying you're jumping to a conclusion which the defense put in your mind.

THE COURT:  Maybe.  I thought the Supreme Court of Illinois put into my mind --

MR. CASSIDY:  Judge, you wouldn't have known what was going on here if they didn't tell you.

THE COURT:  Mr. Cassidy, I'm not required, I don't think, to be any dumber than the average juror.  I am as dumb as the box of rocks, but I am not required to be any dumber than any juror.

MR. CASSIDY:  I think you are, Judge.  You're jumping to a conclusion.

THE COURT:  When he tells me he's down at the

1    ranch    at    11:00    o'clock    at    night    having    a

2    conversation with the defendant after having him

3    sign   forms,   what   do   you   think   I   am   going   to

4    conclude he is?

5         MR. CASSIDY:    The same form that any police

6    officer gives him.

7         THE   COURT:    All   right.    Order   of   Court,

8    February 13.

9                   Mr. Tovar, I'm afraid you will have to

10   return.

11                   (Which were all the proceedings

12                   had in the above-entitled cause

13                   and the case continued to Wednesday,

14                   the 13th day of February, 1991.)

753

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS } ss
COUNTY OF COOK

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME FIVE OF A SIX VOLUME . . . . . . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. .95-0474. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . .LATELY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois. . . .WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and .JEROME HENDRICKS. . . . . . . . . . . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . .JUNE .25. . . . . . . . . . . . . ., 19 96. .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

CCCR-310

# Transcript of Record
## Appeal
## to

APPELLATE

FIRST

**Court of Illinois**
**District**

FILED
JUL 1996
GILBERT S. MARCHMAN
CLERK

SUPPLEMENTAL RECORD

**Circuit Court No.** ___88 CR 12517___

**Trial Judge** ___LEO H. HOLT___

**Reviewing Court No.** ___95-0474___

THE PEOPLE OF THE STATE OF ILLINOIS

## VS.

JEROME HENDRICKS

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY   DEPARTMENT,   CRIMINAL   DIVISION

ORDER ENTERED

JAN 1 / 2007

APPELLATE COURT, FIRST DIVISION

**AURELIA PUCINSKI**

**Clerk of Court**

VOLUME SIX    OF  SIX VOLUMES
SUPPLEMENTAL RECORD

Per ___AP/nd___

**Deputy**



1     IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

2              COOK COUNTY, ILLINOIS

3

4    THE PEOPLE OF THE   )
     STATE OF ILLINOIS,  )  Criminal

5                  )
         Plaintiff,    )   No. 88CR12517

6                  )
      vs.             )   Charge: Murder

7                  )
     JEROME HENDRICKS,   )

8                )
        Defendant.   )

9

                    JURY TRIAL

10           Court commenced pursuant to

11
continuance, February 13, 1991, before the

12
Honorable LEO E.  HOLT and a jury, at 2:00

13
o'clock p.m.

14

15    PRESENT:
          MR. SCOTT CASSIDY,

16          MR. JOHN MURPHY,
           assistant State's Attorneys,

17               for the People;

18          MS. MARIJANE PLACEK,
          MR. VINCENT LUFRANO,

19           assistant Public Defenders,
             for the Defendant.

20          --------------------------

21

22
Rella R. Jordan,

23
Official Court Reporter
Markham, Illinois, 60426

24

```
1              THE COURT:  Both sides ready?

2              MR. MURPHY:  Yes.

3              MS. PLACEK:  Yes.

4              THE COURT:  Last Thursday when we

5    recessed the trial of this case, the witness,

6    Robert Tovar, was on the stand.

7              MR. MURPHY:  That was Monday, Judge.

8              THE COURT:  All right, Monday.

9              Okay.  The intervening holidays threw me

10   off a bit.

11         .         When Mr. Tovar was here, the defense

12   raised an objection that his testimony instigated

13   a devor prolig{} testimony and I have tried to

14   look up that proposition and have identified as

15   nearly as I can certain propositions.  And

16   according to Grahams Handbook of Illinois 5th

17   edition, Section 403.2, Page 173, the following

18   appears:

19                        Quote:  Statements made by

20                   a person before, during or

21                   after being administered a lie

22                   detector test are admissible.

23              "People versus Sickley, S- I- C- K- L- E-

24   Y- 114 Illinois Appellate 3rd, 167, 69 Illinois
```

1    decision, 94, 448 Northeast 2nd, 612, 1983, closed
2    quote.

3            And so I hasten to read what the Court
4    said in People versus Sickley, and People versus
5    Sickley which appears at 114 Illinois Appellate
6    3rd and 167, we find the following at Page 172:

7            Quote, the State argues that despite the
8    fact that our Supreme Court has held that
9    polygraph results are not admissible, (People
10   versus Baines, B- A- I- N- E- S-), 88 Illinois 2,
11   235, Northeast, 1070, closed paren.  This does not
12   preclude the introduction into evidence of
13   statements obtained after a polygraph examination
14   is administered.  We agree.  Closed quote.

15           That's the extent to which Sickley
16   corroborates or supports, it supports, what Cleary
17   and Graham said in their treatises on Illinois
18   evidence.

19           I turn then to Mr. Hunter's Trial
20   Handbook for Illinois lawyers criminal, the 6th
21   edition, Section 38.18, at Page 509, where the
22   following is found:

23                   Quote:  While the results of
24                       a polygraph test are not

```
 1                    admissible, that does not
 2                    preclude the introduction into
 3                    evidence of statements
 4                    obtained after the  polygraph
 5                    examination is administered
 6                    provided they are given
 7                    voluntary, closed quote.
 8           And they cite again People versus
 9      Sickley.
10           That's the extent to which I can find any
11      support for the proposition that a conversation
12      had by a polygrapher with a defendant before,
13      during or subsequent to the administering of a
14      polygraph examination that that conversation is
15      admissible in evidence.
16           The other cases tend to suggest to me, at
17      least, that if admissible, it is frought with
18      danger.  I invite your further educating me.  If
19      you have had an opportunity to look at this
20      subject matter, it's all that I can find in the
21      limited time that I had to deal with it.  Some
22      states, maybe most, maybe a majority of the states
23      tend to follow the Illinois rule.  There are some
24      exceptions, however, but Illinois is, as far as I
```

1    have been able to determine, what one might

2    characterize as being vehemently anti-polygraph.

3    So I invite you to address that problem, if you

4    choose to.

5          MS. PLACEK:  The State was going to brief

6    that, Judge, so I was waiting for them.

7          THE COURT:  Well, the State is proffering

8    the evidence so you have got the burden to

9    overcome.

10         So I will hear from the State.

11         MR. MURPHY:  Well, Judge, at this point,

12   if I may, perhaps, I didn't understand the Court.

13   Will the Court allow the evidence in then?

14         THE COURT:  Not unless you can show me

15   how it's going to be admissible.  I don't think

16   what I read to you and certainly Shipley, Shipley

17   doesn't stand for the proposition that a

18   conversation by a polygrapher and the defendant

19   before, or during the administering of the

20   examination is admissible.

21         Shipley -- Sickley, I mean, may at best

22   stand for the proposition that subsequent to a

23   polygraph examination, and the defendant having

24   been confronted with the results of the

1    examination may thereafter have a conversation

2    with a polygrapher which will become admissible.

3    That is the best that I can get out of Sickley,

4          And given -- I don't know -- the rules of

5    evidence don't change because of the form that the

6    defendant is being tried in changes.  If this were

7    a jury trial, I have almost no doubt in my mind

8    that you couldn't proffer this evidence to the

9    jury and thereby bar the defendant from showing to

10   the jury the circumstances under which the

11   statement was taken, which would immediately evoke

12   conversations about polygraphs, which is

13   inadmissible.

14          Showing the fact-finder that the

15   defendant took the polygraph examination is

16   reversible error, because the inference is, of

17   course, that he failed it.  And I don't know how

18   the defendant would cross examine this polygrapher

19   in order to show the totality of the circumstances

20   without showing that he was being polygraphed.

21   But if you know of some authority that is to the

22   contrary of what I just suggested, I will hear it

23   and further consider it, but right now my

24   inclination is to say to you that the conversation

1    is not admissible.

2            MR. MURPHY:  Judge, our position is

3    simply this:  I'm aware of some legal authority on

4    polygraph testing and, first of all--   and I'm

5    aware also that the case law clearly hold that the

6    result of a polygraph test or the fact that a

7    polygraph test was taken is clearly inadmissible.

8            And, I'm sure your Honor is well aware

9    that we had no intention of eliciting that

10   evidence.  That was brought to your attention not

11   by us but by the defense when the witness was

12   testifying.

13           Your Honor, I am not aware of any case

14   law that precludes the State from introducing a

15   statement that was made by the defendant.

16   Whatever the circumstance may be we do not intend

17   to get into a situation where he's got to and has

18   taken a polygraph test.

19           And, therefore, your Honor, it's our

20   position we are not precluded from introducing

21   into evidence statements which the defendant made.

22   Other than that, Judge, I would have no further

23   argument.

24           If the Court is going to reject--.

1          THE COURT:  Do you know of any case in

2     this jurisdiction or any other jurisdiction that

3     has accepted that proposition?

4          MR. MURPHY:  No, Judge, but I know of no

5     case that precludes it.

6          THE COURT:  I don't know either, but then

7     I haven't looked.  But it would seem to me that

8     the frequency with which the questions posed and

9     the answers made during a polygraph examination

10    are so likely to be inculpatory that you would

11    find the Courts resolving that issue.  If trial

12    courts have been allowing it in with any degree of

13    frequency, it clearly would be reported somewhere

14    in the Illinois Reports.

15         One of the reasons that it may not appear

16    is because trial courts have adhered strictly to

17    the Supreme Court's ban on any evidence even

18    remotely alluding to the proposition that the

19    defendant has been the subject of a polygraph

20    examination.  So the dirth of cases or the failure

21    follow cases, find cases may be of some value in

22    the absence of a -- you know one of the cases that

23    I read, I didn't read the case, but I was reading

24    Mr. Cleary's work, talked about the dangerousness

1    of even alluding to the proposition of polygraph.

2            Ms. Placek, what does your research if

3    any show on this area.

4            MS. PLACEK:  Judge, I too went to Cleary

5    as a starting point.

6            In the Sickley Case, I believe exactly it

7    discussed the fact with the defendant's right of

8    due process being cut off by, in fact, the

9    inability to cross examine without bringing up the

10   circumstances of the statement, therefore, it must

11   be brought out that it was done in a question and

12   answer period with answers being -- if you will

13   suggested to a yes-no circumstance involving the

14   material of a polygraph test itself.

15           We have read the cases this morning, as a

16   matter of fact, which the Court referred to.  It

17   would be our contention, as we objected at the

18   last court date, Monday afternoon, that this

19   gentleman because of the nature of work and

20   because of the status of Illinois case law should,

21   in fact, be barred from testifying.

22           MR. MURPHY:  Judge, may I make one brief

23   argument in response?  Something, I really should

24   have addressed initially.

1            Judge, one witness testified with regard

2       to the statements, a witness, by the name of Larry

3       Nitsche, N- I- T- S- C- H- E-, I believe, and this

4       does not help the Court in terms of polygraph

5       questions, but certain questions were asked by

6       myself and he was not allowed to answer those

7       questions because the defendant did not give

8       information in certain areas, where he was not

9       asked certain questions.

10           One of the purposes of introducing

11      testimony of this specific witness is to show the

12      various specific questions were asked to the

13      defendant and the nature of the statement.  This

14      does not help the Court in resolving that issue

15      but that is the purpose of this witness testifying

16      at this point in the trial.

17           THE COURT:  Well, I'm going to allow you

18      to make an offer of proof as to what your evidence

19      would show for whatever value it may become to you

20      at some subsequent date but it doesn't seem to me

21      that you are right that does not answer or aid me

22      in trying to resolve this problem.

23           I'm more concerned with the artificial

24      nature of what the defendant has to do in this

1    situation in trying to meet this testimony.

2            This testimony is not just out there in a

3    vacuum and it is not as to two of the boys down at

4    Joes's Place having a conversation, and since the

5    defendant would have, I would assume, be entitled

6    to show all of the circumstances around this

7    conversation in order for me to assess, One, it's

8    voluntariness; and 2, whether or not, it's weight,

9    it's credibility, and as soon as he undertakes to

10   do that, he's going to start having to talk about

11   polygraph examinations, and that's what the

12   Illinois Courts have, as I understand it, they are

13   strictly forbidden.

14           So the defendant's objection is sustained

15   and I'll not permit Mr. Tovar to testify about a

16   conversation that he had with the defendant on

17   August 8, 1988, on the evening hours at

18   approximately 10:30 p.m. during the time that the

19   defendant was hooked to a polygraph machine.

20           MR. MURPHY:  Judge, what about pretest

21   questions?  Do you have any problem with that?

22           THE COURT:  Yeah.

23           I suppose Sickley would, at least, stand

24   for the proposition that subsequent to the

1      polygraph examination, statements made by the

2      defendant would be admissible, but prepolygraph

3      statements are just as much barred because they

4      are in preparation for the polygraph.  It is in

5      some respect, even if he's not hooked up to the

6      machine, as of yet, whether he's being asked

7      questions for representative samples of

8      configurations, for lack of a better term, he is,

9      at least, in the process of aiding the polygrapher

10     in formulating questions and otherwise assisting

11     in the presentation of the examination.  It's the

12     same thing.

13             As I said, when I saw Cleary's

14     proposition in Mr. Cleary's book, I thought

15     perhaps that the Sickley Case was going to resolve

16     it for me.  And unfortunately, I think Mr. Cleary

17     just overstated the reach of the Sickley Case, as

18     is often the case, and the cite in the case goes

19     much further in his book than the case actually

20     goes.

21             Or call Mr. Tovar back, if you have some

22     other questions, or call your next witness.

23             MR. MURPHY:  I do have some other

24     questions.

1          MS. PLACEK:  If it pleases the Court, if

2     the State is alleging that the defendant made a

3     statement after this testing, then we would be

4     objecting on Discovery.

5          THE COURT:  I don't know if that's what

6     they are doing.

7          MR. MURPHY:  Judge, I don't know what

8     Counsel is referring to.

9          THE COURT:  I don't know either, so we'll

10    have to wait and see.

11         MS. PLACEK:  I am just informing this

12    Court, Judge, that the objection would be made at

13    this time that we haven't been tendered any

14    statements made after the matter as requested by

15    our Motion for Discovery.

16         MR. MURPHY:  Judge, there were statements

17    made at other times by two other police officers.

18         THE COURT:  Mr. Murphy and Ms. Placek,

19    we'll deal with that when we see what this witness

20    is going to testify to.

21                    (Whereupon the following

22                     proceedings were had in

23                     the hearing and presence

24                     of the jury:)

1              R O B E R T    T O V A R, ()

2    called as a witness herein for the People of the

3    State of Illinois, having been previously duly

4    sworn, resumed the stand and testified as follows:

5                   DIRECT EXAMINATION()

6                   BY MR. MURPHY:

7         Q.    Officer Tovar, you testified you began

8    your conversation with the defendant approximately

9    10:30, August 8, 1988, is that correct?

10        A.    No, later than that.

11        Q.    That is what time he arrived at the

12   police station?

13        A.    Yes.

14        Q.    And, that was at 11th and State?

15        A.    Yes.

16        Q.    That was 10:30 p.m.?

17        A.    Yes.

18        Q.    Approximately how long did you begin

19   speaking with the defendant, if you recall?

20        A.    I would say some time after 11:00

21   o'clock.

22        Q.    And how long did you speak to him?

23        A.    I would say the entire time I was with

24   the defendant, might be a little over an hour.