CASE NO.    O8cv 1589

ATTACHMENT NO.    15

EXHIBIT

TAB (DESCRIPTION)

1      Q.   And so you went passed midnight then
2   approximately?
3      A.   No.  I think just before midnight, about
4   ten to 12,.
5      Q.   And that at the termination of that
6   conversation was that the extent of your contact
7   with the defendant?
8      A.   Yes.
9      Q.   And to your knowledge was he then taken
10  from 11th and State by Det. Ryan and Det. Baker?
11     A.   Yes.
12     Q.   And, Officer, I believe you have already
13  identified the person in court who you spoke to,
14  is that correct?
15     A.   Yes.
16     Q.   And so it is clear --
17          MS. PLACEK:  Stipulate that he would
18  identify the defendant.
19          MR. MURPHY:  I believe he already did.
20          THE COURT:  Stipulation so noted.
21          MR. MURPHY:  No further questions.
22          MS. PLACEK:  Motion to strike is
23  irrelevant the matter before the Court, the entire
24  testimony.

```
 1            THE COURT:  No.
 2            The testimony will stand, the objection
 3   is overruled.
 4                   CROSS EXAMINATION( )
 5                   BY MS. PLACEK:
 6       Q.   Officer, would it be correct in saying
 7   that on that August date when you talked to the
 8   defendant in 1988 it was about in the 90's, if you
 9   can recall?
10       A.   I can't recall at that time.
11            MS. PLACEK:  Thank you.
12            That's all, Judge.
13            THE COURT:  Redirect?
14            MR. MURPHY:  No further questions, Judge.
15            THE COURT:  Thank you, Mr. Tovar.
16            You may step down.
17                (Witness was excused.)
18            THE COURT:  Call your next witness.
19            MR. MURPHY:  The People call Harding
20   Johnson.
21            THE COURT:  There will be a short recess.
22                (Whereupon there was a brief
23                 recess, after which the
24                 following proceedings were had:)
```

1          (Witness was sworn.)

2          THE COURT:  You may proceed.

3          MR. MURPHY:  Thank you, Judge.

4          H A R D I N G    J O H N S O N, { }

5     called as a witness herein for the People of the

6     State of Illinois, having been first duly sworn,

7     was examined and testified as follows:

8               DIRECT EXAMINATION { }

9               BY   MR. MURPHY:

10         Q.   Sir, would you state your name and spell

11    your last name, first and last names?

12         A.   My first name is Harding Johnson.

13         Q.   H- A- R- D I- N- G-?

14         A.   Right.

15         Q.   J- O- H- N- S- O- N-?

16         A.   Right.

17         Q.   Mr. Johnson, do you know Denise Johnson?

18         A.   Yes, I do.

19         Q.   What is your relationship to her, sir?

20         A.   That is my granddaughter.

21         Q.   Mr. Johnson, 1986 and is it '87, where

22    was Denise Johnson living?

23         A.   She was living with me.

24         Q.   And where was that at, sir?

1      A.    On State Street.

2      Q.    And who else was living there besides you

3   and her?

4      A.    My wife and I.

5      Q.    Now, Mr. Johnson, I'm going to show you

6   what has been marked People's Exhibit Number 7 for

7   identification purposes, do you recognize the

8   person in that picture?

9      A.    That is my granddaughter.

10     Q.    Is that Denise Johnson?

11     A.    Yes.

12     Q.    Mr. Johnson, when she was living with you

13  and your wife were you responsible for her care?

14         MS. PLACER:  Objection, form.

15         THE COURT:  Overruled.

16         MR. MURPHY:

17     Q.    Were you and your wife responsible for

18  her medical care, sir?

19     A.    Yes.

20     Q.    And, Mr. Johnson, I would like to direct

21  your attention to the date of August 19, 1986, do

22  you remember that day, sir?

23     A.    Yes, I do.

24     Q.    And did anything unusual happen that day?

1    A.    Yes.  She fell and hurt her wrist.

2    Q.    And which wrist did she hurt?

3    A.    Her left wrist .

4          MR. LuFRANO:   objection, unless he was

5    present at the time she fell.  It's hearsay, your

6    Honor.

7          THE COURT:  How about that, Mr. Murphy?

8          MR. MURPHY:  Judge, it's subject to

9    cross.

10         THE COURT:  That's not the question of

11   whether it's subject to cross, the question is

12   whether it's hearsay.

13         MS. PLACEK:  Motion to strike.

14         THE COURT:  Stricken.

15         MR. MURPHY:

16   Q.    Mr. Johnson, what do you remember about

17   her wrists?

18         MS. PLACEK:  Objection, leading and

19   suggestive.

20         THE COURT:  Overruled.

21   Q.    Did you see her hurt her wrist?

22         MS. PLACEK:  Objection.

23         THE COURT:  Overruled.

24         MR. MURPHY:

772

1      Q.    Did you see her hurt her wrist, Mr.

2   Johnson?

3      A.    No, I didn't see when she hurt her wrist.

4      Q.    What do you remember about her hurting

5   her wrist that day?

6            MS. PLACEK:   Objection.

7            THE COURT:   Overruled.

8            MR. MURPHY:

9      Q.    What do you remember about that day, sir,

10  with regards to her wrist?

11     A.    When I came in from work about 11:30 or

12  twelve clock at night, I taken her to the

13  hospital.

14     Q.    And do you remember what hospital you

15  took her to?

16     A.    I taken her to Roseland Hospital.

17     Q.    And why did you take her to Roseland

18  Hospital, Mr. Johnson?

19     A.    She was crying and said she had broke her

20  wrist.

21           MS. PLACEK:   Objection.

22           THE COURT:   Objection sustained, hearsay.

23           MR. MURPHY:   That is the statement alone,

24  Judge.

1              THE COURT:  That is the statement alone.

2         Well, no.

3              I'm going to retract that, that comes in

4    as an exception of the Hearsay Rule being offered

5    not for the truth of the matter asserted but

6    rather to show what this witness did.

7              Objection overruled.

8              MR. MURPHY:  Thank you, Judge.

9         Q.   And you took her to Roseland Hospital?

10        A.   Yes.

11        Q.   Did you wait for her when she was at

12   Roseland Hospital?

13        A.   Yes.

14        Q.   Did you wait for her when you took her

15   home??

16        A.   Yes, I did.

17        Q.   Did Denise look any different when you

18   took her home from Roseland Hospital?

19        A.   Yes.

20        Q.   How did she look different?

21        A.   Her wrist was wrapped up.

22        Q.   Was that with a bandage?

23        A.   With a bandage.

24        Q.   Now, Mr. Johnson, did you take Denise

1    your granddaughter to Roseland Hospital any other

2    time beside that time?

3        A.    Yes, I did.

4        Q.    When was that, sir?

5        A.    January 10, 1987.

6        Q.    And why did you take her on that

7    particular day, sir?

8        A.    She had fell out in front there.

9            MR. LuFRANO:  Objection to what she had

10    done unless he saw it.

11            THE COURT:  The objection is sustained.

12            MR. MURPHY:

13        Q.    Did you see her fall that day, sir?

14        A.    I was in the house and I heard her

15    hollering.

16        Q.    And, when she hollered, could you tell

17    Judge Holt what happened, what she did?

18            Did she come into the house?

19        A.    She couldn't even open the door because

20    she crawled up on the porch.

21        Q.    And when she crawled up on the porch,

22    what did you do, Mr. Johnson?

23        A.    I opened the door for her.

24        Q.    And did you?

1    A.    Yes, I did.

2    Q.    And where did you go from there, sir?

3    A.    I taken her to Roseland Hospital.

4    Q.    When you got to Roseland Hospital, sir,

5    did you take her anywhere inside Roseland

6    Hospital?

7    A.    Well, when the nurse told me to come in

8    and take her into the X-ray room.

9    Q.    Did you do that?

10    A.    Yes, I did.

11    Q.    When you got to the X-ray room, what did

12    you do with her, sir?

13    A.    Put her in a wheel chair.

14    Q.    And did you leave her in the X-ray room?

15    Or do you remember what happened when you

16    got to the X-ray room?

17    A.    They told me to step outside the door.

18    Q.    Okay.

19    And on that particular date, sir, did you

20    wait for Denise to get finished at Roseland

21    Hospital?

22    A.    Yes, I did.

23    Q.    And when she was finished at Roseland

24    Hospital did she have anything with her that she

1    didn't have when she went in?

2        A.    She had a crutch with her.

3            MR. MURPHY:  Thank you, Mr. Johnson.

4            THE WITNESS:  That is all?

5            MR. MURPHY:  The attorney may have some

6    questions for you, sir.

7                    CROSS EXAMINATION { }

8                    BY MS. PLACEK:

9        Q.    Mr. Johnson, if I say anything that

10   confuses you or you don't understand, you will ask

11   me about it, correct, you will ask me to just

12   straighten out the question, right?

13       A.    (Indicating.)

14       Q.    You have got to say "yes" because that

15   young lady over there has to take down your

16   testimony.  Okay?

17       A.    Yes.

18       Q.    During the time Denise was living with

19   you she was also a ward of the State, the

20   Department of Children and Family Services.

21           MR. MURPHY:  Objection, it's irrelevant.

22           THE COURT:  It may be relevant to the

23   term of who had responsibility for her care.

24           Objection overruled.

1              MS PLACEK:  Correct..

2         Q.   She was a ward of the State, as you got

3    paid by the State to take care of her, correct?

4         A.   Yes.

5         Q.   As a matter of fact, when the State's

6    Attorney sort of asked you about when you took her

7    to Roseland Hospital the first time, I think you

8    were going to say; yes, she had a green card or

9    the State paid for it, right?

10             MR. MURPHY:  Objection, Judge.

11             THE COURT:  Yes, what is the relevance,

12   Ms. Placek?

13             MS. PLACEK:  Judge, I'm going to go into

14   a certain matter that was brought up, not to

15   embarrass this gentleman, but as to change of

16   residency, unless the State is willing to

17   stipulate that this young lady was, in fact, a

18   ward of the department at the time.  I believe the

19   starting time they mentioned with this witness

20   would be 1986.

21             I'm trying to finish up just so in

22   closing remarks they will say that that wasn't

23   shown.

24             THE COURT:  The objection's--.

1      MS. PLACEK:  I will withdraw it, Judge.

2      Q.  Let me ask you this, sir:

3      Her mother was alive at that time,

4  correct, Denise's mother was alive when she was

5  living with you, correct?

6      A.  Yes, she was.

7      Q.  And let me ask you this:  Isn't it

8  correct that Denise eventually left your home and

9  went to Mrs. Fields' home, correct?

10      MR. MURPHY:  Objection, Judge, beyond the

11  scope.

12      THE COURT:  Objection is sustained.

13      MS. PLACEK:  Well, sir, let me ask you

14  this:  Calling your attention to 1987, did Denise

15  live with you that entire year?

16      MR. MURPHY:  Objection.

17      MS. PLACEK:  The State asked about 1987,

18  Judge.

19      THE COURT:  I don't see how it's relevant

20  in connection with -- the objection is sustained.

21      MS. PLACEK:

22      Q.  Sir, when you took her to Roseland

23  Hospital on January 10, 1987 you said that they

24  told you to take her in the X-ray room, correct?

1      A.   Right.

2      Q.   Describe the X-ray room?

3      A.   It's just like going through that door

4  and they had curtains and I just pushed her

5  wheelchair and they told me to step back.

6      Q.   When you say "curtains," approximately

7  where in the hospital, when you came in the door

8  and I'm speaking of the outside door or where?

9      A.   No.  It was about 2 rooms back further.

10     Q.   Further from what, sir?

11     A.   From the front door.

12     Q.   Thank you.

13           And what was in there besides the

14  curtains?

15     A.   (No response.)

16     Q.   What was in there besides the curtains?

17     A.   I don't know what all was in there.

18     Q.   Thank you very much, sir.

19           And you stepped outside of that door,

20  correct?

21     A.   Right.

22     Q.   And, you, as a matter of fact, didn't see

23  Denise for some time after that, correct?

24     A.   (No response.)

1    Q.   Is that correct, sir?

2    A.   Yes.

3    Q.   And let me show you what was previously

4    marked as People's Exhibit Number 8 for

5    identification, you identified that as Denise,

6    correct?

7    A.   Yes, it is.

8    Q.   Is that what Denise looked like when she

9    was living with you?

10   A.   (No response.)

11   Q.   Is that what she looked like when she was

12   living with you, sir?

13   A.   Yes, it is.

14   Q.   Tell me about how old is she in that

15   picture?

16   A.   She's about 11 years old.

17   Q.   Thank you.

18        Now, sir, in answer to the State's

19   questions, I believe you said that during 1986 to

20   '87, she was living with you, correct?

21   A.   Yes.

22   Q.   Did she live with you all of 1987?

23        MR. MURPHY:  Objection.

24        THE COURT:  I'm sorry, Ms. Reporter, can

1    I have the question back.

2            I think it was did she live with you.

3            MS. PLACEK:  All of 1987.

4            THE COURT:  The objection is sustained.

5            MS. PLACEK:

6        Q.    In this X-ray room were there several

7    beds in this X-ray room?

8        A.    Yes, it was.

9            MS. PLACEK:  Thank you very much.

10            That is all, Judge.

11            THE COURT:  Redirect?

12            MR. MURPHY:  I have no further questions.

13            THE COURT:  Thank you, Mr. Johnson, you

14    may step down.

15            MS. PLACEK:  Your Honor, for the purposes

16    of the record because of the court's ruling on

17    certain matters, my associate has gone out to have

18    a subpoena drawn for this gentleman, Judge.  So I

19    would just ask, Judge, since there is a motion to

20    exclude that let's put it this way so we don't

21    have a problem serving him so there is an

22    objection at a later time that he either be put in

23    a witness room or back to where he was staying,

24    Judge.

1          THE COURT:  Mr. Murphy?

2          MS. PLACEK:  Or we can go through his

3     testimony to save the gentleman a trip right now,

4     Judge, and I'll put him on.

5          MR. MURPHY:  Judge, I know that the

6     witness wants to quash the proceedings, I don't

7     know how that will go with the Court's ruling.

8          THE COURT:  I'll allow him to remain in

9     the courtroom but I will not entertain an

10    objection that he has been in the courtroom all

11    along and if Counsel wants him out of the

12    courtroom, I will order him out too, because he's

13    still a potential witness and falls under the

14    exclusionary rule.

15         MS. PLACEK:   .

16         THE COURT:  There is another matter if

17    the --

18         MR. MURPHY:  Judge, we will not raise an

19    objection to him being in the courtroom.

20         MS. PLACEK:  Judge, I have no objection

21    to him being in the courtroom, just as long as at

22    a later time there is not an objection from there.

23         MR. MURPHY:  James Hill.

24         May we proceed, Judge?

1       THE COURT:  Yes.

2       MR. MURPHY:  The State would call James

3  Hill.

4       THE CLERK:  Raise your right hand, sir.

5       THE COURT:  Sir, that microphone is on,

6  if you will speak directly into it and keep your

7  voice up, we'll all be able to hear you.

8       You may proceed, Mr. Cassidy.

9       J A M E S    H I L L, ( )

10  called as a witness herein for the People of the

11  State of Illinois, having been first duly sworn,

12  was examined and testified as follows:

13            DIRECT EXAMINATION ( )

14            BY MR. CASSIDY:

15     Q.   Sir, please state your name?

16     A.   James Christopher Hill, H- I- L- L-.

17     Q.   And how old are you, Mr. Hill?

18     A.   26 years old.

19     Q.   Where do you work?

20     A.   T.  Force Security.

21     Q.   What do you do for them?

22     A.   I am an assistant supervisor.

23     Q.   Calling your attention to August 2, 1988,

24  at approximately 9:30 in the morning, could you

1    please tell the Court where you were at that time?

2        A.    I was at 11720 South Princeton.

3              THE COURT:  11720 South Princeton.

4              MR. CASSIDY:  That is located in Chicago,

5    Cook County, Illinois?

6        A.    Yes, sir.

7        Q.    And how did you get there?

8        A.    I drove my mother there.

9        Q.    And what happened when you arrived there?

10       A.    When I an arrived there, I was there to

11   pick up my cousin Carlina and I seen Mr. Hendricks

12   coming down the street.

13       Q.    The person you refer to as Mr. Hendricks,

14   do you see him in court today?

15       A.    Yes, I do.

16       Q.    Please point to him and describe what he

17   is wearing?

18       A.    He is wearing a gray sweater with a black

19   streak down the sleeve.

20             MR. CASSIDY:  Let the record reflect he

21   has indicated the defendant.

22             THE COURT:  It may so reflect.

23             MR. CASSIDY:

24       Q.    Was anyone with Mr. Hendricks?

1          A.    Yes, he had a young lady with him.

2          Q.    What happened when you saw him?

3          A.    When I saw him my cousin Carlina told

4     me--

5               MS. PLACEK:  Objection.

6               THE COURT:  Objection sustained.

7               MR. CASSIDY:

8          Q.    After your cousin said something to him

9     what happened?

10         A.    I walked up to him and asked him had he

11    seen my cousin Denise.

12         Q.    Who was present?

13         A.    Myself, my mother, my cousin Carlina and

14    the young lady that he was with.

15         Q.    When you asked him that question, what,

16    if anything, did he say?

17         A.    He said no, he hadn't seen her.

18         Q.    What, if anything, did you say?

19         A.    I told him that my cousin Carlina --

20         Q.    Please continue, Mr. Hill?

21         A.    I told him that my cousin Carlina and my

22    sister Yolanda had said that they saw him with

23    her.

24               MS. PLACEK:  Well, now we are getting

1    into double hearsay.

2            THE COURT:  This is conversation that he

3    had with the defendant.

4            MS. PLACEK:  I apologize, Judge.

5            MR. CASSIDY:  Please continue, Mr. Hill.

6        A.   That they had seen him with my cousin

7    Denise the day before.

8        Q.   And what, if anything, then did he say?

9        A.   He said no he hadn't seen her.  Then I

10   described her to him.  I said the young lady that

11   was sitting on the porch and he said yes, I seen

12   her at or about 9:30 that night on my porch with

13   my nephew, Chew.

14       Q.   And, what happened then?

15       A.   He said that he was going to walk the

16   girl that he was walking with to the corner and he

17   would be right back.  He left then came back.

18       Q.   Did he then walk to the corner with the

19   girl?

20       A.   Yes.

21       Q.   What happened then?

22       A.   He later then came back.

23       Q.   Did the same girl come back with him?

24       A.   No, he came back alone.

1          And I asked him, I said, "You are sure
2     you haven't seen her?" He said, "No." I said,
3     Well, we are looking for her and the police are
4     looking for her, if you seen her or know anything
5     will you let us know?" He said he seen her on
6     119th Street and when he seen her he asked her
7     what was she doing there and he told her to go
8     home.
9          Q.   Did he say when he saw her other than
10    119th Street?
11         A.   No, he didn't give me any time at all.
12         Q.   And when he told you he saw her talking
13    to Chew on his front porch was he referring to his
14    front porch, Hendricks's front porch?
15              MS. PLACEK:  Objection.
16              THE COURT:  The objection is sustained.
17              MR. CASSIDY:
18         Q.   Did he tell you whose front porch he seen
19    her talking to Chew?
20              MS. PLACEK:  Objection.
21              THE COURT:  Overruled.
22              THE WITNESS:  He said it was his front
23    porch that he seen Chew talking to Denise on.
24              MR. CASSIDY:

1     Q.   And he said at 9:30.

2          Did he say 9:30 a.m. or 9:30 p.m.?

3     A.   9:30 p.m..

4          MR. CASSIDY:  May I have just a moment,

5     please, Judge?

6          THE COURT:  Sure.

7              (There was a brief pause.)

8          MR. CASSIDY:  No further questions.

9          THE COURT:  Cross?

10             CROSS EXAMINATION{}

11             BY MS. PLACEK:

12    Q.   Mr. Hill, you were the gentleman who

13    previously testified, I believe, on this summer on

14    motions concerning this same matter, correct?

15    A.   Yes, ma'am.

16    Q.   Mr. Hill, approximately what time did you

17    have this conversation with Mr. Hendricks?

18    A.   About 9:30 a.m..

19    Q.   So 9:30 a.m. hadn't passed that day,

20    correct?

21    A.   I didn't understand the question.

22    Q.   Well, sir, you had it at Nine o'clock in

23    the morning, correct?

24    A.   I had the conversation with Mr. Hendricks

1    at Nine o'clock that morning.

2        Q.   So 9:30 in the morning hadn't come yet,

3    correct?

4        A.   9:30 p.m.?

5        Q.   On August 2 hadn't come yet?

6        A.   No.   I talked to him Nine o'clock a.m. on

7    August 2nd.

8        Q.   So 9:30 in that morning hadn't come yet,

9    correct?

10           MR. MURPHY:   Objection.

11           THE COURT:   Do you really need that

12   answer?

13           MS. PLACEK:   No, Judge.   I think the

14   Court can tell.

15       Q.   Sir, let me ask you this:   You said

16   Mr. Hendricks had said that he had seen the young

17   lady at approximately 9:30 in the evening,

18   correct?

19       A.   Yes, ma'am.

20       Q.   What date?

21       A.   August 1st.

22       Q.   Did you ask him the date or is that your

23   assumption?

24       A.   No, I did not ask him the date.

1      Q.   Did he give you the date or was the

2    conversation similar to the way you explained it

3    to the State's Attorney while testifying for his

4    Honor Judge Holt?

5      A.   He did not give me a date.

6      Q.   So in other words when you say 9:30, that

7    is your assumption.

8           9:30, August 1st that's your assumption,

9    correct?

10          MR. CASSIDY:   Objection, Judge, he didn't

11   offer an assumption.

12          THE COURT:   Overruled.

13          MS. PLACEK:   That's your assumption,

14   correct?

15     A.   Yes, ma'am.

16     Q.   Now, calling your attention to this next

17   conversation, the one when Mr. Hendricks had

18   walked this girl to the corner and then came back

19   to where you and your other relatives were

20   standing, did you ask him what date he supposedly

21   told you that he saw the girl on 119th Street?

22     A.   No, ma'am.

23     Q.   Thank you.

24          One final question:

1              Do you know a gentleman by the name of

2    Michael Walker?

3         A.    I know a Michael but I'm not familiar

4    with last names.

5         Q.    Let me ask you this:  You mentioned that

6    you were out with a certain relative that morning

7    looking for the young lady, correct?

8         A.    Yes, ma'am.

9         Q.    One of them was your cousin Caroline?

10        A.    Carlina.

11        Q.    What's her last name?

12        A.    McCoy.

13        Q.    Now, Carlina McCoy to the best of your

14   knowledge do you know where she was the night

15   before?

16        A.    Yes, ma'am.

17        Q.    Was she looking for Denise?

18        A.    Yes, ma'am.

19        Q.    Was she looking for Denise with you?

20        A.    No, ma'am.

21        Q.    Let me also ask you this, sir:  This

22   conversation that you allegedly had with

23   Mr. Hendricks, would it be correct in saying that

24   both of them put together took no more than about

1    two or three minutes?

2        A.    Give or take five minutes.

3        Q.    Two or three minutes?

4        A.    Yeah, about five.

5            MS. PLACEK:  Thank you, that's all.

6            Motion to strike, Judge, as to the prior

7    party as to a conclusion as to dates, Judge, and

8    relevancy.

9            THE COURT:  Overruled.

10           Redirect?

11           MR. CASSIDY:  No; no questions.

12           THE COURT:  Thank you, Mr. Hill, you may

13   step down.

14           (Witness was excused.)

15           MR. MURPHY:  Your Honor, the People would

16   call John Fassl.

17           MS. PLACEK:  Judge, for the purposes of

18   the record, we now have a subpoena for Mr.

19   Johnson.  If we can go through the niceties of

20   asking him to step outside of the courtroom and

21   serving him there.

22           It's set for the 19th.

23           THE COURT:  Do what you have to do,

24   Mrs. Placek.   When you have him served with a

1    subpoena, I'll take steps to enforce your

2    subpoena.

3              THE COURT:  Raise your right hand.

4              (Witness was sworn.)

5              THE COURT:  Sir, that microphone is on,

6    if you will speak directly into it, we'll all be

7    able to hear you.

8              THE WITNESS:  Yes, sir.

9              J O H N    F A S S L, {}

10   called as a witness herein for the People of the

11   State of Illinois, having been first duly sworn,

12   was examined and testified as follows:

13                  DIRECT EXAMINATION

14                  BY MR. MURPHY:

15   Q.   Would you please state your full name?

16   A.   Officer John Fassl, F- A- S- S- L-; Star

17   3142, assigned to the Chicago Police Department.

18   Q.   And how long have you been with the

19   Chicago Police Department?

20   A.   Five years.

21   Q.   And what is your assignment now?

22   A.   Currently I am assigned to the Gun Task

23   Force South.

24   Q.   And, Officer Fassl, I would like to draw

1   your attention to the date of August 8, 1988, do
2   you recall that particular day?
3       A.   Yes, I do.
4       Q.   Do you recall what your assignment was on
5   that day?
6       A.   That date I was assigned to uniform
7   patrol beat 356 on the second watch, would be the
8   day shift, normally runs 8 in the morning to 4:30
9   in the afternoon.
10      Q.   And, Officer Fassl, some time during your
11  shift did you have occasion to receive a call to
12  go to 251 West 117th Street?
13      A.   Yes, I did.
14      Q.   Were you with a partner on that date?
15      A.   No.  That date I was working alone, I was
16  assigned with another officer, Officer Tom Hughes
17  was working uniform beat, 3532 and we were
18  assigned to the same assignment at 251 West 117th
19  Street.
20      Q.   That is one of the areas at that time
21  that you patrolled?
22      A.   That is correct, that is within the
23  boundaries of a police District.
24      Q.   Are you familiar with the address of 251

1    West 117th Street?

2        A.    Yes, I am.

3        Q.    Can you describe that area?

4        A.    The area of 251 West 117th Street is just

5    east of the corner of 117th and Princeton Street

6    in the City of Chicago.  Located at that address

7    at the time was an abandoned house with a garage

8    in the rear.

9        Q.    Was the garage attached or unattached?

10       A.    It's an unattached garage.

11       Q.    Officer Fassl, when you arrived at that

12   location, could you tell Judge Holt what you did?

13       A.    At the time of arrival, the nature of the

14   call was suspicious odor.  We arrived at that

15   location in the rear, pulled in the alley, and I

16   did detect a suspicious odor coming from that

17   location.

18       Q.    And when you detected that odor, what did

19   you do?

20       A.    Exited my vehicle and was directed to the

21   garage by a witness who had called the police.

22   Went in that garage and observed a body in the

23   southeast corner of that garage.

24       Q.    And when you refer to the garage, what

1    garage are you referring to?

2         A.    The garage at the rear of 251 West 117th

3    Street.

4         Q.    This is the abandoned house?

5         A.    That is correct.

6         Q.    Can you describe what you observed when

7    you saw the body?

8         A.    At the time I observed the body it was

9    laying in the southeast corner of the garage with

10   the head of the body pointed south?

11        A.    The victim was laying on her stomach, her

12   hands bound behind her back, she was partially

13   disrobed.

14        Q.    And, Officer Fassl, when you say her

15   hands were bound behind her back, can you describe

16   how they were bound?

17        A.    Yes.  I looked down and I observed that

18   they were bound by what appeared to be a set of

19   shoe laces.

20        Q.    Now you also testified that the victim

21   appeared to be disrobed, can you describe?

22        A.    Partially disrobed, the victim had on a

23   pair of pants, she had a bra, that was on, she was

24   laying face down, the straps on the bra were

1    partially pulled down off of her shoulders.

2              She had what appeared to be an article of

3    clothing tied around her neck and there was also

4    appeared to be a second shoe lace also tied around

5    her neck.

6         Q.   Now, what observations did you make of

7    the victim with regards to the pants she was

8    wearing?

9         A.   The pants appeared to be white or light

10   in color and they appeared to be knee length, what

11   are commonly referred to as pedal pushers.

12        Q.   Officer, was there anything about the

13   condition of the pants?

14        A.   They were soiled and the pants were also

15   unfastened.

16        Q.   Can you tell us how they were unfastened?

17        A.   At the time the victim was face down but

18   the pants were open.

19        Q.   Where were they open?

20        A.   At the front.

21        Q.   Were you able to determine what was

22   around the victim's neck, other than you describe

23   what you indicated was a shoe lace, you also

24   described another item, were you able to determine

1    what that item was?

2        A.    It was a dark-colored object of clothing,

3    I believe it to be the victim's top since she was

4    partially disrobed.

5        Q.    In addition to the items that you

6    described, did you see any other clothing items

7    around the area where the victim was at?

8        A.    At the time the victim had one shoe on.

9        Q.    Which one?

10       A.    The right shoe and I also observed the

11   left shoe was off the victim's foot and it was

12   lying up near the victim's head on what would be

13   the left side of the body.

14       Q.    Were there any shoe laces in those shoes?

15       A.    No.   Both shoes had no shoe laces in

16   them.

17       Q.    Was anything unusual or that you noted

18   about the shoes themselves?

19       A.    I noted the left shoe which was up by the

20   victim's head would appear to be red magic marker

21   had the name "Denise" written on the side of the

22   shoe.   I also noted a brand name of "Princes" on

23   the right shoe.

24       Q.    And what color were those shoes at the

1    time?

2        A.   They were white, light-colored shoes.

3        Q.   Officer Fassl, at the time when you

4    observed the victim, were you able to observe what

5    condition she was in?

6        A.   At the time we discovered the body it was

7    in an high state of decomposition, there was

8    slippage of skin from the face and large

9    infestations by maggots on the body.

10       Q.   Officer Fassl, were you one of the

11   original officers, if not one of the originals,

12   the original officer on the scene?

13       A.   Yes, Officer Hughes and I arrived

14   simultaneously.

15       Q.   As one of the original officers

16   on a crime scene, what is your duty?

17       A.   The main responsibility of the initial

18   officer is protection of the crime scene until

19   Area 2 violent crime detectives can arrive, crime

20   personnel is also responsible for logging who

21   arrived on the crime scene and then to protect our

22   crime scene.

23       Q.   Officer, approximately what time did you

24   arrive, do you recall?

1       A.    It was approximately 2:24 p.m..

2       Q.    That's in the afternoon?

3       A.    On the afternoon of 8, August, '88.

4       Q.    Officer, you testified that there were

5    two items of clothing around the neck, a shoe lace

6    and what you believe was a top, is that correct?

7       A.    That is correct.

8       Q.    Could you describe the top itself, was

9    there anything unusual about the way that top

10   appeared--

11            Strike that.

12            Let me rephrase the question.

13            Was the top pulled up?

14            MS. PLACEK:  Objection.

15            THE COURT:  Objection sustained.

16            MR. MURPHY:  I will withdraw it.

17      Q.    Can you describe where the shoe laces and

18   the top were in relation with being around the

19   neck?

20      A.    The shoe laces appeared to be at the base

21   of the neck closest to the shoulder, where as the

22   top it appeared to be higher at the top of the

23   neck.

24      Q.    And what would be just below the chin?

1        A.    At the back of the neck but it appeared
2    to be at the chin and just below the chin level.
3        Q.    The top was noted then?
4        A.    That is correct.
5        Q.    When you say noted, what happened?
6        A.    There was a large, what would be a common
7    knot, a large knot tied at the rear at the back of
8    the neck.
9        Q.    And, Officer Fassl, you testified in
10   describing the state of decomposition you
11   described maggot infestation, is that correct?
12       A.    That is correct.
13       Q.    Was that in and around the area of the
14   body?
15       A.    Yes.
16       Q.    There were garbage bags near the victim
17   as well?
18       A.    When I initially discovered the body of
19   the victim, there were garbage bags actually on
20   top of the victim.
21       Q.    Was that maggot infestation in and around
22   those garbage bags as well?
23       A.    Yes, it was.
24             MR. MURPHY:  May I approach the witness,

```
1    Judge?
2             THE COURT:  You may.
3             MR. MURPHY:
4         Q.   Officer Fassl, I'm going to show you what
5    has been previously marked as People's Exhibit
6    Number 1, do you recognize the person shown in
7    that photograph?
8         A.   Yes, I do.
9         Q.   Who do you recognize that person to be?
10        A.   The body.
11            MS. PLACEK:  I would like to see it.
12            You had asked who it was.
13            MR. MURPHY:
14        Q.   Officer, could you please describe what
15   is shown in People's Exhibit Number 1?
16        A.   This is the photo of the body that I
17   discovered in the garage at the rear of 251 West
18   117th Street.  This would be a morgue photo that
19   was taken later, the body is turn over on it's
20   back and the body has also been cleaned up.
21            MS. PLACEK:  With all due respect, -- no
22   knowledge of testifying as to the matter stated.
23            THE COURT:  The objection's overruled.
24            MR. MURPHY:  Thank you, Officer.
```

1    Q.   Officer, I'm also going to show you what

2   has been marked People's Exhibit Number 17 for

3   identification, could you please describe?

4    A.   What is shown in this photo would be the

5   south alley of 250 West block of 117th Street.

6   This photo would be taken from west to east, it

7   shows the alley from Princeton, eastbound to the

8   T.

9        On the left is the shrubbery that

10  surrounded the garage at the area of 251 West

11  117th Street.

12   Q.   Officer, I'm going to ask you to take

13  this marker, please mark the area where the garage

14  is shown on this photograph, as best you can.

15        THE WITNESS:   (Indicating.)

16        MR. MURPHY:   Thank you.

17   Q.   I'm also going to show you what has been

18  marked as People's Exhibit Number 18, could you

19  please look at that and describe it please?

20   A.   This is the south alley of 25000 block of

21  117th Street of west Chicago.   This photo would be

22  taken from east to West looking toward Princeton

23  just from the T-alley.

24        The garage which was at the rear of 251

1    West 117th Street is on the right of this photo

2    behind some dense shrubbery.

3        Q.    Again, Officer, I would ask you to mark

4    the area of the garage?

5        A.    You can see a portion of the garage in

6    this photo through the leaves there.

7        Q.    Thank you.

8            Officers, I'm also going to show you what

9    I'm marking as People's Exhibit Number 19 for

10   identification purposes.

11           I would ask you to look at this

12   photograph and tell me what is depicted?

13       A.    This is the rear, what would normally be

14   an overhead door of the garage at the rear of 251

15   West 117th Street.  This photo would be taken from

16   the south looking north, that is the door faced

17   south towards the T-alley.

18           At the time the discovery of the body

19   this was the condition of which the garage door

20   was found, which was boarded up.

21       Q.    Was the condition of that door ever

22   altered during the time you were at the scene?

23       A.    Yes, later time at the request of Area 2

24   violent crimes and officers from the crime lab

1      this door was pulled down for better access to the

2      garage.

3          Q.    Thank you.

4                I'm also going to show you what has been

5      marked People's Exhibit Number 20 for

6      identification purposes.

7                Would you please describe to Judge Holt

8      what is shown in that photo?

9          A.    This photo on the left side of this

10     photograph shows the garage at the rear of 251

11     West 117th Street.

12               This photo was taken from east to west,

13     it also shows the rear of the house at 251 West

14     117th Street.  What you see here shows the

15     boarded-up window on the south of that abandoned

16     residence.

17         Q.    Thank you.

18               Also showing you what has been marked as

19     People's Exhibit Number 21 for identification

20     purposes.

21               Could you please describe what is shown

22     in that photo?

23         A.    This is again what was the overhead door

24     on the south side of the garage at the rear of 251

1    West 117th Street after the boards that were

2    initially covering that had been removed at the

3    request of Area 2 violent crimes.  Now the door is

4    completely open and you can see what the boards

5    that were covering that, we placed to the right of

6    the garage.

7          Q.   Thank you.

8               I'll also show you what has been marked

9    as People's Exhibit Number 22 for identification

10   purposes.

11              Would you please describe what's shown in

12   that photo?

13         A.   Here in this photo it shows the rear

14   which would be the south side of the house at 251

15   West 117th Street.  It also shows the garage,

16   which is to the right here at the rear of 251 West

17   117th Street.

18              When I arrived on the scene, this would

19   be the alley right here, the south alley of West

20   117th Street.  The garage door was open as in the

21   manner it is right now when we arrived on the

22   scene.

23         Q.   Thank you.

24              I'm also going to show you what has been

1    marked People's Exhibit Number 23 for

2    identification purposes and please describe what's

3    shown in that photo?

4        A.   This is the garage at the rear of 251

5    West 117th Street.  It shows this service door

6    which would be on the West side.  That door was

7    open when we initially arrived.  It also shows the

8    boarded-up window on the north side and the second

9    boarded-up window on the West side of the garage.

10        Q.   Thank you.

11           And, Officer, in the photographs I have

12    shown you People's Exhibits 17, 18, 19, 20, 21, 22

13    and 23, do those photographs truly and accurately

14    portray the home at 251 West 117th Street and the

15    garage exterior area as it appeared on August 8,

16    1988?

17        A.   Yes they do.

18        Q.   I'm also going to show you now what has

19    been marked as People's Exhibit Number 24 for

20    identification purposes.

21           Would you please look at that and tell

22    the Judge what's shown in that photo?

23        A.   This is the shot of the interior of the

24    garage at the rear of 251 West 117th Street after

1    the rear doors which had been boarded-up had been

2    removed.

3            At this time the body of the victim has

4    been removed, this area here in the lower right is

5    approximately where the body of the victim had

6    been located.  As you can see there is still some

7    garbage and there's what appears to be maggot

8    infestation on the floor and bodily fluids.

9       Q.    Officer, would you please circle that

10   area.

11           Thank you.

12           I'm also showing you what I am marking as

13   People's Exhibit Number 25 for identification

14   purposes.

15           Could you please describe what's shown in

16   that photo?

17      A.    This is the interior of the garage at the

18   rear of 251 West 117th Street with the rear door

19   on the south of the garage still in place.

20    Here's the body of the victim.  This photo would

21   have been taken from the service door which is

22   located on the West side of that garage.

23           As I entered the garage this would be

24   what was first seen.  As you can see the body of

1    the victim is laying there, 3 bags of garbage, one

2    near the victim's head, one by the side and one

3    near the victim's side.

4         In this photo you can see the victim has

5    a gym shoe on the right foot and no shoe on the

6    left foot.  There is seepage of bodily fluid at

7    the rear of the victim's body near the feet.

8         Q.    Thank you.

9         I'm also going to show you what has been

10   marked, People's Exhibit Number 26, can you

11   describe that to us?

12        A.    This would be a photo of the victim in

13   the original position as what she was found.  That

14   is the southeast corner of the garage at the rear

15   of 251 West 117th Street with the head of the

16   victim pointing to the south.

17        It further illustrates the 3 bags of

18   garbage that were located on the victim.  These

19   are the victim's head, these are the victim's arms

20   which were tied behind her back, the victim's

21   buttocks.  You can see the victim's feet, here and

22   there, one with the right shoe on, left with no

23   shoe.  You can see the high state of decomposition

24   of the victim at the time, and the maggot

1    infestation around the victim, on top of the

2    victim and near the garbage.

3         Q.   I'm also showing you what has been marked

4    previously as People's Exhibit Number 27.

5              What is shown in that photo?

6         A.   That is a close up of the victim, same

7    photo.  As you can see here the victim is lying

8    face down, with an arm tied behind the victim's

9    back, thumb up, the victim's buttocks and rear

10   leg.

11             White gym shoe on left foot without shoe,

12   that shoe is located up here.  You can see the

13   heel of that shoe.

14             You can see the maggot infestation all

15   along the back of the victim, heavy infestation on

16   the right leg and all around the rear of the

17   victim and the victim's left side.

18        Q.   I'm also showing you what has been

19   marked, People's Exhibit Number 29.

20             THE COURT:  28.

21             MR. MURPHY:  Twenty-eight, Judge, I'm

22   sorry.

23        Q.   Could you please tell Judge Holt what is

24   depicted in this photo?

1    A.    Shown here is a close up of the victim,
2    concentrated on the head, the back, the arms and
3    the buttocks of the victim.
4        You see the victim's face down with the
5    head partially resting on a piece of wood, the
6    victim's left arm tied to the lower, the right arm
7    comes down to the bag of garbage, the victim's
8    buttocks where the pants are open, and the back
9    because they were open down in the front and the
10   space and the heavy maggot infestation all around
11   the victim and on the victim.
12   Q.    Officer Fassl, I will also show you what
13   has been marked previously People's Exhibit Number
14   29, can you tell Judge Holt what is depicted in
15   this photo?
16   A.    This is a close up of the victim showing
17   the victim's face down, head turned to the right.
18   You can see the victim's hair.  The victim's face
19   with skin slippage showing.
20       There is an article of clothing which was
21   located around the victim's neck with the knot
22   tied in the rear of that clothing, it shows the
23   victim's back.  The victim had a bra on.  As I
24   said earlier, the straps of the bra partially

1    pulled down off the victim's shoulders.  Also

2    shows her hands tied around her back.  There you

3    can see the shoe lace, and there it shows the

4    advanced state of decomposition and heavy

5    infestation of maggots.

6            Also on the left side of the victim near

7    her head you can see her left gym shoe in this

8    photo where it says "Denise" and what appears in

9    red magic marker written along the side of the

10   shoe.

11       Q.   Officer, could you please circle the area

12   on the shoe where you see the name Denise?

13       A.   (Indicating.)

14       Q.   Will you also circle the area where you

15   described the top, could you please circle where

16   that's shown in the photo?

17       A.   (Indicating).

18       Q.   Thank you.

19            I'm also showing you what has been marked

20   as People's Exhibit Number 30 for identification

21   purposes.

22            Can you tell Judge Holt what that

23   photograph depicts?

24       A.   This is a photo of the victim, standing

1  over the victim.  Shows the back of the victim's

2  head, it shows the top with the knot that was tied

3  at the rear of the victim's neck.

4         Below that, lower than the top, you can

5  see the shoe lace that was also tied around her

6  neck but at a lower point than the top.

7         In this photo you also see the shoe which

8  is on the left side of the victim.  You can see

9  from the angle of this photo you can see the "D-

10  E- N-" the start of "Denise" on the white shoe

11  here.  Shows the victim's bra strap pulled down

12  and where one of the bags of garbage was located.

13     Q.    Thank you.

14         Also showing you what has been marked

15  People's Exhibit Number 31 for identification

16  purposes.

17         Do you recognize that photo?

18     A.    Yes, I do.

19     Q.    What does that show?

20     A.    This shows the victim.  This was also

21  taken from a position standing above the victim,

22  the victim laying on her back, her hands tied

23  behind her back.  This is the victim's buttock

24  area where you can see where the pants had been

1    undone at the front.  There is room in here where
2    they have come away from the back of the victim.
3    And you can also see where the victim is found
4    there is a bag of garbage that was thrown
5    partially on top of the victim's head and another
6    one thrown on the right side of the victim.
7        Q.   I'm also going to show you what has been
8    marked as People's Exhibit Number 32.
9             Can you tell Judge Holt what that
10   photograph shows?
11       A.   This is a photograph taken from above the
12   victim.  It shows the back of the victim's head,
13   you can clearly see the top is tied, the knot in
14   the rear, below that you see the shoe lace that
15   was also tied around the victim's neck.
16            To the left of the victim's head is the
17   left shoe with the name "Denise" printed in a red
18   marker along the side of the shoe.
19       Q.   And, Officer, I'm going to ask you at
20   this time to circle the area showing both the top
21   tied around the victim's neck and also the shoe
22   lace which you observed around the victim's neck?
23       A.   (Indicating.)
24       Q.   Thank you.

1            I'm also going to show you what has been

2    marked as People's Exhibit Number 33 I'm going to

3    ask you to look at this photo and tell me what it

4    shows?

5        A.    This is a photo again taken from above

6    the victim at a closer angle.  It shows the back

7    of the victim's head, top tied around the victim's

8    head, see the shoe lace which is tied lower than

9    the top, just below that.

10           Also shows a closer angle of the gym shoe

11   the left of the victim's name, the name "Denise"

12   in red magic marker on the side of that gym shoe.

13       Q.    Officer Fassl, could you please circle

14   the area on the gym shoe which shows the name

15   "Denise"?

16       A.    (Indicating.)

17       Q.    I'm also showing you what has been marked

18   as People's Exhibit Number 34 for identification

19   purposes, would you please look at that photo and

20   tell Judge Holt what's shown in that photo?

21       A.    Shown here is a close up of what would be

22   the back of the head and the neck and the upper

23   back of the victim.

24           This shows the top that had been tied

1   around the victim's neck, noted in the rear, is

2   directly below that is what appears to be a shoe

3   lace of the victim also tied in a knot in the rear

4   which is lower than the top, closer to the base of

5   the neck.

6       Q.   I am also showing you what has been

7   marked as People's Exhibit Number 35.

8           Officer, would you look at that

9   photograph and tell Judge Holt what that shows?

10      A.   This is again a photo of the rear of the

11  victim's head, neck and upper back.  It shows the

12  top, which is on the top of the victim's neck, the

13  knot at the rear, below that at the base of the

14  victim's neck, shows a shoe lace, there's heavy

15  maggot infestation, the victim's back, and here is

16  the bra strap of the victim that was pulled down

17  off her shoulder.

18      Q.   Officer, if you would, I would like you

19  to mark separately the area where the top is on

20  the victim' neck and also the area where the shoe

21  lace is, if you can do that?

22      A.   This is the area of the top with a knot

23  here, below that is the shoe lace.

24      Q.   Thank you.

1           I'm also showing you what has been marked
2    as People's Exhibit Number 36.
3           Do you recognize who is shown in that
4    photo?
5        A.   Yes, I do.
6        Q.   What is that?
7        A.   This is the victim facing face down as
8    she was found face down.  It shows the lower part
9    of the neck of the victim, the back and the
10   buttocks.  It illustrates how the victim's hands
11   were tied behind her back, it illustrates the shoe
12   laces that were used to bond the victim's hands,
13   also visible are the pants that the victim was
14   wearing at the time she was found and the bra,
15   which was pulled down off her shoulders.
16       Q.   Officer, would you mark the area where
17   the shoe lace is shown tying the victim's hands?
18       A.   (Indicating.)
19       Q.   Thank you.
20           I'm also going to show you what I'm
21   marking as People's Exhibit Number 37.
22           Would you tell Judge Holt who is shown in
23   that photo?
24       A.   This is a close up photograph of the

1    victim's bound hands.  It shows the victim's back,

2    the hands, that they are bound.  Also illustrated

3    here is the shoe lace which the victim hands were

4    bound.  It also shows the victim's pants and the

5    top of the pants and as they are pulled away as

6    they are unfastened in the front.  You can also

7    see the advanced state of decomposition, the

8    slippage starting, the victim's hands.

9         Q.   Officer Fassl, I'm also showing you what

10   has been marked as People's Exhibit Number 30, at

11   least I'm marking People's Exhibit Number 30A,

12   would you please look at that photo and tell the

13   Judge what that photo shows?

14        A.   This is again a close up of the victim's

15   hands with the hands bound behind the victim, it

16   shows the shoe lace that was used to bind the

17   victim's hands, evident of the photo above that is

18   the victim's bra partially pulled up off her

19   shoulders.

20        Q.   I am also showing you what is being

21   marked as People's Exhibit Number 39.  Would you

22   please describe what that photograph shows?

23        A.   This is a photograph that was taken after

24   the victim was turned over when found laying on

1    her stomach.  She was rolled over onto her back.

2    This is a photo, shows the victim's bra partially

3    pulled down off the victim's shoulder, shows

4    advanced state of decomposition, slippage skin

5    of the victim's face, the top, noted around the

6    victim's neck is illustrated in the photograph.

7    It shows the pants the victim had on, the pants

8    that are open in the front, unfastened.

9        Q.    And that photograph shows the pants as

10    they were unfastened as they appeared on August 8,

11    '88?

12        A.    That is correct.

13        Q.    Could you please mark that with the

14    marker that you have.

15            I'm also going to show you what I'm

16    marking as People's Exhibit Number 40 and ask you

17    to look at that photograph and tell me what that

18    shows?

19        A.    This photo was taken after the officers

20    from the crime lab had lifted the victim.  She was

21    laying face forward, laid it back and then rolled

22    the body over, it shows the advanced stages of

23    decomposition, the slippage on the victim.  Again

24    it illustrates the top tied around the victim's

1    neck.  It shows a high level of infestation by

2    maggots, and this is the victim's bra, which had

3    been partially pulled off her shoulders.  As I

4    said, there was an advanced state of slippage in

5    the facial area.

6         Q.   When you refer to that, the face was, in

7    fact, no longer there?

8         A.   In this photo as you can see there is

9    basically no facial features left.

10        Q.   I'm also showing you what has been marked

11   as People's Exhibit Number 41.

12             Do you recognize what is shown in that

13   photo?

14        A.   Yes.  This is a photo of the victim, the

15   victim has now been turned over and laying on her

16   back, there is evidence the victim's hands is

17   still bound behind her back, then here it shows

18   the victim with her pants, the pants are open and

19   the front unfastened in the front.

20        Q.   Is that the condition she was in when

21   you-- although she has been cleaned up a little

22   bit, does that portray the condition she was in

23   when you observed her?

24        A.   Yes.

1      Q.   I'm also showing you what has been marked

2   as People's Exhibit Number 42, could you please

3   tell Judge Holt what that photograph shows?

4      A.   This is a photograph of the top that had

5   been tied around the victim's chin and upper neck,

6   showing the knot that was at the rear of the

7   victim's neck, which that's the way she was found

8   and you can look down and see the knot.

9      Q.   Also showing you what has been marked as

10  People's Exhibit Number 43, do you recognize what

11  that photograph shows?

12     A.   This is a photograph of the victim, shows

13  the victim's head, the victim's right ear, what

14  had been the victim's face.  It shows the shoe

15  lace across the victim in the neck area and the

16  top which was around the victim's neck, noted in

17  the rear.

18     Q.   I am also showing you what has been

19  marked as People's Exhibit Number 44.

20        Do you recognize what has been shown in

21  that photo?

22     A.   This is a photo taken from the left side,

23  it shows the victim's head, neck and shoulder

24  area, advanced state of decomposition of the

1    victim, slippage on the face.  It again shows the
2    shoe lace which was tied and knotted around the
3    victim's neck and the top that was tied and
4    knotted at the rear of the victim's neck.
5         Q.   And finally, I am going to show you what
6    I will mark as People's Exhibit Numbers 45 and 46,
7    can you describe to Judge Holt what's shown in
8    those 2 photographs?
9         A.   What's shown in these photographs, the
10   shoe laces that were found, one tied around the
11   victim's hands, because the victim's hands were
12   bound behind her body and the other one is a shoe
13   lace that was found tied, a knot around the
14   victim's neck.
15        Q.   Officer Fassl, with respect to these
16   photos, which I have shown you, People's Exhibit
17   24 up to and including People's Exhibit Number 46,
18   do those photographs truly and accurately show the
19   scene inside the garage at 251 West 117th Street,
20   the condition of the victim that was found there,
21   and the condition of various items of clothing as
22   they appeared and as she appeared on the date of
23   August 8, 1988?
24        A.   They do.

1          Q.   Officer Fassl, I'm also showing you what

2     has been marked as People's Exhibit Number 12 for

3     identification purposes, do you recognize what

4     Group Exhibit Number 12 -- Do you recognize what

5     those items are?

6          A.   Yes, I do.

7          Q.   What are they?

8          A.   These are the shoe, the right shoe, which

9     was found on the right foot of the victim, and the

10    left shoe was found on the left side of the head

11    of the victim on August 8, 1988 in the garage at

12    251 West 117th Street.

13         Q.   And are those shoes, do those shoes show

14    anything that you recognize from when you observed

15    the shoes on August 8, 1988?

16         A.   These shoes, as I found them on that

17    date, are without laces.  As I stated earlier, the

18    right shoe appears to be a name brand of "Princes"

19    on the side of the shoe.

20              The left shoe, which was illustrated in

21    quite a few of the photographs was found on the

22    left side of the body next to the head.  It shows

23    a marker the name "Denise" on the left side of the

24    shoe.

1      Q.   And, Officer Fassl, are those shoes

2   exactly the same as they appeared on August 8,

3   1988?

4      A.   No.  At that time, when I saw the shoes

5   they appeared a much lighter color, more white.

6      Q.   Since then they have deteriorated to some

7   extent?

8      A.   I would imagine being in the plastic bag.

9           MS. PLACEK:  Objection to what he

10   imagined.

11           THE COURT:  That part will go out.

12           MR. MURPHY:

13      Q.   Other than that they appeared to be the

14   same or substantially the same?

15      A.   Substantially the same, yes.

16      Q.   Officer, you testified that you are

17   familiar with the area in and around 251 West

18   117th Street, is that correct?

19      A.   That is correct.

20      Q.   Are you also familiar with 11720

21   Princeton?

22      A.   Yes, I am.

23      Q.   I am showing you a photograph which has

24   been marked as People's Exhibit Number 47.

1            Do you recognize what is shown in that

2     photo?

3        A.   Yes, it's a photo of the front of the

4     house and the front porch at 11720 South

5     Princeton, which the house here faces east, so the

6     picture would be taken from east to west.

7        Q.   I'm also going to show you what has been

8     marked as People's Exhibit Number 11, do you

9     recognize the area that's shown in that particular

10    photograph?

11       A.   The area that's shown here, this

12    photograph will be taken from approximately 11720

13    Princeton looking in what would be a northeasterly

14    direction.

15            MR. LuFRANO:  Objection to what it's

16    taken from unless he took it.

17            THE COURT:  No, overruled.  He can tell.

18            THE WITNESS:  Taking from a northeasterly

19    direction looking from the south alley of 117th

20    Street and which would be the alley between

21    Princeton and south alley between Princeton and

22    Yale.

23            It shows the areas -- this here is the

24    rear of the house at 251 West 117th Street.

1     Q.   And, Officer, does that, in fact, that

2    area as it exists today, at this time, there is no

3    garage located 251 West 117th Street, is that

4    correct?

5     A.   That is correct.

6     Q.   What is located there?

7     A.   Now, I believe all there is left is a

8    cement pad.

9     Q.   What if anything does that photograph

10   show in regards to the garage at 251 West 117th?

11    A.   It shows the actual garage, the garage at

12   the time of August, '88 would have been standing

13   approximately right here in the photograph, you

14   would be able to see it between the houses here

15   and the 2-flat on the right.

16    Q.   Could you please mark that on the photo

17   where the garage was approximately?

18    A.   (Indicating.)

19    Q.   And where's the house at 251 West 117th

20   Street, is that shown in this photo?

21    A.   This here with the dormer and the window

22   would be the house of 251 West 117th Street.

23    Q.   And the address of 251 West 117th Street,

24   where is that in relation to this house?

1          A.    That would be the house just west of 251

2     West 117th Street.

3          Q.    In fact, is that portion of that house

4     shown in the photograph?

5          A.    Yes, you can see the top of the roof

6     there.

7          Q.    I would ask you to mark that as well.

8          A.    (Marking.)

9          Q.    Officer, showing you what has been marked

10    People's Exhibit Number 9 for identification

11    purposes, do you recognize what is shown in that

12    photo?

13         A.    This is a photo of the rear, 251 West

14    117th Street.

15         Q.    Showing the residence and the pad where

16    the garage had been located and the photo also

17    depicts 255 West 117th Street and 259 West 117th.

18    In fact, 259 is right next door?

19         MS. PLACEK:    I am sorry, Mr. Murphy, I

20    thought the witness indicated 259 West 117th

21    Street ?

22         MR. MURPHY:    Judge, he did.  He said the

23    3 houses over was 259.

24         Q.    Officer, where is 255 West 117th?

1          A.    255 West 117th Street is the house

2     depicted here in the photograph directly west of

3     251 West 117th Street.

4          Q.    Would you please mark that?

5          A.    (Indicating.)

6               THE COURT:  What Exhibit?

7               MR. MURPHY:  Judge, this is People's

8     Exhibit Number 9, which had been previously marked

9     and identified on another day.

10         Q.    Also, Officers, you testified on the area

11    of the garage that is located in this photo, is

12    that correct?

13         A.    That is correct.

14         Q.    Could you please show that as well with

15    this marker?

16         A.    Certainly; the pad here where this garage

17    was located, this photo is taken from the south of

18    the alley.

19         Q.    I am also showing you People's Exhibit

20    Number 10 for identification purposes, do you

21    recognize what is shown?

22         A.    This photo shows the rear of the house at

23    251 West 117th Street.  It shows the side and the

24    rear of the residence located 255 West 117th

1      Street.

2              It also shows the pad where the garage

3      had been located at the rear of 251 West 117th

4      Street.

5          Q.    And finally, Officer, I am going to show

6      you what has been previously marked as People's

7      Exhibit Number 8, do you recognize what is shown

8      in that photo?

9          A.    This photo taken from the rear of 251

10     West 117th Street and the foreground of the

11     photograph you can see the cement pad where the

12     garage had been located, this would be the south

13     alley between Princeton, or Yale, Princeton, and

14     this depicts, this photograph here is the front of

15     the house, which faces east of 11720 South

16     Princeton showing the front of the house and the

17     front porch.

18         Q.    I am sorry for interrupting you.

19         A.    This photograph is taken from a

20     southwesterly direction from east to west.

21         Q.    Could you please mark where on that

22     photograph 11720 Princeton is shown?

23         A.    (Indicating.)

24         Q.    Now, Officer, with regards to this

1    particular photograph, People's Exhibit Number 47,

2    does that truly and accurately portray the way

3    11720 Princeton appeared on the date of August 8,

4    1988 to your knowledge?

5        A.    To the best of my knowledge, yes.

6        Q.    With respect to the other photographs

7    People's Exhibits 8, 9, 10 and 11, those

8    photographs do not portray the way the area in and

9    around 11720 Princeton at 251 West 117th Street

10   appeared on August 8, 1988, is that correct?

11       A.    That is correct.

12       Q.    In fact, these photographs were taken in

13   the winter time?

14       A.    Yes, they are taken in the wintertime.

15   The garage which on August 8, 1988 was located in

16   the area of 251 West 117th Street is now gone.

17       Q.    Other than the fact they were taken in

18   the winter and the garage is removed, do those

19   photographs truly and accurately portray the way

20   those buildings appeared on that date?

21       A.    Yes.

22       Q.    And the way they are related to one

23   another?

24       A.    Yes, they do.

1              MR. MURPHY:  Judge, I would ask that the

2      witness be allowed to step down from the witness

3      stand and approach the Exhibit, the diagram.

4              THE COURT:  Yes.

5                   (Witness steps from the stand.)

6         Q.    Officer, I ask you to look at People's

7      Exhibit Number 6, do you recognize what this is?

8         A.    Yes.

9         Q.    What is this a diagram of?

10        A.    This is a diagram of the area from 117th

11     to 120 Wentworth to Harvard, located in the City

12     of Chicago.

13        Q.    Officer, does that diagram show the area

14     of -- perhaps not this scale -- but, at least,

15     show the area as it appears in open view?

16        A.    Yes.

17        Q.    Would that diagram aid you in describing

18     the area to Judge Holt?

19        A.    Yes, it would.

20        Q.    Officer Fassl, if you would, would you

21     please use this marker and please mark the area

22     where the house is located, 11720?

23        A.    11720 South Princeton is approximately

24     here.  South on Princeton just south of the second

1    house south of the alley here.

2        Q.    If you could use a rectangle or whatever

3    it would take to show approximately the area that

4    the house filled?

5        A.    Indicate building.

6        Q.    And where is the front of the house,

7    would you make that with a "F."

8        A.    There would be the "F" of the house

9    facing east.

10       Q.    Now, Officer, I would also ask you to use

11   that marker you have and mark the area where the

12   house and garage were located at 251 West 117th

13   Street?

14       A.    The house would be located approximately

15   here, 3 houses east of the corner of 117th and

16   Princeton.  The garage is located at the rear of

17   251 West 117th Street here, just West of -- This

18   is a T.  The alley runs south, alley runs east and

19   west, the T-alley runs north and south, the garage

20   at that location is located just to the west of

21   that T-alley.

22       Q.    And, Officer Fassl, with the use of that

23   diagram, would you please mark the area where the

24   house is located at 255 West 117th Street?

1        A.    The house at 255 West 117th Street would

2    be directly next door just to the west of 251,

3    west 117th Street.

4                    (Witness resumes the stand.)

5            MR. MURPHY:

6        Q.    Officer, these photographs what I have

7    already identified, People's Exhibit Numbers 10

8    and 9, other than the distinctions that you have

9    already made, is there another distinction with

10   respect to the house that can be made in

11   comparison to August 8, 1988?

12       A.    The houses depicted in these photographs

13   is no longer abandoned, the windows are

14   unobstructed with shades.  On 8, August, '88, the

15   windows at the rear of the house and the rear had

16   been boarded over because the house was abandoned

17   at that time.

18            MR. MURPHY:    Thank you.

19       Q.    Officer Fassl, at some point after you

20   had taken control of the crime scene, was this

21   matter then turned over to Area 2 detectives to

22   your knowledge?

23       A.    That is correct.

24            MR. MURPHY:  No further questions, Judge.

1            THE COURT:  Before we commence cross

2    examination, we'll take a five-minute recess.

3                    (Whereupon there was a brief

4                     recess, after which the

5                     following proceedings were had:)

6            THE COURT:  Proceed, Counsel.

7                    CROSS EXAMINATION ()

8                    BY MS. PLACEK:

9        Q.    Officers you have identified quite a few

10   pictures in this court today?

11       A.    Yes.

12       Q.    And you have refreshed your memory with

13   your report?

14       A.    Yes.

15       Q.    Would it be correct to say that as you

16   sit there now and what you testified to with the

17   State's Attorney that actually what you are

18   testifying is your fresh memory and what you know

19   eventually happened in this case not on what you

20   recall or saw on the date in time?

21            MR. MURPHY:  Objection to the form of the

22   question.

23            THE COURT:  Overruled, if he answers it.

24            THE WITNESS:  My memory has been

835

1    refreshed from viewing the photographs and from my

2    original case report and that's the extent of my

3    presentation.

4                MS. PLACEK:

5        Q.    Well, aside from your preparation isn't

6    it correct that, in fact, what you have testified

7    today to is enhanced by what was later found out

8    by the Chicago police?

9        A.    Not at all.  My responsibilities and

10   duties at that time and in relation to the case

11   only relates to the Discovery of the body,

12   guarding the crime scene and my observations of

13   the crime scene at that time.  I had no further

14   interest in the case.

15       Q.    Well, let's talk about that for a moment.

16              Today you described for the State's

17   Attorney and for his Honor Judge Holt that you

18   clearly saw not only a piece of clothing, that is,

19   a blouse and shoe laces?

20              MR. MURPHY:  Objection, Judge.

21              MS. PLACEK:  Or shoe lace.

22              THE COURT:  What is the objection?

23              MR. MURPHY:  Well, the characterization

24   to the top as a blouse.

1          MS. PLACEK:  A top, and a shoe lace
2     around the victim's neck, correct?
3          A.   That is correct.
4          Q.   Isn't that correct, in fact, what you
5     have in your report, which was made on the date
6     and time in question, is that you saw a stocking
7     tied around the victim's neck, is that correct?
8          A.   Yeah, I believe that is what is stated in
9     the original case.
10         Q.   And as a matter of fact you mentioned
11    nothing about shoe laces or top, blouse or top
12    around the victim's neck, correct, in your report?
13         A.   That is correct, that is the initial case
14    report is just a summary.
15         Q.   I understand that, Officer, but in that
16    summary, what you have in there -- and correct me
17    if I'm wrong, is that, in fact, a stocking was
18    around her throat?
19         MR. MURPHY:  Objection asked and
20    answered.
21         THE COURT:  Overruled.
22         MS. PLACEK:  Is that correct?
23         A.   That is correct, Counsel.
24         Q.   Thank you.

1          And nothing about the top you described

2    or the shoe laces around her neck, correct?

3        A.   That is correct.

4        Q.   Now, also isn't it correct that at the

5    time, and I am speaking of the date and time in

6    question that you discovered the body, that the

7    body was in an advanced rate of decomposition,

8    that as a matter of fact you believed that the

9    body or the person might have been shot?

10            MR. MURPHY:  Objection, Judge.

11            THE COURT:  Basis?

12            MR. MURPHY:  Relevance.  What this

13   officer might have thought at that time.

14            THE COURT:  What difference would it make

15   what he thought?

16            MS. PLACEK:  Observations, Judge.

17            MR. MURPHY:  Objection, your Honor.

18            THE COURT:  The objection is sustained.

19            MS. PLACEK:  Well, Officer, isn't it

20   correct that when you came to the garage in

21   question you knew you were investigating a

22   homicide, correct?

23       A.   That's not correct.  We responded to a

24   call of a suspicious odor.

1      Q.   Well, once you got there you knew you

2   were investigating a homicide?

3      A.   At the time I was investigating the

4   discovery of a body.

5      Q.   Let me put it this way:

6           Isn't it correct that you thought an

7   instrumentality had been used on this body?

8           MR. MURPHY:  Objection.

9           THE COURT:  Overruled.

10          THE WITNESS:  As initial responding?

11          MS. PLACEK:

12     Q.   Did you understand my question, Officer?

13     A.   Yes, Counsel.

14     Q.   Can you answer it?

15     A.   Nowhere in my responsibilities --

16     Q.   Can you answer my question?

17     A.   I am trying to, Counsel.

18     Q.   Then isn't that correct that you thought

19   an instrumentality had been, in fact, used on the

20   body, yes or no?

21          MR. CASSIDY:  Objection; irrelevant of

22   what this officer thought.

23          THE COURT:  Overruled.  She's not asking

24   him about his thought process, even though that is

1    for the purpose of the question.

2            She is asking him about his observation,

3    his experience and interpretation of what he was

4    viewing, that's what the essence of her question

5    is.

6            And if you use the word "thought," that

7    does not include to me that he is speculating,

8    that he is guessing.  He is an expert.

9            MR. CASSIDY:  Judge, I understand; I

10   understand that.

11           THE COURT:  Your objection is overruled,

12   Mr. Cassidy.

13           MR. CASSIDY:  Judge, he is not testifying

14   to the cause of death.  What is the difference,

15   what is the relevance of it?

16           THE COURT:  It doesn't mean because he

17   can't testify to the cause of death that this

18   question is improper, it doesn't mean that the

19   question is improper.  It may not have much

20   probative value.

21           MR. CASSIDY:  Sure didn't.

22           THE COURT:  That may be, Mr. Cassidy,

23   that it may not have probative value but that

24   doesn't make it inadmissible.

1          MS. PLACEK:

2      Q.   Will you answer the question?

3          THE COURT:  Please read the question, Ms.

4    Reporter.

5                    (Whereupon the record was

6                    read as requested.)

7          THE COURT:  Isn't that true that you

8    thought that instrumentality had been used on this

9    body at the time you saw it?

10     A.   At the time I observed ligatures around

11   the neck, whether I made an inference from that, I

12   did not.

13     Q.   You did not think an instrumentality had

14   been used on the body?

15     A.   I observed ligatures about the victim's

16   neck.

17          MS. PLACEK:  Motion to strike, is

18   non-responsive, Judge.

19          THE COURT:  Motion is granted.

20          MS. PLACEK:  Isn't that correct you

21   thought an instrumentality had been used on the

22   victim?

23          MR. CASSIDY:  Objection, asked and

24   answered.

1              THE COURT:  He's not answered the
2    question.
3              Officer, if you can, you must answer it.
4              MS. PLACEK:  Isn't it correct that you
5    thought an unknown instrumentality was, in fact,
6    used on the victim, yes or no, Officer?
7         A.    Yes.
8         Q.    Isn't it true that you thought that
9    instrumentality was, in fact, a firearm?
10        A.    No.
11        Q.    Showing you -- well, let me ask you this:
12   Isn't it correct that you wrote a report dealing
13   with this matter?
14        A.    Officer Hughes prepared the report, I did
15   sign the report, yes.
16        Q.    When you signed it, did you adopt the
17   report as true and correct?
18        A.    Yes.
19        Q.    Isn't it correct that a portion of that
20   report deals with firearm use on the proposed
21   victim?
22        A.    Yes.
23        Q.    Isn't it correct, yes or no, Officer?
24        A.    Yes, it's a box for firearm.

1       Q.   Isn't it correct that there is a type of
2  weapon going down to type of gun, shotgun and also
3  DNA, meaning does not apply, correct?
4       A.   That is correct.
5       Q.   Is it correct that you marked "unknown
6  firearm?"
7            MR. MURPHY:  Objection, Judge.
8            THE COURT:  Objection sustained.
9            MS. PLACEK:  Wasn't it correct it's
10 marked on the report that you, in fact, adopted
11 "unknown firearm?"
12           MR. MURPHY:  Objection.
13           THE COURT:  Objection sustained.
14           MS. PLACEK:  Basis, Judge?
15           THE COURT:  It's collateral, Ms.  Placek,
16 it has no probative value.
17           MS. PLACEK:  I think it does, Judge.
18           THE COURT:  It's not collateral.
19 Mrs. Placek, ask another question.
20           MS. PLACEK:  Sir, at the time you
21 observed the body, did you believe the body to, in
22 fact, be shot?
23           MR. CASSIDY:  Objection, Judge.
24           THE COURT:  Objection sustained.

843

1          MS. PLACEK:  Well, you described the body

2     for the assistant State's Attorney?

3          A.   Yes.

4          Q.   Would I be correct in saying as part of

5     your description or part of what you saw on that

6     date and time you observed approximately a

7     five-foot-4 black female?

8          A.   That is correct.

9          Q.   Thank you.

10          Now, let me ask you this:  You spoke of

11     doors being broken open by the police or having it

12     broken by the police.  Am I correct in assuming

13     that the service door was, in fact, that is the

14     side door of the garage was open when you came?

15          A.   Yes.

16          Q.   Now let me ask you this, Officer:  You

17     mentioned the scene as you came upon it and you

18     described certain clothing you found there,

19     correct?

20          A.   Yes.

21          Q.   Isn't it correct that also found was a

22     purse with the word, "Las Vegas" on it, if you can

23     recall?

24          A.   I can't recall.

1       Q.   You cannot or can?

2       A.   I cannot.

3       Q.   Did you inventory any of the matters

4   found in the garage?

5       A.   No, I did not.

6       Q.   Approximately how long were you in the

7   garage?

8       A.   In the garage and in the area of the

9   crime scene for approximately 3 to 4 hours.

10      Q.   And you could still smell the body or an

11  odor coming from the garage, correct?

12      A.   That is correct.

13      Q.   And I believe you mentioned certain body

14  seepages, correct?

15      A.   That is correct.

16      Q.   And these were still moist, correct?

17      A.   Yes.

18      Q.   Now, I believe you identified certain

19  photos for the assistant State's Attorney,

20  correct?

21      A.   Yes, I did.

22      Q.   With the exception of the last two which

23  I believe were 45 and 46, were you present when

24  those photos were taken?

1        A.    The -- I was present for -- we have to go
2    photo by photo.
3            Some of the photos shown were morgue
4    photos which I was not present for.  Photos taken
5    which compare with the garage were done and in the
6    wintertime I was not present when those were
7    taken.
8        Q.    Were you present when the so-called scene
9    photos were taken?
10        A.    Yes.
11        Q.    Were you present when the body was turned
12    over?
13        A.    Yes.
14        Q.    So let me ask you this:  When you were
15    present when the body was turned over this is when
16    you saw the body seepage, correct, the fluids?
17        A.    Yes.
18        Q.    Thank you.
19            Now, I will also ask you this:  You
20    identified certain tennis shoes, correct?
21        A.    Yes.
22        Q.    And incidentally you described it as a
23    particular type, that they were whiter, correct?
24        A.    Yes, that is correct.

1      Q.    Did they look new?

2      A.    They appeared lighter color than they are

3   now.

4      Q.    Other than age when you saw them in the

5   garage did they appear to be new shoes?

6      A.    Fairly new shoes, they were still fairly

7   clean and light in color.

8      Q.    Thank you.

9            And by the way that "Denise" wasn't

10  written in green was it?

11     A.    No, it appeared to be red.

12     Q.    Now you mentioned that the winter

13  photographs were taken.  You, of course, were

14  present in August when the photos were taken,

15  correct?

16     A.    Yes.

17     Q.    By the way, am I correct in assuming that

18  one of the things that will enhance the smell in

19  the garage was the heat, if you can recall?

20     A.    Correct, it was August.

21     Q.    Well, besides being August, isn't it

22  correct that the outside temperature, when I speak

23  of outside temperature so we have it clear, that

24  the temperature outside of the garage was

1    approximately 90, if you can recall?

2        A.    It was warm, I can't make an

3    approximation .

4        Q.    Officer, isn't it right it was more than

5    warm it was actually hot?

6            MR. MURPHY:  Objection.

7            MS. PLACEK:  If he knows.

8            THE COURT:  If he knows, he may answer

9    that.

10           THE WITNESS:  Yes, it was hot, it was

11   August.

12       Q.    Not only that, but now we are speaking of

13   the temperature inside of the garage, the

14   temperature inside of the garage was even hotter

15   than the outside temperature, correct?

16       A.    Yes, that is correct.

17       Q.    Thank you.

18           Now, your attention was, in fact, called

19   to this diagram, referring to People's Exhibit

20   Number 6.  And I believe that you described a

21   T-alley, correct?

22       A.    That is correct.

23       Q.    And this T-alley, am I correct in

24   assuming that the garage where you went to that

1    day is at the end of the T-alley?

2         A.    The garage is locate towards the West of

3    the T.

4         Q.    Let's talk about that for a second.

5              How far to the west of the "T" would you

6    say?

7         A.    There is no other garage there, so maybe

8    6 feet to the west of the "T".

9         Q.    And calling your attention again to

10   People's Number 6.  You can see where I am

11   pointing, correct?

12        A.    Yes.

13        Q.    There seems to be a space here, correct?

14        A.    Yes, that depicts the alley.

15        Q.    That's another alley, correct?

16        A.    That's the south alley of West 117th

17   Street, which runs east and west.

18        Q.    So it would be correct that this garage

19   is not only boarded by an east and west alley but

20   a north and south alley, correct?

21        A.    It is to the west of the T-alley, which

22   is the alley that runs north and south.

23        Q.    I understand there is two alleys,

24   correct?

1        A.    That is correct.

2        Q.    Thank you.

3              Now you gave a certain physical

4    description, which I already asked you about.  To

5    refresh your memory, you said the person was

6    approximately 5-foot-4.  Am I correct to assume

7    also that this person was of slight build, that

8    is, the person you observed in the alley?

9        A.    The body of the victim I would not

10   characterize as slight.

11       Q.    How would you characterize it?

12       A.    Medium build.

13       Q.    When you say "medium" just so his Honor

14   Judge Holt and myself know what your speaking what

15   would you say the body in the garage weighed to be

16   a medium build and a five-foot-four height?

17       A.    Approximately 130 pounds.

18       Q.    More than at least 86 pounds, about 130

19   correct?

20       A.    More than 86.

21       Q.    About 130 would be your guesstimate, if

22   you will, correct?

23       A.    That's my guesstimate, yes.

24             MS. PLACEK:  I believe that's all, Judge.

830

1          THE COURT:  Redirect?

2                  REDIRECT EXAMINATION[]

3                  BY MR. MURPHY:

4      Q.   Officer Fassl, when you went to the crime

5  scene did you ever weigh the body yourself?

6          MS. PLACEK:  Objection, we have no

7  problem that it's an estimate of what he saw,

8  Judge.

9          THE COURT:  Overruled.

10          THE WITNESS:  No, I did not.

11      Q.   So you really don't know what the weight

12  of the body is, is that correct?

13      A.   That is correct.

14      Q.   And, the weight that you came up with is

15  merely a guess, is that correct?

16      A.   Strictly a guess, right.

17      Q.   And also as to the size of the body, did

18  you ever take out a tape measure and measure the

19  body from head to toe?

20      A.   No, I did not.

21      Q.   And the questions you were asked with

22  respect to height, is that also a guess on your

23  part?

24      A.   Most definitely, yes.

1    Q.    You really have no knowledge as to what

2    the exact height of this body from head to toe

3    was?

4            MS. PLACEK:  Objection to his vision.

5            THE COURT:  Overruled.

6            MR. MURPHY:  Is that correct, Officer?

7    A.    That is correct.

8            MR. MURPHY:   Nothing further, Judge.

9                RECROSS EXAMINATION {}

10               BY MS. PLACEK:

11   Q.    And these guesses were made on what you

12   saw in the garage on the date and time in

13   question, yes?

14   A.    Yes.

15           MS. PLACEK:  Thank you, that is all.

16           THE COURT:  Anything further?

17           MR. MURPHY:  No.

18           THE COURT:  Thank you, Mr. Fassl.  You

19   may step down.

20               (Witness was excused.)

21           THE COURT:  Mr. Murphy, can we put

22   another witness on and off in 30 minutes?

23           MR. MURPHY:  Judge, I would say that I

24   can do the direct examination in 15 or 20 minutes,

1    where that would leave us for cross, I don't know.

2            THE COURT:  Your witness may have to

3    return tomorrow but he or she will have to return

4    tomorrow anyway.

5            THE CLERK:  Raise your right hand.

6            M I C H A E L    B A K E R, { }

7    Called as a witness herein for the People of the

8    State of Illinois, having been first duly sworn,

9    was examined and testified as follows:

10                   DIRECT EXAMINATION{ }

11                   BY MR. MURPHY:

12       Q.   Would you please state your name?

13       A.   Detective Michael Baker, B- A- K- E- R-,

14    Star 10414; Chicago Police Department.

15       Q.   And, Detective, you testified you are

16    employed with the Chicago Police Department.  How

17    long have you been employed with the Chicago

18    Police Department?

19       A.   18 years.

20       Q.   And how long have you worked as a

21    Detective?

22       A.   Nine years.

23       Q.   Detective Baker, I would like to direct

24    your attention to the date of August 8, 1988 do

1    you remember if you were on duty on that

2    particular date?

3        A.    Yes, sir, I was.

4              I had been working from 4:30 a.m. to one

5    a.m..

6        Q.    That was your assigned shift?

7        A.    Yes.

8        Q.    And did you work pass that shift?

9        A.    Yes, I did.

10       Q.    During the course of that shift, did you

11   have occasion to come in contact with any

12   individual that you see in Court today?

13       A.    Jerome Hendricks.

14       Q.    Could you please point to him and

15   indicate an article of clothing?

16       A.    Gray top.

17             MR. MURPHY:  May the report reflect

18   in-court identification of the defendant, your

19   Honor?

20             THE COURT:  It may so reflect.

21             MR. MURPHY:

22       Q.    Det. Baker, I would like to direct your

23   attention to that evening approximately 9:30 p.m.,

24   did you have occasion to take the defendant

1   anywhere?

2       A.   Yes, I did.

3       Q.   Where did you take him?

4       A.   To 11th and State .

5       Q.   And who else was with you at that time?

6       A.   Det. Roland.

7       Q.   Was the detective at 11th and State for a

8   period of time?

9       A.   Yes, he was.

10      Q.   Was he subsequently taken from 11th and

11  State to another location?

12      A.   After we were through at 11th and State,

13  he was returned to Area 2 violent crimes.

14      Q.   And approximately what time was that?

15      A.   Approximately 1 a.m..

16      Q.   And Det. Baker, when you arrived back to

17  Area 2 violent crimes, what, if anything, did you

18  see?

19      A.   At that time Jerome Hendricks was advised

20  of his rights again by myself, at the time we took

21  a detailed account of his activities on the date

22  in question.

23      Q.   And, this was approximately one in the

24  morning?

1        A.    Yes.

2        Q.    And Det. Baker, where did that interview

3    take place?

4        A.    In the interview room Area 2 violent

5    crimes.

6        Q.    And who else was present?

7        A.    Besides myself and Jerome Hendricks, Det.

8    Roland was present.

9        Q.    And now you testified that you advised

10   the defendant of his rights?

11       A.    Constitutional rights per Miranda.

12       Q.    How's that?

13       A.    From my FOP book.

14            MS. PLACEK:  Judge, we have a motion

15   already, no motion.

16            MR. MURPHY:  Your Honor, for the record,

17   there would be a stipulation between the parties

18   that Detective Baker would testify he gave the

19   defendant his Miranda Rights consistent with

20   People versus Miranda.

21            THE COURT:  The stipulation will be

22   received.

23            So stipulated Counsel?

24            MS. PLACEK:  Yes, Judge.

1          MR. MURPHY:

2      Q.   Now at that time after you gave the

3  defendant his Miranda Rights, what, if anything,

4  did you say to him or did he say to you?

5      A.   I asked him if he would give us an

6  account of his activities on the 1st of August.

7      Q.   That was the 1st of August, 1988?

8      A.   Yes.

9      Q.   And what, if anything, did the defendant

10  tell you?

11     A.   He told us at that time we asked him

12  particularly if he had seen the victim on that

13  date.  He told us that he had.  He asked her to

14  get him some candy or some ice cream from the

15  candy lady on the street.

16     Q.   How was the victim referred to in this

17  conversation?

18     A.   Denise.

19     Q.   Okay.

20     A.   And, he said that he talked to her that

21  day, that was the first day he had met her and he

22  asked her to get him some candy, some ice cream.

23  He said she was going for someone else and she

24  brought something back for him.  He stated later

1    on he went home and went to some friend's house

2    and he came back out later in the evening some

3    time after dark and he saw the victim talking to

4    his nephew on the street.

5        Q.    Now, if I may, Detective-- I don't want

6    to interrupt you-- did he tell you approximately

7    when he had the contact with the victim regarding

8    the ice cream?

9        A.    Some time in the early afternoon.

10       Q.    And when is the next time he told you he

11   saw the victim?

12       A.    Some time late in the p.m., some time he

13   said it was after dark and he said he saw her by

14   the front of his house and she was talking to his

15   nephew.  He related then he went to play

16   basketball on numerous locations.

17       Q.    And, did the defendant tell you anything

18   else at that time?

19       A.    He told us that he went to West Pullman

20   Park and played basketball.   He told us he went

21   to Everett White School and played basketball.

22            I asked who with, he said a fellow by the

23   name of Mike who he went to high school and a

24   subject by the name of "Shorty Mac" who he went to

1    high school, and a fellow that he walked out with

2    by the name of Michael Walker.

3        Q.    And, what, if anything, else did he tell

4    you?

5        A.    We asked him to account for his

6    activities the rest of the night and he said after

7    playing basketball numerous places and having a

8    few beers talking to people he told us that he had

9    to meet his girlfriend at the bus stop 119th and

10   Michigan approximately 3:30 a.m..  He told us he

11   left after playing basketball, he wasn't sure

12   about the time, but he walked down 119th and

13   Michigan.  He told us when he got there he had

14   missed his girlfriend so he walked home.

15            He told us when he got home his

16   girlfriend Jackie was there and his sister and she

17   told him that the police had been by looking for

18   him.

19            MS. PLACEK:  Objection to out-of-court

20   statement and other party, Judge.

21            THE COURT:  No.  Overruled.

22            THE WITNESS:  His sister told him the

23   police had been looking for him and at that time

24   he went to bed.

1      MR. MURPHY:

2      Q.   What time was it that he said this

3   conversation occurred?

4      A.   He wasn't sure of the time but he said

5   the sun was up.

6      Q.   So this was early morning hours of August

7   2, 1988?

8      A.   That would be correct.

9      Q.   And did he say anything else to you

10  during that conversation that you can recall?

11     A.   Yes.

12          He went on to say that later on when he

13  got up he walked his girlfriend Jackie home and in

14  walking her home he ran into relatives of the

15  victim, and at that time the relatives questioned

16  him about how old he thought she was if she was 12

17  and he stated that, "No, he didn't think she was

18  that old," that, at least, that is what he told

19  them at that time.

20     Q.   Now, Det. Baker, how long did this

21  conversation you had with the defendant last until

22  approximately?

23     A.   Approximately an hour and-a-half.

24     Q.   So it was about 2:30 in the morning?

1          A.    Approximately 2:30, yes.

2          Q.    And, Detective, at the time while the

3     defendant was in your presence was he ever allowed

4     to use the bathroom?

5          A.    Yes, he was allowed to use the facility

6     and he was also given a sandwich.

7          Q.    Now, Det. Baker, at the particular time

8     did you make any attempts to verify what the

9     defendant had told you?

10         A.    Yes, we did.

11               MS. PLACEK:  Objection to the form.

12               THE COURT:  Overruled.

13               MR. MURPHY:  Could you tell Judge Holt

14    what, if anything, you and other police officers

15    did with respect to the statement which the

16    defendant gave you?

17         A.    Well, we specifically went to the West

18    Pullman Park--

19               MS. PLACEK:  With all due respect, Judge,

20    as to other police officers, there would be an

21    objection.

22               THE COURT:  Mr. Murphy, if you can would

23    you direct the officer's attention to what he

24    would respond to what he did only?

1            MR. MURPHY:  Yes, Judge, I will.

2       Q.  Detective Baker, perhaps I will rephrase

3  this question:  Could you tell Judge Holt what, if

4  anything, you did after you received this

5  statement from the defendant with respect to

6  verifying the statement that he gave to you?

7       A.  Yes.

8         I went to West Pullman Park, and I went

9  to the Edward White School looking for this Mac or

10  "Shorty Mac" or anyone who might have seen the

11  victim or known the victim who could verify on the

12  date and time he told us he was there if he was,

13  in fact, there.

14         I also attempted to locate Michael Walker

15  who he supplied us that he had met during the

16  evening there.

17       Q.  What, if anything, did you find?

18       A.  We were unable to find anyone at West

19  Pullman or Edward White School that knew the

20  victim or remember seeing him up there.

21       Q.  The victim or the defendant?

22       A.  Excuse me, the defendant.

23         MS. PLACEK:  With all due respect,

24  objection as to hearsay.

1          THE COURT:   The objection is sustained.

2          MS. PLACEK:   Motion to strike.

3          THE COURT:   Stricken.

4          MR. MURPHY:

5     Q.   What else did you see, Detective?

6     A.   I attempted to locate the Michael Walker

7  that he told us he had met.  At the time I spent

8  quite a bit of time looking for him and met with

9  negative results.

10     Q.   What else did you see Detective?

11     A.   In our investigation we received--

12          MS. PLACEK:   With all due represent "we"?

13  Objection to other investigators and as to

14  information received.

15          THE COURT:   Overruled, we will see what

16  it is first.

17          THE WITNESS:   Our investigators -- we

18  were supplied information concerning a possible

19  crime that had been committed in the area where

20  the victim was a young female black.

21          MR. MURPHY:   And at this time, Det.

22  Baker, did you believe that the information that

23  you received was related to this particular case

24  that you were investigating or perhaps could be

1    related?

2        A.    We were unsure but we had to check it

3    out.

4        Q.    What did you do?

5        A.    We followed up on that information.  We

6    subsequently learned that there had been a crime

7    committed, that there was a young female black.

8    After investigation, we found out the two

9    incidents were unrelated.

10            MS. PLACEK:  Objection, motion to strike.

11            THE COURT:  Overruled.

12            MR. MURPHY:  Does that describe a number

13   of activities that you were engaged in during the

14   early morning hours of August 2, 1988 after the

15   defendant gave you the statement that you

16   described?

17       A.    It was in the early morning hours of

18   August 9.

19       Q.    I am sorry, August 9, 1988?

20       A.    Yes.

21            MR. MURPHY:  Could I have a moment,

22   Judge?

23            THE COURT:  You may.

24            MR. MURPHY:

1        Q.   And, Det. Baker, subsequently was Michael

2   Walker, in fact, located by the police?

3        A.   Yes, he was.

4             MS. PLACEK:  Objection, foundation, if he

5   did it himself, Judge; foundation.

6             THE COURT:  Overruled.  If he knows, he

7   may answer.

8             MR. MURPHY:

9        Q.   Was Michael Walker located?

10       A.   Yes, he was.

11            MR. MURPHY:   No further questions,

12   Judge.

13            THE COURT:  Cross examination.

14                 CROSS EXAMINATION[]

15                 BY MS. PLACEK:

16       Q.   Sir, am I correct that you Mirandize

17   suspects, true?

18       A.   Yes.

19       Q.   Thank you.

20            Now drawing your attention to the evening

21   hours of the date and time in question, how long

22   were you at Area 2 before you took the defendant

23   somewhere?

24       A.   I don't understand your question there.

1       Q.   Well, before taking the defendant

2  somewhere, how long were you in Area 2?

3       A.   Since I started work at 4:30, I was out,

4  I came back in with him and we left at

5  approximately 9:30.

6       Q.   Well, would it be correct in saying that

7  you were there from 4:30 to approximately 9:30?

8       A.   I came to work and left at 9:30.

9       Q.   You left at 9:30?

10      A.   The office, yes.

11      Q.   So from 4:30 to 9:30 you were at Area 2?

12      A.   No, I came to work at 4:30.  Some time in

13  the evening we came back in at approximately Eight

14  o'clock or so, went back out.  We came back and

15  subsequently left again with Jerome at 9:30.

16      Q.   Let me ask you this:  Did you see Michael

17  Walker in Area 2 being Mirandized and being

18  questioned about this same event?

19      A.   No.

20           MR. MURPHY:  Objection to the form of the

21  question.

22           THE COURT:  No.  Overruled.

23           MS. PLACEK:  Thank you.

24      Q.   To the best of your knowledge do you know

1   whether Michael Walker was Mirandized and

2   questioned to the same event?

3          MR. MURPHY:  Objection to the form of

4   that question, it's a double question.

5          THE COURT:  If the witness understands

6   it, he may answer.  I don't find it to be a

7   compound question as to have to answer

8   unintelligently.

9          Mr. Cassidy?

10         MR. CASSIDY:  Judge, I have a question.

11         MS. PLACEK:  Judge, if it's a question to

12   instruct the officers --

13         MR. CASSIDY:  No, your Honor.

14         I am making an objection.  I don't

15   believe the officer can testify unless he has

16   personal knowledge whether Michael Walker was

17   Mirandized.  I understand we asked the question

18   that was only to find out what he did next.  I

19   don't think Counsel was offering it as to the

20   truth of the matter asserted.

21         THE COURT:  No, I don't think she cares

22   one way or the other whether Mr. Walker was

23   Mirandized since it's not relevant to anything.

24         MS. PLACEK:  It may be, Judge.

1          Q.   Was Michael Walker Mirandized in the
2     station do you know on the night in question?
3               THE COURT:   You are talking about August
4     8?
5               MS. PLACEK:   That is correct.
6          A.   We didn't know Michael Walker.
7          Q.   So you didn't even know Michael Walker.
8               According to your testimony, you are
9     speaking, I take it, when you say "we," you mean
10    the Chicago Police Department, didn't know Michael
11    Walker may be involved in this case?
12              MR. MURPHY:   Objection.
13              THE COURT:   That's too many questions.
14              MS. PLACEK:   Before we go into the
15    statement, we have a motion as to the testimony as
16    to the alleged statement as prior consistent
17    testimony, Judge.
18              THE COURT:   I'm afraid, I don't
19    understand the nature of what you just said.
20              MS. PLACEK:   I bring the Court's
21    attention to the first day of this trial when Det.
22    Nitsche testified and, I believe, Judge, that a
23    similar matter was brought out.  I would suggest,
24    Judge, that this is a prior consistent statement

1    given by the defendant.  We would have a motion to

2    strike.

3              THE COURT:  I don't have the foggiest

4    notion of what you are talking about.

5              Put a question to the witness.

6              MS. PLACEK:  Sure, Judge.

7              Officer, drawing your attention to the

8    questioning of the defendant, you said that he saw

9    someone by the name of Michael Walker, correct?

10       A.   Yes.

11       Q.   And he played basketball with somebody by

12   the name of Mike, right?

13       A.   Several people.

14       Q.   So Michael Walker, it was your

15   understanding and someone by the name of Mike were

16   two distinct people, correct?

17       A.   Yes.

18       Q.   Thanks.

19              Now, incidentally you said that in the

20   early morning hours of the 9th you went to certain

21   places, correct?

22       A.   Yes.

23       Q.   What was the first place that you went on

24   the early morning hours of the 9th?

1         A.    I believe the first place was West

2    Pullman Park.

3         Q.    What time?

4         A.    The exact time, I don't remember.

5         Q.    Was it before 2 a.m. or after 2 a.m.?

6         A.    Well, we didn't get through talking to

7    Jerome until after 2:30, so it was after 2:30.

8         Q.    Was it before or after the sun went

9    up?

10        A.    It was before the sun came up.

11        Q.    Did you go especially to the basketball

12   court?

13        A.    Yes, I did.

14        Q.    How many people did you see on the

15   basketball court?

16        A.    I don't recall.

17        Q.    Did you see anyone off the basketball

18   court?

19        A.    Yes, I did.

20        Q.    When you say you saw some people, how

21   many did you see?

22        A.    I don't recall.

23        Q.    Was it more than five?

24        A.    Five, 6, maybe a half dozen.

1    Q.   Maybe a dozen?

2    A.   No, it wasn't that many.

3    Q.   How many of them did you talk to?

4    A.   I talked to several of them.

5    Q.   How many is several?

6    A.   Two or three.

7    Q.   Let me ask you this.  What was the next

8  stop you made?

9    A.   Edward White School.

10    Q.   Is that a grammar or high school?

11    A.   Grammer school.

12    Q.   Did you go to a court or is there a

13  basketball court there?

14    A.   There is an exercise facility on the

15  outside, basketball court.

16    Q.   What time did you go there?

17    A.   It was some time just before the sun came

18  up.

19    Q.   So it was still dark?

20    A.   Just turning light, yes.

21    Q.   How many people did you see there?

22    A.   Didn't see anyone there.

23    Q.   So you couldn't talk to anyone at that

24  hour of the morning, could you?

1      A.    If I didn't see anyone, I couldn't talk

2   to them.

3      Q.    Thank you, Officer.

4             But when you did talk to these several

5   people, did you identify yourself as a police

6   officer?

7      A.    Yes, I did.

8      Q.    Did you give them their Miranda Warnings?

9      A.    No.

10            MR. MURPHY:  Objection.

11            THE COURT:  Overruled.

12            MS. PLACEK:  Thank you.

13            May I have one moment, Judge?

14                        (There was a brief pause.)

15            MS. PLACEK:

16      Q.    By the way, I believe you said that as

17   part of the conversation you had with the

18   defendant, that the defendant, in fact, said that

19   on a later date, I believe on the 2nd, he met some

20   of the family, correct?

21      A.    That is correct.

22      Q.    Did he name what family members?

23      A.    Not that I recall, no.

24      Q.    Did you ask him?