CASE NO. _____ O8cv 1589 _____

ATTACHMENT NO. _____ 16 _____

EXHIBIT _____

TAB (DESCRIPTION) _____

1      A.   I don't remember.

2      Q.   Well, do you remember whether or not you

3  asked him at approximately what time he saw these

4  family members?

5      A.   He told me he saw them some time when he

6  was walking his girlfriend Jackie home.

7      Q.   Do you remember whether or not you asked

8  him what time that was?

9      A.   No, I don't remember.

10      Q.   Whether or not-- and I am speaking of

11  the event of August 1st-- you asked him

12  approximately what time he saw the young lady and

13  asked her to get some candy from the candy man?

14      A.   That was some time around noon.

15      Q.   When you say, "around noon" is that what

16  he said or what you remember?

17      A.   That is what I remember him saying.

18      Q.   Do you remember where he saw her at?

19      A.   Somewhere on the street where he lives.

20      Q.   When you say, "somewhere on the street

21  where he lives," do you remember whether or not

22  you asked him exactly where it was?

23      A.   I don't remember if I asked the exact

24  address, no.

1      Q.   Do you remember whether or not you asked

2  him at all exactly where it was?

3      A.   I asked him where he saw her at.  He told

4  me on the street by his house.

5      Q.   Thank you.

6      Would I be correct in assuming that

7  likewise I believe you said on August 1, he

8  allegedly saw her again, right?

9      A.   That is right.

10     Q.   Am I correct in assuming that your

11  investigation and your questioning proceeded like

12  you have been describing, you didn't ask him the

13  exact location, correct?

14     A.   Yes, I did.

15     Q.   I had asked him where he saw her.

16     Q.   And what did he say?

17     A.   He said he saw her in front of his house,

18  she was talking to his nephew.

19     Q.   And did you ask him his nephew's name?

20     A.   I don't remember if I did or not.

21     Q.   Could his nephew have been named Chew?

22     A.   As well as any other name, yes.

23     Q.   When you say, "as well as any other

24  name"--

1          MR. MURPHY:  Objection.

2          THE COURT:  Overruled.

3          MS. PLACEK:  In this investigation of a

4    murder, did you ask whether or not his nephew--

5    for his nephew's real name?

6          A.   I don't recall.

7          Q.   Do you recall whether or not you asked

8    him where his nephew lives, or was that as well as

9    anyplace else?

10         A.   I don't remember.

11         Q.   Well, would I be correct in saying--  and

12   let me also ask you this:  Whether you asked

13   Mr. Hendricks whether or not he saw the girl after

14   that date and time, I'm speaking of August 1st?

15         MR. CASSIDY:  Objection.  This is several

16   questions.  I don't mean to be objecting to

17   interrupt but there are several compound

18   questions.

19         THE COURT:  Do you understand the

20   question, Mr. Baker.

21         THE WITNESS:  No, Judge, not the entirety

22   of it.

23         MS. PLACEK:  Let me ask you this:  In

24   your investigation did you ask Mr. Hendricks

1    whether or not he saw the girl after 9:30, if you

2    recall?

3         A.    What happened after 9:30, I don't

4    understand?

5         Q.    After 9:30, August 1st?

6         A.    After I talked to him I asked him if he

7    saw her again, he said no.

8         Q.    Did you make question of that fact?

9         A.    Make question?

10        Q.    Simple, Officer--

11             MR. CASSIDY:  Objection, Judge, relevance.

12             THE COURT:  And argumentative.

13             MR. CASSIDY:  Sure is.

14             MS. PLACEK:  Officer, let me ask you

15    this:  In this investigation, approximately how

16    long did you speak to the defendant?

17        A.    Approximately an hour and-a-half.

18        Q.    And in that hour and-a-half, am I correct

19    in saying that you didn't put down with accuracy

20    of where he actually saw the girl?

21             MR. CASSIDY:  Objection.

22             THE COURT:  Objection sustained.

23             MS. PLACEK:  Officer,  did you ever ask

24    the defendant what the girl was wearing when, in

1    fact, he saw her?

2        A.   I don't recall if I asked him what

3    clothing she was wearing, no.

4        Q.   Do you recall whether or not you ever

5    asked the defendant whether or not she had changed

6    her clothes between the Twelve o'clock and the

7    9:30 sightings?

8        A.   I don't recall ever asking him if she

9    changed her clothes, no.

10       Q.   Do you ever recall whether or not you

11   checked out whether the defendant went to the high

12   school where he said he went?

13           MR. CASSIDY:  Objection, Judge, to the

14   form of the question.  I don't understand it.

15           THE COURT:  If the witness understands,

16   he may answer.

17           THE WITNESS:  Which high school?

18           MS. PLACEK:  Well, the defendant did give

19   you a name of a gentleman he went to high school

20   with, correct?

21       A.   He said he knew him from high school.

22       Q.   Did you ask what high school the

23   defendant went to?

24       A.   I asked him what high school and he said

1   Harlan.

2       Q.   Did you ever check that out?

3       A.   By going back to the basketball courts,

4   yes.

5       Q.   When you say you checked it, that's how

6   you checked it out?

7       A.   When it's 3 in the morning and he said he

8   saw them at a basketball court that is where I go

9   to check.

10      Q.   So am I correct in saying, as the State's

11  Attorney pointed out, your entire investigation,

12  quite frankly, consisted of going places where

13  there might or might not be people there to check

14  out what you found out from the defendant during

15  the interrogation, correct?

16      A.   Since they were his alibi, yes.

17      Q.   Let me ask you this:  When you say "since

18  they were his alibis" after that Three o'clock

19  time did you ever go back and try and check it out

20  further, yes or no, Officer?

21      A.   No.

22      Q.   Let me ask you this:  Did you ever check

23  out where the defendant, in fact, and I am

24  speaking of going to the high school possibly when

1    it's opened, going to the high school he said he

2    went to and try and find out who Mike was??

3         A.    Harlan High School is--

4              MS. PLACEK:  Motion to strike.  It's

5    non-responsive.

6              MR. CASSIDY:  Judge, may he be able to

7    answer the question?

8              THE COURT:  Miss Placek, there has been

9    an objection.

10             Can I hear the question again, Ms.

11   Reporter?

12                      (Whereupon the record was

13                       read as requested.)

14             THE COURT:  Do you have an objection to

15   that question?

16             MR. MURPHY:  Judge, we don't object to

17   the question.  The officer was in the process of

18   answering it and Counsel interrupted.

19             MS. PLACEK:  I will withdraw and

20   rephrase, Judge.

21             THE COURT:  Put another question.

22             MS. PLACEK:  Did you ever go to the high

23   school the defendant said he attended and find out

24   if, in fact, he went there?

1      A.    No.

2      Q.    Did you ever, in fact, ever go to that

3    high school with an idea to find out who Mike was?

4      A.    No; no, I did not.

5      Q.    Let me ask you this:  You spoke of going

6    to two schools, correct?

7      A.    No, I spoke of going to two places where

8    basketball courts were at.

9      Q.    Well, in those two places, how long of a

10   time were you at the first place?

11     A.    Ten minutes.

12     Q.    Did you have a picture of the defendant?

13     A.    Yes, I did.

14     Q.    And when you had a picture of the

15   defendant, did you, in fact, ask those several

16   people for their names?

17     A.    No, I didn't.

18     Q.    Thank you.

19           The second place there was no one there,

20   correct?

21     A.    Right.

22     Q.    Officer, how long were you totally

23   including the ten minutes you were at the place

24   where there was people involved that morning with

1    looking for people that the defendant had told you

2    about?

3          A.    Several hours.

4          Q.    When you say "several hours" we have ten

5    minutes accounted for at the first place, correct?

6          A.    That is correct.

7          Q.    Well let's talk about the second place.

8    How long did you spend there?

9          A.    I just don't remember.  It takes time to

10   travel.

11         Q.    Would it be correct in saying that in

12   truth the majority of those several hours that you

13   spent weren't in speaking to people or going to

14   people's homes or even in asking people on the

15   street, but in travel time?

16         A.    Yes.

17         Q.    So actually would it be correct in saying

18   that in total ten minutes of those several hours

19   was all you did in the real investigation

20   involving this case, the rest was spent in travel

21   time?

22              MR. CASSIDY:  Objection, Judge,

23   argumentive.

24              THE COURT:  Overruled.

1          MS. PLACEK:  Is that correct?

2     A.   No.

3     Q.   Well, let's talk about it.  You didn't

4  talk to anybody at the second place, correct?

5     A.   That is correct.

6     Q.   How long were you at the second place?

7     A.   There was no one there. Two minutes.

8     Q.   So, now we have twelve minutes.

9          MR. CASSIDY:  Objection, Judge, to her

10  comment.

11          THE COURT:  You can calculate it in your

12  head.

13          MS. PLACEK:  I will try, Judge; I will

14  try.

15     Q.   Twelve minutes you were in total at the

16  two places, is that correct?

17     A.   Approximately.

18     Q.   Now, I believe you said the sun was

19  dawning in the sky when you were at the second

20  place, correct?

21     A.   That is correct.

22     Q.   Approximately what time did you get off

23  work that date, time in question?

24     A.   I didn't.

1      Q.    You stayed all way?

2      A.    Day.

3      Q.    Yes.    Am I correct in assuming that you

4    didn't leave until 12 midnight?

5      A.    No, I said longer than that.

6      Q.    Well, you stayed the following day,

7    correct?

8      A.    That is correct.

9      Q.    So am I correct in saying that, in fact,

10   you started work at approximately Four o'clock on

11   August 8, 1988 and you stayed until the hours of

12   August 10, correct?

13     A.    That is correct.

14     Q.    And you were without sleep, correct?

15     A.    Correct.

16     Q.    And you functioned fine, correct?

17           MR. CASSIDY:  Objection.

18           THE COURT:  Overruled, he can tell us.

19           THE WITNESS:  Yes.

20           MS. PLACEK:  Would it be correct in

21   saying on August 10th you not only functioned

22   fine, but you didn't leave until 11:30 at night.

23           MR. CASSIDY:  Objection, relevance.

24           THE COURT:  Well, we are trying to find

1   out whether his mind was functioning after being

2   up 36 hours or so, which is relative to the

3   quality of his investigation and the credibility

4   of it. Now, it may not have much, but it is

5   relevant, just as relevant.

6          MR. CASSIDY:  Sure, Judge, if he is doing

7   something.

8          THE COURT:  Well, he didn't stay up just

9   to see if he could be awake all that time, Mr.

10  Cassidy.

11         MS. PLACEK:  Is school over, Judge?

12         MR. CASSIDY:  Objection.

13         THE COURT:  Ms. Placek, those comments

14  are not necessary.

15         MS. PLACEK:  I apologize, Judge.

16     Q.   On August 10th, would it be correct in

17  saying did you sign out August 10th or did you

18  continue working August 10?

19     A.   No.

20     Q.   What time did you sign out August 10?

21     A.   About 1 a.m..

22     Q.   So at 1 a.m. August 10 would it be

23  correct in saying that you have worked straight on

24  this case alone from approximately 4 when you

1    checked in on August 8?

2        A.   This case with all its variations, yes.

3        Q.   And you had gone without sleep?

4        A.   Yes.

5        Q.   As you testified, and you had gone

6    without food?

7        A.   I didn't starve myself, I stopped and

8    ate.

9        Q.   How many times?

10       A.   I don't remember.

11       Q.   And by the way the August--   Well, let

12   me ask you this:   By the way, you haven't been up

13   36 hours today, have you?

14           MR. MURPHY:  Objection.

15           THE COURT:  Objection sustained.

16           MS. PLACEK:  Well, let me put it this

17   way, Officer, calling your attention to the

18   testimony today, am I correct in assuming that

19   there were certain things you couldn't remember?

20           MR. MURPHY:  Objection, Judge.

21           THE COURT:  Overruled.

22           MS. PLACEK:  There are certain things you

23   couldn't remember?

24       A.   Certain things, yes.

1      Q.    Am I correct in assuming in order to

2    prepare yourself for testifying today that, in

3    fact, you read your reports, correct?

4        A.    Correct.

5        Q.    Several times, correct?

6        A.    Correct.

7        Q.    Not only several times, but you

8    overlooked the whole investigation of the Chicago

9    Police Department to prepare for any questions

10   that might or might not be asked, correct?

11       A.    I looked over reports that I had

12   available, yes.

13       Q.    Thank you.

14             By the way, again am I correct in

15   assuming that you have not been up 36 hours today?

16       A.    That is correct.

17       Q.    By the way, when we speak of 36 hours

18   previous to this four p.m. starting time, when

19   was the last time-- I'm not meaning to get

20   personal, so I will say sleep-- when was the last

21   time you went to sleep prior to the time you

22   started work on August 8th?

23       A.    I don't know. I probably got up around

24   noon on that day.

1          MS. PLACEK:  Thank you, Officer.

2          THE WITNESS:  You are welcome.

3          MS. PLACEK:  That's all, Judge.

4          THE COURT:  Redirect?

5               REDIRECT EXAMINATION [ ]

6               BY MR. MURPHY:

7     Q.    Det.  Baker, during the course of the

8  conversation you had with the defendant, you asked

9  him what contact he had with the victim on the

10  date of August 1, 1988 and early morning hours of

11  August 2, 1988, is that correct?

12    A.    That is correct.

13    Q.    And the extent of contact he had with her

14  was on two separate occasions that he described

15  them to you, is that correct?

16    A.    That is correct.

17    Q.    That was it?

18    A.    That is correct.

19    Q.    And that was the focus of your

20  questioning you had with him as to what contact he

21  had with this girl, Denise?

22          MS. PLACEK:  Objection, prior

23  consistency, Judge.

24          THE Court:  Overruled.

```
 1              MR. MURPHY:
 2         Q.   Is that correct?
 3         A.   That is correct.
 4         Q.   After he gave you this statement, you
 5    attempted to verify it by going to these parks to
 6    see if anybody saw him on the night before, is
 7    that correct?
 8              MS. PLACEK:  Objection to the word
 9    "verify," Judge.
10              THE COURT:  Overruled.
11              THE WITNESS:  That is correct.
12              MS. PLACEK:
13         Q.   Were you able to find anybody who saw him?
14         A.   No, I was not.
15         Q.   Did you find people who were at the West
16    Pullman Park the night before?
17              MS. Placek:  Objection.
18              THE Court:  The objection is sustained.
19              MR. Murphy:
20         Q.   Now, during the course of this statement
21    he gave you, he told you me met Michael Walker, is
22    that correct?
23              MS. Placek:  Objection, that's not what
24    he stated, Judge.  He said he saw Michael Walker.
```

1      THE Court:  The objection's overruled.

2      MR. Murphy:

3      Q.   What did he tell you with regards to

4  Michael Walker?

5      A.   He had met Michael Walker during the

6  evening.

7      Q.   And when did he say he saw-- met Michael

8  Walker?

9      A.   Between traveling between basketball

10  games.

11      Q.   That would have been on August 1, 1988 or

12  August 2nd?

13      A.   No.  That would have been August 2nd.

14      Q.   And Det.  Baker, you have been asked a

15  lot of questions about how much sleep you had this

16  particular night.  You, in fact, worked past your

17  normal shift, is that correct?

18      A.   That is correct.

19      Q.   And when you worked past the time your

20  shift was supposed to end, why did you do that?

21      MS. Placek:  Objection.

22      THE Court:  The objection is sustained.

23      MR. Murphy:

24      Q.   Well, during the time you stayed on past

1    the normal time your shift would end, did you work

2    on only one case?

3            MS. Placek:  Objection.

4            THE Court:  Overruled.

5            MR. Murphy:

6        Q.   In fact, you worked on that other matter

7    which you described, is that correct?

8        A.   That is correct.

9        Q.   At the time that you handled that matter,

10   you thought there might be a relationship between

11   that matter and this matter, is that correct?

12           MS. Placek:  Objection.

13           THE Court:  Overruled.

14           THE Witness:  That is correct.

15           MR. Murphy:

16       Q.   Other than that matter and this case, did

17   you work on any other cases?

18       A.   No, I did not.

19       Q.   And during the course of time you were

20   completing your investigation or doing your

21   investigation on August 8th and August 9th, did

22   you prepare reports summarizing your activities

23   and the statement you received?

24       A.   Yes, I did.

1          Q.    And did you do that August 8th and August

2     9th?

3          A.    Yes, I did.

4                MR. MURPHY:  Nothing further, Judge.

5                THE Court:  Recross?.

6                MS. Placek:  A few questions.

7                    RECROSS EXAMINATION (}

8                    BY MS. PLACEK:

9          Q.    So, it's not unusual for you to work

10    twenty-four hours past your shift?

11               MR. Murphy:  Objection.

12               THE Court:  Sustained.

13               MS. Placek:

14         Q.    Well, Officer, do you remember when the

15    assistant State's Attorney was asking you

16    questions on direct examination?

17         A.    Yes.

18         Q.    Do you remember you saying that the

19    defendant told you he saw Michael Walker?

20         A.    Yes.

21         Q.    And at that time you used the word not

22    "met" but you used the word "saw" in answer to the

23    State's Attorney's questions?

24         A.    He said he met Michael Walker.

1      Q.   Did you understand my question?

2           Motion to strike; it's not responsive.

3           THE Court:  The motion is granted.

4           MS. Placek:

5      Q.   Isn't it correct that at that time under

6  questioning of the State's Attorney on direct

7  examination, you used the word "saw," correct?

8      A.   I believe so.

9      Q.   And do you remember about five seconds

10 ago, or even less, that I asked you whether or not

11 the defendant told you he saw Michael Walker, you

12 answered my question as "yes," correct?

13     A.   Yes.

14          MS. Placek:  Thank you.

15          Nothing further, Judge.  Thank you.

16          THE Court:  Anything further?

17             RE-REDIRECT EXAMINATION ()

18          BY MR. MURPHY:

19     Q.   Det. Baker, when you prepared your

20 report summarizing the statement the defendant

21 gave you, did you write in your report--.

22          MS. Placek:  Objection to anything he

23 wrote in the statement.

24          THE Court:  Objection sustained.

1          MR. Murphy:  No further questions.

2          THE Court:  Anything further?

3          MS. Placek:  No.

4          THE Court:  Thank you, Mr. Baker.  You

5    may step down.

6          THE Witness:  Thank you, Judge.

7          THE Court:  This matter is continued

8    order of court, February 14, One p.m..

9          MS. Placek:  Your Honor, we've

10   subpoenaed, and we are telling you this for the

11   simple reason--  We filed a subpoena, we also

12   subpoenaed, if the Court remembers Officer

13   Kaddigen from the other day, the subpoena was

14   issued for today.  We attempted to contact him.

15   If you remember the Court's comment to him is try

16   and keep in contact.  I just ask if the State had

17   any contact?

18         MR. CASSIDY:  I got a message that he

19   called.  He left a number and asked did we need

20   him for today, I told him no.

21         MS. Placek:  Well, I'm glad the State is

22   taking good care of our witnesses.

23         THE Court:  Well, your case is ready to

24   go forth.

893

1      MS. Placek:  I understand.  But I would
2    like to talk to him before.
3      THE Court:  Well, you didn't inform us of
4    that.
5      MS. Placek:  Judge, we expected him to
6    call us.
7      THE Court:  Mrs. Placek, if you expect a
8    Chicago Police Officer to call you in response to
9    your subpoena, you haven't been around very long.
10     MS. Placek:  Judge, I'm glad the Court
11   knows where the bias is.
12     THE Court:  The Court's adjourned until
13   tomorrow.
14                         (WHEREUPON the trial of this
15                         cause was adjourned and
16                         continued to tomorrow, February
17                         14, 1991.)
18
19
20
21
22
23
24

STATE OF ILLINOIS    )
                     )   SS:
COUNTY OF COOK       )


        IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT-CRIMINAL DIVISION


THE PEOPLE OF THE      )
STATE OF ILLINOIS      )
                       )
     vs                )        No.  88-CR-12517
                       )
JEROME HENDRICKS       )

              REPORT OF PROCEEDINGS


        BE IT REMEMBERED, that on the 14th day

of February, A.D., 1991, this matter came on for

hearing before the Honorable LEO HOLT, Judge of

said Court.


        APPEARANCES:



        (As heretofore noted.)

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1836 IN ILL. (312) 421-0550

1      THE CLERK:   Sheet 7, Line 1, Jerome Hendricks

2      THE COURT:  Mr. Hendricks.

3               Both sides ready?

4      MS. PLACEK:  Yes, Judge.

5      THE COURT:  Are we waiting for Mr. Lufrano?

6

7      MR. PLACEK:  I believe Mr. Lufrano is a little

8  detained, Judge.  He is in the lockup.

9      THE COURT:  Are you ready to proceed, Mr.

10  Cassidy?

11      MR. CASSIDY:  Yes, Judge.

12      THE COURT:  Call your next witness.

13      MR. CASSIDY:  Thank you, your Honor.

14

15               (Witness sworn.)

16      THE COURT:  That microphone is on.  If you will

17  pull it over in front of you, speak directly into it,

18  keep your voice up, we will all hear you.

19              You may proceed, Mr. Cassidy.

20      MR. CASSIDY:  Thank you, your Honor.

21

22

23

24

2

1          DET. JOHN YUCAITIS,

2   called as a witness herein, after having been first

3   duly sworn, was examined and testified as follows:

4                    DIRECT EXAMINATION

5                         BY

6                    MR. CASSIDY:

7

8          Q    Please state your name and spell your last

9   name?

10         A    My name is John Yucaitis, Y-u-c-a-i-t-i-s.

11         Q    And whom are you employed by?

12         A    I am employed by the Chicago Department

13   of Police.

14

15         Q    And what is your current assignment?

16         A    Currently assigned to Area 2 Violent

17   Crimes.

18         Q    How long have you been assigned there?

19         A    I have been assigned there since February

20   of 1968.

21         Q    And how long have you been a Police

22   Officer?

23

24         A    26 and a half years.

           Q    Calling your attention to the date of

3

897

1   August 9th of 1988, did you work that day as a Chicago

2   Police Officer, Detective?

3         A    Yes, sir, I did.

4         Q    And what watch were you on that day?

5

6         A    The second watch, days.

7         Q    And who is your partner?

8         A    Detective Steve Brownfield.

9         Q    When you started working that day, did you

10  have occasion to take part in an investigation of the

11  victim named Denise Johnson?

12        A    Yes, sir, I did.

13        Q    And did you have occasion, then, to go an

14

15  interview possible witnesses or go to certain

16  locations?

17        A    Yes, sir.

18        Q    And can you please tell the Court what

19  you did when you went to work that day?

20        A    Basically after arriving to work that day,

21  I had been off on the 8th, the 9th, after rollcall, we

22  were apprised of the investigation at hand, the young

23  female that was found in the garage.

24             We talked with some of the investi-

4

1   gating officers that had been on overtime and

2   at approximately 10:00 o'clock, maybe some time after

3   10:00 that morning, my partner and I went to the area

4   of 117th and Princeton where we began just canvassing,

5   trying to talk to people, seeing if we could find

6   something that could aid us in our investigation.

7

8       Q    And then did you then canvass the

9   area?

10      A    Yes, we did.

11      Q    Calling your attention, then, to

12   approximately 4:15 in the afternoon of the same

13   date, were you at Area 2 at this time?

14      A    Yes, sir, I was.

15

16      Q    And did you have occasion, then, to meet

17   a person now known to you to be Jerome Hendricks?

18      A    Yes, I did.

19      Q    Could you look around the court, Detective,

20   and see if you see Jerome Hendricks?

21      A    Jerome is seated with that multi-colored

22   sweater and black shirt, hand on chin.

23      MR. CASSIDY: Let the record reflect an in-court

24   identification of the Defendant, your Honor.

     5

1        THE COURT:    The record may so reflect.

2        MR. CASSIDY:    Q  And did you talk to Mr.

3   Hendricks?

4        A      Yes, sir, I did.

5        Q      And who was present for that conversation?

6

7        A      Initially, at this time, myself,

8   Detective Brownfield and Mr. Hendricks.

9        Q      And where did the conversation take

10  place?

11       A      The conversation took place in Interview

12  Room No. 1.

13

14       Q      Which is in Area 2?

15       A      Yes, sir.

16       Q      And that would be approximately 4:15

17  p.m.?

18       A      Yes.

19       Q      Can you please tell the Judge how this

20  conversation then began?

21

22       A      Basically after entering in the room,

23  I introduced myself and my partner to Mr. Hendricks

24  and informed him then of his rights and I did this

    from my FOP book, I believe it's Page 79.

    6

Q    Do you have your FOP book on you?

A    Yes.

Q    Can you please produce it?

A    Yes, sir.

Q    Can you please read the rights as you read them to Mr. Hendricks that day?

A    I began by saying, do you understand that you have the right to remain silent?  And there was no response, and I asked him, I said, could you answer whether you understand after each right I give you.

Q    Did he respond?

A    Yes, he did.  He responded in the affirmative.  I don't recall if he used the terminology "yeah," or "yes," but it was affirmative.

I then said do you understand that anything you say can and may be used against you in Court or other proceedings.

I said do you understand that, again he answered in the affirmative.

I then said, do you understand you

7

have a right to have a lawyer before we ask you any

questions and have him during questioning, and, again,

Mr. Hendricks answered in the affirmative.

I then said, if you could not

afford or otherwise obtain a lawyer and you

want one, a lawyer will be appointed for you and we

will not ask you any questions until he has been

appointed.

Do you understand that?  And he

answered in the affirmative.

I then said if you decide to

answer now with or without a lawyer, you

still have the right to stop the questioning at any

time or to stop the questioning for the purpose

of consulting a lawyer, and he again answered in the

affirmative.

I then said you may waive the right

to advise of counsel and your right to remain silent

and you may answer questions or make a statement without

consulting a lawyer if you so desire.

Again, Mr. Hendricks answered in the

affirmative.

8

1          I then asked him do you understand

2     all of these rights that I have just read to you,

3     he again said yes.

4                       I said do you wish to answer

5

6     questions at this time? He said yes.

7          Q      Then what happened?

8          A      At this time I said, Jerome, I said my

9     partner and I and everybody in this unit, the

10    exact words I don't recall, but just that we had

11

12    been checking your alibi that you gave us.

13         MS. PLACEK:  Objection.

14         THE COURT:  What is your objection?

15         MS. PLACEK:  At this point it's a conclusion that

16    he made.

17         THE COURT:  This is a conversation, this is

18    what he told and said to the Defendant.  Whether

19    or not there is substance or truth what he is telling

20    the Defendant is another matter.

21

22                     The objection is overruled.

23         THE WITNESS:  He says we have been out in the

24    street all day and the one alibi, alleged alibi that

      you gave, I said, is wrong.  Detective Ryan had talked

9

1  to him and it doesn't verif yyour account.  He

2  allegedly told Joanna Ryan that --

3      MS. PLACEK:  Objection.  Conversation between

4  Detective Ryan, Judge.

5

6      THE COURT:  That part of it is sustained.

7      MR. CASSIDY:  Q  So, basically, you told him you

8  didn't believe his story?

9      A      That is correct.

10      Q      What, if anything, happened then?

11

12      A      I asked him if he was hungry and he said

13  he was and I said, well, we will get something to

14  eat, because we were going to be working overtime

15  that day and I believe we got chicken, we ordered

16  chicken.  I gave him a cigarette, I asked him if he

17  wanted coffee, he declined coffee, he wanted water,

18  I gave him cold water.

19              I said, Jerome, you haven't been

20  telling us the truth, you are holding something back,

21  and food and come at this time, he was eating.

22

23              I stopped asking him questions

24  regarding the homicide investigation while I was

    eating, there was smalltalk about the weather and

10

incidental things.

I then began, I said you know you haven't been telling us the truth, Jerome. He said you are right, he said, but my past, if I told the truth, my past would screw me up.

I said what do you mean? He said, well, you know I have been in the penitentiary, I just got out, I am on parole for rape now and people in the neighborhood saw me with the girl.

I said what are you driving at, Jerome? And he stated that it was either, I believe it was Wednesday or Thursday or Tuesday or Wednesday, which wouldhave been the 3rd or 4th of August that he was in the rear yard and he had been cleaning up brnaches and trash that was in the back yard and next door to him there is an abandoned garage and he noted a cat on this abandoned garage and when he got near the garage he said there was a very strong odor emitting from this garage.

He says that he opened the service door to this garage, looked inside and that he observed the girl that was missing laying in the

11

1    corner.

2                He then said that he entered the

3    garage, he went up to her, he may have touched her, he

4    moved some bags but he couldn't tell anybody about

5    it because of his past, the fact that he was on

6    parole for rape and I said, Jerome, I still think

7    you are holding something back, I said did you

8    ever have sex with her, and he sort of started

9    thinking, didn't want to answer and then he said --

10

11              MS. PLACEK:  Objection.

12              THE COURT:  The objection is sustained.

13              MR. CASSIDY:  Q  Well, after you asked him the

14   question about whether or not he had sex with the

15   girl or not, did he answer your question immediately?

16

17              MS. PLACEK:  Objection.

18              THE COURT:  Overruled.

19              THE WITNESS:  As to having sex with the girl?

20              MR. CASSIDY:  Q  Did he answer that question

21   immediately?

22       A     No, he did not, sir.

23       Q     How long -- Did he eventually say anything

24   after you asked him that question?


     12

1    A    Yes.

2    Q    Approximately how much time lapsed from

3    the time that you asked him the question to the

4    time that he gave the response to that question?

5    A    He had asked me and Steve, my partner,

6

7    Brownfield, that he wanted to think about it for a

8    while.  I said fine.  I closed the door, the door

9    is not going to be locked, I will be sitting by the

10    desk, either call me, if I don't hear you open the

11    door and stick your head out and let me know.

12    Q    Did you tell him anything that he could have

13    possibly done as far as tests to the victim?

14

15    A    Yes.

16    Q    What was that?

17    A    I told him that the young girl would be

18    posted and the results of an autopsy could and would

19    indicate possibly the presence of sperm if she had

20    sexual intercourse.

21    Q    Did you tell him this before you left the

22    room?

23

24    A    I believe I did, yes.

Q    Okay.

13

1          And then you and Detective Brownfield

2   left the room?

3          A     Yes, sir.

4          Q     Did you close the door, then?

5          A     Yes, I did.

6

7          Q     Okay.

8                And then what happened?

9          A     I think it was somewhere around 7:00,

10  a little after 7:00, the door opened and Jerome

11  pointed to me, "John," he said, "I want to talk to

12  you."

13

14         Q     So what did you do, then?

15         A     I says fine, I walked in the room and --

16         Q     Did you go in by yourself?

17         A     Yes.  He didn't want to talk to Steve, he

18  just wanted to talk to me and I went in the room.  I

19  closed the door, I said is there anything you want to

20  tell me?  He says yeah, but he says can I get in trouble,

21  the exact words I don't recall, he inquired could he get

22  in trouble if he admitted to having sex with the

23  girl and I believe I responded to him by

24  saying in all probability, you are going to have some

    14

1  problems.

2          With that, he then said that, well,

3  he said, well, I did have sex with her and he went on

4  to say that on Monday, which would have been the

5  first that he had left his home and he had met the

6

7  girl, Denise, and she had made a pass towards him

8  and told him how much she liked him and began hugging

9  and kissing him and pulled him into her gangway.

10          Once in the gangway, he says

11  she squeezed me and hugged and kissed me and took me

12  in the back yard and he described the back yard as

13  an abandoned car alongside a fence and he says

14  that Denise lead him to this location, that Denise

15  then dropped her pants and he dropped his pants to

16

17  his ankles and the two of them engaged in sexual

18  relations.

19          And I asked him if he had

20  ejaculated in her, and he said no, he did not,

21  that he withdrew and then I told him, you know,

22  Jerome, I explained to you before, I says the girl is

23  going to be posted in an autopsy, in all probability

24  it would reveal that there is a presence of sperm in

her and I think it was at this point where he was

15                    999

1    saying if I tell you what really happened now, you

2    won't believe me, and I says, Jerome, all we want is the

3    truth, and he says, well, let me -- again he says

4    let me think about it.  I said fine, I will be

5    outside the door, and I left him alone in the

6    room and I left.

7

8        Q    Now, after some time or a short period

9    of time, did anything happen, then?

10       A    Well, in between when I left the room the

11   second time, I had made, you know, the powers to be and

12   the other investigating officers aware of my conversa-

13   tions and what he had been telling me, each time telling

14   me a little bit more, little bit more, and it was

15   some time, I would say closer to 8:30 in the

16   evening, that he, again, called me and at that time

17   I had just got done explaining to Detective Joanne

18   Ryan that Jerome was coming around.

19       MR. PLACEK:  Objection to what he said to

20   Joanne Ryan.  It's irrelevant at this point.  Also

21   hearsay at this time.

22

23       THE COURT:  Not what he said, what this witness

24   said is not hearsay.  Objection is overruled.

16

1      MR. CASSIDY:  So what did you and Joanne

2  Ryan do?

3      A    I, at this time, I then entered the

4  room, Interview Room No. 1, again, and I

5  brought Joanne Ryan with me and I introduced

6  Jerome to Joanne Ryan and I said Joanne is

7  working on the case along with me and I says do you

8  

9  want to say anything else, and he says yes, I have been

10  thinking about it, I will tell you.

11              So Joanne and I sat down at the

12  table, Jerome, I believe, was seated on the bench and

13  Jerome began explaining that basically what he had

14  said to me earlier about having sex with the girl

15  in the back yard and after the sex act, he had gone out

16  

17  on the street and allegedly the girl had followed

18  him out there.

19      Q    While you were explaining this or while

20  he was explaining this, was he doing anything at this

21  time?

22      A    To me he seemed like --

23      MR. PLACEK:  Objection.

24      MR. LUFRANO: Objection.

17

1    MS. PLACEK:  Conclusion, to me it seemed as.

2    THE COURT:  Well, I take that as being a figure

3  of speech, but it will go out.

4                    Just tell us what you noticed him

5  doing, not what it seemed to you.   You can do that.

6    THE WITNESS:  Okay, your Honor.

7

8                    While Joanne and I were seated at

9  a table and talking to Jerome and he began relating,

10  again, the sex act in the back yard and leaving the

11  yard and the girl following him, he kept looking at

12  me and like putting his head down.

13    MS. PLACEK:  Objection, like putting his head

14  down.

15

16    THE COURT:  That is an observation that he could

17  well observe with his sense of sight.  Objection is

18  overruled.

19    THE WITNESS:  And I saw that he was starting

20  to communicate pretty well and I asked him, I said,

21  Jerome, am I making you uncomfortable, would you

22  feel better if I left the room, and he said yes, I

23  said okay.

24

                    Like I explained to you, Joanne is

18

1  working on the case, so I left Joanne Ryan alone with

2  him and at this time left the room.

3      MR. CASSIDY:  Could I have just a moment,

4  Judge, please?

5

6      THE COURT:  Sure.

7      MR. CASSIDY:  No.  One minute, Judge, please.

8              Thank you, Judge.  Thank you,

9  Detective.

10      THE COURT: Cross?

11              CROSS EXAMINATION

12              BY

13              MS. PLACEK:

14

15      Q      Detective, how long have you been a

16  Chicago Police Detective?

17      A      Chicago Police Detective, since February

18  of 1968, Ma'am.

19      Q      And how long have you been a member of the

20  police force, all together?

21      A      26 and a half years, Ma'am.

22      Q      Now, in your 26 and a half years, I take

23  it you have worked a lot of overtime, like you

24  already mentioned, is that correct?

19

1      A     Yes.

2      Q     Would it be correct in saying, well, let

3  me ask you this.

4

5                      How long have you worked in Area 2?

6      A     Since February of 1968.

7      Q     And would it be correct in saying that there

8  is nothing wrong with officers working in Area 2

9  who have been away for approximately 36 hours straight?

10     A     Yes, Ma'am, that is true.

11     Q     So, in other words, Officer, the Chicago

12  Police Department takes no care about whether or not

13  an Officer works without sleep for 36 hours, correct?

14

15     MR. CASSIDY:  Objection, your Honor,

16  argumentative.

17     THE COURT:  The objection is sustained.

18     MS. PLACEK:  I will withdraw.

19                      Officer, when officers work 36

20  hours without sleep, do they ever hallucinate or have

21  any ill effects?

22

23     MR. CASSIDY:  Objection, speculative.

24     MS. PLACEK:  If he knows?

       THE WITNESS:  I can only speak for myself and

20

I have never hallucinated, Ma'am.

Q    And let me ask you this.

When you worked for some hours, I take it you weren't taking any naps, this is without sleep, correct?

A    I catnap in the office.

Q    I am speaking of 40 hours straight, without any sleep whatsoever?  Let's say 36 hours straight without any sleep whatsoever, without these catnaps, have you ever worked that long?

A    Yes, Ma'am.

MR. CASSIDY:  Objection, please.

THE COURT:  The objection is usstained, Ms. Placek.  I don't understand the relevance.  The Officer didn't say he worked 36 hours.

MS. PLACEK:  The State mentioned overtime and I want to see exactly how much overtime we are speaking of in this case.

THE COURT:  Ask him.

MS. PLACEK:  Q  How much overtime did you put in on this case?

A    Well, I was still on --

21

915

1     Q     Straight, I am speaking of straight?

2     A     Can I answer the question?

3     Q     Surely, Officer?

4     A     When I began my initial interview with

5  Jerome, I was still on my regular shift. I am not

6  through until 5:00 p.m., Ma'am.

7     Q     Did you leave at 5:00 p.m.?

8     A     No, Ma'am, I did not.

9     Q     How long did you stay?

10     A     I stayed until, Oh, I would say about

11 midnight, maybe later.

12     Q     How long, straight, were you up?

13     A     Well, I believe if my memory serves me

14 right, I probably got up at 7:00 o'clock in the

15 morning on the morning of the 9th, I got to the

16 office at 8:30 in the morning, probably 17 hours

17 before I left, I was up.

18     Q     Straight, correct?

19     A     Up, I got up.

20     Q     Without sleep?

21     A     Yes, correct.

22     Q     Did you have any catnaps in the office?

22

1　　　A　　No, not during the daytime.

2　　　Q　　Let me ask you this, Officer.

3

4　　　　　　　Is Area 2 short of police officers

5　that it requires its officers to work, let's say,

6　36 hours straight?

7　　　MR. CASSIDY:　Objection.　Argumentative.

8　　　THE COURT:　Sustained.　Not relevant.

9　　　MS. PLACEK:　Q　Did you see shift changes?

10　　　A　　Did I see shift changes?

11

12　　　Q　　Yes, Detectives coming in and off duty?

13　　　A　　When I got in there in the morning, I

14　saw some midnight officers leaving.　At 4:30 I seen

15　some afternoon Officers coming and when I left I

16　saw midnight men coming on.

17　　　Q　　Would that be Detectives, also?

18　　　A　　Yes, Ma'am.

19　　　Q　　Thank you.　That is all on that.

20

21　　　　　　　Now, let me ask you this.

22　　　　　　　When you had a conversation with the

23　Defendant, am I correct in saying that the Defendant was

24　not under arrest?

　　　MR. MURPHY:　Objection, Judge.

23

1        THE COURT:  Sustained, not relevant.

2        MS. PLACEK: It goes to the Defendant's cooperation

3   and motive.  I present to the Court People versus

4   Lambert.

5

6        THE COURT:  The objection is sustained.

7        MS. PLACEK:  Q  Well, Officer, was the Defendant

8   cooperating with you?

9        A       He cooperated with me, yes, Ma'am.

10       Q       You weren't forcing him in any way, were

11  you?

12

13       A       No, Ma'am.

14       Q       As a matter of fact, am I correct in saying

15  that before that date and time, you didn't know the

16  Defendant?

17       A       I don't believe I did know.

18       Q       And not only that, but the Defendant kept

19  saying to you that what he was worried about is that

20  if he admitted having sex with the girl, becauseof

21  his background, people would assume the worse, correct?

22

23       A        No, you take that out of context, Counsel.

24              May I explain?

        MS. PLACEK:  I withdraw the question, Judge.

24

1          THE COURT:  When he starts to answer, you can't

2    withdraw, but he has completely answered the question,

3    his answer was no, you took him out of context, that is

4    a complete answer.

5                    Put another question.

6          MS. PLACEK:   Q  Let me ask you this, Officer.

7                    How long, in total, did you speak

8    to the Defendant?

9          A     I began, I believe, my initial conversation

10   with Jerome about 4:15.  It wasn't a straight conversation

11   as I testified, I got him food and there was smalltalk,

12   there was no talk on the case in, I would have to guess,

13   maybe a half an hour, maybe 45 minutes, I don't know.

14         Q     In total?

15         A     I don't know, Ma'am, I am just guessing.

16         Q     And when you spoke to him for a

17   half an hour or 45 minutes in total that night, am

18   I correct in saying that to the best of your knowledge,

19   he didn't know, I believe, the other Chicago Police Office

20   you referred to as Joanne Ryan --

21         A     Could I clarify, ask you a question,

22   Ma'am?  When you are saying in total, I am confused

25

919

here.

Q   Okay.  Let me ask you this, then, Officer.

When you state 45 minutes, was that the 4:15 conversation?

A   Yes, Ma'am.

Q   Then after the 4:15 conversation, which was approximately 45 minutes, when did you next see him?

A   As I stated, I believe it was shortly after 7:00 p.m..

Q   And at 7:00 p.m., do you know where the Defendant was?

A   Room 1.

Q   And were you watching Room 1?

A   I was in the immediate area, yes.

Q   Was anybody speaking to him, at this time?

A   No.

Q   So the Defendant was alone in Room No. 1, correct?

A   That is correct.

26

1    Q    And you were watching the room, correct?

2    A    Yes, Ma'am.

3    Q    And while you were watching the room,

4    let me ask you this.

5                   The Defendant wasn't handcuffed

6    at this time, was he?

7

8    A    No, he was not.

9    Q    How long did you speak to the Defendant at

10   7:00 o'clock concerning this case?

11   A    I would have to guess maybe 15, 20 minutes.

12   Q    After that, did you have an occasion to

13   speak to the Defendant about this case again?

14

15   A    Yes, Ma'am.

16   Q    When did you next speak to the Defendant?

17   A    Next time was when I brought Joanne Ryan

18   in, which I think it was some, it was after 8:00,

19   maybe closer to 8:30.

20   Q    Now, do you know how long the Defendant had

21   been at the station?

22

23   A    Honestly, Ma'am, I do not.

24   Q    Did you ask any of your brother officers,

     before you started speaking to the Defendant, how long

27

JOURNAL MFG. CO. CHICAGO, IL 60607 1-800-323-1636 IN ILL (312) 421-6550

1    the Defendant had been in the station?

2           A    No, Ma'am, I did not.

3           Q    Let me ask you this, also, Officer.

4                     Am I correct in assuming that

5    it's at the 7:00 o'clock conversation when

6    you spoke to the Defendant alone, correct?

8           A    Could you repeat that, please?

9           Q    Am I correct in assuming it's at the

10   7:00 o'clock conversation that you spoke to the

11   Defendant alone?

12          A    That is correct, Ma'am.

13          Q    And am I also correct in assuming

14   that that is when he said I want to speak to John,

15   not Steve, correct?

16          A    Ye called me John, yes.

17          Q    Well, John is your name, correct?

18          A    Yes, it is.

19          Q    And Steve is your partner's name, right?

20          A    Yes, it is.

21          Q    And he didn't want to speak in front of

22   Steve, but he wanted to speak in front of you or talk

23   to you, correct?

28

1    A    He asked for me only.

2    Q    And let me ask you this.

3          To the best of your knowledge, before

4   you had any conversation with the Defendant, did he

5   know this young lady by the name of Joanne Ryan?

6

7    A    I don't know if he did or not, Ma'am.

8    Q    Well, you were in there when -- and I

9   am speaking about the little after 8:00 conversation when

10  she entered the room, did you introduce her to the

11  Defendant?

12

13   A    Yes, I did.

14   Q    Thank you.

15          Now, at that particular time, he

16  ejected you and wanted to speak to Joanne Ryan?

17   A    I don't think he ejected me.

18   Q    Let me ask you this.

19          Did he ask you to leave the room

20  and ask to speak to Joanne alone?

21

22   A    No.

23   Q    Did you leave the room?

24   A    I asked him if he was unconfortable, it

seemed to me --

29

1          MS. PLACEK:  Motion to strike, non-responsive,

2     Judge.

3          THE COURT:  The objection is sustained.

4          MS. PLACEK:  Thank you.

5                         Did you leave the room?

6

7     A     Yes, Ma'am, I did.

8     Q     Thank you.

9                    By the way, the Defendant wasn't

10    handcuffed with Joanne Ryan, correct?

11    A     No, Ma'am, he was not.

12    Q     Now, calling your attention to approximately

13    the 4:15 conversation, I believe that you said that

14    this is the time and the longest conversation you had

15    with the Defendant when the Defendant spoke about

16    going in the garage, correct?

17

18    A     Yes, Ma'am.

19    Q     And I believe you said that you weren't

20    quite sure of the date that he said he went into the

21    garage?

22

23    A     That is correct, Ma'am.

24    Q     And am I correct in assuming that at

      that particular time, you gave the Defendant nothing

      30

1   to write on to write down what he was saying to you,

2   correct?

3        A     That is correct.

4        Q     And you gave him nothing to sign,

5   correct?

6

7        A     That is correct, Ma'am.

8        Q     And am I correct in assuming that also

9   you didn't have a tape recorder going in the

10  room just so you could get verbatim down the

11  conversation as it was stated?

12       A     That is against police department policy,

13  Ma'am.

14

15       Q     Officer -- Motion to strike as non-

16  responsive.

17       THE COURT:  The objection is sustained.

18       MS. PLACEK:  Q  Officer, I take it you didn't

19  have a tape recorder going down to make sure that you

20  had put down or at least you had a verbatim conversation?

21       A     That is correct, Ma'am.

22

23       Q     Now, Officer, calling your attention,

24  again, to the 4:15 conversation, am I correct in

    saying that you made a written report of this conversa-

31

1    tion?

2         A      Yes, Ma'am.

3         Q      And am I correctin saying that you hand-

4    wrote this written report?

5         A      The written report was typed, it wasn't

6    hand written.

7

8         Q      Typed, so I take it you weren't doing

9    it in the room when you were speaking to Jerome

10   Hendricks, typing while you were talking, correct?

11        A      No, Ma'am, I was not.

12        Q      And let's go one step further.

13              I take it that that typewritten

14   conversation that you did to memorialize this was done

15   some time after the conversation, correct?

16        A      Yes, Ma'am.

17        Q      Approximately how long after the

18   conversation?

19        A      I believe the report was done about four

20   days after my conversation with Jerome.

21        Q      Now, am I correct in assuming that that

22   report, done approximately four days after your

23   conversation with Jerome, was done from your memory,

24

32

1  correct?

2      A      No, Ma'am, it was not.

3      Q      Well, was it done from notes?

4      A      Yes, Ma'am.

5      Q      Well, you say notes.  Where are those

6  notes today?

7

8      A      I believe you have them.  I don't have

9  them.

10     Q      Well, when you say you believe I have them,

11  in other words, am I correct in saying that you

12  wrote down everything Jerome said and everything that

13  you said?

14

15     A      I wrote and took notes, yes, Ma'am.

16     Q      Well, -- Motion to strike as non-

17  responsive, Judge.

18     MR. MURPHY:  Judge -- Withdraw, Judge.

19     THE COURT:  The motion is sustained.

20     MS. PLACEK:  Q  I take it in those notes, you

21  didn't write down everything that Jerome said to

22  you and everything that you said to Jerome, correct?

23

24     A      Yes, Ma'am, you are correct.

       Q      And am I correct in assuming that those

33

1   notes, for approximately the 45 minute conversation,

2   and I am speaking of the 4:15, is less than a page

3   and a half?

4        A    Yes, Ma'am.

5

6        Q    Would you say it's less than a page?

7        A    I don't know, I haven't looked at

8   them in some time.

9        Q    Well, Officer, did you look at those

10  notes in preparation for your testimony today?

11

12       A    No, Ma'am, I did not.

13       Q    Well, let me ask you this.

14            Officer, would it be correct in

15  saying that you summarized, even to give you the

16  benefit of the doubt -- Strike that.  I will withdraw

17  that, Judge, that statement.

18            Officer, am I correct in assuming

19  that at best, you summarized the 45 minute conversation

20  in less than a page of hand-written notes, correct?

21  If you can recall?

22

23       A    It's not what I can recall, it's my

24  answer.

         Q    Motion to strike as non-responsive.

34

1    THE COURT:  Sustained.

2    MS. PLACEK:  Q  Officer, am I correct in assuming,

3 and, again, that you summarized, as you stated, a

4 45 minute conversation in less than a page and a half

5 of notes?

6

7    A    No, Ma'am.

8    Q    Well, was there more pages involved with

9 this 45 minute conversation?

10    A    No, Ma'am.

11    Q    So, in less than a page of notes, you

12 summarized that conversation, correct?

13

14    A    No, Ma'am.

15    Q    Well, Officer, was there more than a page

16 and a half?

17    A    No, Ma'am.

18    Q    Thank you.

19                 Now, Officer, your page and a half of

20 notes is, in fact, a summary of your conversation that

21 you had with Jerome, correct?

22

23    A    No, Ma'am.

24    Q    It's the exact words?

    A    No, Ma'am.

35

1    Q    Well, if it isn't the exact words question

2  by question, am I correct in assuming that it's a

3  summary of what you felt or you thought he said and

4  what you said to him?

5    A    No, Ma'am.

6

7    Q    You quoted his exact words?

8    A    Yes, Ma'am.

9    Q    When you say you quoted his exact words

10 in 45 minutes, it went down to approximately a

11 page and a half of notes?

12    A    I didn't say that, Ma'am.

13

14    Q    Well, in your written notes, did you

15 quote his exact words?

16    A    I believe I quoted some of his exact

17 words.

18    Q    So, in other words, am I correct in

19 assuming when you say you quoted some of his exact

20 words, you chose which words you were to quote and

21 which words you weren't, correct?

22

23    A    I would say yes.

24    Q    Well, let me ask you this.

         You stated that you were taking

36

1    these notes -- By the way, are these the general progress

2    notes, so-called?

3        A    Yes, Ma'am.

4        Q    Were you writing them out when you

5    were speaking to Jerome?

6

7        A    Not the whole time, no, Ma'am.

8        Q    Well, let me ask you one step further.

9             Isn't it correct that you were

10   actually writing in your notebook when you were speaking

11   to jerome and filled out these G.P. notes or the

12   General Progress NOtes at a later time?

13

14       A    Only when we are talking about the

15   incident.

16       Q    Let's go one step further.

17            Officer, after you summarized in

18   the G.P. notes the 45 minute conversation with

19   Jerome, did you ever show those notes to Jerome and

20   ask him to sign it to say if that is a true

21   representation of the summary?

22

23       MR. CASSIDY:    Objection, assumes a fact not in

24   evidence.

             The Officer denies there was a

37

1    summarization of it.

2         THE COURT:  Well, I don't suppose that that

3    impedes or means that this question is improper.

4         Some characterization has to be put

5    on and the objection is overruled.

6

7         MS. PLACEK:  Q  Officer, did you ever show the

8    summary of those notes to Jerome and, in fact, make

9    sure that you got it right?

10        A      No, Ma'am.

11        Q      Thank you.

12        Now, Officer, calling your attention,

13   again, to the 7:00 o'clock conversation, the 15 minute

14   conversation you had with Jerome --

15

16        A      Yes, Ma'am.

17        Q      Officer, did you also write notes on that

18   conversation?

19        A      I took some notes, yes, Ma'am.

20        Q      When you say "some notes," was that like

21   procedure with you deciding what was going down on

22   paper and without Jerome knowing what notes you took?

23

24        A      I don't -- Could you repeat the question?

          Q      Surely, Officer.


38

1              The 15 minute conversation at

2  approximately 7:00 o'clock, was that conducted in the

3

4  same manner as the conversation at 4:15?

5      A    No, Ma'am.

6      Q    Well, Officer, let me ask you this.

7               Did you take notes?

8      A    Yes, Ma'am.

9      Q    Did you show those notes to Jerome?

10     A    No, Ma'am.

11

12     Q    Would it be correct in saying that those

13  notes cover a little less than a third of a page?

14     A    I don't know how much they covered, Ma'am.

15     Q    Well, let me ask you this.

16             When you say you don't know how

17  much they cover, to the best of your knowledge, did they

18  cover more than a third of the page?

19

20     A    I can't answer that question, Ma'am.

21     Q    Let me ask you this, also.

22             This is not a verbatim statement of

23  what was said during the conversation, correct?

24     A    That is correct, Ma'am.

       Q    And likewise, am I correct in assuming that,

39

1    in fact, you never showed that note to Jerome and

2    asked him to sign it to see if you had, in fact,

3    accurately used the right words to summarize?

4            MR. CASSIDY:  Argumentative.

5            THE COURT:  Overruled.

6            THE WITNESS:  No, Ma'am.

7

8            MS. PLACEK:  No, am incorrect or no, you never

9    showed it to him?

10           A       I never showed it to him.

11           Q       Would it be correct in saying that the

12   two processes, that is the 45 minute and the 15 minute

13   conversation that you had with Jerome covered less than

14   two pages of notes?

15

16           A       I have to agree with you, I haven't seen

17   the notes in a long time, I don't recall exactly how

18   much space they covered.

19           Q       As a matter of fact, would it be correct

20   in saying that not only that, but you abbreviated

21   words on this note-taking procedure,

22   correct?

23

24           A       I always abbreviate.

             Q       And those abbreviations are known, they

     40

1    are personal only to you?

2        A      Only to me.

3        Q      So, they are only known to you, they

4    can't be challenged in any way, is that correct?

5

6        MR. CASSIDY:  Objection.

7        THE COURT:  Sustained.

8        MS. PLACEK:  Officer, as you stated, abbreviations

9    are only known to you, is that correct?

10       A      I think any intelligent person looking

11   at the notes could decipher what I am trying to say.

12

13       MS. PLACEK:  Motion to strike as non-responsive.

14       THE COURT:  Overruled.

15       MS. PLACEK:  Q  Officer, when you say that, you,

16   at that time, considered Jerome an intelligent person,

17   didn't you?

18       A      Yes, Ma'am.

19       Q      And, so -- But yet you never gave him

20   the right to, in fact, look at those notes and okay

21   them to make sure that you got everything down right,

22

23   correct?

24       MR. CASSIDY:  Objection, argumentative.

         THE COURT:  Overruled.

    41

MS. PLACEK:  Q  Correct?  Is that correct, Officer?

A      Yes, Ma'am, that is correct.

Q      Now, Officer, you stated that, in fact, the formal report that you spoke of earlier as being typed was done some time later, correct?

A      That is correct, Ma'am.

Q      Approximately when was it done?

A      I believe it was done on the 13th.

Q      And the 13th, between the 13th and the 9th, let me reverse that, Judge, just for the sake of clarity; between the 9th and the 13th, I take it you were also working on other cases?

A      I will tell you very honestly, I don't know what I was doing between the 9th and the 13th.

Q      To the best of your knowledge and the best of your experience, were you, in fact, working on other cases?

A      If I was at work, I would have been, yes.

Q      Okay.  Thank you.

Now, Officer, am I correct in assuming

42

1   that it was not until the 13th that you sat down

2   and wrote your formal report, memorializing this

3   conversation, correct?

4

5        A     Yes, Ma'am.

6        Q     And am I also correct in assuming that since

7   Jerome was no longer -- Well, may I withdraw and re-

8   phrase, Judge?

9

10                   Am I correct in saying that this

11  conversation that you had with Jerome, that you wrote

12  in, or excuse me, typed in your formal report, was,

13  in fact, a summarization of the summary that

14  was contained on the notes?

15       A     No, Ma'am.

16       Q     Well, Officer, let me ask you this.

17                   As stated before, you stated

18  that, in fact, you took, typed on the 13th from the

19  notes that you took, correct?

20

21       A     Could you repeat that question, please?

22       Q     As you stated before, Officer, am I

23  correct in assuming that you based, typed upon,

24  in fact, the notes you took when you were speaking to

Jerome?

43

1        A     I didn't understand.  Based the type or

2  case the type?

3

4        Q     You took the type and based what was

5  stated within on the summary -- I am sorry, Officer,

6  are you ill?

7        A     I don't understand what you are saying.

8        Q     Let's start over.

9              You made a typed report,

10  correct?

11

12        A     Yes, Ma'am, I did.

13        Q     And you said to me a few seconds ago

14  that, in fact, you made the typed report based upon

15  the written notes of the 7th, or strike that, the

16  9th, correct?

17        A     Yes, Ma'am.

18        Q     And am I correct in assuming that you

19  stated that these notes, the notes of the 7th were not

20  verbatim, correct?

21

22        A     Notes from the 9th?

23        Q     The notes from the 9th, that they were

24  not verbatim?

        A     Yes, Ma'am.

44

JOURNAL MFG. CO   CHICAGO, IL 60607   1-800-323-1656 IN ILL. (312) 421-0550

1     Q    And not only were they not verbatim, but am

2   I correct in saying that the report, and I am speaking

3   of the typed report, was not in fact a verbatim report,

4   correct?

5

6     A    No,

7     Q    No, I am incorrect or no, I am correct?

8     A    No, Ma'am, it's not a verbatim report.

9     Q    As a matter of fact, am I correct in

10  assuming that although typed, it is a shorter, if

11  you will, paper space than the notes that you took when

12  you were actually speaking to Jerome?

13     A    I don't think so.

14

15     Q    Well, let me ask you this.

16              How many pages did they contain?

17     A    What pages?

18     Q    The typed pages?

19     A    I don't know, Ma'am.

20     Q    By the way, Officer, when you say you

21  don't know, thisis the report that you, in fact,

22  typed?

23

24     A    I didn't type the entire report.

      Q    I see.

45

JOURNAL MFG. CO. CHICAGO IL 60607 1 800-323-1636 IN ILL (312) 421-0550

1              So this is only a portion of the

2  report?  Am I correct?  And if you know or don't

3  know whether or not on the typed report there is any

4  quotation marks on that report?

5

6       A      I believe there is.

7       Q      And where are those quotation marks

8  located?

9       A      I have to see the report to give you that

10 answer, Ma'am.

11

12      Q      Okay.  Thank you.

13              Now, Officer, calling your attention

14 again to that report, and I am speaking of the report

15 that was later typed, was it, in fact, based upon the

16 notes?

17      A      In part, yes.

18      Q      And am I correct that, in fact, the words

19 contained on the typed report are not verbatim of

20 the words contained on the notes?

21

22      A      My notes you are referring to?

23      Q      Your notes, Officer?

24      A      I would have to answer that question

yes.

       Q      So, in other words, the words are

46

JOURNAL MFG CO  CHICAGO, IL 60607 1-800-323-1636 IN ILL (312) 421-0550

1  different, correct?

2          A      Yes, Ma'am.

3          Q      So, am I correct in saying that you,

4  again, summarized your notes in type?

5          A      I don't know how wo answer that question.

6          Q      Well, yes or no, Officer, that is how

7  you answer it.

8          MR. MURPHY:  Judge, I will object.

9          THE COURT:  The objection is sustained.

10         MS. PLACEK:  Q  Officer, are the words contained

11  within the typed report the same as the written

12  notes?

13         A      No, Ma'am.

14         Q      Am I correct in saying that they are not

15  the verbatim words used by yourself or Jerome

16  Hendricks?

17         A      Some are.

18         Q      When you say "some are," are there

19  complete sentences in fact quoted?

20         A      I don't recall, Ma'am, I believe there is.

21         Q      Officer, would it be correct in saying,

22  in fact, that you summarized your notes on the

47

1   typewritten page?

2       A    I don't know how to answer that question,

3   Ma'am.

4       Q    Well, let me ask you this.

5

6            Did you write the typewritten page,

7   did you compose the typewritten page?

8       A    Which page?

9       Q    The typewritten page contained in the

10  statement?

11      A    Which statement?

12      Q    Ovvier, how mahy statements did you

13  take that night?

14

15      A    I took two statements.

16      Q    And after taking those two statements, did

17  you, in fact, summarize them on the typewritten

18  page?

19      A    I typed them on a typewritten paper.

20      Q    And they are not verbatim, the words of

21  yourself or the Defendant, is that correct?

22

23      A    Yes, Ma'am.

24      Q    And they are not the verbatim copy of your

notes, correct?

48

1      A      No, Ma'am, they are not.

2      MR. MURPHY:  Objection.  This is the fourth

3   time this question is asked.

4

5      THE COURT:  Sustained.

6      MS. PLACEK:  Q  I take it you didn't give,

7   in fact, that typewritten page to Mr. Hendricks to

8   look at?

9      A      No, Ma'am, I did not.

10      Q      AndI take it you never gave that typewritten

11   page to Mr. Hendricks to sign, correct?

12

13      A      No, Ma'am, I did not.

14      Q      In other words to make sure that you

15   wrote down everything he actually did say, correct?

16      A      No, Ma'am, I did not.

17      Q      Thank you.

18           Now, Officer, your partner was, in

19   fact, Officer Brownfield, correct?

20      A      Yes, Ma'am.

21      Q      To the best of your knowledge, did he

22

23   sign the general progress report?  The notes?

24      A      I don't know if he did or not.  I usually

    sign the form.

    49

Q    So, in other words, you affixed his name down, correct?

A    Yes, Ma'am.

Q    And is it correct that his name is affixed to the same part dealing with the 15 minute conversation that you say you had with Jerome Hendricks?

A    I don't know if it is.  Possibly it is.

Q    And, Officer, if you say possibly it is, let me ask you this.

That would be incorrect because Officer Brownfield wasn't even present when you had this alleged 15 minute conversation with the Defendant, Jerome Hendricks, correct?

A    No, he was not.

MR. MURPHY:  Objection.

THE COURT:  The objection is sustained.

MS. PLACEK:  Q  Well, was Officer Brownfield present for the 15 minute conversation with Jerome Hendricks?

A    No, Ma'am, he was not.

Q    Thank you.

On your notes, since you affixed

50

1    Officer Brownfield's name on it, would it have, in

2    fact, reflected that he was present for the 15 minute

3    conversation?

4            A       No, Ma'am, it would not.

5            Q       So, his signature on the bottom, either

6    by you or himself, is not an attestation or a

7    confirmation of the report as being true and

8    correct?

9

10           A       No, Ma'am, it is not.

11           MR. CASSIDY:  Objection.

12           THE COURT:  Objection is sustained.  The answer

13   of the witness is stricken.

14           MR. CASSIDY:  Thank you.

15           MS. PLACEK:  Q  Am I correct in assuming -- Well,

16   let me ask you, am I correct in saying that according

17   to your testimony today, Jerome Hendricks admitted

18   having sex with the girl, correct?

19           A       Yes, Ma'am.

20           Q       And he admitted having consentual sex,

21   correct?

22

23           A       Yes, Ma'am.

24           Q       Never during the conversations did he

say he forced the girl, did he?

51

1    A    No, he did not.

2    Q    He admitted not only having consentual

3  sex with the girl, he never admitted hurting the girl,

4  did he?

5

6    A    No, Ma'am.

7    Q    No, I am incorrect or no, he never --

8    A    He never, did not.

9    Q    He never said he killed the girl?

10    A    Not to me, Ma'am, no.

11    THE COURT:  I am sorry?

12    THE WITNESS:  Not to me he did not.

13    MS. PLACEK:  Q  Now, also -- May I have one moment,

14

15  Judge?

16    THE COURT:  You may.

17    MS. PLACEK:  Thank you.

18              During your conversation with

19  Jerome Hendricks, and I am speaking specifically of

20  the 4:15 conversation, if Jerome Hendricks, and I am

21  speaking only of your action, would have got out of the

22

23  chair and left, would you have stopped him?

24    THE WITNESS:  Yes, Ma'am.

     MR. MURPHY:  Objection.

52

1          THE COURT:  Objection is sustained.  Not

2   relevant.

3          MS. PLACEK:  Q  By the way, did you inventory

4   anything involving this matter?

5

6          A     I don't believe I did, Ma'am.

7          Q     That was Officer Ryan, if you know?

8          A     I don't know.

9          Q     You stated that you had Mr. Hendricks

10  in Interview Room 1, correct?

11         A     Yes, Ma'am.

12         Q     And Interview Room 1, is there a round

13  ring on the door -- or strike that.  Is there a

14  round ring on the wall?

15

16         A     Yes, Ma'am.

17         Q     And that is used to handcuff people,

18  correct?

19         A     Yes, Ma'am.

20         Q     And as you stated, Mr. Hendricks was

21  not handcuffed in any way, is that correct?

22

23         A     That is correct.

24         Q     And is there, in fact, is there a doorknob

on the inside door?

       A     Yes, Ma'am.

53

Q        Thank you.

By the way, Officer, at the particular time that you were speaking to Mr. Hendricks about the post, and I am speaking of the autopsy, you talked about autopsy procedures, correct?

A        Yes, Ma'am.

Q        And you spoke, I believe, of the chances of finding sperm, correct?

A        Yes, Ma'am.

Q        Officer, at this time, the autopsy wasn't done, was it?

A        To my knowledge, it was not done.

Q        And, Officer, of your own personal knowledge, you know now that no sperm was found inside of the girl, is that correct?

MR. CASSIDY:  Objection.

THE COURT:  Objection sustained.

MS. PLACEK:  If he knows?

THE COURT:  How could he know, other than by hearsay?

MS. PLACEK: Personal knowledge, if he read it at a later date.

54

1        THE COURT:  The objection is sustained.

2        MS. PLACEK:  Thank you, your Honor.  I believe

3    that is all we have.

4        THE COURT:  Redirect?

5        MR. CASSIDY:  No further questions, Judge.

6        THE COURT:  Thank you, Mr. Yucaitis, thank

7    you very much.

8        MR. YUCAITIS:  Thank you, your Honor.

9    Thank you.

10                           (Witness excused.)

11       THE COURT:  Call your next witness.

12                           (Witness sworn.)

13       THE COURT:  You may be seated, Ma'am.

14                    That microphone is on.  If you

15   will speak directly into it and keep your voice up,

16   we will all hear you.

17                    You may proceed.

18       MR. CASSIDY:  Thank you, your Honor.

55

DET. JOANN RYAN,

called as a witness herein, after having been first

duly sworn  was examined and testified as follows:

DIRECT EXAMINATION

BY

MR. CASSIDY:

Q    Would you please state your name and spell
your last name?

A    Detective Joann Ryan, R-y-a-n.  Star
4593, I am assigned to Area 2 Violent Crimes
Section of the Chicago Police Department.

Q    And how long have you been so employed
there?

A    I have been a police officer for 25 years.

Q    And how long have you been in Area 2?

A    13 years.

Q    Calling your attention to August 9th of
1988, were you working that day?

A    Yes, I was.

Q    And as a Chicago Police Detective?

A    Yes.

Q    What watch were you working that day?

56

A    The afternoon shift.

Q    Approximately some time in the afternoon, did you have an occasion to interview a person known to you then as Michael Walker?

A    Yes, I did.

Q    And later on in the afternoon, did you have a conversation with Detective Yucaitis?

A    Yes, I did.

Q    Did you relate the contents of the conversation to him?

A    Yes, I did.

Q    Calling your attention to approximately 8:30 p.m. on August 9th of 1988, were you at Area 2 located in the City of Chicago?

A    Yes, Ma'am

Q    Can you please tell the Judge what happened approximately that time?

A    At 8:30 that night?

Q    Yes?

A    I was, I spoke, I had spoken with Det. Yucaitis and he asked me, he was talking to us about a suspect in the case of Jerome Hendricks and

57

Det. Yucaitis asked me if I would go into the room and be introduced to Mr. Hendricks and speak with him.

Q    Did you then go into the interview room?

A    Yes, I did.

Q    Which interview room was this?

A    Interview Room 1 located in Area 2. Area 2 Violent crimes.

Q    Then what happened when you entered the room?

A    Det. Yucaitis indicated to me that Jerome had --

MS. PLACEK:  Objection.  Conversation.

THE COURT:  The objection is sustained.

MR. CASSIDY:  Just what happened, if you would, Det. Ryan, when you entered the room.

A    Det. Yucaitis introduced me to Jerome Hendricks.

Q    The person you refer to as Jerome Hendricks, do you see him in Court today?

A    Yes, I do.

Q    Could you please point him out?

58

A     Yes, the gentleman in the gray sweater.

MR. CASSIDY:  Let the record reflect an in-court identification of the Defendant.

THE COURT:  The record may so reflect.

MR. CASSIDY:  Q  After this introduction, then what happened?

A     We began speaking with Jerome and Detective Yucaitis was talking with him about being with the victim on the day of the 1st of August, or the evening.

Q     All right.

A     And Jerome indicated to us that he did, he would rather talk with me alone than with both of us.

Q     After he indicated this, what happened?

A     Detective Yucaitis left the room.

Q     It was just you and the Defendant, then, who were present in this interview room?

A     Yes, that is correct.

Q     What happened, then?

A     I had known that he had been with the victim, I don't recall that he knew her name.

59

MS. PLACEK:  Objection as to past knowledge,

Judge.

THE COURT:  The objection is sustained.

MS. PLACEK:  Motion to strike.

THE COURT:  That portion stricken.

MR. CASSIDY:  Q  Did the Defendant then tell

you what happened?

A    Yes, he told me he had been with the victim

during the evening of the 1st of August, that he had

taken her down a gangway near her home at 11720

Princeton, there was a car parked behind that

address, he told me that he had sex with her at that

location.

He also told me that he had -- she

had been hitting on him all day and she had told him

that she wanted him and that she wanted to be with

him.

He said that after they had sex at

the car, he left and the victim followed him and ran

chasing him around the corner and said, "Come on with

me," and he said she ran ahead of him and went -- the

garage was located at 251 West 117th Street, he said

60

he walked up behind her, behind the garage.  When he
got there, she opened the door and was inside and
when he went inside, she started to hug and kiss him
and she was squeezing his penis.

She then told him not to tell
anybody that she was with him, with her, or anything
was happening.

She then took off her, pulled down
her pants, he said she had one leg out of her pants
and pulled down her underwear and pulled her shirt off
her head.

He said that he removed his -- dropped
his shorts and undershorts to below his knee and that
he, again, had sex with her, entering her vaginally
from the rear and he told her that he -- he told me
that she had pulled the shirt up over her head and
she had something else, he didn't know if it was her
top or if it was just -- just what it was, because he
said it was very dark in there, but she had used
something to put around her mouth in sort of a gag
fashion and she wanted him to hold it and to pull on
it and to ride her like a horse.

61

1          He said that she was bent over from

2    the knees, he did enter her and he ejaculated inside

3    of her.

4

5          Once again she asked him not

6    to say anything to anyone.

7          He said that he left the garage and

8    went to a park, I believe at 123rd Street.

9          Q     And did he say what he was going to do

10   there at the park, then?

11

12         A     I don't know if he told me that.

13         MR. CASSIDY:  No further questions, Judge.

14         THE COURT:  Cross?

15                CROSS EXAMINATION

16                BY

17                MS. PLACEK:

18         Q     Officer, approximately how long did you

19   speak to Mr. Hendricks?

20

21         A     Probably about a half an hour.

22         Q     And, Officer, am I correct that assuming,

23   or let me ask you this.

24                Is it correct in saying that Mr.

Hendricks admitted having consentual sex with the girl,

62

1    is that correct?

2        A      Yes.

3        Q      She admitted that she went with him

4    voluntarily, correct?

5

6        A      Yes, she did.

7        Q      He never admitted killing her?

8        A      No, he didn't.

9        Q      He didn't say anything about that, did he?

10       A      No, he didn't.

11       Q      He said he went freely into the garage,

12   correct?

13

14       A      Yes.

15       Q      And did he give an address for the

16   garage?

17       A      I don't believe he gave the exact address,

18   but the garage that we were talking about, he said

19   later he had seen the following week, he had seen

20   her body in that garage.

21

22       Q      When you say the following week, did he

23   give you a day?

24       A      Yes, Wednesday or Thursday, which would

     have been the week prior to the day, or I am sorry, the

     63

1   week after she was reported missing.

2       Q     So, he said that actually that he didn't

3   see her until approximately a week after she was

4   reported missing, correct?

5

6       A     He saw her on the day that she was reported

7   missing and then the next time he saw her body was in

8   the garage and that was either Wednesday or Thursday

9   on the week following her being reported missing.

10      Q     Thank you.

11            Now, Officer, as a matter of fact,

12  when you spoke to the Defendant for the half an hour,

13  he never said he harmed the girl in any way, did

14  he?

15

16      A     No.

17      Q     No, I am incorrect or no, I am

18  correct?

19      A     No, you are correct.

20      Q     And, Ma'am, I take it likewise that

21  you never made a report in this -- Well, when I

22  say you never made a report, you never made a verbatim

23  report of this conversation you had with the Defendant,

24  did you?

            A     No, I have notes that were written during

64

the conversation with him.

Q    When you say "notes that were written,"
would those be the general progress report?

A    Yes, it would.

Q    How many pages or page is reflected by that
15 minute conversation?

A    I believe there are two pages.

Q    And am I correct in saying that,
in fact, you were writing while Jerome was
speaking?

A    At some times, yes.

Q    And am I correct in saying, quite
frankly, your G.P. notes or General Progress Notes,
like most G.P. Notes, are partial sentences?

A    Yes.

Q    Abbreviations?

A    Yes.

Q    Never verbatim?

A    No, they are verbatim statements.

Q    When you say "verbatim," did you ever
say I said this to him, to which he responded this?

A    No, I didn't.

65

Q       As a matter of fact, it's a summary of your conversation with him, correct?

A       Yes.

Q       Did you ever, as a matter of fact, when Mr. Hendricks said that he saw Ms. Johnson on August 1st, he said he saw her before she was reported missing, correct?  If you can recall?

A       I didn't recall.

Q       And let me also ask you this.

To the best of your knowledge, you said that he said after he had sex with her, that he went to a park, correct?

A       He said he went, I don't know if he said he went to the park or he was on his way to the park.

Q       I think you mentioned 123rd, a park on 123rd?

A       That is what is written there, that is correct.

Q       If you say that is what is written there, are you saying that you are basing your testimony, and after refreshing it, off of your notes?

A       Yes.

66

1      Q    Am I correct in saying that the park on

2  123rd is West Pullman Park?

3      A    That is correct.

4

5      Q    Thank you.

6            By the way, do you know how many

7  police officers spoke to the Defendant before you spoke

8  to the Defendant, if you remember?

9      A    I don't recall, no.

10     Q    Do you recall whether or not you would

11  have known such information at the time that you

12  spoke to him that date and time in question?

13

14     A    Well, at that date and time, I knew he

15  had been arrested the night before and I knew that

16  there were Detectives involved in that.  I knew he

17  had been to the Polygraph Section

18     MS. PLACEK:  Well, motion to strike as to the

19  Polygraph, Judge.

20

21     THE COURT:  Answer not responsive, so it's

22  stricken.

23     MS. PLACEK:  Q  By the way, you said that

24  he was arrested the night before.  Approximately what

time?

67

1          MR. MURPHY:  Objection, Judge.

2          MS. PLACEK:  If she knows.

3          THE WITNESS:  I don't recall.

4          THE COURT:  What is the basis of the objection?

5          MR. MURPHY:  Withdrawn, Judge.

6

7          MS. PLACEK:  Q  And to the best of your

8    knowledge, Mr. Hendricks, from the night before until

9    until you saw him the subsequent evening, some 24

10   hours later, was in continuous police custody, correct?

11         MR. MURPHY:  Objection, Judge.

12         MS. PLACEK:  If she knows.

13         THE COURT:  What is the basis of your objection?

14         MR. MURPHY:  Ralevance, Judge.

15

16         MS. PLACEK:  As to the weight to put on the

17   statement.

18         MR. MURPHY:  Whether he is in custody or not in

19   custody?

20         THE COURT:  Well, I sustained a number of

21   objections along that line, Mr. Murphy, on the grounds

22   that there is no Fourth Amendment violation that is

23   still alive in this case, but on the other hand, the

24   Defendnat has a right to ask the trier of fact to take

68

into consideration the circumstances under which
the statement was made in order to assess what weight to
be given to it and in assessing the totality of the
circumstances surrounding the giving of the
statement, whether or not he was in custody and
coerced, if there was any, or whether or not he
was arrested or not arrested or his circumstances of
being in the police facility could become relevant to
that and after further reflection on that
aspect of the relevancy of the question, the objection
is overruled.

     MS. PLACEK:  Thank you, your Honor.

         You knew that by the time that you
got him, he was in continuous police custody for over
24 hours, correct?

     THE WITNESS:  That is correct.

     MS. PLACEK: Q   You knew he was being constantly
questioned, correct?

     A      Not constantly questioned, no.

     Q      Well, let me ask you this.

         Do you know whether or not five or
six or seven Officers had questioned him before you

69

1    questioned him?

2        A    I don't know the exact number, no.

3        Q    But you knew there was more than, let's

4

5    say, four?

6        A    Yes, I knew that because I knew of the

7    Officers that were involved in the investigation.

8        Q    By the way, approximately how many

9    officers were involved in this investigation?

10       A    From our unit or --

11       Q    If you know, in total?

12

13       A    In total, I haven't any idea.

14       Q    By the way, after your conversation with

15   the Defendant, did you have an opportunity to

16   call the State's Attorney?

17       A    Yes.

18       Q    Thank you.

19            That is all I have, Judge.

20   THE COURT:  Redirect?

21

22   MR. CASSIDY:  No further questions, Judge.

23   THE COURT:  Thank you, Ms. Ryan, you may step

24   down.

                    (Witness excused.)

     70

THE COURT:  Before you call your next witness, we will take a five-minute recess.

MR. MURPHY:  Judge, actually we have no more witnesses.

THE COURT:  You don't have any more witnesses for today?

MR. MURPHY:  We had a witness that was here today, we expected to call.

THE COURT:  I saw her and she told me she had an obligation at the Civic Center.

You are talking about Demacopoulos?

MR. MURPHY:  Yes.

THE COURT:  Assistant State's Attorney?

Counsel, would you approach the Bench.

(Whereupon, a discussion was had off the record.)

THE COURT:  As to Mr. Hendricks, Order of Court, February the 19th.

See you then, Mr. Hendricks.


71

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

(Which were all the pro-

ceedings had in this

matter at this time.)

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS
COUNTY OF COOK } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME SIX .. OF A SIX VOLUME ..... RECORD CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. .95-0474. .............................................................

..............................................................

..............................................................

in a certain cause ....... LATELY .................................. pending in said Court, between

The People of the State of Illinois. ...WERE......................................., Plaintiffs and

JEROME HENDRICKS                    WAS ......................................., Defendant. ...

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, ..JUNE .25 , ............., 19 96..

Aurelia Pucinski ..........
Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY