# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| United States of America, *ex rel.* ) | |
| JEROME HENDRICKS, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 08 C 1589 |
| ) | |
| DONALD HULICK, Warden, Menard ) | |
| Correctional Center, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 1991, following a bench trial in the Circuit Court of Cook County, Illinois, petitioner Jerome Hendricks was convicted of murdering of a twelve-year-old girl, Denise J., aggravated criminal sexual assault, aggravated kidnaping, and concealment of a homicide. The trial court sentenced Hendricks to life imprisonment on the murder conviction and to consecutive sentences of various terms for his other offenses. Hendricks has petitioned the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that (1) the Illinois courts erred by denying him new counsel in his state-court post-conviction proceedings; (2) the Cook County States Attorney's office engaged in prosecutorial misconduct by allegedly adducing false testimony; and (3) his sentence is unconstitutional. For the following reasons, the Court denies Hendricks' petition.

## Background

Factual findings by the state court are presumed correct in a federal habeas corpus proceeding unless they are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Mahaffey v. Schomig*, 294 F.3d 907, 915 (7th Cir. 2005). Because Hendricks has not rebutted the Illinois Appellate Court's factual findings, the Court adopts the following account from the decision of that court in *People v. Hendricks*, 253 Ill. App. 3d 79, 625 N.E.2d 304 (1993) (*Hendricks I*):[1]

> At trial, Yolanda Hill testified that she was the 23 year old cousin of Denise J. On August 1, 1988, Ms. Hill lived at 11720 South Princeton in Chicago. Denise J. was 12 years old at that time and lived with Ms. Hill's mother, Estelle Fields.
>
> Ms. Hill testified that Denise J. came over to her house on August 1, 1988, to baby-sit Ms. Hill's children . . . . At 5:15 p.m. on the evening at issue, Ms. Hill, her two children, her housemate Karlena McCoy and Denise J. were all at Ms. Hill's home. Ms. Hill and McCoy went out onto the porch to discover Denise J., who had Ms. Hill's children with her, speaking with defendant. Ms. Hill told defendant he was not welcome on her porch, took her baby from defendant and gave the child to Denise J. Ms. Hill bent over and told Denise J. that defendant had just been released from jail for rape. Denise J. took the baby indoors and went upstairs. Ms. Hill told defendant that Denise J. was 12 years old and was not allowed to speak to any men. McCoy told defendant to leave, which defendant did after arguing with Ms. Hill and McCoy for five to ten minutes.
>
> Later that evening, after Denise J. spoke to Ms. Hill, Denise J. was allowed to go out onto the porch for five minutes. Ms. Hill checked on Denise J. five minutes later; Denise J. had disappeared. Ms. Hill never saw Denise J. alive again . . . .
>
> James Hill, another cousin of Denise J., testified that on the morning of August 2, 1988, he drove his mother to Ms. Hill's home. Mr. Hill testified that after arriving, he saw defendant coming down the street. Mr. Hill asked defendant whether he had seen Denise J. Defendant stated that

---

[1] References to "defendant" in the quoted passage from *Hendricks I* are to the petitioner in this case, Jerome Hendricks.

he had not.  Mr. Hill told defendant that Ms. Hill and McCoy had seen him with Denise J. and described Denise J.  Defendant indicated that he had seen Denise J. on his porch at 9:30 p.m. with his nephew.  According to Mr. Hill, defendant later told him that defendant had seen Denise J. on 119th Street and told her to go home.

Michael Walker testified that he was approached by defendant on August 2, 1988.  According to Walker, defendant told him that the police were looking for defendant.  Walker testified that defendant wanted him to say he was with defendant on the night Denise J. disappeared.  Walker indicated that he had not been with defendant; rather, he had been searching for Denise J. that evening.

On cross-examination, Walker admitted that he was close to McCoy and Denise J.'s family.  Walker admitted that he said nothing of his conversation with defendant to either the police or Denise J.'s family until after defendant was arrested and placed in custody.  Walker further admitted that he had been convicted twice for selling cocaine and was currently in prison.  Walker testified that the State had promised only to write a letter to the warden indicating that Walker had testified truthfully in court.  Walker indicated that he might receive one month of relocation costs from the state upon his release from prison.

Chicago Police Officer John Fassl testified that on August 8, 1988, he and his partner received a call regarding a suspicious odor coming from a garage at 251 W. 117th Street.  Fassl indicated that the garage was located behind an abandoned house at that address.  Upon entering the garage, Officer Fassl discovered the body of a young girl in the southeast corner of the garage.  The girl was lying on her stomach and her hands were bound behind her back with what appeared to be a set of shoelaces.  The girl's pants were unfastened, her bra straps were pulled down and her top was tied around her neck.  The girl was wearing her right shoe; the left shoe, found near the girl's head, had the name "Denise" written upon it with a red marker . . . .

Area Two Violent Crimes Detective Lawrence Nitsche also testified for the State.  The parties also stipulated to Detective Nitsche's testimony from the pretrial motion to quash and suppress, much of which is detailed here.  Nitsche testified that he was assigned to investigate the Denise J. homicide the afternoon the body was discovered.  Nitsche spoke to Ms. Hill and McCoy, who told him substantially those things to which Ms. Hill testified at trial.  In particular, McCoy told Detective Nitsche that defendant had been arrested before regarding a sexual matter with a young girl.  Detective Nitsche testified that he spoke to a woman named Paula Townsend, who told him that she saw Denise J. speaking with defendant

3

on the night Denise J. disappeared.  Townsend heard defendant ask Denise J. "Would that be okay," to which Denise J. responded that it would.  Townsend then saw Denise J. walk toward 119th Street and defendant walk toward his home.  Detective Nitsche also interviewed Mr. Hill, who told Detective Nitsche about conversations he had with defendant after Denise J's disappearance.  According to Detective Nitsche, defendant initially told Mr. Hill that he had not seen Denise J. on the night of her disappearance, but later told Mr. Hill that he had seen her on 119th Street and still later told Mr. Hill that he saw her on 117th Street.

As a result of these interviews, Detective Nitsche conducted a background check of defendant.  Detective Nitsche learned that defendant was then on parole from a conviction for criminal sexual assault.  Detective Nitsche indicated that the victim in that case had been strangled, though apparently not to the point of death.  Detective Nitsche also learned that defendant had been arrested for another criminal sexual assault that occurred at 251 W. 117th Street . . . .

At trial, Detective Nitsche testified that he conducted an initial interview with defendant at Area Two Police Headquarters on the evening of August 8, 1988.  Defendant told Detective Nitsche that between 6 p.m. and 9 p.m. of the night at issue, he was at his friend Tom's home, which was across the street from his own home.  After returning home for a short time, he went to Pullman Park, where he met Walker and a woman.  Defendant then went to the Everett White School playground, where he drank and played basketball until 4:30 a.m.  According to Detective Nitsche, defendant never indicated that he saw Denise J. on the night of her disappearance.

Detective Michael Baker testified that defendant was then taken for an interview at 11th and State and later returned to Area Two Police Headquarters for a third interview.  Detective Baker testified that during the third interview, defendant admitted that he talked to Denise J. on the night of her disappearance.  Defendant told Detective Baker that Denise J. went to get ice cream for defendant and that he later saw Denise J. in front of his house talking to his nephew.  Defendant then went to play basketball at the Everett White School.  Defendant indicated he played basketball with someone named "Shorty Mac" and walked out with Michael Walker.  Defendant then went to meet his girl friend at 119th Street and Michigan.  When defendant returned home early the next morning, family members informed him that the police were looking for him . . . .

Detective John Yucaitis testified that on August 9, 1988, he and his partner spoke with the detectives investigating this homicide.  Thereafter,

4

Detective Yucaitis and his partner canvassed the area where the body was found. Later that afternoon, Detective Yucaitis and his partner spoke with defendant. Detective Yucaitis told defendant that he did not believe defendant's account of his whereabouts on the night at issue.

According to Detective Yucaitis, defendant stated that he had not told the whole truth because he was on parole for rape and feared that he would not be believed. Defendant then told Yucaitis that on August 3 or 4, 1988, he noticed the odor coming from the garage at 251 W. 117th Street. Defendant entered the garage and noticed the body on the floor. Defendant stated that he did not report his discovery to anyone due to his background . . . .

According to Detective Yucaitis, defendant asked to see him later that evening. Defendant asked whether he could get in trouble if he admitted having sex with the girl; Detective Yucaitis responded in the affirmative. Defendant then admitted having sex with the girl, but insisted that it was consensual. Defendant denied ejaculating into the girl. The conversation was then terminated.

Later that evening, Detective Yucaitis returned with Detective Joann Ryan. Detective Yucaitis left the room after defendant indicated that he wanted to speak with Detective Ryan alone.

Detective Ryan testified that defendant told her that the girl had "hit" on him all day on the date at issue. According to defendant, he and the girl had sex near a car parked behind 11720 S. Princeton and that he left afterwards. Defendant told Detective Ryan that the girl then chased him and led him to the garage at 251 W. 117th Street. Defendant stated that the girl hugged him, kissed him and asked that he not tell anyone she had been with him. According to defendant, the girl then took her pants down and pulled her top over her head. Defendant then had vaginal intercourse with the girl from the rear. Defendant told Detective Ryan that the girl had something like a gag that she stuck in her mouth and asked defendant to hold it, pull on it and "ride her like a horse . . . ."

Assistant State's Attorney Anna Democopolous testified that she took a handwritten statement from defendant after 10 p.m. on August 9, 1988. This statement was substantially similar to the oral statement defendant gave to Detective Ryan, adding that he did not look back at the girl as he left the garage and knew that she did not leave with him. Defendant also related his discovery of the body several days later. Defendant indicated that the girl and the girl's top were in the same position as when he initially left the garage. Defendant denied killing, raping or secretly confining the girl.

*Id.* at 81-86, 625 N.E.2d at 305-08. Based on this testimony and additional evidence presented at trial, the trial judge found Hendricks guilty of first degree murder and later sentenced him to imprisonment for the rest of his natural life. *Id.* at 87-88, 625 N.E.2d at 309-10. He was also found guilty of several additional crimes for which he was sentenced to additional periods of imprisonment. *Id.*

On direct appeal following his conviction, Hendricks argued (1) the unconstitutionality of his arrest and, consequently, the admissibility of the statements he gave to the police; (2) the state had not proved his guilt beyond a reasonable doubt; (3) the sentence of life imprisonment was excessive; and (4) Illinois statutes permitting either life imprisonment or the death penalty violated the constitutional right to due process. The Illinois Appellate Court affirmed the trial court, finding against Hendricks on each of these issues. The Illinois Supreme Court denied his petition for leave to appeal.

On February 24, 1994, Hendricks filed, *pro se*, his first petition for post-conviction relief. In that petition, Hendricks again raised issues regarding the constitutionality of his arrest, the constitutionality of his sentence, and the sufficiency of the evidence against him. The trial court denied the petition, and the appellate court affirmed that decision in an unpublished order.

On April 19, 1994, Hendricks filed, again *pro se*, a second petition for post-conviction relief. The second petition was identical to the first petition filed two months earlier. The trial court denied the second petition. The appellate court, however, found that Hendricks' court-appointed counsel failed to comply with the requirements of Illinois Supreme Court Rule 651(c), which requires a petitioner's counsel to file a certificate

with the court that he or she has consulted with the petitioner, examined the trial record, and made any necessary changes to a *pro se* petition. Due to this failure by Hendricks' counsel in connection with the second post-conviction petition, the appellate court remanded the petition to the trial court for further proceedings on November 18, 1996.

Following remand, Hendricks' post-conviction petition languished in the circuit court for years. The case was transferred between multiple attorneys in the Cook County Public Defender's office without much activity. During that time, Hendricks filed multiple motions on his own seeking the appointment of new counsel. Hendricks' counsel filed a supplemental claim in June 2001 based on the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The proceedings were continued several additional times until the trial court finally denied Hendricks' petition in 2003. Even though it otherwise would have been untimely, the Illinois Supreme Court issued a supervisory order permitting Hendricks to appeal the denial of his second post-conviction petition. The Illinois Appellate Court, in an unpublished order, ordered the circuit court to modify Hendricks' sentence so that all his sentences would run concurrently but otherwise affirmed the trial court.

## Discussion

A district court may grant a writ of habeas corpus only if the state court's adjudication of petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

7

1. **Ineffective assistance of counsel**

Hendricks does not contend that his counsel at trial or on direct appeal were ineffective; rather, he takes issue with the performance of his counsel, attorneys in the office of the Cook County Public Defender, during the state court proceedings on his petitions for post-conviction relief. Ineffective assistance by counsel in post-conviction proceedings, however, is not a basis for granting a writ of habeas corpus. See 28 U.S.C. § 2254(i). "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." Id. Even if section 2254 did not bar Hendricks' petition on this ground, Hendricks' contention would still fail because section 2254 relief is only available for violations of federal law as announced by the Supreme Court, and the Supreme Court has held that there is no constitutional right to counsel in post-conviction proceedings. E.g., Coleman v. Thompson, 501 U.S. 722, 756-57 (1991).

2. **Prosecutorial misconduct**

Hendricks next contends that his constitutional rights were violated due to prosecutorial misconduct. Specifically, Hendricks argues that the prosecutors allegedly knew that some of the witnesses at trial were lying when they testified. The state responds that Hendricks cannot raise this issue in these proceedings because he never raised it in the state courts. Before seeking relief in federal court pursuant to section 2254, a petitioner must first present his federal claims fully and fairly to the state courts. 28 U.S.C. § 2254(b)(1)(A); O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate review process.").

As detailed above, Hendricks raised a number of issues in his direct appeal but did not make any allegations of prosecutorial misconduct. Nor did he raise prosecutorial misconduct in any of his post-conviction petitions. In short, Hendricks never provided the Illinois courts with the opportunity to consider the prosecutorial misconduct claim he raises now. Accordingly, he has defaulted this claim.

The Court "will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default." *Daniels v. Knight*, 476 F.3d 426, 430 (7th Cir. 2007) (citing *Dretke v. Haley*, 541 U.S. 386, 388 (2004)). Hendricks could also overcome the procedural default by showing "a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edward v. Carpenter*, 529 U.S. 446, 451 (2000). Hendricks, however, has not met either of these requirements. Indeed, the only arguments he makes in his petition and reply brief are self-serving, unsupported statements that witnesses lied at trial and the State allegedly knew that this happened. Hendricks provides no explanation for his failure to raise this issue previously, provides no factual or evidentiary basis for his contentions, and cannot demonstrate that a fundamental miscarriage of justice will take place if this claim is not reviewed in federal court.

3. **Sentencing**

Last, Hendricks argues that his natural life sentence is unconstitutional. This contention appears to be based on three grounds. First, Hendricks makes repeated

9

references to improper consecutive sentences imposed by the trial court; he does not, however, identify any rule of federal constitutional law that was violated by the imposition of consecutive sentences. Moreover, the Illinois Appellate Court vacated Hendricks' consecutive sentences and ordered that they be served concurrently. Thus one of the alleged violations of Hendricks' constitutional rights with respect to sentencing has already been corrected.

Second, it is possible to construe Hendricks' claim as arguing that his sentence of life in prison on his murder conviction runs afoul of *Apprendi*. The Seventh Circuit, however, has held that *Apprendi* does not apply retroactively to sentences that were imposed before *Apprendi* was decided. *White v. Battaglia*, 454 F.3d 705, 706 (7th Cir. 2006); *Curtis v. United States*, 294 F.3d 841, 842-44 (7th Cir. 2002).[2] Hendricks' conviction became final in 1994 after the Illinois Supreme Court denied his petition for leave to appeal in his direct appeal from his convictions. *Apprendi* was not decided for another six years and therefore does not apply to Hendricks' sentence.

Third, Hendricks appears to claim that his constitutional rights were violated because he was tried and sentenced by a judge instead of a jury. He cites *Blakely v. Washington*, 542 U.S. 296 (2004), in support of this argument. To the extent Hendricks is arguing that his sentence is improper because it was based on a finding of facts not made by a jury, that argument fails because Hendricks knowingly waived and relinquished his right to a trial by jury. The record clearly demonstrates that when he did so – contrary to what he claims before this Court – the trial judge advised Hendricks

---

[2]The Supreme Court has not yet addressed the issue of whether *Apprendi* applies retroactively.

of his constitutional rights and asked him a number of questions to make sure he understood the rights he was waiving and to make sure he was not making the waiver for an improper reason, such as duress or a threat. Following this questioning, Hendricks signed a jury waiver form in front of the trial judge. A criminal defendant may knowingly waive constitutional protections, *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995), and Hendricks did so with respect to his right to a jury trial.

**Conclusion**

For the reasons stated above, the Court denies Hendricks' petition for a writ of habeas corpus. The Clerk is directed to enter judgment in favor of the respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 5, 2009